**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARRYL BOYD,  )<br>  )<br>  Plaintiff,  )<br>  )<br>  - against -  )<br>  )<br>THE CITY OF BUFFALO; THE COUNTY  )<br>OF ERIE; MICHAEL G. GUADAGNO;  )<br>JOHN MONTONDO; LINDA J. FIAL AS  )<br>EXECUTOR FOR THE ESTATE OF  )<br>ROBERT GRABOWSKI; AND MARTIN  )<br>BULLOCK AS EXECUTOR FOR THE  )<br>ESTATE OF JAMES E. HUNTER,  )<br>  )<br>  Defendants.  )<br>  )<br>  ) | **No. 21 Civ.** __1:22-cv-519__<br><br>**COMPLAINT AND JURY**<br>**DEMAND** |

**LAW OFFICES OF JOEL B. RUDIN, P.C.**

Joel B. Rudin
David E. Rudin
152 West 57th St.
New York, NY 10019
jbrudin@rudinlaw.com
david@rudinlaw.com
Telephone: (212) 752-7600
Fax: (212) 980-2968

*Attorneys for Plaintiff Darryl Boyd*

**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**

Ross E. Firsenbaum
Ryanne E. Perio
Gideon A. Hanft*
Phoebe Silos*
Erin Hughes*
7 World Trade Center
250 Greenwich St.
New York, NY 10007
ross.firsenbaum@wilmerhale.com
ryanne.perio@wilmerhale.com
gideon.hanft@wilmerhale.com
phoebe.silos@wilmerhale.com
erin.hughes@wilmerhale.com
Telephone: (212) 230-8800
Fax: (212) 230-8888

*Application for admission pro hac*
*vice forthcoming*

*Attorneys for Plaintiff Darryl Boyd*

Table of Contents

I.  INTRODUCTION ........................................................................................................1

II.  PARTIES .................................................................................................................2

III.  JURISDICTION, VENUE, AND CONDITIONS PRECEDENT..............................3

IV.  JURY DEMAND .....................................................................................................4

V.  FACTUAL ALLEGATIONS ....................................................................................4

    A.  THE MURDER OF WILLIAM F. CRAWFORD ................................................4

    B.  THE BPD INVESTIGATION POINTS TO LARRY WATSON AND A
        POTENTIAL ACCOMPLICE AS THE PERPETRATORS..................................5

    C.  THE BPD INVESTIGATES MR. BOYD AND FOUR OTHER BLACK
        TEENAGERS, BUT FINDS EVIDENCE CORROBORATING THEIR
        CONSISTENT STATEMENTS THAT THEY WERE NOT INVOLVED
        IN THE MURDER ............................................................................................15

    D.  THE BPD COERCES 15-YEAR-OLD ANDRE HOUGH TO FALSELY
        IMPLICATE MR. BOYD AND HIS FOUR FRIENDS FOR THE
        CRAWFORD MURDER.....................................................................................21

    E.  THE BPD COERCES 17-YEAR-OLD TYRONE WOODRUFF TO
        FALSELY IMPLICATE MR. BOYD AND THE OTHERS FOR THE
        CRAWFORD MURDER.....................................................................................23

    F.  THE BPD ARRESTS MR. BOYD BASED ON THE FALSE, COERCED
        TESTIMONY OF MESSRS. WOODRUFF AND HOUGH ...............................28

    G.  ADDITIONAL INVESTIGATION FURTHER UNDERMINES THE
        DETECTIVES' FLAWED CASE AGAINST MR. BOYD ................................31

    H.  MESSRS. WOODRUFF AND HOUGH BOTH RECANT BEFORE
        TESTIFYING IN THE GRAND JURY BUT DETECTIVES COERCE
        THEM INSTEAD TO EXPAND THEIR FALSE STORIES ..............................33

    I.  THE DEFENDANTS MISLEAD THE GRAND JURY, CAUSING IT TO
        WRONGFULLY INDICT MR. BOYD ..............................................................39

    J.  PLAINTIFF DARRYL BOYD IS TRIED AND CONVICTED BASED ON
        COERCED FALSE TESTIMONY, WITHOUT THE BENEFIT OF
        UNDISCLOSED BRADY MATERIAL ............................................................41

    K.  THE ECDA OPPOSES MR. BOYD'S EFFORTS TO OVERTURN HIS
        CONVICTION...................................................................................................46

    L.  THE COURT VACATES MR. BOYD'S WRONGFUL CONVICTION ...........50

VI.  MR. BOYD'S DAMAGES......................................................................................51

CAUSES OF ACTION ......................................................................................................52

COUNT I

Malicious Prosecution (Federal Claim) ............................................................................ 52

COUNT II

Malicious Prosecution (State Claim) ........................................................................ 53

COUNT III

Evidence Fabrication (Federal Claim) ...................................................................... 53

COUNT IV

Wrongful Pretrial Withholding of Exculpatory Evidence ("Russo" Claim Under Federal Law) .............. 55

COUNT V

*Brady* Claim (Federal Law) .................................................................................. 56

COUNT VI

*Monell* Claim Under Federal Law Against City of Buffalo for Policies of the Buffalo Police
Department .................................................................................................. 57

COUNT VII

*Monell* Claim Under Federal Law Against the County of Erie for Policies of the Erie County
District Attorney ........................................................................................... 65

COUNT VIII

State Law Claim for Negligent Failure of City of Buffalo to Properly Hire, Train, Supervise, and
Discipline the Police ...................................................................................... 93

COUNT IX

State Law Claim for Negligent Infliction of Emotional Distress .............................................. 94

COUNT X

State Law Claim for Negligent Failure of Erie County to Properly Hire, Train, Supervise, and
Discipline Employees of the District Attorney's Office ..................................................... 94

PRAYER FOR RELIEF ........................................................................................... 95

Plaintiff Darryl Boyd, by and through his attorneys, The Law Offices of Joel B. Rudin, P.C., and Wilmer Cutler Pickering Hale and Dorr LLP, respectfully alleges as follows:

I.   **INTRODUCTION**

1.      This civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and New York State law, seeks monetary damages for the extraordinary injuries and harm suffered by Darryl Boyd, who was wrongfully prosecuted, convicted, and imprisoned for more than 28 years for a robbery and murder that he did not commit.

2.      On August 18, 2021, after Mr. Boyd spent more than 28 years incarcerated and another 17 years on parole for the January 2, 1976, murder of William Crawford in Buffalo, New York (the "Crawford Murder"), the New York Supreme Court, County of Erie (the "State Supreme Court") vacated Mr. Boyd's convictions for second-degree murder and first-degree robbery.  Specifically, following an evidentiary hearing on Mr. Boyd's motion to vacate his conviction, the State Supreme Court found that the prosecution had not disclosed to Mr. Boyd's trial counsel crime scene photographs that both (a) contradicted the prosecution's theory of the crime presented at trial, and (b) pointed to another individual, Mr. Crawford's neighbor, as the actual perpetrator.  This non-disclosure violated Mr. Boyd's constitutional right to a fair trial.

3.      These undisclosed crime scene photographs, however, were hardly the only factor that led to Mr. Boyd's wrongful conviction and 28-year imprisonment.  The egregious misconduct perpetrated against Mr. Boyd by the defendants to this lawsuit spanned the course of 45 years—Mr. Boyd's entire adult life.  It included the relentless, bad-faith pursuit of his case by Detectives Guadagno, Montondo, Deubell, Grabowski, Hunter, and others, and by Chief Donovan.  They coerced vulnerable witnesses to provide false statements against Mr. Boyd and failed to turn over multiple items of evidence favorable to the defense, known as *Brady* material, to prosecutors, which resulted in such evidence not being disclosed to the defense.  And the

misconduct also included the suppression by prosecutors of *Brady* material of which they knew or should have known, which similarly contributed to the denial of Mr. Boyd's constitutional right to a fair trial.

4.     All of this was in a case in which there was zero physical evidence linking Mr. Boyd to the Crawford Murder and substantial evidence—which law enforcement authorities suppressed—pointing to two other individuals as the perpetrator or perpetrators.  It was in a case where the main evidence against him was the contradiction-riddled testimony of two minors, both of whom originally told the police that they knew nothing about the murder but whom police then coerced to change their stories.

5.     Instead of prohibiting or discouraging this illegal behavior, the policies, customs, and practices of the City of Buffalo Police Department (the "BPD") and the Erie County District Attorney's Office (the "ECDA") permitted, encouraged, and in certain instances required it.

6.     If not for the misdeeds of Defendants, Mr. Boyd would not have been prosecuted, convicted, and imprisoned in violation of his constitutional rights, and would not have spent 45 years asserting his innocence and fighting for his liberty in connection with a crime that he did not commit.

7.     This lawsuit seeks to hold liable the government entities and individuals, or their estates, who are responsible for destroying Mr. Boyd's life, and to recover from them compensation, as well as punitive damages, for Mr. Boyd's grievous injuries.

## II.    **PARTIES**

8.     Plaintiff Darryl Boyd is a 62-year-old man who resides in Buffalo, New York.

9.     Defendant City of Buffalo (the "City") is a municipal corporation of the State of New York and a resident of the Western District of New York.  The BPD is an agency of the City for whose torts the City is responsible.

10.     Defendant County of Erie (the "County") is a municipal corporation of the State of New York and a resident of the Western District of New York.  The ECDA is an agency of the County for whose torts the County is responsible.

11.     Defendant Michael G. Guadagno at all relevant times was a detective employed by the BPD acting within the scope of his employment and under color of law.  He is sued in his individual and official capacities.

12.     Defendant John Montondo at all relevant times was a detective employed by the BPD acting within the scope of his employment and under color of law.  He is sued in his individual and official capacities.

13.     Defendant Martin Bullock is the Executor for the Estate of James E. Hunter.  At all relevant times, Mr. Hunter was a detective employed by the BPD acting within the scope of his employment and under color of law.  Mr. Bullock is sued in his individual and official capacities.

14.     Defendant Linda J. Fial is the Executor for the Estate of Robert Grabowksi.  At all relevant times, Mr. Grabowski was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Fial is sued in her individual and official capacities.

## III.   JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

15.     This Court has jurisdiction under 28 U.S.C. § 1331 over claims arising under 42 U.S.C. §§ 1983 and 1988 and under 28 U.S.C. § 1343 over claims arising under the common law of the State of New York.

16.     Venue is proper in the Western District of New York under 28 U.S.C. § 1391(b) because that is the judicial district in which Mr. Boyd's claims arose.

17.     On or about December 15, 2021, Plaintiff served the City and the County timely notices of the present claims under New York State law, in accordance with N.Y. Gen. Mun. Law § 50-e.

18.     The City and the County did not within 90 days of service of such notices schedule, and therefore waived their right to, an examination of Mr. Boyd under N.Y. Gen. Mun. Law § 50-h.

19.     Mr. Boyd has duly complied with all conditions precedent to the commencement of this action.

## IV.     JURY DEMAND

20.     Pursuant to the Seventh Amendment of the United States Constitution and Article I, Section 2 of the New York Constitution, Mr. Boyd requests a jury trial on all issues and claims set forth in this Complaint.

## V.     FACTUAL ALLEGATIONS

### A.     THE MURDER OF WILLIAM F. CRAWFORD

21.     At approximately 11:30 p.m. on January 2, 1976, 62-year-old William F. Crawford was brutally murdered outside his home at 2041 Fillmore Avenue in Buffalo, New York.

22.     Mr. Crawford had spent several hours drinking that day at a neighborhood tavern called the Golden Nugget, which was located directly across the street from his house on Fillmore Avenue.  Mr. Crawford regularly drank at the Golden Nugget.

23.     Mr. Crawford was at the Golden Nugget with his neighbor, Lawrence "Larry" Watson, Larry's wife Julia Watson, and Julia's son William "Bill" Howard.

24.     The Watsons lived at 2049 Fillmore Avenue, two houses north from Mr. Crawford's house.

25.     Mr. Crawford purchased rounds of drinks for the group and, in the process of paying for them, displayed a significant amount of cash—approximately $300 in tens and twenties.

26.     The barmaid, Debbie Jeffrey, instructed Mr. Crawford to put his money away, as the Watsons and Mr. Howard, who were sitting with him at the bar, had observed it.

27.     At approximately 11:30 p.m., Ms. Jeffrey suggested that Mr. Crawford go home, as he was intoxicated.

28.     Typically, Ms. Jeffrey or the owner of the Golden Nugget would walk Mr. Crawford across the street to his house after he became drunk, but on that evening, the tavern was crowded, and neither was able to escort Mr. Crawford home.

29.     Mr. Watson offered to walk Mr. Crawford home, and the two left the Golden Nugget together.

30.     At approximately 1:00 a.m. on the morning of January 3, Margaret Crawford, Mr. Crawford's wife, became concerned that her husband had not returned home yet.  She went downstairs and looked out the side door into the driveway, where she saw her husband lying in the driveway in the snow next to the side door, apparently unconscious.  She called 911 for help.

31.     Medics transported Mr. Crawford to Sisters of Charity Hospital, where he was pronounced dead.  He had been beaten to death with a blunt instrument and apparently robbed of his wallet.

**B.      THE BPD INVESTIGATION POINTS TO LARRY WATSON AND A POTENTIAL ACCOMPLICE AS THE PERPETRATORS**

32.     The BPD Homicide Unit began investigating in the early morning hours of January 3, 1976.

33.     Pursuant to its usual practice, the Homicide Unit did not assign any one detective to officially lead the investigation but worked collectively under the supervision of the Chief of Homicide, Leo J. Donovan.

34.     Detectives, including those named in this lawsuit, worked collaboratively as a team, exchanging information with each other and reporting all developments to Donovan.

35.     Detectives Paul Delano and Gerald Dove were the first detectives to report to the crime scene.

36.     They observed a large pool of blood close to the side door of the house, where Mr. Crawford's body was found, as well as a few drops of blood on the side of the house by the side door.  The side door was approximately 35 feet up the driveway from the sidewalk.

37.     Detectives Delano and Dove also noted in their report that a bloodstained hat had been found alongside the victim's body and placed inside the hall door by the ambulance attendant.

38.     While at the crime scene, Detectives Delano and Dove interviewed the victim's widow, Margaret Crawford.

39.     Ms. Crawford reported that she became concerned when her husband did not "ring the bell" for her to come unlock the side door for him.

40.     She said this was their custom when he was out drinking—evidently, he would not bring his own keys.

41.     When she went downstairs to check the door, she found her husband lying in the driveway and called 911.

42.     Detectives Delano and Dove next reported to Sisters Hospital, where they observed Mr. Crawford's body.

43.     They noted in their police report that a set of keys were found on the body.

44.     The keys were never vouchered.

45.     There is no record of an investigation into the owner of the keys.

46.     There is no record of what happened to the keys.

47.     Detectives Delano and Dove returned to the crime scene, where an experienced police photographer, Alfred Hauser, met them.

48.     The photographer documented the areas pertinent to the investigation, including the street, the sidewalk, the house, the driveway, and the backyard.

49.     The large pool of blood that the photographer observed and photographed was located well up the driveway, on the ground or on the side of the house next to the side door where Mr. Crawford's body was found.

50.     The photographer did not document any signs of a struggle on the sidewalk in front of the house or at the bottom of the driveway.

51.     His photographs showed that there was no blood in those locations and there were no drag marks in the snow in those areas.

52.     A police photograph also documented a single set of footprints, made by a heavyset man, in the snow in the backyard of Mr. Crawford's house, leading toward the house of Larry and Julia Watson two doors down.

53.     Detectives Delano and Dove conducted several more interviews that night, including of Bill Howard, Larry Watson's stepson.

54.     Mr. Howard reported that Mr. Crawford left the Golden Nugget alone around 1:30 a.m. (which, the detectives knew, was after the paramedics had already arrived to transport Mr. Crawford to the hospital).

55.     Detectives Delano and Dove also interviewed Julia Watson.

56.     Ms. Watson also told detectives that Mr. Crawford left alone, but she put the time around 9:30 p.m., or four hours earlier than Bill Howard said.  She said that she and her husband left together around 11:15 p.m.

57.     Detectives Delano and Dove asked Ms. Watson if they could interview Mr. Watson, but Ms. Watson reported that he was drunk and that she was unable to wake him.

58.     Detectives Delano and Dove also interviewed the barmaid, Debbie Jeffrey.

59.     She told a very different story than Ms. Watson and her son Bill Howard:  She said Mr. Crawford did not leave the bar alone, but rather left the Golden Nugget with Mr. Watson.

60.     The detectives noted that there were large discrepancies in the story told by Mr. Howard and Ms. Watson, on the one hand, and Ms. Jeffrey's statement on the other.

61.     Detectives Edwin Gorski and Robert Grabowski continued the investigation when their shift began at 4:00 p.m. on January 3, 1976.

62.     They interviewed a patron of the Golden Nugget named Frances Kalb.

63.     Ms. Kalb informed them that she saw Mr. Crawford drinking with the Watsons and Mr. Howard the previous evening.

64.     Ms. Kalb said that Mr. Crawford left with Mr. Watson around 11:30 p.m.

65.     She further said that she saw Mr. Watson return to the bar approximately 20 minutes later and immediately leave again with his wife.

66.     Ms. Kalb also informed the detectives that sometime after the Watsons left together, she observed Ms. Jeffrey receive a call from Ms. Watson.

67.     Ms. Watson stated that her husband was missing his keys and asked Ms. Jeffrey to check for them at the bar.

68.     According to Ms. Kalb, Mr. Howard told Ms. Jeffrey that the keys were in Mr. Watson's pocket, which Ms. Jeffrey conveyed to Ms. Watson.

69.     Detectives Gorski and Grabowski also interviewed Mr. Watson.

70.     Mr. Watson told the detectives that Mr. Crawford left the Golden Nugget around 12:00 a.m.

71.     Mr. Watson said that he just happened to be leaving at the same time to use the bathroom at his house across the street and two doors down.

72.     Mr. Watson claimed that while Mr. Crawford was in front of the tavern preparing to cross the street, Mr. Watson noticed the door to his own house open and went over to investigate.

73.     Mr. Watson did not mention that he had offered to walk Mr. Crawford home.

74.     Detectives Gorski and Grabowski next interviewed Ms. Jeffrey (who had already been interviewed by Detectives Dove and Delano).

75.     In this second interview, Ms. Jeffrey told the detectives that Mr. Watson had *offered* to walk Mr. Crawford home.

76.     Ms. Jeffrey also corroborated Ms. Kalb's statement that, after Mr. Watson returned and left with his wife, Ms. Watson called the tavern and asked her to search for Mr. Watson's keys.

77.     During this interview, Ms. Jeffrey reported to the detectives that she suspected Mr. Watson was the killer of Mr. Crawford.

78.     During their shift on January 3, 1976, Detectives Gorski and Grabowski reported receiving "an anonymous call from a black male." The caller stated that "Andre Howe" and "Gerry Boyd" killed Mr. Crawford.

79.     The detectives obtained a criminal record print out and a mugshot of a Jerome Boyd, a 37-year-old man living nearby at 32 Glenny Drive.

80.     Jerome Boyd is a different person than, and is of no relation to, Darryl Boyd.

81.     The BPD did not document any attempts to locate or interview Jerome Boyd.

82.     However, the next day, January 4, 1976, Detectives Delano, Dove, and Pantano returned to the Golden Nugget with Jerome Boyd's mugshot.

83.     The owner of the Golden Nugget, Ralph Davis, recognized Jerome Boyd as a regular patron of the tavern.

84.     A bartender, Theotis "Teddy" Love, confirmed that he served a drink to Jerome Boyd the night Mr. Crawford was murdered.

85.     On January 6, 1976, Detectives Delano and John Ludtka took a formal statement from Ms. Kalb.

86.     Ms. Kalb repeated her statement that Mr. Crawford had been drinking with the Watsons and Mr. Howard, and that either Mr. or Ms. Watson told Ms. Jeffrey not to worry because they would take Mr. Crawford home.

87.     Ms. Kalb again stated that Mr. Watson and Mr. Crawford left together after 11:00 p.m.

88.     Detectives Delano and Ludtka showed Ms. Kalb the mugshot of Jerome Boyd and she identified him as "a real big guy that came in and talked with Julia [Watson] and stayed for only a few minutes."

- 10 -

89.     Ms. Kalb also repeated her statement that she was present at the Golden Nugget, overheard Ms. Watson call the tavern to ask Ms. Jeffrey to search for her husband's keys, and heard Mr. Howard tell Ms. Jeffrey that the keys were in the pocket of Mr. Watson's jacket.

90.     Also on January 6, 1976, Detectives Stanley Suszek and Melvin Lobbett took a formal statement from Ms. Jeffrey.

91.     Ms. Jeffrey informed the detectives that Mr. Crawford had about $300 in cash on him the night he was murdered, and that he had tried to lay it all out on the bar.  She thought that this was a stupid thing to do and instructed him to put it away.

92.     She was certain that the Watsons and Mr. Howard had seen Mr. Crawford displaying the cash.

93.     Ms. Jeffrey again stated that, normally, she or someone else working at the Golden Nugget would walk Mr. Crawford home when he became intoxicated, but on the evening of January 2, the bar was crowded, and she could not leave.

94.     She again stated that Mr. Watson offered to walk Mr. Crawford home.

95.     She stated that Mr. Watson was gone for about 20 minutes, which Ms. Jeffrey described as "long enough," suggesting to detectives that Mr. Watson had enough time to walk Mr. Crawford across the street, commit the murder (while dropping his keys), go to his house two doors down to clean up, and return to the tavern.

96.     Also on January 6, 1976, Detectives Gorski and Grabowski interviewed the victim's wife, Ms. Crawford, again.

97.     Ms. Crawford informed them that her husband typically returned home from the bar around 11:30 p.m. and came in through the side door.

98.     Ms. Crawford stated that on the night of the murder, she was watching TV in bed when she felt a thud that shook the side of the house.

99.     It was about 11:30 p.m.

100.     She said that when her husband still had not returned home by 1:00 a.m., she went downstairs to check the door and found Mr. Crawford lying in the driveway.

101.     The next day, on January 7, 1976, the BPD conducted formal interviews of and prepared written statements by Larry and Julia Watson.

102.     Detectives Ludtka and Francis Manista interviewed Mr. Watson.

103.     Mr. Watson denied that he had seen Mr. Crawford with a large amount of cash but admitted that Ms. Jeffrey told Mr. Crawford to put his wallet away.

104.     Mr. Watson now admitted what he had omitted before—that Ms. Jeffrey had asked him to take Mr. Crawford home—but stated that he did not do so.

105.     Mr. Watson now claimed that he and Mr. Crawford shook hands outside the Golden Nugget, he wished Mr. Crawford a happy New Year, and he crossed the street to his house.

106.     Mr. Watson's admission contradicted Ms. Jeffrey's statement that she did not ask Mr. Watson to take Mr. Crawford home, but rather Mr. Watson offered to take Mr. Crawford home.

107.     Mr. Watson told detectives Ludtka and Manista that he and Mr. Crawford were followed out of the Golden Nugget by a tall, dark man with a moustache and kinky hair.

108.     Jerome Boyd, whom Ms. Kalb described as a "real big guy" whom she had seen talking to Ms. Watson, appeared to fit this description.

109.    Mr. Watson claimed that, once in his driveway of his own house, he noticed his front door open and went inside to investigate.

110.    This statement contradicted his prior statement to police that he noticed his front door open while standing outside the tavern with Mr. Crawford.

111.    Mr. Watson claimed that he found nothing amiss in his house, went to the bathroom, and returned to the Golden Nugget, where Ms. Watson said she was ready to leave. He said they left the tavern and returned home.

112.    The same day, January 7, 1976, Detectives Delano and Vincent Pantano interviewed Ms. Watson.

113.    Ms. Watson admitted that she saw that Mr. Crawford had money laying on the bar but claimed that she did not see the amount.

114.    Ms. Watson now admitted that her husband left the tavern with Mr. Crawford.

115.    Ms. Watson stated that her husband returned to the Golden Nugget after 15 to 20 minutes, that she then gave her beer to her son, Mr. Howard, and she and Mr. Watson went home.

116.    Ms. Watson claimed that she and her husband were planning to return to the Golden Nugget, but Mr. Watson misplaced his keys, so she called Ms. Jeffrey at the bar to tell her that they would not be coming back.

117.    Detectives Delano and Pantano interviewed Ms. Jeffrey again on January 12, 1976.

118.    Ms. Jeffrey was adamant that she did not ask Mr. Watson to walk Mr. Crawford home, but that Mr. Watson affirmatively volunteered, "stating that he had to go anyway, to use the bathroom."

- 13 -

119.    According to the detectives, Ms. Jeffrey was "definite on this point."

120.    She also stated that, "because of the close proximity of everybody sitting at the bar together, [it] would have been impossible for everyone else there not to have seen [Mr. Crawford's] money."

121.    Detectives noted, however, that the Watsons both denied seeing how much money Mr. Crawford was carrying.

122.    Ms. Jeffrey said she found it odd that, when Mr. Watson returned to the Golden Nugget, he and his wife left in a hurry.  They left without saying goodbye to Ms. Jeffrey, which was uncharacteristic of them, and they left unfinished drinks on the bar even though, in her experience, they always finished their drinks before they left.

123.    Thus, in the days following the Crawford Murder, the named Defendants, together with their colleagues, learned the following information pointing towards two suspects, Mr. Watson and Jerome Boyd, as the likely perpetrator or perpetrators of the crime:

- On the night he was killed, Mr. Crawford had been at the Golden Nugget drinking heavily with the Watsons and Mr. Howard;

- Mr. Crawford had displayed approximately $300 in cash in front of the Watsons and Mr. Howard, which they saw;

- Mr. Watson volunteered to walk the intoxicated Mr. Crawford home to his house across the street;

- Messrs. Watson and Crawford were followed out of the Golden Nugget by a large man, potentially Jerome Boyd, whom a witness had seen talking with Ms. Watson;

- Jerome Boyd was the subject of an anonymous tip stating that he was one of the killers;

- Mr. Crawford was beaten and robbed at approximately 11:30 p.m. at the side door of his house, where his body was found in a pool of blood;

- A set of footprints in the snow led through the backyard of the Crawford property towards Mr. Watson's house;

- Mr. Watson returned to the Golden Nugget approximately 20 minutes later and left in a hurry with his wife, without finishing their drinks or saying goodnight to the barmaid, which was uncharacteristic for them;

- Mr. Watson, his wife Julia, and his stepson Bill Howard made a series of false or contradictory statements to police apparently trying to distance Mr. Watson from the victim, Mr. Crawford;

- A set of keys was found on or near Mr. Crawford's body, although Ms. Crawford reported that her husband's usual practice was to ring the bell for her to let him in through the side entrance to their home;

- After returning home with her husband, Ms. Watson called the Golden Nugget and reported that her husband was missing his keys; and

- The barmaid at the Golden Nugget, Ms. Jeffrey, who knew Mr. Watson and observed his conduct on the night of the murder, believed he had committed the crime.

**C.     THE BPD INVESTIGATES MR. BOYD AND FOUR OTHER BLACK TEENAGERS, BUT FINDS EVIDENCE CORROBORATING THEIR CONSISTENT STATEMENTS THAT THEY WERE NOT INVOLVED IN THE MURDER**

124.    On January 7, 1976, Detectives Deubell and Guadagno reported that they had received an anonymous call (the second such call the Defendants claimed to have received), this time from a woman who stated that the person who killed Mr. Crawford was Darryn Gibson, who lived on Rodney Street.  The female caller reportedly gave no further information.

125.    Assuming this call was received at all, the absence of any detail about Mr. Gibson or the caller meant that the officers had absolutely no basis to credit the information, and certainly lacked probable cause to arrest Mr. Gibson.

126.    Nevertheless, immediately after receiving the call, at approximately 10:30 a.m., Detectives Deubell and Guadagno took Mr. Gibson into their custody at his home where he lived with his mother and father and forced him, alone, to accompany them to BPD Headquarters.

127.    There, together with Detectives Manista and Pantano, they questioned him illegally for approximately eight hours.

- 15 -

128.   The BPD did not document that Mr. Gibson resisted arrest or was otherwise uncooperative.

129.   Mr. Gibson was 16 years old.  His parents were not present with him during this lengthy, custodial interview.

130.   According to the report of Detectives Deubell and Guadagno, Mr. Gibson told the detectives that, on the night of January 2, 1976, he was playing cards with his friends Mr. Boyd, John Walker, Floyd Martin, and Tyrone "Tony" Woodruff in the Glenny Projects at 138 Glenny Drive, in the sixth-floor apartment of a girl named Shirley Floyd.

131.   Mr. Gibson provided the home addresses of his four friends, all between 16 and 17 years of age.

132.   Mr. Gibson said that on January 2, shortly after the news came on, at about 11:15 p.m., Messrs. Walker and Woodruff caught a cab from the Fillmore Cab Company.

133.   Mr. Gibson said they took a cab from the Glenny Projects to their homes on Best Street, approximately two and a half miles and an eight-minute drive south of the Glenny Projects.

134.   Mr. Gibson said that Mr. Martin, who lived just downstairs from Shirley Floyd's apartment, walked downstairs to go home as well.

135.   Mr. Gibson said that just after Messrs. Walker and Woodruff left in the cab, Messrs. Gibson and Boyd walked home along Fillmore Avenue (past Mr. Crawford's house) to Leroy Street, where Mr. Gibson and Mr. Boyd split up and went to their respective homes.

136.   Mr. Gibson estimated that he arrived home at about 11:35 p.m.

137.   Mr. Gibson consented to a polygraph exam.

138.    Prior to the examination, he had been in police custody and questioned for hours. Nevertheless, the examiner claimed, in a report dated five days later (the date Mr. Boyd and the others were arrested), that the results couldn't be trusted because of "the lack of a pre-test conference and inaccuracy of available information."

139.    This made no sense, since there was nothing preventing the examiner, during the many hours Mr. Gibson was in police custody, from conducting a "pre-test conference" and asking Mr. Gibson the pertinent questions directly.

140.    The most logical inference from the above circumstances is that Mr. Gibson's responses to the examiner's questions suggested he was being truthful.

141.    The next day, January 8, 1976, Detectives Guadagno and Deubell went to the Fillmore Cab Company to investigate the accuracy of Mr. Gibson's statement.

142.    The Fillmore Cab Company confirmed that Cab No. 150, driven by a driver named "Geno," was dispatched to the Glenny Projects at 11:28 p.m.

143.    A second cab, Cab No. 163, driven by Brian Woods, was dispatched to the Glenny Projects at 11:44 p.m.

144.    According to the Company's records, these were the only two cabs dispatched to the Glenny Projects that evening.

145.    Any police officer really believing Mr. Gibson or his friends had committed the crime would have interviewed the two drivers.  The drivers could have noticed blood stains, torn clothing, large amounts of cash, strange behavior, or other indicia of the crime, or overheard the suspects making incriminating comments.

146.    However, the detectives did not document any attempt to locate or interview either cab driver.

147.    Because witnesses at the Golden Nugget on the night of the Crawford Murder confirmed that Mr. Crawford and Mr. Watson left together around 11:30 p.m., the evidence that Mr. Walker and Mr. Woodruff took the first taxicab at 11:28 p.m. meant the five boys could not have committed the crime together.

148.    The BPD conducted several additional interviews on January 8 which further confirmed Mr. Gibson's account of events.

149.    Detectives Guadagno and Deubell went to the Glenny Projects, where they interviewed Sheryl ("Shirley") Floyd.

150.    Ms. Floyd confirmed that Messrs. Boyd, Walker, Martin, Gibson, and Woodruff were at her apartment on the night of the Crawford Murder, just as Mr. Gibson had told the BPD.

151.    Ms. Floyd identified other individuals—Nathaniel Zachery, Dennis Wilson and his brother, Larry Martin, Victoria Bryant, and persons named "Nick" and "Ann"—who were at the party in her apartment that night as well.

152.    Ms. Floyd stated that the boys left her apartment around midnight, give or take an hour.

153.    Nathaniel Zachery, who was at Ms. Floyd's apartment when detectives came to meet her, confirmed that he was with the boys that evening.

154.    Detectives Guadagno and Deubell also went to 93 Leroy Street looking for Mr. Boyd.

155.    Mr. Boyd was not home, but they spoke with his mother, who confirmed that Mr. Boyd returned home just past midnight on January 3, 1976.

156.     Between January 8 and 11, 1976, detectives interviewed and took statements from three of the four boys Mr. Gibson said he was playing cards with at Ms. Floyd's apartment the night of the Crawford Murder—Messrs. Boyd, Walker, and Woodruff.

157.     All three gave substantially the same account of their whereabouts and thus further confirmed Mr. Gibson's account.

158.     Specifically, on January 8, 1976, Detectives Guadagno and Deubell, despite lacking any evidence implicating Mr. Boyd in the murder, took him into their custody and, without administering *Miranda* warnings, interrogated him in a BPD interview room.

159.     Mr. Boyd told these detectives that, earlier on January 2, a boy named Andre Hough was at his house at 93 Leroy Street.

160.     Mr. Boyd stated that, during the early evening, he and Mr. Hough walked to the Glenny Projects, where they watched TV at the apartment of a Ms. Washington, along with several other members of the Washington family.

161.     He stated that, later in the evening, he left Ms. Washington's apartment to join Messrs. Walker, Gibson, Martin, and Woodruff at Shirley Floyd's apartment in the building next door.

162.     Mr. Boyd said that Floyd Martin's brother, Eugene, called a cab from the Fillmore Cab Company.  However, when the cab arrived, Eugene was not ready.  The cab driver refused to wait any longer, so Messrs. Walker and Woodruff took that cab and headed home.

163.     The BPD had already confirmed that this cab was dispatched to the Glenny Projects at 11:28 p.m.

164.     Mr. Boyd said Eugene Martin called for a second cab, having missed the first cab.

165.     The BPD had already confirmed that this cab was dispatched to the Glenny Projects at 11:44 p.m.

166.     Mr. Boyd said that after Eugene Martin called the second cab, but before it arrived, Messrs. Boyd and Gibson began walking home together up Fillmore Avenue.  They split up at Leroy Street.

167.     Mr. Boyd consented to take a polygraph exam.

168.     However, neither Detectives Guadagno nor Deubell, who interrogated him, nor the other detectives involved in the investigation, ever conducted one.

169.     Rather, knowing that Mr. Boyd's statement conformed to the other evidence they had collected, Detectives Guadagno and Deubell falsely wrote in their report, without elaboration, that he had "changed his story several times."

170.     They pressured him, before letting him go, into signing a false statement that he had provided two different times when he had arrived home.

171.     On January 11, 1976, the BPD lacked any evidence that Messrs. Walker and Woodruff were involved in the murder.

172.     Nevertheless, they brought these two teenagers in their custody to BPD Headquarters for questioning.

173.     Detectives Arnet, Hunter, and John Montondo interviewed Mr. Walker.

174.     Mr. Walker stated that, on the night of January 2, he was with Messrs. Boyd, Martin, Gibson, and Woodruff at Ms. Floyd's apartment in the Glenny Projects.

175.     He stated that he took a cab with Mr. Woodruff around midnight, went home, and went to bed.

176.     Mr. Walker consented to a polygraph exam, but the BPD never conducted one.

177.    Even though Mr. Walker had provided a statement that was consistent with the statements of the other suspects and witnesses and volunteered to take a polygraph test, Detectives Arnet, Hunter and Montondo falsely wrote in their report that he had "lied through his statement."

178.    They further wrote, falsely, that Mr. Walker made "different statements" to them orally than he had made in his signed statement.

179.    Contrary to basic police practice, nowhere did they record what his inconsistent oral statements or lies supposedly were.

180.    Detectives Arnet, Hunter, and Montondo questioned Mr. Woodruff.

181.    Mr. Woodruff, during hours of questioning, truthfully denied any knowledge of who participated in the Crawford murder.

182.    Consistent with all the other evidence these and the other detectives had obtained, Mr. Woodruff said he was with Messrs. Martin, Gibson, Walker, and Boyd at Ms. Floyd's apartment on the night of January 2 and that he had taken a cab home with Mr. Walker.

183.    However, Detectives Arnet, Hunter, and Montondo, in their report, falsely accused Mr. Woodruff of "lying."

184.    As with Mr. Walker, and contrary to basic police practice, they made no record of the specific statements Mr. Woodruff allegedly had made that they contended were false.

185.    This was because their intent was not to build a legitimate case against Messrs. Walker and Woodruff but to fabricate a basis to continue interrogating them and ultimately to arrest and prosecute them.

**D.   THE BPD COERCES 15-YEAR-OLD ANDRE HOUGH TO FALSELY IMPLICATE MR. BOYD AND HIS FOUR FRIENDS FOR THE CRAWFORD MURDER**

186.    Following the murder, in early January 1976, 15-year-old Andre Hough, an eighth grader, was questioned by police on several occasions about whether he had any knowledge of the incident.

187.    Detectives made clear to Mr. Hough that they suspected him of being involved in the murder and, as he later testified, harassed him and "came down on [him] pretty hard."

188.    Telling him that they wanted him to name names, they told him the names of the people they had in mind as participants in the murder.

189.    Mr. Hough initially told detectives he had no knowledge of any unlawful behavior in connection with the Crawford Murder.

190.    After doing so, he "passed" a polygraph examination.

191.    However, detectives deliberately failed to document his initial statements exculpating the police suspects and the results of the polygraph examination.

192.    Questioned by Detectives Guadagno and Deubell, Mr. Hough gave the same account of his whereabouts as Mr. Boyd.

193.    He did not tell the detectives that Mr. Boyd had said or done anything incriminating.

194.    He was then threatened with prosecution for murder if he did not provide information against the other boys.

195.    Mr. Hough was brought back to BPD Headquarters for further interrogation on January 12, 1976.

196.    Detectives Guadagno and Deubell again accused Mr. Hough of knowing about and participating in the murder.

197.     Coerced by Detectives Guadagno and Deubell to implicate the other boys to save himself, Mr. Hough then began to do so.

198.     According to police reports, he now said that Mr. Boyd had confessed to him that Mr. Boyd and the four other boys had seen Mr. Crawford in his driveway, run after him, beat him, and taken his wallet.

199.     However, under intense pressure to provide any additional information that he had, Mr. Hough swore that he could think of no additional information.

### E.     THE BPD COERCES 17-YEAR-OLD TYRONE WOODRUFF TO FALSELY IMPLICATE MR. BOYD AND THE OTHERS FOR THE CRAWFORD MURDER

200.     On January 12, 1976, Detectives Hunter and Arnet once more took Tyrone Woodruff illegally into their custody, telling him, or leading him to believe, he was under arrest for the Crawford Murder.

201.     Bringing him to the Buffalo Police Department homicide unit for further interrogation, these detectives stood over him, armed with guns, and, in an intimidating, accusatory, and coercive manner, harshly interrogated him.

202.     Despite being alone and just 17 years of age, police refused him permission to call his parents or a lawyer.

203.     Mr. Woodruff at first continued to truthfully deny any knowledge of the Crawford Murder.

204.     However, detectives Arnet and Manista told Mr. Woodruff that they had his friends upstairs.

205.     They threatened him, falsely, that his friends had accused him of the crime and that they had other evidence implicating him as well.

206.    They told him, falsely, that, if he did not provide information against the others, one or more of them would cooperate against him and he would face life imprisonment.

207.    On the other hand, they told him, if he minimized his own involvement in the crime while cooperating against the other boys, the detectives would speak with the ECDA about arranging for him to receive complete immunity from prosecution.

208.    Detectives Hunter and Manista prepared reports, both false, that contradicted each other about how detectives ultimately succeeded in getting Mr. Woodruff to change his story and incriminate himself and the other boys.

209.    According to Detective Hunter's report, Mr. Woodruff was allowed to eat devil's food cake his mother had sent with him and to call his mother and aunt, before "[h]e started asking Det. Arnet questions, and subsequently admitted to Det. Arnet that he was a witness to the Crawford homicide."

210.    This made it appear that Mr. Woodruff, totally of his own volition, simply decided to come clean.

211.    According to Detective Manista's report, however, at 5:40 p.m., he received an anonymous phone call about the investigation from a "negro female who wished to remain anonymous."

212.    This was the third time detectives claimed to have received an anonymous call and the second time they used such a call as a basis to detain and question a suspect.

213.    The anonymous caller reportedly knew and provided names and specific home addresses for each of the five boys.

214.    However, according to the report, the caller identified "Darryl Gibson" as a participant, which incorrectly combined Darryl Boyd's first name and Darryn Gibson's last name.

215.    This call, assuming it occurred at all, was a fake.

216.    The names and the addresses, except for the error regarding the names of Messrs.' Boyd and Gibson, consisted of the information that Mr. Gibson had provided in his initial statement to police.

217.    The anonymous caller also incorporated other information that the BPD had already received in its investigation, including that some of the boys had gone home in a cab and, according to Mr. Hough, had divided up proceeds at 138 Glenny Drive.

218.    Any competent detective would have tried to convince such a potentially valuable witness, assuming she was real, to identify herself so she potentially could testify or otherwise further assist the investigation.

219.    Any competent detective would have protected the voice and the identity of such an informant, assuming she was real, from the alleged murderer she was implicating.

220.    However, according to Detective Manista's report, at the time he took the call, Mr. Woodruff just happened to be in the room with him and Detective Arnet and was permitted to "listen … to the conversation."

221.    After hearing a tipster directly implicate him, according to Detective Manista's report, "Tyrone Woodruff became very nervous and could barely raise a cup of coffee he was drinking."

222.    Detective Manista's report continued:  "He was asked by Det. Manista in the presence of Det. Arnet if he could remember anything now; he was told that a person puts him in

a hallway [sic] dividing money.  At 5:45 P.M. he told Dets. Manista & Arnet 'Gibson was hitting him, Gibson was hitting him, I think.'"

223.    According to Detective Manista, he immediately reported to Chief Donovan, Chief of Homicide Detectives, "what had taken place."

224.    Chief Donovan thus knew how detectives had used this fake anonymous call to coerce Mr. Woodruff to implicate himself and his friends in the homicide.

225.    Detectives Deubell and Manista, joined by Chief Donovan, then continued to interrogate Mr. Woodruff.

226.    At 8:50 p.m., after an additional three hours of interrogation, Mr. Woodruff was told to sign a statement in question-and-answer form, typed by Detective Manista, which purported to be under oath.

227.    Fed a story by Detectives Arnet, Deubell, and Manista, and Chief Donovan, Mr. Woodruff purportedly stated that Mr. Gibson said he wanted to get some money and had somehow heard that there was a man in a bar flashing a lot of money.

228.    Mr. Woodruff stated that he did not know what bar it was, or how Mr. Gibson knew about the man flashing money.

229.    Mr. Woodruff said that while the group was walking down Fillmore Avenue, supposedly hoping to cross paths with a victim to rob, Mr. Gibson allegedly found a pipe and put it up his sleeve.

230.    Mr. Woodruff said that the group apparently spotted Mr. Crawford as he was entering his driveway.

231.    According to Mr. Woodruff, Mr. Gibson beat Mr. Crawford at the end of the driveway, and Messrs. Gibson and Boyd together dragged him up the driveway.

232.    Mr. Woodruff said that Mr. Boyd allegedly stole his wallet.

233.    Mr. Woodruff did not mention any involvement by Messrs. Walker or Martin.

234.    Although the BPD knew that Mr. Crawford was old, heavy set, and had been wearing a large Stetson hat, Mr. Woodruff could not describe the man in any way except that he was white—a fact that had been supplied to him at the start of his previous interview.

235.    Mr. Woodruff said that the group allegedly returned to the Glenny Projects and called a cab, which Messrs. Walker and Woodruff took home.

236.    Mr. Woodruff, minimizing his own role in the crime, denied receiving any of the money or being present when the money was divided up.

237.    Although the written statement purported to document the entire interview of Mr. Woodruff, after three hours it was less than three pages, with nearly half of it consisting of a *Miranda* waiver and his viewing of photographs of his friends.

238.    Chief Donovan was personally present for Mr. Woodruff's interrogation and his signing of the statement.

239.    BPD detectives involved in the investigation knew that Mr. Woodruff's account—that he and the other four boys walked together from the Glenny Projects to the Golden Nugget and committed a robbery—was untrue.

240.    This was because several witnesses—including Ms. Kalb (the Golden Nugget patron), Ms. Jeffrey (the barmaid), Ms. Crawford (the widow), Mr. Watson (the likely perpetrator), and his wife—put the time of the crime either *at* or *after* the time Messrs. Walker and Woodruff entered the taxicab at the Glenny Projects and went home.

241.    Moreover, the physical evidence at the crime scene did not support the story Mr. Woodruff had been pressured to come up with or adopt.

- 27 -

242.    Neither the responding officers nor the police photographer had seen or documented any pools of blood or other signs of a struggle in front of the house, on the sidewalk at the entrance to the driveway, or along the driveway leading to the place where Mr. Crawford's body had been found.

243.    There were no marks in the snow suggesting that Mr. Crawford had been dragged up the driveway from the sidewalk.

244.    Mr. Crawford's Stetson hat surely would have fallen off at the bottom of the driveway had he been assaulted with a pipe and dragged the 35 feet from the sidewalk to the place where he was found, but it was found by his body.

245.    And the single set of footprints in the snow in the backyard leading towards Mr. Watson's house pointed to Mr. Watson as the perpetrator, not a group of five young boys.

246.    Remarkably, even though Mr. Woodruff had confessed his involvement in a vicious robbery/murder for which he potentially faced 25 years to life in prison, Chief Donovan and the other detectives did not arrest him but instead released him from custody and allowed him to go home.

247.    In the ensuing weeks and months, detectives and prosecutors fed Mr. Woodruff additional details to incorporate into this account in order to conform it to other evidence they had collected, or to make his story seemingly more incriminating of the individual criminal defendants.

### F.   THE BPD ARRESTS MR. BOYD BASED ON THE FALSE, COERCED TESTIMONY OF MESSRS. WOODRUFF AND HOUGH

248.   After Mr. Woodruff signed his coerced, false statement of January 12, 1976, Chief Donovan, knowing the investigation was corrupted, authorized the arrests of Mr. Boyd and his co-defendants, Messrs. Walker, Gibson, and Martin.

249.   Detectives Hunter and Arnet arrested Messrs. Boyd and Gibson.

250.   They brought the two boys to the location where Detective Guadagno had arrested Mr. Walker, and then the detectives took the boys at the same time to police headquarters before taking each of them to a separate room for further interrogation.

251.   They continually tried to turn one boy against the others as they had done with Mr. Woodruff.

252.   During his arrest, Mr. Boyd repeatedly proclaimed his innocence.

253.   However, in a report submitted by Detectives Arnet, Montondo, and Hunter, the detectives falsely claimed that Mr. Boyd had "feigned any type [of] knowledge what so ever [sic] of the above mentioned investigation."

254.   After Mr. Boyd was arrested, his mother, Thomacenia Knight, brought several witnesses to BPD Headquarters, and they confirmed that Mr. Boyd was at the Glenny Projects on the evening of January 2 until around midnight.

255.   Detectives Guadagno, Hunter, and others, meanwhile, tried to coerce a false confession from the slightly built, 16-year-old Mr. Walker.

256.   They showed him gruesome photographs of Mr. Crawford's body, while towering over him and wearing their guns.

257.   They told Mr. Walker that they knew he had committed the murder, but that if he said he was a lookout with Mr. Woodruff, they would go easy on him.

258.    When Mr. Walker continually denied guilt and went to stand up, Detective Hunter said that, if he got up, Hunter would "beat your motherfucking ass."

259.    They claimed that they had an anonymous female caller on the line who alleged that she had seen Mr. Walker and his friends at the Glenny Projects dividing up the proceeds of the robbery.

260.    This was the same ruse they reportedly had used to coerce Mr. Woodruff's confession.

261.    As with Mr. Woodruff, the detectives lied to Mr. Walker that his friends and other witnesses were implicating him, but that he could obtain leniency if he cooperated with the police.

262.    Mr. Walker continued to maintain his innocence.

263.    Detectives Guadagno and Deubell, in their report, falsely accused Mr. Walker of having "refused to aid us in this investigation."

264.    In fact, in aid of the investigation, he truthfully answered the detectives' questions, but the answers were not those that they wanted to hear.

265.    Before his booking, Mr. Martin was interviewed by Detective Montondo.

266.    Like the other boys, Mr. Martin informed the detective that he had been at Shirley Floyd's apartment in the Glenny Projects with Messrs. Boyd, Gibson, Walker, and Woodruff the night of January 2.

267.    Like the other boys, he stated that Messrs. Walker and Woodruff left in a taxicab, and Messrs. Gibson and Boyd walked home together.

268.    Mr. Martin said that he returned to the party with his brother after the others left.

269.   Detective Montondo wrote in his report that Mr. Martin was lying, despite the evidence corroborating Martin's statement and the consistency of his statement with the statements of the other suspects and witnesses.

270.   Taking and sharing credit with all the homicide detectives under his command who were collectively responsible with him for manufacturing the case, Chief Donovan listed himself and the entire Homicide Unit as the arresting officers for Mr. Boyd and the other three boys.

271.   To initiate a criminal proceeding, Chief Donovan and Detective Dove both signed a sworn criminal court complaint falsely accusing Messrs. Boyd, Walker, Gibson, and Martin of second-degree murder and criminal possession of a dangerous weapon.

272.   They attached the false statement they had coerced from Mr. Woodruff on January 12, 1976, as the factual basis for the complaint.

273.   Although the detectives and Chief Donovan knew from multiple witnesses that the attack had occurred at about 11:30 p.m. or later, after Messrs. Walker and Woodruff had gone home in a cab, they falsely alleged in the complaint that the attack had occurred at about 10:30 p.m.

### G.   ADDITIONAL INVESTIGATION FURTHER UNDERMINES THE DETECTIVES' FLAWED CASE AGAINST MR. BOYD

274.   Mr. Boyd and his three co-defendants were arraigned in court on January 13, 1976.

275.   All were remanded to the Erie County Holding Center, pending a preliminary hearing to be held on January 16, 1976.

276.   On January 15, 1976, Detectives Montondo and John Regan, at the request of Detectives Deubell and Guadagno, interviewed the owner of a bodega called Simpson's Store,

located approximately three blocks from the Golden Nugget, to corroborate Mr. Hough's story, coerced from him by police, that he saw Mr. Boyd spending a lot of money at the store the day after the murder.

277.     According to the detectives' report, the owner of Simpson's Store and her daughter knew the boys but did not recall seeing them on either January 2, when they supposedly were present waiting for the emergence of Mr. Crawford from the Golden Nugget, or January 3, 1976, when they supposedly were there in possession of the robbery proceeds.

278.     This *contradicted* Mr. Hough's story (and Mr. Woodruff's).

279.     To minimize the significance of the owners' statements, Detective Montondo wrote:  "Simpson's Delicatessen is a very small store and it would be easy for the workers to overlook anyone, especially if they were busy."

280.     However, the owner and her daughter had not said they were busy.

281.     Moreover, the small size of the store would have made a group of 16-year-old boys flashing unusually large amounts of cash more, not less, conspicuous.

282.     On January 16, 1976, a preliminary hearing was held to determine whether there was probable cause to continue the prosecution and to hold Mr. Boyd and his co-defendants in custody.

283.     Mr. Woodruff, who had been given complete immunity from prosecution, was the principal witness against the defendants.

284.     Based upon the false story of Mr. Woodruff that the detectives had coerced out of him, the court found probable cause for the prosecution and continued the defendants' detention.

285.   At the hearing, neither the named Defendants nor their fellow detectives disclosed information in their individual and joint possession that would have negated the probable cause found by the court, including, but not limited to:

- the coercive tactics they had used to pressure Mr. Woodruff to accuse Mr. Boyd and the other boys;

- the evidence they had collected corroborating Mr. Woodruff's initial story denying any knowledge of the crime;

- the evidence proving that Mr. Woodruff left in a taxicab before the Crawford Murder occurred and therefore could not have seen it;

- the forensic evidence contradicting Mr. Woodruff's account of the crime, including the crime scene photographs showing the absence of blood or drag marks in the driveway; and

- the wealth of evidence, including a crime scene photograph, incriminating Larry Watson as well as Jerome Boyd.

286.   Had this evidence been disclosed, the case would have been dismissed at arraignment, or Mr. Boyd would have been released from custody.

287.   On the same date as the preliminary hearing, a supposed witness, according to police records, came forward to tell the prosecutor handling the case, Chief Donovan, and Detective Dove that he and two of his friends—another young black man and a black woman—had witnessed the assault.  The witness's account of events materially contradicted Mr. Woodruff's statements, but his statement was not disclosed to the defense either.

## H.   MESSRS. WOODRUFF AND HOUGH BOTH RECANT BEFORE TESTIFYING IN THE GRAND JURY BUT DETECTIVES COERCE THEM INSTEAD TO EXPAND THEIR FALSE STORIES

288.   On February 11, 1976, a grand jury was convened to hear evidence concerning the Crawford Murder.

289.   Before giving any testimony, Messrs. Woodruff and Hough were first brought to the ECDA's office.

290.     According to police reports, Mr. Hough, in the presence of his mother, was questioned by Detectives Delano and Guadagno.

291.     Mr. Hough recanted his prior statement about the boys.

292.     According to the reports of the two detectives, he told them that he "wanted to change his story about the truth of the statement" he had previously given.  "He said that he lied in the statement about what [Darryl] Boyd told him.  He said [Mr. Boyd] never told him that he killed William Crawford."

293.     The detectives deliberately omitted from their reports the details of the questions and answers in which Mr. Hough exonerated the suspects.

294.     After the detectives' prolonged questioning failed to shake her son from recanting, Mr. Hough's mother said that she would be leaving, but she obtained the promise of Detectives Delano and Guadagno to drive her son, who was in their custody, home.

295.     However, according to their own reports, instead of doing that, they accused Mr. Hough of lying and threatened him that he had better tell the truth.

296.     Under intense pressure and with his mother no longer present, this 15-year-old boy recanted his recantation and then was led by the detectives to further embellish his previous story.

297.     While he previously said that he recalled no additional information, he now claimed for the first time that, before the assault, Messrs. Boyd and Gibson (both 16 years old) went into the Golden Nugget Bar to look around and then waited with the other boys down the street for Mr. Crawford to come outside.

298.     Mr. Hough was then put into the grand jury to testify to this newly embellished story.

299.   During his grand jury testimony, Mr. Hough claimed that he overheard Mr. Gibson state on the night of the murder, "I'm going to get me some money tonight."

300.   Mr. Hough had not made this claim in any of his prior statements to police officers.

301.   In fact, it was Mr. Woodruff who had previously claimed that on the night of the Crawford homicide, he heard Mr. Gibson say, "I'm going to get me some money tonight."

302.   Mr. Hough only testified to this statement before the grand jury because it had been suggested to him by law enforcement officials as part of an attempt to coordinate his testimony with that of Mr. Woodruff.

303.   Meanwhile, Detectives Guadagno and Delano went to talk to Mr. Woodruff before he was to testify before the grand jury.

304.   However, they discovered that Mr. Woodruff, too, had recanted.

305.   Again, they deliberately omitted from their reports the details of what Mr. Woodruff said to exculpate the suspects, including Mr. Boyd.

306.   Detective Delano noted in his report that Mr. Woodruff was so nervous that he was shaking.

307.   Detective Delano, according to his own report, accused Mr. Woodruff of lying and demanded that he tell "the whole story."

308.   In their separate reports, Detectives Delano and Guadagno each took credit for coercing Mr. Woodruff into withdrawing his recantation and embellishing his story.

309.   Detective Delano reported that he confronted Mr. Woodruff with Mr. Hough's new statement which then led Mr. Woodruff to change his story to match Mr. Hough's.

310.     Detective Guadagno, on the other hand, without mentioning Mr. Hough's new statement playing any role, reported that he "talked with Tony and he came up with more important information."

311.     Up until this point in the investigation, the BPD had been unable to explain how Mr. Boyd and the other defendants supposedly knew that, if they walked down Fillmore Avenue, they would happen across a victim, flush with cash, to rob.

312.     The statements that the detectives previously had coerced from Messrs. Woodruff and Hough made it appear that it was pure serendipity that they stumbled across Mr. Crawford, who just happened to have a lot of cash on him.

313.     Now, however, Detectives Delano and Guadagno pressured Mr. Woodruff to adopt Mr. Hough's new statement that the boys had engaged in a reconnaissance mission at the Golden Nugget that resulted in their targeting Mr. Crawford.

314.     In Mr. Woodruff's new version of events, fed to him by Detectives Guadagno and Delano, before the boys even left the Glenny Projects, someone suggested they go to a bar, because "maybe somebody in one of the bars has cashed a check."

315.     According to Mr. Woodruff's new story, Mr. Gibson, hiding a pipe up his sleeve, and Mr. Boyd supposedly went into the Golden Nugget.

316.     This was an establishment, the detectives knew, which served an older demographic, and any 16-year-olds would have stood out and been denied admission.

317.     Indeed, the barmaid, Ms. Jeffrey, and other witnesses had told them they did not see any of the boys in the bar the night of the murder.

318.     Nevertheless, knowing from multiple witnesses that Mr. Crawford had been seen flashing money at the bar, the detectives caused Mr. Woodruff to incorporate this circumstance into his new story.

319.     Now, Mr. Woodruff claimed that Messrs. Gibson and Boyd had reported to the rest of the group that they had seen an "old white dude with a lot of money in the bar."

320.     According to Detectives Delano's and Guadagno's reports, the boys then walked approximately three blocks down Fillmore to Simpson's Store, where they waited for Mr. Crawford to leave the Golden Nugget.

321.     The boys allegedly waited for Mr. Crawford to cross the street—which put him on the sidewalk directly in front of his house, at the entrance to his driveway—then ran the three blocks to ambush him at the end of the driveway.

322.     Mr. Woodruff alleged that Mr. Gibson hit the victim in the head with the pipe several times at the end of his driveway by the sidewalk, and then all five of them dragged him up the driveway to the side door.

323.     The BPD knew that the physical evidence at the crime scene contradicted this account.

324.     First, as noted above, there was no evidence of any pools of blood or dragging along the driveway, and despite such a violent encounter, Mr. Crawford's hat had not fallen off but was found next to his body at the side entrance to his house, about 35 feet from the sidewalk.

325.     Second, it made no sense that the boys had begun to run after Mr. Crawford had already crossed the street.

326.    It would have taken them much longer to run three long blocks, from Simpson's Store to Mr. Crawford's house, then it would have taken Mr. Crawford to walk the 35 feet from the sidewalk in front of his house to the side door.

327.    Nor did it make any sense that five 16-year-olds would have decided to wait indefinitely, during a cold January night, by the store, having no idea when the specific man they allegedly were targeting would come out of the tavern.

328.    Mr. Woodruff's new story also contained internal contradictions about his receipt of robbery proceeds.

329.    In his prior statements, he denied seeing or hearing about the money being divided up, but now Mr. Woodruff was induced to say that he was with the group when they returned to the Glenny Projects to divide up the money.

330.    Additionally, in Detective Delano's report, Mr. Woodruff allegedly received $25, while Detective Guadagno reported that Mr. Woodruff said he received $15; in his January 12 statement, he denied receiving any money at all.

331.    Detective Guadagno handwrote a statement and had Mr. Woodruff sign it.

332.    That statement contained still another contradiction:  Contrary to his alleged oral statement that Messrs. Boyd and Gibson had gone inside the Golden Nugget and then spotted the old man with the money, in this version, Mr. Woodruff stated that they only opened the door to the bar and peeked in.

333.    In still another amazing coincidence, according to Mr. Woodruff's newly expanded statement, it was at this precise moment that Mr. Crawford flashed his money.

334.    Following his session with Detectives Guadagno and Delano, Mr. Woodruff testified before the grand jury.

335.    Only after testifying, according to the detectives' reports, were Messrs. Woodruff and Hough "released" from police custody.

336.    In other words, to make sure that these vulnerable boys would recant their recantations, augment their original stories, and then testify before the grand jury, the officer defendants held them prisoner.

337.    Their detention was not only coercive but also illegal, as neither had been charged with any crime; indeed, Mr. Woodruff had been given complete immunity from prosecution.

338.    Throughout their investigation, the detectives either deliberately refrained from taking notes or deliberately destroyed whatever notes they had taken.

339.    During all interrogations of suspects and witnesses that occurred at Buffalo Police Headquarters, detectives had recording equipment but deliberately did not use it so that there would be no record of their coercive tactics and of inconsistent statements by their witnesses.

## I.    THE DEFENDANTS MISLEAD THE GRAND JURY, CAUSING IT TO WRONGFULLY INDICT MR. BOYD

340.    The BPD detectives involved in the investigation knew that the coerced testimony Messrs. Woodruff and Hough gave in the grand jury implicating Mr. Boyd and his friends in the Crawford Murder was false.  The entirety of their investigation contradicted it.

341.    Detectives Guadagno, Delano, Deubell, and Montondo personally testified before the grand jury.

342.    Prior to Mr. Boyd's indictment, these and other detectives collectively knowledgeable about and responsible for the investigation failed to turn over to the ECDA and/or to inform the grand jury about a plethora of evidence which, viewed individually or cumulatively, completely undermined the prosecution's case.

343.    This evidence included but was not limited to:

- Mr. Woodruff's initial statement that he did not know anything about the Crawford Murder;

- the manner in which Mr. Woodruff had been threatened with arrest and prosecution and repeatedly coerced and promised immunity to induce him to change his various stories;

- the material inconsistencies in Mr. Woodruff's various statements;

- the crime scene photographs contradicting Mr. Woodruff's story;

- the witness statements about the timing of Mr. Crawford leaving the Golden Nugget, together with the taxicab evidence, which proved that Mr. Woodruff was not present at the time of the murder;

- the fact of Mr. Woodruff's recantation and the details of his recanting statements;

- the coercion of Mr. Hough to implicate the defendants notwithstanding his passing of a polygraph examination, including the threat to arrest him for the Crawford murder;

- Mr. Hough's recantation and other inconsistent statements;

- the manner in which Messrs. Woodruff's and Hough's enhanced stories had been orchestrated and coordinated by the BPD;

- the statements by the owner at Simpson's Store, and by Ms. Jeffrey and other witnesses present in the Golden Nugget, which contradicted the statements of Messrs. Hough and Woodruff;

- that police illegally detained Messrs. Woodruff and Hough in their custody until they completed their testimony;

- the anonymous phone call accusing Mr. Woodruff, as well as his terrified reaction to the call, before he changed his story;

- the unlawful investigative detention of Mr. Boyd without probable cause and the manner in which his statements had been coerced and/or fabricated;

- the police documentation that a set of house keys had been found near Mr. Crawford's body, the statement from the widow, Ms. Crawford, that her husband typically rang the bell for her to let him in the house, and the recorded statements from witnesses at the Golden Nugget that Julia Watson had called the bar after she and her husband left asking the barmaid to search for her husband Larry Watson's missing keys—evidence showing that the house keys near the body had been Mr. Watson's;

- statements from witnesses at the Golden Nugget who observed Mr. Watson volunteer to walk Mr. Crawford home, and then return 20 minutes later, collect his wife, and leave in a hurry;

- the false or conflicting statements of Larry Watson, his wife Julia Watson, and his stepson Bill Howard about their interactions with Mr. Crawford the night of the murder;

- statements from the barmaid, Debbie Jeffrey, in which she explicitly stated that she suspected Mr. Watson of committing the crime and the circumstances which led her to that conclusion;

- the crime scene photograph showing footsteps leading from Mr. Crawford's backyard towards Mr. Watson's house; and

- the tip and identification evidence pointing to Jerome Boyd as a second possible suspect.

344.  On or about February 27, 1976, the grand jury, as a result of having been deceived about the material facts, and relying on fabricated evidence, indicted Mr. Boyd and his three co-defendants for first-degree robbery and second-degree murder.

345.  On information and belief, shortly after the Crawford Murder, and while Mr. Boyd and his co-defendants were in custody without bail for the Crawford Murder, a man named William Crosby was murdered in his home.

346.  Mr. Crosby lived in the house directly between Mr. Crawford and Mr. Watson at 2045 Fillmore Avenue and may have had knowledge about Mr. Crawford's murder.

347.  On information and belief, the BPD never made an arrest for the murder of William Crosby.

348.  On information and belief, the murder of William Crosby took place after Mr. Boyd was arrested and in custody, but before his trial, for the Crawford Murder.

349.  No information concerning the murder of William Crosby, which took place in the immediate vicinity of the Crawford Murder at a time when it was impossible for Mr. Boyd or his friends to have been involved, was ever disclosed to Mr. Boyd's defense counsel.

J.     **PLAINTIFF DARRYL BOYD IS TRIED AND CONVICTED BASED ON COERCED FALSE TESTIMONY, WITHOUT THE BENEFIT OF UNDISCLOSED *BRADY* MATERIAL**

350.     Mr. Boyd was brought to trial on April 21, 1977, before an all-white jury, on charges of first-degree robbery and second-degree murder.

351.     ADA Timothy Drury prosecuted the case.

352.     He was one of the most senior prosecutors in the ECDA to whom the DA assigned many of the office's most serious and important cases.

353.     Prior to Mr. Boyd's trial, Mr. Boyd's defense counsel, Mark Hulnick, requested that he be permitted to examine the ECDA's file and that it produce all *Brady* material to him.

354.     Despite these requests, ADA Drury did not disclose dozens of pieces of evidence favorable to the defense in advance of or even during trial.  This evidence included, but is not limited to, the documents and information described in ¶¶ 123 and 343, *supra*.

355.     Consistent with the ECDA's policy, procedure, practice, and/or custom of impermissibly narrowing the scope of its *Brady* obligations to include only truly "exculpatory"— rather than favorable—material, ADA Drury failed to disclose any evidence he did not deem "exculpatory," including evidence that impeached the prosecution's key witnesses; evidence that pointed to other suspects as perpetrators of the crime; and evidence regarding the second murder, which took place across the street from the Golden Nugget when Mr. Boyd was incarcerated.

356.     Also consistent with the policies, procedures, practices, and/or customs of the ECDA, the only materials ADA Drury turned over to the defense were the exhibits the prosecution entered into evidence or marked for identification, including some of the crime scene photographs, as well as the formal, sworn statements in question-and-answer format of testifying witnesses.

357.     These witness statements were not disclosed until after each witness had completed his or her direct examination.

358.     This late disclosure deprived defense counsel of the opportunity to investigate the information, to incorporate it into his opening statement or a theory of defense, and to fully prepare to utilize it during cross-examination of the witness.

359.     ADA Drury did not disclose to the defense statements of the prosecution's witnesses that were unsigned by the witnesses and instead merely summarized in police reports, despite his absolute duty to do so under the New York State *Rosario* rule as well as the requirements of *Brady*.

360.     Nor did he disclose any statement by any witness whom the prosecution did not call to testify, even where it was favorable to the defense.

361.     The prosecution disclosed no handwritten notes taken by any detective at any time during the investigation and also failed to disclose that handwritten notes had been destroyed.

362.     The prosecution presented no physical or forensic evidence tying Mr. Boyd (or any of the other defendants) to the crime.

363.     Its case was based on the false testimony of Messrs. Woodruff and Hough, together with testimony by Detective Guadagno, based upon his own false report, that Mr. Boyd had made inconsistent statements concerning the timing of when he returned home the night of the murder.

364.     The failure of the prosecution to disclose the aforementioned *Brady* material also severely handicapped Mr. Boyd's counsel's attempt to contradict or impeach the critical testimony of Messrs. Woodruff and Hough, and it deprived Mr. Boyd of his constitutional right to present a defense that someone else had committed the crime.

365.     During his summation, Mr. Hulnick, without the benefit of the suppressed police reports and information, nevertheless argued, from inconsistencies in Mr. Woodruff's story, that law enforcement authorities had pressured him to change his story and indoctrinated him.

366.     Even though this assertion was true, ADA Drury angrily objected, "These are wild allegations, there is no proof of it."

367.     During his closing argument, ADA Drury urged the all-white jury to credit Mr. Woodruff even though, or perhaps because, he was a "ghetto kid… a kook … an idiot, a nitwit," and a "blithering idiot."

368.     In fact, Mr. Woodruff was, and is, a highly intelligent man—a far cry from "a nitwit" or "a blithering idiot"—whose halting testimony resulted from the fact that he had been coerced to lie.

369.     ADA Drury's argument was a thinly disguised emotional appeal to the racial prejudices of the all-white jury.

370.     ADA Drury contended that Mr. Woodruff initially lied when denying any knowledge of the crime, but then came back voluntarily with his father to confess at least some of the truth.

371.     This argument was contradicted by the undisclosed police reports documenting that Mr. Woodruff was picked up, taken back to BPD Headquarters, and coercively interrogated for hours, without any family member being present, before he changed his story.

372.     ADA Drury contended that the police had to work through Mr. Boyd's friends because they didn't have any other evidence of how the Crawford Murder was committed.

373.     However, this was not true:  The BPD had substantial evidence, undisclosed to the defense, obtained from numerous witnesses at the Golden Nugget and Mr. Watson's

neighbors, implicating Mr. Watson, and additional independent evidence implicating Jerome Boyd.

374.   ADA Drury told the jury that "[t]he police turned over everything they had to you."

375.   This was untrue:  The BPD had gathered a great deal of evidence implicating other suspects and contradicting the prosecution's case, but this evidence had not been disclosed to the defense or the jury.

376.   ADA Drury told the jury:  "I would absolutely reject, if I were to make this argument to you, any suggestion, any beliefs [that] the police or our office or myself had anything to do with changing Tyrone's testimony or making it fit any pattern."

377.   This statement, too, was proven untrue by the undisclosed police reports of January 12, 1976, concerning the anonymous phone call, and of February 11, 1976, revealing that detectives, supposedly orchestrated by ADA Drury, had gone from Mr. Hough to Mr. Woodruff to harmonize their new accounts.

378.   Any allegation of a "conspiracy" to fabricate evidence, he said, was "absolutely ridiculous," even though the above undisclosed evidence showed it was true.

379.   Contrary to fundamental rules governing courtroom advocacy, ADA Drury personally vouched for the integrity of the investigation and prosecution, and for Mr. Woodruff's truthfulness.

380.   Again, appealing to the all-white jurors' possible racial prejudice, ADA Drury argued that Mr. Woodruff was "hapless, stupid, but we are asking you to believe him."

381.   While telling the jury that his personal beliefs did not matter, ADA Drury still told them, "I believe him."

382.     ADA Drury misleadingly stated that the BPD had found "no footprints on *either side* of that house so that nobody jumped the yard.  Woodruff said they went out the same way they came."

383.     This argument was misleading since the BPD had documented in a crime scene photograph, which had been suppressed from the defense, footprints leading from the backyard of Mr. Crawford's house towards Mr. Watson's house.

384.     On April 29, 1977, the jury convicted Mr. Boyd of second-degree murder and first-degree robbery.

385.     After Mr. Boyd's conviction but before his August 1977 sentencing, Thelma Green, Andre Hough's foster mother, told detectives that Mr. Hough had admitted to her that he had lied in his testimony implicating Mr. Boyd after being told what to say.

386.     Ms. Green told ADA Drury she believed Mr. Hough was not telling the truth, adding that her son had told her, after one of the co-defendants' trials, that he had been lying about the whole thing.

387.     On August 3, 1977, with Mr. Boyd and his counsel continuing to maintain his innocence, the court sentenced him to serve 20 years to life in prison, and he was sent upstate to serve his time.

### K.     THE ECDA OPPOSES MR. BOYD'S EFFORTS TO OVERTURN HIS CONVICTION

388.     Following his conviction, Mr. Boyd continued to maintain his innocence.

389.     Mr. Boyd appealed his conviction, arguing, among other things, that ADA Drury's summation comments had violated his constitutional right to a fair trial.

390.     In its brief opposing Mr. Boyd's appeal, the District Attorney, ratifying ADA Drury's misconduct, argued that the summation was "proper in all respects."

391.    The Appellate Division affirmed it.  *See People v. Boyd,* 84 A.D.2d 689 (4th Dep't 1981), lv to app. den., 55 N.Y.2d 879 (1982).

392.    On March 23, 1984, Mr. Boyd moved, pursuant to Criminal Procedure Law § 440.10, to vacate his conviction, based, among other things, on Mr. Hough's most recent recantation.

393.    In opposing the motion, the ECDA continued to suppress Mr. Hough's original recantation of February 11, 1976, and emphasized the other "evidence" of guilt the detectives had manufactured, including Mr. Boyd's alleged false statements to police and Mr. Woodruff's testimony.

394.    The court denied the motion on November 28, 1984.

395.    Mr. Boyd filed a motion for reconsideration on December 5, 1984.  That motion was denied as well.

396.    On January 23, 1986, Mr. Boyd again moved to vacate his conviction pursuant to § 440.10, this time based upon the recantation, in the form of a sworn oral deposition, of Mr. Woodruff.

397.    Mr. Woodruff testified that he had been intimidated by armed police from the BPD to adopt a story based upon information the police gave him.

398.    He further alleged that he had been told that the police had other witnesses "upstairs" ready to "take his place"—i.e., testify against the others, and him—if he did not cooperate, and that he would be charged with murder and go to prison for life.

399.    In fact, he testified, he had not been involved in the murder at all and knew nothing about it, as he first told police on January 11, 1976.

400.     He said that the police had coerced him before he had any contact with ADA Drury.

401.     The defense submitted as exhibits photographic evidence contradicting Mr. Woodruff's trial testimony that Mr. Crawford had been dragged up the driveway through the snow.

402.     In opposing the defense motion, the ECDA continued the coverup of the voluminous, favorable evidence that had been suppressed at the time of Mr. Boyd's trial and contributed to his conviction.

403.     The affidavit of ADA Louis A. Haremski falsely stated that Mr. Woodruff had consistently been interviewed "in the presence of his parents."

404.     In fact, the ECDA knew or should have known from undisclosed police reports that, in his initial interview on January 11, 1976, and the next day when he was coerced into changing his story, Mr. Woodruff was interrogated by police outside the presence of his family.

405.     ADA Haremski further misrepresented that Mr. Woodruff had voluntarily changed his story the next day.

406.     In making this argument, he continued his office's suppression of the police reports documenting how police had coerced Mr. Woodruff.

407.     The ECDA also continued to suppress the other evidence, including but not limited to the items described in ¶¶ 123 and 343, *supra*, and elsewhere in this Complaint, contradicting Mr. Woodruff's trial testimony and implicating third-party suspects.

408.     Indeed, the affidavit falsely asserted that the jury in Mr. Boyd's trial had all the prior statements and circumstances "surrounding Tyrone Woodruff's election to testify against his cohorts," when this was patently untrue.

409.     Relying on the ECDA's submission, the court (Kasler, J.) denied the motion without a hearing.

410.     Mr. Boyd was granted parole in 1996, after serving 20 years in prison for the Crawford Murder.

411.     Thereafter, he served eight additional years after parole authorities, believing him to be a murderer, accused him of minor, technical parole violations.

412.     But for his wrongful conviction, he would not have been on parole, subject to onerous, highly technical conditions of release, would not have been considered a murderer who parole authorities were looking for an excuse to reincarcerate, and would not have been reimprisoned.

413.     Mr. Boyd continued to maintain his innocence and fight to have his wrongful conviction vacated and his name cleared.

414.     On or about October 1, 2012, Mr. Boyd, now represented by attorney Steven M. Cohen, moved once again to vacate his conviction based upon newly discovered evidence.

415.     The evidence included a second, even more detailed, sworn recantation of Mr. Woodruff, again in the form of an oral deposition, as well as newly discovered police documents obtained through a FOIL request, which supported Mr. Woodruff's claim that his testimony against Mr. Boyd and the other boys had been coerced.

416.     In opposing Mr. Boyd's motion, ADA Nicholas Texido falsely contended that all police documents had been turned over at trial and that, even if they had not been, they were not material.

417.     On or about August 31, 2014, Mr. Boyd requested records from his case from the ECDA under the Freedom of Information Law.

418.   The Chief of the ECDA Appeals Bureau, Donna A. Milling, denied the request, claiming untruthfully:  "All disclosable documents were turned over to your trial attorney pursuant to discovery rules."

## L.   THE COURT VACATES MR. BOYD'S WRONGFUL CONVICTION

419.   On October 13, 2020, a prominent Buffalo criminal defense attorney, Paul J. Cambria, Jr., of Lipsitz Green Scime Cambria LLP, handling the case *pro bono*, filed a motion on behalf of Mr. Boyd and his only surviving co-defendant, John Walker, to vacate their convictions pursuant to CPL § 440.10.

420.   Mr. Boyd moved on the grounds that the ECDA, during each of their separate trials in 1977, had failed to disclose two favorable crime scene photographs.

421.   One was the photograph showing a single set of footprints in the snow, made by a heavyset man, in the backyard of Mr. Crawford's property, leading in the direction of Mr. Watson's property two houses over.

422.   The second, which contradicted Mr. Woodruff's trial testimony, showed the absence of dragging marks and footprints in the snow along Mr. Crawford's driveway.

423.   After holding an evidentiary hearing, the court (Burns, J.) granted Mr. Boyd's motion and, on August 18, 2021, vacated the convictions of Messrs. Boyd and Walker.

424.   The court credited the testimony of retired Judge James McLeod, who had represented Floyd Martin at the last of the four defendants' trials in 1977.

425.   Judge McLeod testified that, unlike the other defense counsel, he had made a specific discovery request for all the police photographs and thus had received the two photographs in question that contradicted the prosecution's theory of the case.

426.   He testified that these exhibits had proven decisive in the jury voting to acquit his client, Mr. Martin.

427.   Judge McLeod recalled that, based upon the photographs, together with the testimony that Mr. Watson had left the Golden Nugget with Mr. Crawford, he had contended that Mr. Woodruff's testimony was not truthful and that Mr. Watson likely was the killer.

428.   Judge McLeod's testimony was corroborated by handwritten notes in the prosecution's present case file showing that indeed he had made an argument during his trial summation about the significance of the footprints in the snow at the rear of Mr. Crawford's property.

429.   On August 18, 2021, the present District Attorney, John Flynn, acknowledging that he lacked any evidence with which to retry Messrs. Boyd and Walker, dismissed the indictment against them.

## VI.   MR. BOYD'S DAMAGES

430.   Mr. Boyd's injuries and damages include, but are not limited to:

(a)   his complete loss of liberty, during his pretrial and posttrial incarceration, totaling more than 28 years;

(b)   severe restrictions upon his liberty, privacy, and personal autonomy during parole supervision totaling another 17 years;

(c)   physical injuries he suffered during assaults upon him by guards and other inmates;

(d)   the mental and emotional effects of such assaults and of the gruesome, terrifying, homicidal, and disfiguring assaults on other inmates that he witnessed;

(e)   past and future physical illnesses and injuries as a result of his wrongful conviction and his experiences in prison;

(f)   past and future mental and emotional suffering;

(g)     the loss of the services, society, companionship, and consortium of his

          mother and other family members;

(h)     the loss of employment income and diminution of future earning ability in

          an amount to be determined;

(i)      legal fees and expenses for which he is responsible, including trial and

          post-trial representation; and

(j)      interest to the extent available under controlling law.

## CAUSES OF ACTION

### COUNT I
**42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth
Amendments Against the Individual Defendants**

431.    Mr. Boyd repeats and realleges each allegation contained in the preceding

paragraphs as if fully set forth herein.

432.    The Individual Defendants, surviving or sued through the Executors and/or

Administrators of their Estates, individually and/or in concert with each other and others

unnamed, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to

continue criminal proceedings against Mr. Boyd, without probable cause to believe that Mr.

Boyd was guilty of any crime or could be successfully prosecuted, and caused him to be

deprived of his liberty, in violation of his rights under the Fourth, Fifth, and Fourteenth

Amendments to the United States Constitution.

433.    The criminal proceedings terminated in Mr. Boyd's favor.

434.    By virtue of the foregoing, and pursuant to 42 U.S.C. § 1983, the Individual

Defendants, personally or through their Estates, are liable for the violations of Mr. Boyd's

constitutional rights and his resulting injuries.

## COUNT II
### Malicious Prosecution under New York State Law Against the Individual Defendants and the City of Buffalo

435.    Mr. Boyd repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

436.    The Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, individually and/or in concert with each other and others unnamed, acted with actual malice to initiate and/or to continue criminal proceedings against Mr. Boyd without probable cause to believe that Mr. Boyd was guilty of any crime or could be successfully prosecuted, in violation of his rights under the common law of the State of New York.

437.    The criminal proceedings terminated in Mr. Boyd's favor.

438.    By virtue of the foregoing, the Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, are liable to Mr. Boyd for malicious prosecution under the common law of the State of New York and for all his resultant damages.

439.    Under the principle of *respondeat superior*, the Defendant City is liable for the malicious prosecution of Mr. Boyd by the Individual Defendants and other municipal employees, all of whom were acting within the scope of their employment, and for Mr. Boyd's resultant damages.

## COUNT III
### 42 U.S.C. § 1983 Unreasonable Seizure under the Fourth Amendment, and Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, Due to the Fabrication of False or Misleading Evidence by the Individual Defendants

440.    Mr. Boyd repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

441.    The Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, acting individually and/or in concert with each other and with others, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to fabricate or manufacture false or misleading police reports, witness statements, and a Criminal Court complaint (collectively, the "Fabricated Evidence").

442.    The Individual Defendants forwarded, or caused to be forwarded, the Fabricated Evidence to prosecutors in the ECDA, intending that it be used against Mr. Boyd during a criminal prosecution.

443.    The Individual Defendants knew that the Fabricated Evidence, if considered by a jury, would be likely to influence a jury's decision at trial to convict Mr. Boyd.

444.    As a result of the Individual Defendants' conduct in forwarding, or causing to be forwarded, the Fabricated Evidence to the ECDA, prosecutors in that office initiated and continued a criminal prosecution of Mr. Boyd, and he lost his liberty.

445.    The Individual Defendants' conduct violated Mr. Boyd's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

446.    The above misconduct was outrageous and shocking to the conscience.

447.    By virtue of the foregoing, the Individual Defendants are liable to Mr. Boyd, pursuant to 42 U.S.C. § 1983, for the violation of his constitutional rights and his resultant injuries.

<u>**COUNT IV**</u>

**42 U.S.C. § 1983 Unreasonable Seizure under the Fourth Amendment, Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, and Denial of Reasonable Bail under the Eighth Amendment, Due to the Pretrial Withholding of Favorable Evidence Likely to Result in Plaintiff's Release from Custody ("*Russo* Claim") <u>by the Individual Defendants</u>**

448.     Mr. Boyd repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

449.     Following the initiation of Mr. Boyd's prosecution with the filing of a Criminal Court complaint, the continuation of the charges was subject to a preliminary hearing, at which a judge determines whether there was probable cause to prosecute, and a proceeding before a grand jury, which would decide whether the evidence supported formally charging Mr. Boyd by indictment and binding him over for trial.

450.     Under New York law, as well as the Eighth and Fourteenth Amendments to the United States Constitution, the court, following the filing of charges, was required, upon application of the defendant, to consider whether to fix a reasonable bail so that the defendant could obtain his release.

451.     Under New York law, the strength of the prosecution's case was a significant factor for a court in determining whether to fix a reasonable bail and the amount of such bail.

452.     Despite knowing this, the Individual Defendants withheld, or caused to be withheld, from the ECDA, Mr. Boyd and his lawyer, the grand jury, and the court exculpatory and impeachment evidence and other evidence favorable to the defense that completely undermined the prosecution's case.

453.     Had such evidence been timely disclosed, the charges against Mr. Boyd likely would not have survived the preliminary hearing or the determination by the grand jury, and/or the court would have released Mr. Boyd on his own recognizance or on a reasonable bail.

454.    The failure to make timely disclosure of such obviously significant evidence undermining the entire case caused Mr. Boyd to be unnecessarily and unreasonably deprived of his liberty.

455.    This conduct was shocking to the conscience.

456.    It violated Mr. Boyd's constitutional rights to be free of unlawful or unreasonable seizure under the Fourth and Fourteenth Amendments, to reasonable bail under the Eighth and Fourteenth Amendments, to a fair trial under the Sixth and Fourteenth Amendments, and to due process of law under the Fifth and Fourteenth Amendments.

457.    By virtue of the foregoing, the Individual Defendants or their Estates are liable, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Boyd's constitutional rights and his resultant injuries.

**<u>COUNT V</u>**
**42 U.S.C. § 1983 Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments by Withholding Evidence Favorable to the Defense ("*Brady* Claim") by the Individual Defendants**

458.    Mr. Boyd repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

459.    At all relevant times, Mr. Boyd had a right—under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and *Brady v. Maryland*, 363 U.S. 83 (1963) and its progeny—to timely disclosure to him, by the prosecution, of all evidence in its possession, custody or control that was favorable to his defense, either because it tended to show his innocence, tended to impeach the credibility of the prosecution's witnesses against him, or both ("*Brady* material").

460.    In furtherance of this right, police officers, including the Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, had a duty to

- 56 -

timely disclose, or to ensure the timely disclosure of, all potential *Brady* material to the ECDA so that it could decide what to disclose to the defense.

461.    The Individual Defendants violated this duty by knowingly, willfully, intentionally, recklessly, and/or negligently failing to timely disclose to the prosecutors in charge of Mr. Boyd's criminal prosecution numerous items of *Brady* material, including documents and unrecorded information, including but not limited to the material enumerated in ¶¶ 123 and 343, *supra,* and elsewhere in this Complaint, and by destroying their notes.

462.    The undisclosed *Brady* material was material to the outcome of the trial at which Mr. Boyd was convicted.  But for the Individual Defendants' failure to disclose or cause the disclosure of the *Brady* material, there is a reasonable likelihood that Mr. Boyd would have been acquitted or otherwise received a more favorable outcome to his trial.

463.    By virtue of the foregoing, the Individual Defendants or their Estates are liable, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Boyd's constitutional rights and his resultant injuries.

**<u>COUNT VI</u>**
**42 U.S.C. § 1983 and *Monell* Municipal Liability for the Conduct of Employees of the BPD**
**<u>Against the City of Buffalo</u>**

464.    Mr. Boyd repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

465.     At all relevant times, the Police Commissioner, detectives, and other police officers employed by the BPD were agents and employees of the Defendant City.

466.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner or his authorized delegates, including the Chief of the Homicide Detectives Unit, during all times relevant to this Complaint, had final responsibility for training,

instructing, supervising, and disciplining police officers and other employees of the BPD with respect to the investigation and prosecution of criminal matters, including homicides.

467.    The areas in which the Police Commissioner or his authorized delegates, including the Chief of the Homicide Detectives Unit, were responsible for training, instructing, supervising, and disciplining police officers and other employees of the BPD included but were not limited to:

(a)    the constitutional obligation, pursuant to the Fourth, Fifth, and Fourteenth Amendments to the Constitution, not to initiate or continue a prosecution, and to cause a criminal defendant's deprivation of liberty, without probable cause to believe he or she has committed a crime;

(b)    the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, not to fabricate or manufacture evidence, including the coercion of confessions and witness statements through illegal detentions without probable cause, threats, lies, or trickery and the preparation of false or materially misleading or incomplete reports, for use against criminal suspects and defendants in criminal prosecutions and trials; and

(c)    the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, to make timely disclosure of evidence favorable to the defense to the prosecution for disclosure in turn to a criminal defendant for use during pretrial and trial proceedings at which the defendant's liberty is at stake.

468.    During all times material to this Complaint, the City, through its policymaking officials in the BPD, owed a duty to the public at large and to Mr. Boyd to implement policies, procedures, training, discipline, customs, regulations, and practices sufficient to prevent, deter, and avoid conduct by BPD employees that would result in the violation of the above-mentioned constitutional obligations.

469.    During all times material to this Complaint, these policymakers, including the Chief of the Homicide Detectives Unit, to whom policymaking responsibilities for homicide investigations had been delegated, knowingly and intentionally breached, or were deliberately indifferent to, this duty.

470.    Furthermore, these policymakers created substantial incentives for their employees to commit the above-described constitutional violations by pressuring police officers, particularly homicide detectives handling high-profile investigations, to close cases and initiate prosecutions through coercion, trickery, falsification of reports, and suppression of evidence.

471.    The aforesaid deliberate or de facto policies, procedures, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees) were implemented or tolerated by policymaking officials for the Defendant City—including but not limited to the Police Commissioner, the Chief of Detectives, and the Chief of the Homicide Detectives Unit—who knew, or should have known:

        (a)    to a moral certainty that such policies, procedures, practices, and/or customs concern issues that regularly arise during criminal investigations and prosecutions;

(b)     that such issues present BPD employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

(c)     that BPD employees facing such issues have strong incentives to make the wrong choices, especially given the pressure placed on BPD employees to make arrests, close cases, and secure indictments and convictions;

(d)     that the wrong choice by BPD employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury; and

(e)     that BPD employees had a history of making wrong choices in such matters.

472.    At the time of Mr. Boyd's arrest and prosecution, BPD policymaking officials were on notice of the risk of misconduct by BPD employees that would violate the constitutional obligations identified in ¶ 467.

473.    City policymaking officials were on notice based in part on numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division discussing the constitutional obligations of police officers during criminal investigations and prosecutions.

474.    City policymaking officials were on notice based on the inherent obviousness of the need to train, supervise, and discipline police officers with respect to their constitutional obligations to counteract the pressure on such officers to close cases and to obtain arrests and convictions.

475.     Indeed, BPD policymakers knew, prior to and during the period of the Crawford investigation, that numerous BPD officers had orchestrated an arrest and conviction in a high-profile robbery-murder case of a Black suspect using the same deceptive, coercive, and dishonest practices that the entire Homicide Detectives Unit then used in this case.

476.     In a federal habeas corpus proceeding then pending in Buffalo, the BPD was credibly accused of obtaining the arrest and conviction of the petitioner by coercing a confession from a Black suspect through lies and threats. As Chief Judge Curtin of this Court ultimately wrote in vacating the conviction, the BPD had illegally detained and interrogated numerous Black men without probable cause, including the petitioner, whom detectives picked up based upon an alleged anonymous tip.  They questioned the petitioner for hours at night when an attorney, friends and family could not offer their support to him, a tactic intended to heighten his anxiety.  They surrounded him, kept him in isolation, lied to him that he had been implicated by others, threatened him with dire consequences if he did not confess, suggested to him that he minimize his role, and promised him leniency in exchange for doing so—exactly the tactics used in Plaintiff Boyd's case.

477.     Chief Judge Curtin wrote that the police officers' lying to petitioner was "an obvious effort to trick him into implicating himself and others.  This police practice is to be soundly condemned.  Such deception clearly has no place in our system of justice." *Robinson v. Smith,* 451 F. Supp. 1278 (W.D.N.Y. 1978) (Curtin, C.J.).

478.     Notwithstanding their awareness of the widespread use of such tactics by the BPD, prior to the investigation of the Crawford Murder on January 2, 1976, and through Mr. Boyd's trial in April 1977, BPD policymaking officials failed to adequately instruct, train, discipline and supervise police officers with respect to their obligations (1) to disclose, to the

defense or to prosecutors, evidence impeaching the credibility of prosecution witnesses or tending to exculpate criminal suspects or defendants; (2) to make a record of coercion or inducement of witnesses and of witnesses' prior inconsistent statements; (3) to preserve rather than destroy their handwritten notes; (4) to refrain from fabricating evidence, including by using coercion or deception to obtain false confessions and witness statements and preparing false, materially misleading, or incomplete reports; and (5) to refrain from initiating or continuing a prosecution without probable cause.

479.     The issues of whether to preserve and to disclose evidence favorable to the defense to prosecutors or to the defense, how to ensure that evidence is not fabricated through false confessions and witness statements and false, misleading, or incomplete reports, and how to ensure that a prosecution is not initiated or continued without probable cause regularly arise in criminal investigations and prosecutions.

480.     Nevertheless, the BPD provided no or plainly inadequate *Brady*-related training; provided no or plainly inadequate training concerning making and preserving a record of information that was favorable to a criminal suspect or defendant; had no policies at all, or at least no policies that were adequately made known to detectives, requiring disclosure of *Brady* material; and did not discipline officers who failed their constitutional duty to disclose such information to prosecutors.

481.     Similarly, the BPD provided no or plainly inadequate training on interview and interrogation protocols to ensure the truthfulness of confessions and witness statements; affirmatively encouraged officers to illegally detain witnesses and suspects for interrogation and use or close their eyes to coercive interview and interrogation tactics likely to lead to false confessions and witness statements; provided no or plainly inadequate training on preparing

reports that are truthful, accurate, and complete; had no policies at all, or at least no policies that were adequately made known to detectives, discouraging officers from using coercive interview and interrogation tactics, including the unlawful detention of witnesses and suspects, including vulnerable teenagers, without probable cause, likely to lead to false confessions and witness statements; encouraged or at least tolerated detectives' practice to refrain from making a record of information favorable to suspects and defendants and to destroy their notes, and did not discipline officers who fabricated evidence by coercing false confessions and witness statements and preparing false, materially misleading, or incomplete reports.

482.    Indeed, rather than provide formal training on lawful interrogation techniques, the BPD endorsed on-the-job training by detectives who had a history and practice of unlawfully coercing witnesses, thereby perpetuating such practices and creating an atmosphere in which detectives assumed either that such techniques were appropriate or that, even if inappropriate or unlawful, they would get away with them without personal consequence to them.

483.    The BPD also provided no or plainly inadequate training on how to ensure that probable cause exists to initiate or continue a prosecution, including ensuring that the prosecution is not initiated or continued based on the use of manufactured or otherwise unreliable evidence.

484.    BPD policymaking officials had, before Mr. Boyd's arrest, issued no Patrol Guide provision or other written directive to officers concerning when, if at all, to disclose information favorable to a criminal suspect or defendant to prosecutors.

485.    With deliberate indifference to such misconduct, BPD policymaking officials failed to take adequate steps to train, supervise, or discipline BPD employees to prevent or deter such constitutional violations from occurring.

486.    As a result of the foregoing, at the time of the investigation of the Crawford

Murder, it was the policy, custom or practice of BPD detectives to coerce false statements from

suspects and witnesses, including inherently vulnerable teenagers, through unlawful

investigatory detentions without probable cause and other means, to prepare false or misleading

investigative reports, to fail to document information that was favorable to suspects and

defendants or to destroy their notes containing such information, and to withhold evidence and

information favorable to a criminal suspect or defendant from prosecutors.

487.    Additionally, detectives were encouraged to engage in such illegal activities by

their knowledge that it would be at the very least tolerated and excused by BPD policymakers for

whom closing high-profile cases with arrests was the priority.

488.    This is apparent from the knowing participation in such illegal activities, during

the Crawford investigation by Defendant Donovan, the Chief of the Homicide Detectives Unit,

and the policymaking official for the department with respect to homicide investigations.

489.    Indeed, he ratified the conduct of the unit he led and made it into municipal policy

by approving the arrest of Mr. Boyd and his friends, designating all the detectives in the unit as

co-arresting officers, and signing under oath the false criminal court complaint that initiated the

prosecution.

490.    That the entire Homicide Detectives Unit knowingly participated in fabricating a

case against Mr. Boyd and his young teenaged friends, documenting their fabricated case

through a series of false or misleading investigative reports, omitting information favorable to

the suspects from their reports, destroying their notes, and withholding information favorable to

a criminal suspect or defendant from the prosecutors, proves the existence of an anything-goes

culture of illegality that policymakers' indifference to such misconduct predictably had wrought and that such misconduct was, at that time, the policy, custom and practice of the BPD.

491.    The aforementioned unconstitutional or deliberately indifferent policies, procedures, training, discipline, customs, regulations, and/or practices of the BPD were a direct, foreseeable, proximate, and/or substantial cause of the violations of Mr. Boyd's federal constitutional rights in this case by employees of the BPD and his resulting injuries.

492.    By virtue of the foregoing, the Defendant City is liable for the violation of Mr. Boyd's constitutional rights pursuant to 42 U.S.C. § 1983 and his resultant injuries.

## COUNT VII
### 42 U.S.C. § 1983 and *Monell* Municipal Liability Against the County of Erie for the Misconduct of Prosecutors

493.    Mr. Boyd repeats and realleges each allegation contained in paragraphs 1 through 492 as if fully set forth herein.

494.    The Erie County District Attorney and his authorized delegates, at all relevant times, had final authority with respect to the training, supervision, discipline, and overall management of personnel employed by or assigned to the ECDA with respect to all of the office's functions, including the investigation and prosecution of criminal cases, and constituted County policymakers for whose actions or omissions the County is liable.

495.    The District Attorney, at all relevant times, was and is an elected officer of the County, and the ECDA was and is substantially funded out of the County's budget.

496.    The District Attorney was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

497.    The DA and his assistant district attorneys are agents and employees of the Defendant County.

498.     Under New York State law, the County, at all relevant times, was liable for torts committed by County officers and employees, including the District Attorney and his assistants. *See* N.Y. County Law §§ 53, 941.

499.     The County represents such officers and employees in judicial proceedings and indemnifies them because they are County officials.

500.     At the time of Mr. Boyd's criminal trial, as a criminal defendant, he was entitled, under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, to timely disclosure of all material information that was in the actual or constructive possession, custody, or control of the ECDA and that was favorable to the defense, including but not limited to exculpatory information that tended to contradict the prosecution's case or otherwise show he was innocent, and impeachment information that tended to undercut the credibility of the witnesses against him, known as "*Brady* material."

501.     The prosecution was constitutionally required to disclose *Brady* material as soon as reasonably possible regardless of whether the defense had made a specific request for it.

502.     The prosecution was constitutionally required to find out about and disclose such information, whether it was in its actual possession or in the possession of any police department that had been involved in the investigation or prosecution of the matter.

503.     This was a continuing obligation even after a conviction at trial, such as during proceedings brought by a convicted defendant challenging the fairness of his conviction.

504.     While the right to timely disclosure of *Brady* material was intended to guarantee the fairness of a criminal trial, the prosecution also had an obligation under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution to disclose evidence favorable to the defense early in a criminal prosecution, where it was so clearly relevant to

whether the prosecution should continue, or the defendant should be released on bail, that the suppression of it would shock the conscience.

505.    Similar to the *Brady* obligation is the state constitutional requirement, established by *People v. Rosario,* 9 N.Y.2d 286 (1961), requiring disclosure at trial of the prior recorded statements of prosecution witnesses so that defense counsel, singularly dedicated to his client's cause, could decide how to use such material to impeach such witnesses.

506.    Often, *Rosario* material also contained information that was favorable to the defense as defined by *Brady* and its progeny.

507.    Related to *Brady* is a prosecutor's constitutional obligation, at all stages of a criminal prosecution, not to rely on or fail to correct false or misleading evidence or argument.

508.    The suppression of evidence favorable to the defense from the court during a preliminary hearing or bail hearing, or from a grand jury deciding whether to vote an indictment, and from a petit or trial jury, likely would leave an impermissibly false or misleading impression with the fact finder about the strength of the evidence supporting the prosecution's case and about the defendant's guilt.

509.    The federal constitutional obligation to make timely disclosure of evidence favorable to the defense for use during pretrial and trial proceedings superseded any provisions of the state's Criminal Procedure Law or the *Rosario* rule to the extent such state rule was less protective of a criminal defendant's rights.

510.    In other words, the federal constitutional requirement of prompt disclosure of evidence favorable to the defendant, irrespective of whether the defense had made a specific request, applied even though state discovery provisions required a specific request for discovery

material and permitted the prosecutor to withhold the prior recorded statements of its witnesses until after they had completed their direct testimony at trial.

511.    Such state rules did not provide sufficient, timely disclosure to enable the defense a reasonable opportunity under *Brady*'s constitutional rule to investigate the information, integrate it into the defendant's trial strategy, and prepare an effective cross-examination.

512.    Furthermore, a prosecutor had a constitutional obligation not to conduct himself before a jury in a manner that would deprive a criminal defendant of his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

513.    At the time of Mr. Boyd's trial in 1977, there were well-established rules of behavior for prosecutors before a jury, particularly with respect to opening arguments and summations, which were intended to ensure a fair trial.

514.    If serious enough, the violation of such rules would deprive a criminal defendant of his federal constitutional rights.

515.    The well-established rules regarding prosecutorial conduct prohibited prosecutors from making false or misleading factual assertions or arguments, making arguments calculated to distract the jury by appealing to its prejudices and emotions, arguing "facts" or "evidence" that were not in the record, expressing the prosecutor's personal belief in the defendant's guilt or as to a witness's credibility, vouching for a witness's credibility, calling the defendant or his witnesses liars, ridiculing or belittling the role of defense counsel, or implying falsely that the defendant had a burden of proof.

516.    The prosecutors handing the prosecution of Mr. Boyd violated all these rules.

517.    As set forth above, the prosecutors of Mr. Boyd relied on false or misleading evidence and argument to cause a judge to find probable cause to continue the prosecution at a

preliminary hearing and to keep Mr. Boyd in jail, to deceive a grand jury into voting to indict

Mr. Boyd and the other defendants, and to convict Mr. Boyd at trial.

518.    They suppressed from the court, the grand jury, the trial jury, and, of course, from

the defense, evidence that proved that the witnesses against Mr. Boyd were lying or not credible,

that police had coerced them into lying, that a known third party was likely to have committed

the crime, and that similar crimes had been committed in the area after Mr. Boyd had been taken

into custody.

519.    Had this evidence been timely disclosed, Mr. Boyd would have been released

early in the proceedings and ultimately would have achieved a more favorable outcome to his

trial.

520.    Further, as shown above, the trial prosecutor, ADA Drury, delivered an

inflammatory summation which violated virtually all the above rules of conduct for prosecutors,

violated Mr. Boyd's constitutional right to a fair trial, and contributed as well to the jury's guilty

verdict.

521.    Thereafter, prosecutors at the ECDA, reflecting the ECDA's ongoing indifference

to *Brady* violations, successfully opposed Mr. Boyd's motions to overturn his conviction by

misleading the courts about whether specified items had been disclosed at trial and whether such

items were favorable to the defense under *Brady* at all.

522.    This behavior prolonged for many years Mr. Boyd's imprisonment as well as the

deep restrictions upon his liberty as a parolee.

523.    Individually and collectively, the above misconduct deprived Mr. Boyd of his

constitutional rights to due process and a fair trial and to be free from unreasonable seizure and

was a substantial cause of Mr. Boyd's constitutional injuries.

524.     Individually and collectively, these violations of Mr. Boyd's constitutional rights were directly, foreseeably, proximately, and/or substantially caused by the unlawful policies, customs, or practices of the ECDA as well as by the deliberate indifference of policymakers at that office, acting on behalf of the Defendant County, to the occurrence of such constitutional violations.

525.     Under the principles of municipal liability for federal civil rights violations, at all relevant times, the District Attorney or his authorized delegates had final managerial responsibility for establishing lawful policies of the office and for training, instructing, supervising, and disciplining attorneys and other employees of the ECDA regarding their constitutional obligations.

526.     Nevertheless, at the time of Mr. Boyd's trial, the ECDA maintained unlawful policies, customs, or practices, and was indifferent to violations of fair trial rights, all of which were a substantial cause of the violations of his constitutional rights and to his damages.

527.     Specifically, first, the ECDA had an unlawful policy, custom, or practice of impermissibly limiting its obligation to disclose *Brady* material to the defense to include only truly "exculpatory"—rather than favorable—material.  This baseless narrowing of the *Brady* doctrine's scope, which encompasses not only exculpatory material but also all other information favorable to the defense, such as impeachment evidence and evidence identifying alternate perpetrators of the crime, deprived criminal defendants of their constitutional right to a fair trial.

528.     Second, the ECDA had an unlawful policy not to disclose *Brady* material to the defense, the court, or the grand jury at the preliminary hearing, bail hearing, and grand jury stages of a case, thereby deceiving fact finders about the strength of the prosecution's case and causing criminal defendants to be unfairly and unreasonably deprived of their liberty.

529.     Third, the ECDA had an unlawful policy, custom, or practice of not disclosing evidence favorable to the defense, *even* exculpatory evidence, for use at trial unless the defense specifically requested it, and then often did not disclose it anyway.

530.     Fourth, the ECDA had an unlawful policy, custom, or practice to disclose only formal witness statements that were signed by the witness, as opposed to statements memorialized in police reports or that were handwritten only, and to make even this limited disclosure only after such witness completed his direct examination at trial, thus making it difficult, if not impossible, for the defense to investigate the information, incorporate it into counsel's opening statement and overall defense strategy, and plan an effective cross-examination.

531.     Fifth, the ECDA had an unlawful policy, custom, or practice of not disclosing police reports containing information favorable to the defense obtained from witnesses who were not called by the prosecution to testify.

532.     Sixth, the ECDA had a policy, custom, or practice for prosecutors, especially in high profile cases, to make inflammatory, misleading, and even false summations that violated the aforementioned well-established rules of behavior and which, like *Brady* violations, deprived criminal defendants such as Mr. Boyd of their constitutional right to a fair trial.

533.     Indeed, prosecutors would give summations that were false or misleading precisely because they contradicted evidence that the same prosecutors had suppressed under *Brady.*

534.     Finally, seventh, the ECDA had a policy, custom, or practice of continuing to withhold *Brady* material when faced with post-trial motions by a defendant challenging the lawfulness of his conviction, thereby prolonging the defendant's imprisonment.

535.    The District Attorney and his designees, as policymakers for the ECDA and the County, encouraged such violations to occur through their policy of deliberate indifference to them.

536.    At all relevant times, the ECDA had no prosecution manual or other written rules or procedures regarding *Brady* and *Rosario* disclosure or trial advocacy, including summation behavior.

537.    At all relevant times, the ECDA had no employee handbook, manual, or other document setting forth any disciplinary process for prosecutorial misconduct, or potential sanctions for them, nor was any such process made known to employees in some other manner as a deterrent to such misconduct.

538.    At all relevant times, even though the District Attorney knew or should have known that prosecutors on his staff, including the most experienced prosecutors handling the ECDA's most important cases, were committing constitutional violations that deprived criminal defendants of their constitutional right to a fair trial, he did not supervise, or require supervision of, prosecutors in connection with such functions.

539.    He and his designees kept no record of misconduct by individual prosecutors.

540.    He neither investigated nor disciplined prosecutors who violated rules designed to protect the fair trial rights of criminal defendants.

541.    He did not train prosecutors in such functions, even when he became aware or should have been aware of appellate decisions that showed the ECDA's policies, customs or practices were unlawful.

542.    The knowledge among ECDA prosecutors that there would be no personal consequence for them if they violated the due process and fair trial rights of criminal defendants

encouraged prosecutors, including the prosecutor handling Mr. Boyd's case, to believe that such violations would go unpunished.

543.    The District Attorney's policy, custom, and/or practice of approval, ratification of, or deliberate indifference to, violations by ECDA prosecutors of their constitutional obligations to afford criminal defendants a fair trial foreseeably encouraged such violations to continue.

544.    Just four years before Mr. Boyd's prosecution was initiated, in *Giglio v. United States*, 405 U.S. 150 (1972), the United States Supreme Court held that a prosecutor's office is responsible for disclosing impeachment evidence known to members of the office even if the trial prosecutor in the given case is not aware of such evidence.

545.    The same rule applied to evidence known to police detectives who worked on the case.

546.    In the same decision, the Court advised district attorneys to adopt office-wide information-management systems to keep track of impeachment evidence to make sure that the assigned prosecutor would learn about it and disclose it.

547.    Nevertheless, the ECDA adopted no system of checklists, receipts, or other procedures to ensure that all investigative records of the BPD would be made available to the assigned prosecutor so that he could fulfill his *Brady* obligations.

548.    The absence of any such procedures created the predictable risk that, in a case like Mr. Boyd's, police records containing evidence favorable to the defense would not be obtained or disclosed.

549.    In *United States v. Agurs*, 427 U.S. 97 (1976), handed down while Mr. Boyd's case was awaiting trial, the United States Supreme Court explicitly held that prosecutors are

required under *Brady* to disclose information favorable to the defense regardless of whether the defense had specifically requested such disclosure.

550.    This decision made clear that the ECDA policy, custom, or practice to withhold such material absent a specific request was unconstitutional, yet the District Attorney failed to train prosecutors about this decision or make clear that the policy, custom, or practice of the office in this regard had to change.

551.    As a result, Mr. Boyd's prosecutor, and the prosecutors involved in handling the trials of Messrs. Gibson, Walker and Martin, did not disclose evidence favorable to the defense unless it was specifically requested in a discovery motion or, under the ECDA's overly restrictive view of the state *Rosario* obligation, had to be disclosed as a witness's formal, signed, prior-recorded statement.

552.    Court decisions before, during, and immediately after Mr. Boyd's trial revealed the misunderstanding of ECDA prosecutors regarding their *Brady* and related *Rosario* obligations and the ECDA's policy, custom, and practice to apply *Brady* and *Rosario* in an overly narrow manner.

553.    In *People v. Anderson*, 25 A.D.2d 602 (4th Dept. 1966), the Appellate Division unanimously reversed a defendant's felony assault conviction because of the prosecution's failure to disclose the testimony of the complainant and a second witness before a separate grand jury investigating a second defendant's involvement in the same incident.

554.    In *People v. Kampshoff,* 53 A.D.2d 325, 332 (4th Dept. 1976), the Appellate Division did not reverse, but it noted that—as in Mr. Boyd's case—the prosecution had failed to disclose a key witness's statements recorded in police reports.

555.    In *People v. Mitchell,* 99 Misc.2d 332 (Sup. Ct., Erie Co. 1979), a Supreme Court justice had to order the ECDA to disclose grand jury testimony where there was "no question" that it was "exculpatory."

556.    The court warned that "compliance with Brady cannot be made with clue-dangling or gamesmanship in place of full disclosure." *Id.* (quoting *People v. Bottom,* 76 Misc.2d 525, 529 (Sup. Ct., N.Y. 1974)).

557.    In *People v. Cadby,* 75 A.D.2d 713 (4th Dept. 1980), the Appellate Division held that the prosecution had impermissibly withheld the prior statement of a key witness, the complainant, recorded in a police report, evidently—as in Mr. Boyd's case—because it was not a signed statement.

558.    The prosecution waited to disclose the statement until the defense elicited its existence from the prosecution's last witness, the police officer who had recorded it—too late to use it to cross-examine the declarant.  The Appellate Division remanded the case for a hearing into how prejudicial the error was to the defendant's right to a fair trial.

559.    In *Matter of Potenza v. Kane,* 79 A.D.2d 467 (4th Dept. 1981), a mistrial had to be declared because of the trial prosecutor's apparent negligence in failing to disclose a tape recording of the defendant.

560.    In *People v. Clark,* 89 A.D.2d 820 (4th Dept. 1982), the Appellate Division did not reverse due to lack of sufficient prejudice, but it noted that the prosecution did not disclose exculpatory material until near the close of the People's direct case.

561.    That the policy of the ECDA at the time of Mr. Boyd's trial was to achieve convictions at any cost and to tolerate, if not encourage, misconduct is shown by various circumstances that include, but are not limited to:

- 75 -

(a) the promotion of prosecutors to executive positions, and to handle the most significant of the office's trials, who had a reputation for and a history of such misconduct;

(b) the failure to adopt or utilize any manuals, rules, procedures, or training to prohibit or prevent such misconduct;

(c) the failure to take any disciplinary action when prosecutors committed misconduct or were found by courts to have done so, and

(d) the DA's brief on appeal defending ADA Drury's summation misconduct in Mr. Boyd's case and similar misconduct by prosecutors in other cases.

562. This policy of deliberate indifference created an anything-goes or winning-is-everything mentality that was a substantial cause of the constitutional violations in Mr. Boyd's case and his resultant injuries.

563. The District Attorney's blind eye to outrageous behavior by one of the county's most well-known prosecutors, ADA Albert M. Ranni, set the tone for the ECDA and revealed the DA's indifference to misconduct similar to that which led to Mr. Boyd's conviction.

564. Mr. Ranni was notorious in the Buffalo criminal justice community for his overzealous and improper tactics.

565. Nevertheless, the DA assigned him some of the most important cases in the office, appointed him chief of the felony bureau in 1973, and then promoted him to deputy DA in charge of prosecutions in 1982.

566. His promotions and continuation as a high-level executive occurred notwithstanding his history of misconduct and a series of extraordinarily harsh court decisions condemning it.

567.     While Mr. Boyd's prosecution was pending in 1976, Mr. Ranni used pervasively improper tactics to obtain the conviction of a completely innocent man, J. L. Ivey, on three counts of murder and two counts of first-degree robbery.

568.     Mr. Ranni brought the case based upon patently improper eyewitness identifications by witnesses to whom the police repeatedly showed Mr. Ivey's photograph, even after they initially failed to recognize him and even though they had given descriptions of the perpetrator that did not fit Mr. Ivey's appearance.

569.     In overturning the conviction, the Appellate Division, in a unanimous decision by five justices, deplored Mr. Ranni's behavior throughout the trial.  *See People v. Ivey,* 83 A.D.2d 788 (4th Dept. 1981).

570.     It wrote that "the record is replete with numerous and repeated acts of improper and prejudicial conduct … which deprived the defendant of a fair trial."

571.     Writing that it would discuss just a few of Mr. Ranni's many acts of misconduct, the court noted that he repeatedly offered into evidence, in front of the jury, clearly inadmissible composite sketches that the court had ordered to be excluded, then made a "highly improper" argument to the jury "insinuat[ing] that the court's ruling unfairly precluded him" from offering such evidence.

572.     The court "condemn[ed] the prosecutor's inflammatory and prejudicial opening statement and summation," which tried to scare the jury that an acquittal "would mean that the 'murderer goes free,'" as well as his remarks to the jury implying "that he knew some things about the case he wished that they knew …"

573.     The court also "condemned" the prosecutor's "attempts in his summation to inject sympathy for the victim" and his "disparagement" of the defendant's alibi witnesses and his lawyer.

574.     Following the reversal of Mr. Ivey's conviction, new evidence emerged that someone else committed the crime, and he was fully acquitted at his retrial.

575.     Thereafter, the New York Court of Claims, finding by clear and convincing evidence that Mr. Ivey was innocent, awarded him substantial damages for the unjust conviction that Mr. Ranni's misconduct had brought about.

576.     There was no negative consequence to Mr. Ranni even though his egregious misconduct had caused the conviction, and years of imprisonment, of an innocent man, and cost the taxpayers the expense of a civil settlement.

577.     In 1977, the year that Mr. Boyd and his three friends were all tried for the Crawford Murder, Mr. Ranni used similar tactics to gain the conviction of Kenneth Johnson for robbery and rape.

578.     On appeal, all five justices of the Appellate Division condemned Mr. Ranni's behavior.  *See People v. Johnson*, 62 A.D.2d 555 (4th Dept. 1978).

579.     In a rare rebuke, the majority opinion of three justices called out Mr. Ranni by name in expressing their "concern with misconduct of Mr. Ranni throughout the trial" while warning, in an apparent indirect reference to the County, that "unadulterated unfairness and deceit have become the rule."

580.     The majority did not reverse the conviction because of the overwhelming evidence of the defendant's guilt, but in the dissenting opinion by Justice Hancock, he and Justice Witmer detailed the misconduct by Mr. Ranni that had disturbed the entire court.

581.    Justice Hancock wrote that "the record is … permeated with acts of improper, overreaching and prejudicial conduct by the prosecuting attorney … ."

582.    Justice Hancock recorded his and Justice Witmer's "particular disapproval" of Mr. Ranni accusing the defense of having "sugared up," "staged," and "rehearsed" the testimony of defense witnesses.  They condemned as "highly improper" his having accused the defendant of lying when he pleaded not guilty to unrelated charges—a formal process that occurs in virtually every criminal case—only to later admit guilt, and then argued in summation that the defendant's not guilty plea in the case at hand was similarly false:

> "Now, the mere assertion of innocence isn't proof.    You know now that this assertion, this claim is often made by guilty people to avoid justice.  The defendant himself raised this claim on prior occasions:  other crimes—not rape crimes—other crimes; pleaded not guilty."

583.    Justice Hancock disapproved of the prosecutor's tactics "in asking irrelevant questions of the defendant … which were obviously asked for their prejudicial effect," such as whether he remembered admitting to a judge in an unrelated case that he had "called the arresting officer … a 'motherfucker,'" and portraying the defendant as a "hard drug traffic[ker]" through repetitive questioning distorting his involvement in small marijuana sales.

584.    Finally, Justices Hancock and Witmer condemned Mr. Ranni for deriding defense counsel by calling him "Dr. Hocus Pocus" and saying that "the D.A. is not going to prosecute for perjury" because defense counsel's arguments had not been made under oath.

585.    Summing up, Justice Hancock wrote:

> From the record there clearly emerges the picture of an overbearing prosecutor obsessed with the idea of obtaining a conviction at any costs, ignoring the court's rulings, deliberately asking improper and prejudicial questions, and engaging in unpardonable efforts in comments during the trial and in summation to disparage defense counsel and destroy his credibility with the jury.

586.     Subsequently, Federal District Judge John Elfvin, in *Johnson v. Smith*, CIV 81-329E, issued a rare grant of federal habeas corpus relief, vacating the defendant's conviction because Mr. Ranni's pervasive misconduct had violated his federal constitutional right to due process and a fair trial.

587.     Significantly, the court noted that the District Attorney's Office had conceded that Mr. Ranni's conduct had been "improper."

588.     Notwithstanding these decisions and his acknowledgment of Mr. Ranni's misconduct, the District Attorney permitted Mr. Ranni to continue to handle the most notorious cases the office prosecuted, unrestrained by basic rules of fairness, and promoted him to Deputy DA in charge of prosecutions.

589.     In the famous multiple-murder prosecution of Pvt. Joseph Christopher in the mid-1980s, the Appellate Division affirmed the manslaughter conviction because of overwhelming evidence of guilt but refused to "condone" Mr. Ranni's behavior.  *People v. Christopher*, 170 A.D.2d 1020 (4th Dept. 1991).  Noting that the State had conceded his misconduct, the court wrote:

> [T]he Trial Assistant engaged in inappropriate and improper conduct during his cross-examination of a defense psychiatrist, his direct examination of the People's psychiatrist, and on summation. The Trial Assistant, whose misconduct has resulted in at least one reversal of a murder conviction by this Court *(see, People v. Ivey,* 83 A.D.2d 788), consistently referred to matters not in evidence, made himself an unsworn witness, flouted rulings by the trial court on evidentiary matters, and made flippant remarks which detracted from the seriousness of the proceedings.

590.     Other prosecutors in the office, including in Mr. Boyd's case, engaged in misconduct similar to Mr. Ranni's both before and immediately after Mr. Boyd's trial.

591.    The conduct, as well as the court decisions noting it, demonstrated the existence of unlawful policies, customs and practices; the DA's failure to take any disciplinary or other remedial action showed the ECDA's policy of deliberate indifference to such misconduct.

592.    In *People v. Moore,* 26 A.D.2d 902 (4th Dept. 1966), the Appellate Division reversed the conviction and required a new trial because the prosecutor, during his summation, improperly commented on the defendant's exercise of his constitutional right to remain silent and "exceeded proper limits in telling the jury that if they wanted to live in a community where crime runs rampant they should acquit the defendant."

593.    In *People v. Slaughter,* 28 A.D.2d 1082 (4th Dept. 1967), the court reversed a murder conviction after the prosecutor, ridiculing the defendant's insanity defense, stated falsely in summation that if the defendant was acquitted, he would be "on the streets again within 30 days," decried permissive societal attitudes, urged the jury not to "extend to the Henry Slaughters of the world the license to strike out and kill … or are you going to call them to task?  Are you going to protect, finally here, … the rights of the community in which you live."

594.    In *People v. Zachery,* 31 A.D.2d 732 (4th Dept. 1968), the Appellate Division reversed a robbery conviction due to the "prejudicial conduct of the prosecutor in calling to the witness stand a co-defendant with advance knowledge that he was going to invoke the privilege against self-incrimination and refuse to answer questions" and the "impropriety" in eliciting the out-of-court statement of a co-defendant incriminating the defendant.

595.    In *People v. Washington,* 32 A.D.2d 605 (4th Dept. 1969), the Appellate Division reversed a robbery conviction where the prosecutor improperly cross-examined the defendant repeatedly whether he had twice kicked a police officer in the groin, in an improper effort "to persuade the jury that defendant was an habitual groin kicker."

596.    In *People v. Damon,* 24 N.Y.2d 256 (1969), the Court of Appeals reversed a child sexual assault conviction because an Erie County prosecutor in summation argued that the defendant was "a homosexual or deviate," improperly vouched for the police while personally attacking defense counsel, falsely argued prejudicial "facts" that were not in evidence, and made inflammatory remarks to the jury about the nature of the crime.

597.    In *People v. Cardinale,* 35 A.D.2d 1073 (4th Dept. 1970), although the defendant was charged only with criminal contempt, the court reversed the conviction because of the prosecutor's "highly prejudicial" opening statement that the grand jury had heard evidence that the defendant, police officers, and public officials had been involved in a gambling conspiracy.

598.    In *People v. Reingold,* 44 A.D.2d 191 (4th Dept. 1974), the Appellate Division reversed a burglary conviction because the prosecutor, in bad faith, cross-examined the defendant to show he had a criminal propensity in a manner that was "so improper and inflammatory that it made an impartial consideration of the competent evidence adduced at trial virtually impossible."

599.    In *People v. Ketchum*, 35 N.Y.2d 740 (1974), the Court of Appeals noted "grievous misconduct by the prosecution in cross-examination and summation which we strongly condemn."

600.    In *People v. Greer,* 49 A.D.2d 297, 303-04 (4th Dept. 1975), the court reversed a rape conviction because of the prosecutor's "improper" cross-examination of the defendant impermissibly intended to show his criminal propensity.

601.    In *People v. Donaldson,* 49 A.D.2d 1004 (4th Dept. 1975), the Appellate Division, in reversing the conviction, condemned the prosecutor for arguing improper inferences from hearsay evidence, improperly arguing a negative inference against the defendant for exercising

his constitutional right not to testify, and for his "entirely improper and prejudicial" urging of the jury to credit the testimony of a prosecution witness with a long criminal record because the *grand jury* had believed him.

602.    In *People v. Balsano,* 51 A.D.2d 130 (4th Dept. 1976), the court reversed a conviction for unlawful imprisonment where, among other things, the prosecutor improperly questioned the defendant about criminal conduct not related to his credibility, improperly elicited that he had a pending charge, improperly asked the jury to draw a negative inference from the defendant's failure to call a witness, and repeatedly forced the defense to object to "inflammatory" remarks, causing the trial judge to "properly admonish[] the prosecutor."

603.    In *People v. Weston,* 51 A.D.2d 881 (4th Dept. 1976), the Appellate Division reversed a conviction for burglary, rape, and robbery because the prosecutor cross-examined the defendant in bad faith about his criminal propensity.  The court also agreed with the defendant's condemnation of the prosecutor's "inflammatory and intimidating" remarks in summation and admonished him not to "put his personal credibility behind his statements and make himself an 'unsworn witness.'"

604.    In *People v. Mordino,* 58 A.D.2d 197 (4th Dept. 1977), the Appellate Division reversed a high-profile, organized crime related murder conviction obtained in 1975 because, among other things, the prosecutor gave an "inflammatory" summation during which he improperly castigated the defendants as "vultures" and argued their guilt by association ("if you walk like a duck and you talk like a duck and you keep the company of ducks then you are a damn duck").

605.    In *Robinson v. Smith,* 451 F. Supp. 1278 (W.D.N.Y. 1978) (Curtin, C.J.), a federal court vacated a murder conviction that the ECDA obtained through its knowing use of a

confession that Buffalo police coerced from a suspect by falsely claiming an accomplice had confessed "in an obvious effort to trick him into implicating himself and others.  This police practice is to be soundly condemned.  Such deception clearly has no place in our system of justice."

606.    In *People v. Keller,* 67 A.D.2d 153 (4th Dept 1979), the Appellate Division unanimously reversed an assault and weapons conviction due to pervasive misconduct by an ECDA prosecutor.

607.    In an unanimous opinion by five justices, the *Keller* court condemned the prosecutor for his "egregious errors" and "grossly improper remarks" in repeatedly referring to the defendant and his witnesses as liars, repeatedly expressing his personal opinion about witnesses' credibility, implying in summation there was a lie detector test and other evidence the jury had been prevented from hearing, and making various "irrelevant and inflammatory" remarks which, in their totality, "patently deprived the defendant of a fair trial … ."

608.    In *People v. King,* 72 A.D.2d 930 (4th Dept. 1979), the Appellate Division, while reversing an attempted robbery conviction because of the misconduct of the trial judge, noted that the prosecutor joined him in some of it, including holding *ex parte* "conferences … outside of the presence of defense counsel."

609.    In *Matter of Potenza v. Kane,* 79 A.D.2d 467, 472 (4th Dept. 1981), while refusing, following a mistrial, to bar a second trial on the basis of pervasive prosecutorial misconduct, the Appellate Division noted that many of the defense counsel's objections to the prosecutor's improper opening statement had been sustained and the court had "minimized the possible prejudice by admonishing the prosecutor before the jury."  The Appellate Division also

noted that it did not "condone" the prosecutor's repeated failure to follow the court's warning against leading questions.

610.    In *People v. Terry,* 83 A.D.2d 491 (4th Dept. 1981), the Appellate Division reversed a robbery conviction in part because of the prosecutor's "totally improper" argument that the jury should hold against the defendant his failure to produce to testify as an alibi witness a government employee whose identity was unknown to him.

611.    In *People v. Mordino,* 83 A.D.2d 775 (4th Dept. 1981), the court declined to reverse a murder conviction for prosecutorial misconduct, but only because defense counsel did not object to many of the improper questions, where the defense did object the court gave "curative" instructions to prevent prejudice, and the conduct was not "*egregiously* improper … as would warrant a reversal" (emphasis added).

612.    In *People v. Vance,* 89 A.D.2d 347 (4th Dept. 1982), the Appellate Division reversed a robbery conviction because the prosecutor acted as an investigator and then asked the jury to credit his personal investigative findings over the defense case.  The court concluded:  "In a case such as this where credibility is the only issue, a prosecutor who oversteps the bounds of legitimate advocacy and makes himself an 'unsworn witness' against the defendant affects the fairness of the trial and unduly prejudices the defendant."

613.    In *People v. Herlan,* 99 A.D.2d 647 (4th Dept. 1984), the court reversed a burglary conviction because the prosecutor repeatedly questioned the defendant during cross-examination about "why would a police officer of sixteen years risk his pension to perjure himself in court over you?  Any reason?" and made similar improper arguments during summation.

614.    In *People v. Grafton,* 115 A.D.2d 952 (4th Dept. 1985), the Appellate Division affirmed an order dismissing a rape indictment because the prosecutor, in the grand jury,

"introduced irrelevant and prejudicial evidence … , intimidated witnesses whose testimony would have been helpful to defendant, asked witnesses irrelevant and improper questions of a highly personal nature in an effort to embarrass them, and deliberately confused and deceived witnesses and the Grand Jury by selective presentation of evidence."

615.    The misconduct of three different homicide prosecutors during the four trials related to the Crawford Murder further showed the existence of unlawful policies, customs, and practices at the ECDA regarding *Brady* disclosure, the use of false, misleading, and inflammatory evidence and argument to deny criminal defendants their right to a fair trial, and the District Attorney's tolerance of such unlawful behavior.

616.    The first of Mr. Boyd's co-defendants to be tried was Darryn Gibson, who was brought to trial on January 10, 1977.

617.    Prior to his trial, Mr. Gibson's defense counsel made only a general request that the ECDA produce all *Brady* material but did not make specific requests such as for photographs or witness statements favorable to the defense.

618.    ADA Drury prosecuted Mr. Gibson's case.

619.    He was one of the District Attorney's top trial prosecutors who handled some of the ECDA's most important cases.

620.    Thus, his pervasive misconduct in the Gibson and Boyd prosecutions is highly probative of the unlawful policies, customs, practices and behavior that the District Attorney approved of or consciously tolerated.

621.    Consistent with the policies, procedures, practices, and/or customs of the ECDA, ADA Drury, with regard to the Gibson trial:

(a)     did not turn over any statements, reports, photographs, or other documentary evidence, favorable to the defense under *Brady*, in advance of the trial;

(b)     Only disclosed the formal, sworn statements in question-and-answer format of testifying witnesses, but not oral statements summarized in police reports, even where such statements were exculpatory or impeaching;

(c)     did not disclose statements until the end of each witness's direct examination, which deprived defense counsel of the ability to investigate the information, to integrate it into a defense strategy, to use it during his opening statement, or to fully prepare to use it during his cross-examination of the witness;

(d)     did not disclose the statements of non-testifying witnesses that were favorable to the defense; and

(e)     only disclosed the photographs and other items of evidence that the prosecution used in its direct case, but not other photographs that tended to contradict the prosecution's case.

622.    During the Gibson trial, Mr. Gibson's defense counsel became aware through cross examination of Larry Watson that this witness had given another statement to the BPD, which ADA Drury had not disclosed and pressed for disclosure of the report that summarized such statement.

623.    Rather than agree to provide it, ADA Drury initially suggested that the defense, by not having previously requested the report, had waived any right to disclosure, even though the defense had not known about it.

624.    Continuing to resist disclosure, he said further that, before agreeing to disclose the police report, he would have to check with his office's appellate section.

625.    However, the court directed him to make disclosure.

626.    ADA Drury then belatedly disclosed to Mr. Gibson's defense counsel a single police report summarizing one of Mr. Watson's prior statements, but not all of Mr. Watson's prior statements, even though the undisclosed statements contradicted his trial testimony and tended to incriminate him in the murder itself.

627.    Nor did ADA Drury disclose the statements of other witnesses tending to implicate Mr. Watson in the murder.

628.    Even as to the statement he did disclose, it was too late for defense counsel to incorporate the information into his overall defense theory or even to utilize it during cross-examination:  Mr. Watson already had completed his testimony.

629.    Caught having failed to disclose statements in police reports that were not in question-and-answer form and under oath, ADA Drury then belatedly disclosed additional police reports dated February 11, 1976, containing the unsigned statements of Messrs. Woodruff and Hough on that date, and the police report containing the exculpatory statement of Shirley Floyd that the boys were playing cards at her apartment the night of the Crawford Murder.

630.    He acknowledged that these reports likely constituted *Brady* material.

631.    He blamed his late disclosure of them on his having only just received them from the BPD, even though the case had been pending for a year.

632.    However, ADA Drury did not disclose the rest of the *Brady* material in his and/or the BPD's possession contradicting or impeaching Messrs. Woodruff and Hough, showing the coercive behavior of the detectives, and inculpating third party suspects Larry Watson and Jerome Boyd.

633.    After the trial, he took all witness statements back, making sure they would not be disclosed to Mr. Gibson's co-defendants.

634.    During his summation, ADA Drury, despite his knowledge of the fundamental rules regarding advocacy, violated most of them.

635.    He misrepresented that Mr. Woodruff was questioned about the murder and admitted his participation in the presence of his father and his minister, when in fact, undisclosed police reports showed the young man had been coercively interrogated on January 12, 1976, alone, for hours.

636.    He falsely represented that Mr. Woodruff's questioning "never occurred under police pressure."

637.    He falsely represented that "all the paper work and everything else concerned with this was furnished to this defense counsel," even though he knew, or should have known, that numerous police documents had been withheld from the defense, including reports that were obviously favorable to the defense under *Brady.*

638.    He argued to the jury the truthfulness of Mr. Watson's testimony that Mr. Watson had run to his home, abandoning Mr. Crawford because he had seen the door to his house open, without disclosing Mr. Watson's inconsistent statements on this issue and any of the additional witness statements circumstantially inculpating Mr. Watson in the murder itself.

639.    Mr. Gibson was convicted of second-degree murder on January 21, 1977.

- 89 -

640.   When Mr. Boyd was then brought to trial later in 1977, ADA Drury, who handled that trial as well, did *not* disclose the police reports that he had belatedly disclosed to Mr. Gibson's counsel and then demanded back, let alone the additional *Brady* material he had fully withheld from Mr. Gibson.

641.   Of the statements he did disclose, he did so only after the witness had completed his or her direct examination, thereby depriving the defense of the opportunity to put such material to full use.

642.   Mr. Drury also made a slew of improper arguments during his summation that denied Mr. Boyd his right to a fair trial, *see* ¶¶ 634-638, *supra,* which the DA then ratified by defending on appeal as "proper in all respects."

643.   Two other prosecutors, ADAs James Verrastro and David Henry, handled the trial prosecution of Mr. Boyd's friend, John Walker, beginning June 6, 1977, and Floyd Martin's case later the same year.

644.   Like ADA Drury and other prosecutors in the office, their practice, too, was to not disclose prior witness statements until after the witness testified on direct and even then only disclosed formal, signed statements.  They, too, did not disclose statements or evidence, even though such materials favored the defense under *Brady,* if the witness did not testify or the statement or evidence was not specifically requested by the defense.

645.   Accordingly, ADAs Verrastro and Henry withheld the same material and evidence at the Walker and Martin trials that ADA Drury had withheld at Mr. Boyd's trial, with one exception.

646.   After counsel for Floyd Martin specifically demanded disclosure of all crime scene photographs, not just the ones the prosecution was itself using, the prosecutors disclosed

the two additional photographs, which had been withheld during the prior three trials, to Mr. Martin's attorney.

647.    During the Walker trial, ADA Henry continued the pattern of ECDA prosecutors making false, misleading, or otherwise improper summation arguments that exploited the office's *Brady* violations and denied Mr. Walker a fair trial.

648.    He went outside the trial record to represent that Andre Hough's statements all were "the same," even though he knew that Mr. Hough not only had made various inconsistent statements but also had recanted more than once.

649.    He represented that Mr. Hough had no motive or other reason to lie when he knew or should have known that police had threatened him with arrest and prosecution for the murder and otherwise coerced him.

650.    He contended that Mr. Woodruff had no motive to lie, and that he had implicated himself and the others purely out of conscience ("maybe it got to him"), when he knew or should have known that Mr. Woodruff only changed his story after being threatened with life imprisonment but was then lured with a promise, which was realized, of complete immunity.

651.    He argued that the witnesses, including Messrs. Woodruff and Hough, had been separated and could not possibly have conformed their stories, despite knowing that, as revealed in the police reports of February 11, 1976, two detectives, purportedly at ADA Drury's direction, had shuttled between Messrs. Hough and Woodruff to make sure they did conform their stories.

652.    Mr. Walker was convicted of second-degree murder and first-degree robbery on April 29, 1977.

653.    The fourth of the co-defendants brought to trial was Floyd Martin.  Mr. Martin's trial commenced on July 6, 1977.

654.     Mr. Martin was represented by defense counsel James A.W. McLeod.

655.     ADA Verrastro prosecuted the case.

656.     Based upon the crime scene photographs that Mr. McLeod had received, which the other defendants had not, as well as the testimony that Mr. Watson was the last person seen with Mr. Crawford before he was murdered, Mr. McLeod contended that Mr. Watson was the likely killer.

657.     Unbeknownst to counsel, police records contained powerful additional evidence supporting this theory, but Mr. McLeod did the best he could with the limited evidence that had been disclosed to him.

658.     It was enough.  On July 14, 1977, the jury acquitted Mr. Martin.

659.     None of the prosecutors in any of the cases discussed in ¶¶ 553-614 were properly supervised by the DA or other executives, nor were any investigated or disciplined for the misconduct after the misconduct was complained about by the defense and/or substantiated by court decisions.

660.     Policymakers' deliberate indifference created an anything-goes or winning-is-everything atmosphere which was a substantial cause of the violation of Mr. Boyd's constitutional rights and of his injuries and damages.

661.     The aforesaid deliberate or de facto policies, procedures, practices and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for the Defendant County, including, but not limited to, the District Attorney and his delegates, who knew:

(a) to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b) that such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

(c) that employees facing such issues have strong incentives to make the wrong choices, especially given the pressure the ECDA places on prosecutors to win convictions at any cost;

(d) that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of the accused and cause him constitutional injury; and

(e) that employees of the ECDA had a history of making wrong choices in such matters.

662. The aforesaid policies, procedures, regulations, practices, and/or customs of the ECDA were, collectively and individually, a substantial factor in bringing about the aforesaid violations of Mr. Boyd's rights under the Constitution and laws of the United States and in causing his damages.

663. By virtue of the foregoing, the Defendant County is liable for the violation of Mr. Boyd's constitutional rights pursuant to 42 U.S.C. § 1983 and his resultant injuries.

## COUNT VIII
**Municipal Liability Against the City of Buffalo for Its Negligent Failure to Properly Hire, Train, Supervise and Discipline the BPD Detectives Who Investigated Plaintiff and Caused His Arrest and Prosecution**

664. Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 492 of this Complaint.

665.    By virtue of the foregoing, the Defendant City is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees with regard to their aforementioned duties, which was a substantial cause of the Individual Defendants' wrongful conduct and the injuries suffered by Plaintiff.

## COUNT IX
### Negligent Infliction of Emotional Distress (Individual Defendants and City of Buffalo)

666.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 492 of this Complaint.

667.    The Individual Defendants breached a duty of care owed to Plaintiff, which unreasonably endangered his physical safety and caused him to fear for his physical safety.

668.    Defendants' conduct was extreme and outrageous.

669.    Defendants' conduct caused Plaintiff to suffer serious bodily injuries in county jail and/or prison and severe emotional distress.

670.    The Defendant City is liable under the doctrine of *respondeat superior*.

## COUNT X
### Municipal Liability Against the County of Erie for Its Negligent Failure to Properly Hire, Train, Supervise and Discipline the ECDA Prosecutors Who Investigated and/or Prosecuted Plaintiff and Caused His Wrongful Prosecution and Conviction

671.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 430 and 493-663 of this Complaint.

672.    By virtue of the foregoing, the Defendant County is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees with regard to their aforementioned duties, which was a substantial cause of the wrongful conduct and of the injuries that were suffered by Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Boyd demands judgment against Defendants as follows:

    (a)    compensatory damages for the damages described above of not less than $84,000,000;

    (b)    punitive damages of not less than $28,000,000;

    (c)    reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

    (d)    pre-judgment interest as allowed by law; and

    (e)    such other and further relief as this Court may deem just and proper.

 

/s/ Joel B. Rudin
_____
JOEL B. RUDIN
DAVID E. RUDIN
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com
david@rudinlaw.com

/s/ Ross E. Firsenbaum
ROSS E. FIRSENBAUM
RYANNE E. PERIO
GIDEON A. HANFT*
PHOEBE SILOS*
ERIN HUGHES*
Wilmer Cutler Pickering
    Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
ross.firsenbaum@wilmerhale.com
ryanne.perio@wilmerhale.com
gideon.hanft@wilmerhale.com
phoebe.silos@wilmerhale.com
erin.hughes@wilmerhale.com

*Application for admission pro hac vice
forthcoming

Attorneys for Plaintiff Darryl Boyd

Dated:          New York, New York
                July 6, 2022