# EXHIBIT 9

HodgsonRuss LLP ATTORNEYS

**Peter Sahasrabudhe**
Associate
Direct Dial: 716.848.1508
Direct Facsimile: 716.849.0349
*PSahasra@hodgsonruss.com*

February 10, 2023

***All Via E-Mail***

**LAW OFFICES OF JOEL B. RUDIN, P.C.**
152 West 57th Street
New York, New York 10019

Joel B. Rudin, Esq.
jbrudin@rudinlaw.com
David E. Rudin, Esq.
david@rudinlaw.com
Jacob Loup, Esq.
jloup@rudinlaw.com

**HOOVER & DURLAND, LLP**
561 Franklin Street
Buffalo, New York 14202

Timothy Hoover, Esq.
thoover@hooverdurland.com
Spencer Durland, Esq.
sdurland@hooverdurland.com

**WILMER HALE**
7 World Trade Center
250 Greenwich Street
New York, New York 10007

Ross E. Firsenbaum, Esq.
ross.firsenbaum@wilmerhale.com
Ryanne E. Perio, Esq.
ryanne.perio@wilmerhale.com
Phoebe H. Silos (*Pro Hac Vice Counsel*)
Phoebe.Silos@wilmerhale.com
Gideon A. Hanft (*Pro Hac Vice Counsel*)
Gideon.Hanft@wilmerhale.com

Dear Counsellors:

**Re:** ***John Walker, Jr. v. City of Buffalo, et al.***
**Case No. 22-cv-00520**
**and**
***Darryl Boyd v. City of Buffalo, et al.***
**Case No. 22-cv-00519**

We write in response to your meet-and-confer letter dated February 3, 2023. With this letter, we intend to address the discovery issues which, in plaintiffs' view, remain outstanding.

**The Crawford Homicide File**

First, with respect to the City's search for the Crawford homicide file, the staff at the Buffalo Police Department's historic records facility, commonly referred to as the "River Rock facility," has searched multiple times for a file identified with the number 76-1458. The only homicide file they were able to find bearing that number is the one that our office has already produced. They searched every single homicide file in their possession from the year 1976, which is the year when the Crawford homicide occurred.

In other wrongful conviction litigation we have handled on behalf of the City, the River Rock facility is where homicide files have been located. Further, according to our understanding, the River Rock facility is the only facility that keeps homicide files created before the departmental use of computers.[1] Given that the City has done multiple comprehensive searches for the homicide file in the place where the file would be, the City has fulfilled its obligation to conduct a diligent search for the records plaintiffs have requested. Further, cold-case detectives assigned to re-investigate the Crawford murder have searched for additional files in the homicide office and elsewhere. They have relayed to me that there are no additional files in their possession.

Although the homicide file that we produced does not contain all of the police reports created in connection with the Crawford homicide, all relevant police reports are contained in the County's recent production of documents. As we have discussed during our meet and confer calls, copy machine technology was not as advanced in the 1970's as it was in the 1990's. Thus, while in the 1990's it may have been common practice for the police to maintain their own copy of a homicide file after it was forwarded to the District Attorney's Office, it likely was not possible for them to do so in 1976 when the Crawford homicide and plaintiff's criminal trial took place. It would thus make perfect sense, given the state of technology at the time, that a comprehensive set of the police reports and other investigative materials developed by the police would be in the possession of the County. As we have repeatedly communicated, we believe the entire police file was turned over to the District Attorney's Office.

---

[1] No search can be done until a homicide file number is identified, given that records were not kept by victim name nor the name of any person arrested for the offense. In this case, because there had been a cold case re-investigation, members of the department already knew the homicide file number we were looking for (likely because they saw Court documents reflecting the homicide file number which were filed in connection with plaintiff's post-conviction motions). In other cases, the City has had to wait for the County to make productions before homicide files could be produced.

HodgsonRuss LLP ATTORNEYS



**Personnel and Training Records**

Our office has produced all of the personnel records in our possession which have been requested by plaintiffs. Over the course of two weeks, the recently retired lieutenant who acted as the custodian of records for BPD spent multiple hours each day with clerical staff going through boxes of personnel files in Room 525 at BPD's new headquarters. BPD's current headquarters is located on Court Street here in Downton Buffalo. Room 525 is accessible to a limited number of authorized personnel. The former custodian of records also explained that he oversaw the movement of these personnel files from BPD's old headquarters, which were located at Franklin Street in the City of Buffalo. He confirmed that the index cards we produced, along with any records of discipline, would be the only records that remain. Certain documents which would have been contained within the files before they were moved, such as letters of commendation and records sick leave, were not retained.

With respect to training manuals or training materials, we have already represented to you on multiple occasions that, beginning in the late 1970's, Erie County Police Services facilitated the initial police academy which was attended by all prospective officers in Erie County, regardless of the police department the prospective officers were joining. We have also represented to you that, after the police academy, subsequent "training" received by police officers largely consisted of on the job, informal training. This includes officers who subsequently were promoted to detective and who then began to work as part of BPD's Homicide Bureau. In the 1970's, the many trainings now made available to homicide detectives throughout the country were either non-existent or not widely used.

We have been in regular communication with BPD's Inspector of Communication and Administration, who works directly under the current Commissioner of Police. After multiple inquiries with various staff and personnel, we have determined that BPD is not in the possession of any training materials from fifty years ago. Many documents and records were not retained when BPD moved headquarters in 2018. It is very likely that, if the Department was ever in possession of training materials from fifty years ago, any such documents were destroyed or not retained when headquarters moved. We would also direct plaintiffs attention to New York's document retention schedule for local governments, which states that training materials addressing "core law enforcement activities" need only be retained for forty years.[2]

---

[2] http://www.archives.nysed.gov/records/local-government-records-schedule-browse?combine=training: This legislation was passed in 2020, and previous retention schedules likely required an even shorter retention time.

**Search of Every Single Arrest Made in the Time Periods Identified in Requests 9-13**

The City and BPD stand by their position that they are not permitted to search New York's criminal record data base for a non-law enforcement purpose absent authorization. BPD does not maintain its own criminal record data-base, but rather is an authorized user of a data base maintained by the New York Division of Criminal Justice Services (DCJS). BPD may only search this data-base when it is actively investigating a crime.

During our most recent meet and confer call, it was suggested, for the first time, that BPD should seek to quantify every single arrest that was made during the time periods specified in requests 9 through 13 of plaintiffs' request for production. It was then suggested that, if it is possible to quantify the number of arrests made during those time periods, BPD should then determine whether a file exits for those arrests. Then, as counsel suggested, a search of every single one of the files that are in existence is required to determine if any of the arrests involved certain non-parties who were interviewed in the investigation of the Crawford homicide.

A mere description of such a request demonstrates that it is overly burdensome and not proportional to the needs of this litigation. Notwithstanding the representation in your letter, we have also offered many reasons why this request imposes an undue and disproportional burden. No records from the time periods specified in request 9 through 13 are digitized.[3] If any records do exist, they are boxed without index in BPD's historic records facility. Moreover, we have explained, on multiple occasions, that records were not kept by victim name or by the name of a person who was ultimately arrested. Records were organized numerically. There is no way to ascertain whether any of the numerically recorded files involved any of the non-parties who are the subject of requests 9 through 13. We have also explained that an arrest would not necessarily have an investigative file associated with it, as many arrests were made on site, and did not require any paper work beyond the filing of a criminal complaint, which would be forwarded to the District Attorney's Office. To do what was described on our last call would take months and would require countless hours by attorneys and clerical workers employed by BPD, who have considerable job responsibilities aside from responding to discovery requests in civil litigation.

It should also be noted that the evidence sought in requests 9 through 13 are of limited probative value. The criminal records of non-parties does nothing to prove or disprove whether or not probable cause existed for plaintiff's arrest and prosecution, or whether evidence which was used against plaintiff at his criminal trial was fabricated or made up. Moreover, some of the evidence sought can easily be obtained at depositions. For example, during a deposition,

---

[3] To the extent this request seeks criminal records of charges filed after the Crawford investigation, they seek information which is not relevant to any of the claims or defenses in this action. Plaintiffs seek these records to show that certain witnesses were intimidated at the time they were interviewed, so clearly the only relevance of these records is focused upon charges that they had incurred at the time of the Crawford investigation.

plaintiff's counsel can ask Tyrone Woodruff whether he had any criminal history prior to being interviewed in connection with the Crawford homicide. That process will take a matter of seconds as opposed to the countless hours it would take for BPD search each and every box from the time periods specified in requests 9 through 13.

**<u>Conclusion</u>**

The records requested by plaintiffs in this action date back half a century. Plaintiff is also seeking records from a municipality which, over the past fifty years, has changed administrations on dozens of occasions. With each change in administration, record keeping practices changed. The place where records have been maintained have moved on multiple occasions in the over the past five decades, and many records have been destroyed or have not been retained. This document retention process reveals that plaintiffs' discovery requests, by their very nature, impose very heavy burdens upon the City and BPD. Plaintiffs may be dissatisfied with the documents they have received thus far. But that dissatisfaction is not appropriately directed at the City and BPD, both of which have been incredibly diligent in attempting to provide responsive materials. The lack of materials available stems from the ancient history of these cases, rather than a lack of diligence on the part of our clients.

Very truly yours,

*//s Peter A. Sahasrabudhe*

Peter Sahasrabudhe

Copy to: Jennifer Persico, Esq.
Lippes Mathias LLP
(via email jpersico@lippes.com)