**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARRYL BOYD,<br><br>Plaintiff,<br><br>- against -<br><br>THE CITY OF BUFFALO; THE COUNTY OF ERIE; MICHAEL G. GUADAGNO; JOHN MONTONDO; LINDA J. FIAL AS EXECUTOR FOR THE ESTATE OF ROBERT GRABOWSKI; AND MARTIN BULLOCK AS EXECUTOR FOR THE ESTATE OF JAMES E. HUNTER,<br><br>Defendants. | **Case No. 1:22-cv-519** |
| JOHN WALKER, JR.<br><br>Plaintiff,<br><br>- against -<br><br>THE CITY OF BUFFALO; THE COUNTY OF ERIE; MICHAEL G. GUADAGNO; JOHN MONTONDO; LINDA J. FIAL AS EXECUTOR FOR THE ESTATE OF ROBERT GRABOWSKI; AND MARTIN BULLOCK AS EXECUTOR FOR THE ESTATE OF JAMES E. HUNTER,<br><br>Defendants. | **Case No. 1:22-cv-520** |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO BIFURCATE AND STAY *MONELL* DISCOVERY**

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

I. The Precarious Health of Plaintiffs and Other Key Witnesses ..... 3

II. BPD Detectives Manufactured a Case Against Plaintiffs and Withheld Evidence ..... 4

III. Defendants' Brady Violations Deprived Plaintiffs of a Fair Trial ..... 9

IV. Summation Misconduct Reinforced the Constitutional Violations and Compounded the Failure to Provide Plaintiffs with a Fair Trial ..... 11

V. The Defendants Succeeded in Obtaining Their Preferred Fact Discovery Schedule Based Upon the Monell Discovery They Now Seek to Avoid ..... 13

VI. Defendants Failed to Raise Bifurcation For the Next Four Months ..... 14

VII. Defendants' Bifurcation Motions ..... 15

ARGUMENT ..... 16

I. Principles of Estoppel and Waiver Bar the Defendants' Untimely Request for Bifurcation ..... 16

A. Defendants' Current Position Cannot Be Reconciled with Past Representations to the Court ..... 17

B. The Court Adopted Defendants' Position in Its Case Management Order. ..... 18

C. Granting Defendants' Bifurcation Motions Would Prejudice Plaintiffs ..... 18

D. Granting the Bifurcation Motions Would Damage Judicial Integrity ..... 20

II. The County Fails to Show Good Cause to Bifurcate Discovery ..... 21

A. The Evidence That County Prosecutors Committed Constitutional Violations Is Overwhelming ..... 23

B. Bifurcating Discovery Would Waste Judicial and Party Resources ..... 26

C. Bifurcating Discovery Would Severely Prejudice Defendants ..... 29

III. For Similar Reasons, the City's Bifurcation Motion Should be Denied ..... 30

A. The City Cannot Prevail on the Underlying Constitutional Violations at Summary Judgment ..... 30

B. Conducting Discovery Against the City Seriatim Would Cause Enormous Waste and Duplication ..... 35

CONCLUSION ..... 35

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ambrose v. City of New York*,
623 F. Supp. 2d 454 (S.D.N.Y. 2009)........................................................ 22, 25

*Arnold v. Krause, Inc.*,
232 F.R.D. 58 (W.D.N.Y.2004)........................................................ 21

*Arnold v. Krause, Inc.*,
233 F.R.D. 126 (W.D.N.Y.2005)........................................................ 21

*Bellamy v. City of New York*,
914 F.3d 727 (2d Cir. 2019)........................................................ 22, 24, 25

*Browning Mfg. v. Mims*,
179 F.3d 197 (5th Cir. 1999) ........................................................16

*Cadiz v. Kruger*,
2007 WL 4293976 (N.D. Ill. Nov. 29, 2007) ........................................................ 26

*Cadle v. City of Chicago*,
2015 WL 6742070 (N.D. Ill. Nov. 2, 2015) ........................................................ 21, 35

*Carter v. City of New York*,
2013 WL 553756 (S.D.N.Y. Feb. 8, 2013)........................................................ 22, 34

*Casaccia v. City of Rochester*,
2020 WL 1042149 (W.D.N.Y. 2020) ........................................................ 22

*Cohalan v. Genie Indus.*,
276 F.R.D. 161 (S.D.N.Y. 2011) ........................................................ 19

*Crawley v. City of Syracuse*,
2018 WL 3716782 (N.D.N.Y. Aug. 3, 2018) ........................................................ 21

*Dallas v. Goldberg*,
143 F. Supp. 2d 312 (S.D.N.Y. 2001)........................................................ 21

*Daniels v. City of Sioux City*,
294 F.R.D. 509 (N.D. Iowa 2013) ........................................................ 21

*DeRosa v. Nat'l Envelope Corp.*,
595 F.3d 99 (2d Cir. 2010)........................................................................ 17, 19, 20

*DeVito v. Barrant*,
2005 WL 2033722 (E.D.N.Y. Aug. 23, 2005)............................................................ 22

*Dixon v. City of Buffalo, et al.*,
19-cv-1678 (WMS)(JJM) (W.D.N.Y., Mar. 8, 2022).............................................. 24, 32, 33

*Gross v. Lunduski*,
304 F.R.D. 136 (W.D.N.Y. 2014)........................................................................... 27

*Guadalupe v. City of New York*,
2016 WL 675440 (S.D.N.Y. Feb. 16, 2016)................................................................ 34

*Gugino v. City of Buffalo*,
21-cv-283 (LJV)(LGF) (W.D.N.Y., Oct. 6, 2022). ....................................................... 33

*In re Adelphia Recovery Tr.*,
634 F.3d 678 (2d Cir. 2011)........................................................................ 17, 19, 20

*Ismail v. Cohen*,
899 F.2d 183 (2d Cir. 1990)........................................................................... 27

*Isnady v. Vill. of Walden*,
2022 WL 3587593 (S.D.N.Y. Aug. 19, 2022)............................................................ 17

*Johnson v. Baltimore Police Dep't*,
500 F. Supp. 3d 454 (D. Md. 2020)........................................................................ 30

*Jones v. City of New York*,
988 F. Supp. 2d 305 (E.D.N.Y. 2013) ........................................................................ 25

*King v. City of New York*,
2014 WL 4954621 (E.D.N.Y. Sept. 30, 2014) ............................................................ 35

*Kyles v. Whitley*,
514 U.S. 419 (1995)........................................................................................ 11

*Land Ocean Logistics, Inc. v. Aqua Gulf Corp.*,
181 F.R.D. 229 (W.D.N.Y. 1998)........................................................................... 19

*Lia v. Saporito*,
541 F. App'x 71 (2d Cir. 2013) ........................................................................... 18

*Lopez v. City of New York*,

2021 WL 2739058 (S.D.N.Y. July 1, 2021) .......... 21, 22, 27, 33

*McCoy v. City of New York*,
2008 WL 3884388 (E.D.N.Y. Aug. 13, 2008) .......... 22

*McKinley v. Everest Receivable Servs., Inc.*,
2022 WL 446407 (W.D.N.Y. Feb. 14, 2022) .......... 16

*Mitchum v. Foster*,
407 U.S. 225 (1972) .......... 21

*Oliver v. City of New York*,
540 F. Supp. 3d 434 (S.D.N.Y. 2021) .......... 23

*Ortiz v. Wagstaff*,
523 F. Supp. 3d 347 (W.D.N.Y. 2021) .......... 24

*Owen v. City of Indep., Mo.*,
445 U.S. 622 (1980) .......... 21

*Parker v. Columbia Pictures Indus.*,
204 F.3d 326 (2d Cir. 2000) .......... 20

*Pavlovich v. City of New York*,
1992 WL 230472 (S.D.N.Y. Aug. 31, 1992) .......... 22

*Pavone v. Gibbs*,
1997 WL 833472 (E.D.N.Y. Sept. 29, 1997) .......... 29

*People v. Walker and Boyd*,
No. 41413 (Sup. Ct., Erie Co., August 18, 2021) .......... 10, 23

*Reed Elsevier, Inc. v. Muchnick*,
559 U.S. 154 (2010) .......... 18

*Republic of Ecuador v. Chevron Corp.*,
638 F.3d 384 (2d Cir. 2011) .......... 18

*Roper v. City of New York*,
2017 WL 462270 (S.D.N.Y. Jan. 25, 2017) .......... 21, 22, 23, 32

*Rustgi v. Reams*,
536 F. Supp. 3d 802 (D. Colo. 2021) .......... 27

*Shemendera v. First Niagara Bank N.A.*,
288 F.R.D. 251 (W.D.N.Y. 2012) .......... 21

*Simon v. Safelite Glass Corp.*,
128 F.3d 68 (2d Cir. 1997)........................................................................................ 17

*United States v. Lawson*,
736 F.2d 835 (2d Cir. 1984)...................................................................................... 24

*United States v. Payne*,
63 F.3d 1200 (2d Cir. 1995)...................................................................................... 11

*Van de Kamp v. Goldstein*,
555 U.S. 335 (2009).................................................................................................. 25

*Walker v. City of New York*,
974 F.2d 293 (2d Cir. 1992)...................................................................................... 25

*Wight v. BankAmerica Corp.*,
219 F.3d 79 (2d Cir. 2000)........................................................................................ 20

*Woodworth v. United States*,
287 F. Supp. 3d 345 (W.D.N.Y. 2017) ..................................................................... 19

**STATUTES**

Fed. R. Evid. 404(b)................................................................................................... 27

Plaintiffs Darryl Boyd and John Walker, Jr. ("Plaintiffs") respectfully submit this memorandum of law in opposition to the Motion to Bifurcate and Stay *Monell* Discovery, dated February 15, 2023 (Dkt. 64) filed by the City of Buffalo (the "City") and the Motion to Bifurcate Discovery on Plaintiffs' *Monell* claims, dated February 15, 2023 (Dkt. 62) filed by the County of Erie (the "County" and, collectively with the City, "Defendants") (collectively, the "Bifurcation Motions").[1]

## PRELIMINARY STATEMENT

Plaintiffs Darryl Boyd and John Walker, Jr. spent decades in prison and on parole for a murder they did not commit due to the unconstitutional conduct of the Buffalo Police Department (the "BPD"), its homicide detectives, and the Erie County District Attorney's Office (the "ECDA"). Now, five months after obtaining a scheduling order with a lengthy period to complete all fact discovery, including *Monell* discovery, Defendants seek to bifurcate and stay *Monell* discovery based on generic arguments that are inapplicable to *this* case. The Court should deny the Bifurcation Motions for two reasons.

*First*, whether framed as waiver or estoppel, Defendants cannot seek bifurcation at this late stage of fact discovery. Defendants advocated to this Court during the September 30, 2022 initial conference that the schedule to complete *all* fact discovery—including *Monell* discovery—should be 13 months, for the express reason that the *Monell* portion of the fact discovery at issue would require more time than the 7.5-month period that Plaintiffs proposed for the fact discovery period. *See* Dkt. 32, 33. The Court issued a scheduling order giving Defendants much of the extra time they requested, setting a 10-month period to complete all fact discovery. Defendants cannot let

[1] To avoid duplication, Plaintiffs cite to the docket numbers for *Darryl Boyd v. The City of Buffalo, et al.*, Case No. 22-cv-519, to refer to the docket entries in both cases.

more than half of that period elapse by dodging and weaving in response to Plaintiffs' discovery requests and then seek to bifurcate *Monell* discovery as though a schedule had not been set. Defendants' motions do not show good cause—as required to obtain bifurcation, and as required to modify this Court's scheduling order—nor could they. The Bifurcation Motions do not even attempt to argue that anything has changed to justify their about-face. That, of course, is because nothing has. While Defendants' motions rely on the claimed breadth of Plaintiffs' discovery requests, Plaintiffs served those requests *before* the September 30 conference and Defendants argued for a 13-month fact discovery period that led to the schedule that the Court entered.

Further, when Defendants objected to Plaintiffs' discovery requests, they did not object on the ground that *Monell* discovery was premature or that the discovery period was or should be bifurcated. Had they, Plaintiffs could have (and would have) sought relief immediately given the scheduling order. However, Defendants strung Plaintiffs along for over four months (letting nearly half of the fact discovery period elapse) before raising the notion of bifurcation for the first time, substantially prejudicing Plaintiffs. This Court should not countenance Defendants' conduct and should exercise its broad discretion to deny the Bifurcation Motions for these reasons alone.

*Second*, even if the Court were to consider the merits of the Bifurcation Motions (which it should not), it should still deny them. Defendants' principal argument—that they may win summary judgment on Plaintiffs' underlying constitutional claims and, therefore, *Monell* discovery would be obviated—is wrong. Their respective motion papers are utterly devoid of any such showing. By contrast, Plaintiffs, in the accompanying Declaration of Joel Rudin, dated February 27, 2023 (the "Rudin Decl."), the attached exhibits, and this memorandum, show that, even before taking depositions and obtaining outstanding document discovery and interrogatory

responses, Plaintiffs already have sufficient evidence to defeat any summary judgment motion on their underlying constitutional claims.

Since *Monell* discovery will have to be taken, it should be taken now, before more witnesses to events in 1976 and 1977—including Plaintiffs themselves, who suffer from serious illnesses; the surviving Erie County District Attorney, who is 88; and the chief trial prosecutor who prosecuted Plaintiffs' cases, who is 82—die or suffer loss of memory, an inherent difficulty given most of the events occurred 46 years ago. If *Monell* discovery will be as time-consuming as Defendants complain (which it would not be had they not wasted four months doing nothing), then they should start now. The County's unspecified assertions of burden are unrelated to Plaintiffs' actual discovery requests, and the City's vague claim of burden is refuted by its previous representations that it no longer possesses the relevant material. Nor should Plaintiffs, their surviving attorneys, or other critical witnesses such as the surviving prosecutors and detectives be required to be deposed twice. The Bifurcation Motions should be quickly denied before Defendants achieve their goal of imposing substantial, additional delay.

## BACKGROUND

### I. The Precarious Health of Plaintiffs and Other Key Witnesses

Plaintiffs Darryl Boyd and John Walker, Jr. spent 28 and 22 years incarcerated, respectively, and each served an additional 17 years on parole after being prosecuted for and convicted of a crime they did not commit—the 1976 murder of William Crawford. Mr. Walker is 63, and within the last year suffered a heart attack and is being evaluated for lung cancer. Rudin Decl. ¶ 6. He suffers from advanced disc degeneration, chronic lung disease, coronary artery disease, and is severely underweight. *Id.* Mr. Boyd, also 63, has Stage 3 chronic kidney disease that required him to be hospitalized last year. *Id.* Witnesses on both sides who are crucial to Plaintiffs' ability to prove their claims are elderly and may become unavailable if discovery is

bifurcated, including former Erie County District Attorney, Edward Cosgrove, who is 88 years old, and the ADA who prosecuted Plaintiffs' criminal cases, Timothy Drury, who is 82. *Id.* Individual Defendants James Montondo and Michael Guadagno are 91 and 77, respectively. *Id.* Other individuals listed in the parties' initial disclosures, such as Mr. Boyd's lawyer at his criminal trial, are in their 70s. *Id.* ¶ 7.

## II. BPD Detectives Manufactured a Case Against Plaintiffs and Withheld Evidence

William Crawford was robbed and murdered shortly before midnight on January 2, 1976, outside his house at 2041 Fillmore Avenue after a night drinking at the Golden Nugget bar, located directly across the street. Rudin Decl. ¶ 12. Five witnesses told the BPD that Mr. Crawford left the bar or that they heard loud noises apparently caused by the assault at 11:30 p.m. or after. *Id.* ¶ 19. James McLeod, a retired judge and the attorney for Plaintiffs' co-defendant, Floyd Martin, has testified that photographs of the scene revealed footsteps leading out of the backyard and toward the home of Lawrence "Larry" Watson, who spent the evening with Mr. Crawford at the Golden Nugget. *Id.* ¶¶ 98-99. The photographs also showed no signs of dragging in the driveway, indicating that the attack on Mr. Crawford did not occur until he reached his side door. *Id.*

The BPD initially focused on Watson, who lived two doors away from Crawford, and Jerome Boyd (unrelated to Plaintiff Darryl Boyd), who lived at the nearby Glenny Drive Projects. *Id.* ¶ 13. A barmaid, Debbie Jeffrey, and a patron, Frances Kalb, separately told BPD detectives that Crawford had flashed a lot of money directly in front of Watson while they were drinking together, and that Watson then volunteered to walk Mr. Crawford home and left the bar with him. *Id.* ¶ 20. Ms. Jeffrey told detectives that Watson returned 20 to 25 minutes later and then left suddenly with his wife, uncharacteristically not saying goodbye or finishing their drinks. *Id.* ¶ 21.

Ms. Jeffrey, Ms. Kalb, Watson's wife Julia, and his stepson, Bill Howard, all told BPD detectives that after going home from the bar the second time, Watson could not find his keys. *Id.*

¶ 26. These witnesses told the police that when Julia Watson called the bar looking for her husband's keys, Howard said that Watson had placed them in his jacket pocket. *Id.*

A police report noted that a set of keys was found next to Mr. Crawford's body at the hospital, evidently recovered at the crime scene. *Id.* ¶ 27. Mr. Crawford's wife reported to BPD detectives that her husband's practice was to ring the bell for her to let him in through the side entrance to their home, implying he did not carry a set of keys. *Id.* ¶ 25. There is no police voucher for the keys found next to Mr. Crawford's body and no report indicating any investigation was made to determine if the keys were Mr. Crawford's or Watson's. *Id.* ¶ 28

On January 3, 1976, a report notes, police received an anonymous tip that the individuals who committed the offense were "Andre Howe" and "Jerome Boyd." *Id.* ¶ 29. Police found that Jerome Boyd had a police record, lived nearby, was 37 years of age, and was African American. *Id.* ¶ 30. Watson had reported that a dark-skinned man with kinky hair in his 30s followed him and Crawford out of the bar. *Id.* ¶ 31. Police showed Jerome Boyd's photo to witnesses who had been at the bar that night, who said he drank and left suddenly. *Id.* ¶ 32.

On January 7, according to another P-73, the detectives reported that they received an anonymous call that Darryn Gibson had been involved in the crime. *Id.* ¶ 33. The detectives interviewed the 16-year-old Mr. Gibson that same day. *Id.* ¶ 34. He said he had spent the night of the crime at the Glenny Drive Projects with his teenage friends Mr. Boyd, Mr. Walker, Tyrone Woodruff, and Floyd Martin, as well as others, and that, at about 11:15 p.m., Messrs. Walker and Woodruff took a Fillmore Cab Company taxi home. *Id*. The next day, detectives went to the Fillmore Cab Company and confirmed from the company's written logs that a pickup was made at 11:28 p.m.; the taxi number and driver were listed in their report. *Id.* ¶ 35. A second pick-up at the Glenny Drive Projects occurred at 11:44 p.m.; that cab number and driver name were also

listed. *Id.* The report stated there were no other pickups at the Glenny Drive Projects that night. *Id.*

In separate interrogations, despite not knowing about the taxicab information the BPD had obtained, Messrs. Walker, Boyd, and Woodruff all corroborated Mr. Gibson's whereabouts, including the taxi ride. *Id.* ¶ 37. Boyd elaborated that a second cab was called for other friends after Messrs. Walker and Woodruff left in the first one, and that Messrs. Boyd and Gibson had then walked home, while Mr. Martin stayed behind since he lived at the Glenny Drive Projects. *Id.* Each of these statements was corroborated by the independent taxi evidence. *Id.*

On January 12, police reports show, police picked up all the boys and brought them to the Homicide office for a second round of interrogation. *Id.* ¶ 38. According to a P-73 dated January 12, Sergeant James E. Hunter and Detective Robert F. Arnet seized the 17-year-old Mr. Woodruff from his home and held him, alone, for questioning at the Homicide Bureau. *Id.* ¶ 39.

The police reports of what happened next were contradictory. Sergeant Hunter reported that Woodruff spontaneously confessed his involvement while eating and making phone calls. *Id.* ¶ 40. However, Detective Francis Manista's P-73 report contradicts Defendant Hunter and reveals the manipulative tactics employed by the BPD. Manista described a phone call from "a negro female who wished to remain anonymous" and who claimed to have witnessed the five boys, including Mr. Woodruff, "cutting up the money" at 138 Glenny, and knew they were responsible for killing the "white man on Fillmore." *Id.* ¶ 41. According to the report, the caller stated that afterwards, about midnight, Woodruff and Walker left in a cab. *Id.* ¶ 42. The caller gave all of the boys' addresses. *Id.* The detectives tried to persuade her to come in and cooperate, but she refused and hung up. *Id.* Manista reported that Mr. Woodruff sat in the Homicide office with detectives listening to the entirety of this "anonymous" call and was so terrified by it that he "could

barely raise a cup of coffee." *Id.* ¶ 42. Only after this call did Woodruff tell detectives the story they wanted to hear and said, "Gibson was hitting him, I think." *Id.* Notably, Mr. Woodruff could only describe the victim as "white," a fact that detectives supplied to him at the outset of the interview. *Id.* ¶ 42.

A jury could reasonably conclude that this call was staged. Homicide detectives would not permit a suspected murderer to listen in on a call from a person accusing him of participating in a murder, while asking the caller for her name. This call was devised to frighten Mr. Woodruff and coerce him into confessing and becoming a witness against the other boys, even though the detectives knew, based upon the taxicab evidence and the timing of the murder, that they could not have been together at the time the crime was committed. Manista apprised the Chief of the Homicide Squad, Leo J. Donovan, what had taken place, and Donovan then personally participated in taking a signed, written statement from Mr. Woodruff that they all knew had to be false. *Id.* ¶ 42.

On January 12, 1976, Andre Hough, 15 years old, also gave a signed statement. *Id.* ¶ 44. In it, he claimed that Mr. Gibson, before the robbery, talked about "getting some money" that night, and that the next day, he saw Mr. Boyd with an unusual amount of cash. *Id.* Just prior to their statements to a grand jury, both Hough and Mr. Woodruff recanted their statements. Two P-73s, dated February 11, 1976, contained Hough's recantation. *Id.* ¶ 45. On the day he was scheduled to appear before the grand jury, Hough recanted his confession in the presence of ADA Drury, Detective Paul R. Delano, and his mother. *Id.* ¶ 46. After his recantation, Hough's mother asked if the detectives could take her son home. Delano reported that he told Hough's mother that he would drive her 15-year-old son home, but as soon as she left, he and Detective Michael G. Guadagno instead continued to hold him in custody and pressured him to recant his recantation

and further expand his story. *Id.* ¶¶ 47-48. Hough then said for the first time—after swearing on January 12 that he had no additional information—that the boys knew before leaving the Glenny Drive Projects that a man at the Golden Nugget had a lot of money. *Id.* ¶ 48. ADA Drury then sent Guadagno and Delano to pressure a "shaking and nervous" Mr. Woodruff to adopt the same story, which he did after they accused him of having "not told the whole story," and told him what Hough had said. *Id.* ¶¶ 50-52.

Delano reported that Mr. Woodruff had signed a "new confession" that Guadagno wrote out, and they gave it to ADA Drury, who told them to put it in their file. *Id.* ¶ 52. The handwritten statement contradicted the longer statement reported in the P-73 reports. *Id.* ¶ 53. Whereas Mr. Woodruff was quoted in the reports, and testified at trial, that Messrs. Boyd and Gibson "went in" the Golden Nugget and stayed a "few minutes," the handwritten statement said the two boys had merely "opened the door" and, in an amazing stroke of good fortune, had "seen the old man with a lot of money." *Id.*

The detectives' reports documenting their coercion are consistent with the sworn testimony of both Hough and Mr. Woodruff. At Mr. Boyd's trial, Hough testified that detectives told him they would charge him with the murder unless he helped them and took him to the Homicide office for interrogation, without his parents being present. *Id.* ¶ 56. He testified they threatened him even though he had taken and passed a polygraph examination. *Id.* In 1985 and again in 2010, in connection with Plaintiffs' post-judgment motions, Mr. Woodruff gave sworn oral depositions alleging he was coerced by the BPD, who told him falsely that his friends were accusing him and that he faced life imprisonment, but that if he cooperated, he might receive complete immunity, which is ultimately what happened. *Id.* ¶ 58. Plaintiffs expect that Mr. Woodruff will testify in the current lawsuits. *Id.* ¶ 59.

John Walker also will testify to the detectives' use of coercive tactics. *Id.* ¶ 60. He will testify that police falsely told him that a caller had implicated him, and unless he cooperated, he would go to prison. *Id.* Police also told him that his friends were accusing him, so he might as well cooperate. *Id.* In addition, Mr. Walker, then 16 years of age, will testify that an armed detective threatened to strike him during his interrogation. *Id.* Both Messrs. Walker and Boyd will testify that they were forced to sign partially false statements, and that police reports claiming they had given contradictory or incomplete information were themselves untrue. *Id.* ¶ 61.

## III. Defendants' *Brady* Violations Deprived Plaintiffs of a Fair Trial

The documentary evidence already exchanged in discovery—records of pretrial proceedings, trial transcripts, trial exhibits, and police reports—corroborated by witness testimony, establishes every element of Plaintiffs' *Brady* claims that favorable evidence was not disclosed at their trials. Indeed, the evidence of these constitutional violations are primarily in the trial transcripts, a matter of public record.

Regarding Plaintiffs' *Brady* claim, the documentary evidence already exchanged establishes what evidence was disclosed and what was withheld. As detailed in the Rudin Declaration, pretrial discovery was narrowly limited. Rudin Decl. ¶ 69-70. During pretrial hearings and during the trials, the ADAs all followed the same practice of disclosing the pretrial statements of witnesses, known as *Rosario* material, only at the end of each witness's direct testimony. *Id.* ¶ 70. ADAs made a record of each document they disclosed, and the document received an exhibit number, which was marked on the document. *Id.* ¶¶ 78-79, 87-88, 91. Certain witness statements disclosed by the County in discovery contain these exhibit markings. *Id.* ¶¶ 86, 101.

With few exceptions, the only statements that were disclosed were the formal, typed, and signed statements of testifying witnesses. *Id.* ¶¶ 93-98. Statements that were recounted in P-73

reports but not signed by the witness, handwritten statements, and statements by non-testifying witnesses, were not disclosed. *Id.* The defense attorneys had minutes to review the material they received, and then had to proceed with their cross-examinations. *Id.* ¶ 78. The exacting record the prosecutors made of what was disclosed under *Rosario* establishes what was *not* disclosed: the third-party culpability evidence implicating Larry Watson and Jerome Boyd; the evidence showing that Messrs. Woodruff and Walker left in a taxi *before* the crime was committed; and the evidence showing that Hough and Mr. Woodruff were coerced into fabricating false stories. *Id.* ¶ 101-02. Plaintiffs expect surviving defense counsel will corroborate that they did not receive any of this favorable evidence and that, if they had, they would have used it in their clients' defense. *Id.* ¶ 103.

Finally, at the 2021 CPL 440 hearing resulting in the overturning of Plaintiffs' convictions, the New York State Supreme Court 8th Judicial District found that the prosecution had not disclosed to Messrs. Boyd and Walker at their trials the photographs showing footprints in the snow leading from Crawford's backyard to Watson's, which supported the defense that Watson was the killer—and showing the lack of dragging marks in the driveway—which contradicted Mr. Woodruff's testimony. *Id.* ¶ 98. Buffalo City Court Judge, James McLeod, testified that these photographs formed the centerpiece of his successful defense of Mr. Martin. *Id.* ¶ 99. In his decision vacating the convictions, Justice Christopher Burns ruled that Messrs. Boyd and Walker's defense counsel's document requests encompassed these photographs, but the County failed to produce them. *See* Decision and Order at 5-6, *People v. Walker and Boyd*, No. 41413 (Sup. Ct., Erie Co., August 18, 2021).

Plaintiffs have asserted *Brady* claims against Michael G. Guadagno, John Montondo, Linda J. Fial as Executor for the Estate of Robert Grabowski, and Martin Bullock as Executor for the

Estate of James E. Hunter (the "Individual Defendants"), and the City on a *Monell* theory, and against the County under *Monell* as well. Sworn evidence would permit a jury to reasonably find the Individual Defendants and/or the City liable. ADAs Drury and Henry have sworn they would have disclosed all *Brady* material, which, since all *Brady* material was not disclosed, would permit a jury to infer that BPD detectives withheld favorable evidence from the prosecutors. *Id.* ¶¶ 62-65. A jury could also hold the County liable for the *Brady* violations because prosecutors are deemed to at least constructively possess what is in a police agency's case file for the same case. *See Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995); *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). Moreover, a jury could reasonably find that ADA Drury and other prosecutors had *actual* possession of the case file but did not disclose these materials to the defense pursuant to the County's unconstitutional policies and practices. ADA Drury's own affidavit already admits that he would have obtained possession in such a case of the complete police file. *Id.* ¶ 63. And, to this day, the BPD swears it has *no* file because it gave its file to the ECDA; in fact, the file has been produced by the County. *See* Dkt. 56.[2]

## IV. Summation Misconduct Reinforced the Constitutional Violations and Compounded the Failure to Provide Plaintiffs with a Fair Trial

The *Brady* violations were compounded by summation misconduct that further deprived Plaintiffs of a fair trial. ADA Drury and Henry's summations exploited their suppression of *Brady* material and made the prejudicial effect even worse. The allegations in the Complaints are based upon the trial transcripts—public records—showing this misconduct. At Mr. Boyd's trial, ADA Drury objected to defense counsel Mark Hulnick's argument that Mr. Woodruff had been pressured to change his story and had been indoctrinated, exclaiming in front of the jury, "These

---

2 Plaintiffs are entitled to plead claims in the alternative and have a jury decide which defendants are responsible and apportion damages.

are wild allegations, there is no proof of it," even while suppressing the precise evidence proving it. Boyd Compl. ¶¶ 365-366. ADA Drury similarly misrepresented that Woodruff *voluntarily* changed his initial story, when he knew how Woodruff had been *coerced* through the anonymous call ruse. *Id.* ¶¶ 370-371. ADA Drury represented that "[t]he police turned over everything they had to you," when he knew there were many reports, favorable to the defense, which the prosecution had not disclosed. *Id.* ¶¶ 374-375. He "absolutely reject[ed]" that either he or his office had anything to do with changing Mr. Woodruff's testimony or conspiring to fabricate evidence, when he knew, again from the undisclosed reports, that he, Guadagno, and Delano had collaborated in pressuring Mr. Woodruff to change his story just prior to his grand jury testimony. *Id.* ¶¶ 376-378. Finally, he improperly vouched for the integrity of the investigation, improperly expressed his personal belief in the truthfulness of his witnesses, repeatedly misrepresented the evidence, and repeatedly appealed to the racial prejudices of the all-white jury, essentially arguing that jurors should not blame Mr. Woodruff for his inconsistencies because he was a "ghetto kid … a kook … an idiot, a nitwit," a "blithering idiot," and "stupid." *Id.* ¶¶ 367-369, 379-383.

There was egregious summation misconduct at Mr. Walker's trial as well that deprived him of his fair trial rights. Among other things, ADA Henry represented to the jury that Hough's statements were all "the same" while he failed to disclose Hough's recantation. Walker Compl. ¶¶ 639-643. He contended that Hough and Mr. Woodruff had no conceivable motive to lie, and that Mr. Woodruff had implicated the others out of "conscience," when he knew or should have known the suppressed evidence showed they had been tricked or coerced. *Id.* And he argued that Mr. Woodruff and Hough had been separated and could not possibly have conformed their stories when the suppressed February 11 police reports showed the DA's Office and the BPD had

pressured Mr. Woodruff to adopt Hough's new story and to testify to it in front of the grand jury. Walker Compl. ¶¶ 377-83.

## V. The Defendants Succeeded in Obtaining Their Preferred Fact Discovery Schedule Based Upon the *Monell* Discovery They Now Seek to Avoid

On February 25 and April 15, 2022, after Plaintiffs' convictions were vacated but long before they initiated these actions, Plaintiffs sent FOIL requests to the City and County seeking, among other documents, personnel files, training materials, and disciplinary records. Rudin Decl. ¶ 8-9. Despite follow-ups from Plaintiffs, neither the City nor the County produced any such documents in response to the FOIL requests. *Id.*

Plaintiffs filed the Complaints in these actions on July 6, 2022. *Id.* ¶ 10. The Complaints contain extensive factual allegations in support of Plaintiffs' *Monell* claims, including allegations of deficient policies, training, supervision, and discipline and, as to the County, allegations of numerous additional instances of prosecutorial misconduct that went undisciplined—all in support of the theory of deliberate indifference by policymakers. Boyd Compl. ¶¶ 464-663. Plaintiffs specifically identified a series of cases in which courts reprimanded the County or the BPD for misconduct akin to the misconduct in this case. Boyd Compl. ¶¶ 553-613.

On August 30, 2022, this Court ordered an initial case management conference to be held on September 30, 2022. *See* Dkt. 29. Prior to the parties' initial meet-and-confer to negotiate a scheduling order for discovery, Plaintiffs sent Defendants a proposed order providing for a six-month period to complete all fact discovery, including *Monell* discovery. Dkt. 33 at 1-2. During the September 12, 2022 meet-and-confer, the County requested a 30-day expansion of the fact discovery period (and the City joined in that request). *Id*. After Plaintiffs agreed to Defendants' counterproposal, Defendants retracted their agreement and said that the proposed schedule was no longer acceptable. *Id*. Defendants explicitly argued that a more extended discovery window was

necessary because Plaintiffs would seek discovery to support their *Monell* claims. *See* Dkt. 33 at 2-3; Defendants did not mention bifurcation on this call. Rudin Decl. ¶ 11.

Having failed to agree, the parties submitted competing proposals to the Court. Plaintiffs requested a 7.5-month period to complete all fact discovery. *See* Dkt. 34. Defendants proposed a 13-month schedule that specifically included language calling for the completion of "*All fact discovery* … by no later than October 23, 2023." Dkt. 32-1 (emphasis added). Consistent with their proposed schedule, Defendants made no mention of bifurcation. *See* Dkt. 32.

On September 29, 2022, in advance of the initial case management conference, Plaintiffs served their interrogatories and documents requests. *See* Dkt. 63, Exs. 1, 2. Plaintiffs' discovery requests sought documents and information clearly relevant to the *Monell* claims. *Id.*

The Court held a scheduling conference on September 30, 2022. *See* Dkt. 65. After hearing from both sides, the Court entered a scheduling order that included a period of 10 months to complete "all fact discovery." Dkt. 34. The Court's order also provided that no extension of the deadlines would be granted except upon a motion filed prior to an applicable deadline showing good cause to modify the deadline. *Id.* Fully aware of the scope of Plaintiffs' discovery requests, Defendants failed to raise bifurcation once again. *See* Dkt. 65.

**VI. Defendants Failed to Raise Bifurcation For the Next Four Months**

Defendants served their responses to Plaintiffs' discovery requests on October 31, 2022. *See* Dkt. 48, Exs. A, B. Both Defendants objected to each and every interrogatory and document request on numerous grounds. *Id*. Defendants did not object to any on the grounds that *Monell* discovery should be bifurcated or was premature. *Id.* Over the course of the next three months, the parties had at least five teleconferences and Defendants sent Plaintiffs at least six written correspondences concerning *Monell* discovery, at no time raising the prospect of bifurcation. Rudin Decl. ¶ 10. To the contrary, Defendants asserted either that they were unable to find certain

*Monell* discovery, would produce other *Monell* discovery, and in certain circumstances were refusing to produce some *Monell* discovery because they had purportedly concluded that it was unduly burdensome, thus giving all indications that "all" fact discovery was proceeding as the Court's scheduling order required. Dkt. 48 Exs. D, H, I, J.

The County did not even raise the prospect of bifurcation when Plaintiffs filed a pre-motion letter with this Court on January 6, 2023 concerning Defendants' failures to produce *Monell* (and other) discovery. *See* Dkt. 48. The Court scheduled a hearing for January 13, 2023.[3] *See* Dkt. 49. When the Court asked the County for an explanation of their delayed production, the County did not mention bifurcation; instead, it stated that they had "work[ed] through [Plaintiffs'] requests" and had "broken the log jam." *See* Dkt. 60 at 8:01-11.

Defendants requested bifurcation in pre-motion letters on January 23, 2023, four and a half months after Plaintiffs provided their initial discovery requests. Dkt. 55, 57; *see also* Dkt. 63, Exs. 1, 2.

## VII. Defendants' Bifurcation Motions

At a January 25 hearing on Plaintiffs' motion to compel, Plaintiffs proposed that Plaintiffs and Defendants file briefs in support of their motions to compel and for bifurcation, respectively, in seven days. Tr. of Jan. 25 Hearing at 9:2-9. The County informed the Court that it needed three weeks to file its bifurcation motion, delaying the filing of Plaintiffs' motion to compel. *Id.* at 9:23-10:1. Evidencing its real motive—further delay—the County ended up filing a boilerplate motion that, except for three pages at the beginning discussing the circumstances of this case, is virtually identical to the submission it made in *Dixon v. City of Buffalo, et al.*, 19-cv-1678. Indeed, the

---

3 The City raised the issue of bifurcation for the first time in a letter filed on January 13, 2023, one hour before the scheduled conference. *See* Dkt. 52.

County's cynical copy-and-paste of a motion it could have prepared in a few hours is shown by its reference to how a joint trial might prejudice the fair trial rights of individual County defendants, even though in this case, unlike in *Dixon,* there is no individual County defendant. *See* Mem. of Law in Support of County's Motion to Bifurcate ("County Mem."), Dkt. 62-1, at 9-10. Neither of the Bifurcation Motions establishes good cause for modifying the Court's scheduling order. Both motions rely almost entirely on the conclusion that bifurcation is warranted because the Court will grant summary judgment to Defendants as to constitutional violations, but neither explains why the Court would do so, or engages with any of the hundreds of facts in the Complaints that are based on documents already in the record and that will easily defeat summary judgment.

## ARGUMENT

### I. Principles of Estoppel and Waiver Bar the Defendants' Untimely Request for Bifurcation

Defendants sought and obtained from this Court a scheduling order providing that "all fact discovery" would be completed in a period of 10 months, and that good cause is required to modify that order. *See* Dkt. 34. Having sought and obtained that schedule based on the anticipated scope of *Monell* discovery, Defendants cannot now, after allowing half of that period to elapse, seek to bifurcate that discovery. Principles of estoppel and waiver bar the Defendants from doing so.

Estoppel is meant to "prevent internal inconsistency, to preclude litigants from playing 'fast and loose' with the courts, and to avoid deliberate changing of positions for exigencies of the moment." *McKinley v. Everest Receivable Servs., Inc.*, 2022 WL 446407, at *6 (W.D.N.Y. Feb. 14, 2022) (quoting *Browning Mfg. v. Mims*, 179 F.3d 197, 206 (5th Cir. 1999). Courts apply judicial estoppel when (1) a party's new position is "clearly inconsistent with its earlier position"; (2) the court adopted the party's previous position in the earlier proceeding; and (3) the party asserting the conflicting position would "derive an unfair advantage against the party seeking

estoppel." *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (citation omitted). In addition to these three factors, the Second Circuit applies judicial estoppel to "situations where the risk of inconsistent results with its impact on judicial integrity is certain." *Id.* (citation omitted). This requirement is satisfied if the court had previously "accepted the accuracy of the litigant's statements." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 696 (2d Cir. 2011). Defendants' transparent strategy of delay easily satisfies each of these factors.

### A. Defendants' Current Position Cannot Be Reconciled with Past Representations to the Court

Courts apply the principal of judicial estoppel when there is a "a true inconsistency between the statements in the two proceedings" and if these statements cannot be reconciled, there is occasion to apply estoppel. *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72-73 (2d Cir. 1997). Such inconsistencies are found when plaintiffs "fail[] to disclose [] relevant claims" during proceedings and then "continue[] to pursue undisclosed claims on his own behalf and for his sole benefit despite learning that he was obligated to disclose them." *Isnady v. Vill. of Walden*, 2022 WL 3587593, at *16 (S.D.N.Y. Aug. 19, 2022). The inconsistent position does not need to be a deliberate misrepresentation: the court may find that judicial estoppel prevents a party from "tak[ing] a position in the short term knowing that it may be on the verge of taking an inconsistent future action." *In re Adelphia Recovery Tr.*, 634 F.3d 678, 696 (2d Cir. 2011). In *Adelphia*, the Second Circuit determined that a party's previous position was inconsistent because it "left th[e] court with [a] distinct … belief," and the court and other parties would have "undoubtedly" approached the situation differently. *Id.* at 697-98.

Here, Defendants' prior position on *Monell* is well-documented. Defendants proposed a schedule to Plaintiffs and this Court that omitted any mention of *Monell* bifurcation. *See* Dkt. 32-1. Through months of meet-and-confers, correspondence, and filings with the Court,

Defendants failed to raise the issue. Rudin Decl. ¶ 18. Most critically, Defendants' earlier short-term position—that they needed a longer discovery period to account for simultaneous, non-bifurcated *Monell* discovery—was reflected in their proposed case management order. Dkt. 32-1. This omission, strategic or unintentional, cannot be reconciled with this instant motion.

**B. The Court Adopted Defendants' Position in Its Case Management Order.**

The second factor in judicial estoppel analysis is met when "the party's former position has been adopted in *some way* by the court in the earlier proceeding." *Lia v. Saporito*, 541 F. App'x 71, 74 (2d Cir. 2013) (citation omitted). In assessing the second factor, courts inquire as to whether a "party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id.* (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 170 (2010) (emphasis omitted)). The court need not expressly adopt this prior inconsistent position. *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.4 (2d Cir. 2011).

Defendants clearly sought an elongated discovery period that included additional time based on the need to accommodate *Monell* discovery. They proposed a fact discovery period that was six months longer than Plaintiffs' proposal and far exceeded the Court's instruction that the case be scheduled for trial within a year of the initial conference. *See* Dkt. 32-1. To ameliorate concerns about these complexities, the Court set a schedule that was longer than Plaintiffs' original proposal and exceeded the district's standard discovery calendar. *See* Dkt. 34. The Court expressly set a date of August 2, 2023 for the close of *all* fact discovery—resting on Defendants' failure to assert discovery would be bifurcated. *See* Dkt. 34.

**C. Granting Defendants' Bifurcation Motions Would Prejudice Plaintiffs**

Courts also consider whether the party asserting the inconsistent positions would receive an "unfair advantage against the party seeking estoppel," or whether it presents an "unfair

detriment" to the party seeking estoppel. *In re Adelphia Recovery Tr.*, 634 F.3d 678, 696 (2d Cir. 2011); *see also DeRosa*, 595 F.3d at 103 (the doctrine of judicial estoppel applies "especially" when it prejudices "the party who has acquiesced in the position formerly taken by [the party to be estopped]" (citation omitted)). Here, the detriments are obvious. Plaintiffs have litigated the entire case in reliance on the Case Management Order and on Defendants' failures to object to Plaintiffs' discovery requests as premature or otherwise based on bifurcation,[4] with the understanding that Defendants were engaging in good-faith meet-and-confers about all fact discovery, which would conclude in August. Had Plaintiffs known that Defendants were seeking to bifurcate *Monell* discovery, Plaintiffs would have teed that issue up for the Court months ago, rather than spending hours attempting to prosecute such issues through meet and confers.

Moreover, bifurcation will only continue to prejudice Plaintiffs by causing further delay to multiple rounds of document discovery, depositions, and dispositive motion practice. This unnecessary delay poses risk of loss of critical witness testimony, as many of the relevant witnesses concerning events from more than four decades ago are of advanced age, and many have serious health concerns. *See* Rudin Decl. ¶ 6. Furthermore, Defendants themselves have repeatedly stated that the passage of time has resulted in a loss of documents, *see, e.g.*, County Mem. at 2, and further delay only adds to the potential of greater loss.

---

[4] Failure to object to *Monell* discovery in these circumstances alone demonstrates that Defendants waived their chance to seek bifurcation. *See, e.g.*, *Woodworth v. United States*, 287 F. Supp. 3d 345, 348 (W.D.N.Y. 2017); *Land Ocean Logistics, Inc. v. Aqua Gulf Corp.*, 181 F.R.D. 229, 229 (W.D.N.Y. 1998); *Cohalan v. Genie Indus.*, 276 F.R.D. 161, 163 (S.D.N.Y. 2011) ("A failure to respond or object to a discovery request in a timely manner waives any objection which may have been available." (citation omitted)).

**D. Granting the Bifurcation Motions Would Damage Judicial Integrity**

Judicial estoppel is intended to prevent a party who "plays fast and loose with the courts from gaining unfair advantage." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000) (citation omitted). In keeping with the principles of judicial estoppel, the Second Circuit evaluates whether "the risk of inconsistent results with its impact on judicial integrity is certain." *DeRosa*, 595 F.3d at 103. This requirement is satisfied if the court had previously "accepted the accuracy of the litigant's statements." *In re Adelphia*, 634 F.3d at 696. As discussed above, the Court relied on Defendants' representations when setting the Case Management Order, and on their agreement that no extension of the deadlines would be granted except upon a motion filed prior to an applicable deadline showing good cause to modify the deadline. Dkt. 34. To grant Defendants' Bifurcation Motions, which reverse their months-long positions and the Court's (and Plaintiffs') reliance on those positions in issuing its Order, would reward the Defendants for gaming the system.

Defendants do not even discuss the existing scheduling order, let alone demonstrate the required "good cause" to amend it. *See* Dkt. 34. "A finding of 'good cause' depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000). Here, Defendants learned of Plaintiffs' discovery requests the day before this Court entered its scheduling order. *See* Dkt. 63, Exs. 1, 2. They litigated the discovery schedule with those requests in hand and received most of the time they requested for the completion of "all fact discovery." *See* Dkt. 32-1, 34. Now, months later, they ask the Court to modify its schedule based on these same discovery requests. *See* Dkt. 62-1, 64-5. The Defendants raise no explanation for their lack of diligence and cannot show good cause for a modification. *See, e.g.*, *Shemendera v. First Niagara Bank N.A.*, 288 F.R.D. 251, 253 (W.D.N.Y. 2012) (denying motion to amend a scheduling order where the party failed to provide sufficient explanation for delay); *Arnold v.*

*Krause, Inc*. 232 F.R.D. 58, 65 (W.D.N.Y.2004), *adopted*, 233 F.R.D. 126 (W.D.N.Y.2005) (denying motion to amend where the moving party failed to show the requisite "foresight" or "attention" to predictable discovery issues.).

## II. The County Fails to Show Good Cause to Bifurcate Discovery

The purpose of Section 1983 is to vindicate the rights of individuals who have been harmed by public officials' violation of their constitutional rights. *See Mitchum v. Foster*, 407 U.S. 225, 242 (1972). Section 1983 litigation against municipalities serves not only to provide compensation for constitutional torts but also to hold municipalities accountable for their conduct and deter future abuses. *See Owen v. City of Indep., Mo.*, 445 U.S. 622, 651 (1980) (denying immunity to municipalities in order to afford a remedy against a "[government] institution that has been established to protect the very rights it has transgressed."); *Daniels v. City of Sioux City*, 294 F.R.D. 509, 512 (N.D. Iowa 2013) (the purpose of such litigation is to "discover, and bring to light, evidence of governmental abuses"); *Cadle v. City of Chicago*, 2015 WL 6742070, at *4 (N.D. Ill. Nov. 2, 2015) (*Monell* claims "potential for policy change and deterrence … provides non-monetary benefits not only to Plaintiff but society generally").

"Contrary to Defendants' representation, "[b]ifurcation is the exception rather than the rule." *Crawley v. City of Syracuse*, 2018 WL 3716782, at *4 (N.D.N.Y. Aug. 3, 2018) (citation omitted). The party seeking "bifurcation 'bears the burden of demonstrating good cause.'" *Lopez v. City of New York*, 2021 WL 2739058, at *1 (S.D.N.Y. July 1, 2021) (quoting *Roper v. City of New York*, 2017 WL 462270, at *1 (S.D.N.Y. Jan. 25, 2017)).

"[A] court determining whether to grant a stay of discovery pending a motion [to bifurcate] must look to the particular circumstances and posture of each case." *Roper*, 2017 WL 462270, at

*1 (first alteration in original) (citation omitted).[5] While courts in this Circuit and elsewhere have granted bifurcation of *Monell* claims in certain cases, there the underlying constitutional claims were in doubt or the *Monell* claim appeared weak or unserious. Courts *deny* bifurcation motions where the individual defendants' liability would not be dispositive of municipal liability, or where "there is a close nexus between the conduct of an official on a given occasion and a municipal practice or policy," *Pavlovich v. City of New York*, 1992 WL 230472, at *3 (S.D.N.Y. Aug. 31, 1992) (citation omitted), and thus there is likely to be a substantial overlap of witnesses and evidence. *See, e.g.*, *Lopez*, 2021 WL 2739058, at *1; *Casaccia v. City of Rochester*, 2020 WL 1042149, at *3; *Carter*, 2013 WL 553756, at *1; *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 480 (S.D.N.Y. 2009); *McCoy v. City of New York*, 2008 WL 3884388, at *2-3 (E.D.N.Y. Aug. 13, 2008); *DeVito v. Barrant*, 2005 WL 2033722, at *11 (E.D.N.Y. Aug. 23, 2005). Such is the case here.

Even in cases where bifurcation is otherwise appropriate, the court must examine whether the prejudice to the party opposing bifurcation outweighs the benefits. *See Casaccia*, 2020 WL 1042149, at *3 (courts consider "whether the party opposing bifurcation will be prejudiced if it is granted" (citation omitted)). Given Plaintiffs' health concerns, the potential for prejudice is enormous.

---

[5] Defendants mention two cases in this District where bifurcation was granted, but in numerous wrongful conviction cases brought by Plaintiffs' counsel alleging constitutional violations by district attorney's offices and police departments, bifurcation has virtually always been denied. *See* Rudin Decl. ¶ 125. Plaintiffs' counsel was co-counsel in the *Bellamy* case the County cites. *See* County Mem. at 7. The Second Circuit's decision reversing summary judgment, contrary to the County's citation, did not endorse bifurcation but merely noted it had occurred, and then, the case having been needlessly delayed several years, ordered *Monell* discovery to occur. *See Bellamy v. City of New York*, 914 F.3d 727, 756 n.29 (2d Cir. 2019).

### A. The Evidence That County Prosecutors Committed Constitutional Violations Is Overwhelming

The County is unlikely to prevail at summary judgment based on a defense that the County did not commit a constitutional violation. Justice Burns already has found that *Brady* material was not disclosed and overturned Plaintiffs' convictions because there is a reasonable probability that disclosure of such evidence would have resulted in a favorable outcome in Plaintiffs' trials. *See* Decision and Order at 5-6, *People v. Walker and Boyd*, No. 41413 (Sup. Ct., Erie Co., August 18, 2021). This finding was based upon evidence that Plaintiffs can present: the testimony of Judge McLeod together with notes from the ECDA's own files corroborating his testimony. Rudin Decl. ¶ 99. The suppression of these photographs alone suffices to defeat summary judgment.

But the non-disclosure of two photographs is only the visible tip of the iceberg of misconduct previously submerged in the records of this investigation and prosecution. Defendants failed to disclose numerous pieces of additional *Brady* material including evidence pointing to two other men as the likely killer or killers; the taxicab evidence together with the evidence of when the crime occurred; and the evidence showing that the testimony of Mr. Woodruff and Hough was coerced, manufactured, and contradicted by other witnesses. *See* supra 4-13. This evidence unquestionably was favorable and material, and thus was required to be disclosed under *Brady*.

These facts rebut the County's key justification for phasing discovery. The County relies on precedent where courts bifurcated discovery until "enough information is available on the individual claims—either at the close of discovery or following summary judgment—to assess the strength of a claim that a constitutional violation actually took place." *Oliver v. City of New York*, 540 F. Supp. 3d 434, 436 (S.D.N.Y. 2021) (quoting *Roper*, 2017 WL 462270, at *1). However, the County cites absolutely no facts suggesting it has a path to summary judgment. Meanwhile,

Plaintiffs have shown—based on court records, trial transcripts, and police records from the ECDA's own files referenced in the Rudin Declaration—there is no such path.

Plaintiffs also have plausibly alleged, and can prove with the trial transcripts alone, summation misconduct so egregious and prejudicial that it violated their constitutional right to a fair trial. ADAs Drury and Henry grossly misled the jury in each case and made arguments they knew were false in light of the *Brady* material they knew or should have known about but had withheld. ADA Drury also made inherently racist appeals while improperly vouching for the credibility of the prosecution's witnesses. *See* supra at 12-13. The Second Circuit, in *Bellamy*, 914 F.3d at 762, held that a *Monell* claim can be based upon summation misconduct and the impact of such misconduct on the outcome of the criminal trial is a jury question. Where, as here, the underlying constitutional violation is clear, there is no proper basis to block *Monell* discovery.

The strength of Plaintiffs' *Monell* claims against the County distinguishes this case from *Dixon v. City of Buffalo*, and other cases granting motions to bifurcate. Unlike in *Dixon*, where this Court bifurcated discovery in part because of the possibility that discovery would show the plaintiff's constitutional claims were not viable, *see Dixon v. City of Buffalo, et al.*, 19-cv-1678 (WMS)(JJM) (W.D.N.Y., Mar. 8, 2022), Dtk. 73 at 9, here, evidence in the record already substantiates the underlying constitutional claims and ensures that *Monell* discovery will occur.

Moreover, unlike in *Dixon*, where the plaintiff had an individual claim against a prosecutor, here, Plaintiffs' *only* constitutional claim involving the County is their *Monell* claim.[6] As Judge

[6] To the extent Defendants think they can prevail based on any collateral estoppel effect of decisions denying Plaintiffs' earlier 440 motions, *see* County Mem. at 1, County Answer 54-55, City Answer ¶ 685, they would be wrong as a matter of law to assert that these judgments have any preclusive effect. *See, e.g., Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 366 (W.D.N.Y. 2021); *see also United States v. Lawson*, 736 F.2d 835, 837 (2d Cir. 1984) (effect of reversal of criminal conviction is to "nullify the judgment entirely and place the parties in the position of no trial having taken place"). In any event, several constitutional violations at issue here either were never raised

Chin stated in denying a motion to stay *Monell* discovery, "If I deny the motion [to dismiss plaintiff's *Monell* claims based on the District Attorney's conduct], then I'm going to allow *Monell* discovery. There's no point in bifurcating it, because that's really all we have with respect to that part of [the case]." *Ambrose*, 623 F. Supp. 2d 454 at 480. The only effect of bifurcation here would be to cause unnecessary and prejudicial delay.

The County's legal argument that Plaintiffs' *Monell* claim may be untenable as a matter of law, *see* County Mem. at 16, is not in good faith. In *Bellamy v. City of New York*, 914 F.3d at 760, and *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), the Second Circuit squarely upheld lawsuits against a municipality (there, the City of New York) based upon prosecutorial *Brady* violations and, in *Bellamy,* summation misconduct as well. In *Bellamy*, the Second Circuit rejected the County's argument here that municipal liability may be foreclosed by *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), which only deals with immunity for individual prosecutors and has no application to liability under *Monell*. As for *Jones v. City of New York*, 988 F. Supp. 2d 305 (E.D.N.Y. 2013), not only did that court dismiss claims based on the sufficiency of the plaintiff's proof, *id.* at 318, but also, to the extent it suggested there could be no municipal liability for prosecutorial misconduct, *Bellamy* expressly rejected this suggestion, 914 F.3d at 760. It is extraordinary that the County would choose to ignore well-known, controlling Second Circuit decisions.

---

in a 440 motion (e.g., evidence fabrication and malicious prosecution) and others were resolved in Plaintiffs' favor (i.e., the granting of Plaintiffs' 440 motion based on Defendants' failure to provide Plaintiffs with certain crime scene photographs).

Plaintiffs also have a claim against the County for negligent failure to properly hire, train, supervise, and discipline the ECDA prosecutors who investigated and/or prosecuted Plaintiffs and caused their wrongful prosecution and conviction. That claim, too, requires discovery into office-wide policies and practices

Finally, the County's argument that it would suffer prejudice if *Monell* discovery is not bifurcated is nonsensical. *See* County Mem. at 15-17. The municipality is the only County defendant and cannot be prejudiced by evidence required to demonstrate its own unconstitutional policy or custom under *Monell*.

**B. Bifurcating Discovery Would Waste Judicial and Party Resources**

As discussed above, because *Monell* discovery will occur irrespective of the County's Bifurcation Motion, staying *Monell* discovery would impede, not further, judicial economy. *See Cadiz v. Kruger*, 2007 WL 4293976, at *5 (N.D. Ill. Nov. 29, 2007) (deferring *Monell* discovery "would create additional costs and inefficiencies. . . without achieving any offsetting benefit"). Bifurcation would prolong the case through unnecessary discovery disputes and the inefficiencies of two separate rounds of discovery, including second depositions of many witnesses, and two rounds of summary judgment briefing. Two complex sets of summary judgment motions not only would waste the parties' time but would create massive judicial inefficiency.

There are up to six ADAs involved in this case who would have to be deposed twice: the trial prosecutors—Timothy Drury, David Henry, and James Verrastro—and the appellate prosecutors who perpetuated violations of Plaintiffs' constitutional rights by continuing the ECDA's suppression of favorable evidence, including ADAs Louis Haremski, Nicholas Texido, and Donna Milling. Rudin Decl. ¶ 16. Former Erie County DA Cosgrove would also need to testify twice, first regarding his involvement in this case and then regarding his role setting policies. *Id.* ¶ 6. Several defense attorneys, including Judge McLeod, could need to testify twice, first about their involvement in this case and then about their experience dealing with the ECDA more broadly. *Id.* ¶ 7.

Furthermore, recent experience in this circuit shows that bifurcation raises discovery disputes on the scope of deposition questioning. In this district, the example of *Gugino v. City of*

*Buffalo, et al.* 21-cv-283 (LJV)(LGF) (W.D.N.Y.) reveals the complexities of determining whether deposition questions bear upon *both* the underlying constitutional violations, on the one hand, and training and policy, on the other. *See* Rudin Decl. ¶ 118; *see also Rustgi v. Reams*, 536 F. Supp. 3d 802, 827 (D. Colo. 2021) ("Bifurcation in this case, where there is close connection and overlap between the individual and entity liability claims, would be costly, waste time, and result in duplicative litigation."). Training and policy are relevant in questioning the prosecutors about what they did, or likely did, in this particular case, particularly where the enormous passage of time may have dimmed their memories. Additionally, their history of misconduct would be relevant to whether, under F. R. Evid. 404(b), they acted similarly here, and to their testimonial credibility. *See, e.g., Ismail v. Cohen*, 899 F.2d 183, 188 (2d Cir. 1990) (affirming admission under Rule 404(b) of post-incident misconduct evidence that officer participated in a similar incident soon after the incident at issue); *Gross v. Lunduski*, 304 F.R.D. 136, 147 (W.D.N.Y. 2014) (finding misconduct files subject to discovery where information could be used for Rule 608(b) impeachment). Similarly, office policy, training, and practice would be essential areas of questioning in determining whether their summations were in bad faith.

The County cannot show good cause to bifurcate discovery merely because *Monell* discovery may prove burdensome. "The examination of governmental policy and custom necessary to prove up a *Monell* claim is not, under the law, an independent harm against which the Court must protect; it is a consequence of the standards set forth by the Supreme Court for the establishment of municipal liability." *Lopez*, 2021 WL 2739058, at *2.

The County contends that it may need to review "possibly hundreds of criminal cases," County's Mem. of Law at 13, "an unknown universe of criminal cases," *id.* at 14, and "countless other prosecutions," *id.* at 16. This is a speculative burden of its own creation. Plaintiffs claim

that the County had a policy of deliberate indifference to *Brady* violations and summation misconduct, shown by an absence of training, supervision, and discipline despite a history of violations found in court decisions. Boyd Compl. ¶¶ 543, 552-591. Plaintiffs have requested materials from 31 cases described in the Complaint where courts have *already found* prosecutorial misconduct by the ECDA. *See* Dkt. 63, Ex. A. Plaintiffs are entitled to the names of the prosecutors and any records showing they were, or were not, investigated or disciplined after the appellate courts criticized their misconduct, or whether they received raises and promotions. *See* Dkt. 63.1 at 15-18, Memorandum of Law in Support of Plaintiffs' Motion to Compel Discovery ("Mot. to Compel"). Whether prosecutors were investigated or disciplined is a matter of historical record. Indeed, Plaintiffs' theory most likely will be proven by an *absence* of disciplinary records. Furthermore, the courts' findings in these cases *already* reveal misconduct; production of the appellate briefs and motion papers will reveal whether the County defended and ratified the illegality. After the County informs Plaintiffs which files they have located, Plaintiffs' counsel can work with the County to streamline discovery, including reviewing the trial transcripts to determine which ones, if any, should be photocopied.

While it is true the Complaints also allege a separate theory of unlawful custom or practice to withhold evidence, Defendants have no burden to prove that in other cases they acted lawfully. Accordingly, the County's claimed discovery burden concern is a red herring. Moreover, as discussed in Plaintiffs' motion to compel, the County's minimal efforts to comply with discovery thus far belie their claims of burden. Mot. to Compel at 7-11. The County's burden arguments rest on the assumption that bifurcation in these cases is the rule rather than the exception. *Monell* claims inherently require broader discovery than individual claims, but if that were sufficient to require bifurcation, then bifurcation would be automatic and not a matter of a case-by-case

analysis. As the court in *Pavone v. Gibbs* said of this exact argument, "there is no limiting principle to defendants' argument. If defendants were granted the relief they seek on this record based only upon speculation and their generalized assertion of prejudice, then the trial of virtually any civil rights action against a municipality and its individual employees would require bifurcation." 1997 WL 833472, at *2 (E.D.N.Y. Sept. 29, 1997).

The County's concern about privilege is another red herring. Despite having months to sift through the requested case files, the County has not identified any privileged documents. Mot. to Compel at 13. There is a process for claiming privilege and protecting privacy: serving a privilege log and moving for a protective order. The County has failed to take these steps. *Id.* Raising the complexity of privilege issues as a basis for bifurcation, while failing to respond to requests for a privilege log, is yet another example of the County's cynical approach to discovery.

Finally, the County claims that responding to Plaintiffs' discovery requests relevant to their *Monell* claim will "significantly delay dispositive motion practice." *See* County Mem. at 9. The County seeks to grant itself the power to unilaterally extend the Case Management Order, under which there is a generous deadline before dispositive motions are due. *See* Dkt. 34. The deadline was set three months after the filing of the Complaints, with full awareness of Plaintiffs' claims, and *after* Plaintiffs served their discovery requests. *See* supra at 14. It may only be extended for "good cause." *See* Dkt. 34. The County's gamesmanship in delaying discovery through inaction and then filing a belated, baseless bifurcation motion is not "good cause" for still more extensions.

**C. Bifurcating Discovery Would Severely Prejudice Defendants**

Even if there were a legitimate benefit from bifurcation—and there is none—it would be outweighed by the irreparable prejudice bifurcation would cause Plaintiffs. Plaintiffs, both in their 60s, struggle with severe health problems. Rudin Decl. ¶ 6. They are entitled to have their claims heard expeditiously on the merits; a delay risks their not living to testify when the cases go to trial.

Delay due to bifurcation would also pose an unacceptable risk of depriving Plaintiffs of meaningful testimony from the various essential witnesses. The age of the witnesses is a basis to *expedite Monell* discovery. *See Johnson v. Baltimore Police Dep't*, 500 F. Supp. 3d 454, 463 (D. Md. 2020) (denying motion to stay *Monell* discovery in 32-year-old wrongful conviction case because of the prejudice from the risk of losing evidence from fading memories). Former Erie County DA Cosgrove is central to Plaintiffs' claims of unconstitutional policies or practice and failure to train or discipline, but he is 88 years old. Rudin Decl. ¶ 6. Defendants Montondo and Guadagno are 91 and 77, respectively. *Id.* ADAs Drury and Henry are 82 and 76, respectively. *Id.* Plaintiffs' other potential witnesses include Mr. Boyd's mother, who is 80 and was recently diagnosed with lung cancer, and defense attorneys Gary Bittner, who represented Mr. Gibson, Mr. Hulnick, and Judge McLeod, who are 78, 78, and 73, respectively. *Id.* ¶ 7. The risks of delay are clear; Mr. Walker's trial attorney, David Jay, is deceased, as are all but two of the detectives. *Id.* ¶ 6, 90.

## III. For Similar Reasons, the City's Bifurcation Motion Should be Denied

### A. The City Cannot Prevail on the Underlying Constitutional Violations at Summary Judgment

The City's conclusory argument that Plaintiffs' claims somehow will not survive summary judgment is equally dubious. Plaintiffs' claims of evidence fabrication, malicious prosecution, and *Brady* violations against the Individual Defendants and the City are immune from summary judgment as well. All turn on issues of fact that must be submitted to a jury.

*First*, Plaintiffs allege that the Individual Defendants fabricated evidence against them. These claims are based on witness testimony corroborated by documentary evidence. Mr. Woodruff was the principal witness against Plaintiffs whose coerced statements and testimony were used in the criminal complaint depriving Plaintiffs of their liberty, grand jury testimony

resulting in their indictment, and trial resulting in their convictions. Mr. Woodruff already has given sworn testimony that he was coerced into signing false statements and that his hours of denials were omitted from P-73 reports. Rudin Dec. ¶ 58. Even without his testimony, police reports and transcripts reveal the BPD's effort to coerce Mr. Woodruff and Hough to confess and match their stories to the prosecution's invented narrative. *See* supra at 6-9.

*Second*, the strength of Plaintiffs' claims of malicious prosecution is already clear. In addition to the evidence of the BPD coercing Mr. Woodruff, the Individual Defendants manufactured a case against Plaintiffs knowing that it was impossible for them to have committed the crime: the timing of the crime, together with the taxicab company's logbook showing Messrs. Walker and Woodruff were on their way home before the crime happened, shows police *knew* the story they coerced from Mr. Woodruff and Hough was false. *See* supra at 5-6, 10, 24. The evidence inculpating Watson and Jerome Boyd further showed that the BPD knew that other individuals murdered Mr. Crawford while prosecuting Plaintiffs and their teenaged friends. *See* supra at 4-5.

*Third*, a jury could readily find that the Individual Defendants violated Plaintiffs' *Brady* rights by withholding favorable documents from the ECDA. A jury could credit former ADAs Drury's and Henry's sworn testimony that they would have disclosed all such *Brady* material and infer therefore that police withheld favorable evidence from the prosecutors. *See* supra at 11. The trial transcripts and other records establish that favorable evidence was not disclosed to the defense. Rudin Decl. ¶ 100. While Plaintiffs also seek to hold the County liable for the *Brady* violations, they are entitled to pursue alternative theories of liability and let a jury decide how to apportion liability and damages.

Not a single fact alleged in this case and discussed above is mentioned in the City's Bifurcation Motion. *See* Mem. of Law in Support of City's Motion to Bifurcate ("City Mem."), Dkt. 64-5. Instead, the City cites *Dixon v. City of Buffalo,* without any factual analysis of why the bifurcation granted there would be appropriate here. Indeed, it is telling that, in the City's declaration, it *concedes* that Plaintiffs likely have sufficient evidence to show the underlying violations occurred. *See* Dkt. 64-1 at ¶ 6 ("If even a small portion of the story told in the complaints regarding what happened to plaintiffs could be substantiated, plaintiffs would seemingly have more than sufficient evidence to pursue liability against all individual defendants as well as the City."). This concession all but defeats the City's motion. In essence, the City's treats bifurcation as automatic in *Monell* cases, but this is directly contrary to the law, which requires an examination of "the particular circumstances and posture of each case." *Roper*, 2017 WL 462270, at *1.

Indeed, the strength of the underlying constitutional claims, the limited scope of remaining *Monell* discovery from the City, and the posture of discovery in this case are all factors that distinguish this case from *Dixon*.

In *Dixon*, this Court was concerned about the burden on the defendants of *Monell* discovery. *See Dixon*, Dkt. 73 at 7-9. Here, *Monell* discovery against the City is extremely limited and already largely completed. The City has represented to Plaintiffs and the Court that it has already produced all the personnel files of the BPD employees requested by Plaintiffs in its possession, does not possess any training materials from the time period in question, and has produced all available policies and procedures in its possession responsive to Plaintiffs' requests. *See* Dkt. 57. As a result, the remaining *Monell* document discovery the City portrays as "overwhelming" is limited to producing a set of minutes from meetings of the City's claims committee as well as formal responses to Plaintiffs' interrogatories and discovery requests

confirming the City's representations. Mot. to Compel at 19-20. If any document or deposition discovery proves burdensome, the Court can deal with this in the ordinary course. *See Lopez*, 2021 WL 2739058, at *1 ("Defendants' issues with respect to the scope of discovery at this stage are best dealt with pursuant to the standards under Federal Rule of Civil Procedure 26(b) rather than through a stay or bifurcation of discovery.").

Additionally, in *Dixon*, this Court was unconvinced by the plaintiff's concern about delay given that the case had been pending for over two years with little discovery and that the plaintiff had waited more than a year before moving to compel. *See Dixon*, Dkt. 128 at 5, 9. In this case, Plaintiffs have been diligent, providing their discovery requests the day before the initial conference and pressing for discovery updates throughout the case. Mot. to Compel at 6-11.

The City's self-serving assertion that the bifurcation order benefited the litigants in *Dixon* does not stand up to scrutiny. *See* City Mem. at 5. Plaintiff's counsel in *Dixon* had already scheduled depositions before the bifurcation order. *Dixon v. City of Buffalo*, 19-cv-1678 (WMS)(JJM) (W.D.N.Y.), Dkt. 64 (Feb. 2, 2022). Nothing suggests that depositions have narrowed the plaintiff's *Monell* claim.

The City's reliance on another case in this District, *Gugino v. City of Buffalo*, is further misplaced. In *Gugino*, in ordering written discovery bifurcated, the court was not convinced of the strength of the plaintiff's claim of individual liability, including administration of an allegedly unconstitutional curfew. 21-cv-283 (LJV)(LGF), Dkt. 48 at 6 (Oct. 6, 2022). The court emphasized that defendants had demonstrated that plaintiffs' *Monell* requests were burdensome, *id.* at 5, and that bifurcation did not pose "serious risk of loss of evidence," Dkt. 48 at 6. This case could not be more different. The record conclusively documents the Individual Defendants'

liability. Remaining *Monell* discovery against the City will not be burdensome, and a stay would gravely prejudice Plaintiffs given their dire health and the advanced age of most witnesses.

*Gugino* is also a case study in the dangers of bifurcation. On February 13, 2023, during the first deposition in the *Gugino* case, counsel for the City[7] directed the deponent not to answer plaintiff's counsel's questions and sought a protective order based in part on the bifurcation ruling. *Gugino v. City of Buffalo, et al.*, 21-cv-283 (LJV)(LGF), Dkt. 54-4 (Feb. 13, 2023). In an emergency hearing the next day, Magistrate Judge Foschio rejected the City's abuse of the bifurcation order to prevent the plaintiff from asking questions relevant to their *Monell* claims. *See* Rudin Decl., Ex. 40 at 21, 28-29. The court stated that its order staying *Monell* document discovery applied only to document discovery. *See id.* at 22. The very next day, on February 15, the City in *this* case disingenuously described *Gugino* as a model case where the parties were making *progress* in discovery. *See* City Mem. at 5-6, Dkt 64-1 at ¶¶ 33-35.

Finally, prompt pursuit of Plaintiffs' *Monell* claim against the City is warranted due to another factor not present in the other cases: the possibility that the City will not indemnify the Individual Defendants, leaving Plaintiffs with worthless individual judgments, or that these Defendants will successfully assert qualified immunity defenses. *See Guadalupe v. City of New York*, 2016 WL 675440, at *1 (S.D.N.Y. Feb. 16, 2016) ("[I]f the individual defendants are found to be entitled to qualified immunity, the City may still be held liable, in which case it would be the only source of compensation."). The Individual Defendants may also defend against liability by blaming the City for lack of training or that their misconduct was consistent with BPD policy. *See Carter*, 2013 WL 553756, at *1 (denying motion for bifurcation because a "finding that the Individual Defendants are not liable for Carter's injuries would not necessarily obviate the need

[7] The same counsel represents the City in these cases.

for litigating his claims against the City."). A jury must be able to assign liability to the Individual Defendants, the City, or both.

### B. Conducting Discovery Against the City Seriatim Would Cause Enormous Waste and Duplication

To prove their claims of constitutional violations in the investigation and prosecution of their cases, Plaintiffs will depose the surviving Individual Defendants—Michael Guadagno and John Montondo, who are 77 and 91 years of age, respectively. Rudin Decl. ¶ 6. If discovery is bifurcated, these witnesses would need to be deposed twice.

Bifurcation would also add unnecessary complexity and confusion over the scope of depositions for individual liability. BPD training and policy is relevant to Plaintiffs' claims against the Individual Defendants because bad faith can be inferred based on egregious deviations from routine police conduct. *See King v. City of New York*, 2014 WL 4954621, at *5 (E.D.N.Y. Sept. 30, 2014). The BPD's failure to discipline officers is relevant to individual liability because the individual defendants may have coerced other suspects or witnesses, falsified documents, testified falsely, or suppressed *Brady* material knowing they would not face any consequences. *See Cadle*, 2015 WL 6742070, at *3. This overlap between the individual and the *Monell* claims means there is no neat division and that depositions, as in *Gugino*, would be a constant source of dispute.

## CONCLUSION

For these reasons, the Court should deny the Bifurcation Motions.

Dated: New York, New York
February 28, 2023

*/s/ Joel B. Rudin*
Joel B. Rudin
David E. Rudin
LAW OFFICES OF JOEL B. RUDIN, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com
david@rudinlaw.com

*/s/ Timothy W. Hoover*
Timothy W. Hoover
Spencer Durland
HOOVER & DURLAND LLP
561 Franklin Street
Buffalo, New York 14202
(716) 800-2604
thoover@hooverdurland.com
sdurland@hooverdurland.com

*/s/ Ross E. Firsenbaum*
Ross E. Firsenbaum
Ryanne E. Perio
Gideon A. Hanft
Phoebe Silos
Erin Hughes
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
ross.firsenbaum@wilmerhale.com
ryanne.perio@wilmerhale.com
gideon.hanft@wilmerhale.com
phoebe.silos@wilmerhale.com
erin.hughes@wilmerhale.com

*Attorneys for Plaintiffs Darryl Boyd and John Walker, Jr.*