**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| DARRYL BOYD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| - against - | ) | **Case No. 1:22-cv-519** |
| | ) | |
| THE CITY OF BUFFALO; THE COUNTY OF ERIE; MICHAEL G. GUADAGNO; JOHN MONTONDO; LINDA J. FIAL AS EXECUTOR FOR THE ESTATE OF ROBERT GRABOWSKI; AND MARTIN BULLOCK AS EXECUTOR FOR THE ESTATE OF JAMES E. HUNTER, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

|  |  |  |
|---|---|---|
| JOHN WALKER, JR. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| - against - | ) | **Case No. 1:22-cv-520** |
| | ) | |
| THE CITY OF BUFFALO; THE COUNTY OF ERIE; MICHAEL G. GUADAGNO; JOHN MONTONDO; LINDA J. FIAL AS EXECUTOR FOR THE ESTATE OF ROBERT GRABOWSKI; AND MARTIN BULLOCK AS EXECUTOR FOR THE ESTATE OF JAMES E. HUNTER, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF JOEL B. RUDIN IN OPPOSITION**
**TO DEFENDANTS' MOTIONS TO BIFURCATE**

JOEL B. RUDIN, an attorney admitted to practice in the State of New York, hereby declares pursuant to 28 U.S.C. § 1746, under the penalties of perjury, as follows:

### INTRODUCTION

1. I am an attorney of record for Plaintiffs John Walker, Jr. and Darryl Boyd, am fully familiar with the facts and circumstances relevant to this case, and make this Declaration in support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Bifurcate and Stay *Monell* under Fed. R. Civ. P. Rule 26(c)-(d).

2. Plaintiffs' separate lawsuits are effectively identical for purposes of opposing the Defendant's Motions to Bifurcate and Stay *Monell* Discovery (the "Bifurcation Motions"). The lawsuits each contain claims against the County of Erie, the City of Buffalo, and Michael G. Guadagno, John Montondo, Linda J. Fial as Executor for the Estate of Robert Grabowski, and Martin Bullock as Executor for the Estate of James E. Hunter (the "Individual Defendants").

3. The claims against the Individual Defendants are for evidence fabrication, malicious prosecution under state and federal law, and failure to timely disclose exculpatory evidence pretrial and *Brady* material at trial. The claims against the City are for policy, custom or practice under *Monell* and, for the state law claims, *respondeat superior* liability. The sole claim involving the County is a *Monell* claim.

4. The principal ground Defendants advance for bifurcation is that they may prevail on summary judgment on Plaintiffs' underlying constitutional claims and therefore *Monell* discovery will be unnecessary. In this declaration, I include facts and attach documentary evidence showing that the Defendants will not prevail at summary judgment, and that Defendants should be estopped from moving now for bifurcation in view of their conduct thus far in these actions.

1

### RELEVANT FACTS CONCERNING PLAINTIFFS' HEALTH
### AND THE AVAILABILITY OF WITNESSES

5.      Plaintiffs Darryl Boyd and John Walker, Jr. are both 63 years of age.  They were convicted in 1977 at 17-years-old and sent to prison.  They served 28 and 22 years, respectively.  Mr. Walker completed his parole in 2015.  Mr. Boyd was on parole until his conviction was overturned and his case dismissed in 2021.

6.      Both Mr. Boyd and Mr. Walker are in poor physical condition, and their longevity is in doubt.  Mr. Walker had a heart attack last year and suffers from heart disease, is exceedingly frail, and cannot walk except with the aid of a cane or by leaning on his teenage son.  He has been tentatively diagnosed with lung cancer and is awaiting further tests.  Mr. Boyd has stage 3 chronic kidney disease.  Former Erie County District Attorney Edward Cosgrove, who was the D.A. at the time of Plaintiffs' prosecution, is 88 years old.  The chief trial prosecutor, Timothy Drury, is 82 years old.  The other prosecutors, David Henry and James Verrastro, are 76 and 73 years of age, respectively.  Defendant John Montondo is 91 years old, and Michael Guadagno is 77 years old.  The other culpable police detectives are all deceased.

7.      Plaintiffs' criminal trial attorneys Mark Hulnick and Gary Bittner are both 78 years of age.  Judge James McLeod, who was the criminal trial attorney of one of Plaintiffs' co-defendants, is 73 years old.  Mr. Boyd's mother, a potential fact and damages witness, is 80 years old and also has been diagnosed with lung cancer.

### FACTS RELEVANT TO WHY PRINCIPLES OF ESTOPPEL AND WAIVER
### BAR DEFENDANTS FROM SEEKING BIFURCATION NOW

8.      True and correct copies of Plaintiffs' FOIL requests to the City and County for police and prosecutorial records concerning this prosecution, policy, training, and disciplinary

2

materials, and files in other cases involving similar misconduct, on February 25, 2022 and April 15, 2022 are attached as Exhibits 1-4.

9.      A true and correct copy of an email sent by Plaintiffs' counsel to Defendants' counsel regarding these requests, dated September 16, 2022, is attached as Exhibit 5.

10.      The Complaints in this case, including *Monell* claims, were filed July 6, 2022. *See* Dkt. 1. Plaintiffs met-and-conferred with Defendants regarding the entry of a scheduling order on September 12 and September 16, 2022. Plaintiffs met-and-conferred regarding discovery with the City on November 11, November 28, and December 15, 2022. Plaintiffs met-and-conferred with the County on December 6, 2022. Defendants' counsel did not raise the issue of bifurcation or object to Plaintiffs' discovery requests as premature on the grounds of bifurcation in any of these meetings.

11.      Defendants did not raise the issue of bifurcation at any point in the discovery process prior to January 13, 2023 in the case of the City, *see* Dkt. 53, and January 23, 2023 in the case of the County, *see* Dkt. 55.

### FACTS RELEVANT TO WHY DEFENDANTS WILL NOT WIN SUMMARY JUDGMENT ON THE UNDERLYING CONSTITUTIONAL CLAIMS

**Background of the Case**

12.      As set forth in the Complaints, this case involved the robbery/murder of William Crawford, shortly before midnight on January 2, 1976. The robbery/murder took place after Mr. Crawford left a tavern called the Golden Nugget to cross the street to his home at 2041 Fillmore Avenue, Buffalo. Darryn Gibson, Darryl Boyd, John Walker, Jr., and Floyd Martin were investigated, and eventually prosecuted, for this crime.

13.      Police records show that police initially focused on two suspects who were at the bar that evening: Lawrence "Larry" Watson, who lived two doors down from the victim, and

3

Jerome Boyd, who lived in a nearby housing project. They then shifted their attention to five 16 or 17-year-old African-American boys who lived nearby: Darryl Boyd, John Walker, Darryn Gibson, Floyd Martin, and Tyrone Woodruff.

14.   On January 12, 1976, Buffalo Police Department ("BPD") officers succeeded in turning Tyrone Woodruff against his friends. The officers also obtained a partially corroborating statement from a 15-year-old boy, Andre Hough. Based upon these statements, Messrs. Boyd, Walker, Gibson, and Martin were all formally charged with the robbery/murder.

15.   Four separate trials of these defendants were held in this order: Mr. Gibson, Mr. Boyd, Mr. Walker, and Mr. Martin.

16.   During the grand jury and pretrial stages, the overall case was handled by then Assistant D.A. Timothy Drury. He handled all pretrial discovery and the first two trials. The second two trials were handled by ADAs David Henry and James Verrastro. ADAs Louis Haremski, Nicholas Texido, and Donna Milling handled Plaintiffs' CPL 440.10 hearings.

**Facts Relevant to the Individual Police Claims**

17.   As noted above, the BPD's investigation initially focused on Larry Watson.

18.   Mr. Crawford had been drinking in the Golden Nugget on Fillmore Avenue, across the street from his house. He was found, fatally beaten, near the steps to the side entrance to his house, about 35 feet up his driveway. His wallet was missing. A true and correct copy of the police report describing Mr. Crawford's condition is attached as Exhibit 6.

19.   Police documents show that at least five witnesses—Margaret Crawford, William Howard, Frances Kalb, Larry Watson, and Clarence Neubecker—told police that they saw Mr. Crawford leave the bar at 11:30 p.m. or later, or that they heard thumping noises or a commotion

4

that likely involved the attack on Mr. Crawford at or after that time. True and correct copies of the police reports providing these witness statements are attached as Exhibits 6 and 7.

20.    A barmaid, Debbie Jeffrey, as well as a patron, Frances Kalb, reported that Crawford had displayed about $300 in cash while drinking at the bar with Larry Watson, as well as Mr. Watson's wife and stepson. They also reported that Mr. Watson surely saw the money because it was right in front of him. True and correct copies of these witness statements of Ms. Jeffrey and Ms. Kalb are attached as Exhibit 8.

21.    Ms. Jeffrey said that shortly after Mr. Crawford displayed the money, Mr. Watson, volunteered to walk Mr. Crawford home, that Mr. Watson left with Mr. Crawford, and that Mr. Watson returned 20-25 minutes later, gathered up his wife, and left suddenly after about 10 minutes. Ms. Jeffrey said that the pair uncharacteristically did not say their goodbyes or finish their drinks that night. A true and correct copy of this statement of Ms. Jeffrey is attached as Exhibit 9.

22.    On January 3, 1976, during an early interview, Ms. Jeffrey told police that she suspected that Watson had "harmed" Mr. Crawford, and in an interview later that day, that Watson had "time enough," presumably to commit the crime, before he returned. *See* Exhibits 7, 8.

23.    Police reports noted discrepancies between Mr. Watson's account and the accounts of the other witnesses. Mr. Watson denied seeing Mr. Crawford flashing a lot of cash and initially stated it was merely coincidental that he left at the same time as Mr. Crawford. *See* Exhibit 7.

24.    Mr. Watson claimed that he saw the screen door to his house open, and left Mr. Crawford when he crossed the street to investigate. *See* Exhibit 7.

25.    In a P-73 statement, Mr. Crawford's wife, Margaret, said that she would let her husband in the side door after he went out drinking (evidently because he would not take his keys).

5

True and correct copies of the police reports describing the statements of Mr. Crawford's wife are attached as Exhibits 6, 10.

26.     Mses. Jeffrey and Kalb reported, and Mr. Watson's wife Julia Watson, and her son William "Bill" Howard later confirmed, that after going home from the bar the second time, Mr. Watson could not find his keys. Mr. Howard told Julia Watson, who called the bar looking for the keys, that Mr. Watson had placed them in his jacket pocket (from which they could have fallen out). *See* Exhibit 7.

27.     A police report noted that a set of keys were found next to Crawford's body at the hospital, evidently recovered at the crime scene. *See* Exhibit 6.

28.     Defendants have produced no police voucher for the keys and no report indicating that any attempt was made to investigate if they belonged to Mr. Crawford or Mr. Watson.

29.     A BPD report notes that on January 3, 1976, police received an anonymous tip that the individuals who committed the offense were "Andre Howe" and "Jerome Boyd." A true and correct copy of the report containing this anonymous tip is attached as Exhibit 11.

30.     Police found that Jerome Boyd (no relation to Darryl Boyd) had a criminal record, lived nearby in the Glenny Drive Projects, was 37 years of age, and was African American. A true and correct copy of the police report on Jerome Boyd is attached as Exhibit 12.

31.     Mr. Watson had told police that a dark-skinned man with kinky hair in his 30s followed him and Mr. Crawford out of the bar. A true and correct copy of the statement of Mr. Watson is attached as Exhibit 13.

32.     Police showed Jerome Boyd's photo to witnesses who had been at the bar that night. The bar owner, Ralph Davis, recognized Jerome Boyd as a regular customer. A bartender, Theotis Love, identified Jerome Boyd as a man he had served a drink on the night of Mr. Crawford's

murder. Bar patron Frances Kalb identified him as "a real big guy that came in and talked with Julia [Watson] and stayed for only a few minutes." True and correct copies of the reports and witness statements indicating Jerome Boyd's presence in the bar that evening are attached as Exhibit 14.

33.    On January 7, 1976, police received an anonymous tip that Darryn Gibson had been involved in the crime. A true and correct copy of the report containing this anonymous tip is attached as Exhibit 15.

34.    Later the same day, the detectives interviewed Mr. Gibson. He said that on the night in question, he had been at the Glenny Drive Projects with his teenage friends, Messrs. Boyd, Walker, Woodruff, and Martin, as well as several others. Mr. Gibson said that at about 11:15 p.m., Messrs. Walker and Woodruff took a Fillmore Cab Company taxi home. A true and correct copy of the statement of Darryn Gibson is attached as Exhibit 16.

35.    On January 8, 1976, detectives went to the Fillmore Cab Company and confirmed from the company's written logs that a pickup was made at 11:28 p.m.; the taxi number and driver were listed. A second pickup occurred at 11:44 p.m. That cab number and driver name were also listed in the P-73. The report stated that there were no other pickups at the Glenny Drive Projects that night. A true and correct copy of the P-73 describing the police investigation of the taxi records is attached as Exhibit 17.

36.    The Defendants have produced no P-73 showing the police ever interviewed the two taxi drivers.

37.    In separate interrogations, Messrs. Walker, Boyd and Woodruff all confirmed Mr. Gibson's presence and the taxi ride. Mr. Boyd elaborated that a second cab was called for other friends after Messrs. Walker and Woodruff left in the first one, and that he and Mr. Gibson then

7

walked home, while Mr. Martin stayed behind since he lived at the Glenny Drive Projects.  True and correct copies of the statements of Messrs. Walker, Boyd, and Woodruff are attached as Exhibit 18.

38.    Police reports show that on January 12, 1976, BPD officers picked up all the boys and brought them to the Homicide office for another round of interrogation.  True and correct copies of the police report describing these detentions and interrogations are attached as Exhibit 19.

39.    According to their P-73 dated January 12, Sergeant James E. Hunter and Detective Robert F. Arnet seized Mr. Woodruff, 17 years of age, from his home and held him, alone, for further interrogation at the Homicide Bureau.  *See* Exhibit 19.

40.    According to this report, Mr. Woodruff munched on some Devil's Food cake, made a few phone calls, and then spontaneously decided to change his story and "admit[] to Det. Arnet that he was a witness to the Crawford homicide."  *See* Exhibit 19.

41.    However, according to the P-73 report authored by Detective Francis M. Manista, "[Det. Manista] received a telephone call from a negro female who wished to remain anonymous."  The caller claimed to have witnessed the five boys, including Mr. Woodruff, "cutting up the money" at 138 Glenny and knew they were responsible for killing the man on Fillmore.  She said that afterwards, at about midnight, Messrs. Woodruff and Walker left in a cab.  The caller gave all the boys' addresses.  The detectives tried to persuade her to come in and cooperate, but she refused and hung up. *See* Exhibit 20.

42.    Manista's report then stated:

> During this conversation (phone) Tyrone "Tony" Woodruff was seated in the main Homicide Office and was listening to the conversation.  He was in the company of Detective Hebert Arnet; it was noted that Tyrone Woodruff became very nervous and could barely raise a cup of coffee he was drinking.

8

He was asked by Det. Manista in the presence of Det. Arnet if he could remember anything now; he was told that a person puts him in a hall-way dividing money. At 5:45 P.M. he told Dets. Manista & Arnet "Gibson was hitting him, Gibson was hitting him, I think".

Det. Manista apprised Chief Donovan what had taken place and Det. Deubell was also told about the phone call and the statement that Woodruff made to Dets. Arnet and Manista.

A two and a half page statement was taken from Tyrone Woodruff and is part of the Crawford Homicide File.

*See* Exhibit 20.

43.  Manista's report stated that, as a result of the call, Mr. Woodruff became so frightened and nervous that he could not even hold his coffee cup. Only then did Mr. Woodruff begin to change his story. *See* Exhibit 20.

44.  On January 12, 1976, Andre Hough, who was 15 years old, also gave a signed statement. In it, he claimed that before the robbery, Darryn Gibson talked about "getting some money" that night, and that the next day, Mr. Boyd admitted involvement in the killing. A true and correct copy of the report containing the statement of Andre Hough is attached as Exhibit 21.

45.  Two P-73s dated February 11, 1976 contained Mr. Hough's recantation and revealed how Messrs. Woodruff and Hough came to expand their initial stories concerning the alleged planning of the robbery of Crawford. True and correct copies of the reports containing Mr. Woodruff and Hough's recantations are attached as Exhibits 22 and 23.

46.  The February 11 reports disclosed BPD detectives' meetings with these two witnesses right before ADA Drury put them in the grand jury to testify. In Detective Michael G. Guadagno's report, he first noted that Mr. Hough *recanted*. Mr. Hough admitted that his statement—that Darryl Boyd admitted to the murder—was a lie. *See* Exhibit 22.

9

47. Detective Paul R. Delano's report of the same date stated that Mr. Hough's mother was present while Detectives Delano and Guadagno, as well as ADA Drury himself, spoke with her son. Mr. Hough's mother finally agreed to leave when the detectives promised her that they would give 15-year-old Andre a ride home. *See* Exhibit 23.

48. *After* Mrs. Hough left, in Drury's presence, "Andre was *advised* by Det. Delano that he was lying and that he *better tell the truth* … ." Exh. 23 at 1. Mr. Hough then "admitted to ADA Drury that the statement is, in fact, true." Exhibit 22 at 1. Mr. Hough then expanded his story, claiming that Mr. Gibson had advance knowledge that there was a man at the Golden Nugget with a lot of money. Exh. 23 at 1. After this statement, ADA Drury immediately put Mr. Hough in the grand jury. *See* Exhibit 22 at 1.

49. According to Detective Guadagno's report, just before ADA Drury put Mr. Hough into the grand jury, ADA Drury told the detectives to speak with Mr. Woodruff, who was waiting in another room. *See Exhibit* 22 at 1. While Detective Guadagno wrote that he spoke to Woodruff "and he came up with more important information," *id.*, Detective Delano's report painted a different picture.

50. According to Detective Delano, after Detective Guadagno spent some time with Mr. Woodruff, Detective Delano joined them and saw that Mr. Woodruff was "shaking and nervous." *See Exhibit* 23 at 1. Mr. Woodruff said that he didn't know why, but Detective Delano advised him it was because "he has not told the whole story… ." *Id.* Then, Detective Delano wrote that when Mr. Woodruff was "confronted by Det. Delano with the statement made by Andre [Hough] that two of his associates went to the Tavern first and had picked out a score before the assault and robbery, he stated to the detectives, Yes, okay, I'll tell you the truth." *Id.* at 1-2.

51.     Delano reported that Mr. Woodruff then stated that either Mr. Boyd or Mr. Gibson said, "let's go down to Fillmore Avenue; maybe somebody in one of the bars has cashed a check or something." *See Exhibit* 23 at 2.  Messrs. Gibson and Boyd then supposedly went inside the tavern and said that "there was an old white dude at the bar with some money, We'll wait for him down the street." *Id.*  Then Mr. Boyd said, "there's the dude now." *Id.*  According to Mr. Woodruff's new story, they waited for the old man to cross the street and start to enter his driveway before they ran down the street, attacked him, and then dragged him up the driveway where the some of the boys beat and robbed him. *Id.*

52.     Detective Delano reported that Mr. Woodruff had signed a "new confession" that Detective Guadagno wrote out.  They gave the new confession to ADA Drury, who told the detectives to put it in their file.  *See* Exhibit 22 at 2.

53.     While Mr. Woodruff was quoted in the police reports as saying, and testified at trial, that Messrs. Boyd and Gibson "went in" the Golden Nugget and stayed a "couple of minutes," the signed statement stated that the two boys had merely "opened the door" and, in an amazing stroke of good fortune, "seen the old man with a lot of money."  A true and correct copy of the handwritten statement of Mr. Woodruff dated February 11, 1976 is attached as Exh. 24.

54.     ADA Drury then put Mr. Woodruff into the grand jury.  *See* Exhibit 23.

55.     The reports from February 11 stated that, only after Messrs. Woodruff and Hough testified were they "released" and was Hough finally given the "ride back home" that had been promised his mother.  *See* Exhibit 22.

56.     Although Mr. Hough is deceased, he provided sworn testimony at Mr. Boyd's trial that detectives told him they would charge him with the murder unless he helped them.  He also testified that detectives took him to the Homicide Bureau for interrogation without his parents

11

present.  It was only at that point that Mr. Hough accused the others.  He also testified that the detectives threatened him even though he had taken and passed a polygraph examination.  A true and correct copy of excerpts of the transcript from the 1977 trial of Mr. Boyd is attached as Exhibit 25.  *See* Exhibit 25 at 368-69.

57.     Mr. Woodruff testified that police told him he would "make it easy on [him]self" if he cooperated against the other boys.  *See Exhibit* 25 at 201.  He also admitted that he was given immunity from prosecution during a preliminary hearing that occurred January 16, 1976.  A true and correct copy of excerpts of the transcript from the 1977 trial of Mr. Walker is attached as Exhibit 26.  *See* Exhibit 26 at 158.

58.     And in 1985, and again in 2010, Woodruff gave sworn oral depositions, in support of the Plaintiffs' post-judgment motions, alleging in detail how he was coerced by police.  True and correct copies of Mr. Woodruff's sworn recantations are attached as Exhibits 27 and 28.

59.     Plaintiffs expect Mr. Woodruff will testify in detail regarding this coercion in a deposition in this case and at trial.

60.     Mr. Walker also will testify about the BPD detectives' use of coercive tactics.  He will testify that police told him (falsely) that a caller had implicated him, and that unless he cooperated with police, he would go to prison.  He also will testify that he was told (falsely) that his friends were accusing him, and so he might as well cooperate.  In addition, the slightly built Walker, then 16 years of age, will testify that he was threatened with physical force during his interrogation.

61.     Messrs. Walker and Boyd will testify that they were pressured to sign statements that had false information in them and that police reports claiming they had given contradictory or incomplete information were themselves untrue.

**The Criminal Prosecutions and Extent of Disclosure of Police Records**

62.    Then-ADA Timothy Drury handled all pretrial discovery and hearings with regard to all four defendants.   A true and correct copy of excerpts of the transcript from the June 3, 2021 440 hearing is attached as Exhibit 29.  *See* Ex. 29 at 29:1-17.

63.    In opposing a 440 motion filed by Messrs. Boyd and Walker in 2012, Mr. Drury, then a State Supreme Court Justice, swore in an affidavit as follows:  "As a homicide prosecutor, I would receive the entire Buffalo Police prosecution file upon being assigned to a case.  The prosecution file would contain any and all documents generated by the police, including all P-73 documentation."  A true and correct copy of Mr. Drury's 2012 statement is attached as Exhibit 30.

64.    Drury was Chief of the Major Crimes Bureau and an experienced homicide prosecutor, who reportedly acted as an advisor to the Homicide Bureau of the Buffalo Police Department ("BPD") at the time of the prosecution of Plaintiffs' case.  A true and correct copy of a 1979 news article that references Mr. Drury's duties is attached as Exhibit 31.

65.    At the same time, Mr. Drury, and former ADA David Henry, who handled the Walker prosecution, swore in their 440 testimony that they would disclose all *Brady* material.   *See* Exhibit 29 at 41, 53.

**The ECDA's Failure to Produce the Documents in Question**

66.    I have examined the pretrial motions of the defendants in each of the four cases. They contained requests for (1) discovery material under New York Criminal Procedure Law Art. 240, (2) a bill of particulars, and (3) exculpatory and other favorable evidence under *Brady v. Maryland,* 373 U.S. 83 (1963).  True and correct copies of the pretrial motions in these four cases are attached as Exhibit 32.

67.      The state court in this case entered a formal order, dated June 29, 1976, and filed July 10, 1976, resolving what facts had to be disclosed in a bill of particulars and what materials had to be disclosed under CPL Art. 240.  The former order required *Brady* material to be disclosed generally, did not contain specific requirements as to *Brady*, and directed that a pretrial hearing be conducted.  A true and correct copy of the order of June 29, 1976 is attached as Exhibit 33.

68.      Following the court's order, On October 7, 1976, ADA Drury wrote counsel for each of the four defendants that he was disclosing to the defendants with his letter a bill of particulars, medical and scientific reports, and statements of the defendants.  A true and correct copy of ADA Drury's October 7, 1976 letter is attached as Exhibit 34.

69.      A joint pretrial hearing concerning the admissibility of the defendants' statements to police was then conducted on November 15-17, and an identification or *Wade* hearing was conducted December 6-8.  Mr. Drury represented the prosecution at all of these pretrial proceedings.  All four defendants and their counsel participated.  True and correct copies of excerpts from the transcript of the November 15-17 and December 6-8 hearings are attached as Exhibits 35 and 36.

70.      I have examined the transcripts.  During these hearings, Mr. Drury identified the documents he considered relevant and was disclosing or otherwise making part of the record.  The transcripts show such documents were strictly limited to the formal identification and statement notices, the formal signed statements of the defendants, and a few P-73 police reports containing the substance of oral statements made by the defendants.  *See* Exhibit 35 at 11.

71.      During the November 17, 1976 court session, Mr. Boyd's attorney, Mark Hulnick, renewed his prior request for "discovery and in camera inspection of Mr. Drury's files."  However, the court denied this application.  *See* Exhibit 35 at 355.

14

72.  On December 6, 1976, at the beginning of the *Wade* hearing into the lawfulness of pretrial identification procedures, Mr. Drury objected to showing the defense any of cooperating witness Andre Hough's statements to police as well as his grand jury testimony.  Mr. Drury contended that these documents were not relevant to the limited issue of identification that was the subject of the hearing.  The court agreed with Mr. Drury, and the materials were not disclosed to the defense.  *See* Exhibit 36 at 12-13.

73.  When Mr. Woodruff testified later the same day, no police documents concerning him were disclosed, and none of the four defense attorneys who examined him referred to any police document.

74.  At the close of the hearing testimony, the court stated that it would dictate its decision into the record the next week and expected to hold a trial the first week of January 1977.

75.  The clerk's notes in the court file show that in early January the court ordered separate trials for each of the four defendants.

76.  The first trial, that of Darryn Gibson, began with jury selection on January 4, 1977, and opening statements occurred on January 10, 1977.  Mr. Gibson was represented by attorney Gary Bittner; the prosecutor was ADA Drury.  A true and correct copy of excerpts of the transcript of Mr. Gibson's trial is attached as Exhibit 37.

77.  There is no entry in the clerk's notes, and nothing in the D.A.'s file disclosed in the present action in discovery, indicating that any additional discovery materials were disclosed to any of the defendants prior to the Gibson trial.

78.  During the trial, ADA Drury made a record of each item of *Rosario* material he was disclosing during each witness's direct examination.  *See* Exhibit 37 at 179.

79.     The transcript, which I've carefully reviewed, shows him asking that each report or photograph that he disclosed be marked with a number as a People's exhibit.  *See* Exhibit 37 at 179.

80.     On January 21, 1977, Mr. Gibson was convicted of felony (robbery) murder.  On March 14, 1977, he was sentenced to 25 years to life.

81.     Next to be tried, beginning with jury selection on April 21, 1977, was Plaintiff Boyd, represented by Mark Hulnick.  *See* Exhibit 25.

82.     Once more, the prosecutor was ADA Drury. *See Exhibit* 25.

83.     Immediately prior to the beginning of *voir dire*, Mr. Drury was ordered by the court to disclose a witness list.  *See* Exhibit 25 at 2-3.

84.     Neither the transcript, the court clerk's notes, nor the District Attorney's case file disclosed in discovery in the present action, indicate that any further discovery material was provided before the trial began.

85.     On April 26, opening statements were given.  *See* Exhibit 25 at 23.

86.     Each time a witness testified for the prosecution, Mr. Drury, at the close of his direct examination, carefully made a record of the *Rosario* material that he was producing for that witness.  These statements were limited to formal, signed statements and prior sworn testimony.  Mr. Drury marked each such document as an exhibit, and then showed it to defense counsel, who usually requested a brief period to review the materials.  *See* Exhibit 25 at 156-159, 370-373.

87.     Mr. Drury did not mark, or document disclosure of, any police reports containing a witness's statement if the statement was not in a formal question and answer format, typed, and signed.

16

88.     The trial record does not indicate that Mr. Drury disclosed any statement, in any form, by any witness, whom he did not call to testify for the People.

89.     As to the exhibits that were marked, including the photographs, the evidence was returned to Mr. Drury.  The police reports contain the court reporter's stamp, the date, and the exhibit number for Mr. Boyd's trial.  *See* Exhibit 21 at 1.

90.     Mr. Walker's trial began on June 6, 1977.  His attorney was David Jay, who is deceased.  The prosecutors were David Henry and James Verrastro, who are alive.  A true and correct copy of excerpts of Mr. Walker's trial transcript are attached as Exhibit 26.

91.     There is nothing in the District Attorney's files, or in the trial transcript, indicating that these prosecutors produced anything to Mr. Walker's counsel except for the *Rosario* material that was identified and marked during the trial.

92.     At the 440 hearing in 2021, former ADA Henry, one of Mr. Walker's trial prosecutors, testified that Mr. Drury handled all discovery production for all four defendants.  *See* Exhibit 29 at 44-45.  ("I had nothing to do with responding to the … demands. … Judge Drury … was responsible for producing or answering defense demands.").

93.     At Mr. Walker's trial, as at Mr. Boyd's trial, the prosecutor marked each item of *Rosario* material he was disclosing to the defense at the end of each prosecution witness's direct testimony, and then gave it to the defense attorney to review in court and attempt to use in cross-examination.  Once again, this *Rosario* material was limited to the witnesses who testified and to their formal, signed statements.  P-73 reports summarizing oral statements of witnesses were not disclosed.  *See* Exhibit 26 at 9, 53-55, 107, 154.

94.     With a few exceptions, the same reports were introduced at Boyd and Walker's trials, presumably the originals.  Each such report contains the court reporter's stamp, the date, and

17

the exhibit number from that trial.  True and correct copies of the police-prepared written statements that were disclosed and marked at either or both of the trials are annexed as Exhibit 38.

95.     First, at the Boyd trial, where the prosecution did not call Debbie Jeffrey, none of her statements were disclosed, according to the transcript.  At the Walker trial, ADA Henry called Ms. Jeffrey as a prosecution witness and disclosed her signed statement immediately before the start of cross-examination.  *See* Exhibit 26 at 107.  Prosecutors did not disclose at either trial the P-73 reports stating that Jeffrey suspected Watson was the killer and her additional statements.

96.     The second difference between the trials was that during his direct examination of Detective Gerald O. Dove at the Boyd trial, Mr. Drury disclosed a P-73 report authored by Det. Dove, dated January 3, 1976, about his activities that day.  It contained a summary of initial interviews of Margaret Crawford, Bill Howard, Ralph Davis, and Julia Watson.  *See* Ex. 25 at 113. There is nothing in the Walker trial transcript, or any exhibit marker on the report, indicating this report was disclosed by Mr. Henry at the Walker trial.

97.     As can be readily determined by comparing the reports that were disclosed during the criminal trials to the additional reports attached to this Declaration, *see* Exhibits 7, 11, 12, and 14, critical reports were not disclosed during Messrs. Boyd and Walker's criminal trials.  These include: the reports documenting the anonymous calls implicating "Andre Howe" and Jerome Boyd; the reports showing the identifications of and statements concerning Jerome Boyd; the reports showing police suspicion of Watson; and the unsigned oral statements of Larry Watson, Julia Watson, Debbie Jeffrey, Frances Kalb, William Howard, and Margaret Crawford, which tended to implicate Larry Watson.

98.     In addition, the State Supreme Court in 2021, following a CPL 440.10 hearing, determined by a preponderance of the evidence that two exculpatory photographs were not

18

disclosed to either Mr. Boyd or Mr. Walker's defense counsel. One photograph showed the footprints of a heavy man in the snow in the rear of Mr. Crawford's house, leading towards Mr. Watson's house. The other showed the lack of dragging marks in the driveway, which was inconsistent with Mr. Woodruff's testimony that the boys first attacked Mr. Crawford at the bottom of his driveway and then dragged him approximately 35 feet up the driveway to the side door of his house. *See* Dkt 62-3.

99.    In reaching this conclusion, the Court credited the testimony of James McLeod, counsel for Floyd Martin (who was tried last of the four boys), that the two photographs were only disclosed to him, but not the other defense lawyers, because only he made a specific discovery demand for disclosure of *all* the photographs. *See* Dkt. 62-3. The court relied on a note in the District Attorney's file to corroborate Mr. McLeod's recollection of what he argued at the Martin trial. A true and correct copy of this exhibit from the 2021 440 proceeding is attached as Exhibit 39.

100.    Regarding the testimony of Tyrone Woodruff and Andre Hough directly implicating Messrs. Boyd, Walker, and the other two boys, Plaintiffs' trial transcripts show that the following reports were not disclosed at either of the trials: the reports documenting that Crawford left the bar or the assault occurred after 11:30 p.m. (except for the January 3, 1976 Det. Dove report, which was disclosed only at the Boyd trial and only contained one witness's statement about the time); the taxicab company evidence; the use of the phone call to cause Woodruff to cooperate; Woodruff's handwritten statement contradicting his signed statement; the anonymous call implicating "Andre Howe" and "Jerome Boyd"; Andre Hough's recantation; and the reports of February 11.

101.    I have carefully examined the records of the Boyd and Walker trials to see which police reports were used by the lawyers in cross-examination.  While the transcripts reflect that defense counsel used the reports that were disclosed and given exhibit numbers to cross-examine the witnesses, the transcripts do not show that any of the reports that were not identified on the record as *Rosario* material were used.

102.    Neither attorney asserted a third-party culpability defense involving Watson. While Mr. Hulnick, at Boyd's trial, pointed out that there was a man who left the bar behind Watson and Crawford, he did not name Boyd or cite any evidence that he had been identified as having been present that night.  Neither attorney cited the taxicab evidence, the evidence that the crime occurred after the 11:28 p.m. pickup of Woodruff and Walker, the ruse phone call involving Woodruff, Woodruff's handwritten statement, Hough's recantation, or the events of February 11 and the reports themselves.

103.    Plaintiffs' counsel have interviewed the three surviving defense attorneys (Mr. Walker's counsel is deceased).  Plaintiffs expect them to testify that they would have used the undisclosed materials had they been disclosed.

**The Favorability and Materiality of the Undisclosed Reports**

104.    At the Boyd and Walker trials, the prosecution presented Larry Watson as an innocent witness to Crawford leaving the bar, and this testimony went unchallenged.

105.    Mr. Watson claimed that he did not learn about what happened until the next morning.  At the Boyd trial, he agreed with ADA Drury's leading question that, when police came that night, he "told them about what you know and what you have told us," and that he then gave a "statement" on January 7.  *See* Exhibit 25 at 68-69.

106.    This question implied that Watson's undisclosed statement, before he signed a written statement, was consistent with his trial testimony and that he had been candid with the police, which the undisclosed police reports contradict.

107.    The prosecutors introduced testimony by Margaret Crawford that she heard a thumping sound from the side of her house, where her husband's body was later found, before 11 p.m., even though she had told police, in interviews that were not disclosed at the Walker trial, that it occurred either at 11:30 or 12:30.  Only one of these statements was disclosed at the Boyd trial (but it was meaningless to defense counsel without the taxicab records).  She also testified her husband had a key, which was contradicted by her statement (not disclosed at any trial) that she would let her husband in the side door (because he *didn't* have a key).  *See* Exhibit 6 at 1.

108.    The prosecutors presented the testimony of Det. Dove that he searched the backyard and adjoining yards for weapons and saw no footprints in the adjoining yards, which would have been contradicted by the undisclosed photograph showing footprints leading towards Watson's house in the snow.  *See* Exhibit 25 at 111.

109.    They introduced Hough and Woodruff to testify to the planning, the commission, and the aftermath of the crime. These witnesses were not impeached with any of the information contained in the undisclosed materials.

110.    ADA Drury elicited from Hough at Boyd's trial that he gave testimony before the grand jury that was consistent with his second, supposedly truthful statement to police.  *See* Exhibit 25 at  369-370.  However, Drury did not ask Hough about, or disclose, his recantation or his statements on February 11 as depicted in the police reports.

21

**The Prosecutors' Summations**

111.    Drury's conduct during summations, based upon the undisputed record in the trial transcript, is spelled out in the Boyd Complaint at ¶¶ 365-383.

112.    Similarly, ADA Henry's conduct during summation is spelled out in the Walker Complaint, ¶¶ 639-643.

113.    In granting Plaintiffs' motion to vacate their convictions in 2021, the state court held that Plaintiffs had established, by a preponderance of the evidence, that the undisclosed two photographs were sufficiently favorable and material that the convictions had to be vacated under the *Brady* standard of a reasonable probability that the outcome of the trial would have been more favorable.    *See* Dkt. 62-3.    This was without consideration of any of the other undisclosed favorable evidence or the prosecutors' summation misconduct.

*Monell* **Cases with Unitary Discovery**

114.    My firm has been litigating *Monell* cases involving misconduct by district attorneys' offices and police departments since 1995.  Virtually all of them have been handled with unified discovery and were not bifurcated for purposes of discovery or trial.  *See, e.g.*, *Fraser v. City of New York*, No. 20-cv-4926 (CM)(OTW) (S.D.N.Y.); *Taylor v. City of New York*, No. 18-cv-5500 (KAM)(ST) (E.D.N.Y.); *Benitez v. City of New York*, No. 17-cv-3827 (SJ)(SJB) (E.D.N.Y.); *Felix v. City of New York*, No. 13-cv-3079 (ALC) (S.D.N.Y.); *Colon v. City of New York*, 12-cv-9205 (JMF) (S.D.N.Y.); *Collins v. City of New York*, No. 11-cv-0766 (FB)(RML) (E.D.N.Y.); *Zahrey v. City of New York*, No. 98-cv-4546 (DCP)(JCF) (S.D.N.Y.); *Leka v. City of New York*, No. 04-cv-8784 (DAB) (S.D.N.Y.); *Poventud v. City of New York*, No. 07-cv-3998 (DAB) (S.D.N.Y.); *Ramos v. City of New York*, Index No. 21770/93 (Sup. Ct. Bronx Cty.).  In *Bellamy v. City of New York*, No. 12-cv-1025 (AMD)(PK) (E.D.N.Y.), the Second Circuit reversed

22

a grant of summary judgment and required *Monell* discovery to be conducted anyway. *See Bellamy v. City of New York,* 914 F.3d 727 (2d Cir. 2019). The bifurcation order delayed the case, which settled shortly before a unified trial was to be held, for years.

**Dixon v. City of Buffalo, et al. and Gugino v. City of Buffalo, et al.**

115. The City represents that bifurcation orders in *Dixon v. City of Buffalo, et al.*, 19-cv-1678 (WMS)(JJM) (W.D.N.Y.) and *Gugino v. City of Buffalo, et al.*, 21-cv-283 (LJV)(LGF) led to efficiencies. *See* Dkt. 64-1 at ¶¶ 33-35.

116. The public docket on ECF in the *Dixon* case indicates that plaintiff's counsel had already scheduled depositions before the bifurcation order. *See Dixon v. City of Buffalo*, 19-cv-283 (WMS)(JJM) (W.D.N.Y.), Dkt. 64 (Feb. 2, 2022).

117. The public docket on ECF in the *Gugino* case indicates that, on February 13, 2023, following a bifurcation order, the very first deposition in the case was interrupted when counsel for the City instructed the deponent not to answer questions based in part on his interpretation of the bifurcation order. *Gugino v. City of Buffalo, et al.*, 21-cv-283 (LJV)(LGF), Dkt. 54-4 (Feb. 13, 2023).

118. On February 14, at an emergency hearing on the parties' cross motions to compel and for a protective order, the court ruled in favor of the plaintiff, *Gugino v. City of Buffalo*, Dkt. 60, and rejected the City's attempt to use the bifurcation order, which applied only to document discovery, to limit questions at depositions. A true and correct copy of the transcript of the February 14, 2023 hearing in *Gugino v. City of Buffalo* is attached as Exhibit 40. *See* Exhibit 40 21--22, 28-29.

119. The very next day, on February 15, the City filed its motion to bifurcate discovery in this case and pointed to *Gugino* and *Dixon* as models for discovery.

WHEREFORE, for the reasons set forth in Plaintiffs' accompanying Memorandum of Law,

Defendants' Motions to Bifurcate should be denied.


/s/*Joel B. Rudin, Esq.*
JOEL B. RUDIN, ESQ.


Dated:  February 28, 2023
              New York, New York

24