# LAW OFFICES OF JOEL B. RUDIN, P.C.

CARNEGIE HALL TOWER
152 WEST 57TH STREET
EIGHTH FLOOR
NEW YORK, NEW YORK 10019

TELEPHONE: (212) 752-7600
FACSIMILE: (212) 980-2968
E-MAIL: jbrudin@rudinlaw.com

JOEL B. RUDIN

JACOB "COBY" LOUP
DAVID E. RUDIN

DAVID S. KEENAN
(OF COUNSEL)

THELONIOUS COLEMAN
(PARALEGAL)

April 21, 2023

**Via ECF**
The Honorable Jeremiah J. McCarthy
United States Magistrate Judge
Robert H. Jackson United States Courthouse
2 Niagara Square
Buffalo, New York 14202

      Re:    *Darryl Boyd v. The City of Buffalo, et al.*, Index No. 22-cv-519[1]
              *John Walker v. The City of Buffalo, et al.*, Index No. 22-cv-520

Dear Judge McCarthy:

      We write on behalf of Plaintiffs Darryl Boyd and John Walker, Jr., to further explain their right to discovery of material related to the 16 cases, narrowed from the 30 listed in the Complaints, involving misconduct by Erie County prosecutors.[2] We first address the several theories for recovery we are advancing under *Monell* and why the County's objections are unfounded. We then discuss the relevance of each case individually. Plaintiffs understand that this letter may cover ground addressed in prior briefing but thought a comprehensive submission would be more convenient for the Court's review than a submission consisting of citations to prior letters.

## I.    Relevant Background

      On September 29, 2022, Plaintiffs requested transcripts, motion papers, court orders, and other materials from 30 Erie County District Attorney ("ECDA") case files involving prosecutions in which courts found misconduct by prosecutors from the mid-1960s to the mid-1980s. Plaintiffs explained the relevance of these cases to their *Monell* claims in their motion to compel, filed on February 25, 2022, Dkt. No. 64-1, at 15-18, and reply, filed on March 7, 2023, Dkt. No. 73, at 4-6.

---

[1]     To avoid duplication, Plaintiffs cite to the document numbers in *Boyd v. City of Buffalo, et al.*, No. 22-cv-519, to refer to the docket entries in both cases.

[2]     Because we have been able to independently obtain the court file in one of the 16 cases, *People v. Cadby,* 75 A.D.2d 713 (4th Dep't 1980), we no longer seek that file and are substituting for it *People v. Clark,* 89 A.D.2d 820 (4th Dep't 1982).

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 2

   Plaintiffs' *Monell* claim alleges that *Brady* violations and summation misconduct by Erie County prosecutors caused their unconstitutional convictions and that such misconduct in turn was caused by the unlawful policies, customs, or practices of the ECDA. The *Brady* violations included not disclosing evidence pointing to third parties as the possible perpetrator(s), showing that the crime occurred after the Plaintiffs already were on their way home in a taxicab or by foot, and impeaching the credibility of the two main prosecution witnesses. The summation misconduct included making false or misleading arguments, misstating the evidence, citing facts not in evidence, personally vouching for the credibility and good faith of prosecution witnesses, calling the defendants and their witnesses liars, ridiculing or belittling the role of defense counsel, improperly shifting the burden of proof, and making emotional appeals to racist prejudice. Dkt. No. 78 (Boyd Am. Compl.), at ¶¶ 373-91, 523-34, 655-59.[3]

   The Complaints allege that the above misconduct resulted from the ECDA's unlawful policies, customs or practices of (1) making late or untimely disclosure of *Brady* material; (2) not disclosing statements favorable to the defense made by non-testifying witnesses as well as statements by testifying witnesses that were not signed by them, even when they were favorable to the defense under *Brady*; (3) improperly narrowing *Brady* to "exculpatory" evidence and not disclosing what prosecutors considered to be "mere" impeachment evidence; (4) using false or misleading evidence and argument; (5) making inflammatory and other improper arguments in summation, denying defendants their right to a fair trial; (6) failing to adequately train and supervise prosecutors despite a history of *Brady,* summation, and other fair trial violations; (7) defending, and thereby ratifying, misconduct after it occurred; and (8) failing to have any disciplinary system and to impose discipline for any and all forms of prosecutorial misconduct, thereby communicating that winning was all that mattered and misconduct would be tolerated. Dkt. No. 78 (Boyd Am. Compl.), at ¶¶ 533-51.

   Plaintiffs' original discovery demand sought evidence supportive of the above theories of recovery. We sought training and policy materials, as well as written procedures for supervision and discipline (or admissions that such materials didn't exist). We also sought case files for the 30 cases identified in the Complaints to determine the extent to which the unlawful conduct that occurred in this case occurred in those cases in order to demonstrate the existence of the unlawful policies, customs, and practices alleged in the Complaints. Further, we sought the identity of the prosecutors involved in the 30 cases, as well as their relevant personnel and disciplinary records, to determine whether policymakers not only tolerated but rewarded their misconduct through promotions and raises. Finally, we sought motion papers and appellate briefs to discover what misconduct complaints were made against the prosecutors and whether the ECDA defended and thereby ratified misbehavior after it was exposed.

---

[3] In this letter we reference the Boyd Complaint; the Walker Complaint's *Monell* allegations are virtually identical.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 3

Over seven months, the County produced literally *nothing* responsive: no training or policy materials, no written disciplinary procedures, no case files, no names of prosecutors responsible for the misconduct cases, and no personnel records.

In our view, all 30 case files were relevant and discoverable. But, after the court asked us to narrow our requests, we went through the painful task of doing so, cutting out 14 of the 30 cases files (while reserving the right to ask for the omitted case files to the extent the County claimed it could not find the files we were still requesting). Dkt. No. 87-2, at 2.

In response to our initial narrowing from 30 to 16 cases, on April 6, 2023, the County claimed that the task of finding even one of the 16 case files is "virtually insurmountable," Dkt. No. 91-1, at 3, and declined to make any search at all. The County cited a February 15, 2023 attorney affirmation in which an attorney for the County described touring a storage facility without opening a single box or reviewing a single piece of paper. *Id.* It appears that this facility tour is the entirety of the County's efforts to comply with their discovery obligations.

In its letter, the County argued, on the one hand, that it should not be required to produce case files for trials that occurred after Plaintiffs' trials in 1977, questioning the relevancy of cases tried after Plaintiffs were tried, but on the other hand, declined to search for trial files predating Plaintiffs' trials because the cases were too old and difficult to find (without any showing that any search was even attempted). In this fashion, the County has refused to search for, or disclose, anything. Since the individual prosecutors have absolute immunity and the only way for Plaintiffs to recover is to sue the County under *Monell,* the County's refusal to meet its discovery obligations represents a transparent effort to prevent the Plaintiffs from pursuing any claim involving County actors, even though such actors ruined their lives. We assume the County's ultimate intention is—after providing no discovery—to seek dismissal of the *Monell* claim on the basis that Plaintiffs lack the evidence to prove it and to try to outlast the two Plaintiffs, who are not just in their 60s but are in poor health, through continuous delays.

Plaintiffs are pursuing several well-established theories of municipal liability under *Monell.* One is a failure-to-train claim, which requires, at least as to a *Brady* claim involving a district attorney's office, some showing of prior incidents of misconduct putting policymakers on notice of the need for training. *See, e.g., Connick v. Thompson*, 563 U.S. 51, 61-62 (2011); *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992). A second is proof of an inherently unlawful policy, custom or practice that led to the misconduct. *See, e.g., Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004). A third is a showing that wrongdoing resulted from employees' awareness that policymakers would tolerate misconduct and were indifferent to it—a showing that may be premised upon a lack of disciplinary consequences for wrongdoing or a practice of defending or ratifying it. *See e.g., Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). Plaintiffs' Complaints allege all three theories. Dkt. No. 78 (Am. Compl.), at ¶¶ 534-51.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 4

      Plaintiffs' theories for recovery for prosecutorial misconduct are well-established in the law and have not been challenged by the County. Courts have upheld claims alleging injuries caused by unlawful office-wide policies by District Attorneys, *see Bellamy v. City of New York*, 914 F.3d 727, 761-62 (2d Cir. 2019) (upholding claim of illegal policy to wall off trial prosecutors from knowledge of benefits provided to or promised to witnesses, in violation of *Brady*); *Myers v. County of Orange,* 157 F.3d 66, 77 (2d Cir. 1998) (unlawful cross-complaint policy that violated equal protection). They have upheld unlawful training claims involving *Brady. See, e.g., Walker v. City of New York, supra.* And they have upheld inadequate discipline claims in cases involving *Brady* violations and summation misconduct. *See Bellamy,* 914 F.3d at 761-65; *Walker*, 974 F.2d at 300 (upholding lawsuit on theory of "a practice of condoning perjury (evidenced perhaps by a failure to discipline for perjury)" and a failure to discipline prosecutors for *Brady* violations generally); *Collins v. City of New York,* 923 F.Supp.2d 462, 477-78 (E.D.N.Y. 2013)**;** *Ramos v. City of New York,* 285 A.D.2d 284, 305-06 (1st Dep't 2001).

      Finally, we note that there is a difference between what is ultimately determined to be admissible at trial and a plaintiff's right to obtain discovery. The right under the Federal Rules to obtain discovery of potentially relevant evidence, or leads to relevant evidence, is a broad one, and is of necessity exploratory. In determining whether a plaintiff's discovery requests are appropriate, a court considers whether a request may lead to relevant evidence, not whether the results of the search, still unknown, will lead to evidence that the trial court ultimately will decide to admit. *See Dobson v. Dougherty*, 2018 WL 6321390, at *4 (W.D.N.Y. Dec. 4, 2018) (material "may be relevant and discoverable even if it is later deemed inadmissible at trial").

      The County appears to rely on three bases to deny discovery. It contends that post-incident cases are irrelevant, that searching for old case files is unduly burdensome, and that the cases about which we seek discovery are insufficiently similar to the allegations of misconduct in this case. These arguments ignore Plaintiffs' aforementioned theories of recovery and relevant case law.

## II.   Post-Incident Cases Must be Disclosed

      If Plaintiffs' *Monell* claim was limited to a failure to train, the County would be correct that court decisions handed down after Plaintiffs' criminal trials in 1977 would be irrelevant because, following *Connick v. Thompson,* they would not establish the requisite pre-incident notice of a need to train. However, the County ignores that Plaintiffs also allege the existence of unlawful policies, practices, and customs, including a policy of deliberate indifference to *Brady* violations, summation misconduct, and other fair trial violations. In relation to these claims, post-incident evidence is relevant, not to show notice, but to "shed some light on what policies existed … on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1166-67 (1st Cir. 1989). As the Second Circuit has stated, post-incident ratification of misconduct, through a failure to discipline or to institute other remediation,

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 5

permits an inference that such deliberate indifference by policymakers also existed at the time of the violation of the plaintiff's rights. *See Gentile v. County of Suffolk*, 926 F.2d 142, 151 (2d Cir. 1991). *See also Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (same); *Henry v. County of Shasta*, 132 F.3d 512, 520 (9th Cir. 1997), *amended*, 137 F.3d 1372 (1998) ("failure even after being sued to correct a blatantly unconstitutional course of [conduct]…" is evidence of the prior policy); *Collins*, 923 F. Supp. 2d at 477 (upholding the use of "after-the-fact events" to prove "a prior policy of acquiescence").

Moreover, the Plaintiffs here do not merely allege that their rights were violated during their 1977 trials, but that the ECDA, pursuant to its policy of deliberate indifference to *Brady* violations, improperly defended the trial prosecutors' misconduct through the vacatur of Plaintiffs' convictions in 2021. Dkt. No. 83 (Boyd Am. Compl.), at ¶ 396-426, 529-30.

In their letter to Plaintiffs, the County relies on *Rodriguez v. City of New York,* 607 F.Supp.3d 285, 299 (E.D.N.Y. 2022), for the proposition that post-incident misconduct cases are not discoverable. However, *Rodriguez* did not address discoverability, and is inapposite. The court in *Rodriguez* granted a motion to dismiss the plaintiff's *Monell* claim because the complaint insufficiently alleged pre-incident notice of a need for training and supervision. In our case, the County has not challenged the sufficiency or plausibility of our Complaints, which cite numerous prosecutorial misconduct decisions both before and after the Plaintiffs' 1977 trials; it just wants to deny Plaintiffs the evidence necessary to prove them. Moreover, *Rodriguez* addressed the insufficiency of plaintiff's factual allegations in relation to an inadequate training and supervision claim. It did not address whether a plaintiff who *also* alleges inadequate discipline and improper ratification—as Plaintiffs do in this case—is entitled to post-incident discovery. Here, unlike in *Rodriguez,* and consistent with the above-cited case law, we are entitled to such discovery based upon our contention that policymakers' deliberate indifference to post-incident prosecutorial misconduct permits an inference that they had a similar mindset at the time of the Plaintiffs' trials. The win-at-all-costs or anything-goes atmosphere that policymakers' indifference created directly led to the misconduct that caused Plaintiffs' unconstitutional convictions and their grievous injuries.

*Cooks v. Town of Southampton*, 2015 WL1476672, at *7 (E.D.N.Y. March 31, 2015), also cited by the County, does not broadly hold that post-incident documents are never discoverable. Rather, it is based upon the court's conclusion that the sought-after discovery—HIPAA-protected health records of a police officer that played no role in the plaintiff's exoneration—was not warranted by the plaintiff's specific claims in that case. The decision has no bearing upon this case and its far different *Monell* claims.

### III.   Our Discovery Demands are Not Unduly Burdensome

The limited number of case files from which we seek production does not present the County with a burden that is undue in relation to the issues in this case. To the contrary, because the ECDA successfully opposed the Plaintiffs' numerous requests, over many years, to vacate

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 6

their convictions, until such a motion finally was granted in 2021, Plaintiffs, besides suffering a total of 84 collective years in prison and on parole, now have no choice but to seek records that are old. Particularly due to our substantial narrowing of our request to portions of just 16 case files, the burden on the County is not out of proportion to the needs of the case. *See, e.g., Benitez v. Lopez*, 372 F. Supp. 3d 84, 89 (E.D.N.Y. 2018) ("Plaintiff has proffered a specific list of cases … it is not a general speculative inquiry into Defendants' files, but a directed and focused list of 26 cases that can be identified and retrieved."). In this era in which virtually every civil and criminal case requires exhaustive retrieval and review of social media, digital, telephone, surveillance, medical, forensic, and other records, the task before the County is not unduly burdensome.

As discussed above, the County has determined the existence of storage boxes at a facility but apparently has not opened a single box. It has demonstrated there is no indexing system, no way to determine which boxes contain case records, and no way to locate case files from the period involved in this case. New York prosecutors' offices are required to preserve records. N.Y. County Law § 700(7). What is "extraordinary," Dkt. No. 91-1, at 3, is not the virtually non-existent steps the County has taken to find the materials, but rather the claimed inability of a sophisticated County District Attorney's Office to locate its own case files.

Plaintiffs' own case files, and those of their two co-defendants, were still in the County's possession when Plaintiffs filed their most recent 440 motion in 2021. There is no reason to assume that the 16 case files we have requested are not similarly retrievable.

Finally, once the County has located the boxes, we have agreed to review the materials before the County has to scan and copy them, and then to cover that cost. We have also offered the County the option to produce the complete case files, obviating the need for the County to review the materials. In this fashion, we would reduce the "burden" on the County even further.

**IV.     Discovery Should Not be Denied on the Purported Basis of Dissimilarity**

The County makes no argument that the post-incident cases are too dissimilar to permit discovery. As for the pre-incident cases, in their letter of April 6, the County does not dispute the relevance of *Moore, Slaughter, Damon, Donaldson, Weston, and Balsano,* and take issue only with *Kampshoff, Anderson*, and *Mordino.* We first address the general considerations and then, in case the County now makes additional arguments, address each case individually.

In *Connick v. Thompson*, 563 U.S. 51 (2011), the Supreme Court held that, before a District Attorney will be required to train prosecutors about *Brady* obligations—a legal and ethical requirement prosecutors are presumed to have learned about in law school—there must be the occurrence of *Brady* violations showing a need for training with respect to particular categories of disclosure. *Id.* at 61-62. Even so, it defined "category" broadly, requiring, in a case involving failure to disclose blood-type evidence, prior notice of a need for training in

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 7

disclosure of scientific evidence "of any kind." *Id.* at 62-63.  Meanwhile, the Court did not rule at all on the requisites of a failure-to-discipline claim or on the scope of discovery in such cases. This is because *Connick* came to the Court following a jury trial; the relevance of discovery, as opposed to the sufficiency of the evidence presented at trial, was not at issue.

Plaintiffs' claim here, as discussed above, is far broader than the narrow failure-to-train claim that was presented in *Connick*.  We contend that the ECDA tolerated all forms of trial-related misconduct, including *Brady* violations, knowing use of false or misleading testimony, and improper summations, thereby creating what the *Connick* Court termed a "culture of indifference," 563 U.S. at 68 n. 10, in which prosecutors knew that, to achieve the preeminent goal of winning convictions, they could commit such constitutional violations with impunity. This *de facto* policy of indifference and tolerance of violations was not limited to any narrow category of *Brady* violation or summation misconduct, but to misconduct generally that impacted a criminal defendant's constitutional right to a fair trial.

Our theory of recovery is fully supported by Second Circuit case law.  *Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992), upheld a lawsuit on the theory that a DA's Office had "a practice of condoning perjury (evidenced perhaps by a failure to discipline for perjury)" and a failure to discipline prosecutors for *Brady* violations generally.  In *Gentile v. County of Suffolk*, 926 F.2d 142, 153 (2d Cir. 1991), the Circuit upheld a civil verdict based upon evidence that the DA's Office, together with the Suffolk County Police, "consistently ignore[d] evidence of misconduct"—the evidence was not limited to any particular category.  In *Fiacco v. City of Rensselaer*, 783 F.2d 319, 330-32 (2d Cir. 1986), too, the Circuit upheld a claim based upon a municipality's history of "uninterested and superficial" responses to various forms of police misconduct complaints which "would have been viewed by the officers ... as reflecting an indifference."  In *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013), the district court denied dismissal and permitted discovery under the theory that, "despite scores of cases involving Brady violations and other prosecutorial misconduct," the Brooklyn DA had "never disciplined an assistant for such misconduct, even after the violations were confirmed by court decisions."  Here, too, the theory was a general policy of indifference which predictably created a lax office culture.

The Second Circuit has carefully distinguished between the specificity required for an inadequate training claim versus a claim of inadequate supervision or discipline.  *See Amnesty America v. Town of West Hartford*, 361 F.3d 113, 127-32 (2d Cir. 2011) (Sotomayor, C.J.) (dismissing an inadequate police training claim while upholding a claim for inadequate supervision); *Cash v. Cty. of Erie*, 654 F.3d 324, 336 (2d Cir. 2011) (distinguishing the failure-to-train context, where "the 'nuance' of a particular training need may only become apparent … after a pattern of violations arises in substantially similar circumstances," from "the deliberate

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 8

indifference concern … with the adequacy of defendants' own actions" to deter constitutional violations).

Indeed, in rejecting the very argument that the County makes here, the late Judge Deborah Batts, in *Poventud v. City of New York*, 2015 WL 1062186, at *16 (S.D.N.Y. Mar. 9, 2015), reasoned: "Although Defendants contend that the Supreme Court's holding regarding the level of specificity required in a failure to train claim extends to failure to discipline claims, the two claims are 'distinct theories of ... deliberate indifference'" (quoting *Amnesty Am.,* 361 F.3d at 127 & n. 8).

In sum, Defendants may not rely on *Connick* to artificially narrow the categories of misconduct for which they must produce files. The *Brady* or disclosure violations need not be of the same category, nor need the types of summation misconduct or other fair trial violations. What the 16 cases have in common with our case—or at least what we believe the records of those cases will prove—is a complete and deliberate indifference by the ECDA to all forms of prosecutorial misconduct, including disclosure violations and serious summation misconduct, which a jury may find created the lax atmosphere that led to the violations that occurred in Plaintiffs' cases.

Below are the 16 specific cases for which we are requesting case materials, narrowed where possible due to our independent obtaining of court records.

1. ***People v. Anderson*, 25 A.D.2d 602 (4th Dept. 1966)**

This case is discussed in the Amended Complaint at ¶ 561. The Appellate Division unanimously reversed a defendant's felony assault conviction because of the prosecution's failure to disclose the testimony of the complainant and a second witness before a separate grand jury investigating a second defendant's involvement in the same incident. The narrow view of the lower court of the ECDA's disclosure obligation, despite the state's own *Rosario* rule and the likelihood that undisclosed grand jury testimony would contain impeachment material, likely followed the ECDA's improper objection to having to disclose the documents in question. We cannot tell from the appellate briefs what position the ECDA took on the disclosure issue before the lower court ruled, nor do we have the parties' arguments in the lower court, and we do not have the grand jury testimony or the trial transcript, both of which are necessary to analyze whether a true *Brady* violation occurred. The County's objection that it was the trial court's erroneous decision denying disclosure that was reversed, *see* Dkt. No. 91-1, at 2, overlooks the importance of ascertaining what the ECDA's position was and, as just explained, whether a true *Brady* violation occurred. The trial and grand jury transcripts thus should be disclosed.

2. *People v. Moore*, 26 A.D.2d 902 (4th Dept. 1966)

This case is discussed in the Amended Complaint at ¶ 600. The Appellate Division reversed the conviction and required a new trial because the prosecutor (ADA Edward Decker), during his summation, improperly commented on the defendant's exercise of his constitutional right to remain silent and "exceeded proper limits in telling the jury that if they wanted to live in a community where crime runs rampant they should acquit the defendant." *Moore*, 26 A.D.2d at 902. In Plaintiffs' case, the prosecutors similarly made arguments shifting the burden of proof and made emotional appeals for convictions. The transcript containing the prosecutor's improper summation, and motion papers containing the ECDA's position on the summation misconduct, are relevant to Plaintiffs' claim that the ECDA had an unlawful policy or practice of encouraging or allowing its prosecutors to deliver egregiously prejudicial summations and subsequently condoning or ratifying such misconduct. Court decisions rarely quote the misconduct in full or the context, and the court transcript is the best evidence of exactly what occurred. We seek the trial transcripts and motion papers.

3. *People v. Slaughter*, 28 A.D.2d 1082 (4th Dept. 1967)

This case is discussed in the Amended Complaint at ¶ 601. The court reversed a murder conviction after the prosecutor (ADA Thomas P. Cleary), ridiculing the defendant's insanity defense, stated falsely in summation that if the defendant was acquitted, he would be "on the streets again within 30 days," decried permissive societal attitudes, urged the jury not to "extend to the Henry Slaughters of the world the license to strike out and kill … or are you going to call them to task? Are you going to protect, finally here, … the rights of the community in which you live." *Slaughter*, 28 A.D.2d at 1082. Case materials from *People v. Slaughter* are relevant to Plaintiffs' summation misconduct claims for the reasons described above regarding *People v. Moore*. We seek the trial transcript and motion papers.

4. *People v. Damon*, 24 N.Y.2d 256 (1969)

This case is discussed in the Amended Complaint at ¶ 604. The Court of Appeals reversed a child sexual assault conviction because an ECDA prosecutor in summation argued that the defendant was "a homosexual or deviate," improperly vouched for the police while personally attacking defense counsel, falsely argued prejudicial "facts" that were not in evidence, and made inflammatory remarks to the jury about the nature of the crime. *Damon*, 24 N.Y.2d at 259-60. Case materials from *People v. Damon* are relevant to Plaintiffs' summation misconduct claims, and they will reveal the name of the ADA.

5. *People v. Donaldson*, 49 A.D.2d 1004 (4th Dept. 1975)

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 10

This case is discussed in the Amended Complaint at ¶ 609. The Appellate Division, in reversing the conviction, condemned the prosecutor for arguing improper inferences from hearsay evidence, improperly arguing a negative inference against the defendant for exercising his constitutional right not to testify, and for his "entirely improper and prejudicial" urging of the jury to credit the testimony of a prosecution witness with a long criminal record because the *grand jury* had believed him. *Donaldson*, 49 A.D.2d at 1005. Plaintiffs seek the pretrial motion papers, and the hearing and trial transcripts, to be able to show exactly what the offensive remarks were and the context.

6. ***People v. Weston*, 51 A.D.2d 881 (4th Dept. 1976)**

This case is discussed in the Amended Complaint at ¶ 611. The Appellate Division reversed a conviction for burglary, rape, and robbery because the prosecutor cross-examined the defendant in bad faith about his criminal propensity. *Weston*, 51 A.D.2d at 882. The court also agreed with the defendant's condemnation of the prosecutor's "inflammatory and intimidating" remarks in summation and admonished him not to "put his personal credibility behind his statements and make himself an 'unsworn witness.'" *Id.* at 883. We seek pretrial motion papers and the hearing and trial transcripts.

7. ***People v. Balsano*, 51 A.D.2d 130 (4th Dept. 1976)**

This case is discussed in the Amended Complaint at ¶ 610. The court reversed a conviction for unlawful imprisonment where, among other things, the prosecutor improperly questioned the defendant about criminal conduct not related to his credibility, improperly elicited that he had a pending charge, improperly asked the jury in summation to draw a negative inference from the defendant's failure to call a witness, and repeatedly forced the defense during summations to object to "inflammatory" remarks, causing the trial judge to "properly admonish[] the prosecutor." *Balsano*, 51 A.D.2d at 133-34. We seek the pretrial motion papers, and hearing and trial transcripts, for the reasons discussed with reference to the prior cases.

8. ***People v. Kampshoff*, 53 A.D.2d 325, 332 (4th Dept. 1976)**

This case is discussed in the Amended Complaint at ¶ 562. The Appellate Division noted "under the rule of *People v. Rosario*, the court improperly refused defendant's request for the production of police memoranda covering all interviews with the witnesses." *Kampshoff*, 53 A.D.2d at 332. The appellate records do not clarify whether the "improper" position the court adopted was urged by the prosecutor. The underlying trial records are necessary to determine this. Of clear relevance to our *Brady* claims, the transcript in this murder case will also demonstrate the manner in which the prosecutor documented disclosures of police documents and the types of documents disclosed.

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 11

9. *People v. Mordino*, 58 A.D.2d 197 (4th Dept. 1977)

This case is discussed in the Amended Complaint at ¶ 612. The Appellate Division rebuked an ECDA prosecutor's inflammatory summation as "improper" for castigating the defendants as "vultures" and arguing their guilt by association ("if you walk like a duck and you talk like a duck and you keep the company of ducks then you are a damn duck"). *Mordino*, 58 A.D.2d at 201, 204, 207. The Appellate Division considered it necessary to reprimand the ADAs even as it reversed on a different ground. We are seeking the pretrial motion papers as well as the trial transcript, which will reveal the full context of the prosecutor's offensive remarks and allow us to determine which of the two prosecutors, Thomas P. Cleary and Charles B. Widysh, made them. If it was ADA Cleary, he was also the ADA in the above *Slaughter* case, and his repetition of the same misconduct, presumably after not being retrained or disciplined, would be supportive of our *Monell* claim. The Appellate Division's decision to reverse on a ground other than the misconduct has no bearing upon whether the prosecutor acted improperly and was deserving of discipline.

10. *People v. Johnson*, 62 A.D.2d 555 (4th Dept. 1978)

This case is discussed in the Amended Complaint at ¶¶ 585-96. On appeal, all five justices of the Appellate Division condemned the ECDA prosecutor's behavior. *See Johnson*, 62 A.D.2d 555. In a public rebuke, the majority opinion of three justices called out the prosecutor, Albert Ranni, by name in expressing their "concern with misconduct of ADA Ranni throughout the trial" while warning, in an apparent indirect reference to ECDA as a whole, that "*unadulterated unfairness and deceit have become the rule*." *Id.* at 560 (emphasis added).

The majority did not reverse the conviction because of the overwhelming evidence of the defendant's guilt, but in the dissenting opinion by Justice Hancock, he and Justice Witmer further detailed the misconduct by ADA Ranni that had disturbed the entire court. Justice Hancock wrote that "the record is … permeated with acts of improper, overreaching and prejudicial conduct by the prosecuting attorney … ." *Id.* at 569 (Hancock, *J.*, dissenting). After detailing some of ADA Ranni's extensive misconduct, Justice Hancock wrote:

> From the record there clearly emerges the picture of an overbearing prosecutor obsessed with the idea of obtaining a conviction at any costs, ignoring the court's rulings, deliberately asking improper and prejudicial questions, and engaging in unpardonable efforts in comments during the trial and in summation to disparage defense counsel and destroy his credibility with the jury.

*Id.* at 571.

Subsequently, Federal District Judge John Elfvin, in *Johnson v. Smith*, CIV 81-329E, issued a grant of federal habeas corpus relief, vacating the defendant's conviction because ADA

Ranni's pervasive misconduct had violated the petitioner's federal constitutional right to due process and a fair trial. Significantly, the court noted that the ECDA had conceded that ADA Ranni's conduct was "improper." (Notwithstanding these decisions and his acknowledgment of ADA Ranni's misconduct, the District Attorney permitted ADA Ranni to continue to handle the most notorious cases the office prosecuted and promoted him to Deputy DA in charge of prosecutions.).

Because ADA Ranni was continually promoted notwithstanding this remarkable decision and his numerous appellate rebukes, it is essential that we obtain the hearing and trial transcripts as the best, non-hearsay evidence of what occurred in order to be able to fully prove the nature and extent of his misconduct in this case and thus the significance of the ECDA failure to discipline him and giving him a promotion. We are seeking all pre- and post-trial motion papers because they may bear upon the ADA's understanding of his *Brady* obligations and may contain accusations of prosecutorial misconduct and the Office's response.

> **11. *People v. Keller*, 67 A.D.2d 153 (4th Dept. 1979)**

This case is discussed in the Amended Complaint at ¶¶ 614-15. The Appellate Division unanimously reversed an assault and weapons conviction due to pervasive misconduct by an ECDA prosecutor. In an unanimous opinion by five justices, the *Keller* court condemned the prosecutor for his "egregious errors" and "grossly improper remarks" in repeatedly referring to the defendant and his witnesses as liars, repeatedly expressing his personal opinion about witnesses' credibility, implying in summation there was a lie detector test and other evidence the jury had been prevented from hearing, and making various "irrelevant and inflammatory" remarks which, in their totality, "patently deprived the defendant of a fair trial … ." *Keller*, 67 A.D.2d at 159-62. We seek the pretrial and post-trial motion papers and the trial transcript for the above-stated reasons. As in *Johnson,* there was egregious misconduct in this case which we need to be able to fully analyze in relation to ECDA policy and practice and the failure to discipline theory.

> **12. *People v. Mitchell*, 99 Misc.2d 332 (Sup. Ct., Erie Co. 1979)**

This case is discussed in the Amended Complaint at ¶ 563. A Supreme Court justice had to order the ECDA to disclose grand jury testimony where there was "no question" that it was "exculpatory." *Mitchell*, 99 Misc.2d at 333. The court warned that "compliance with Brady cannot be made with clue-dangling or gamesmanship in place of full disclosure." *Id.* (quoting *People v. Bottom,* 76 Misc.2d 525, 529 (Sup. Ct., N.Y. 1974)). We request the motion practice, if any, leading to the court's decision and the grand jury transcripts. The suggestion that the ADA engaged in "clue-dangling and gamesmanship" certainly alludes to intentional misconduct.

> **13. *People v. Ivey*, 83 A.D.2d 788 (4th Dept. 1981)**

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 13

This case is extensively discussed in the Amended Complaint at ¶¶ 575-83. In overturning the conviction, the Appellate Division, in a unanimous decision by five justices, once again deplored ADA Ranni's behavior throughout the trial, again taking the extraordinary step of calling him out by name. *See Ivey,* 83 A.D.2d 788. It wrote that "the record is replete with numerous and repeated acts of improper and prejudicial conduct … which deprived the defendant of a fair trial." *Id.* at 788. Writing that it would discuss *just a few* of ADA Ranni's many acts of misconduct, the court noted that he repeatedly offered into evidence, in front of the jury, clearly inadmissible composite sketches that the court had ordered to be excluded, then made a "highly improper" argument to the jury "insinuat[ing] that the court's ruling unfairly precluded him" from offering such evidence. *Id.* at 788-89. The court "condemn[ed] the prosecutor's inflammatory and prejudicial opening statement and summation," which tried to scare the jury that an acquittal "would mean that the 'murderer goes free,'" as well as his remarks to the jury implying "that he knew some things about the case he wished that they knew …" *Id.* at 789. The court also "condemned" the prosecutor's "attempts in his summation to inject sympathy for the victim" and his "disparagement" of the defendant's alibi witnesses and his lawyer. *Id.* Much of this misconduct is very similar to what occurred at Plaintiffs' trials.

Following the reversal of Mr. Ivey's conviction, new evidence emerged that someone else committed the crime, and he was fully acquitted at his retrial. Thereafter, the New York Court of Claims, finding by clear and convincing evidence that Mr. Ivey was innocent, awarded him substantial damages for the unjust conviction that ADA Ranni's misconduct had brought about. We have obtained nothing in this crucially important case besides the court decisions, and request disclosure of the hearing (if any) and trial transcripts, and any pretrial and post-trial motion practice.

**14.** *Matter of Potenza v. Kane,* **79 A.D.2d 467 (4th Dept. 1981)**

This case is discussed in the Amended Complaint at ¶¶ 567, 617. ADA Ranni prosecuted this case as well. The Court declared a mistrial based on ADA Ranni's negligence in failing to disclose a tape recording of the defendant. *Matter of Potenza*, 79 A.D.2d at 473-74. While refusing to grant the extraordinary relief of a double jeopardy bar to a second trial due to ADA Ranni's pervasive misconduct at the first trial, the Appellate Division noted that many of the defense counsel's objections to the prosecutor's improper opening statement had been sustained and the court had "minimized the possible prejudice by admonishing the prosecutor before the jury." *Id.* at 472. The Appellate Division also noted that it did not "condone" ADA Ranni's repeated failure to follow the court's warning against leading questions. *Id.* at 473. We are seeking all motion papers, both pre- and post-trial, and all hearing and trial transcripts. These materials will serve to prove the underlying misconduct and as a predicate for arguing that the ECDA which continued to promote ADA Ranni after this case occurred, was deliberately indifferent to such misbehavior.

**15.** *People v. Vance,* **89 A.D.2d 347 (4th Dept. 1982)**

LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 14

This case is discussed in the Amended Complaint at ¶ 620. The Appellate Division reversed a robbery conviction because the prosecutor acted as an investigator and then asked the jury to credit his personal investigative findings over the defense case. *Vance*, 89 A.D.2d at 350-51. The court concluded: "In a case such as this where credibility is the only issue, a prosecutor who oversteps the bounds of legitimate advocacy and makes himself an 'unsworn witness' against the defendant affects the fairness of the trial and unduly prejudices the defendant." *Id.* at 351. We are seeking the hearing and trial transcripts and pretrial motion papers.

### 16. *People v. Clark*, 89 A.D.2d 820 (4th Dep't 1982)

We have notified the County that, based upon our review of independently-obtained court records, we are substituting this case for *People v. Cadby*. *See* p.1, n.2, *supra*.

In this case, the Appellate Division declined to reverse for a late *Brady* disclosure, noting the defense neither requested an adjournment nor moved for a mistrial. Nevertheless, the appellate briefs reveal that, eight months before trial, the court directed the prosecutor to search his and the BPD's files for *Brady* material and turn it over, yet, not until well into the trial did the ADAs disclose a crucial P-73 report showing that the People's principal eyewitness had initially identified the People's star cooperating witness as one of the killers and that there had been an anonymous call shortly after the murder naming three non-defendants as the killers (just as there was anonymous caller information naming other suspects that was not disclosed to Plaintiffs Boyd and Walker). The ADA reportedly argued none of this was *Brady*, a highly revealing admission with regard to the ECDA's policies and practices. While disagreeing, the court declined to order a mistrial, reasoning the defense now had the material and was not sufficiently prejudiced. The defense also complained that (as in Plaintiffs' trials) *Giglio* and *Rosario* material and police photos were not disclosed until the beginning of the trial and that favorable grand jury testimony of two witnesses was not turned over until the middle of trial, preventing adequate use of it. Several witnesses told detailed stories of how they had been coerced by detectives or the DA's office. Homicide Detective John Montondo, one of the named Defendants in Plaintiffs' cases, was specifically named by one witness. Other detectives who participated in the investigation included Francis M. Manista, Frank C. Deubell, Leo J. Donovan, Gerald O. Dove, Vincent Pantano, and Stanley Suszek, all named as Defendants or involved in investigating the Crawford Murder. The essential P-73 that was withheld until mid-trial was authored by Detectives Dove, Pantano, and Suszek.

The above provides numerous avenues to investigate to develop evidence concerning who was responsible for the late *Brady* disclosures, including the Buffalo Police Department's and ECDA's practices with regard to disclosure of police reports, as well as the use by these agencies in this case of coercive interrogation techniques similar to the techniques used in

# LAW OFFICES OF JOEL B. RUDIN, P.C.

Honorable Jeremiah J. McCarthy
April 21, 2023
Page 15

Plaintiffs' case. We request disclosure of the complete trial file, including all police reports, motion papers, and transcripts.

* * * *

Plaintiffs served their discovery requests seven months ago. We request that the Court order the County to produce the requested case files within 20 days from the Court's decision.

Respectfully submitted,

/s/ Joel B. Rudin
Joel B. Rudin
David E. Rudin
LAW OFFICES OF JOEL B. RUDIN, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com
david@rudinlaw.com

Timothy W. Hoover
Spencer Durland
HOOVER & DURLAND LLP
561 Franklin Street
Buffalo, New York 14202
(716) 800-2604
thoover@hooverdurland.com
sdurland@hooverdurland.com

Ross E. Firsenbaum
Ryanne E. Perio
Gideon A. Hanft
Phoebe Silos
Erin Hughes
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
ross.firsenbaum@wilmerhale.com
ryanne.perio@wilmerhale.com
gideon.hanft@wilmerhale.com
phoebe.silos@wilmerhale.com
erin.hughes@wilmerhale.com

*Attorneys for Plaintiffs Darryl Boyd and John Walker, Jr.*

cc:   Jennifer C. Persico
      Brian C. Mahoney
      Alexander W. Eaton
      *Counsel for Defendant County of Erie*

      Hugh M. Russ III
      Peter A. Sahasrabudhe
      Adam W. Perry
      *Counsel for City Defendants*