# EXHIBIT 1

STATE OF NEW YORK
SUPREME COURT        :        COUNTY OF ERIE

_____

THE PEOPLE OF THE STATE OF NEW YORK,

        v.                                    Ind. No. 82-1064

TOMMY ROLLINS,

                   Defendant.

_____

## ORDER TO SHOW CAUSE

        **UPON** reading the annexed affirmation of Timothy W. Hoover, Esq.,
counsel for Movants Darryl Boyd and John Walker, Jr. ("Movants"), sworn to on the
24th day of October, 2023, with Exhibits A-N ("Hoover Affirm."), and sufficient cause
being shown and for the reasons set forth in the Hoover Affirm., it is hereby:

        **ORDERED** that the Erie County District Attorney's Office show cause at a
Special Term of this Court to be held at Part ___18___, 25 Delaware Avenue, Buffalo,
New York 14202 on October ~~November~~ *9th* 2:30 pm, 2023, or as soon as counsel can be
heard, why an order should not be entered herein partially unsealing this case on a
limited, non-public basis, subject to a protective order, solely for use by the parties in
the pending federal civil rights lawsuits brought by Movants captioned *Boyd v. City of
Buffalo, et al.*, No. 22-CV-519-LJV-JJM (W.D.N.Y.) and *Walker v. City of Buffalo, et al.*,
No. 22-CV-520-LJV-JJM (W.D.N.Y.), including inspection and copying, and grant such
other and further relief as this Court deems just and proper; and

        **ORDERED** that responding papers, if any, be received by this Court
(Part __18__, 25 Delaware Avenue, Buffalo, New York 14202) and by counsel for
Movants (Hoover & Durland LLP, 561 Franklin Street, Buffalo, New York 14202) by
5:00 p.m. on ~~October~~ *November* 2nd, 2023; and

        **ORDERED** that reply papers, if any, be received by this Court and the
Erie County District Attorney's Office by 5:00 p.m. on the day before the above return
date scheduled by the Court; and

2023 OCT 31  AM 11:14

RECEIVED

EC DISTRICT ATTORNEY
OCT 31 2023 AM 11:20

**SUFFICIENT CAUSE APPEARING, IT IS HERRBY ORDERED**

that service of a copy of this Order to Show Cause and the supporting papers on which

this Order to Show Cause is granted be made upon the Erie County District Attorney's

Office, 25 Delaware Avenue, Buffalo, New York 14202, by hand delivery on or before

~~October~~ November 2nd, 2023, which shall be deemed good and sufficient service; and

**SUFFICIENT CAUSE APPEARING, IT IS HERRBY ORDERED**

that service by Movants of this Order to Show cause and the supporting papers on which

this Order to Show Cause is granted on Defendant Tommy Rollins is excused and is not

required, as good cause to excuse service has been established by the Hoover Affirm. and

by the Affidavit of Maria DiPirro, executed on October 17, 2023, and attached as Exhibit

C to the Hoover Affirm.

DATED:     Buffalo, New York
           October 30, 2023

Hon. Susan M. Eagan

ENTER.

STATE OF NEW YORK
SUPREME COURT          :          COUNTY OF ERIE

_____

THE PEOPLE OF THE STATE OF NEW YORK,

        v.                                   Ind. No. 82-1064

TOMMY ROLLINS,

                   Defendant.

_____

## AFFIRMATION OF TIMOTHY W. HOOVER IN SUPPORT OF ORDER TO SHOW CAUSE AND APPLICATION FOR AN ORDER PARTIALLY UNSEALING THIS ACTION ON A LIMITED, NON-PUBLIC BASIS, SUBJECT TO A PROTECTIVE ORDER

        TIMOTHY W. HOOVER, under penalty of perjury and pursuant to CPLR Rule 2106, affirms and states as follows:

        1.        I am an attorney at law duly licensed to practice in the State of New York, and I am a partner in the law firm of Hoover & Durland LLP. Along with the Law Offices of Joel B. Rudin, P.C. and Wilmer Cutler Pickering Hale and Dorr LLP, Hoover & Durland LLP is counsel for Movants Darryl Boyd and John Walker, Jr. ("Movants").

        2.        I am fully familiar with the facts and circumstances described below, and make this Affirmation in support of Movants' order to show cause and application pursuant to Criminal Procedure Law § ("CPL") 160.50 for an order partially unsealing the records this case on a limited, non-public basis, subject to a protective order, solely for use by the parties in the pending federal civil rights lawsuits brought by Movants, pursuant to 42 U.S.C. § 1983, in the United States District Court for the Western District of New York.

        3.        In sum, in the early 1980s, in this case, Defendant Tommy Rollins, then 15 years old, was subjected to outrageous misconduct by members of the Buffalo Police Department ("BPD"), resulting in the dismissal and sealing of this case against him. Movants, as teenagers, had likewise been subjected to outrageous misconduct by, among others, the BPD, by some of the same personnel, a few years earlier, resulting in

their wrongful convictions and decades in prison.  Nearly forty-years later, their convictions have been vacated and charges dismissed.

4.      As a result, Movants seek to gain access to and use relevant but sealed records of the misconduct against Rollins in their federal suits against the BPD and Erie County, pursuant to a limited unsealing order, for use on a non-public basis pursuant an existing protective order.  The compelling showing by Movants and the interests of justice overwhelmingly support this application, and the motion should be granted.

## STATEMENT OF THE CASE AND SUMMARY OF ARGUMENT

5.      Movants Boyd and Walker were arrested by members of BPD on January 12, 1976, when they were 16 years old, and were separately prosecuted by the Erie County District Attorney's Office ("ECDA") in Supreme Court, Erie County.  They were tried and convicted in 1977 for a robbery/murder they did not commit.  In 2021, The Honorable Christopher Burns, J.S.C., vacated their convictions pursuant to CPL 440.10 and dismissed the charges against them once the ECDA decided not to retry them.

6.      In 2022, Movants filed lawsuits against the City of Buffalo, Erie County, and individual police officers, including retired Detective John Montondo and the Estate of the former Chief of the Buffalo Police Department's Homicide Unit, Leo J. Donovan, alleging various violations of their federal civil rights, including claims under *Monell v. Department of Social Services of Services*, 436 U.S. 658 (1978), seeking municipal liability for the unlawful policies, customs, or practices of the BPD and ECDA. *See* **Ex. A** (Amended Complaint ("Boyd Compl.") in *Boyd v. City of Buffalo, et. al.*, 22-CV-519-LJV-JJM (W.D.N.Y.) ("Boyd Action")); **Ex. B** (Amended Complaint ("Walker Compl.") in *Walker v. City of Buffalo, et. al.*, 22-CV-520-LJV-JJM (W.D.N.Y.) ("Walker Action")).

7.      Movants' actions seek compensation for their 28 and 22 years, respectively, incarcerated and an additional 17 years (individually) on parole due to

their wrongful convictions.

8.      The present application seeks to unseal records in this unrelated prosecution, *People v. Tommy Rollins,* Ind. No. 82-1064 (Sup. Ct. Erie Cty.).  The records are highly relevant to Movants' federal civil rights claims because they concern similar misconduct by some of the same detectives, including Leo J. Donovan and John Montondo, and the indifference of BPD officials to such misconduct.

9.      The records in this case are sealed pursuant to CPL 160.50 because the case was dismissed in 1985 following a finding by The Honorable Theodore Kasler, J.S.C., that BPD detectives had committed "blatant and egregious misconduct" in coercing a confession from Mr. Rollins, a teenager like the individuals coerced to incriminate Movants were when they were also interrogated by Buffalo police.  *See infra* ¶¶ 7-8.

10.     As set forth below and in the attached Affidavit of Maria DiPirro, sworn to on October 17, 2023 (**Ex. C**) ("DiPirro Aff."), we have made diligent efforts to obtain Mr. Rollins's consent to unseal, but have been unable to locate him.  And we have asked the ECDA and the County of Erie, through its counsel in the Boyd Action and the Walker Action, to consent to this limited unsealing, but their counsel never responded. *See* **Ex. N** (Email from Joel B. Rudin, Esq., to Brian C. Mahoney, Esq., Jennifer Persico, Esq., and Alexander W. Eaton, Esq., counsel for County of Erie, among others, dated Sep. 13, 2023, seeking consent of the ECDA and the County of Erie to the unsealing of the court file in this case).

11.     Because Movants' interest in disclosure far outweighs the minimal privacy interests retained by Mr. Rollins in his highly publicized case, and because the unsealing will be on a partial, limited, non-public basis only for the purpose of the Boyd Action and the Walker Action pursuant to a confidentiality order, the application should be granted.

12.     This application and motion is brought by order to show cause because Justice Kasler retired in or about 1993, because the matter is otherwise

closed/sealed, and because there is at present a January 16, 2024 fact discovery cutoff in the federal actions. *See* **Ex. D** (Boyd Action, ECF Docs. 125, 124 (Text Order Adopting Proposed Case Management Order, and Stipulation and Proposed Amended Case Management Order); Walker Action, ECF Docs. 123, 122 (Text Order Adopting Proposed Case Management Order, and Stipulation and Proposed Amended Case Management Order)).

## FACTUAL BACKGROUND

### A.   Boyd and Walker's Federal Section 1983 Lawsuits

13.    In the Boyd Compl. and in the Walker Compl., Movants Boyd and Walker allege that BPD homicide detectives manufactured a case against them and two friends, all 16-years-old, for the homicide of William Crawford by coercing two teenage witnesses, Tyrone Woodruff and Andre Hough. On January 12, 1976, a day after the 17-year-old Woodruff denied any knowledge of the Crawford homicide, detectives, despite lacking probable cause, took him into custody and brought him back to the homicide office. Boyd Compl. ¶ 208.[1] Detectives denied Woodruff permission to call his parents or a lawyer and threatened him, falsely, that his friends had accused him of the crime, that the police had other evidence implicating him, and that he would face life imprisonment if he did not provide information against his friends. *Id.* ¶¶ 209-14. On the other hand, detectives told him that if he confessed and implicated his friends, he would receive complete immunity from prosecution (which is in fact what then happened). *Id.* ¶ 215. According to a police report, Detectives then allowed Woodruff to overhear an anonymous phone call (which the circumstances show was a ruse or fake call) accusing him of the homicide and naming his alleged accomplices, including Movants. *Id.* ¶¶ 219-28. Terrified, Woodruff relented to the story fed to him by detectives and implicated himself and his friends in the homicide. *Id.* ¶¶ 229-44. Later,

---

[1]    For ease of reference, Movants cite to the paragraph numbers for the Amended Complaint in the Boyd Action (Ex. A) to refer to the Amended Complaints in both cases. The Amended Complaints are materially identical for the present purposes.

Woodruff expanded on his initial, barebones story when detectives pressured him to conform his account to allegations they had just obtained, also through coercion, from a second witness, Andre Hough, who was just 15 years of age. *Id.* ¶¶ 311-47.

14.    Movants allege, based upon police reports and hearing and trial testimony, that detectives also brought Hough into BPD headquarters multiple times, even after he told them he had no knowledge of the Crawford homicide. *Id.* ¶¶ 194-203. Detectives accused Hough of participating in the murder and threatened him with prosecution for murder—even though they had no case against him—if he did not provide information against the other boys. *Id.* ¶ 204.  Under this intense pressure, the 15-year-old Hough falsely implicated the other boys in the murder. *Id.* ¶¶ 205-07. Hough later recanted during a subsequent interview with detectives in which he was accompanied by his mother. *Id.* ¶¶ 297-301.  Hough's mother then left the interview based on the detectives' promise they would drive her son home. *Id.* ¶ 302.  Instead, detectives threatened Hough again—now alone—causing him to recant his recantation and further embellish his story. *Id.* ¶¶ 303-10, 343-47.

15.    Movants Boyd and Walker further allege that detectives deliberately omitted inconsistent statements favorable to Movants by Woodruff and Hough from police reports and signed witness statements. *Id.* ¶¶ 245, 301, 313.  The detectives also omitted from their reports the threats they made against the boys and the inducements they made to the boys to lie. *Id.*

16.    In their *Monell* claim against the City of Buffalo, Movants Boyd and Walker allege that the BPD had an unlawful policy, custom, or practice of coercing false statements from suspects and witnesses, especially vulnerable teenagers, as well as a policy of deliberate indifference to such unlawfully coercive interrogations when they occurred, and that such policies, customs or practices were a substantial cause of the violations of Movants' rights and resulting injuries. *Id.* ¶¶ 472-500.  Movants also allege that an unlawful policy of failing to document information favorable to suspects and defendants, and a policy of deliberate indifference to such a practice, was a substantial

cause of the violations of their rights and resulting injuries.  *Id.* ¶¶ 347, 494.

**B.** **Police Misconduct in the Instant Case**

17.     In 1982, BPD detectives arrested Tommy Rollins and his cousin,
Shelby Davis, for the rape and murder of an elderly couple that lived next door to Davis.
A *Huntley* hearing was held in 1983, including on May 31, 1983, before Justice Kasler.
Two years later, in 1985, Justice Kasler threw out the evidence of Mr. Rollins's coerced
confession due to "blatant and egregious misconduct" by Buffalo homicide detectives,
specifically Homicide Chief Leo Donovan and Detective John Montondo.  **Ex. E** (Order
at 23, *People v. Davis and Rollins*, No. 82-1064 (Sup. Ct. Erie Cty. Apr. 15, 1985)[2]; **Ex.
F** (*Judge Throws Out Evidence, Cites Police Misconduct*, The Buffalo News (Apr. 16,
1985)).

18.     Justice Kasler rebuked the homicide detectives for what he called
"deliberate" violations in illegally holding the 15-year-old Mr. Rollins incommunicado
from his family for nearly nine hours.  Ex. E at 23, 25; Ex. F.  He reprimanded Chief
Donovan for having "brow-beaten" the intellectually impaired Mr. Rollins into
admitting complicity in the killings and implicating his cousin as the killer.  Ex. E at 18,
22; Ex. F.  The homicide detectives' conduct, Justice Kasler said, was "an orgy of
constitutional and statutory illegal police conduct."  Ex. E at 25; Ex. F.

19.     The Court also noted that homicide detectives acknowledged during
hearings that they had failed to include apparently inconsistent remarks Mr. Rollins
gave them about the crime in his signed written statement.  Ex. E at 10; Ex. F.

20.     Justice Kasler subsequently dismissed the case against Mr. Rollins.
*See* **Ex. G** (*Errors by Police Lead to Dismissal Of Murder Charges*, The Buffalo News
(May 18, 1985)).

21.     Following Justice Kasler's dismissal of the case against Mr. Rollins,

---

[2]     The Erie County Clerk's Office produced this redacted copy of Justice
Kasler's April 15, 1985, decision to Movants' counsel on July 27, 2023, because the case
against co-defendant Shelby Davis is not sealed.  However, the Davis court file does not
include the transcript of the *Huntley* hearing involving Rollins's motions.

the case was sealed pursuant to CPL § 160.50 because it terminated in favor of the accused.

22.     Movants are unable to obtain the Rollins court file from the Erie County Clerk's Office, including the pretrial hearing transcript, because Mr. Rollins's case is sealed.

23.     In July 2023, Boyd and Walker asked private investigators to attempt to locate and speak to Tommy Rollins to obtain his consent to unseal his case under CPL 160.50. *See* DiPirro Aff. ¶ 1. After numerous attempts to locate Mr. Rollins at his last known address, the investigators learned from a neighbor that Mr. Rollins had moved over a year ago. *See id.* ¶¶ 2-3. Investigators' attempts to locate Mr. Rollins through searches of multiple databases were unsuccessful. *See id.* ¶ 4. The investigators found phone numbers for and called six members of Rollins's family, but only one, Mr. Rollins's sister, answered the phone. *See id.* ¶ 5. She declined to provide Mr. Rollins's contact information and said that she would contact Mr. Rollins. *See id.* ¶¶ 6-7. She then stopped responding to the investigators' efforts to contact her. *See id.* ¶¶ 8-10.

24.     During depositions of John Montondo and another retired detective, John Regan, in the Boyd Action and the Walker Action, Movants elicited that the BPD never investigated the misconduct identified by Mr. Rollins and the Court in this case, nor did it discipline the detectives involved. *See* **Ex. H** (Montondo Dep. 31:22-32:12, 226:9-227:22); **Ex. I** (Regan Dep. 213:1-17). To the contrary, Detective Montondo was given an award. Ex. H at 230:7-232:7; **Ex. J** (*Winners of Mayor's Merit Awards Honored*, The Buffalo News (May 17, 1986)).

## ARGUMENT

25.     CPL 160.50 provides that "[u]pon the termination of a criminal action or proceeding against a person in favor of such person...unless...the court on its own motion...determines that the interests of justice require otherwise and states the reasons for such determination on the record, the record of such action or proceeding shall be sealed."

26.     The Court of Appeals has recognized that criminal courts have an "inherent power" beyond the provisions of CPL 160.50 to grant relief to release sealed records when required by the interests of justice, which "grows out of that measure of discretionary authority courts enjoy with respect to their own records insofar as they pertain to the business of the court and when essential to the proper administration of justice." *Matter of Hynes v. Karassik*, 47 N.Y.2d 659, 664 (1979).  The movant must make a "compelling demonstration" showing that his "interest outweigh[s] the statutorily granted protection" and that the information is "relevant and could not be obtained by conventional investigative means." *People v. Cruz*, 1 Misc.3d 908(A) at *8 (Sup. Ct. Bronx Cty. Jan. 5, 2004).

27.     Where a party in a federal civil action seeks to unseal state court records, it is appropriate for the movant to apply first to the state court that possesses and/or controls the sealed records at issue. *See id.* at *3.  With that said, state privacy rules should never be permitted to "frustrate the important federal interests in broad discovery and truth-seeking and the interest in vindicating important federal substantive policy such as that embodied in section 1983." *King v. Conde*, 121 F.R.D. 180, 187 (E.D.N.Y. 1988); *see also Adams v. Buffalo Pub. Sch.*, No. 13-CV-435-RJA-HBS, 2014 WL 3882182, at *6 (W.D.N.Y. Aug. 7, 2014) (state law does not bar discovery in federal civil rights action).

28.     Records in this case are likely to contain evidence highly relevant to and likely supportive of Movants' federal civil rights claims.  Movants allege that the BPD, including two of the same detectives involved in interrogating Mr. Rollins, Homicide Bureau Chief Donovan and Detective Montondo, violated their rights by, among other things, coercing false statements from teenagers Woodruff and Hough to manufacture a case against Movants.  Movants further allege that an unlawful policy, custom, or practice of coercive interrogations of minors, as well as a policy of deliberate indifference to such conduct, was a substantial cause of these violations.

29.     Evidence in the court file—especially the hearing testimony of

Detective Montondo, possibly Chief Donovan, and other detectives of what they admittedly did to illegally coerce statements from Rollins and conceal their misbehavior—will likely support the use of such similar act evidence against them pursuant to F.R.E. 404(b), the federal analogue to *People v. Molineux*, 168 N.Y. 264 (1901). *See Gross v. Lunduski*, 304 F.R.D. 136, 145 (W.D.N.Y. 2014) (similar act evidence admissible). As a defendant in the federal lawsuit, Detective Montondo's testimony would be directly admissible as a party-admission. *See* F.R.E. 801(d)(2).

30.     In addition, the hearing testimony and other material in the court file will be relevant to and likely will support Movants' *Monell* or municipal liability claims. The sworn hearing testimony of Detective Montondo and other officers may be the best evidence of their misconduct and may provide far more detail than the state court's written decision. This detail will make the failure of the BPD to discipline these detectives for their misconduct even more compelling evidence of an attitude of deliberate indifference. The involvement of Chief Donovan, chief of homicide and a policymaker for the BPD in homicide investigations, is especially probative of municipal policy. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127 (2d Cir. 2004) (holding that "a single action on a policymaker's part is sufficient to create a municipal policy").

31.     While this case post-dates Movants' prosecution by a few years, the Court overseeing Movants' cases has already held that post-incident misconduct is relevant and discoverable. The Court granted Movants' motion to compel production of case materials from after Movants' prosecution, noting that a factfinder may infer from such subsequent acts of misconduct, and the failure of policymakers to discipline the offenders, a policy of deliberate indifference that existed at the time of the violation of the Plaintiffs' rights. *See* **Ex. K** (Boyd Action, ECF Doc. 104 (Decision and Order), at 12-13) (collecting cases)).

32.     Finally, the transcript and briefs also likely contained in the court file will contain arguments by defense counsel and ADA Albert Ranni, the prosecutor at

the pretrial phase of the Rollins-Davis prosecution.  Mr. Ranni was the chief of the Felony Trials Bureau at the time of Movants' trials in 1977 and his misconduct in numerous cases, for which he was promoted rather than disciplined, is a major focus of Movants' *Monell* claims against the County.  *See* Ex. A (*Boyd* Compl.) at ¶¶ 571-97. Indeed, Mr. Ranni was an "advisor" to the Homicide Bureau, according to a contemporaneous article, **Ex. L** (*County May Expand Legal Aid for Police*, The Buffalo News (Aug. 7, 1974)), and thus Mr. Ranni's conduct in this case is also relevant to Movants' *Monell* claims against the City and the County.

33.     Movants have been unsuccessful in attempting to locate Mr. Rollins to obtain a CPL 160.50 waiver, *see supra* ¶ 23, and there are no other state-based means to obtain the contents of the requested case files, including the pretrial hearing transcript and briefing, which are critical to vindicating Movants' federal constitutional rights.

34.     Balanced against the interests embodied in Section 1983, and given that the unsealing request is a partial one, with the documents not being made available to the public, and disclosure to Movants subject to the terms of the existing protective order in the federal actions, the privacy concerns in unsealing of this case are non-existent. The case against Mr. Rollins and Mr. Davis for a high-profile murder and the court's emphatic dismissal of the case against Mr. Rollins due to misconduct were publicized in newspaper articles from the time of the events.  *See, e.g.*, Exs. F, G.  Those newspaper articles remain available to the public at present via the internet, and some of them are freely accessible.

35.     That Mr. Rollins's name and the details of his case are already known to the public limits any harm to Mr. Rollins from unsealing the file.  *See Woodard v. City of New York*, No. 99-CV-1123, 2000 WL 516890, at *5 (E.D.N.Y. Mar. 10, 2000) (ordering production of sealed records where names of arrestees and underlying events were known to all parties and a matter of public record).  Moreover, this Court may order the production of the Rollins court file under the confidentiality

order already in place in the federal action, **Ex. M** (Boyd Action, ECF Doc. 107 (Protective Order)) and limit disclosure of the records to the parties.

36.   Movants will serve the accompanying Order to Show Cause on the District Attorney's Office by the date directed by the Court.

37.   Service upon Mr. Rollins should be excused in light of the impossibility of locating him.

38.   While I am unaware of any basis on which the present motion should be denied, Movants intend to reply and, if necessary, will offer oral argument in support of the limited unsealing.  A municipality's possible desire to suppress relevant evidence of misconduct to try to gain a tactical litigation advantage in a case involving similar misconduct by the same employees is the antithesis of the interests of justice.

WHEREFORE, for the reasons set forth above, the Court should issue an Order to Show Cause setting a schedule for response, reply and a return date, should grant the motion to unseal the court file pursuant to CPL § 160.50, and should grant such other and further relief as would be just and proper.

DATED:      Buffalo, New York
            October 24, 2023

**HOOVER & DURLAND LLP**

By: _____
        Timothy W. Hoover
        Spencer L. Durland
        561 Franklin Street
        Buffalo, New York 14202
        (716) 800-2604
        *thoover@hooverdurland.com*

**LAW OFFICES OF JOEL B. RUDIN, P.C.**
Joel B. Rudin
David E. Rudin
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
*jbrudin@rudinlaw.com*

- 11 -

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Ross E. Firsenbaum
Ryanne E. Perio
Gideon A. Hanft
Phoebe Silos
Erin Hughes
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
*ross.firsenbaum@wilmerhale.com*

*Attorneys for Movants Darryl Boyd and John Walker, Jr.*

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

_____

DARRYL BOYD,

                   Plaintiff,

          - against -

THE CITY OF BUFFALO; THE COUNTY
OF ERIE; MICHAEL G. GUADAGNO;
JOHN MONTONDO; LINDA J. FIAL AS
EXECUTOR FOR THE ESTATE OF
ROBERT GRABOWSKI; MARTIN
BULLOCK AS EXECUTOR FOR THE
ESTATE OF JAMES E. HUNTER;
JENNIFER G. FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF
ROBERT F. ARNET; JENNIFER G.
FLANNERY AS ADMINISTRATOR FOR
THE ESTATE OF FRANK C. DEUBELL;
JENNIFER G. FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF
LEO J. DONOVAN; JENNIFER G.
FLANNERY AS ADMINISTRATOR FOR
THE ESTATE OF FRANCIS M. MANISTA,
JR.; AND DAWN M. DIRIENZO AS
EXECUTOR FOR THE ESTATE OF PAUL
R. DELANO,

                   Defendants.

**Index No. 22-cv-519**

**AMENDED COMPLAINT AND**
**JURY DEMAND**

**LAW OFFICES OF JOEL B. RUDIN, P.C.**

Joel B. Rudin
David E. Rudin
152 West 57th St.
New York, NY 10019
jbrudin@rudinlaw.com
david@rudinlaw.com
Telephone: (212) 752-7600
Fax: (212) 980-2968

_**Attorneys for Plaintiff Darryl Boyd**_

**WILMER CUTLER PICKERING**
    **HALE AND DORR LLP**

Ross E. Firsenbaum
Ryanne E. Perio
Gideon A. Hanft (_pro hac vice_)
Phoebe Silos (_pro hac vice_)
Erin Hughes (_pro hac vice_)
7 World Trade Center
250 Greenwich St.
New York, NY 10007
ross.firsenbaum@wilmerhale.com
ryanne.perio@wilmerhale.com

**HOOVER & DURLAND LLP**

Timothy W. Hoover
Spencer L. Durland
561 Franklin St.
Buffalo, NY 14202
thoover@hooverdurland.com
sdurland@hooverdurland.com
Telephone: (716) 800-2600

*Attorneys for Plaintiff Darryl Boyd*

gideon.hanft@wilmerhale.com
phoebe.silos@wilmerhale.com
erin.hughes@wilmerhale.com
Telephone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Plaintiff Darryl Boyd*

## Table of Contents

I.     INTRODUCTION ..........................................................................................1

II.    PARTIES .....................................................................................................3

III.   JURISDICTION, VENUE, AND CONDITIONS PRECEDENT........................5

IV.   JURY DEMAND ..........................................................................................5

V.    FACTUAL ALLEGATIONS ..........................................................................6

     A.    THE MURDER OF WILLIAM F. CRAWFORD ...................................6

     B.    THE BPD INVESTIGATION POINTS TO LARRY WATSON AND A POTENTIAL ACCOMPLICE AS THE PERPETRATORS...................................7

     C.    THE BPD INVESTIGATES MR. BOYD AND FOUR OTHER BLACK TEENAGERS, BUT FINDS EVIDENCE CORROBORATING THEIR CONSISTENT STATEMENTS THAT THEY WERE NOT INVOLVED IN THE MURDER ..........................................................................17

     D.    THE BPD COERCES 15-YEAR-OLD ANDRE HOUGH TO FALSELY IMPLICATE MR. BOYD AND HIS FOUR FRIENDS FOR THE CRAWFORD MURDER ..........................................................................23

     E.    THE BPD COERCES 17-YEAR-OLD TYRONE WOODRUFF TO FALSELY IMPLICATE MR. BOYD AND THE OTHERS FOR THE CRAWFORD MURDER ..........................................................................24

     F.    THE BPD ARRESTS MR. BOYD BASED ON THE FALSE, COERCED TESTIMONY OF MESSRS. WOODRUFF AND HOUGH ...............................30

     G.    ADDITIONAL INVESTIGATION FURTHER UNDERMINES THE DETECTIVES' FLAWED CASE AGAINST MR. BOYD ...................................33

     H.    MESSRS. WOODRUFF AND HOUGH BOTH RECANT BEFORE TESTIFYING IN THE GRAND JURY BUT DETECTIVES COERCE THEM INSTEAD TO EXPAND THEIR FALSE STORIES .............................35

     I.    THE DEFENDANTS MISLEAD THE GRAND JURY, CAUSING IT TO WRONGFULLY INDICT MR. BOYD ...................................................41

     J.    PLAINTIFF DARRYL BOYD IS TRIED AND CONVICTED BASED ON COERCED FALSE TESTIMONY, WITHOUT THE BENEFIT OF UNDISCLOSED BRADY MATERIAL ....................................................43

     K.    THE ECDA OPPOSES MR. BOYD'S EFFORTS TO OVERTURN HIS CONVICTION..........................................................................................48

     L.    THE COURT VACATES MR. BOYD'S WRONGFUL CONVICTION ...........51

VI.   MR. BOYD'S DAMAGES.............................................................................53

CAUSES OF ACTION.........................................................................................54

COUNT I

Malicious Prosecution (Federal Claim) ............................................................... 54

COUNT II

Malicious Prosecution (State Claim) ........................................................................... 54

COUNT III

Evidence Fabrication (Federal Claim) ........................................................................ 55

COUNT IV

Wrongful Pretrial Withholding of Exculpatory Evidence ("Russo" Claim Under Federal Law) .............. 56

COUNT V

*Brady* Claim (Federal Law) ........................................................................................ 58

COUNT VI

*Monell* Claim Under Federal Law Against City of Buffalo for Policies of the Buffalo Police Department.................................................................................................................. 59

COUNT VII

*Monell* Claim Under Federal Law Against the County of Erie for Policies of the Erie County District Attorney ......................................................................................................... 66

COUNT VIII

State Law Claim for Negligent Failure of City of Buffalo to Properly Hire, Train, Supervise, and Discipline the Police ................................................................................................. 95

COUNT IX

State Law Claim for Negligent Infliction of Emotional Distress.............................. 95

COUNT X

State Law Claim for Negligent Failure of Erie County to Properly Hire, Train, Supervise, and Discipline Employees of the District Attorney's Office............................................. 96

PRAYER FOR RELIEF ..............................................................................................96

Plaintiff Darryl Boyd, by and through his attorneys, The Law Offices of Joel B. Rudin, P.C., and Wilmer Cutler Pickering Hale and Dorr LLP, respectfully alleges as follows:

## I.   <u>INTRODUCTION</u>

1.      This civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and New York State law, seeks monetary damages for the extraordinary injuries and harm suffered by Darryl Boyd, who was wrongfully prosecuted, convicted, and imprisoned for more than 28 years for a robbery and murder that he did not commit.

2.      On August 18, 2021, after Mr. Boyd spent more than 28 years incarcerated and another 17 years on parole for the January 2, 1976, murder of William Crawford in Buffalo, New York (the "<u>Crawford Murder</u>"), the New York Supreme Court, County of Erie (the "<u>State Supreme Court</u>") vacated Mr. Boyd's convictions for second-degree murder and first-degree robbery.  Specifically, following an evidentiary hearing on Mr. Boyd's motion to vacate his conviction, the State Supreme Court found that the prosecution had not disclosed to Mr. Boyd's trial counsel crime scene photographs that both (a) contradicted the prosecution's theory of the crime presented at trial, and (b) pointed to another individual, Mr. Crawford's neighbor, as the actual perpetrator.  This non-disclosure violated Mr. Boyd's constitutional right to a fair trial.

3.      These undisclosed crime scene photographs, however, were hardly the only factor that led to Mr. Boyd's wrongful conviction and 28-year imprisonment.  The egregious misconduct perpetrated against Mr. Boyd by the defendants to this lawsuit spanned the course of 45 years—Mr. Boyd's entire adult life.  It included the relentless, bad-faith pursuit of his case by Detectives Guadagno, Montondo, Deubell, Grabowski, Hunter, Arnet, Deubell, Manista, Delano, and others, and by Chief Donovan.  They coerced vulnerable witnesses to provide false statements against Mr. Boyd and failed to turn over multiple items of evidence favorable to the defense, known as *Brady* material, to prosecutors, which resulted in such evidence not being

disclosed to the defense.  And the misconduct also included the suppression by prosecutors of *Brady* material of which they knew or should have known, which similarly contributed to the denial of Mr. Boyd's constitutional right to a fair trial.

4.      All of this was in a case in which there was zero physical evidence linking Mr. Boyd to the Crawford Murder.  It was in a case where the main evidence against him was the contradiction-riddled testimony of two minors, both of whom originally told the police that they knew nothing about the murder but whom police then coerced to change their stories.

5.      Moreover, it was in a case where there was substantial evidence—which law enforcement authorities suppressed—pointing to two other individuals as the perpetrator or perpetrators as opposed to Mr. Boyd and his teenage friends.  The primary alternative suspect, the victim's neighbor and the last person known to have seen Mr. Crawford before his murder, Lawrence "Larry" Watson, spoke to police detectives reinvestigating the case in 2019.

6.      The detectives asked Mr. Watson about Mr. Boyd and his friends and what happened on the night in question.  Nearing death, Mr. Watson told the detectives : "They didn't do it."

7.      This statement was never disclosed to Mr. Walker prior to this civil litigation.

8.      Instead of prohibiting or discouraging the type of illegal behavior that occurred in this case, the policies, customs, and practices of the City of Buffalo Police Department (the "BPD") and the Erie County District Attorney's Office (the "ECDA") permitted, encouraged, and in certain instances required it.

9.      If not for the misdeeds of Defendants, Mr. Boyd would not have been prosecuted, convicted, and imprisoned in violation of his constitutional rights, and would not have spent 45

years asserting his innocence and fighting for his liberty in connection with a crime that he did not commit.

10.     This lawsuit seeks to hold accountable the government entities and individuals, or their estates, who are responsible for destroying Mr. Boyd's life, and to recover from them compensation, as well as punitive damages, for Mr. Boyd's grievous injuries.

## II.     <u>PARTIES</u>

11.     Plaintiff Darryl Boyd is a 63-year-old man who resides in Buffalo, New York.

12.     Defendant City of Buffalo (the "<u>City</u>") is a municipal corporation of the State of New York and a resident of the Western District of New York.  The BPD is an agency of the City for whose torts the City is responsible.

13.     Defendant County of Erie (the "<u>County</u>") is a municipal corporation of the State of New York and a resident of the Western District of New York.  The ECDA is an agency of the County for whose torts the County is responsible.

14.     Defendant Michael G. Guadagno at all relevant times was a detective employed by the BPD acting within the scope of his employment and under color of law.  He is sued in his individual and official capacities.

15.     Defendant John Montondo at all relevant times was a detective employed by the BPD acting within the scope of his employment and under color of law.  He is sued in his individual and official capacities.

16.     Defendant Martin Bullock is the Executor for the Estate of James E. Hunter.  At all relevant times, Mr. Hunter was a detective employed by the BPD acting within the scope of his employment and under color of law.  Mr. Bullock is sued in his individual and official capacities.

17.     Defendant Linda J. Fial is the Executor for the Estate of Robert Grabowksi.  At all relevant times, Mr. Grabowski was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Fial is sued in her individual and official capacities.

18.     Defendant Jennifer G. Flannery is the Administrator for the Estate of Robert F. Arnet.  At all relevant times, Mr. Arnet was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Flannery is sued in her individual and official capacities.

19.     Defendant Jennifer G. Flannery is the Administrator for the Estate of Frank C. Deubell.  At all relevant times, Mr. Deubell was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Flannery is sued in her individual and official capacities.

20.     Defendant Jennifer G. Flannery is the Administrator for the Estate of Leo J. Donovan.  At all relevant times, Mr. Donovan was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Flannery is sued in her individual and official capacities.

21.     Defendant Jennifer G. Flannery is the Administrator for the Estate of Francis M. Manista, Jr.  At all relevant times, Mr. Manista was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Flannery is sued in her individual and official capacities.

22.     Defendant Dawn M. Dirienzo is the Executor for the Estate of Paul R. Delano.  At all relevant times, Mr. Delano was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Dirienzo is sued in her individual and official capacities.

## III.     <u>JURISDICTION, VENUE, AND CONDITIONS PRECEDENT</u>

23.    This Court has jurisdiction under 28 U.S.C. § 1331 over claims arising under

42 U.S.C. §§ 1983 and 1988 and under 28 U.S.C. § 1343 over claims arising under the common

law of the State of New York.

24.    Venue is proper in the Western District of New York under 28 U.S.C. § 1391(b)

because that is the judicial district in which Mr. Boyd's claims arose.

25.    On or about December 15, 2021, Plaintiff served the City and the County timely

notices of the present claims under New York State law, in accordance with N.Y. Gen. Mun.

Law § 50-e.

26.    The City and the County did not within 90 days of service of such notices

schedule, and therefore waived their right to, an examination of Mr. Boyd under N.Y. Gen. Mun.

Law § 50-h.

27.    Mr. Boyd has duly complied with all conditions precedent to the commencement

of this action.

## IV.     <u>JURY DEMAND</u>

28.    Pursuant to the Seventh Amendment of the United States Constitution and Article

I, Section 2 of the New York Constitution, Mr. Boyd requests a jury trial on all issues and claims

set forth in this Complaint.

## V.    FACTUAL ALLEGATIONS

### A.    THE MURDER OF WILLIAM F. CRAWFORD

29.    At approximately 11:30 p.m. on January 2, 1976, 62-year-old William F. Crawford was brutally murdered outside his home at 2041 Fillmore Avenue in Buffalo, New York.

30.    Mr. Crawford had spent several hours drinking that day at a neighborhood tavern called the Golden Nugget, which was located directly across the street from his house on Fillmore Avenue.  Mr. Crawford regularly drank at the Golden Nugget.

31.    Mr. Crawford was at the Golden Nugget with his neighbor, Lawrence "Larry" Watson, Larry's wife Julia Watson, and Julia's son William "Bill" Howard.

32.    The Watsons lived at 2049 Fillmore Avenue, two houses north from Mr. Crawford's house.

33.    Mr. Crawford purchased rounds of drinks for the group and, in the process of paying for them, displayed a significant amount of cash—approximately $300 in tens and twenties.

34.    The barmaid, Debbie Jeffrey, instructed Mr. Crawford to put his money away, as the Watsons and Mr. Howard, who were sitting with him at the bar, had observed it.

35.    At approximately 11:30 p.m., Ms. Jeffrey suggested that Mr. Crawford go home, as he was intoxicated.

36.    Typically, Ms. Jeffrey or the owner of the Golden Nugget would walk Mr. Crawford across the street to his house after he became drunk, but on that evening, the tavern was crowded, and neither was able to escort Mr. Crawford home.

37.    Mr. Watson offered to walk Mr. Crawford home, and the two left the Golden Nugget together.

38.    At approximately 1:00 a.m. on the morning of January 3, Margaret Crawford, Mr. Crawford's wife, became concerned that her husband had not returned home yet.  She went downstairs and looked out the side door into the driveway, where she saw her husband lying in the driveway in the snow next to the side door, apparently unconscious.  She called 911 for help.

39.    Medics transported Mr. Crawford to Sisters of Charity Hospital, where he was pronounced dead.  He had been beaten to death with a blunt instrument and apparently robbed of his wallet.

**B.    THE BPD INVESTIGATION POINTS TO LARRY WATSON AND A POTENTIAL ACCOMPLICE AS THE PERPETRATORS**

40.    The BPD Homicide Unit began investigating in the early morning hours of January 3, 1976.

41.    Pursuant to its usual practice, the Homicide Unit did not assign any one detective to officially lead the investigation but worked collectively under the supervision of the Chief of Homicide, Leo J. Donovan.

42.    Detectives, including those named in this lawsuit, worked collaboratively as a team, exchanging information with each other and reporting all developments to Donovan.

43.    Detectives Paul Delano and Gerald Dove were the first detectives to report to the crime scene.

44.    They observed a large pool of blood close to the side door of the house, where Mr. Crawford's body was found, as well as a few drops of blood on the side of the house by the side door.  The side door was approximately 35 feet up the driveway from the sidewalk.

45.    Detectives Delano and Dove also noted in their report that a bloodstained hat had been found alongside the victim's body and placed inside the hall door by the ambulance attendant.

46.     While at the crime scene, Detectives Delano and Dove interviewed the victim's widow, Margaret Crawford.

47.     Ms. Crawford reported that she became concerned when her husband did not "ring the bell" for her to come unlock the side door for him.

48.     She said this was their custom when he was out drinking—evidently, he would not bring his own keys.

49.     When she went downstairs to check the door, she found her husband lying in the driveway and called 911.

50.     Detectives Delano and Dove next reported to Sisters Hospital, where they observed Mr. Crawford's body.

51.     They noted in their police report that a set of keys were found on the body.

52.     The keys were never vouchered.

53.     There is no record of an investigation into the owner of the keys.

54.     There is no record of what happened to the keys.

55.     Detectives Delano and Dove returned to the crime scene, where an experienced police photographer, Alfred Hauser, met them.

56.     The photographer documented the areas pertinent to the investigation, including the street, the sidewalk, the house, the driveway, and the backyard.

57.     The large pool of blood that the photographer observed and photographed was located well up the driveway, on the ground or on the side of the house next to the side door where Mr. Crawford's body was found.

58.     The photographer did not document any signs of a struggle on the sidewalk in front of the house or at the bottom of the driveway.

59. His photographs showed that there was no blood in those locations and there were no drag marks in the snow in those areas.

60. A police photograph also documented a single set of footprints, made by a heavyset man, in the snow in the backyard of Mr. Crawford's house, leading toward the house of Larry and Julia Watson two doors down.

61. Detectives Delano and Dove conducted several more interviews that night, including of Bill Howard, Larry Watson's stepson.

62. Mr. Howard reported that Mr. Crawford left the Golden Nugget alone around 1:30 a.m. (which, the detectives knew, was after the paramedics had already arrived to transport Mr. Crawford to the hospital).

63. Detectives Delano and Dove also interviewed Julia Watson.

64. Ms. Watson also told detectives that Mr. Crawford left alone, but she put the time around 9:30 p.m., or four hours earlier than Bill Howard said. She said that she and her husband left together around 11:15 p.m.

65. Detectives Delano and Dove asked Ms. Watson if they could interview Mr. Watson, but Ms. Watson reported that he was drunk and that she was unable to wake him.

66. Detectives Delano and Dove also interviewed the barmaid, Debbie Jeffrey.

67. She told a very different story than Ms. Watson and her son Bill Howard: She said Mr. Crawford did not leave the bar alone, but rather left the Golden Nugget with Mr. Watson.

68. The detectives noted that there were large discrepancies in the story told by Mr. Howard and Ms. Watson, on the one hand, and Ms. Jeffrey's statement on the other.

69. Detectives Edwin Gorski and Robert Grabowski continued the investigation when their shift began at 4:00 p.m. on January 3, 1976.

70. They interviewed a patron of the Golden Nugget named Frances Kalb.

71. Ms. Kalb informed them that she saw Mr. Crawford drinking with the Watsons and Mr. Howard the previous evening.

72. Ms. Kalb said that Mr. Crawford left with Mr. Watson around 11:30 p.m.

73. She further said that she saw Mr. Watson return to the bar approximately 20 minutes later and immediately leave again with his wife.

74. Ms. Kalb also informed the detectives that sometime after the Watsons left together, she observed Ms. Jeffrey receive a call from Ms. Watson.

75. Ms. Watson stated that her husband was missing his keys and asked Ms. Jeffrey to check for them at the bar.

76. According to Ms. Kalb, Mr. Howard told Ms. Jeffrey that the keys were in Mr. Watson's pocket, which Ms. Jeffrey conveyed to Ms. Watson.

77. Detectives Gorski and Grabowski also interviewed Mr. Watson.

78. Mr. Watson told the detectives that Mr. Crawford left the Golden Nugget around 12:00 a.m.

79. Mr. Watson said that he just happened to be leaving at the same time to use the bathroom at his house across the street and two doors down.

80. Mr. Watson claimed that while Mr. Crawford was in front of the tavern preparing to cross the street, Mr. Watson noticed the door to his own house open and went over to investigate.

81. Mr. Watson did not mention that he had offered to walk Mr. Crawford home.

82. Detectives Gorski and Grabowski next interviewed Ms. Jeffrey (who had already been interviewed by Detectives Dove and Delano).

83. In this second interview, Ms. Jeffrey told the detectives that Mr. Watson had *offered* to walk Mr. Crawford home.

84. Ms. Jeffrey also corroborated Ms. Kalb's statement that, after Mr. Watson returned and left with his wife, Ms. Watson called the tavern and asked her to search for Mr. Watson's keys.

85. During this interview, Ms. Jeffrey reported to the detectives that she suspected Mr. Watson was the killer of Mr. Crawford.

86. During their shift on January 3, 1976, Detectives Gorski and Grabowski reported receiving "an anonymous call from a black male." The caller stated that "Andre Howe" and "Gerry Boyd" killed Mr. Crawford.

87. The detectives obtained a criminal record print out and a mugshot of a Jerome Boyd, a 37-year-old man living nearby at 32 Glenny Drive.

88. Jerome Boyd is a different person than, and is of no relation to, Darryl Boyd.

89. The BPD did not document any attempts to locate or interview Jerome Boyd.

90. However, the next day, January 4, 1976, Detectives Delano, Dove, and Pantano returned to the Golden Nugget with Jerome Boyd's mugshot.

91. The owner of the Golden Nugget, Ralph Davis, recognized Jerome Boyd as a regular patron of the tavern.

92. A bartender, Theotis "Teddy" Love, confirmed that he served a drink to Jerome Boyd the night Mr. Crawford was murdered.

93. On January 6, 1976, Detectives Delano and John Ludtka took a formal statement from Ms. Kalb.

94. Ms. Kalb repeated her statement that Mr. Crawford had been drinking with the Watsons and Mr. Howard, and that either Mr. or Ms. Watson told Ms. Jeffrey not to worry because they would take Mr. Crawford home.

95. Ms. Kalb again stated that Mr. Watson and Mr. Crawford left together after 11:00 p.m.

96. Detectives Delano and Ludtka showed Ms. Kalb the mugshot of Jerome Boyd and she identified him as "a real big guy that came in and talked with Julia [Watson] and stayed for only a few minutes."

97. Ms. Kalb also repeated her statement that she was present at the Golden Nugget, overheard Ms. Watson call the tavern to ask Ms. Jeffrey to search for her husband's keys, and heard Mr. Howard tell Ms. Jeffrey that the keys were in the pocket of Mr. Watson's jacket.

98. Also on January 6, 1976, Detectives Stanley Suszek and Melvin Lobbett took a formal statement from Ms. Jeffrey.

99. Ms. Jeffrey informed the detectives that Mr. Crawford had about $300 in cash on him the night he was murdered, and that he had tried to lay it all out on the bar. She thought that this was a stupid thing to do and instructed him to put it away.

100. She was certain that the Watsons and Mr. Howard had seen Mr. Crawford displaying the cash.

101. Ms. Jeffrey again stated that, normally, she or someone else working at the Golden Nugget would walk Mr. Crawford home when he became intoxicated, but on the evening of January 2, the bar was crowded, and she could not leave.

102.    She again stated that Mr. Watson offered to walk Mr. Crawford home.

103.    She stated that Mr. Watson was gone for about 20 minutes, which Ms. Jeffrey described as "long enough," suggesting to detectives that Mr. Watson had enough time to walk Mr. Crawford across the street, commit the murder (while dropping his keys), go to his house two doors down to clean up, and return to the tavern.

104.    Also on January 6, 1976, Detectives Gorski and Grabowski interviewed the victim's wife, Ms. Crawford, again.

105.    Ms. Crawford informed them that her husband typically returned home from the bar around 11:30 p.m. and came in through the side door.

106.    Ms. Crawford stated that on the night of the murder, she was watching TV in bed when she felt a thud that shook the side of the house.

107.    It was about 11:30 p.m.

108.    She said that when her husband still had not returned home by 1:00 a.m., she went downstairs to check the door and found Mr. Crawford lying in the driveway.

109.    The next day, on January 7, 1976, the BPD conducted formal interviews of and prepared written statements by Larry and Julia Watson.

110.    Detectives Ludtka and Francis Manista interviewed Mr. Watson.

111.    Mr. Watson denied that he had seen Mr. Crawford with a large amount of cash but admitted that Ms. Jeffrey told Mr. Crawford to put his wallet away.

112.    Mr. Watson now admitted what he had omitted before—that Ms. Jeffrey had asked him to take Mr. Crawford home—but stated that he did not do so.

- 13 -

113.    Mr. Watson now claimed that he and Mr. Crawford shook hands outside the Golden Nugget, he wished Mr. Crawford a happy New Year, and he crossed the street to his house.

114.    Mr. Watson's admission contradicted Ms. Jeffrey's statement that she did not ask Mr. Watson to take Mr. Crawford home, but rather Mr. Watson offered to take Mr. Crawford home.

115.    Mr. Watson told detectives Ludtka and Manista that he and Mr. Crawford were followed out of the Golden Nugget by a tall, dark man with a moustache and kinky hair.

116.    Jerome Boyd, whom Ms. Kalb described as a "real big guy" whom she had seen talking to Ms. Watson, appeared to fit this description.

117.    Mr. Watson claimed that, once in the driveway of his own house, he noticed his front door open and went inside to investigate.

118.    This statement contradicted his prior statement to police that he noticed his front door open while standing outside the tavern with Mr. Crawford.

119.    Mr. Watson claimed that he found nothing amiss in his house, went to the bathroom, and returned to the Golden Nugget, where Ms. Watson said she was ready to leave. He said they left the tavern and returned home.

120.    The same day, January 7, 1976, Detectives Delano and Vincent Pantano interviewed Ms. Watson.

121.    Ms. Watson admitted that she saw that Mr. Crawford had money laying on the bar but claimed that she did not see the amount.

122.    Ms. Watson now admitted that her husband left the tavern with Mr. Crawford.

123.    Ms. Watson stated that her husband returned to the Golden Nugget after 15 to 20 minutes, that she then gave her beer to her son, Mr. Howard, and she and Mr. Watson went home.

124.    Ms. Watson claimed that she and her husband were planning to return to the Golden Nugget, but Mr. Watson misplaced his keys, so she called Ms. Jeffrey at the bar to tell her that they would not be coming back.

125.    Detectives Delano and Pantano interviewed Ms. Jeffrey again on January 12, 1976.

126.    Ms. Jeffrey was adamant that she did not ask Mr. Watson to walk Mr. Crawford home, but that Mr. Watson affirmatively volunteered, "stating that he had to go anyway, to use the bathroom."

127.    According to the detectives, Ms. Jeffrey was "definite on this point."

128.    She also stated that, "because of the close proximity of everybody sitting at the bar together, [it] would have been impossible for everyone else there not to have seen [Mr. Crawford's] money."

129.    Detectives noted, however, that the Watsons both denied seeing how much money Mr. Crawford was carrying.

130.    Ms. Jeffrey said she found it odd that, when Mr. Watson returned to the Golden Nugget, he and his wife left in a hurry.  They left without saying goodbye to Ms. Jeffrey, which was uncharacteristic of them, and they left unfinished drinks on the bar even though, in her experience, they always finished their drinks before they left.

131.    Thus, in the days following the Crawford Murder, the named Defendants, together with their colleagues, learned the following information pointing towards two suspects, Mr. Watson and Jerome Boyd, as the likely perpetrator or perpetrators of the crime:

- On the night he was killed, Mr. Crawford had been at the Golden Nugget drinking heavily with the Watsons and Mr. Howard;

- Mr. Crawford had displayed approximately $300 in cash in front of the Watsons and Mr. Howard, which they saw;

- Mr. Watson volunteered to walk the intoxicated Mr. Crawford home to his house across the street;

- Messrs. Watson and Crawford were followed out of the Golden Nugget by a large man, potentially Jerome Boyd, whom a witness had seen talking with Ms. Watson;

- Jerome Boyd was the subject of an anonymous tip stating that he was one of the killers;

- Mr. Crawford was beaten and robbed at approximately 11:30 p.m. at the side door of his house, where his body was found in a pool of blood;

- A set of footprints in the snow led through the backyard of the Crawford property towards Mr. Watson's house;

- Mr. Watson returned to the Golden Nugget approximately 20 minutes later and left in a hurry with his wife, without finishing their drinks or saying goodnight to the barmaid, which was uncharacteristic for them;

- Mr. Watson, his wife Julia, and his stepson Bill Howard made a series of false or contradictory statements to police apparently trying to distance Mr. Watson from the victim, Mr. Crawford;

- A set of keys was found on or near Mr. Crawford's body, although Ms. Crawford reported that her husband's usual practice was to ring the bell for her to let him in through the side entrance to their home;

- After returning home with her husband, Ms. Watson called the Golden Nugget and reported that her husband was missing his keys; and

- The barmaid at the Golden Nugget, Ms. Jeffrey, who knew Mr. Watson and observed his conduct on the night of the murder, believed he had committed the crime.

### C. THE BPD INVESTIGATES MR. BOYD AND FOUR OTHER BLACK TEENAGERS, BUT FINDS EVIDENCE CORROBORATING THEIR CONSISTENT STATEMENTS THAT THEY WERE NOT INVOLVED IN THE MURDER

132.     On January 7, 1976, Detectives Deubell and Guadagno reported that they had received an anonymous call (the second such call the Defendants claimed to have received), this time from a woman who stated that the person who killed Mr. Crawford was Darryn Gibson, who lived on Rodney Street.  The female caller reportedly gave no further information.

133.     Assuming this call was received at all, the absence of any detail about Mr. Gibson or the caller meant that the officers had absolutely no basis to credit the information, and certainly lacked probable cause to arrest Mr. Gibson.

134.     Nevertheless, immediately after receiving the call, at approximately 10:30 a.m., Detectives Deubell and Guadagno took Mr. Gibson into their custody at his home where he lived with his mother and father and forced him, alone, to accompany them to BPD Headquarters.

135.     There, together with Detectives Manista and Pantano, they questioned him illegally for approximately eight hours.

136.     The BPD did not document that Mr. Gibson resisted arrest or was otherwise uncooperative.

137.     Mr. Gibson was 16 years old.  His parents were not present with him during this lengthy, custodial interview.

138.     According to the report of Detectives Deubell and Guadagno, Mr. Gibson told the detectives that, on the night of January 2, 1976, he was playing cards with his friends Mr. Boyd, John Walker, Floyd Martin, and Tyrone "Tony" Woodruff in the Glenny Projects at 138 Glenny Drive, in the sixth-floor apartment of a girl named Shirley Floyd.

139. Mr. Gibson provided the home addresses of his four friends, all between 16 and 17 years of age.

140. Mr. Gibson said that on January 2, shortly after the news came on, at about 11:15 p.m., Messrs. Walker and Woodruff caught a cab from the Fillmore Cab Company.

141. Mr. Gibson said they took a cab from the Glenny Projects to their homes on Best Street, approximately two and a half miles and an eight-minute drive south of the Glenny Projects.

142. Mr. Gibson said that Mr. Martin, who lived just downstairs from Shirley Floyd's apartment, walked downstairs to go home as well.

143. Mr. Gibson said that just after Messrs. Walker and Woodruff left in the cab, Messrs. Gibson and Boyd walked home along Fillmore Avenue (past Mr. Crawford's house) to Leroy Street, where Mr. Gibson and Mr. Boyd split up and went to their respective homes.

144. Mr. Gibson estimated that he arrived home at about 11:35 p.m.

145. Mr. Gibson consented to a polygraph exam.

146. Prior to the examination, he had been in police custody and questioned for hours. Nevertheless, the examiner claimed, in a report dated five days later (the date Mr. Boyd and the others were arrested), that the results couldn't be trusted because of "the lack of a pre-test conference and inaccuracy of available information."

147. This made no sense, since there was nothing preventing the examiner, during the many hours Mr. Gibson was in police custody, from conducting a "pre-test conference" and asking Mr. Gibson the pertinent questions directly.

148. The most logical inference from the above circumstances is that Mr. Gibson's responses to the examiner's questions suggested he was being truthful.

149.    The next day, January 8, 1976, Detectives Guadagno and Deubell went to the Fillmore Cab Company to investigate the accuracy of Mr. Gibson's statement.

150.    The Fillmore Cab Company confirmed that Cab No. 150, driven by a driver named "Geno," was dispatched to the Glenny Projects at 11:28 p.m.

151.    A second cab, Cab No. 163, driven by Brian Woods, was dispatched to the Glenny Projects at 11:44 p.m.

152.    According to the Company's records, these were the only two cabs dispatched to the Glenny Projects that evening.

153.    Any police officer really believing Mr. Gibson or his friends had committed the crime would have interviewed the two drivers. The drivers could have noticed blood stains, torn clothing, large amounts of cash, strange behavior, or other indicia of the crime, or overheard the suspects making incriminating comments.

154.    However, the detectives did not document any attempt to locate or interview either cab driver.

155.    Because witnesses at the Golden Nugget on the night of the Crawford Murder confirmed that Mr. Crawford and Mr. Watson left together around 11:30 p.m., the evidence that Mr. Walker and Mr. Woodruff took the first taxicab at 11:28 p.m. meant the five boys could not have committed the crime together.

156.    The BPD conducted several additional interviews on January 8 which further confirmed Mr. Gibson's account of events.

157.    Detectives Guadagno and Deubell went to the Glenny Projects, where they interviewed Sheryl ("Shirley") Floyd.

158.     Ms. Floyd confirmed that Messrs. Boyd, Walker, Martin, Gibson, and Woodruff were at her apartment on the night of the Crawford Murder, just as Mr. Gibson had told the BPD.

159.     Ms. Floyd identified other individuals—Nathaniel Zachery, Dennis Wilson and his brother, Larry Martin, Victoria Bryant, and persons named "Nick" and "Ann"—who were at the party in her apartment that night as well.

160.     Ms. Floyd stated that the boys left her apartment around midnight, give or take an hour.

161.     Nathaniel Zachery, who was at Ms. Floyd's apartment when detectives came to meet her, confirmed that he was with the boys that evening.

162.     Detectives Guadagno and Deubell also went to 93 Leroy Street looking for Mr. Boyd.

163.     Mr. Boyd was not home, but they spoke with his mother, who confirmed that Mr. Boyd returned home just past midnight on January 3, 1976.

164.     Between January 8 and 11, 1976, detectives interviewed and took statements from three of the four boys Mr. Gibson said he was playing cards with at Ms. Floyd's apartment the night of the Crawford Murder—Messrs. Boyd, Walker, and Woodruff.

165.     All three gave substantially the same account of their whereabouts and thus further confirmed Mr. Gibson's account.

166.     Specifically, on January 8, 1976, Detectives Guadagno and Deubell, despite lacking any evidence implicating Mr. Boyd in the murder, took him into their custody and, without administering *Miranda* warnings, interrogated him in a BPD interview room.

167.     Mr. Boyd told these detectives that, earlier on January 2, a boy named Andre Hough was at his house at 93 Leroy Street.

168.     Mr. Boyd stated that, during the early evening, he and Mr. Hough walked to the Glenny Projects, where they watched TV at the apartment of a Ms. Washington, along with several other members of the Washington family.

169.     He stated that, later in the evening, he left Ms. Washington's apartment to join Messrs. Walker, Gibson, Martin, and Woodruff at Shirley Floyd's apartment in the building next door.

170.     Mr. Boyd said that Floyd Martin's brother, Eugene, called a cab from the Fillmore Cab Company.  However, when the cab arrived, Eugene was not ready.  The cab driver refused to wait any longer, so Messrs. Walker and Woodruff took that cab and headed home.

171.     The BPD had already confirmed that this cab was dispatched to the Glenny Projects at 11:28 p.m.

172.     Mr. Boyd said Eugene Martin called for a second cab, having missed the first cab.

173.     The BPD had already confirmed that this cab was dispatched to the Glenny Projects at 11:44 p.m.

174.     Mr. Boyd said that after Eugene Martin called the second cab, but before it arrived, Messrs. Boyd and Gibson began walking home together up Fillmore Avenue.  They split up at Leroy Street.

175.     Mr. Boyd consented to take a polygraph exam.

176.     However, neither Detectives Guadagno nor Deubell, who interrogated him, nor the other detectives involved in the investigation, ever conducted one.

177.     Rather, knowing that Mr. Boyd's statement conformed to the other evidence they had collected, Detectives Guadagno and Deubell falsely wrote in their report, without elaboration, that he had "changed his story several times."

178.     They pressured him, before letting him go, into signing a false statement that he had provided two different times when he had arrived home.

179.     On January 11, 1976, the BPD lacked any evidence that Messrs. Walker and Woodruff were involved in the murder.

180.     Nevertheless, they brought these two teenagers in their custody to BPD Headquarters for questioning.

181.     Detectives Arnet, Hunter, and John Montondo interviewed Mr. Walker.

182.     Mr. Walker stated that, on the night of January 2, he was with Messrs. Boyd, Martin, Gibson, and Woodruff at Ms. Floyd's apartment in the Glenny Projects.

183.     He stated that he took a cab with Mr. Woodruff around midnight, went home, and went to bed.

184.     Mr. Walker consented to a polygraph exam, but the BPD never conducted one.

185.     Even though Mr. Walker had provided a statement that was consistent with the statements of the other suspects and witnesses and volunteered to take a polygraph test, Detectives Arnet, Hunter and Montondo falsely wrote in their report that he had "lied through his statement."

186.     They further wrote, falsely, that Mr. Walker made "different statements" to them orally than he had made in his signed statement.

187.     Contrary to basic police practice, nowhere did they record what his inconsistent oral statements or lies supposedly were.

188.     Detectives Arnet, Hunter, and Montondo questioned Mr. Woodruff.

189.     Mr. Woodruff, during hours of questioning, truthfully denied any knowledge of who participated in the Crawford murder.

190.    Consistent with all the other evidence these and the other detectives had obtained, Mr. Woodruff said he was with Messrs. Martin, Gibson, Walker, and Boyd at Ms. Floyd's apartment on the night of January 2 and that he had taken a cab home with Mr. Walker.

191.    However, Detectives Arnet, Hunter, and Montondo, in their report, falsely accused Mr. Woodruff of "lying."

192.    As with Mr. Walker, and contrary to basic police practice, they made no record of the specific statements Mr. Woodruff allegedly had made that they contended were false.

193.    This was because their intent was not to build a legitimate case against Messrs. Walker and Woodruff but to fabricate a basis to continue interrogating them and ultimately to arrest and prosecute them.

### D.    THE BPD COERCES 15-YEAR-OLD ANDRE HOUGH TO FALSELY IMPLICATE MR. BOYD AND HIS FOUR FRIENDS FOR THE CRAWFORD MURDER

194.    Following the murder, in early January 1976, 15-year-old Andre Hough, an eighth grader, was questioned by police on several occasions about whether he had any knowledge of the incident.

195.    Detectives made clear to Mr. Hough that they suspected him of being involved in the murder and, as he later testified, harassed him and "came down on [him] pretty hard."

196.    Telling him that they wanted him to name names, they told him the names of the people they had in mind as participants in the murder.

197.    Mr. Hough initially told detectives he had no knowledge of any unlawful behavior in connection with the Crawford Murder.

198.    After doing so, he "passed" a polygraph examination.

199.    However, detectives deliberately failed to document his initial statements exculpating the police suspects and the results of the polygraph examination.

200.    Questioned by Detectives Guadagno and Deubell, Mr. Hough gave the same account of his whereabouts as Mr. Boyd.

201.    He did not tell the detectives that Mr. Boyd had said or done anything incriminating.

202.    He was then threatened with prosecution for murder if he did not provide information against the other boys.

203.    Mr. Hough was brought back to BPD Headquarters for further interrogation on January 12, 1976.

204.    Detectives Guadagno and Deubell again accused Mr. Hough of knowing about and participating in the murder.

205.    Coerced by Detectives Guadagno and Deubell to implicate the other boys to save himself, Mr. Hough then began to do so.

206.    According to police reports, he now said that Mr. Boyd had confessed to him that Mr. Boyd and the four other boys had seen Mr. Crawford in his driveway, run after him, beat him, and taken his wallet.

207.    However, under intense pressure to provide any additional information that he had, Mr. Hough swore that he could think of no additional information.

**E.    THE BPD COERCES 17-YEAR-OLD TYRONE WOODRUFF TO FALSELY IMPLICATE MR. BOYD AND THE OTHERS FOR THE CRAWFORD MURDER**

208.    On January 12, 1976, Detectives Hunter and Arnet once more took Tyrone Woodruff illegally into their custody, telling him, or leading him to believe, he was under arrest for the Crawford Murder.

- 24 -

209.     Bringing him to the Buffalo Police Department homicide unit for further interrogation, these detectives stood over him, armed with guns, and, in an intimidating, accusatory, and coercive manner, harshly interrogated him.

210.     Even though Mr. Woodruff was alone and just 17 years of age, police refused him permission to call his parents or a lawyer.

211.     Mr. Woodruff at first continued to truthfully deny any knowledge of the Crawford Murder.

212.     However, detectives Arnet and Manista told Mr. Woodruff that they had his friends upstairs.

213.     They threatened him, falsely, that his friends had accused him of the crime and that they had other evidence implicating him as well.

214.     They told him, falsely, that, if he did not provide information against the others, one or more of them would cooperate against him and he would face life imprisonment.

215.      On the other hand, they told him, if he minimized his own involvement in the crime while cooperating against the other boys, the detectives would speak with the ECDA about arranging for him to receive complete immunity from prosecution.

216.     Detectives Hunter and Manista prepared reports, both false, that contradicted each other about how detectives ultimately succeeded in getting Mr. Woodruff to change his story and incriminate himself and the other boys.

217.     According to Detective Hunter's report, Mr. Woodruff was allowed to eat devil's food cake his mother had sent with him and to call his mother and aunt, before "[h]e started asking Det. Arnet questions, and subsequently admitted to Det. Arnet that he was a witness to the Crawford homicide."

- 25 -

218.    This made it appear that Mr. Woodruff, totally of his own volition, simply decided to come clean.

219.    According to Detective Manista's report, however, at 5:40 p.m., he received an anonymous phone call about the investigation from a "negro female who wished to remain anonymous."

220.    This was the third time detectives claimed to have received an anonymous call and the second time they used such a call as a basis to detain and question a suspect.

221.    The anonymous caller reportedly knew and provided names and specific home addresses for each of the five boys.

222.    However, according to the report, the caller identified "Darryl Gibson" as a participant, which incorrectly combined Darryl Boyd's first name and Darryn Gibson's last name.

223.    This call, assuming it occurred at all, was a fake.

224.    The names and the addresses, except for the error regarding the names of Messrs.' Boyd and Gibson, consisted of the information that Mr. Gibson had provided in his initial statement to police.

225.    The anonymous caller also incorporated other information that the BPD had already received in its investigation, including that some of the boys had gone home in a cab and, according to Mr. Hough, had divided up proceeds at 138 Glenny Drive.

226.    Any competent detective would have tried to convince such a potentially valuable witness, assuming she was real, to identify herself so she potentially could testify or otherwise further assist the investigation.

227.    Any competent detective would have protected the voice and the identity of such an informant, assuming she was real, from the alleged murderer she was implicating.

228.    However, according to Detective Manista's report, at the time he took the call, Mr. Woodruff just happened to be in the room with him and Detective Arnet and was permitted to "listen … to the conversation."

229.    After hearing a tipster directly implicate him, according to Detective Manista's report, "Tyrone Woodruff became very nervous and could barely raise a cup of coffee he was drinking."

230.    Detective Manista's report continued:  "He was asked by Det. Manista in the presence of Det. Arnet if he could remember anything now; he was told that a person puts him in a hallway [sic] dividing money.  At 5:45 P.M. he told Dets. Manista & Arnet 'Gibson was hitting him, Gibson was hitting him, I think.'"

231.    According to Detective Manista, he immediately reported to Chief Donovan, Chief of Homicide Detectives, "what had taken place."

232.    Chief Donovan thus knew how detectives had used this fake anonymous call to coerce Mr. Woodruff to implicate himself and his friends in the homicide.

233.    Detectives Deubell and Manista, joined by Chief Donovan, then continued to interrogate Mr. Woodruff.

234.    At 8:50 p.m., after an additional three hours of interrogation, Mr. Woodruff was told to sign a statement in question-and-answer form, typed by Detective Manista, which purported to be under oath.

235.    Fed a story by Detectives Arnet, Deubell, and Manista, and Chief Donovan, Mr. Woodruff purportedly stated that Mr. Gibson said he wanted to get some money and had somehow heard that there was a man in a bar flashing a lot of money.

236.    Mr. Woodruff stated that he did not know what bar it was, or how Mr. Gibson knew about the man flashing money.

237.    Mr. Woodruff said that while the group was walking down Fillmore Avenue, supposedly hoping to cross paths with a victim to rob, Mr. Gibson allegedly found a pipe and put it up his sleeve.

238.    Mr. Woodruff said that the group apparently spotted Mr. Crawford as he was entering his driveway.

239.    According to Mr. Woodruff, Mr. Gibson beat Mr. Crawford at the end of the driveway, and Messrs. Gibson and Boyd together dragged him up the driveway.

240.    Mr. Woodruff said that Mr. Boyd allegedly stole his wallet.

241.    Mr. Woodruff did not mention any involvement by Messrs. Walker or Martin.

242.    Although the BPD knew that Mr. Crawford was old, heavy set, and had been wearing a large Stetson hat, Mr. Woodruff could not describe the man in any way except that he was white—a fact that had been supplied to him at the start of his previous interview.

243.    Mr. Woodruff said that the group allegedly returned to the Glenny Projects and called a cab, which Messrs. Walker and Woodruff took home.

244.    Mr. Woodruff, minimizing his own role in the crime, denied receiving any of the money or being present when the money was divided up.

245.     Although the written statement purported to document the entire interview of Mr. Woodruff, after three hours it was less than three pages, with nearly half of it consisting of a *Miranda* waiver and his viewing of photographs of his friends.

246.     Chief Donovan was personally present for Mr. Woodruff's interrogation and his signing of the statement.

247.     BPD detectives involved in the investigation knew that Mr. Woodruff's account—that he and the other four boys walked together from the Glenny Projects to the Golden Nugget and committed a robbery—was untrue.

248.     This was because several witnesses—including Ms. Kalb (the Golden Nugget patron), Ms. Jeffrey (the barmaid), Ms. Crawford (the widow), Mr. Watson (the likely perpetrator), and his wife—put the time of the crime either *at* or *after* the time Messrs. Walker and Woodruff entered the taxicab at the Glenny Projects and went home.

249.     Moreover, the physical evidence at the crime scene did not support the story Mr. Woodruff had been pressured to come up with or adopt.

250.     Neither the responding officers nor the police photographer had seen or documented any pools of blood or other signs of a struggle in front of the house, on the sidewalk at the entrance to the driveway, or along the driveway leading to the place where Mr. Crawford's body had been found.

251.     There were no marks in the snow suggesting that Mr. Crawford had been dragged up the driveway from the sidewalk.

252.     Mr. Crawford's Stetson hat surely would have fallen off at the bottom of the driveway had he been assaulted with a pipe and dragged the 35 feet from the sidewalk to the place where he was found, but it was found by his body.

253.    And the single set of footprints in the snow in the backyard leading towards Mr. Watson's house pointed to Mr. Watson as the perpetrator, not a group of five young boys.

254.    Remarkably, even though Mr. Woodruff had confessed his involvement in a vicious robbery/murder for which he potentially faced 25 years to life in prison, Chief Donovan and the other detectives did not arrest him but instead released him from custody and allowed him to go home.

255.    In the ensuing weeks and months, detectives and prosecutors fed Mr. Woodruff additional details to incorporate into this account in order to conform it to other evidence they had collected, or to make his story seemingly more incriminating of the individual criminal defendants.

### F.    THE BPD ARRESTS MR. BOYD BASED ON THE FALSE, COERCED TESTIMONY OF MESSRS. WOODRUFF AND HOUGH

256.    After Mr. Woodruff signed his coerced, false statement of January 12, 1976, Chief Donovan, knowing the investigation was corrupted, authorized the arrests of Mr. Boyd and his co-defendants, Messrs. Walker, Gibson, and Martin.

257.    Detectives Hunter and Arnet arrested Messrs. Boyd and Gibson.

258.    They brought the two boys to the location where Detective Guadagno had arrested Mr. Walker, and then the detectives took the boys at the same time to police headquarters before taking each of them to a separate room for further interrogation.

259.    They continually tried to turn one boy against the others as they had done with Mr. Woodruff.

260.    During his arrest, Mr. Boyd repeatedly proclaimed his innocence.

261.    However, in a report submitted by Detectives Arnet, Montondo, and Hunter, the detectives falsely claimed that Mr. Boyd had "feigned any type [of] knowledge what so ever [sic] of the above mentioned investigation."

262.    After Mr. Boyd was arrested, his mother, Thomacenia Knight, brought several witnesses to BPD Headquarters, and they confirmed that Mr. Boyd was at the Glenny Projects on the evening of January 2 until around midnight.

263.    Detectives Guadagno, Hunter, and others, meanwhile, tried to coerce a false confession from the slightly built, 16-year-old Mr. Walker.

264.    They showed him gruesome photographs of Mr. Crawford's body, while towering over him and wearing their guns.

265.    They told Mr. Walker that they knew he had committed the murder, but that if he said he was a lookout with Mr. Woodruff, they would go easy on him.

266.    When Mr. Walker continually denied guilt and went to stand up, Detective Hunter said that, if he got up, Hunter would "beat your motherfucking ass."

267.    They claimed that they had an anonymous female caller on the line who alleged that she had seen Mr. Walker and his friends at the Glenny Projects dividing up the proceeds of the robbery.

268.    This was the same ruse they reportedly had used to coerce Mr. Woodruff's confession.

269.    As with Mr. Woodruff, the detectives lied to Mr. Walker that his friends and other witnesses were implicating him, but that he could obtain leniency if he cooperated with the police.

270.    Mr. Walker continued to maintain his innocence.

271. Detectives Guadagno and Deubell, in their report, falsely accused Mr. Walker of having "refused to aid us in this investigation."

272. In fact, in aid of the investigation, he truthfully answered the detectives' questions, but the answers were not those that they wanted to hear.

273. Before his booking, Mr. Martin was interviewed by Detective Montondo.

274. Like the other boys, Mr. Martin informed the detective that he had been at Shirley Floyd's apartment in the Glenny Projects with Messrs. Boyd, Gibson, Walker, and Woodruff the night of January 2.

275. Like the other boys, he stated that Messrs. Walker and Woodruff left in a taxicab, and Messrs. Gibson and Boyd walked home together.

276. Mr. Martin said that he returned to the party with his brother after the others left.

277. Detective Montondo wrote in his report that Mr. Martin was lying, despite the evidence corroborating Martin's statement and the consistency of his statement with the statements of the other suspects and witnesses.

278. Taking and sharing credit with all the homicide detectives under his command who were collectively responsible with him for manufacturing the case, Chief Donovan listed himself and the entire Homicide Unit as the arresting officers for Mr. Boyd and the other three boys.

279. To initiate a criminal proceeding, Chief Donovan and Detective Dove both signed a sworn criminal court complaint falsely accusing Messrs. Boyd, Walker, Gibson, and Martin of second-degree murder and criminal possession of a dangerous weapon.

280. They attached the false statement they had coerced from Mr. Woodruff on January 12, 1976, as the factual basis for the complaint.

281.     Although the detectives and Chief Donovan knew from multiple witnesses that the attack had occurred at about 11:30 p.m. or later, after Messrs. Walker and Woodruff had gone home in a cab, they falsely alleged in the complaint that the attack had occurred at about 10:30 p.m.

### G.     ADDITIONAL INVESTIGATION FURTHER UNDERMINES THE DETECTIVES' FLAWED CASE AGAINST MR. BOYD

282.     Mr. Boyd and his three co-defendants were arraigned in court on January 13, 1976.

283.     All were remanded to the Erie County Holding Center, pending a preliminary hearing to be held on January 16, 1976.

284.     On January 15, 1976, Detectives Montondo and John Regan, at the request of Detectives Deubell and Guadagno, interviewed the owner of a bodega called Simpson's Store, located approximately three blocks from the Golden Nugget, to corroborate Mr. Hough's story, coerced from him by police, that he saw Mr. Boyd spending a lot of money at the store the day after the murder.

285.     According to the detectives' report, the owner of Simpson's Store and her daughter knew the boys but did not recall seeing them on either January 2, when they supposedly were present waiting for the emergence of Mr. Crawford from the Golden Nugget, or January 3, 1976, when they supposedly were there in possession of the robbery proceeds.

286.     This *contradicted* Mr. Hough's story (and Mr. Woodruff's).

287.     To minimize the significance of the owners' statements, Detective Montondo wrote:  "Simpson's Delicatessen is a very small store and it would be easy for the workers to overlook anyone, especially if they were busy."

288.     However, the owner and her daughter had not said they were busy.

289.     Moreover, the small size of the store would have made a group of 16-year-old boys flashing unusually large amounts of cash more, not less, conspicuous.

290.     On January 16, 1976, a preliminary hearing was held to determine whether there was probable cause to continue the prosecution and to hold Mr. Boyd and his co-defendants in custody.

291.     Mr. Woodruff, who had been given complete immunity from prosecution, was the principal witness against the defendants.

292.     Based upon the false story of Mr. Woodruff that the detectives had coerced out of him, the court found probable cause for the prosecution and continued the defendants' detention.

293.     At the hearing, neither the named Defendants nor their fellow detectives disclosed information in their individual and joint possession that would have negated the probable cause found by the court, including, but not limited to:

- the coercive tactics they had used to pressure Mr. Woodruff to accuse Mr. Boyd and the other boys;

- the evidence they had collected corroborating Mr. Woodruff's initial story denying any knowledge of the crime;

- the evidence proving that Mr. Woodruff left in a taxicab before the Crawford Murder occurred and therefore could not have seen it;

- the forensic evidence contradicting Mr. Woodruff's account of the crime, including the crime scene photographs showing the absence of blood or drag marks in the driveway; and

- the wealth of evidence, including a crime scene photograph, incriminating Larry Watson as well as Jerome Boyd.

294.     Had this evidence been disclosed, the case would have been dismissed at arraignment, or Mr. Boyd would have been released from custody.

295. On the same date as the preliminary hearing, a supposed witness, according to police records, came forward to tell the prosecutor handling the case, Chief Donovan, and Detective Dove that he and two of his friends—another young black man and a black woman— had witnessed the assault. The witness's account of events materially contradicted Mr. Woodruff's statements, but his statement was not disclosed to the defense either.

### H. MESSRS. WOODRUFF AND HOUGH BOTH RECANT BEFORE TESTIFYING IN THE GRAND JURY BUT DETECTIVES COERCE THEM INSTEAD TO EXPAND THEIR FALSE STORIES

296. On February 11, 1976, a grand jury was convened to hear evidence concerning the Crawford Murder.

297. Before giving any testimony, Messrs. Woodruff and Hough were first brought to the ECDA's office.

298. According to police reports, Mr. Hough, in the presence of his mother, was questioned by Detectives Delano and Guadagno.

299. Mr. Hough recanted his prior statement about the boys.

300. According to the reports of the two detectives, he told them that he "wanted to change his story about the truth of the statement" he had previously given. "He said that he lied in the statement about what [Darryl] Boyd told him. He said [Mr. Boyd] never told him that he killed William Crawford."

301. The detectives deliberately omitted from their reports the details of the questions and answers in which Mr. Hough exonerated the suspects.

302. After the detectives' prolonged questioning failed to shake her son from recanting, Mr. Hough's mother said that she would be leaving, but she obtained the promise of Detectives Delano and Guadagno to drive her son, who was in their custody, home.

303. However, according to their own reports, instead of doing that, they accused Mr. Hough of lying and threatened him that he had better tell the truth.

304. Under intense pressure and with his mother no longer present, this 15-year-old boy recanted his recantation and then was led by the detectives to further embellish his previous story.

305. While he previously said that he recalled no additional information, he now claimed for the first time that, before the assault, Messrs. Boyd and Gibson (both 16 years old) went into the Golden Nugget Bar to look around and then waited with the other boys down the street for Mr. Crawford to come outside.

306. Mr. Hough was then put into the grand jury to testify to this newly embellished story.

307. During his grand jury testimony, Mr. Hough claimed that he overheard Mr. Gibson state on the night of the murder, "I'm going to get me some money tonight."

308. Mr. Hough had not made this claim in any of his prior statements to police officers.

309. In fact, it was Mr. Woodruff who had previously claimed that on the night of the Crawford homicide, he heard Mr. Gibson say, "I'm going to get me some money tonight."

310. Mr. Hough only testified to this statement before the grand jury because it had been suggested to him by law enforcement officials as part of an attempt to coordinate his testimony with that of Mr. Woodruff.

311. Meanwhile, Detectives Guadagno and Delano went to talk to Mr. Woodruff before he was to testify before the grand jury.

312. However, they discovered that Mr. Woodruff, too, had recanted.

313.     Again, they deliberately omitted from their reports the details of what Mr. Woodruff said to exculpate the suspects, including Mr. Boyd.

314.     Detective Delano noted in his report that Mr. Woodruff was so nervous that he was shaking.

315.     Detective Delano, according to his own report, accused Mr. Woodruff of lying and demanded that he tell "the whole story."

316.     In their separate reports, Detectives Delano and Guadagno each took credit for coercing Mr. Woodruff into withdrawing his recantation and embellishing his story.

317.     Detective Delano reported that he confronted Mr. Woodruff with Mr. Hough's new statement which then led Mr. Woodruff to change his story to match Mr. Hough's.

318.     Detective Guadagno, on the other hand, without mentioning Mr. Hough's new statement playing any role, reported that he "talked with Tony and he came up with more important information."

319.     Up until this point in the investigation, the BPD had been unable to explain how Mr. Boyd and the other defendants supposedly knew that, if they walked down Fillmore Avenue, they would happen across a victim, flush with cash, to rob.

320.     The statements that the detectives previously had coerced from Messrs. Woodruff and Hough made it appear that it was pure serendipity that they stumbled across Mr. Crawford, who just happened to have a lot of cash on him.

321.     Now, however, Detectives Delano and Guadagno pressured Mr. Woodruff to adopt Mr. Hough's new statement that the boys had engaged in a reconnaissance mission at the Golden Nugget that resulted in their targeting Mr. Crawford.

322.     In Mr. Woodruff's new version of events, fed to him by Detectives Guadagno and Delano, before the boys even left the Glenny Projects, someone suggested they go to a bar, because "maybe somebody in one of the bars has cashed a check."

323.     According to Mr. Woodruff's new story, Mr. Gibson, hiding a pipe up his sleeve, and Mr. Boyd supposedly went into the Golden Nugget.

324.     This was an establishment, the detectives knew, which served an older demographic, and any 16-year-olds would have stood out and been denied admission.

325.     Indeed, the barmaid, Ms. Jeffrey, and other witnesses had told them they did not see any of the boys in the bar the night of the murder.

326.     Nevertheless, knowing from multiple witnesses that Mr. Crawford had been seen flashing money at the bar, the detectives caused Mr. Woodruff to incorporate this circumstance into his new story.

327.     Now, Mr. Woodruff claimed that Messrs. Gibson and Boyd had reported to the rest of the group that they had seen an "old white dude with a lot of money in the bar."

328.     According to Detectives Delano's and Guadagno's reports, the boys then walked approximately three blocks down Fillmore to Simpson's Store, where they waited for Mr. Crawford to leave the Golden Nugget.

329.     The boys allegedly waited for Mr. Crawford to cross the street—which put him on the sidewalk directly in front of his house, at the entrance to his driveway—then ran the three blocks to ambush him at the end of the driveway.

330.     Mr. Woodruff alleged that Mr. Gibson hit the victim in the head with the pipe several times at the end of his driveway by the sidewalk, and then all five of them dragged him up the driveway to the side door.

331.    The BPD knew that the physical evidence at the crime scene contradicted this account.

332.    First, as noted above, there was no evidence of any pools of blood or dragging along the driveway, and despite such a violent encounter, Mr. Crawford's hat had not fallen off but was found next to his body at the side entrance to his house, about 35 feet from the sidewalk.

333.    Second, it made no sense that the boys had begun to run after Mr. Crawford had already crossed the street.

334.    It would have taken them much longer to run three long blocks, from Simpson's Store to Mr. Crawford's house, than it would have taken Mr. Crawford to walk the 35 feet from the sidewalk in front of his house to the side door.

335.    Nor did it make any sense that five 16-year-olds would have decided to wait indefinitely, during a cold January night, by the store, having no idea when the specific man they allegedly were targeting would come out of the tavern.

336.    Mr. Woodruff's new story also contained internal contradictions about his receipt of robbery proceeds.

337.    In his prior statements, he denied seeing or hearing about the money being divided up, but now Mr. Woodruff was induced to say that he was with the group when they returned to the Glenny Projects to divide up the money.

338.    Additionally, in Detective Delano's report, Mr. Woodruff allegedly received $25, while Detective Guadagno reported that Mr. Woodruff said he received $15; in his January 12 statement, he denied receiving any money at all.

339.    Detective Guadagno handwrote a statement and had Mr. Woodruff sign it.

340.    That statement contained still another contradiction:  Contrary to his alleged oral statement that Messrs. Boyd and Gibson had gone inside the Golden Nugget and then spotted the old man with the money, in this version, Mr. Woodruff stated that they only opened the door to the bar and peeked in.

341.    In still another amazing coincidence, according to Mr. Woodruff's newly expanded statement, it was at this precise moment that Mr. Crawford flashed his money.

342.    Following his session with Detectives Guadagno and Delano, Mr. Woodruff testified before the grand jury.

343.    Only after testifying, according to the detectives' reports, were Messrs. Woodruff and Hough "released" from police custody.

344.    In other words, to make sure that these vulnerable boys would recant their recantations, augment their original stories, and then testify before the grand jury, the officer defendants held them prisoner.

345.    Their detention was not only coercive but also illegal, as neither had been charged with any crime; indeed, Mr. Woodruff had been given complete immunity from prosecution.

346.    Throughout their investigation, the detectives either deliberately refrained from taking notes or deliberately destroyed whatever notes they had taken.

347.    During all interrogations of suspects and witnesses that occurred at Buffalo Police Headquarters, detectives had recording equipment but deliberately did not use it so that there would be no record of their coercive tactics and of inconsistent statements by their witnesses.

## I. THE DEFENDANTS MISLEAD THE GRAND JURY, CAUSING IT TO WRONGFULLY INDICT MR. BOYD

348.    The BPD detectives involved in the investigation knew that the coerced testimony Messrs. Woodruff and Hough gave in the grand jury implicating Mr. Boyd and his friends in the Crawford Murder was false.  The entirety of their investigation contradicted it.

349.    Detectives Guadagno, Delano, Deubell, and Montondo personally testified before the grand jury.

350.    Prior to Mr. Boyd's indictment, these and other detectives collectively knowledgeable about and responsible for the investigation failed to turn over to the ECDA and/or to inform the grand jury about a plethora of evidence which, viewed individually or cumulatively, completely undermined the prosecution's case.

351.    This evidence included but was not limited to:

- Mr. Woodruff's initial statement that he did not know anything about the Crawford Murder;

- the manner in which Mr. Woodruff had been threatened with arrest and prosecution and repeatedly coerced and promised immunity to induce him to change his various stories;

- the material inconsistencies in Mr. Woodruff's various statements;

- the crime scene photographs contradicting Mr. Woodruff's story;

- the witness statements about the timing of Mr. Crawford leaving the Golden Nugget, together with the taxicab evidence, which proved that Mr. Woodruff was not present at the time of the murder;

- the fact of Mr. Woodruff's recantation and the details of his recanting statements;

- the coercion of Mr. Hough to implicate the defendants notwithstanding his passing of a polygraph examination, including the threat to arrest him for the Crawford murder;

- Mr. Hough's recantation and other inconsistent statements;

- the manner in which Messrs. Woodruff's and Hough's enhanced stories had been orchestrated and coordinated by the BPD;

- the statements by the owner at Simpson's Store, and by Ms. Jeffrey and other witnesses present in the Golden Nugget, which contradicted the statements of Messrs. Hough and Woodruff;

- that police illegally detained Messrs. Woodruff and Hough in their custody until they completed their testimony;

- the anonymous phone call accusing Mr. Woodruff, as well as his terrified reaction to the call, before he changed his story;

- the unlawful investigative detention of Mr. Boyd without probable cause and the manner in which his statements had been coerced and/or fabricated;

- the police documentation that a set of house keys had been found near Mr. Crawford's body, the statement from the widow, Ms. Crawford, that her husband typically rang the bell for her to let him in the house, and the recorded statements from witnesses at the Golden Nugget that Julia Watson had called the bar after she and her husband left asking the barmaid to search for her husband Larry Watson's missing keys—evidence showing that the house keys near the body had been Mr. Watson's;

- statements from witnesses at the Golden Nugget who observed Mr. Watson volunteer to walk Mr. Crawford home, and then return 20 minutes later, collect his wife, and leave in a hurry;

- the false or conflicting statements of Larry Watson, his wife Julia Watson, and his stepson Bill Howard about their interactions with Mr. Crawford the night of the murder;

- statements from the barmaid, Debbie Jeffrey, in which she explicitly stated that she suspected Mr. Watson of committing the crime and the circumstances which led her to that conclusion;

- the crime scene photograph showing footsteps leading from Mr. Crawford's backyard towards Mr. Watson's house; and

- the tip and identification evidence pointing to Jerome Boyd as a second possible suspect.

352. On or about February 27, 1976, the grand jury, as a result of having been deceived about the material facts, and relying on fabricated evidence, indicted Mr. Boyd and his three co-defendants for first-degree robbery and second-degree murder.

353. On information and belief, shortly after the Crawford Murder, and while Mr. Boyd and his co-defendants were in custody without bail for the Crawford Murder, a man named William Crosby was murdered in his home.

354. Mr. Crosby lived in the house directly between Mr. Crawford and Mr. Watson at 2045 Fillmore Avenue and may have had knowledge about Mr. Crawford's murder.

355. On information and belief, the BPD never made an arrest for the murder of William Crosby.

356. On information and belief, the murder of William Crosby took place after Mr. Boyd was arrested and in custody, but before his trial, for the Crawford Murder.

357. No information concerning the murder of William Crosby, which took place in the immediate vicinity of the Crawford Murder at a time when it was impossible for Mr. Boyd or his friends to have been involved, was ever disclosed to Mr. Boyd's defense counsel.

**J.** **PLAINTIFF DARRYL BOYD IS TRIED AND CONVICTED BASED ON COERCED FALSE TESTIMONY, WITHOUT THE BENEFIT OF UNDISCLOSED *BRADY* MATERIAL**

358. Mr. Boyd was brought to trial on April 21, 1977, before an all-white jury, on charges of first-degree robbery and second-degree murder.

359. ADA Timothy Drury prosecuted the case.

360. He was one of the most senior prosecutors in the ECDA to whom the DA assigned many of the office's most serious and important cases.

361. Prior to Mr. Boyd's trial, Mr. Boyd's defense counsel, Mark Hulnick, requested that the ECDA permit him to examine the case file and produce all *Brady* material to him.

362. Despite these requests, ADA Drury did not disclose dozens of pieces of evidence favorable to the defense in advance of or even during trial. This evidence included, but is not limited to, the documents and information described in ¶¶ 131 and 351, *supra*.

- 43 -

363.     Consistent with the ECDA's policy, procedure, practice, and/or custom of impermissibly narrowing the scope of its *Brady* obligations to include only truly "exculpatory"— rather than all favorable—material, ADA Drury failed to disclose any evidence he did not deem "exculpatory," including evidence that impeached the prosecution's key witnesses; evidence that pointed to other suspects as perpetrators of the crime; and evidence regarding the second murder, which took place across the street from the Golden Nugget when Mr. Boyd was incarcerated.

364.     Also consistent with the policies, procedures, practices, and/or customs of the ECDA, the only materials ADA Drury turned over to the defense were the exhibits the prosecution entered into evidence or marked for identification, including some of the crime scene photographs, as well as the formal, sworn statements in question-and-answer format of testifying witnesses.

365.     These witness statements were not disclosed until after each witness had completed his or her direct examination.

366.     This late disclosure deprived defense counsel of the opportunity to investigate the information, to incorporate it into his opening statement or a theory of defense, and to fully prepare to utilize it during cross-examination of the witness.

367.     ADA Drury did not disclose to the defense statements of the prosecution's witnesses that were unsigned by the witnesses and instead merely summarized in police reports, despite his absolute duty to do so under the New York State *Rosario* rule as well as the requirements of *Brady*.

368.     Nor did he disclose any statement by any witness whom the prosecution did not call to testify, even where it was favorable to the defense.

369.    The prosecution disclosed no handwritten notes taken by any detective at any time during the investigation and also failed to disclose that handwritten notes had been destroyed.

370.    The prosecution presented no physical or forensic evidence tying Mr. Boyd (or any of the other defendants) to the crime.

371.    Its case was based on the false testimony of Messrs. Woodruff and Hough, together with testimony by Detective Guadagno, based upon his own false report, that Mr. Boyd had made inconsistent statements concerning the timing of when he returned home the night of the murder.

372.    The failure of the prosecution to disclose the aforementioned *Brady* material also severely handicapped Mr. Boyd's counsel's attempt to contradict or impeach the critical testimony of Messrs. Woodruff and Hough, and it deprived Mr. Boyd of his constitutional right to present a defense that someone else had committed the crime.

373.    During his summation, Mr. Hulnick, without the benefit of the suppressed police reports and information, nevertheless argued, from inconsistencies in Mr. Woodruff's story, that law enforcement authorities had pressured him to change his story and indoctrinated him.

374.    Even though this assertion was true, ADA Drury angrily objected, "These are wild allegations, there is no proof of it."

375.    During his closing argument, ADA Drury urged the all-white jury to credit Mr. Woodruff even though, or perhaps because, he was a "ghetto kid… a kook … an idiot, a nitwit," and a "blithering idiot."

376.    In fact, Mr. Woodruff was, and is, a highly intelligent man—a far cry from "a nitwit" or "a blithering idiot"—whose halting testimony resulted from the fact that he had been coerced to lie.

377.     ADA Drury's argument was a thinly disguised emotional appeal to the racial prejudices of the all-white jury.

378.     ADA Drury contended that Mr. Woodruff initially lied when denying any knowledge of the crime, but then came back voluntarily with his father to confess at least some of the truth.

379.     This argument was contradicted by the undisclosed police reports documenting that Mr. Woodruff was picked up, taken back to BPD Headquarters, and coercively interrogated for hours, without any family member being present, before he changed his story.

380.     ADA Drury contended that the police had to work through Mr. Boyd's friends because they didn't have any other evidence of how the Crawford Murder was committed.

381.     However, this was not true:  The BPD had substantial evidence, undisclosed to the defense, obtained from numerous witnesses at the Golden Nugget and Mr. Watson's neighbors, implicating Mr. Watson, and additional independent evidence implicating Jerome Boyd.

382.     ADA Drury told the jury that "[t]he police turned over everything they had to you."

383.     This was untrue:  The BPD had gathered a great deal of evidence implicating other suspects and contradicting the prosecution's case, but this evidence had not been disclosed to the defense or the jury.

384.     ADA Drury told the jury:  "I would absolutely reject, if I were to make this argument to you, any suggestion, any beliefs [that] the police or our office or myself had anything to do with changing Tyrone's testimony or making it fit any pattern."

- 46 -

385.     This statement, too, was proven untrue by the undisclosed police reports of January 12, 1976, concerning the anonymous phone call, and of February 11, 1976, revealing that detectives, supposedly orchestrated by ADA Drury, had gone from Mr. Hough to Mr. Woodruff to harmonize their new accounts.

386.     Any allegation of a "conspiracy" to fabricate evidence, he said, was "absolutely ridiculous," even though the above undisclosed evidence showed it was true.

387.     Contrary to fundamental rules governing courtroom advocacy, ADA Drury personally vouched for the integrity of the investigation and prosecution, and for Mr. Woodruff's truthfulness.

388.     Again, appealing to the all-white jurors' possible racial prejudice, ADA Drury argued that Mr. Woodruff was "hapless, stupid, but we are asking you to believe him."

389.     While telling the jury that his personal beliefs did not matter, ADA Drury still told them, "I believe him."

390.     ADA Drury misleadingly stated that the BPD had found "no footprints on *either side* of that house so that nobody jumped the yard.  Woodruff said they went out the same way they came."

391.     This argument was misleading since the BPD had documented in a crime scene photograph, which had been suppressed from the defense, footprints leading from the backyard of Mr. Crawford's house towards Mr. Watson's house.

392.     On April 29, 1977, the jury convicted Mr. Boyd of second-degree murder and first-degree robbery.

- 47 -

393. After Mr. Boyd's conviction but before his August 1977 sentencing, Thelma Green, Andre Hough's foster mother, told detectives that Mr. Hough had admitted to her that he had lied in his testimony implicating Mr. Boyd after being told what to say.

394. Ms. Green told ADA Drury she believed Mr. Hough was not telling the truth, adding that her son had told her, after one of the co-defendants' trials, that he had been lying about the whole thing.

395. On August 3, 1977, with Mr. Boyd and his counsel continuing to maintain his innocence, the court sentenced him to serve 20 years to life in prison, and he was sent upstate to serve his time.

## K.  THE ECDA OPPOSES MR. BOYD'S EFFORTS TO OVERTURN HIS CONVICTION

396. Following his conviction, Mr. Boyd continued to maintain his innocence.

397. Mr. Boyd appealed his conviction, arguing, among other things, that ADA Drury's summation comments had violated his constitutional right to a fair trial.

398. In its brief opposing Mr. Boyd's appeal, the District Attorney, ratifying ADA Drury's misconduct, argued that the summation was "proper in all respects."

399. The Appellate Division affirmed it. *See People v. Boyd,* 84 A.D.2d 689 (4th Dep't 1981), lv to app. den., 55 N.Y.2d 879 (1982).

400. On March 23, 1984, Mr. Boyd moved, pursuant to Criminal Procedure Law § 440.10, to vacate his conviction, based, among other things, on Mr. Hough's most recent recantation.

401. In opposing the motion, the ECDA continued to suppress Mr. Hough's original recantation of February 11, 1976, and emphasized the other "evidence" of guilt the detectives

had manufactured, including Mr. Boyd's alleged false statements to police and Mr. Woodruff's testimony.

402.    The court denied the motion on November 28, 1984.

403.    Mr. Boyd filed a motion for reconsideration on December 5, 1984.  That motion was denied as well.

404.    On January 23, 1986, Mr. Boyd again moved to vacate his conviction pursuant to § 440.10, this time based upon the recantation, in the form of a sworn oral deposition, of Mr. Woodruff.

405.    Mr. Woodruff testified that he had been intimidated by armed police from the BPD to adopt a story based upon information the police gave him.

406.    He further alleged that he had been told that the police had other witnesses "upstairs" ready to "take his place"—i.e., testify against the others, and him—if he did not cooperate, and that he would be charged with murder and go to prison for life.

407.    In fact, he testified, he had not been involved in the murder at all and knew nothing about it, as he first told police on January 11, 1976.

408.    He said that the police had coerced him before he had any contact with ADA Drury.

409.    The defense submitted as exhibits photographic evidence contradicting Mr. Woodruff's trial testimony that Mr. Crawford had been dragged up the driveway through the snow.

410.    In opposing the defense motion, the ECDA continued the coverup of the voluminous, favorable evidence that had been suppressed at the time of Mr. Boyd's trial and contributed to his conviction.

411.    The affidavit of ADA Louis A. Haremski falsely stated that Mr. Woodruff had consistently been interviewed "in the presence of his parents."

412.    In fact, the ECDA knew or should have known from undisclosed police reports that, in his initial interview on January 11, 1976, and the next day when he was coerced into changing his story, Mr. Woodruff was interrogated by police outside the presence of his family.

413.    ADA Haremski further misrepresented that Mr. Woodruff had voluntarily changed his story the next day.

414.    In making this argument, he continued his office's suppression of the police reports documenting how police had coerced Mr. Woodruff.

415.    The ECDA also continued to suppress the other evidence, including but not limited to the items described in ¶¶ 131 and 351, *supra*, and elsewhere in this Complaint, contradicting Mr. Woodruff's trial testimony and implicating third-party suspects.

416.    Indeed, the affidavit falsely asserted that the jury in Mr. Boyd's trial had all the prior statements and circumstances "surrounding Tyrone Woodruff's election to testify against his cohorts," when this was patently untrue.

417.    Relying on the ECDA's submission, the court (Kasler, J.) denied the motion without a hearing.

418.    Mr. Boyd was granted parole in 1996, after serving 20 years in prison for the Crawford Murder.

419.    Thereafter, he served eight additional years after parole authorities, believing him to be a murderer, accused him of minor, technical parole violations.

420.    But for his wrongful conviction, he would not have been on parole, subject to onerous, highly technical conditions of release, would not have been considered a murderer who

- 50 -

parole authorities were looking for an excuse to reincarcerate, and would not have been reimprisoned.

421.    Mr. Boyd continued to maintain his innocence and fight to have his wrongful conviction vacated and his name cleared.

422.    On or about October 1, 2012, Mr. Boyd, now represented by attorney Steven M. Cohen, moved once again to vacate his conviction based upon newly discovered evidence.

423.    The evidence included a second, even more detailed, sworn recantation of Mr. Woodruff, again in the form of an oral deposition, as well as newly discovered police documents obtained through a FOIL request, which supported Mr. Woodruff's claim that his testimony against Mr. Boyd and the other boys had been coerced.

424.    In opposing Mr. Boyd's motion, ADA Nicholas Texido falsely contended that all police documents had been turned over at trial and that, even if they had not been, they were not material.

425.    On or about August 31, 2014, Mr. Boyd requested records from his case from the ECDA under the Freedom of Information Law.

426.    The Chief of the ECDA Appeals Bureau, Donna A. Milling, denied the request, claiming untruthfully:  "All disclosable documents were turned over to your trial attorney pursuant to discovery rules."

### L.    THE COURT VACATES MR. BOYD'S WRONGFUL CONVICTION

427.    On October 13, 2020, a prominent Buffalo criminal defense attorney, Paul J. Cambria, Jr., of Lipsitz Green Scime Cambria LLP, handling the case *pro bono*, filed a motion on behalf of Mr. Boyd and his only surviving co-defendant, John Walker, to vacate their convictions pursuant to CPL § 440.10.

428.    Mr. Boyd moved on the grounds that the ECDA, during each of their separate trials in 1977, had failed to disclose two favorable crime scene photographs.

429.    One was the photograph showing a single set of footprints in the snow, made by a heavyset man, in the backyard of Mr. Crawford's property, leading in the direction of Mr. Watson's property two houses over.

430.    The second, which contradicted Mr. Woodruff's trial testimony, showed the absence of dragging marks and footprints in the snow along Mr. Crawford's driveway.

431.    After holding an evidentiary hearing, the court (Burns, J.) granted Mr. Boyd's motion and, on August 18, 2021, vacated the convictions of Messrs. Boyd and Walker.

432.    The court credited the testimony of retired Judge James McLeod, who had represented Floyd Martin at the last of the four defendants' trials in 1977.

433.    Judge McLeod testified that, unlike the other defense counsel, he had made a specific discovery request for all the police photographs and thus had received the two photographs in question that contradicted the prosecution's theory of the case.

434.    He testified that these exhibits had proven decisive in the jury voting to acquit his client, Mr. Martin.

435.    Judge McLeod recalled that, based upon the photographs, together with the testimony that Mr. Watson had left the Golden Nugget with Mr. Crawford, he had contended that Mr. Woodruff's testimony was not truthful and that Mr. Watson likely was the killer.

436.    Judge McLeod's testimony was corroborated by handwritten notes in the prosecution's present case file showing that indeed he had made an argument during his trial summation about the significance of the footprints in the snow at the rear of Mr. Crawford's property.

437.    On September 23, 2021, the present District Attorney, John Flynn, acknowledging that he lacked any evidence with which to retry Messrs. Boyd and Walker, moved to dismiss the indictment against them, and the court dismissed the charges.

## VI.    MR. BOYD'S DAMAGES

438.    Mr. Boyd's injuries and damages include, but are not limited to:

   (a)    his complete loss of liberty, during his pretrial and posttrial incarceration, totaling more than 28 years;

   (b)    severe restrictions upon his liberty, privacy, and personal autonomy during parole supervision totaling another 17 years;

   (c)    physical injuries he suffered during assaults upon him by guards and other inmates;

   (d)    the mental and emotional effects of such assaults and of the gruesome, terrifying, homicidal, and disfiguring assaults on other inmates that he witnessed;

   (e)    past and future physical illnesses and injuries as a result of his wrongful conviction and his experiences in prison;

   (f)    past and future mental and emotional suffering;

   (g)    the loss of the services, society, companionship, and consortium of his mother and other family members;

   (h)    the loss of employment income and diminution of future earning ability in an amount to be determined;

   (i)    legal fees and expenses for which he is responsible, including trial and post-trial representation; and

   (j)    interest to the extent available under controlling law.

## CAUSES OF ACTION

### COUNT I

**42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments Against the Individual Defendants**

439.   Mr. Boyd repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

440.   The Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, individually and/or in concert with each other and others unnamed, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Mr. Boyd, without probable cause to believe that Mr. Boyd was guilty of any crime or could be successfully prosecuted, and caused him to be deprived of his liberty, in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

441.   The criminal proceedings terminated in Mr. Boyd's favor.

442.   By virtue of the foregoing, and pursuant to 42 U.S.C. § 1983, the Individual Defendants, personally or through their Estates, are liable for the violations of Mr. Boyd's constitutional rights and his resulting injuries.

### COUNT II

**Malicious Prosecution under New York State Law Against the Individual Defendants and the City of Buffalo**

443.   Mr. Boyd repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

444.   The Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, individually and/or in concert with each other and others unnamed, acted with actual malice to initiate and/or to continue criminal proceedings against Mr. Boyd without probable cause to believe that Mr. Boyd was guilty of any crime or could be

successfully prosecuted, in violation of his rights under the common law of the State of New York.

445.     The criminal proceedings terminated in Mr. Boyd's favor.

446.     By virtue of the foregoing, the Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, are liable to Mr. Boyd for malicious prosecution under the common law of the State of New York and for all his resultant damages.

447.     Under the principle of *respondeat superior*, the Defendant City is liable for the malicious prosecution of Mr. Boyd by the Individual Defendants and other municipal employees, all of whom were acting within the scope of their employment, and for Mr. Boyd's resultant damages.

## <u>COUNT III</u>
### **42 U.S.C. § 1983 Unreasonable Seizure under the Fourth Amendment, and Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, Due to the <u>Fabrication of False or Misleading Evidence by the Individual Defendants</u>**

448.     Mr. Boyd repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

449.     The Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, acting individually and/or in concert with each other and with others, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to fabricate or manufacture false or misleading police reports, witness statements, and a Criminal Court complaint (collectively, the "<u>Fabricated Evidence</u>").

450.     The Individual Defendants forwarded, or caused to be forwarded, the Fabricated Evidence to prosecutors in the ECDA, intending that it be used against Mr. Boyd during a criminal prosecution.

451. The Individual Defendants knew that the Fabricated Evidence, if considered by a jury, would be likely to influence a jury's decision at trial to convict Mr. Boyd.

452. As a result of the Individual Defendants' conduct in forwarding, or causing to be forwarded, the Fabricated Evidence to the ECDA, prosecutors in that office initiated and continued a criminal prosecution of Mr. Boyd, and he lost his liberty.

453. The Individual Defendants' conduct violated Mr. Boyd's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution, and his rights to procedural and substantive due process and a fair trial, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

454. The above misconduct was outrageous and shocking to the conscience.

455. By virtue of the foregoing, the Individual Defendants are liable to Mr. Boyd, pursuant to 42 U.S.C. § 1983, for the violation of his constitutional rights and his resultant injuries.

## COUNT IV
**42 U.S.C. § 1983 Unreasonable Seizure under the Fourth Amendment, Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, and Denial of Reasonable Bail under the Eighth Amendment, Due to the Pretrial Withholding of Favorable Evidence Likely to Result in Plaintiff's Release from Custody ("*Russo* Claim") by the Individual Defendants**

456. Mr. Boyd repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

457. Following the initiation of Mr. Boyd's prosecution with the filing of a Criminal Court complaint, the continuation of the charges was subject to a preliminary hearing, at which a judge determines whether there was probable cause to prosecute, and a proceeding before a grand jury, which would decide whether the evidence supported formally charging Mr. Boyd by indictment and binding him over for trial.

458.     Under New York law, as well as the Eighth and Fourteenth Amendments to the United States Constitution, the court, following the filing of charges, was required, upon application of the defendant, to consider whether to fix a reasonable bail so that the defendant could obtain his release.

459.     Under New York law, the strength of the prosecution's case was a significant factor for a court in determining whether to fix a reasonable bail and the amount of such bail.

460.     Despite knowing this, the Individual Defendants withheld, or caused to be withheld, from the ECDA, Mr. Boyd and his lawyer, the grand jury, and the court exculpatory and impeachment evidence and other evidence favorable to the defense that completely undermined the prosecution's case.

461.     Had such evidence been timely disclosed, the charges against Mr. Boyd likely would not have survived the preliminary hearing or the determination by the grand jury, and/or the court would have released Mr. Boyd on his own recognizance or on a reasonable bail.

462.     The failure to make timely disclosure of such obviously significant evidence undermining the entire case caused Mr. Boyd to be unnecessarily and unreasonably deprived of his liberty.

463.     This conduct was shocking to the conscience.

464.     It violated Mr. Boyd's constitutional rights to be free of unlawful or unreasonable seizure under the Fourth and Fourteenth Amendments, to reasonable bail under the Eighth and Fourteenth Amendments, to a fair trial under the Sixth and Fourteenth Amendments, and to due process of law under the Fifth and Fourteenth Amendments.

465. By virtue of the foregoing, the Individual Defendants or their Estates are liable, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Boyd's constitutional rights and his resultant injuries.

### COUNT V
### 42 U.S.C. § 1983 Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments by Withholding Evidence Favorable to the Defense ("*Brady* Claim") by the Individual Defendants

466. Mr. Boyd repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

467. At all relevant times, Mr. Boyd had a right—under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and *Brady v. Maryland*, 363 U.S. 83 (1963) and its progeny—to timely disclosure to him, by the prosecution, of all evidence in its possession, custody or control that was favorable to his defense, either because it tended to show his innocence, tended to impeach the credibility of the prosecution's witnesses against him, or both ("*Brady* material").

468. In furtherance of this right, police officers, including the Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, had a duty to timely disclose, or to ensure the timely disclosure of, all potential *Brady* material to the ECDA so that it could decide what to disclose to the defense.

469. The Individual Defendants violated this duty by knowingly, willfully, intentionally, recklessly, and/or negligently failing to timely disclose to the prosecutors in charge of Mr. Boyd's criminal prosecution numerous items of *Brady* material, including documents and unrecorded information, including but not limited to the material enumerated in ¶¶ 131 and 351, *supra,* and elsewhere in this Complaint, and by destroying their notes.

470.     The undisclosed *Brady* material was material to the outcome of the trial at which

Mr. Boyd was convicted.  But for the Individual Defendants' failure to disclose or cause the

disclosure of the *Brady* material, there is a reasonable likelihood that Mr. Boyd would have been

acquitted or otherwise received a more favorable outcome to his trial.

471.     By virtue of the foregoing, the Individual Defendants or their Estates are liable,

pursuant to 42 U.S.C. § 1983, for the violation of Mr. Boyd's constitutional rights and his

resultant injuries.

### COUNT VI
### 42 U.S.C. § 1983 and *Monell* Municipal Liability for the Conduct of Employees of the BPD Against the City of Buffalo

472.     Mr. Boyd repeats and realleges each allegation contained in the preceding

paragraphs as if fully set forth herein.

473.      At all relevant times, the Police Commissioner, detectives, and other police

officers employed by the BPD were agents and employees of the Defendant City.

474.     Under the principles of municipal liability for federal civil rights violations, the

City's Police Commissioner or his authorized delegates, including the Chief of the Homicide

Detectives Unit, during all times relevant to this Complaint, had final responsibility for training,

instructing, supervising, and disciplining police officers and other employees of the BPD with

respect to the investigation and prosecution of criminal matters, including homicides.

475.     The areas in which the Police Commissioner or his authorized delegates,

including the Chief of the Homicide Detectives Unit, were responsible for training, instructing,

supervising, and disciplining police officers and other employees of the BPD included but were

not limited to:

(a)     the constitutional obligation, pursuant to the Fourth, Fifth, and Fourteenth

Amendments to the Constitution, not to initiate or continue a prosecution,

and to cause a criminal defendant's deprivation of liberty, without

probable cause to believe he or she has committed a crime;

(b)     the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and

Fourteenth Amendments, not to fabricate or manufacture evidence,

including the coercion of confessions and witness statements through

illegal detentions without probable cause, threats, lies, or trickery and the

preparation of false or materially misleading or incomplete reports, for use

against criminal suspects and defendants in criminal prosecutions and

trials; and

(c)     the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and

Fourteenth Amendments, to make timely disclosure of evidence favorable

to the defense to the prosecution for disclosure in turn to a criminal

defendant for use during pretrial and trial proceedings at which the

defendant's liberty is at stake.

476.     During all times material to this Complaint, the City, through its policymaking

officials in the BPD, owed a duty to the public at large and to Mr. Boyd to implement policies,

procedures, training, discipline, customs, regulations, and practices sufficient to prevent, deter,

and avoid conduct by BPD employees that would result in the violation of the above-mentioned

constitutional obligations.

477.     During all times material to this Complaint, these policymakers, including the

Chief of the Homicide Detectives Unit, to whom policymaking responsibilities for homicide

investigations had been delegated, knowingly and intentionally breached, or were deliberately

indifferent to, this duty.

478.     Furthermore, these policymakers created substantial incentives for their employees to commit the above-described constitutional violations by pressuring police officers, particularly homicide detectives handling high-profile investigations, to close cases and initiate prosecutions through coercion, trickery, falsification of reports, and suppression of evidence.

479.     The aforesaid deliberate or de facto policies, procedures, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees) were implemented or tolerated by policymaking officials for the Defendant City—including but not limited to the Police Commissioner, the Chief of Detectives, and the Chief of the Homicide Detectives Unit—who knew, or should have known:

    (a)     to a moral certainty that such policies, procedures, practices, and/or customs concern issues that regularly arise during criminal investigations and prosecutions;

    (b)     that such issues present BPD employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

    (c)     that BPD employees facing such issues have strong incentives to make the wrong choices, especially given the pressure placed on BPD employees to make arrests, close cases, and secure indictments and convictions;

    (d)     that the wrong choice by BPD employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury; and

    (e)     that BPD employees had a history of making wrong choices in such matters.

480.     At the time of Mr. Boyd's arrest and prosecution, BPD policymaking officials were on notice of the risk of misconduct by BPD employees that would violate the constitutional obligations identified in ¶ 475.

481.     City policymaking officials were on notice based in part on numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division discussing the constitutional obligations of police officers during criminal investigations and prosecutions.

482.     City policymaking officials were on notice based on the inherent obviousness of the need to train, supervise, and discipline police officers with respect to their constitutional obligations to counteract the pressure on such officers to close cases and to obtain arrests and convictions.

483.     Indeed, BPD policymakers knew, prior to and during the period of the Crawford investigation, that numerous BPD officers had orchestrated an arrest and conviction in a high-profile robbery-murder case of a Black suspect using the same deceptive, coercive, and dishonest practices that the entire Homicide Detectives Unit then used in this case.

484.     In a federal habeas corpus proceeding then pending in Buffalo, the BPD was credibly accused of obtaining the arrest and conviction of the petitioner by coercing a confession from a Black suspect through lies and threats. As Chief Judge Curtin of this Court ultimately wrote in vacating the conviction, the BPD had illegally detained and interrogated numerous Black men without probable cause, including the petitioner, whom detectives picked up based upon an alleged anonymous tip.  They questioned the petitioner for hours at night when an attorney, friends and family could not offer their support to him, a tactic intended to heighten his anxiety.  They surrounded him, kept him in isolation, lied to him that he had been implicated by

others, threatened him with dire consequences if he did not confess, suggested to him that he minimize his role, and promised him leniency in exchange for doing so—exactly the tactics used in Plaintiff Boyd's case.

485.    Chief Judge Curtin wrote that the police officers' lying to petitioner was "an obvious effort to trick him into implicating himself and others.  This police practice is to be soundly condemned.  Such deception clearly has no place in our system of justice."  *Robinson v. Smith,* 451 F. Supp. 1278 (W.D.N.Y. 1978) (Curtin, C.J.).

486.    Notwithstanding their awareness of the widespread use of such tactics by the BPD, prior to the investigation of the Crawford Murder on January 2, 1976, and through Mr. Boyd's trial in April 1977, BPD policymaking officials failed to adequately instruct, train, discipline and supervise police officers with respect to their obligations (1) to disclose, to the defense or to prosecutors, evidence impeaching the credibility of prosecution witnesses or tending to exculpate criminal suspects or defendants; (2) to make a record of coercion or inducement of witnesses and of witnesses' prior inconsistent statements; (3) to preserve rather than destroy their handwritten notes; (4) to refrain from fabricating evidence, including by using coercion or deception to obtain false confessions and witness statements and preparing false, materially misleading, or incomplete reports; and (5) to refrain from initiating or continuing a prosecution without probable cause.

487.    The issues of whether to preserve and to disclose evidence favorable to the defense to prosecutors or to the defense, how to ensure that evidence is not fabricated through false confessions and witness statements and false, misleading, or incomplete reports, and how to ensure that a prosecution is not initiated or continued without probable cause regularly arise in criminal investigations and prosecutions.

488.    Nevertheless, the BPD provided no or plainly inadequate *Brady*-related training; provided no or plainly inadequate training concerning making and preserving a record of information that was favorable to a criminal suspect or defendant; had no policies at all, or at least no policies that were adequately made known to detectives, requiring disclosure of *Brady* material; and did not discipline officers who failed their constitutional duty to disclose such information to prosecutors.

489.    Similarly, the BPD provided no or plainly inadequate training on interview and interrogation protocols to ensure the truthfulness of confessions and witness statements; affirmatively encouraged officers to illegally detain witnesses and suspects for interrogation and use or close their eyes to coercive interview and interrogation tactics likely to lead to false confessions and witness statements; provided no or plainly inadequate training on preparing reports that are truthful, accurate, and complete; had no policies at all, or at least no policies that were adequately made known to detectives, discouraging officers from using coercive interview and interrogation tactics, including the unlawful detention of witnesses and suspects, including vulnerable teenagers, without probable cause, likely to lead to false confessions and witness statements; encouraged or at least tolerated detectives' practice to refrain from making a record of information favorable to suspects and defendants and to destroy their notes, and did not discipline officers who fabricated evidence by coercing false confessions and witness statements and preparing false, materially misleading, or incomplete reports.

490.    Indeed, rather than provide formal training on lawful interrogation techniques, the BPD endorsed on-the-job training by detectives who had a history and practice of unlawfully coercing witnesses, thereby perpetuating such practices and creating an atmosphere in which

detectives assumed either that such techniques were appropriate or that, even if inappropriate or unlawful, they would get away with them without personal consequence to them.

491.    The BPD also provided no or plainly inadequate training on how to ensure that probable cause exists to initiate or continue a prosecution, including ensuring that the prosecution is not initiated or continued based on the use of manufactured or otherwise unreliable evidence.

492.    BPD policymaking officials had, before Mr. Boyd's arrest, issued no Patrol Guide provision or other written directive to officers concerning when, if at all, to disclose information favorable to a criminal suspect or defendant to prosecutors.

493.    With deliberate indifference to such misconduct, BPD policymaking officials failed to take adequate steps to train, supervise, or discipline BPD employees to prevent or deter such constitutional violations from occurring.

494.    As a result of the foregoing, at the time of the investigation of the Crawford Murder, it was the policy, custom or practice of BPD detectives to coerce false statements from suspects and witnesses, including inherently vulnerable teenagers, through unlawful investigatory detentions without probable cause and other means, to prepare false or misleading investigative reports, to fail to document information that was favorable to suspects and defendants or to destroy their notes containing such information, and to withhold evidence and information favorable to a criminal suspect or defendant from prosecutors.

495.    Additionally, detectives were encouraged to engage in such illegal activities by their knowledge that it would be at the very least tolerated and excused by BPD policymakers for whom closing high-profile cases with arrests was the priority.

496.     This is apparent from the knowing participation in such illegal activities, during the Crawford investigation by Defendant Donovan, the Chief of the Homicide Detectives Unit, and the policymaking official for the department with respect to homicide investigations.

497.     Indeed, he ratified the conduct of the unit he led and made it into municipal policy by approving the arrest of Mr. Boyd and his friends, designating all of the detectives in the unit as co-arresting officers, and signing under oath the false criminal court complaint that initiated the prosecution.

498.     That the entire Homicide Detectives Unit knowingly participated in fabricating a case against Mr. Boyd and his young teenaged friends, documenting their fabricated case through a series of false or misleading investigative reports, omitting information favorable to the suspects from their reports, destroying their notes, and withholding information favorable to a criminal suspect or defendant from the prosecutors, proves the existence of an anything-goes culture of illegality that policymakers' indifference to such misconduct predictably had wrought and that such misconduct was, at that time, the policy, custom and practice of the BPD.

499.     The aforementioned unconstitutional or deliberately indifferent policies, procedures, training, discipline, customs, regulations, and/or practices of the BPD were a direct, foreseeable, proximate, and/or substantial cause of the violations of Mr. Boyd's federal constitutional rights in this case by employees of the BPD and his resulting injuries.

500.     By virtue of the foregoing, the Defendant City is liable for the violation of Mr. Boyd's constitutional rights pursuant to 42 U.S.C. § 1983 and his resultant injuries.

## COUNT VII
### 42 U.S.C. § 1983 and *Monell* Municipal Liability Against the County of Erie for the Misconduct of Prosecutors

501.     Mr. Boyd repeats and realleges each allegation contained in paragraphs 1 through 438 as if fully set forth herein.

502.    The Erie County District Attorney and his authorized delegates, at all relevant times, had final authority with respect to the training, supervision, discipline, and overall management of personnel employed by or assigned to the ECDA with respect to all of the office's functions, including the investigation and prosecution of criminal cases, and constituted County policymakers for whose actions or omissions the County is liable.

503.    The District Attorney, at all relevant times, was and is an elected officer of the County, and the ECDA was and is substantially funded out of the County's budget.

504.    The District Attorney was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

505.    The DA and his assistant district attorneys are agents and employees of the Defendant County.

506.    Under New York State law, the County, at all relevant times, was liable for torts committed by County officers and employees, including the District Attorney and his assistants. *See* N.Y. County Law §§ 53, 941.

507.    The County represents such officers and employees in judicial proceedings and indemnifies them because they are County officials.

508.    At the time of Mr. Boyd's criminal trial, as a criminal defendant, he was entitled, under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, to timely disclosure of all material information that was in the actual or constructive possession, custody, or control of the ECDA and that was favorable to the defense, including but not limited to exculpatory information that tended to contradict the prosecution's case or otherwise show he was innocent, and impeachment information that tended to undercut the credibility of the witnesses against him, known as "*Brady* material."

509.     The prosecution was constitutionally required to disclose *Brady* material as soon as reasonably possible regardless of whether the defense had made a specific request for it.

510.     The prosecution was constitutionally required to find out about and disclose such information, whether it was in its actual possession or in the possession of any police department that had been involved in the investigation or prosecution of the matter.

511.     This was a continuing obligation even after a conviction at trial, such as during proceedings brought by a convicted defendant challenging the fairness of his conviction.

512.     While the right to timely disclosure of *Brady* material was intended to guarantee the fairness of a criminal trial, the prosecution also had an obligation under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution to disclose evidence favorable to the defense early in a criminal prosecution, where it was so clearly relevant to whether the prosecution should continue, or the defendant should be released on bail, that the suppression of it would shock the conscience.

513.     Similar to the *Brady* obligation is the state constitutional requirement, established by *People v. Rosario,* 9 N.Y.2d 286 (1961), requiring disclosure at trial of the prior recorded statements of prosecution witnesses so that defense counsel, singularly dedicated to his client's cause, could decide how to use such material to impeach such witnesses.

514.     Often, *Rosario* material also contained information that was favorable to the defense as defined by *Brady* and its progeny.

515.     Related to *Brady* is a prosecutor's constitutional obligation, at all stages of a criminal prosecution, not to rely on or fail to correct false or misleading evidence or argument.

516.     The suppression of evidence favorable to the defense from the court during a preliminary hearing or bail hearing, or from a grand jury deciding whether to vote an indictment,

and from a petit or trial jury, likely would leave an impermissibly false or misleading impression with the fact finder about the strength of the evidence supporting the prosecution's case and about the defendant's guilt.

517.    The federal constitutional obligation to make timely disclosure of evidence favorable to the defense for use during pretrial and trial proceedings superseded any provisions of the state's Criminal Procedure Law or the *Rosario* rule to the extent such state rule was less protective of a criminal defendant's rights.

518.    In other words, the federal constitutional requirement of prompt disclosure of evidence favorable to the defendant, irrespective of whether the defense had made a specific request, applied even though state discovery provisions required a specific request for discovery material and permitted the prosecutor to withhold the prior recorded statements of its witnesses until after they had completed their direct testimony at trial.

519.    Such state rules did not provide sufficient, timely disclosure to enable the defense a reasonable opportunity under *Brady*'s constitutional rule to investigate the information, integrate it into the defendant's trial strategy, and prepare an effective cross-examination.

520.    Furthermore, a prosecutor had a constitutional obligation not to conduct himself before a jury in a manner that would deprive a criminal defendant of his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

521.    At the time of Mr. Boyd's trial in 1977, there were well-established rules of behavior for prosecutors before a jury, particularly with respect to opening arguments and summations, which were intended to ensure a fair trial.

522.    If serious enough, the violation of such rules would deprive a criminal defendant of his federal constitutional rights.

523.     The well-established rules regarding prosecutorial conduct prohibited prosecutors from making false or misleading factual assertions or arguments, making arguments calculated to distract the jury by appealing to its prejudices and emotions, arguing "facts" or "evidence" that were not in the record, expressing the prosecutor's personal belief in the defendant's guilt or as to a witness's credibility, vouching for a witness's credibility, calling the defendant or his witnesses liars, ridiculing or belittling the role of defense counsel, or implying falsely that the defendant had a burden of proof.

524.     The prosecutors handing the prosecution of Mr. Boyd violated all these rules.

525.     As set forth above, the prosecutors of Mr. Boyd relied on false or misleading evidence and argument to cause a judge to find probable cause to continue the prosecution at a preliminary hearing and to keep Mr. Boyd in jail, to deceive a grand jury into voting to indict Mr. Boyd and the other defendants, and to convict Mr. Boyd at trial.

526.     They suppressed from the court, the grand jury, the trial jury, and, of course, from the defense, evidence that proved that the witnesses against Mr. Boyd were lying or not credible, that police had coerced them into lying, that a known third party was likely to have committed the crime, and that similar crimes had been committed in the area after Mr. Boyd had been taken into custody.

527.     Had this evidence been timely disclosed, Mr. Boyd would have been released early in the proceedings and ultimately would have achieved a more favorable outcome to his trial.

528.     Further, as shown above, the trial prosecutor, ADA Drury, delivered an inflammatory summation which violated virtually all the above rules of conduct for prosecutors,

violated Mr. Boyd's constitutional right to a fair trial, and contributed as well to the jury's guilty verdict.

529. Thereafter, prosecutors at the ECDA, reflecting the ECDA's ongoing indifference to *Brady* violations, successfully opposed Mr. Boyd's motions to overturn his conviction by misleading the courts about whether specified items had been disclosed at trial and whether such items were favorable to the defense under *Brady* at all.

530. This behavior prolonged for many years Mr. Boyd's imprisonment as well as the deep restrictions upon his liberty as a parolee.

531. Individually and collectively, the above misconduct deprived Mr. Boyd of his constitutional rights to due process and a fair trial and to be free from unreasonable seizure and was a substantial cause of Mr. Boyd's constitutional injuries.

532. Individually and collectively, these violations of Mr. Boyd's constitutional rights were directly, foreseeably, proximately, and/or substantially caused by the unlawful policies, customs, or practices of the ECDA as well as by the deliberate indifference of policymakers at that office, acting on behalf of the Defendant County, to the occurrence of such constitutional violations.

533. Under the principles of municipal liability for federal civil rights violations, at all relevant times, the District Attorney or his authorized delegates had final managerial responsibility for establishing lawful policies of the office and for training, instructing, supervising, and disciplining attorneys and other employees of the ECDA regarding their constitutional obligations.

534.  Nevertheless, at the time of Mr. Boyd's trial, the ECDA maintained unlawful policies, customs, or practices, and was indifferent to violations of fair trial rights, all of which were a substantial cause of the violations of his constitutional rights and to his damages.

535.  Specifically, first, the ECDA had an unlawful policy, custom, or practice of impermissibly limiting its obligation to disclose *Brady* material to the defense to include only truly "exculpatory"—rather than favorable—material.  This baseless narrowing of the *Brady* doctrine's scope, which encompasses not only exculpatory material but also all other information favorable to the defense, such as impeachment evidence and evidence identifying alternate perpetrators of the crime, deprived criminal defendants of their constitutional right to a fair trial.

536.  Second, the ECDA had an unlawful policy not to disclose *Brady* material to the defense, the court, or the grand jury at the preliminary hearing, bail hearing, and grand jury stages of a case, thereby deceiving fact finders about the strength of the prosecution's case and causing criminal defendants to be unfairly and unreasonably deprived of their liberty.

537.  Third, the ECDA had an unlawful policy, custom, or practice of not disclosing evidence favorable to the defense, *even* exculpatory evidence, for use at trial unless the defense specifically requested it, and then often did not disclose it anyway.

538.  Fourth, the ECDA had an unlawful policy, custom, or practice to disclose only formal witness statements that were signed by the witness, as opposed to statements memorialized in police reports or that were handwritten only, and to make even this limited disclosure only after such witness completed his direct examination at trial, thus making it difficult, if not impossible, for the defense to investigate the information, incorporate it into counsel's opening statement and overall defense strategy, and plan an effective cross-examination.

539.    Fifth, the ECDA had an unlawful policy, custom, or practice of not disclosing police reports containing information favorable to the defense obtained from witnesses who were not called by the prosecution to testify.

540.    Sixth, the ECDA had a policy, custom, or practice for prosecutors, especially in high profile cases, to make inflammatory, misleading, and even false summations that violated the aforementioned well-established rules of behavior and which, like *Brady* violations, deprived criminal defendants such as Mr. Boyd of their constitutional right to a fair trial.

541.    Indeed, prosecutors would give summations that were false or misleading precisely because they contradicted evidence that the same prosecutors had suppressed under *Brady*.

542.    Finally, seventh, the ECDA had a policy, custom, or practice of continuing to withhold *Brady* material when faced with post-trial motions by a defendant challenging the lawfulness of his conviction, thereby prolonging the defendant's imprisonment.

543.    The District Attorney and his designees, as policymakers for the ECDA and the County, encouraged such violations to occur through their policy of deliberate indifference to them.

544.    At all relevant times, the ECDA had no prosecution manual or other written rules or procedures regarding *Brady* and *Rosario* disclosure or trial advocacy, including summation behavior.

545.    At all relevant times, the ECDA had no employee handbook, manual, or other document setting forth any disciplinary process for prosecutorial misconduct, or potential sanctions for them, nor was any such process made known to employees in some other manner as a deterrent to such misconduct.

546.    At all relevant times, even though the District Attorney knew or should have known that prosecutors on his staff, including the most experienced prosecutors handling the ECDA's most important cases, were committing constitutional violations that deprived criminal defendants of their constitutional right to a fair trial, he did not supervise, or require supervision of, prosecutors in connection with such functions.

547.    He and his designees kept no record of misconduct by individual prosecutors.

548.    He neither investigated nor disciplined prosecutors who violated rules designed to protect the fair trial rights of criminal defendants.

549.    He did not train prosecutors in such functions, even when he became aware or should have been aware of appellate decisions that showed the ECDA's policies, customs or practices were unlawful.

550.    The knowledge among ECDA prosecutors that there would be no personal consequence for them if they violated the due process and fair trial rights of criminal defendants encouraged prosecutors, including the prosecutor handling Mr. Boyd's case, to believe that such violations would go unpunished.

551.    The District Attorney's policy, custom, and/or practice of approval, ratification of, or deliberate indifference to, violations by ECDA prosecutors of their constitutional obligations to afford criminal defendants a fair trial foreseeably encouraged such violations to continue.

552.    Just four years before Mr. Boyd's prosecution was initiated, in *Giglio v. United States*, 405 U.S. 150 (1972), the United States Supreme Court held that a prosecutor's office is responsible for disclosing impeachment evidence known to members of the office even if the trial prosecutor in the given case is not aware of such evidence.

553.    The same rule applied to evidence known to police detectives who worked on the case.

554.    In the same decision, the Court advised district attorneys to adopt office-wide information-management systems to keep track of impeachment evidence to make sure that the assigned prosecutor would learn about it and disclose it.

555.    Nevertheless, the ECDA adopted no system of checklists, receipts, or other procedures to ensure that all investigative records of the BPD would be made available to the assigned prosecutor so that he could fulfill his *Brady* obligations.

556.    The absence of any such procedures created the predictable risk that, in a case like Mr. Boyd's, police records containing evidence favorable to the defense would not be obtained or disclosed.

557.    In *United States v. Agurs*, 427 U.S. 97 (1976), handed down while Mr. Boyd's case was awaiting trial, the United States Supreme Court explicitly held that prosecutors are required under *Brady* to disclose information favorable to the defense regardless of whether the defense had specifically requested such disclosure.

558.    This decision made clear that the ECDA policy, custom, or practice to withhold such material absent a specific request was unconstitutional, yet the District Attorney failed to train prosecutors about this decision or make clear that the policy, custom, or practice of the office in this regard had to change.

559.    As a result, Mr. Boyd's prosecutor, and the prosecutors involved in handling the trials of Messrs. Gibson, Walker and Martin, did not disclose evidence favorable to the defense unless it was specifically requested in a discovery motion or, under the ECDA's overly

restrictive view of the state *Rosario* obligation, had to be disclosed as a witness's formal, signed, prior-recorded statement.

560.     Court decisions before, during, and immediately after Mr. Boyd's trial revealed the misunderstanding of ECDA prosecutors regarding their *Brady* and related *Rosario* obligations and the ECDA's policy, custom, and practice to apply *Brady* and *Rosario* in an overly narrow manner.

561.     In *People v. Anderson*, 25 A.D.2d 602 (4th Dept. 1966), the Appellate Division unanimously reversed a defendant's felony assault conviction because of the prosecution's failure to disclose the testimony of the complainant and a second witness before a separate grand jury investigating a second defendant's involvement in the same incident.

562.     In *People v. Kampshoff,* 53 A.D.2d 325, 332 (4th Dept. 1976), the Appellate Division did not reverse, but it noted that—as in Mr. Boyd's case—the prosecution had failed to disclose a key witness's statements recorded in police reports.

563.     In *People v. Mitchell,* 99 Misc.2d 332 (Sup. Ct., Erie Co. 1979), a Supreme Court justice had to order the ECDA to disclose grand jury testimony where there was "no question" that it was "exculpatory."

564.     The court warned that "compliance with Brady cannot be made with clue-dangling or gamesmanship in place of full disclosure." *Id.* (quoting *People v. Bottom,* 76 Misc.2d 525, 529 (Sup. Ct., N.Y. 1974)).

565.     In *People v. Cadby,* 75 A.D.2d 713 (4th Dept. 1980), the Appellate Division held that the prosecution had impermissibly withheld the prior statement of a key witness, the complainant, recorded in a police report, evidently—as in Mr. Boyd's case—because it was not a signed statement.

566. The prosecution waited to disclose the statement until the defense elicited its existence from the prosecution's last witness, the police officer who had recorded it—too late to use it to cross-examine the declarant. The Appellate Division remanded the case for a hearing into how prejudicial the error was to the defendant's right to a fair trial.

567. In *Matter of Potenza v. Kane,* 79 A.D.2d 467 (4th Dept. 1981), a mistrial had to be declared because of the trial prosecutor's apparent negligence in failing to disclose a tape recording of the defendant.

568. In *People v. Clark,* 89 A.D.2d 820 (4th Dept. 1982), the Appellate Division did not reverse due to lack of sufficient prejudice, but it noted that the prosecution did not disclose exculpatory material until near the close of the People's direct case.

569. That the policy of the ECDA at the time of Mr. Boyd's trial was to achieve convictions at any cost and to tolerate, if not encourage, misconduct is shown by various circumstances that include, but are not limited to:

(a) the promotion of prosecutors to executive positions, and to handle the most significant of the office's trials, who had a reputation for and a history of such misconduct;

(b) the failure to adopt or utilize any manuals, rules, procedures, or training to prohibit or prevent such misconduct;

(c) the failure to take any disciplinary action when prosecutors committed misconduct or were found by courts to have done so, and

(d) the DA's brief on appeal defending ADA Drury's summation misconduct in Mr. Boyd's case and similar misconduct by prosecutors in other cases.

570.    This policy of deliberate indifference created an anything-goes or winning-is-everything mentality that was a substantial cause of the constitutional violations in Mr. Boyd's case and his resultant injuries.

571.    The District Attorney's blind eye to outrageous behavior by one of the county's most well-known prosecutors, ADA Albert M. Ranni, set the tone for the ECDA and revealed the DA's indifference to misconduct similar to that which led to Mr. Boyd's conviction.

572.    Mr. Ranni was notorious in the Buffalo criminal justice community for his overzealous and improper tactics.

573.    Nevertheless, the DA assigned him some of the most important cases in the office, appointed him chief of the felony bureau in 1973, and then promoted him to deputy DA in charge of prosecutions in 1982.

574.    His promotions and continuation as a high-level executive occurred notwithstanding his history of misconduct and a series of extraordinarily harsh court decisions condemning it.

575.    While Mr. Boyd's prosecution was pending in 1976, Mr. Ranni used pervasively improper tactics to obtain the conviction of a completely innocent man, J. L. Ivey, on three counts of murder and two counts of first-degree robbery.

576.    Mr. Ranni brought the case based upon patently improper eyewitness identifications by witnesses to whom the police repeatedly showed Mr. Ivey's photograph, even after they initially failed to recognize him and even though they had given descriptions of the perpetrator that did not fit Mr. Ivey's appearance.

- 78 -

577.    In overturning the conviction, the Appellate Division, in a unanimous decision by five justices, deplored Mr. Ranni's behavior throughout the trial.  *See People v. Ivey,* 83 A.D.2d 788 (4th Dept. 1981).

578.    It wrote that "the record is replete with numerous and repeated acts of improper and prejudicial conduct … which deprived the defendant of a fair trial."

579.    Writing that it would discuss just a few of Mr. Ranni's many acts of misconduct, the court noted that he repeatedly offered into evidence, in front of the jury, clearly inadmissible composite sketches that the court had ordered to be excluded, then made a "highly improper" argument to the jury "insinuat[ing] that the court's ruling unfairly precluded him" from offering such evidence.

580.    The court "condemn[ed] the prosecutor's inflammatory and prejudicial opening statement and summation," which tried to scare the jury that an acquittal "would mean that the 'murderer goes free,'" as well as his remarks to the jury implying "that he knew some things about the case he wished that they knew …"

581.    The court also "condemned" the prosecutor's "attempts in his summation to inject sympathy for the victim" and his "disparagement" of the defendant's alibi witnesses and his lawyer.

582.    Following the reversal of Mr. Ivey's conviction, new evidence emerged that someone else committed the crime, and he was fully acquitted at his retrial.

583.    Thereafter, the New York Court of Claims, finding by clear and convincing evidence that Mr. Ivey was innocent, awarded him substantial damages for the unjust conviction that Mr. Ranni's misconduct had brought about.

584.    There was no negative consequence to Mr. Ranni even though his egregious misconduct had caused the conviction, and years of imprisonment, of an innocent man, and cost the taxpayers the expense of a civil settlement.

585.    In 1977, the year that Mr. Boyd and his three friends were all tried for the Crawford Murder, Mr. Ranni used similar tactics to gain the conviction of Kenneth Johnson for robbery and rape.

586.    On appeal, all five justices of the Appellate Division condemned Mr. Ranni's behavior.  *See People v. Johnson*, 62 A.D.2d 555 (4th Dept. 1978).

587.    In a rare rebuke, the majority opinion of three justices called out Mr. Ranni by name in expressing their "concern with misconduct of Mr. Ranni throughout the trial" while warning, in an apparent indirect reference to the County, that "unadulterated unfairness and deceit have become the rule."

588.    The majority did not reverse the conviction because of the overwhelming evidence of the defendant's guilt, but in the dissenting opinion by Justice Hancock, he and Justice Witmer detailed the misconduct by Mr. Ranni that had disturbed the entire court.

589.    Justice Hancock wrote that "the record is … permeated with acts of improper, overreaching and prejudicial conduct by the prosecuting attorney … ."

590.    Justice Hancock recorded his and Justice Witmer's "particular disapproval" of Mr. Ranni accusing the defense of having "sugared up," "staged," and "rehearsed" the testimony of defense witnesses.  They condemned as "highly improper" his having accused the defendant of lying when he pleaded not guilty to unrelated charges—a formal process that occurs in virtually every criminal case—only to later admit guilt, and then argued in summation that the defendant's not guilty plea in the case at hand was similarly false:

"Now, the mere assertion of innocence isn't proof. You know now that this assertion, this claim is often made by guilty people to avoid justice. The defendant himself raised this claim on prior occasions: other crimes—not rape crimes—other crimes; pleaded not guilty."

591.  Justice Hancock disapproved of the prosecutor's tactics "in asking irrelevant questions of the defendant … which were obviously asked for their prejudicial effect," such as whether he remembered admitting to a judge in an unrelated case that he had "called the arresting officer … a 'motherfucker,'" and portraying the defendant as a "hard drug traffic[ker]" through repetitive questioning distorting his involvement in small marijuana sales.

592.  Finally, Justices Hancock and Witmer condemned Mr. Ranni for deriding defense counsel by calling him "Dr. Hocus Pocus" and saying that "the D.A. is not going to prosecute for perjury" because defense counsel's arguments had not been made under oath.

593.  Summing up, Justice Hancock wrote:

From the record there clearly emerges the picture of an overbearing prosecutor obsessed with the idea of obtaining a conviction at any costs, ignoring the court's rulings, deliberately asking improper and prejudicial questions, and engaging in unpardonable efforts in comments during the trial and in summation to disparage defense counsel and destroy his credibility with the jury.

594.  Subsequently, Federal District Judge John Elfvin, in *Johnson v. Smith*, CIV 81-329E, issued a rare grant of federal habeas corpus relief, vacating the defendant's conviction because Mr. Ranni's pervasive misconduct had violated his federal constitutional right to due process and a fair trial.

595.  Significantly, the court noted that the District Attorney's Office had conceded that Mr. Ranni's conduct had been "improper."

596.  Notwithstanding these decisions and his acknowledgment of Mr. Ranni's misconduct, the District Attorney permitted Mr. Ranni to continue to handle the most notorious

cases the office prosecuted, unrestrained by basic rules of fairness, and promoted him to Deputy

DA in charge of prosecutions.

597.    In the famous multiple-murder prosecution of Pvt. Joseph Christopher in the mid-

1980s, the Appellate Division affirmed the manslaughter conviction because of overwhelming

evidence of guilt but refused to "condone" Mr. Ranni's behavior.  *People v. Christopher*, 170

A.D.2d 1020 (4th Dept. 1991).  Noting that the State had conceded his misconduct, the court

wrote:

> [T]he Trial Assistant engaged in inappropriate and improper conduct during his
> cross-examination of a defense psychiatrist, his direct examination of the People's
> psychiatrist, and on summation. The Trial Assistant, whose misconduct has resulted
> in at least one reversal of a murder conviction by this Court *(see, People v. Ivey,* 83
> A.D.2d 788), consistently referred to matters not in evidence, made himself an
> unsworn witness, flouted rulings by the trial court on evidentiary matters, and made
> flippant remarks which detracted from the seriousness of the proceedings.

598.    Other prosecutors in the office, including in Mr. Boyd's case, engaged in

misconduct similar to Mr. Ranni's both before and immediately after Mr. Boyd's trial.

599.    The conduct, as well as the court decisions noting it, demonstrated the existence

of unlawful policies, customs and practices; the DA's failure to take any disciplinary or other

remedial action showed the ECDA's policy of deliberate indifference to such misconduct.

600.    In *People v. Moore,* 26 A.D.2d 902 (4th Dept. 1966), the Appellate Division

reversed the conviction and required a new trial because the prosecutor, during his summation,

improperly commented on the defendant's exercise of his constitutional right to remain silent

and "exceeded proper limits in telling the jury that if they wanted to live in a community where

crime runs rampant they should acquit the defendant."

601.    In *People v. Slaughter,* 28 A.D.2d 1082 (4th Dept. 1967), the court reversed a

murder conviction after the prosecutor, ridiculing the defendant's insanity defense, stated falsely

in summation that if the defendant was acquitted, he would be "on the streets again within 30 days," decried permissive societal attitudes, urged the jury not to "extend to the Henry Slaughters of the world the license to strike out and kill … or are you going to call them to task?  Are you going to protect, finally here, … the rights of the community in which you live."

602.     In *People v. Zachery,* 31 A.D.2d 732 (4th Dept. 1968), the Appellate Division reversed a robbery conviction due to the "prejudicial conduct of the prosecutor in calling to the witness stand a co-defendant with advance knowledge that he was going to invoke the privilege against self-incrimination and refuse to answer questions" and the "impropriety" in eliciting the out-of-court statement of a co-defendant incriminating the defendant.

603.     In *People v. Washington,* 32 A.D.2d 605 (4th Dept. 1969), the Appellate Division reversed a robbery conviction where the prosecutor improperly cross-examined the defendant repeatedly whether he had twice kicked a police officer in the groin, in an improper effort "to persuade the jury that defendant was an habitual groin kicker."

604.     In *People v. Damon,* 24 N.Y.2d 256 (1969), the Court of Appeals reversed a child sexual assault conviction because an Erie County prosecutor in summation argued that the defendant was "a homosexual or deviate," improperly vouched for the police while personally attacking defense counsel, falsely argued prejudicial "facts" that were not in evidence, and made inflammatory remarks to the jury about the nature of the crime.

605.     In *People v. Cardinale,* 35 A.D.2d 1073 (4th Dept. 1970), although the defendant was charged only with criminal contempt, the court reversed the conviction because of the prosecutor's "highly prejudicial" opening statement that the grand jury had heard evidence that the defendant, police officers, and public officials had been involved in a gambling conspiracy.

606.     In *People v. Reingold,* 44 A.D.2d 191 (4th Dept. 1974), the Appellate Division reversed a burglary conviction because the prosecutor, in bad faith, cross-examined the defendant to show he had a criminal propensity in a manner that was "so improper and inflammatory that it made an impartial consideration of the competent evidence adduced at trial virtually impossible."

607.     In *People v. Ketchum*, 35 N.Y.2d 740 (1974), the Court of Appeals noted "grievous misconduct by the prosecution in cross-examination and summation which we strongly condemn."

608.     In *People v. Greer,* 49 A.D.2d 297, 303-04 (4th Dept. 1975), the court reversed a rape conviction because of the prosecutor's "improper" cross-examination of the defendant impermissibly intended to show his criminal propensity.

609.     In *People v. Donaldson,* 49 A.D.2d 1004 (4th Dept. 1975), the Appellate Division, in reversing the conviction, condemned the prosecutor for arguing improper inferences from hearsay evidence, improperly arguing a negative inference against the defendant for exercising his constitutional right not to testify, and for his "entirely improper and prejudicial" urging of the jury to credit the testimony of a prosecution witness with a long criminal record because the *grand jury* had believed him.

610.     In *People v. Balsano,* 51 A.D.2d 130 (4th Dept. 1976), the court reversed a conviction for unlawful imprisonment where, among other things, the prosecutor improperly questioned the defendant about criminal conduct not related to his credibility, improperly elicited that he had a pending charge, improperly asked the jury to draw a negative inference from the defendant's failure to call a witness, and repeatedly forced the defense to object to "inflammatory" remarks, causing the trial judge to "properly admonish[] the prosecutor."

611.    In *People v. Weston,* 51 A.D.2d 881 (4th Dept. 1976), the Appellate Division

reversed a conviction for burglary, rape, and robbery because the prosecutor cross-examined the

defendant in bad faith about his criminal propensity.  The court also agreed with the defendant's

condemnation of the prosecutor's "inflammatory and intimidating" remarks in summation and

admonished him not to "put his personal credibility behind his statements and make himself an

'unsworn witness.'"

612.    In *People v. Mordino,* 58 A.D.2d 197 (4th Dept. 1977), the Appellate Division

reversed a high-profile, organized crime related murder conviction obtained in 1975 because,

among other things, the prosecutor gave an "inflammatory" summation during which he

improperly castigated the defendants as "vultures" and argued their guilt by association ("if you

walk like a duck and you talk like a duck and you keep the company of ducks then you are a

damn duck").

613.    In *Robinson v. Smith,* 451 F. Supp. 1278 (W.D.N.Y. 1978) (Curtin, C.J.), a federal

court vacated a murder conviction that the ECDA obtained through its knowing use of a

confession that Buffalo police coerced from a suspect by falsely claiming an accomplice had

confessed "in an obvious effort to trick him into implicating himself and others.  This police

practice is to be soundly condemned.  Such deception clearly has no place in our system of

justice."

614.    In *People v. Keller,* 67 A.D.2d 153 (4th Dept 1979), the Appellate Division

unanimously reversed an assault and weapons conviction due to pervasive misconduct by an

ECDA prosecutor.

615.    In an unanimous opinion by five justices, the *Keller* court condemned the

prosecutor for his "egregious errors" and "grossly improper remarks" in repeatedly referring to

the defendant and his witnesses as liars, repeatedly expressing his personal opinion about witnesses' credibility, implying in summation there was a lie detector test and other evidence the jury had been prevented from hearing, and making various "irrelevant and inflammatory" remarks which, in their totality, "patently deprived the defendant of a fair trial … ."

616.    In *People v. King,* 72 A.D.2d 930 (4th Dept. 1979), the Appellate Division, while reversing an attempted robbery conviction because of the misconduct of the trial judge, noted that the prosecutor joined him in some of it, including holding *ex parte* "conferences … outside of the presence of defense counsel."

617.    In *Matter of Potenza v. Kane,* 79 A.D.2d 467, 472 (4th Dept. 1981), while refusing, following a mistrial, to bar a second trial on the basis of pervasive prosecutorial misconduct, the Appellate Division noted that many of the defense counsel's objections to the prosecutor's improper opening statement had been sustained and the court had "minimized the possible prejudice by admonishing the prosecutor before the jury."  The Appellate Division also noted that it did not "condone" the prosecutor's repeated failure to follow the court's warning against leading questions.

618.    In *People v. Terry,* 83 A.D.2d 491 (4th Dept. 1981), the Appellate Division reversed a robbery conviction in part because of the prosecutor's "totally improper" argument that the jury should hold against the defendant his failure to produce to testify as an alibi witness a government employee whose identity was unknown to him.

619.    In *People v. Mordino,* 83 A.D.2d 775 (4th Dept. 1981), the court declined to reverse a murder conviction for prosecutorial misconduct, but only because defense counsel did not object to many of the improper questions, where the defense did object the court gave

"curative" instructions to prevent prejudice, and the conduct was not "*egregiously* improper …
as would warrant a reversal" (emphasis added).

620. In *People v. Vance,* 89 A.D.2d 347 (4th Dept. 1982), the Appellate Division
reversed a robbery conviction because the prosecutor acted as an investigator and then asked the
jury to credit his personal investigative findings over the defense case. The court concluded: "In
a case such as this where credibility is the only issue, a prosecutor who oversteps the bounds of
legitimate advocacy and makes himself an 'unsworn witness' against the defendant affects the
fairness of the trial and unduly prejudices the defendant."

621. In *People v. Herlan,* 99 A.D.2d 647 (4th Dept. 1984), the court reversed a burglary
conviction because the prosecutor repeatedly questioned the defendant during cross-examination
about "why would a police officer of sixteen years risk his pension to perjure himself in court
over you? Any reason?" and made similar improper arguments during summation.

622. In *People v. Grafton,* 115 A.D.2d 952 (4th Dept. 1985), the Appellate Division
affirmed an order dismissing a rape indictment because the prosecutor, in the grand jury,
"introduced irrelevant and prejudicial evidence … , intimidated witnesses whose testimony
would have been helpful to defendant, asked witnesses irrelevant and improper questions of a
highly personal nature in an effort to embarrass them, and deliberately confused and deceived
witnesses and the Grand Jury by selective presentation of evidence."

623. The misconduct of three different homicide prosecutors during the four trials
related to the Crawford Murder further showed the existence of unlawful policies, customs, and
practices at the ECDA regarding *Brady* disclosure, the use of false, misleading, and
inflammatory evidence and argument to deny criminal defendants their right to a fair trial, and
the District Attorney's tolerance of such unlawful behavior.

624. The first of Mr. Boyd's co-defendants to be tried was Darryn Gibson, who was brought to trial on January 10, 1977.

625. Prior to his trial, Mr. Gibson's defense counsel made only a general request that the ECDA produce all *Brady* material but did not make specific requests such as for photographs or witness statements favorable to the defense.

626. ADA Drury prosecuted Mr. Gibson's case.

627. He was one of the District Attorney's top trial prosecutors who handled some of the ECDA's most important cases.

628. Thus, his pervasive misconduct in the Gibson and Boyd prosecutions is highly probative of the unlawful policies, customs, practices and behavior that the District Attorney approved of or consciously tolerated.

629. Consistent with the policies, procedures, practices, and/or customs of the ECDA, ADA Drury, with regard to the Gibson trial:

    (a)    did not turn over any statements, reports, photographs, or other documentary evidence, favorable to the defense under *Brady*, in advance of the trial;

    (b)    only disclosed the formal, sworn statements in question-and-answer format of testifying witnesses, but not oral statements summarized in police reports, even where such statements were exculpatory or impeaching;

    (c)    did not disclose statements until the end of each witness's direct examination, which deprived defense counsel of the ability to investigate the information, to integrate it into a defense strategy, to use it during his

opening statement, or to fully prepare to use it during his cross-examination of the witness;

(d)     did not disclose the statements of non-testifying witnesses that were favorable to the defense; and

(e)     only disclosed the photographs and other items of evidence that the prosecution used in its direct case, but not other photographs that tended to contradict the prosecution's case.

630.     During the Gibson trial, Mr. Gibson's defense counsel became aware through cross examination of Larry Watson that this witness had given another statement to the BPD, which ADA Drury had not disclosed and pressed for disclosure of the report that summarized such statement.

631.     Rather than agree to provide it, ADA Drury initially suggested that the defense, by not having previously requested the report, had waived any right to disclosure, even though the defense had not known about it.

632.     Continuing to resist disclosure, he said further that, before agreeing to disclose the police report, he would have to check with his office's appellate section.

633.     However, the court directed him to make disclosure.

634.     ADA Drury then belatedly disclosed to Mr. Gibson's defense counsel a single police report summarizing one of Mr. Watson's prior statements, but not all of Mr. Watson's prior statements, even though the undisclosed statements contradicted his trial testimony and tended to incriminate him in the murder itself.

635.     Nor did ADA Drury disclose the statements of other witnesses tending to implicate Mr. Watson in the murder.

636.    Even as to the statement he did disclose, it was too late for defense counsel to incorporate the information into his overall defense theory or even to utilize it during cross-examination:  Mr. Watson already had completed his testimony.

637.    Caught having failed to disclose statements in police reports that were not in question-and-answer form and under oath, ADA Drury then belatedly disclosed additional police reports dated February 11, 1976, containing the unsigned statements of Messrs. Woodruff and Hough on that date, and the police report containing the exculpatory statement of Shirley Floyd that the boys were playing cards at her apartment the night of the Crawford Murder.

638.    He acknowledged that these reports likely constituted *Brady* material.

639.    He blamed his late disclosure of them on his having only just received them from the BPD, even though the case had been pending for a year.

640.    However, ADA Drury did not disclose the rest of the *Brady* material in his and/or the BPD's possession contradicting or impeaching Messrs. Woodruff and Hough, showing the coercive behavior of the detectives, and inculpating third party suspects Larry Watson and Jerome Boyd.

641.    After the trial, he took all witness statements back, making sure they would not be disclosed to Mr. Gibson's co-defendants.

642.    During his summation, ADA Drury, despite his knowledge of the fundamental rules regarding advocacy, violated most of them.

643.    He misrepresented that Mr. Woodruff was questioned about the murder and admitted his participation in the presence of his father and his minister, when in fact, undisclosed police reports showed the young man had been coercively interrogated on January 12, 1976, alone, for hours.

- 90 -

644.     He falsely represented that Mr. Woodruff's questioning "never occurred under police pressure."

645.     He falsely represented that "all the paper work and everything else concerned with this was furnished to this defense counsel," even though he knew, or should have known, that numerous police documents had been withheld from the defense, including reports that were obviously favorable to the defense under *Brady*.

646.     He argued to the jury the truthfulness of Mr. Watson's testimony that Mr. Watson had run to his home, abandoning Mr. Crawford because he had seen the door to his house open, without disclosing Mr. Watson's inconsistent statements on this issue and any of the additional witness statements circumstantially inculpating Mr. Watson in the murder itself.

647.     Mr. Gibson was convicted of second-degree murder on January 21, 1977.

648.     When Mr. Boyd was then brought to trial later in 1977, ADA Drury, who handled that trial as well, did *not* disclose the police reports that he had belatedly disclosed to Mr. Gibson's counsel and then demanded back, let alone the additional *Brady* material he had fully withheld from Mr. Gibson.

649.     Of the statements he did disclose, he did so only after the witness had completed his or her direct examination, thereby depriving the defense of the opportunity to put such material to full use.

650.     Mr. Drury also made a slew of improper arguments during his summation that denied Mr. Boyd his right to a fair trial, *see* ¶¶ 375-391, *supra,* which the DA then ratified by defending on appeal as "proper in all respects."

651.    Two other prosecutors, ADAs James Verrastro and David Henry, handled the trial prosecution of Mr. Boyd's friend, John Walker, beginning June 6, 1977, and Floyd Martin's case later the same year.

652.    Like ADA Drury and other prosecutors in the office, their practice, too, was to not disclose prior witness statements until after the witness testified on direct and even then only disclosed formal, signed statements.  They, too, did not disclose statements or evidence, even though such materials favored the defense under *Brady,* if the witness did not testify or the statement or evidence was not specifically requested by the defense.

653.    Accordingly, ADAs Verrastro and Henry withheld the same material and evidence at the Walker and Martin trials that ADA Drury had withheld at Mr. Boyd's trial, with one exception.

654.    After counsel for Floyd Martin specifically demanded disclosure of all crime scene photographs, not just the ones the prosecution was itself using, the prosecutors disclosed the two additional photographs, which had been withheld during the prior three trials, to Mr. Martin's attorney.

655.    During the Walker trial, ADA Henry continued the pattern of ECDA prosecutors making false, misleading, or otherwise improper summation arguments that exploited the office's *Brady* violations and denied Mr. Walker a fair trial.

656.    He went outside the trial record to represent that Andre Hough's statements all were "the same," even though he knew that Mr. Hough not only had made various inconsistent statements but also had recanted more than once.

- 92 -

657.     He represented that Mr. Hough had no motive or other reason to lie when he knew or should have known that police had threatened him with arrest and prosecution for the murder and otherwise coerced him.

658.     He contended that Mr. Woodruff had no motive to lie, and that he had implicated himself and the others purely out of conscience ("maybe it got to him"), when he knew or should have known that Mr. Woodruff only changed his story after being threatened with life imprisonment but was then lured with a promise, which was realized, of complete immunity.

659.     He argued that the witnesses, including Messrs. Woodruff and Hough, had been separated and could not possibly have conformed their stories, despite knowing that, as revealed in the police reports of February 11, 1976, two detectives, purportedly at ADA Drury's direction, had shuttled between Messrs. Hough and Woodruff to make sure they did conform their stories.

660.     Mr. Walker was convicted of second-degree murder and first-degree robbery on April 29, 1977.

661.     The fourth of the co-defendants brought to trial was Floyd Martin.  Mr. Martin's trial commenced on July 6, 1977.

662.     Mr. Martin was represented by defense counsel James A.W. McLeod.

663.     ADAs Verrastro and Henry prosecuted the case.

664.     Based upon the crime scene photographs that Mr. McLeod had received, which the other defendants had not, as well as the testimony that Mr. Watson was the last person seen with Mr. Crawford before he was murdered, Mr. McLeod contended that Mr. Watson was the likely killer.

665.     Unbeknownst to counsel, police records contained powerful additional evidence supporting this theory, but Mr. McLeod did the best he could with the limited evidence that had been disclosed to him.

666.     It was enough.  On July 14, 1977, the jury acquitted Mr. Martin.

667.     None of the prosecutors in any of the cases discussed in ¶¶ 561-622 were properly supervised by the DA or other executives, nor were any investigated or disciplined for the misconduct after the misconduct was complained about by the defense and/or substantiated by court decisions.

668.     Policymakers' deliberate indifference created an anything-goes or winning-is-everything atmosphere which was a substantial cause of the violation of Mr. Boyd's constitutional rights and of his injuries and damages.

669.     The aforesaid deliberate or de facto policies, procedures, practices and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for the Defendant County, including, but not limited to, the District Attorney and his delegates, who knew:

(a)     to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)     that such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

(c)     that employees facing such issues have strong incentives to make the wrong choices, especially given the pressure the ECDA places on prosecutors to win convictions at any cost;

     (d)    that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of the accused and cause him constitutional injury; and

     (e)    that employees of the ECDA had a history of making wrong choices in such matters.

670.    The aforesaid policies, procedures, regulations, practices, and/or customs of the ECDA were, collectively and individually, a substantial factor in bringing about the aforesaid violations of Mr. Boyd's rights under the Constitution and laws of the United States and in causing his damages.

671.    By virtue of the foregoing, the Defendant County is liable for the violation of Mr. Boyd's constitutional rights pursuant to 42 U.S.C. § 1983 and his resultant injuries.

## COUNT VIII
**Municipal Liability Against the City of Buffalo for Its Negligent Failure to Properly Hire, Train, Supervise and Discipline the BPD Detectives Who Investigated Plaintiff and Caused His Arrest and Prosecution**

672.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 500 of this Complaint.

673.    By virtue of the foregoing, the Defendant City is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees with regard to their aforementioned duties, which was a substantial cause of the Individual Defendants' wrongful conduct and the injuries suffered by Plaintiff.

## COUNT IX
**Negligent Infliction of Emotional Distress (Individual Defendants and City of Buffalo)**

674.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 500 of this Complaint.

- 95 -

675.    The Individual Defendants breached a duty of care owed to Plaintiff, which unreasonably endangered his physical safety and caused him to fear for his physical safety.

676.    Defendants' conduct was extreme and outrageous.

677.    Defendants' conduct caused Plaintiff to suffer serious bodily injuries in county jail and/or prison and severe emotional distress.

678.    The Defendant City is liable under the doctrine of *respondeat superior*.

### COUNT X
**Municipal Liability Against the County of Erie for Its Negligent Failure to Properly Hire, Train, Supervise and Discipline the ECDA Prosecutors Who Investigated and/or Prosecuted Plaintiff and Caused His Wrongful Prosecution and Conviction**

679.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 438 and 501-671 of this Complaint.

680.    By virtue of the foregoing, the Defendant County is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees with regard to their aforementioned duties, which was a substantial cause of the wrongful conduct and of the injuries that were suffered by Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Boyd demands judgment against Defendants as follows:

(a)    compensatory damages for the damages described above of not less than $84,000,000;

(b)    punitive damages of not less than $28,000,000;

(c)    reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

(d)    pre-judgment interest as allowed by law; and

(e)    such other and further relief as this Court may deem just and proper.

/s/ Joel B. Rudin
_____
JOEL B. RUDIN
DAVID E. RUDIN
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com
david@rudinlaw.com


/s/ Ross E. Firsenbaum
_____
ROSS E. FIRSENBAUM
RYANNE E. PERIO
GIDEON A. HANFT (*pro hac vice*)
PHOEBE SILOS (*pro hac vice*)
ERIN HUGHES (*pro hac vice*)
Wilmer Cutler Pickering
      Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
ross.firsenbaum@wilmerhale.com
ryanne.perio@wilmerhale.com
gideon.hanft@wilmerhale.com
phoebe.silos@wilmerhale.com
erin.hughes@wilmerhale.com


/s/ Timothy W. Hoover
_____
TIMOTHY W. HOOVER
SPENCER L. DURLAND
Hoover & Durland LLP
561 Franklin Street
Buffalo, NY 14202
(716) 800-2600
hoover@hooverdurland.com
sdurland@hooverdurland.com

*Attorneys for Plaintiff Darryl Boyd*

Dated:        New York, New York
              March 13, 2023

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN WALKER, JR. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| - against - | ) |
| | ) |
| THE CITY OF BUFFALO; THE COUNTY | ) |
| OF ERIE; MICHAEL G. GUADAGNO; | ) |
| JOHN MONTONDO; LINDA J. FIAL AS | ) |
| EXECUTOR FOR THE ESTATE OF | ) |
| ROBERT GRABOWSKI; MARTIN | ) |
| BULLOCK AS EXECUTOR FOR THE | ) |
| ESTATE OF JAMES E. HUNTER; | ) |
| JENNIFER G. FLANNERY AS | ) |
| ADMINISTRATOR FOR THE ESTATE OF | ) |
| ROBERT F. ARNET; JENNIFER G. | ) |
| FLANNERY AS ADMINISTRATOR FOR | ) |
| THE ESTATE OF FRANK C. DEUBELL; | ) |
| JENNIFER G. FLANNERY AS | ) |
| ADMINISTRATOR FOR THE ESTATE OF | ) |
| LEO J. DONOVAN; JENNIFER G. | ) |
| FLANNERY AS ADMINISTRATOR FOR | ) |
| THE ESTATE OF FRANCIS M. MANISTA, | ) |
| JR.; AND DAWN M. DIRIENZO AS | ) |
| EXECUTOR FOR THE ESTATE OF PAUL | ) |
| R. DELANO, | ) |
| | ) |
| Defendants. | ) |

Index No. 22-cv-520

**AMENDED COMPLAINT AND**
**JURY DEMAND**

<br>

**LAW OFFICES OF JOEL B. RUDIN, P.C.**

Joel B. Rudin
David E. Rudin
152 West 57th St.
New York, NY 10019
jbrudin@rudinlaw.com
david@rudinlaw.com
Telephone: (212) 752-7600
Fax: (212) 980-2968

***Attorneys for Plaintiff John Walker, Jr.***

**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**

Ross E. Firsenbaum
Ryanne E. Perio
Gideon A. Hanft (*pro hac vice*)
Phoebe Silos (*pro hac vice*)
Erin Hughes (*pro hac vice*)
7 World Trade Center
250 Greenwich St.
New York, NY 10007
ross.firsenbaum@wilmerhale.com
ryanne.perio@wilmerhale.com

**HOOVER & DURLAND LLP**

Timothy W. Hoover
Spencer L. Durland
561 Franklin St.
Buffalo, NY 14202
thoover@hooverdurland.com
sdurland@hooverdurland.com
Telephone (716) 800-2600

*Attorneys for Plaintiff John Walker, Jr.*

gideon.hanft@wilmerhale.com
phoebe.silos@wilmerhale.com
erin.hughes@wilmerhale.com
Telephone: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Plaintiff John Walker, Jr.*

# Table of Contents

I. INTRODUCTION .................................................................................................1

II. PARTIES........................................................................................................3

III. JURISDICTION, VENUE, AND CONDITIONS PRECEDENT.............................5

IV. JURY DEMAND ...............................................................................................5

V. FACTUAL ALLEGATIONS ..............................................................................6

    A.      THE MURDER OF WILLIAM F. CRAWFORD ............................................6

    B.      THE BPD INVESTIGATION POINTS TO LARRY WATSON AND A POTENTIAL ACCOMPLICE AS THE PERPETRATORS.............................7

    C.      THE BPD INVESTIGATES MR. WALKER AND FOUR OTHER BLACK TEENAGERS, BUT FINDS EVIDENCE CORROBORATING THEIR CONSISTENT STATEMENTS THAT THEY WERE NOT INVOLVED IN THE MURDER ...............................................................................17

    D.      THE BPD COERCES 15-YEAR-OLD ANDRE HOUGH TO FALSELY IMPLICATE MR. WALKER AND HIS FOUR FRIENDS FOR THE CRAWFORD MURDER...............................................................23

    E.      THE BPD COERCES 17-YEAR-OLD TYRONE WOODRUFF TO FALSELY IMPLICATE MR. WALKER AND THE OTHERS FOR THE CRAWFORD MURDER...............................................................25

    F.      THE BPD ARRESTS MR. WALKER BASED ON THE FALSE, COERCED TESTIMONY OF MESSRS. WOODRUFF AND HOUGH.......30

    G.      ADDITIONAL INVESTIGATION FURTHER UNDERMINES THE DETECTIVES' FLAWED CASE AGAINST MR. WALKER .....................33

    H.      MESSRS. WOODRUFF AND HOUGH BOTH RECANT BEFORE TESTIFYING IN THE GRAND JURY BUT DETECTIVES COERCE THEM INSTEAD TO EXPAND THEIR FALSE STORIES ........................35

    I.      THE DEFENDANTS MISLEAD THE GRAND JURY, CAUSING IT TO WRONGFULLY INDICT MR. WALKER.....................................................41

    J.      PLAINTIFF JOHN WALKER IS TRIED AND CONVICTED BASED ON COERCED FALSE TESTIMONY, WITHOUT THE BENEFIT OF UNDISCLOSED BRADY MATERIAL .......................................................43

    K.      THE ECDA OPPOSES MR. WALKER'S EFFORTS TO OVERTURN HIS CONVICTION .................................................................................47

    L.      THE COURT VACATES MR. WALKER'S WRONGFUL CONVICTION....................................................................................50

VI. MR. WALKER'S DAMAGES...........................................................................51

CAUSES OF ACTION ............................................................................................52

COUNT I

Malicious Prosecution (Federal Claim) ......................................................................................... 52

COUNT II

Malicious Prosecution (State Claim) ............................................................................................. 53

COUNT III

Evidence Fabrication (Federal Claim) .......................................................................................... 54

COUNT IV

Wrongful Pretrial Withholding of Exculpatory Evidence ("Russo" Claim Under Federal Law) .............. 55

COUNT V

*Brady* Claim (Federal Law) .......................................................................................................... 56

COUNT VI

*Monell* Claim Under Federal Law Against City of Buffalo for Policies of the Buffalo Police Department .......................................................................................................................... 58

COUNT VII

*Monell* Claim Under Federal Law Against the County of Erie for Policies of the Erie County District Attorney ........................................................................................................................ 65

COUNT VIII

State Law Claim for Negligent Failure of City of Buffalo to Properly Hire, Train, Supervise, and Discipline the Police .......................................................................................................... 97

COUNT IX

State Law Claim for Negligent Infliction of Emotional Distress ................................................. 97

COUNT X

State Law Claim for Negligent Failure of Erie County to Properly Hire, Train, Supervise, and Discipline Employees of the District Attorney's Office ................................................................ 98

PRAYER FOR RELIEF ................................................................................................................. 98

Plaintiff John Walker, Jr., by and through his attorneys, The Law Offices of Joel B. Rudin, P.C., and Wilmer Cutler Pickering Hale and Dorr LLP, respectfully alleges as follows:

I. **INTRODUCTION**

1.     This civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and New York State law, seeks monetary damages for the extraordinary injuries and harm suffered by John Walker, Jr., who was wrongfully prosecuted, convicted, and imprisoned for more than 22 years for a robbery and murder that he did not commit.

2.     On August 18, 2021, after Mr. Walker spent more than 22 years incarcerated and another 17 years on parole for the January 2, 1976, murder of William Crawford in Buffalo, New York (the "Crawford Murder"), the New York Supreme Court, County of Erie (the "State Supreme Court") vacated Mr. Walker's convictions for second-degree murder and first-degree robbery.

3.     Specifically, following an evidentiary hearing on Mr. Walker's motion to vacate his conviction, the State Supreme Court found that the prosecution had not disclosed to Mr. Walker's trial counsel crime scene photographs that both (a) contradicted the prosecution's theory of the crime presented at trial, and (b) pointed to another individual, Mr. Crawford's neighbor, as the actual perpetrator.  This non-disclosure violated Mr. Walker's constitutional right to a fair trial.

4.     These undisclosed crime scene photographs, however, were hardly the only factor that led to Mr. Walker's wrongful conviction and 22-year imprisonment.  The egregious misconduct perpetrated against Mr. Walker by the defendants to this lawsuit spanned the course of 45 years—Mr. Walker's entire adult life.  It included the relentless, bad-faith pursuit of his

- 1 -

case by Detectives Guadagno, Montondo, Deubell, Grabowski, Hunter, Arnet, Deubell, Manista, Delano, and others, and by Chief Donovan.  They coerced vulnerable witnesses to provide false statements against Mr. Walker and failed to turn over multiple items of evidence favorable to the defense, known as *Brady* material, to prosecutors, which resulted in such evidence not being disclosed to the defense.  And the misconduct also included the suppression by prosecutors of *Brady* material of which they knew or should have known, which similarly contributed to the denial of Mr. Walker's constitutional right to a fair trial.

5.      All of this was in a case in which there was zero physical evidence linking Mr. Walker to the Crawford Murder.  It was in a case where the main evidence against him was the contradiction-riddled testimony of two minors, both of whom originally told the police that they knew nothing about the murder but whom police then coerced to change their stories.

6.      Moreover, it was in a case where there was substantial evidence—which law enforcement authorities suppressed—pointing to two other individuals as the perpetrator or perpetrators as opposed to Mr. Walker and his teenage friends.  The primary alternative suspect, the victim's neighbor and the last person known to have seen Mr. Crawford before his murder, Lawrence "Larry" Watson, spoke to police detectives reinvestigating the case in 2019.

7.      The detectives asked Mr. Watson about Mr. Walker and his friends and what happened on the night in question.  Nearing death, Mr. Watson told the detectives: "They didn't do it."

8.      This statement was never disclosed to Mr. Walker prior to this civil litigation.

9.      Instead of prohibiting or discouraging the type of illegal behavior that occurred in this case, the policies, customs, and practices of the City of Buffalo Police Department (the

"BPD") and the Erie County District Attorney's Office (the "ECDA") permitted, encouraged, and in certain instances required it.

10. If not for the misdeeds of Defendants, Mr. Walker would not have been prosecuted, convicted, and imprisoned in violation of his constitutional rights, and would not have spent 45 years asserting his innocence and fighting for his liberty in connection with a crime that he did not commit.

11. This lawsuit seeks to hold accountable the government entities and individuals, or their estates, who are responsible for destroying Mr. Walker's life, and to recover from them compensation, as well as punitive damages, for Mr. Walker's grievous injuries.

## II. **PARTIES**

12. Plaintiff John Walker is a 63-year-old man who resides in Buffalo, New York.

13. Defendant City of Buffalo (the "City") is a municipal corporation of the State of New York and a resident of the Western District of New York. The BPD is an agency of the City for whose torts the City is responsible.

14. Defendant County of Erie (the "County") is a municipal corporation of the State of New York and a resident of the Western District of New York. The ECDA is an agency of the County for whose torts the County is responsible.

15. Defendant Michael G. Guadagno at all relevant times was a detective employed by the BPD acting within the scope of his employment and under color of law. He is sued in his individual and official capacities.

16. Defendant John Montondo at all relevant times was a detective employed by the BPD acting within the scope of his employment and under color of law. He is sued in his individual and official capacities.

17.     Defendant Martin Bullock is the Executor for the Estate of James E. Hunter.  At all relevant times, Mr. Hunter was a detective employed by the BPD acting within the scope of his employment and under color of law.  Mr. Bullock is sued in his individual and official capacities.

18.     Defendant Linda J. Fial is the Executor for the Estate of Robert Grabowksi.  At all relevant times, Mr. Grabowski was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Fial is sued in her individual and official capacities.

19.     Defendant Jennifer G. Flannery is the Administrator for the Estate of Robert F. Arnet.  At all relevant times, Mr. Arnet was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Flannery is sued in her individual and official capacities.

20.     Defendant Jennifer G. Flannery is the Administrator for the Estate of Frank C. Deubell.  At all relevant times, Mr. Deubell was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Flannery is sued in her individual and official capacities.

21.     Defendant Jennifer G. Flannery is the Administrator for the Estate of Leo J. Donovan.  At all relevant times, Mr. Donovan was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Flannery is sued in her individual and official capacities.

22.     Defendant Jennifer G. Flannery is the Administrator for the Estate of Francis M. Manista, Jr.  At all relevant times, Mr. Manista was a detective employed by the BPD acting within the scope of his employment and under color of law.  Ms. Flannery is sued in her individual and official capacities.

- 4 -

23. Defendant Dawn M. Dirienzo is the Executor for the Estate of Paul R. Delano. At all relevant times, Mr. Delano was a detective employed by the BPD acting within the scope of his employment and under color of law. Ms. Dirienzo is sued in her individual and official capacities.

## III. JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

24. This Court has jurisdiction under 28 U.S.C. § 1331 over claims arising under 42 U.S.C. §§ 1983 and 1988 and under 28 U.S.C. § 1343 over claims arising under the common law of the State of New York.

25. Venue is proper in the Western District of New York under 28 U.S.C. § 1391(b) because that is the judicial district in which Mr. Walker's claims arose.

26. On or about December 15, 2021, Plaintiff served the City and the County timely notices of the present claims under New York State law, in accordance with N.Y. Gen. Mun. Law § 50-e.

27. The City and the County did not within 90 days of service of such notices schedule, and therefore waived their right to, an examination of Mr. Walker under N.Y. Gen. Mun. Law § 50-h.

28. Mr. Walker has duly complied with all conditions precedent to the commencement of this action.

## IV. JURY DEMAND

29. Pursuant to the Seventh Amendment of the United States Constitution and Article I, Section 2 of the New York Constitution, Mr. Walker requests a jury trial on all issues and claims set forth in this Complaint.

## V.    FACTUAL ALLEGATIONS

### A.    THE MURDER OF WILLIAM F. CRAWFORD

30.    At approximately 11:30 p.m. on January 2, 1976, 62-year-old William F. Crawford was brutally murdered outside his home at 2041 Fillmore Avenue in Buffalo, New York.

31.    Mr. Crawford had spent several hours drinking that day at a neighborhood tavern called the Golden Nugget, which was located directly across the street from his house on Fillmore Avenue.  Mr. Crawford regularly drank at the Golden Nugget.

32.    Mr. Crawford was at the Golden Nugget with his neighbor, Lawrence "Larry" Watson, Larry's wife Julia Watson, and Julia's son William "Bill" Howard.

33.    The Watsons lived at 2049 Fillmore Avenue, two houses north from Mr. Crawford's house.

34.    Mr. Crawford purchased rounds of drinks for the group and, in the process of paying for them, displayed a significant amount of cash—approximately $300 in tens and twenties.

35.    The barmaid, Debbie Jeffrey, instructed Mr. Crawford to put his money away, as the Watsons and Mr. Howard, who were sitting with him at the bar, had observed it.

36.    At approximately 11:30 p.m., Ms. Jeffrey suggested that Mr. Crawford go home, as he was intoxicated.

37.    Typically, Ms. Jeffrey or the owner of the Golden Nugget would walk Mr. Crawford across the street to his house after he became drunk, but on that evening, the tavern was crowded, and neither was able to escort Mr. Crawford home.

38.    Mr. Watson offered to walk Mr. Crawford home, and the two left the Golden Nugget together.

39.     At approximately 1:00 a.m. on the morning of January 3, Margaret Crawford, Mr. Crawford's wife, became concerned that her husband had not returned home yet.  She went downstairs and looked out the side door into the driveway, where she saw her husband lying in the driveway in the snow next to the side door, apparently unconscious.  She called 911 for help.

40.     Medics transported Mr. Crawford to Sisters of Charity Hospital, where he was pronounced dead.  He had been beaten to death with a blunt instrument and apparently robbed of his wallet.

### B.     THE BPD INVESTIGATION POINTS TO LARRY WATSON AND A POTENTIAL ACCOMPLICE AS THE PERPETRATORS

41.     The BPD Homicide Unit began investigating in the early morning hours of January 3, 1976.

42.     Pursuant to its usual practice, the Homicide Unit did not assign any one detective to officially lead the investigation but worked collectively under the supervision of the Chief of Homicide, Leo J. Donovan.

43.     Detectives, including those named in this lawsuit, worked collaboratively as a team, exchanging information with each other and reporting all developments to Donovan.

44.     Detectives Paul Delano and Gerald Dove were the first detectives to report to the crime scene.

45.     They observed a large pool of blood close to the side door of the house, where Mr. Crawford's body was found, as well as a few drops of blood on the side of the house by the side door.  The side door was approximately 35 feet up the driveway from the sidewalk.

46.     Detectives Delano and Dove also noted in their report that a bloodstained hat had been found alongside the victim's body and placed inside the hall door by the ambulance attendant.

47.     While at the crime scene, Detectives Delano and Dove interviewed the victim's widow, Margaret Crawford.

48.     Ms. Crawford reported that she became concerned when her husband did not "ring the bell" for her to come unlock the side door for him.

49.     She said this was their custom when he was out drinking—evidently, he would not bring his own keys.

50.     When she went downstairs to check the door, she found her husband lying in the driveway and called 911.

51.     Detectives Delano and Dove next reported to Sisters Hospital, where they observed Mr. Crawford's body.

52.     They noted in their police report that a set of keys were found on the body.

53.     The keys were never vouchered.

54.     There is no record of an investigation into the owner of the keys.

55.     There is no record of what happened to the keys.

56.     Detectives Delano and Dove returned to the crime scene, where an experienced police photographer, Alfred Hauser, met them.

57.     The photographer documented the areas pertinent to the investigation, including the street, the sidewalk, the house, the driveway, and the backyard.

58.     The large pool of blood that the photographer observed and photographed was located well up the driveway, on the ground or on the side of the house next to the side door where Mr. Crawford's body was found.

59.     The photographer did not document any signs of a struggle on the sidewalk in front of the house or at the bottom of the driveway.

60.     His photographs showed that there was no blood in those locations and there were no drag marks in the snow in those areas.

61.     A police photograph also documented a single set of footprints, made by a heavyset man, in the snow in the backyard of Mr. Crawford's house, leading toward the house of Larry and Julia Watson two doors down.

62.     Detectives Delano and Dove conducted several more interviews that night, including of Bill Howard, Larry Watson's stepson.

63.     Mr. Howard reported that Mr. Crawford left the Golden Nugget alone around 1:30 a.m. (which, the detectives knew, was after the paramedics had already arrived to transport Mr. Crawford to the hospital).

64.     Detectives Delano and Dove also interviewed Julia Watson.

65.     Ms. Watson also told detectives that Mr. Crawford left alone, but she put the time around 9:30 p.m., or four hours earlier than Bill Howard said.  She said that she and her husband left together around 11:15 p.m.

66.     Detectives Delano and Dove asked Ms. Watson if they could interview Mr. Watson, but Ms. Watson reported that he was drunk and that she was unable to wake him.

67.     Detectives Delano and Dove also interviewed the barmaid, Debbie Jeffrey.

68.     She told a very different story than Ms. Watson and her son Bill Howard:  She said Mr. Crawford did not leave the bar alone, but rather left the Golden Nugget with Mr. Watson.

69.     The detectives noted that there were large discrepancies in the story told by Mr. Howard and Ms. Watson, on the one hand, and Ms. Jeffrey's statement on the other.

- 9 -

70. Detectives Edwin Gorski and Robert Grabowski continued the investigation when their shift began at 4:00 p.m. on January 3, 1976.

71. They interviewed a patron of the Golden Nugget named Frances Kalb.

72. Ms. Kalb informed them that she saw Mr. Crawford drinking with the Watsons and Mr. Howard the previous evening.

73. Ms. Kalb said that Mr. Crawford left with Mr. Watson around 11:30 p.m.

74. She further said that she saw Mr. Watson return to the bar approximately 20 minutes later and immediately leave again with his wife.

75. Ms. Kalb also informed the detectives that sometime after the Watsons left together, she observed Ms. Jeffrey receive a call from Ms. Watson.

76. Ms. Watson stated that her husband was missing his keys and asked Ms. Jeffrey to check for them at the bar.

77. According to Ms. Kalb, Mr. Howard told Ms. Jeffrey that the keys were in Mr. Watson's pocket, which Ms. Jeffrey conveyed to Ms. Watson.

78. Detectives Gorski and Grabowski also interviewed Mr. Watson.

79. Mr. Watson told the detectives that Mr. Crawford left the Golden Nugget around 12:00 a.m.

80. Mr. Watson said that he just happened to be leaving at the same time to use the bathroom at his house across the street and two doors down.

81. Mr. Watson claimed that while Mr. Crawford was in front of the tavern preparing to cross the street, Mr. Watson noticed the door to his own house open and went over to investigate.

82. Mr. Watson did not mention that he had offered to walk Mr. Crawford home.

83. Detectives Gorski and Grabowski next interviewed Ms. Jeffrey (who had already been interviewed by Detectives Dove and Delano).

84. In this second interview, Ms. Jeffrey told the detectives that Mr. Watson had *offered* to walk Mr. Crawford home.

85. Ms. Jeffrey also corroborated Ms. Kalb's statement that, after Mr. Watson returned and left with his wife, Ms. Watson called the tavern and asked her to search for Mr. Watson's keys.

86. During this interview, Ms. Jeffrey reported to the detectives that she suspected Mr. Watson was the killer of Mr. Crawford.

87. During their shift on January 3, 1976, Detectives Gorski and Grabowski reported receiving "an anonymous call from a black male." The caller stated that "Andre Howe" and "Gerry Boyd" killed Mr. Crawford.

88. The detectives obtained a criminal record print out and a mugshot of a Jerome Boyd, a 37-year-old man living nearby at 32 Glenny Drive.

89. Jerome Boyd is a different person than, and is of no relation to, Darryl Boyd.

90. The BPD did not document any attempts to locate or interview Jerome Boyd.

91. However, the next day, January 4, 1976, Detectives Delano, Dove, and Pantano returned to the Golden Nugget with Jerome Boyd's mugshot.

92. The owner of the Golden Nugget, Ralph Davis, recognized Jerome Boyd as a regular patron of the tavern.

93. A bartender, Theotis "Teddy" Love, confirmed that he served a drink to Jerome Boyd the night Mr. Crawford was murdered.

- 11 -

94.     On January 6, 1976, Detectives Delano and John Ludtka took a formal statement from Ms. Kalb.

95.     Ms. Kalb repeated her statement that Mr. Crawford had been drinking with the Watsons and Mr. Howard, and that either Mr. or Ms. Watson told Ms. Jeffrey not to worry because they would take Mr. Crawford home.

96.     Ms. Kalb again stated that Mr. Watson and Mr. Crawford left together after 11:00 p.m.

97.     Detectives Delano and Ludtka showed Ms. Kalb the mugshot of Jerome Boyd and she identified him as "a real big guy that came in and talked with Julia [Watson] and stayed for only a few minutes."

98.     Ms. Kalb also repeated her statement that she was present at the Golden Nugget, overheard Ms. Watson call the tavern to ask Ms. Jeffrey to search for her husband's keys, and heard Mr. Howard tell Ms. Jeffrey that the keys were in the pocket of Mr. Watson's jacket.

99.     Also on January 6, 1976, Detectives Stanley Suszek and Melvin Lobbett took a formal statement from Ms. Jeffrey.

100.    Ms. Jeffrey informed the detectives that Mr. Crawford had about $300 in cash on him the night he was murdered, and that he had tried to lay it all out on the bar.  She thought that this was a stupid thing to do and instructed him to put it away.

101.    She was certain that the Watsons and Mr. Howard had seen Mr. Crawford displaying the cash.

102.    Ms. Jeffrey again stated that, normally, she or someone else working at the Golden Nugget would walk Mr. Crawford home when he became intoxicated, but on the evening of January 2, the bar was crowded, and she could not leave.

103.     She again stated that Mr. Watson offered to walk Mr. Crawford home.

104.     She stated that Mr. Watson was gone for about 20 minutes, which Ms. Jeffrey described as "long enough," suggesting to detectives that Mr. Watson had enough time to walk Mr. Crawford across the street, commit the murder (while dropping his keys), go to his house two doors down to clean up, and return to the tavern.

105.     Also on January 6, 1976, Detectives Gorski and Grabowski interviewed the victim's wife, Ms. Crawford, again.

106.     Ms. Crawford informed them that her husband typically returned home from the bar around 11:30 p.m. and came in through the side door.

107.     Ms. Crawford stated that on the night of the murder, she was watching TV in bed when she felt a thud that shook the side of the house.

108.     It was about 11:30 p.m.

109.     She said that when her husband still had not returned home by 1:00 a.m., she went downstairs to check the door and found Mr. Crawford lying in the driveway.

110.     The next day, on January 7, 1976, the BPD conducted formal interviews of and prepared written statements by Larry and Julia Watson.

111.     Detectives Ludtka and Francis Manista interviewed Mr. Watson.

112.     Mr. Watson denied that he had seen Mr. Crawford with a large amount of cash but admitted that Ms. Jeffrey told Mr. Crawford to put his wallet away.

113.     Mr. Watson now admitted what he had omitted before—that Ms. Jeffrey had asked him to take Mr. Crawford home—but that he did not do so.

- 13 -

114.     Mr. Watson now claimed that he and Mr. Crawford shook hands outside the Golden Nugget, he wished Mr. Crawford a happy New Year, and he crossed the street to his house.

115.     Mr. Watson's admission contradicted Ms. Jeffrey's statement that she did not ask Mr. Watson to take Mr. Crawford home, but rather Mr. Watson offered to take Mr. Crawford home.

116.     Mr. Watson told detectives Ludtka and Manista that he and Mr. Crawford were followed out of the Golden Nugget by a tall, dark man with a moustache and kinky hair.

117.     Jerome Boyd, whom Ms. Kalb described as a "real big guy" whom she had seen talking to Ms. Watson, appeared to fit this description.

118.     Mr. Watson claimed that, once in the driveway of his own house, he noticed his front door open and went inside to investigate.

119.     This statement contradicted his prior statement to police that he noticed his front door open while standing outside the tavern with Mr. Crawford.

120.     Mr. Watson claimed that he found nothing amiss in his house, went to the bathroom, and returned to the Golden Nugget, where Ms. Watson said she was ready to leave. He said they left the tavern and returned home.

121.     The same day, January 7, 1976, Detectives Delano and Vincent Pantano interviewed Ms. Watson.

122.     Ms. Watson admitted that she saw that Mr. Crawford had money laying on the bar but claimed that she did not see the amount.

123.     Ms. Watson now admitted that her husband left the tavern with Mr. Crawford.

- 14 -

124.     Ms. Watson stated that her husband returned to the Golden Nugget after 15 to 20 minutes, that she then gave her beer to her son, Mr. Howard, and she and Mr. Watson went home.

125.     Ms. Watson claimed that she and her husband were planning to return to the Golden Nugget, but Mr. Watson misplaced his keys, so she called Ms. Jeffrey at the bar to tell her that they would not be coming back.

126.     Detectives Delano and Pantano interviewed Ms. Jeffrey again on January 12, 1976.

127.     Ms. Jeffrey was adamant that she did not ask Mr. Watson to walk Mr. Crawford home, but that Mr. Watson affirmatively volunteered, "stating that he had to go anyway, to use the bathroom."

128.     According to the detectives, Ms. Jeffrey was "definite on this point."

129.     She also stated that, "because of the close proximity of everybody sitting at the bar together, [it] would have been impossible for everyone else there not to have seen [Mr. Crawford's] money."

130.     Detectives noted, however, that the Watsons both denied seeing how much money Mr. Crawford was carrying.

131.     Ms. Jeffrey said she found it odd that, when Mr. Watson returned to the Golden Nugget, he and his wife left in a hurry.  They left without saying goodbye to Ms. Jeffrey, which was uncharacteristic of them, and they left unfinished drinks on the bar even though, in her experience, they always finished their drinks before they left.

132.    Thus, in the days following the Crawford Murder, the named Defendants, together with their colleagues, learned the following information pointing towards two suspects, Mr. Watson and Jerome Boyd, as the likely perpetrator or perpetrators of the crime:

- On the night he was killed, Mr. Crawford had been at the Golden Nugget drinking heavily with the Watsons and Mr. Howard;

- Mr. Crawford had displayed approximately $300 in cash in front of the Watsons and Mr. Howard, which they saw;

- Mr. Watson volunteered to walk the intoxicated Mr. Crawford home to his house across the street;

- Messrs. Watson and Crawford were followed out of the Golden Nugget by a large man, potentially Jerome Boyd, whom a witness had seen talking with Ms. Watson;

- Jerome Boyd was the subject of an anonymous tip stating that he was one of the killers;

- Mr. Crawford was beaten and robbed at approximately 11:30 p.m. at the side door of his house, where his body was found in a pool of blood;

- A set of footprints in the snow led through the backyard of the Crawford property towards Mr. Watson's house;

- Mr. Watson returned to the Golden Nugget approximately 20 minutes later and left in a hurry with his wife, without finishing their drinks or saying goodnight to the barmaid, which was uncharacteristic for them;

- Mr. Watson, his wife Julia, and his stepson Bill Howard made a series of false or contradictory statements to police apparently trying to distance Mr. Watson from the victim, Mr. Crawford;

- A set of keys was found on or near Mr. Crawford's body, although Ms. Crawford reported that her husband's usual practice was to ring the bell for her to let him in through the side entrance to their home;

- After returning home with her husband, Ms. Watson called the Golden Nugget and reported that her husband was missing his keys; and

- The barmaid at the Golden Nugget, Ms. Jeffrey, who knew Mr. Watson and observed his conduct on the night of the murder, believed he had committed the crime.

- 16 -

### C. THE BPD INVESTIGATES MR. WALKER AND FOUR OTHER BLACK TEENAGERS, BUT FINDS EVIDENCE CORROBORATING THEIR CONSISTENT STATEMENTS THAT THEY WERE NOT INVOLVED IN THE MURDER

133.    On January 7, 1976, Detectives Deubell and Guadagno reported that they had received an anonymous call (the second such call the Defendants claimed to have received), this time from a woman who stated that the person who killed Mr. Crawford was Darryn Gibson, who lived on Rodney Street.  The female caller reportedly gave no further information.

134.    Assuming this call was received at all, the absence of any detail about Mr. Gibson or the caller meant that the officers had absolutely no basis to credit the information, and certainly lacked probable cause to arrest Mr. Gibson.

135.    Nevertheless, immediately after receiving the call, at approximately 10:30 a.m., Detectives Deubell and Guadagno took Mr. Gibson into their custody at his home where he lived with his mother and father and forced him, alone, to accompany them to BPD Headquarters.

136.    There, together with Detectives Manista and Pantano, they questioned him illegally for approximately eight hours.

137.    The BPD did not document that Mr. Gibson resisted arrest or was otherwise uncooperative.

138.    Mr. Gibson was 16 years old.  His parents were not present with him during this lengthy, custodial interview.

139.    According to the report of Detectives Deubell and Guadagno, Mr. Gibson told the detectives that, on the night of January 2, 1976, he was playing cards with his friends Mr. Walker, Darryl Boyd, Floyd Martin, and Tyrone "Tony" Woodruff in the Glenny Projects at 138 Glenny Drive, in the sixth-floor apartment of a girl named Shirley Floyd.

- 17 -

140. Mr. Gibson provided the home addresses of his four friends, all between 16 and 17 years of age.

141. Mr. Gibson said that on January 2, shortly after the news came on, at about 11:15 p.m., Messrs. Walker and Woodruff caught a cab from the Fillmore Cab Company.

142. Mr. Gibson said they took a cab from the Glenny Projects to their homes on Best Street, approximately two and a half miles and an eight-minute drive south of the Glenny Projects.

143. Mr. Gibson said that Mr. Martin, who lived just downstairs from Shirley Floyd's apartment, walked downstairs to go home as well.

144. Mr. Gibson said that just after Messrs. Walker and Woodruff left in the cab, Messrs. Gibson and Boyd walked home along Fillmore Avenue (past Mr. Crawford's house) to Leroy Street, where Mr. Gibson and Mr. Boyd split up and went to their respective homes.

145. Mr. Gibson estimated that he arrived home at about 11:35 p.m.

146. Mr. Gibson consented to a polygraph exam.

147. Prior to the examination, he had been in police custody and questioned for hours. Nevertheless, the examiner claimed, in a report dated five days later (the date Mr. Walker and the others were arrested), that the results couldn't be trusted because of "the lack of a pre-test conference and inaccuracy of available information."

148. This made no sense, since there was nothing preventing the examiner, during the many hours Mr. Gibson was in police custody, from conducting a "pre-test conference" and asking Mr. Gibson the pertinent questions directly.

149. The most logical inference from the above circumstances is that Mr. Gibson's responses to the examiner's questions suggested he was being truthful.

150.     The next day, January 8, 1976, Detectives Guadagno and Deubell went to the Fillmore Cab Company to investigate the accuracy of Mr. Gibson's statement.

151.     The Fillmore Cab Company *confirmed* that Cab No. 150, driven by a driver named "Geno," was dispatched to the Glenny Projects at 11:28 p.m.

152.     A second cab, Cab No. 163, driven by Brian Woods, was dispatched to the Glenny Projects at 11:44 p.m.

153.     According to the Company's records, these were the only two cabs dispatched to the Glenny Projects that evening.

154.     Any police officer really believing Mr. Gibson or his friends had committed the crime would have interviewed the two drivers.  The drivers could have noticed blood stains, torn clothing, large amounts of cash, strange behavior, or other indicia of the crime, or overheard the suspects making incriminating comments.

155.     However, the detectives did not document any attempt to locate or interview either cab driver.

156.     Because witnesses at the Golden Nugget on the night of the Crawford Murder confirmed that Mr. Crawford and Mr. Watson left together around 11:30 p.m., the evidence that Mr. Walker and Mr. Woodruff took the first taxicab at 11:28 p.m. meant the five boys could not have committed the crime together.

157.     The BPD conducted several additional interviews on January 8 which further confirmed Mr. Gibson's account of events.

158.     Detectives Guadagno and Deubell went to the Glenny Projects, where they interviewed Sheryl ("Shirley") Floyd.

- 19 -

159.     Ms. Floyd confirmed that Messrs. Walker, Boyd, Martin, Gibson, and Woodruff were at her apartment on the night of the Crawford Murder, just as Mr. Gibson had told the BPD.

160.     Ms. Floyd identified other individuals—Nathaniel Zachery, Dennis Wilson and his brother, Larry Martin, Victoria Bryant, and persons named "Nick" and "Ann"—who were at the party in her apartment that night as well.

161.     Ms. Floyd stated that the boys left her apartment around midnight, give or take an hour.

162.     Nathaniel Zachery, who was at Ms. Floyd's apartment when detectives came to meet her, confirmed that he was with the boys that evening.

163.     Detectives Guadagno and Deubell also went to 93 Leroy Street looking for Darryl Boyd.

164.     Mr. Boyd was not home, but they spoke with his mother, who confirmed that Mr. Boyd returned home just past midnight on January 3, 1976.

165.     Between January 8 and 11, 1976, detectives interviewed and took statements from three of the four boys Mr. Gibson said he was playing cards with at Ms. Floyd's apartment the night of the Crawford Murder—Messrs. Boyd, Walker, and Woodruff.

166.     All three gave substantially the same account of their whereabouts and thus further confirmed Mr. Gibson's account.

167.     Specifically, on January 8, 1976, Detectives Guadagno and Deubell, despite lacking any evidence implicating the boys' in the murder, took Mr. Boyd into their custody and, without administering *Miranda* warnings, interrogated him in a BPD interview room.

168.     Mr. Boyd told these detectives that, earlier on January 2, a boy named Andre Hough was at his house at 93 Leroy Street.

169.     Mr. Boyd stated that during the early evening, he and Mr. Hough walked to the Glenny Projects, where they watched TV at the apartment of a Ms. Washington, along with several other members of the Washington family.

170.     He stated that at around 9:30 p.m., later in the evening, he left Ms. Washington's apartment to join Messrs. Walker, Gibson, Martin, and Woodruff at Shirley Floyd's apartment in the building next door.

171.     Mr. Boyd said that Floyd Martin's brother, Eugene, called a cab from the Fillmore Cab Company.  However, when the cab arrived, Eugene was not ready.  The cab driver refused to wait any longer, so Messrs. Walker and Woodruff took that cab and headed home.

172.     The BPD had already confirmed that this cab was dispatched to the Glenny Projects at 11:28 p.m.

173.     Mr. Boyd said that Eugene Martin called for a second cab, having missed the first cab.

174.     The BPD had already confirmed that this cab was dispatched to the Glenny Projects at 11:44 p.m.

175.     Mr. Boyd said that after Eugene Martin called the second cab, but before it arrived, Messrs. Boyd and Gibson began walking home together up Fillmore Avenue.  They split up at Leroy Street.

176.     Mr. Boyd consented to a polygraph exam.

177.     However, neither Detectives Guadagno nor Deubell, who interrogated him, nor the other detectives involved in the investigation, ever conducted one.

178.     Rather, knowing that Mr. Boyd's statement conformed to the other evidence they had collected, Detectives Guadagno and Deubell falsely wrote in their report, without elaboration, that he had "changed his story several times."

179.     They pressured him, before letting him go, into signing a false statement that he had provided two different times when he had arrived home.

180.     On January 11, 1976, the BPD lacked any evidence that Messrs. Walker and Woodruff were involved in the murder.

181.     Nevertheless, they brought these two teenagers in their custody to BPD Headquarters for questioning.

182.     Detectives Arnet, Hunter, and John Montondo interviewed Mr. Walker.

183.     Mr. Walker stated that, on the night of January 2, he was with Messrs. Boyd, Martin, Gibson, and Woodruff at Ms. Floyd's apartment in the Glenny Projects.

184.     He stated that he took a cab with Mr. Woodruff around midnight, went home, and went to bed.

185.     Mr. Walker consented to a polygraph exam, but the BPD never conducted one.

186.     Even though Mr. Walker had provided a statement that was consistent with the statements of the other suspects and witnesses and volunteered to take a polygraph test, Detectives Arnet, Hunter and Montondo falsely wrote in their report that he had "lied through his statement."

187.     They further wrote, falsely, that Mr. Walker made "different statements" to them orally than he had made in his signed statement.

188.     Contrary to basic police practice, nowhere did they record what his inconsistent oral statements or lies supposedly were.

- 22 -

189.     Detectives Arnet, Hunter, and Montondo questioned Mr. Woodruff.

190.     Mr. Woodruff, during hours of questioning, truthfully denied any knowledge of who participated in the Crawford murder.

191.     Consistent with all the other evidence these and the other detectives had obtained, Mr. Woodruff said he was with Messrs. Martin, Gibson, Walker, and Boyd at Ms. Floyd's apartment on the night of January 2 and that he had taken a cab home with Mr. Walker.

192.     However, Detectives Arnet, Hunter and Montondo, in their report, falsely accused Mr. Woodruff of "lying."

193.     As with Mr. Walker, and contrary to basic police practice, they made no record of the specific statements Mr. Woodruff allegedly had made that they contended were false.

194.     This was because their intent was not to build a legitimate case against Messrs. Walker and Woodruff but to fabricate a basis to continue interrogating them and ultimately to arrest and prosecute them.

### D.     THE BPD COERCES 15-YEAR-OLD ANDRE HOUGH TO FALSELY IMPLICATE MR. WALKER AND HIS FOUR FRIENDS FOR THE CRAWFORD MURDER

195.     Following the murder, in early January 1976, 15-year-old Andre Hough, an eighth grader, was questioned by police on several occasions about whether he had any knowledge of the incident.

196.     Detectives made clear to Mr. Hough that they suspected him of being involved in the murder and, as he later testified, harassed him and "came down on [him] pretty hard."

197.     Telling him that they wanted him to name names, they told him the names of the people they had in mind as participants in the murder.

198.     Mr. Hough initially told detectives he had no knowledge of any unlawful behavior in connection with the Crawford Murder.

199.    After doing so, he "passed" a polygraph examination.

200.    However, detectives deliberately failed to document his initial statements exculpating the police suspects.

201.    Questioned by Detectives Guadagno and Deubell, Mr. Hough gave the same account of his whereabouts as Mr. Boyd.

202.    He did not tell the detectives that Mr. Boyd had said or done anything incriminating.

203.    He was then threatened with prosecution for murder if he did not provide information against the other boys.

204.    Mr. Hough did not mention Mr. Walker, except to say that Mr. Walker and the other boys picked Mr. Boyd up from Ms. Washington's apartment that night and went to 138 Glenny Drive.

205.    This statement corroborated Messrs. Walker, Boyd, Gibson, and Woodruffs' previous statements about Mr. Walker's whereabouts on the night of the Crawford homicide.

206.    Mr. Hough was brought back to BPD Headquarters for further interrogation on January 12, 1976.

207.    Detectives Guadagno and Deubell again accused Mr. Hough of knowing about and participating in the murder.

208.    Coerced by Detectives Guadagno and Deubell to implicate the other boys to save himself, Mr. Hough then began to do so.

209.    According to police reports, he now said that Mr. Boyd had confessed to him that Mr. Boyd, Mr. Walker, and the other three boys had seen Mr. Crawford in his driveway, run after him, beat him, and taken his wallet.

- 24 -

210.     However, under intense pressure to provide any additional information that he had, Mr. Hough swore that he could think of no additional information.

### E.     THE BPD COERCES 17-YEAR-OLD TYRONE WOODRUFF TO FALSELY IMPLICATE MR. WALKER AND THE OTHERS FOR THE CRAWFORD MURDER

211.     On January 12, 1976, Detectives Hunter and Arnet once more took Tyrone Woodruff illegally into their custody, telling him, or leading him to believe, he was under arrest for the Crawford Murder.

212.      Bringing him to the Buffalo Police Department homicide unit for further interrogation, these detectives stood over him, armed with guns, and, in an intimidating, accusatory, and coercive manner, harshly interrogated him.

213.     Even though Mr. Woodruff was alone and just 17 years of age, police refused him permission to call his parents or a lawyer.

214.     Mr. Woodruff at first continued to truthfully deny any knowledge of the Crawford Murder.

215.     However, detectives Arnet and Manista told Mr. Woodruff that they had his friends upstairs.

216.     They threatened him, falsely, that his friends had accused him of the crime and that they had other evidence implicating him as well.

217.     They told him, falsely, that, if he did not provide information against the others, one or more of them would cooperate against him and he would face life imprisonment.

218.      On the other hand, they told him, if he minimized his own involvement in the crime while cooperating against the other boys, the detectives would speak with the ECDA about arranging for him to receive complete immunity from prosecution.

- 25 -

219.     Detectives Hunter and Manista prepared reports, both false, that contradicted each other about how detectives ultimately succeeded in getting Mr. Woodruff to change his story and incriminate himself and the other boys.

220.     According to Detective Hunter's report, Mr. Woodruff was allowed to eat devil's food cake his mother had sent with him and to call his mother and aunt, before "[h]e started asking Det. Arnet questions, and subsequently admitted to Det. Arnet that he was a witness to the Crawford homicide."

221.     This made it appear that Mr. Woodruff, totally of his own volition, simply decided to come clean.

222.     According to Detective Manista's report, however, at 5:40 p.m., he received an anonymous phone call about the investigation from a "negro female who wished to remain anonymous."

223.     This was the third time detectives claimed to have received an anonymous call and the second time they used such a call as a basis to detain and question a suspect.

224.     The anonymous caller reportedly knew and provided names and specific home addresses for each of the five boys.

225.     However, according to the report, the caller identified "Darryl Gibson" as a participant, which incorrectly combined Darryl Boyd's first name and Darryn Gibson's last name.

226.     This call, assuming it occurred at all, was a fake.

227.     The names and the addresses, except for the error regarding the names of Messrs.' Boyd and Gibson, consisted of the information that Mr. Gibson had provided in his initial statement to police.

- 26 -

228.     The anonymous caller also incorporated other information that the BPD had already received in its investigation, including that some of the boys had gone home in a cab and, according to Mr. Hough, had divided up proceeds at 138 Glenny Drive.

229.     Any competent detective would have tried to convince such a potentially valuable witness, assuming she was real, to identify herself so she potentially could testify or otherwise further assist the investigation.

230.     Any competent detective would have protected the voice and the identity of such an informant, assuming she was real, from the alleged murderer she was implicating.

231.     However, according to Detective Manista's report, at the time he took the call, Mr. Woodruff just happened to be in the room with him and Detective Arnet and was permitted to "listen … to the conversation."

232.     After hearing a tipster directly implicate him, according to Detective Manista's report, "Tyrone Woodruff became very nervous and could barely raise a cup of coffee he was drinking."

233.     Detective Manista's report continued:  "He was asked by Det. Manista in the presence of Det. Arnet if he could remember anything now; he was told that a person puts him in a hallway [sic] dividing money.  At 5:45 P.M. he told Dets. Manista & Arnet 'Gibson was hitting him, Gibson was hitting him, I think.'"

234.     According to Detective Manista, he immediately reported to Chief Donovan, Chief of Homicide Detectives, "what had taken place."

235.     Chief Donovan thus knew how detectives had used this fake anonymous call to coerce Mr. Woodruff to implicate himself and his friends in the homicide.

- 27 -

236.    Detectives Deubell and Manista, joined by Chief Donovan, then continued to interrogate Mr. Woodruff.

237.    At 8:50 p.m., after an additional three hours of interrogation, Mr. Woodruff was told to sign a statement in question-and-answer form, typed by Detective Manista, which purported to be under oath.

238.    Fed a story by Detectives Arnet, Deubell, and Manista and Chief Donovan, Mr. Woodruff purportedly stated that Mr. Gibson said he wanted to get some money and had somehow heard that there was a man in a bar flashing a lot of money.

239.    Mr. Woodruff stated that he did not know what bar it was, or how Mr. Gibson knew about the man flashing money.

240.    Mr. Woodruff said that while the group was walking down Fillmore Avenue, supposedly hoping to cross paths with a victim to rob, Mr. Gibson allegedly found a pipe and put it up his sleeve.

241.    Mr. Woodruff said that the group apparently spotted Mr. Crawford as he was entering his driveway.

242.    According to Mr. Woodruff, Mr. Gibson beat Mr. Crawford at the end of the driveway, and Messrs. Gibson and Boyd together dragged him up the driveway.

243.    Mr. Woodruff said that Mr. Boyd allegedly stole his wallet.

244.    Mr. Woodruff did not mention any involvement by Messrs. Walker or Martin.

245.    Although the BPD knew that Mr. Crawford was old, heavy set, and had been wearing a large Stetson hat, Mr. Woodruff could not describe the man in any way except that he was white—a fact that had been supplied to him at the start of his previous interview.

- 28 -

246.     Mr. Woodruff said that the group allegedly returned to the Glenny Projects and called a cab, which Messrs. Walker and Woodruff took home.

247.     Mr. Woodruff, minimizing his own role in the crime, denied receiving any of the money or being present when the money was divided up.

248.     Although the written statement purported to document the entire interview of Mr. Woodruff, after three hours it was less than three pages, with nearly half of it consisting of a *Miranda* waiver and his viewing of photographs of his friends.

249.     Chief Donovan was personally present for Mr. Woodruff's interrogation and his signing of the statement.

250.     BPD detectives involved in the investigation knew that Mr. Woodruff's account that he and the other four boys walked together from the Glenny Projects to the Golden Nugget and committed a robbery—was untrue.

251.     This was because several witnesses—including Ms. Kalb (the Golden Nugget patron), Ms. Jeffrey (the barmaid), Ms. Crawford (the widow), Mr. Watson (the likely perpetrator), and his wife—put the time of the crime either *at* or *after* the time Messrs. Walker and Woodruff entered the taxicab at the Glenny Projects and went home.

252.     Moreover, the physical evidence at the crime scene did not support the story Mr. Woodruff had been pressured to come up with or adopt.

253.     Neither the responding officers nor the police photographer had seen or documented any pools of blood or other signs of a struggle in front of the house, on the sidewalk at the entrance to the driveway, or along the driveway leading to the place where Mr. Crawford's body had been found.

254.    There were no marks in the snow suggesting that Mr. Crawford had been dragged up the driveway from the sidewalk.

255.    Mr. Crawford's Stetson hat surely would have fallen off at the bottom of the driveway had he been assaulted with a pipe and dragged the 35 feet from the sidewalk to the place where he was found, but it was found by his body.

256.    And the single set of footprints in the snow in the backyard leading towards Mr. Watson's house pointed to Mr. Watson as the perpetrator, not a group of five young boys.

257.    Remarkably, even though Mr. Woodruff had confessed his involvement in a vicious robbery/murder for which he potentially faced 25 years to life in prison, Chief Donovan and the other detectives did not arrest him but instead released him from custody and allowed him to go home.

258.    In the ensuing weeks and months, detectives and prosecutors fed Mr. Woodruff additional details to incorporate into this account in order to conform it to other evidence they had collected, or to make his story seemingly more incriminating of the individual criminal defendants.

**F.      THE BPD ARRESTS MR. WALKER BASED ON THE FALSE, COERCED TESTIMONY OF MESSRS. WOODRUFF AND HOUGH**

259.    After Mr. Woodruff signed his coerced, false statement of January 12, 1976, Chief Donovan, knowing the investigation was corrupted, authorized the arrests of Mr. Walker and his co-defendants, Messrs. Boyd, Gibson, and Martin.

260.    Detective Guadagno arrested Mr. Walker.

261.    Detectives Hunter and Arnet arrested Messrs. Boyd and Gibson and brought the two boys to the location where Detective Guadagno had arrested Mr. Walker.

262.    The detectives took the boys at the same time to police headquarters before taking each of them to a separate room for further interrogation.

263.    They continually tried to turn one boy against the others as they had done with Mr. Woodruff.

264.    Detectives Guadagno, Hunter, and others, meanwhile, tried to coerce a false confession from the slightly built, 16-year-old Mr. Walker.

265.    They showed him gruesome photographs of Mr. Crawford's body, while towering over him and wearing their guns.

266.    They told Mr. Walker that they knew he had committed the murder, but that if he said he was a lookout with Mr. Woodruff, they would go easy on him.

267.    When Mr. Walker continually denied guilt and went to stand up, Detective Hunter said that, if he got up, Hunter would "beat your motherfucking ass."

268.    They claimed that they had an anonymous female caller on the line who alleged that she had seen Mr. Walker and his friends at the Glenny Projects dividing up the proceeds of the robbery.

269.    This was the same ruse they reportedly had used to coerce Mr. Woodruff's confession.

270.    As with Mr. Woodruff, the detectives lied to Mr. Walker that his friends and other witnesses were implicating him, but that he could obtain leniency if he cooperated with the police.

271.    Mr. Walker continued to maintain his innocence.

272.    Detectives Guadagno and Deubell, in their report, falsely accused Mr. Walker of having "refused to aid us in this investigation."

- 31 -

273.     In fact, in aid of the investigation, he truthfully answered the detectives'
questions, but the answers were not those that they wanted to hear.

274.     During his arrest, Mr. Boyd repeatedly proclaimed his innocence.

275.     However, in a report submitted by Detectives Arnet, Montondo and Hunter, the
detectives falsely claimed that Mr. Boyd had "feigned any type knowledge what so ever [sic] of
the above mentioned investigation."

276.     After Mr. Boyd was arrested, his mother, Thomacenia Knight, brought several
witnesses to BPD Headquarters, and they confirmed that Mr. Boyd was at the Glenny Projects on
the evening of January 2 until around midnight.

277.     Before his booking, Mr. Martin was interviewed by Detective Montondo.

278.     Like the other boys, Mr. Martin informed the detective that he had been at Shirley
Floyd's apartment in the Glenny Projects with Messrs. Boyd, Gibson, Walker, and Woodruff the
night of January 2.

279.     Like the other boys, he stated that Messrs. Walker and Woodruff left in a taxicab,
and Messrs. Gibson and Boyd walked home together.

280.     Mr. Martin said that he returned to the party with his brother after the others left.

281.     Detective Montondo wrote in his report that Mr. Martin was lying, despite the
evidence corroborating Martin's statement and the consistency of his statement with the
statements of the other suspects and witnesses.

282.     Taking and sharing credit with all the homicide detectives under his command,
who were collectively responsible with him for manufacturing the case, Chief Donovan listed
himself and the entire Homicide Unit as the arresting officers for Mr. Walker and the other three
boys.

283.    To initiate a criminal proceeding, Chief Donovan and Detective Dove both signed a sworn criminal court complaint falsely accusing Messrs. Walker, Boyd, Gibson, and Martin of second-degree murder and criminal possession of a dangerous weapon.

284.    They attached the false statement they had coerced from Mr. Woodruff on January 12, 1976, as the factual basis for the complaint.

285.    Although the detectives and Chief Donovan knew from multiple witnesses that the attack had occurred at about 11:30 p.m. or later, after Messrs. Walker and Woodruff had gone home in a cab, they falsely alleged in the complaint that the attack had occurred at about 10:30 p.m.

## G.    ADDITIONAL INVESTIGATION FURTHER UNDERMINES THE DETECTIVES' FLAWED CASE AGAINST MR. WALKER

286.    Mr. Walker and his three co-defendants were arraigned in court on January 13, 1976.

287.    All were remanded to the Erie County Holding Center, pending a preliminary hearing to be held on January 16, 1976.

288.    On January 15, 1976, Detectives Montondo and John Regan, at the request of Detectives Deubell and Guadagno, interviewed the owner of a bodega called Simpson's Store, located approximately three blocks from the Golden Nugget, to corroborate Mr. Hough's story, coerced from him by police, that he saw Mr. Boyd spending a lot of money at the store the day after the murder.

289.    According to the detectives' report, the owner of Simpson's Store and her daughter knew the boys but did not recall seeing them on either January 2, when they supposedly were present waiting for the emergence of Mr. Crawford from the Golden Nugget, or January 3, 1976, when they supposedly were there in possession of the robbery proceeds.

- 33 -

290.    This *contradicted* Mr. Hough's story (and Mr. Woodruff's).

291.    To minimize the significance of the owners' statements, Detective Montondo wrote: "Simpson's Delicatessen is a very small store and it would be easy for the workers to overlook anyone, especially if they were busy."

292.    However, the owner and her daughter had not said they were busy.

293.    Moreover, the small size of the store would have made a group of 16-year-old boys flashing unusually large amounts of cash more, not less, conspicuous.

294.    On January 16, 1976, a preliminary hearing was held to determine whether there was probable cause to continue the prosecution and to hold Mr. Walker and his co-defendants in custody.

295.    Mr. Woodruff, who had been given complete immunity from prosecution, was the principal witness against the defendants.

296.    Based upon the false story of Mr. Woodruff that the detectives had coerced out of him, the court found probable cause for the prosecution and continued the defendants' detention.

297.    At the hearing, neither the named Defendants nor their fellow detectives disclosed information in their individual and joint possession that would have negated the probable cause found by the court, including, but not limited to:

- the coercive tactics they had used to pressure Mr. Woodruff to incriminate Mr. Walker and the other boys;

- the evidence they had collected corroborating Mr. Woodruff's initial story denying any knowledge of the crime;

- the evidence proving that Mr. Woodruff left in a taxicab before the Crawford Murder occurred and therefore could not have seen it;

- the forensic evidence contradicting Mr. Woodruff's account of the crime, including the crime scene photographs showing the absence of blood or drag marks in the driveway; and

- 34 -

- the wealth of evidence, including a crime scene photograph, incriminating Larry Watson as well as Jerome Boyd.

298.    Had this evidence been disclosed, the case would have been dismissed at arraignment, or Mr. Walker would have been released from custody.

299.    On the same date as the preliminary hearing, a supposed witness, according to police records, came forward to tell the prosecutor handling the case, Chief Donovan, and Detective Dove that he and two of his friends—another young black man and a black woman—had witnessed the assault.  The witness's account of events materially contradicted Mr. Woodruff's statements, but his statement was not disclosed to the defense either.

## H.    MESSRS. WOODRUFF AND HOUGH BOTH RECANT BEFORE TESTIFYING IN THE GRAND JURY BUT DETECTIVES COERCE THEM INSTEAD TO EXPAND THEIR FALSE STORIES

300.    On February 11, 1976, a grand jury was convened to hear evidence concerning the Crawford Murder.

301.    Before giving any testimony, Messrs. Woodruff and Hough were first brought to the ECDA's office.

302.    According to police reports, Mr. Hough, in the presence of his mother, was questioned by Detectives Delano and Guadagno.

303.    Mr. Hough recanted his prior statement about the boys.

304.    According to the reports of the two detectives, he told them that he "wanted to change his story about the truth of the statement" he had previously given.  "He said that he lied in the statement about what [Darryl] Boyd told him.  He said [Mr. Boyd] never told him that he killed William Crawford."

305.    The detectives deliberately omitted from their reports the details of the questions and answers in which Mr. Hough exonerated the suspects.

- 35 -

306.    After the detectives' prolonged questioning failed to shake her son from recanting, Mr. Hough's mother said that she would be leaving, but she obtained the promise of Detectives Delano and Guadagno to drive her son, who was in their custody, home.

307.    However, according to their own reports, instead of doing that, they accused Mr. Hough of lying and threatened him that he had better tell the truth.

308.    Under intense pressure and with his mother no longer present, this 15-year-old boy recanted his recantation and then was led by the detectives to further embellish his previous story.

309.    While he previously said that he recalled no additional information, he now claimed for the first time that, before the assault, Messrs. Boyd and Gibson (both 16 years old) went into the Golden Nugget Bar to look around and then waited with Mr. Walker and the other boys down the street for Mr. Crawford to come outside.

310.    Mr. Hough was then put into the grand jury to testify to this newly embellished story.

311.    During his grand jury testimony, Mr. Hough claimed that he overheard Mr. Gibson state on the night of the murder, "I'm going to get me some money tonight."

312.    Mr. Hough had not made this claim in any of his prior statements to police officers.

313.    In fact, it was Mr. Woodruff who had previously claimed that on the night of the Crawford homicide, he heard Mr. Gibson say, "I'm going to get me some money tonight."

314.    Mr. Hough only testified to this statement before the grand jury because it had been suggested to him by law enforcement officials as part of an attempt to coordinate his testimony with that of Mr. Woodruff.

315.    Detectives Guadagno and Delano went to talk to Mr. Woodruff before he was to testify before the grand jury.

316.    However, they discovered that Mr. Woodruff, too, had recanted.

317.    Again, they deliberately omitted from their reports the details of what Mr. Woodruff said to exculpate the suspects, including Mr. Walker.

318.    Detective Delano noted in his report that Mr. Woodruff was so nervous that he was shaking.

319.    Detective Delano, according to his own report, accused Mr. Woodruff of lying and demanded that he tell "the whole story."

320.    In their separate reports, Detectives Delano and Guadagno each took credit for coercing Mr. Woodruff into withdrawing his recantation and embellishing his story.

321.    Detective Delano reported that he confronted Mr. Woodruff with Mr. Hough's new statement which then led Mr. Woodruff to change his story to match Mr. Hough's.

322.    Detective Guadagno, on the other hand, without mentioning Mr. Hough's new statement playing any role, reported that he "talked with Tony and he came up with more important information."

323.    Up until this point in the investigation, the BPD had been unable to explain how Mr. Walker and the other defendants supposedly knew that, if they walked down Fillmore Avenue, they would happen across a victim, flush with cash, to rob.

324.    The statements that the detectives previously had coerced from Messrs. Woodruff and Hough made it appear that it was pure serendipity that they stumbled across Mr. Crawford, who just happened to have a lot of cash on him.

325.     Now, however, Detectives Delano and Guadagno pressured Mr. Woodruff to adopt Mr. Hough's new statement that the boys had engaged in a reconnaissance mission at the Golden Nugget that resulted in their targeting Mr. Crawford.

326.     In Mr. Woodruff's new version of events, fed to him by Detectives Guadagno and Delano, before the boys even left the Glenny Projects, someone suggested they go to a bar, because "maybe somebody in one of the bars has cashed a check."

327.     According to Mr. Woodruff's new story, Mr. Gibson, hiding a pipe up his sleeve, and Mr. Boyd supposedly went into the Golden Nugget.

328.     This was an establishment, the detectives knew, which served an older demographic, and any 16-year-olds would have stood out and been denied admission.

329.     Indeed, the barmaid, Ms. Jeffrey, and other witnesses had told them they did not see any of the boys in the bar the night of the murder.

330.     Nevertheless, knowing from multiple witnesses that Mr. Crawford had been seen flashing money at the bar, the detectives caused Mr. Woodruff to incorporate this circumstance into his new story.

331.     Now, Mr. Woodruff claimed that Messrs. Gibson and Boyd had reported to the rest of the group that they had seen an "old white dude with a lot of money in the bar."

332.     According to Detectives Delano's and Guadagno's reports, the boys then walked approximately three blocks down Fillmore to Simpson's Store, where they waited for Mr. Crawford to leave the Golden Nugget.

333.     The boys allegedly waited for Mr. Crawford to cross the street—which put him on the sidewalk directly in front of his house, at the entrance to his driveway—then ran the three blocks to ambush him at the end of the driveway.

334.    Mr. Woodruff alleged that Mr. Gibson hit the victim in the head with the pipe several times at the end of his driveway by the sidewalk.

335.    Under intense pressure, and contrary to his January 12 statement to police, Mr. Woodruff claimed that Mr. Walker actively participated in the crime by searching Mr. Crawford and, along with the other four boys, dragging him up the driveway to the side door.

336.    The BPD knew that the physical evidence at the crime scene contradicted this account.

337.    First, as noted above, there was no evidence of any pools of blood or dragging along the driveway, and despite such a violent encounter, Mr. Crawford's hat had not fallen off but was found next to his body at the side entrance to his house, about 35 feet from the sidewalk.

338.    Second, it made no sense that the boys had begun to run after Mr. Crawford had already crossed the street.

339.    It would have taken them much longer to run three long blocks, from Simpson's Store to Mr. Crawford's house, than it would have taken Mr. Crawford to walk the 35 feet from the sidewalk in front of his house to the side door.

340.    Nor did it make any sense that five 16-year-olds would have decided to wait indefinitely, during a cold January night, by the store, having no idea when the specific man they allegedly were targeting would come out of the tavern.

341.    Mr. Woodruff's new story also contained internal contradictions about his receipt of robbery proceeds.

342.    In his prior statements, he denied seeing or hearing about the money being divided up, but now Mr. Woodruff was induced to say that he was with the group when they returned to the Glenny Projects to divide up the money.

- 39 -

343.    Additionally, in Detective Delano's report, Mr. Woodruff allegedly received $25, while Detective Guadagno reported that Mr. Woodruff said he received $15; in his January 12 statement, he denied receiving any money at all.

344.    Detective Guadagno handwrote a statement and had Mr. Woodruff sign it.

345.    That statement contained still another contradiction: Contrary to his alleged oral statement that Messrs. Boyd and Gibson had gone inside the Golden Nugget and then spotted the old man with the money, in this version, Mr. Woodruff stated that they only opened the door to the bar and peeked in.

346.    In still another amazing coincidence, according to Mr. Woodruff's newly expanded statement, it was at this precise moment that Mr. Crawford flashed his money.

347.    Following his session with Detectives Guadagno and Delano, Mr. Woodruff testified before the grand jury.

348.    Only after testifying, according to the detectives' reports, were Messrs. Woodruff and Hough "released" from police custody.

349.    In other words, to make sure that these vulnerable boys would recant their recantations, augment their original stories, and then testify before the grand jury, the officer defendants held them prisoner.

350.    Their detention was not only coercive but also illegal, as neither had been charged with any crime; indeed, Mr. Woodruff had been given complete immunity from prosecution.

351.    Throughout their investigation, the detectives either deliberately refrained from taking notes or deliberately destroyed whatever notes they had taken.

352.     During all interrogations of suspects and witnesses that occurred at Buffalo Police Headquarters, detectives had recording equipment but deliberately did not use it so that there would be no record of their coercive tactics and of inconsistent statements by their witnesses.

## I.     THE DEFENDANTS MISLEAD THE GRAND JURY, CAUSING IT TO WRONGFULLY INDICT MR. WALKER

353.     The BPD detectives involved in the investigation knew that the coerced testimony Messrs. Woodruff and Hough gave in the grand jury implicating Mr. Walker and his friends in the Crawford Murder was false.  The entirety of their investigation contradicted it.

354.     Detectives Guadagno, Delano, Deubell, and Montondo personally testified before the grand jury.

355.     Prior to Mr. Walker's indictment, these and other detectives collectively knowledgeable about and responsible for the investigation failed to turn over to the ECDA and/or to inform the grand jury about a plethora of evidence which, viewed individually or cumulatively, completely undermined the prosecution's case.

356.     This evidence included but was not limited to:

- Mr. Woodruff's initial statement that he did not know anything about the Crawford Murder;

- the manner in which Mr. Woodruff had been threatened with arrest and prosecution and repeatedly coerced and promised immunity to induce him to change his various stories;

- the material inconsistencies in Mr. Woodruff's various statements;

- the crime scene photographs contradicting Mr. Woodruff's story;

- the witness statements about the timing of Mr. Crawford leaving the Golden Nugget, together with the taxicab evidence, which proved that Mr. Woodruff was not present at the time of the murder;

- the fact of Mr. Woodruff's recantation and the details of his recanting statements;

- 41 -

- the coercion of Mr. Hough to implicate the defendants notwithstanding his passing of a polygraph examination, including the threat to arrest him for the Crawford murder;

- Mr. Hough's recantation and other inconsistent statements;

- the manner in which Messrs. Woodruff's and Hough's enhanced stories had been orchestrated and coordinated by the BPD;

- the statements by the owner at Simpson's Store, and by Ms. Jeffrey and other witnesses present in the Golden Nugget, which contradicted the statements of Messrs. Hough and Woodruff;

- that police illegally detained Messrs. Woodruff and Hough in their custody until they completed their testimony;

- the anonymous phone call accusing Mr. Woodruff, as well as his terrified reaction to the call, before he changed his story;

- the unlawful investigative detention of Mr. Walker without probable cause and the manner in which his statements had been coerced and/or fabricated;

- the police documentation that a set of house keys had been found near Mr. Crawford's body, the statement from the widow, Ms. Crawford, that her husband typically rang the bell for her to let him in the house, and the recorded statements from witnesses at the Golden Nugget that Julia Watson had called the bar after she and her husband left asking the barmaid to search for her husband Larry Watson's missing keys—evidence showing that the house keys near the body had been Mr. Watson's;

- statements from witnesses at the Golden Nugget who observed Mr. Watson volunteer to walk Mr. Crawford home, and then return 20 minutes later, collect his wife, and leave in a hurry;

- the false or conflicting statements of Larry Watson, his wife Julia Watson, and his stepson Bill Howard about their interactions with Mr. Crawford the night of the murder;

- statements from the barmaid, Debbie Jeffrey, in which she explicitly stated that she suspected Mr. Watson of committing the crime and the circumstances which led her to that conclusion;

- the crime scene photograph showing footsteps leading from Mr. Crawford's backyard towards Mr. Watson's house; and

- the tip and identification evidence pointing to Jerome Boyd as a second possible suspect.

357.    On or about February 27, 1976, the grand jury, as a result of having been deceived about the material facts, and relying on fabricated evidence, indicted Mr. Walker and his three co-defendants for first-degree robbery and second-degree murder.

358.    On information and belief, shortly after the Crawford Murder, and while Mr. Boyd and his co-defendants were in custody without bail for the Crawford Murder, a man named William Crosby was murdered in his home.

359.    Mr. Crosby lived in the house directly between Mr. Crawford and Mr. Watson at 2045 Fillmore Avenue and may have had knowledge about Mr. Crawford's murder.

360.    On information and belief, the BPD never made an arrest for the murder of William Crosby.

361.    On information and belief, the murder of William Crosby took place after Mr. Walker was arrested and in custody, but before his trial, for the Crawford Murder.

362.    No information concerning the murder of William Crosby, which took place in the immediate vicinity of the Crawford Murder at a time when it was impossible for Mr. Walker or his friends to have been involved, was ever disclosed to Mr. Walker's defense counsel.

**J.    PLAINTIFF JOHN WALKER IS TRIED AND CONVICTED BASED ON COERCED FALSE TESTIMONY, WITHOUT THE BENEFIT OF UNDISCLOSED *BRADY* MATERIAL**

363.    Mr. Walker was brought to trial on June 6, 1977, before an all-white jury, on charges of first-degree robbery and second-degree murder.

364.    ADAs David Henry and James Verrastro prosecuted the case.

365.    Prior to Mr. Walker's trial, his defense counsel, David Jay, requested that the ECDA produce all *Brady* material to him.

366.    Despite this request, ADAs Henry and Verrastro, and/or ADA Timothy Drury who handled some of the discovery before them, did not disclose dozens of pieces of evidence

- 43 -

favorable to the defense in advance of or even during trial. This evidence included, but is not limited to, the documents and information described in ¶¶ 132 and 356, *supra*.

367. Consistent with the ECDA's policy, procedure, practice, and/or custom of impermissibly narrowing the scope of its Brady obligations to include only truly "exculpatory"—rather than favorable—material, ADAs Henry and Verrastro failed to disclose any evidence they did not deem "exculpatory," including evidence that impeached the prosecution's key witnesses; evidence that pointed to other suspects as perpetrators of the crime; and evidence regarding the second murder, which took place across the street from the Golden Nugget that occurred when Mr. Walker was incarcerated.

368. Also consistent with the policies, procedures, practices, and/or customs of the ECDA, the only materials ADAs Henry and Verrastro turned over to the defense were the exhibits the prosecution entered into evidence or marked for identification, including some of the crime scene photographs, as well as the formal, sworn statements in question-and-answer format of testifying witnesses.

369. These witness statements were not disclosed until after each witness had completed his or her direct examination.

370. As just one example of this behavior, ADAs Henry and Verrastro did not turn over Mr. Hough's grand jury testimony to defense counsel until the middle of Mr. Hough's direct examination.

371. When Mr. Jay asked for time to review the statement, the Court reminded ADA Henry that it had previously directed him to turn over prior statements to defense counsel.

372. To shift blame, ADA Henry stated that he turned over the statement late because "we had a sick secretary take them home and do them last night."

- 44 -

373.  This did not explain why the prosecutors had not followed the court's order and disclosed the testimony previously.

374.  This late disclosure deprived defense counsel of the opportunity to investigate the information, to incorporate it into his opening statement or a theory of defense, and to fully prepare to utilize it during cross-examination of the witness.

375.  Unaware of the undisclosed evidence impeaching the credibility of the key prosecution witnesses, Messrs. Woodruff and Hough, as well as the undisclosed evidence implicating third parties in the murder, Mr. Walker's counsel made a tactical decision to forego a defense that Mr. Walker was not at the scene of the crime and contended instead that he had not done enough to make him guilty of the robbery and the murder.

376.  Competent counsel likely would have made a completely different tactical decision, leading to a more favorable outcome of the trial, had numerous items of *Brady* material not been withheld.

377.  The trial testimony of Mr. Hough focused almost exclusively on his claim that he had overheard Mr. Gibson state, while in the presence of Mr. Walker and the other boys, "I'm going to get me some money tonight."

378.  Mr. Hough had not made this claim in any of his prior statements to police officers.

379.  However, Mr. Walker's defense counsel did not receive any of Mr. Hough's prior signed statements to police officers until the completion of Mr. Hough's direct examination, and thus defense counsel had no opportunity to carefully plan his cross-examination with such statements.

380.    ADAs Henry and Verrastro never disclosed at all statements of the prosecution's witnesses that were unsigned by the witnesses and instead merely summarized in police reports, including statements of both Mr. Hough and Mr. Woodruff, despite their absolute duty to do so under the New York State *Rosario* rule as well as the requirements of *Brady*.

381.    Nor did they disclose any statement by any witness whom the prosecution did not call to testify, even where it was favorable to the defense.

382.    The prosecution disclosed no handwritten notes taken by any detective at any time during the investigation and also failed to disclose that handwritten notes had been destroyed.

383.    The prosecution presented no physical or forensic evidence tying Mr. Walker (or any of the other defendants) to the crime.

384.    The failure of the prosecution to disclose the aforementioned *Brady* material not only prevented the defense from making appropriate strategy decisions about the nature of the defense, but it also severely handicapped Mr. Walker's counsel's attempt to contradict or impeach Messrs. Woodruff and Hough's specific testimony implicating his client.

385.    It also deprived Mr. Walker of his constitutional right to present a defense that someone else had committed the crime.

386.    During his summation, Mr. Jay, without the benefit of the suppressed police reports and information, nevertheless argued, from inconsistencies in Mr. Woodruff's story, that prosecutors had pressured him to change his story and indoctrinated him.

387.    Falsely denying that Mr. Woodruff had been pressured or had any motive to lie, ADA Henry argued, "What is the motive?  The D.A. told him that that's what Walker did[?]  Well, how did the D.A. know that? . . . even if the D.A. did know . . . we wouldn't need Woodruff, would we."

388.     ADA Henry's argument denying that prosecutors told Mr. Woodruff what to say was belied by, among other things, the undisclosed police report of February 11, 1976, revealing that detectives, supposedly orchestrated by ADA Henry's colleague, ADA Drury, had gone from Mr. Hough to Mr. Woodruff to harmonize their new accounts.

389.     His representation that Mr. Hough had no motive to lie similarly was untrue:  Mr. Hough had been threatened with arrest and prosecution for the murder and was forcibly detained until he gave testimony in the grand jury favoring the prosecution.

390.     ADA Henry also falsely stated that Mr. Hough's testimony was totally consistent and never differed from his prior statements.

391.     In an inflammatory appeal to the jury's emotions, ADA Henry repeatedly mentioned "puddles of blood" on the walls caused by the attack.

392.     There was no such evidence in the trial record.

393.     On June 9, 1977, the jury convicted Mr. Walker of second-degree murder and first-degree robbery.

394.     After Mr. Walker's conviction but before his August 1977 sentencing, Thelma Green, Andre Hough's foster mother, told detectives that Mr. Hough had admitted to her that he had lied in his testimony implicating Mr. Walker and his friends after being told what to say.

395.     Ms. Green told ADA Drury that she believed Mr. Hough was not telling the truth, adding that her son had told her that he had been lying about the whole thing.

396.     On August 3, 1977, with Mr. Walker continuing to maintain his innocence, the court sentenced him to serve 17 years to life in prison, and he was sent upstate to serve his time.

**K.     THE ECDA OPPOSES MR. WALKER'S EFFORTS TO OVERTURN HIS CONVICTION**

397.     Following his conviction, Mr. Walker continued to maintain his innocence.

- 47 -

398.    Mr. Walker appealed his conviction, but the Appellate Division affirmed it.  *See People v. Walker*, 147 A.D.2d 927 (4th Dept. 1989), lv to app. den., 74 N.Y.2d 821 (1989).

399.    On September 24, 1982, Mr. Walker moved, pursuant to Criminal Procedure Law § 440.10, to vacate his conviction based on new evidence.

400.    The ECDA opposed the motion, incorrectly arguing, among other things, that Mr. Walker had no right to bring such a motion when he had not yet perfected his direct appeal.

401.    While the court granted a hearing for Mr. Walker's co-defendant, Mr. Gibson, it apparently followed the ECDA's argument in denying a hearing for Mr. Walker.

402.    On January 23, 1986, Mr. Walker again moved to vacate his conviction pursuant to CPL § 440.10, this time based upon the recantation, in the form of a sworn oral deposition, of Mr. Woodruff.

403.    Mr. Woodruff testified that he had been intimidated by armed police from the BPD to adopt a story based upon information the police gave him.

404.    He further alleged that he had been told that the police had other witnesses "upstairs" ready to "take his place"—i.e., testify against the others, and him—if he did not cooperate, and that he would be charged with murder and go to prison for life.

405.    In fact, he testified, he had not been involved in the murder at all and knew nothing about it, as he first told police on January 11, 1976.

406.    He said that the police had coerced him before he had any contact with ADA Drury, the lead prosecutor at Messrs. Gibson and Boyd's trials.

407.    The defense submitted as exhibits photographic evidence contradicting Mr. Woodruff's trial testimony that Mr. Crawford had been dragged up the driveway through the snow.

- 48 -

408.    In opposing the defense motion, the ECDA continued the coverup of the voluminous, favorable evidence that had been suppressed at the time of Mr. Walker's trial and contributed to his conviction.

409.    The affidavit of ADA Louis A. Haremski falsely stated that Mr. Woodruff had consistently been interviewed "in the presence of his parents."

410.    In fact, the ECDA knew or should have known from undisclosed police reports that, in his initial interview on January 11, 1976, and the next day when he was coerced into changing his story, Mr. Woodruff was interrogated by police outside the presence of his family.

411.    ADA Haremski further misrepresented that Mr. Woodruff had voluntarily changed his story the next day.

412.    In making this argument, he continued his office's suppression of the police reports documenting how police had coerced Mr. Woodruff.

413.    The ECDA also continued to suppress the other evidence, including but not limited to the items described in ¶¶ 132 and 356, *supra*, and elsewhere in this Complaint, contradicting Mr. Woodruff's trial testimony and implicating third-party suspects.

414.    Indeed, the affidavit falsely asserted that the jury in Mr. Walker's trial had all the prior statements and circumstances "surrounding Tyrone Woodruff's election to testify against his cohorts," when this was patently untrue.

415.    Relying on the ECDA's submission, the court (Kasler, J.) denied the motion without a hearing.

416.    Mr. Walker was granted parole in 1998, after serving 22 years in prison for the Crawford Murder.

417. Mr. Walker continued to maintain his innocence and fight to have his wrongful conviction vacated and his name cleared.

418. On or about October 1, 2012, Mr. Walker, now represented by attorney Steven M. Cohen, moved once again to vacate his conviction based upon newly discovered evidence.

419. The evidence included a second, even more detailed, sworn recantation of Mr. Woodruff, again in the form of an oral deposition, as well as newly discovered police documents obtained through a FOIL request, which supported Mr. Woodruff's claim that his testimony against Mr. Walker and the other boys had been coerced.

420. In opposing Mr. Walker's motion, ADA Nicholas Texido falsely contended that all police documents had been turned over at trial and that, even if they had not been, they were not material.

### L. THE COURT VACATES MR. WALKER'S WRONGFUL CONVICTION

421. On October 13, 2020, a prominent Buffalo criminal defense attorney, Paul J. Cambria, Jr., of Lipsitz Green Scime Cambria LLP, handling the case *pro bono*, filed a motion on behalf of Mr. Walker and his only surviving co-defendant, Darryl Boyd, to vacate their convictions pursuant to CPL § 440.10.

422. Mr. Walker moved on the grounds that the ECDA, during each of their separate trials in 1977, had failed to disclose two favorable crime scene photographs.

423. One was the photograph showing a single set of footprints in the snow, made by a heavyset man, in the backyard of Mr. Crawford's property, leading in the direction of Mr. Watson's property two houses over.

424. The second, which contradicted Mr. Woodruff's trial testimony, showed the absence of dragging marks and footprints in the snow along Mr. Crawford's driveway.

- 50 -

425.     After holding an evidentiary hearing, the court (Burns, J.) granted Mr. Walker's motion and, on August 18, 2021, vacated the convictions of Messrs. Walker and Boyd.

426.     The court credited the testimony of retired Judge James McLeod, who had represented Floyd Martin at the last of the four defendants' trials in 1977.

427.     Judge McLeod testified that, unlike the other defense counsel, he had made a specific discovery request for all the police photographs and thus had received the two photographs in question that contradicted the prosecution's theory of the case.

428.     He testified that these exhibits had proven decisive in the jury voting to acquit his client, Mr. Martin.

429.     Judge McLeod recalled that, based upon the photographs, together with the testimony that Mr. Watson had left the Golden Nugget with Mr. Crawford, he had contended that Mr. Woodruff's testimony was not truthful and that Mr. Watson likely was the killer.

430.     Judge McLeod's testimony was corroborated by handwritten notes in the prosecution's present case file showing that indeed he had made an argument during his trial summation about the significance of the footprints in the snow at the rear of Mr. Crawford's property.

431.     On September 23, 2021, the present District Attorney, John Flynn, acknowledging that he lacked any evidence with which to retry Messrs. Walker and Boyd, moved to dismiss the indictment against them, and the court granted the motion.

## VI.     **MR. WALKER'S DAMAGES**

432.     Mr. Walker's injuries and damages include, but are not limited to:

(a)     his complete loss of liberty during his pretrial and posttrial incarceration, totaling more than 22 years;

- 51 -

(b)    severe restrictions upon his liberty, privacy, and personal autonomy during parole supervision totaling another 17 years;

(c)    physical injuries he suffered during assaults upon him by guards and other inmates, as well his lack of adequate medical care for such injuries;

(d)    the mental and emotional effects of such assaults and of the gruesome, terrifying, homicidal, and disfiguring assaults on other inmates that he witnessed;

(e)    past and future physical illnesses and injuries as a result of his wrongful conviction and his experiences in prison;

(f)    past and future mental and emotional suffering;

(g)    the loss of the services, society, companionship, and consortium of his mother and other family members;

(h)    the loss of employment income and diminution of future earning ability in an amount to be determined;

(i)    legal fees and expenses for which he is responsible, including trial and post-trial representation; and

(j)    interest to the extent available under controlling law.

## CAUSES OF ACTION

### COUNT I
**42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments Against the Individual Defendants**

433.    Mr. Walker repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

434.    The Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, individually and/or in concert with each other and others

unnamed, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Mr. Walker, without probable cause to believe that Mr. Walker was guilty of any crime or could be successfully prosecuted, and caused him to be deprived of his liberty, in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

435.    The criminal proceedings terminated in Mr. Walker's favor.

436.    By virtue of the foregoing, and pursuant to 42 U.S.C. § 1983, the Individual Defendants, personally or through their Estates, are liable for the violations of Mr. Walker's constitutional rights and his resulting injuries.

### COUNT II
**Malicious Prosecution under New York State Law Against the Individual Defendants and the City of Buffalo**

437.    Mr. Walker repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

438.    The Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, individually and/or in concert with each other and others unnamed, acted with actual malice to initiate and/or to continue criminal proceedings against Mr. Walker without probable cause to believe that Mr. Walker was guilty of any crime or could be successfully prosecuted, in violation of his rights under the common law of the State of New York.

439.    The criminal proceedings terminated in Mr. Walker's favor.

440.    By virtue of the foregoing, the Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, are liable to Mr. Walker for malicious prosecution under the common law of the State of New York and for all his resultant damages.

- 53 -

441.    Under the principle of *respondeat superior*, the Defendant City is liable for the malicious prosecution of Mr. Walker by the Individual Defendants and other municipal employees, all of whom were acting within the scope of their employment, and for Mr. Walker's resultant damages.

### <u>COUNT III</u>
**42 U.S.C. § 1983 Unreasonable Seizure under the Fourth Amendment, and Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, Due to the <u>Fabrication of False or Misleading Evidence by the Individual Defendants</u>**

442.    Mr. Walker repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

443.    The Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, acting individually and/or in concert with each other and with others, acted deliberately, willfully, recklessly, and/or with deliberate indifference to the truth, to fabricate or manufacture false or misleading police reports, witness statements, and a Criminal Court complaint (collectively, the "<u>Fabricated Evidence</u>").

444.    The Individual Defendants forwarded, or caused to be forwarded, the Fabricated Evidence to prosecutors in the ECDA, intending that it be used against Mr. Walker during a criminal prosecution.

445.    The Individual Defendants knew that the Fabricated Evidence, if considered by a jury, would be likely to influence a jury's decision at trial to convict Mr. Walker.

446.    As a result of the Individual Defendants' conduct in forwarding, or causing to be forwarded, the Fabricated Evidence to the ECDA, prosecutors in that office initiated and continued a criminal prosecution of Mr. Walker, and he lost his liberty.

447.    The Individual Defendants' conduct violated Mr. Walker's right to be free from unreasonable seizure, as guaranteed by the Fourth Amendment to the United States Constitution,

and his rights to procedural and substantive due process and a fair trial, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

448.     The above misconduct was outrageous and shocking to the conscience.

449.     By virtue of the foregoing, the Individual Defendants are liable to Mr. Walker, pursuant to 42 U.S.C. § 1983, for the violation of his constitutional rights and his resultant injuries.

**COUNT IV**
**42 U.S.C. § 1983 Unreasonable Seizure under the Fourth Amendment, Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, and Denial of Reasonable Bail under the Eighth Amendment, Due to the Pretrial Withholding of Favorable Evidence Likely to Result in Plaintiff's Release from Custody ("*Russo* Claim") by the Individual Defendants**

450.     Mr. Walker repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

451.     Following the initiation of Mr. Walker's prosecution with the filing of a Criminal Court complaint, the continuation of the charges was subject to a preliminary hearing, at which a judge determines whether there was probable cause to prosecute, and a proceeding before a grand jury, which would decide whether the evidence supported formally charging Mr. Walker by indictment and binding him over for trial.

452.     Under New York law, as well as the Eighth and Fourteenth Amendments to the United States Constitution, the court, following the filing of charges, was required, upon application of the defendant, to consider whether to fix a reasonable bail so that the defendant could obtain his release.

453.     Under New York law, the strength of the prosecution's case was a significant factor for a court in determining whether to fix a reasonable bail and the amount of such bail.

454.    Despite knowing this, the Individual Defendants withheld, or caused to be withheld, from the ECDA, Mr. Walker and his lawyer, the grand jury, and the court exculpatory and impeachment evidence and other evidence favorable to the defense that completely undermined the prosecution's case.

455.    Had such evidence been timely disclosed, the charges against Mr. Walker likely would not have survived the preliminary hearing or the determination by the grand jury, and/or the court would have released Mr. Walker on his own recognizance or on a reasonable bail.

456.    The failure to make timely disclosure of such obviously significant evidence undermining the entire case caused Mr. Walker to be unnecessarily and unreasonably deprived of his liberty.

457.    This conduct was shocking to the conscience.

458.    It violated Mr. Walker's constitutional rights to be free of unlawful or unreasonable seizure under the Fourth and Fourteenth Amendments, to reasonable bail under the Eighth and Fourteenth Amendments, to a fair trial under the Sixth and Fourteenth Amendments, and to due process of law under the Fifth and Fourteenth Amendments.

459.    By virtue of the foregoing, the Individual Defendants or their Estates are liable, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Walker's constitutional rights and his resultant injuries.

## COUNT V
### 42 U.S.C. § 1983 Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments by Withholding Evidence Favorable to the Defense ("*Brady* Claim") by the Individual Defendants

460.    Mr. Walker repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

461.    At all relevant times, Mr. Walker had a right—under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and *Brady v. Maryland*, 363 U.S. 83 (1963) and its progeny—to timely disclosure to him, by the prosecution, of all evidence in its possession, custody or control that was favorable to his defense, either because it tended to show his innocence, tended to impeach the credibility of the prosecution's witnesses against him, or both ("*Brady* material").

462.    In furtherance of this right, police officers, including the Individual Defendants, surviving or sued through the Executors and/or Administrators of their Estates, had a duty to timely disclose, or to ensure the timely disclosure of, all potential *Brady* material to the ECDA so that it could decide what to disclose to the defense.

463.    The Individual Defendants violated this duty by knowingly, willfully, intentionally, recklessly, and/or negligently failing to timely disclose to the prosecutors in charge of Mr. Walker's criminal prosecution numerous items of "*Brady*" material, including documents and unrecorded information, including but not limited to the material enumerated in ¶¶ 132 and 356, *supra,* and elsewhere in this Complaint, and by destroying their notes.

464.    The undisclosed *Brady* material was material to the outcome of the trial at which Mr. Walker was convicted.  But for the Individual Defendants' failure to disclose or cause the disclosure of the *Brady* material, there is a reasonable likelihood that Mr. Walker would have been acquitted or otherwise received a more favorable outcome to his trial.

465.    By virtue of the foregoing, the Individual Defendants or their Estates are liable, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Walker's constitutional rights and his resultant injuries.

<u>COUNT VI</u>
**42 U.S.C. § 1983 and *Monell* Municipal Liability for the Conduct of Employees of the BPD**
<u>Against the City of Buffalo</u>

466.    Mr. Walker repeats and realleges each allegation contained in the preceding

paragraphs as if fully set forth herein.

467.    At all relevant times, the Police Commissioner, detectives, and other police

officers employed by the BPD were agents and employees of the Defendant City.

468.    Under the principles of municipal liability for federal civil rights violations, the

City's Police Commissioner or his authorized delegates, including the Chief of the Homicide

Detectives Unit, during all times relevant to this Complaint, had final responsibility for training,

instructing, supervising, and disciplining police officers and other employees of the BPD with

respect to the investigation and prosecution of criminal matters, including homicides.

469.    The areas in which the Police Commissioner or his authorized delegates,

including the Chief of the Homicide Detectives Unit, were responsible for training, instructing,

supervising, and disciplining police officers and other employees of the BPD included but were

not limited to:

        (a)    the constitutional obligation, pursuant to the Fourth, Fifth, and Fourteenth

                Amendments to the Constitution, not to initiate or continue a prosecution,

                and to cause a criminal defendant's deprivation of liberty, without

                probable cause to believe he or she has committed a crime;

        (b)    the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and

                Fourteenth Amendments, not to fabricate or manufacture evidence,

                including the coercion of confessions and witness statements through

                illegal detentions without probable cause, threats, lies, or trickery and the

                preparation of false or materially misleading or incomplete reports, for use

against criminal suspects and defendants in criminal prosecutions and

trials; and

(c)     the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and

Fourteenth Amendments, to make timely disclosure of evidence favorable

to the defense to the prosecution for disclosure in turn to a criminal

defendant for use during pretrial and trial proceedings at which the

defendant's liberty is at stake.

470.    During all times material to this Complaint, the City, through its policymaking

officials in the BPD, owed a duty to the public at large and to Mr. Walker to implement policies,

procedures, training, discipline, customs, regulations, and practices sufficient to prevent, deter,

and avoid conduct by BPD employees that would result in the violation of the above-mentioned

constitutional obligations.

471.    During all times material to this Complaint, these policymakers, including the

Chief of the Homicide Detectives Unit, to whom policymaking responsibilities for homicide

investigations had been delegated, knowingly and intentionally breached, or were deliberately

indifferent to, this duty.

472.    Furthermore, these policymakers created substantial incentives for their

employees to commit the above-described constitutional violations by pressuring police officers,

particularly homicide detectives handling high-profile investigations, to close cases and initiate

prosecutions through coercion, trickery, falsification of reports, and suppression of evidence.

473.    The aforesaid deliberate or de facto policies, procedures, practices, and/or

customs (including the failure to properly instruct, train, supervise, and/or discipline employees)

were implemented or tolerated by policymaking officials for the Defendant City—including but

not limited to the Police Commissioner, the Chief of Detectives, and the Chief of the Homicide Detectives Unit—who knew, or should have known:

> (a)  to a moral certainty that such policies, procedures, practices, and/or customs concern issues that regularly arise during criminal investigations and prosecutions;
>
> (b)  that such issues present BPD employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;
>
> (c)  that BPD employees facing such issues have strong incentives to make the wrong choices, especially given the pressure placed on BPD employees to make arrests, close cases, and secure indictments and convictions;
>
> (d)  that the wrong choice by BPD employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him constitutional injury; and
>
> (e)  that BPD employees had a history of making wrong choices in such matters.

474.  At the time of Mr. Walker's arrest and prosecution, BPD policymaking officials were on notice of the risk of misconduct by BPD employees that would violate the constitutional obligations identified in ¶ 469.

475.  City policymaking officials were on notice based in part on numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division discussing the constitutional obligations of police officers during criminal investigations and prosecutions.

476. City policymaking officials were on notice based on the inherent obviousness of the need to train, supervise, and discipline police officers with respect to their constitutional obligations to counteract the pressure on such officers to close cases and to obtain arrests and convictions.

477. Indeed, BPD policymakers knew, prior to and during the period of the Crawford investigation, that numerous BPD officers had orchestrated an arrest and conviction in a high-profile robbery-murder case of a Black suspect using the same deceptive, coercive, and dishonest practices that the entire Homicide Detectives Unit then used in this case.

478. In a federal habeas corpus proceeding then pending in Buffalo, the BPD was credibly accused of obtaining the arrest and conviction of the petitioner by coercing a confession from a Black suspect through lies and threats. As Chief Judge Curtin of this Court ultimately wrote in vacating the conviction, the BPD had illegally detained and interrogated numerous Black men without probable cause, including the petitioner, whom detectives picked up based upon an alleged anonymous tip. They questioned the petitioner for hours at night when an attorney, friends and family could not offer their support to him, a tactic intended to heighten his anxiety. They surrounded him, kept him in isolation, lied to him that he had been implicated by others, threatened him with dire consequences if he did not confess, suggested to him that he minimize his role, and promised him leniency in exchange for doing so—exactly the tactics used in Plaintiff Walker's case.

479. Chief Judge Curtin wrote that the police officers' lying to petitioner was "an obvious effort to trick him into implicating himself and others. This police practice is to be soundly condemned. Such deception clearly has no place in our system of justice." *Robinson v. Smith,* 451 F. Supp. 1278 (W.D.N.Y. 1978) (Curtin, C.J.).

480.     Notwithstanding their awareness of the widespread use of such tactics by the BPD, prior to the investigation of the Crawford Murder on January 2, 1976, and through Mr. Walker's trial in April 1977, BPD policymaking officials failed to adequately instruct, train, discipline and supervise police officers with respect to their obligations (1) to disclose, to the defense or to prosecutors, evidence impeaching the credibility of prosecution witnesses or tending to exculpate criminal suspects or defendants; (2) to make a record of coercion or inducement of witnesses and of witnesses' prior inconsistent statements; (3) to preserve rather than destroy their handwritten notes; (4) to refrain from fabricating evidence, including by using coercion or deception to obtain false confessions and witness statements and preparing false, materially misleading, or incomplete reports; and (5) to refrain from initiating or continuing a prosecution without probable cause.

481.     The issues of whether to preserve and to disclose evidence favorable to the defense to prosecutors or to the defense, how to ensure that evidence is not fabricated through false confessions and witness statements and false, misleading, or incomplete reports, and how to ensure that a prosecution is not initiated or continued without probable cause regularly arise in criminal investigations and prosecutions.

482.     Nevertheless, the BPD provided no or plainly inadequate *Brady*-related training; provided no or plainly inadequate training concerning making and preserving a record of information that was favorable to a criminal suspect or defendant; had no policies at all, or at least no policies that were adequately made known to detectives, requiring disclosure of *Brady* material; and did not discipline officers who failed their constitutional duty to disclose such information to prosecutors.

483.     Similarly, the BPD provided no or plainly inadequate training on interview and interrogation protocols to ensure the truthfulness of confessions and witness statements; affirmatively encouraged officers to illegally detain witnesses and suspects for interrogation and use or close their eyes to coercive interview and interrogation tactics likely to lead to false confessions and witness statements; provided no or plainly inadequate training on preparing reports that are truthful, accurate, and complete; had no policies at all, or at least no policies that were adequately made known to detectives, discouraging officers from using coercive interview and interrogation tactics, including the unlawful detention of witnesses and suspects, including vulnerable teenagers, without probable cause, likely to lead to false confessions and witness statements; encouraged or at least tolerated detectives' practice to refrain from making a record of information favorable to suspects and defendants and to destroy their notes, and did not discipline officers who fabricated evidence by coercing false confessions and witness statements and preparing false, materially misleading, or incomplete reports.

484.     Indeed, rather than provide formal training on lawful interrogation techniques, the BPD endorsed on-the-job training by detectives who had a history and practice of unlawfully coercing witnesses, thereby perpetuating such practices and creating an atmosphere in which detectives assumed either that such techniques were appropriate or that, even if inappropriate or unlawful, they would get away with them without personal consequence to them.

485.     The BPD also provided no or plainly inadequate training on how to ensure that probable cause exists to initiate or continue a prosecution, including ensuring that the prosecution is not initiated or continued based on the use of manufactured or otherwise unreliable evidence.

486. BPD policymaking officials had, before Mr. Walker's arrest, issued no Patrol Guide provision or other written directive to officers concerning when, if at all, to disclose information favorable to a criminal suspect or defendant to prosecutors.

487. With deliberate indifference to such misconduct, BPD policymaking officials failed to take adequate steps to train, supervise, or discipline BPD employees to prevent or deter such constitutional violations from occurring.

488. As a result of the foregoing, at the time of the investigation of the Crawford Murder, it was the policy, custom or practice of BPD detectives to coerce false statements from suspects and witnesses, including inherently vulnerable teenagers, through unlawful investigatory detentions without probable cause and other means, to prepare false or misleading investigative reports, to fail to document information that was favorable to suspects and defendants or to destroy their notes containing such information, and to withhold evidence and information favorable to a criminal suspect or defendant from prosecutors.

489. Additionally, detectives were encouraged to engage in such illegal activities by their knowledge that it would be at the very least tolerated and excused by BPD policymakers for whom closing high-profile cases with arrests was the priority.

490. This is apparent from the knowing participation in such illegal activities, during the Crawford investigation by Defendant Donovan, the Chief of the Homicide Detectives Unit, and the policymaking official for the department with respect to homicide investigations.

491. Indeed, he ratified the conduct of the unit he led and made it into municipal policy by approving the arrest of Mr. Walker and his friends, designating all the detectives in the unit as co-arresting officers, and signing under oath the false criminal court complaint that initiated the prosecution.

492. That the entire Homicide Detectives Unit knowingly participated in fabricating a case against Mr. Walker and his young teenaged friends, documenting their fabricated case through a series of false or misleading investigative reports, omitting information favorable to the suspects from their reports, destroying their notes, and withholding information favorable to a criminal suspect or defendant from the prosecutors, proves the existence of an anything-goes culture of illegality that policymakers' indifference to such misconduct predictably had wrought and that such misconduct was, at that time, the policy, custom and practice of the BPD.

493. The aforementioned unconstitutional or deliberately indifferent policies, procedures, training, discipline, customs, regulations, and/or practices of the BPD were a direct, foreseeable, proximate, and/or substantial cause of the violations of Mr. Walker's federal constitutional rights in this case by employees of the BPD and his resulting injuries.

494. By virtue of the foregoing, the Defendant City is liable for the violation of Mr. Walker's constitutional rights pursuant to 42 U.S.C. § 1983 and his resultant injuries.

### COUNT VII
### 42 U.S.C. § 1983 and *Monell* Municipal Liability Against the County of Erie for the Misconduct of Prosecutors

495. Mr. Walker repeats and realleges each allegation contained in paragraphs 1 through 432 as if fully set forth herein.

496. The Erie County District Attorney and his authorized delegates, at all relevant times, had final authority with respect to the training, supervision, discipline, and overall management of personnel employed by or assigned to the ECDA with respect to all of the office's functions, including the investigation and prosecution of criminal cases, and constituted County policymakers for whose actions or omissions the County is liable.

497. The District Attorney, at all relevant times, was and is an elected officer of the County, and the ECDA was and is substantially funded out of the County's budget.

- 65 -

498.    The District Attorney was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

499.    The DA and his assistant district attorneys are agents and employees of the Defendant County.

500.    Under New York State law, the County, at all relevant times, was liable for torts committed by County officers and employees, including the District Attorney and his assistants. *See* N.Y. County Law §§ 53, 941.

501.    The County represents such officers and employees in judicial proceedings and indemnifies them because they are County officials.

502.    At the time of Mr. Walker's criminal trial, as a criminal defendant, he was entitled, under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, to timely disclosure of all material information that was in the actual or constructive possession, custody, or control of the ECDA and that was favorable to the defense, including, but not limited to, exculpatory information that tended to contradict the prosecution's case or otherwise show he was innocent, and impeachment information that tended to undercut the credibility of the witnesses against him, known as "*Brady* material."

503.    The prosecution was constitutionally required to disclose *Brady* material as soon as reasonably possible regardless of whether the defense had made a specific request for it.

504.    The prosecution was constitutionally required to find out about and disclose such information, whether it was in its actual possession or in the possession of any police department that had been involved in the investigation or prosecution of the matter.

505.    This was a continuing obligation even after a conviction at trial, such as during proceedings brought by a convicted defendant challenging the fairness of his conviction.

506.    While the right to timely disclosure of *Brady* material was intended to guarantee the fairness of a criminal trial, the prosecution also had an obligation under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution to disclose evidence favorable to the defense early in a criminal prosecution, where it was so clearly relevant to whether the prosecution should continue, or the defendant should be released on bail, that the suppression of it would shock the conscience.

507.    Similar to the *Brady* obligation is the state constitutional requirement, established by *People v. Rosario,* 9 N.Y.2d 286 (1961), requiring disclosure at trial of the prior recorded statements of prosecution witnesses so that defense counsel, singularly dedicated to his client's cause, could decide how to use such material to impeach such witnesses.

508.    Often, *Rosario* material also contained information that was favorable to the defense as defined by *Brady* and its progeny.

509.    Related to *Brady* is a prosecutor's constitutional obligation, at all stages of a criminal prosecution, not to rely on or fail to correct false or misleading evidence or argument.

510.    The suppression of evidence favorable to the defense from the court during a preliminary hearing or bail hearing, or from a grand jury deciding whether to vote an indictment, and from a petit or trial jury, likely would leave an impermissibly false or misleading impression with the fact finder about the strength of the evidence supporting the prosecution's case and about the defendant's guilt.

511.    The federal constitutional obligation to make timely disclosure of evidence favorable to the defense for use during pretrial and trial proceedings superseded any provisions of the state's Criminal Procedure Law or the *Rosario* rule, to the extent such state rule was less protective of a criminal defendant's rights.

512. In other words, the federal constitutional requirement of prompt disclosure of evidence favorable to the defendant, irrespective of whether the defense had made a specific request, applied even though state discovery provisions required a specific request for discovery material and permitted the prosecutor to withhold the prior recorded statements of its witnesses until after they had completed their direct testimony at trial.

513. Such state rules did not provide sufficient, timely disclosure to enable the defense a reasonable opportunity under *Brady*'s constitutional rule to investigate the information, integrate it into the defendant's trial strategy, and prepare an effective cross-examination.

514. Furthermore, a prosecutor had a constitutional obligation not to conduct himself before a jury in a manner that would deprive a criminal defendant of his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

515. At the time of Mr. Walker's trial in 1977, there were well-established rules of behavior for prosecutors before a jury, particularly with respect to opening arguments and summations, which were intended to ensure a fair trial.

516. If serious enough, the violation of such rules would deprive a criminal defendant of his federal constitutional rights.

517. The well-established rules regarding prosecutorial conduct prohibited prosecutors from making false or misleading factual assertions or arguments, making arguments calculated to distract the jury by appealing to its prejudices and emotions, or arguing "facts" or "evidence" that were not in the record.

518. The prosecutors handling the prosecution of Mr. Walker violated these rules.

519. As set forth above, the prosecutors of Mr. Walker relied on false or misleading evidence and argument to cause a judge to find probable cause to continue the prosecution at a

preliminary hearing and to keep Mr. Walker in jail, to deceive a grand jury into voting to indict Mr. Walker and the other defendants, and to convict Mr. Walker at trial.

520.    They suppressed from the court, the grand jury, the trial jury, and, of course, from the defense, evidence that proved that the witnesses against Mr. Walker were lying or not credible, that police had coerced them into lying, that a known third party was likely to have committed the crime, and that similar crimes had been committed in the area after Mr. Walker had been taken into custody.

521.    Had this evidence been timely disclosed, Mr. Walker would have been released early in the proceedings and ultimately would have achieved a more favorable outcome to his trial.

522.    Thereafter, prosecutors at the ECDA, reflecting the Office's ongoing indifference to *Brady* violations, successfully opposed Mr. Walker's motions to overturn his conviction by misleading the courts about whether specified items had been disclosed at trial and whether such items were favorable to the defense under *Brady* at all.

523.    This behavior prolonged for many years Mr. Walker's imprisonment as well as the deep restrictions upon his liberty as a parolee.

524.    Individually and collectively, the above misconduct deprived Mr. Walker of his constitutional rights to due process and a fair trial and to be free from unreasonable seizure and was a substantial cause of Mr. Walker's constitutional injuries.

525.    Individually and collectively, these violations of Mr. Walker's constitutional rights were directly, foreseeably, proximately, and/or substantially caused by the unlawful policies, customs, or practices of the ECDA as well as by the deliberate indifference of

policymakers at that office, acting on behalf of the Defendant County, to the occurrence of such constitutional violations.

526.    Under the principles of municipal liability for federal civil rights violations, at all relevant times, the District Attorney or his authorized delegates had final managerial responsibility for establishing lawful policies of the office and for training, instructing, supervising, and disciplining attorneys and other employees of the ECDA regarding their constitutional obligations.

527.    Nevertheless, at the time of Mr. Walker's trial, the ECDA maintained unlawful policies, customs, or practices, and was indifferent to violations of fair trial rights, all of which were a substantial cause of the violations of his constitutional rights and to his damages.

528.    Specifically, first, the ECDA had an unlawful policy, custom or practice of impermissibly limiting its obligation to disclose *Brady* material to the defense to include only truly "exculpatory"—rather than favorable—material.  This baseless narrowing of the *Brady* doctrine's scope, which encompasses not only exculpatory material but also all other information favorable to the defense, such as impeachment evidence and evidence identifying alternate perpetrators of the crime, deprived criminal defendants of their constitutional right to a fair trial.

529.    Second, the ECDA had an unlawful policy not to disclose *Brady* material to the defense, the court, or the grand jury at the preliminary hearing, bail hearing, and grand jury stages of a case, thereby deceiving fact finders about the strength of the prosecution's case and causing criminal defendants to be unfairly and unreasonably deprived of their liberty.

530.    Third, the ECDA had an unlawful policy, custom or practice of not disclosing evidence favorable to the defense, even exculpatory evidence, for use at trial unless the defense specifically requested it, and then often did not disclose it anyway.

531. Fourth, the ECDA had an unlawful policy, custom or practice to not disclose impeachment information contained in the prior recorded statements of prosecution witnesses until after such witnesses completed their direct examination at trial, thus making it difficult, if not impossible, for the defense to investigate the information, incorporate it into counsel's opening statement and overall defense strategy, and plan an effective cross-examination.

532. Fifth, the ECDA had an unlawful policy, custom or practice of not disclosing police reports containing information favorable to the defense obtained from witnesses who were not called by the prosecution to testify.

533. Sixth, the ECDA had a policy, custom or practice for prosecutors, especially in high-profile cases, to make inflammatory, misleading, and even false summations that violated the aforementioned, well-established rules of behavior and which, like *Brady* violations, deprived criminal defendants such as Mr. Walker of their constitutional right to a fair trial.

534. Indeed, prosecutors would give summations that were false or misleading precisely because they contradicted evidence that the same prosecutors had suppressed under *Brady*.

535. Finally, seventh, the ECDA had a policy, custom or practice of continuing to withhold *Brady* material when faced with post-trial motions by a defendant challenging the lawfulness of his conviction, thereby prolonging the defendant's imprisonment.

536. The District Attorney and his designees, as policymakers for the ECDA and the County, encouraged such violations to occur through their policy of deliberate indifference to them.

537.    At all relevant times, the ECDA had no prosecution manual or other written rules or procedures regarding *Brady* and *Rosario* disclosure or trial advocacy, including summation behavior.

538.    At all relevant times, the ECDA had no employee handbook, manual, or other document setting forth any disciplinary process for prosecutorial misconduct, or potential sanctions for them, nor was any such process made known to employees in some other manner as a deterrent to such misconduct.

539.    At all relevant times, even though the District Attorney knew or should have known that prosecutors on his staff, including the most experienced prosecutors handling the ECDA's most important cases, were committing constitutional violations that deprived criminal defendants of their constitutional right to a fair trial, he did not supervise, or require supervision of, prosecutors in connection with such functions.

540.    He and his designees kept no record of misconduct by individual prosecutors.

541.    He neither investigated nor disciplined prosecutors who violated rules designed to protect the fair trial rights of criminal defendants.

542.    He did not train prosecutors in such functions, even when he became aware or should have been aware of appellate decisions that showed the ECDA's policies, customs or practices were unlawful.

543.    The knowledge among ECDA prosecutors that there would be no personal consequence for them if they violated the due process and fair trial rights of criminal defendants encouraged prosecutors, including the prosecutor handling Mr. Walker's case, to believe that such violations would go unpunished.

544.     The District Attorney's policy, custom, and/or practice of approval, ratification of, or deliberate indifference to, violations by ECDA prosecutors of their constitutional obligations to afford criminal defendants a fair trial foreseeably encouraged such violations to continue.

545.     Just four years before Mr. Walker's prosecution was initiated, in *Giglio v. United States*, 405 U.S. 150 (1972), the United States Supreme Court held that a prosecutor's office is responsible for disclosing impeachment evidence known to members of the office even if the trial prosecutor in the given case is not aware of such evidence.

546.     The same rule applied to evidence known to police detectives who worked on the case.

547.     In the same decision, the Court advised district attorneys to adopt office-wide information-management systems to keep track of impeachment evidence to make sure that the assigned prosecutor would learn about it and disclose it.

548.     Nevertheless, the ECDA adopted no system of checklists, receipts, or other procedures to ensure that all investigative records of the BPD would be made available to the assigned prosecutor so that he could fulfill his *Brady* obligations.

549.     The absence of any such procedures created the predictable risk that, in a case like Mr. Walker's, police records containing evidence favorable to the defense would not be obtained or disclosed.

550.     In *United States v. Agurs*, 427 U.S. 97 (1976), handed down while Mr. Walker's case was awaiting trial, the United States Supreme Court explicitly held that prosecutors are required under *Brady* to disclose information favorable to the defense regardless of whether the defense had specifically requested such disclosure.

551. This decision made clear that the ECDA policy, custom, or practice to withhold such material absent a specific request was unconstitutional, yet the District Attorney failed to train prosecutors about this decision or make clear that the policy, custom, or practice of the office in this regard had to change.

552. As a result, Mr. Walker's prosecutors, and the prosecutors involved in handling the trials of Messrs. Gibson, Boyd and Martin, did not disclose evidence favorable to the defense unless it was specifically requested in a discovery motion or, under the ECDA's overly restrictive view of the state *Rosario* obligation, had to be disclosed as a witness's formal, signed, prior-recorded statement.

553. Court decisions before, during, and immediately after Mr. Walker's trial revealed the misunderstanding of ECDA prosecutors regarding their *Brady* and related *Rosario* obligations and the ECDA's policy, custom, and practice to apply *Brady* and *Rosario* in an overly narrow manner.

554. In *People v. Anderson*, 25 A.D.2d 602 (4th Dept. 1966), the Appellate Division unanimously reversed a defendant's felony assault conviction because of the prosecution's failure to disclose the testimony of the complainant and a second witness before a separate grand jury investigating a second defendant's involvement in the same incident.

555. In *People v. Kampshoff,* 53 A.D.2d 325, 332 (4th Dept. 1976), the Appellate Division did not reverse, but it noted that—as in Mr. Walker's case—the prosecution had failed to disclose a key witness's statements recorded in police reports.

556. In *People v. Mitchell,* 99 Misc.2d 332 (Sup. Ct., Erie Co. 1979), a Supreme Court justice had to order the ECDA to disclose grand jury testimony where there was "no question" that it was "exculpatory."

- 74 -

557.    The court warned that "compliance with Brady cannot be made with clue-dangling or gamesmanship in place of full disclosure."  *Id.* (quoting *People v. Bottom,* 76 Misc.2d 525, 529 (Sup. Ct., N.Y. 1974)).

558.    In *People v. Cadby,* 75 A.D.2d 713 (4th Dept. 1980), the Appellate Division held that the prosecution had impermissibly withheld the prior statement of a key witness, the complainant, recorded in a police report, evidently—as in Mr. Walker's case—because it was not a signed statement.

559.    The prosecution waited to disclose the statement until the defense elicited its existence from the prosecution's last witness, the police officer who had recorded it—too late to use it to cross-examine the declarant.  The Appellate Division remanded the case for a hearing into how prejudicial the error was to the defendant's right to a fair trial.

560.    In *Matter of Potenza v. Kane,* 79 A.D.2d 467 (4th Dept. 1981), a mistrial had to be declared because of the trial prosecutor's apparent negligence in failing to disclose a tape recording of the defendant.

561.    In *People v. Clark,* 89 A.D.2d 820 (4th Dept. 1982), the Appellate Division did not reverse due to lack of sufficient prejudice, but it noted that the prosecution did not disclose exculpatory material until near the close of the People's direct case.

562.    That the policy of the ECDA at the time of Mr. Walker's trial was to achieve convictions at any cost and to tolerate, if not encourage, misconduct is shown by various circumstances that include, but are not limited to:

      (a)    the promotion of prosecutors to executive positions, and to handle the most significant of the office's trials, who had a reputation for and a history of such misconduct;

(b)    the failure to adopt or utilize any manuals, rules, procedures, or training to prohibit or prevent such misconduct; and

(c)    the failure to take any disciplinary action when prosecutors committed misconduct or were found by courts to have done so.

563.    This policy of deliberate indifference created an anything-goes or winning-is-everything mentality that was a substantial cause of the constitutional violations in Mr. Walker's case and his resultant injuries.

564.    The District Attorney's blind eye to outrageous behavior by one of the county's most well-known prosecutors, ADA Albert M. Ranni, set the tone for the ECDA and revealed the DA's indifference to misconduct similar to that which led to Mr. Walker's conviction.

565.    Mr. Ranni was notorious in the Buffalo criminal justice community for his overzealous and improper tactics.

566.    Nevertheless, the DA assigned him some of the most important cases in the office, appointed him chief of the felony bureau in 1973, and then promoted him to deputy DA in charge of prosecutions in 1982.

567.    His promotions and continuation as a high-level executive occurred notwithstanding his history of misconduct and a series of extraordinarily harsh court decisions condemning it.

568.    While Mr. Walker's prosecution was pending in 1976, Mr. Ranni used pervasively improper tactics to obtain the conviction of a completely innocent man, J. L. Ivey, on three counts of murder and two counts of first-degree robbery.

569.    Mr. Ranni brought the case based upon patently improper eyewitness identifications by witnesses to whom the police repeatedly showed Mr. Ivey's photograph, even

after they initially failed to recognize him and even though they had given descriptions of the perpetrator that did not fit Mr. Ivey's appearance.

570.    In overturning the conviction, the Appellate Division, in a unanimous decision by five justices, deplored Mr. Ranni's behavior throughout the trial.  *See People v. Ivey,* 83 A.D.2d 788 (4th Dept. 1981).

571.    It wrote that "the record is replete with numerous and repeated acts of improper and prejudicial conduct … which deprived the defendant of a fair trial."

572.    Writing that it would discuss just a few of Mr. Ranni's many acts of misconduct, the court noted that he repeatedly offered into evidence, in front of the jury, clearly inadmissible composite sketches that the court had ordered to be excluded, then made a "highly improper" argument to the jury "insinuat[ing] that the court's ruling unfairly precluded him" from offering such evidence.

573.    The court "condemn[ed] the prosecutor's inflammatory and prejudicial opening statement and summation," which tried to scare the jury that an acquittal "would mean that the 'murderer goes free,'" as well as his remarks to the jury implying "that he knew some things about the case he wished that they knew …"

574.    The court also "condemned" the prosecutor's "attempts in his summation to inject sympathy for the victim" and his "disparagement" of the defendant's alibi witnesses and his lawyer.

575.    Following the reversal of Mr. Ivey's conviction, new evidence emerged that someone else committed the crime, and he was fully acquitted at his retrial.

- 77 -

576.     Thereafter, the New York Court of Claims, finding by clear and convincing evidence that Mr. Ivey was innocent, awarded him substantial damages for the unjust conviction that Mr. Ranni's misconduct had brought about.

577.     There was no negative consequence to Mr. Ranni even though his egregious misconduct had caused the conviction, and years of imprisonment, of an innocent man, and cost the taxpayers the expense of a civil settlement.

578.     In 1977, the year that Mr. Walker and his three friends were all tried for the Crawford Murder, Mr. Ranni used similar tactics to gain the conviction of Kenneth Johnson for robbery and rape.

579.     On appeal, all five justices of the Appellate Division condemned Mr. Ranni's behavior.  *See People v. Johnson,* 62 A.D.2d 555 (4th Dept. 1978).

580.     In a rare rebuke, the majority opinion of three justices called out Mr. Ranni by name in expressing their "concern with misconduct of Mr. Ranni throughout the trial" while warning, in an apparent indirect reference to the County, that "unadulterated unfairness and deceit have become the rule."

581.     The majority did not reverse the conviction because of the overwhelming evidence of the defendant's guilt, but in the dissenting opinion by Justice Hancock, he and Justice Witmer detailed the misconduct by Mr. Ranni that had disturbed the entire court.

582.     Justice Hancock wrote that "the record is … permeated with acts of improper, overreaching and prejudicial conduct by the prosecuting attorney …"

583.     Justice Hancock recorded his and Justice Witmer's "particular disapproval" of Mr. Ranni accusing the defense of having "sugared up," "staged," and "rehearsed" the testimony of defense witnesses.  They condemned as "highly improper" his having accused the defendant

of lying when he pleaded not guilty to unrelated charges—a formal process that occurs in virtually every criminal case—only to later admit guilt, and then argued in summation that the defendant's not guilty plea in the case at hand was similarly false:

> "Now, the mere assertion of innocence isn't proof. You know now that this assertion, this claim is often made by guilty people to avoid justice. The defendant himself raised this claim on prior occasions: other crimes—not rape crimes—other crimes; pleaded not guilty."

584.    Justice Hancock disapproved of the prosecutor's tactics "in asking irrelevant questions of the defendant … which were obviously asked for their prejudicial effect," such as whether he remembered admitting to a judge in an unrelated case that he had "called the arresting officer … a 'motherfucker,'" and portraying the defendant as a "hard drug traffic[ker]" through repetitive questioning distorting his involvement in small marijuana sales.

585.    Finally, Justices Hancock and Witmer condemned Mr. Ranni for deriding defense counsel by calling him "Dr. Hocus Pocus" and saying that "the D.A. is not going to prosecute for perjury" because defense counsel's arguments had not been made under oath.

586.    Summing up, Justice Hancock wrote:

> From the record there clearly emerges the picture of an overbearing prosecutor obsessed with the idea of obtaining a conviction at any costs, ignoring the court's rulings, deliberately asking improper and prejudicial questions, and engaging in unpardonable efforts in comments during the trial and in summation to disparage defense counsel and destroy his credibility with the jury.

587.    Subsequently, Federal District Judge John Elfvin, in *Johnson v. Smith*, CIV 81-329E, issued a rare grant of federal habeas corpus relief, vacating the defendant's conviction because Mr. Ranni's pervasive misconduct had violated his federal constitutional right to due process and a fair trial.

588.    Significantly, the court noted that the District Attorney's Office had conceded that Mr. Ranni's conduct had been "improper."

589.    Notwithstanding these decisions and his acknowledgment of Mr. Ranni's misconduct, the District Attorney permitted Mr. Ranni to continue to handle the most notorious cases the office prosecuted, unrestrained by basic rules of fairness, and promoted him to Deputy DA in charge of prosecutions.

590.    In the famous multiple-murder prosecution of Pvt. Joseph Christopher in the mid-1980s, the Appellate Division affirmed the manslaughter conviction because of overwhelming evidence of guilt but refused to "condone" Mr. Ranni's behavior.  *People v. Christopher*, 170 A.D.2d 1020 (4th Dept. 1991).  Noting that the State had conceded his misconduct, the court wrote:

> [T]he Trial Assistant engaged in inappropriate and improper conduct during his cross-examination of a defense psychiatrist, his direct examination of the People's psychiatrist, and on summation. The Trial Assistant, whose misconduct has resulted in at least one reversal of a murder conviction by this Court *(see, People v. Ivey,* 83 A.D.2d 788), consistently referred to matters not in evidence, made himself an unsworn witness, flouted rulings by the trial court on evidentiary matters, and made flippant remarks which detracted from the seriousness of the proceedings.

591.    Other prosecutors in the office, including in Mr. Walker's case, engaged in misconduct similar to Mr. Ranni's both before and immediately after Mr. Walker's trial.

592.    The conduct, as well as the court decisions noting it, demonstrated the existence of unlawful policies, customs, and practices; the DA's failure to take any disciplinary or other remedial action showed the ECDA's policy of deliberate indifference to such misconduct.

593.    In *People v. Moore,* 26 A.D.2d 902 (4th Dept. 1966), the Appellate Division reversed the conviction and required a new trial because the prosecutor, during his summation, improperly commented on the defendant's exercise of his constitutional right to remain silent and "exceeded proper limits in telling the jury that if they wanted to live in a community where crime runs rampant they should acquit the defendant."

594.     In *People v. Slaughter,* 28 A.D.2d 1082 (4th Dept. 1967), the court reversed a murder conviction after the prosecutor, ridiculing the defendant's insanity defense, stated falsely in summation that if the defendant was acquitted, he would be "on the streets again within 30 days," decried permissive societal attitudes, urged the jury not to "extend to the Henry Slaughters of the world the license to strike out and kill … or are you going to call them to task?  Are you going to protect, finally here, … the rights of the community in which you live."

595.     In *People v. Zachery,* 31 A.D.2d 732 (4th Dept. 1968), the Appellate Division reversed a robbery conviction due to the "prejudicial conduct of the prosecutor in calling to the witness stand a co-defendant with advance knowledge that he was going to invoke the privilege against self-incrimination and refuse to answer questions" and the "impropriety" in eliciting the out-of-court statement of a co-defendant incriminating the defendant.

596.     In *People v. Washington,* 32 A.D.2d 605 (4th Dept. 1969), the Appellate Division reversed a robbery conviction where the prosecutor improperly cross-examined the defendant repeatedly whether he had twice kicked a police officer in the groin, in an improper effort "to persuade the jury that defendant was an habitual groin kicker."

597.     In *People v. Damon,* 24 N.Y.2d 256 (1969), the Court of Appeals reversed a child sexual assault conviction because an Erie County prosecutor in summation argued that the defendant was "a homosexual or deviate," improperly vouched for the police while personally attacking defense counsel, falsely argued prejudicial "facts" that were not in evidence, and made inflammatory remarks to the jury about the nature of the crime.

598.     In *People v. Cardinale,* 35 A.D.2d 1073 (4th Dept. 1970), although the defendant was charged only with criminal contempt, the court reversed the conviction because of the

- 81 -

prosecutor's "highly prejudicial" opening statement that the grand jury had heard evidence that the defendant, police officers, and public officials had been involved in a gambling conspiracy.

599.   In *People v. Reingold,* 44 A.D.2d 191 (4th Dept. 1974), the Appellate Division reversed a burglary conviction because the prosecutor, in bad faith, cross-examined the defendant to show he had a criminal propensity in a manner that was "so improper and inflammatory that it made an impartial consideration of the competent evidence adduced at trial virtually impossible."

600.   In *People v. Ketchum*, 35 N.Y.2d 740 (1974), the Court of Appeals noted "grievous misconduct by the prosecution in cross-examination and summation which we strongly condemn."

601.   In *People v. Greer,* 49 A.D.2d 297, 303-04 (4th Dept. 1975), the court reversed a rape conviction because of the prosecutor's "improper" cross-examination of the defendant impermissibly intended to show his criminal propensity.

602.   In *People v. Donaldson,* 49 A.D.2d 1004 (4th Dept. 1975), the Appellate Division, in reversing the conviction, condemned the prosecutor for arguing improper inferences from hearsay evidence, improperly arguing a negative inference against the defendant for exercising his constitutional right not to testify, and for his "entirely improper and prejudicial" urging of the jury to credit the testimony of a prosecution witness with a long criminal record because the *grand jury* had believed him.

603.   In *People v. Balsano,* 51 A.D.2d 130 (4th Dept. 1976), the court reversed a conviction for unlawful imprisonment where, among other things, the prosecutor improperly questioned the defendant about criminal conduct not related to his credibility, improperly elicited that he had a pending charge, improperly asked the jury to draw a negative inference from the

defendant's failure to call a witness, and repeatedly forced the defense to object to "inflammatory" remarks, causing the trial judge to "properly admonish[] the prosecutor."

604.     In *People v. Weston,* 51 A.D.2d 881 (4th Dept. 1976), the Appellate Division reversed a conviction for burglary, rape, and robbery because the prosecutor cross-examined the defendant in bad faith about his criminal propensity.  The court also agreed with the defendant's condemnation of the prosecutor's "inflammatory and intimidating" remarks in summation and admonished him not to "put his personal credibility behind his statements and make himself an 'unsworn witness.'"

605.     In *People v. Mordino,* 58 A.D.2d 197 (4th Dept. 1977), the Appellate Division reversed a high-profile, organized crime related murder conviction obtained in 1975 because, among other things, the prosecutor gave an "inflammatory" summation during which he improperly castigated the defendants as "vultures" and argued their guilt by association ("if you walk like a duck and you talk like a duck and you keep the company of ducks then you are a damn duck").

606.     In *Robinson v. Smith,* 451 F. Supp. 1278 (W.D.N.Y. 1978) (Curtin, C.J.), a federal court vacated a murder conviction that the ECDA obtained through its knowing use of a confession that Buffalo police coerced from a suspect by falsely claiming an accomplice had confessed "in an obvious effort to trick him into implicating himself and others.  This police practice is to be soundly condemned.  Such deception clearly has no place in our system of justice."

607.     In *People v. Keller,* 67 A.D.2d 153 (4th Dept 1979), the Appellate Division unanimously reversed an assault and weapons conviction due to pervasive misconduct by an ECDA prosecutor.

608.     In an unanimous opinion by five justices, the *Keller* court condemned the prosecutor for his "egregious errors" and "grossly improper remarks" in repeatedly referring to the defendant and his witnesses as liars, repeatedly expressing his personal opinion about witnesses' credibility, implying in summation there was a lie detector test and other evidence the jury had been prevented from hearing, and making various "irrelevant and inflammatory" remarks which, in their totality, "patently deprived the defendant of a fair trial… ."

609.     In *People v. King,* 72 A.D.2d 930 (4th Dept. 1979), the Appellate Division, while reversing an attempted robbery conviction because of the misconduct of the trial judge, noted that the prosecutor joined him in some of it, including holding *ex parte* "conferences … outside of the presence of defense counsel."

610.     In *Matter of Potenza v. Kane,* 79 A.D.2d 467, 472 (4th Dept. 1981), while refusing, following a mistrial, to bar a second trial on the basis of pervasive prosecutorial misconduct, the Appellate Division noted that many of the defense counsel's objections to the prosecutor's improper opening statement had been sustained and the court had "minimized the possible prejudice by admonishing the prosecutor before the jury."  The Appellate Division also noted that it did not "condone" the prosecutor's repeated failure to follow the court's warning against leading questions.

611.     In *People v. Terry,* 83 A.D.2d 491 (4th Dept. 1981), the Appellate Division reversed a robbery conviction in part because of the prosecutor's "totally improper" argument that the jury should hold against the defendant his failure to produce to testify as an alibi witness a government employee whose identity was unknown to him.

612.     In *People v. Mordino,* 83 A.D.2d 775 (4th Dept. 1981), the court declined to reverse a murder conviction for prosecutorial misconduct, but only because defense counsel did

not object to many of the improper questions, where the defense did object the court gave

"curative" instructions to prevent prejudice, and the conduct was not "*egregiously* improper …

as would warrant a reversal" (emphasis added).

613.    In *People v. Vance,* 89 A.D.2d 347 (4th Dept. 1982), the Appellate Division

reversed a robbery conviction because the prosecutor acted as an investigator and then asked the

jury to credit his personal investigative findings over the defense case.  The court concluded:  "In

a case such as this where credibility is the only issue, a prosecutor who oversteps the bounds of

legitimate advocacy and makes himself an 'unsworn witness' against the defendant affects the

fairness of the trial and unduly prejudices the defendant."

614.    In *People v. Herlan,* 99 A.D.2d 647 (4th Dept. 1984), the court reversed a burglary

conviction because the prosecutor repeatedly questioned the defendant during cross-examination

about "why would a police officer of sixteen years risk his pension to perjure himself in court

over you?  Any reason?" and made similar improper arguments during summation.

615.    In *People v. Grafton,* 115 A.D.2d 952 (4th Dept. 1985), the Appellate Division

affirmed an order dismissing a rape indictment because the prosecutor, in the grand jury,

"introduced irrelevant and prejudicial evidence … , intimidated witnesses whose testimony

would have been helpful to defendant, asked witnesses irrelevant and improper questions of a

highly personal nature in an effort to embarrass them, and deliberately confused and deceived

witnesses and the Grand Jury by selective presentation of evidence."

616.    The misconduct of three different homicide prosecutors during the four trials

related to the Crawford Murder further showed the existence of unlawful policies, customs, and

practices at the ECDA regarding *Brady* disclosure, the use of false, misleading, and

- 85 -

inflammatory evidence and argument to deny criminal defendants their right to a fair trial, and the District Attorney's tolerance of such unlawful behavior.

617.     The first of Mr. Walker's co-defendants to be tried was Darryn Gibson, who was brought to trial on January 10, 1977.

618.     Prior to his trial, Mr. Gibson's defense counsel made only a general request that the ECDA produce all *Brady* material but did not make specific requests such as for photographs or witness statements favorable to the defense.

619.     ADA Timothy Drury prosecuted Messrs. Gibson and Boyd at trial.

620.     He was one of the District Attorney's top trial prosecutors who handled some of the ECDA's most important cases.

621.     Thus, his pervasive misconduct in the Gibson and Boyd prosecutions is highly probative of the unlawful policies, customs, practices and behavior that the District Attorney approved of or consciously tolerated.

622.     Consistent with the policies, procedures, practices, and/or customs of the ECDA, ADA Drury, with regard to the Gibson trial:

> (a)     did not turn over any statements, reports, photographs, or other documentary evidence, favorable to the defense under *Brady*, in advance of the trial;
>
> (b)     only disclosed the formal, sworn statements in question-and-answer format of testifying witnesses, but not oral statements summarized in police reports, even where such statements were exculpatory or impeaching;

- 86 -

(c)     did not disclose statements until the end of each witness's direct examination, which deprived defense counsel of the ability to investigate the information, to integrate it into a defense strategy, to use it during his opening statement, or to fully prepare to use it during his cross-examination of the witness;

(d)     did not disclose the statements of non-testifying witnesses that were favorable to the defense; and

(e)     only disclosed the photographs and other items of evidence that the prosecution used in its direct case, but not other photographs that tended to contradict the prosecution's case.

623.    During the Gibson trial, Mr. Gibson's defense counsel became aware through cross examination of Larry Watson that this witness had given another statement to the BPD, which ADA Drury had not disclosed and pressed for disclosure of the report that summarized such statement.

624.    Rather than agree to provide it, ADA Drury initially suggested that the defense, by not having previously requested the report, had waived any right to disclosure, even though the defense had not known about it.

625.    Continuing to resist disclosure, he said further that, before agreeing to disclose the police report, he would have to check with his office's appellate section.

626.    However, the court directed him to make disclosure.

627.    ADA Drury then belatedly disclosed to Mr. Gibson's defense counsel a single police report summarizing one of Mr. Watson's prior statements, but not all of Mr. Watson's

prior statements, even though the undisclosed statements contradicted his trial testimony and tended to incriminate him in the murder itself.

628.    Nor did ADA Drury disclose the statements of other witnesses tending to implicate Mr. Watson in the murder.

629.    Even as to the statement he did disclose, it was too late for defense counsel to incorporate the information into his overall defense theory or even to utilize it during cross-examination:  Mr. Watson already had completed his testimony.

630.    Caught having failed to disclose statements in police reports that were not in question-and-answer form and under oath, ADA Drury then belatedly disclosed additional police reports dated February 11, 1976, containing the unsigned statements of Messrs. Woodruff and Hough on that date, and the police report containing the exculpatory statement of Shirley Floyd that the boys were playing cards at her apartment the night of the Crawford Murder.

631.    He acknowledged that these reports likely constituted *Brady* material.

632.    He blamed his late disclosure of them on his having only just received them from the BPD, even though the case had been pending for a year.

633.    However, ADA Drury did not disclose the rest of the *Brady* material in his and/or the BPD's possession contradicting or impeaching Messrs. Woodruff and Hough, showing the coercive behavior of the detectives, and inculpating third party suspects Larry Watson and Jerome Boyd.

634.    After the trial, he took all witness statements back, making sure they would not be disclosed to Mr. Gibson's co-defendants.

635.    During his summation, ADA Drury, despite his knowledge of the fundamental rules regarding advocacy, violated most of them.

- 88 -

636.    He misrepresented that Mr. Woodruff was questioned about the murder and admitted his participation in the presence of his father and his minister, when in fact, undisclosed police reports showed the young man had been coercively interrogated on January 12, 1976, alone, for hours.

637.    He falsely represented that Mr. Woodruff's questioning "never occurred under police pressure."

638.    He falsely represented that "all the paper work and everything else concerned with this was furnished to this defense counsel," even though he knew, or should have known, that numerous police documents had been withheld from the defense, including reports that were obviously favorable to the defense under *Brady*.

639.    He argued to the jury the truthfulness of Mr. Watson's testimony that Mr. Watson had run to his home, abandoning Mr. Crawford because he had seen the door to his house open, without disclosing Mr. Watson's inconsistent statements on this issue and any of the additional witness statements circumstantially inculpating Mr. Watson in the murder itself.

640.    Mr. Gibson was convicted of second-degree murder on January 21, 1977.

641.    When Mr. Boyd was then brought to trial in April 1977, before an all-white jury, ADA Drury handled that trial as well.

642.    Prior to Mr. Boyd's trial, Mr. Boyd's defense counsel, Mark Hulnick, requested that the ECDA permit him to examine the case file and produce all *Brady* material to him.

643.    Despite these requests, ADA Drury did not disclose dozens of pieces of evidence favorable to the defense in advance of or even during trial.  This evidence included, but is not limited to, the documents and information described in ¶¶ 132 and 356, *supra*.

644. Consistent with the ECDA's policy, procedure, practice, and/or custom of impermissibly narrowing the scope of its *Brady* obligations to include only truly "exculpatory"—rather than all favorable—material, ADA Drury failed to disclose any evidence he did not deem "exculpatory," including evidence that impeached the prosecution's key witnesses; evidence that pointed to other suspects as perpetrators of the crime; and evidence regarding the second murder, which took place across the street from the Golden Nugget when Mr. Boyd was incarcerated.

645. Also consistent with the policies, procedures, practices, and/or customs of the ECDA, the only materials ADA Drury turned over to the defense were the exhibits the prosecution entered into evidence or marked for identification, including some of the crime scene photographs, as well as the formal, sworn statements in question-and-answer format of testifying witnesses.

646. These witness statements were not disclosed until after each witness had completed his or her direct examination.

647. This late disclosure deprived defense counsel of the opportunity to investigate the information, to incorporate it into his opening statement or a theory of defense, and to fully prepare to utilize it during cross-examination of the witness.

648. ADA Drury did not disclose to the defense statements of the prosecution's witnesses that were unsigned by the witnesses and instead merely summarized in police reports, despite his absolute duty to do so under the New York State *Rosario* rule as well as the requirements of *Brady*.

649. Nor did he disclose any statement by any witness whom the prosecution did not call to testify, even where it was favorable to the defense.

650.    The prosecution disclosed no handwritten notes taken by any detective at any time during the investigation and also failed to disclose that handwritten notes had been destroyed.

651.    The prosecution presented no physical or forensic evidence tying Mr. Boyd (or any of the other defendants) to the crime.

652.    Its case was based on the false testimony of Messrs. Woodruff and Hough, together with testimony by Detective Guadagno, based upon his own false report, that Mr. Boyd had made inconsistent statements concerning the timing of when he returned home the night of the murder.

653.    The failure of the prosecution to disclose the aforementioned *Brady* material also severely handicapped Mr. Boyd's counsel's attempt to contradict or impeach the critical testimony of Messrs. Woodruff and Hough, and it deprived Mr. Boyd of his constitutional right to present a defense that someone else had committed the crime.

654.    During his summation, Mr. Hulnick, without the benefit of the suppressed police reports and information, nevertheless argued, from inconsistencies in Mr. Woodruff's story, that law enforcement authorities had pressured him to change his story and indoctrinated him.

655.    Even though this assertion was true, ADA Drury angrily objected, "These are wild allegations, there is no proof of it."

656.    During his closing argument, ADA Drury urged the all-white jury to credit Mr. Woodruff even though, or perhaps because, he was a "ghetto kid… a kook … an idiot, a nitwit," and a "blithering idiot."

657.    In fact, Mr. Woodruff was, and is, a highly intelligent man—a far cry from "a nitwit" or "a blithering idiot"—whose halting testimony resulted from the fact that he had been coerced to lie.

658. ADA Drury's argument was a thinly disguised emotional appeal to the racial prejudices of the all-white jury.

659. ADA Drury contended that Mr. Woodruff initially lied when denying any knowledge of the crime, but then came back voluntarily with his father to confess at least some of the truth.

660. This argument was contradicted by the undisclosed police reports documenting that Mr. Woodruff was picked up, taken back to BPD Headquarters, and coercively interrogated for hours, without any family member being present, before he changed his story.

661. ADA Drury contended that the police had to work through Mr. Boyd's friends because they didn't have any other evidence of how the Crawford Murder was committed.

662. However, this was not true: The BPD had substantial evidence, undisclosed to the defense, obtained from numerous witnesses at the Golden Nugget and Mr. Watson's neighbors, implicating Mr. Watson, and additional independent evidence implicating Jerome Boyd.

663. ADA Drury told the jury that "[t]he police turned over everything they had to you."

664. This was untrue: The BPD had gathered a great deal of evidence implicating other suspects and contradicting the prosecution's case, but this evidence had not been disclosed to the defense or the jury.

665. ADA Drury told the jury: "I would absolutely reject, if I were to make this argument to you, any suggestion, any beliefs [that] the police or our office or myself had anything to do with changing Tyrone's testimony or making it fit any pattern."

666.    This statement, too, was proven untrue by the undisclosed police reports of January 12, 1976, concerning the anonymous phone call, and of February 11, 1976, revealing that detectives, supposedly orchestrated by ADA Drury, had gone from Mr. Hough to Mr. Woodruff to harmonize their new accounts.

667.    Any allegation of a "conspiracy" to fabricate evidence, he said, was "absolutely ridiculous," even though the above undisclosed evidence showed it was true.

668.    Contrary to fundamental rules governing courtroom advocacy, ADA Drury personally vouched for the integrity of the investigation and prosecution, and for Mr. Woodruff's truthfulness.

669.    Again, appealing to the all-white jurors' possible racial prejudice, ADA Drury argued that Mr. Woodruff was "hapless, stupid, but we are asking you to believe him."

670.    While telling the jury that his personal beliefs did not matter, ADA Drury still told them, "I believe him."

671.    ADA Drury misleadingly stated that the BPD had found "no footprints on *either side* of that house so that nobody jumped the yard. Woodruff said they went out the same way they came."

672.    This argument was misleading since the BPD had documented in a crime scene photograph, which had been suppressed from the defense, footprints leading from the backyard of Mr. Crawford's house towards Mr. Watson's house.

673.    On April 29, 1977, the jury convicted Mr. Boyd of second-degree murder and first-degree robbery.

674.    ADAs James Verrastro and David Henry handled the trial prosecution of Mr. Walker, beginning June 6, 1977, and Floyd Martin's case later the same year.

675.     Like ADA Drury and other prosecutors in the office, their practice, too, was to not disclose prior witness statements until after the witness testified on direct and then only formal, signed statements.  They, too, did not disclose statements or evidence, even though such materials favored the defense under *Brady,* if the witness did not testify or the statement or evidence was not specifically requested by the defense.

676.     Accordingly, they withheld the same material and evidence at Mr. Walker's and Mr. Martin's trials that ADA Drury had withheld at Messrs. Boyd and Gibson's trials, with one exception.

677.     After counsel for Floyd Martin specifically demanded disclosure of all crime scene photographs, not just the ones the prosecution was itself using, the prosecutors disclosed the two additional photographs, which had been withheld during the prior three trials, to Mr. Martin's attorney.

678.     During Mr. Walker's trial, ADA Henry continued the pattern of ECDA prosecutors making false, misleading, or otherwise improper summation arguments that exploited the office's *Brady* violations and denied Mr. Walker a fair trial.

679.     He went outside the trial record to represent that Andre Hough's statements all were "the same," even though he knew that Mr. Hough not only had made various inconsistent statements but also had recanted more than once

680.     He represented that Mr. Hough had no motive or other reason to lie when he knew or should have known that police had threatened him with arrest and prosecution for the murder and otherwise coerced him.

681.     He contended that Mr. Woodruff had no motive to lie, and that he had implicated himself and the others purely out of conscience ("maybe it got to him"), when he knew or should

have known that Mr. Woodruff only changed his story after being threatened with life imprisonment but was then lured with a promise, which was realized, of complete immunity.

682.     He argued that the witnesses, including Messrs. Woodruff and Hough, had been separated and could not possibly have conformed their stories, despite knowing that, as revealed in the police reports of February 11, 1976, two detectives, purportedly at ADA Drury's direction, had shuttled between Messrs. Hough and Woodruff to make sure they did conform their stories.

683.     Mr. Walker was convicted of second-degree murder and first-degree robbery on April 29, 1977.

684.     The fourth of the co-defendants brought to trial was Floyd Martin. Mr. Martin's trial commenced on July 6, 1977.

685.     Mr. Martin was represented by defense counsel James A.W. McLeod.

686.     ADAs Verrastro and Henry prosecuted the case.

687.     Based upon the crime scene photographs that Mr. McLeod had received, which the other defendants had not, as well as the testimony that Mr. Watson was the last person seen with Mr. Crawford before he was murdered, Mr. McLeod contended that Mr. Watson was the likely killer.

688.     Unbeknownst to counsel, police records contained powerful additional evidence supporting this theory, but Mr. McLeod did the best he could with the limited evidence that had been disclosed to him.

689.     It was enough. On July 14, 1977, the jury acquitted Mr. Martin.

690.     None of the prosecutors in any of the cases discussed in ¶¶ 554-615 were properly supervised by the DA or other executives, nor were any investigated or disciplined for the

misconduct after the misconduct was complained about by the defense and/or substantiated by court decisions.

691.    Policymakers' deliberate indifference created an anything-goes or winning-is-everything atmosphere, which was a substantial cause of the violation of Mr. Walker's constitutional rights and of his injuries and damages.

692.    The aforesaid deliberate or de facto policies, procedures, practices and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for the Defendant County, including, but not limited to, the District Attorney and his delegates, who knew:

>    (a)    to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

>    (b)    that such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

>    (c)    that employees facing such issues have strong incentives to make the wrong choices, especially given the pressure the ECDA places on prosecutors to win convictions at any cost;

>    (d)    that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of the accused and cause him constitutional injury; and

>    (e)    that employees of the ECDA had a history of making wrong choices in such matters.

- 96 -

693.     The aforesaid policies, procedures, regulations, practices, and/or customs of the ECDA were, collectively and individually, a substantial factor in bringing about the aforesaid violations of Mr. Walker's rights under the Constitution and laws of the United States and in causing his damages.

694.     By virtue of the foregoing, the Defendant County is liable for the violation of Mr. Walker's constitutional rights pursuant to 42 U.S.C. § 1983 and his resultant injuries.

**COUNT VIII**
**Municipal Liability Against the City of Buffalo for Its Negligent Failure to Properly Hire, Train, Supervise and Discipline the BPD Detectives Who Investigated Plaintiff and Caused His Arrest and Prosecution**

695.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 494 of this Complaint.

696.     By virtue of the foregoing, the Defendant City is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees with regard to their aforementioned duties, which was a substantial cause of the Individual Defendants' wrongful conduct and the injuries suffered by Plaintiff.

**COUNT IX**
**Negligent Infliction of Emotional Distress (Individual Defendants and City of Buffalo)**

697.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 494 of this Complaint.

698.     The Individual Defendants breached a duty of care owed to Plaintiff, which unreasonably endangered his physical safety and caused him to fear for his physical safety.

699.     Defendants' conduct was extreme and outrageous.

700.     Defendants' conduct caused Plaintiff to suffer serious bodily injuries in county jail and/or prison and severe emotional distress.

701.    The Defendant City is liable under the doctrine of *respondeat superior*.

**COUNT X**
**Municipal Liability Against the County of Erie for Its Negligent Failure to Properly Hire, Train, Supervise and Discipline the ECDA Prosecutors Who Investigated and/or Prosecuted Plaintiff and Caused His Wrongful Prosecution and Conviction**

702.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 432 and 495-694 of this Complaint.

703.    By virtue of the foregoing, the Defendant County is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees with regard to their aforementioned duties, which was a substantial cause of the wrongful conduct and of the injuries that were suffered by Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Walker demands judgment against Defendants as follows:

(a)    compensatory damages for the damages described above of not less than $84,000,000;

(b)    punitive damages of not less than $28,000,000;

(c)    reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;

(d)    pre-judgment interest as allowed by law; and

(e)    such other and further relief as this Court may deem just and proper.

/s/ Joel B. Rudin
JOEL B. RUDIN
DAVID E. RUDIN
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com
david@rudinlaw.com


/s/ Ross. E. Firsenbaum
ROSS E. FIRSENBAUM
RYANNE E. PERIO
GIDEON A. HANFT (*pro hac vice*)
PHOEBE SILOS (*pro hac vice*)
ERIN HUGHES (*pro hac vice*)
Wilmer Cutler Pickering
    Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
ross.firsenbaum@wilmerhale.com
ryanne.perio@wilmerhale.com
gideon.hanft@wilmerhale.com
phoebe.silos@wilmerhale.com
erin.hughes@wilmerhale.com


/s/ Timothy W. Hoover
TIMOTHY W. HOOVER
SPENCER L. DURLAND
Hoover & Durland LLP
561 Franklin Street
Buffalo, NY 14202
(716) 800-2600
thoover@hooverdurland.com
sdurland@hooverdurland.com

*Attorneys for Plaintiff John Walker, Jr.*


Dated:          New York, New York
                March 13, 2023

# EXHIBIT C

STATE OF NEW YORK
SUPREME COURT        :        COUNTY OF ERIE
_____

THE PEOPLE OF THE STATE OF NEW YORK,

          v.                                 Ind. No. 82-1064

TOMMY ROLLINS,

                  Defendant.
_____

## <u>AFFIDAVIT OF MARIA DIPIRRO</u>

STATE OF NEW YORK        :
                        ss.:
COUNTY OF ERIE        :

        MARIA DIPIRRO, being duly sworn, hereby deposes and says that:

        1.      On July 18, 2023, my investigation firm received a request to locate and speak with Tommy Rollins.

        2.      Investigators made numerous attempts to locate and interview Mr. Rollins at his last known address of 881 Smith Street, Buffalo, New York. Attempts were made at various hours of the day and on weekends. All attempts met with negative results.

        3.      Investigators conducted a neighborhood canvass and spoke with a resident next door who indicated that Mr. Rollins's grandmother, who owned the residence, had passed away, the family sold the house, and Mr. Rollins moved over a year ago. He did not know Mr. Rollins's current whereabouts.

        4.      Investigators attempted to locate Mr. Rollins via database searches, utility checks, USPS Forwarding address searches, and motor vehicle searches. All attempts met with negative results.

        5.      Investigators then located family members via database: Elizabeth Rollins Johnson (62), Lori Lavelle King (52), Nacotra Rollins (54), Shawntay Rollins (36), Wade Rollins (47), and Wade Rollins (51). All numbers associated with the family members were called. Only Lori Lavelle King answered the phone.

6.      On August 23, 2023, investigators spoke with Ms. King, who stated that she was Mr. Rollins's sister and that she would contact him and have him call. She would not give out his number. Investigators followed up with a text as well as impressing upon her the necessity to speak with Mr. Rollins.

7.      On August 24, 2023, investigators called and then texted Ms. King, who said she was familiarizing herself with the case before she talked to Mr. Rollins.

8.      On August 25, 2023, investigators called and then texted Ms. King with no response.

9.      On August 28, 2023, investigators called and then texted Ms. King with no response.

10.     Ms. King was contacted via telephone or text on August 30, September 1, and September 4, 2023. Investigators conducted an activity check at her address on September 6 and September 9, 2023. All attempts met with negative results.

_____
Maria DiPirro

Sworn to and subscribed before me
this 17th day of October, 2023.

_____
Notary Public

TIMOTHY W. HOOVER
No. 02HO6189482
Notary Public, State of New York
Qualified in Erie County
My Commission Expires June 23, 2016

24

TWH

- 2 -

# EXHIBIT D

| | |
|---|---|
| **From:** | webmaster@nywd.uscourts.gov |
| **To:** | Courtmail@nywd.uscourts.gov |
| **Subject:** | Activity in Case 1:22-cv-00519-LJV-JJM Boyd v. The City of Buffalo et al Text Order |
| **Date:** | Monday, October 16, 2023 4:09:20 PM |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. DISTRICT COURT

## U.S. District Court, Western District of New York

## Notice of Electronic Filing

The following transaction was entered on 10/16/2023 at 4:07 PM EDT and filed on 10/16/2023

**Case Name:**  Boyd v. The City of Buffalo et al
**Case Number:**  1:22-cv-00519-LJV-JJM
**Filer:**
**Document Number:** 125(No document attached)

**Docket Text:**
**TEXT ORDER: The parties' Stipulation and Proposed Second Amended Case Management Order [124] is hereby approved and adopted. Fact discovery by January 16, 2024. Pretrial dispositive motions by May 31, 2024. SO ORDERED. Issued by Hon. Jeremiah J. McCarthy on 10/16/2023. (EG)**

**1:22-cv-00519-LJV-JJM Notice has been electronically mailed to:**

Hugh M. Russ, III    hruss@hodgsonruss.com, Stimchack@hodgsonruss.com, efilingbflo@hodgsonruss.com

Adam W. Perry    aperry@hodgsonruss.com, llazarus@hodgsonruss.com

Jennifer C. Persico    jpersico@lippes.com, mhurley@lippes.com, skemnitzer@lippes.com

Timothy W. Hoover    thoover@hooverdurland.com, sdurland@hooverdurland.com, timothy.w.hoover@gmail.com

Brian Clinton Mahoney    bmahoney@lippes.com, kmahoney@lippes.com

Spencer Leeds Durland    sdurland@hooverdurland.com, thoover@hooverdurland.com

Peter A. Sahasrabudhe     psahasra@hodgsonruss.com, llazarus@hodgsonruss.com, pbudhe05@gmail.com, stimchack@hodgsonruss.com

Jacob Loup     jloup@rudinlaw.com

David E Rudin     david@rudinlaw.com

Joel Barry Rudin     jbrudin@rudinlaw.com, psharma@rudinlaw.com, thelo@rudinlaw.com, theresa@rudinlaw.com

Ryanne E. Perio     ryanne.perio@wilmerhale.com

Ross E. Firsenbaum     ross.firsenbaum@wilmerhale.com, whdocketing@wilmerhale.com

Gideon A. Hanft     gideon.hanft@wilmerhale.com, whdocketing@wilmerhale.com

Alexander Warfield Eaton     aeaton@lippes.com, aeatonesq@gmail.com, sevans@lippes.com

**1:22-cv-00519-LJV-JJM Notice has been delivered by other means to:**

Erin E. Hughes
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
New York, NY 10007

Phoebe H. Silos
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
New York, NY 10007

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARRYL BOYD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| against | ) **No. 22 Civ. 519 (LJV) (JJM)** |
| | ) |
| THE CITY OF BUFFALO, *et al.*, | ) |
| | ) |
| Defendants. | ) |

| | |
|---|---|
| JOHN J. WALKER, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| against | ) **No. 22 Civ. 520 (LJV) (JJM)** |
| | ) |
| THE CITY OF BUFFALO, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**JOINT STIPULATION OF EXTENSION OF DISCOVERY DEADLINES AND**
**[PROPOSED] SECOND AMENDED CASE MANAGEMENT ORDER**

This Stipulation is entered into by and between Plaintiff Darryl Boyd, Plaintiff John

Walker, Jr., (collectively, "Plaintiffs"); Defendants The City of Buffalo, Michael G. Guadagno,

John Montondo, Linda J. Fial as Executor for the Estate of Robert Grabowski, Martin Bullock as

Executor for the Estate of James E. Hunter, Jennifer G. Flannery as Administrator for the Estates

of Frank C. Deubell, Leo J. Donovan, and Francis M. Manista, Jr., and Dawn M. Dirienzo as

Executor for the Estate of Paul R. Delano, (collectively the "City Defendants"); and Defendant

The County of Erie, (the "County" and collectively with the City Defendants and the Plaintiffs,

the "Parties"), as follows:

1

WHEREAS, on July 18, 2023, this Court entered a text order adopting the parties "Amended Case Management Order" which, among other things, set the deadline for the close of fact discovery on November 2, 2023, *see* Dkt. 114, 115;

WHEREAS, the Parties have determined that they collectively seek to take at least an additional 7 fact depositions;

WHEREAS, Defendants have requested an extension of the fact discovery deadline to allow for the completion of these depositions;

WHEREAS, counsel for the County of Erie have trials scheduled in the months of October and December and certain counsel for Plaintiffs have trial scheduled in the month of November;

WHEREAS, the Parties have agreed, subject to the Court's consent to extend the fact discovery period, to schedule the remaining depositions of the County's witnesses on November 3, November 10, and November 28, 2023 and Defendants seek to depose Plaintiffs and two non-party witnesses after the completion of such depositions;

WHEREAS, subject to approval from the Court, the Parties agree to extend the deadline for the completion of fact discovery to January 16, 2024 to allow for the completion of these depositions;

WHEREAS, subject to approval from the Court, the Parties agree to extend all subsequent deadlines in the prior case management order by a corresponding amount; and

WHEREAS, this extension is not sought for the purpose of undue delay and no party will be prejudiced by the brief extension of time;

THEREFORE, the Parties, by and through their respective counsel, hereby stipulate and agree, subject to the Court's approval, to the entry of the following Second Amended Case Management Order:

The Court hereby ORDERS entry of the following Second Amended Case Management Order:

1)      All fact discovery shall be completed by no later than **January 16, 2024**.

2)      Each party intending to offer the testimony of an expert in connection with any issue as to which it bears the burden of proof (including claims, counterclaims, cross-claims or affirmative defenses) shall identify such expert(s) and provide reports pursuant to Rule 26 by no later than **March 1, 2024**.  Each party intending to offer other expert testimony (*i.e.*, testimony in response to expert testimony previously designated by an opposing party, or in support of an issue as to which the offering party does not bear the burden of proof), shall identify such expert(s) and provide reports pursuant to Rule 26 by no later than **April 1, 2024**.

3)      All expert depositions shall be completed by no later than **May 1, 2024**.

4)      Pretrial dispositive motions, if any, shall be filed by no later than **May 31, 2024**. Such motions shall be made returnable before Judge Vilardo unless the referral order grants the Magistrate Judge authority to hear and report upon dispositive motions.

5)      If no pretrial dispositive motions are filed, the parties shall contact Judge Vilardo's chambers by **May 18, 2024** to schedule a trial date.

6)      The procedures provided in the Court's Case Management Order dated September 30, 2023, Dkt. 34, including the procedure for raising discovery disputes, remain in effect.

**No extension of the above deadlines will be granted except upon a motion, filed prior to the deadline, showing good cause for the extension.  Absent truly exceptional circumstances, any motion for an extension shall be made at least one week prior to the deadline sought to be extended.  The parties are reminded that "a finding of good cause depends on the diligence of the moving party."  <u>Parker v. Columbia Pictures Industries</u>, 204 F.3d 326, 340 (2d. Cir. 2000).**

PURSUANT TO STIPULATION, IT IS SO ORDERED:

Dated:

_____
        JEREMIAH J. MCCARTHY
        United States Magistrate Judge

Respectfully submitted,

*/s/ Gideon A. Hanft*
Gideon A. Hanft
Ross E. Firsenbaum
Ryanne E. Perio
Phoebe Silos
Erin E. Hughes
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
ross.firsenbaum@wilmerhale.com
ryanne.perio@wilmerhale.com
gideon.hanft@wilmerhale.com
phoebe.silos@wilmerhale.com
erin.hughes@wilmerhale.com

*/s/ Joel B. Rudin*
Joel B. Rudin
David E. Rudin
LAW OFFICES OF JOEL B. RUDIN,
P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com
david@rudinlaw.com

*/s/ Timothy W. Hoover*
Timothy W. Hoover
Spencer L. Durland
HOOVER & DURLAND LLP
561 Franklin Street
Buffalo, New York 14202

*/s/ Peter A. Sahasrabudhe*
Hugh M. Russ III, Esq.
Adam W. Perry, Esq.
Peter A. Sahasrabudhe, Esq.
HODGSON RUSS LLP
The Guaranty Building
140 Pearl Street — Suite 100
Buffalo, New York 14202
(716) 856-4000

*Attorneys for Defendants City of Buffalo;*
*Michael G. Guadagno; John Montondo;*
*Linda J. Fial as Executor for the Estate of*
*Robert Grabowski; Martin Bullock as*
*Executor for the Estate of James E.*
*Hunter; Jennifer G. Flannery as*
*Administrator for the Estate of Frank C.*
*Deubell; Jennifer G. Flannery as*
*Administrator for the Estate of Leo J.*
*Donovan; Jennifer G. Flannery as*
*Administrator for the Estate of Francis M.*
*Manista, Jr.; and Dawn M. Dirienzo as*
*Executor for the Estate of Paul R. Delano*

*/s/ Jennifer C. Persico*
LIPPES MATHIAS LLP
Jennifer C. Persico
Brian Clinton Mahoney
Alexander Eaton
50 Fountain Plaza
Ste 1700
Buffalo, NY 14202
(716) 853-5100

*Attorneys for Defendant*
*County of Erie*

(716) 800-2604
thoover@hooverdurland.com
sdurland@hooverdurland.com

*Attorneys for Plaintiffs Darryl Boyd and*
*John Walker, Jr.*

| | |
|---|---|
| **From:** | webmaster@nywd.uscourts.gov |
| **To:** | Courtmail@nywd.uscourts.gov |
| **Subject:** | Activity in Case 1:22-cv-00520-LJV-JJM Walker, Jr. v. The City of Buffalo et al Text Order |
| **Date:** | Monday, October 16, 2023 4:10:51 PM |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. DISTRICT COURT

### U.S. District Court, Western District of New York

## Notice of Electronic Filing

The following transaction was entered on 10/16/2023 at 4:09 PM EDT and filed on 10/16/2023

**Case Name:**      Walker, Jr. v. The City of Buffalo et al
**Case Number:**     1:22-cv-00520-LJV-JJM
**Filer:**
**Document Number:** 123(No document attached)

**Docket Text:**
**TEXT ORDER: The parties' Stipulation and Proposed Second Amended Case Management Order [122] is hereby approved and adopted. Fact discovery by January 16, 2024. Pretrial dispositive motions by May 31, 2024. SO ORDERED. Issued by Hon. Jeremiah J. McCarthy on 10/16/2023. (EG)**

**1:22-cv-00520-LJV-JJM Notice has been electronically mailed to:**

Hugh M. Russ, III    hruss@hodgsonruss.com, Stimchack@hodgsonruss.com, efilingbflo@hodgsonruss.com

Adam W. Perry    aperry@hodgsonruss.com, llazarus@hodgsonruss.com

Jennifer C. Persico    jpersico@lippes.com, mhurley@lippes.com, skemnitzer@lippes.com

Timothy W. Hoover    thoover@hooverdurland.com, sdurland@hooverdurland.com, timothy.w.hoover@gmail.com

Brian Clinton Mahoney    bmahoney@lippes.com, kmahoney@lippes.com

Spencer Leeds Durland    sdurland@hooverdurland.com, thoover@hooverdurland.com

Peter A. Sahasrabudhe     psahasra@hodgsonruss.com, llazarus@hodgsonruss.com, pbudhe05@gmail.com, stimchack@hodgsonruss.com

Jacob Loup     jloup@rudinlaw.com

David E Rudin     david@rudinlaw.com

Joel Barry Rudin     jbrudin@rudinlaw.com, psharma@rudinlaw.com, thelo@rudinlaw.com, theresa@rudinlaw.com

Ryanne E. Perio     ryanne.perio@wilmerhale.com

Ross E. Firsenbaum     ross.firsenbaum@wilmerhale.com, whdocketing@wilmerhale.com

Gideon A. Hanft     gideon.hanft@wilmerhale.com, whdocketing@wilmerhale.com

Alexander Warfield Eaton     aeaton@lippes.com, aeatonesq@gmail.com, sevans@lippes.com

**1:22-cv-00520-LJV-JJM Notice has been delivered by other means to:**

Erin E. Hughes
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
New York, NY 10007

Phoebe H. Silos
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
New York, NY 10007

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARRYL BOYD, )<br><br>Plaintiff, )<br><br>against )<br><br>THE CITY OF BUFFALO, *et al*., )<br><br>Defendants. ) | **No. 22 Civ. 519 (LJV) (JJM)** |

| | |
|---|---|
| JOHN J. WALKER, JR., )<br><br>Plaintiff, )<br><br>against )<br><br>THE CITY OF BUFFALO, *et al*., )<br><br>Defendants. ) | **No. 22 Civ. 520 (LJV) (JJM)** |

**JOINT STIPULATION OF EXTENSION OF DISCOVERY DEADLINES AND**
**[PROPOSED] SECOND AMENDED CASE MANAGEMENT ORDER**

This Stipulation is entered into by and between Plaintiff Darryl Boyd, Plaintiff John Walker, Jr., (collectively, "Plaintiffs"); Defendants The City of Buffalo, Michael G. Guadagno, John Montondo, Linda J. Fial as Executor for the Estate of Robert Grabowski, Martin Bullock as Executor for the Estate of James E. Hunter, Jennifer G. Flannery as Administrator for the Estates of Frank C. Deubell, Leo J. Donovan, and Francis M. Manista, Jr., and Dawn M. Dirienzo as Executor for the Estate of Paul R. Delano, (collectively the "City Defendants"); and Defendant The County of Erie, (the "County" and collectively with the City Defendants and the Plaintiffs, the "Parties"), as follows:

1

WHEREAS, on July 18, 2023, this Court entered a text order adopting the parties "Amended Case Management Order" which, among other things, set the deadline for the close of fact discovery on November 2, 2023, *see* Dkt. 114, 115;

WHEREAS, the Parties have determined that they collectively seek to take at least an additional 7 fact depositions;

WHEREAS, Defendants have requested an extension of the fact discovery deadline to allow for the completion of these depositions;

WHEREAS, counsel for the County of Erie have trials scheduled in the months of October and December and certain counsel for Plaintiffs have trial scheduled in the month of November;

WHEREAS, the Parties have agreed, subject to the Court's consent to extend the fact discovery period, to schedule the remaining depositions of the County's witnesses on November 3, November 10, and November 28, 2023 and Defendants seek to depose Plaintiffs and two non-party witnesses after the completion of such depositions;

WHEREAS, subject to approval from the Court, the Parties agree to extend the deadline for the completion of fact discovery to January 16, 2024 to allow for the completion of these depositions;

WHEREAS, subject to approval from the Court, the Parties agree to extend all subsequent deadlines in the prior case management order by a corresponding amount; and

WHEREAS, this extension is not sought for the purpose of undue delay and no party will be prejudiced by the brief extension of time;

THEREFORE, the Parties, by and through their respective counsel, hereby stipulate and agree, subject to the Court's approval, to the entry of the following Second Amended Case Management Order:

The Court hereby ORDERS entry of the following Second Amended Case Management Order:

1)      All fact discovery shall be completed by no later than **January 16, 2024**.

2)      Each party intending to offer the testimony of an expert in connection with any issue as to which it bears the burden of proof (including claims, counterclaims, cross-claims or affirmative defenses) shall identify such expert(s) and provide reports pursuant to Rule 26 by no later than **March 1, 2024**.  Each party intending to offer other expert testimony (*i.e.*, testimony in response to expert testimony previously designated by an opposing party, or in support of an issue as to which the offering party does not bear the burden of proof), shall identify such expert(s) and provide reports pursuant to Rule 26 by no later than **April 1, 2024**.

3)      All expert depositions shall be completed by no later than **May 1, 2024**.

4)      Pretrial dispositive motions, if any, shall be filed by no later than **May 31, 2024**. Such motions shall be made returnable before Judge Vilardo unless the referral order grants the Magistrate Judge authority to hear and report upon dispositive motions.

5)      If no pretrial dispositive motions are filed, the parties shall contact Judge Vilardo's chambers by **May 18, 2024** to schedule a trial date.

6)      The procedures provided in the Court's Case Management Order dated September 30, 2023, Dkt. 34, including the procedure for raising discovery disputes, remain in effect.

**No extension of the above deadlines will be granted except upon a motion, filed prior to the deadline, showing good cause for the extension.  Absent truly exceptional circumstances, any motion for an extension shall be made at least one week prior to the deadline sought to be extended.  The parties are reminded that "a finding of good cause depends on the diligence of the moving party."  <u>Parker v. Columbia Pictures Industries</u>, 204 F.3d 326, 340 (2d. Cir 2000).**

PURSUANT TO STIPULATION, IT IS SO ORDERED:

Dated:

_____
JEREMIAH J. MCCARTHY
United States Magistrate Judge

Respectfully submitted,

_/s/ Gideon A. Hanft_
Gideon A. Hanft
Ross E. Firsenbaum
Ryanne E. Perio
Phoebe Silos
Erin E. Hughes
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
ross.firsenbaum@wilmerhale.com
ryanne.perio@wilmerhale.com
gideon.hanft@wilmerhale.com
phoebe.silos@wilmerhale.com
erin.hughes@wilmerhale.com

_/s/ Joel B. Rudin_
Joel B. Rudin
David E. Rudin
LAW OFFICES OF JOEL B. RUDIN,
P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com
david@rudinlaw.com

_/s/ Timothy W. Hoover_
Timothy W. Hoover
Spencer L. Durland
HOOVER & DURLAND LLP
561 Franklin Street
Buffalo, New York 14202

_/s/ Peter A. Sahasrabudhe_
Hugh M. Russ III, Esq.
Adam W. Perry, Esq.
Peter A. Sahasrabudhe, Esq.
HODGSON RUSS LLP
The Guaranty Building
140 Pearl Street — Suite 100
Buffalo, New York 14202
(716) 856-4000

_Attorneys for Defendants City of Buffalo;_
_Michael G. Guadagno; John Montondo;_
_Linda J. Fial as Executor for the Estate of_
_Robert Grabowski; Martin Bullock as_
_Executor for the Estate of James E._
_Hunter; Jennifer G. Flannery as_
_Administrator for the Estate of Frank C._
_Deubell; Jennifer G. Flannery as_
_Administrator for the Estate of Leo J._
_Donovan; Jennifer G. Flannery as_
_Administrator for the Estate of Francis M._
_Manista, Jr.; and Dawn M. Dirienzo as_
_Executor for the Estate of Paul R. Delano_

_/s/ Jennifer C. Persico_
LIPPES MATHIAS LLP
Jennifer C. Persico
Brian Clinton Mahoney
Alexander Eaton
50 Fountain Plaza
Ste 1700
Buffalo, NY 14202
(716) 853-5100

_Attorneys for Defendant_
_County of Erie_

4

(716) 800-2604
thoover@hooverdurland.com
sdurland@hooverdurland.com

*Attorneys for Plaintiffs Darryl Boyd and*
*John Walker, Jr.*

# EXHIBIT E

STATE OF NEW YORK
SUPREME COURT : COUNTY OF ERIE

---

THE PEOPLE OF THE STATE OF NEW YORK

       -against-                  INDICTMENT
                                  NO. 82-1064

SHELBY DAVIS, JR.,

               Defendants

---

            RICHARD J. ARCARA, District Attorney
            of Erie County (NICHOLAS C. COSTANTINO,
            Assistant District Attorney, of counsel)
            for People

            MARK J. MAHONEY
            for Defendant -

            ARTHUR S. ANDERSON , SR.,
            for Defendant - SHELBY DAVIS, JR.

                          O R D E R

KASLER, J.

    These are motions by defendants                  and

Shelby Davis, Jr. to suppress evidence.  It is the principal

claim of defendant             that his interrogation

was not in compliance with Family Ct Act §724(a) and CPL 140.20

(6) and therefore all statements made by him were rendered

involunatry "Per se", and inadmissible.  He further claims that

his interrogation at an undesignated location, Family Ct Act

§724(b)(ii), namely, at the J.F.K. Center, in the police car

and at Buffalo Police Department Headquarters, requires suppression of his statements.  It is further claimed that his oral statements at the J.F.K. Center and in the police car must be suppressed because he was "in custody"; that he was detained threeat by the police without probable cause and was questioned while in custody at the J.F.K. Center and in the police car without being advised of his <u>Miranda</u> rights; and that he was interrogated by Detective Montondo without being advised of his <u>Miranda</u> rights and without waiving same.  Defendant also claims that the subsequent video statement and the written instatements are inadmissible because all were derived from the prior illegally obtained statements.  And finally, it is claimed that the statements made to his mother were privileged.

It is the contention of the defendant Shelby Davis, Jr. that his statements made to Detective Montondo and Chief of Homicide Donovan must be suppressed because he was interrogated in custody without prior "Miranda" warnings, and that the statements made to Michael Moeller and Michael Hudson, inmates of the Erie County Holding Center, must be suppressed because they were then acting as agents of the police.  Finally, and again in connection with the statements made to Moeller and Hudson, defendant Davis claims that his Sixth Amendment rights to counsel were violated.

-2-

## STATEMENT OF FACTS

On July 27, 1982, the bodies of Edward Feldt and
were found at their residence at No.    Pink Street, in the
City of Buffalo.  The cause of death in both instances was
due to violent criminal agency.

The Buffalo Police Department Homicide Bureau detectives
in a door to door canvass in the immediate vicinity of the
murder location questioned residents, one of whom was the
defendant Shelby Davis, Jr. who resided at No. 64 Pink Street
immediately adjacent to the residence of the homicide victims.
During this chance interview, Davis informed the police that
he was not at home during the weekend when the homicides occurred
having been away at a relatives' home within the City of Buffalo.

On Wednesday, July 28, 1982, Detective John Montondo
went to 64 Pink Street to speak with the defendant Davis, but he
was not at home at that time.  Montondo then went to    Pink
Street to conduct a search for evidence at the scene, and in the
area adjacent to it, including the backyard of the defendant
Davis' residence.  There, in a plastic garbage bag, which had
been placed in a garbage can located at the rear of the backyard
portion of defendant Davis' residence, approximately nine feet
from the fence separting the two residences, Montondo found

-3-

broken glass.  He did not have a search warrant, nor did he receive consent of any person residing at No. 64 Pink Street to come upon the premises or to rummage through the garbage can.  Detective Montondo then returned to headquarters with the broken glass, as well as the rear door of  Pink Street and submitted these items for fingerprints and comparison processing. Subsequently, the Buffalo Police Department Evidence Unit veri-fied that the broken glass fit the missing glass portion of the rear door.  Positive fingerprint identification showing that the fingerprints on the broken glass belonged to defendant Davis was not obtained until Friday, July 30th, 1982.

On Thursday, July 29, 1982, at 8:07 a.m., Detective Montondo returned to No. 64 Pink Street to question defendant Davis about the glass, and then brought him to the homicide bureau for questioning about the Feldt murders.  Defendant Davis stated that he had found the glass in his backyard on Saturday morning and had placed it in his garbage can after inserting it into a black plastic garbage bag.  He also stated that he had checked the Feldts' back door on Tuesday, so as to explain the presence of his fingerprints thereon.  At 10:20 a.m. in response to Detective Montondo's question "Why did you do it?", defendant Davis replied that he "didn't mean for it to happen that way".

-4-

Although the detectives interrogating Davis considered him a "suspect" and admitted that he wasn't free to leave, Davis was not given his Miranda warnings at anytime during this interrogation at the homicide bureau.

At approximately 10:00 a.m. on July 29, 1982, (while Davis was being interrogated), Police Officers Craven and Lipinczyk went to the J.F.K. Recreation Center on Clinton Street. There, they inquired of Mr. Arthur Peoples, the supervisor of the Mayor's Summer Youth Program, to call                    , a 15 year-old youth                    , to answer some questions concerning the defendant Davis. When                    arrived, he was asked whether he had gone to the hospital the day before with the defendant Davis.        acknowledged that he had done so but explained that treatment was unavailable at the time and that the defendant Davis was directed to return later that evening. At one point the detectives asked        if he had been on Pink Street the prior weekend. In response,        admitted that he had been on Pink Street and that he had heard screams emanating from    Pink Street. After this information was elicited, the police officers immediately decided to bring        downtown to police headquarters. It is clear from this record that both        and Arthur Peoples were told that        had to go downtown, that        was not given a choice nor told that he could refuse to do so, and that Miranda

-5-

warnings were not given.

At the hearing,          testified that he did not want

to go with the police officers but that he did not believe that

he had a choice in the matter.  The police officers agreed that

they had no basis to arrest him at this point.

After making the determination and so advising

and Peoples that          had to be taken downtown to police

headquarters, the police officers continued their questioning.

Although it is unclear whether it occurred at the J.F.K. Center

or in the police car enroute to headquarters,          stated

that he looked inside the windows of the house at No.     Pink

Street and saw two individuals assaulting the occupants.

Based upon these statements, therefore, and before the

police arrived at headquarters with          , he was in custody

and not free to leave.  The police officers testified that they

believed they had a basis to arrest him and that he would not

be allowed to leave even if he wanted to.

Upon arrival at headquarters, approximately at 11:00

a.m., Detectives Craven and Lipinczyk observed Detectives

Montondo and Dove exiting.  They left defendant          in the

car, and briefly spoke with Detective Montondo, advising him

of          identity, and Detective Craven telling him about

        stating that he heard screams emanating from No.

Pink Street.

-6-

Detective Montondo then questioned          alone, in
the back of the police car.  Detective Montondo agreed that
defendant        could have been under arrest but that he
didn't know; that he failed to inquire about defendant's status;
that he failed to inquire whether        had been read his
Miranda rights or whether he desired to waive them.  Nevertheless,
Detective Montondo proceeded to ask questions.

An interrogation of the defendant        , which was
recorded on video tape, commenced at 12:29 p.m. on July 29,
1982.  It was not until some one and one-half hours after
arriving at police headquarters that the defendant        was
first advised of his "Miranda" rights by Detective Lipinczyk.
When asked each time whether he had an understanding of each
right he only answered "yes" or "yes sir".

From 12:20 p.m. until 12:57 p.m. the defendant was
interroaged on video tape by Detectives Craven and Lipinczyk.
Part of this time,        acknowledged being in the vicinity
of Pink Street, and said he saw two people running away.  Then
he said that he had heard some screaming and saw somebody kick
somebody, and named        , Shelby Davis, Jr. and Gregory
Davis, as the perpetrators.  However, during this period of
time, he testified that he was outside   Pink Street as he
observed these struggles inside.  At 12:57 p.m., Chief Donovan
entered the room and shortly  thereafter he began asking

defendant          questions.  Chief Donovan had entered the

room because he believed that          was not saying the same

things he had told other police officers.  Chief Donovan had

observed that up to this point defendant          demeanor was

reluctant and that          was resisting the efforts of police

officers in extracting the information which Donovan believed

had already given to another police officer.  Because

was not precisely giving the information that Chief

Donovan thought he had to convey, Donovan went into the room

to try to move things along and prompt him to overcome the resis-

tance that he had in telling his story.  Chief Donovan told

defendant          to "tell the truth", and said "you told me

you were in the house".  Chief Donovan did admit that he had

not been told this personally by the defendant but, he stated,

"I knew that he had told Detectives Montondo, Lipinczyk and

Craven, that he had been in the house".  His questioning at

this point was designed to elicit from the defendant

the same information that had previously been obtained by

Detective Montondo, information that defendant          had

resisted giving in the prior video taped interrogation.  Chief

Donovan put questions to the defendant          which suggested

his presence in the house.  Only thereafter did the defendant

state that he was in the house.

-8-

The video taped interview ended at approximately 1:35 p.m.  Between that time and 4:10 p.m., the defendant just sat in the homicide office.  At no time was he offered the opportunity for a phone call nor was there any effort on the part of the police to contact his mother.  At about 4:10 p.m., the police began to take a written statement.  Detective Craven testified that there was no explanation as to why Detective Suszek began to take a statement, except that Detective Suszek stated that he had been talking to the defendant        , and that the defendant would make a statement.  Detective Suszek testified that he decided to take the statement on his own authority, he had no assignment to do it, and no one had suggested that there was a need for a typewritten statement.  Detective Skomski, on the other hand, overheard Detective Suszek being instructed to conduct an interview of the defendant        .

Detective Stanley Suszek questioned the defendant for some thirty to forty minutes before taking anything down in writing.  There is no indication of any explanation of rights during this period of time.  Suszek did not ask the defendant in this oral interview if he understood his rights or whether he had given up his rights or if he wished to give up his rights.  The only questions in the written statement relating to the defendant's understanding of his rights were the following:

-9-

"Q.   After, Det. Lipinczyk read you your
      rights, did you then, and do you now,
      understand them, your rights?

 A.   When he read them to me, I under-
      stood them.

 Q.   So that now you have no questions
      about your rights, is that correct?

 A.   No."

Nor did Detective Craven ask the defendant what he meant by the answers he gave.  He did not ask the defendant whether he had ever given up his rights previously, nor did he ask the defendant if he then wanted to given up his rights. Rather, the detective immediately began asking the defendant questions about the offense charged.

The typewritten statement was begun at 4:10 p.m. and concluded at 6:45 p.m.  After the conclusion of the typewritten statement, according to Detective Suszek and the reports which he filed, the defendant        stated other things which were so inconsistent with his prior story that it brought the defendant "to the point of no longer being believed"; but Detective Suszek made no record of what those inconsistencies were, nor does he remember what those inconsistencies were.

Detective Suszek could not recall what occurred between 6:45 p.m. and 8:00 p.m., the time at which his report stated the interview concluded.  It appears that at 7:00 p.m.

-10-

there was a second videotaping of Gregory Davis and Shelby

Davis, Jr., during which defendant Davis assaulted the defendant

Thereafter the defendant          sat until 11:00 p.m.

when his mother was allowed to see him for the first time that

day.  When Detective Montondo brought                to see her

son, she was at least "very anxious to see her son".  No effort

was made to allow her to talk to her son privately and while

Montondo listened to everything the defendant said, he failed

to recall or report what the mother stated.

During the entire twelve (12) hours that defendant

was in the custody of the police, no effort had been made

by the police to contact his mother or any other adult in a

position to protect his interests.  He had not been allowed to

call his mother when he had asked, and was not otherwise given

the opportunity to call.

The egregious behavior of the police with respect

to the defendant          was further compounded by their holding

him incommunicado from his mother and grandmother.  Within 15

minutes after receiving a phone call from Mr. Peoples, the

defendant's supervisor at the J.F.K. Center, informing the

defendant's mother and grandmother that the defendant

had been picked up by the police, these women began making

calls to the police in an attempt to ascertain his whereabouts.

-11-

The defendant             lived at                         , which
was adjacent to his maternal grandmother's home.  Due to his
mother's physical infirmity, it was the defendant's grandmother,
however, who exercised custody and control over this youth.
The maternal grandmother's phone number was the one the defendant
       listed with his employer.

                              the grandmother, and her daughter
    , defendant's mother, started making phone calls to the
police at Precincts 4 and 8 at approximately 10:45 a.m. on
July 29, 1982.  These precincts did not give out any information
as to the whereabouts of the defendant             They referred
the        mother and grandmother to the duty officer at police
headquarters to find out "if anybody had been arrested".  On
calling that number, they were informed that no one by the name
of                   had been arrested.

       Later in the day,                         and her daughter
       called 911, the police emergency number, to report the
defendant            missing.  When the police came in response
to the 911 call, the defendant's mother had gone to see Inelle
Davis, the mother of Gregory Davis and the aunt of defendant
Shelby Davis, Jr., who had called to say that she knew where
the defendant        was.  The police officers who responded
to the 911 call told the grandmother                    to
call the Buffalo Police Homicide Office to report defendant

-12-

missing.  Meanwhile, Inelle Davis had told defendant's mother                     that her son was at headquarters.  Upon her return to her home,                     called the homicide office shortly before 7:00 p.m., some nine (9) hours after her son had been taken into custody.  She was told to come down to headquarters and "talk some sense into your son and then you can bring him home".  This was the first time she was apprised of her son's whereabouts by any member of the Buffalo Police Department.

arrived at the homicide bureau at about 8:00 p.m. and was placed in a room with her mother by Detective Montondo.  She remained at police headquarters until 10:00 p.m. and no police officer made any attempt whatsoever to take her to her son or give her any reason whatsoever why she couldn't see her son.  Finally, she walked down the hall and <u>observed</u> Chief Donovan making a statement to the news media.  Thereafter, she was finally allowed to see her son at 11:00 p.m., some twelve (12) hours after he had been taken into custody.  She testified that when she saw her son "he looked like he didn't know me at all. His eyes were very swollen."                     testified her son looked frightened and scared out of his mind.  He didn't respond to two of her questions and then stated, "Mom, I didn't kill anybody".

-13-

In accordance with People's Hearing Exhibit 5, it was
not until on August 10, 1982, when any portion of Buffalo Police
Department Headquarters at 74 Franklin Street in the City of
Buffalo was designated by the Appellate Division, in accordance
with 22 NYCRR 1039.6(a) and §724(ii) of the Family Ct Act, as
a facility for the questioning of children.  Even then, the only
portion of that facility designated for the questioning of
children was the "Homicide Bureau, Room 326, Private Office of
the Chief of Homicide".  The testimony during the hearing is
devoid of any mention that the interrogation of the defendant
took place at that location, but only in the "middle
office" (video tape), and outer office.

## RE: SHELBY DAVIS, JR.

On the morning of July 28th, 1982, Detective Montondo
went to No. 64 Pink Street, the residence of the defendant
Shelby Davis, Jr., which was immediately adjacent to No.
Pink Street, the victims' residence.  He testified that his
original purpose was to speak to the defendant Davis.  Not
finding anyone at home, he then decided "to recheck the scene"
and decided to rummage through a garbage can which was located
at No. 64 Pink Street, nine (9) feet away from the fence
separating defendant Davis' premises from No.     Pink Street,
the site of the homicide.  The broken glass was found in a

-14-

plastic garbage bag in the garbage can and could only be found by rummaging through it.  At the time of the search, Detective Montondo had neither a search warrant nor an arrest warrant, nor did he have permission or consent to search the premises.

The glass was subsequently found to match the glass from the rear door of the house at No.    Pink Street, and more importantly, it did bear a fingerprint of the defendant Davis.

Sometime in August, 1982, a prosecution witness by the name of Michael Moeller provided an eight page document to the police containing details of the homicide at No.    Pink Street and purportedly based upon statements made by the defendant Davis.  Moeller alleged that defendant Davis confided in him for the purpose of seeking legal advice and aid in the defense of the charges against him.

Mr. Moeller testified on direct examination that he was at the holding center infirmary one day when he was "pulled over" by a Lieut. Dray of the Erie County Sheriff's Department and asked him if he heard anything on the gallery to let him know.  Needless to say, Moeller was housed on the same gallery as the defendant Davis.  According to his testimony, Moeller initially thought that Dray had been referring to a rumored break out at the jail.  After talking to defendant Davis, Moeller then concluded that Dray's request had referred to

Davis.  Four or five days after talking to Davis, Moeller sent a note to Dray informing him of what Davis had said.  Detective Montondo then came to the holding center and spoke with Moeller. The conversations with defendant Davis lasted for about threee weeks in August, and culminated with the eight page statement prepared by the witness Moeller and dated August 15th, 1982.

Mr. Moeller, age 32, was in detention awaiting trial on charges for burglary and assault.  By his own admission, he had a record of some 20 arrests and had served about 12 years in jail.  Subsequently, his bail was reduced from $5000.00 to $2500.00 allegedly for fear of harm when it became known to the other inmates that he was an informer.

Otherwise, Mr. Moeller testified that no promises had been made to him and that he did not need any favored treatment because he was confident that he would be acquitted of the charges pending against him.

The prosecution also produced another jailhouse infor- mant by the name of Michael Hudson, with a record of some 34 arrests and who had served seven or eight jail terms.  He testified that he had a conversation on December 7, 1982, with the defendant Davis at the holding center at 10 Delaware Avenue. Hudson was there on a weapon possession charge.  The record seems to indicate that Mr. Hudson was released from the holding center on December 7th, and he testified that he was arrested

-16-

on December 13, 1982 by the Drug Enforcement Agency, brought to Buffalo Police Headquarters and immediately requested to speak to homicide squad detectives about the Feldt murders. Then, in minute detail, he recountered the alleged admissions by defendant Davis as to the break-in, the murders and the glass in the garbage can.  He also testified that he received no promises, except that his co-operation or non-co-operation would be mentioned at the appropriate time to the courts.  He denied that there was any governmental request for his procuring of the information from the defendant Davis.

This is the substance of the evidence necessary to decide the issues herein.


## HUNTLEY ISSUE

As previously noted, defendant            contends that the police failed to comply with sections 724(a) of the Family Court Act and section 140.20(6) Criminal Procedure Law, thereby rendering any and all statements made by him inadmissible "per se".

Beyond that, defendant contends that he was initially taken into custody without probable cause; that he was subjected to custodial interrogation at the J.F.K. Center and in the police car enroute to headquarters without being provided

-17-

with Miranda warnings; that he was subjected to custodial interrogation by Detective Montondo in the police car upon his arrival at headquarters, again without Miranda warnings; that upon being advised of his Miranda warnings by Detective Lipinczyk, he could not have known or understood his rights and therefore could not have waived same; that not only did the police fail to comply with the aforementioned statute, they affirmatively denied him access to his mother and grandmother; that, when Chief Donovan interrogated him, he was in effect, "brow beaten"; and finally, that all of the interrogations which were conducted were done so in an "Undesignated" location, Family Ct Act, §724(b)(ii).

On the other hand, the prosecution contends that defendant         voluntarily accompanied the police to head-quarters and was not in custody when he made certain statements in the police car. The prosecution further contends that the absence of defendant        mother or his grandmother was not attributable to police misconduct and that the defendant knowingly, intelligently and voluntarily waived his Miranda rights prior to making his incriminating statements.  Finally, the prosecution contends that a totality of the circumstances analysis requires that the exclusionary rule not be applied and that all statements made by the defendant be held to be admissible at trial.

-18-

The law pertaining to the instant matter of the defendant           is historically developed, explained and applied in the case of People v Castro, 118 Misc2d 868.  Because the language in Castro is so highly appropriate to a resolution of the issues presented here, numerous portions of the decision bear repeating.  At page 881 of Castro, supra, it was stated:

> "In New York it has been noted that section
> 724 of the Family Court Act and CPL 140.20,
> (subd 6) mandate that the police immediately
> notify the parent of a juvenile, who has
> been arrested, as to his arrest and where
> he is being detained.  Case law has rendered
> inadmissible, per se, any statements made by a
> defendant in violation of these statutory
> provisions.  (emphasis supplied)."

At page 877-878 of Castro, supra, the case authorities were supplied as follows:

> "In People v Kocik, 63 AD2d 230 and People
> v Bevilaqua, 45 NY2d 508, the interrogation
> of the defendant during which neither the
> mother nor the attorney was present was ruled
> inadmissible.  The Appellate Division, Second
> Department, in Matter of Michelet P. (70 AD2d
> 68, 71, 72), dealth with a 15 year old who
> made inculpatory statements during the course
> of police questioning in a murder investigation,
> and clearly enunciated the 'per se' doctrine.
> As appears from Matter of Brian P.T., (58 AD2d
> 868) the requirement to notify a party legally
> responsible for the juvenile is strict. The
> emotional and intellectual immaturity of a
> juvenile creates an obvious need for the
> advice of a guardian and counsel at an
> interrogation from which charges of juvenile
> delinquency may ensure (see Matter of
> William L., 29 AD2d 182, 184)."

At page 880 of <u>Castro</u>, <u>supra</u>, the significance of a parent vis-a-vis    the right to counsel was explained thusly:

"from a juvenile's point of view, the request to consult a parent is the equivalent of a request to consult an attorney, which, pursuant to <u>Miranda v Arizona</u> (384 US 436, 473, 474) amounts to an invocation of the Fifth Amendment privilege.  (See <u>People v Burton</u>, 6 Cal3rd 375; also see <u>Matter of Roland K.</u>, 82 Cal App 3rd 295; <u>Fields v State</u>, 377 So 2nd 223 [Fla]; <u>Subletta v State</u>, 365 So 2nd 775 [Fla]; <u>Matter of Dino</u>, 359 So 2d 586 [La]; <u>Commonwealth v Lawson</u>, 478 Pa 200; <u>Commonwealth v Roane</u>, 459 Pa 389; <u>Matter of R.E.J.</u>, 511 SW 2d 347 [Tex].

"It is fatuous to assume that a minor in custody will be in a position to call an attorney for assistance and it is unrealistic to attribute no significance to his call for help from the only person to whom he normally looks - a parent or a guardian." (<u>People v Burton</u>, <u>supra</u>, 382).

"This theme is repeated in <u>Commonwealth v Cain</u> (361 Mass 224, 229, n 3) as follows: 'The Miranda warning that a boy had a right to consult a lawyer was hollow indeed when he was denied access to his father who, practically speaking, was the only avenue through which he could effectively evaluate and, if he wished, exercise the right to counsel.'

"The Supreme Court employed the Miranda warnings as a protective device to dispel the compulsion inherent in custodial surroundings. (<u>Miranda v Arizona</u>, 384 US 436, 457, 458.)  It has been held that '[t]he mere recital of his 'rights' to a youth of 14, who was unattended by a guardian . . . was insufficient to alleviate the coercive atmosphere borne of these circumstances.' (<u>Matter of Nelson</u>, 58 Misc2d 748, 750.)

"The capacity of a juvenile, who, as in our
case, is 14 years old, to comprehend his con-
stitutional rights and knowingly and volun-
tarily waive them is addressed in <u>Gallegos</u>
<u>v Colorado</u> (370 US 49, 54), as follows:
'A 14 year-old boy, no matter how sophisticated
. . . is unable to know how to protect his own
interests or how to get the benefits of his
constitutional rights . . . Without some adult
protection against this inequality, a 14 year-
old boy would not be able to know, let alone
assert, such constitutional rights as he
had.'"

Applying the facts of this case to the law as stated
above, it is abundantly clear that before the police picked the
defendant          up, they knew that he was 15 years-old.  They
also knew where he lived because they were informed of his
employment in the Mayor's Summer Youth Program and his presence
at the J.F.K. Center by a friend of his mother's at his very
place of residence.

After talking briefly to          at the J.F.K. Center,
the police told him and his adult supervisor, Mr. Arthur Peoples,
that          had <u>to</u> <u>go</u> downtown to police headquarters.  It
was Mr. Peoples himself, on his own volition, and not at the
instance of the police, who successfully contacted
mother and grandmother 15 minutes later.  The record is devoid
of any indication that the police requested Peoples to notify
a relative of          nor did they attempt to do so themselves
at this or any other juncture.  Instead, they took          into

-21-

custody at the J.F.K. Center fully intending to transport him
to headquarters and not to his home where either his mother
or grandmother could easily have been informed of his detention
and that he was being driven to police headquarters for interro-
gation.  At the outside of police headquarters, he was interro-
gated "in camera" in the rear of the police car by Detective
Montondo, who did not administer the Miranda warnings.  Then
he was taken to the homicide offices, twice interrogated on
video tape, once assaulted by defendant Davis on video tape,
and then "brow-beaten" by Chief of Homicide Donovan to tell
the truth.

    Meanwhile his mother immediately started/inquiries as
making
to her son's whereabouts, calling police precincts 4 and 8
and then police headquarters.  None of these inquiries, however,
provided any helpful information.  It was not until after
speaking with Inelle Davis, the mother of Gregory Davis, that

   mother was advised to call the homicide bureau.  Upon
doing do, at 7:00 p.m. approximately, she was told to come down
to the bureau and talk some sense into her son and then she
could take him home.  Hence, it was not until this 15 year-old
youth had been held in custody for some eight to nine hours,
without a single attempt on the part of the police to notify
his relatives of his detention, that the police even acknowledged

-22-

that          was in fact then in custody.  Compounding the

blatant and egregious misconduct of the police in holding

incommunicado during this period of time, upon the

mother's arrival at headquarters at approximately 8:00 p.m.

she was totally ignored and not permitted to see her son for

some three and one-half hours.  Hence, twelve hours had expired

since defendant          had been taken into custody, yet,

during this time the police never once sought to make his

mother and grandmother available to him.  Instead, they

deliberately denied him access to his relatives.  In the

reported cases, the police attempts to locate the parent were

at least "feeble and insufficient".  Here, they were non-

existent; even worse, they were deliberate in denying him

access!

        Having concluded that the police violated the law

pursuant to Section 724 of the Family Court Act and Section

140.20, subd 6 of the CPL in failing to notify the mother  that

defendant          was arrested and where he was being detained,

it becomes necessary to determine at what point did the police

misconduct initiate.  As previously noted, prior to actually

talking to          , the police knew that he was 15 years-old

and that he had been with the defendant Davis (who, at the

time the police were proceeding to the J.F.K. Center, was the

-23-

prime suspect) at the hospital the day before.  From an indepen-
dent source, Mr. McDade, the police also knew of the defendant
Davis' relief that the investigation was at a standstill.  Hence,
based upon their knowledge , and prior to talking to
the police had to know  that in all likelihood        would
either incriminate himself or the defendant Davis.  No other
reason could explain, therefore, why        would have been
asked by the detectives if he himself had been on Pink Street
when defendant Davis was the prime suspect and the police knew
that        was "<u>involved</u>" with Davis (Hearing, May 31st, 1983,
page 67).

    As the Court of Appeals recently stated in <u>People v
Ferro</u>, 63 NY2d 316, 322-323:

> "As the <u>Innis</u> case [446 US 290] makes clear,
> 'the term 'interrogation' under <u>Miranda</u> refers
> not only to express questioning, but also to
> any words or actions on the part of the police
> (other than those normally attendant to arrest
> and custody) that the police should know are
> reasonably likely to elicit an incriminating
> response' (446 US at 301).  But, because
> '[t]he latter portion of his definition focuses
> primarily upon the perceptions of the suspect,
> rather than the intent of the police' (id.),
> the question is not what was the subjective
> intent of the police but rather what words or
> actions, <u>in light of their knowledge</u> concerning
> the suspect, they '<u>should have known</u>' were
> reasonably likely to elicit an incriminating
> response.' (emphasis supplied)".

    Hence, <u>Miranda</u> warnings should have been given prior
to the question - had he been on Pink Street - being asked of
defendant

Therefore, I now hold that any and all statements, whether written, oral or on video tape made by defendant following the question - had you been on Pink Street? - are suppressed due to the failure of the police to provide <u>Miranda</u> warnings; the seizure of        , without probable cause, after his admission that he had been on Pink Street and that he had heard screams; the failure of the police after seizing to immediately notify his mother or grandmother of his arrest and detention; and the deliberate denial of access to those relatives.

The prosecution has importuned this court to deny suppression of the statements on a theory of the totality of circumstances doctrine and analysis. The truth is that this court has not experienced any other matter before it, nor read any case which revealed such an "orgy of constitutional and statutory illegal police conduct" as was exhibited in this case.

In the light of the above, there is no need to pass upon the issue of the competency of the defendant        to comprehend the meaning of the Miranda warnings or effectively waive same.

MIRANDA AND DUNAWAY ISSUES

Defendant Davis has moved to suppress all statements made to Chief Leo Donovan and Detective John Montondo upon the ground that he was interrogated while in custody without being given the requisite Miranda warnings.

The testimony of Detective John Montondo in volume 16, pages 25 through 37 inclusive, of the Hearing Transcript, reveals the following:  On direct examination, Detective Montondo testified that on July 28th, 1982, he went to the Pink Street location to talk to the defendant Shelby Davis, Jr.  Finding no one at home he rechecked the scene and the area adjacent to it, which included defendant Davis' back yard.  He testified that he found broken glass, which he believed formed a part of the rear door of the victims' premises, in a black plastic garbage bag in a garbage can located to the rear of No. 64 Pink Street, the residence of the defendant, and nine feet away from the fence separating    Pink Street from 64 Pink Street.  It is undisputed that Montondo's entry onto the premises of 64 Pink Street and rummaging through the garbage can was without benefit of a search warrant.  It is well settled that "Evidence seized by means of a trespass is inadmissible under the Fourth Amendment" (Silverthorn Lbr. Co. v United States, 251 US 385; 40 S Ct 182; 64 L. Ed 319; Johnson v United States,

333 US 10; 168 S Ct 367; 92 L. Ed 436).  An exact situation to

this case was completely described in Work v United States,

243 F 2d 660, 662, as follows:

> "The articles seized in the present case
> had not been abandoned either 'to the open
> field,' as was done in Hester v United States,
> 265 U.S. 57, 44 S Ct 445, 446, 68 L. Ed. 898,
> or otherwise abandoned so as to lose the
> protection of the home provided by the Fourth
> Amendment, however mean the home.  The trash
> receptacle in which the phial was found was in
> close proximity to the house.  It was an adjunct
> to the domestic use of the home by appellant.
> It was within the curtilage of 'general en-
> closure surrounding the dwelling.'  Care
> v. United States, 10 Cir., 231 F. 2d 22, 25.
> See Walker v. United States, 5 Cir., 225
> F. 2d 447, 449; Wakkuri v. United States,
> 6 Cir., 67 F. 2d 844; Childers v. Commonwealth,
> 198 Ky. 848, 250 S. W. 106.  A photograph of
> the lower half of the premises, when viewed
> in light of the evidence, shows that the
> receptacle was under the stone porch or stoop
> constituting a part of the house itself.  That
> the receptacle might have been partially visible
> from the street is immaterial.  We point out,
> however, that no evidence indicates that it
> was visible from the street.  The placing of
> the phial in this receptacle, so situated and
> used, is not to be construed as an abandonment
> of the phial unless to persons impliedly or
> expressly authorized to remove the receptacle,
> or expressly authorized to remove the recep-
> tacle's contents, such as the trashmen, for
> purposes of destruction.  In the alleged
> circumstances of this case there could not
> be said to be an abandonment even to those
> persons; there was, rather, a hiding.
>
> "The phial and its contents should have
> been suppressed."

That same day, viz., July 28th, Detective Montondo, received permission from the Feldt family to remove the rear door so that a determination could be made whether the illegally procured glass fit the door.  He testified that the glass did fit and that defendant Davis' fingerprints were found on same.

Further, on direct examination, Detective Montondo stated that he returned to the residence of the defendant Davis, at No. 64 Pink Street, at 8:08 a.m. on July 29th, had him awakened, and that his purpose was to question him in regards to the glass found in his yard.  However, Davis was not questioned at home but was brought downtown to the police homicide bureau at 8:30 a.m.  Detective Montondo stated that defendant Davis was not in custody but was merely brought in for questioning. Defendant Davis was questioned in the inner office or middle office, which also had within it the door from No.    Pink Street.  He was informed by Detective Montondo that the police had the glass that fit the door, which was pointed out to the defendant, and he was further informed that the door was pro- cessed for fingerprints, and in fact still had fingerprint powder on it.  This forced the defendant to start explaining why his fingerprints were on the door glass and why he had placed the glass in his garbage can.  Finally, at about 10:30 and 10:45 a.m., Detective Montondo asked Davis, without Miranda

-28-

warnings having been provided, "Why did you do it?"  Davis'
reply was, "I didn't mean it to happen that way" and he then
refused to elaborate any further on his answer.  Montondo
later informed Davis that the juvenile defendant

had implicated him in the killings.  It was only then,
according to Montondo's testimony, that he determined that the
defendant Davis was not free to do.  While Montondo conceded
that Davis was a suspect (Montondo had even asked Davis if
he had been in the house) incredibly, he testified that after
Davis stated, "I didn't mean it to happen that way" in response
to his question, "Why did you do it?", Davis was still free to
go.

On cross-examination, Detective Montondo stated that
defendant Davis' fingerprints were not positively identified
on the glass until the 30th day of July, whereas Davis was led
to believe that the fingerprints had been identified and to
implicate himself on the 29th day of July.  The record is silent
as to when or how defendant Davis' fingerprints were procured
for comparison.  After this questioning, Detective Montondo
decided to return to the crime scene, but before doing so he
encountered the defendant          being brought to headquarters.
After being briefed, Montondo questioned defendant          in
the back of the police car on the street outside of headquarters
and that is where he was told that defendant          was present

-29-

at No.    Pink Street and that defendant Shelby Davis, Jr. did
the killings.  He then returned and relayed this information
to Chief Donovan, Detective Montondo testifying that it was
only at this time that he felt defendant Davis was not free
to go.

The record is clear that at no time, between the hours
of 8:07 to 10:45 a.m., which was approximately the time the
defendant Davis made the statement, "I didn't mean to do it"
in response to Detective Montondo's question, "Why did you do
it?" were the <u>Miranda</u> warnings given!  This is merely the first
ground for the suppression of the statement by defendant Davis.

The second ground is the rule established in <u>Dunaway</u>
<u>v New York</u> (442 US 200, 60 L Ed 2d 824, 99 S Ct 2248), and made
obligatory upon the States under the Fourth and Fourteenth
Amendments to the United States Constitution.

It will be illuminating to compare the fact situation
in the <u>Dunaway</u> case (<u>supra</u>) and the fact situation as found by
this court.

In <u>Dunaway</u>, <u>supra</u>, the United States Supreme Court
stated the fact situation as follows, at page 829:

> "On March 26, 1971, the proprietor of a
> pizza parlor in Rochester, N.Y. was killed
> during an attempted robbery.  On August 10,
> 1971, Det. Anthony Fantigrossi of the
> Rochester Police was told by another officer
> that an informant had supplied a possible
> lead implicating petitioner in the crime.

Fantigrossi questioned the supposed source
of the lead - a jail inmate awaiting trial
for burglary - but learned nothing that
supplied 'enough information to get a warrant'
for petitioner's arrest.  . . . Nevertheless,
Fantigrossi ordered other detectives to
'pick up' petitioner and 'bring him in.'
. . . Three detectives located petitioner
at a neighbor's house on the morning of
August 11.  Petitioner was taken into
custody; although he was <u>not told</u> he was
under arrest, he would have been physically
restrained if he had attempted to leave.
. . . He was driven to police headquarters
in a police car and placed in an interrogation
room, where he was questioned by officers
<u>after</u> being given the warnings required by
<u>Miranda v Arizona</u>, 384 US 436, 16 L. Ed 2d
694, 865 S Ct 1602, . . . (1966).  Petitioner
waived counsel and eventually made statements
and drew sketches that incriminated him in
the crime.[2]"

In summary, the following is what the police knew in

the case at bar prior to 8:07 a.m., July 29th.  On the 28th

they had received a phone call from one Jimmy McDade informing

them that the defendant Davis breathed a sigh of relief, while

watching a noon television news program that there wasn't

anything new in the homicide investigation.  Mr. McDade was

again interviewed on the 29th of July and reiterated the same

information but added the fact that defendant Davis requested

defendant          to accompany him to a hospital to have an

industrial injury treated.  A police check of a local nearby

hospital revealed that neither defendant Davis nor defendant

          had been there.

On the 28th, Detective Montondo trespassed onto the premises owned by Shelby Davis, Sr., and rummaged in the garbage can and procured the glass missing from the No. Pink Street rear door. It must be borne in mind that this is all the information the police possessed at 8:07 a.m. when defendant Davis was awakened and taken to police headquarters. The record is silent whether defendant Davis was requested or voluntarily agreed to come to police headquarters. Yet, it was clear that Davis was considered a "suspect"; he was picked up by Montondo, transported to headquarters, questioned about the killings, confronted with the glass, and was never told that he was free to leave.

It has already been established that Miranda warnings were not given and I have also concluded that Davis was seized and taken into custody without probable cause.

In Dunaway v New York, supra, the Supreme Court framed the question in the following manner, at page 832, (60 L Ed2d 832):

> "We first consider whether the Rochester Police violated the Fourth and Fourteenth Amendments when, without probable cause to

-32-

arrest, they took petitioner into custody,
transported him to the police station, and
detained him there for interrogation."

The Court answered its own question as follows, at

page 832:

"The Fourth Amendment, applicable to the
States through the Fourteenth Amendment, . . .
provides: 'The right of the people to be secure
in their persons . . . against unreasonable
searches and seizures, shall not be violated,
and no warrants shall issue but upon probable
cause . . .'  There can be little doubt that
petitioner was 'seized' in the Fourth
Amendment sense when he was taken involuntarily
to the police station.  And respondent State
concedes that the police lacked probable cause
to arrest petitioner before his incriminating
statements during interrogation.  Nevertheless
respondent contends that the seizure of the
petitioner did not amount to arrest and was
therefore permissible under the Fourth Amend-
ment because the police had a 'reasonable
suspicion' that petitioner possessed 'intimate
knowledge about a serious and unsolved crime."
. . . We disagree.  . . . the Fourth Amendment's
guarantee against unreasonable seizures of
persons was analyzed in terms of arrest, probable
cause for arrest, and warrants based on such
probable cause.  The basic principles were
relatively simple and straightforward: The
term 'arrest' was synonymous with those
seizures governed by the Fourth Amendment.
While warrants were not required in all
circumstances, the requirement of probable
cause, as elaborated in numerous precedents,
was treated as absolute." . . .

-33-

"Respondent States now urges the Court to apply a balancing test, rather than the general rule, to custodial interrogations, and to hold that 'seizures' such as that in this case may be justified by mere 'reasonable suspicion'.

The Court answered this argument as follows, at page 836:

"Petitioner was not questioned briefly where he was found.  Instead, he was taken from a neighbors home to a police car, transported to a police station, and placed in an interrogation room.  He was never informed that he was 'free to go', indeed he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody.  The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest' under state law.  The mere facts that petitioner was not told he was under arrest, was not 'booked', and would not have an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes . . . obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in Terry and its progeny.  Indeed, any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based upon probable cause." . . . "To argue that the Fourth Amendment does not apply to the investigory stage is fundamentally to misconceive the purposes of the Fourth Amendment.  Investigatory seizures would subject unlimited numbers of innocent persons to harassment and ignominy incident to involuntary detention.  Nothing is more clear than that the Fourth Amendment was

-34-

> meant to prevent wholesale intrusions upon
> the personal security of our citizenry,
> whether these intrusions were termed
> 'arrests' or 'investigory detentions.'"

It is clear from the above that the defendant Davis'
"seizure" was virtually identical to the factual situation
presented in Dunaway. Even if Miranda warnings had been given
to the defendant Davis by Detective Montondo at any time prior
to 10:30 a.m. on the 29th of July, however, the statement would
still be inadmissible because of the following cited from
Dunaway at page 838-839, which the Court stated as follows:

> "But Brown v Illinois, 422 US 590, 45 L. Ed.
> 2d 416, 95 S Ct 2254 (1975), settled that 'the
> exclusionary rule . . . when utilized to
> effectuate the Fourth Amendment, serves
> interests and policies that are distinct
> from those it serves under the Fifth,'
> 422 US at 601 . . . and held therefore that
> Miranda warnings, and the exclusion of a
> confession made without them, do not alone
> sufficiently deter a Fourth Amendment violation.'
> Ibid. 'If Miranda warnings by themselves,
> were held to attenuate the taint of an
> unconstitutional arrest, regardless of how
> wanton and purposeful the Fourth Amendment
> violation, the effect of the exclusionary
> rule would be substantially diluted . . .
> Arrests made without warrant or with probable
> cause, for quesioning or 'investigation,'
> would be encouraged by the knowledge that
> evidence derived therefrom could well be
> made admissible at trial by the simple
> expedient of giving Miranda warnings.'
> Id at page 602, 45 L. Ed 2d 416 . . .

"Consequently, although a confession after
proper Miranda warnings may be found 'voluntary'
for purposes of the Fifth Amendment, this type
of 'voluntariness' is merely a 'threshold
requirement' for Fourth Amendment analysis,
422 US at 604.  . . .  Indeed, if the Fifth
Amendment has been violated, the Fourth
Amendment issue would not have to be reached."

Because defendant Davis was illegally seized, and
his statements were obtained as a result of the exploitation
of that seizure and there existed a close causal connection
between the illegal seizure and the statements, even had
Miranda warnings been provided, all statements made by Davis
would still be suppressed on this ground.

There is yet a further illegality in the interrogation
of defendant Davis when he was confronted, in the interrogation
room, of the homicide bureau, with the rear door from No.
Pink Street.  He was also told that the glass missing from that
door was found in the garbage can at No. 64 Pink Street,
defendant's residence.

The recent case of the People v Alfio Ferro, 63 NY2d
316, has established the following test:

"What constitutes 'interrogation' of a suspect who,
after 'Miranda' warnings, has declined to answer questions
is determined not by the subjective intent of the police,
but whether an objective observer with the same knowledge
concerning the suspect as the police had would conclude that

-36-

the remark or conduct of the police was reasonably likely to elicit a response."

After applying this test to the facts in Ferro, the Court of Appeals held:

> "the conduct of the police in placing in front of the cell in which defendant was being detained furs stolen from the murder victim's residence constituted interrogation and because no new 'Miranda' warnings were administered to defendant Ferro, his statements made subsequent to viewing the furs should have been suppressed." People v Ferro, supra, p 319.

Here of course, not only was defendant put in a position where he could observe the items of evidence, namely the broken glass and door frame, like the situation in Ferro, Davis was interrogated about these items without Miranda warnings and therefore all statements made by Davis to Detective Montondo even before Montondo asked him, "Why did you do it?" must be suppressed.

<u>THE TESTIMONY OF MICHAEL MOELLER</u>
<u>AND MICHAEL HUDSON</u>

Michael Moeller's testimony must also be suppressed.
Moeller was in custody awaiting trial on charges unrelated to
those of the defendant Davis, and was not previously acquainted
with him.  At the request of Lieut. Dray of the Erie County
Sheriff's Department made shortly after Davis was housed on
the same jail block, Moeller was asked if he heard anything
and, if so, to report same to him.  Ultimately the witness
Moeller prepared an eight page statement as to what the
defendant Davis told him at the behest of Lieut. Dray.  Sub-
sequently, Moeller's bail was reduced and he was released
from custody.

In <u>United States v Henry</u>, 447 US 264, 65 L Ed2d 115,
100 S Ct 2183, the fact situation there was quite similar to
the fact situation in the instant case.

> "On November 21, 1972 shortly after Henry
> was incarcerated, government agents working
> on the Janaf robbery contacted one Nichols,
> an inmate at the Norfolk City Jail, who
> for some time prior to this meeting had been
> engaged to provide confidential information
> to the Federal Bureau of Investigation as
> a paid informant.  Nichols was then serving
> on local forgery charges.  The record does
> not disclose whether the agent contacted
> Nichols specifically to acquire information
> about <u>Henry</u> on the Janaf robbery.

-38-

"Nichols informed the agent that he was
housed in the same cell block with several
federal prisoners awaiting trial, including
Henry.  The agent told him to be alert to
any statements made by the federal prisoners,
but not to initiate any conversation with or
question Henry regarding the bank robbery.
In early December, after Nichols had been
released from jail, the agent again contacted
Nichols, who reported that he and Henry had
engaged in conversation and that Henry told
him about the robbery of the Janaf bank.
Nichols was paid for furnishing the informa-
tion."  United States v Henry, 65 L. Ed. 2d
115, 119.

Here, of course, with Moeller being held in custody
in close proximity to the defendant Davis, shortly after Davis
arrived in early August, 1982, Lt. Dray actively solicited
Moeller to let him know if he heard anything on the gallery,
or in Moeller's own words, "If I should hear anything that I
think, you know, might be of interest to him, that I should
let him know." (Volume 15, page 31).  A few days later,
Moeller contacted Lt. Dray who in turn contacted Detective
Montondo and Moeller and Montondo spoke.  Eventually, Moeller
authored an eight page statement, signed August 15th, 1982,
describing in minute detail what Davis allegedly told him.

During the hearing, I have paid particular attention
to the testimony of Michael Moeller.  In assessing his credi-
bility, I am simply not convinced that Moeller is believable
when he provides the temporal sequence of his conversations

-39-

with Dray and then defendant Davis.  Having rejected that
portion of his testimony, what is left is Montondo's meeting
on August 8th, 1982 and Moeller's statement of August 15th,
1982 narrating Davis' admissions.  Accordingly, the sole
inference I can draw is that Moeller was acting as an agent
for the police (cf. People v Cardona, 41 NY2d 533) and his
                    will
testimony/not be permitted at trial.    Like the situation
presented in Henry, supra, a scenario was intentionally created
to induce Davis to make incriminating statements thereby
violating Davis' Sixth Amendment right to counsel.

          In the matter of the statements made to Michael
Hudson, another inmate of the holding center, the evidence
does not indicate the active connivance of the police.  Hudson
will be permitted to testify to everything except what defendant
Davis told him concerning the broken glass and that his finger-
prints were on it.  The reason for the restriction is that the
glass was procured as a result of a trespass and the prosecution
will not be permitted to introduce the broken glass into
evidence at trial.  And the matter of the broken glass was
utilized by the police to confront Davis thereby providing the
basis of such alleged admission to the witness Hudson.

CONCLUSION

For the reasons previously stated and in summary, I find and determine as follows:

1.  Motion to suppress any and all statements made by the defendant         to the police on July 29th, 1982, commencing with and including his response "that he had been on Pink Street and that he had heard screams emanating from    Pink Street" and all statements made thereafter is hereby GRANTED.

2.  Motion to suppress any and all statements made by the defendant Davis to the police, commencing with his seizure by Detective Montondo at approximately 8:07 a.m. on July 29th, 1982,  and any and all statements made thereafter is hereby GRANTED.

3.  Motion to suppress the broken glass illegally seized by way of trespass by Detective Montondo on July 28th, 1982, from the back yard of 64 Pink Street is hereby GRANTED.

4.   Motion to suppress the testimony at
     trial of the witness Michael Moeller
     is hereby GRANTED.

5.   Motion to suppress the testimony at
     trial of the witness Michael Hudson
     to the extent that he will not be
     permitted to testify relative to Davis'
     admissions concerning the broken glass
     and his fingerprints being on the glass
     is hereby GRANTED but, otherwise, DENIED.

It is so ordered.


DATED: Buffalo, New York
       April /5  , 1985


                              _____
                              THEODORE S. KASLER
                              Justice of Supreme Court



Erie County Clerk
92 Franklin Street
Buffalo, NY 14202
Criminal/Records

JUL 27 2023

Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th FL.
New York, NY 10019

c/o Thela Coleman

# EXHIBIT F

The Buffalo News

https://buffalonews.newspapers.com/image/875635082

The Buffalo News (Buffalo, New York) · Tue, Apr 16, 1985 · Page 1

Downloaded on May 2, 2023

# Judge Throws Out Evidence, Cites Police Misconduct

### By MATT GRYTA

A judge Monday afternoon threw out the bulk of the evidence against two Buffalo cousins, including their confessions, in the 1982 slaying of an elderly Pink Street couple for what he called "blatant and egregious misconduct" by Buffalo homicide detectives.

State Supreme Court Justice Theodore S. Kasler also disallowed allegedly incriminating fingerprint evidence in slayings of Edward and Antoinette Feldt, faulting police for trespassing at the home of murder suspect Shelby Davis, the victims' next-door-neighbor.

Justice Kasler rebuked homicide investigators for what he called "deliberate" violations of state law governing treatment of juvenile suspects in their handling of murder suspect Tommy Rollins.

He agreed with defense attorneys that police illegally held Rollins, then 15, incommunicado from his family for nearly nine hours after he and Davis, then 21, were arrested five days after the July 24, 1982, slayings.

Justice Kasler accused Buffalo Police Homicide Chief Leo J. Donovan of having "brow-beaten" the intellectually impaired Rollins into admitting complicity in the slayings and implicating his cousin Davis as the killer.

"The truth is that this court has not experienced any other matter before it, nor read any case which reveals such an orgy of constitutional and statutory illegal police conduct as was exhibited in this case," he said.

Nicholas C. Costantino, chief of the district attorney's Major Felony Bureau, said prosecutors will review the Kasler rulings before deciding whether to appeal.

Mark J. Mahoney, Rollins' attorney, said he will move for an immediate trial if prosecutors don't appeal the Kasler rulings or ask to have the murder indictment against the defendants dismissed.

Davis has been in custody since he and Rollins were arrested a day after an informant reportedly gave police Davis's name in the slayings.

Mr. Feldt, 78, and Mrs. Feldt, 81, were slain, and Mrs. Feldt was sexually assaulted during a late night robbery in the home at 62 Pink St. where Mrs. Feldt had lived since childhood.

Rollins has been free on property bail.

The judge noted that police admit Rollins had been "assaulted" by Davis during the second of two police videotaped interrogations the day of their arrests and that neither was advised of his constitutional rights for at least 90 minutes after being taken into custody.

Justice Kasler said Rollins' mother and grandmother had filed a missing persons report on Rollins before police told them he was at police headquarters and they should come and "talk some sense" into him.

Police handling of Rollins, then classified as a juvenile for criminal court treatment, violated state law that requires the families of such suspects be notified immediately.

Rollins' mother said she wasn't allowed to talk to her son, who has an IQ of about 70 and has been found to be intellectually impaired, for about three hours after she arrived at headquarters, the judge said.

The judge noted homicide detectives acknowledged during hearings two years ago that they had failed to include in a written statement signed by Rollins apparently inconsistent remarks he gave them about the crime.

Police admitted those inconsistencies were left out because they put Rollins "to the point of no longer being believed."

The judge also quashed as prosecution evidence a piece of glass from the victim's home on which police allegedly found Davis' fingerprints because it was found while a detective was rummaging through Davis' garbage a day before the cousins' arrest.

Police actually were trespassing on Davis' property at 64 Pink St., the judge ruled, because they lacked a legal search warrant or Davis' permission to search his property.

Justice Kasler has yet to rule on a $300 contempt of court fine he imposed on defense attorney Mahoney following June 1983 hearings or on Mr. Mahoney's long-filed motions.

See SLAYING
Page A-2, Column 1



Copyright © 2023 Newspapers.com. All Rights Reserved.



EXHIBIT

47

CJG 4/21/23

PENGAD 800-631-6989

BOYD-WALKER-00041723

# EXHIBIT G

# Errors by Police Lead to Dismissal Of Murder Charges

### By MATT GRYTA

The judge who recently criticized Buffalo police for mishandling the probe of the 1982 slaying of an elderly Pink Street couple dismissed murder charges Friday against one of the two cousins charged with the crimes.

Without opposition from prosecutors, State Supreme Court Justice Theodore S. Kasler granted defense attorney Mark J. Mahoney's motions to dismiss the case against Tommy Rollins, now 18.

Justice Kasler also scheduled a hearing May 28 on motions by Arthur S. Anderson, attorney for Shelby Davis, now 25, to dismiss charges against Davis, Mr. Rollins' cousin and co-defendant.

Erie County District Attorney Richard J. Arcara acknowledged Friday that his office decided not to challenge Justice Kasler's April 15 ruling suppressing evidence in the case against Mr. Rollins.

As for Davis, Mr. Arcara said his office would press for a trial, rather than appeal the suppression of evidence ruling, which he indicated would be fruitless.

After an 18-month review, Justice Kasler threw out most of the evidence for what he called "blatant and egregious misconduct" by Buffalo homicide detectives.

In a blistering denunciation of the handling of the case, the judge faulted investigators for forcing confessions from both defendants before advising them of their legal rights and holding Mr. Rollins, a juvenile at the time, for hours before notifying his family — a violation of state law on police handling of juveniles. Justice Kasler suppressed both confessions and reputed fingerprint evidence against Davis.

Davis, who had lived next door to the victims — Edward Feldt, 78, and his wife Antoinette, 81 — has been jailed since he and Mr. Rollins were arrested five days after the July 24, 1982, attack in the Feldts' Pink Street home.

Both Feldts' were bludgeoned, and Mrs. Feldt was sexually assaulted, reputedly by Davis, authorities said.

Mr. Rollins, who has been diagnosed as intellectually impaired, had been free on property bail posted in 1983 by his family.

Mr. Mahony, Mr. Rollins' attorney, said Friday he had pushed for dismissal because Justice Kasler's ruling had left prosecutors with "insufficient" evidence against Mr. Rollins, who reportedly acted only as a lookout during the late-night break in.

Justice Kasler has yet to rule on Mr. Mahoney's request to drop a $300 contempt-of-court fine imposed on Mr. Mahoney during June 1983 hearings in the murder case.

Justice Kasler has not demanded payment of the fine he levied when Mr. Mahoney, despite the judge's orders, repeatedly urged Mr. Rollins not to answer a prosecutor's demand to tell the "true story" of the Feldt killings.

During the hearing, the judge ruled that Mr. Mahoney's decision to let Mr. Rollins testify in his own defense opened the defendant to a full array of prosecution questions.

Copyright © 2023 Newspapers.com. All Rights Reserved.

POWERED BY Newspapers™

BOYD-WALKER-00041726

# EXHIBIT H

JOHN F. MONTONDO

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

----------------------------------------------

**DARRYL BOYD,**

       Plaintiff,

 -vs-                Index No. 22-cv-519

**THE CITY OF BUFFALO; THE COUNTY OF ERIE; MICHAEL G. GUADAGNO; JOHN MONTONDO; LINDA J. FIAL AS EXECUTOR FOR THE ESTATE OF ROBERT GRABOWSKI; MARTIN BULLOCK AS EXECUTOR FOR THE ESTATE OF JAMES E. HUNTER; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF ROBERT F. ARNET; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF FRANK C. DEUBELL; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF LEO J. DONOVAN; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF FRANCIS M. MANISTA, JR.; AND DAWN M. DIRIENZO AS EXECUTOR FOR THE ESTATE OF PAUL R. DELANO,**

       Defendants.

----------------------------------------------

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

------------------------------------------

**JOHN WALKER, JR.,**

        Plaintiff,

 -vs-                 Index No. 22-cv-520

**THE CITY OF BUFFALO; THE COUNTY OF ERIE; MICHAEL G. GUADAGNO; JOHN MONTONDO; LINDA J. FIAL AS EXECUTOR FOR THE ESTATE OF ROBERT GRABOWSKI; MARTIN BULLOCK AS EXECUTOR FOR THE ESTATE OF JAMES E. HUNTER; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF ROBERT F. ARNET; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF FRANK C. DEUBELL; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF LEO J. DONOVAN; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF FRANCIS M. MANISTA, JR.; AND DAWN M. DIRIENZO AS EXECUTOR FOR THE ESTATE OF PAUL R. DELANO,**

        Defendants.
------------------------------------------

Examination before trial of **JOHN F. MONTONDO**, taken pursuant to Federal Law and Rules of Civil Procedures, taken in the law offices of Hodgson Russ LLP, The Guaranty Building, 140 Pearl Street, Buffalo, New York 14202, taken on June 21, 2023, commencing at 9:47 a.m., ending at 2:19 p.m., held before Carly J. Garretson, Notary Public.

1    was into that heavy, so I was detailed to go

2    and assist Bill Reagan prosecute the case.

3        So I was still -- I was just transferred

4    over there.  I was in Precinct 6 at the time.

5    And I went there, and the outcome -- finally,

6    we got a conviction.  And at that time, that's

7    when the DA asked me if when I retired if I'd

8    like to come to work there and he'd consider

9    it.

10   **BY MR. RUDIN:**

11   Q.  That's Mr. Arcara?

12   A.  I forgot about that, the reason I went there.

13       I was detailed there because it was a case I

14       was very much involved in.

15   Q.  So Mr. Arcara is the one who told you that he

16       was thinking of hiring you?

17   A.  Yes.

18   Q.  Did Mr. Arcara ever ask you any questions

19       about your conduct in the Tommy Rollins case

20       before he hired you?

21   A.  No.

22   Q.  Did anyone at the Buffalo Police Department

23       ever, to your knowledge, conduct any

1       investigation of your role in the Tommy

2       Rollins case --

3   A.  No.

4   Q.  -- while you were employed by the police

5       department?

6   A.  No.

7   Q.  To your knowledge, did anyone at the Buffalo

8       Police Department conduct any investigation of

9       any of the detectives involved in the Tommy

10      Rollins case?

11          **MR. SAHASRABUDHE:**  Object to form.

12          **THE WITNESS:**  Not to my knowledge.

13      **BY MR. RUDIN:**

14  Q.  Was one of the people involved in questioning

15      Tommy Rollins, Chief Donovan?

16  A.  No, he never did.  But I wasn't -- I really

17      can't answer that because I wasn't there.

18  Q.  Do you know whether there was a Detective Dove

19      who was involved in questioning Tommy Rollins?

20  A.  He was working that day, I know that.

21  Q.  Do you know whether or not anyone at the

22      Buffalo Police Department ever conducted any

23      investigation of Detective Dove's role in the

1  Q. So Donovan may have been present?

2  A. He could have been, sure.

3  Q. Do you know whether or not Donovan stepped

4     down as police homicide bureau chief as a

5     result of this case?

6         **MR. SAHASRABUDHE:** Objection to form.

7         **THE WITNESS:** No.

8     **BY MR. RUDIN:**

9  Q. Do you know whether or not there was any

10    investigation made by the police department of

11    Donovan's role in this case?

12 A. No.  I know it got a lot of bad publicity.  A

13    lot of errors made.

14 Q. Do you know whether or not any of the

15    detectives, including Donovan, who were

16    involved in the investigation of this case

17    were ever investigated by the Buffalo Police

18    Department for their actions?

19        **MR. SAHASRABUDHE:** Form.

20        **THE WITNESS:** No.  I know with the bad

21    publicity I got transferred to number six.

22    And they said they just needed a sergeant at

23    six, but I knew that it was because of that

```
 1        case.
 2        BY MR. RUDIN:
 3    Q.  Do you know if anything happened to Donovan as
 4        a result of this case?
 5    A.  No.
 6    Q.  Did you receive any training from the Buffalo
 7        Police Department concerning any of the --
 8        withdrawn.
 9            After this hearing was conducted in 1983,
10        did the Buffalo Police Department send you
11        back for any -- withdrawn.
12            After this hearing was conducted in
13        1983 --
14    A.  Did they send me back to school?  No.
15    Q.  After this hearing was conducted in 1983, did
16        the Buffalo Police Department ever ask you to
17        participate in any further training?
18    A.  No.
19    Q.  After the court decision came down in 1985,
20        did the police department ask you to
21        participate in any further training?
22    A.  No.
23    Q.  Before your involvement in this investigation
```

1              (Whereupon, Buffalo News article dated

2         5/17/86, was then received and marked as

3         Exhibit Number 49 respectively for

4         identification.)

5

6         **BY MR. RUDIN:**

7    Q.  Let me show you Plaintiff's 49, which is an

8         article in the Buffalo News dated May 17th,

9         1986, concerning your winning a mayor's merit

10        award.

11   A.  Yes.

12   Q.  Do you remember that?

13   A.  Yes.

14   Q.  What was the award for?

15   A.  I believe it was for a baby death and -- yeah,

16        one of them was a baby death and I think the

17        other was Pink Street.

18   Q.  Pink Street is the Rollins case?

19   A.  Yeah, I think.  I'm not sure.  Two cases.  I

20        thought it said which cases.

21   Q.  And you received this award after you had

22        retired?

23   A.  What year was it?

```
 1      Q.  May 17th, 1986.
 2      A.  Yeah.  It must have, yeah.  I must have been
 3          in the DA's office at the time.
 4      Q.  And the -- was that the award by the mayor
 5          himself, Mayor Griffin?
 6      A.  Yeah.  Jimmy Griffin.
 7      Q.  And he was joined by a Police Commissioner
 8          Degenhart?
 9      A.  Yes.
10      Q.  And he was also the police commissioner in
11          1976 when the Crawford case was investigated,
12          correct?
13      A.  I think he was.
14      Q.  And the other person who gave you this award
15          was James Jackson, then chief of the homicide
16          bureau?
17      A.  What was the name?
18      Q.  James Jackson.  Doesn't ring a bell?
19      A.  Don't ring a bell at all.
20      Q.  Did this occur in a public ceremony?
21      A.  No, just in his office.
22      Q.  But the mayor's office released it to the
23          press?
```

1      A. I don't believe the press was there, but they
2         may have been.  I don't know.
3      Q. Well, but the press covered it?
4      A. Yeah.  Yeah, they got the story, but I don't
5         know if they were there.
6      Q. And did you receive a plaque for that one?
7      A. Yes.
8      Q. Did the plaque make reference to the specific
9         cases you were being honored for?
10     A. Yes.
11     Q. Do you still have that plaque?
12     A. I may have.  I don't know.  I got all my stuff
13        in a thing where we go back and forth.  We
14        just got a cottage at the lake, and I have a
15        lot of stuff.  And a lot of stuff I gave away.
16        I have a large family.  I had seven kids.  I
17        got grand kids, and every once in a while one
18        of them will say, can I have that?  And I'll
19        give it to them.
20     Q. But when you say by the cottage, you mean up
21        in this area?
22     A. Brant, New York.  The lake.
23     Q. That's where you're staying now?

# EXHIBIT I

JOHN REGAN

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

----------------------------------------------

**DARRYL BOYD,**

       Plaintiff,

 -vs-                Index No. 22-cv-519

**THE CITY OF BUFFALO; THE COUNTY
OF ERIE; MICHAEL G. GUADAGNO;
JOHN MONTONDO; LINDA J. FIAL AS
EXECUTOR FOR THE ESTATE OF
ROBERT GRABOWSKI; MARTIN
BULLOCK AS EXECUTOR FOR THE
ESTATE OF JAMES E. HUNTER;
JENNIFER G. FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF
ROBERT F. ARNET; JENNIFER G.
FLANNERY AS ADMINISTRATOR FOR
THE ESTATE OF FRANK C. DEUBELL;
JENNIFER G. FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF
LEO J. DONOVAN; JENNIFER G.
FLANNERY AS ADMINISTRATOR FOR
THE ESTATE OF FRANCIS M.
MANISTA, JR.; AND DAWN M. DIRIENZO
AS EXECUTOR FOR THE ESTATE OF PAUL
R. DELANO,**

       Defendants.

----------------------------------------------

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

------------------------------------------------

**JOHN WALKER, JR.,**

       Plaintiff,

 -vs-                  Index No. 22-cv-520

**THE CITY OF BUFFALO; THE COUNTY OF ERIE; MICHAEL G. GUADAGNO; JOHN MONTONDO; LINDA J. FIAL AS EXECUTOR FOR THE ESTATE OF ROBERT GRABOWSKI; MARTIN BULLOCK AS EXECUTOR FOR THE ESTATE OF JAMES E. HUNTER; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF ROBERT F. ARNET; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF FRANK C. DEUBELL; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF LEO J. DONOVAN; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF FRANCIS M. MANISTA, JR.; AND DAWN M. DIRIENZO AS EXECUTOR FOR THE ESTATE OF PAUL R. DELANO,**

       Defendants.

------------------------------------------------

Video-recorded examination before trial of **JOHN REGAN**, taken pursuant to Federal Law and Rules of Civil Procedures, taken in the law offices of Hodgson Russ LLP, The Guaranty Building, 140 Pearl Street, Buffalo, New York 14202, taken on July 12, 2023, commencing at 9:21 a.m., ending at 1:57 p.m., held before Carly J. Garretson, Notary Public.

1     Q. Yeah.  Okay.  Do you know whether or not at

2         any time between 1982, when the crime

3         occurred, 1983, when the hearing occurred, and

4         1985, when Justice Kessler'S decision was

5         issued, whether the Buffalo Police Department

6         conducted any inquiry into the conduct of any

7         of the detectives involved in that case?

8     A. Not to my knowledge, but --

9     Q. Do you know whether or not the police

10        department took any disciplinary action

11        against any of the detectives involved in that

12        case?

13     A. Not that I know of, like I say.

14     Q. Do you know whether or not any disciplinary

15        action was taken against Chief Donovan as a

16        result of his involvement in that case?

17     A. No.  I don't know.

18     Q. Do you have any recollection of being present

19        for or conducting interviews of witnesses

20        Michael Warren or Sam Brown in 1976 in

21        connection with this case, that's the case of

22        Walker and Boyd?

23     A. The only connection I think was that we

# EXHIBIT J

The Buffalo News

https://buffalonews.newspapers.com/image/875637496

The Buffalo News (Buffalo, New York) · Sat, May 17, 1986 · Page 6

Downloaded on Apr 24, 2023

# Winners of Mayor's Merit Awards Honored

**By SUSAN SCHULMAN**

Six civilians, 12 police officers, a police squad and a Coast Guard officer were honored Friday with the mayor's Merit Award for outstanding acts of courage and dedication to the Buffalo Police Department and the city's residents.

During ceremonies in City Hall, Mayor Griffin was joined by Police Commissioner Ralph V. Degenhart and James C. Jackson, chief of the Homicide Bureau, in presenting awards to the following:

✔ Police Officers Gerald Marranca and Denise Kinseel for chasing, subduing and arresting a suspect accused of shooting and wounding two persons Sept. 9. The two also were cited for their handling of a case leading to the arrest of a man suspected of rape.

✔ Officers Terrance Adams and Arthur Collins, for their July 5 actions in an incident in which a suspect shot and injured one officer, then attempted to beat that officer with a nightstick.

✔ Officers Philip Tisdale, Reginald Minor, Carl Jones and Henry Holt, for their Aug. 10 actions involving a shooting and a fire. The officers kicked a gas can off a burning porch, then went into the house and removed 10 children and a woman, who had been shot in the leg. A suspect "with a distinct smell of gasoline" was arrested a short time later.

✔ Detective Donald Mix and Officer Michael Craft, who, on Feb. 14, 1986, arrested two persons involved in a holdup.

✔ Acting Detective James Murphy, whose investigative work cracked a major burglary ring, and resulted in three arrests and the recovery of more than $1 million dollars in stolen property.

✔ Det. Sgt. John Montondo, for his "determination to his job," particularly in the investigation of two murders, one of which involved an 18-month-old baby.

✔ The Robbery Squad, which, under the command of Assistant Chief Edward Muldowney, has worked hand in hand with the FBI on bank robbery investigations.

✔ Chief Petty Officer Richard Schmidt, of the U.S. Coast Guard, who climbed down icy rocks to save a woman who had jumped off the Peace Bridge on Feb. 15, 1986.

✔ William Buyers, who helped police arrest a rape suspect by contacting police when he spotted a man who matched the description of the person whom authorities believed committed several sexual attacks in Delaware Park in 1984.

✔ Michelle Clifford and Mary Shen, who gave police information enabling the officers to arrest two bank robbery suspects.

✔ Danny Sanders, who helped save lives by quickly reporting a house fire he spotted on Donaldson Road.

✔ Jerome McDowell, who Feb. 15 chased and subdued a 16-year-old who reportedly had taken a purse from a woman on Pearl Street.

✔ Frank Lustan, the son of a Buffalo police captain, who chased and subdued two men who had mugged an elderly woman.

Copyright © 2023 Newspapers.com. All Rights Reserved.



EXHIBIT

49

CJG  6/21/23

PENGAD 800-631-6989

BOYD-WALKER-00041727

# EXHIBIT K

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DARRYL BOYD,

                                Plaintiff,

v.

THE CITY OF BUFFALO, *et al.*,

                                Defendants.

**DECISION AND ORDER**

22-cv-00519(JLV)(JJM)

---

JOHN WALKER, Jr.,

                                Plaintiff,

v.

THE CITY OF BUFFALO, *et al.*,

                                Defendants.

22-cv-00520(JLV)(JJM)

---

        Following separate jury trials, plaintiffs Darryl Boyd and John Walker, Jr. were convicted in 1977 of second degree murder and first degree robbery in connection with the January 2, 1976 murder of William Crawford. After exhausting their appellate rights and several unsuccessful collateral attacks to their convictions, on August 18, 2021, the New York State Supreme Court, County of Erie, granted their New York Criminal Procedure Law ("CPL") §440.10 motion, resulting in the vacatur of their convictions. Thereafter, plaintiffs commenced these 42 U.S.C. §1983 actions for alleged constitutional and New York State law violations arising from their prosecutions.

        Before the court are the motions of the defendant County of Erie to bifurcate and stay discovery concerning plaintiffs' claims pursuant to <u>Monell v. Department of Social Services</u>

of City of New York, 436 U.S. 658 (1978) (Boyd v. The City of Buffalo, *et al.* (22-cv-519) [62];

Walker, Jr. v. The City of Buffalo, *et al.* (22-cv-520) [63]), as well the remaining portions of

plaintiffs' motions to compel (Boyd v. The City of Buffalo, *et al.* (22-cv-519) [63]; Walker, Jr. v.

The City of Buffalo, *et al.* (22-cv-520) [64]).[1]  Having heard oral argument on March 13, 2023

[77], and considered the parties' submissions [62-63, 68, 70-73, 87, 91, 95, 99-101, 103], for the

following reasons the County's motions to bifurcate and stay are denied, and plaintiffs'

remaining motions to compel are granted.


## BACKGROUND

The parties' familiarity with the factual allegations is presumed.  The Amended

Complaints each assert two claims against the County: the first, pursuant to 42 U.S.C. §1983, for

Monell liability arising from the alleged misconduct of the Erie County District Attorney's

Office ("ECDAO") prosecutors ([78], Count VII); and the second, a state law claim arising from

its alleged negligent failure to properly hire, train, and supervise the ECDAO prosecutors (id.,

Count X).

The Monell claim against the County contains extensive allegations concerning

the Constitutional violations committed by the ECDAO prosecutors responsible for prosecuting

plaintiffs, as well as the alleged deliberate indifference by the ECDAO policymakers. *See*

Amended Complaint [78], Count VII.  No ECDAO prosecutors, the Erie County District

Attorney ("ECDA"), or other County employees are named as defendants in either action.

---

[1]      Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF
pagination. Unless otherwise noted, all docket entries will be to Boyd v. The City of Buffalo, *et al.* (22-
cv-519).

At the outset of these cases, which were filed on July 6, 2022, the County did not oppose the Monell discovery proceeding on the same track as the other discovery in this case. In fact, plaintiffs contend - and the County does not refute - that its proposed Case Management Order [32-1] specifically proposed a lengthier period for fact discovery (of October 23, 2023) "to account for simultaneous, non-bifurcated Monell discovery" (plaintiffs' Memorandum of Law [70] at 24; plaintiffs' September 16, 2022 letter [33]), which was partially adopted. *See* Case Management Order [34], ¶7 (adopting a fact discovery deadline of August 2, 2023). It was not until January 23, 2023, four months after the entry of the Case Management Order, that the County moved to bifurcate the Monell discovery.

As the County notes, plaintiffs' "First Set of Interrogatories and Requests for Production . . . requests voluminous information and documentation going back over [40] years almost all of which relates only to their Monell claims". County's Memorandum of Law [62-1] at 9. The parties have been able to resolve plaintiffs' motion to compel concerning that discovery, except for Request for Production Nos. 9 and 10 ([63-3] at 14-15),[2] which have been narrowed to a dispute concerning the production of the case files from 16 prosecutions that occurred prior and subsequent to plaintiffs' convictions.

According to the County, these records are maintained at an off-site storage facility, which contains "tens, if not hundreds, of thousands of Bankers Boxes of County files spanning several decades", and encompassing "all departments within the County - not just the [ECDAO]". Eaton Affirmation [72-2], ¶10. Having "moved sites multiple times", the records are

---

[2]     At the April 13, 2023 conference, the parties reached certain agreements to resolve portions of plaintiffs' motions to compel, which I directed them to memorialize and to identify any remaining portions of the motions that require a decision. *See* April 13, 2023 Text Order [92]. Consistent with that directive, the parties have since each submitted competing proposed Orders. *See* [99] (plaintiffs' version), [101-2] (the County's version). Notwithstanding their differences, the parties agree that the remaining areas of dispute are the 16 case files. *See* [99], ¶6; [101-2], ¶9.

not maintained in a readily searchable fashion. Id., ¶13. In fact, at the April 13, 2023 conference the County's attorney acknowledged that the records "are not stored in a very organized fashion". Transcript [94] at 26. It describes the task of locating these files as "gargantuan" (Eaton Affirmation [72-2], ¶13), with potentially "hundreds of man hours . . . . spent in vain", if "[p]laintiffs are not successful on their underlying constitutional claims". Reply Memorandum of Law [72] at 7. Therefore, it contends that "[t]he efficient use of all parties' and the Court's resources clearly favors bifurcation of [the Monell] discovery". Id.


## DISCUSSION

### A.     The County's Motions to Bifurcate and Stay

"[U]pon a showing of good cause a district court has considerable discretion to stay discovery pursuant to [Fed. R. Civ. P. ("Rule")] 26(c). Rule 26(d) also allows the Court to control the sequence and timing of discovery, particularly where resolution of a preliminary matter may decide the entire case." Oliver v. City of New York, 540 F.Supp.3d 434, 435 (S.D.N.Y. 2021). See also Baker v. Orleans County, 1997 WL 436703, *1 (W.D.N.Y. 1997) ("district courts are given reasonable latitude and discretion to establish a priority or to fashion an appropriate sequence of the discovery to be performed in each case").

Municipalities cannot be held liable under 42 U.S.C. §1983 for the acts of their employees unless their policies and customs were the "moving force behind the constitutional violation". City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989). Although no individual County employees are named as defendants in these actions,[3] plaintiffs still "must prove the

---

[3]      Although the ECDAO prosecutors are not individually named as defendants in this action, "the plaintiff[s] need not sue the individual tortfeasors at all, but may proceed solely against the municipality". Askins v. Doe No. 1, 727 F.3d 248, 253 (2d Cir. 2013).

denial of a constitutional right by a municipal officer in order to hold [the County] liable under Monell". Aquino v. City of New York, 2017 WL 2223921, *1 (S.D.N.Y. 2017). *See also* Oliver, 540 F.Supp.3d at 436 ("[i]n a lawsuit containing a Monell claim, if the plaintiff cannot show that his or her constitutional rights were violated by any individual defendants, the Monell claim will also fail"); Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006) ("[b]ecause the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell was entirely correct").

"There is competing caselaw regarding whether an action should be bifurcated due to Monell claims. On the one hand, some courts have bifurcated discovery until individual defendant liability has been established." Fleming v. City of New York, 2023 WL 1861223, *2 (S.D.N.Y. 2023). *See, e.g.,* Gavin v. City of New York, 2021 WL 3774113, *5 (S.D.N.Y. 2021) ("since the proof required to establish a Monell claim is substantially different from the proof necessary to establish individual liability, the most prudent course is to address the Monell claims separately and to stay discovery concerning those claims until the liability of the individual defendants is established"); Morales v. Irizarry, 1996 WL 609416, *1 (S.D.N.Y. 1996) ("[t]he overwhelming weight of authority holds that since the City's liability is derivative of the individual defendants' liability, and since the proof required to establish a Monell claim is substantially different from the proof necessary to establish individual liability, the most prudent course is to try the Monell claims separately and to stay discovery concerning those claims until the liability of the individual defendants is established"); Roper v. City of New York, 2017 WL 462270, *2 (S.D.N.Y. 2017) ("courts often stay discovery on Monell claims until enough information is available [on the] individual claims - either at the close of discovery or following

- 5 -

summary judgment - to assess the strength of a claim that a constitutional violation actually took place"); Gugino v. City of Buffalo, 2022 WL 5240162, *2 (W.D.N.Y. 2022).

However, other courts "have held that Monell claims do not necessarily warrant bifurcation", particularly where no efficiencies are gained by doing so. Fleming, 2023 WL 1861223 at *2. See, e.g., Crawley v. City of Syracuse, 2018 WL 3716782, *4 (N.D.N.Y. 2018) ("[b]ifurcation is the exception rather than the rule"); Lopez v. City of New York, 2021 WL 2739058, *2 (S.D.N.Y. 2021); Casaccia v. City of Rochester, 2020 WL 1042149, *4 (W.D.N.Y. 2020).

Ultimately, the decision "[w]hether to bifurcate lies within the Court's discretion", Lynch v. City of New York, 2020 WL 5750492, *2 (S.D.N.Y. 2020), based upon the "particular circumstances and posture of each case". Roper, 2017 WL 462270, *1. "The moving party bears the burden of demonstrating good cause under Fed. R. Civ. P. 26(c)." Id.

In opposing the County's motion to bifurcate, plaintiffs argue that estoppel and waiver bar the County from seeking bifurcation (plaintiffs' Memorandum of Law [70] at 22-27), and that it otherwise fails to demonstrate good cause for its motion. Id. at 27-36. Although I do not find that the County's failure to earlier move to bifurcate judicially estops it from seeking bifurcation, that delay, coupled with other factors, demonstrates that it has failed to meet its burden of establishing good cause for bifurcation.

Initially, a stay and bifurcation of Monell discovery will only promote efficiency if there is some basis to conclude that plaintiffs will not be able to make the threshold showing necessary to establish Monell liability - i.e., that constitutional violations were committed by the prosecutors who tried them. Otherwise, "[f]ar from advancing judicial economy and convenience, this approach would invite redundancy and waste". Palma v. Montgomery County,

Maryland, 598 F. Supp. 3d 288, 300 (D. Md. 2022). *See also* Cadiz v. Kruger, 2007 WL 4293976, *5 (N.D. Ill. 2007) ("a stay of Monell discovery will achieve cost savings only if one assumes that the parties are never required to go back and conduct Monell discovery at some later date").

Plaintiffs offer a detailed account of the alleged conduct of the ECDAO prosecutors, and characterize the evidence that the prosecutors committed constitutional violations during their trials as "overwhelming". [70] at 29. *See also* Rudin Declaration [71], ¶¶66-110. Apart from generalized assertions, the County offers no specific arguments as to why plaintiffs will not be able to establish that constitutional violations were committed by its prosecutors. *See* Cadiz, 2007 WL 4293976, *5 ("[t]he City's motion does not speak at all to the merits of the individual Section 1983 claim or explain why we should predict the failure of plaintiff's individual claims, and thus we have no reason to conclude that plaintiff's individual Section 1983 claims will fail"). Without determining whether plaintiffs will ultimately be able to establish at summary judgment that constitutional violations were committed by the ECDAO prosecutors, from what has been presented thus far at this early stage, it seems likely that bifurcation will only defer, but not eliminate, the need for Monell discovery. *See* Lopez v. The City of New York, 2021 WL 2739058, *2 (S.D.N.Y. 2021) ("[a]t this stage . . . the Court cannot decide that the Monell claim is without merit much less that it is so clearly without merit that discovery should not be permitted").

Nor will this "additional Monell discovery . . . transform an otherwise small case into a large one". Cadiz, 2007 WL 4293976, *4. The parties have been able to resolve their disputes concerning much of the Monell discovery requested thus far, and the County's desire to stay and bifurcate Monell discovery arises from a particular item of Monell discovery, rather

than from the burden of such discovery as a whole. The County's opposition to the burden and relevance of obtaining other case files, while understandable, is "best dealt with pursuant to the standards under [Rule] 26(b) rather than through a stay or bifurcation of discovery". Lopez, 2021 WL 2739058, *3. *See also* Fleming, 2023 WL 1861223, *3 ("[a]ny concern regarding the relevance, proportionality, burden, and delay of Plaintiff's requested Monell discovery will be addressed by the Court through case and discovery management").

Finally, the delay resulting from a stay and bifurcation of the Monell discovery would severely prejudice plaintiffs. *See* Casaccia, 2020 WL 1042149 at *3 ("[i]n determining whether to bifurcate, a court may consider" a variety of factors, including "whether the party opposing bifurcation will be prejudiced if it is granted"). The advanced ages of key witnesses, including the former ECDA, Edward Cosgrove, who is 88 years old, and the ECDAO prosecutor for the Boyd trial, Timothy Drury, who is 82 years old, as well as the precarious health of the plaintiffs, weigh against further delay. *See* Plaintiff's Memorandum of Law [70] at 9-10. [4] Likewise, the City of Buffalo defendants have withdrawn their motion to bifurcate, and are equally entitled to a prompt resolution of this action.

By contrast, any prejudice to the County from not bifurcating the remaining Monell discovery is minimal because, as discussed above, bifurcation would be unlikely to eliminate the need for this discovery. Moreover, the burden to locate these records appears to be at least partially self-created. *See* Brooks v. Macy's, Inc., 2011 WL 1793345, *4 (S.D.N.Y. 2011) ("the burden that results from disorganized record-keeping does not excuse a party from producing relevant documents").

---

[4]    While the County has acknowledged its willingness to allow witnesses to be deposed on Monell issues (transcript [94] at 19), this would not eliminate the potential need for repeated depositions if Monell paper discovery were stayed and relevant documents for questioning were only produced after the fact.

While I recently granted bifurcation in <u>Dixon v. City of Buffalo</u>, <u>et al.</u>, 19-cv-01678(WMS)(JJM) (March 8, 2022 Decision and Order [73]), another 42 U.S.C. §1983 action arising from a vacated conviction, these remain individualized determinations (<u>see</u> <u>Roper</u>, 2017 WL 462270, *1), and the circumstances here are sufficiently distinct to not warrant bifurcation. Therefore, the County's motions are denied.

**B.      Plaintiffs' Motions to Compel**

"A district court has wide latitude to determine the scope of discovery". <u>In re Mirena IUS Levonorgestrel-Related Product Liability Litigation (No. II)</u>, 982 F.3d 113, 124 (2d Cir. 2020). Although "a party must be afforded a meaningful opportunity to establish the facts necessary to support his claim" (<u>id</u>.), discovery is generally limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Rule 26(b)(1).

"Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept." <u>Austin Air Systems, Ltd. v. Sager Electrical Supply Co., Inc.</u>, 2022 WL 464230, *12 (W.D.N.Y. 2022), <u>adopted</u>, 2023 WL 540119 (W.D.N.Y. 2023). Relevance "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case". <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. 340, 351 (1978). "However, a party generally must demonstrate a concrete linkage between the discovery sought and the claims or defenses asserted in the case." <u>White v. City of Mount Vernon</u>, 2022

- 9 -

WL 16578086, *2 (S.D.N.Y. 2022). "The party seeking the discovery bears the burden of establishing relevance." Id.

"Proportionality focuses on the marginal utility of the discovery sought." Vaigasi v. Solow Management Corp., 2016 WL 616386, *14 (S.D.N.Y. 2016). "Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." In re LIBOR-Based Financial Instruments Antitrust Litigation, No. 11 MDL 2262 (NRB), 2023 WL 2871090, *5 (S.D.N.Y. 2023).

1.    **The 16 Case Files**

The parties have reached agreement on nearly all of plaintiffs' motion to compel, except for plaintiffs' request for the "hearing and trial transcripts, motion papers, and court orders" for the prosecutions underlying the following 16 cases (*see* [99], ¶6; [101-2], ¶9):

i.     People v. Anderson, 25 A.D.2d 602 (4th Dept. 1966)
ii.    People v. Moore, 26 A.D.2d 902 (4th Dept. 1966)
iii.   People v. Slaughter, 28 A.D.2d 1082 (4th Dept. 1967)
iv.    People v. Damon, 24 N.Y.2d 256 (1969)
v.     People v. Donaldson, 49 A.D.2d 1004 (4th Dept. 1975)
vi.    People v. Weston, 51 A.D.2d 881 (4th Dept. 1976)
vii.   People v. Balsano, 51 A.D.2d 130 (4th Dept. 1976)
viii.  People v. Kampshoff, 53 A.D.2d 325, 332 (4th Dept. 1976)
ix.    People v. Mordino, 58 A.D.2d 197 (4th Dept. 1977)
x.     People v. Johnson, 62 A.D.2d 555 (4th Dept. 1978)
xi.    People v. Keller, 67 A.D.2d 153 (4th Dept. 1979)
xii.   People v. Mitchell, 99 Misc.2d 332 (Sup. Ct., Erie Co. 1979)
xiii.  People v. Clark, 89 A.D.2d 820 (4th Dept. 1982)[5]
xiv.   People v. Ivey, 83 A.D.2d 788 (4th Dept. 1981)
xv.    Matter of Potenza v. Kane, 79 A.D.2d 467 (4th Dept. 1981)
xvi.   People v. Vance, 89 A.D.2d 347 (4th Dept. 1982).

---

[5]    Although plaintiffs initially sought the case file in People v. Cadby, 75 A.D.2d 713 (4th Dept. 1980), they were able to independently obtain those materials, prompting them to substitute Clark for Cadby. *See* plaintiffs' April 21, 2023 letter brief [95] at 1 n. 2.

While the County maintains its objections to the production of these case files based on burden and relevance, it states that it is prepared to "conduct a search of its records for . . . case files . . . i-iv". April 21, 2023 letter brief [100] at 3.

### 2. Relevance

The County objects to the relevance of cases files v-ix, because they were "decided less than three months before this incident and cannot support [p]laintiffs' Monell claims" (April 21, 2023 letter brief [100] at 3), and to the relevance of case files x-xvi, because these cases "occurred "after the [p]laintiffs' convictions and are therefore irrelevant to their Monell claims". Id.

"Municipalities . . . are liable under § 1983 only if the challenged conduct was pursuant to a municipal policy or custom . . . or caused by a failure to train". Guillette v. Burlington Police Department, 2022 WL 2208122, *1 (2d Cir. 2022) (Summary Order). *See also* Haslinger v. Westchester County, 2023 WL 219198, *1 (2d Cir. 2023) (Summary Order) ("Monell extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, leads to a constitutional violation"); Frost v. New York City Police Department, 980 F.3d 231, 257 (2d Cir. 2020) ("Monell does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation"); Allen v. Stringer, 2021 WL 4472667, *2 (2d Cir. 2021) (Summary Order) (same).

Where Monell liability is premised on a failure to train theory, it is well settled that "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates". Connick v.

- 11 -

Thompson, 563 U.S. 51, 63 n. 7 (2011). *See also* Greene v. City of New York, 742 F. App'x

532, 536–37 (2d Cir. 2018) (Summary Order). In fact, plaintiffs acknowledge that if their

"Monell claim was limited to a failure to train . . . court decisions handed down after [p]laintiffs'

criminal trials in 1977 would be irrelevant". April 21, 2023 letter brief [95] at 4.

        However, as discussed above, failure to train is not the sole method of

establishing Monell liability.  Such liability can also be premised on the existence of an

unconstitutional policy (s*ee, e.g.,* Frost, 980 F.3d at 257), which "may be pronounced or tacit and

reflected in either action or inaction". Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011).

For instance, Monell liability may be based on the theory that "an officer with final

policymaking authority ordered, ratified, or was aware of a subordinate's unconstitutional

actions, and consciously chose to ignore them, effectively ratifying the actions", or that

"unconstitutional practices were so widespread, persistent, and manifest as to imply constructive

acquiescence on the part of the City". Hu v. City of New York, 927 F.3d 81, 104-05 (2d Cir.

2019).

        As plaintiffs note, their broadly framed Amended Complaints rely on policy or

custom and failure to train theories. *See* April 21, 2023 letter brief [95] at 3-4. *See, e.g.,*

Amended Complaint [78], ¶¶532-58.  Unlike the failure to train theory of Monell liability,

"[s]ubsequent or contemporaneous conduct can be circumstantial evidence of the existence of

preceding municipal policy or custom". Chepilko v. City of New York, 2012 WL 398700, *15

(E.D.N.Y. 2012); Collins v. City of New York, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013)

(although the Second Circuit has not addressed the issue, the court agreed with "several circuits"

that "have expressly held that a policymaker's response to constitutional violations can support

an inference that the violation conformed to a preexisting policy"); Kogut v. County of Nassau,

2012 WL 3704710, *3 (E.D.N.Y. 2012) ("unlike with Plaintiffs' constructive acquiesce theory - evidence of subsequent violations is irrelevant to a failure-to-train analysis").[6]

See also Bordanaro v. McLeod, 871 F.2d 1151, 1167 (1st Cir. 1989) ("[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right"); Salvato v. Miley, 790 F.3d 1286, 1297 (11th Cir. 2015) (same); Henry v. County of Shasta, 132 F.3d 512, 519 (9th Cir. 1997), opinion amended on denial of reh'g, 137 F.3d 1372 (9th Cir. 1998) ("post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry"); Grandstaff v. City of Borger, Texas, 767 F.2d 161, 171 (5th Cir. 1985) ("[t]he disposition of the policymaker may be inferred from his conduct after the [alleged constitutional violation]"); Groark v. Timek, 989 F. Supp. 2d 378, 397-98 (D.N.J. 2013) ("subsequent constitutional violations cannot be used to show its knowledge of an unconstitutional custom or policy at the time of plaintiff's . . . incident. Subsequent incidents, however, may be relevant to show a continuous pattern that supports a finding of an accepted custom or policy. They are also relevant to issues of 'pattern, intent, and absence of mistake'").

Apart from disputing the temporal relevance of the requested case files, the County also challenges their factual relevance. Relying on the allegations of prosecutorial misconduct in the Amended Complaint, and pointing to the fact that "[p]laintiffs can only hold

---

[6]     Many of the cases that the County relies upon (see, e.g., April 21, 2023 letter brief [100] at 3) are distinguishable insofar as the plaintiffs were pursuing a failure to train theory of Monell liability. See O'Neal v. City of New York, 196 F. Supp. 3d 421, 435 (S.D.N.Y. 2016), aff'd, 679 F. App'x 16 (2d Cir. 2017) (since the decisions "were decided after the events affecting O'Neal . . . [he] cannot rely on them to plead that the City had notice of the alleged failure to train prosecutors to avoid Brady violations"); Rodriguez v. City of New York, 607 F. Supp. 3d 285, 299 (E.D.N.Y. 2022) (quoting from Mosca v. City of New York, 2018 WL 6835524, *6 (E.D.N.Y. 2018), report and recommendation adopted in relevant part, 2019 WL 938936 (E.D.N.Y. 2019), which also addressed Monell liability based on a failure to train theory).

- 13 -

the County liable for the *same* underlying constitutional violation that caused their alleged injury", the County contends that in order to be relevant, any other cases must specifically "relate to withholding of <u>Brady</u> material or improper summation remarks" (May 1, 2023 letter brief [103] at 2 (emphasis in the original)), rather than more broadly to any form of prosecutorial misconduct that impacted a criminal defendant's constitutional right to a fair trial, as plaintiffs' contend. *See* April 21, 2023 letter brief [95] at 8 ("[w]hat the 16 cases have in common with our case . . . is a complete indifference by the [ECDAO] to all forms of prosecutorial misconduct . . . which a jury may find created a lax atmosphere that led to the violations that occurred in [p]laintiffs' cases"). It is unnecessary for me to resolve this argument, since, from the summaries provided by plaintiffs (April 21, 2023 letter brief [95] at 8-15), it appears that many, if not all, of the case files sought involve findings (or potential allegations)[7] of either summation or <u>Brady</u> misconduct by the prosecutor.

Connick, supra, suggests that more similarity than just the same type of prosecutorial misconduct may be required to establish <u>Monell</u> liability. There, the <u>Brady</u> violation was the prosecutor's failure "to disclose the crime lab report to [the plaintiff's] counsel". 563 U.S. at 59. While the plaintiff pointed to the fact that state courts had overturned four other convictions from that prosecutor's office for <u>Brady</u> violations, the Supreme Court found that these violations did not put the prosecutor's office on notice that its training was

---

[7]     For instance, the County points that in <u>Anderson</u>, 25 A.D.2d at 603, it was unclear whether the trial court or prosecutor was responsible for the failure to disclose; in <u>Kampshoff</u>, 53 A.D.2d at 332, the Appellate Division, despite affirming the defendant's conviction, noted that the trial court (as opposed to the prosecutor) "improperly refused defendant's request for the production" of certain discovery; and in <u>Mordino</u>, 58 A.D.2d at 199, the sole question on appeal was whether media coverage tainted the defendant's right to a fair trial. The County's April 13, 2023 letter [91-1] at 2. While the relevance of these cases presents a closer question, for the reasons set forth by plaintiffs ([95] at 8, 10-11; [87] at 2-3 n. 2), I agree that they are at least potentially relevant so as to warrant disclosure. *See* <u>Brooks v. Macy's, Inc.</u>, 2011 WL 1793345, *2 (S.D.N.Y. 2011) ("[o]rdinarily, discovery concerning all relevant or potentially relevant issues is permitted").

"inadequate with respect to the sort of <u>Brady</u> violation at issue here", because "[n]one of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind". <u>Id</u>. at 62-63.

Thus, some courts have recognized that pursuant to <u>Connick</u> the comparable incidents must "closely resemble", <u>Strode v. County of San Diego</u>, 2019 WL 527468, *3 (S.D. Cal. 2019), or be "highly similar" to the underlying misconduct. <u>Gianonne v. City of Naperville</u>, 2017 WL 2569603, *2 (N.D. Ill. 2017). *See also* <u>Williams v. City of Birmingham</u>, 323 F. Supp. 3d 1324, 1334 (N.D. Ala. 2018) ("<u>Connick</u> illustrates the principle" that "courts demand a high degree of factual similarity between prior incidents and the episode involving the plaintiff for the former to be relevant to § 1983 liability for an alleged failure to train or supervise").

However, as plaintiffs note, <u>Connick</u> did not "did not rule at all on the requisites of a failure-to-discipline claim or on the scope of discovery in such cases", which is subject to a more relaxed standard of similarity. Plaintiffs' April 21, 2023 letter brief [95] at 7-8. "In the failure to discipline or supervise context, courts have required notice of similar types of constitutional violations, such as excessive force or withholding exculpatory material. But, those courts have not required the precise behaviors-such as the failure to disclose exculpatory scientific evidence-as required in the failure to train context." <u>Poventud v. City of New York</u>, 2015 WL 1062186, *16 (S.D.N.Y. 2015).

Therefore, I conclude that plaintiffs have offered enough at this stage to demonstrate that the 16 case files fall within the broad scope of relevant discovery. Whether and to what extent plaintiffs will be able to utilize the information from the 16 case files to establish <u>Monell</u> liability is a separate question.

3. **Burden**

"Once the movant establishes relevance, the burden shifts to the resisting party, who is tasked with showing how each request is not relevant, or how each request is overly broad, burdensome, or oppressive, despite the broad and liberal construction afforded by the federal discovery rules." <u>Yong Biao Ji v. Aily Foot Relax Station Inc.</u>, 2021 WL 1930362, *2 (S.D.N.Y. 2021).

It is burdensome to produce documents "in any civil case that involves events from decades ago or facts that extend over a long period of time". <u>Jackson v. City of Cleveland</u>, 2022 WL 17089769, *2 (N.D. Ohio 2022). Any added difficultly in locating these records appears largely attributable to the County's own failure to maintain its records in an organized fashion, and "the burden that results from disorganized record-keeping does not excuse a party from producing relevant documents". <u>Brooks</u>, 2011 WL 1793345, *4. *See also* <u>Kozlowski v. Sears, Roebuck & Co.</u>, 73 F.R.D. 73, 76 (D. Mass. 1976) ("[t]o allow a defendant whose business generates massive records to frustrate discovery by creating an inadequate filing system, and then claiming undue burden, would defeat the purposes of the discovery rules").

"[L]itigants have an obligation . . . to make *reasonable* efforts to locate responsive documents." <u>Maxwell v. New York University</u>, 2009 WL 1576295, *13 (S.D.N.Y. 2009) (emphasis in original), <u>aff'd</u>, 407 F. App'x 524 (2d Cir. 2010). The County's previous ability to locate plaintiffs' cases files in connection with their most recent CPL §440.10 motion in 2021 (*see* plaintiffs' April 21, 2023 letter [95] at 5) suggests that the 16 cases files are not irretrievable. However, regardless of whether the County will ultimately be able to locate all or some of these case files, the importance of these 16 targeted files to plaintiffs' ability to establish the County's liability outweighs the burden associated with making reasonable efforts to locate them. *See* <u>Klein v. Madison</u>, 2018 WL 3535301, *2 (E.D. Pa. 2018) ("the

proportionality of [the plaintiff's] requests must be measured against the exacting burden of proof a plaintiff faces to establish municipal liability under <u>Monell</u>").  Therefore, the County shall undertake reasonable efforts to locate and produce the 16 cases files identified above.

    If the County is unable to produce any of the 16 files, it shall file a detailed statement of its efforts to locate the missing files by June 29, 2023.  The County may respond to that submission by July 7, 2023, and a telephonic conference to address the submissions is scheduled for July 12, 2023 at 11:00 a.m. To access the teleconference, the parties shall dial 888-808-6929 and enter access code 1533000# sufficiently in advance of the proceeding.

<b>CONCLUSION</b>

    For these reasons, the County's motions (<u>Boyd v. The City of Buffalo, <i>et al.</i></u> (22-cv-519) [62]); <u>Walker, Jr. v. The City of Buffalo, <i>et al.</i></u> (22-cv-520) [63]) to bifurcate and stay discovery concerning plaintiffs' claim pursuant to <u>Monell</u> are denied, and plaintiff's remaining motions to compel (<u>Boyd v. The City of Buffalo, <i>et al.</i></u> (22-cv-519) [63]; <u>Walker, Jr. v. The City of Buffalo, <i>et al.</i></u> (22-cv-520) [64]) are granted.

**SO ORDERED**.

Dated: May 19, 2023

           <u>/s/Jeremiah J. McCarthy</u>
           JEREMIAH J. MCCARTHY
           United States Magistrate Judge

# EXHIBIT L

The Buffalo News
https://buffalonews.newspapers.com/image/872387507

Buffalo Evening News (Buffalo, New York) · Wed, Aug 7, 1974 · Page 7
Downloaded on Feb 17, 2023

# County May Expand Legal Aid for Police

Possible expansion of a program to provide police officers with legal assistance by on-call assistant district attorneys was discussed Tuesday at a meeting of top Buffalo police officials and two of the lawyers involved.

Deputy Commissioner Leo T. Callaghan said the district attorney's office seemed "pleased with the way Buffalo police are responding" to the countywide program and would consider expansion.

Under the program, started July 23, Asst. Dist. Atty. Timothy J. Drury, Dennis Repka and Albert Ranni have been available on an "on-call" basis for consultation in legal problems involved in police work.

The program was designed, Deputy Commissioner Callaghan said, to help with "legal questions that arise in the men's minds, where they feel that a DA could advise them on how to proceed."

Mr. Drury and Mr. Ranni, who attended the meeting with Commissioner Thomas R. Blair, his deputy commission-

ers and the department's captains and inspectors, also agreed to look into possible preparation of a manual to aid officers in preparing court accusatory documents, he added.

**PUBLIC**

We are being im
duplicated for
service, quality, f
—where? ... at th
ping center.

**BROADWAY**

THURS. 7-5 ● FRI. 7-8

**BROADWAY**

999 BROA
FREE PA

Copyright © 2023 Newspapers.com. All Rights Reserved.

Newspapers™

BOYD-WALKER-00046426

# EXHIBIT M

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

DARRYL BOYD,

   Plaintiff,

       - against -

THE CITY OF BUFFALO; THE COUNTY OF
ERIE; MICHAEL G. GUADAGNO; JOHN
MONTONDO; LINDA J. FIAL AS
EXECUTOR FOR THE ESTATE OF ROBERT
GRABOWSKI; MARTIN BULLOCK AS
EXECUTOR FOR THE ESTATE OF JAMES
E. HUNTER; JENNIFER G. FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF
ROBERT F. ARNET; JENNIFER G.
FLANNERY AS ADMINISTRATOR FOR
THE ESTATE OF FRANK C. DEUBELL;
JENNIFER G. FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF
LEO J. DONOVAN; JENNIFER G.
FLANNERY AS ADMINISTRATOR FOR
THE ESTATE OF FRANCIS M. MANISTA,
JR.; AND DAWN M. DIRIENZO AS
EXECUTOR FOR THE ESTATE OF PAUL R.
DELANO,

               Defendants.

**Case No. 1:22-cv-519 (LJV) (JJM)**

|                                                                   |     |                                    |
|-------------------------------------------------------------------|-----|------------------------------------|
| JOHN WALKER, JR.,                                                 | )   |                                    |
|                                                                   | )   |                                    |
| Plaintiff,                                                        | )   |                                    |
|                                                                   | )   |                                    |
| - against -                                                       | )   | **Case No. 1:22-cv-520 (LJV) (JJM)** |
|                                                                   | )   |                                    |

THE CITY OF BUFFALO; THE COUNTY OF
ERIE; MICHAEL G. GUADAGNO; JOHN
MONTONDO; LINDA J. FIAL AS
EXECUTOR FOR THE ESTATE OF ROBERT
GRABOWSKI; MARTIN BULLOCK AS
EXECUTOR FOR THE ESTATE OF JAMES
E. HUNTER; JENNIFER G. FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF
ROBERT F. ARNET; JENNIFER G.
FLANNERY AS ADMINISTRATOR FOR
THE ESTATE OF FRANK C. DEUBELL;
JENNIFER G. FLANNERY AS
ADMINISTRATOR FOR THE ESTATE OF
LEO J. DONOVAN; JENNIFER G.
FLANNERY AS ADMINISTRATOR FOR
THE ESTATE OF FRANCIS M. MANISTA,
JR.; AND DAWN M. DIRIENZO AS
EXECUTOR FOR THE ESTATE OF PAUL R.
DELANO,

                                               Defendants.

## PROTECTIVE ORDER REGARDING CONFIDENTIALITY OF DOCUMENTS AND OTHER INFORMATION PRODUCED BY PLAINTIFFS IN DISCOVERY

Having considered the parties' submissions [96, 98], the following provisions shall govern disclosure and use by Defendants of certain documents produced by Plaintiffs containing Plaintiffs' Confidential Personal Information:

**1.** Any documents produced by a Plaintiff in either or both of the above-captioned actions (each an "Action" and collectively the "Actions") can be used in either or both of the Actions.

-2-

**2.**      Because of the nature of the dispute, discovery in the above-captioned matter will likely require the disclosure of documents and other media containing sensitive or confidential personal information.  For example, Plaintiffs' medical, psychological, or psychiatric records are likely to be relevant to the parties' claims and defenses.  As discovery continues, the need to disclose additional confidential and personal information will likely arise.

**3.**      Accordingly, "Confidential Personal Information" is hereby defined to mean the following categories of information:

      **A**.      A Plaintiff's private and confidential medical, psychological, or financial information; and

      **B.**      A Plaintiff's social security numbers, home telephone numbers and addresses.

If documents contain other particular types of sensitive or confidential information that plaintiffs believe require treatment as Confidential Personal Information, they may bring those issues to my attention.

**4.**      Any documents produced in the Actions by a Plaintiff or testimony provided in a deposition, affidavit or otherwise that contain Confidential Personal Information may be designated "Confidential" by such Plaintiff.

**5.**      All Confidential Personal Information produced in the Actions by a Plaintiff shall be used by Defendants solely in the Actions and shall not be used by Defendants for any other purpose.  Nothing herein shall prevent Plaintiffs from using Confidential Personal Information for any purpose.

**6.**      Upon receiving Confidential Personal Information, Defendants may disclose or make available such information only to (a) other Defendants in these Actions, (b) Defendants'

counsel of record in the Actions (including all partners, counsel and associate attorneys of said counsel, and any legal assistants, clerical secretarial or other support staff thereof operating under the supervision of such counsel of record), (c) any court with jurisdiction over the Actions, (d) necessary court personnel, professional court reporters/stenographers/video operators and necessary staff for deposition or trial testimony, (e) experts and consultants retained by Defendants in connection with the Actions, to the extent that such person has a need to review the Confidential Personal Information provided to them to assist Defendants in the defense of the Actions, (f) any witness or potential witness in these Actions in the course of the witness' deposition or trial testimony conducted in the Actions to the extent reasonably deemed necessary by counsel for Defendants in order to examine such witness or prepare such witness for such deposition or trial testimony, (g) support personnel retained by counsel for Defendants for purposes of preparing demonstrative or other exhibits for deposition, trial or other court proceedings in the Actions such as those involved in copying, graphic production, non-technical jury, trial consulting services or investigation in the Actions retained by counsel for Defendants, (h) jurors in the Actions, and (i) any other person pursuant to an order of the Court or written consent of the producing Plaintiff.

      **7.**     A party may challenge the designation of information produced during this action as "Confidential" by bringing the issue to the attention of the Court via telephone conference or a letter to the Court, provided, however, that the receiving party first made a good-faith attempt to resolve the dispute by conferring with the producing party. A good-faith effort must include ample notice, an opportunity to review the issue, a discussion between the parties, and a response in writing if necessary to protect the record therein. After presentation to the Court, a formal motion may be filed. Unless and until the parties agree that information designated as

"Confidential" is not entitled to the protections conferred by such designation, or, in the absence of agreement, the Court so rules, said information shall remain Confidential Personal Information subject to this Order. Plaintiffs bear the burden of demonstrating that the information constitutes Confidential Personal Information.

**8.**     Defendants shall not be obligated to challenge the propriety of Plaintiffs' "Confidential" designations when initially received, and a failure to do so shall not preclude a subsequent challenge thereto.

**9.**     The Confidential designation set forth in paragraph 3 of this Order shall be made by stamping the document containing Confidential Personal Information as "Confidential pursuant to Protective Order" on each page of the document.

**10.**     Any inadvertent or mistaken production of material that Plaintiffs claim is subject to the attorney-client privilege, work-product doctrine or any other applicable privilege or protection from disclosure shall not operate to waive such protection from disclosure.  Upon written request made promptly by Plaintiffs to Defendants after the Plaintiffs discover such inadvertent production, Defendants shall promptly return the information for which a claim of inadvertent production is made and destroy all copies thereof.

**11.**     No person receiving discovery materials designated Confidential shall disclose such discovery materials or any information contained therein to any person who is not entitled to receive such discovery materials under paragraph 6.  Each person to whom discovery materials designated Confidential are disclosed pursuant to this Order shall be advised that such information is being disclosed pursuant to, and subject to the terms of, an Order of the Court and that the sanctions for any violations of the Order may include penalties which may be imposed by the Court for contempt.  Further, Defendants wishing to disclose Confidential Personal

Information Documents to any person in paragraph 6(e)-(g) shall ensure that such person executes an Undertaking in the form attached hereto before gaining access to any such material. Defendants' counsel of record shall maintain a copy of such undertakings and shall make such copies available to Plaintiffs upon request or order of the Court.

**11.** As to documents not otherwise designated as Confidential, the receiving party may not disseminate a document to a third party without first fully redacting personal information such as social security numbers, home addresses and telephone numbers, and dates of birth.

**12.** This Order shall not prejudice in any way the rights of any Party from using discovery material deemed "Confidential" from Confidential Personal Information, or from referring to or reciting any information contained in such materials, in proceedings before this Court, including motion papers, affidavits, briefs, or other papers and depositions filed with the Court or at any deposition, or at any hearing conference or trial before the Court. All material designated Confidential filed with the Court, and any portion of any pleading, motion paper, affidavit, brief, deposition transcript, memorandum or other paper filed with the Court disclosing such material shall be identified as Confidential, filed under seal in the manner prescribed by the Court's Local Rules of Civil Procedure, and kept under seal until further order of the Court. The filing Party may ask the Party that has designated the materials Confidential to agree in writing to the public filing of Confidential Personal Information without sealing. Where possible, the parties shall publicly file redacted papers on the public docket that exclude only the portions of such papers that disclose Confidential Personal Information.

**13.** In the event of a dispute that requires the Court's attention regarding the propriety of Plaintiffs' (a) designation of particular Confidential Personal Information as "Confidential" or

(b) assertion of a privilege or other protection from disclosure with respect to an inadvertently produced document, the dispute shall be submitted to the Court for resolution pursuant to the Court's individual practices for discovery-related motion practice and the local rules, L. R. Civ. P. 7(d)(3), and a determination shall be made under and pursuant to the Federal Rules of Civil Procedure and the legal authorities applicable hereto as the same may then be in effect. Until said dispute is resolved by the Court, the documents or information shall retain their designation as Confidential and/or privileged or otherwise protected from disclosure and thereafter shall be designated as the Court may direct, provided that nothing contained herein shall be deemed to waive or otherwise limit the right of any Party to appeal from, or seek review of, the determination by the Court of any such dispute.

**14.** Defendants shall take all steps reasonably required to protect the Confidential Personal Information produced in these Actions. In the event that Confidential Personal Information is inadvertently disclosed to any unauthorized person or entity, such material shall not lose its confidentiality status by reason of such inadvertent disclosure.

**15.** Within sixty (60) days after the final termination of this litigation by settlement or exhaustion of all appeals, all Confidential Information produced or designated and all reproductions thereof shall be returned to the Producing Party or, at the Receiving Party's option, shall be destroyed. In the event that any Receiving Party chooses to destroy physical objects and documents, such Party shall certify in writing within sixty (60) days of the final termination of this litigation that it has undertaken its best efforts to destroy such physical objects and documents, and that such physical objects and documents have been destroyed to the best of its knowledge. Notwithstanding anything to the contrary, counsel of record for the Parties may retain one copy of documents constituting work product, a copy of pleadings, motion papers, discovery responses, deposition transcripts and

deposition and trial exhibits. This Stipulation shall not be interpreted in a manner that would violate any applicable rules of professional conduct.

**16.** This Order shall not prevent any Party from applying to the Court for further or additional protective orders, for the modification of this Order, for relief from this Order, or from agreeing with the other Parties to modify this Order subject to approval of the Court.

SO ORDERED.

Dated: June 2, 2023

/s/Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARRYL BOYD, ) | |
| Plaintiff, ) | |
| - against - ) | **Case No. 1:22-cv-519 (LJV) (JJM)** |
| THE CITY OF BUFFALO; THE COUNTY OF ERIE; MICHAEL G. GUADAGNO; JOHN MONTONDO; LINDA J. FIAL AS EXECUTOR FOR THE ESTATE OF ROBERT GRABOWSKI; MARTIN BULLOCK AS EXECUTOR FOR THE ESTATE OF JAMES E. HUNTER; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF ROBERT F. ARNET; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF FRANK C. DEUBELL; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF LEO J. DONOVAN; JENNIFER G. FLANNERY AS ADMINISTRATOR FOR THE ESTATE OF FRANCIS M. MANISTA, JR.; AND DAWN M. DIRIENZO AS EXECUTOR FOR THE ESTATE OF PAUL R. DELANO, ) | |
| Defendants. ) | |

```
                                         )
JOHN WALKER, JR.,                        )
                                         )
                    Plaintiff,           )
                                         )
        - against -                      )        Case No. 1:22-cv-520 (LJV) (JJM)
                                         )
THE CITY OF BUFFALO; THE COUNTY OF )
ERIE; MICHAEL G. GUADAGNO; JOHN          )
MONTONDO; LINDA J. FIAL AS               )
EXECUTOR FOR THE ESTATE OF ROBERT )
GRABOWSKI; MARTIN BULLOCK AS             )
EXECUTOR FOR THE ESTATE OF JAMES         )
E. HUNTER; JENNIFER G. FLANNERY AS       )
ADMINISTRATOR FOR THE ESTATE OF          )
ROBERT F. ARNET; JENNIFER G.             )
FLANNERY AS ADMINISTRATOR FOR            )
THE ESTATE OF FRANK C. DEUBELL;          )
JENNIFER G. FLANNERY AS                  )
ADMINISTRATOR FOR THE ESTATE OF          )
LEO J. DONOVAN; JENNIFER G.              )
FLANNERY AS ADMINISTRATOR FOR            )
THE ESTATE OF FRANCIS M. MANISTA,        )
JR.; AND DAWN M. DIRIENZO AS             )
EXECUTOR FOR THE ESTATE OF PAUL R. )
DELANO,                                  )
                                         )
                    Defendants.          )
```

## **UNDERTAKING**

I have read the Stipulation and Protective Order Regarding Confidentiality of Documents and Other Information Produced by Plaintiffs in Discovery, dated _____ (the "Order") in the above-captioned actions (the "Actions").

I understand the terms of the Order and I agree to be bound by its terms and conditions with respect to any documents, materials or information designated CONFIDENTIAL that are furnished to me as set forth in the Order.  I further agree: (a) not to disclose to any person or entity any documents, materials or information designated CONFIDENTIAL, (b) not to make any copies of any documents, materials or information designated CONFIDENTIAL for my own

- 10 -

retention after the termination of the Actions; (c) not to use any documents, materials or information designated CONFIDENTIAL except in accordance with the Order; and (d) to return to Plaintiffs such CONFIDENTIAL materials all copies (including excerpts and summaries) thereof, within thirty (30) days of the termination of the Actions.

I hereby consent to the jurisdiction of the United States District Court for the Western District of New York with regard to any proceedings to enforce the terms and conditions of the Order.

_____
Signature

_____
Print Name

_____
Date

Sworn to and subscribed before me
this __ day of ____ 2023.

_____
Notary Public

# EXHIBIT N

| | |
|---|---|
| **From:** | Joel B. Rudin |
| **To:** | Brian C. Mahoney; David Rudin; Sahasrabudhe, Peter A.; Russ III, Hugh M. |
| **Cc:** | Perry, Adam W.; Jennifer C. Persico; Alexander W. Eaton; Serena M. Kemnitzer; Thelo Coleman; WH Buffalo 5 Internal Team; Timothy Hoover; Spencer Durland; Firsenbaum, Ross; Perio, Ryanne; Hanft, Gideon A. |
| **Subject:** | RE: Boyd and Walker v. City of Buffalo et al. |
| **Date:** | Wednesday, September 13, 2023 5:19:11 PM |
| **Attachments:** | image001.png |

Dear Brian, Jennifer and Alex,

I'm writing to request your client County of Erie's consent, and that of the D.A.'s office, to the unsealing of the Supreme Court file in the Tommy Rollins case, *People v. Rollins,* Ind. No. 82-1064. This is the case I already questioned John Montondo and the 30(b)(6) witness, John Regan, about at their depositions.  It is relevant to our *Monell* claim because it concerns alleged misconduct of former Det. Montondo and then Homicide Chief Leo Donovan in coercing statements from a young Black suspect similar to the conduct we allege in this case.  Justice Kasler castigated the police conduct in suppressing Rollins' statements and then dismissed the case.  We elicited at the depositions that neither Montondo nor Donovan apparently were disciplined for their alleged misconduct.

We have obtained the court records of the codefendant, Shelby Davis, Jr., because he was convicted, but the records do not include the suppression hearing transcript, which is sealed under CPL 160.50. Nor have we been able to obtain the underlying motion papers.

Because the matter is sealed, we need to make an unsealing application.  We request the D.A.'s and Erie County's consent to this application.

Please let us know your position by Monday if possible.  I appreciate your consideration.

Regards,

Joel

---

**From:** Brian C. Mahoney <bmahoney@lippes.com>
**Sent:** Monday, August 21, 2023 7:19 PM
**To:** Joel B. Rudin <jbrudin@rudinlaw.com>; David Rudin <David@rudinlaw.com>; Sahasrabudhe, Peter A. <PSahasra@hodgsonruss.com>; Russ III, Hugh M. <HRuss@hodgsonruss.com>
**Cc:** Perry, Adam W. <APerry@hodgsonruss.com>; Jennifer C. Persico <jpersico@lippes.com>; Alexander W. Eaton <aeaton@lippes.com>; Serena M. Kemnitzer <skemnitzer@lippes.com>; Thelo Coleman <thelo@rudinlaw.com>; WH Buffalo 5 Internal Team <WHBuffalo5InternalTeam@wilmerhale.com>; Timothy Hoover <thoover@hooverdurland.com>; Spencer Durland <sdurland@hooverdurland.com>; Firsenbaum, Ross <Ross.Firsenbaum@wilmerhale.com>; Perio, Ryanne <Ryanne.Perio@wilmerhale.com>; Hanft, Gideon A. <Gideon.Hanft@wilmerhale.com>
**Subject:** Re: Boyd and Walker v. City of Buffalo et al.

Joel-

We can plan on finishing Judge Drury's deposition on September 11th as scheduled.

Thanks,
Brian

Get Outlook for iOS

**Brian C. Mahoney**
Partner



50 Fountain Plaza, Suite 1700
Buffalo, NY 14202-2216

ph: 716.853.5100 ext. 1310 | fx: 716.853.5199
bmahoney@lippes.com | lippes.com
LinkedIn // Twitter // Facebook

This email message, including attachments, are confidential and may be protected by the attorney/client or other applicable privileges.  The information is intended to be conveyed only to the designated recipient(s) of the email message.  Unauthorized use, dissemination, distribution or reproduction of this message by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful.  If you are not an intended recipient, please notify the sender immediately, delete the message from your email system, and destroy any other copies in your possession.

**From:** Joel B. Rudin <jbrudin@rudinlaw.com>
**Sent:** Saturday, August 19, 2023 8:39:03 PM
**To:** Brian C. Mahoney <bmahoney@lippes.com>; David Rudin <David@rudinlaw.com>; Sahasrabudhe, Peter A. <PSahasra@hodgsonruss.com>; Russ III, Hugh M. <HRuss@hodgsonruss.com>
**Cc:** Perry, Adam W. <APerry@hodgsonruss.com>; Jennifer C. Persico <jpersico@lippes.com>; Alexander W. Eaton <aeaton@lippes.com>; Serena M. Kemnitzer <skemnitzer@lippes.com>; Thelo Coleman <thelo@rudinlaw.com>; WH Buffalo 5 Internal Team <WHBuffalo5InternalTeam@wilmerhale.com>; Timothy Hoover <thoover@hooverdurland.com>; Spencer Durland <sdurland@hooverdurland.com>; Firsenbaum, Ross <Ross.Firsenbaum@wilmerhale.com>; Perio, Ryanne <Ryanne.Perio@wilmerhale.com>; Hanft, Gideon A. <Gideon.Hanft@wilmerhale.com>
**Subject:** RE: Boyd and Walker v. City of Buffalo et al.

Thank you, Brian.  Can Mr. Drury stay late to finish in one day?  Alternatively, would he be able to finish the next morning if need be?  Of course it would be better to finish in one day.

Joel

**From:** Brian C. Mahoney <bmahoney@lippes.com>

**Sent:** Friday, August 18, 2023 3:47 PM
**To:** David Rudin <David@rudinlaw.com>; Sahasrabudhe, Peter A. <PSahasra@hodgsonruss.com>;
Russ III, Hugh M. <HRuss@hodgsonruss.com>
**Cc:** Perry, Adam W. <APerry@hodgsonruss.com>; Jennifer C. Persico <jpersico@lippes.com>;
Alexander W. Eaton <aeaton@lippes.com>; Serena M. Kemnitzer <skemnitzer@lippes.com>; Joel B.
Rudin <jbrudin@rudinlaw.com>; Thelo Coleman <thelo@rudinlaw.com>; WH Buffalo 5 Internal
Team <WHBuffalo5InternalTeam@wilmerhale.com>; Timothy Hoover
<thoover@hooverdurland.com>; Spencer Durland <sdurland@hooverdurland.com>; Firsenbaum,
Ross <Ross.Firsenbaum@wilmerhale.com>; Perio, Ryanne <Ryanne.Perio@wilmerhale.com>; Hanft,
Gideon A. <Gideon.Hanft@wilmerhale.com>
**Subject:** Re: Boyd and Walker v. City of Buffalo et al.

Joel-
We are confirming that Judge Tim Drury is available for his deposition on Monday September 11
starting at 11 am at our office.
Jerry Solomon is confirmed for his depostion on September 12 from 9-1 pm and Jim Verrastro on the
12th from 1-5 pm at our office.
Thanks,
Brian

Get Outlook for iOS

**Brian C. Mahoney**
Partner



50 Fountain Plaza, Suite 1700
Buffalo, NY 14202-2216

ph: 716.853.5100 ext. 1310 | fx: 716.853.5199
bmahoney@lippes.com | lippes.com
LinkedIn  //  Twitter  //  Facebook

This email message, including attachments, are confidential and may be protected by the attorney/client
or other applicable privileges.  The information is intended to be conveyed only to the designated
recipient(s) of the email message.  Unauthorized use, dissemination, distribution or reproduction of this
message by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful.  If
you are not an intended recipient, please notify the sender immediately, delete the message from your
email system, and destroy any other copies in your possession.

**From:** David Rudin <David@rudinlaw.com>
**Sent:** Thursday, August 17, 2023 10:55:05 AM
**To:** Sahasrabudhe, Peter A. <PSahasra@hodgsonruss.com>; Russ III, Hugh M.
<HRuss@hodgsonruss.com>
**Cc:** Perry, Adam W. <APerry@hodgsonruss.com>; Jennifer C. Persico <jpersico@lippes.com>; Brian
C. Mahoney <bmahoney@lippes.com>; Alexander W. Eaton <aeaton@lippes.com>; Serena M.
Kemnitzer <skemnitzer@lippes.com>; Joel B. Rudin <jbrudin@rudinlaw.com>; Thelo Coleman

<thelo@rudinlaw.com>; WH Buffalo 5 Internal Team <WHBuffalo5InternalTeam@wilmerhale.com>;
Timothy Hoover <thoover@hooverdurland.com>; Spencer Durland
<sdurland@hooverdurland.com>; Firsenbaum, Ross <Ross.Firsenbaum@wilmerhale.com>; Perio,
Ryanne <Ryanne.Perio@wilmerhale.com>; Hanft, Gideon A. <Gideon.Hanft@wilmerhale.com>
**Subject:** RE: Boyd and Walker v. City of Buffalo et al.

Hi Peter,

Since the County is getting us dates for the former ADA depositions by the end of this week, could
we connect again once we have those dates and see if we can schedule Detective Paradowski's
deposition around them?  Depending on the dates from the County, we could schedule Detective
Paradowski's deposition the day after Drury (or the day after Verrastro/Solomon if they're back-to-
back with Drury).  That way I'll already be in Buffalo and can stay an extra day for Detective
Paradowski's deposition.  If not, I can depose Detective Paradowski on Zoom.  Any day in early
September works for me, depending on the ADA deposition schedule.

Best,
David

---

**From:** Sahasrabudhe, Peter A. <PSahasra@hodgsonruss.com>
**Sent:** Tuesday, August 15, 2023 4:22 PM
**To:** David Rudin <David@rudinlaw.com>; Russ III, Hugh M. <HRuss@hodgsonruss.com>
**Cc:** Perry, Adam W. <APerry@hodgsonruss.com>; Jennifer C. Persico <jpersico@lippes.com>; Brian
C. Mahoney <bmahoney@lippes.com>; Alexander W. Eaton <aeaton@lippes.com>; Serena M.
Kemnitzer <skemnitzer@lippes.com>; Joel B. Rudin <jbrudin@rudinlaw.com>; Thelo Coleman
<thelo@rudinlaw.com>; WH Buffalo 5 Internal Team <WHBuffalo5InternalTeam@wilmerhale.com>;
Timothy Hoover <thoover@hooverdurland.com>; Spencer Durland
<sdurland@hooverdurland.com>; Firsenbaum, Ross <Ross.Firsenbaum@wilmerhale.com>; Perio,
Ryanne <Ryanne.Perio@wilmerhale.com>; Hanft, Gideon A. <Gideon.Hanft@wilmerhale.com>
**Subject:** RE: Boyd and Walker v. City of Buffalo et al.

Hi David:

On Friday I asked Joel if there were certain dates in August that would work well for Detective
Paradowski's deposition.  Next week is going to be tough as we have multiple depositions scheduled
in other matters throughout the week.

Could you provide dates in late August or early September that might work on your end for
Detective Paradowski's deposition?

--Peter

**Peter A. Sahasrabudhe**
Associate
Hodgson Russ LLP

Tel:  716.848.1508
Fax:  716.819.4651



Twitter | LinkedIn | website | Bio | e-mail | vCard

The Guaranty Building  |  140 Pearl Street, Suite 100  |  Buffalo, NY 14202
Tel: 716.856.4000  |  map

---

**From:** David Rudin <David@rudinlaw.com>
**Sent:** Thursday, August 10, 2023 1:17 PM
**To:** Sahasrabudhe, Peter A. <PSahasra@hodgsonruss.com>; Russ III, Hugh M. <HRuss@hodgsonruss.com>
**Cc:** Perry, Adam W. <APerry@hodgsonruss.com>; Jennifer C. Persico <jpersico@lippes.com>; Brian C. Mahoney <bmahoney@lippes.com>; Alexander W. Eaton <aeaton@lippes.com>; Serena M. Kemnitzer <skemnitzer@lippes.com>; Joel B. Rudin <jbrudin@rudinlaw.com>; Thelo Coleman <thelo@rudinlaw.com>; WH Buffalo 5 Internal Team <WHBuffalo5InternalTeam@wilmerhale.com>; Timothy Hoover <thoover@hooverdurland.com>; Spencer Durland <sdurland@hooverdurland.com>; Firsenbaum, Ross <Ross.Firsenbaum@wilmerhale.com>; Perio, Ryanne <Ryanne.Perio@wilmerhale.com>; Hanft, Gideon A. <Gideon.Hanft@wilmerhale.com>
**Subject:** RE: Boyd and Walker v. City of Buffalo et al.

---

**External Email - Use Caution**

---

Hi Peter,

Thanks for working with us on completing the City 30(b)(6) deposition.  We appreciate your finding a date when Detective Paradowski is available in August.  We'd like to depose him and Lissa Redmond as 30(b)(6) representatives of the City.  Please provide us dates when they're available by August 18.  Since we'll count Ms. Redmond as a 30(b)(6) witness, do we need to subpoena her or will you produce her under the 30(b)(6) notice?  If we need to subpoena her, will you accept service of a subpoena on her behalf?

Thanks also for the update on the City's records witnesses.  We appreciate your trying to find a single day for the three depositions and look forward to hearing from you on a date.

Best,
David

---

**From:** Sahasrabudhe, Peter A. <PSahasra@hodgsonruss.com>
**Sent:** Wednesday, August 9, 2023 9:19 AM
**To:** David Rudin <David@rudinlaw.com>; Russ III, Hugh M. <HRuss@hodgsonruss.com>
**Cc:** Perry, Adam W. <APerry@hodgsonruss.com>; Jennifer C. Persico <jpersico@lippes.com>; Brian

C. Mahoney <bmahoney@lippes.com>; Alexander W. Eaton <aeaton@lippes.com>; Serena M. Kemnitzer <skemnitzer@lippes.com>; Joel B. Rudin <jbrudin@rudinlaw.com>; Thelo Coleman <thelo@rudinlaw.com>; WH Buffalo 5 Internal Team <WHBuffalo5InternalTeam@wilmerhale.com>; Timothy Hoover <thoover@hooverdurland.com>; Spencer Durland <sdurland@hooverdurland.com>; Firsenbaum, Ross <Ross.Firsenbaum@wilmerhale.com>; Perio, Ryanne <Ryanne.Perio@wilmerhale.com>; Hanft, Gideon A. <Gideon.Hanft@wilmerhale.com>
**Subject:** RE: Boyd and Walker v. City of Buffalo et al.

Hi David:

We disagree with your assessment of Mary Evans's preparedness.  She has first-hand knowledge of the reinvestigation and BPD's cold-case unit and was prepared to testify about both of those topics.

That being said, we can produce Detective Paradowski for a deposition.  You can count that as a 30(b)(6) deposition, or a fact deposition, or both, we won't object. We expect Detective Paradowski to give very similar testimony to the testimony given by Detective Evans, but we certainly can produce him.  I will try to find a date when Detective Peradowski is available in August.  Alternatively, we can have Detective Evans talk to Detective Paradowski and you can ask her questions about what she spoke about with Detective Paradowski, but that seems inefficient.

As far as Lisa Redmond goes, as you know, the City is not in possession of any documents detailing any steps Lisa Redmond took to re-investigate the Crawford homicide.  If you want Detective Evans or Detective Peradowski to talk to Lisa Redmond and then to ask them questions about what Lisa Redmond told them, we can do that.  It may be preferable simply to subpoena Lisa Redmond though and see what she has to say.  Again, you can count that as a 30(b)(6) deposition, a fact deposition, or both, we won't object.  Let us know how you want to proceed.

As far as the City's record collection, that will have to be three witnesses, two of whom have recently retired and are no longer employed by the City or BPD.  We are trying to confirm those witnesses contact information and find a date convenient for all three witnesses, as it seems inefficient to hold the deposition on three separate dates.  We will try to get back to you with dates for those three depositions as soon as possible.

--Peter


**Peter A. Sahasrabudhe**
Associate
Hodgson Russ LLP

Tel:   716.848.1508
Fax:   716.819.4651



Twitter | LinkedIn | website | Bio | e-mail | vCard

The Guaranty Building | 140 Pearl Street, Suite 100 | Buffalo, NY 14202
Tel: 716.856.4000 | map

---

**From:** David Rudin <David@rudinlaw.com>
**Sent:** Tuesday, August 8, 2023 4:29 PM
**To:** Russ III, Hugh M. <HRuss@hodgsonruss.com>; Sahasrabudhe, Peter A. <PSahasra@hodgsonruss.com>
**Cc:** Perry, Adam W. <APerry@hodgsonruss.com>; Jennifer C. Persico <jpersico@lippes.com>; Brian C. Mahoney <bmahoney@lippes.com>; Alexander W. Eaton <aeaton@lippes.com>; Serena M. Kemnitzer <skemnitzer@lippes.com>; Joel B. Rudin <jbrudin@rudinlaw.com>; Thelo Coleman <thelo@rudinlaw.com>; WH Buffalo 5 Internal Team <WHBuffalo5InternalTeam@wilmerhale.com>; Timothy Hoover <thoover@hooverdurland.com>; Spencer Durland <sdurland@hooverdurland.com>; Firsenbaum, Ross <Ross.Firsenbaum@wilmerhale.com>; Perio, Ryanne <Ryanne.Perio@wilmerhale.com>; Hanft, Gideon A. <Gideon.Hanft@wilmerhale.com>
**Subject:** Boyd and Walker v. City of Buffalo et al.

---

| External Email - Use Caution |
|---|

---

Dear Hugh and Peter,

Please see the attached letter regarding the City 30(b)(6) deposition.

Thanks,
David

David E. Rudin
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, NY 10019
Office: (212) 752-7600
Cell: (917) 584-3587
Fax: (212) 980-2968

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you.*

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.