**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARRYL BOYD, | ) |
| | ) |
| Plaintiff, | ) **Case No. 1:22-cv-519** |
| | ) |
| - against - | ) |
| | ) |
| THE CITY OF BUFFALO, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| JOHN WALKER, JR., | ) |
| | ) |
| Plaintiff, | ) **Case No. 1:22-cv-520** |
| | ) |
| - against - | ) |
| | ) |
| THE CITY OF BUFFALO, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS ........................................................................................4

    A.    The Crawford Murder and Original Suspects ........................................4

    B.    BPD's Fabrication of Evidence and Initiation of the Prosecution ...........6

    C.    Evidence Fabricated by the BPD Is Used to Continue the Prosecution and
        Convict Plaintiffs ..............................................................................12

    D.    ECDA Prosecutors Fail to Disclose *Brady* Material ............................15

    E.    At Long Last, Plaintiffs' Convictions Are Vacated in 2021 and the Case Is
        Dismissed .........................................................................................17

ARGUMENT ........................................................................................................17

I.    The City Defendants' Proximate Cause Defense to Evidence Fabrication and Malicious
    Prosecution Presents Jury Issues ................................................................18

    A.    Plaintiffs are Entitled to a Jury Trial on Their Evidence Fabrication Claim ........18

        1.    Applicable Law ....................................................................18

        2.    Application to the Facts ........................................................21

    B.    The City Defendants' Arguments for Summary Judgment on Plaintiffs'
        Malicious Prosecution Claims Have the Same Infirmity as their Evidence
        Fabrication Arguments ........................................................................29

    C.    The City is Liable for Malicious Prosecution Under *Respondent Superior* .........33

II.    The City Does Not Challenge Plaintiffs' *Monell* Claim Based upon Unlawful
    Interrogation Practices, just Their *Brady* Claim, and as to that Claim It Fails to Show that
    Plaintiffs Lack a Viable Case .....................................................................34

    A.    There Is Ample Evidence Establishing the Underlying Constitutional
        Violations Perpetrated by the BPD ......................................................35

    B.    City Policy and Custom Caused the Constitutional Violations Perpetrated
        by the BPD .......................................................................................37

        1.    The City Does Not Dispute That It Is Liable for the Acts of Its
            Policymaker, Homicide Chief Leo Donovan ...........................37

III.    Plaintiffs Are Entitled To A Jury Trial about whether the County's Policies, Customs, or
    Practices Were a Substantial Cause of the *Brady* Violations and Summation Misconduct
    that Denied Them Fair Trials ......................................................................50

    A.    There Is Ample Evidence Establishing That ADAs Drury and Henry
        Violated Plaintiffs' Constitutional Rights ...........................................50

        1.    Drury Withheld *Brady* Material During Plaintiffs' Preliminary
            Hearing ..............................................................................51

2.     Drury and Henry Withheld *Brady* Material During Plaintiffs' Trials ........................................................................................52

3.     Drury and Henry Engaged in Summation Misconduct That Deprived Plaintiffs of a Fair Trial.............................................56

B.    The Constitutional Violations Perpetrated by ADAs Drury and Henry Were Caused by ECDA Policy, Custom, and Practice .........................................61

1.     Policy and Practice......................................................................61

2.     The County Is Liable for the ECDA's Policy of Deliberate Indifference to Plaintiffs' Fair-Trial Rights................................67

3.     The County Is Also Liable on a Stand-Alone Claim for Failing to Train Prosecutors in Their *Brady* Obligations ...........................73

IV.    Defendants Are Not Entitled to Summary Judgment on Plaintiffs' State Law Claimsfor Negligent Hiring, Supervision, and Discipline .................................................76

V.    The City Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Claims for Negligent Infliction of Emotional Distress ........................................................79

CONCLUSION.................................................................................................................79

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amnesty America v. Town of West Hartford*,
    361 F.3d 113 (2d Cir. 2004)...........................................................39, 46, 48, 71, 74

*Ashley v. City of New York*,
    992 F.3d 128 (2d Cir. 2021)...........................................................................18

*Barnes v. City of New York*,
    68 F.4th 123 (2d Cir. 2023) ......................................................................18, 19

*Batista v. Rodriguez*,
    702 F.2d 393 (2d Cir. 1983)...........................................................................49

*Becker v. Poling Transportation Corp.*
    356 F.3d 381 (2d Cir. 2004)...........................................................................19

*Bellamy v. City of New York*,
    914 F.3d 727 (2d Cir. 2019)...........................................................50, 56, 57, 75

*Bermudez v. City of New York*,
    790 F.3d 368 (2d Cir. 2015)......................................................................21, 32

*Blake v. Race*,
    487 F. Supp. 2d 187 (E.D.N.Y. 2007) .............................................................20

*Bordanaro v. McLeod*,
    871 F.2d 1151 (1st Cir. 1989)........................................................................47

*Boyd v. City of New York*,
    336 F.3d 72 (2d Cir. 2003).............................................................................30

*Brady v. Maryland*,
    373 U.S. 83 (1963).....................................................................................45, 51

*Cadoret v. Sikorsky Aircraft Corp.*,
    323 F. Supp. 3d 319 (D. Conn. 2018) .............................................................35

*Cameron v. City of New York*,
    598 F.3d 50 (2d Cir. 2010).........................................................................19, 31

*Cash v. County of Erie*,
    654 F.3d 324 (2d Cir. 2011)......................................................................34, 48, 49

*Collins v. City of New York*,
    923 F. Supp. 2d 462 (E.D.N.Y. 2013) ................................................47

*Colon v. City of New York*,
    60 N.Y.2d 78 (1983) ................................................................................30

*Colon v. City of Rochester*,
    419 F. Supp. 3d 586 (W.D.N.Y. 2019) ...................................................33

*Connick v. Thompson*,
    563 U.S. 51 (2011)...........................................34, 37, 44, 71, 75

*Conte v. County of Nassau*,
    2010 WL 3924677 (E.D.N.Y. Sept. 30, 2010) ......................................38

*D.J. by Comfort v. Corning-Painted Post Area School District*,
    2024 WL 989703 (W.D.N.Y. Mar. 7, 2024).........................................77

*DiSimone v. Phillips*,
    461 F.3d 181 (2d Cir. 2006)....................................................................64

*Disorbo v. Hoy*,
    74 F. App'x 101 (2d Cir. 2003) .......................................................48, 49

*Doe v. City of New York*,
    2018 WL 6095847 (S.D.N.Y. Nov. 21, 2018)......................................77

*Doe v. N.Y.C., Dep't of Social Services*,
    649 F.2d 134 (2d Cir. 1981)....................................................................19

*Dory v. Ryan*,
    25 F.3d 81 (2d Cir. 1994)........................................................................20

*Dufort v. City of New York*,
    874 F.3d 338 (2d Cir. 2017)....................................................................30

*Eifert v. Bush*,
    27 A.D.2d 950 (2d Dep't 1967) .............................................................76

*Estate of Roman v. City of Newark*,
    914 F.3d 789 (3d Cir. 2019)....................................................................48

*Ferrari v. County of Suffolk*,
    2013 WL 4017022 (E.D.N.Y. Aug. 6, 2013), *rev'd on other grounds*, 845 F.3d 46
    (2d Cir. 2016).........................................................................................42

*Fiacco v. City of Rensselaer*,
    783 F.2d 319 (2d Cir. 1986).............................................................48, 49

*Frost v. New York City Police Dep't,*
980 F.3d 231 (2d Cir. 2020)............................................................18, 19

*Gentile v. County of Suffolk,*
926 F.2d 142 (2d Cir. 1991)............................................................47, 49

*Giglio v. United States,*
405 U.S. 150 (1972)............................................................45, 51, 63

*Gonzalez v. Bratton,*
48 F. App'x 363 (2d Cir. 2002) ............................................................79

*Grandstaff v. City of Borger,*
767 F.2d 161 (5th Cir. 1985) ............................................................47

*Greene v. City of New York,*
742 F. App'x 532 (2d Cir. 2018) ............................................................72

*Hall v. Smathers,*
240 N.Y. 486 (1925)............................................................76

*Haughey v. County of Putnam,*
2020 WL 1503513 (S.D.N.Y. Mar. 29, 2020) ................................................38, 40

*Hayvin Gaming, LLC v. Workinman Interactive, LLC,*
2024 WL 2702202 (W.D.N.Y. May 24, 2024)............................................................35

*Heck v. Humphrey,*
512 U.S. 477 (1994)............................................................19

*Henry v. County of Shasta,*
132 F.3d 512 (9th Cir. 1997), *amended,* 137 F.3d 1372 (9th Cir. 1998)............................47

*Hicks ex rel. Nolette v. Berkshire Farm Center & Services for Youth,*
123 A.D.3d 1319 (3d Dep't 2014) ............................................................78

*Higazy v. Templeton,*
505 F.3d 161 (2d Cir. 2007)............................................................19, 20

*Hoffman v. Verizon Wireless, Inc.,*
125 A.D.3d 806 (2d Dep't 2015) ............................................................78

*Jeffes v. Barnes,*
208 F.3d 49 (2d Cir. 2000)............................................................37, 38, 39, 40, 61

*Jett v. Dallas Independent School District,*
491 U.S. 701 (1989)............................................................38

*Johnson v. Jamaica Hospital*,
   62 N.Y.2d 523 (1984) ....................................................................................79

*Jones v. Town of East Haven*,
   691 F.3d 72 (2d Cir. 2012)......................................................34, 48, 67, 71

*Karoon v. New York City Transit Authority*,
   241 A.D.2d 323 (1st Dep't 1997) ...............................................................76

*Kennedy v. McKesson Co*.,
   58 N.Y.2d 500 (1983) ....................................................................................79

*Kerman v. City of New York*,
   374 F.3d 93 (2d Cir. 2004)......................................................................19, 21

*Ketcham v. City of Mount Vernon*,
   992 F.3d 144 (2d Cir. 2021).........................................................................17

*Kinge v. State*,
   20 Misc. 3d 161 (Ct. Cl. 2007), *aff'd*, 79 A.D.3d 1473 (3d Dep't 2010) ...............................77

*Kinge v. State*,
   79 A.D.3d 1473 (3d Dep't 2010) ...........................................................77, 78

*Kyles v. Whitley*,
   514 U.S. 419 (1995)........................................................................................56

*Lippoldt v. Cole*,
   468 F.3d 1204 (10th Cir. 2006) ..................................................................19

*Lopez v. City of New York*,
   105 F. Supp. 3d 242 (E.D.N.Y. 2015) .......................................................20

*Lucente v. County of Suffolk*,
   980 F.3d 284 (2d Cir. 2020).........................................34, 40, 42, 61, 67

*Manganiello v. City of New York*,
   612 F.3d 149 (2d Cir. 2010)..........................................................................30

*Matusick v. Erie County Water Authority*,
   757 F.3d 31 (2d Cir. 2014)............................................................36, 40, 61

*Mays v. City of Middletown*,
   70 A.D.3d 900 (2d Dep't 2010) ..................................................................79

*Miranda v. Arizona*,
   384 U.S. 436 (1966)........................................................................................46

*Monell v. Department of Social Services*,
  436 U.S. 658 (1978)........................................................................34

*Morse v. Fusto*,
  804 F.3d 538 (2d Cir. 2015)............................................................18

*Newson v. City of New York*,
  2019 WL 3997466 (E.D.N.Y. Aug. 23, 2019)............................37, 52

*Newton v. City of New York*,
  681 F. Supp. 2d 473 (S.D.N.Y. 2010).............................................76

*Nunez v. City of New York*,
  735 F. App'x 756 (2d Cir. 2018) .....................................................72

*Ortiz v. Stambach*,
  657 F. Supp. 3d 243 (W.D.N.Y. 2023) (Wolford, C.J.), *appeal pending*, No. 23-352
  (2d Cir.)............................................................................................35

*Ortiz v. Wagstaff*,
  523 F. Supp. 3d 347 (W.D.N.Y. 2021) (Wolford, C.J.)....................31

*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986)........................................................................38

*People v. Consolazio*,
  40 N.Y.2d 446 (1976) .....................................................................72

*People v. Ivey*,
  83 A.D.2d 788 (4th Dep't 1981) .....................................................69

*People v. Johnson*,
  62 A.D.2d 555 (4th Dep't. 1978), *aff'd*, 47 N.Y.2d 785 (1979)....................69, 70

*People v. Rosario*,
  9 N.Y.2d 286 (1961) ..................................................................50, 51

*Poventud v. City of New York*,
  750 F.3d 121 (2d Cir. 2014) (en banc)............................................52

*Primeau v. Town of Amherst*,
  303 A.D.2d 1035 (4th Dep't 2003)..................................................77

*Redd v. N.Y.S. Division of Parole*,
  678 F.3d 166 (2d Cir. 2012)............................................................21

*Ricciuti v. N.Y.C. Transit Authority*,
  124 F.3d 123 (2d Cir. 1997)............................................................31

*Rodick v. City of Schenectady,*
    1 F.3d 1341 (2d Cir. 1993)..................................................................................33

*Rodriguez v. City of New York,*
    590 F. Supp. 3d 518 (E.D.N.Y. 2022), *amended on other grounds*, 607 F. Supp. 3d 285
    (E.D.N.Y. 2022)...........................................................................................37

*Rodriguez v. County of Los Angeles,*
    891 F.3d 776 (9th Cir. 2018) ......................................................................48

*Rosenfeld v. Lenich,*
    370 F. Supp. 3d 335 (E.D.N.Y. 2019) ....................................................38, 39

*Rowley v. City of New York,*
    2005 WL 2429514 (S.D.N.Y. Sept. 30, 2005)............................................76

*Russell v. Smith,*
    68 F.3d 33 (2d Cir. 1995)...........................................................................30

*Russo v. City of Bridgeport,*
    479 F.3d 196 (2d Cir. 2007)..........................................................36, 37, 51

*Rutherford v. City of Mount Vernon,*
    2023 WL 6395375 (S.D.N.Y. Sept. 29, 2023)............................................63

*San Filippo v. U.S. Trust Co. of N.Y., Inc.,*
    737 F.2d 246 (2d Cir. 1984)........................................................................20

*Savino v. City of New York,*
    331 F.3d 63 (2d Cir. 2003)..........................................................................30

*Sheehan v. City of New York,*
    40 N.Y.2d 496 (1976) .................................................................................19

*Smalls v. Collins,*
    10 F.4th 117 (2d Cir. 2021) ........................................................................19

*Smith v. City of Fontana,*
    818 F.2d 1411 (9th Cir. 1987) ....................................................................48

*Stampf v. Long Island Railroad Co.,*
    761 F.3d 192 (2d Cir. 2014)........................................................................29

*Taylor v. City of New York,*
    2021 WL 848966 (E.D.N.Y. Mar. 4, 2021) ..........................................36, 52

*Thompson v. City of New York,*
    50 Misc. 3d 1037 (Sup. Ct., Bronx Cnty. 2015) ........................................76

*Timothy Mc. v. Beacon City School District*,
    127 A.D.3d 826 (2d Dep't 2015) ........................................................78

*Torvicia v. Suffolk County*,
    17 F.4th 342 (2d Cir. 2021) ...............................................................41

*Townes v. City of New York*,
    176 F.3d 138 (2d Cir. 1999)...............................................................20

*United States v. Agurs*,
    427 U.S. 97 (1976)..............................................................................51

*United States ex rel. Haynes v. McKendrick*,
    481 F.2d 152 (2d Cir. 1973)...............................................................58

*Vann v. City of New York*,
    72 F.3d 1040 (2d Cir. 1995)..........................................................18, 49

*Vann v. City of Rochester*,
    2019 WL 2646616 (W.D.N.Y. June 27, 2019) .................................72

*Vineyard v. County of Murray*,
    990 F.2d 1207 (11th Cir. 1993) .........................................................68

*Walker v. City of New York*,
    974 F.2d 293 (2d Cir. 1992)..........................................34, 44, 45, 50, 74, 75

*Wray v. City of New York*,
    490 F.3d 189 (2d Cir. 2007)...............................................................20

*Zahrey v. Coffey,*
    221 F.3d 342 (2d Cir. 2000)..........................................................19, 20

*Zeranti v. United States*,
    358 F. Supp. 3d 244 (W.D.N.Y. 2019) .........................................76, 78

*Zilioli v. City of New York*,
    2020 WL 1548763 (S.D.N.Y. Apr. 1, 2020).....................................77

**Docket Cases**

*Epps v. City of Buffalo*, No. 19-cv-281-LJV-LGF (W.D.N.Y).....................33

**Statutes**

N.Y. Crim. Proc. Law § 1.20(16) ....................................................................22

**Rules**

Fed. R. Civ. P. 8(d)(3)..................................................................................................................76

Fed. R. Civ. P. 56(a) ................................................................................................................17

Fed. R. Evid. 801(d)(2)(D)........................................................................................................54

**INTRODUCTION**

On August 18, 2021, the New York Supreme Court vacated the convictions of Darryl Boyd and John Walker, Jr. for the January 2, 1976, murder of William Crawford. The court held that the failure of the Erie County District Attorney ("ECDA") to disclose a crime scene photograph that supported a defense that another individual was the actual perpetrator had denied Boyd and Walker a fair trial. This was just the tip of the iceberg when it came to the wrongful conduct that caused Boyd and Walker to be prosecuted at 16 and convicted of a crime they did not commit. Boyd and Walker spent 28 and 22 years incarcerated, respectively, and a combined 34 more years under severe parole conditions. To obtain a measure of justice for the destruction of their lives, Boyd and Walker brought the instant lawsuits against the City of Buffalo ("City") and County of Erie ("County"), along with the individual Buffalo Police Department ("BPD") detectives responsible for their wrongful prosecution and convictions (together, "Individual Defendants"). In moving for summary judgment, Defendants distort both the facts and the law; their motions should be denied.[1]

Discovery has now confirmed that the undisclosed photograph that alone warranted vacatur of Plaintiffs' 44-year-old convictions barely scratches the surface of the City's and County's wrongdoing. The jury will see evidence showing that the entire case against Boyd and Walker was fabricated by BPD detectives and that police documents and information that could have been used to undermine the case were deliberately suppressed. These included reports and information showing how the two main witnesses were coerced into implicating Plaintiffs even though police *knew* from other evidence that the witnesses' denials of knowledge of the crime were truthful. Documents making a far stronger case against two other suspects were also suppressed.

---

[1]     *See* Dkt. 165-38, City's Memorandum of Law In Support of Motion for Summary Judgment ("City Br."); Dkt. 166-2 Memorandum of Law In Support of Defendant County of Erie's Motion for Summary Judgment ("County Br.").

In their motion, the City and Individual Defendants (together, "City Defendants") do not deny that Plaintiffs have sufficient evidence to establish evidence fabrication and malicious prosecution, or that those violations resulted from municipal policy and practice. Rather, they try to shift the blame to ECDA prosecutors for "independently" proceeding with the case and withholding *Brady* material. However, as set forth below, the evidence establishes that BPD detectives, led by Homicide Chief Leo J. Donovan, initiated this prosecution by filing a Criminal Court complaint and caused Plaintiffs to be deprived of their liberty without informing either the ECDA or the court that the evidence was falsified. Their false evidence then was predictably used at every subsequent juncture—at a preliminary hearing, before the grand jury, and at trial—to continue the deprivation of Plaintiffs' liberty. The City Defendants' proximate cause defense that Erie County prosecutors at some point decided to use the fabricated evidence independently is not borne out by the proof, nor is it legally viable. Just because a prosecutor joins a scheme to prosecute a criminal defendant with fabricated evidence does not absolve the investigative officials who fabricated the evidence and recruited him. As for Plaintiffs' *Monell* claim, the City disputes only that police caused *Brady* violations, not evidence fabrications, and at most identifies issues of fact for a jury.

As for the County's motion, it does not deny that the evidence Plaintiffs rely on constitutes *Brady* material, but it insists that its prosecutors disclosed it. However, as set forth below and in Plaintiffs' accompanying Counterstatement of Additional Material Facts ("Counterstatement"), documentary evidence and the deposition testimony of the two lead prosecutors proves the contrary. The County's other contention—that no policy, custom or practice of the ECDA caused the *Brady* violations—also, at most, raises a jury question. Explicit deposition testimony of the former Erie County DA., the County's Rule 30(b)(6) witness, the two prosecutors who handled

Plaintiffs' criminal cases, and the County's expert establishes that the *Brady* decisions made in this case were consistent with and caused by the policies and practices of the ECDA at that time. The record further establishes, as an additional basis for *Monell* liability, that the District Attorney, as the policymaker for the County, was deliberately indifferent to *Brady,* summation, and related fair trial violations and that this indifference led to the violations that harmed Plaintiffs.

That Defendants have filed specious summary judgment motions is particularly lamentable given the admissions City and County policymakers have made about this case. After a New York Supreme Court Justice vacated Plaintiffs' convictions in 2021, then-District Attorney John Flynn, on behalf of the County, publicly acknowledged that the evidence presented at Plaintiffs' trials was "weak" and that he would not appeal or re-try the case. Shortly after that, all nine members of the Buffalo Common Council formally proclaimed that Darryl Boyd and John Walker "were profiled, wrongly blamed, falsely accused, and then indicted, prosecuted, and convicted, for a brutal robbery and murder they did not commit," expressed "jubilation upon the[ir] exoneration," and congratulated them at a Common Council ceremony. The Common Council's proclamation was consistent with public statements made by Buffalo's then Police Commissioner, Byron Lockwood, that he believed in Walker's innocence. Having proclaimed and celebrated Boyd and Walker's innocence, the City now seems to be cynically preparing a defense that they are guilty.

Darryl Boyd and John Walker, now 64 years of age and in ill health, their lives having been ruined by Defendants, are entitled to a jury trial to resolve their claims. Let a jury decide the measure of damages after watching Defendants, through their attorneys, retraumatize them. Defendants' meritless motions should be denied.

## STATEMENT OF FACTS

### A.      The Crawford Murder and Original Suspects

In the early morning hours of January 3, 1976, William Crawford's wife discovered his body outside their home on Fillmore Avenue in Buffalo. *See* Counterstatement at ¶¶ 1, 16. Crawford had spent the night of January 2, 1976, drinking heavily at the Golden Nugget, a bar across the street from his house. *See id.* at ¶¶ 2–6. Police records show that Crawford, who was intoxicated, had flashed several hundred dollars in cash in clear view of other bar patrons, including his neighbor, Larry Watson, who was the last person seen with Crawford as they left the bar together. *See id.* at ¶¶ 6–8, 12–13. When Crawford failed to arrive home, his wife looked outside and discovered his body in the driveway next to a side door, shortly after 1:00 a.m. *See id.* at ¶¶ 14–16. He was badly beaten about the head and bloodied. *See id.* at ¶¶ 17–18. His wallet was missing. *See id.* at ¶ 19. First responders and police arrived to transport Crawford to the hospital and photograph the scene. *See id.* at ¶¶ 20–21.

Initially, the investigation focused on Watson. *See id.* at ¶¶ 32–69. When Detective Grabowski interviewed Watson, he confirmed that he had left at the same time as Crawford but denied seeing any substantial sums of money or offering to walk Crawford home. *See id.* at ¶¶ 51–55. However, Debbie Jeffrey, their server at the Golden Nugget, and another customer, Francis Kalb, directly contradicted Watson's report. They told police in a series of statements, including under oath, that Crawford's money had been clearly visible to Watson as the two men drank together. *See id.* at ¶¶ 32–46, 57–60, 66. Jeffrey was definite that Watson had volunteered to walk Crawford home. *See id.* at ¶ 43. She further informed police that Watson returned shortly afterwards but that he then urgently ushered his wife, Julia, out of the bar, uncharacteristically leaving behind unfinished drinks and not saying goodbye. *See id.* at ¶¶ 44, 66. Detectives reported that Jeffrey told police she suspected Watson of harming Crawford, *see id.* at ¶ 45, and they made

a point of noting in their reports discrepancies between Watson's story and the others' accounts, *see id.* at ¶ 36.

The physical evidence also pointed to Watson. Police reports indicate that Julia Watson called the Golden Nugget shortly before Crawford's body was found to report that her husband had lost his keys. *See id.* at ¶¶ 41, 46. A pair of keys were found near Crawford's body. *See id.* at ¶¶ 31. Crawford's wife told detectives that after a night of drinking, Crawford would knock on the side door to their house, implying he would not take his keys (and thus suggesting that the keys found by his body may have been Watson's). *See id*. But police neither vouchered the keys nor documented any investigation into their ownership. *See id.* at ¶¶ 47–50. Meanwhile, a police photograph showed a single set of footprints made by a heavyset man leading from Crawford's backyard in the direction of Watson's property two doors away. *See id.* at ¶ 28.

Besides Watson, the police initially suspected a second adult patron of the Golden Nugget that night: Jerome Boyd. Detectives Grabowksi and Gorski documented receipt of an anonymous call implicating "Gerry Boyd," obtained Jerome Boyd's mugshot and arrest record, and made them part of the file. *See id.* at ¶¶ 70–73. Detective Delano and others determined that Jerome Boyd lived nearby at the Glenny Apartments, that he was known to patronize the Golden Nugget, and that two eyewitnesses said he was there drinking on the night of the murder. *See id.* at ¶¶ 72–75. Meanwhile, Larry Watson acknowledged that a man matching Jerome Boyd's appearance left immediately behind Watson and Crawford in the minutes before Crawford was murdered. *See id.* at ¶ 75. However, the police never interviewed Jerome Boyd or made further investigation of his activities that night. *See id.* at ¶¶ 78–80.

Police instead claimed to have received still another anonymous call, this time accusing a neighborhood youth, Darryn Gibson. *See id.* at ¶ 81. Gibson and his teenaged friends then became the principal focus of the police investigation. *See id.* at ¶¶ 81–265.

### B.    BPD's Fabrication of Evidence and Initiation of the Prosecution

The subject of the second alleged call, Gibson, was 16 years old. *See id.* at ¶ 86. Lacking any basis to credit the tip, Detectives Deubell and Guadagno nevertheless took the teenager into custody and brought him downtown to be interviewed at the Homicide Bureau office. *See id.* at ¶ 83, 87. There, on January 7, they learned from Gibson that he had spent most of the evening on January 2 at the Glenny Apartments with his friends Boyd, Walker, Floyd Martin, and Tyrone Woodruff. *See id.* at ¶ 92. Gibson, in a signed, sworn statement, and in oral statements to police, said that his friends Walker and Woodruff went home in a taxicab between 11:15 and 11:30 p.m., while he and Boyd walked home shortly afterwards. *See id.* at ¶¶ 94–97.

On January 8, police interviewed Darryl Boyd, who supplied an additional, important detail. *See id.* at ¶¶ 118–22. Boyd said that, shortly after Walker and Woodruff left by taxi, other friends called for and were picked up by a second cab. *See id.* at ¶¶ 121–22. Around the same time, Boyd said that he and Gibson walked home, leaving Floyd Martin, who lived at the Glenny Apartments, behind. *See id.* at ¶ 122.

Detectives Deubell and Guadagno went immediately to the office of the Fillmore Taxicab Company to investigate the boys' story. They confirmed it. *See id.* at ¶¶ 133–45. In a P-73 report, Detective Guadagno relayed that he and Detective Deubell reviewed a company logbook showing that a taxicab had made a pickup at 11:28 p.m. at the Glenny Apartments, and a second cab had arrived shortly thereafter at 11:44 p.m. *See id.* at ¶¶ 134–37. They determined that these were the only taxis dispatched to the Glenny Apartments that night. *See id.* Thus, the police knew the boys' accounts of the two cab pickups were true, and they now knew the exact times.

During their initial investigation, the police had interviewed four witnesses who told them the time of the assault was *after* the first taxicab pickup of Woodruff and Walker. Francis Kalb told detectives that Watson and Crawford left the Golden Nugget at about 11:30 p.m. *See id.* at ¶ 39. Larry Watson said that Crawford left about midnight. *See id.* at ¶¶ 55. Crawford's neighbor, Clarence Neubecker, said that Crawford was a "fighter" and that he heard what sounded like a fight about 12 or 12:30 p.m. *See id.* at ¶¶ 56. Crawford's widow told the detectives that she heard or felt a loud noise or collision by the side door of her house about 11:30 p.m. *See id.* at ¶ 61.[2] If Walker and Woodruff were in a taxicab, or home, when the assault occurred, they could not have committed it together, as the lead prosecutor in these cases, Timothy J. Drury, conceded in his deposition. *See id.* at ¶ 427.

There is no report that the police ever interviewed the taxi drivers, which could have further confirmed the boys' innocence. *See id.* at ¶ 145. But, when the detectives interviewed the other boys, all of them confirmed the taxicab pickup of Woodruff and Walker, even though none could have possibly known what the Fillmore Taxicab Company records showed, or even that police consulted them. Woodruff and Walker, interviewed separately on January 11, after denying any knowledge of the Crawford assault, told detectives they went home in a taxicab that night together. *See id.* at ¶¶ 169, 182. Indeed, Woodruff repeated that part of his account in every subsequent statement. *See id.* at ¶¶ 200 n.213. And Floyd Martin reported the same fact to detectives when he was interviewed on January 12. *See id.* at ¶ 251.

---

[2]    The bartender, Deborah Jeffrey, subsequently told Detective Delano on January 12 that Crawford left the bar with Watson between 10:30 and 11:30 p.m., although she was not sure of the time. *See id.* at ¶¶ 13 n.21.

Despite knowing the boys were almost certainly innocent and having strong evidence against two other suspects, detectives picked up each of the boys and used coercive interrogation techniques to try and get them to turn on the others. *See id.* at ¶¶ 188–254. Ultimately, Woodruff succumbed. *See id.* at ¶¶ 205–14. While Woodruff was isolated from his family at the Homicide Bureau, and despite his continual denial of any knowledge of the crime during hours of interrogation, Detectives Hunter, Arnet, and Manista falsely told him that his friends were implicating him and that he would go to prison for the rest of his life unless he cooperated against them. *See id.* at ¶¶ 205, 207–08, 210. The detectives told him, also falsely, that an anonymous witness was implicating him in the crime. *See id.* at ¶ 209. Woodruff broke down crying. *See id.* at ¶ 211. But Homicide Chief Donovan then offered him a lifeline: if he implicated the other boys while minimizing his own involvement as a mere lookout, he would get complete immunity from prosecution. *See id.* at ¶¶ 212, 218–20. Woodruff, broken, agreed to do so. *See id.* at ¶ 213. The detectives then helped him manufacture a false story, rejecting his guesses about what to say and feeding him details to adopt in a written statement. *See id.* at ¶¶ 214–216.

Hours later, Chief Donovan and his subordinates got Woodruff to sign a sworn statement implicating himself and the others. *See id.* at ¶¶ 200–04, 214–15. The statement, in question-and-answer format, on its face appeared to be a complete, verbatim account of the questioning, but in fact it was a recreation typed by a detective after the interrogation was complete. *See id.* at ¶¶ 214–16. It omitted the tactics police used to get Woodruff to change and craft his story, including the threats, the ruses, and the promise of immunity. *See id.* at ¶¶ 214–17. It falsely asserted that he had voluntarily decided to change his story of the previous day and that he had waived his *Miranda* rights. *See id.* at ¶¶ 200–02. It falsely asserted that Woodruff's father and pastor were there the

entire time, when in fact they only arrived at the end of the ordeal to witness Woodruff sign the statement and to take him home. *See id.* at ¶¶ 203, 225.

While omitting from Woodruff's statement the truth about what caused him to change his story, two detectives prepared P-73 reports that provided contradictory, and false, explanations of his purported confession. Detective Sergeant Hunter dictated a report, also on behalf of Detectives Montondo and Arnet, claiming that Woodruff voluntarily admitted he witnessed the crime after being fed cake his mother had sent with him and being permitted to make several telephone calls to family members. *See id.* at ¶¶ 189–90. On the other hand, Detective Manista dictated a report claiming that, in the presence of Manista and Arnet, Woodruff changed his story after somehow overhearing a telephone call from "a negro female who wished to remain anonymous." *See id.* at ¶¶ 191–99. The caller purportedly claimed that Woodruff, Walker, and Gibson were responsible for the killing, gave their home addresses, and alleged that she was present at 138 Glenny and saw them divide up the money before "Toni and John Walker left in a cab." *See id.* at ¶¶ 192–94. After listening to this call, Woodruff "became very nervous and could barely raise a cup of coffee he was drinking." *See id.* at ¶¶ 197. He was asked by Manista in the presence of Arnet if he could remember anything now and was told that a person witnessed him in the hallway dividing money. *See id.* at ¶¶ 197. At 5:45 p.m., he told Manista and Arnet "Gibson was hitting him, Gibson was hitting him, I think." *See id.* at ¶¶ 199. Chief Donovan was then apprised of these events and participated in taking Woodruff's formal written statement. *See id.* at ¶¶ 200.

Woodruff, in his deposition, testified that both reports are false. There was no cake, and he was not permitted phone calls. *See id.* at ¶¶ 204–06. Nor did he change his story after just happening to overhear an anonymous call. *See id.* at ¶ 206. Of course, that story is absurd. Guadagno acknowledged that it was basic police practice to try to get an anonymous caller such

as this to identify herself and cooperate with the police as a witness. *See id.* at ¶¶ 193. No homicide detective would allow a murder suspect to listen in during this process and potentially be able to identify a caller who was demanding anonymity while accusing him of murder.

Detectives Deubell and Guadagno also threatened a second teenager, Andre Hough, a fifteen-year-old eighth grader, with arrest and prosecution until he implicated Boyd and the other boys in the murder. *See id.* at ¶¶ 148–64. Hough signed two written statements, in question-and-answer format, on January 8 and 12: the first claimed that Boyd had a lot of money on January 3 and that the boys would not let Hough come along on some unspecified outing because he might "say something"; the second claimed that, the day after the murder, Boyd flashed a lot of cash at Simpson's Store before buying merchandise and admitting to Hough that he and the other boys had committed the crime. *See id.* at ¶¶ 156, 256–57. What police did not document was that, according to Hough's own admission under cross-examination at a pretrial hearing, he initially told police he knew nothing about the crime and passed a police polygraph test but was then threatened with arrest for the murder anyway unless he cooperated. *See id.* at ¶¶ 149–55, 157–61. Only then did he change his story. *See id.* at ¶ 157. The principal ECDA prosecutor handling the Crawford case, former ADA Timothy Drury, confirmed during his deposition that Hough refused to take another polygraph after Hough changed his story. *See id.* at ¶¶ 259.

Drury has testified that he was called down to the Homicide Bureau and spoke to Woodruff for about half an hour or more on January 12. *See id.* at ¶¶ 218. Woodruff already had signed his sworn statement, witnessed by his faither and minister; Drury assumed (incorrectly, according to Woodruff) they had been there for the entire interrogation. *See id.* at ¶ 221. Drury, who acknowledged there was no basis to arrest or prosecute Woodruff for the Crawford murder, was *not* aware that police in fact had threatened Woodruff with arrest. *See id.* at ¶¶ 188, 222–24, 320.

The only circumstance of Woodruff's interrogation that Drury acknowledged being aware of was that Chief Donovan had offered Woodruff immunity, which Drury understood (also incorrectly) occurred after Woodruff already was cooperating. *See id.* at ¶¶ 219, 223. He admitted it "probably" was improper for the police to offer a suspect immunity in exchange for cooperation without the District Attorney's authorization, but he went along with it because Woodruff was an essential witness. *See id.* at ¶¶ 219–20, 231. Drury did not recall seeing the police file at this time, but he did believe he saw a few reports, including Manista's report claiming that Woodruff came clean after overhearing the anonymous phone call from the "negro female." *See id.* at ¶ 223, 239, 319. He does believe he received the police file by the time of the preliminary hearing on January 16, 1976. *See id.* at ¶ 310.

Following Woodruff's "confession" on January 12, Chief Donovan ordered the arrest of the other four boys, crediting himself and the full Homicide Squad as the arresting officers. *See id.* at ¶¶ 232–36. BPD detectives testified at their depositions that it was the practice of all homicide detectives to collaborate on every investigation, reading and becoming familiar with the prior detective work and reports in an investigation. *See id.* at ¶ 243. Donovan commenced the prosecution by signing and filing in court a sworn complaint. *See id.* at ¶¶ 233–34. This charging instrument was explicitly based upon Woodruff's January 12 statement, which Donovan attached; Hough was not mentioned. *See id.* at ¶¶ 234. The next day, based upon this complaint, the boys were arraigned and detained without bail. *See id.* at ¶¶ 23–38.

Drury has testified that probable cause for the prosecution was supplied by Woodruff's statement, and without it, there would have been no prosecution. *See id.* at ¶¶ 231. Drury testified that he did not review, and had no involvement in the preparation of, the Criminal Court complaint.

*See id.* at ¶¶ 235. Believing that Woodruff was voluntarily cooperating, Drury did not investigate then, or ever, what led him to inculpate the other boys. *See id.* at ¶¶ 223–24.

### C. Evidence Fabricated by the BPD Is Used to Continue the Prosecution and Convict Plaintiffs

At the preliminary hearing, Woodruff was the only witness to inculpate Walker, Boyd, and the others. *See id.* at ¶ 313. Before doing so, and now represented by counsel, he invoked his Fifth Amendment privilege until he was formally granted complete immunity from prosecution. *See id.* at ¶¶ 315. He testified that, after making his initial sworn statement of January 11, he voluntarily came clean in his statement of January 12 in the hope of receiving leniency. *See id.* at ¶¶ 316–17. His two signed statements were marked as exhibits and were the only police documents that were disclosed. *See id.* at ¶ 314. Guided through his direct examination by Drury and protected by Drury's objections to defense cross–examination, Woodruff did not disclose that police had promised him immunity from all prosecution before he changed his story. *See id.* at ¶ 317. He did not testify about any of the other coercive circumstances of his interrogation. *See id.* Meanwhile, he flatly denied having been arrested or threatened with arrest, and Drury did not correct this testimony. *See id.* at ¶¶ 316, 318. Woodruff falsely claimed his father and minister were there when he was questioned, which Drury also did not correct. *See id.* None of the alibi evidence involving the taxicab records and witness statements about the timing of the incident or of the third-party culpability evidence was disclosed. *See id.* at ¶¶ 310–11. Based upon Woodruff's false testimony, the court found probable cause, continued the boys' detention, and bound them over for grand jury proceedings. *See id.* at ¶ 323.

On January 15, 1976, at the request of Detectives Deubell and Guadagno, Detectives Montondo and Regan went to Simpson's Store to investigate Hough's new story. *See id.* at ¶ 261. The owner and her daughter both said that the boys came to their store regularly, but that they did

not recall them being there on January 2 or 3, let alone "flashing any large bills" or spending money. *See id.* at ¶ 262. Trying to discount the importance of these statements, Montondo wrote: "Simpson's Delicatessen is a very small store and it would be easy for the workers to over look any one, especially if they were busy." *See id.* at ¶¶ 263. Years later, at their depositions, Montondo and Regan both admitted that this statement made no sense since, if anything, the owners would be *more* likely to see a boy flash a lot of money in such a small store. *See id.* at ¶¶ 264–65.

On February 11, Detectives Guadagno and Deubell came to the ECDA's office for the grand jury presentation. Before testifying, Hough recanted, admitting that his statement that Boyd confessed to the Crawford murder was a lie. *See id* at ¶¶ 267–69. Guadagno and Deubell authored P-73 reports noting that Hough recanted, but including none of the details of what appears to have been an extended discussion. *See id.* at ¶¶ 269–70. At some point, Drury threatened Hough with prosecution for perjury, then apparently left him with the two detectives. *See id.* at ¶¶ 271. After promising Hough's mother that they would take him home, Guadagno and Delano instead informed Hough he was lying and had "better" confirm his prior story. *See id.* at ¶¶ 272–73. They further pressured Hough to add additional detail, causing Hough to say for the first time that Gibson and Boyd had gone inside the Golden Nugget and seen a man showing a lot of money. *See id.* at ¶¶ 273–74. Drury then placed Hough in the grand jury to give this account. *See id.* at ¶ 275.

Armed with Hough's revised story, the detectives immediately went to interrogate Woodruff. *See id.* at ¶ 276. Detective Deubell reported in a P-73 that he provided Hough's new statement to Woodruff and accused him of not disclosing all the events leading up to the homicide. *See id.* at ¶¶ 278. Woodruff, who Deubell reported was shaking and nervous, then agreed to revise his story to match Hough's. *See id*. at ¶¶ 277–80. Evidently unaware of how the detectives had pressured Woodruff to align his story with Hough's, Drury immediately placed Woodruff before

the grand jury to relate his revised story. *See id.* at ¶¶ 286, 291. The detectives then finally gave Hough the ride home they had promised his mother hours earlier. *See id.* at ¶ 287. They also released Woodruff, against whom no charges were pending, from their custody. *See id.*

Woodruff's signed statement of January 12 was an exhibit before the grand jury. *See id.* at ¶¶ 295. None of the circumstances of how Woodruff had been compelled to change his story were in that exhibit or were disclosed to the grand jury, nor was the evidence that Woodruff was in a taxicab when the crime occurred and therefore could not have witnessed it or that Watson and Jerome Boyd were more likely perpetrators of the crime. *See id.* at ¶¶ 295–97. This was even though Drury acknowledged in his deposition that, on the date of the grand jury presentation, he suspected Watson and Jerome Boyd of having committed the crime. *See id.* at ¶ 418.

Drury did not elicit from Hough during his grand jury testimony that he initially told police he knew nothing about the Crawford incident, passed a polygraph, was threatened with arrest and prosecution before he gave his signed statements of January 8 and 12, and then refused to take a polygraph about his new, coerced story. *See id.* at ¶¶ 294, 296. City Defendants contend that these circumstances "were made known [to] ADA Drury," City Br. at 16, but do not acknowledge in the text what they bury in a footnote: Drury only learned this when Hough was cross-examined by the defense at a *Wade* hearing held many months after Plaintiffs were indicted. *See* Counterstatement at ¶¶ 152–59. And City Defendants do not contend that Drury was aware of Hough's recantation on February 11 or how detectives coerced him to withdraw his recantation. *See* Dkt. 165-37, City Defendants' Statement of Material Facts ("City Statement") ¶¶ 136–47. Drury represented at the Gibson trial in January 1977 that he had only "recently" received the two P-73 reports about the February 11 BPD handling of Woodruff and Hough. *See* Counterstatement at ¶¶ 291.

14

Woodruff and Hough each ultimately testified at Boyd and Walker's trials. *See id.* at ¶¶ 351, 374. Hough recanted again immediately following Boyd's trial and provided a declaration under oath recanting again in 1982, before he passed away in 1989. *See id.* at ¶ 509–12. Woodruff recanted in 1985 and, since then, has consistently asserted that he and his friends had nothing to do with the crime and that he was coerced into giving a false confession by the police. *See id.* at ¶¶ 513-15.

### D.      ECDA Prosecutors Fail to Disclose *Brady* Material

Drury was in charge of pretrial discovery in all four boys' criminal cases, handled Gibson and Boyd's trials, and documented the limited disclosures he made to the defense pursuant to Criminal Procedure Law Sect. 240.20 and the *Rosario* rule. *See id.* at ¶¶ 324–354, 818. The defense lawyers requested in their pretrial motions, and the Court repeatedly ordered, prompt *Brady* disclosure, but Drury testified he disclosed no *Brady* material at any time. *See id.* at ¶¶ 324–25, 346, 818. Drury testified at his deposition that, during pretrial hearings and at Boyd's trial, pursuant to his general practice, he documented on the record, by marking as exhibits, all *Rosario* material and other exhibits, including photographs, he disclosed to the defense. *See id.* at ¶¶ 333, 354. He has no record or memory of disclosing anything else. *See id.* at ¶¶ 328, 323, 340, 348. Drury testified that whatever he decided to disclose, or not disclose, under *Brady* was pursuant to ECDA policy and practice. *See id.* at ¶¶ 421, 818–21. ADA David Henry, the lead prosecutor at Walker and Martin's trials, confirmed that Drury handled all pretrial discovery and Henry did not disclose anything else. *See id.* at ¶ 366. Henry, too, testified that he documented on the trial record all *Rosario* and other disclosures he made. *See id.* at ¶¶ 354, 369. He recalled no *Brady* disclosures and testified that his views of what constituted *Brady* material were consistent with the policies and practices of the ECDA. *See id.* at ¶¶ 810, 813–18.

Based upon the exhibits marked at trial and Drury and Henry's testimony about the prosecutors' practices, a jury could reasonably find that the prosecutors did not disclose, to either Boyd or Walker or their counsel, (i) the third-party culpability evidence, (ii) the witness statements and taxicab records showing that Woodruff and Walker were in a taxi or already home when the crime occurred, (iii) the January 12 and February 11 reports concerning the BPD interrogations of Woodruff and Hough, (iv) the January 15 report concerning the Simpson's Store interviews, (v) Hough's refusal to take a second polygraph, and (vi) many of the unrecorded circumstances of Woodruff's interrogation, including the detectives' refusal to accept his repeated denials, his crying, the absence of any adult family member or friend during his interrogation, the feeding to him of the details of the story, the timing of the police immunity offer before he changed his story, and Drury's role in ratifying this offer on January 12. *See id.* at ¶¶ 388–432. Nor did the prosecution correct Woodruff's false testimony that the report was a verbatim account of his interview. *See id.* at ¶ 361; *see also* ¶¶ at 433–45.

James McLeod, a retired Buffalo City Court judge who in 1976 was a defense lawyer in private practice, represented the fourth of the boys to be tried, Floyd Martin. *See id.* at ¶ 91. McLeod obtained a full acquittal for Martin. *See id.* at ¶ 490. There was a critical difference in the discovery McLeod obtained from the ECDA and what the attorneys representing Walker and Boyd received. Because he made a specific request for all the crime scene photographs, McLeod has testified, he alone received the defense-favorable crime scene photograph showing footprints in the direction of Watson's property and testified to its central role in his successful argument to the jury that Watson was likely the true killer. *See id.* at ¶¶ 493–97. Significantly, McLeod reviewed the other *Brady* material Plaintiffs contend was not disclosed and testified that the prosecutors did not disclose it to him either. *See id.* at ¶¶ 408, 419, 422, 426, 432, 434, 439, 444, 450 .

### E. At Long Last, Plaintiffs' Convictions Are Vacated in 2021 and the Case Is Dismissed

As noted above, the crime scene photograph was the basis for Boyd and Walker's successful 2021 440 motion to overturn their convictions. *See id.* at ¶¶ 516–17. Justice Christopher J. Burns, after an evidentiary hearing at which Drury and McLeod testified, vacated Plaintiffs' convictions because of the non-disclosure of the photograph. *See id.* . Then-District Attorney John Flynn elected not to pursue an appeal or re-trial, recognizing in a public statement that the evidence presented at the trials was "weak." *See id.* at ¶¶ 519–20. Upon the dismissal of Boyd and Walker's convictions, the City, through the unanimous proclamation of all nine members of the Buffalo Common Council, recognized that Boyd and Walker "were profiled, wrongly blamed, falsely accused, and then indicted prosecuted, and convicted, for a brutal robbery and murder they did not commit," and expressed "jubilation upon the[ir] exoneration[.]" *See id.* at ¶¶ 521–22.

Boyd served 20 years in prison, through 1996, but thereafter saw his parole violated on four occasions for technical alleged violations, each time being reimprisoned for two years. *See id.* at ¶¶ 504–06. Walker, while still imprisoned, was granted work release in 1992, then was returned to prison despite an excellent work record over four and a haf years, because of a change in policy concerning release of convicted murderers. *See id.* at ¶ 507. He was restored to parole in 1998 and remained under intense supervision until his parole was terminated in 2015. *See id.* at ¶ 508. Darryl Boyd, a 62-year-old grandfather, remained on parole supervision under a 9 p.m. curfew until his conviction was vacated in 2021. *See id.* at ¶ 506.

## ARGUMENT

As Defendants concede, summary judgment is improper unless a party can show that there is no genuine dispute as to any material fact on a claim, and it is therefore entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). All evidence is to be construed in the manner most

favorable to the non-moving parties, here Boyd and Walker. *See*, *e.g.*, *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 148 (2d Cir. 2021). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).

## I.  THE CITY DEFENDANTS' PROXIMATE CAUSE DEFENSE TO EVIDENCE FABRICATION AND MALICIOUS PROSECUTION PRESENTS JURY ISSUES

### A.  Plaintiffs Are Entitled to a Jury Trial on Their Evidence Fabrication Claim

The City Defendants do not dispute that Plaintiffs can establish the elements of their evidence fabrication claim but argue only that they are entitled to judgment as a matter of law because ADA Drury exercised "independent" judgment in utilizing the evidence they had fabricated. City Br. at 33. This proximate causation defense, which ignores the relevant case law and facts in the record, is wrong. At the very least, there are issues of fact for trial.

#### 1.  Applicable Law

The elements of an evidence fabrication claim under § 1983 are well established in the Second Circuit: (i) that an investigating official, (ii) fabricated information, (iii) likely to influence a jury's verdict, (iv) forwarded the information to a prosecutor, and (v) the plaintiff suffered a deprivation of life, liberty, or property as a result. *See Barnes v. City of New York*, 68 F.4th 123, 128 (2d Cir. 2023) (citing cases). "Evidence" can consist not just of a false witness account, but also of a document that contains false information or that is materially misleading by omission. *Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021), citing *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015). A deprivation of liberty occurs merely by the institution of a prosecution, regardless of whether the plaintiff is detained, although pretrial detention of course also satisfies this element. *See Barnes*, 68 F.4th at 129–30 (citing *Ashley*, 992 F.3d at 139).

The constitutional protection against police fabrication of evidence is independent of the due process claim of knowing use of false evidence at trial, though such claims may coincide. *See Frost v. New York City Police Dep't,* 980 F.3d 231, 249–50 (2d Cir. 2020). A pre-trial evidence fabrication claim may be brought regardless of whether there is independent probable cause, *see id.* at 248, regardless of the plaintiff's possible guilt, *see Smalls v. Collins,* 10 F.4th 117, 133 (2d Cir. 2021), and regardless of whether the evidence is introduced at trial, *Barnes*, 68 F.4th at 130, or affects the trial's outcome, *Frost*, 980 F.3d at 250–51, although of course the further use of such evidence at trial provides an additional basis for liability, *see Barnes*, 68 F.4th at 130; *Frost,* 980 F.3d at 250; *Smalls,* 10 F.4th at 132 n. 12.

Under the express language of § 1983, an official may be liable for depriving an individual of a federal constitutional right or for causing such a deprivation. Under basic tort principles, such wrongdoing need not be an exclusive cause, just a substantial one. *See Doe v. N.Y.C., Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981); *see also Lippoldt v. Cole*, 468 F.3d 1204, 1219 (10th Cir. 2006) (concurrent cause).

Under the common tort principles that are the "starting point" for construing § 1983, *see Heck v. Humphrey*, 512 U.S. 477, 483 (1994), "an intervening cause *interrupts* the natural sequence of events, *turns aside* their course, [or] *prevents* the natural and probable result of the original act or omission[.]" *Becker v. Poling Transp. Corp.* 356 F.3d 381, 392 (2d Cir. 2004) (emphasis added) (quoting *Sheehan v. City of New York,* 40 N.Y.2d 496, 503 (1976)). Such a defense does not apply where a third party foreseeably continues or acquiesces in a course of conduct that the wrongdoer has set in motion, *Kerman v. City of New York,* 374 F.3d 93, 126–27 (2d Cir. 2004) (citing cases), but only where the subsequent decisionmaker would have acted "in the absence of the antecedent misconduct." *Higazy v. Templeton,* 505 F.3d 161, 177 (2d Cir. 2007)

(quoting *Zahrey v. Coffey,* 221 F.3d 342, 352 n.8 (2d Cir. 2000)); *accord, Cameron v. City of New York*, 598 F.3d 50, 63–64 (2d Cir. 2010).

Where a case is based upon evidence fabricated by the police, the prosecutor who relies on such evidence does not act "in the absence of the antecedent misconduct" but because of it. He allows the original wrongdoer to accomplish exactly what he intended.

A defendant who fabricates evidence "cannot hide behind the decision of the DA to prosecute." *Blake v. Race,* 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007). It would be "bizarre" to find that an investigator who "foists fabricated evidence on an unsuspecting ADA … can be liable … , but that if he acts in concert with an equally culpable ADA … he cannot." *Lopez v. City of New York*, 105 F. Supp. 3d 242, 250 (E.D.N.Y. 2015) (rejecting application of a proximate cause defense where a police officer "acts in concert with an equally culpable ADA … [who knows] the fabricated evidence to be so"); *see also Dory v. Ryan,* 25 F.3d 81, 84 (2d Cir. 1994) (on pet. for reh.), (police officer liable for conspiring with prosecutor to fabricate evidence even though the prosecutor has absolute immunity) (citing *San Filippo v. U.S. Trust Co. of N.Y., Inc.*, 737 F.2d 246 (2d Cir. 1984)).

City Defendants rely on *Townes v. City of New York,* 176 F.3d 138, 147 (2d Cir. 1999), but there the Court recognized that there is no superseding cause defense where a judge or prosecutor (as in Plaintiffs' case) is misled or pressured to rely upon manufactured evidence. *See, e.g.*, *Zahrey,* 221 F.3d at 351–52 (construing *Townes*). Defendants' reliance on *Wray v. City of New York,* 490 F.3d 189 (2d Cir. 2007), is similarly misplaced. There, the Second Circuit held it was not reasonably foreseeable to the police defendants that a judge would allow identification evidence they obtained to be introduced at trial if the police tactics were unlawful. However, the Court later limited *Wray* to its facts, holding that it is a jury question whether a court or prosecutor's reliance

on a coerced confession was reasonably foreseeable. *Higazy,* 505 F.3d at 177. Of course, in Plaintiffs' case, reliance on Woodruff's and Hough's coerced statements is what is at issue. Indeed, it is well established that causation is almost always a jury question. *See Kerman*, 374 F.3d at 127; *Redd v. N.Y.S. Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012). *Bermudez v. City of New York*, 790 F.3d 368 (2d Cir. 2015), which the City Defendants cite in support of their motion to dismiss Plaintiffs' malicious prosecution claim but ignore regarding evidence fabrication, is on point. There, the Circuit Court *rejected* a proximate cause defense to evidence fabrication. The Court did so because (as in Plaintiffs' case) the prosecutor was not present when the witness in question was interrogated and, even though the witness stuck to the same story, that "very well" may have resulted from the officers' "suggestive presentation … or because of more overt coercion." *Id.* at 375–76.

### 2. Application to the Facts

In this case, the City Defendants appear to contend that ADA Drury's actions were an "independent" cause of harm because he became aware at some point of the circumstances of Woodruff's interrogation. City Br. at 33. This argument is wrong for many reasons. *First*, Drury testified that the BPD filed the false Criminal Court complaint and caused Plaintiffs to be deprived of their liberty without his prior review or knowledge of the underlying circumstances. *Second*, there is no evidence that Drury, before using Woodruff's false story at the arraignment, the preliminary hearing, the grand jury, and at Boyd's trial knew, as the police did, that it was false. *Third*, even if it is assumed police did not realize Woodruff's January 12 story was false, they manufactured a false or misleading signed statement, and other reports, which concealed the true circumstances of his interrogation and thus misled all subsequent factfinders, including Drury, concerning the new story's lack of reliability. *Fourth*, the City Defendants ignore a great deal of significant false evidence, beyond Woodruff's signed statement of January 12, which the

Individual Defendants manufactured and handed to Drury for use against Plaintiffs and which a jury could infer was a substantial cause of the continuation of the prosecution. *Fifth,* assuming *arguendo* Drury had full knowledge of the falsity of the testimony, his joining the detectives in their unlawful scheme to use it against Plaintiffs does not get them off the hook.

Starting with the filing of the criminal complaint, the record shows that the detectives, led by Chief Donovan, jointly arrested Gibson, Boyd, Walker, and Martin, and then commenced their prosecution based upon a complaint they drafted, to which Woodruff's false signed statement was attached, without any involvement of Drury. *See* N.Y. Crim. Proc. Law § 1.20(16) ("A criminal action … commences with the filing of an accusatory instrument against a defendant in a criminal court[.]"). The complaint alleged that the four boys participated in the robbery and killing of Crawford, and that it occurred about 10:30 p.m. on January 2, 1976. *See* Counterstatement at ¶ 233. Plaintiffs were arraigned on this Complaint, and the court, in reliance on it, then detained them without bail. *See id.* at ¶ 238. Their deprivation of liberty resulted from the police filing, not any independent action of Drury's. If the filing was false, the police are liable for evidence fabrication, and it was.

Woodruff, at his deposition, testified that his January 12 statement was false and, from the circumstances, a jury could reasonably infer that the police knew it. *See id.* ¶¶ 204–16. Woodruff testified that BPD detectives coerced him into adopting it over his protestations over many hours that he knew nothing about the crime. *See id.* Indeed, the detectives coerced Woodruff to claim he saw the other four boys rob and kill Crawford even though they knew that Woodruff and Walker were on their way home in a taxicab before Crawford left the bar or was assaulted. *See id.* at ¶¶ 133–44. Detectives were also aware of considerable evidence pointing to two other individuals, Larry Watson and Jerome Boyd, as more likely suspects. *See id.* at ¶¶ at 20–80. And they knew

the crime scene evidence did not support the story they caused Woodruff to fabricate that the boys beat Crawford at the foot of his driveway and then dragged him through the snow to the side of his house. *See id.* at ¶¶ 26–30.

Even if the detectives did not subjectively believe Woodruff's coerced story was false, they prepared false documents intended to give the false impression that he volunteered his new statement and that it was reliable when the opposite in fact was true. *See id.* at ¶¶ 189–204. Then they handed those documents off to Drury, who relied on them throughout the prosecution. *See id.* at ¶¶ 221–24, 231. Woodruff's signed statement, which detectives typed for him and had him sign under oath, and which was attached to the complaint, used a question-and-answer format as if it was a complete, verbatim transcript typed up in real time as they questioned Woodruff. *See id.* at ¶ 234. This gave the statement an appearance of completeness, accuracy, and reliability that was false. Woodruff testified at his deposition that police interrogated him for many hours and typed out the statement afterwards; it was not a verbatim account at all. *See id.* at ¶¶ 213–17.

Woodruff further testified that most of the specific statements in it were untrue, while the coercive circumstances used to bring about his new story were omitted. *See id.* at ¶¶ 200–16. These included: (i) Woodruff was interrogated for many hours, (ii) he repeatedly told the detectives he had no knowledge of the crime, (iii) the detectives repeatedly accused him of lying and refused to accept his truthful answers, (iv) Woodruff's father and minister only arrived at the end to "witness" his signature, (v) police showed him photos of the boys they were investigating to identify, (vi) police told him he was under arrest for the murder, lied to him that he had been accused by other witnesses, and lied to him that if he did not cooperate, one of the other boys would and he would go to prison for life, (vii) police told him all he had to do was implicate himself minimally so long as he implicated the others, (viii) he was frightened and crying, (ix) police offered him the

lifeline of complete immunity to induce him to change his story, and (x) after he agreed to "cooperate," the detectives rejected his guesses about the circumstances of the crime and fed him "facts" to incorporate into his statement. *See id*.

The Individual Defendants are further liable because, after the BPD caused Plaintiffs to be detained based on Woodruff's false statement, it was reasonably foreseeable that prosecutors would continue the harm by utilizing the same evidence. This is what in fact occurred. Woodruff's statement was marked as an exhibit at the preliminary hearing, in the grand jury, and at each Plaintiff's trial. *See id.* at ¶¶ 234, 284, 314, 355. Indeed, the entire prosecution was based upon Woodruff's statement and the testimony he gave based upon it.

The City Defendants fail to proffer facts—let alone undisputed facts—showing that prosecutors were aware that Woodruff's underlying story of January 12 and his signed statement purporting to memorialize that story were false or materially misleading. Drury spoke to Woodruff briefly on January 12, and on many occasions thereafter, but there is no evidence that Drury concluded that Woodruff's story or statement was false but proceeded with the prosecution anyway. Woodruff testified that he was afraid to disclose to Drury that the statement police had forced him to sign was false. *See id.* at ¶¶ 226. Not only were the detectives who coerced him present on January 12 when Drury briefly spoke with Woodruff and on later occasions, *see id.* at ¶¶ 218, 276–77, but as Drury later elicited, Woodruff had no immunity for perjury, Drury admittedly threatened Hough with perjury if he persisted in recanting, *see id.* at ¶ 271, and no doubt Woodruff had the same fear.

More specifically, Drury claims he did not know, when the prosecution commenced, about the evidence showing that Woodruff was riding home in a taxi when the crime occurred. *See id.* ¶¶ 223–24, 239. And while he presumably reviewed the P-73 report about this at some subsequent

point, the City Defendants fail to prove when. More importantly, they fail to prove that Drury, who was not present for Woodruff's interrogation, ever learned most of the coercive circumstances that brought about Woodruff's statement and created a high likelihood, together with the taxicab evidence, that it was false. Indeed, the *only* one of the coercive circumstances that City Defendants can show Drury knew is that police offered Woodruff immunity. *See id.* ¶¶ 219. But Drury testified at his deposition that he did *not* know that police told Woodruff that he was arrested and would be prosecuted unless he cooperated. *See id.* ¶ at 222. Quite to the contrary, he erroneously believed Woodruff was cooperative before he was offered immunity. *See id.* at ¶ 223.

This was not the only way in which Drury was affirmatively misled by the detectives. The BPD also led Drury to believe, mistakenly, that, contrary to Woodruff's signed statement, when Woodruff agreed to cooperate, his father and minister were present. *See id.* ¶¶ 221. Drury testified that he would have considered it significant to Woodruff's credibility that the police fed him information on the suspects they wanted to implicate, but Drury did not know that happened either. *See id.* ¶ 214. Drury considered it significant to know why Woodruff changed his story, but all he knew about that, at least as of the date of the preliminary hearing, was the *false* information contained in Detective Manista's January 12th P-73: that Woodruff had overheard an anonymous caller accuse him. *See id.* at ¶¶ 223, 319. Drury *never* learned that Manista's report was false; to the contrary, he believed that such interrogation tactics were normal for the BPD. *See id.* ¶ at 671.

Moreover, the City Defendants' motion does not grapple with the proof that Woodruff's January 12 statement was not the only false or misleading evidence that the Individual Defendants manufactured and prosecutors relied upon. The other such evidence includes the following:

> (1) The two contradictory January 12 P-73 reports by Detectives Hunter and Manista purporting to document the events that led Woodruff to change his story. *See id.* at 189–99. That both reports ultimately were disclosed to Drury does not help the City

Defendants because Drury testified that he relied on the Manista report not knowing that both reports were false. *See id.* ¶¶ 319.

(2) A January 3, 1976, P-73 report by Sergeant Dove in which he asserted, consistent with his later testimony, that there were no footprints in Crawford's backyard leading towards Watson's house, *see id.* ¶¶ 27, when, according to McLeod, there was a police photograph documenting such footprints, *see id.*

(3) The omission from the BPD record that the forensic evidence did not support Woodruff's claim that the boys assaulted Crawford at the bottom of his snow-covered driveway and dragged him to the side door of his house. *See id.* at ¶¶ 25–30.

(4) Boyd's January 8 statement and a P-73 report claiming that Boyd repeatedly changed his story, implying consciousness of guilt. *See id.* ¶¶ 123–30. Boyd testified that he was coerced and tricked into signing his written statement and that both statements were false. *See id.*

(5) A January 11 P-73 report claiming (a) that Walker had made false statements to the police, *see id.* at ¶¶ 176–77, which Walker testified was false, *see id.* at ¶ 172, and which, together with Walker's signed statement omitted that Walker was physically threatened, *id.* at ¶¶ 173–74.

(6) A January 12 P-73 report claiming that Walker was uncooperative when in fact he answered detectives' questions and explained his innocence, and which omitted that the detectives threatened him with physical harm. *See id.* ¶¶ 174–76.

(7) Woodruff's February 11 statement, recorded in P-73 reports, and his grand jury testimony, alleging that Gibson and Boyd went into the Golden Nugget to scout a victim and saw Crawford with a lot of money, which police coerced him to adopt after they obtained a similar story from Hough. *See id.* ¶¶ 277–88. Drury represented to the court almost a year after Plaintiffs were indicted that he had *just* received these reports. *See id.* ¶¶ 291.

(8) Hough's two sworn statements, in question-and-answer format, dated January 8 and 12, implicating Boyd and the other boys, which falsely purported to be his complete, verbatim statements. These police-prepared statements omitted that Hough initially told detectives that he had no information about the homicide, "passed" a polygraph examination, but was then threatened with arrest and prosecution unless he implicated Boyd and the other suspects. *See id.* ¶¶ 146–61. The City Defendants cite no evidence that Drury was aware of how Hough had been coerced before Hough himself revealed it at the *Wade* hearing.

(9) Hough February 11 statement in which, after he recanted, detectives pressured him to withdraw his recantation and adopt a new, more detailed story that the boys went into the Golden Nugget and saw Crawford flash a lot of money. *See id.* ¶¶ 267–75. This was the false story that Hough then testified to in the grand jury, leading to Plaintiffs'

indictment. *See id.* ¶¶ 275. Again, Drury told the court at Gibson's trial that he had just received the police reports which reveal the apparent police coercion. The City Defendants do not claim, and cite no evidence to support, that Drury was aware of the coercion of Hough (and Woodruff) on February 11.

As for the responsibility of each Individual Defendant for the fabricated evidence, only Detectives Montondo, Grabowski, and Arnet contend that the evidence is insufficient to establish their individual liability. *See* City Br. at 35–36. Plaintiffs consent to the dismissal of claims against Detective Grabowski. However, with respect to Detectives Montondo and Arnet, a jury may reasonably find that these detectives acted in concert with the other detectives to initiate and cause the continuation of Plaintiffs' prosecution based upon false evidence.

To begin, the roles of the different homicide detectives cannot be so easily disentangled. The arrest card for both Boyd and Walker lists "Leo J. Donovan and Squad" as the arresting officers. *See* Counterstatement at ¶ 240. At a pre-trial hearing, Detective Hunter testified that Chief Donovan was "in charge of every case and everything in every case." *See id.* at ¶ 240. Testifying as a representative of the City, former Detective Regan confirmed that when an arrest card said, "Leo J. Donovan and squad," that meant the entire squad was being credited with the arrest. *See id.* at ¶ 242. And at their depositions, Montondo, Guadagno, and Regan all confirmed that, in 1976, homicide detectives worked jointly on investigations and, as a matter of practice, each detective reviewed the entire case file prior to taking investigative steps. *See id.* at ¶¶ 243. Given the BPD's collective approach to homicide investigations, the BPD Homicide Bureau was jointly responsible for the wrongful actions of all detectives in this case.

Even if the Individual Defendants' coordinated actions and collective status as arresting officers do not suffice to establish liability, the additional evidence of Montondo and Arnet's individual actions suffice to create a jury question. With respect to Arnet, the day after the homicide, Arnet, together with Detective Sergeant Hunter, interviewed numerous witnesses,

including the victim's wife, went to the morgue, and vouchered the victim's belongings. *See id.* at ¶¶ 20 n.29. Arnet, a jury could infer, knew that keys were found near Crawford's body at the hospital, but failed to voucher or investigate them, even though Watson's missing keys, together with his other actions, made him a suspect. *See id.* at ¶¶ 46–50.

Arnet and Montondo were both fully involved in fabricating evidence against Walker on January 11. On that day, the two detectives brought in Walker and Woodruff for questioning. *See id.* at ¶¶ 166, 180. Montondo dictated a report, also submitted on behalf of Arnet, which claimed that in "verbal conversations with both Woodruff and Walker they made several different statements than they did in the written statement," and accused them of lying, which Walker and Woodruff have testified is false. *See id.* at ¶¶ 176, 183. Arnet and Montondo, a jury could infer, were both aware of the taxicab evidence and witness statements establishing that, in fact, the two boys' accounts that they left the Glenny Apartments by taxi and knew nothing about any murder were true. *See id.* at ¶¶ 133–45. Despite acknowledging that he and Arnet interviewed Walker and Woodruff and obtained oral statements from them that allegedly differed from their written statements, Montondo typed the two boys' written statements in a question-and-answer format, which falsely implied these were their complete statements, and never indicated anywhere what the purportedly inconsistent statements were, let alone that there had been a course of questioning before any statements were typed. *See id.* at ¶¶ 176–77, 182–83.

On January 12, Montondo, as part of the concerted effort to pick up all the boys on the same day and get them to falsely implicate each other, *see id.* at ¶¶ 246–53, participated in arresting and interrogating Floyd Martin, during which Martin corroborated the other boys' accounts that Walker and Woodruff went home by cab while Boyd and Gibson walked, *see id.* at ¶¶ 250–51. Consistent with the modus operandi of the other detectives, Montondo claimed Martin lied but did

not specify how, *see id.* at ¶¶ 252–53, and booked Martin on the false murder charge, *see id.* at ¶¶ 246–48. Meanwhile, Arnet went with Hunter to arrest Woodruff and subject him to the second interrogation which, in Arnet's presence, caused him to fabricate a new story and sign a false written statement. *See id.* at ¶¶ 185–216. According to the report that Hunter dictated on behalf of himself, Arnet, and Montondo, these detectives were present when Woodruff agreed to cooperate after eating Devil's food cake and making calls to his family. *See id.* at ¶¶ 189–90. According to Detective Manista's P-73 report, Arnet was also present when Woodruff was allegedly convinced to cooperate after hearing an anonymous caller implicate him. *See id.* at ¶¶ 191–99. Woodruff has testified that both reports were false. *See id.* at ¶¶ 204–16. Arnet also went with Hunter to arrest Darryn Gibson and remained in the car while Hunter arrested Boyd. *See id.* at ¶¶ 246. Arnet and Montondo then personally escorted Boyd at police headquarters to be formally booked on the false charges and then took him to the cell block to be held pending arraignment. *See id.* at ¶¶ 232 n.246.

Detective Montondo further showed his bad faith by dictating the P-73 report on January 15 falsely claiming that the reason Simpson Store employees did not see Boyd flashing cash was because it was "a very small store and it would be easy for the workers to over look [sic] any one, especially if they were busy." *See id.* at ¶¶ 261–65. Montondo, at his deposition, admitted this statement made no sense. *See id.* at ¶ 64.

In sum, the evidence, and all reasonable inferences therefrom, are sufficient to present Plaintiffs' claims against Montondo and Arnet to the jury.

### B. The City Defendants' Arguments for Summary Judgment on Plaintiffs' Malicious Prosecution Claims Have the Same Infirmity as their Evidence Fabrication Arguments

To prove malicious prosecution under both § 1983 and New York law, Plaintiffs must show (1) the initiation or continuation of a criminal proceeding against them; (2) termination of the proceeding in their favor; (3) lack of probable cause for commencing the proceeding; and (4) actual

malice as a motivation for Defendants' actions. *See Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 198 (2d Cir. 2014); *see also Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995). "A lack of probable cause generally creates an inference of malice." *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) (citations omitted). The City Defendants dispute the third element, arguing that the ECDA somehow had probable cause to indict Plaintiffs independent of the Individual Defendants' actions in fabricating the evidence because Drury personally interviewed Woodruff. In addition, Montondo claims he is entitled to summary judgment because there's "no evidence … [he] caused or contributed to Plaintiffs' indictment in any way." City Br. at 32.

In a malicious prosecution action, probable cause means "probable cause to believe that [the prosecution] could succeed." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). While an indictment by a grand jury creates a presumption of probable cause, the presumption may be rebutted "by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Manganiello*, 612 F.3d at 162 (citing *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983))). "[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause." *Id*. at 161 (quoting *Colon*, 60 N.Y.2d at 82). So may promoting a witness to a prosecutor "with no concern whatever for whether [the witness's] statements were truthful," "ignor[ing] evidence that was inconsistent with [a detective's] belief that [the suspect] was guilty," or failing to inform a prosecutor of exculpatory or impeachment evidence that undercuts a witness's statement or a police theory of guilt. *Id*. at 162–63.

The initiation element requires that the defendant advise, importune, or encourage the authorities to act, including filing false charges or preparing false evidence intending or expecting

that it would be relied upon by a prosecutor. *Id.* at 163; *see also Dufort v. City of New York*, 874 F.3d 338, 353 (2d Cir. 2017) (initiation element met with evidence that police officers "forwarded statements to a prosecutor without sharing that the statements were suspect"). Police officers who collaborate on an investigation may share collective responsibility for initiating, or causing the initiation, of a wrongful prosecution. *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).

"[G]enerally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior." *Cameron*, 598 F.3d at 63; *see also Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 365 (W.D.N.Y. 2021) (Wolford, C.J.) ("[T]he prosecutors cannot serve as a superseding cause where they relied on evidence fabricated by the defendant.").

Except with respect to Montondo, the City Defendants do not dispute that Boyd and Walker have sufficient evidence to reach a jury on the various elements of malicious prosecution. The City Defendants initiated the prosecution; their purported "probable cause," a jury could find, was fabricated or unreliable; they acted with malice by relying on evidence they had falsified or knew was unreliable, and by failing to investigate exculpatory leads as well as other suspects; they caused Plaintiffs to be deprived of their liberty; and the prosecution was favorably terminated. *See* Counterstatement ¶ 520. However, the City Defendants argue they may escape liability because ADA Drury interviewed Woodruff himself, but they are plainly wrong.

As shown by the above, the entire case the BPD handed to Drury was permeated with fraud, or so a jury could find, but the BPD did not reveal the fraud to Drury. Woodruff's essential story, as memorialized in his sworn statement, was false or, based upon the way the police elicited it, totally unreliable. *See* Counterstatement at ¶¶ 185–217. But neither Woodruff, nor the police,

revealed to Drury that Woodruff's story was false or enough of the circumstances of how police obtained it to provide Drury a full and independent basis to evaluate its reliability. *See id.* at ¶¶ 216–26. Indeed, the City Defendants appear to admit that Drury was unaware, when Woodruff testified in the grand jury, that the detectives just minutes before had fed a visibly frightened Woodruff a new story that they had coerced from Hough. City Statement at ¶¶ 136–45. Drury claimed in January 1977 that he had just recently received the detectives' reports of this episode. *See* Counterstatement at ¶ 291. This was eleven months after Drury put Woodruff before the grand jury not knowing how detectives had just coerced him to conform his testimony to Hough's. *See id.* at ¶¶ 286, 295. Overall, the actions of the BPD in coercing Woodruff on at least two occasions to manufacture a false story and then swear under oath to its truthfulness made Woodruff afraid to reveal to Drury that he had lied, both because of what the police could do to him and because he would open himself up to a perjury prosecution. *See id.* at ¶¶ 236. Drury never learned the truth precisely because of the misconduct of the BPD. At every stage, Drury's decision to proceed with the prosecution was not independent of the BPD but rather the direct and foreseeable result of its misconduct.

Indeed, the very case on which City Defendants rely betrays the emptiness of their position. In *Bermudez v. City of New York*, 790 F.3d 368, 375–76 (2d Cir. 2015), the Second Circuit noted that, "Once the witnesses had adopted a story … they might very well have decided to stick with that … and for that reason have misinformed the ADA when he subsequently questioned them." That, of course, is precisely what happened with Woodruff. The reason the Court upheld summary judgment for defendants on the malicious prosecution claim is that the prosecutor interviewed two independent witnesses and, despite knowing about issues with their initial out-of-court

identifications, derived probable cause from them regardless of how police had coerced the third witness. *Id.*

That is not the case here, where the only other witness to inculpate the Plaintiffs, Hough, provided much more limited evidence than Woodruff and *also* was coerced in ways that were not revealed to Drury before Drury used him in the grand jury. *See* Counterstatement at ¶¶ 149–55, 294. The only other case that City Defendants cite is the pending report and recommendation in *Epps v. City of Buffalo*, No. 19-cv-281-LJV-LGF (W.D.N.Y. June 3, 2024). City Br. at 31. The *Epps* recommendation by the magistrate judge was not based on superseding cause because a prosecutor personally interviewed a police-coerced witness, but primarily on a finding that there was little or no police misconduct in the first place. *See* Dkt. 165-7 at 45–53.

Finally, the City Defendants' position that Plaintiffs lack evidence to hold Montondo liable for malicious prosecution is wrong for the same reasons it is wrong regarding evidence fabrication, *supra* at 28–29. There is no question a jury could find that he participated in the fabrication of evidence and it was reasonably foreseeable to him that such evidence would be used to initiate or continue the Plaintiffs' prosecution, and it in fact was.

## C. The City is Liable for Malicious Prosecution Under *Respondent Superior*

City Defendants argue that Plaintiffs failed to plead *respondeat superior* liability for their New York malicious prosecution claim, *see* City Br. 39, but this is simply incorrect. Plaintiffs' Complaints allege *respondeat superior* liability. *See* Boyd Compl. at ¶ 447 ("Under the principle of respondeat superior, the Defendant City is liable for the malicious prosecution of Mr. Boyd by Individual Defendants and other municipal employees, all of whom were acting within the scope of their employment, and for Mr. Boyd's resultant damages."); Walker Compl. at ¶ 441 (same as to Walker). New York law is clear that a municipality can be held liable for the actions of its

employees in a malicious prosecution action. *See Rodick v. City of Schenectady*, 1 F.3d 1341, 1348 (2d Cir. 1993); *Colon v. City of Rochester*, 419 F. Supp. 3d 586, 603 (W.D.N.Y. 2019).

## II. THE CITY DOES NOT CHALLENGE PLAINTIFFS' *MONELL* CLAIM BASED UPON UNLAWFUL INTERROGATION PRACTICES, JUST THEIR *BRADY* CLAIM, AND AS TO THAT CLAIM IT FAILS TO SHOW THAT PLAINTIFFS LACK A VIABLE CASE

Count VI seeks to hold the City liable for the BPD's misconduct pursuant to § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658, 694–95 (1978). "To hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (cleaned up). Actionable policies and customs "may be pronounced or tacit and reflected in either action or inaction." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). Municipalities are liable not only for their formal enactments, *see Monell*, 436 U.S. at 690, but also for the acts of their policymaking officials, *see Connick v. Thompson*, 563 U.S. 51, 61 (2011), the widespread practices of their non-policymaking employees, *see Lucente*, 980 F.3d at 298, and their failures to adequately train, supervise, or discipline their employees, where such failures rise to the level of deliberate indifference, *see Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992). A general policy of deliberate indifference to employee misconduct may create a culture in which non-policymaking employees feel free to violate constitutional rights with impunity, *see Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012); *see infra* at 47–50 (citing additional case law).

Before detailing the underlying constitutional violations at issue, and the various *Monell* theories supporting municipal liability, Plaintiffs note that the City's *Monell* argument is limited to the contention that the City maintained a practice of *Brady* compliance and followed it in

Plaintiffs' cases. City Br. at 36–38. The City does not dispute, for purposes of summary judgment, that the BPD used fabricated evidence to maliciously prosecute Plaintiffs, *see supra* at 18, and thus any other challenge to Plaintiff' *Monell* cause of action is waived. *See, e.g.*, *Hayvin Gaming, LLC v. Workinman Interactive, LLC*, 2024 WL 2702202, at *5 (W.D.N.Y. May 24, 2024) (Geraci, D.J.) (movant cannot obtain summary judgment based on argument raised for the first time in reply); *Cadoret v. Sikorsky Aircraft Corp.*, 323 F. Supp. 3d 319, 326 n.7 (D. Conn. 2018) (same). A court should deny summary judgment if even one salient fact or theory of recovery is unchallenged. *See Ortiz v. Stambach*, 657 F. Supp. 3d 243, 257 (W.D.N.Y. 2023) (Wolford, C.J.), *appeal pending*, No. 23-352 (2d Cir.). Here, almost our entire case is unchallenged.

With that preface, Plaintiffs turn first to the underlying constitutional violations committed by the BPD and then to the *Monell* theories under which the City is liable.

## A. There Is Ample Evidence Establishing the Underlying Constitutional Violations Perpetrated By the BPD

As discussed at length above, the City does not contest, for summary-judgment purposes, that BPD detectives used coercive and suggestive interrogation techniques and other illicit investigative practices to fabricate evidence and maliciously prosecute Plaintiffs in violation of their Fourth, Fifth, Sixth, and Fourteenth Amendment rights, and that they did so pursuant to municipal policy, custom, or practice. While the City does maintain that BPD detectives fulfilled their *Brady* obligations, a jury could reasonably conclude otherwise.

Citing testimony indicating that the BPD gave prosecutors the Crawford "file," the City contends that no police-*Brady* violation could have occurred. City Br. at 37–38. But even if the BPD gave prosecutors every document generated during the Crawford investigation, Plaintiffs contend, based upon the record evidence, that *Brady* material was deliberately kept out of the police reports included in the "file."

For example, BPD detectives knew that, during his interrogation on January 12, Woodruff was isolated from his family and friends, that he repeatedly denied any knowledge of or responsibility for Crawford's murder, and that he changed his story only after being threatened with arrest and imprisonment, terrorized to the point of tears, and finally promised complete immunity. *See* Counterstatement at ¶¶ 204–16. Detectives also knew that once Woodruff agreed to "cooperate," he made implausible statements about the murder and had to be fed the names of the people he was to accuse and basic information about the crime. *See id.* at ¶¶ 214–15, 288. The P-73 reports placed in the homicide file did not truthfully relate any of these circumstances of Woodruff's interrogation: none of his exculpatory or inconsistent statements, and none of the coercion. *See id.* at ¶¶ 189–204. Detectives Guadagno and Montondo, who participated in some of the key interrogations of Woodruff and other witnesses, destroyed their notes. *See id.* at ¶¶ 299–304, 700–05. Accordingly, a reasonable juror could conclude that the BPD suppression of evidence favorable to the accused caused a traditional *Brady* violation at trial.

Moreover, police suppression of evidence also deprived Plaintiffs of their constitutional rights under the principle applied in *Russo v. City of Bridgeport*. There, the Second Circuit recognized that criminal defendants have, under the Fourth Amendment, "a clearly-established constitutional right to be free from prolonged detention caused by law enforcement officials' mishandling or suppression of exculpatory evidence in a manner which 'shocks the conscience.'" 479 F.3d 196, 211 (2d Cir. 2007).[3] A *Russo* violation occurs when police or prosecutors before trial withhold *Brady* material that, if disclosed, may cause the court to dismiss the case or set reasonable bail. *See, e.g.*, *Taylor v. City of New York*, 2021 WL 848966, at *7–8 (E.D.N.Y. Mar.

---

[3]     Though *Russo* was decided in 2007, a municipality may be liable under *Monell* even if the underlying constitutional right was not clearly established. *See Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 54–55 (2d Cir. 2014).

4, 2021) (plaintiff stated a viable *Russo* claim by alleging that a detective and an ADA withheld a "large volume of impeachment and exculpatory evidence," which, if disclosed, "may have" caused the judge to "grant[] a reasonable bail").[4] Here, the BPD's suppression of evidence regarding the circumstances of Woodruff's "confession"—the *only* grounds for prosecution cited in the BPD's false Criminal Court complaint, *see id.* at ¶¶ 234—caused a conscience-shocking deprivation of Plaintiffs' liberty long before trial. *See Russo*, 479 F.3d at 205.

### B. City Policy and Custom Caused the Constitutional Violations Perpetrated by the BPD

The BPD's investigative misconduct is chargeable to the City on at least four theories of *Monell* liability: (i) Homicide Chief Leo Donovan, who headed and directed the Crawford investigation, was a policymaker whose actions automatically trigger municipal liability; (ii) the BPD's investigative misconduct followed BPD practice; (iii) the BPD failed to train its homicide detectives; and (iv) the City maintained a policy of deliberate indifference to misconduct in homicide investigations, fostering an anything-goes attitude among detectives. Boyd Compl. ¶¶ 473–500; Walker Compl. ¶¶ 467–94.

### 1. The City Does Not Dispute That It Is Liable for the Acts of Its Policymaker, Homicide Chief Leo Donovan

A municipality is liable for "the acts of its policymaking officials," *Connick*, 563 U.S. at 61, if those officials have "final policymaking authority in the particular area involved," *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). Whether a given official qualifies as a policymaker is a

---

[4] *See also Rodriguez v. City of New York*, 590 F. Supp. 3d 518, 546–47 (E.D.N.Y. 2022) (plaintiff stated a viable *Russo* claim by alleging police officers' suppression of the coercive techniques they used to elicit an incriminating statement from a key witness), *amended on other grounds*, 607 F. Supp. 3d 285 (E.D.N.Y. 2022); *Newson v. City of New York*, 2019 WL 3997466, at *6 (E.D.N.Y. Aug. 23, 2019) (plaintiff stated a viable *Russo* claim by alleging that prosecutors' belated disclosure of a ballistics report prolonged his pretrial detention).

question of law, which a court answers by looking to state and local positive law and to custom and usage having the force of law. *Id.* at 57.[5]

Many municipal policymakers are explicitly identified in state or local enactments, but a formal grant of policymaking authority is not required. When a policymaker delegates policymaking authority to a subordinate, that subordinate is herself a policymaker when she acts within the scope of the delegation. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality); *see also, e.g.*, *Haughey v. Cnty. of Putnam*, 2020 WL 1503513, at *11 (S.D.N.Y. Mar. 29, 2020) (collecting cases supporting this proposition). "[T]he official in question need not be a municipal policymaker for all purposes," but only "with respect to the conduct challenged." *Jeffes*, 208 F.3d at 57 (holding that, although others had general authority over inmate conditions and jail personnel, the sheriff was the policymaker for "jail operations" involving enforcing a "code of silence" among guards).

Here, the Commissioner of Police—a conceded policymaker—delegated to the Chief of the Homicide Bureau since 1964, Leo Donovan, the authority to make policy for the conduct of homicide investigations. *See* Counterstatement at ¶¶ 652–65. Regan, testifying as a representative of the City, admitted that, as of January 1976, accountability for homicide investigations lay with the Chief of the Homicide Bureau. *See id.* at ¶¶ 654, 656–60. Regan further admitted that Homicide Chief Donovan was the boss; that homicide detectives had to conform to Chief Donovan's ways; that Chief Donovan was responsible for how the BPD conducted homicide investigations; and that

---

[5]     Though policymaker-status is a question of law, decided by the trial judge before the case is submitted to the jury, *see Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989), it "involves a fact-intensive inquiry," *Rosenfeld v. Lenich*, 370 F. Supp. 3d 335, 354 (E.D.N.Y. 2019) (cleaned up), not conducive to summary judgment. If the record leaves any doubt as to whether a given official qualifies as a policymaker, courts will not grant summary judgment on this ground. *See, e.g.*, *Conte v. Cnty. of Nassau*, 2010 WL 3924677, at *30 (E.D.N.Y. Sept. 30, 2010).

Chief Donovan set the policies for questioning homicide witnesses and suspects and taking them into custody. *See id.*. As one detective put it during a *Huntley* hearing in the underlying criminal cases, Chief Donovan was "in charge of every case and every thing in every case." *Id.* at ¶ 655; *see, e.g., Jeffes*, 208 F.3d at 60 (emphasizing deposition testimony that the sheriff "runs the jail on his own," is "autonomous," and is "in charge and has the authority for the jail"); *Rosenfeld v. Lenich*, 370 F. Supp. 3d 335, 354 (E.D.N.Y. 2019) (deputy bureau chief in the Kings County DA's Office was a policymaker with respect to wiretaps).

Because Chief Donovan was a policymaker, the City is liable for any constitutional violations that he committed, commanded, or ratified (whether explicitly or tacitly). *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). This "is a question of fact for the jury," *Jeffes*, 208 F.3d at 61, and the jurors hearing Plaintiffs' cases will have ample evidence to consider. Chief Donovan personally led the Crawford investigation. *See* Counterstatement at ¶¶ 233–34, 240–41, 243. Every P-73 was addressed to him, and he reviewed each one. *See id.* at ¶¶ 663–65. Donovan also discussed investigative strategy with the principal detectives, *see id.* at ¶ 661, and personally participated in the coercive interrogation that ultimately yielded the false statement Woodruff signed on January 12, *see id.* at ¶¶ 200–16. Indeed, Donovan was the official who decided to offer Woodruff transactional immunity for murder, without first checking with prosecutors. *See id.* at ¶¶ 200, 219–20. Donovan listed himself as the "arresting officer" for each of the four defendants, including Boyd and Walker, and personally signed the criminal complaint that was based upon the false story he and other detectives had coerced from Woodruff, and to which Woodruff's false written statement was attached. *See id.* at ¶¶ 233–34, 240–41. Further, Donovan's complaint claimed that the murder occurred at 10:30 p.m. on January 2, when he knew

from police reports it happened later, after Woodruff and Walker had gone home in a cab. *See id.* at ¶¶ 141, 233.

In sum, Donovan was responsible for the evidence fabrication that occurred, and for the suppression of evidence that would have revealed it. *See Haughey*, 2020 WL 1503513, at *12 (because a town fire chief had been delegated final authority over arson determinations, his conduct triggered policymaker liability under *Monell*). A reasonable juror could find that Donovan committed, commanded, or ratified all of the BPD's constitutional violations, making the City liable for Plaintiffs' injuries.

<div style="margin-left: 2em;">

2. <u>The City Largely Does Not Dispute That It Is Liable for the BPD's Widespread Practice of Coercing Witnesses, Fabricating Evidence, and Suppressing *Brady* Material</u>

</div>

The acts of non-policymaking municipal employees are cognizable under *Monell* if they "were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisors must have been aware." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (cleaned up); *see also Jeffes*, 208 F.3d at 62 ("[A] jury could permissibly find that the code of silence was a practice or custom that constituted the municipality's standard operating procedure."). Custom or practice may be shown with evidence of supervisory indifference to unlawful behavior by even one subordinate. *See Lucente*, 980 F.3d at 301–08 (indifference to one corrections officer's incidents of sexual misconduct towards inmates); *Matusick*, 757 F.3d at 62–63 (supervisory indifference to a campaign of racist harassment directed at a single white employee who had married a Black woman revealed a "custom and practice" triggering *Monell* liability). In Plaintiffs' cases, a jury could reasonably conclude that the police abuses which occurred during the Crawford investigation were business as usual for the Homicide Squad.

On behalf of the City, Regan testified that he could not identify any aspect of the Crawford investigation that was inconsistent with the BPD's practice in 1976. *See* Counterstatement at ¶ 666 The County's expert on police and prosecutorial practices, Professor Kevin Gagan, similarly testified that the BPD's handling of Woodruff and Hough was, in every respect, consistent with BPD practice in the 1970s. *See id.* at ¶ 667. And numerous defense witnesses further testified that it was consistent with BPD practice for detectives to take witnesses into custody without probable cause, *see id.* at ¶ 670;  allow suspects to overhear fake anonymous phone calls implicating them in murder, *see id.* at ¶ 671, even though this tactic was intimidating and coercive, *see id.* at ¶¶ 669; and tell one witness what another witness was saying to influence the first witness to change his story, *see id.* at ¶ 672.

Similarly, as to the BPD's false and misleading documentation of interrogations and its suppression of *Brady* material, the BPD Manual *directed* detectives to prepare witness statements using the misleading question-and-answer format, *see id.* at ¶707, and defense witnesses conceded that the BPD *required* detectives to destroy all notes of witness interviews, *see id.* at ¶¶ 669–703, making it impossible for defense counsel to determine whether the reports prepared from the notes were complete and accurate, *see id.* at ¶ 704; that the BPD had no specific policy, rule, or procedure requiring detectives to give prosecutors all evidence favorable to the accused, *see id.* at ¶ 698; and that it was BPD practice to omit from police reports the threats and inducements employed during interrogations, *see id.* at ¶ 719.

Based on this evidence, a reasonable juror could find that the Crawford investigation was carried out pursuant to widespread BPD practice. *See Torvicia v. Suffolk Cnty.*, 17 F.4th 342, 355 (2d Cir. 2021) (holding that the deposition testimony of a police officer describing the

department's "standard procedure" was enough to support the conclusion that the County maintained a particular policy).[6]

In addition to this direct evidence of BPD practice in 1976, there are the inferences to be drawn from decades of supervisory indifference to misconduct by the Homicide Bureau (if not the entire BPD), even after a comprehensive New York State Commission of Investigation report in 1961 ("1961 Report") found corruption, inefficacy, and an absence of supervision, discipline, and training at the BPD. *See* Counterstatement at ¶¶ 523–33; *Lucente*, 980 F.3d at 301–08 (holding that persistent supervisory indifference to a pattern of sexual misconduct created a factual question as to the existence of a widespread municipal practice). Specifically regarding departmental discipline, the 1961 Report stated:

> Our investigation revealed Departmental discipline had failed in each of four vital phases: (1) The Department failed properly to investigate and follow up citizen complaints of misconduct against police officers. (2) It lacked sure and effective machinery to investigate other evidence of police misconduct on its own initiative. (3) It failed to establish adequate supervision so as to assure performance of routine police assignments. (4) It failed to utilize available statutory powers providing for disciplinary proceedings against officers charged with misconduct. The result was inevitable. Enforcement of Department discipline was almost non-existent.

*See* Counterstatement at ¶¶ 531.

Despite these findings, the evidence shows that the BPD continued as before, acquiescing in egregious instances of investigative misconduct. From the 1960s through the 1980s, the BPD was on notice of numerous instances in which Chief Donovan and other homicide detectives, including several involved in this case (Detectives Montondo, Hunter, Dove, and Gorski),

---

[6]     *See also Ferrari v. Cnty. of Suffolk*, 2013 WL 4017022, at *10 (E.D.N.Y. Aug. 6, 2013) (finding evidence sufficient to establish, as matter of law, the existence of a custom where, *inter alia*, there was deposition testimony from an assistant county attorney "that her training … consisted of observing other assistant[s] … conduct hearings and that the legal arguments [] she asserted at Plaintiff's hearing . . . was *consistent with* the training she received") (emphasis added), *rev'd on other grounds*, 845 F.3d 46 (2d Cir. 2016).

participated in rounding up Black suspects without probable cause and in coercing witnesses to implicate police suspects. *See id.* at ¶¶ 534–628. If the practices reflected in these episodes were contrary to municipal policy, rather than an expression of it, one would expect the City to act. Yet the City's representative witness was not aware of any investigation into these alleged acts or discipline meted out. *See id.* at ¶¶ 685–95. In fact, the City cannot identify *any* instance in which *any* BPD officer was disciplined for investigative misconduct. *See id.* at ¶ 696. Montondo spent 20 years in the BPD, and he cannot recall *even one* BPD inquiry into a detective's conduct during an investigation. *See id.* at ¶¶ 685. Guadagno too cannot recall a *single* instance of discipline for investigative misconduct. *See id*. On the contrary, though Donovan personally engaged in repeated misconduct, he was promoted to Chief of Homicide in 1964 and he stayed there until 1985. *See id.* at ¶¶ 691–92. Likewise, Montondo testified that his work in one case—in which a respected County Court judge found an "orgy of constitutional and statutory illegal police conduct," *see id.* at ¶¶ 623–28—earned him a medal from the City's quintessential policymaker, the Mayor. *See id.* at ¶ 696.

A reasonable juror could look at the uniformity of practice among the many detectives involved in the 1976 Crawford investigation and in other investigations before and after it, at the persistent supervisory indifference to the 1961 Report and judicial opinions criticizing the types of practices deployed in the Crawford investigation, and, most importantly of all, at the testimony from defense witnesses *admitting* that every aspect of the Crawford investigation was consistent with BPD practice in 1976, and conclude that the misconduct permeating the Crawford investigation did indeed stem from widespread municipal practice.

The City's lone response is that "the City witnesses in these cases all testified that the homicide division had a practice of turning every document over to the District Attorneys' Office

upon request." City Br. at 37. But turning over "documents" is not the same as satisfying *Brady*, especially where, as here, the police systematically destroy their notes of witness interviews and systemically omit impeachment material from written reports.

3.    The City Does Not Dispute That It Is Liable for Failing to Train Its Homicide Detectives

The City's failure to train its detectives on how to question witnesses and suspects, and how to memorialize those interactions, creates a third basis for *Monell* liability.

To start, the lack of training is not open to reasonable debate. As set forth at length in the Counterstatement, police witnesses testified that in general they received no training on how to question witnesses or suspects, including juveniles. *See* Counterstatement at ¶¶ 638–43, 644–49. In particular, detectives received no training about whether a potential witness could be threatened with prosecution and imprisonment if he did not cooperate with the police; falsely told that he was implicated in the crime and should change his story; promised non-prosecution, immunity, or leniency in exchange for implicating himself or someone else in a crime; and pressured to falsely implicate others. *See id.* at ¶ 638. Nor were detectives trained how to memorialize interrogations, *see id.* at ¶¶ 717–19, what *Brady* required of them, *see id.* at ¶ 703, whether to document a witness's inconsistent statements, and what suggestions and promises, if any, they could make to the witness, *see id.* at ¶¶ 717–18.

This failure to train qualifies as a municipal policy if it "amount[s] to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Connick*, 563 U.S. at 61 (cleaned up). A failure to train amounts to deliberate indifference when (i) "a policymaker knows to a moral certainty that her employees will confront a given situation"; (ii) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or … there is a history of employees mishandling the

situation"; and (iii) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker*, 974 F.2d at 297–98 (cleaned up). A reasonable juror could find the *Walker* test satisfied here.

*First*, City policymakers obviously knew that in *every* homicide case, detectives would have to question suspects and witnesses, and memorialize those interactions in reports.

*Second*, conducting and memorializing interrogations presents detectives with a "difficult choice." As to the conduct of an interrogation, even a detective determined to act in good faith must negotiate the line between tactics that extract the truth from a reluctant interviewee and tactics that coerce an initially truthful interviewee to tell a lie that fits the law-enforcement narrative. As Plaintiffs' interrogation expert, Alan Hirsch, explains, untrained detectives might overzealously pursue a confession or accusation without appreciating the degree to which ratcheting up the pressure increases the likelihood of false testimony. *See* Counterstatement at ¶ 643. Even in scenarios where "the proper course is clear," interrogations still present a difficult choice because the drive to secure convictions gives detectives "powerful incentives to make the wrong choice." *Walker*, 974 F.2d at 297.

The same is true of memorializing interrogations. Detectives acting in good faith will not necessarily appreciate the importance of complete documentation, and the obligation to preserve and disclose evidence favorable to the accused evolved rapidly in the years preceding the Crawford investigation, starting with the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963). Indeed, *Giglio v. United States*, 405 U.S. 150 (1972), which extended *Brady* to impeachment information, was decided less than four years before Plaintiffs' prosecution were initiated. *See infra* at 51. Moreover, detectives tempted to falsify, shade, or doctor reports face powerful incentives to pursue these inclinations in order to secure convictions.

*Third*, making the wrong choice when conducting or memorializing an interrogation is likely to result in constitutional violations. At the time of the Crawford investigation, detectives in Buffalo and elsewhere commonly used an inherently coercive interrogation technique popularly known as the Reid Method. *See* Counterstatement at ¶¶ 673–74; *see also Miranda v. Arizona*, 384 U.S. 436, 449–56 (1966) (discussing the Reid Method and its dangers). Even its proponents understood that the Reid Method posed a serious risk of false confessions and accusations, especially when the target was a juvenile. *See id.* at ¶¶675; *Miranda*, 384 U.S. at 455 n.24 (noting the risks of "a false confession"). To mitigate this risk, the Reid Method was only to be used when the detective had "a high degree of confidence" in the suspect's guilt, *see id.* at ¶ 676, and even then the detective was not to make threats or "hold out any inducement whatsoever," since threats and promises could "induce an innocent man to confess," *see id.* at ¶ 677.[7]

Gamesmanship in documentation is equally likely to result in constitutional violations. Omitting impeachment material from police reports, and destroying the notes that may contain such information, ensures that such material goes undiscovered. Creating signed statements which purport to be complete and verbatim records, but which in fact omit the coercion under which the statement was made, is fabrication of evidence. *See supra* at 24–25.

*Finally*, the BPD's failure to train its homicide detectives is closely related to the constitutional violations alleged here. *See, e.g.*, *Amnesty Am.*, 361 F.3d at 129–30 & n.10. The BPD interrogated Woodruff (age 17) and Hough (age 15) using the highly risky Reid Method in a manner that "ignore[ed] restraints urged by Reid and Associates" themselves. *See*

---

[7]     The BPD Manual selectively recognizes this danger. Though the Manual contains no guidance on interrogating suspects, apart from advising detectives to administer *Miranda* warnings and avoid leading questions, *see* Counterstatement at ¶¶ 633–34, its section on questioning a *police officer* accused of misconduct states that the questioning "shall not be overly long" and that the accused officer should not be pressured with "threats or promises," *see id.* at ¶ 632.

Counterstatement at ¶¶ 162–64, 228–30. In particular, detectives used the Reid Method without any "objective and reliable evidence" implicating Woodruff and the other boys, *see id.*; they ignored the contradictions, vagaries, and implausibilities in Woodruff's and Hough's narratives, *see id.* at; they ignored the fact that Woodruff's and Hough's statements failed to generate new evidence, *see id.*; and, worst of all, they greatly increased the Reid Method's already-substantial pressure by making explicit threats and promises to Woodruff and Hough, *see id.* The result of this coercion was, predictably, false testimony from Woodruff and Hough. And the BPD's creation of false, misleading, and incomplete witness statements helped to hide the coercion and coaching directed at the prosecution's star witnesses.

4.   The City Does Not Dispute That It Is Liable for Its Policy of Deliberate Indifference to the Rights of Suspects

While failure to train itself gives rise here to *Monell* liability, the City's indifference was even broader than a failure to train. Although state and federal judges, writing before and after the Crawford investigation,[8] repeatedly found that BPD detectives violated the constitutional rights of the accused, the BPD never disciplined the detectives responsible, *see id.* at ¶¶ 685, 689, 695, , and never developed written rules or manuals to constrain them, *see id.* at ¶¶ 632–37. A municipality

---

[8]     The 1961 Report and some appellate decisions predated the Crawford investigation. *See* Counterstatement at ¶¶ 523, 535, 553. Other appellate decisions were issued after the Crawford investigation, but those decisions, and the City's persistent failure to respond, are still probative of deliberate indifference at the time of the Crawford investigation itself. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("[p]ost-event evidence can shed some light on what policies existed in the [municipality] on the date of an alleged deprivation of constitutional right"); *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 151 (2d Cir. 1991) (post-incident ratification permits inference that unlawful policy existed at the time of the violation of the plaintiff's rights); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (same); *Henry v. Cnty. of Shasta*, 132 F.3d 512, 520 (9th Cir. 1997), *amended*, 137 F.3d 1372 (9th Cir. 1998) (holding that "failure even after being sued to correct a blatantly unconstitutional course of [conduct]" is evidence of the prior policy); *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (upholding the use of "after-the-fact events" to prove "a prior policy of acquiescence").

may be held liable either for deliberate indifference to the occurrence of violations, thereby allowing them to continue, or to the need for investigation, discipline, or other remedial action, thereby fostering a licentious culture which also leads to recurrences.

In *Jones v. Town of East Haven*, the Second Circuit, while finding the plaintiff's proof deficient, recognized that a plaintiff could satisfy *Monell* by making "a showing of deliberate indifference on the part of supervisory personnel to abuse of the rights of black people, which was communicated to line officers so as to give them the sense that they could engage in such abuse of rights without risking appropriate disciplinary consequences." 691 F.3d at 82. In *Disorbo v. Hoy*, 74 F. App'x 101, 104 (2d Cir. 2003), the Court held that "[t]he jury reasonably could have inferred that the City's failure to discipline adequately and the subsequent promotions of officers involved in Rodick's beating created an atmosphere whereby the police department tolerated misconduct and even police brutality."). *See also Estate of Roman v. City of Newark,* 914 F.3d 789, 800–01 (3d Cir. 2019) (failure to train, supervise, or discipline created culture where officers "knew there would be no professional consequences for their actions"); *Rodriguez v. Cnty. of Los Angeles,* 891 F.3d 776, 803 (9th Cir. 2018) (failure to take remedial action "perpetuated a culture where excessive force was encouraged"); *Smith v. City of Fontana,* 818 F.2d 1411, 1420 n.13 (9th Cir. 1987) (failure to discipline could give rise to an "atmosphere of lawlessness"); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 330–32 (2d Cir. 1986) (failure to investigate prior incidents "would have been viewed by the officers … as reflecting an indifference").

On either a deliberate indifference or "atmosphere of lawlessness" theory, even one, or a handful, of tolerated abuses may suffice to establish *Monell* liability. *See, e.g., Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (one incident); *Amnesty Am.,* 361 F.3d at 129 (single

"egregious" incident); *Disorbo*, 74 F. App'x at 104 (single incident and subsequent promotion of the officer involved); *Fiacco*, 783 F.2d at 329–32 (five incidents).

The tolerated misconduct need not be the same as the misconduct in the plaintiff's case. *See, e.g.*, *Cash,* 654 F.3d at 337 (prior tolerated incident of invited "sexual contact" versus the violent sexual assault committed by the defendant officer); *Vann v. City of New York*, 72 F.3d 1040, 1050 (2d Cir. 1995) (deliberate indifference shown by "Department's general methods of dealing with problem policemen"); *Gentile v. Cnty of Suffolk*, 926 F.2d 142, 146 (2d Cir. 1991) (same, where "employee misconduct … in several different areas of criminal law" was tolerated); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("[T]he persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*.").

As set forth at length above and in Plaintiffs' Counterstatement, the unconstitutional tactics used in the Crawford investigation reflected standard operating procedure for the BPD. Their application before and after the Crawford investigation provoked sharp criticisms from the judiciary, yet no officer was ever disciplined, no new training was ever implemented, no closer supervision was applied, Leo Donovan was rewarded with a decades-long tenure as Chief of the Homicide Squad, and Montondo's blatant illegality in one case earned him a commendation from the mayor. A reasonable juror could easily conclude that the City's deliberate indifference to investigative misconduct, in fact, its lauding and promotion of detectives who were neck-deep in it, allowed investigatory misconduct to occur while simultaneously creating or perpetuating a culture in which detectives were encouraged to pursue arrests and convictions by any means necessary, including coercion, threats, fabrication of evidence, and suppression of *Brady* material.

This culture was almost certain to result in the framing of innocent people, which is precisely what happened to Plaintiffs.

III. **PLAINTIFFS ARE ENTITLED TO A JURY TRIAL ABOUT WHETHER THE COUNTY'S POLICIES, CUSTOMS, OR PRACTICES WERE A SUBSTANTIAL CAUSE OF THE *BRADY* VIOLATIONS AND SUMMATION MISCONDUCT THAT DENIED THEM FAIR TRIALS**

Plaintiffs allege that ECDA prosecutors Drury and Henry violated their constitutional rights by suppressing a trove of *Brady* material and delivering egregiously improper summations. Boyd Compl. ¶¶ 375–91, 524–31, 648–50; Walker Compl. ¶¶ 518–24. Though Drury and Henry enjoy immunity from individual liability, it is well established that a county District Attorney is a municipal policymaker, and that where a District Attorney's managerial or administrative policies result in *Brady* violations, summation misconduct, or both, the County is liable under § 1983 and *Monell.   See Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019); *Walker v. City of New York*, 974 F.2d 293, 301–02 (2d Cir. 1992). A reasonable juror could readily find that under DA Cosgrove, the ECDA (i) maintained a widespread practice of suppressing evidence favorable to the accused, both at preliminary hearings and at trials, and of engaging in summation misconduct; (ii) maintained a policy of deliberate indifference to criminal defendants' fair-trial rights; and (iii) failed to train prosecutors on their *Brady* obligations. While the County devotes most of its motion to defending Drury's and Henry's conduct, it conspicuously ignores much of the record in the process. What little the County says about *Monell* liability is meritless.

A. **There Is Ample Evidence Establishing That ADAs Drury and Henry Violated Plaintiffs' Constitutional Rights**

New York law obliges prosecutors to disclose certain information to criminal defendants. In 1977, prosecutors' state-law disclosure obligations derived from two main sources: the New York Criminal Procedure Law ("CPL") and *People v. Rosario*, 9 N.Y.2d 286 (1961). *See* Counterstatement at ¶¶ 745–47. The CPL provided for limited pretrial discovery that covered

things like the defendant's own statements and the results of scientific tests. *See id.* at ¶ 746. *Rosario* required the prosecution to disclose any prior statement of a witness it called at trial, if the prior statement bore on the subject-matter of the witness's direct examination. 9 N.Y.2d at 288–90. ECDA prosecutors withheld *Rosario* material until the witness's direct examination at trial was complete. *See* Counterstatement at ¶ 748.

The U.S. Constitution imposes additional disclosure obligations. In *Brady*, the Supreme Court held that a prosecutor's suppression of "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Just five years before Plaintiffs' criminal trials, the Supreme Court held that the *Brady* rule includes impeachment evidence, and that favorable evidence is "material" under *Brady* if it "could in any reasonable likelihood have affected the judgment of the jury." *Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (cleaned up). Less than one year before Plaintiffs' criminal trials, the Supreme Court held that prosecutors must disclose evidence favorable to the accused without waiting for a defense request. *See United States v. Agurs*, 427 U.S. 97, 107–13 (1976). In addition, as discussed *supra* at 36–37, *Russo*, based upon the established principle that prosecutors may not mislead a court, held that they must disclose defense-favorable material early enough so that the court can consider it in determining whether to dismiss the case or set reasonable bail so as to prevent prolonged unlawful detention. *See Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007).

1.   Drury Withheld *Brady* Material During Plaintiffs' Preliminary Hearing

Here, Drury admits that he received the police file before the preliminary hearing, *see* Counterstatement at ¶ 310, that without Woodruff's statement, there was not probable cause to prosecute, *see id.* at ¶ 231, and that he did not disclose, during the preliminary hearing, (i) police reports showing that Woodruff and Walker were in a taxicab when the crime occurred, *see id.* at

¶¶ 310–11; (ii) the Manista P-73 report stating that police terrorized Woodruff into changing his story, *see id.*; (iii) the Hunter P-73 report stating that, contrary to Woodruff's signed statement and hearing testimony, Woodruff was alone during his interrogation, *see*; (iv) the fact that Woodruff had been threatened with arrest before changing his story, *see id.* at ¶ 318; (v) the fact that Woodruff had been promised immunity before changing his story, *see id.* at ¶¶ 317–18; and (vi) the evidence of third-party culpability, *see id.* at ¶¶ 310–11.

Had this material been disclosed, the trial judge may have set reasonable bail or dismissed the case outright. *See id.* at ¶¶ 322. The case presented at the preliminary hearing boiled down to Woodruff's accusation, and Woodruff's accusation amounts to very little when viewed in light of the material that Drury suppressed. Drury's suppression qualifies as conscience-shocking, given the volume of patently exculpatory and impeaching material he suppressed. *See Taylor v. City of New York*, 2021 WL 848966, at *7 (E.D.N.Y. Mar. 4, 2021); *Newson v. City of New York*, 2019 WL 3997466, at *6 (E.D.N.Y. Aug. 23, 2019).

2.     Drury and Henry Withheld *Brady* Material During Plaintiffs' Trials

*Brady* violations are cognizable under § 1983. *See Poventud v. City of New York*, 750 F.3d 121, 132 n.12 (2d Cir. 2014) (en banc). The three components of a *Brady* violation are: (i) the evidence in question was favorable to the accused, because it was either exculpatory or impeaching; (ii) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (iii) there is a reasonable probability that disclosure of the favorable evidence would have yielded a different outcome at the accused's criminal trial. *Id.* at 133. As the County's expert rightly concedes, given the presumption of innocence and the unanimity needed for a conviction,

a defendant would obtain a "different" or more favorable result if at least one juror would have voted to acquit. *See* Counterstatement at ¶¶ 740.

ADAs Drury and Henry violated Plaintiffs' *Brady* rights at trial by failing to disclose the same evidence Drury withheld at the preliminary hearing, plus the following: (i) the Simpson's Store report of January 15 undermining Hough's testimony, *see id.* at ¶¶ 454–55; (ii) the P-73 reports of February 11 revealing Hough's recantation, how police pressured Hough to adopt a new story, and how they coerced a terrified Woodruff to conform his testimony to Hough's new account, *see id.* at ¶ 447, 450; (iii) Woodruff's signed handwritten statement of February 11 claiming, contrary to his grand jury and trial testimony that Boyd and Gibson went inside the Golden Nugget, that they merely peeked inside, *see id.* at ¶ 449; (iv) Hough's refusal to take a second polygraph test after changing his story *see id.* at ¶¶ 443–44; and (v) the crime scene photo showing footprints in Crawford's backyard leading in the direction of Watson's property, *see id.* at ¶¶ 488–501.

The County does not dispute that the ECDA possessed all this material, save for the photo of footprints in Crawford's backyard, the very existence of which the County denies. County Br. at 8–9. This dispute presents a question of fact. James McLeod, Floyd Martin's trial counsel, testified that the photo did exist, that he received it after explicitly requesting all photographs, and that he used it to great effect in securing Martin's acquittal. *See id.* at ¶¶ 495. At the summary-judgment stage, the Court must accept McLeod's testimony.

The County does not deny that the allegedly suppressed material is favorable to the accused and so had to be disclosed under *Brady*. And contrary to the County's contention, County Br. at 9–12, a jury must decide whether the prosecutors failed to do so. Drury and Henry both testified that, as a general matter, they took pains to memorialize any disclosures made to the defense, *see*

Counterstatement at ¶¶ 333, 354, 369, and the record shows them adhering to this practice in Plaintiffs' cases, *see id.* at ¶¶ 325, 327, 331, 341, 347, 389. All the allegedly suppressed *Brady* material is missing from the prosecutors' recitals of the material they disclosed, *see id.* at ¶¶ 304–87, and Drury and Henry testified that they have no record or recollection of making additional, undocumented disclosures to Plaintiffs' attorneys, *see id.* at ¶¶ 388–455. Further, Drury and Henry testified that they did not turn over *anything* that they deemed *Brady* material. *See id.* at ¶¶ 324–25, 810–813. Finally, whereas Plaintiffs' defense lawyering expert opined that any reasonably competent defense attorney would have used the allegedly suppressed *Brady* material at trial, *see id.* at ¶¶ 411, 417, 431, 440, 446, 457, the only materials that Plaintiffs' attorneys used or attempted to use throughout Plaintiffs' criminal proceedings were materials that the prosecution had made a record of disclosing, *see id.* at ¶¶ 356–63, 377–85.

Ignoring all this evidence, the County contends that ADA Drury must have disclosed every P-73 report in the Crawford homicide file because he said he had done so during a 1976 *Huntley* hearing. County Br. at 9–10. Doubtful admissibility aside, Drury's hearsay statement simply highlights one of the many factual disputes precluding summary judgment. A jury must weigh Drury's prior statement against the contrary evidence Plaintiffs' have amassed, and against the clear indications that Drury's comment at the *Huntley* hearing meant only that he had turned over the handful of P-73 reports that he considered to be *Rosario* material for purposes of that hearing. *See id.* at ¶¶ 328–29, 331–32.[9]

---

[9] During both the *Huntley* hearing and the later *Wade* hearing, Drury marked as an exhibit each report he disclosed and *refused* to disclose additional reports, prompting Boyd's counsel to ask the court to examine the prosecution's file for *Brady* material—a request Drury opposed and the court denied. *See* Counterstatement at ¶ 329.

Finally, a reasonable juror could easily find that the undisclosed *Brady* evidence was material to the outcome of Plaintiffs' trials. Both defense expert Zeidman and DA John Flynn agreed that the case against Boyd and Walker was weak. *See id.* at ¶¶ 411, 417, 431, 440, 446, 457, 519.[10] As Professor Zeidman explains at length, had the prosecution fulfilled its *Brady* obligations, defense counsel could have made a compelling case that the murder occurred at or after 11:30 p.m.; that at the time of the murder, Woodruff and Walker were in a taxicab and Darryl Boyd was walking home; and that the true culprit was Larry Watson—the last person seen with Crawford before his death—acting alone or in concert with Jerome Boyd. *See id.* at ¶¶ 411, 417. This is the sort of concrete counter-narrative that jurors find appealing and, unlike Woodruff's account, it actually comports with the physical evidence and common sense. *See id.*. Indeed, Drury admits that even as he was asking a grand jury to indict Plaintiffs for the Crawford murder, *he still suspected that Larry Watson and Jerome Boyd had jointly committed the homicide* based on the evidence in the police file, *see id.* at ¶ 418.

Because Plaintiffs' defense lawyers were denied this compelling evidence of third-party culpability, along with the time-of-death and taxicab evidence that would have established the alibi defense they were trying to pursue, their defense was whittled down to a single tactic: attack the credibility of Woodruff and Hough. These attacks, without the undisclosed *Brady* material, were far weaker than they should have been. *See id.* at ¶¶ 440, 446. The suppressed material also exposed the detectives' failure to interview the taxicab drivers, their failure to pursue the investigation of Larry Watson and Jerome Boyd, and their preparation of false, misleading, and biased reports, all of which demonstrated their tunnel vision and lack of integrity. *See id.* at ¶¶ 411, 417, 431, 440, 446, 457. It bears reiterating that the defense had no obligation to prove the witnesses were lying

---

[10]     Flynn's statement is admissible as a party admission. *See* Fed. R. Evid. 801(d)(2)(D).

or that someone else committed the crimes, but just to convince a single juror that they raised a reasonable doubt.

Floyd Martin's acquittal is particularly telling on the issue of materiality. The Martin trial was essentially identical to the Gibson, Boyd, and Walker trials, except that Martin's attorney had obtained the photo of footprints in Crawford's backyard, which he used to point the finger at Watson. *See id.* at ¶¶ 488–503. A reasonable juror could conclude, as did Justice Burns, that this photo alone made the difference for Martin. Add to this the mountain of additional *Brady* material that was suppressed, and the materiality element is overwhelmingly satisfied. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (Brady materiality must be judged cumulatively).

3.   Drury and Henry Engaged in Summation Misconduct That Deprived Plaintiffs of a Fair Trial

Summation is a critical phase in a criminal trial, and one where the prosecutor may be most tempted to engage in "gamesmanship and winning at all costs." *See* Counterstatement at ¶ 458. To ensure the defendant a fair trial, prosecutors delivering summations are forbidden from arguing outside the four corners of the evidence; making false, misleading, irrelevant, or inflammatory arguments; expressing a personal belief about the truth or falsity of any testimony or evidence (an illicit practice known as vouching); shifting the burden to the defendant; commenting on the defendant's failure to testify; and denigrating the defense, the defendant, or the defendant's attorney. *See id.* (citing cases).

When a prosecutor engages in summation misconduct and the resulting prejudice is substantial, a conviction is a denial of due process. *See Bellamy*, 914 F.3d at 762. When evaluating summation misconduct in the context of a § 1983 claim, courts consider (i) the severity of the misconduct; (ii) any curative measures taken; and (iii) how certain a conviction was absent the misconduct. *Id.* In *Bellamy*, the Second Circuit upheld a summation-misconduct claim where the

prosecutor expressed his "personal opinion as to a defendant's guilt," denigrated the defendant by calling him a liar, improperly shifted the burden of proof by asking rhetorically "[w]here is there proof defendant had no motive to kill somebody?" and implored the jurors to not let Bellamy "get away with it, not this time." *Id*. at 763–64. While defense counsel's failure to object cut against Bellamy, the overall proof was weak, leading the Second Circuit to conclude that "a civil jury evaluating Bellamy's due process claim could reasonably find that [the prosecutor]'s improper remarks pushed this case over the line." *Id*. at 764.

Here too, a reasonable juror could find that Drury's summation in Boyd's case, and Henry's summation in Walker's case, each rose to the level of a constitutional violation and was a substantial factor in causing Plaintiffs' convictions. Seeking to explain away Woodruff's failings as a witness, Drury suggested that his testimony should be judged on a lower standard: Woodruff was a "ghetto kid," *see id.* at ¶ 463, who lived in "a junkyard," *see id.* at ¶¶ 464; a "blithering idiot," *see id.* at ¶ 463, a "snook," an "idiot," a "nitwit," *see id.*, "[h]apless, stupid," *see id.*, and "as bad as the rest of them," *see id.* at ¶ 465. Continuing in this mocking and dehumanizing vein, Drury belittled the terror Boyd felt when being interrogated about a murder, *see id.* at ¶¶ 469 ("The poor kid is confused, the poor kid is only 16. He is in there without his mommy and daddy"); said of defense witness Joyce Washington, "I also hope you don't believe that kid for a minute," *see id.* at ¶ 470; sarcastically described defense witness Dorothea Luster as "the mother, precious thing," *see id.* ; and called the testimony of defense witness Allison Zachery "worthless," *see id*.

The County would excuse Drury's denigration of Woodruff on the ground that, if anything, Drury's comments *diminished* Woodruff's credibility, County Br. at 15, but Drury testified that in fact he denigrated Woodruff for the express purpose of *enhancing* Woodruff's credibility, *see id.* at ¶¶ 467. Evidently, Drury thought the jury would more readily overlook Woodruff's failings as

a witness if he disparaged Woodruff as a poor, dumb, Black kid. However, it was not just Woodruff whom Drury denigrated based upon his race (although that was bad enough), but he indirectly denigrated Darryl Boyd and his friends by saying that Woodruff, the "hapless, stupid" "ghetto kid," was "as bad as the rest of them."

The County says that the 1970s was a different era. County Boyd Br. at 15; *accord* County Walker Br. at 15 (making the same point to excuse Henry's gratuitous racial commentary), but a jury enforcing constitutional guarantees in 2024 is not constrained by the "sensibilities and mores" of the 1970s. County Walker Br. at 15–16 (cleaned up). Whether or not 1970s America routinely trafficked in racial stereotypes, the Constitution does not tolerate prosecutors using racial stereotypes to win criminal convictions. *See U.S. ex rel. Haynes v. McKendrick*, 481 F.2d 152, 153–56, 166 (2d Cir. 1973) (holding that a Niagara County prosecutor violated the Due Process Clause when he appealed to racial prejudice by, *inter alia*, denigrating his Black eyewitness in an effort to explain away the gaps in her testimony).

Besides, Drury's racial appeals are only part of the problem. Drury deliberately exploited his suppression of *Brady* material by making arguments that he knew, based upon the material he had withheld, were false. In defense of Woodruff's testimony, Drury said, "I would absolutely reject" the suggestion that "the police or our office or myself had anything to do with changing Tyronne's testimony or making it fit in any pattern," *see id.* at ¶ 475; he denied that "we had fed" Woodruff information, *see id.*; he decried as "absolutely ridiculous" the "suggestion that there is any conspiracy here to make the testimony fit the facts," *see id.*; and when defense counsel asserted that Woodruff had been pressured and indoctrinated, he stood up and objected, "[t]hese are wild allegations, *there is no proof of it*," *see id.* at ¶ 4611(emphasis added). In defense of the police investigation, Drury added: "[y]ou got what you have. *The police turned over everything to you.*"

*See id.* at ¶ 472 (emphasis added). When Drury made these statements to the jury, he knew that the BPD had pressured Woodruff into implicating the other boys and to align his story with Hough's, and that he had suppressed from the defense and the jury a large volume of investigative material that proved the very things Drury was falsely denying. The County offers no excuse for Drury's misconduct.

As in *Bellamy*, Drury also vouched for his witnesses and his case. He personally endorsed Woodruff's veracity, *see* Counterstatement at ¶¶ 466 ("I submit to you still he is telling the truth"), and opined that Woodruff was truthful because he had a lawyer, *see id.* at ¶ 468. Going outside the record to suggest that an uncalled police witness would have corroborated testimony presented at trial, Drury said: "Is two policemen better than one? I put one on, I thought it was sufficient." *See id.* at ¶ 471. Drury also directly appealed to the jurors' sympathy, *see id.* at ¶ 473 ("If you tend toward sympathy you know what happened to that man, you know his family circumstances"), and he shifted the burden even more egregiously than the prosecutor in *Bellamy* when he commented on Boyd's failure to testify, *see id.* at ¶¶ 474 ("[Y]ou see what Darryl [Boyd] has to offer. Zilch."). The County also ignores these aspects of Drury's summation.

Henry's summation in Walker's case followed a similar pattern. Striving to keep race at the forefront of the jurors' minds, Henry said: "Andre [Hough] gives you all five of them together, the planning, in a sense, sixteen year old *black* kids plan." *See id.* at ¶ 479 (emphasis added). Henry punctuated the rest of his summation with inflammatory and exaggerated references to blood: "blood spattered, splashed up on the house"; "two puddles of blood"; "blood is just absolutely splattered all over"; "blood spattering on the walls"; "One of the worst things probably about this homicide, the puddles of blood, blood on the walls"; "[Darryn Gibson] flaying away on the man's head, and the blood splattering the walls, and runout out on the sidewalk." *See id.* at ¶¶ 484–85.

This blood-drenched rhetoric—which the County disingenuously calls a "mere description of the [crime] scene," County Walker Br. at 15—was irrelevant to the sole issue before the jury: the identity of Crawford's killer. It also was misleading. While blood was found by the side door of Crawford's house, there was no blood "on the sidewalk"—a fact that undermined Woodruff's account of a violent assault beginning at the roadside. *See id.* at ¶¶ 23–30.[11]

Henry also emulated Drury in making patently false statements that exploited the prosecution's suppression of *Brady* material. Specifically, Henry asserted that neither Woodruff nor Hough had a motive to lie, *see id.* at ¶¶ 480; that their testimony corroborated each other even though they had not "gotten together" to conform their stories, *see id.* at ¶¶ 482; that Larry Watson had no motive to lie, *see id.* at ¶¶ 483; and that Hough's testimony was credible because it "is the same" and he relates it "without any mistake," *see id.* at ¶¶ 481. At the time he made these statements, a reasonable juror could find, Henry knew that Woodruff and Hough had both been threatened with prosecution for murder if they did not implicate their friends; that Woodruff had been coached to match his story to Hough's; that Larry Watson, the original suspect in the murder, had an obvious motive to lie; that Hough, far from being consistent, had actually recanted; and that these contradicting facts were buried in police reports that Henry and Drury had kept from the defense. *See id.* at ¶¶ 388–455. The County ignores this aspect of Henry's summation.

In a final bid to overcome the factual disputes surrounding Drury's and Henry's summations, the County notes that Professor Gagan approves of them. County Br. at 15–16. But Professor Zeidman disagrees with Professor Gagan: he concludes that Drury's and Henry's

---

[11]     Walker's counsel objected to Henry's gratuitous references to pools of blood, but his objection was overruled and no curative instruction was given. *See* Counterstatement at ¶¶ 485. Defense counsel made no other objections, though that is hardly surprising. As Professor Gagan conceded, defense lawyers often do not object to summation misconduct for fear that they will appear obstructive or call extra attention to the improper remark. *See id.* at ¶¶ 485 n.26.

summations were wildly improper. *See id.* at ¶¶ 476–77, 486–87. Guided by the court's legal instructions, a jury will have to make up its own mind. As in *Bellamy*, a reasonable juror could conclude, given the weakness of the evidence in each case, that the prosecutors' summations denied Plaintiffs their right to a fair trial.

### B. The Constitutional Violations Perpetrated by ADAs Drury and Henry Were Caused by ECDA Policy, Custom, and Practice

Plaintiffs have pled, and there is evidence to support, at least three theories of *Monell* liability: (i) the prosecutorial misconduct resulted from ECDA policy and widespread practice; (ii) the prosecutorial misconduct resulted from the ECDA's policy of deliberate indifference to the fair-trial rights of criminal defendants and the "anything-goes" attitude that likely engendered; and (iii) the *Brady* violations resulted from inadequate training. Boyd Compl. ¶¶ 532–58; Walker Compl. ¶¶ 525–51.

#### 1. Policy and Practice

As noted above, the acts of non-policymaking municipal employees are actionable if they "were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage," *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014), or a "municipality's standard operating procedure," *Jeffes v. Barnes*, 208 F.3d 49, 62 (2d Cir. 2000). Plaintiffs can meet this standard and establish the existence of an unlawful practice through testimony admitting or establishing that a given unlawful act was consistent with municipal practice. *See supra* at 41-42 & n.7 (citing cases). Such testimony makes unnecessary relying on the alternative method of proof that the County argues is lacking in this case: an overwhelming number of demonstrably prior similar acts proving the existence of a practice. *See, e.g.,* County Br. at 14, 21 (and cases cited therein). Supervisory indifference to misconduct also creates a fact

question as to the existence of a widespread municipal practice. *See Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 301–08 (2d Cir. 2020).

### a) *The ECDA's unlawful Russo practice*

Former defense attorney McLeod testified that, in the 1970s, it was the ECDA's practice to not disclose exculpatory information affecting the probable-cause or bail determination at the time of the arraignment or preliminary hearing. *See* Counterstatement at ¶¶ 769 & n.831. Henry, on behalf of the County, testified similarly. *See id.* at ¶¶ 769 n.831. Drury did as well. *See id.* A reasonable juror could therefore conclude that Drury acted pursuant to widespread ECDA practice when he suppressed exculpatory and impeachment material during Plaintiffs' preliminary hearing. Although Count VII expressly alleges *Monell* liability based on the County's practice of *Russo* violations, Boyd Compl. ¶¶ 536, Walker Compl. ¶¶ 529, the County's motion fails to address the issue, thereby conceding it for summary-judgment purposes, *see supra* at 35.

### b) *The ECDA's unlawful Brady policies and practices*

A reasonable juror could also conclude that prosecutors' suppression of *Brady* material during Plaintiffs' trials were not aberrant incidents but resulted from ECDA policy and widespread practice. Indeed, it is hardly a coincidence that *four* prosecutors – two each at Boyd's trial (ADAs Solomon and Drury) and at Walker's (ADAs Henry and Verrastro) – violated their constitutional disclosure obligations.

*First*, deposition testimony directly establishes that the *Brady* decisions made in Plaintiffs' cases reflected ECDA policy and practice. Drury, who was the lead trial attorney at Boyd's trial, testified that the *Brady* decisions he made as a prosecutor conformed to ECDA policy and practice, *see id.* at ¶¶ 818–20. A juror who finds that Drury withheld *Brady* material could conclude, based on Drury's testimony, that his suppression of *Brady* material comported with, and resulted from, office policy and practice.

Similarly, Henry—who was the lead trial attorney at Walker's trial and the County's Rule 30(b)(6) witness—testified that in 1976 and 1977, it was consistent with ECDA practice for prosecutors to deem all of the allegedly suppressed *Brady* material, including evidence of Plaintiffs' alibi, the police reports impeaching Woodruff and Hough, and the third-party culpability evidence, to fall outside *Brady*'s ambit. *See id.* at ¶¶ 813. A reasonable juror could credit these admissions and conclude that the *Brady* violations alleged in this case emanated from office practice.

*Second*, a reasonable juror could conclude that the ECDA made a practice of excluding impeachment material from *Brady*'s ambit. Court records show ECDA prosecutors, including members of its Appeal Bureau, repeatedly arguing that *Brady* applied only to exculpatory material, even after the Supreme Court expressly held to the contrary, in 1972, in *Giglio*, 405 U.S. at 154-55; *see* Counterstatement at ¶¶ 737, 778–8. During depositions taken in this case, County witnesses confirmed that the view articulated by ECDA prosecutors in these instances conformed to ECDA practice in 1977. *See id.* at ¶¶ 802–05, 815.[12] As the County's expert put it, the ECDA's position "in the '70s and '80s was that [evidence] had to be exculpatory" to constitute *Brady* material, *see id.* at ¶ 775. impeachment material did not qualify as evidence favorable to the accused, *see id.* at ¶ 776. *Compare Rutherford v. City of Mount Vernon*, 2023 WL 6395375, at *26 (S.D.N.Y. Sept. 29, 2023) (finding a question of fact as to widespread practice based on deposition testimony evincing an incorrect understanding of the authority to conduct strip searches and contemporaneous expressions of this misunderstanding).

---

[12]    Because DA Cosgrove testified that the role of the Appeals Bureau in his office included "educating the assistant district attorneys as to the law and what was required of them," *see* Counterstatement at ¶ 781 n.843, the Bureau's position that *Brady* did not cover impeachment material reflects not simply ECDA practice but ECDA policy as well.

*Third*, the County's expert testified that in 1976 and 1977, ECDA prosecutors made a practice of suppressing even exculpatory evidence if they thought that evidence was unreliable. *See* Counterstatement at ¶¶ 789–801. *Compare DiSimone v. Phillips*, 461 F.3d 181, 194-95 (2d Cir. 2006) (flatly rejecting the notion that a prosecutor has discretion to suppress *Brady* material "which he views as mistaken or false").[13] Unlike members of the "upper crust," Gagan explained, *see* Counterstatement at ¶ 793(a), "inner city minority" witnesses like Woodruff and Hough invariably lie to the police, *see id.* at ¶¶ 793(d)–(e), 795. When such witnesses make inconsistent or exonerating statements, prosecutors can deem that evidence unreliable and withhold it, to ensure that some "defense attorney" does not bamboozle "a jury of affluent Caucasian people who don't understand the interactions in the inner city." *See id.* at ¶¶ *See id.* at ¶¶ 790, 793(d)–(g). On this basis, Gagan concluded that all the allegedly suppressed *Brady* material could be justifiably withheld. *See* Plaintiffs' Response to ¶ 119 of County's Statement of Material Facts.[14] A reasonable juror could find that Drury and Henry were following this 1977 unlawful practice that Gagan described when they made no *Brady* disclosures to Plaintiffs' counsel.

*Fourth*, a reasonable juror could find that ECDA prosecutors made a practice of withholding *Brady* material not explicitly requested by the defense, notwithstanding the Supreme Court's decision in *Agurs*. Testifying on behalf of the County, Henry testified that in 1977, he understood *Brady* to require a defense request. ¶¶ *See id.* at ¶ 806. He presumed that his practice

---

[13] Gagan's depiction of ECDA practice finds additional support in court records and Henry's deposition testimony. *See id.* at ¶¶ 802–05, 815.

[14] For example, according to ECDA practice, Hough's recantation was not *Brady* material, s*ee* Counterstatement at ¶ 798, because "Hough was an inner-city kid," meaning that the prosecutors "were entitled to discount the truthfulness of his recantation" and, on that basis, withhold it from the defense, *see id.* at ¶ 799. The Simpson's Store interview contradicting Hough's account was not *Brady* material either, according to ECDA practice, because the prosecution naturally "wouldn't get the cooperation from the witnesses in the community and in the neighborhood." *See id.* at ¶¶ 80.

was based upon the practices of the office generally, and that others did what he did. *See id.* at ¶ *See id.* at ¶ 806 n.881. Henry's supposition is borne out by the other evidence in the record. During an October 1976 trial, a senior ECDA prosecutor claimed that he had not "withheld" notes of witness statements because defense counsel "didn't ask for [them]." *See id.* at ¶ 811. Likewise, when McLeod wrote to Henry to request disclosure of *Brady* material, Henry responded that McLeod needed to specify what material he was requesting. *See id.* at ¶ 808. The County contends that because McLeod later received the exculpatory backyard footprints photo, the ECDA could not have maintained a "policy mandating nondisclosure." County Br. at 8. But the inconsistent disclosure of that photo furthers Plaintiffs' point. McLeod received the footprints photo after he specifically demanded all "photographs." *See* Counterstatement at ¶¶ 493, 495. Plaintiffs' attorneys, who made only generic *Brady* demands, *see id.* at ¶¶ 494, did not receive the footprints photo or any other *Brady* material, *see see id.* at ¶¶ 409, 816.[15]

<p style="text-align:center">*    *    *    *</p>

Though the County does not directly address the four categories of illicit-practice evidence discussed above, it does claim that the record "indicate[s] a pattern of disclosure" because nine P-73 reports were marked as exhibits during pretrial or trial proceedings. County Br. at 10-11. But a juror could easily conclude that these disclosures do not reflect a general practice of obedience to *Brady*. The first P-73 on the County's list—a report authored by Detective James Riley—was included in error; the P-73 was stamped "received" by the *Homicide Squad*, not by any court. *See* Counterstatement. at ¶ 456. Of the eight remaining P-73 reports, five memorialized statements made by the defendants themselves, County Br. at 11, and so were disclosed under CPL § 240.20

---

[15] While the County touts ADA Drury's "automatic" disclosure of a few P-73 reports immediately following Woodruff's direct examination in the Gibson trial, County Br. at 11-12, a reasonable juror could find this *Rosario* disclosure immaterial to the ECDA's *Brady* practices.

or *Rosario*, not under *Brady*. *See id.* at ¶ 327. The two P-73 reports memorializing Hough's recantation were disclosed as *Rosario* material in the Gibson trial, *see id.* at ¶¶ 341, after Gibson's lawyer took Drury to task for withholding *Rosario* material, *see id*. In accordance with his usual practice, however, Drury retrieved both exhibits after the Gibson trial concluded, *see id.* at ¶¶ 342, and he never disclosed them to Plaintiffs' lawyers, *see id.* at ¶¶ 447. Drury disclosed the last P-73 report—a January 3 report authored by Detective Dove— as *Rosario* material during Boyd's trial (but not Walker's) immediately after Dove's direct examination, *see id.* at ¶¶ 347, 432,  because it bore on Dove's testimony about his "general investigation" of the crime scene, *see id.* at ¶¶ 347, not because it memorialized witness statements covered by *Brady*. Indeed, Drury and Henry both testified that they did not make *any Brady* disclosures to Plaintiffs' attorneys. *See id.* at ¶¶ 346, 366. In short, these eight courtroom disclosures do not obviate the many questions of fact surrounding the ECDA's *Brady* practices.

c)    *The ECDA's unlawful summation practices*

The County's representative testified that the ECDA had no formal policies on summation conduct. *See id.* at ¶¶ 757-60. New ADAs learned the office practice by seeking informal guidance from the Appeals Bureau and observing more senior ADAs in action. *See id.* at ¶¶ 765–67; County's Statement of Material Facts at ¶¶ 136, 143–44. Drury testified that he tried cases in conformity with DA Cosgrove's policies, *see id.* at ¶ 818, that his summation in Boyd's trial comported with the guidance he had received from the Chief of the Appeals Bureau, *see id.* at ¶¶ 841, and that it was consistent with ECDA practice for him to claim that prosecutors had nothing to do with Woodruff changing his story, *see id.* at ¶ 840, to claim that the police had provided everything to the jury, *see id.*, and to denigrate Woodruff as a "ghetto kid" who lived in a "junkyard," *see id.* at ¶ 839. Professor Gagan likewise testified that Drury's denigration of Woodruff was consistent with ECDA practice. *See id*.

The ECDA's persistent indifference to summation misconduct also is evidence that such misconduct was the Office's practice. In 14 cases decided between 1966 and 1985—7 of which were decided before Plaintiffs' criminal trials—the Appellate Division severely criticized ECDA prosecutors for summation misconduct. *See id.* at ¶¶ 836. The nature of the summation misconduct committed in these cases mirrors the summation misconduct committed in Plaintiffs' cases: prosecutors vouched for their witnesses, their case, or the underlying police investigation; made inflammatory and denigrating comments; shifted the burden of proof; and played to ethnic or other prejudice. *See id.* . Most of these cases resulted in vacated convictions, *see id*, and in many of them, the Appeals Bureau conceded that the summation was improper, *see id*. Yet the County's representative could not identify *any* instance between 1966 and 1985 in which a prosecutor was disciplined in any way for summation misconduct. *See id.* at ¶¶ 849. 54. *Compare Lucente*, 980 F.3d at 301-08 (finding such inaction implies existence of a practice). A reasonable juror could conclude that widespread ECDA practice condoned and led to the summation abuses that occurred in both Plaintiffs' trials.

2.       The County Is Liable for the ECDA's Policy of Deliberate Indifference to Plaintiffs' Fair-Trial Rights

In addition to the ECDA's unlawful *Russo*, *Brady*, and summation practices, a reasonable juror could find that the ECDA maintained a general policy of "deliberate indifference on the part of supervisory personnel to abuse of the [fair-trial] rights of [defendants], which was communicated to line [ADAs] so as to give them the sense that they could engage in such abuse of rights without risking appropriate disciplinary consequences." *Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012). A jury could reasonably infer such deliberate indifference not only from the ECDA's failure to ever investigate or discipline prosecutors for such misconduct but also from its failure to promulgate policy materials to guide prosecutors, to adequately supervise them,

and, as also discussed below, *see infra* at 73–76, to properly train them. Failure to train may be considered as a stand-alone claim or as one aspect of an overall policy of deliberate indifference to criminal defendants' fair-trial rights.

As discussed above, a failure to discipline employees creates liability either because the policymaker's inaction predictably causes additional misconduct to occur or, by its toleration of such incidents, it creates an anything goes atmosphere that encourages their recurrence. *See supra* at 48-49 (and cases collected therein). The County's own witnesses implicitly conceded the application of this theory. County expert Gagan testified that disciplining ADAs is essential to deter future violations, *see* Counterstatement at ¶¶ 844, while the County's Rule 30(b)(6) witness, David Henry, who handled Walker's trial in 1977, acknowledged that tolerating ADA misconduct, even once, can poison an entire office, *see id.* at ¶¶ 843.

Between 1966 and 1981, there were ten cases of *Brady* violations documented in judicial opinions or articles in the Buffalo press, which DA Cosgrove regularly read, *see* Counterstatement at ¶¶ 835–36, there were 15 documented cases of summation misconduct; and there were 12 documented cases of other prosecutorial misconduct, *see id.* at ¶¶ 832, 834, 836. In 5 of these cases, the Appeals Bureau conceded that the prosecutor had engaged in misconduct. *See id.* at ¶¶ 842. Yet *not one* of the ECDA witnesses deposed in this case could identify *any* occasion where an ADA was investigated or disciplined for misconduct committed in the course of a criminal prosecution. *See id.* at ¶¶ 849–50, 854. Indeed, the ECDA did not even have a system, formal or informal, for conducting a disciplinary investigation or inquiry. *See id.* at ¶¶ 845–48. *See, e.g.*, *Vineyard v. Cnty. of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993) (finding single incident liability where incident was attributable to the sheriff's failure to have any policy manual or procedures for

disciplining officers). It did not evaluate its ADAs. *See id.* at ¶¶ 852–53. Nor did DA Cosgrove consider prior misconduct when deciding whether to promote an ADA. *See id.* at ¶¶ 851.

Former ADA Albert Ranni, who headed Drury's and Henry's felony trial bureau, *see id.* at ¶ 870., offers a particularly noteworthy example. Though the County would prefer to dismiss Ranni as "one bad apple," County Br. at 16 (cleaned up), he is hardly an outlier, and his tenure is especially probative given his rank and the gravity and notoriety of his misconduct. Prosecutors in the office saw Ranni as a role model, *see id.* at ¶ 878, and many junior prosecutors made a point of watching his trials, *see id.* at ¶¶ 879. Outside the office, however, Ranni was notorious for his courtroom misconduct. *See id.* at ¶¶ 877.

In *People v. Ivey*, for example, a murder trial held one year before Plaintiffs' trials, Ranni suppressed the fact that an eyewitness had initially identified someone other than the defendant, and then, in summation, contrasted the "good" victim with the "garbage" defense witnesses, made a thinly disguised appeal to racism, denigrated defense counsel, vouched for his own recollection of the evidence, and argued that acquittal would turn a murderer loose on society. *See* Counterstatement at ¶¶ 811, 822, 824, .836. The Appellate Division unanimously reversed, holding that Ranni's serial misconduct deprived the defendant of a fair trial. 83 A.D.2d 788, 789 (4th Dep't 1981). *Ivey* was a well-known case in the office, including to D.A. Cosgrove. *See id.* at ¶¶ 881-82.

In *People v. Johnson*, a high-profile rape trial held the same year as Plaintiffs' trials, Ranni delivered a summation that denigrated the defense, vouched for prosecution witnesses, touted the "chastity" of the victim, shifted the burden to the defense, and stoked the jurors' fear of rapists. *See* Counterstatement at ¶¶ 836.o. The Appellate Division majority (barely) upheld the conviction but denounced Ranni by name, and, in an apparent reference to the ECDA generally, warned that

"unadulterated unfairness and deceit have become the rule." *People v. Johnson*, 62 A.D.2d 555, 559-60 (4th Dep't. 1978), *aff'd*, 47 N.Y.2d 785 (1979); *see also id.* at 570-71 (Hancock & Witmer, JJ., dissenting) ("From the record there clearly emerges the picture of an overbearing prosecutor obsessed with the idea of obtaining a conviction at all costs[.]"). This Court later granted habeas relief. *See* Counterstatement at ¶¶ 936 n.956.  Drury attended the case testified that he followed it as Ranni conducted it. *See id.* at ¶ 880.

The Appellate Division's criticisms of Ranni were well-known throughout the ECDA, *see id.* at ¶ 880, and during their depositions in this case, DA Cosgrove and Drury conceded that Ranni should have been disciplined, *see id.* at ¶¶ 883, 885. What happened, though, is that *none* of Ranni's misconduct resulted in *any discipline whatsoever*, *see id.* at ¶¶ 886–87, and Ranni retained his senior position as chief of the bureau to which Drury and Henry were assigned, *see id.* at ¶¶ 870–75.

The County notes that Ranni "played no role in [Plaintiffs'] prosecution," County Br. at 16, and asserts that "none of the cases cited by Plaintiff[s] involve any misconduct on the part of Drury," *id.* at 14. But that is incorrect. Drury emulated the behavior modeled by his Bureau Chief and was similarly condoned. Drury, before Plaintiffs' trials, caused a mistrial by asking a defendant on cross-examination "if he had not raped another woman … while awaiting trial," even though all charges relating to that incident had been dismissed, and in another case told an eyewitness whom to identify while threatening to prosecute him if he refused. *See id.* at ¶¶ 855-59. Immediately after Plaintiff's trials, Drury caused two more mistrials, in one case because he suppressed *Brady* material, in another because he improperly questioned a defendant in the middle of a trial while the defense attorney was in chambers speaking with the judge. *See id.* at ¶¶ 860-64 In none of these matters was Drury even investigated, let alone disciplined. *See id.* at ¶¶ 865–68.

Indeed, he had no supervision whatsoever during his handling of Plaintiffs' prosecution and trials. *See id.* at ¶¶ 891. (Neither did ADA Henry, *id.* at 892).

The County argues that 30 instances of tolerated prosecutorial misconduct, taking several forms and perpetrated over 25 years, cannot, as a matter of law, establish deliberate indifference. County Br. at 20. They argue that some of the violations in the Erie County misconduct cases were different than in Plaintiffs' cases or occurred after their trials. However, as have discussed herein, the unpunished behavior need not be identical or even similar to cause the spread of an anything-goes attitude, s*ee supra* at 49–50, and a policymaker's toleration of misconduct occurring after a plaintiff's trial may give rise to an inference that he had a similarly indifferent attitude or policy at the time of his trial which led to the misconduct. *See supra* at 47 n.8. (collecting cases).

The County, in relying on *Connick v. Thompson,* seems to assume that everything *Connick* says about failure-to-train cases applies to *Monell* theories generally. County Br. at 21-22. But in *Connick,* the Court evaluated only whether the evidence sufficed to support a stand-alone failure to train claim. *Connick v. Thompson*, 563 U.S. 51, 61-64 (2011). Noting that a failure-to-train claim is the "most tenuous" form of *Monell* liability, it held that, before a District Attorney can be required to expend limited resources on a *Brady* training program, he must be on notice of a "*specific reason*, such as a pattern of violations," to believe such a program is necessary to prevent future violations. *Connick*, 563 U.S. at 67 (emphasis added). However, *Connick* does not elaborate on other forms of *Monell* liability, and post-*Connick* decisions from the Second Circuit do not cabin other theories of *Monell* recovery based upon it. *Connick's* narrow holding has no bearing upon Plaintiffs' theory here that a policy of disciplinary and supervisory "inaction" following prosecutorial misconduct at trial allows to continue, or encourages, a noxious anything-goes culture. *See, e.g., Jones,* 691 F.3d at 81 (citing *Amesty Am. v. Town of W. Hartford,* 361 F.3d 113,

126 (2d Cir. 2004)); *supra* at 48-49 (citing cases). The two Second Circuit cases the County relies on, besides being unpublished, are essentially unlawful training or practice, not failure-to-discipline cases. *See Greene v. City of New York*, 742 F. App'x 532, 537 (2d Cir. 2018); *Nunez v. City of New York*, 735 F. App'x 756, 760 (2d Cir. 2018).[16]

Moreover, the ECDA's unflagging tolerance for prosecutorial misconduct is not the only evidence of its policymaker's indifference to fair-trial rights, particularly disclosure obligations. The ECDA had no written policies governing *Brady* and *Rosario* compliance and statutory discovery, the content of summations, and other aspects of trial advocacy, even though it was suggested by ABA Standards for prosecutors' offices. *See* Counterstatement at ¶ 752–62. Cosgrove was indifferent to supervising line ADAs about *Brady* compliance. *See* Counterstatement at ¶¶ 889. As we have seen, the District Attorney also tolerated an affirmatively illegal series of practices regarding *Brady* compliance and, as we discuss in the next section, had an inadequate *Brady* training program  *See infra* at 73–76  And he allowed a practice of blatantly violating the state's related *Rosario* disclosure rule.  In this latter regard, the County's expert correctly acknowledged that, in 1977, P-73 reports memorializing witness statements clearly qualified as *Rosario* material. *See* Counterstatement at ¶ 828. Yet the County's 30(b)(6) representative said that in 1977, the Office did not understand P-73 reports to qualify as *Rosario* material and had no policy requiring their disclosure. *See id.* at ¶¶ 827. Similarly, while it was clear by 1977 that *Rosario* applied to handwritten notes of witness interviews, *see People v. Consolazio*, 40 N.Y.2d 446, 453 (1976), the ECDA tolerated a practice of BPD detectives systematically destroying their interview notes, thereby preventing the defense from obtaining potential

---

[16]     *See Vann v. City of Rochester*, 2019 WL 2646616 (W.D.N.Y. June 27, 2019), is a failure-to-train case as well. *Id.* at *7–*8.

impeachment material, *see supra* at 41–43. The County's expert testified that ECDA prosecutors almost certainly knew about the BPD's note destruction and that the DA was obligated to instruct police officers that they must preserve notes subject to *Rosario*. *See id.* at ¶ 828. Yet DA Cosgrove took no such steps. *See id.* at ¶¶ 759, 825–26.

Considering all this evidence of deliberate indifference, a jury could reasonably conclude that the ethos instilled in ECDA prosecutors was to get convictions by any means necessary and that this poisonous culture was a substantial factor in causing Plaintiffs' wrongful convictions.

### 3. The County Is Also Liable on a Stand-Alone Claim for Failing to Train Prosecutors in Their *Brady* Obligations

Notwithstanding *Connick*, the record here also amply establishes County liability on a stand-alone claim for the ECDA's failure to train its prosecutors regarding their *Brady* obligations. No training materials were produced in discovery, *see id.* at ¶¶ 762–63, and neither Henry nor ADAs Solomon or Verrastro could recall any *Brady* training, *see id.* at ¶¶ 764–65. Their testimony is borne out by the ECDA's widespread misunderstanding of the *Brady* rule. *See supra* at 62–64.[17]

Unable to present convincing proof of *Brady* training, or to explain why prosecutors well-schooled on *Brady*'s requirements did not understand or follow recent Supreme Court decisions such as *Giglio* and *Agurs*, the County contents itself with establishing that there is some evidence of some training. Prosecutors learned on the job, the County notes, "[e]xperienced prosecutors would instruct newer prosecutors," the First Assistant was available to field questions, and the ECDA sometimes held "instructional sessions" on unspecified topics. County Br. at 18–19. Even if this evidence were undisputed—and it is not, *see* Counterstatement at ¶¶ 762–66—it does not establish that prosecutors received *Brady* training, let alone reasonably adequate such training.

---

[17]    DA Cosgrove and Drury claimed that the ECDA provided some *Brady* training, *see* County Statement of Facts at ¶¶ 128, 142, but again, such testimony simply creates a factual dispute.

The more substantial question is whether DA Cosgrove's failure to train amounted to deliberate indifference. The answer to that question is yes if (i) Cosgrove knew to a moral certainty that his prosecutors would confront *Brady* issues; (ii) *Brady* issues at that time presented a difficult choice that training would make less difficult; (iii) the wrong choice would frequently cause a constitutional violation; and (iv) a specific deficiency in the ECDA's training program was closely related to Plaintiffs' injuries. *See supra* at 48–49; *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992); *Amnesty Am.*, 361 F.3d at 129-30 & n.10.

A reasonable juror could find these elements satisfied. As to the first and second elements, prosecutors invariably confront *Brady* issues, and *Brady* issues present difficult choices that training will make less difficult. As admitted by the County's expert, this was particularly true in 1977, when the Supreme Court's decisions suddenly and dramatically changed the legal landscape to now require prosecutors to disclose *Brady* material without waiting for a request and to include impeachment material. Indeed, Professor Gagan testified that the Supreme Court's *Brady* jurisprudence was "in such an extreme state of flux" in 1976 and 1977 that many ECDA prosecutors did not understand their obligations. *See* Counterstatement at ¶ 750. Training was even more necessary because ECDA prosecutors already took an unlawfully narrow view of disclosure of potential impeachment material under *Rosario*—not applying it to most P-73 reports and handwritten notes—and without training, they failed to appreciate that *Brady* imposed broader obligations than *Rosario*. *See* Counterstatement at ¶¶ 815–27. Moreover, even when prosecutors know that *Brady* requires disclosure, they had "powerful incentives" to make the wrong choice,

*Walker*, 974 F.2d at 297, because disclosing *Brady* material would reduce the likelihood of a conviction while suppression of it was unlikely to be discovered.

The third *Walker* element is easily satisfied: *Walker* itself held that "withholding *Brady* material will virtually always lead to a substantial violation of constitutional rights." 974 F.2d at 300. As to the fourth element, a reasonable juror could find that Drury and Henry would have disclosed the *Brady* material they suppressed, and Plaintiffs would not have been convicted, if prosecutors had been trained to properly apply *Brady*, *Giglio*, and *Agurs*.

Granted, as the County points out, County Br. at 5 n.1, *Connick* reasons that when it comes to *Brady* compliance, "[a] district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the absence of *specific reason*, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations." *Connick*, 563 U.S. at 67 (emphasis added). But here, a jury could find that DA Cosgrove had a "specific reason" to believe that untrained prosecutors would violate *Brady*, notwithstanding their law-school education and professional obligations, due to the Supreme Court's then-recent decisions in *Giglio* and *Agurs*, and the interplay between *Giglio* and *Rosario*. *See Walker*, 974 F.2d at 300 (holding that "in 1971, just seven years after *Brady* was decided," and many years before the Connick case was tried, a District Attorney could not rely on prosecutors to apply *Brady* without "training or supervision").[18] As a result, Gagan testified, DA Cosgrove had the responsibility to take reasonable steps to ensure that prosecutors complied with their obligations. *See id.* at ¶ 751.[19] In view of DA

---

[18]     Though *Walker* predates *Connick*, it remains good law in the Second Circuit. *See, e.g.*, *Bellamy*, 914 F.3d at 751, 758–61 (examining and endorsing *Walker*).

[19]     In *Connick*, by contrast, the alleged failure to train related to a later time period, when *Brady*, *Giglio*, and *Agurs* were deeply engrained, and the municipality in *Connick* did not concede, as Professor Gagan did, that widespread confusion among prosecutors made *Brady* training necessary.

Cosgrove's abject failure to train ECDA prosecutors regarding their *Brady* obligations this is a virtual admission of liability.

## IV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STATE LAW CLAIMS FOR NEGLIGENT HIRING, SUPERVISION, AND DISCIPLINE

The City argues that summary judgment on Plaintiffs' negligent hiring, training, and supervision claim should be granted because it is undisputed that the individual defendants were acting within the scope of their employment during all relevant times and thus Plaintiffs have an adequate remedy for malicious prosecution under *respondeat superior*. *See* City Br. at 39 (citing *Thompson v. City of New York*, 50 Misc. 3d 1037, 1053-54 (Sup. Ct., Bronx Cnty. 2015)). However, the City's Amended Answer in fact *denies* Plaintiffs' allegations regarding scope of employment. *See* Dkt. 86 City's Am. Answer at ¶¶ 14–22. The City also denies that *respondeat superior* liability applies. *See id.* at ¶ 447; City Br. at 39. Plaintiffs are entitled to assert alternative theories so long as the City denies *respondeat superior* liability. *See Zeranti v. United States*, 358 F. Supp. 3d 244, 260 n.10 (W.D.N.Y. 2019) (stating that Fed. R. Civ. P. 8(d)(3) permits a plaintiff to "pursue alternative theories of liability ... at the summary judgment stage") (cleaned up).

Even if the City were to concede the Individual Defendants acted within the scope of their employment, Plaintiffs may pursue their negligent retention claim. *See Hall v. Smathers*, 240 N.Y. 486, 490 (1925) (upholding claims against defendants for assault by their employee acting "within the scope of his authority" *and* for negligent retention). The cases cited by the City (and County)—*Thompson*, 50 Misc. 3d at 1054 and *Newton v. City of New York*, 681 F. Supp. 2d 473, 488 (S.D.N.Y. 2010)—rely on New York cases dismissing negligent hiring, training, and supervision claims because that the claim is superfluous where the employer is already fully liable under a theory of *respondeat superior* for the same underlying wrong. *See Karoon v. New York City Transit Auth.*, 241 A.D.2d 323, 324 (1st Dep't 1997) (citing *Eifert v. Bush*, 27 A.D.2d 950, 951 (2d Dep't

1967)); *see also Rowley v. City of New York*, 2005 WL 2429514, at *12 (S.D.N.Y. Sept. 30, 2005) (citing *Karoon* for scope of employment requirement). Here, however, the negligent retention claim is not superfluous. The City is fighting all liability for malicious prosecution, including under *respondeat superior*, and if the jury agrees, Plaintiffs still should be entitled to recover under their negligent retention claim based upon one of their other theories of wrongful conduct, such as evidence fabrication or *Brady*.

A negligent supervision claim exists to redress and deter injurious conduct besides malicious prosecution. New York employers may not enable state and federal constitutional torts any more than they may enable common law torts. *See D.J. by Comfort v. Corning-Painted Post Area Sch. Dist.*, 2024 WL 989703, at *12 (W.D.N.Y. Mar. 7, 2024) (denying motion to dismiss negligent retention claim where no other state tort claims survived and sole other claim was for a violation of the Equal Protection Clause pursuant to § 1983); *Kinge v. State*, 79 A.D.3d 1473, 1478 (3d Dep't 2010) (upholding plaintiff's verdict on *both* malicious prosecution and negligent supervision claims); *Primeau v. Town of Amherst,* 303 A.D.2d 1035, 1036 (4th Dep't 2003) (employer may be held liable where employee commits a "tort or [is] guilty of a claimed wrong"); *Kinge v. State*, 20 Misc. 3d 161, 168 (Ct. Cl. 2007) (negligent supervision claims are viable despite lack of another underlying actionable tort against the State), *aff'd*, 79 A.D.3d 1473 (3d Dep't 2010).

"An employer does not need to have notice of an employee's propensity to behave in the exact manner in which he behaved with a plaintiff in order for liability to attach, only notice of the employee's propensity for that sort of behavior." *Zilioli v. City of New York*, 2020 WL 1548763, at *9 (S.D.N.Y. Apr. 1, 2020) (cleaned up). "Even a single previous report of misconduct may be sufficient to create an issue of fact regardless of the severity of the previous incident." *Doe v. City*

*of New York*, 2018 WL 6095847, at *7 (S.D.N.Y. Nov. 21, 2018). Plaintiffs have proffered evidence that the City was aware or should have been aware of Chief Donovan and Sergeant Hunter's propensity for misconduct, yet negligently retained them in senior positions and failed to train or supervise them. *See* Counterstatement at ¶¶ 550, 573–96, 604–14, 620–26, 653–60, 680–92. The City has made no showing it lacked such knowledge, let alone that there is no factual issue for the jury. *See, e.g.*, *Zeranti*, 358 F. Supp. 3d. at 260 (denying summary judgment where "genuine dispute of material fact as to whether Defendant *should have* known that" therapist had a propensity to enter into a relationship with patient).[20]

As for the County, Plaintiffs did not sue any individual County employees due to prosecutorial immunity, and the County has not conceded (or denied) in any binding pleading or stipulation that its prosecutors acted at all relevant times in the scope of their employment. Moreover, Plaintiffs' negligent training and supervision claim against the County is not duplicative of any other claim, since there is no *respondeat superior* liability against the County for the fair trial violations caused by its failure to adequately train or supervise Drury. The County was on notice that Drury had a history of violating the fair trial rights of criminal defendants, including in *People v. Williams* in 1973, and in *People v. Conorozzo and Muszynski* in March 1977, a month before the Boyd trial, as reported in contemporaneous newspaper articles, but failed to train or

---

[20]      *See also Timothy Mc. v. Beacon City Sch. Dist.*, 127 A.D.3d 826, 828–29 (2d Dep't 2015) (denying summary judgment where defendant failed to show employer had no knowledge of employee's propensity to engage in misconduct); *Hoffman v. Verizon Wireless, Inc.*, 125 A.D.3d 806, 807–08 (2d Dep't 2015) (triable issue of fact); *Hicks ex rel. Nolette v. Berkshire Farm Ctr. & Servs. for Youth*, 123 A.D.3d 1319, 1320 (3d Dep't 2014); *Kinge*, 79 A.D.3d at 1478 (upholding Court of Claims' bench ruling against State for negligent supervision claim where senior investigator's "lack of action and oversight [] provided Investigator Harding with the opportunity not only to fabricate fingerprint evidence, but also to then proceed, without challenge or any realistic fear of detection, in providing false testimony regarding such evidence").

discipline him, retained him in its employment, and continued to assign him the office's most serious prosecutions. *See* Counterstatement at ¶¶ 855–68.

## V. THE CITY DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

City Defendants' sole argument is that this claim is foreclosed by Plaintiffs' claims for malicious prosecution and other constitutional claims. *See* City Br. at 38. However, Plaintiffs' claim sounding in negligence is distinct from their intentional tort claims. *See Gonzalez v. Bratton*, 48 F. App'x 363, 365 (2d Cir. 2002) (reversing dismissal of emotional distress claim after finding it was "quite simply, not duplicative of her false imprisonment claim" and "therefore not barred"). A factfinder could reject the officers acted intentionally but find they were negligent.

Under New York law, a plaintiff has a cause of action for negligent infliction of emotional distress if he suffers an emotional injury from defendant's breach of a duty which unreasonably endangered his own physical safety. *See Kennedy v. McKesson Co.*, 58 N.Y.2d 500, 504 (1983). The duty must be specific to the plaintiff, and not some amorphous, free-floating duty to society. *See Johnson v. Jamaica Hosp.*, 62 N.Y.2d 523, 526–27 (1984). Here, Individual Defendants assumed a duty to Boyd and Walker when they placed them under arrest. *See Mays v. City of Middletown*, 70 A.D.3d 900, 902 (2d Dep't 2010) ("[B]ecause the plaintiff was in their custody, the police had a duty to safeguard him against foreseeable dangers."). However, rather than safeguard Plaintiffs against the foreseeable dangers of imprisonment, including physical harm and emotional torment, Individual Defendants chose to pursue Plaintiffs on charges that no reasonable officer could have believed to be legitimate.

## CONCLUSION

The Court should (i) deny Defendants' motions for summary judgment and (ii) award any alternative or additional relief the Court deems just and proper.

Dated:  New York, New York
June 24, 2024

Respectfully submitted,

**LAW OFFICES OF JOEL B. RUDIN, P.C.**
By: /s/ Joel B. Rudin
Joel B. Rudin
David E. Rudin
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
*jbrudin@rudinlaw.com*

**WILMER CUTLER PICKERING
HALE AND DORR LLP**
By: /s/ Ryanne E. Perio
Ross E. Firsenbaum
Ryanne E. Perio
Gideon A. Hanft
Phoebe Silos
Erin Hughes
Trena Riley
Melissa Zubizaretta
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
*ross.firsenbaum@wilmerhale.com*

**HOOVER & DURLAND LLP**

By: /s/ Spencer L. Durland
Timothy W. Hoover
Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*

*Attorneys for Plaintiffs Darryl Boyd
and John Walker, Jr.*