**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| DARRYL BOYD, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 1:22-cv-519** |
| | ) | |
| - against - | ) | |
| | ) | |
| THE CITY OF BUFFALO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

| | | |
|---|---|---|
| JOHN WALKER, JR., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 1:22-cv-520** |
| | ) | |
| - against - | ) | |
| | ) | |
| THE CITY OF BUFFALO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS DARRYL BOYD AND JOHN WALKER, JR.'S RESPONSE TO
DEFENDANTS' RULE 56(A) STATEMENTS AND COUNTERSTATEMENT OF
<u>ADDITIONAL MATERIAL FACTS</u>**

# TABLE OF CONTENTS

PART I: PLAINTIFFS' RESPONSES TO DEFENDANTS' RULE 56(A) STATEMENTS..................................................................................................3

    General Responses and Objections.................................................................3

    Plaintiffs' Specific Responses to City Defendants' Rule 56(a) Statement ......................5

    Plaintiffs' Specific Responses to the County's Rule 56(a) Statement ..............................84

PART II: PLAINTIFFS' COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS ...............................................................................................................158

I.     The BPD Homicide Squad Fabricated Evidence of Boyd and Walker's Involvement in the Murder of William Crawford and Ignored Evidence of Their Innocence ...........................................................................................................158

II.    The ECDA Failed to Turn Over *Brady* Evidence During the Prosecutions of Boyd and Walker ........................................................................................................207

III.   ECDA Prosecutors Conducted Improper Summations In The Boyd And Walker Trials ................................................................................................................234

IV.   Floyd Martin Was Acquitted Because His Attorney Relied on Evidence Not Disclosed to Boyd and Walker ..........................................................................239

V.    Boyd and Walker Spent Decades in Prison and Under Parole Supervision Due to Their Wrongful Convictions ..............................................................................241

VI.   Post-Trial Developments Revealed Errors in Boyd and Walker's Convictions .............242

VII.  The City Had an Unlawful Custom or Practice of Using Coercive Interrogation Tactics Against Suspects and Witnesses....................................................................244

VIII. The BPD Had an Unlawful Custom or Practice of *Brady* Violations, Preparation of False or Misleading Reports, and Destroying Notes Potentially Revealing Exculpatory or Impeachment Evidence ..........................................................................273

IX.   The Misconduct of ADAs in Plaintiffs' Cases Resulted from Patterns and Practices of the ECDA ...........................................................................................278

X.    The ECDA Maintained a Policy of Deliberate Indifference to the Fair Trial Rights of Criminal Defendants .........................................................................................302

Pursuant to Federal Rule 56(c)(1) and Local Rule 56(a)(2), Plaintiffs Darryl Boyd and John Walker, Jr. respectfully submit, in support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, responses to Defendants' Rule 56(a) Statements (Part I) ("Responses"), and their own Counterstatement of Additional Material Facts that present genuine issues for trial (Part II) ("Counterstatement").

**PART I: PLAINTIFFS' RESPONSES TO DEFENDANTS' RULE 56(A) STATEMENTS**

Pursuant to Federal Rule 56(c)(1) and Local Rule 56(a)(2), Plaintiffs Darryl Boyd and John Walker, Jr. respond to each of Defendants' assertions of fact, and in doing so, establish that there are numerous material facts as to which there exists a genuine issue for trial.

**General Responses and Objections**

1.       Plaintiffs object to, and move to strike, the paragraphs (including footnotes) in Defendants' Rule 56(a) Statements to the extent that they that are compound (*i.e.,* contain multiple claimed undisputed statements of fact) and thus require Plaintiffs to provide multiple responses to each paragraph. *See, e.g., Auto Ins. Co. v. Hartford, Conn. v. Electrolux Home Products, Inc.*, 2012 WL 6629238, at *1 n.1 (S.D.N.Y. Dec. 20, 2012). Plaintiffs respectfully submit that if these paragraphs are not struck in their entirety, then the showing of a dispute as to any proposition in a paragraph renders the entire paragraph as disputed. *See id.*

2.       Plaintiffs object to, and move to strike, the paragraphs (including footnotes) in Defendants' Rule 56(a) Statements pursuant to Local Rule 56(a)(1) to the extent that they do not provide citations to supporting evidence. *Day Spring Enterprises, Inc. v. LMC Int'l, Inc.*, 2004 WL 2191568, at *11 (W.D.N.Y. Sept. 24, 2004) (holding that where a party submitted statements unsupported by record citations, the court would disregard any "unsupported conclusory statements").

3.      Plaintiffs reserve their objections to the paragraphs (including footnotes) in Defendants' Rule 56(a) Statements to the extent that they rely on inadmissible evidence and reserve their right to move *in limine* to preclude any inadmissible testimony or evidence on which such statements are based, whether cited herein or not. *See* Fed. R. Evid. 802; *Webster v. Travelers Transp. Servs.*, 2016 WL 11750355, at *4 (W.D.N.Y. Dec. 12, 2016) (holding that a party had "not raised a genuine issue of fact for trial because the evidence it relie[d] upon was inadmissible hearsay").

4.      Plaintiffs object to, and move to strike, the paragraphs (including footnotes) in Defendants' Rule 56(a) Statements to the extent that the facts alleged are not material to Defendants' motions for summary judgment. *EEOC v. Green Lantern Inn, Inc.*, 2022 WL 1507944, at *2 (W.D.N.Y. March 8, 2022) (recommending that the parties' Local Rule 56 statements be disregarded where immaterial). By responding to any paragraph in Defendants' Rule 56(a) Statements, including by responding that a statement is undisputed, Plaintiffs do not concede that the information in the paragraph is material to Defendants' motions.

5.      Plaintiffs object to, and move to strike, the paragraphs (including footnotes) in Defendants' Rule 56(a) Statements to the extent that Defendants rely on documents that have not been authenticated. *See, e.g., U.S. Information Systems, Inc. v. Int'l Broth. Of Elec. Workers Local Union No. 3,* 2006 WL 2136249, at *7 (S.D.N.Y. Aug. 1, 2006) (striking exhibits in support of Rule 56 statement for lack of authentication).

6.      Plaintiffs object to, and move to strike, the paragraphs in Defendants' Rule 56(a) Statements to the extent that Defendants rely on inaccurate citations or quotations of the record.[1]

---

[1]      Plaintiffs' Responses present the paragraphs in Defendants' Rule 56(a) Statements as they appear in such Statements, including any typographical or other errors in those documents.

7.      Nothing in these Responses shall be construed as an admission that any evidence relied on by Defendants is admissible and/or authentic. Plaintiffs reserve all rights to argue that any evidence is inadmissible and/or not authentic for any reason.

8.      By responding that a given paragraph is undisputed for the purposes of these Responses, Plaintiffs do not waive the right to dispute its admissibility or contents at trial.

9.      Plaintiffs do not respond to the headings in Defendants' Rule 56(a) Statements because they are not alleged statements of fact. Plaintiffs do not concede the accuracy of the headings but reproduce them below for clarity and ease of the Court's review.

**<u>Plaintiffs' Specific Responses to City Defendants' Rule 56(a) Statement</u>**

<u>Early Investigation of the Death of William Crawford</u>

1.  During the early morning hours of January 3, 1976, William Crawford's wife, Margaret Crawford, discovered him beaten and unconscious outside of their home at 2041 Fillmore Avenue in the City of Buffalo.  Declaration of Peter Sahasrabudhe in Support of Motion for Summary Judgment ("Decl."), Exhibit 3 (hereinafter "Homicide File") at p. COE002124.

**Response:**  Disputed.

   a.   Plaintiffs do not dispute that Mr. Crawford wife discovered him beaten outside of their home at 2041 Fillmore Ave.

   b.   However, this paragraph omits the material fact that the detectives reported that Crawford's body was specifically found "in the driveway" of the home. Declaration of Peter Sahasrabudhe in Support of Motion for Summary Judgment ("Sahasrabudhe Decl."), Ex. 3 (Homicide File) at COE002124. Crawford was pronounced dead shortly thereafter. *ld.*

2.  Crawford was pronounced dead shortly thereafter.  (*Id.*).

**Response:**  Undisputed.

3.  The individuals who took over control of the crime scene were homicide detectives Gerald Dove and Paul Delano.  (*ld.*) at COE002125.

**Response:**  Disputed.

    a.   The evidence cited does not support the proposition that Detectives Dove and Delano "took over control of the crime scene," nor is it clear what "took over control" means in this context.

    b.   In fact, all Buffalo Police Department ("BPD") homicide detectives worked jointly on investigations under Chief Leo Donovan. *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 138:18–139:02. Chief Donovan was "in charge of every case and everything in every case." Sahasrabudhe Decl., Ex. 17 (Guadagno Dep.) at 127:4–128:18; Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 92:11–93:7; Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 23:14–25:14.

    c.   Further, this paragraph omits the material fact that the detectives reported that, after Crawford's body was discovered, other officers, including Patrolmen Tully and Szpila, as well as various emergency personnel were also present at the crime scene. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002125.

    4.   In their preliminary investigation, Detectives Dove and Delano learned that Crawford had spent the evening of January 2, 1976 drinking at a bar across the street from his home known as the Golden Nugget Tavern.  (*Id.*). at COE 002126.

**Response:**  Undisputed.

    5.   Detectives Dove and Delano interviewed the owner of the bar and the "barmaid" working that evening, Debbie Jeffries.  (*Id.*).

**Response:**  Undisputed.[2]

---

[2]    While Plaintiffs do not dispute the substance of this paragraph, the barmaid's name is actually "Debbie Jeffrey." Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000388. Throughout these Responses, Plaintiffs will not dispute Defendants' statements solely for the purpose correcting Jeffrey's name.

6. Through these interviews, Detectives Dove and Delano learned that Crawford had a considerable amount of cash on his person in the hours leading up to his death. (*Id.*). at COE002126–2127.

**Response:**  Disputed.

a. Plaintiffs do not dispute that Detectives Dove and Delano reported that they learned that Crawford had a considerable amount of cash on his person in the hours before his death.

b. However, this paragraph omits the material fact that Detectives Dove and Delano also stated in the same police report that they learned that, when at the Golden Nugget, Crawford displayed his cash (about $300 in tens and twenties) to others at the bar, and that Larry Watson observed him display the cash. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002149–50; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000388–89; *see also* Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002183.

7. Ms. Jefferies also specifically reported to Detectives Dove and Delano that Crawford's neighbor, Larry Watson, had left the bar with him that evening. (*Id.*). at  COE002127.

**Response:**  Undisputed.

8. This information was recorded, preserved, and made accessible to the Assistant District Attorneys who ultimately handled the case.  Sahasrabudhe Decl., Ex. 4 ("Drury Aff.") at 1 5; Ex. 8 ("Henry Dep.") at p. 377.

**Response:**  Disputed.

a. It is not clear what "[t]his information" means in this context. It is not clear if "[t]his information" includes the information in Paragraphs 1–7, the information in Paragraph 7, or some other set of information. To the extent that "[t]his information" refers to the statements disputed by Plaintiffs in Paragraphs 1, 3, and 6, Plaintiffs dispute this paragraph for the reasons set forth in response to Paragraphs 1, 3, and 6.

b. Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD

turned over all materials generated during the Crawford murder investigation to the prosecutors handling the cases. Instead, there is evidence that BPD detectives did not preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

c. The cited evidence does not support the proposition that all of "this information" was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry stated that they would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

d. There is no page five to the exhibit, so Plaintiffs dispute that the citation to this page supports the propositions in Paragraph 8. *See* Sahasrabudhe Decl., Ex. 4 (Drury Aff.).

9. During a later shift on January 3, 1976, homicide detectives Edwin Gorski and Robert Grabowski interviewed a witness named Francis Kalb.   Homicide File COE002131.

**Response:**  Undisputed.

10. Ms. Kalb reported that, on the evening of Crawford's murder, Debbie Jefferies asked Larry Watson and his wife, Julia, to walk Crawford home.  (*Id.*).

**Response:**  Disputed.

a. Plaintiffs do not dispute the proposition that the detectives reported that Kalb recalled that Jeffrey asked the Watsons to walk Crawford home.

    b. However, Plaintiffs dispute this paragraph to the extent it is intended to convey that Jeffrey actually asked the Watsons to walk Crawford home. Instead, there is evidence that Watson offered to walk Crawford home. *See infra*, Counterstatement ¶¶ 12, 43.

11. She further reported that Larry Watson accompanied Crawford out of the Golden Nugget. (*ld.*).

**Response**: Disputed.

    a. Plaintiffs do not dispute that the detectives reported that Kalb told them that Watson accompanied Crawford out of the Golden Nugget.

    b. However, this paragraph omits the material fact that in the same report, the detectives noted that Kalb told them that Watson accompanied Crawford out of the Golden Nugget at about 11:30 p.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002131.

12. Also, according to Ms. Kalb, Larry Watson returned to the tavern, got his wife, and went home. (*ld.*).

**Response**: Disputed.

    a. Plaintiffs do not dispute that the detectives reported that Kalb told them that Watson returned to the tavern, got his wife, and went home.

    b. However, this paragraph omits the material fact that in the same report, the detectives noted that Kalb told them that Watson returned to the tavern after having been gone for about 20 minutes. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002131.

13. A while later, according to Ms. Kalb, Debbie Jeffries received a call from Larry Watson inquiring about his keys, which were apparently missing. (*ld.*).

**Response**: Disputed.

    a. The evidence cited does not support the proposition that Kalb told the detectives that Jeffrey received a call from Larry Watson inquiring about his keys. The cited police report

instead states that Kalb reported that Jeffrey "received a phone call from Julia (Watson) asking her to look around for Larry (Watson's) keys." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002131.

14. Larry Watson's stepson, Bill Howard, apparently relayed to Mr. Watson that his keys were in his jacket pocket. (*Id.*).

**Response:**  Disputed.

    a.  The evidence cited does not support the proposition that Howard relayed to Watson that his keys were in his jacket pocket. The cited police report states only that Kalb reported to detectives that Howard "told [Jeffrey] to tell Julia [Watson] that his keys were in his jacket pocket." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002131.

    b.  Plaintiffs dispute this paragraph to the extent it is intended to convey that Watson's keys were actually in his jacket pocket. Instead, there is evidence to suggest that Watson lost his keys while attacking Crawford, as a set of keys were found on Crawford's body. *See infra*, Counterstatement ¶¶ 31, 41, 46–50.

15. This information was recorded, preserved, and made available to the ADAs who ultimately prosecuted the case. Drury Aff. at ¶ 5; Henry Dep. at p. 377.

**Response:**  Disputed.

    a.  It is not clear what "[t]his information" means in this context. It is not clear if "[t]his information" includes the information in Paragraphs 9–14, the information in Paragraph 14, or some other set of information. To the extent that "[t]his information" refers to the statements disputed by Plaintiffs in Paragraphs 10–14, Plaintiffs dispute this paragraph for the reasons set forth in response to Paragraphs 10–14.

    b.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD turned over all materials generated during the Crawford murder investigation to the

prosecutors handling the cases. Instead, there is evidence that BPD detectives did not preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

c. The cited evidence does not support the proposition that all of "this information" was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry stated that they would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

16. Detectives Gorski and Grabowski also interviewed Larry Watson.  Homicide File at COE002131–2132.

**Response:**  Undisputed.

17. Watson told them that, after leaving the bar with Crawford, he noticed that the door to his home was ajar.  (*Id.*). at COE 2132.

**Response:**  Disputed.

a. Plaintiffs do not dispute the proposition that Detectives Gorski and Grabowski reported that Watson told them that he noticed that the door to his home was open.

b. However, Plaintiffs dispute this paragraph to the extent it is intended to convey that Watson actually noticed that the door to his home was open. Instead, the fact that Watson's statements to police contradicted other witness accounts, omitted critical details, and

changed over time is evidence to suggest that he was lying to the detectives about noticing

that the door to his home was open. *See infra*, Counterstatement ¶¶ 51–54, 61, 66.

18. He therefore left Crawford outside of the bar and went to his home to see if there had been a break-in. (*Id.*).

**Response:**  Disputed.

    a.   Plaintiffs do not dispute that the detectives reported that Watson told them that he left

Crawford outside of the bar and went home. Sahasrabudhe Decl., Ex. 3 (Homicide File) at

COE002132.

    b.   However, Plaintiffs dispute this paragraph to the extent it is intended to convey that Watson

actually left Crawford outside the bar and went home. Instead, the fact that Watson's

statements to police contradicted other witness accounts, omitted critical details, and

changed over time is evidence to suggest that he was lying to the detectives about checking

to see if there had been a break in at his home. *See infra*, Counterstatement ¶¶ 51–54, 61,

66.

19. After checking for a break in, Mr. Watson reported that he used the bathroom in his home, then returned to the Golden Nugget to get his wife and return home with him. (*Id.*).

**Response:**  Disputed.

    a.   Plaintiffs do not dispute that the detectives reported that Watson told them that he checked

his house for a break in. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002132.

    b.   Plaintiffs do not dispute that the detectives reported that Watson told them that he went

home to use the bathroom. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002132.

    c.   Plaintiffs do not dispute that Watson returned to the Golden Nugget and then left with his

wife. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002132, 2148, 2150, 2159; Ex. 1

(Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000389–903.

d. However, Plaintiffs dispute this paragraph to the extent it is intended to convey that Watson actually checked his home for a break in. Instead, the fact that Watson's statements to police contradicted other witness accounts, omitted critical details, and changed over time is evidence to suggest that he was lying to the detectives about checking his home for a break in. *See infra*, Counterstatement ¶¶ 51–54, 61, 66.

e. Plaintiffs also dispute this paragraph to the extent that it is intended to convey that Watson actually used the bathroom in his home. Instead, the fact that Watson's statements to police contradicted other witness accounts, omitted critical details, and changed over time is evidence to suggest that he was lying to the detectives about going home and using the bathroom. *See infra*, Counterstatement ¶¶ 51–54, 61, 66.

20. The detectives recorded and preserved this information, and the ADAs who ultimately handled the case had access to it.  Drury Aff. At ¶ 5; Henry Dep. at p. 377.

**Response**: Disputed.

a. It is not clear what "this information" means in this context. It is not clear if "this information" includes the information in Paragraphs 16–19, the information in Paragraph 19, or some other set of information. To the extent that "this information" refers to the statements disputed by Plaintiffs in Paragraphs 17–19, Plaintiffs dispute this paragraph for the reasons set forth in response to Paragraphs 17–19.

b. Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD turned over all materials generated during the Crawford murder investigation to the prosecutors handling the cases. Instead, there is evidence that BPD detectives did not preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

c. The cited evidence does not support the proposition that all of "this information" was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry stated that they would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

21. Detectives Gorski and Grabowski then interviewed Debbie Jefferies, who gave the same account to them as she had to Detectives Dove and Delano.  Homicide File at COE002132–2133.

**Response:**  Disputed.

a. Plaintiffs do not dispute that Jeffrey's account to Detectives Gorski and Grabowski was fundamentally consistent with her account to Detectives Dove and Delano.

b. However, Plaintiffs dispute this paragraph to the extent that it is meant to convey that Jeffrey provided the exact same details to detectives during each statement. In addition to recounting the same facts that she had told Detectives Dove and Delano, Jeffrey also told Detectives Gorski and Grabowski that Watson offered to take Crawford home, and she denied that she asked anyone to take Crawford home. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002133. She further reported to Detectives Gorski and Grabowski that Watson returned to the bar about 20 minutes later, got his wife, and left the tavern. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002133. She also told Detectives Gorski and Grabowski that "she suspects Larry Watson of harming William Crawford." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002133.

22. Ms. Jefferies emphatically stated that Mr. Watson volunteered to walk Crawford home. (*Id.*). at COE002133.

**Response:**  Undisputed.


23. Ms. Jefferies further stated that Mr. Crawford had approximately $300 on his person.  (*Id.*).

**Response:**  Undisputed.


24. This information was recorded, preserved, and made available for the ADA's review. Drury Aff. At ¶5; Henry Dep. At p. 377.

**Response:**  Disputed.

a.  It is not clear what "[t]his information" means in this context.  It is not clear if "[t]his information" includes the information in Paragraphs 21–23, the information in Paragraph 23, or some other set of information. To the extent that "[t]his information" refers to the statements disputed by Plaintiffs in Paragraph 21, Plaintiffs dispute this paragraph for the reasons set forth in response to Paragraph 21.

b.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD turned over all materials generated during the Crawford murder investigation to the prosecutors handling the cases. Instead, there is evidence that BPD detectives did not preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

c.  The cited evidence does not support the proposition that all of "this information" was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry stated that they would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these

15

prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

25. Later on, in Detectives Gorski and Grabowski's shift on January 3, 1976, they received an anonymous tip.  Homicide File at COE002135.

**Response:**  Undisputed.

26. The tipster told them that Crawford had been murdered by two individuals named Andre Howe and Gerry Boyd.  (*Id.*).

**Response:**  Undisputed.

27. Detectives Gorski and Grabowski then pulled mugshot of a Jerome Boyd who had previously been arrested for multiple criminal offenses, including assault.  (*ld.*). at COE002135–2136.

**Response:**  Undisputed.

28. The detectives preserved and recorded this information and made it available for the ADA's review.  Drury Aff. At ¶ 5; Henry Dep. At p. 377.

**Response:**  Disputed.

a. It is not clear what "this information" means in this context. It is not clear if "this information" includes the information in Paragraphs 25–27, the information in Paragraph 27, or some other set of information.

b. Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD turned over all materials generated during the Crawford murder investigation to the prosecutors handling the cases. Instead, there is evidence that BPD detectives did not preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

16

c. The cited evidence does not support the proposition that all of "this information" was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry stated that they would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

29. During a subsequent shift, Detectives Dove, Delano, and Vincent Pantano showed Jerome Boyd's mugshot to employees of the Golden Nugget.  Homicide File at COE002140.

**Response:**  Undisputed.

30. A waiter/bartender, Theotis Love, recognized Jerome Boyd and stated that Jerome Boyd had been at the bar on the night of the Crawford murder.  (*Id.*).

**Response:**  Disputed.

a. Plaintiffs do not dispute that Love recognized Jerome Boyd and stated that Jerome Boyd had been at the bar on the night of the Crawford murder.

b. However, Plaintiffs dispute this paragraph because it omits the material fact that Love also told the detectives that he served a drink to Jerome Boyd on the night of the Crawford murder. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002140.

31. The detectives recorded and preserved this information and made it available for the ADA's review.  Drury Aff. At ¶ 5; Henry Dep. at p. 377.

**Response:**  Disputed.

a.  It is not clear what "this information" means in this context. It is not clear if "this information" includes the information in Paragraphs 29–30, the information in Paragraph 30, or some other set of information. To the extent that "this information" refers to the statements disputed by Plaintiffs in Paragraph 30, Plaintiffs dispute this paragraph for the reasons set forth in response to Paragraph 30.

b.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD turned over all materials generated during the Crawford murder investigation to the prosecutors handling the cases. Instead, there is evidence that BPD detectives did not preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

c.  The cited evidence does not support the proposition that all of "this information" was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry stated that they would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

32.  On January 6, 1976, Detective Delano and a Detective John Ludtka took a sworn statement from Francis Kalb.  Homicide File at COE002147–2148.

**Response:**  Undisputed.

33.  In her sworn statement, Ms. Kalb gave the same account of the evening of the Crawford murder.  (*Id.*).

**Response:** Disputed.

a. Plaintiffs do not dispute that Kalb's account to Detectives Delano and Ludtka was fundamentally consistent with her account on the night of the Crawford murder.

b. However, Plaintiffs dispute Paragraph 33 to the extent that it is meant to convey that Kalb provided the exact same details to detectives during each statement. In addition to recounting the same facts that she had told detectives on the night of the Crawford murder, Kalb also told Detectives Delano and Ludtka that Crawford had displayed money on the bar in front of him. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002147. Moreover, during this interview, the detectives showed Kalb a mug shot of Jerome Boyd, and Kalb told the detectives that the mug shot "looks like a real big guy that came in and talked with Julia and stayed for only a few minutes" on the night of the murder. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002148.

34. Namely, Ms. Kalb stated that Crawford left the bar with Larry Watson.  (*Id.*).

**Response:**  Undisputed.

35. Further Ms. Kalb stated that Mr. Watson came back to the bar to get his wife a few minutes later, and then called the bar to see if he had left his keys after he had left.  (*Id.*).

**Response:**  Disputed.

a. Plaintiffs do not dispute that Kalb told the detectives that Watson came back to the bar to get his wife after leaving with Crawford.

b. However, this paragraph omits the material fact that Watson came back to the bar and then left with his wife some time after 11 p.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002148.

c. Moreover, the evidence cited does not support the proposition that Watson came back to the bar "a few minutes later." The cited evidence instead states that Watson came back to the bar "a little while later." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002148. Further, other police reports indicate that Watson returned to the bar after about 20 or 25 minutes. *See infra*, Counterstatement ¶ 63.

d. The evidence cited also does not support the proposition that "Mr. Watson … called the bar to see if he had left his keys." Instead, the evidence cited supports the proposition that "Julia [Watson] was on the phone" with Jeffrey and that Julia Watson told Jeffrey "that Larry Watson couldn't find his keys." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002148.

36. Ms. Kalb also confirmed that Jerome Boyd was at the Golden Nugget on the night of the murder after being shown his mug shot.  (*Id.*).

**Response**:  Undisputed.

37. The Detectives recorded and preserved this statement and made it available for the ADA's review.  Drury Aff. At ¶ 5; Henry Dep. At p. 377.

**Response**:  Disputed.

a. It is not clear what "this statement" means in this context. It is not clear if "this statement" includes the statements in Paragraphs 32–36, the statements in Paragraph 36, or some other set of information. To the extent that "this statement" refers to the statements disputed by Plaintiffs in Paragraphs 33 and 35, Plaintiffs dispute this paragraph for the reasons set forth in response to Paragraph 33 and 35.

b. Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD turned over all materials generated during the Crawford murder investigation to the prosecutors handling the cases. Instead, there is evidence that BPD detectives did not

preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

c.  The cited evidence does not support the proposition that "this statement" was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry stated that they would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Aff.) at 377. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

38.  Also on January 6, 1976, Detectives Stanley Suzek and Melvin Lobbett interviewed Debbie Jeffries.  Homicide File at COE 2149–2151.

**Response:**  Undisputed.[3]

39.  Ms. Jeffries gave the same account that she has previously given the detectives when they interviewed her at the Golden Nugget.  She repeated that Larry Watson offered to walk Mr. Crawford home and that he returned twenty minutes later to get his wife.  (*Id.*).

**Response:**  Disputed.

a.  Plaintiffs do not dispute that Jeffrey's account to Detectives Suszek and Lobbett was fundamentally consistent with her previous two statements to detectives.

---

[3]  Plaintiffs do not dispute the substance of this paragraph. However, Plaintiffs note that "Detective Stanley Suzek" is spelled "Detective Stanley Suszek" in the cited exhibit. Sahasrabudhe Decl., Ex. 3 (Homicide File at COE002149); Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000388.

b. Plaintiffs also do not dispute that Jeffrey repeated to the detectives that Watson offered to walk Crawford home and that he returned about twenty minutes later. Specifically, the evidence cited states that Jeffrey said that Watson was gone for "long enough … about 20 or 25 minutes." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002151; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000390.

c. However, Plaintiffs dispute this paragraph to the extent that it is meant to convey that Jeffrey provided the exact same details to detectives during each of the three statements. In her sworn statement to Detectives Suszek and Lobbett, Jeffrey said that she was "sure" that the Watsons and Howard saw Crawford display his money at the bar, and that it was done in a flashy manner. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002150; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000389–90. Jeffrey also told the detectives that an "[o]lder group" of customers frequent the Golden Nugget, and that she always checks customers' IDs. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002151; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000389–90.

40. Further, Mr. Watson called the bar to inquire about his keys.  (*Id.*).

**Response:**  Disputed.

a. The evidence cited does not support the proposition that "Mr. Watson called the bar to inquire about his keys." The cited police report includes no information about a phone call regarding Watson's keys. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002149–50; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000389–90.

b. Other documents support the proposition that Julia Watson called the bar to inquire about Larry Watson's keys. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002131, 2147–48.

41. Ms. Jefferies also stated that she told Crawford to put his wallet away because his substantial amount of cash would have been visible to the other patrons of the bar.  (*Id.*).

**Response:**  Undisputed.

42. The Detectives recorded and preserved these statements.  Drury Aff. At ¶ 5; Henry Dep. At p. 377.  The statements were made available for the ADAs' review.  (*Id.*).

**Response:**  Disputed.

    a.  It is not clear what "these statements" means in this context. It is not clear if "these statements" includes the statements in Paragraphs 38–41, the statements in Paragraph 41, or some other set of information. To the extent that "these statements" refers to the statements disputed by Plaintiffs in Paragraphs 39–40, Plaintiffs dispute this paragraph for the reasons set forth in response to Paragraph 39–40.

    b.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD turned over all materials reflecting these statements to the prosecutors handling the cases. Instead, there is evidence that BPD detectives did not preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

    c.  The cited evidence does not support the proposition that all of "these statements" were recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry stated that they would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the

"homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

43. The next day, January 7, 1976, Detectives Delano and Pantano took a statement from Julia Watson, Larry Watson's wife.  Homicide File at COE2158–2159.

**Response**:  Undisputed.

44. Ms. Watson reported that her husband left the Golden Nugget with Mr. Crawford and returned fifteen minutes later.  (*Id.*).

**Response**:  Disputed.

    a.  Plaintiffs do not dispute that the detectives reported that Julia Watson told them that her husband left the Golden Nugget with Crawford and then returned.

    b.  However, the evidence cited does not support the proposition that Julia Watson told the detectives that her husband "returned fifteen minutes later." Instead, the police report cited states that Julia Watson reported that her husband returned after "[a]bout 15 or 20 minutes." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002159.

45. After her husband returned, Ms. Watson reported that they left the bar because she was ready to go home.  (*Id.*).  She further stated that Mr. Watson went to use the bathroom at his house before he came back.  (*Id.*).

**Response**:  Disputed.

    a.  Plaintiffs do not dispute that the detectives reported that Julia Watson told the detectives that, once her husband returned, she was ready to leave.

    b.  Plaintiffs do not dispute the proposition that the detectives reported that Julia Watson told them that her husband went to use the bathroom before he came back.

    c.  Plaintiffs dispute this paragraph to the extent it is intended to convey that the Watsons left the bar because Julia Watson was ready to go home. Instead, the fact that Julia Watson's statements to police contradicted other eyewitness accounts and changed over time is

24

evidence that she was lying to the detectives. *See infra*, Counterstatement ¶¶ 33–36, 62–63.

d.  Plaintiffs also dispute this paragraph to the extent that it is intended to convey that Larry Watson actually left the bar to use the bathroom. Instead, the fact that Julia Watson's statements to police contradicted other eyewitness accounts and changed over time is evidence that she was lying to the detectives. *See infra*, Counterstatement ¶¶ 33–36, 62–63.

46. Detectives also took a sworn statement from Larry Watson on January 7, 1976.  Homicide File at COE2158–2159.

**Response:** Undisputed.

47. Mr. Watson reported he left the Golden Nugget with William Crawford and left him behind so that he could check to see if his house was broken into.  (*ld.*).

**Response:** Disputed.

a.  Plaintiffs do not dispute that the detectives reported that Watson told them that he left the Golden Nugget with Crawford.

b.  Plaintiffs also do not dispute that the detectives reported that Watson told them that he left Crawford behind to check to see if his house was broken into.

c.  However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Watson actually left Crawford behind to check if his house was broken into. Instead, the fact that Watson's statements to police contradicted other eyewitness accounts and changed over time is evidence that he was lying to the detectives. *See infra*, Counterstatement ¶¶ 51–54, 61, 66.

48. Mr. Watson further reported that, upon returning to his home, he used the bathroom.   (*ld.*).
Mr. Watson further reported that he then returned to the bar where his wife told him she was ready to
go home.  (*ld.*).

**Response:**  Disputed.

    a.   Plaintiffs do not dispute that the detectives reported that Watson told them that he went

         home and used the bathroom.

    b.   Plaintiffs do not dispute that the detectives reported that Watson told them that he returned

         to the bar where his wife told him she was ready to go home.

    c.   However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that

         Watson actually went home and used the bathroom and that his wife told him she was ready

         to go home when he returned. Instead, the fact that Watson's statements to police

         contradicted other eyewitness accounts and changed over time is evidence that he was lying

         to the detectives. *See infra*, Counterstatement ¶¶ 51–54, 61, 66.

49. Mr. Watson said the last time he saw Mr. Crawford is when the two of them left the bar
together and he wished Crawford a happy new year.   (*ld.*).

**Response:**  Disputed.

    a.   Plaintiffs do not dispute that the detectives reported that Watson told them that the last time

         he saw Crawford is when the two of them left the bar together.

    b.   However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that

         the last time Watson saw Crawford was when they left the bar and Watson wished

         Crawford a happy new year. Instead, the fact that Watson's statements to police

         contradicted other eyewitness accounts and changed over time is evidence that he was lying

         to the detectives. *See infra*, Counterstatement ¶¶ 51–54, 61, 66.

50. In summary, from January 3, 1976, through January 7, 1976, the detectives developed
evidence which tended to suggest that Larry Watson and Jermo Boyd were responsible for murder of

William Crawford, but the detectives did not hide or conceal this information.    Drury Aff. At ¶ 5;
Henry Dep. At p. 377.

**Response**:  Disputed.[4]

a.  Plaintiffs do not dispute that from January 3, 1976, through January 7, 1976, the detectives
developed evidence which tended to suggest that Larry Watson and Jerome Boyd were
responsible for the Crawford murder.

b.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD
turned over all materials suggesting that Larry Watson and Jerome Boyd were responsible
for murdering Crawford to the prosecutors handling the cases. Instead, there is evidence
that BPD detectives did not preserve or turn over their handwritten notes taken during the
Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement
¶¶ 299–303.

c.  The evidence cited does not support the proposition that the detectives did not hide or
conceal information related to whether Watson or Jerome Boyd were responsible for the
Crawford murder. The cited evidence indicates merely that prosecutors Timothy Drury and
David Henry would get the "entire homicide file" for each of their cases. Sahasrabudhe
Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23. The
sources cited do not clarify what the "entire homicide file" includes, or how they knew all
documents related to Watson and Jerome Boyd's involvement in the Crawford Murder
were included in the "homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5;
Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

---

[4]    In addition to the information disputed in Plaintiffs' response to Paragraph 50, Plaintiffs
note that "Jermo Boyd" is spelled "Jerome Boyd." Sahasrabudhe Decl., Ex. 3 (Homicide File) at
COE002140.

d. Moreover, there is no evidence that information related to whether Watson or Jerome Boyd were responsible for the Crawford murder was disclosed to the defense.

51. In fact, ADA Timothy Drury has acknowledged that he knew Larry Watson and Jerome Boyd were considered suspects prior to bringing charges against Plaintiffs in these cases.   Decl Ex. 7 ("Drury Dep.") at p. 402–403.

**Response:**  Disputed.

a. The cited testimony does not support the proposition that Drury acknowledged that he knew Watson and Boyd were considered suspects prior to bringing charges against Plaintiffs. Drury testified that as of February 11, 1976, he thought that it was possible that Watson and Boyd collaborated in the crime. Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 402:17–403:3. However, charges were brought against Plaintiffs nearly a month earlier, on January 12, 1976. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002187–88.

The Initial Investigation of Plaintiffs and Their Friends

52. On January 7, 1976, Detective Frank Deubell of the homicide division received a phone call from an anonymous female caller.   Homicide File at COE002152.

**Response:**  Disputed.

a. Plaintiffs do not dispute that Detective Deubell authored a P-73 report stating that he received a phone call from an anonymous female caller on January 7, 1976.

b. Plaintiffs dispute this paragraph to the extent it relies upon unreliable and inadmissible hearsay within hearsay.

c. However, Plaintiffs dispute that Detective Deubell actually received a call from an anonymous female on January 7, 1976. Defendants state no facts indicating that the BPD made any attempt to identify the alleged caller or determine whether there was any basis for her statements. *See generally* City Defendants' Rule 56(a) Statement.

53. The caller stated that the person responsible for the Crawford murder was Darryn Gibson. (*ld.*).

**Response:**  Disputed.

a.  Plaintiffs do not dispute that Detective Deubell authored a P-73 report stating that a purported anonymous caller said that the person responsible for the Crawford murder was Darryn Gibson.

b.  Plaintiffs dispute this paragraph to the extent it relies upon unreliable and inadmissible hearsay within hearsay.

c.  Plaintiffs also dispute that Detective Deubell actually received a call from an anonymous female on January 7, 1976, or that this purported caller stated that Darryn Gibson was responsible for the Crawford murder. The caller provided no evidence corroborating her claim. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002152. Moreover, Defendants state no facts indicating that the BPD made any attempt to identify the alleged caller or determine whether there was any basis for her statements. *See generally* City Defendants 56(a) Statement.

54. Detective Deubell and Detective Michael Guadagno then checked Darryn Gibosn's criminal history, which revealed that Gibson had been arrested for assault, burglary with guns, and sealing automobiles.   (*ld.*).

**Response:**  Disputed.[5]

a.  Plaintiffs dispute this paragraph because the proposition that Gibson was arrested for these offenses relies entirely upon unreliable and inadmissible hearsay within hearsay. *See* Fed. R. Evid. 802.

---

[5]      In addition to the information disputed in Plaintiffs' response to Paragraph 54, Plaintiffs note that "Darryn Gibosn's" is spelled "Darryn Gibson's." *See* Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002152.

b.  Plaintiffs dispute the proposition in Paragraph 54 to the extent it is intended to convey that Gibson was actually arrested for these offenses. The evidence cited is not a criminal record, nor does it even state that the detectives checked Gibson's criminal history. Instead, it is merely a police report in which detectives assert that Gibson has been arrested for certain offenses. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002152.

55.  With this new information from the anonymous caller and their background check, Detectives Deubell and Guadagno found Darryn Gibson and took him in for a statement.    (*Id.*). at p. COE002152–2158.

**Response:**  Disputed.

a.  Plaintiffs do not dispute that Detectives Deubell and Guadagno found and interrogated Darryn Gibson based only on the information from an alleged anonymous caller and Gibson's prior arrest record.

b.  Plaintiffs dispute this paragraph to the extent it relies upon unreliable and inadmissible hearsay within hearsay.

c.  Plaintiffs also dispute that Detective Deubell actually received a call from an anonymous female on January 7, 1976, or that this purported caller stated that Darryn Gibson was responsible for the Crawford murder. The caller provided no evidence corroborating her claim. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002152. Moreover, Defendants state no facts indicating that the BPD made any attempt to identify the alleged caller or determine whether there was any basis for her statements. *See generally* City Defendants' 56(a) Statement.

56.  The detectives did not conceal or hide from prosecutors the fact that Gibson came to their attention through an anonymous caller.    This information was recorded, preserved, and made available for the ADAs review.    Drury Aff. At ¶ 5; Henry Dep. At p. 377.

**Response:**  Disputed.

a.  Plaintiffs dispute this paragraph to the extent it relies upon unreliable and inadmissible hearsay within hearsay. *See* Fed. R. Evid. 802.

b.  Plaintiffs also dispute the proposition that Gibson came to the BPD's attention through an anonymous caller. Plaintiffs dispute that Detective Deubell actually received a call from an anonymous female on January 7, 1976, or that this purported caller stated that Darryn Gibson was responsible for the Crawford murder. The caller provided no evidence corroborating her claim. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002152. Moreover, Defendants state no facts indicating that the BPD made any attempt to identify the alleged caller or determine whether there was any basis for her statements. *See generally,* City Defendants' 56(a) Statement.

c.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD turned over all materials regarding the referenced anonymous call to the prosecutors handling the cases. Instead, there is evidence that BPD detectives did not preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

d.  The cited evidence does not support the proposition that all of "[t]his information" was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry stated that they would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Ex. 8 (Henry Dep.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl. Ex. 4 (Drury Aff.) at ¶ 5; Ex. 8 (Henry Dep.) at 377:7–23.

57. In his sworn statement of January 7, 1976, Gibson relayed to Detectives Deubell and Guadagno that he spent the evening of the Crawford murder with his four friends:  Plaintiffs, Floyd Martin, and Tyrone Woodruff.   Homicide File at COE002156–2157.

**Response:**  Undisputed.

58. According to Gibson, he and his friends spent the evening hanging out in the Glenny Drive Projects in the City of Buffalo, which is walking distance to the Golden Nugget.   (*ld.*).

**Response:**  Undisputed.

59. Gibson told the detectives that, at around 11:15, Tyrone Woodruff and Plaintiff Walker took a cab home.   (*ld.*).

**Response:**  Undisputed.

60. After the cab came, Gibson reported that he and Plaintiff Boyd walked back to their respective homes.   (*ld.*).

**Response:**  Undisputed.

61. To get home,  Boyd and Gibson had to pass the Golden Nugget.   (*ld.*).

**Response:**  Undisputed.

62. In his statement, Gibson denied any knowledge of the Crawford murder.  (*ld.*).

**Response:**  Undisputed.

63. The detectives recorded Gibson's statement, preserved it, and made it available for the ADAs eventual review.   Drury Aff. At ¶ 5; Henry Dep. at p. 377.

**Response:**  Disputed.

   a.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Gibson's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 123–25, 170–171, 710–16.

b. Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD turned over all materials reflecting Gibson's statement to prosecutors handling the cases. Instead, there is evidence that BPD detectives did not preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

c. The cited evidence does not support the proposition that "Gibson's statement" was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry stated that they would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at Dep.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

64. In order to check the veracity of Gibson's statement, Detectives Deubell and Guadagno went to interview Boyd during their shift the next day.   Homicide File at COE002165.

**Response:**  Undisputed.

65. The detectives had run a criminal background check on Boyd which showed that he had committed multiple juvenile offenses, including a robbery of a laundromat where he discharged a sawed-off shotgun leaving behind a severely injured victim.  (*Id.*). at COE002153.

**Response:**  Disputed.

a. Plaintiffs dispute this paragraph because the proposition that Boyd committed these juvenile offenses relies entirely upon unreliable and inadmissible hearsay within hearsay. *See* Fed. R. Evid. 802.

b.  Plaintiffs dispute this paragraph because the probative value is substantially outweighed by a danger of unfair prejudice. *See* Fed. R. Evid. 403.

c.  Plaintiffs dispute this paragraph to the extent it is intended to convey that Boyd was actually arrested for these juvenile offenses. The evidence cited is not a criminal record, nor does it even state that the detectives checked Boyd's criminal history. Instead, it is merely a police report in which detectives assert that Boyd has been arrested for these offenses. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002153.

d.  Plaintiffs dispute this paragraph to the extent it implies that Boyd intentionally discharged a gun. Sahasrabudhe Decl., Ex. 15 (Boyd Dep.) at 15:16–16:1. Instead, the gun went off accidentally. Sahasrabudhe Decl., Ex. 15 (Boyd Dep.) at 15:16–16:1.

66. This offense had earned Boyd the nickname of "the Shotgun Kid." (*Id.*).

**Response**: Disputed.

a.  Plaintiffs dispute this paragraph because the proposition that Boyd committed these juvenile offenses relies entirely upon unreliable and inadmissible hearsay within hearsay. *See* Fed. R. Evid. 802.

b.  Plaintiffs dispute this paragraph because the probative value is substantially outweighed by a danger of unfair prejudice. *See* Fed. R. Evid. 403.

c.  Plaintiffs dispute this paragraph to the extent it is intended to convey that Boyd was actually arrested for these juvenile offenses. The evidence cited is not a criminal record, nor does it even state that the detectives checked Boyd's criminal history. Instead, it is merely a police report in which detectives assert that Boyd has been arrested for certain offenses. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002153

    d.  The evidence cited does not support the proposition that the referenced offense "earned Boyd the nickname of 'the Shotgun Kid.'" It indicates only that Detectives Deubell and Guadagno wrote in their report that Boyd was nicknamed "the Shotgun Kid." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002153.

    e.  Plaintiffs dispute that Boyd was ever nicknamed "the Shotgun Kid." Boyd testified that he has never gone by this nickname. Sahasrabudhe Decl., Ex. 15 (Boyd Dep.) at 316:11–20.

67. Initially, the detectives were unable to locate Boyd at his home, but they were directed to the home of Thelma Green, where Boyd's mother claimed he had been on the night of the murder. (*Id.*) at COE002164.

**Response:** Disputed.

    a.  Plaintiffs dispute this paragraph to the extent that the evidence cited neither states, implies, nor relates in any way to the propositions in this paragraph.

68. Upon their arrival at Thelma Green's apartment, located in the Glenny Drive apartments, Ms. Green introduced the detectives to her foster son, Andre Hough.   Hough told the detectives that he could give a statement as to Boyd's whereabouts on the night of the Crawford murder.   (*Id.*).

**Response:** Disputed.

    a.  Plaintiffs dispute this paragraph to the extent that the evidence cited neither states, implies, nor relates in any way to the propositions in this paragraph.

69. Detectives Guadagno and Deubell then took a sworn statement from Hough at police headquarters.   (*Id.*). at COE002165–2167.

**Response:** Disputed.

    a.  Plaintiffs do not dispute that BPD detectives reported interviewing Hough on January 8, 1976, or that they prepared a limited, reconstructed statement for him to sign.

b. Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Hough to make this statement. *See infra*, Counterstatement ¶¶ 146–64.

c. Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Hough's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 123–25, 170–71, 710–16.

70. In his January 8, 1976, sworn statement, Hough told detectives that, in the early evening on the night of the Crawford murder, he was with Boyd at an apartment in the Glenny Drive projects. (*Id.*).

**Response**: Disputed.

a. Plaintiffs do not dispute that BPD detectives reported interviewing Hough on January 8, 1976, or that they prepared a limited, reconstructed statement for him to sign that contains the statement summarized in this paragraph.

b. Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Hough to make this statement. *See infra*, Counterstatement ¶¶ 146–64.

c. Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Hough's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ ¶¶ 123–25, 170–71, 710–716.

71. The apartment belonged to a Ms. Washington, the mother of Boyd's then girlfriend. (*Id.*).

**Response**: Disputed.

a. Plaintiffs do not dispute that BPD detectives reported interviewing Hough on January 8, 1976, or that they prepared a limited, reconstructed statement for him to sign that contains the information summarized in this paragraph.

36

b.  Plaintiffs dispute this Paragraph because it omits the material fact that the detectives coerced Hough to make this statement. *See infra*, Counterstatement ¶¶ 146–64.

c.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Hough's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 123–25, 170–71, 710–16.

72. Hough told the Detectives that Darryn Gibson, John Walker, Tyrone Woodruff, and Floyd Martin knocked on the door and asked for Darryl Boyd.   (*ld.*).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that BPD detectives reported interviewing Hough on January 8, 1976, or that they prepared a limited, reconstructed statement for him to sign that contains the information summarized in this paragraph.

b.  Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Hough to make this statement. *See infra*, Counterstatement ¶¶ 146–64.

c.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Hough's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ ¶¶ 123–25, 170–71, 710–16.

73. According to Hough, Boyd accompanied these four individuals and left Hough behind. Someone asked if Hough should accompany this group of friends, but one member of the group stated that Hough should be left behind because he might say something or tell on them.  (*ld.*).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that BPD detectives reported interviewing Hough on January 8, 1976, or that they prepared a limited, reconstructed statement for him to sign that contains the statements summarized in this paragraph.

b. However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that a member of the group actually stated that Hough should be left behind because he might say something or tell on them. While one of the boys, John Walker, stated that Hough could not come to a party with them that night, Plaintiffs dispute that Walker—or any of the other boys—said that it was "because he might say something or tell on them." Sahasrabudhe Decl., Ex. 14 (Walker Dep.) at 114:21–115:22.

c. Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Hough to make this statement. *See infra*, Counterstatement ¶¶ 146–64.

d. Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Hough's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 123–25, 170–71, 710–16.

74. Hough also reported that he saw Boyd the next day on January 3, 1976.  Boyd apparently had with him a considerable amount of cash on this day.   (*ld.*).

**Response:**  Disputed.

a. Plaintiffs do not dispute that BPD detectives reported interviewing Hough on January 8, 1976, or that they prepared a limited, reconstructed statement for him to sign that contains the statement summarized in this paragraph.

b. However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Boyd actually had a considerable amount of cash on him on January 3, 1976.

c. Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Hough to make this statement. *See infra*, Counterstatement ¶¶ 146–64.

d. Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Hough's answers verbatim, in complete form, preserved them, and

turned them over to prosecutors. *See infra*, Counterstatement ¶¶ ¶¶ 123–25, 170–71, 710–16.

75. Further, Boyd convinced Hough to call into the police station to see if the police were looking into him for the murder.   (*Id.*).

**Response:**  Disputed.

    a.  Plaintiffs do not dispute that BPD detectives reported interviewing Hough on January 8, 1976, or that they prepared a limited, reconstructed statement for him to sign that contains the statement summarized in this paragraph.

    b.  However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Boyd actually convinced Hough to call the police station to see if the police were looking into him for the murder, or that Hough called the police station at all. Instead, Boyd testified that he never talked to Hough about the murder, which he learned about on the news. Sahasrabudhe Decl., Ex. 15 (Boyd Dep.) at 208:19–209:7, 289:2–10.

    c.  Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Hough to make this statement. *See infra*, Counterstatement ¶¶ 146–64.

    d.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Hough's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 123–25, 170–71, 710–16.

76. After interviewing Hough, Detectives Deubell and Guadagno went to find Floyd Martin to see if he could corroborate Darryn Gibson's story.   (*Id.*). at COE002169.

**Response:**  Disputed.

    a.  Plaintiffs do not dispute that Detectives Deubell and Guadagno reported that they went to find Martin.

b. However, the evidence cited does not support the proposition that the detectives actually went to find Martin to "see if he could corroborate Gibson's story."

77. While looking for Martin, they actually happened upon Darryl Boyd at the Glenny Drive apartments.  (*ld.*).

**Response**: Disputed.

a. Plaintiffs do not dispute that Detectives Deubell and Guadagno reported that while looking for Martin, they located Boyd at the Glenny Apartments.

b. However, the evidence cited does not support the proposition that the detectives actually went to find Martin to "see if he could corroborate Gibson's story."

78. Detectives Deubell and Guadagno brough Boyd to police headquarters to give a statement. (*ld.*). at COE002170–2171.

**Response**: Disputed.

a. Plaintiffs do not dispute that BPD picked up Boyd on January 8, 1976 and brought him to BPD headquarters for questioning.

b. Plaintiffs dispute this paragraph because it omits the following material facts:

1. At a pretrial hearing in the underlying criminal cases, Guadagno confirmed that Boyd was not free to leave during this questioning. *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 55:22–56:05.

2. Boyd testified in his deposition in this case that the typed statement does not accurately reflect many of the statements he actually told BPD on January 8, 1976. Sahasrabudhe Decl., Ex. 15 (Boyd Dep.) at 86:6–91:8, 99:23–102:25.

c. Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Boyd's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 123–24, 170–71, 299, 710–16.

79. In a sworn statement, Boyd stated that he met up with Walker, Gibson, Martin, and Woodruff at the Glenny Drive projects on the evening of the Crawford murder.  (*ld.*).

**Response:**  Undisputed.


80. Boyd stated that, after going to hang out at an apartment occupied by Shirley Floyd, Mr. Woodruff and Mr. Walker took a cab home.  (*ld.*).

**Response:**  Undisputed.


81. He also told the police that another group of people they were hanging out with called another cab after Woodruff and Walker got in the first one.  (*ld.*).

**Response:**  Undisputed.


82. Finally, Boyd told the police that he walked to his home with Darryn Gibson, which required them to walk down Fillmore and pass the Golden Nugget.   (*ld.*).

**Response**:  Disputed.

    a.   The evidence cited does not support the proposition that Boyd told the police that he walked home with Gibson. Instead, the police report cited states that Boyd and Gibson "split up" to walk to their own homes after getting to Leroy Street. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002170.

    b.   The evidence cited does not support the proposition that Boyd and Gibson's walk home required them to walk down Fillmore and pass the Golden Nugget. The cited report states that they walked down Fillmore, but it does not state that the boys passed the Golden Nugget. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002170–71.


83. Next, during the same shift, Detectives Deubell and Guadagno checked with the Fillmore Cab Company to see if taxis had been sent to the Glenny Drive apartments on the evening of the Crawford murder.   (*ld.*). at COE002173.

**Response:**  Undisputed.

84. They learned that two cabs had been dispatched to the Glenny Drive apartments—one at 11:28 and one at 11:44. ( *Id.*).

**Response:** Undisputed.

85. The Detectives recorded and preserved this information. The information was accessible to the ADA's handling the Crawford case. Drury Aff. at ¶ 5; Henry Dep. At p. 377.

**Response:** Disputed.

a. It is not clear what "[t]his information" means in this context. It is not clear if "this information" includes the information in Paragraphs 64–84, the information in Paragraph 84, or some other set of information. To the extent that "[t]his information" refers to the statements disputed by Plaintiffs in Paragraphs 65–78, Plaintiffs dispute this paragraph for the reasons set forth in response to Paragraphs 65–78, 82.

b. Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD turned over all materials generated during the Crawford murder investigation to the prosecutors handling the cases. Instead, there is evidence that BPD detectives did not preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

c. The cited evidence does not support the proposition that all of "this information" was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry stated that they would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the

"homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8

Dep.) at 377:1–23.

86. Next, Detectives Deubell and Guadagno interviewed Shirley Floyd, who told them that Gibson, Boyd, Walker, Martin, and Woodruff, had all been at her apartment on the night of the Crawford murder.   Homicide File at COE002173–2174.

**Response:**  Undisputed.

87. Ms. Floyd could not remember with certainty when the five boys left her apartment.   (*ld.*).

**Response:**  Disputed.

a.  Plaintiffs do not dispute that the detectives reported that Floyd could not provide them with

an exact time that the boys left her apartment.

b.  Plaintiffs dispute this paragraph to the extent it indicates that Floyd did not provide the

detectives with a time that the boys left her apartment. Sahasrabudhe Decl., Ex. 3

(Homicide File) at COE002173. The cited report states that Floyd told the detectives that

the boys "left around [m]idnight or 1:00 am," and that she "could have been off an hour

either way." *Id*.

88. The next investigative steps taken by the detectives came on January 11, 1976.   Detectives James Hunter, Robert Arnet, and John Montondo picked up Plaintiff Walker and Tyrone Woodruff for questioning.   (*ld.*). at COE002175.

**Response:**  Undisputed.

89. Both Walker and Woodruff gave sworn statements to the detectives on January 11, 1976. (*ld.*). at COE002176–2180.

**Response:**  Disputed.

a.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded

their questions and Walker's and Woodruff's answers verbatim, in complete form,

preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 123–25, 169–71, 709–16.

90. Both Walker and Woodruff claimed that they took a cab home after hanging out with their friends at the Glenny Drive Apartments.   (*Id.*).

**Response:**  Undisputed.

91. Both Walker and Woodruff denied any involvement in the crime. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002176–2180.

**Response:**  Undisputed.

92. Walker and Woodruff's statements were recorded, preserved, and made accessible to ADA's handling the Crawford case.   E x .   4 ,   Drury Aff. at ¶ 5; Ex. 8, Henry Dep. at p. 377.

**Response:**  Disputed.

a.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that the BPD turned over all materials reflecting these statements to the prosecutors handling the cases. Instead, there is evidence that BPD detectives did not preserve or turn over their handwritten notes taken during the Crawford murder investigation to the ECDA or the defense. *See infra*, Counterstatement ¶¶ 299–303.

b.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Walker's and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 170–71, 709–16.

c.  The cited evidence does not support the proposition that this information was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23. The sources cited do not clarify

what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) Dep.) at 377:7–23.

## Andre Hough's Second Statement to the Police

93. On January 12, 1976, Andre Hough gave a second statement in connection with BPD's investigation of the Crawford murder.   Homicide File at COE002194–2195.   The statement was taken by Detectives Guadagno and Deubell.  (*Id.*).

**Response**:  Undisputed.

94. Also present for Hough's second statement was his foster mother, Thelma Green.   (*Id.*).

**Response**:  Disputed.

a. Plaintiffs dispute that Hough's foster mother was present when he gave his second statement to the BPD. Hough testified at the *Wade* Hearing that he spoke with police without his mother present. Sahasrabudhe Decl., Ex. 18 (Hough *Wade* Hrng. Tr.) at 56:2–16; *Boyd* Dkt. 168-10 (Hough *Wade* Hrng Tr.) at 21:2–11

b. At a pre-trial hearing in the Floyd Martin trial, Hough testified that he was alone when he gave the second statement to the BPD, and that "after the statement my mother and her sister came."  Ex. 16 (7/11/77 Martin Hrng. Tr.) at 3:9–16.

95. During this statement, Hough relayed that, on the day after the Crawford murder, Boyd relayed to him that he, Gibson, Walker, Martin, and Woodruff took part in the crime.   (*Id.*).

**Response**:  Disputed.

a. Plaintiffs do not dispute that the reconstructed, limited statement prepared by detectives states that Hough said that Boyd said that Boyd, Gibson, Walker, Martin, and Woodruff took part in the crime.

b. Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Hough to make this statement. *See infra*, Counterstatement ¶¶ 146–64.

c. Moreover, Plaintiffs dispute this paragraph because it omits the material fact that at the Walker trial, Hough testified that he knew nothing about the crime as of January 8, 1976, when he provided his first statement to police. Sahasrabudhe Decl., Ex. 13 (Hough Trial Tr.) at 11:19–20.

96. Hough relayed that Boyd had reported to him that the boys beat Mr. Crawford up and took his money.   (*Id.*).

**Response**: Disputed.

a. Plaintiffs do not dispute that the reconstructed, limited statement prepared by detectives states that Hough said that Boyd said that the boys beat Crawford up and took his money.

b. Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Hough to make this statement. *See infra*, Counterstatement ¶¶ 146–64.

c. Moreover, Plaintiffs dispute this paragraph because it omits the material fact that at the Walker trial, Hough testified that he knew nothing about the crime as of January 8, 1976, when he provided his first statement to police. Sahasrabudhe Decl., Ex. 13 (Hough Trial Tr.) at 11:19–20.

97. Hough further stated that the reason he did not come forward with this information in his first statement was that he feared retaliation.  (*Id.*).

**Response**: Disputed.

a. The evidence cited does not support the proposition that "the reason [Hough] did not come forward with this information in his first statement was that he feared retaliation." The reconstructed, limited statement prepared by detectives states that Hough said that he did

not initially provide the information in his second statement because he was "afraid that [he] would be involved with it." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002194.

b.  Hough also stated that the information he provided in his first statement was "true." *Id.*

c.  Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Hough to make this statement. *See infra*, Counterstatement ¶¶ 146–64.

d.  Moreover, Plaintiffs dispute this paragraph because it omits the material fact that at the Walker trial, Hough testified that he knew nothing about the crime as of January 8, 1976, when he provided his first statement to police. Sahasrabudhe Decl., Ex. 13 (Hough Trial Tr.) at 11.

98.  Hough signed his second statement and his foster mother witnessed the statement by adding her signature.   (*Id.*).

**Response:**  Disputed.

a.  Plaintiffs do not dispute that Hough's signature and Thelma Green's signature appear at the end of the limited, reconstructed statement prepared by detectives.

b.  However, Plaintiffs dispute that Hough's foster mother "witnessed the statement by adding her signature." Hough testified at the *Wade* Hearing that he spoke with police without his mother present. Sahasrabudhe Decl., Ex. 18 (Hough *Wade* Hrng. Tr.) at 56:2–16; *Boyd* Dkt. 168-10 (Wade Hearing Tr.) at 21:2–11.

c.  At a pre-trial hearing in the Floyd Martin trial, Hough testified that he was alone when he gave the second statement to the BPD, and that "after the statement my mother and her sister came." Ex. 16 (7/11/77 Martin Hrng. Tr.) at 3:9–16.

99.  In subsequent criminal proceedings, Hough claimed that, when he initially told detectives that he had no pertinent knowledge regarding the Crawford murder, he passed a polygraph test.   Decl. Ex. 18 ("Hough Wade Hearing Testimony"); Ex. 13 ("Hough Trial Testimony") at COE006136.

**Response:**  Undisputed.

100.     Hough also claimed that, after he changed his story to implicate Boyd and the four other boys in the homicide, he refused to take a lie detector test.   (*Id.*).

**Response:**  Undisputed.

101.     Both of these facts were made known the ADA Drury, who still chose to proceed with using Hough as a witness in Plaintiffs' subsequent prosecutions.   Drury Dep. At p. 268–369.

**Response:**  Disputed.

    a.  Plaintiffs dispute this paragraph to the extent that it is unclear what "both of these facts"

       refers to.


102.     Despite having Hough's new statement, the detectives did not make any arrests. The detectives did not make any arrests until Tyrone Woodruff gave a second statement to the police shortly after Hough gave his.   Ex. 3, Homicide File at COE0022043.

**Response:**  Disputed.

    a.  Plaintiffs dispute the statements in this paragraph because Woodruff was arrested at his

       home and brought to the police station before Hough provided his statement on January

       12, 1976.

    b.  The detectives' interrogation of Woodruff on January 12, 1976 ended at 8:50 p.m.

       Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002205.

    c.  Walker was arrested at 8:15 p.m. on January 12, 1976, prior to the completion of

       Woodruff's interrogation and the execution of his statement. Sahasrabudhe Decl., Ex. 3

       (Homicide File) at COE002185.

    d.  Gibson was arrested at 7:45 p.m. on January 12, 1976, prior to the completion of

       Woodruff's interrogation and the execution of his statement. Sahasrabudhe Decl., Ex. 3

       (Homicide File) at COE002189.

    e.  Boyd was arrested at 7:43 p.m. on January 12, 1976, prior to the completion of Woodruff's

       interrogation and the execution of his statement. Sahasrabudhe Decl., Ex. 3 at COE002190.

f. Detectives Deubell and Montondo arrived at Martin's home at 4:15 p.m. Sahasrabudhe
Decl., Ex. 3 (Homicide File) at COE002185. Martin was arrested at 6:30 p.m. on January
12, 1976, prior to the completion of Woodruff's interrogation and the execution of his
statement. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002191.

g. Hough's interrogation on January 12, 1976 began at 5:17 p.m. and ended at 6:37 p.m.
Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002194–95.

<u>The Detectives Account of Woodruff's January 12, 1976 Confession</u>

103.      Detectives Hunter and Arnet did not believe that Woodruff was being forthcoming
or truthful in his statement given on January 11, 1976.   As such, they decided to take him in for
questioning again the next day on January 12.   (*Id.*). at COE002197.

**<u>Response</u>:** Disputed.

a. Plaintiffs do not dispute that that Woodruff was interrogated a second time on January 12,
or that Detectives Hunter and Arnet wrote in their report that they did not believe that
Woodruff was being forthcoming. Sahasrabudhe Decl., Ex. 3 (Homicide File) at
COE002175.

b. However, the evidence cited does not support the proposition that Woodruff was in fact
not being forthcoming or truthful. *See infra*, Counterstatement ¶¶ 180–84.

104.      Detectives Hunter and Arnet went to Woodruff's home, and Woodruff's parents
gave them permission to take him to police headquarters for questioning.   Decl. Ex. 9 ("Woodruff
Dep.") at p. 75.

**<u>Response</u>:** Disputed.

a. The evidence cited does not support the proposition that "Woodruff's parents gave
[detectives] permission to take him to police headquarters for questioning." Woodruff
testified only that his parents were present when he was taken from his home and placed
in the police car. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 75:21–24.

105.       While Woodruff was sitting in the office of the homicide division, Detective Manista reported that he got an anonymous call from a female tipster.   Homicide File at COE2202.

**Response:** Disputed.

a.   Plaintiffs do not dispute that Detective Manista authored a report stating that he received an anonymous call from a female tipster while Woodruff was sitting in the office of the homicide division.

b.   Plaintiffs dispute this paragraph to the extent it is intended to convey that Detective Manista actually received an anonymous call. In his deposition in this case, Woodruff denied overhearing any such anonymous call. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 100:14–102:3.

106.       According to a police report authored by Detective Manista, the tipster claimed that she saw Gibson, Boyd, Walker, Martin, and Woodruff splitting up money at the Glenny Drive projects after the Crawford murder.   (*Id.*).

**Response:** Disputed.

a.   Plaintiffs do not dispute that Detective Manista authored a report that stated that while Woodruff was being interrogated, Manista received an anonymous phone call naming John Walker, "Darryl Gibson," Floyd Martin, and "Toni" as Crawford's killers. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002202.

b.   However, Plaintiffs dispute this paragraph to the extent it relies upon unreliable and inadmissible hearsay within hearsay. *See* Fed. R. Civ. P. 802.

c.   Plaintiffs also dispute this paragraph to the extent it is intended to convey that Manista actually received an anonymous call, or that the alleged caller's tip was accurate. The BPD collected evidence showing that Walker and Woodruff were either riding in a taxicab or already home at the time of the crime, and therefore the alleged anonymous caller's

statement regarding their involvement in the crime could not have been truthful. *See infra*, Counterstatement ¶¶ 133–45.

107.     Detective Manista's report also stated that Woodruff overheard his conversation with the female tipster.   (*ld.*).

**<u>Response</u>:**  Disputed.

   a. Plaintiffs do not dispute that Detective Manista authored a report stating that he received an anonymous call from a female tipster while Woodruff was sitting in the office of the homicide division.

   b. Plaintiffs dispute this paragraph to the extent it is intended to convey that Detective Manista actually received an anonymous call. In his deposition in this case, Woodruff denied overhearing any such anonymous call.   Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 100:14–102:3.

108.     Detective Manista's report asserted that,  after overhearing the conversation and being told that a witness had implicated him and his friends in the Crawford murder, Woodruff began admitting that he and his friends were responsible.   (*ld.*).

**<u>Response</u>:**  Disputed.

   a. Plaintiffs do not dispute that Detective Manista authored a report stating that Woodruff began admitting that he and his friends were responsible after overhearing an anonymous call.

   b. However, Plaintiffs dispute this paragraph to the extent it is intended to convey that there was actually an anonymous call, that Woodruff overheard it, or that such a call prompted Woodruff to admit involvement in the Crawford murder. *See infra*, Counterstatement ¶ 206.

c.  Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff during his January 12 interrogation. *See infra*, Counterstatement ¶¶ 185–230.

109.     Thereafter, Detective Manista informed Chief of the homicide division, Leo Donovan and Detective Deubell that Woodruff was confessing to the crime.   (*ld.*).

**Response:**  Disputed.

a.  Plaintiffs dispute this paragraph to the extent that it misstates the record. The report states that "Det. Manista apprised Chief Donovan what had taken place." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002202.

b.  Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff during his January 12 interrogation. *See infra*, Counterstatement ¶¶ 185–230.

110.     Detective Deubell, Manista, and Chief Donovan then took a sworn statement from Woodruff where he admitted that he and his friends participated in the Crawford murder.   (*ld.*). at COE002203–2205.

**Response:**  Disputed.

a.  Plaintiffs do not dispute that the reconstructed, limited statement prepared by detectives states that Woodruff admitted that he and his friends participated in the Crawford murder.

b.  Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–230.

c.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 709–16.

111.    Detective Manista's report detailing the circumstances of Woodruff's sworn statement was preserved and made available for ADAs to review when they prosecuted the Crawford murder.   Drury Aff. At ¶ 5; Henry Dep. at p. 377.

**Response:** Disputed.

a.  Plaintiffs dispute that Detective Manista's report "detail[s] the circumstances of Woodruff's sworn statement." This paragraph omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–230.

b.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 709–16.

c.  The cited evidence does not support the proposition that the statement was recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 5 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 5 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

112.    In a report dated January 12, 1976, Detective Hunter summarized the work that various detectives did during his shift.   In this report, Detective Hunter asserted that Woodruff began admitting to involvement in the Crawford murder after being allowed to eat a piece of devils food cake that his mother sent with him.   Homicide File at COE002197.

**Response:** Disputed.

a. Plaintiffs do not dispute that Detective-Sergeant Hunter authored a report asserting that Woodruff began admitting to knowledge of the Crawford murder after being allowed to eat a piece of devil's food cake that his mother sent with him.

b. Plaintiffs dispute this paragraph to the extent it is intended to convey that Woodruff actually began admitting to knowledge of the Crawford murder after being allowed to eat a piece of devil's food cake. Woodruff testified that he never ate a snack at the police department. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 89:18–90:19.

c. Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–230.

113.        Detective Hunter further asserted that after being allowed to make calls to his reverend and mother, Woodruff decided to reveal to Arnet that he and his friends were involved in the Crawford homicide.   (*ld.*).

**Response:** Disputed.

a. Plaintiffs do not dispute that Detective-Sergeant Hunter authored a report that stated that Woodruff made calls and allegedly told Arnet that he and the others were involved in the Crawford murder.

b. However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Woodruff actually placed calls and actually told Arnet that he was involved in the Crawford homicide.   Woodruff testified that this did not happen.   Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 89:20–91:8.

c. Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–230.

114.    Detective Hunter's report detailing Woodruff's decision to confess was preserved and maintained by BPD's homicide division.    The report was made available to the ADAs who handled the prosecution for the Crawford murder.    As such, to the extent that Detectives Hunter and Manista created reports which could be viewed as inconsistent or contradictory, this was not hidden from the ADAs involved in the case.    Drury Aff. At ¶ 5; Henry Dep. At p. 377.

**Response:**   Disputed.

a.   Plaintiffs dispute that Detective-Sergeant Hunter's report "detail[s] Woodruff's decision to confess." This paragraph omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–230.

b.   The cited evidence does not support the proposition the reports were recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 5 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 5 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

<u>Woodruff's Account of his Confession</u>

115.    At a deposition given in connection with these lawsuits, Woodruff testified that detectives coerced him into giving a false confession.    Specifically, Woodruff claimed that detectives told him that, if he did not tell him that he and his friends were involved in the Crawford murder, someone else from the group would.    Woodruff Dep. at p. 81.    Woodruff could not recall which Detective made these comments to him or when during his interactions with the police these comments were made.

**Response:**   Undisputed.

116.    Further, Woodruff claimed that the detectives told him that, if he told them he and his friends were involved in the Crawford murder, he would be given immunity.    (*ld.*). at p. 125–126. Woodruff could not say which detective made these comments or when during his interactions with the police these comments were made.

**Response:** Disputed.

a. Woodruff testified that he was offered immunity after hours of aggressive interrogation by police and testified that "I think they really broke me and say well, you know, we can get you immunity." Officers told Woodruff that he "could go home if [he] change[d] his story" but that if [he] didn't, [he] would go to jail." Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 165:10–25.

117.     Woodruff also claims that detectives told him he was under arrest before he gave his sworn confession.  (*Id.*). at p. 80.  Woodruff could not say when detectives told him he was under arrest, or which detective made such a statement.

**Response:** Disputed.

a. Plaintiffs dispute that "Woodruff could not say when detectives told him he was under arrest."  Woodruff testified at the *Wade* hearing in 1976 that he was arrested when officers came to his house and before he was taken to the police station, and confirmed in his deposition in this case that he was under arrest while speaking to police. Sahasrabudhe Decl., Ex. 19 (Woodrufff *Wade* Hrng. Tr.) at 126:3–127:1, 130:2–20; Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 153:10–154:21.

118.     Even crediting Woodruff's current deposition testimony, the factors of his interrogation which he claims were coercive came were made known to the ADAs involved in this case.   For example, Woodruff testified during criminal proceedings that detectives told him he was under arrest.   Decl. Ex. 19 ("Woodruff Wade Hearing") at p. 126; Drury Dep. at p. 244–247.

**Response:** Disputed.

a. Plaintiffs dispute that the coercive interrogation tactics used to procure Woodruff's false confession "were made known to the ADAs involved in this case." ADA Drury testified that:

56

1.  He understood at this time that that Woodruff agreed to cooperate when one of his parents and his minister were present. Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 227–228.  In fact, they arrived only after the interrogation. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 91:17–92:20.

2.  On January 12, 1976, he was not aware that Woodruff was placed under arrest prior to his interrogation. Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 229:15–230:14.

3.  As of January 12, 1976, he had no awareness of Woodruff's prior statement denying involvement, and the extent of his understanding was that Woodruff was fully cooperative with the investigation. Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 226:21–228:5; 230:10–233:10.

119.    Further, ADA Drury acknowledged that on January 12, 1976, the day Woodruff gave his sworn confession, that he knew a detective had made promises of immunity to Mr. Woodruff. Drury Dep. at p. 263–265.   ADA Drury nonetheless chose to move forward with the prosecutions based on Woodruff's sworn confession.

**Response:**  Disputed.

a.  Plaintiffs do not dispute that ADA Drury acknowledged that he was aware on January 12, 1976 that the BPD had made promises of immunity to Woodruff.

b.  However, Plaintiffs dispute this paragraph because it misstates the record. Drury testified that it was Chief Donovan that offered Woodruff immunity. Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 239:8.

c.  Plaintiffs further dispute the proposition that Woodruff gave a "sworn confession." It omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–230.

The Contents of Woodruff's Confession/Statement

120.     At deposition, Woodruff acknowledged that he adopted his sworn statement/confession dated January 12, 1976.   Woodruff Dep. at p. 97–98.

**Response:**  Disputed.

a.  The evidence cited does not support the proposition that Woodruff "adopted his sworn statement." Woodruff testified that he recalled the police preparing a statement for Woodruff to sign. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 96:7–96:22.  However, this paragraph omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–230.

121.     The detectives involved in taking the statement were Detective Deubell, Detective Manista, and Chief Donovan.   Homicide File at COE002203.

**Response:**  Disputed.

a.  Plaintiffs dispute this paragraph to the extent that reference to "the statement" indicates that the detectives recorded their investigations verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 709–16.

122.     The statement reflects that, before substantive questioning began, detectives read Woodruff his Miranda rights, which Woodruff waived.   (*ld.*).

**Response:**  Disputed.

a.  Plaintiffs do not dispute that the reconstructed, limited statement prepared by detectives purports to state that Woodruff waived his *Miranda* rights.

b.  However, Plaintiffs dispute this paragraph to the extent it is intended to convey that Woodruff actually waived his *Miranda* rights before questioning began.

c.  Woodruff was arrested as his home, before being taken in a police car to the police station. Sahasrabudhe Decl., Ex. 19 (Woodruff Wade Tr.) at 126:3–22, 130:2–10.

d.  Woodruff signed the Miranda card at 4:16 p.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002206. The alleged anonymous call occurred at 5:40 p.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002202. Woodruff's typed statement began at 6:40 p.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002203.

e.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 709–16.

f.  The limited, reconstructed statement does not account for anything said at Woodruff's home, in the police vehicle, or at the police station. Nor does the record reflect how long Woodruff was at the station before signing the *Miranda* card or beginning his statement.

123.    Woodruff then told the detectives that on the evening of the Crawford murder, Darryn Gibson told Boyd, Walker, Martin, and Woodruff, that he wanted to "get him some money." (*ld.*).

**Response:** Disputed.

a.  Plaintiffs do not dispute that the reconstructed, limited statement prepared by detectives states that Woodruff told detectives that Gibson told the others that he wanted to get money.

b.  However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Gibson, Boyd, Walker, Martin, and Woodruff actually had any knowledge of or involvement in the Crawford murder. Evidence in the record indicates their innocence. *See infra*, Counterstatement ¶¶ 20–80, 102–07, 133–45, 488–501.

c.  Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–230.

d. Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 709–16.

124.    According to Woodruff's statement, the boys then headed from the Glenny projects down Fillmore Avenue, where they saw Crawford exiting the Golden Nugget.  Woodruff told the police that, after leaving the projects, Gibson found a pipe, which he hid in his sleeve.    (*ld.*). at COE002203–2205.

**Response**:  Disputed.

a. Plaintiffs do not dispute that reconstructed, limited statement prepared by detectives states that Woodruff said that they saw Crawford exiting the Golden Nugget and that Gibson found a pipe.

b. However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Gibson, Boyd, Walker, Martin, and Woodruff actually had any knowledge of or involvement in the Crawford murder. Evidence in the record indicates their innocence. *See infra*, Counterstatement ¶¶ 20–80, 102–07, 133–45, 488–501.

c. Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–230.

d. Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 709–16.

125.    Woodruff further stated that, upon seeing Crawford, the boys started running after him.  (*ld.*).

**Response**:  Disputed.

a.   The evidence cited does not support the proposition that "upon seeing Crawford, the boys started running after him." The reconstructed, limited statement states, "we saw a man, after we had crossed Fillmore he was coming toward us, no we didn't cross, we kept straight on. Then Gibson and Boyde [sic] approached the man as he was going like into his drive-way." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002203.

b.   Plaintiffs do not dispute that the reconstructed, limited statement prepared by detectives states that Woodruff told detectives that they approached Crawford.

c.   However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Gibson, Boyd, Walker, Martin, and Woodruff actually had any knowledge of or involvement in the Crawford murder. Evidence in the record indicates their innocence. *See infra*, Counterstatement ¶¶ 20–80, 102–07, 133–45, 488–501.

d.   Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–231.

e.   Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 204, 215, 709–16.

126.    Woodruff relayed that Gibson hit Crawford in the head with the pipe and that Boyd went through Crawford's pockets and took his wallet.   (*Id.*).

**Response:**  Disputed.

a.   Plaintiffs do not dispute that the reconstructed, limited statement prepared by detectives states that Woodruff told detectives that Gibson hit Crawford and took his wallet.

b.   However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Gibson, Boyd, Walker, Martin, and Woodruff actually had any knowledge of or

involvement in the Crawford murder. Evidence in the record indicates their innocence. *See infra*, Counterstatement ¶¶ 20–80, 102–07, 133–45, 509–22.

c. Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–231.

d. Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 204, 215, 709–11.

127.    Woodruff also relayed that Gibson, Boyd, and Martin dragged Crawford's into an "alley" near his house.  (*ld.*).

**Response:** Disputed.

a. Plaintiffs do not dispute that the reconstructed, limited statement prepared by detectives states that Woodruff told detectives that they dragged Crawford's body.

b. However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Gibson, Boyd, Walker, Martin, and Woodruff actually had any knowledge of or involvement in the Crawford murder. Evidence in the record indicates their innocence. *See infra*, Counterstatement ¶¶ 20–80, 102–07, 133–45, 509–22.

c. Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–231.

d. Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 204, 215, 709–11.

128.    Further, Woodruff stated that he and Walker merely stood there as the other three boys dragged the body.   (*Id.*).

**Response:** Disputed.

a.  Plaintiffs do not dispute that the reconstructed, limited statement prepared by detectives states that Woodruff told detectives that he and Walker stood by while the others dragged the body.

b.  However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Gibson, Boyd, Walker, Martin, and Woodruff actually had any knowledge of or involvement in the Crawford murder. Evidence in the record indicates their innocence. *See infra*, Counterstatement ¶¶ 20–80, 102–07, 133–45, 509–22.

c.  Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–231.

d.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 204, 215, 709–11.

129.    Woodruff has testified inconsistently as to whether he was accompanied by his father and his reverend, L.T. Boyce, when he gave his January 12 statement.   However, at the very least, the record reflects that his father and reverend signed his sworn statement as "witnesses."   (*Id.*). at COE00205; Woodruff Dep. at p. 94–95, 185–186.

**Response:** Disputed.

a.  Woodruff testified that his father and reverend came to pick him up after he provided his statement. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) 92:3–20.

   b.   Woodruff testified at the *Wade* hearing in 1976 that he was taken to the police station only by police officers, and was thus unaccompanied by any parent. Sahasrabudhe Decl., Ex. 19 (Woodruff *Wade* Hrng. Tr.) 131:9–22.

   c.   Woodruff explained that by the time his father and pastor arrived, the interrogation was over, and he had "already [given] them what they wanted." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002493.

130.      So, at the very least, Woodruff's father and reverend were present for some portion of his interactions with the police on January 12, 1976.   (*Id.*).

**Response:**  Disputed.

   a.   Plaintiffs dispute this proposition to the extent that "interactions with police" is imprecise.

   b.   Woodruff testified that his father and reverend came to pick him up after he provided his statement. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 92:3–20.

   c.   Woodruff testified at the *Wade* hearing in 1976 that he was taken to the police station only by police officers, and was thus unaccompanied by any parent. Sahasrabudhe Decl., Ex. 19 (Woodruff *Wade* Hrng. Tr.) at 131:9–22.

   d.   Woodruff explained that by the time his father and pastor arrived, the interrogation was over, and he had "already [given] them what they wanted." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002493.

131.      Based on this sworn statement made by Woodruff, Plaintiffs, along with Gibson and Martin, were arrested for involvement in the Crawford murder.   Homicide File at COE002188–2191. Woodruff was not arrested or charged, as ADA Drury agreed to give Woodruff immunity in exchange for his cooperation in the prosecution of his four friends.

**Response:**  Disputed.

a. Plaintiffs dispute this paragraph because Woodruff was arrested before he arrived at the police station on January 12, 1976. Sahasrabudhe Decl., Ex. 19 (Woodruff *Wade* Hrng. Tr.) at 126:3–22, 130:2–10.

b. Plaintiffs, Gibson, and Martin were arrested before Woodruff signed his statement on January 12, 1976. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002188–2190.

c. Martin was arrested before the time detectives reported that they began interrogating Woodruff. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002191.

d. Woodruff was offered immunity by the BPD on January 12, 1976, while he was under arrest without probable cause. Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 249:1–17; Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 125:25–126:11, 164:5–166:7.

e. Woodruff testified at his deposition in this case that the January 12, 1976 P-73 authored by Detective Manista was materially inaccurate. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 100:20–102:3.

The Events Following Woodruff's January 12, 1976 Statement/Confession

132.    Immediately after Woodruff gave his statement to police detectives, he met with ADA Drury, who was called over to police headquarters by the detectives.   Drury Dep. at p. 226.

**Response**: Disputed.

a. The evidence cited does not support the proposition that ADA Drury was called over to police headquarters by "the detectives." Drury testified that Chief Donovan called him to the police station. Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 41:2–3.

133.    When ADA Drury first met with Woodruff, Woodruff told him that he and his four friends had participated in the Crawford murder.   *See id.*

**Response**: Disputed.

a. The evidence cited does not support the proposition that Woodruff "told [Drury] that he and his four friends had participated in the Crawford murder." ADA Drury testified that he "debriefed" Woodruff. Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 224:13.

134.    At deposition, Woodruff acknowledged that he had multiple meetings with ADA Drury in between January 12, 1976 and February 11, 1976, when he testified in front of a grand jury. Woodruff Dep. at p. 107–110.

**Response:**  Undisputed.

135.    Woodruff acknowledges that, during each of the meetings, he maintained that he and his four friends participated in the Crawford murder.   (*ld.*).

**Response:**  Disputed.

a. The evidence cited does not support the proposition that Woodruff "maintained" a consistent story during "each of the meetings" with ADA Drury. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 124:6–18.

b. Woodruff testified at his deposition in this case that he relayed stories that he knew made no sense because he had no actual knowledge of the crime and hoped that the BPD detectives and ADA Drury would realize he could not have been telling the truth and would not call him to testify. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 123:8–124:13; 169:15–172:15.

Events Before the Grand Jury Proceedings

136.    On February 11, 1976, Woodruff and Hough were scheduled to testify before a grand jury in connection with the criminal charges brought against Plaintiffs, Gibson, and Martin. Homicide File COE002228–22232.

**Response:**  Undisputed.

137.    Before he was scheduled to testify, Hough stated that he wished to change his story and that his January 12 statement had been made up.   (*ld.*). at COE002228.

**Response:**  Undisputed.

138.    ADA Drury thus requested that Detectives Delano and Guadagno speak with Hough.   (*ld.*).

**Response**:  Disputed.

    a.  The evidence cited does not support the proposition that ADA Drury requested that Detectives Delano and Guadagno speak with Hough. Rather the report states that "Delano was ordered to the District Attorney's Office" and "met with Mr. Drury and Andre Hough." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002228.

    139.     During this conversation with Hough, Detective Delano told Hough that he believed he was lying and encouraged Hough to tell the truth.   (*Id.*).

**Response**:  Disputed.

    a.  The evidence cited does not support the proposition that Detective Delano told Hough that "he believed" Hough was lying and "encouraged" him to tell the truth. Rather, the report states that Detective Delano told Hough "that he was lying and that he had better tell the truth." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002228.

    b.  Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Hough to make this statement. *See infra*, Counterstatement ¶¶ 269–75.

    140.     After speaking with the detectives, Hough re-affirmed that Boyd had confessed to him that he and the other boys were involved in the Crawford murder.  (*Id.*).

**Response**:  Disputed.

    a.  The evidence cited does not support the proposition that after "speaking with the detectives," Hough "re-affirmed" that Boyd had confessed to him. Specifically, Hough withdrew his recantation under coercive circumstances. *See infra*, Counterstatement ¶¶ 269–75.

    b.  Hough's new account of Boyd's statements to him was also materially different than his previous account. Specifically, detectives reported that Hough stated that "he was told that Boyd and Gibson went into the Tavern first and looked around and that they waited for Mr.

Crawford down the street." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002228.

141.     Hough also added to his account and told the detectives that he had heard that Gibson and Boyd went into the Golden Nugget first, saw Mr. Crawford with a considerable amount of cash, and then waited for Mr. Crawford down the street with the other three boys.  After adding to his account, Hough testified in front of a grand jury and implicated Plaintiffs, Gibson, and Martin.   (*ld.*).

**Response:**  Disputed.

    a.  Plaintiffs dispute this paragraph because it omits the material facts that Hough withdrew

       his recantation under coercive circumstances. *See infra*, Counterstatement ¶¶ 269–75.

142.     After speaking with Hough, Detective Guadagno conducted a further interview of Woodruff.   Homicide File COE002228–22232.

**Response:**  Disputed.

    a.  The evidence cited does not support the proposition that Detective Guadagno "spoke" with

       Hough or "conducted a further interview" of Woodruff. Rather, Detective Guadagno:

         1.  Ignored that Woodruff wanted to recant his prior statements;

         2.  Noted that Woodruff was shaking and nervous;

         3.  Told Woodruff that he was not telling the truth;

         4.  Confronted Woodruff with Hough's new statement claiming that Mr. Gibson and Mr.

            Boyd had gone inside the Golden Nugget bar; and

         5.  Threatened Woodruff to reiterate and expand his allegations to include what Hough

            reportedly stated. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002228–32.

143.     After speaking with Detective Guadagno, Woodruff amended his prior statement to add that, prior to the Crawford murder, Gibson and Boyd went into the Golden Nugget and saw Mr. Crawford.   (*ld.*) at COE0022231–22233.

**Response:**  Disputed.

    a.  The evidence cited does not support the proposition that Detective Guadagno "spoke" with

       Woodruff, or that Woodruff "amended his prior statement." Rather, Detective Guadagno:

1. Ignored that Woodruff wanted to recant his prior statements;

2. Noted that Woodruff was shaking and nervous;

3. Told Woodruff that he was not telling the truth;

4. Confronted Woodruff with Hough's new statement claiming that Mr. Gibson and Mr. Boyd had gone inside the Golden Nugget bar; and

5. Threatened Woodruff to reiterate and expand his allegations to include what Hough reportedly stated. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002228–32.

144.      Detective Guadagno memorialized this amendment in a handwritten statement, which Woodruff signed.  (*ld*.). at COE0022232.

**Response:** Disputed.

a. The cited evidence does not support the proposition that Detective Guadagno "memorialized" an "amendment" that Woodruff signed.

b. Woodruff testified that the statement cited was not true, that it was not in his handwriting, and that his attorney was not present during this interrogation prior to his grand jury testimony. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 120:1–121:15.

c. Plaintiffs also dispute this proposition because it omits the following material facts related to the circumstances of Woodruff's interrogation:

1. Woodruff wanted to recant his prior statements;

2. Guadagno noted that Woodruff was shaking and nervous;

3. Guadagno told Woodruff that he was not telling the truth;

4. Guadagno confronted Woodruff with Hough's new statement claiming that Mr. Gibson and Mr. Boyd had gone inside the Golden Nugget bar; and

5.     Guadagno threatened Woodruff to reiterate and expand his allegations to include what Hough reportedly stated.  Sahasrabudhe Decl., Ex. 3 (Homicide Dep.) at COE002228–32.

145.     After he signed the handwritten amendment, Woodruff also testified in front of the grand jury.  As result of Woodruff and Hough's testimony, a grand jury indicted Plaintiffs, Gibson, and Martin for the murder and robbery of Wiliam Crawford.  Sahasrabudhe Decl. Ex. 20 ("Indictment").

**Response**: Disputed.

a.    The cited evidence does not support the proposition that Woodruff provided a "handwritten amendment."

b.    Woodruff testified that the statement cited was not true, that it was not in his handwriting, and that his attorney was not present during this interrogation prior to his grand jury testimony. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 120:1–121:15.

a.    Plaintiffs also dispute this proposition because it omits the following material facts related to the circumstances of Woodruff's interrogation:

1.     Woodruff wanted to recant his prior statements;

2.     Guadagno noted that Woodruff was shaking and nervous;

3.     Guadagno told Woodruff that he was not telling the truth;

4.     Guadagno confronted Woodruff with Hough's new statement claiming that Mr. Gibson and Mr. Boyd had gone inside the Golden Nugget bar; and

5.     Guadagno threatened Woodruff to reiterate and expand his allegations to include what Hough reportedly stated. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002228–32.

146.        Police reports detailing Detectives Delano and Guadagno's interactions with Woodruff and Hough prior to their grand jury testimony were preserved and made available for ADA Drury's review.   Drury Aff. At ¶ 5; Henry Dep. at p. 377.

**Response:** Disputed.

a.  The cited evidence does not support the proposition that the reports were recorded, preserved, and made accessible to the ADAs involved in the case. The cited evidence indicates merely that prosecutors Timothy Drury and David Henry would typically get the "entire homicide file" for each of their cases. Sahasrabudhe Decl., Ex. 5 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Aff.) at 377:7–23. The sources cited do not clarify what the "entire homicide file" includes, or how these prosecutors knew all documents related to the Crawford investigation were included in the "homicide file." Sahasrabudhe Decl., Ex. 5 (Drury Aff.) at ¶ 5; Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 377:7–23.

b.  ADA Drury presented the revised stories of Hough and Woodruff to the grand jury without knowledge of the coercive circumstances that induced their testimony. *See infra*, Counterstatement ¶¶ 266–293.

c.  ADA Drury stated on the record on January 14, 1977, during Gibson's trial, that he had just then obtained the P-73 reports revealing the coercive circumstances and coordination of Hough and Woodruff's testimony before their grand jury appearances. *Boyd* Dkt. 168-5 (Gibson Trial Tr.) at 184:6–10; *see also* Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 495:1–10, 496:17–14.

147.        Further, Woodruff's handwritten amendment was also made available for ADA Drury and other ADA's review.   (*ld.*).

**Response:** Disputed.

a. The cited evidence does not support the proposition that Woodruff provided a "handwritten amendment."

b. Woodruff testified that the statement cited was not true, that it was not in his handwriting, and that his attorney was not present during this interaction before the grand jury. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 120:1–121:15.

c. Drury testified that he had no recollection or record of providing this handwritten statement to defense counsel. Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 216:3–12

<u>The Criminal Trials of Plaintiffs and Their Friends</u>

148.    Of the group of four tried for the Crawford murder, Gibson was the first to go to trial.    ADA Drury called both Woodruff and Hough to testify against Gibson. Sahasrabudhe Decl. Ex. 12C ("Woodruff Gibson Trial Testimony"); Sahasrabudhe Decl. Ex.13C ("Hough Gibson Trial Testimony").

**Response**: Undisputed.

149.    Both Woodruff and Hough gave testimony suggesting Gibson's guilt.  Based on the testimony of Hough and Woodruff, a jury convicted Gibson.  (*ld.*).

**Response**: Disputed.

a. Plaintiffs do not dispute that Woodruff and Hough gave testimony at the Gibson trial suggesting his guilt and that a jury convicted Gibson.

b. Plaintiffs dispute this paragraph because it omits the material facts that Woodruff and Hough's trial testimony was coerced and fabricated by BPD detectives. *See infra*, Counterstatement ¶¶ 146–64, 185–231, 266–93.

150.    The next of the group to be tried was Plaintiff Boyd.    Boyd's criminal trial took place in the spring of 1977.    Sahasrabudhe Decl. Ex. 12A ("Woodruff Boyd Trial Testimony") at COE00584 (showing trial taking place in April of 1977).

**Response**: Undisputed.

151.    Both Woodruff and Hough testified against Boyd after being called by ADA Drury. Based on their testimony, a jury convicted Boyd, who received a significant sentence.  Sahasrabudhe Decl. Ex. 12A (Woodruff Boyd Trial Testimony); Decl. Ex. 13A ("Hough Boyd Trial Testimony").

**Response:**  Disputed.

    a.  Plaintiffs do not dispute that Woodruff and Hough gave testimony at the Boyd trial suggesting his guilt and that a jury convicted Boyd. Plaintiffs do not dispute that Boyd received a significant sentence.

    b.  Plaintiffs dispute this paragraph because it omits the material facts that Woodruff and Hough's trial testimony was coerced and fabricated by BPD detectives. *See infra*, Counterstatement ¶¶ 146–64, 185–231, 266–93.

152.      Plaintiff Walker was the next individual tried.   ADA David Henry and ADA James Verastro handled Walker's prosecution.   *See generally* Henry Dep.

**Response:**  Undisputed.

153.      A jury convicted Walker, again, primarily due to the testimony of Woodruff and Hough.   Sahasrabudhe Decl. Ex. 12B ("Woodruff Walker Trial Testimony") Decl. Ex. 13B ("Hough Boyd Trial Testimony").

**Response:**  Disputed.

    a.  Plaintiffs do not dispute that Woodruff and Hough gave testimony at the Walker and that a jury convicted Walker "primarily due to the testimony of Woodruff and Hough."

    b.  Plaintiffs dispute this paragraph because it omits the material facts that Woodruff and Hough's trial testimony was coerced and fabricated by BPD detectives. *See infra*, Counterstatement ¶¶ 146–64, 185–231, 266–93.

154.      The final individual tried for the Crawford murder was Floyd Martin.  ADAs Henry and Verastro handled Martin's prosecution.   *See generally* Henry Dep.

**Response:**  Undisputed.

155.      Woodruff testified against Martin.   Woodruff Dep. at p. 123.

**Response:**  Undisputed.

156.    However, unlike the previous three trials, Hough did not testify.    Henry Dep. at p. 373.[6]

**Response:**  Disputed.

   a.  The evidence cited does not support the proposition that Hough did not testify.

   b.  Hough's name appears on a witness list as appearing for the prosecution during the Martin trial. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE005454.

157.    James McLeod, a future judge, represented Martin at his trial.  *See generally* Decl. Ex. 11 ("McLeod Dep.").

**Response:**  Undisputed.

158.    The jury hearing evidence at Martin's trial acquitted him of the charges brought against him.  (*Id.*).

**Response:**  Undisputed.

Vacatur of Plaintiffs' Convictions

159.    In 2021, Plaintiffs filed a motion to set aside their convictions pursuant to NY CPL 440.  Decl. Ex. 6 ("Justice Burns Decision and Order").

**Response:**  Undisputed.

160.    The basis for this motion was a claim made by James McLeod, the attorney for the only member of the group to be acquitted.  (*Id.*). at COE004352.

**Response:**  Disputed.

   a.  Plaintiffs do not dispute that a basis of their 2021 440 motion was evidence offered by Judge James McLeod pointing to Watson as a potential suspect.

   b.  However, Plaintiffs dispute that this was the only basis of their motion.

---

[6] Note that the County Defendant's own Statement of Material Facts states: "The court clerk's records indicate Woodruff, Hough, and his foster brother Jonathan Hough testified at the Martin trial.  (COE 9451) Unlike the previous three trials, Martin testified in his own defense. (COE 9452)."  *See* Dkt. 166-1 County Statement of Material Facts, ¶80.  As the City and County's statements of "undisputed" facts are directly contradictory on this point, it is clear that the point is, in fact, disputed.

161.     According to McLeod, he had access to a photograph which showed one set of footprints leading away from Crawford's home into his backyard during his trial.  (*Id.*). at COE004354.

**Response**:  Disputed.

      a.  Plaintiffs do not dispute that the photograph in question showed one set of footprints leading away from Crawford's body through his backyard.

      b.  However, Plaintiffs dispute this paragraph because it omits the material facts that the set of footprints were made by a heavyset man and led in the direction of Watson's house. *See infra*, Counterstatement ¶¶ 495–96, 503.

162.     According to McLeod, he was able to effectively use this photograph to debunk the prosecution's theory that multiple perpetrators were responsible for the Crawford murder.   McLeod claimed that he created a reasonable doubt as to whether only one individual was responsible for the Crawford murder through effective use of the photograph.  (*Id.*).

**Response**:  Disputed.

      a.  Plaintiffs do not dispute that McLeod was able to effectively use the photograph in question to debunk the prosecution's theory that multiple perpetrators were responsible for the Crawford murder, and that he was able to create reasonable doubt on that subject through effective use of the photograph.

      b.  Plaintiffs dispute this paragraph because it omits the following material facts:

          1.  McLeod testified that he based his successful theory of defense on photographs that he received in discovery, one of which depicted a single set of footprints made by a heavyset man leading away from Crawford's body through the backyard of Crawford's house in the direction of Watson's house and another which clearly showed the absence of dragging marks in Crawford's driveway, contradicting Woodruff's account of the crime. *See infra*, Counterstatement ¶¶ 495.

      2.     ADA Henry's notes confirm that McLeod argued in summation "convict the heavyset man." *See infra*, Counterstatement ¶¶ 502–03.

163.     Through their 440 motion in 2021, Plaintiffs argued that their attorneys were not given access to this photograph during their respective trials.   As such, Plaintiffs' alleged that the ADAs handling their trials committed *Brady* violations.   *See generally id.*

**Response:**  Disputed.

      a.    Plaintiffs do not dispute that their attorneys were not given access to the crime scene photograph depicting footprints leading towards Watson's house, or that the failure to disclose this photograph was a *Brady* violation.

      b.    However, Plaintiffs dispute this paragraph because it omits the material fact that their attorneys were also not given access to the crime scene photograph depicting a lack of drag marks in the driveway.  *See infra*, Counterstatement ¶¶ 27, 496–499.

164.     Ultimately, New York State Supreme Court Justice Christopher Burns found that it was more likely than not that a Brady violation had been committed by the ADAs handling Plaintiffs' prosecutions.  (*ld.*). at COE004357.

**Response:**  Undisputed.

165.     Accordingly, Justice Burns vacated Plaintiffs' convictions and ordered  that Plaintiffs were entitled to a new trial.   The Erie County District Attorneys' Office elected not to re-try Plaintiffs.  (*ld.*).

**Response:**  Undisputed.

166.     Importantly, Justice Burns decision makes no finding that the homicide detectives involved in investigating the Crawford murder committed a Brady violation.   Indeed, during his deposition testimony in this matter, James McLeod acknowledged that the photograph he was able to effectively use was a police photo.   McCleod Dep. at p. 392–394.

**Response:**  Disputed.

      a.    Plaintiffs do not dispute that the court's stated basis for vacating Plaintiffs' convictions was not a *Brady* violation committed by BPD detectives.

      b.    Plaintiffs also do not dispute that the two photographs Judge McLeod received in discovery were crime scene photographs taken by the BPD.

c. However, Plaintiffs dispute this paragraph to the extent it is intended to convey that BPD detectives committed no *Brady* violations in connection with this case. Evidence in the record establishes that they did. *See infra*, Counterstatement ¶¶ 302–03.

167.     In short, McLeod's testimony establishes that the detectives complied with their *Brady* obligations by giving prosecutors access to the photograph.  In other words, the basis for the vacatur of Plaintiffs' convictions had nothing to do with the conduct of the detectives  sued in this case.  (*Id.*).

**Response**:  Disputed.

a. Plaintiffs do not dispute that the court's stated basis for vacating Plaintiffs' convictions was not a *Brady* violation committed by BPD detectives.

b. Plaintiffs also do not dispute that the two photographs Judge McLeod received in discovery were crime scene photographs taken by the BPD.

c. However, Plaintiffs dispute this paragraph to the extent it is intended to convey that BPD detectives committed no *Brady* violations in connection with this case. Evidence in the record establishes that they did. *See infra*, Counterstatement ¶¶ ¶¶ 302–03.

Detective Montondo

168.     Detective John Montondo assisted in picking up Woodruff and Walker and taking them into the police station for their January 11, 1976 statements.   Homicide File at COE002175.

**Response**:  Undisputed.

169.     Thereafter, Detective Montondo typed Walker's and Woodruff's statements on January 11, 1976.  (*Id.*). at COE002176–2180.  Neither Walker nor Woodruff's statement implicated Plaintiffs in the Crawford murder.  *See* (*id.*).

**Response**:  Disputed.

a. Plaintiffs do not dispute that neither Walker nor Woodruff implicated Plaintiffs in the Crawford murder on January 11, 1976.

b. However, Plaintiffs dispute this paragraph because it omits the following material facts:

1.  Detective Montondo authored a report summarizing the interrogation of Walker on January 11, 1976. The report states that Walker had "lied through his statement" and that he made "different statements" to them orally than he had made in his signed statement. Detective Montondo did not record what Walker's inconsistent oral statements or lies supposedly were. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002175.

2.  On January 11, 1976, Detectives Hunter, Arnet, and Montondo also interviewed Woodruff. According to the P-73 report describing this interrogation, Woodruff was questioned for an hour and a half on January 11. During this time, Woodruff denied any knowledge of the Crawford murder. Despite providing a statement wholly consistent with the other boys, in their report, Detectives Arnet, Hunter, and Montondo stated that Woodruff was "lying," but made no record of the specific statements they contended were lies. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002179–80.

3.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Walker's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 709–11.

170.    Detective Montondo questioned Floyd Martin on January 12, 1976, and Plaintiffs and their friends were arrested.   Homicide File at COE002192–2193.   Martin did not give a statement implicating Plaintiffs as a result of Detective Montondo's interview.   (*Id.*).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that Martin did not implicate Plaintiffs in the Crawford murder.

b. The evidence cited does not support the proposition that Detective Montondo merely "questioned" Martin on January 12, 1976. Rather, Detective Montondo arrested and interrogated Martin.

c. Plaintiffs dispute this paragraph to the extent it indicates that the detectives recorded their questions and Martin's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. *See infra*, Counterstatement ¶¶ 709–11.

171.     On January 15, 1976, Detective Montondo went to Simpson's Store to determine if, as Woodruff had stated, he and his friends had been there prior to the Crawford murder.   (*ld.*). at COE 2215.   Detective Montondo did not find or report any information implicating Plaintiffs in the Crawford murder when he went to Simpson's Store.   (*ld.*).

**Response**: Disputed.

a. Plaintiffs do not dispute that Detective Montondo did not find or report any information implicating Plaintiffs in the Crawford Murder when he went to Simpson's Store on January 15, 1976.

b. However, Plaintiffs dispute this paragraph because it omits the material facts that:

1. Montondo found and reported information that was affirmatively favorable to the defense—namely, that the store owner and her daughter were working the night of January 2, 1976, knew Gibson, Boyd, Walker, Martin, and Woodruff, and did not recall seeing them at the store that evening, contradicting Woodruff's account that the boys waited at Simpson's Store for Crawford to exit the Golden Nugget. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002215.

2. Montondo found and reported additional information that was affirmatively favorable to the defense—namely, that the store owner and her daughter also did not recall seeing Boyd at the store on January 3, 1976, contradicting Hough's account

79

that Boyd was spending a large amount of money there the day after the Crawford Murder. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002215.

172.     Detective Montondo took no other relevant investigative steps for purposes of this motion.

**Response**: Disputed.

a. Plaintiffs dispute this paragraph because it omits the material fact that at their depositions in this case, Detectives Guadagno, Montondo, and Regan all testified that homicide detectives worked jointly on investigations and shared evidence, with all of them working under Chief Donovan's supervision and direction. Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 126:3–128:21; Ex. 16 (Montondo Dep.) at 96:6–98:13; Ex.10 (Regan Dep.) at 23:15–24:5.

Detective Grabowski

173.     Detective Grabowski did not even investigate Plaintiffs for the Crawford murder prior to their arrest.  *See generally* (*id.*).

**Response**: Disputed.

a. The evidence cited does not support the proposition that Detective Grabowski did not investigate the Crawford Murder prior to Plaintiffs' arrests. Detective Grabowski took numerous steps to investigate the Crawford murder.  *See infra*, Counterstatement ¶¶ 37, 42–43, 51–52, 56–57, 61, 71, 73, 399, 405, 412.

b. Plaintiffs also dispute this paragraph because it omits the material fact that at their depositions in this case, Detectives Guadagno, Montondo, and Regan all testified that homicide detectives worked jointly on investigations and shared evidence, with all of them working under Chief Donovan's supervision and direction. Sahasrabudhe Decl., Ex. 17A

(Guadagno Dep.) at 126:3–128:21; Ex.16 (Montondo Dep.) at 96:6–98:13; Ex.10 (Regan Dep.) at 23:15–24:5.

174.     Detective Grabowski's investigative steps actually uncovered evidence favorable to Plaintiffs.   Namely, Detective Grabowski interviewed Francis Kalb, Larry Watson, and Debbie Jeffries.   Homicide File at COE00213; COE002131–2132; COE002132–2133.

**Response:**  Undisputed.

175.     Detective Grabowski also pulled a mugshot of Gerald Boyd and placed it into the homicide file suggesting that Gerald Boyd was a suspect for the Crawford murder.  Homicide File at 2135.

**Response:**  Disputed.

   a.  Plaintiffs do not dispute that Detective Grabowski obtained a mugshot of Jerome Boyd, or that Jerome Boyd was a suspect in the Crawford murder investigation.

   b.  Plaintiffs dispute this paragraph because it omits the material fact that Detective Grabowski and his colleagues made no attempt to follow up on Jerome Boyd as a suspect, despite there being no reason to clear him. Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 175:6–176:20, 183:20–184:4; Ex. 17 (Guadagno Dep.) at 162:3–6, 165:2–6.

176.     None of the evidence developed by Detective Grabowski was used as evidence against Plaintiffs.

**Response:**  Disputed.

   a.  Plaintiffs do not dispute that Detective Grabowski developed evidence that was favorable to the defense (evidence that was improperly withheld from the defense).

   b.  However, Plaintiffs dispute this paragraph because it omits the material fact that at their depositions in this case, Detectives Guadagno, Montondo, and Regan all testified that homicide detectives worked jointly on investigations and shared evidence, with all of them working under Chief Donovan's supervision and direction. Sahasrabudhe Decl., Ex. 17A

(Guadagno Dep.) at 126:3–128:21; Ex.16 (Montondo Dep.) at 96:6–98:13; Ex. 10 (Regan Dep.) at 23:15–24:5.

<u>Detective Arnet</u>

177.     Detective Arnet does not appear to have authored any reports or forwarded any information to the Erie County District Attorneys' Office in connection with the Crawford murder. *See generally*, (*id*).

**Response:** Disputed.

a.  The evidence cited does not support the proposition that Detective Arnet did not author any reports or forward any information to the ECDA in connection with the Crawford murder. Detective Arnet authored a report summarizing the interrogation of Walker on January 11, 1976. The report states that Walker had "lied through his statement" and that he made "different statements" to them orally than he had made in his signed statement. Detective Arnet did not record what Walker's inconsistent oral statements or lies supposedly were. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002175.

b.  On January 11, 1976, Detectives Hunter, Arnet, and Montondo also interviewed Woodruff. According to the P-73 report describing this interrogation, Woodruff was questioned for an hour and a half on January 11. During this time, Woodruff denied any knowledge of the Crawford murder. Despite Woodruff providing a statement wholly consistent with the other boys, in their report, Detectives Arnet, Hunter, and Montondo stated that Woodruff was "lying," but made no record of the specific statements they contended were lies. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002176–77.

c.  Detective Arnet arrested Woodruff at his home without probable cause on January 12, 1976. Sahasrabudhe Decl., Ex. 19 (Woodruff *Wade* Hrng. Tr.) at 126:3–127:1, 130:2–20;

Ex. 9 (Woodruff Dep.) at 153:10–154:21; Ex. 3 (Homicide File) at COE002206; Ex. 7 (Drury Dep.) at 248:4–49:17.

d.  Plaintiffs dispute this paragraph because it omits the material fact that at their depositions in this case, Detectives Guadagno, Montondo, and Regan all testified that homicide detectives worked jointly on investigations and shared evidence, with all of them working under Chief Donovan's supervision and direction. Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 126:3–128:21; Ex.16 (Montondo Dep.) at 96:6–98:13; Ex.10 (Regan Dep.) at 23:15–24:5.

**Plaintiffs' Specific Responses to the County's Rule 56(a) Statement**

1.   William Crawford ("Crawford") was robbed and murdered in his driveway at 2041 Fillmore Avenue, Buffalo, New York the evening of January 2, 1976 (the "Crawford murder").  (COE 2124).

**Response**: Undisputed.

2.   Prior to his murder, Crawford spent several hours drinking at the Golden Nugget Inn, a bar located directly across the street from his house.  (COE 2131–34)

**Response**: Undisputed.

3.   Crawford's widow – Margaret Crawford – ("Mrs. Crawford") discovered her husband unconscious in the driveway adjacent to the residence's side door around 1:00 a.m. on January 3, 1976 and called for emergency aid.  (COE 2124)

**Response**: Disputed.

a.   The evidence cited does not support the proposition that Margaret Crawford "discovered her husband unconscious" around 1:00 a.m. on January 3, 1976.

b.   Margaret Crawford heard noise in the alley adjacent to the residence's side door around 11:30 a.m. on January 2, 1976. At around 12:30 a.m. on January 3, 1976, she looked out the side door window and saw Crawford's feet, at which point she called her son James Crawford. She next called Fullers Tavern around 1:10 a.m. and then called for emergency aid. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002125; COE002146.

4.   Mrs. Crawford requested emergency aid and paramedics arrived shortly thereafter.  (COE 2124–26)

**Response**: Undisputed.

5.   EMT David Donnelly ("Donnelly") testified that when he first responded, they found Crawford in the driveway and detected a pulse.  He noticed a pool of blood by Crawford's head. (Walker Trial Trans., p. 63:6–65:14)

**Response**: Undisputed.

6.   Crawford was transported to Sisters of Charity Hospital, but Crawford died prior to arrival. (Walker Trial Trans., p. 65:18–66:9) (COE 2124)

**Response**: Undisputed.

7.   Donnelly prioritized keeping Crawford alive over preserving evidence.  A number of people, including Donnelly, the detectives, and BPD Photographer Albert Hauser ("Hauser"), were present and moving about the crime scene in the immediate aftermath of Crawford's murder.  (Walker Trial Trans., p. 68:18–23–69:1–4)

**Response**: Disputed.

a.   The evidence cited does not support the proposition that Donnelly "prioritized keeping Crawford alive over preserving evidence." Donnelly testified generally that "[i]n a case where there is a pulse [his] primary concern is life." That testimony was not specific to the Crawford murder, nor did he testify that any evidence in the Crawford murder was destroyed because of his actions. *Boyd* Dkt. 168-7 (Walker Trial Transcript) at 68:20–23.

b.   The evidence cited does not support the proposition that a number of people "were present and moving about the crime scene in the immediate aftermath of Crawford's murder." Officers Tully and Szpila, who responded to the crime scene at approximately 1:20 a.m. on January 3, 1976, searched "the immediate vicinity for evidence and possible suspects." This search was conducted after Crawford was removed from the crime scene. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002124.

c.   Plaintiffs dispute this paragraph to the extent it is intended to convey that evidence of the Crawford murder was destroyed by Donnelly, Tully, Szpila, Hauser, or anyone else prior

to detectives' documentation of the crime scene, as there is no evidence in the record to support that proposition.

8.   At 1:50 A.M. BPD Detective Seargent Gerald Dove ("Dove") and Detective Paul Delano received a radio call to go to Sisters of Charity Hospital, however they were re-routed back to the scene so the rescue squad could show them where they located Crawford's body.   Dove and Delano proceeded to the scene. (COE 2125)

**Response**: Undisputed.

9.   Hauser took several photographs of the crime scene and inspected the immediate area. Dove noted there being a large pool of blood where Crawford was found and blood spatter on the side of the house.   COE 2125; Walker Trial Trans., p. 74:8–19)

**Response**: Disputed.

   a.   Plaintiffs object to this paragraph because it omits the material fact that blood splatter was located specifically next to the cellar window, between the side door and the back of the house. *Boyd* Dkt. 168-6 (Boyd Trial Transcript) at 46:18–47:15; 54:1.

   b.   Plaintiffs also object to this paragraph because it omits the material fact that Hauser also took photographs of the Golden Nugget. *Boyd* Dkt. 168-6 (Boyd Trial Transcript) at 52:12–23.

   c.   Hauser also took photos of the blood and the driveway in front of the house. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002126.

10.   Photographs of the crime scene taken the evening of January 2-3, 1976 by Hauser depict several sets of footprints in the driveway.   (COE 4433–36, 4442–43, 4474, 4478, 4480, 4506, 4508, 4514, 4534, 4536–37; Walker Trial Trans., p. 39–43) There is no testimony or evidence of footprints in the backyard.

**Response**: Disputed.

   a.   Plaintiffs do not dispute that some photographs of the crime scene taken the night of January 2-3, 1976 by Hauser depict disruption to the snow in the driveway.

b. However, Plaintiffs dispute this paragraph because it omits the material fact that James Mcleod, defense counsel for Floyd Martin, testified at a hearing in 2021 and at his deposition in this case that he received in discovery a photograph depicting the driveway with undisturbed snow absent of dragging marks and no footprints. Sahasrabudhe Decl., Ex. 11 (McLeod Dep.) at 19:1–24:12; *Boyd* Dkt. 168-3 (2021 CPL § 440 Motion) at 7:14–27:3 (COE003894–914).

c. The evidence cited also does not support the proposition that "[t]here is no testimony or evidence of footprints in the backyard." McLeod testified that he received in discovery a photograph depicting a single set of footprints, which a BPD officer at Martin's trial testified were made by a single, heavyset man, leading from Crawford's body through the backyard of Crawford's house in the direction of Watson's house. 137:8–138:1, 225:13–228:20; *Boyd* Dkt. 168-3 (2021 CPL § 440 Motion) at 7:14–9:12, 12:9–16, 23:10–24:9 (COE003894–96, COE003899, COE003910–11); Ex. 2 (ADA Henry: Martin Trial Notes).

d. ADA Henry's notes of the Floyd Martin trial corroborate McLeod's testimony that such a photo existed and that McLeod made use of it at trial as they contain the notation "Convict the heavyset man." Ex. 2 (ADA Henry: Martin Trial Notes).

e. In his order vacating Plaintiffs' convictions, Justice Burns credited McLeod's testimony regarding the photographs. *Boyd* Dkt. 168-3 (2021 CPL § 440 Motion) at COE004354–56.

11. Court markings on Hauser's photographs indicate they were produced for the Gibson, Walker, and Boyd trials, as well as at a November 16, 1976 Huntley Hearing. (COE 4433–4537)

**Response**: Disputed.

a. Plaintiffs do not dispute that court markings on certain of Hauser's photographs indicate they were produced for the Gibson, Walker, and Boyd trials and the November 16, 1976 *Huntley* hearing

b. Plaintiffs dispute this paragraph to the extent it implies that all of Hauser's photographs were produced for the Gibson, Walker, and Boyd trials and the November 16, 1976 *Huntley* hearing.

c. Plaintiffs dispute this paragraph because it omits the material fact that McLeod received photographs in discovery for the Martin trial that were not disclosed to Boyd or Walker, one of which depicted a single set of footprints leading away from Crawford's body through the backyard of Crawford's house and another which clearly showed the absence of dragging marks in Crawford's driveway. *See infra*, Counterstatement ¶¶ 488–503.

12. Dove testified that it was raining and there was snow on the ground.  (Walker Trial Trans., p. 73)

**Response**: Undisputed.

13. Dove examined the backyard and the crusted snow had not been disturbed.  (Walker Trial Trans., p. 75–76)

**Response**: Disputed.

a. The evidence cited does not support the proposition that the snow had not been disturbed in Crawford's backyard. Dove testified that he examined the homes adjacent to Crawford's house looking for footprints or a weapon. He examined the backyards of those homes and found the snow behind those adjacent homes had not been disturbed. *Boyd* Dkt. 168-7 (Walker Trial Transcript) at 76:10–20.

b. Plaintiffs dispute this paragraph because it omits the material fact that McLeod received photographs in discovery for the Martin trial that were not disclosed to Boyd or Walker, one of which depicted a single set of footprints leading away from Crawford's body through the backyard of Crawford's house and another which clearly showed the absence of dragging marks in Crawford's driveway. *See infra*, Counterstatement ¶¶ 488–503.

14. BPD began its investigation on January 3, 1976.  This included canvassing the neighborhood (including the nearby Glenny Street Projects) (the "Glenny Projects") and speaking to Crawford's neighbors and witnesses present at the Golden Nugget the previous evening.  (COE 2125–35)

**Response**: Disputed.

a. The evidence cited does not support the proposition that the BPD "canvassed the neighborhood," including the Glenny Street Projects, on January 3, 1976." The first time BPD detectives reported visiting the Glenny Apartments and interviewing witnesses there was nearly a week later, on January 8, 1976, when Detectives Guadagno and Deubell reporting interviewing Sheryl Floyd. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002173.

15. On January 3, 1976 the BPD spoke to Frances Kalb ("Kalb"), Larry Watson ("Watson"), and Debbie Jeffrey ("Jeffrey").  (COE 2132–34)

**Response**: Undisputed.

16. Jeffrey gave BPD a sworn statement on January 6, 1976.  She recalled Crawford drinking in the Golden Nugget and displaying a large amount of cash.  Crawford left the bar with Watson, who returned 25-30 minutes later.  (COE 2148–50)

**Response:** Disputed.

a. Plaintiffs do not dispute that Jeffrey gave BPD a sworn statement on January 6, 1976. Additionally, Plaintiffs do not dispute that Jeffrey recalled that Crawford was drinking at the Golden Nugget and displaying a large amount of cash, or that he left with Watson.

b. However, this paragraph omits the material fact that Jeffrey stated in her sworn statement that Watson offered to walk Crawford home. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002149–50. Detectives Dove and Delano reported that Jeffrey told them that "Larry Watson said that he was going to take Crawford home," that Jeffrey was "definite on this point," and that Jeffrey "emphatically denie[d] asking anyone to take William Crawford

89

home, but state[d] that Larry Watson said that he was going to take Crawford home."
Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002133; COE002183.

17. Also on January 3, 1976 the BPD received a tip from an anonymous black male that Andre Howe and Gerry Boyd were responsible for the murder around 6:30 P.M.  (COE 2123)

**Response**: Disputed.

    a.   Plaintiffs do not dispute the proposition that BPD detectives reported that they received a tip from an anonymous black male that Andre Howe and Gerry Boyd were responsible for the murder at approximately 6:30 p.m. on January 3, 1976.

    b.   However, Plaintiffs dispute this paragraph in so far as the cited evidence does not support this proposition.

18. Kalb gave a sworn statement on January 6, 1976.  She recalled being a patron at the Golden Nugget on January 2, 1976.  She saw Crawford drinking with Watson and recalled barmaid Debbie Jeffrey asked Watson and his stepson to take Crawford home, which they agreed to do.  (COE 2147–48)

**Response**: Disputed.

    a.   Plaintiffs do not dispute the proposition that Kalb's sworn statement states that she recalled Jeffrey asked Watson and his stepson to take Crawford home.

    b.   However, Plaintiffs dispute this paragraph to the extent it is intended to convey that Jeffrey actually asked Watson and his stepson to walk Crawford home. According to a report authored by Detectives Dove and Delano on January 3, 1976, Jeffrey "emphatically denie[d] asking anyone to take William Crawford home, but state[d] that Larry Watson said that he was going to take Crawford home." Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002133.

    c.   Plaintiffs further dispute this paragraph because it omits the material fact that Kalb was interviewed prior to January 6, 1976, on January 3, 1976 and stated that:

1.   Watson accompanied Crawford out of the Golden Nugget at about 11:30 p.m;

2.   Watson returned to the Golden Nugget about 20 minutes later, left with his wife, Julia Watson, and returned to their home;

3.   Julia Watson later called Jeffrey asking Jeffrey to look for Watson's keys;

4.   Howard told Jeffrey to tell Julia Watson that Watson's keys were in his jacket pocket; and

5.   Jeffrey did tell Julia Watson that Watson's keys were in his jacket pocket.

   Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002131.

19. BPD also spoke to Margaret Crawford on January 6, 1976. She was hard of hearing, but recalled being in bed around 11:30 P.M. on January 2, 1976 and hearing, or rather feeling, a loud noise near the side door of the residence. (COE 2146)

**Response**: Undisputed.

20. BPD received an anonymous tip on January 7, 1976 that "the person who killed the man on Fillmore Avenue is Darryn Gibson ("Gibson"), who lives on Rodney Street.". (COE 2152)

**Response**: Disputed.

a.   Plaintiffs do not dispute that Detective Deubell authored a P-73 report stating that he received a phone call from an anonymous caller on January 7, 1976.

b.   However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Detective Deubell actually received an anonymous tip on January 7, 1976 stating that "the person who killed the man on Fillmore Avenue is Darryn Gibson ("Gibson"), who lives on Rodney Street." None of the evidence produced in this action indicates that the BPD made any attempt to identify the alleged caller or determine whether there was any basis for their statements.

21. BPD followed up on the tip and picked up Gibson at his home and took him to BPD headquarters for questioning on January 7, 1976.  He stated that he was at the Glenny Projects the evening of January 2, 1976 playing cards with John Walker ("Walker"), Darryl Boyd ("Boyd" or "Plaintiff"), Tyrone "Tony" Woodruff ("Woodruff"), and Floyd Martin ("Martin") (collectively, the "Group").  He denied any involvement in the murder and was released.  (COE 2152–54)

**Response**: Disputed.

    a.   Plaintiffs do not dispute that BPD officers interrogated Darryn Gibson based only on the information from an alleged anonymous caller. Additionally, Plaintiffs do not dispute that the P-73 report authored by Detectives Deubell and Guadagno states that Gibson stated that he was at the Glenny Apartments the evening of January 2, 1976 playing cards with Walker, Boyd, Woodruff, and Martin. Plaintiffs also do not dispute that the P-73 report authored by Detectives Deubell and Guadagno states that Gibson denied any involvement in the murder.

    b.   Plaintiffs dispute this paragraph because it omits the material fact that Gibson informed the BPD that Walker and Woodruff left in a cab around 11:15 p.m., which the BPD corroborated with the Fillmore Cab Company, which confirmed that two cars were dispatched to the Glenny Projects at 11:28 p.m. and 11:44 p.m. *See infra*, Counterstatement ¶¶ 94, 133–45.

22. BPD then went to Boyd's house.  They spoke to Boyd's mother, who told them he was at Thelma Green's ("Green") apartment in the Glenny Projects on January 2, 1976.  (COE 2165)

**Response**: Undisputed.

23. BPD proceeded to Green's residence.  Her foster son, Andre Hough ("Hough"), told BPD the Group was with him at the Glenny Projects on January 2, 1976.  (COE 2165)

**Response**: Disputed.

    a.   The evidence cited does not support the proposition that Hough told the BPD the "Group" was with him at the Glenny Projects on January 2, 1976. According to the P-73 report

authored by Detectives Guadagno and Deubell, Hough told detectives that he was with Boyd at Washington's apartment at the Glenny Apartments. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002165.

24. When asked whether his name is pronounced "Hough" or "Huff" at a Wade Hearing, he replied "Hough."  (COE 1330)

**Response**: Disputed.

    a.  Plaintiffs dispute that any meaning or relevance can be taken or inferred from a transcript without accompanying audio stating that the name "Hough" is pronounced "Hough."

25. BPD then interviewed Hough on January 8, 1976.  He gave a sworn statement wherein he said the Group gathered at the Glenny Projects the night of the Crawford murder.  There, Hough observed one of the Group asking if the rest of the Group wanted Hough to come (but did not specify where), to which either Walker or Gibson replied, "[N]o, I think he might tell someone or say something." The Group then departed.  (COE2166–67)

**Response**: Disputed.

    a.  Plaintiffs do not dispute that BPD detectives reported interviewing Hough on January 8, 1976, or that they prepared a reconstructed, limited statement for him to sign.

    b.  Plaintiffs dispute this paragraph because it omits the material fact that Hough's statement on January 8, 1976 was coerced. *See infra*, Counterstatement ¶¶ 146–64.

    c.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Hough's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. During the Crawford murder investigation, BPD detectives typed witness statements after the interrogation concluded and thus, the statements include only a reconstructed portion of the interview. *See infra*, Counterstatement ¶¶ 123–24, 170–71, 709–11.

26. Hough also told the BPD that he was at Boyd's house the evening of January 3, 1976 – the day after the Crawford murder.  Around 7:30 P.M. Boyd said to Hough, "You know you killed that man, you hit him in the head with a pipe, and I went into his pocket and got the money." Hough also recalled Boyd dialing a number, handing Hough a telephone, and telling him to ask the person on the other end if they "ha[d] my name Andre Hough and Darryl Boyd for murdering that man." Hough began to spell Boyd's name and Boyd ended the phone call.  Hough also observed Boyd displaying cash (COE 2166–67)

**Response**: Disputed.

    a.  Plaintiffs do not dispute that BPD detectives prepared a reconstructed, limited statement for Hough to sign that contains the statements quoted in this paragraph.

    b.  However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Hough actually had knowledge of the Crawford murder, or that Gibson, Boyd, Walker, Martin, and Woodruff actually had any knowledge of or involvement in the Crawford murder. Evidence in the record indicates their innocence. *See infra*, Counterstatement ¶¶ 20–80, 102–07, 133–45, 509–22.

    c.  Plaintiffs dispute this paragraph because it omits the material fact that Hough's statement on January 8, 1976 was coerced. *See infra*, Counterstatement ¶¶ 146–64.

    d.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Hough's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. During the Crawford murder investigation, BPD detectives typed witness statements after the interrogation concluded and thus, the statements include only a reconstructed portion of the interview. *See infra*, Counterstatement ¶¶ 123–24, 170–71, 709–11.

27. BPD picked up Boyd on January 8, 1976 and brought him to BPD headquarters for questioning.  Boyd gave a sworn statement where he denied involvement in the murder, provided the same alibi as Gibson, and claimed to have learned about the murder by watching the Channel 7 News at 12:00 P.M. on January 3, 1976.  (COE 2170–71)

**Response**: Disputed.

a.  Plaintiffs do not dispute that the BPD picked up Boyd on January 8, 1976 and brought him to BPD headquarters for questioning, or that Boyd denied involvement in the Crawford murder and provided the same alibi as Gibson.

b.  Plaintiffs dispute this paragraph because it omits the material fact that Boyd informed the BPD that Walker and Woodruff left Shirley Floyd's that night in a cab, and that Floyd Martin, Martin's brother, and Shirley Floyd called a second cab. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002170. The BPD corroborated this statement with the Fillmore Cab Company, which confirmed that two cabs were dispatched to the Glenny Projects at 11:28 p.m. and 11:44 p.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002173.

c.  Plaintiffs dispute this paragraph because it omits the material fact that the statement typed by the BPD does not accurately reflect many of Boyd's statements to detectives on January 8, 1976 and that Boyd was pressured to change his account. *See infra,* Counterstatement ¶¶ 123–32.

d.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Boyd's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. During the Crawford murder investigation, BPD detectives typed witness statements after the interrogation concluded and thus, the statements include only a reconstructed portion of the interview. *See infra*, Counterstatement ¶¶ 123–24, 170–71, 709–11.

28. BPD questioned Walker for the first time on January 11, 1976. He was picked up at his house and brought to BPD headquarters where he gave a sworn statement. Walker claimed to have learned about the Crawford murder by reading the newspaper and hearing it on the "News." He also denied involvement in the murder and provided that either Gibson or Boyd told him the BPD would want to talk to him. (COE 2175–77)

**Response**: Disputed.

    a.   Plaintiffs do not dispute that the BPD questioned Walker on January 11, 1976, that Walker denied involvement in the Crawford murder, or that he learned about the Crawford murder by reading the newspaper and hearing it on the news.

    b.   Plaintiffs dispute this paragraph because it omits the material fact that the statement typed by the BPD does not accurately reflect many of Walker's statements to detectives on January 11, 1976, and that Walker was pressured to change his account. *See infra,* Counterstatement ¶¶ 170–78.

    c.   Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Walker's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. During the Crawford murder investigation, BPD detectives typed witness statements after the interrogation concluded and thus, the statements include only a reconstructed portion of the interview. *See infra*, Counterstatement ¶¶ 123–24, 170–71, 709–11.

29. Walker testified at his deposition that he learned of the Crawford murder from the "news" early on Saturday, January 3, 1976. [Walker Dep. Tr., 129:3–13]

**Response**: Undisputed.

30. Boyd also testified at his deposition that he learned of the Crawford murder by watching the Channel 7 News at 12:00 P.M. on Saturday, January 3, 1976. He identified the broadcasters, as well. (Boyd Dep. Trans., p. 207:13–216:12)

**Response**: Undisputed.

31. There was no news broadcast on Channel 7 – or any other channel in Buffalo – at 12:00 P.M. on January 3, 1976. (COE 19049)

**Response**: Disputed.

a. Plaintiffs dispute this statement as the County relies exclusively on a document that has not been authenticated and is inadmissible.

b. The evidence cited does not support this proposition that "[t]here was no news broadcast on Channel 7 – or any other channel in Buffalo – at 12:00 P.M. on January 3, 1976." The evidence cited contains illegible TV listings for specific selections of TV channels for January 3, 1976

32. Woodruff also gave a sworn statement to the BPD on January 11, 1976.  He denied any involvement in the murder and provided a similar alibi as Gibson, Walker, and Boyd.  (COE 2175, 11177–78)

**Response**: Disputed.

a. Plaintiffs do not dispute that BPD questioned Woodruff on January 11, 1976, that Woodruff denied involvement in the Crawford murder, and that he provided a fundamentally similar account of his whereabouts as Gibson, Walker, and Boyd.

b. Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. During the Crawford murder investigation, BPD detectives typed witness statements after the interrogation concluded and thus, the statements include only a reconstructed portion of the interview. *See infra*, Counterstatement ¶¶ 123–24, 170–71, 709–11.

33. Woodruff gave another sworn statement to the BPD on January 12, 1976.  This time, he told them that once the Group convened at the Glenny Projects, Gibson suggested going out to "get him some money tonight." Gibson then remarked that he did not want Hough to accompany them.  Near Simpson's Store – a convenience store formerly on Fillmore Avenue near the Crawford residence, Gibson picked up a pipe and put it in his sleeve.  They then observed Crawford walking toward his driveway and approached him.  Gibson then struck Crawford in the face and head with the pipe. Gibson and Boyd dragged Crawford down the driveway and Boyd removed what Woodruff thought

to be a wallet from Crawford's pocket. Woodruff remained back at the street during the robbery. The Group then proceeded back to the Glenny Projects. (COE 2203–05) Woodruff's father and minister were both present for this statement. (COE 11205)

**Response**: Disputed.

    a.  Plaintiffs do not dispute that the BPD interrogated Woodruff on January 12, 1976, or that detectives prepared a reconstructed, limited statement for him to sign.

    b.  However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that Gibson, Boyd, Walker, Martin, and Woodruff actually had any knowledge of or involvement in the Crawford murder. Evidence in the record indicates their innocence. *See infra*, Counterstatement ¶¶ 20–80, 102–07, 133–45, 509–22.

    c.  Plaintiffs dispute this paragraph because it omits the material fact that the detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–231.

    d.  Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Woodruff's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. During the Crawford murder investigation, BPD detectives typed witness statements after the interrogation concluded and thus, the statements include only a reconstructed portion of the interview. *See infra*, Counterstatement ¶¶ 123–24, 170–71, 709–11.

34. While questioning Woodruff, BPD received a phone call from an "anonymous negro female" saying that Gibson, Walker, Martin and "Toni" were responsible for killing the white man on Fillmore Avenue. Woodruff then became tense and struggled to raise the cup of coffee he was holding. (COE 2202)

**Response**: Disputed.

a.  Plaintiffs do not dispute that Detective Manista authored a report stating that he received an anonymous call from a female tipster while Woodruff was sitting in the office of the homicide division.

b.  Plaintiffs dispute this paragraph to the extent it relies upon unreliable and inadmissible hearsay within hearsay.

c.  Plaintiffs also dispute this paragraph to the extent it is intended to convey that Manista actually received an anonymous call, or that the alleged caller's tip was accurate. The BPD collected evidence showing that Walker and Woodruff were either riding in a taxicab or already home at the time of the crime, and therefore the alleged anonymous caller's statement regarding their involvement in the crime could not have been truthful. *See infra*, Counterstatement ¶¶ 133–45.

35.  Hough gave a second sworn statement to BPD on January 12, 1976.  This time, he told the BPD that Boyd had told him that the Group committed the Crawford murder.  Hough's foster mother was present for the statement.  (COE 2194–96)

**Response**: Disputed.

a.  Plaintiffs do not dispute that BPD detectives reported interrogating Hough on January 12, 1976, or that they prepared a reconstructed, limited statement for him to sign.

b.  Plaintiffs dispute that Hough's foster mother was present when he gave his second statement to the BPD. Hough testified at the *Wade* Hearing that he spoke with police without his mother present. Sahasrabudhe Decl., Ex. 18 (Hough Wade) at 21:2–11, 56:15–16.

c.  At a pre-trial hearing in the Floyd Martin trial, Hough testified that he was alone when he gave the second statement to the BPD, and that "after the statement my mother and her

sister came." Sahasrabudhe Decl., Ex. 13 (Hough Trial Tr.) at 3:9–16; Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE008616.

d. Plaintiffs dispute this paragraph to the extent that it indicates that the detectives recorded their questions and Hough's answers verbatim, in complete form, preserved them, and turned them over to prosecutors. During the Crawford murder investigation, BPD detectives typed witness statements after the interrogation concluded and thus, the statements include only a reconstructed portion of the interview. *See infra*, Counterstatement ¶¶ 123–24, 170–71, 709–11.

36. Woodruff agreed to testify against Boyd, Walker, Gibson, and Martin in exchange for prosecutorial immunity. He was represented by counsel for his immunity deal. (COE 11234–36)

**Response**: Disputed.

a. Plaintiffs do not dispute that the BPD offered Woodruff immunity in exchange for implicating Gibson, Boyd, Walker, and Martin in the Crawford murder.

b. Plaintiffs dispute this paragraph because it omits the material fact that Woodruff was initially offered immunity on January 12, 1976, while he was under arrest and without probable cause, without an attorney representing him. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002202–2206; Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 248–49; Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 125–27, 164–68.

c. Plaintiffs dispute this paragraph because it omits the material fact that prior to being offered immunity, BPD officers threatened Woodruff, stating that he was "going away for life" and that they had an anonymous witness ready to implicate him and his friends in the Crawford murder. Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 249:5–21; Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 125:25–127:18, 164:7–168:19.

    d.  Plaintiffs dispute this paragraph because it omits the material fact that Woodruff testified in his deposition for this case that he was promised immunity on January 12, 1976 if he admitted to minor involvement in the Crawford murder.  Woodruff also testified that after he was promised immunity, BPD officers gave him information about the Crawford murder, admonished Woodruff when he made statements inconsistent with their story, and wrote Woodruff's witness statement, which he ultimately signed.  Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 125:25–127:18, 164:7–168:19.

37. Boyd, Walker, Gibson, and Martin were arrested on January 12, 1976 and charged with second degree murder and criminal possession of a weapon.  (COE 2187–88)

**Response**: Undisputed.

38. Boyd, Walker, Gibson, and Martin were arraigned on January 13, 1976 and remanded to the Erie County Holding Center.  (COE 2213)

**Response**: Undisputed.

39. A preliminary hearing for all four defendants was held in Buffalo City Court on January 16, 1976.  Woodruff was represented by John Spadafora.  Mark Hulnick represented Boyd.  James McLeod represented Martin.  Dan Barry represented Walker.  Joseph La Tona represented Gibson. (Preliminary Hearing Trans., p. 1)

**Response**: Undisputed.

40. Woodruff testified at the preliminary hearing with immunity.  Both of his prior statements were produced and he confirmed they were the only two he had given up to that point.  (Preliminary Hearing Trans., p. 11:7–12:6)

**Response**: Disputed.

    a.  Plaintiffs do not dispute that Woodruff testified at the preliminary hearing with immunity.  Plaintiffs also do not dispute that two reconstructed, limited statements attributed to Woodruff were produced at the hearing.

b. Plaintiffs dispute this paragraph because it omits the material fact that ADA Drury testified at his deposition in this case that he did not disclose any P-73 reports to the defense at the preliminary hearing, and therefore all of Woodruff's statements and the circumstances surrounding those statements were not produced. Sahasrabudhe Decl., Ex. 7 (Drury Dep.) at 85:4–6.

c. Plaintiffs dispute this paragraph because it omits the material fact that BPD detectives coerced Woodruff to make his January 12 statement. *See infra*, Counterstatement ¶¶ 185–231.

41. Woodruff testified that he was not told he would be charged with murder unless he made a statement to police.  (Preliminary Hearing Trans., p. 52:20–22)

**Response**: Disputed.

a. Plaintiffs do not dispute that, at the preliminary hearing in the underlying criminal cases, in response to the question "Were you told you would be charged with murder unless you made a statement?" Woodruff testified: "Not as far as I can remember."

b. Plaintiffs dispute this paragraph to the extent it intends to convey that Woodruff was, in fact, not told he would be charged with murder unless he made a statement to police.

c. In 1985, Woodruff stated that officers told him that if he did not cooperate he would be charged and "they had somebody upstairs ready to take my place." He stated that officers were armed and that they intimidated him. *See* Ex. 18 (11/1/85 Woodruff Recantation) at 5:22–23, 6:7–14.

d. In 2010, Woodruff testified that "from day one I was pressured;" that he was told by BPD that they "got somebody upstairs that's gonna come down and take your place;" and that BPD made it clear to Woodruff that he would be "locked up." Ex. 19 (4/6/10 Woodruff Recantation) at 4:5, 8:1–2, 15:1–7

    e.  Finally, Woodruff testified in his deposition in this case that BPD told him he would go to jail if he did not alter his testimony to fit BPD's narrative or did not cooperate. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 156:21–23, 161:3–7.

    f.  Plaintiffs dispute this paragraph because it omits the material fact that Woodruff's January 12 statement and his testimony at proceedings thereafter was coerced and fabricated. *See infra*, Counterstatement ¶¶ 185–231.

42. Erie County Medical Examiner Henry Severson ("Severson") issued his report on January 21, 1976.  (COE 2101–07) He observed that Crawford had been beaten with a blunt instrument.  (COE 2101)

**Response**: Undisputed.

43. Severson later testified that the murder weapon "would had to have been linear, heavy, an object of some kind, particularly a pipe." [Walker Trial Tr., 101:3–4]

**Response**: Disputed.

    a.  Plaintiffs do not dispute that Severson testified that the murder weapon "would had to have been linear, heavy, and object of some kind, particularly a pipe."

    b.  However, Plaintiffs dispute this paragraph to the extent it intends to convey that the murder weapon was actually a pipe. There is no evidence in the record regarding what the murder weapon was other than the medical report stating that the one of the causes of death was "[b]lunt force injuries to the head and face." *Boyd* Dkt. 168-2 (Medical Examiner's Report Forensics) at COE002101.

44. Woodruff gave an additional statement on February 11, 1976.  He told the same story as his previous statement but added the detail that Boyd and Gibson had opened a door of the Golden Nugget and observed Crawford displaying cash before retreating back to Simpson's Store and waited for Crawford to exit the bar.  (COE 2233)

**Response**: Disputed.

    a.   Plaintiffs dispute this paragraph because it omits the material fact that Woodruff's February

          11, 1976 statement was coerced and fabricated by BPD. *See infra*, Counterstatement ¶¶

          266–92; Sahasrabudhe Decl., Ex 3 (Homicide File) at COE002231–33.

    45. Also on February 11, 1976, Woodruff testified before the grand jury and implicated the four in the crime.  (COE 11191–97)

**Response**: Disputed.

    a.   Plaintiffs do not dispute the fact that Woodruff testified before the grand jury on February

          11, 1976 and implicated Gibson, Boyd, Walker, and Martin.

    b.   Plaintiffs dispute this paragraph because it omits the material fact that Woodruff's January

          12 statement and his testimony at proceedings thereafter was coerced and fabricated. *See*

          *infra*, Counterstatement ¶¶ 185–231, 266–92, 294–97, 513–15.

    46. BPD canvassed the Glenny Projects on February 25, 1976.  They spoke to Elizabeth Hoffler ("Hoffler"), who recalled that the evening of January 2, 1976, she left her apartment between 1:00 and 2:00 A.M.  She encountered several youths around the elevator and offered to pay them for a ride. One of the youths then struck her in the face.  She later recognized the youth on television as one of the boys arrested for the Crawford murder.  She went back to her apartment on the sixth floor and later saw the same five boys enter apartment F8, where there was a party in progress.  (COE 2242–43)

**Response**: Disputed.

    a.   Plaintiffs do not dispute the proposition that BPD detectives reported that they spoke to

          Elizabeth Hoffler on February 25, 1976.

    b.   Plaintiffs dispute this paragraph to the extent it is intended to convey that Hoffler's account

          of the evening of January 2, 1976 is accurate. Boyd, Walker, Martin, and Gibson all told

          detectives that they left the Glenny Apartments prior to 12:00 a.m. Sahasrabudhe Decl.,

          Ex. 3 (Homicide File) at COE002156; COE00217; COE002176–177; COE0021792–193.

          Walker and Woodruff took a cab home from the Fillmore Cab Company, and shortly

thereafter Gibson and Boyd walked home. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002156–57. BPD officers corroborated the boys' account. Detectives Guadagno and Deubell confirmed with the Fillmore Cab Company that only two cars were dispatched to the Glenny Projects at 11:28 p.m. and 11:44 p.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002173–74.

47. Hoffler's sister Doloris White ("White") testified at the Huntley Hearing. She was with Hoffler on January 2-3, 1976 and recognized Gibson and Boyd as the boys who accosted her sister, identifying Gibson as the one who slapped her. She recalled the interaction occurring around 1:30 A.M. on January 3, 1976. (Huntley Hearing Trans., p. 219–221, 225)

**Response**: Disputed.

a. Plaintiffs do not dispute that White testified at the *Huntley* hearing that she was with Hoffler on January 2-3, 1976, and that she claimed to recognize Gibson and Boyd.

b. Plaintiffs dispute this paragraph to the extent it intends to convey that Gibson and Boyd were actually in the Glenny Apartments between 1:00 a.m. and 2:00 a.m. on January 3, 1976 or that Gibson actually slapped White. Boyd, Walker, Martin, and Gibson all told detectives that they left the Glenny Apartments prior to 12:00 a.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002156; COE002170; COE002176–77; COE002192–93. Walker and Woodruff took a cab home from the Fillmore Cab Company, and shortly thereafter Gibson and Boyd walked home. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002156–57. BPD officers corroborated the boys' account. Detectives Guadagno and Deubell confirmed with the Fillmore Cab Company that only two cars were dispatched to the Glenny Projects at 11:28 p.m. and 11:44 p.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002173–174.

    c.  Plaintiffs dispute this paragraph because it excludes the material fact that Hoffler did not testify at the *Huntley* hearing, and neither Hoffler nor White testified at Gibson's, Walker's or Boyd's trial.

48. White also identified Martin, who lived in the same building as her.  (Huntley Hearing Trans., p. 222:14–20)

**Response**: Disputed.

    a.  Plaintiffs do not dispute that White testified at the *Huntley* hearing and that she claimed to recognize Martin.

    b.  However, Plaintiffs dispute this paragraph to the extent it is intended to convey that Martin was actually present for this alleged interaction with Hoffler. Boyd, Walker, Martin, and Gibson all told detectives that they left the Glenny Apartments prior to 12:00 a.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002156; COE002170; COE002176–177; COE002192–93. Walker and Woodruff took a cab home from the Fillmore Cab Company, and shortly thereafter Gibson and Boyd walked home. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002156–57. BPD officers corroborated the boys' account. Detectives Guadagno and Deubell confirmed with the Fillmore Cab Company that only two cars were dispatched to the Glenny Projects at 11:28 p.m. and 11:44 p.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002173–74.

49. Regarding the timeline of the evening and early morning, Gibson had previously told police that Walker and Woodruff left the Glenny Projects in a cab around 11:15 P.M and that he and Boyd walked home.  Gibson said he arrived home at 11:35 P.M.  (COE 2156)

**Response**: Disputed.

    a.  The evidence cited does not support the proposition that Gibson previously told BPD detectives that he arrived home at 11:35 p.m. Rather, the statement prepared by detectives

and signed by Gibson states that Gibson got home at "about 11:35 p.m." Sahasrabudhe
Decl., Ex. 3 (Homicide File) at COE002156.

50. Martin had previously told police that he and Gibson walked home and split up around
11:25 P.M. and that he arrived home at 11:30 P.M.  (COE 2170)

**Response**: Disputed.

    a.  The cited evidence is the statement of Darryl Boyd and does not support the stated
propositions, though Boyd's account of the evening of January 2, 1976 is fundamentally
consistent with Martin's account. Sahasrabudhe Decl., Ex. 3 (Homicide File) at
COE002170.

    b.  According to the P-73 report prepared by Montondo regarding his interrogation of Martin
on January 12, 1976, prior to Martin's booking, Martin "denied leaving the projects."
Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002192.

51. Walker previously told police that he left the Glenny Projects in a cab with Woodruff
around midnight.  (COE 2176)

**Response**: Undisputed.

52. In his first interaction with police, Woodruff said he did not recall what time he left the
Glenny Projects.  (COE 2179)

**Response**: Undisputed.

53. Dorothea Luster ("Luster") – resident of the apartment where the Group said they were on
January 2, 1976 – told BPD that Boyd left her apartment at midnight.  (COE 2200) Shirley Floyd – who
also lived at the apartment where the Group was on January 2, 1976 told BPD that the five of them
came over around 3:30 A.M. on January 3, 1976 and stayed until 4:30 or 5:00 A.M.  (COE 2238)

**Response**: Disputed.

    a.  Plaintiffs do not dispute that the statement signed by Luster states that Boyd left her
apartment at midnight. Plaintiffs also do not dispute that the statement signed by Floyd

states that Floyd told BPD detectives that Martin, Boyd, Gibson, Woodruff, and Walker went to Floyd's apartment around 3:30 a.m. on January 3, 1976 and left around 4:30 a.m. or 5:00 a.m.

b.  However, Plaintiffs dispute this paragraph to the extent it intends to convey that Boyd actually left Luster's apartment at midnight; that Martin, Boyd, Gibson, Woodruff, and Walker went to Floyd's apartment around 3:30 a.m.; or that they left Floyd's apartment around 4:30 a.m. or 5:00 a.m.

c.  Boyd, Walker, Martin, and Gibson all told detectives that they left the Glenny Apartments prior to 12:00 a.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002156; COE002170; COE002176–77; COE002192–93. Walker and Woodruff took a cab home from the Fillmore Cab Company, and shortly thereafter Gibson and Boyd walked home. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002156–57. BPD officers corroborated the boys' account. Detectives Guadagno and Deubell confirmed with the Fillmore Cab Company that only two cars were dispatched to the Glenny Projects at 11:28 p.m. and 11:44 p.m. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002173–74.

54. There is no record of BPD talking to any cab driver dispatched to the Glenny Projects on January 2-3, 1976.  (COE 2124–2254)

**Response**: Undisputed.

55. Gibson's defense attorney Gary Bittner ("Bittner") served an omnibus motion which included demands pursuant to Brady on April 14, 1976.  (COE 1893–95)

**Response**: Disputed.

a. Plaintiffs do not dispute that Bittner served an omnibus motion that included demands pursuant to *Brady* on April 4, 1976.

b. However, Plaintiffs dispute this paragraph because it omits the material fact that the omnibus motion did not include a specific request for crime scene photographs. *Boyd* Dkt. 168–2 (Gibson Motions) at COE001893.

56. At a November 15-16, 1976 Huntley Hearing, Drury represented that he "turned over all P-73s to the defense." McLeod refused to show Drury a witness statement, claiming attorney work product privilege.  (COE 1193:11–1194:17)

**Response**: Disputed.

a. The evidence cited does not support the proposition that "At a November 15-16, 1976 Huntley Hearing, Drury represented that he 'turned over all P-73s to the defense'" or that McLeod refused to show Drury a witness statement, claiming attorney work product privilege.

b. The record of the November 15, 1976 *Huntley* hearing reflects that five P-73 reports were marked as exhibits at the hearing. Drury did not disclose any other materials to the defendants beyond the marked exhibits listed in the court's record of the *Huntley* hearing. *See Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 7:7–17, 13:20–14:11, 143:6–22, 157:16–19, 166:18–22.

c. Drury disclosed only the P-73 reports that he considered to be *Rosario* material for purposes of the *Huntley* hearing.

d. Former ADA Henry, testifying as the representative of the ECDA, confirmed that the decision not to disclose this material was representative of the *Brady* policy of the ECDA.

Sahasrabudhe Decl., Ex. 8 (Henry Dep.) at 310:9–312:13, 316:19–317:17, 353:10–355:11, 368:10–371:17.

e.   The *Huntley* hearing transcript reflects that the ECDA was instructed to make efforts to determine the existence of the witness statement cited by the defendants, which they were unable to do. Instead, Drury demanded to see a statement from the same witness that McLeod had, at which point McLeod and Jay claimed the statement was protected by attorney work product privilege. *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 271:7–278:15.

57. During the same proceeding, Drury stated, "[I]f counsel has a P-73 that would help this officer, I think it would be good to hand it over to him," in reference to Jay's line of questioning. (COE 1124:1–3) There was no testimony offered at the Huntley Hearing indicating the coercion of any witness or defendant.  (COE 963–1322)

**Response**: Disputed.

a.   Plaintiffs do not dispute that Drury stated during the *Huntley* hearing, "[I]f counsel has a P-73 that would help this officer, I think it would be good to hand it over to him."

b.   However, Plaintiffs dispute this paragraph to the extent it states that there was no testimony offered at the *Huntley* hearing indicating the coercion of any witness or defendant. This Paragraph omits the following material facts:

   1.   Deubell testified that Boyd was detained for the length of his interrogation by BPD on January 8, 1976. *Boyd* Dkt. 168-9 (*Huntley* Hearing Tr.) at 103:16.

   2.   Drury testified that Woodruff was given immunity. *Boyd* Dkt. 168-9 (*Huntley* Hearing Tr.) at 348:7–8.

c.   Plaintiffs further dispute this paragraph because it omits the material fact that the purpose of the *Huntley* hearing is to consider whether the *defendants'* statements were given voluntarily. Hough and Woodruff, who were not defendants, were coerced into giving false statements and testimony. *See infra*, Counterstatement ¶¶ 146–64, 185–231, 266–92.

Therefore, the absence of testimony about coercion at this hearing is not evidence that no witnesses were coerced.

58. Gibson was tried and convicted in January 1977. Woodruff and Hough both testified against Gibson, implicating him in the Crawford murder. ADA Timothy Drury ("Dury") prosecuted Gibson. (Gibson Trial Trans., p. 141–345)

**Response**: Disputed.

a. Plaintiffs do not dispute that Gibson was tried and convicted in January 1977, that Woodruff and Hough gave testimony at the Gibson trial suggesting his guilt, or that Drury prosecuted Gibson.

b. Plaintiffs dispute this paragraph because it omits the material facts that Woodruff and Hough's trial testimony resulted from the statements that were coerced and fabricated by BPD detectives. *See infra*, Counterstatement ¶¶ 146–64, 185–231, 266–92.

59. Woodruff's grand jury testimony was disclosed and introduced as Exhibit 27 in Gibson's trial. (Gibson Trial Trans., p. 301:5–11) Bittner did not raise an issue regarding the disclosure of the grand jury testimony. (Gibson Trial Trans.)

**Response**: Disputed.

a. Plaintiffs do not dispute that Bittner did not object on the record regarding the disclosure of the grand jury testimony.

b. However, Plaintiffs dispute this paragraph to the extent that the phrase "did not raise an issue" is unclear and imprecise. The Gibson trial transcript reflects that the grand jury testimony was only first given to Bittner when it was introduced by Drury as Exhibit 27 in the Gibson trial and that Bittner requested a brief recess to review the grand jury testimony. *Boyd* Dkt. 168-5 (Gibson Trial Transcript) at 302:18–303:2.

c. Additionally, Plaintiffs dispute this paragraph to the extent that it is intended to convey that disclosure to Bittner satisfied the *Brady* requirements as to Boyd and Walker.

60. Bittner offered Woodruff's January 12, 1976 statement as Exhibit 21.  (Gibson Trial Trans., p. 195:3–14)

**Response**:  Disputed.

a.  Plaintiffs dispute this paragraph to the extent it is intended to convey that Bittner's introduction of Woodruff's January 12 statement satisfies the ECDA's *Brady* requirement as to Boyd and Walker.

61. Boyd was tried and convicted in April 1977.  ADA Drury prosecuted Boyd.  Again, Woodruff and Hough were among the witnesses who testified against Boyd.  Woodruff and Hough's accounts implicated Boyd.  (Boyd Trial Trans.)

**Response**: Disputed.

a.  Plaintiffs do not dispute that Boyd was tried and convicted in April 1977, that Woodruff and Hough gave testimony at the Boyd trial suggesting his guilt, or that Drury prosecuted Boyd.

b.  Plaintiffs dispute this paragraph because it omits the material facts that Woodruff and Hough's trial testimony resulted from the statements that were coerced and fabricated by BPD detectives. *See infra*, Counterstatement ¶¶ 146–64, 185–231, 266–92.

62. Prior to trial, Mark Hulnick – Boyd's defense attorney – served an omnibus motion on or about April 6, 1976.  This included Brady demands.  (COE 2258–70)

**Response**:  Disputed.

a.  Plaintiffs do not dispute that Hulnick served an omnibus motion that included demands pursuant to *Brady* on April 6, 1976.

b.  However, Plaintiffs dispute this paragraph because it omits the material fact that the omnibus motion did not include a specific request for crime scene photographs. *Boyd* Dkt. 168-2 (Boyd Motions) at COE002258–70.

63. Boyd did not testify at his trial.  (Boyd Trial Trans., p. 2)

**Response**: Undisputed.

64. Dove testified that he searched Crawford's backyard and the adjoining yards for weapons. He did not find one, nor did he observe any footprints in the adjoining yards. (Boyd Trial Trans., p. 110:16–111:2)

**Response**: Disputed.

a. Plaintiffs do not dispute that Dove testified that he searched the adjourning yards for weapons, and that he did not find a weapon or footprints in the adjoining yards.

b. However, Plaintiffs dispute this paragraph as the evidence cited does not support the proposition that Dove searched Crawford's backyard or that Dove saw the snow had not been disturbed in Crawford's backyard. Dove testified that he examined the homes adjacent to Crawford's house looking for footprints or a weapon. He examined the backyards of those homes and found the snow behind those adjacent homes had not been disturbed. *Boyd* Dkt. 168-7 (Walker Trial Transcript) at 76:10–20.

c. Plaintiffs dispute this paragraph because it omits the material fact that McLeod received photographs in discovery for the Martin case that were not disclosed to Boyd or Walker, one of which depicted a single set of footprints leading away from Crawford's body through the backyard of Crawford's house and another which clearly showed the absence of dragging marks in Crawford's driveway. *See infra*, Counterstatement ¶¶ 488–503.

65. There was no testimony offered at Boyd's trial indicating the existence of a photograph depicting footprints in Crawford's backyard. (Boyd Trial Trans.)

**Response**: Disputed.

a. Plaintiffs do not dispute that there was no testimony regarding the referenced photograph.

b. However, Plaintiffs dispute this paragraph to the extent it is intended to convey that no such photograph existed. Instead, there is evidence that a photograph depicting a single set

of footprints leading away from Crawford's body through the backyard of Crawford's house was admitted into evidence at the Martin trial. *See infra*, Counterstatement ¶¶ 488–503.

c. Plaintiffs dispute this paragraph because it omits the material fact that McLeod received photographs in discovery for the Martin trial that were not disclosed to Boyd or Walker, one of which depicted a single set of footprints leading away from Crawford's body through the backyard of Crawford's house and another which clearly showed the absence of dragging marks in Crawford's driveway. *See infra*, Counterstatement ¶¶ 488–503.

66. During his summation, Drury quoted the testimony of BPD photographer Albert Hauser ("Hauser") and Dove that there was blood found at the crime scene.  (Boyd Trial Trans., p. 615:3–4)

**Response**: Disputed.

a. The evidence cited does not support the proposition that Drury quoted the testimony of Hauser and Dove that there was blood found at the crime scene. Drury stated:

a. "I think it was Dove mainly and also Donnelly, the fireman, the other people, describe the scene of it." *Boyd* Dkt. 168-6 (Boyd Trial Tr.) at 614:12–14.

b. "Woodruff plays down the number of beatings to the head, you know it was vicious enough to scatter some of his blood against the wall back there." *Boyd* Dkt. 168-6 (Boyd Trial Tr.) at 615:3–6.

67. Drury referred to Woodruff as a "blithering idiot," arguing that his testimony would have sounded smoother if it were rehearsed.  (Boyd Trial Trans., p. 607:2–5)

**Response**: Disputed.

a.  Plaintiffs do not dispute that Drury referred to Woodruff as a "blithering idiot."

b.  Plaintiffs dispute this paragraph because it omits the material fact that Woodruff's testimony resulted from the confession that was coerced and fabricated by BPD detectives. *See infra*, Counterstatement ¶¶ 185–231, 266–92.

c.  Plaintiffs also dispute this paragraph to the extent it intends to convey that Woodruff's testimony was not rehearsed or influenced by Drury. At his deposition in this case, Woodruff testified that he met with Drury "quite a few times" after the grand jury and that he met with Drury before each trial "to prepare." During those meetings, if Woodruff said something that didn't make sense, Drury would say "it couldn't happen like that, we're going to do it like this." Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 122:6–124:13.

68. Drury later remarked that Woodruff was more forthcoming once represented by counsel and eventually told the truth. He described Woodruff as a "product of his environment" and a "ghetto kid." He asked the jury to believe Woodruff because he named the pipe as the murder weapon, despite being an "idiot" and "nitwit" (Boyd Trial Trans., p. 613:21–614:14)

**Response**: Disputed.

a.  Plaintiffs do not dispute that Drury described Woodruff as a "product of his environment" and a "ghetto kid," or that he called him an "idiot" and "nitwit."

b.  Plaintiffs dispute this paragraph because it omits the material fact that Woodruff's trial testimony resulted from the confession that was coerced and fabricated by BPD detectives. *See infra*, Counterstatement ¶¶ 146–64, 185–231, 266–92.

69. Drury also noted Dove's testimony that there were no footprints on either side of Crawford's house, indicating nobody "jumped the yard." (Boyd Trial Trans., p. 614:15–17)

**Response**: Disputed.

a.  Plaintiffs do not dispute that Drury said nobody "jumped the yard."

b.  Plaintiffs dispute this paragraph because it omits the material fact that McLeod received photographs in discovery for the Martin trial that were not disclosed to Boyd or Walker, one of which depicted a single set of footprints leading away from Crawford's body through the backyard of Crawford's house and another which clearly showed the absence of dragging marks in Crawford's driveway. *See infra*, Counterstatement ¶¶ 488–503.

70. Walker was tried and convicted in June 1977.  He was represented by David Jay ("Jay") (Walker Trial Trans.)

**Response**: Undisputed.

71. Like Bittner and Hulnick, Jay served an omnibus motion prior to trial on or about March 10, 1976 which included discovery demands, including requests for Brady material.  (COE 2584–93)

**Response**: Disputed.

a.  Plaintiffs do not dispute that Jay served an omnibus motion that included demands pursuant to *Brady* on March 10, 1976.

b.  However, Plaintiffs dispute this paragraph because it omits the material fact that the omnibus motion did not include a specific request for crime scene photographs. *Boyd* Dkt. 168-2 (Walker Motions) at COE002584–93.

72. ADA David Henry ("Henry") prosecuted the case, with assistance from ADAs James Verrastro ("Verrastro").  (Walker Trial Trans., p. 1)

**Response**: Undisputed.

73. Addressing Woodruff's credibility, Henry remarked that, "Mr. Jay is right.  Tyrone Woodruff is a liar.  Nothing here is going to change that.  He gave a statement on the 11th, he lied; I don't know anything about it.  He gave a statement on the 13th, Gibson and Boyd did it; I don't know anything more period two contradictory statements.  Then he moves on to his next statement, and he

still lied.  He's still not telling the whole truth.  He moves on to the next statement period now, the grand jury.  At this point he tells what happened the whole night.  Well, if Woodruff is a liar then I suppose is a jury, you can make your decision that we shouldn't convict John Walker." (Walker Trial Trans., p. 142:143:3)

**Response**: Disputed.

   a. This paragraph does not accurately reflect ADA Henry's summation. Henry stated: "Mr. Jay is right. Tyrone Woodruff is a liar. Nothing here is going to change that. He gave a statement on the 11th, he lied; I don't know anything about it. He gave a statement on the 13th, Gibson and Boyd did it; I don't know anything more. Two contradictory statements. Then he moves on to his next statement, and he still lied. He's still not telling the whole truth. He moves on to the next statement. Now, the Grand Jury. At this point he tells what happened the whole night. Well, if Woodruff is a liar then I suppose as a jury, you can make your decision that we shouldn't convict John Walker." *Boyd* Dkt. 168-7 (Walker Trial Transcript at 142:143:3.

   b. Plaintiffs dispute this paragraph because it omits the material fact that Woodruff's statements and trial testimony resulted from the confession that was coerced and fabricated by BPD detectives. *See infra*, Counterstatement ¶¶ 184–231, 266–92.

74. Again, Woodruff implicated Walker in the Crawford murder. (Walker Trial Trans., p. 115–203)

**Response**: Disputed.

   a. Plaintiffs do not dispute that Woodruff testified at the Walker trial.

   b. Plaintiffs dispute this paragraph because it omits the material fact that Woodruff's trial testimony resulted from the confession that was coerced and fabricated by BPD detectives. *See infra*, Counterstatement ¶¶ 185–231, 266–92.

75. There was no testimony offered at Walker's trial indicating the existence of a photograph depicting footprints in Crawford's backyard.  (Walker Trial Trans.)

**Response**: Disputed.

    a.   Plaintiffs do not dispute that there was no testimony regarding the referenced photograph.

    b.   However, Plaintiffs dispute this proposition to the extent it is intended to convey that there no such photograph existed. Instead, there is evidence that a photograph depicting a single set of footprints leading away from Crawford's body through the backyard of Crawford's house was admitted into evidence at the Martin trial. *See infra*, Counterstatement ¶¶ 185–231, 266–92.

    c.   Plaintiffs dispute this paragraph because it omits the material fact that McLeod received photographs in discovery for the Martin trial that were not disclosed to Boyd or Walker, one of which depicted a single set of footprints leading away from Crawford's body through the backyard of Crawford's house and another which clearly showed the absence of dragging marks in Crawford's driveway. *See infra*, Counterstatement ¶¶ 185–231, 266–92.

76. Joseph Tatar ("Tatar") – a fellow inmate at the Erie County Holding Center while Gibson, Boyd, Walker, and Martin were awaiting trial – testified.  (COE 11115–62)

**Response**: Undisputed.

77. Tatar testified that while playing cards with Walker and Gibson, Walker said to Gibson, "[W]hy did you hit the man so hard in the head, you know, we've been in here all summer; we've been in here eight months." (COE 1117:20–23)

**Response**: Disputed.

    a.  Plaintiffs do not dispute that Tatar testified at Walker's trial.

    b.  Plaintiffs object to this paragraph as it omits the following material facts:

        1.  Tatar was the first to reach out to Cosgrove stating he had testimony pertaining to the Crawford murder and asking for help with his parole violation in the same letter. Ex. 125 (9/1/76 Tatar Letter to Cosgrove).

        2.  Tatar testified in the Walker trial in exchange for a deal in which Tatar got five years of probation for an 11-count indictment that included felony burglary and arson charges. *Boyd* Dkt. 168-7 (Walker Trial Transcript) at 30:18–31:2.

78. Four letters Tatar wrote to the District Attorney were introduced as Exhibits 30-33 at Gibson's trial.  Bittner believed he had previously received them at the Wade Hearing.  (Gibson Trial Trans., p. 362:21–363:7)

**Response**: Disputed.

    a.  Plaintiffs dispute this paragraph because it misstates Bittner's statement on the record in the Gibson trial. Instead, Bittner stated that he "looked at a couple of" the letters Tatar wrote to the District Attorney at the *Wade* hearing. *Boyd* Dkt. 168-5 (Gibson Trial Tr.) at 362:21–363:1.

79. Martin was tried in July 1977.  The trial was again prosecuted by Henry and Verrastro.  He was acquitted and there is no surviving transcript of his trial.  (COE 9446–53)

**Response**: Disputed.

    a.  Plaintiffs do not dispute that Martin was tried in July 1977, that he was prosecuted by Henry and Verrastro, that he was acquitted, and that Defendants have not produced a transcript of his trial.

    b.  However, Plaintiffs dispute this paragraph because it omits the material fact that court clerk handwritten notes of the Martin trial and ADA Henry's handwritten notes from the Martin trial were preserved.  Ex. 2 (ADA Henry: Martin Trial Notes) at COE006205

80. The court clerk's records indicate Woodruff, Hough, and his foster brother Jonathan Hough testified at the Martin trial.  (COE 9451) Unlike the previous three trials, Martin testified in his own defense.  (COE 9452).[7]

**Response**: Undisputed.

81. Martin was represented by James McLeod ("McLeod") at trial.  (COE 9446)

**Response**: Undisputed.

82. The court clerk's notes do not reflect McLeod introducing any exhibits at trial.  (COE 9446–53)

**Response**: Disputed.

    a.  The evidence cited does not support the proposition that the court clerk's notes do not reflect McLeod introducing any exhibits at trial. There is a reference to "Defense Exhibit D" at COE009452 and COE009461.

---

[7]    Note that the City Defendants' own Statement of Undisputed Facts states that "Hough did not testify" at the Martin Trial.  *See* Dkt. 163-37 City Statement of Material Facts, ¶156.  As the City and County's statements of "undisputed" facts are directly contradictory on this point, it is clear that the point is, in fact, disputed.

b. Plaintiffs dispute this paragraph because it omits the material fact that the court clerk's notes do not purport to be a comprehensive record of what occurred in Martin's trial.

c. Plaintiffs further dispute this paragraph because there is evidence in the record that McLeod did, in fact, introduce and make use of exhibits. McLeod testified at a hearing in 2021 and at his deposition in this case that he received in discovery a photograph depicting a single set of footprints, which a BPD officer at Martin's trial testified were made by a single, heavyset man, leading from Crawford's body through the backyard of Crawford's house in the direction of Watson's house. *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 224:9–228:16; *Boyd Boyd* Dkt. 168-3 (2021 CPL § 440 Motion) at 11:21–14:11 (COE003897–3901); ADA Henry's notes of the Floyd Martin trial corroborate McLeod's testimony that such a photo existed, and that McLeod made use of it at trial as they contain the notation "Convict the heavyset man."  Ex. 2 (ADA Henry: Martin Trial Notes) at COE006205.

83. Boyd and Walker were sentenced on August 3, 1977.  McLeod appeared on behalf of Boyd at the proceeding.  (COE 1726)

**Response**: Undisputed.

84. There, McLeod confirmed that his office withdrew a CPL § 440 motion on Boyd's behalf. (COE 1730:17–1732:18).  He also stated that the "exact same proof" existed in Boyd's case as it did in Martin's.  (COE 1736:8–19)

**Response**:  Disputed.

a. Plaintiffs do not dispute that McLeod confirmed that his office withdrew a CPL § 440 motion and stated at Boyd's sentencing that "the exact same proof that existed for Mr. Boyd existed for my client." *Boyd* Dkt. 168-2 (Sentencing Hearing Tr.) at 11:14–16 (COE001736).

b. However, Plaintiffs dispute this paragraph because it takes McLeod's statement out of context. This paragraph omits the material fact that at Boyd's sentencing, McLeod stated, "I'm simply saying that as far as the evidence is concerned, there is nothing to show that there was more than one person involved in that attack." *Boyd* Dkt. 168-2 (Sentencing Hearing Tr.) at 14:12–16 (COE001739). McLeod testified at his deposition in this case that this was a reference to the photograph that he used at the Martin trial showing a single set of footprints in the backyard of the Crawford property and the testimony of one of the detectives concerning the heavyset man who left footprints in the snow. Sahasrabudhe Decl., Ex. 11 (McLeod Dep.) at 232:7–233:15.

c. Further, this paragraph omits the material fact that McLeod also stated at Boyd's sentencing: "I stand here to be corrected by any evidence that was not presented during the course of the trial which I attended." *Boyd* Dkt. 168-2 (Sentencing Hearing Tr.) at 14:16–19 (COE001739). McLeod testified at his deposition in this case that he meant he only knew the evidence introduced at the Martin trial, did not know what evidence was introduced at Boyd's trial or any of the other trials, and assumed the other defense lawyers, including Boyd's trial counsel, had received the photograph of the single set of footprints in the backyard. Sahasrabudhe Decl., Ex. 11 (McLeod Dep.) at Tr. 84:16–87:6, 234:3– 236:2, 239:19–241:13.

d. This Paragraph also omits the material fact that the sentencing court told McLeod, "You weren't at this trial.  You had nothing—you didn't attend the trial.  You didn't try the case. You don't know what the evidence was, and the fact that you had another case in which another boy was accused of this—of participating in this same crime does not mean that

the evidence was the same in that case as in this case." *Boyd* Dkt. 168-2 (Sentencing Hrng. Tr.) at 15:1–10 (COE001740).

e.  This Paragraph omits the material fact that McLeod testified that he was not involved in the CPL § 440 motion for Boyd, which was handled by another attorney in his office, for whom he filled in at Boyd's sentencing. Sahasrabudhe Decl., Ex. 11 (McLeod Dep.) at 89:19–90:9. The 1977 CPL § 440 motion had nothing to do with the crime scene photos. *Id*. at 239:19–240:16.

f.  This paragraph omits the material fact that McLeod noted his law firm would not have withdrawn the 440 motion, which was based upon Hough's mother's claim her son had admitted lying against Boyd, had the prosecution disclosed the detectives' February 11, 1976, P-73 reports stating that Hough in fact had recanted. Sahasrabudhe Decl., Ex. 11 (McLeod Dep.) at 245:10–247:1, 276:15–280:8.

85. Boyd filed his direct appeal on or about May 1, 1981, alleging the trial court made an improper Sandoval ruling, Boyd's statement to BPD should have been suppressed, that Drury's summation denied Boyd a fair trial, and that the jury instructions regarding Boyd's alibi defense were erroneous.  (COE 3627–57).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that Boyd filed a direct appeal raising those general issues based upon the trial record.

b.  Plaintiffs dispute this paragraph because it omits the material fact that, at the time of Boyd's direct appeal, his counsel was unaware of the extensive *Brady* material the People continued to withhold. *See infra*, Counterstatement 304–457, 488–503. The People's opposition continued to exploit their *Brady* violations, arguing that Boyd's trial counsel's assertion that the police and Drury fed a confession to Woodruff was a "baseless accusation." Ex. 3 (Boyd Respondent's Brief) at COE002735.

86. Boyd's direct appeal was summarily denied.  People v. Boyd, 84 A.D.2d 689, 448 N.Y.S.2d 913 (1981).

**Response**:  Undisputed.

87. Boyd subsequently filed a CPL § 440 motion in 1984, alleging the Erie County District Attorney's Office ("ECDAO") failed to provide Hulnick with Brady material, specifically a January 12, 1976 P-73 identifying Dorsette Bostic ("Bostic") as a potential witness, and that Hough had recanted his trial testimony, now claiming that he had been coerced by the BPD.  (COE 12177–80).

**Response**:  Undisputed.

88. A CPL § 440 Hearing was held on November 16, 1985, where Bostic was the sole witness.  (COE 12080–12169).

**Response**:  Undisputed.

89. The court denied the motion, finding that Hough's recantation was not newly discovered evidence because the issue had been raised in Boyd's withdrawn 1977 CPL § 440 motion and that Bostic's testimony was "peripheral and inconsequential," and that his identity was known to Hulnick on December 27, 1976.  (COE 12177–80).

**Response**:  Undisputed.

90. Walker and Boyd also challenged their convictions through a 1986 CPL § 440 motion filed by McLeod.  (COE 12001).

**Response**:  Undisputed.

91. The motion claimed to contain newly discovered evidence – that being Woodruff's recantation of his prior testimony.  Woodruff then claimed he had been coerced into confessing by BPD detectives and that the Group had no involvement in the Crawford murder.  There was no mention of a photograph of Crawford's backyard in the motion.  (COE 11953–54).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that in their 1986 CPL § 440 motion, Boyd and Walker argued that their convictions should be vacated based on the newly discovered evidence of Woodruff's recantation.

b.  Plaintiffs do not dispute that their 1986 CPL § 440 motion did not address a photograph of Crawford's backyard.

c.  However, Plaintiffs dispute this paragraph because it omits the material fact that McLeod was unaware at this time that the photographs he received in connection with the Martin trial were not disclosed to the attorneys for Boyd and Walker. Sahasrabudhe Decl., Ex. 11 (McLeod Dep.) at 294:3–16.

92. The motion was denied and the court noted that Woodruff did not provide an explanation as to how he was coerced into confessing and criticized the newly manufactured Woodruff statement for being largely leading questions with "yes" or "no" answers.  (COE 11959, 11968).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that the court denied Boyd and Walker's 1986 CPL § 440 motion, for the reasons stated in its decision.

b.  Plaintiffs dispute that Woodruff's recantation was "manufactured" or that the court found it was "manufactured." Woodruff has explained in his deposition in this case how his recantation came about. Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 172:18–176:15.

c.  The court did not hear this explanation, or further details about how police coerced Woodruff, because, in violation of CPL § 440.30(5), it denied Boyd and Walker's right to an evidentiary hearing.

93. The court found that Woodruff did not set forth the exact nature and extent of his allegedly false testimony, and did not explain the lapse in time between the trials and his recantation. (COE 11959).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that in a written decision, the court denied Boyd and Walker's 1986 CPL § 440 motion. Plaintiffs rely on the written decision for its contents.

b. However, Plaintiffs dispute this paragraph because it omits the material fact that, pursuant to CPL 440.30(5), the defendants were not required to provide this level of detail in their motion papers, and the court's denial of the motion on this basis, and without an evidentiary hearing, denied Boyd and Walker their right to such a hearing.

94. Walker's direct appeal was denied in 1989.  People v. Walker, 147 A.D.2d 927, 927, 538 N.Y.S.2d 734 (1989).  There, the court found there was no evidence to support Walker's argument that Tatar was acting as an agent of the ECDAO.  See id.

**Response**:  Disputed.

a. Plaintiffs do not dispute that Walker's direct appeal was denied.

b. However, Plaintiffs dispute that court found that there was "no evidence." Rather, the court upheld the trial court's conclusion based upon the evidence it said it had examined. *People v. Walker*, 147 A.D.2d 927, 927 (4th Dep't 1989).

95. McLeod now asserts he achieved Martin's acquittal by using a photograph of footprints in Crawford's backyard to develop a third-party culpability defense, alleging Crawford's neighbor Larry Watson ("Watson") was responsible for the murder.  (McLeod Dep. Trans., p. 138:16–139:12).

**Response**:  Disputed.

a. Plaintiffs do not dispute that McLeod has testified that he used photographs of footprints in Crawford's backyard to support a third-party culpability defense.

b. Plaintiffs dispute this paragraph to the extent that it is intended to convey that McLeod's present account is new. Instead, as early as Boyd's sentencing hearing, McLeod referenced evidence showing there was only one person involved in the attack. McLeod referenced evidence showing there was only one person involved in the attack. Boyd Dkt. 168-2 (Sentencing Hearing Tr.) at 14:12–16 (COE001739).

c. Further, in a speech McLeod gave in 2005, referenced *infra* in County Rule 56(a) Statement ¶ 96, McLeod stated: "But more importantly there were other photographs. And those other

photographs showed that there was one other set of footprints around that house that night. And that one set of footprints was a set of footprints that came from the backyard over a fence in the direction of the house of the neighbor who had left Mr. Crawford on the curb to walk across the street." *Boyd* Dkt. 173 (Justice Delayed Vid.) at 17:06–17:36.

96. This argument first surfaced in or around 2005 when McLeod gave a speech about the alleged backyard photograph.  McLeod stated that, "The police photographs that were used – what the police had and they still have somewhere – were photographs that showed from every angle possible, but more importantly from the front of the house all the way to the back of the house, was there were one set of footprints in the snow.  That one set of footprints in the snow from the front of the house to the back was a set of footprints from Mr. Crawford because Mr. Crawford was the only one – the only one – who walked up that driveway from the street to the back of the house that night." (Vid., 16:25–17:36) McLeod further claimed that the footprints could only have been left by at someone at least six feet tall and weighing at least 200 pounds.  (Vid. 23:00–23:10).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that McLeod made the above statement at a dinner in or around 2005.

b.  However, Plaintiffs dispute that the 2005 speech was the first time McLeod alleged that police photographs showed only one person was involved in the attack. Instead, as early as Boyd's sentencing hearing, McLeod referenced evidence showing there was only one person involved in the attack. *Boyd* Dkt. 168-2 (Sentencing Hearing Tr.) at 14:12–16 (COE001739).

c.  Further, in the 2005 speech, McLeod stated: "But more importantly there were other photographs. And those other photographs showed that there was one other set of footprints around that house that night. And that one set of footprints was a set of footprints that came from the backyard over a fence in the direction of the house of the neighbor who had left Mr. Crawford on the curb to walk across the street." *Boyd* Dkt. 173 (Justice Delayed Vid.) at 17:06–17:36.

97. The firm McLeod was working at in 1977 is no longer in existence and he does not know where the Martin case file is.  (McLeod Dep. Trans., p. 223:1–23).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that the Doyle firm where McLeod worked in 1977 no longer exists and that McLeod does not know what happened to the files at that firm.

b.  Plaintiffs dispute this proposition to the extent it is intended to convey that McLeod intentionally or negligently misplaced the files. McLeod was no longer at the firm when the firm closed. Sahasrabudhe Decl., Ex. 11 (McLeod Dep.) at 223:1–20.

98. Franco Kroese ("Kroese") – a juror at the Martin trial – gave a deposition in connection with this case on February 2, 2024.  He recalls feeling that Martin was guilty but could not vote to convict because of the jury instructions.  (Kroese Dep. Trans., p. 16:2–17:5).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that Kroese recalled "feeling" that Martin was guilty.

b.  Plaintiffs also do not dispute that Kroese did not vote to convict Martin.

c.  However, Plaintiffs dispute this paragraph because the cited testimony is taken out of context. This paragraph omits the material fact that Kroese did not remember, or incorrectly remembered, virtually everything about the trial.

1.  Kroese could not remember the defendant's name. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 15:8–12.

2.  Kroese did not recognize photos shown to him at his deposition in this case that were introduced in evidence at the Martin trial. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 20:10–23:7.

3.  Kroese incorrectly recalled the victim as Black. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 48:2–48:7.

4. Kroese incorrectly recalled that the defendant did not testify but that his mother did. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 54:18–56:2.

5. Kroese did not recall the defense or prosecution's arguments on opening or summation. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 52:10–18, 56:21–58:1.

6. Kroese did not recall any discussion of the victim's neighbor, *Boyd.* Dkt. 168-19 (Kroese Dep.) at 57:6–8, despite the neighbor, Watson, having testified at the trial, *Boyd* Dkt. 168-3 (Martin Trial Clerk's Notes) at COE009450.

7. Kroese incorrectly testified that none of the five boys allegedly involved in the murder testified at trial or that any police officers testified. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 63:18–20, 64:22–65:2.

d. This paragraph further omits the material fact that Kroese's nephew is an associate at Defendant's law firm, Lippes Mathias, and that Lippes Matthias did legal work for Kroese's business in 2023. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 76:7–78:9. During the preceding hour and a half of deposition questioning by the County and Plaintiffs, including detailed questioning about conversations between Lippes Mathias and Kroese leading up to the deposition, Kroese did not mention his familial connection to the firm. *Id*. at 78:18–79:17. Nor was it ever disclosed by Kroese or any lawyer for Lippes Mathias prior to the deposition.

99. Kroese also stated that he has no memory of seeing any photograph of Crawford's backyard or any party making any argument about it. (Kroese Dep. Trans., p. 19:5–20).
**Response**:

a. Plaintiffs do not dispute that Kroese testified about his lack of memory of seeing any photograph of Crawford's backyard, or of any party making any argument about it.

b.   However, Plaintiffs dispute this paragraph because it omits the material fact that Kroese did not remember, or incorrectly remembered, virtually everything about the trial.

    1.   Kroese could not remember the defendant's name. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 15:8–12.

    2.   Kroese did not recognize photos shown to him at his deposition in this case that were introduced in evidence at the Martin trial. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 20:10–23:7.

    3.   Kroese incorrectly recalled the victim as Black. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 48:2–48:7.

    4.   Kroese incorrectly recalled that the defendant did not testify but that his mother did. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 54:18–56:2.

    5.   Kroese did not recall the defense or prosecution's arguments on opening or summation. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 52:10–18, 56:21–58:1.

    6.   Kroese did not recall any discussion of the victim's neighbor, *Boyd.* Dkt. 168-19 (Kroese Dep.) at 57:6–8, despite the neighbor, Watson, having testified at the trial. *Boyd* Dkt. 168-3 (Martin Trial Clerk's Notes) at COE009450.

    7.   Kroese incorrectly testified that none of the five boys allegedly involved in the murder testified at trial or that any police officers testified. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 63:18–20, 64:22–65:2.

c.   This paragraph further omits the material fact that Kroese's nephew is an associate at Defendant's law firm, Lippes Mathias, and that Lippes Mathias did legal work for Kroese's business in 2023. *Boyd.* Dkt. 168-19 (Kroese Dep.) at 76:7–78:9. During the preceding hour and a half of deposition questioning by the County and Plaintiffs, including detailed

questioning about conversations between Lippes Mathias and Kroese leading up to the deposition, Kroese did not mention his familial connection to the firm. *Id*. at 78:18–79:17. Nor was it ever disclosed by Kroese or any lawyer for Lippes Mathias prior to the deposition.

100.　　Boyd and Walker filed another unsuccessful CPL § 440 motions in 2012, represented by Attorney Stephen Cohen.  (COE 11826–50, 12519–45).

**Response**: Undisputed.[8]

101.　　Like the 1986 motion, Woodruff gave another statement recanting his trial testimony.  Boyd and Walker argued this was newly discovered evidence.  (COE 11838–40, 12531–38).

**Response**: Disputed.

a.　Plaintiffs do not dispute that they submitted, with their 2012 motions, deposition testimony given by Woodruff on April 6, 2010, recanting his trial testimony. *See Boyd*. Dkt. 168-4 (2012 Boyd and Walker 440 Motion) at COE011837 (¶ 75), COE012533 (¶ 96).

b.　However, Plaintiffs dispute this paragraph because it omits the material fact that Plaintiffs also relied on newly discovered evidence supporting the veracity of the recantation: "recently obtained P-73 police reports that were kept from defense counsel and not known to them at the times of the original trials." *See Boyd*. Dkt. 168-4 (2012 Boyd and Walker 440 Motion) at COE011837 (¶ 73), COE012532 (¶ 94).

102.　　Despite McLeod having made public statements regarding the alleged backyard photograph years prior, this was not mentioned in the motion.  (COE 11826–50, 12519–45).

---

[8]　　While Plaintiffs do not dispute the substance of this paragraph, the name of Boyd and Walker's attorney during their CPL § 440 motions in 2012 is "Steven Cohen," not "Stephen Cohen." *Boyd* Dkt. 168-4 at COE011826, 12519.

**Response**:  Undisputed.

103.    Walker and Boyd also alleged that P-73s containing exculpatory material were withheld from Hulnick and Jay during their underlying trials.  (COE 11842–48, 12538–45).

**Response**:  Undisputed.

104.    The court denied the motions on September 25, 2013.  In rejecting Boyd's motion, the court found that Woodruff's recent recantation was not more credibly than the one he provided for the earlier CPL § 440 motion, that Drury did not coerce Woodruff's original testimony, and that there was no basis for the claim that evidence was withheld, and that Boyd failed to provide any credible evidence beyond speculation that his conviction was unconstitutionally obtained.  (COE 11857–60).

**Response**:  Disputed.

a.  Plaintiffs dispute this paragraph because it omits the material fact that the court overlooked the extent to which Woodruff's sworn statement, in deposition format, claiming that he had been coerced, was corroborated by the newly disclosed police documents, including a P-73 report by Detective-Sergeant Hunter dated January 12, 1976, showing that, contrary to the previous 440 court's finding, *see Boyd* Dkt. 168-4 (Sept. 25, 2013 Decision on Boyd's 440 Motion) at COE011857 (citing previous 440 court's finding), Woodruff's father and minister were *not* with him when the interrogation began on January 12, 1976; the police inspection of the taxicab company logbook, together with the P-73 reports documenting witness statements about the timing of the assault, showing that Woodruff was not even present when the crime occurred; the February 11 P-73 reports showing the police fed Hough's embellished account to Woodruff to adopt**;** and the Simpson's Store report of January 15, 1976, contradicting Woodruff's false story that the boys waited outside Simpson's Store. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002197, 2173, 2131–34, 2183–84, 2126, 2228–32, 2215.

b. Plaintiffs dispute this paragraph because it omits the material fact that the court relied on ADA Drury's affidavit, *see Boyd* Dkt. 168-4 (Sept. 25, 2013 Decision on Boyd's 440 Motion), at COE011859–60; *see also id.* at COE012433 (same reliance on Drury's affidavit in decision denying Walker's motion), wherein he assumed he turned over to the defense all the police P-73s, an assumption that was based on his statement at a pretrial hearing that he had turned over "all" P-73s (Sahasrabudhe Decl., Ex. 4 (Drury Aff.) at COE003988; *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 277:11–12)—when in fact he was referring to the P-73s that constituted *Rosario* material for the hearing in question and otherwise he refused to turn over additional P-73s. *See infra*, Counterstatement, ¶¶ 327–29.

c. Plaintiffs also dispute this paragraph because it omits the material fact that the court's decision arbitrarily denied the motion without a hearing, in violation of state law, where the defendants based their motion upon non-record facts that were material and, if established, would entitle them to relief. *See* CPL § 440.30(5).

105. Denying Walker's motion, the court found that it was illogical to credit Woodruff's claim that he was coerced into testifying by Drury because he was represented by counsel, that Woodruff's recantation was not newly discovered evidence, that the allegation that any Brady material was withheld was unsubstantiated, and that Walker had provided no credible evidence beyond speculation that his conviction was unconstitutionally obtained. (12427–34).

**Response**: Disputed.

a. Plaintiffs dispute that the court found that it was illogical to credit a claim that Woodruff was coerced into testifying by Drury. Rather, the court wrote, "[I]t is illogical to suggest that the prosecuting attorney would be able to rehearse and coach the testimony of a witness who is represented by counsel at every stage." *Boyd.* Dkt. 168-4 (2012 Walker 440 Motion) at COE012431.

b. Furthermore, Plaintiffs dispute this paragraph because it omits the material fact that counsel was not present when the police coerced Woodruff on January 12 and February 11, 1976, and locked him into sworn accounts which he could not recant without risking being prosecuted for perjury. *See infra*, Counterstatement ¶¶ 185–215.

c. Plaintiffs also dispute this paragraph because it omits the material fact that the court relied on the 1987 decision deeming Woodruff's recantation incredible because "the record … reveals that at the initial police interrogation held on January 11, 1976 at Buffalo Police Headquarters he was questioned in the presence of his parents. At a second interrogation on January 12, 1976, Mr. Woodruff was questioned in the presence of his father… and his parents' minister[.]" Boyd Dkt. 168-4 at COE012430.

d. Plaintiffs further dispute this paragraph because it omits the material fact that, in fact, Detective Seargent Hunter's P-73 of January 12, 1976, which the defense and the court did not have in 1987, shows that his father and his parents' minister did not accompany him to police headquarters and only arrived later, once Woodruff was already locked into his story. Sahasrabudhe Decl., Ex. 3 (Homicide File) at COE002197.

e. Plaintiffs incorporate here their response to ¶ 104 of the County's 56.1 statement, *supra*.

106.    Boyd and Walker filed a joint CPL §440 motion on October 13, 2020.  (COE 4001).

**Response**:  Undisputed.


107.    This time, they alleged they were denied effective assistance of counsel because their defense attorneys failed to request photographs from the ECDAO during the underlying prosecutions.  They alleged that this was also a Brady violation.  (COE 3991–4001).

**Response**:  Disputed.

a. Plaintiffs do not dispute that they alleged in the referenced motion that they were denied effective assistance of counsel because their defense attorneys failed to request photographs from the ECDA during the underlying prosecutions.

b. However, Plaintiffs dispute that they alleged that their defense attorneys' failure was a *Brady* violation. Rather, they alleged that the prosecution's failure to disclose a photograph that "showed only one set of footprints—those of a large male—at the scene of the crime" violated *Brady*. *Boyd* Dkt. 168-3 (2021 CPL § 440 Motion) at COE003994 (¶ 17), COE004000–01 (¶¶ 47–48).

108.      This was the first time that the alleged backyard photograph was referenced in a court filing.  (COE 3994).

**Response**:  Undisputed.

109.      A CPL § 440 Hearing was held on June 3, 2021.  McLeod testified that, upon request, he was provided with a photograph of the backyard, stating, "Well, the photograph, coupled with the testimony of the – I can't remember who the detective was at the – at the trial, were – depicted photos that came from the rear of the home.  The officer was able to testify as to – given information relative to the size – and when I say size, the approximate height and approximate weight of the individual who would have left the footprints there.  And the footprints that were there were footprints that I argued led directly to the home of the last individual scene with Mr. Crawford at the dash at the bar where he had been prior to his demise." (COE 3888, 3895).

**Response**:  Disputed.

a. Plaintiffs dispute that this is an accurate quotation from the transcript. The County's quotation contains two errors, noted herein in **bold type**: "Well, the photograph, coupled with the testimony of the – I can't remember who the detective was at the – at the trial, were – depicted photos that came from the rear of the home. The officer was able to testify as to – given information relative to the size – and when I say size, the approximate height and approximate weight of the individual who would have left the footprints there. And

the footprints that were there were footprints that I argued led directly to the home of the last individual **scene** [the transcript reads "seen"] with Mr. Crawford at the **dash** [the transcript has an actual dash, not the word "dash"] at the bar where he had been prior to his demise." *Boyd* Dkt. 168-3 (2021 CPL § 440 Motion) at 9:3–12.

110.     The motion was granted on August 18, 2021.  Therein, the court found that while it is impossible to determine which photographs were used at the Martin trial, a note Henry had made during summation (which he could not recall the basis for) to "convict the heavyset man" tipped the scale "ever so slightly in favor of the defendants." (COE 4356–57, 3926–27).

**Response**:  Disputed.

a.   Plaintiffs do not dispute that their motion was granted on August 18, 2021.

b.   Plaintiffs dispute that the court found that it was impossible to determine which photographs were used at the Martin trial. Rather, it wrote that "it is impossible for this Court to say definitively that the photos described by Mr. McLeod existed." *Boyd* Dkt. 168-3 (2021 CPL § 440 Motion) at COE004355.

c.   Plaintiffs dispute that Henry could not recall the basis for the note that he made during summation. Henry testified that he made this note based on something he heard in McLeod's summation. *Boyd* Dkt. 168-3 (2021 CPL § 440 Motion) at COE003926:17–3927:25.

d.   Plaintiffs dispute that the court concluded that the note "tipped the scale." Rather, the court wrote, "After a thorough review of all the materials submitted, including the Court files maintained in the case, the Court finds the scales tip ever so slightly in favor of the defendants." *Boyd* Dkt. 168-3 (2021 CPL § 440 Motion) at COE004357.

111.     Plaintiff's expert legal witness Steven Zeidman testified at his deposition that Hulnick, Jay, and McLeod were all reasonably competent defense attorneys. (Zeidman Depo. Trans., p. 27:1–11).

**Response**:  Undisputed.

112.     In his report, Zeidman offered the disclaimer that, "I have not been asked for an opinion on the issue of what materials were or were not disclosed by the prosecution to the defense at the Boyd and Walker trials.  However, for purposes of my opinion about other issues, I have been asked to assume that the documents and information in question were not disclosed."  (Zeidman Rep., p. 5).

**Response**:  Undisputed.

113.     Zeidman later opined that Drury did not disclose the alleged backyard photograph to Boyd's defense counsel.  (Zeidman Rep., p. 20).

**Response**:  Disputed.

a.  Plaintiffs dispute that Zeidman opined on whether Drury disclosed this photograph. Instead, for the purpose of analysis, he assumed the photograph was not disclosed. *See Boyd* Dkt. 168-23 (Zeidman Report) at 20 ("Boyd and Walker allege, and I assume, that ADA Drury did not … disclose the footprint photograph testified to by attorney McLeod" (emphasis added)).

114.     The County's legal expert witness Kevin Gagan ("Gagan") also prepared a report and was deposed.  (Gagan Rep.; Gagan Depo. Trans.).

**Response**:  Disputed

a.  Plaintiffs do not dispute that County expert Gagan prepared a report and was deposed.

b.  However, Plaintiffs dispute the characterization of Gagan as a "legal expert witness." Gagan himself acknowledged that he is not acting as an expert in criminal procedure in this case, and that he does not consider himself an expert in criminal defense lawyering standards, tactics, or practice. *Boyd* Dkt. 169-1 (Gagan Dep.) at 66:8–10, 82:7–10. When asked if he is acting as an expert on *Brady*, he said, "I think so, yeah, a little." *Id.* at 66:11–13.

115.     Gagan did not find any intentional withholding of blatantly exculpatory evidence in the Boyd and Walker trials.  (Gagan Rep., p. 4).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that Gagan wrote, "I cannot find in the available records of these cases any intentional withholding of blatantly exculpatory evidence." *Boyd* Dkt. 169-2 (Gagan Report) at 4.

b.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that there was no intentional withholding of *Brady* material. There is evidence in the record that the ECDA suppressed material, favorable evidence from Walker's and Boyd's defense counsel. *See infra*, Counterstatement ¶¶ 304–503.

c.  Plaintiffs also dispute this paragraph to the extent that it is intended to convey that evidence must be "blatantly exculpatory" to fall within the ambit of *Brady*. As Gagan conceded at his deposition in this case, neither the Supreme Court nor any other court that he is aware of has adopted such a standard. *Boyd* Dkt. 169-1 (Gagan Dep.) at 224:4–9.

116.     He also noted that no appellate judges took issue with Drury or Henry's summation at the time and it does not make sense to analyze prosecutors in 1977 through the lens of 2024 sensibilities.  (Gagan Rep., 4).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that Gagan wrote that no appellate judges took issue with Drury or Henry's summation at the time.

b.  Plaintiffs do not dispute that Gagan wrote that it does not make sense to analyze prosecutors in 1977 through the lens of 2024 sensibilities.

c.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that Drury's and Henry's summations did not violate legal restrictions on summations applicable in 1977. Their summations contravened such rules. *See infra*, Counterstatement ¶¶ 458–87.

117.     Gagan concluded that in both the Boyd trial, Rosario material pertaining to Woodruff, Hough, and Debbie Jeffrey was produced after they testified on direct, in compliance with the standard at the time. (Gagan Rep., p. 10–11).

**Response**: Disputed.

a.   Plaintiffs do not dispute that Gagan wrote that material pertaining to Hough and Woodruff was produced in the Boyd trial.

b.   Plaintiffs dispute that Gagan wrote that material pertaining to Jeffrey was produced in the Boyd trial. Instead, Gagan wrote that "Ms. Jefferey [sic] was not called as a witness for the prosecution and thus, there was no obligation at the time to turn over any *Rosario* material pertaining to her." *Boyd* Dkt. 169-2 (Gagan Report) at 11.

c.   Plaintiffs dispute this paragraph to the extent that it is intended to convey that in Boyd's prosecution, the ECDA fulfilled its disclosure obligations as to statements by Woodruff, Hough, and Jeffrey. Though the ECDA did produce some *Rosario* material pertaining to Woodruff and Hough after their direct examinations, it withheld several other items of *Rosario. See infra*, Counterstatement ¶¶ 354–55. As for statements by Ms. Jeffrey, the prosecution was obligated to produce them under *Brady. See infra*, Counterstatement ¶¶ 32–37, 42–48, 51, 54, 57–59, 64–66, 90–91, 399–401, 407.

118.     Gagan also did not find Drury's summation to be racially charged. (Gagan Rep., 11–12).

**Response**: Disputed.

a.   Plaintiffs do not dispute that Gagan wrote that Drury's summation contained "no racially charged language, especially when evaluated within the linguistic conventions of the times." *Boyd* Dkt. 169-2 (Gagan Report) at 11.

b. Plaintiffs dispute this paragraph to the extent that it is intended to convey that Drury's summation was not racially charged. Drury's summation did contain racially inflammatory language. *See infra*, Counterstatement ¶¶ 463–65, 477.

119.    Gagan found no wrongdoing by the ECDAO in Walker's trial.  (Gagan Rep., 20–23).

**Response**:  Disputed.

a. Plaintiffs do not dispute that Gagan wrote that Walker's trial was "conducted in accord with the laws, ethics, and standard prosecution practices in place in 1977." *Boyd* Dkt. 169-2 (Gagan Report) at 11.

b. Plaintiffs dispute this paragraph to the extent that it is intended to convey that Walker's trial was in fact "conducted in accord with the laws, ethics, and standard prosecution practices in place in 1977." *Boyd* Dkt. 169-2 (Gagan Report) at 23. The ECDA committed numerous fair trial violations in Walker's case. *See infra*, Counterstatement ¶¶ 304–457, 478–503.

120.    Regarding the summations from both trials, Gagan concluded that, "I otherwise found that the prosecutors' summations in the Boyd and Walker trials were consistent with the established rules of evidence, complied with traditional etiquette and advocacy, and were in line with the sensibilities and mores of the period in which the cases were tried.  I believe that is why, after numerous appeals in these cases, no appellate judge found the summations to be anything but proper advocacy at the time.  I find it unsettling to use the sensibilities, rules, standards, and protocols of 2024 to judge the ethics, actions, and responsibilities of the police and the prosecutors in 1977." (Gagan Rep., p. 4).

**Response**:  Disputed.

a. Plaintiffs dispute that Gagan wrote the statements attributed to him in Paragraph 120. The County's quotation contains two errors, noted herein in **bold type**: **"I otherwise** [Gagan wrote "further"] found that the prosecutors' summations in the Boyd and Walker trials were consistent with the established rules of evidence, complied with traditional etiquette

140

**and** [Gagan wrote "in"] advocacy, and were in line with the sensibilities and mores of the

period in which the cases were tried. I believe that is why, after numerous appeals in these

cases, no appellate judge found the summations to be anything but proper advocacy at the

time. I find it unsettling to use the sensibilities, rules, standards, and protocols of 2024 to

judge the ethics, actions, and responsibilities of the police and the prosecutors in 1977."

*Boyd* Dkt. 169-2 (Gagan Report) at 4.

b. Plaintiffs dispute this paragraph to the extent that it is intended to convey that the

summations in Boyd's and Walker's trials were proper. The prosecutors violated the rules

of summation conduct. *See infra*, Counterstatement ¶¶ 458–87.

121.       Gagan also found that, "…that speculation on a prosecution 47 years in the past as
to what evidence may have existed in addition (or subtraction) to the evidence presented at trial and
what a defense attorney or a prosecutor might have done with such evidence had it existed then is
specious at best and leads, just as it has done in this civil suit, to unfettered speculation replete with
unprovable conspiracy theories that lose their tether to the facts.  Speculation is a risky endeavor fraught
with more uncertainty than clarity, especially concerning the investigation of an incident so long ago.
There is simply no way to reasonably judge the actions, defenses, strategies of the parties and the
worth of evidence used (and evidence not used) over the passage of almost half a century.  (Gagan
Rep., p. 4).

**Response**:  Disputed.

a. Plaintiffs do not dispute that Gagan wrote the statements attributed to him in this paragraph.

b. Plaintiffs dispute this paragraph to the extent that it is intended to convey that Plaintiffs'

claims are speculative, that Plaintiffs advance "unprovable conspiracy theories," and that

"[t]here is simply no way to reasonably judge the actions, defenses, strategies of the parties

and the worth of evidence used (and evidence not used) over the passage of almost half a

century." Plaintiffs' Counterstatement and Memorandum of Law demonstrate the falsity

of these assertions.

122.      Gagan concluded that Drury and Henry complied with the Rosario standard of disclosing witness statements after the witness testified on direct was proper.  "In 1977, it was the common practice and accepted protocol to disclose witness statements after each witness testified on direct examination as former ADAs Drury and Henry did in these trials.  This may seem out of step under today's protocols, but it was the practice of nearly every prosecutor in 1977.  If ADA Drury and ADA Henry's practice in that regard were such an improper understanding of Rosario as to constitute prosecutorial misconduct, so then was virtually every conviction obtained in that time period.  Such an interpretation would be absurd." (Gagan Rep., p. 6).

**Response**: Disputed.

    a.  Plaintiffs do not dispute that Gagan wrote the statements attributed to him in this paragraph.

    b.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that the practice of disclosing witness statements after direct examination was categorically lawful in 1977—even where the statements were materially favorable to the defense. *See infra*, Counterstatement ¶ 749; *see generally id. at* ¶¶ 772–74.

123.      Gagan also found that, "…[A]ssuming that in 1977 a document was not shared with the defense in a criminal investigation based on a lack of a record of the disclosure or a failure to memorialize it, is an extremely misleading thing to do.  It is conjecture.  Conjecture should have no place in a court of law.  That is as true in 2024 as it was in 1977.  With that in mind and, after a review of the materials in this case, it is my opinion that the police and the prosecution in the Boyd and Walker trials complied with their legal and ethical obligations in these cases as best they could during the period in which they labored." (Gagan Rep., p. 23–24).

**Response**: Disputed.

    a.  Plaintiffs do not dispute that Gagan wrote the statements attributed to him in this paragraph.

    b.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that Plaintiffs rely upon the absence of records/memorialization of disclosures in a misleading or conjectural way. Plaintiffs' Counterstatement presents substantial evidence that ECDA prosecutors suppressed material they were legally obligated to disclose, including evidence that, had this material been disclosed, a record would have been made of the disclosure (but there is none). *See infra*, Counterstatement ¶¶ 304–457, 488–503.

c.  Plaintiffs dispute this paragraph to the extent that it is intended to convey the blanket assertion that "the police and the prosecution in the Boyd and Walker trials complied with their legal and ethical obligations in these cases as best they could during the period in which they labored." Plaintiffs' Counterstatement and Memorandum of Law demonstrate the falsity of this assertion.

## ECDAO Hiring, Training, and Disciplinary Procedures

124.     Henry was designated as the County's 30(b)(6) witness and gave a deposition on August 11, 2023.  (Henry Dep. Trans., p. 16:11–17) He provided several insights into the ECDAO's hiring, training, and disciplinary policies in the mid-1970s.

**Response**:  Undisputed.

125.     In the mid-1970s hiring was primarily handled by Erie County District Attorney Ed Cosgrove ("Cosgrove").  Cosgrove expected his employees to seek justice and follow the law.  (Henry Dep. Trans., p. 46:6–12; Cosgrove Dep. Trans., p. 39:7–21).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that Cosgrove was the County's decisionmaker concerning hiring.

b.  Plaintiffs dispute this paragraph to the extent that it is intended to convey that Cosgrove did not maintain a policy of deliberate indifference to the rights of criminal defendants. Cosgrove did indeed maintain such a policy. *See infra*, Counterstatement ¶¶ 832–92.

126.     Henry looked to First Assistant District Attorney Joseph McCarthy ("McCarthy") for guidance.  (Henry Dep. Trans., p. 36:12–18).

**Response**:  Disputed.

a.  Plaintiffs dispute this paragraph to the extent it is intended to convey that Henry was supervised by McCarthy in his handling of cases. Henry testified that he does not recall looking to anyone in particular for guidance when he was handling the Walker or Martin cases. *Boyd* Dkt. 168-17 (Henry Dep.) at 36:20–37:5.

127.      Prosecutors in the ECDAO would primarily go to McCarthy with questions they had regarding the handling of cases.  (Henry Dep. Trans., p. 51:14–17).

**Response**:  Disputed.

a.  Plaintiffs dispute that the cited testimony supports this proposition. Henry only stated that prosecutors went to McCarthy, not that he was the one they "primarily" went to. *Boyd* Dkt. 168-17 (Henry Dep.) at 51:3–17.

128.      McCarthy was in charge of establishing policies with regard to Brady, Rosario, and discovery.  (Henry Dep. Trans., p. 43:5–10).

**Response**:  Disputed.

a.  Plaintiffs dispute this paragraph to the extent it is intended to convey that McCarthy was a policymaker with respect to *Brady*, *Rosario*, and discovery. At his deposition in this case, former D.A. Cosgrove agreed that he trusted his supervisors to conform to the policies that he set for his office. *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 85:9–12.

b.  Plaintiffs also dispute this paragraph to the extent it is intended to convey that the ECDA had written policies with respect to any of these topics. The ECDA had none. *See infra*, Counterstatement ¶¶ 753–54, 757–61.

129.      The policy of how to prosecute a case was dictated by the Criminal Procedure Law (Henry Dep. Trans., p. 56:2–8; 70:4–11).

**Response**:  Disputed.

a.  Plaintiffs dispute this paragraph to the extent it is intended to convey that the ECDA had written policies for the handling of criminal cases by its line prosecutors.  The ECDA had none. *See infra*, Counterstatement ¶¶ 753–54, 757–61.

130.      In general, ECDAO policy was not to violate the law.  (Henry Dep. Trans., p. 47:7–13, 56:10–23, 57:1–6).

144

**<u>Response</u>**: Disputed.

a. Plaintiffs dispute this Paragraph because the ECDA had a policy of deliberate indifference to the fair trial rights of criminal defendants. *See infra*, Counterstatement ¶¶ 832–92.

131.     The Screening Bureau would turn over Brady material.  (Henry Dep. Trans., p. 62:4–17).

**<u>Response</u>**: Disputed.

a. Plaintiffs dispute that the cited testimony supports the proposition in Paragraph 131. Henry testified that "there was information turned over while a case was in the screening bureau. Because at that point, the screening bureau would attempt to dispose of cases by entrance of a plea, so they had—they would turn over information to the defense." *Boyd* Dkt. 168-17 (Henry Dep.) 62:4–17. Though Henry's testimony came in response to the question, "Well, were there any unwritten or informal policies at the DA's office about when information that fell under *Brady* would be provided?" (*Id*. at 62:4–7), he did not specifically testify that the Screening Bureau would turn over information falling under *Brady*, only that it would turn over unspecified "information."

b. Plaintiffs also dispute the proposition on the grounds that neither the Screening Bureau, nor any other arm of the ECDA, disclosed the *Brady* material that was withheld in Mr. Boyd's and Mr. Walker's cases. *See infra*, Counterstatement ¶¶ 304–457, 488–503.

132.     There was a general policy to turn over photographs that were in the file.  (Henry Dep. Trans., p. 81:7–82:2).

**<u>Response</u>**: Disputed.

a. The ECDA did not disclose to counsel for Gibson, Boyd, Walker, and Martin all of the photographs in its possession:

1.     The BPD's file for the Crawford case included 20 photographs. Ex. 5 (BPD Photos)

145

2.   Drury testified that he had the complete police file by the time of the preliminary hearing on January 16, 1977. *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 185:7–10.

3.   Drury testified that he has no recollection of showing any photographs to Gibson's defense attorney other than the 12 that were marked as exhibits and entered into evidence at Gibson's trial (*id.* at 141:4–142:2)—eight fewer than the total number in the file.

4.   Drury testified that he disclosed 10 photographs to Boyd's counsel, and that he disclosed eight more when Boyd's defense attorney discovered that more existed (*id.* at 142:18–146:2), making a total of 18—two fewer than the total number in the file.

5.   Henry testified that he lacks knowledge of whether any photographs were disclosed to Walker's defense attorney in addition to the nine that were marked as exhibits and introduced into evidence at Walker's trial (*Boyd* Dkt. 168-17 (Henry Dep.) at 121:16–122:8)—11 fewer than the total number in the file.

6.   Henry testified, at the June 3, 2021, 440 hearing in the underlying case, that between 9 and 11 photographs were disclosed to Martin's attorney (Boyd Dkt. 168-3 at COE003931:2–5 (2021 CPL § 440 Hrng. Tr.))—9 to 11 fewer than the total number in the file.

7.   A photograph documenting a single set of footprints, made by a heavyset man, in the snow in the backyard of Crawford's house, leading away from Crawford's body and toward the Watsons' home two doors down, was disclosed to counsel for Martin but not to counsel for Boyd or Walker. *See* Counterstatement, *infra*, ¶¶ 28, 409, 488–503.

b.   Henry testified that the ECDA did not have written policies regarding how to prosecute criminal cases other than what was dictated by the Criminal Procedure Law, *Boyd* Dkt.

168-17 (Henry Dep.) at 56:2–8, but in 1977, the Criminal Procedure Law did not specifically require the disclosure of photographs, nor did it have any provision for disclosure of *Brady* or *Rosario* material. Ex. 4 (CPL § 240 as of 1976-77).

133.     An ADA would meet with the police officers before a trial and determine whether there was any Brady information that needed to be turned over.  (Henry Dep. Trans., p. 63:20, 64:5).

**Response**:  Disputed.

   a.  Plaintiffs dispute that the cited testimony supports this proposition. Former ADA Henry testified that "generally speaking," prosecutors would meet with officers before trial and see about material known to the BPD in the case, not that they would determine whether there was Brady information that needed to be turned over. *Boyd* Dkt. 168-17 (Henry Dep.) at 63:8–64:5.

   b.  Plaintiffs also dispute this proposition on the grounds that former ADA Verrastro testified that in a case he was trying, whether he spoke to the investigating detectives "[d]epended upon the case," and he doesn't recall whether he would speak with the detectives who investigated the case even if they weren't witnesses that he was putting on in the trial. *Boyd* Dkt. 168-18 (Verrastro Dep.) at 45:13–22.

134.     It was also custom to receive the police file with the indictment.  (Henry Dep. Trans., p. 24:7–13).

**Response**:  Disputed.

   a.  Plaintiffs dispute this paragraph to the extent that the evidence cited neither states, implies, nor relates in any way to the propositions in this paragraph.

   b.  Plaintiffs also dispute this proposition on the grounds that former ADA Drury testified that he had the complete police file by the time of the preliminary hearing on January 16, 1977. *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 185:7–10.

135.     The Appellate Bureau gave guidance with the proper conduct of opening statements and summations.  (Henry Dep. Trans., p. 44:20, 45:2).

**Response**:  Disputed.

a.  Plaintiffs do not dispute that the Appeals Bureau gave guidance to ADAs on summations.

b.  Plaintiffs dispute this paragraph to the extent it is intended to convey that the ECDA had any kind of formal training regarding opening statements or summations. The cited testimony does not support that proposition. Instead, Henry testified that the Appeals Bureau informally gave guidance as to what a prosecutor should not do in opening statements and summations when an ADA went to them and asked for it. *Boyd* Dkt. 168-17 (Henry Dep.) at 44:20–45:18.

c.  Plaintiffs also dispute this paragraph to the extent it is intended to convey that the Appeals Bureau taught ADAs the correct rules applicable to opening statements and summations at the time. ECDA ADAs gave unlawful summations. *See infra*, Counterstatement ¶¶ 458–87, 832, 836, 839–42.

136.     ADAs would regularly go to the Appellate Bureau for assistance with preparing a summation.  (Henry Dep. Trans., p. 70; 13–17).

**Response**:  Undisputed.

137.     More senior attorneys would handle the most difficult cases, including homicides. (Henry Dep. Trans., p. 48:5–13, 52:18–53:5).

**Response**:  Disputed.

a.  Plaintiffs dispute this paragraph because evidence in the record shows that junior prosecutors regularly handled homicide cases:

1.  Former ADA Solomon testified that he handled preliminary hearings in homicide cases while he was assigned to the City Court Bureau, which was in his first year as

an ADA. Ex. 52 (Solomon Dep. Day I) at 17:9–11 (started at the ECDA in March 1974), 20:15–21:1 (handled preliminary hearings in homicide cases while in the City Court Bureau), 21:2–8 (was in the City Court Bureau until probably February or March 1975).

2.    Solomon also first-chaired homicide trials within his first two-and-a-half years at the ECDA. Ex. 52 (Solomon Dep. Day I) at 17:9–11 (started at the ECDA in March 1974), 27:21–30:16 (second-chaired the murder trial of Linda Smith), 31:6–13 (first-chaired homicide cases before he second-chaired homicide cases), Ex. 126 (transcript showing that the trial of Linda Smith, which Solomon second-chaired, commenced on August 9, 1976).

3.    Former ADA Henry handled the Walker trial a little over three years into his tenure as an ADA. *Boyd* Dkt. 168-17 (Henry Dep.) at 26:2–6 (joined the ECDA as a full-time employee in May 1974); *Boyd.* Dkt. 168-7 (Walker Trial Transcript) at COE000001 (showing that the trial of John Walker commenced on June 6, 1977, and that Henry represented the People).

4.    Former ADA Drury testified that he started at the ECDA in 1969 (*Boyd* Dkt. 168-14 (Drury Dep. Day I) at 26:21–23), and that as of February 11, 1976, he had been prosecuting homicide cases four or five years (*Boyd* Dkt. 168-15 (Drury Dep. Day II) at 397:10–14), meaning that he had started prosecuting homicide cases about two to three years into his tenure as an ADA.

138.    Discipline was handled by either McCarthy or Cosgrove and the information was not circulated around the office.  (Henry Dep. Trans., p. 55:1–2).

**Response**:  Disputed.

 a. Plaintiffs dispute this paragraph because the Cosgrove Administration never disciplined an Assistant District Attorney for prosecutorial misconduct. *See infra*, Counterstatement ¶ 849.

 139. Training started at the front desk and with observing different sections of the office performing their duties.  ADAs would then be assigned to Buffalo City Court, one of the justice courts, and from there to the Screening Bureau, then to the Grand Jury Bureau, and finally to Felony Trials. (Henry Dep. Trans., p. 71:4–23).

**Response**:  Disputed.

 a. Plaintiffs do not dispute that training at the ECDA was "on-the-job." *See infra*, Counterstatement ¶¶ 762–67.

 b. However, the cited testimony does not support the propositions in this paragraph. Henry testified that ADAs would, after working at the desk, be assigned to the City Court Bureau *or* the Justice Court Bureau (not that they would be "assigned to Buffalo City Court, one of the justice courts"), and that they would subsequently be assigned to the Screening Bureau, Grand Jury Bureau, or the Felony Trials Bureau (not that they would be assigned "to the Screening Bureau, then to the Grand Jury Bureau, and finally to Felony Trials"). *Boyd* Dkt. 168-17 (Henry Dep.) at 71:4–72:10.

 140. There was a system in place where experienced prosecutors would instruct newer prosecutors.  (Henry Dep. Trans., p. 72:11–15).

**Response**:  Undisputed.

 141. There were instructional sessions regarding how to conduct different aspects of a criminal proceeding held in the grand jury room.  (Henry Dep. Trans., p. 73:9–18).

**Response**:  Disputed.

a.  The cited testimony does not support the proposition in this paragraph. In the cited portion of his testimony, Henry stated that he recalls receiving training in the grand jury room on how to run a *Wade* hearing, not on "how to conduct different aspects of a criminal proceeding." *Boyd* Dkt. 168-17 (Henry Dep.) at 73:9–18.

b.  Plaintiffs dispute this paragraph because the evidence shows that the ECDA did not offer any formal training on how to conduct a criminal proceeding:

1.  Former ADA Drury testified that he does not know whether he ever received any formal training concerning how to try a criminal case. *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 46:5–8.

2.  Former ADA Solomon testified that the ECDA had very few in-office training sessions, up until some point after 1980 and prior to 1982. Ex. 53 (Solomon Dep. Day II) at 35:19–36:14.

3.  In an August 31, 2023 interrogatory response, the County stated that it "has searched for and is not aware of any documentation maintained by the ECDA regarding training received by ADAs prior to December 31, 1977, and consequently does not intend to rely on such documentation at trial." Ex. 55 (County's 8/31/23 Supp. Interrogatory Responses) at 4.

4.  The County's expert witness, Kevin Gagan, was not familiar with the ECDA's training programs. *Boyd* Dkt. 169-1 (Gagan Dep.) at 91:12–16.

142.  Like Henry, Drury testified at his deposition that ADAs received direction from the Appeals Bureau regarding compliance with Brady and Rosario requirements.  (Drury Dep. Trans., p. 46:9–16).

**Response**: Disputed.

a.  Plaintiffs do not dispute that the Appeals Bureau provided direction to ADAs concerning *Brady* and *Rosario*.

b.  Plaintiffs dispute this paragraph to the extent it is intended to convey the truth of the cited testimony, in which Drury stated that the ECDA had formal training on *Brady* or *Rosario*. Boyd Dkt. 168-14 (Drury Dep. Day I) 46:9–16. The ECDA had no formal training programs on these topics. *See infra*, Counterstatement ¶¶ 762–67.

c.  Plaintiffs dispute this paragraph to the extent it claims that Henry gave the same testimony as *Drury* on this point. The County has provided no facts or citations to support that assertion.

143.    Drury recalls being trained on what he could and could not argue in summation by ADA Judith Manzella in the Appellate Bureau.  (Drury Dep. Trans., p. 56:15–21).

**Response**:  Undisputed.

144.    Verrastro would also direct questions to Manzella and other mentors.  (Verrastro Dep. Trans., p. 22:11–21).

**Response**:  Undisputed.

145.    Verrastro also received guidance on working with the police department.  (Verrastro Dep. Trans., p. 8–14).

**Response**:  Disputed.

a.  The testimony cited does not support the proposition that Verrastro received guidance on working with the police department. In fact, Verrastro testified that he did not remember. Verrastro did state that he knows he received guidance about working with the police department, but he then added, "I don't have any recollection one way or the other." *Boyd* Dkt. 168-18 (Verrastro Dep.) at 25:8–14. Asked for the basis of his statement that he knows he received guidance, Verrastro referenced discussing the contents of felony indictments

with police officers he was putting on to testify, *id.* at 25:16–26:3, indicating that he was merely assuming on the basis of this remembered activity that he received guidance about how to work with the department. The next question posed was whether he received guidance on how to work with the officers when he was putting them on to testify, and Verrastro responded that he lacked recollection. *Id.* at 26:4–8.

146.    Verrastro also testified that the ECDAO policy was to turn over *Brady* information that was favorable to the defendant.  (Verrastro Dep. Trans., p. 27:12–18).

**Response**:  Disputed.

    a.  Plaintiffs dispute that Verrastro testified that the ECDAO policy was to turn over *Brady* information that was favorable to the defendant. When asked if he received "guidance" from anyone at the ECDA regarding compliance with *Brady*, Verrastro stated, "Brady was to turn over information that was favorable to a defendant." *Boyd* Dkt. 168-18 (Verrastro Dep.) at 27:12–18. However, Verrastro was not claiming that he actually received guidance to that effect (let alone that this was the ECDA policy)—the next question posed was whether he received "any guidance on that topic," and Verrastro responded that he lacked recollection. *Id*. at 27:20–28:1.

    b.  Plaintiffs also dispute this paragraph to the extent it is intended to convey that this was the ECDA's policy. Instead, the ECDA viewed *Brady* as limited to "exculpatory" evidence. *See infra*, Counterstatement ¶¶ 775–805.

147.    Drury testified at his deposition that former ADA Albert Ranni ("Ranni") was "imaginative" and "had a strong personality."  (Drury Dep. Trans., p. 69:5–17).

**Response**:  Undisputed.

148.    Ranni was reprimanded by appellate courts on multiple occasions.  (Henry Dep. Trans., p. 257–87).

**Response**:  Undisputed.

149.      Henry does not recall Ranni having any role in Walker's prosecution.  There is likewise no record evidence that Ranni was involved in Boyd's prosecution.  (Henry Dep. Trans., p. 34:4–8).

**Response**:  Disputed.

    a.  Plaintiffs do not dispute that Henry testified that he remembers no discussions with Ranni regarding the Walker case. *Boyd* Dkt. 168-17 (Henry Dep.) at 34:4–8.

    b.  However, Plaintiffs dispute this paragraph to the extent it is intended to convey that Ranni had no role in Plaintiffs' prosecution. Henry testified that homicide cases such as Walker's were prosecuted by the Felony Trial Bureau, of which Ranni was the chief. *Boyd* Dkt. 168-17 (Henry Dep.) at 35:11–17.

150.      Drury testified that other ADAs did not try to model their trial behavior and style after Ranni.  (Drury Dep. Trans., p. 485:14–17).

**Response**:  Disputed.

    a.  Plaintiffs do not dispute that Drury testified that other ADAs did not try to model their trial behavior and style after Ranni.

    b.  However, Plaintiffs dispute this paragraph to the extent that it is intended to convey that ADAs did not try to model their trial behavior and style after Ranni. Instead, the evidence shows the following:

        1.  Ranni was looked up to, and considered a role model, by ADAs at the ECDA. *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 68:15–69:1.

        2.  Other ADAs watched Ranni's trials. *Boyd* Dkt. 168-17 (Henry Dep.) at 284:15–18 (from time to time, during a trial like the Johnson trial, prosecutors would stop into

the courtroom and watch Ranni); *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 77:18–19 (attended some of the Johnson trial).

3. Cosgrove testified that one of the ways ADAs learned how they should practice law was by looking to supervisors in the office, whom they would look to as role models. *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 84:20–85:3.

4. Ranni was a supervisor—he served as Chief of Felony Trials in the Cosgrove Administration. *Boyd* Dkt. 168-17 (Henry Dep.) at 268:8–269:13 (Albert Ranni was the ECDA's chief of felony trials when Henry left the ECDA in 1977, and "[y]ou put the dates together, and it sounds like [Ranni] was" in the chief's position in late 1976), 282:3–9 (Ranni was chief of the Felony Trial Bureau in March and April 1977); Ex. 52 (Solomon Dep. Day I) at 25:18–21, 37:3–12, Ex. 53 (Solomon Dep. Day II) at 40:19–42:2 (Solomon was in the Felony Trial Bureau from 1975 to about 1981 or 1982, and Al Ranni was its chief for some of that time); *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 128:3–6 (is sure he did not contact the author of a May 18, 1979, *Buffalo Evening News* article, describing Ranni as "chief trial counsel," to ask for a retraction of the description of Ranni's title).

151.    Cosgrove left the ECDAO December 31, 1981.  (Cosgrove Dep. Trans., p. 31),

**Response**:  Undisputed.

152.    Henry left the ECDAO in 1977.  (Henry Dep. Trans., p. 27)

**Response**:  Disputed.

a. Plaintiffs dispute this paragraph because Henry testified that 1977 was the approximate year that he left the ECDA. *Boyd* Dkt. 168-17 (Henry Dep.) at 27:12–13.

153.     Drury left the ECDAO in 1979.  (Drury Dep. Trans., p. 26)

**<u>Response</u>**:  Undisputed.

## PART II: PLAINTIFFS' COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Federal Rule 56(c)(1) and Local Rule 56(a)(2), Plaintiffs Darryl Boyd and John Walker, Jr. respectfully submit this Counterstatement of Additional Material Facts.  There are numerous factual issues that will be addressed at trial in addition to those addressed here, and Plaintiffs reserve the right to provide additional evidence at trial.  Finally, Plaintiffs incorporate the discussion of the many disputed issues of fact addressed in Part I of this submission.

I.  **The BPD Homicide Squad Fabricated Evidence of Boyd and Walker's Involvement in the Murder of William Crawford and Ignored Evidence of Their Innocence**

A.    <u>William F. Crawford was Killed on January 2, 1976.</u>

1.    On January 2, 1976, 62-year-old William F. Crawford was beaten and robbed outside his home at 2041 Fillmore Avenue in Buffalo, New York. He subsequently passed away from his injuries (the "<u>Crawford Murder</u>").[9]

2.    Earlier that night, Crawford was drinking at a neighborhood tavern called the Golden Nugget.[10]

3.    Crawford was drinking with his neighbor, Lawrence "Larry" Watson, Larry's wife, Julia Watson, and Julia's son, William "Bill" Howard.[11]

4.    The Golden Nugget was located directly across the street from Crawford's home. Crawford frequented the establishment.[12]

---

[9]    Sahasrabudhe Decl., Ex. 3A at COE002149 (unclear), COE002142; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB–Walker/Boyd_000388.

[10]    Sahasrabudhe Decl., Ex. 3A at COE002125–26; *see also id.* at COE002149 (unclear), COE002147; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000388.

[11]    Sahasrabudhe Decl., Ex. 3A at COE002133, COE002149–50 (unclear), COE002160, COE002147; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000388–389.

[12]    Sahasrabudhe Decl., Ex. 3A at COE002132, COE002149 (unclear), COE002126; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000388.

5.      The Watsons lived at 2049 Fillmore Avenue, two houses north of Crawford.[13]

6.      On the night of January 2, 1976, Crawford purchased rounds of drinks for himself, the Watsons, and Howard.[14]

7.      When paying for the drinks, Crawford displayed a significant amount of cash—approximately $300 in tens and twenties.[15]

8.      The Watsons and Howard, who were sitting with him at the bar, observed Crawford display the cash.[16]

9.      The barmaid, Debbie Jeffrey, became concerned and instructed Crawford to put his money away.[17]

10.     Jeffrey suggested that Crawford go home, as he was intoxicated.[18]

11.     Typically, Jeffrey or the owner of the Golden Nugget would walk Crawford across the street to his house after he became drunk, but on that evening, the tavern was crowded, and neither was able to escort Crawford home.[19]

---

[13]     Sahasrabudhe Decl., Ex. 3A at COE002160.

[14]     *Id.* at COE002131, COE002133, COE002149 (unclear), COE002126, COE002147; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000388.

[15]     Sahasrabudhe Decl., Ex. 3A at COE002149–50 (unclear), COE002183; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at, COB-Walker/Boyd_000388–89.

[16]     Sahasrabudhe Decl., Ex. 3A at COE002150 (unclear); Ex. 1 (Jan. 6, 1976 Jeffrey Statement), COB-Walker/Boyd_000389.

[17]     Sahasrabudhe Decl., Ex. 3A at COE002150 (unclear), COE002147–48; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) COB-Walker/Boyd_000389.

[18]     Sahasrabudhe Decl., Ex. 3A at COE002131.

[19]     *Id.* at COE002149 (unclear), COE002183; Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000388.

12.     Instead, Watson offered to walk Crawford home, and the two left the Golden Nugget together.[20]

13.     Numerous witness accounts of the evening state that Crawford and Watson left the Golden Nugget together around 11:30 p.m. or later.[21]

14.     Crawford never made it back inside his house that night.[22]

15.     His wife, Margaret Crawford, reported to police that she had heard loud noises in her side alley at approximately 12:30 a.m.[23]

16.     At approximately 1:00 a.m. on the morning of January 3, 1976, Ms. Crawford became concerned that her husband had not returned home. She went downstairs and looked out the side door, where she saw her husband lying in the driveway. She called 911 for help.[24]

17.     Medics transported Crawford to Sisters of Charity Hospital, where he was pronounced dead.[25]

18.     An autopsy determined that Crawford's cause of death was a massive subdural hematoma caused by multiple fractures of the face.[26]

---

[20]     Sahasrabudhe Decl., Ex. 3A at COE002131.

[21]     *Id.* at COE002131–34 (showing that Kalb places the departure at 11:30 p.m., Larry Watson places it at midnight, and Crawford's neighbor Clarence Neubecker heard a commotion at 12:00 or 12:30 a.m.), COE002183–84 (showing Jeffrey stating that Mr. Watson and Mr. Crawford could have left at "about 10:30 or perhaps an hour later"), COE002126 (showing Howard placing Crawford's departure time at 1:30 a.m.).

[22]     *Id.* at COE002125.

[23]     *Id*.

[24]     *Id*.; *see also id.* at COE002146.

[25]     *Id.* at COE002126.

[26]     *Id*. at COE002130.

19.     Crawford had been robbed of his wallet.[27]

B.     The BPD's Initial Investigation Pointed to Two Suspects: Larry Watson and Jerome Boyd

20.     The Buffalo Police Department ("BPD") Homicide Unit began investigating the Crawford Murder in the early morning hours of January 3, 1976.[28] BPD Detectives Paul Delano and Gerald Dove were the first detectives to arrive at the crime scene.[29]

21.     A police photographer, Albert Hauser, took photographs of the crime scene that night.[30]

22.     There was snow on the ground in the early morning hours of January 3, 1976.[31]

23.     The BPD's photographs and search of the crime scene indicated that Crawford had been beaten near the side door of his house, where his body was found.[32]

24.     The side door of Crawford's house is 54 feet up the driveway from the sidewalk.[33]

25.     Detectives Delano and Dove observed a large pool of blood in the driveway close to the side door of the house, where Crawford's body was found. They also found a few drops of blood on the side of the house, close to the side door.[34]

---

[27]     *See id.* at COE002146 (Ms. Crawford informs detectives that Mr. Crawford carried a black regular folding wallet in his right back pocket), COE002164 (Nurse informs detectives that a wallet was not found on Mr. Crawford's body).

[28]     *Id.* at COE002125.

[29]     *Id.* Detective Arnet and Detective-Sergeant Hunter went to the morgue and vouchered the victim's belongings. *Id.* at COE002128.

[30]     *Id.* at COE002126; *see also* Ex. 5 (BPD Photos) at COB-Walker/Boyd_000569–88.

[31]     Ex. 5 (BPD Photos).

[32]     *Infra*, Counterstatement ¶¶ 25–30.

[33]     Ex. 6 (Puckett Report) at 4.

[34]     Sahasrabudhe Decl., Ex. 3A at COE002125.

26.     Neither the BPD photographs nor the police reports document that blood was found on the street or anywhere else between the street and the side door of Crawford's home.[35]

27.     A BPD crime scene photograph documented that there were no drag marks in the snow in the driveway leading to Crawford's house.[36]

28.     Although Detective Dove reported no footprints in Crawford's yard, another BPD crime scene photograph documented a single set of footprints, made by a heavyset man, in the snow in the backyard of Crawford's house, leading away from Crawford's body and toward the Watsons' home two doors down.[37]

29.     Detectives Dove and Delano found a bloodstained hat, which had apparently fallen off Crawford's head during the attack, near the side door of the home.[38]

30.     Neither the BPD photographs nor the police reports document that any other articles of clothing were found anywhere between the street and the side door of Crawford's home, where the bloodstained hat was found.[39]

31.     In their January 3, 1976 P-73 report describing the crime scene, Detectives Dove and Delano reported that a set of keys were found on Crawford's body.[40] In her statement to Detectives Dove and Delano in this report, Margaret Crawford told BPD detectives that her

---

[35]    Ex. 5 (BPD Photos)

[36]    *Id.* at COB-Walker/Boyd_000578–84.

[37]    Sahasrabudhe Decl., Ex. 3A at COE002125; *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 137:1–138:7, 224:9–228:16; *Boyd* Dkt. 168-3 at COE003894–3900 (440 Hrng. Tr. at 7:14–14:10); Ex. 2 (Henry: Martin Trial Notes).

[38]    Sahasrabudhe Decl., Ex. 3A at COE002126.

[39]    Ex. 5 (BPD Photos).

[40]    Sahasrabudhe Decl., Ex. 3A at COE002126.

husband would typically "ring the bell" when returning home, implying that he did not carry keys with him and that she would unlock the door for him.[41]

32.     Detectives Dove and Delano spoke with Howard, Jeffrey, and Julia Watson in the early morning hours of January 3, 1976.[42]

33.     Jeffrey informed the detectives that Crawford displayed a substantial amount of cash in the presence of the Watsons and that he left with Larry Watson.[43]

34.     Conversely, Julia Watson and Howard each told Detectives Dove and Delano that Crawford left the bar alone.[44]

35.     The detectives asked Julia Watson if they could interview Larry Watson, but she told them that he was drunk, and she could not wake him.[45]

36.     After these interviews, Detectives Dove and Delano noted that there were large discrepancies in the story told by Howard and Julia Watson on the one hand, and Jeffrey on the other.[46]

37.     In the afternoon on January 3, 1976, Detectives Robert Grabowski and Edwin Gorski conducted further investigation and took witness statements from Jeffrey, Frances Kalb, and Larry Watson in a P-73 report.[47]

38.     Kalb was a patron who was present at the Golden Nugget the previous night.[48]

---

[41]     *Id.* at COE002125.

[42]     *Id.* at COE002126–27.

[43]     *Id.*

[44]     *Id.*

[45]     *Id.* at COE002127.

[46]     *Id.*

[47]     *Id.* at COE002131–34.

[48]     *Id.* at COE002131.

39.     Kalb recounted that Crawford had purchased several rounds of drinks for the Watsons, displayed his cash in their view, and then left the bar with Watson at 11:30 p.m.[49]

40.     Kalb also told the detectives that approximately twenty minutes after leaving with Crawford, Watson had returned to the bar and quickly escorted his wife away.[50]

41.     Kalb informed the detectives that shortly after the second departure, Julia Watson called the bar to say that her husband had lost his keys, and Howard had informed her over the phone that Larry Watson's keys were in his coat pocket.[51]

42.     Jeffrey told Detectives Grabowski and Gorski that Crawford flashed around $300 in cash while drinking with Watson.[52]

43.     Jeffrey informed Detectives Grabowski and Gorski that Watson volunteered to walk Crawford home and adamantly denied that she had asked him to do so.[53]

44.     She also told them that she found it odd that when Watson returned to the Golden Nugget after his departure with Crawford, he and his wife left without finishing their drinks and saying goodbye to Jeffrey.[54]

45.     Jeffrey told the detectives that she suspected Watson had harmed Crawford.[55]

46.     Jeffrey confirmed Kalb's account that Julia Watson had called after their departure to inquire about Larry Watson's lost keys.[56]

---

[49]    *Id.* at COE002148.

[50]    *Id.*

[51]    *Id.*

[52]    *Id.* at COE002132–33.

[53]    *Id.*

[54]    *Id.*

[55]    *Id.*

[56]    *Id.* at COE002133.

47.     Detective Michael Guadagno testified at his deposition in this case that if Watson's keys were found by Crawford's body, it would be incriminating of Watson.[57]

48.     Detective John Regan, testifying on behalf of the City, testified at his deposition in this case that if Watson's keys were found by the body of the victim, that would indicate that Watson should be more closely investigated.[58]

49.     Detective Regan also testified that proper police practice required the police to follow up on investigating the keys.[59]

50.     However, Defendants have produced no evidence in this action indicating that the BPD made any attempt to investigate the owner of the keys found on Crawford's body.[60]

51.     Watson's initial statement to Detectives Grabowski and Gorski contradicted the other eyewitness accounts as well as his wife and stepson's initial statements to Detectives Dove and Delano.[61]

52.     Watson told Detectives Grabowski and Gorski that it was coincidence that he left the Golden Nugget at the same time as Crawford to use the bathroom at his house across the street.[62]

---

[57]     Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 179:1–6.

[58]     Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 186:13–187:15.

[59]     *Id.* at 189:16–190:10.

[60]     *See* Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 189:6–16; *see generally* City Statement of Material Facts (containing no statement regarding investigation of the keys).

[61]     Sahasrabudhe Decl., Ex. 3A at COE002131–32; *see also* s*upra*, Counterstatement ¶¶ 33–34, 38–46.

[62]     Sahasrabudhe Decl., Ex. 3A at COE002132.

53.     Watson claimed that he noticed that the door to his house was open, and he went over to investigate.[63]

54.     In contradiction to Jeffrey's account, Watson did not mention that he offered to walk Crawford home.[64]

55.     Watson placed his departure from the Golden Nugget with Crawford at around midnight.[65]

56.     In the same report, Detectives Grabowski and Gorski memorialized a conversation with Crawford's neighbor, Clarence Neubecker, who said he heard a commotion near his house at 12:00 or 12:30 a.m.[66]

57.     On January 6, 1976, Detectives Grabowski and Gorski obtained a sworn statement from Jeffrey. Jeffrey's account was consistent with her two prior descriptions of the night of January 2, 1976.[67]

58.     She informed the detectives that she was sure the Watsons and Howard had seen Crawford displaying the cash.[68]

59.     When asked how long Watson was gone prior to returning for his wife, Jeffrey responded "long enough"— indicating her belief in Watson's guilt.[69]

---

[63]     *Id.*

[64]     *Id.*

[65]     *Id.*

[66]     *Id.* at COE002133–34.

[67]     *Id.* at COE002149–51 (unclear); Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000388–90.

[68]     *Id.*

[69]     Sahasrabudhe Decl., Ex. 3A at COE002151 (unclear); Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB-Walker/Boyd_000390.

60.     On January 6, 1976, Detective Delano and Sergeant John Ludtka obtained a sworn statement from Frances Kalb in which she repeated her prior description of events and described Watson and Crawford as leaving together after 11:00 p.m.[70]

61.     Also on January 6, 1976, Detectives Grabowski and Gorski reported an additional conversation with Margaret Crawford in which she recalled hearing a loud sound, resembling something crashing into the side of her home, at approximately 11:30 p.m.[71]

62.     In their subsequent interviews, Larry and Julia Watson provided BPD detectives with changed stories that still contradicted other eyewitness accounts, as well as each other's.[72]

63.     In a sworn witness statement on January 7, 1976, Julia Watson admitted to Detectives Delano and Vincent Pantano that she saw Crawford had money on display at the bar. She also admitted that her husband left the Golden Nugget with Crawford and returned about 20 minutes later.[73]

64.     Larry Watson also changed his story. In a sworn witness statement on January 7, 1976, Watson told Sergeant Lutdka and Detective Francis Manista that Jeffrey asked him to take Crawford home on the night of the murder, but he did not admit that he volunteered to take Crawford home.[74]

65.     He also admitted that Jeffrey told Crawford to put his wallet away, but he told the detectives that he did not see Crawford with a large amount of cash.[75]

---

[70]     Sahasrabudhe Decl., Ex. 3A at COE002147–48.

[71]     *Id.* at COE002146.

[72]     *Infra*, Counterstatement ¶¶ 63–65.

[73]     Sahasrabudhe Decl., Ex. 3A at COE002158–59.

[74]     *Id.* at COE002160–61.

[75]     *Id.*

66.     On January 12, 1976, Detectives Pantano and Delano authored another P-73 report in which Jeffrey again contradicted the Watsons' accounts that they did not see Crawford displaying cash and stated that the two left abnormally quickly upon Watson's return to the bar.[76]

67.     Detective Guadagno testified at his deposition in this case that he considered Larry Watson a suspect, and he did not have an explanation for why the investigation into him stopped.[77]

68.     Detective John Montondo also testified at his deposition in this case that the BPD considered Watson a suspect.[78]

69.     Detective Regan, testifying on behalf of the City, also was not aware of any information that allowed the BPD to eliminate Watson as a suspect.[79]

70.     During their investigation, the BPD also found evidence implicating a second suspect—Jerome Boyd (no relation to Darryl Boyd)—in the Crawford Murder.[80]

71.     During their shift on January 3, 1976, Detectives Gorski and Grabowski reported receiving "an anonymous call from a black male." The caller stated that "Andre Howe" and "Gerry Boyd" killed Crawford.[81]

72.     Detective Delano obtained a criminal record print out and a mugshot of Jerome Boyd, a 37-year-old man living nearby at 32 Glenny Drive.[82]

---

[76]     *Id.* at COE002183–84.

[77]     Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 182:11–22.

[78]     Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 190:22–192:8.

[79]     Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 181:7–183:19.

[80]     *Infra*, Counterstatement ¶¶ 71–77; *see also* Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 152:13–156:19.

[81]     Sahasrabudhe Decl., Ex. 3A at COE002135; *see also id.* at COE002140.

[82]     *Id.* at COE002136–37.

73.     When Detectives Gorski and Grabowski returned to the Golden Nugget on January 4, 1976 to show the picture, the owner, Ralph Davis, recognized Jerome Boyd as a regular patron of the bar.[83]

74.     A bartender, Theotis "Teddy" Love, confirmed that he served a drink to Jerome Boyd the night of the Crawford Murder.[84]

75.     During her interview on January 6, 1976, Kalb identified Jerome Boyd as "a real big guy that came in and talked with Julia [Watson] and stayed for only a few minutes."[85]

76.     During his interview on January 7, 1976, Watson told Sergeant Lutdka and Detective Manista that the man who followed him and Crawford out of the Golden Nugget "was tall, dark, and he w[ore] a mustache [and] kinky hair."[86]

77.     Detective Guadagno testified at his deposition in this case that he considered Jerome Boyd a suspect.[87]

78.     Detective Guadagno also agreed that proper police practice required that the BPD conduct further investigation of Jerome Boyd to determine whether he was involved in the Crawford Murder, and detectives developed no evidence excluding him as a suspect.[88]

---

[83]     *Id.* at COE002140.

[84]     *Id.*

[85]     *Id.* at COE002148.

[86]     *Id.* at COE002161.

[87]     Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 152:13–156:19.

[88]     *Id.* at 162:3–165:6.

79.      Detective Regan also testified on behalf of the City that proper police practice required that the BPD interview Jerome Boyd before eliminating him as a suspect, and he was unaware of any basis to remove Jerome Boyd as a suspect.[89]

80.      However, Defendants have produced no evidence in this action suggesting that the BPD attempted to locate or interview Jerome Boyd, or to clear him as a suspect.[90]

C.      <u>The BPD Turned Its Focus To Darryn Gibson Based on An Alleged Anonymous Call</u>

81.      On January 7, 1976, Detectives Guadagno and Frank Deubell reported that they had received an anonymous call (the second such call the Defendants claimed to have received)—this time from a woman who stated that the person who killed Crawford was Darryn Gibson, who lived on Rodney Street. The female caller reportedly gave no further information.[91]

82.      Detective Guadagno testified at his deposition in this case that he had no recollection of receiving this anonymous call.[92]

83.      Despite having no evidence to corroborate the alleged caller's claim, immediately after receiving the call, at approximately 10:30 a.m., Detectives Guadagno and Deubell took Gibson into their custody at his home and transported him to BPD Headquarters.[93]

---

[89]      Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 175:12–176:16, 183:20–184:1.

[90]      *See generally* City Statement of Material Facts (containing no statement regarding any measures to interview Jerome Boyd or eliminate him as a suspect).

[91]      Sahasrabudhe Decl., Ex. 3A at COE002152.

[92]      Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 198:17–201:7.

[93]      Sahasrabudhe Decl., Ex. 3A at COE002152.

84.     Detectives Deubell, Guadagno, Manista, and Pantano then questioned Gibson in the Homicide Interrogation Room for approximately eight hours.[94]

85.     The BPD did not document that Gibson resisted arrest or was otherwise uncooperative.[95]

86.     Gibson was 16 years old. His parents were not present with him during this lengthy, custodial interview.[96]

87.     The steps BPD detectives took after allegedly receiving an anonymous call about Gibson contrast with the steps BPD detectives took after receiving an anonymous call about Jerome Boyd.[97]

88.     BPD detectives had evidence that Jerome Boyd was in the Golden Nugget with the victim just before the murder, yet there is no evidence that the BPD took any steps to interview or even locate Jerome Boyd.[98]

89.     Conversely, BPD detectives took Gibson into custody without any evidence apart from the anonymous call.[99]

---

[94]     *See id.* (reporting that Gibson was taken into custody at approximately 10:30 a.m. on January 7, 1976); *id.* at COE002156 (reporting that Gibson gave a statement to officers starting at 5:00 p.m. on January 7, 1976).

[95]     *See* City Statement of Material Facts at ¶¶ 57–61 (indicating Gibson answered questions without resistance).

[96]     Sahasrabudhe Decl., Ex. 3A at COE002156, COE002152; Sahasrabudhe Decl., Ex. 3B at COE002213.

[97]     Compare *supra*, Counterstatement ¶¶ 81–86, with *supra*, Counterstatement ¶¶ 71–80; *see also* Sahasrabudhe Decl., Ex. 3A at COE002140 (reporting Jerome Boyd's birthdate as October 5, 1939).

[98]     *Supra*, Counterstatement ¶¶ 71–80.

[99]     *Supra*, Counterstatement ¶¶ 81–86.

90.     In fact, the BPD had evidence tending to show that Gibson was *not* involved in the Crawford Murder.

91.     The day prior, on January 6, Jeffrey informed BPD detectives that the Golden Nugget was frequented by an "[o]lder group" of customers who were "[m]ostly couples"—unlike the 16-year-old Gibson—and that she checks customers' IDs.[100]

92.     During his interrogation on January 7, 1976, Gibson told the detectives that, on the night of January 2, 1976, he was playing cards with his friends Darryl Boyd, John Walker, Floyd Martin, and Tyrone "Tony" Woodruff in the Glenny Projects at 138 Glenny Drive, in the sixth-floor apartment of an individual named Sheryl "Shirley" Floyd.[101]

93.     Gibson provided the home addresses of his four friends, who were all between 16 and 17 years of age.[102]

94.     Gibson told the detectives that on January 2, shortly after the news came on at about 11:15 p.m., Walker and Woodruff took a cab from the Fillmore Cab Company home.[103]

95.     Gibson said that Martin, who lived just downstairs from Shirley Floyd's apartment, walked downstairs to go home as well.[104]

96.     Gibson said that shortly after Walker and Woodruff left in the cab, he and Boyd walked home along Fillmore Avenue (past Crawford's house) to Leroy Street, where he and Boyd split up and went to their respective homes.[105]

---

[100]    Sahasrabudhe Decl., Ex. 3A at COE002151 (unclear); Ex. 1 (Jan. 6, 1976 Jeffrey Statement) at COB–Walker/Boyd_000390.

[101]    Sahasrabudhe Decl., Ex. 3A at COE002152, COE002156.

[102]    *Id.* at COE002152.

[103]    *Id.* at COE002156.

[104]    *Id.*

[105]    *Id.* at COE002156–57.

97.     Gibson estimated that he arrived home at about 11:35 p.m.[106]

98.     During this interrogation, Gibson consented to a polygraph exam.[107]

99.     Gibson had been in police custody and was questioned for hours prior to the polygraph examination.[108] Nevertheless, the examiner reported that the results couldn't be trusted because of "the lack of a pre-test conference and inaccuracy of available information."[109]

100.    The polygraph report also states that Gibson "exhibited deception criteria," yet provides no explanation or information about what these criteria were.[110]

101.    Over the next five days, January 8 through 12, the BPD conducted additional interviews that corroborated Gibson's account of events and provided further evidence that neither Gibson nor the other boys he was with were involved in the Crawford Murder.[111]

D.      Witnesses Corroborated Gibson's Account of the Boys' Whereabouts the Night of the Crawford Murder

102.    On January 8, 1976, Detectives Guadagno and Deubell went to the Glenny Apartments, where they interviewed Shirley Floyd.[112]

103.    Floyd's statements to the detectives corroborated what Gibson had told them the day prior.[113]

---

[106]   *Id.*

[107]   *Id.* at COE002153.

[108]   *See supra*, Counterstatement ¶¶ 83–84.

[109]   Sahasrabudhe Decl., Ex. 3B at COE002212.

[110]   *Id.*

[111]   *Infra*, Counterstatement ¶¶ 102–45, 165–84.

[112]   Sahasrabudhe Decl., Ex. 3A at COE002173–74.

[113]   *Id.*

104.    Floyd told the detectives that Boyd, Walker, Martin, Gibson, and Woodruff were at her apartment on January 2, 1976.[114]

105.    Floyd identified other individuals—Nathaniel Zachery, Dennis Wilson and his brother, Larry Martin, Victoria Bryant, and persons named "Nick" and "Ann"—who were at the party in her apartment that night as well.[115]

106.    Floyd stated that the boys left her apartment around midnight, give or take an hour.[116]

107.    Nathaniel Zachery, who was present at Floyd's apartment when detectives interviewed her on January 8, confirmed that he was with the boys on the evening of January 2, 1976.[117]

E.    Boyd's Account of the Boys' Whereabouts the Night of the Crawford Murder Was Consistent

108.    Between January 8 and 12, 1976, detectives also interviewed and took statements from the four boys Gibson said he was playing cards with at Floyd's apartment the night of the Crawford Murder: Darryl Boyd, John Walker, Tyrone Woodruff, and Floyd Martin.[118]

109.    The BPD reports show that, during each of their initial interviews with detectives, all four boys gave substantially the same account of their whereabouts.[119]

---

[114]    *Id.*

[115]    *Id.* at COE002173.

[116]    *Id.*

[117]    *Id.*

[118]    *Infra*, Counterstatement ¶¶ 110–32, 165–84, 246–54.

[119]    *Id.*

110.    On January 8, Detectives Guadagno and Deubell went to 93 Leroy Street looking for Darryl Boyd.[120]

111.    Boyd was not home, but the detectives spoke with his mother, who confirmed that Boyd returned home just past midnight on January 3, 1976.[121]

112.    Detectives Guadagno and Deubell went to Martin's home where they found Boyd, and they brought him to their office and took his statement.[122]

113.    Guadagno testified at his deposition in this case that Boyd's presence near the crime scene (i.e. walking home on Fillmore Avenue) provided sufficient grounds to detain him for questioning.[123]

114.    At a pretrial hearing in the underlying criminal cases, Guadagno confirmed that Boyd was not free to leave during this questioning.[124]

115.    Boyd told the detectives that, earlier in the day on January 2, a boy named Andre Hough was with him at his house at 93 Leroy Street.[125]

116.    Boyd stated that, during the early evening, he and Hough walked to the Glenny Projects, where they watched TV at the apartment of a Mrs. Washington, along with several other members of the Washington family.[126]

---

[120]    Sahasrabudhe Decl., Ex. 3A at COE002165.

[121]    *Id.*

[122]    *Id.* at COE002169–71.

[123]    Sahasrabudhe Decl., Ex. 17B (Guadagno Dep.) at 266:1–269:7.

[124]    *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 55:22–57:6.

[125]    Sahasrabudhe Decl., Ex. 3A at COE002170.

[126]    *Id.*

117.    Boyd stated that, later in the evening, he left Mrs. Washington's apartment to join Walker, Gibson, Martin, and Woodruff at Floyd's apartment in the building next door.

118.    Boyd explained that he then spent several hours in Floyd's apartment with Walker, Gibson, Martin, Woodruff, and Martin's brother, Eugene Martin.[127]

119.    Later that evening, Boyd said that Eugene Martin called a cab from the Fillmore Cab Company. However, when the cab arrived, Eugene was not ready to leave.

120.    The cab driver refused to wait any longer, so Walker and Woodruff took that cab and headed home.[128]

121.    Eugene Martin then called for a second cab, having missed the first.[129]

122.    Boyd said that after Eugene Martin called the second cab, but before it arrived, Boyd and Gibson began walking home together up Fillmore Avenue. They split up at Leroy Street to go to their respective homes.[130]

123.    Detectives Guadagno and Deubell purported to record Boyd's statements from their questioning in a typed statement in question-and-answer format.[131]

124.    However, rather than a verbatim transcript of Boyd's interview, the statement typed by the BPD was in fact reconstructed and typed after the interrogation and includes only a portion of the interview.[132]

---

[127]    *Id.*

[128]    *Id.*

[129]    *Id.*

[130]    *Id.*

[131]    *Id.* at COE002170–71.

[132]    *Boyd* Dkt. 168-13 (Boyd Dep.) at 258:7–11, 436:3–437:1.

125.    Moreover, the statement typed by the BPD does not accurately reflect many of Boyd's statements to detectives on January 8, 1976.[133]

126.    At his deposition in this case, Boyd stated that, in contrast to what is reflected in the typed statement, he did not change his story about the time he got home after the police told him that they had spoken to his mother.[134]

127.    Boyd also testified that, in contrast to what is reflected in the typed statement, he did not tell police that he and Gibson visited a woman named Cheryl Anderson on the night of January 2, 1976.[135]

128.    Boyd further testified that he did not make the handwritten correction that appears in the typed statement.[136]

129.    Detectives Guadagno and Deubell nevertheless wrote in their report, without elaboration, that Boyd had "changed his story several times."[137]

130.    In fact, Boyd provided a statement that was consistent with the statements of Gibson, witnesses at the Golden Nugget, and other individuals in the Glenny Projects.[138]

131.    Boyd consented to take a polygraph exam.[139]

---

[133]    *Infra*, Counterstatement ¶ 126–28.

[134]    Sahasrabudhe Decl., Ex. 3A at COE002170–71; *Boyd* Dkt. 168-13 (Boyd Dep.) at 441:23–442:17.

[135]    *Boyd* Dkt. 168-13 (Boyd Dep.) at 443:18–444:1.

[136]    Sahasrabudhe Decl., Ex. 3A at COE002171; *Boyd* Dkt. 168-13 (Boyd Dep.) at 444:5–22.

[137]    Sahasrabudhe Decl., Ex. 3A at COE002169.

[138]    *Supra*, Counterstatement ¶¶ 90–107; *see also* Sahasrabudhe Decl., Ex. 3A at COE002171.

[139]    Sahasrabudhe Decl., Ex. 3A at COE002171.

132. However, Defendants have produced no evidence in this action that Boyd's polygraph was ever taken.[140]

F. <u>Taxi Records Confirmed Gibson and Boyd's Statements Regarding Their Whereabouts the Night of the Crawford Murder</u>

133. On January 8, 1976, Detectives Guadagno and Deubell investigated Gibson and Boyd's account with the Fillmore Cab company.[141]

134. The Fillmore Cab Company corroborated Gibson and Boyd's statements to the BPD about the boys' whereabouts on January 2, 1976.[142]

135. The cab company confirmed that Cab No. 150, driven by a driver named "Geno," was dispatched to the Glenny Apartments at 11:28 p.m.[143]

136. The cab company also confirmed that a second cab, Cab No. 163, driven by Brian Woods, was dispatched to the Glenny Apartments at 11:44 p.m.[144]

137. According to the cab company's records, these were the only two cabs dispatched to the Glenny Apartments that evening.[145]

138. The cab company's statement about the timing of the two cabs sent to the Glenny Apartments on January 2, 1976 aligned with Gibson and Boyd's statements to the BPD.[146]

---

[140] *See generally* City Statement of Material Facts (containing no indication that Boyd received a polygraph examination).

[141] Sahasrabudhe Decl., Ex. 3A at COE002173.

[142] *Id.*; *see also supra*, Counterstatement ¶¶ 94–97, 118–22.

[143] Sahasrabudhe Decl., Ex. 3A at COE002173.

[144] *Id.*

[145] *Id.*

[146] *See supra*, Counterstatement ¶¶ 94–97, 118–22, *infra*, Counterstatement ¶ 139; *see also* Sahasrabudhe Decl., Ex. 17B (Guadagno Dep.) at 284:4–22.

139.     Detective Guadagno testified at this deposition in this case that he was aware that the cab company's statement about the times of the taxicabs "checked out" with Gibson and Boyd's statements.[147]

140.     Further, because several witnesses at the Golden Nugget on the night of the Crawford Murder stated that Crawford and Watson left together around 11:30 p.m. or later, the evidence that Walker and Woodruff took a cab together at 11:28 p.m. showed the five boys could not have committed the crime together.[148]

141.     Detective Guadagno acknowledged at his deposition in this case that four witnesses made statements that Crawford left the bar and/or the crime occurred after 11:30 p.m. on January 2, 1976.[149]

142.     Detectives Guadagno and Montondo acknowledged at their depositions in this case that it might have been significant, and might have been an alibi, if Walker and Woodruff were in a taxicab at the time that the murder happened.[150]

143.     Detective Montondo testified that, based on his police practice and training, he should have attempted to interview the cab driver, and that it would have been "commonsense" to have done so.[151]

---

[147]     Sahasrabudhe Decl., Ex. 17B (Guadagno Dep.) at 283:11–284:22.

[148]     *See supra*, Counterstatement ¶¶ 13, 15.

[149]     Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 197:6–198:16.

[150]     *Id.* at 217:2–10; *see also* Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 133:3–136:9.

[151]     *Id.* at 136:4–9.

144.    Detective Regan, testifying on behalf of the City, testified that the cab company's statement required further investigation and that the BPD should have interviewed the cab drivers.[152]

145.    However, Defendants have produced no evidence in this action that the BPD attempted to interview or even locate either cab driver to determine whether Walker and Woodruff were in either cab.[153]

G.    Guadagno and Deubell Coerced Andre Hough To Implicate Boyd and Walker

146.    On January 8, 1976, Detectives Guadagno and Deubell also spoke to Thelma Greene and her foster son, Hough, at their home regarding Darryl Boyd's whereabouts on January 2, 1976.[154]

147.    Boyd had given a statement that he had been with Hough earlier in the evening on January 2, 1976, before meeting up with Gibson, Walker, Martin, and Woodruff.[155]

148.    Hough was 15 years old.[156]

149.    Detectives Guadagno and Deubell brought Hough to the police station without a parent and took a written statement.[157]

---

[152]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 195:7–198:21.

[153]    *See generally* City Statement of Material Facts (containing no indication that detectives contacted the cab drivers); *see also* Sahasrabudhe Decl., Ex. 17 (Guadagno Dep.) at 220:15–222:2 (stating that he had no memory of interviewing a taxicab driver in connection with this case and that he made no record of any such interview).

[154]    Sahasrabudhe Decl., Ex. 3A at COE002165.

[155]    Sahasrabudhe Decl., Ex. 3A at COE002170–71.

[156]    *Id.* at COE002165–67.

[157]    *Boyd* Dkt. 168-10 (*Wade* Hrng. Tr.) at 54:3–56:16.

150.    At his deposition in this case, Detective Guadagno admitted that a parent or guardian needed to be present for the questioning of a 15-year-old.[158]

151.    Hough was not permitted to leave the interrogation.[159]

152.    Initially, Hough explained that he did not have information about the Crawford Murder.[160]

153.    Specifically, Hough told the BPD that he and Boyd were at Ms. Washington's house when the other boys "came and got Darryl," and that was all he knew.[161]

154.    Hough was administered a polygraph test regarding this statement and informed that he passed.[162]

155.    The BPD detectives nevertheless rejected the results and threatened Hough with prosecution for the Crawford Murder.[163]

156.    After hearing these threats, Hough gave a statement to the BPD casting suspicion on Gibson, Boyd, Walker, Martin, and Woodruff:

   a.    Hough stated that he and Boyd were together at an apartment in the Glenny Apartments the night of January 2, 1976, when Gibson, Walker, Martin, and Woodruff approached and said they were going to "pull[] something." Boyd asked

---

[158]    Sahasrabudhe Decl., Ex. 17B (Guadagno Dep.) at 273:23–274:17.

[159]    *Boyd* Dkt. 168-10 (*Wade* Hrng. Tr.) at 65:14–66:21.

[160]    *Id.* at 56:6–8 ("First they asked—I asked then to take a lie detector test and I passed the test and they still said I knew something about it.").

[161]    *Boyd* Dkt. 168-6 (Boyd Trial Tr.) at 368:11–20.

[162]    *Boyd* Dkt. 168-10 (*Wade* Hrng. Tr.) at 59:19–60:4; 168-6 (Boyd Trial Tr.) at 368:11–369:6.

[163]    *Boyd* Dkt. 168-10 (*Wade* Hrng. Tr.) at 65:14–66:21; 168-6 (Boyd Trial Tr.) 368:11–369:6.

if Hough should come, but the other boys did not want him to come because he might "say something."[164]

    b.    Boyd displayed substantial amounts of cash at Simpson's Delicatessen on January 3, 1976.[165]

157.    Detectives Guadagno and Deubell authored a P-73 report describing Hough's interrogation, but omitted that Hough initially denied any knowledge of the crime, passed a polygraph test, and then was threatened with prosecution for the crime prior to offering his statement.[166]

158.    Detectives Guadagno and Deubell also authored a formal witness statement attributed to Hough, which likewise omitted the details of the interrogation that preceded his statement.[167]

159.    Hough was at the police station for questioning for approximately eight hours.[168]

160.    The formal witness statement consisted of fewer than two pages of questions and answers.[169]

161.    No notes from the officers conducting Hough's interrogation were maintained in the BPD's file.[170]

---

[164]    Sahasrabudhe Decl., Ex. 3A at COE002165.

[165]    *Id.* at COE002166–67.

[166]    *Id.* at COE002165.

[167]    *Id.* at COE002166–67.

[168]    *Boyd* Dkt. 168-10 (*Wade* Hrng. Tr.) at 45:12–20.

[169]    Sahasrabudhe Decl., Ex. 3A at COE002166–67.

[170]    *See generally* City Statement of Material Facts (containing no record of the notes of Hough's interrogation).

162.     Alan Hirsch, an expert in interrogation tactics that lead to false confessions, opined that the following tactics used against Hough were likely to generate false testimony:

a.   Isolating a juvenile for hours at a police station without a parent or guardian present;

b.   Confronting the witness with certainty of guilt and claiming to have evidence to prove his involvement;

c.   Threatening the witness with prosecution in response to denials of involvement; and

d.   Promising the witness that an inculpatory statement will lead to leniency or immunity from prosecution.[171]

163.     Hirsch opined that the interrogating officers departed from established recommended practices for interrogations in 1976 in ways that were known to produce unreliable testimony, including by:

a.   Using coercive interrogation tactics with a witness "whose guilt [was not] definite or reasonably certain";

b.   Using a direct threat of prosecution against Hough;

c.   "[P]oint[ing] out the possible consequences of a confession" and "hold[ing] out an[] inducement" by offering to release Hough if he accused the five boys of involvement in the Crawford Murder.[172]

164.     Hirsch concluded that the tactics employed against Hough neglected procedural safeguards proscribed by the leading interrogation approach in 1976.[173]

---

[171]     Ex. 7 (Hirsch Report) at 3, 5, 7, 20, 21.

[172]     *Id*. at 11–12, 17–21.

[173]     *Id*. at 11–12, 17–21.

H.    Walker and Woodruff Gave Consistent Statements of Their Whereabouts on the Night of the Crawford Murder

165.    On January 11, 1976, Detective James Hunter decided the detectives should pick up John Walker, Jr. and Tyrone Woodruff.[174]

166.    Detectives Hunter, Robert Arnet, and Montondo picked up Walker from his home and brought him to the station for interrogation.[175]

167.    Walker testified at his deposition in this case that the detectives questioned him with no parent or lawyer present, and the detectives had their guns visible on their hips.[176]

168.    During his interrogation, Walker informed the detectives that, on the night of January 2, 1976, he was with Boyd, Martin, Gibson, and Woodruff at Shirley Floyd's apartment in the Glenny Apartments.[177]

169.    Walker also stated, consistent with the records the BPD obtained from the Fillmore Cab Company, that he took a cab with Woodruff around midnight to go home.[178]

170.    As they did with Boyd, rather than create a verbatim transcript of Walker's interview, the BPD detectives reconstructed and typed Walker's statement after the interrogation concluded and included only a portion of the interview.[179]

171.    Moreover, the statement typed by the BPD does not accurately reflect many of Walker's statements to detectives on January 11, 1976.[180]

---

[174]    Sahasrabudhe Decl., Ex. 3A at COE002175.

[175]    *Id.*

[176]    Sahasrabudhe Decl., Ex. 14A (Walker Dep. Day I) at 154:23–155:16.

[177]    Sahasrabudhe Decl., Ex. 3A at COE002176–77.

[178]    *Id.* at COE002176.

[179]    Sahasrabudhe Decl., Ex. 14A (Walker Dep. Day I) at 143:13–144:2, 151:17–152:4.

[180]    *Infra*, Counterstatement ¶¶ 172–74; *see also* Sahasrabudhe Decl., Ex. 14A (Walker Dep. Day I) at 151:17–152:4.

172.    Walker testified at his deposition in this case that the typed statement misrepresented what he told the officers in several ways:

    a.    The statement records Walker saying he left the Glenny Apartments at midnight, but he told detectives that he left between 11:30 p.m. and 12:00.[181]

    b.    The statement records Walker saying he went to a store on Fillmore Avenue on January 2, but Walker testified that he told detectives that he did not visit the store that day.[182]

    c.    The statement records Walker saying that that he and his friends went straight to Floyd's upon arriving at the Glenny Apartments at 5:00 p.m., but Walker testified that he told detectives that he went to Floyd's at around 10:00 p.m.[183]

    d.    The statement records Walker saying that the five boys had been together only once since January 2, but Walker testified that he told detectives that he and his friends saw each other frequently in the following days.[184]

173.    Walker also testified at his deposition in this case that, at one point in the interrogation, he denied involvement and attempted to leave the interrogation.[185]

---

[181]    Sahasrabudhe Decl., Ex. 3A at COE002176–77; Ex. 14A (Walker Dep. Day I) at 162:16–163:9.

[182]    Sahasrabudhe Decl., Ex. 3A at COE002176–77; Ex. 14A (Walker Dep. Day I) at 165:14–166:6.

[183]    Sahasrabudhe Decl., Ex. 3A at COE002176–77; Ex. 14B (Walker Dep. Day II) at 338:20–141:8.

[184]    Sahasrabudhe Decl., Ex. 3A at COE002176–77; Ex. 14B (Walker Dep. Day II) at 341:20–143:8.

[185]    Sahasrabudhe Decl., Ex. 14A (Walker Dep. Day I) at 155:19–156:10.

174.   When he did so, Detective-Sergeant Hunter told him to sit down and that if he stood up again, Hunter was going to "beat [his] ass."[186]

175.   Walker's January 11, 1976 statement about his whereabouts was consistent with the statements of Gibson, Boyd, witnesses at the Golden Nugget, and other individuals in the Glenny Projects that night.[187]

176.   However, Detectives Arnet, Hunter, and Montondo wrote in their report that Walker had "lied through his statement" and that he made "different statements" to them orally than he had made in his signed statement.[188]

177.   The detectives did not record what Walker's inconsistent oral statements or lies supposedly were.[189]

178.   Walker consented to a polygraph exam.[190]

179.   However, Defendants have produced no evidence in this action that Walker's polygraph was ever taken.[191]

180.   On January 11, 1976, Detectives Hunter, Arnet, and Montondo also interviewed Woodruff.[192]

---

[186]   *Id.* at 156:11–158:7

[187]   Sahasrabudhe Decl., Ex. 3A at COE002177.

[188]   Sahasrabudhe Decl., Ex. 3A at COE002175.

[189]   *Id.*

[190]   *Id.* at COE002177.

[191]   *See generally* City Statement of Material Facts (containing no indication that Boyd received a polygraph examination).

[192]   Sahasrabudhe Decl., Ex. 3A at COE002179.

181.    According to the P-73 report describing this interrogation, Woodruff was questioned for an hour and a half on January 11.[193] During this time, Woodruff denied any knowledge of the Crawford Murder.[194]

182.    Consistent with all the other evidence the BPD had obtained to date, Woodruff stated that he was with Martin, Gibson, Walker, and Boyd at Shirley Floyd's apartment on the night of January 2, 1976, and that he had taken a cab home with Walker.[195]

183.    In their report, Detectives Arnet, Hunter, and Montondo stated that Woodruff was "lying," but made no record of the specific statements they contended were lies.[196]

184.    At his deposition in this case, Detective Guadagno acknowledged that the boys gave relatively the same account of their whereabouts on the night of January 2, 1976.[197]

I.    Arnet, Hunter, Manista, Montodo, Deubell, and Donovan Coerced Tyrone Woodruff To Implicate Boyd And Walker

185.    On January 12, 1976, Detectives Hunter and Arnet brought Woodruff from his house to the police headquarters for questioning again.[198]

186.    Detective Guadagno acknowledged at his deposition in this case that when the interrogation began, there was no adult present with Woodruff.[199]

---

[193]    *See id.* at COE002179–80 (noting that the statement "started at 6:50 PM" and "ended at 8:20 PM").

[194]    *Id.*

[195]    *Id.* at COE002179.

[196]    *Id.* at COE002176–77.

[197]    Sahasrabudhe Decl., Ex. 17B (Guadagno Dep.) at 310:13–312:10, 320:5–323:20.

[198]    Sahasrabudhe Decl., Ex. 3B at COE002197–99. At his deposition in this case, Woodruff testified that he recalled one long interrogation on January 12, 1976, rather than one interview on January 11, 1976, followed by an interrogation on January 12, 1976. *See* Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 69:18–71:9.

[199]    Sahasrabudhe Decl., Ex. 17B (Guadagno Dep.) at 326:5–327:14.

187. Woodruff was placed under arrest during the interrogation.[200]

188. ADA Timothy Drury, who handled all pretrial discovery and was the lead trial prosecutor in the Gibson and Boyd cases, acknowledged at his deposition in this case that the BPD lacked probable cause to arrest Woodruff prior to his "confession."[201]

189. Detective-Sergeant Hunter authored a P-73 report of Woodruff's January 12, 1976 interrogation. The report stated that, after arriving, Woodruff was permitted to make calls to relatives and eat a piece of cake that his mother had packed for him.[202]

190. According to the report, after eating the cake, Woodruff began asking Detective Arnet questions and subsequently admitted to Arnet that he was a witness to the Crawford Murder.[203]

191. A second P-73 report authored by Detective Manista relates a different version of Woodruff's January 12, 1976 interrogation.[204]

192. Detective Manista reported that while Woodruff was being interrogated, Manista received an anonymous phone call naming John Walker, "Darryl Gibson," Floyd Martin, and "Toni" as Crawford's killers. [205]

---

[200]   Sahasrabudhe Decl., Ex. 3B at COE002206; *Boyd* Dkt. 168-10 (*Wade* Hrng. Tr.) at 125:14–132:10.

[201]   *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 248:3–249:17.

[202]   Sahasrabudhe Decl., Ex. 3B at COE002197–99.

[203]   *Id.*

[204]   *Id.* at COE002202.

[205]   *Id.*

193.     Detective Guadagno acknowledged at his deposition in this case that it was basic police practice to try to get an anonymous caller such as this to identify herself and cooperate with the police as a witness.[206]

194.     Although the alleged caller did not get Boyd or Gibson's names right—combining Boyd's first name with Gibson's last name—the caller allegedly recited each boy's home address.[207]

195.     The caller stated that the boys divided money at the Glenny Apartments, and then Walker and "Toni" left in a cab.[208]

196.     Detective Manista reported that the anonymous caller was a "negro female," but refused to identify herself or meet with the police.[209]

197.     According to the report, Woodruff was present when detectives received this call, and he was permitted to listen in.[210]

198.     Detective Guadagno acknowledged at his deposition in this case that allowing Woodruff to listen to this anonymous call would be a form of "intimidation."[211]

199.     Detective Manista reported that, after hearing the call, Woodruff told him, "Gibson was hitting him, Gibson was hitting him, I think."[212]

---

[206]     Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 108:3–115:2.

[207]     Sahasrabudhe Decl., Ex. 3B at COE002202.

[208]     *Id.*

[209]     *Id.*

[210]     *Id.*

[211]     Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 108:1–115:2.

[212]     Sahasrabudhe Decl., Ex. 3B at COE002202.

200.     Detectives Manista and Deubell, and Chief of Homicide Leo Donovan, authored a formal witness statement attributed to Woodruff, purporting to capture his confession.[213]

201.     The statement is alleged to have been made voluntarily after Woodruff waived his *Miranda* rights.[214]

202.     The statement is alleged to contain Woodruff's voluntary correction of his prior statements.[215]

203.     The statement is alleged to have been made in the presence of Woodruff's father and pastor.[216]

204.     Tyrone Woodruff testified at his deposition in this case that both P-73 reports and the formal witness statement are fabrications.[217]

205.     Instead, he was questioned for hours on his own, without his father or pastor present.[218]

206.     Woodruff testified that he never ate a snack at the police department and never overheard an anonymous phone call.[219]

207.     Rather, the BPD detectives repeatedly rejected his efforts to deny involvement in or knowledge of the Crawford Murder and told him he would go to jail if he did not change his testimony.[220]

---

[213]     *Id.* at COE002203–05.

[214]     *Id.*

[215]     *Id.*

[216]     *Id.*

[217]     Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 86:6–91:8, 99:23–102:25.

[218]     *Id.* at 144:9–145:6, 148:12–21.

[219]     *Id.* at 89:18–90:20, 99:23–102:25.

[220]     *Id.* at 148:15–149:16, 156:3–23.

208.     They informed Woodruff that he was "going away for life" because he would be prosecuted for the Crawford Murder.[221]

209.     The detectives informed Woodruff that they had an anonymous witness ready to implicate him and his friends in the crime.[222]

210.     They further informed Woodruff that another one of the boys was "wanted to take [his] place" and cooperate with the investigation.[223]

211.     Woodruff was crying and scared during his interrogation.[224]

212.     Woodruff testified that the BPD promised him immunity and that he would be able to go home, provided he admitted to minor involvement and implicated others in the Crawford Murder.[225]

213.     This promise of immunity "broke" Woodruff, and he agreed to change his statement.[226]

214.     Woodruff testified that after he was promised immunity, the detectives gave him information about the Crawford Murder and fed him lines to create the formal witness statement, which he signed.[227]

---

[221]     *Id.* at 126:3–20.

[222]     *Id.* at 102:4–103:25.

[223]     *Id.* at 81:13–82:22, 124:19–125:23, 134:20–136:9, 149:6–150:10, 156:3–23.

[224]     *Id.* at 162:13–163:05.

[225]     *Id.* at 125:25–127:4, 164:18–166:7.

[226]     *Id.* at 134:20–36:9, 164:18–166:7.

[227]     *Id.* at 166:9–68:19.

215.    Woodruff explained that it took multiple attempts to create a comprehensible statement, because the detectives would repeatedly tell him that the statement was not right, and he would change his story to give them what they wanted to hear. [228]

216.    Woodruff's statement is three pages long and does not mention the boys entering the Golden Nugget or waiting near Simpson's Delicatessen for Crawford to leave the bar.[229]

217.    No notes from the detectives conducting Woodruff's January 12, 1976 interrogation were maintained in the BPD's file.[230]

218.    ADA Drury confirmed at his deposition in this case that he arrived at the BPD station after Woodruff's confession.[231]

219.    ADA Drury recalled that it was Chief Donovan who called him to the station and likely Chief Donovan who offered Woodruff immunity for testifying against his friends.[232]

220.    ADA acknowledged that it was "probably" improper for Chief Donovan to offer a suspect immunity in exchange for cooperation without the District Attorney's authorization, but he went along with it because Woodruff was an essential witness.[233]

221.    ADA Drury testified that he understood at this time that that Woodruff agreed to cooperate when one of his parents and his minister were present.[234]

---

[228]    *Id.*

[229]    Sahasrabudhe Decl., Ex. 3B at COE002203–05.

[230]    *See generally* City Statement of Material Facts (containing no reference to notes of Woodruff's interrogation).

[231]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 231:23–236:16.

[232]    *Id.* at 231:23–232:7, 239:2–9.

[233]    *Id.* at 233:21–234:21, 241:7–11.

[234]    *Id.* at 227:22–228:23.

222.    ADA Drury also testified that on January 12, 1976, he was not aware that Woodruff was placed under arrest prior to his confession.[235]

223.    ADA Drury confirmed that, as of January 12, 1976, he had no awareness of Woodruff's prior statement denying involvement, and the extent of his understanding was that Woodruff was fully cooperative with the investigation.[236]

224.    ADA Drury confirmed that he did not independently examine what led Woodruff to inculpate the other boys.[237]

225.    Woodruff testified that his pastor and father only arrived after the interrogation to take him home.[238]

226.    Woodruff testified that after he made his initial false confession to the detectives, he "shut down" and was unable to speak about the pressures he faced and the falsity of his confession.[239]

227.    Hirsch has explained that Woodruff's interrogation relied on the same problematic tactics as Hough's, and detectives would have understood the risks of a false confession from these practices in 1976.[240]

228.    Hirsch opined that the following tactics used against Woodruff were likely to generate false testimony:

    a.    Isolating a juvenile for hours at a police station without a parent or guardian present;

---

[235]    *Id.* at 229:15–230:2.

[236]    *Id.* at 226:21–228:5, 231:10–233:10.

[237]    *Id.* at 229:10–14.

[238]    Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 91:17–92:20, 105:6–7.

[239]    *Id.* at 105:8–106:06.

[240]    Ex. 7 (Hirsch Report) at 11–12.

b.   Confronting the witness with certainty of guilt and claiming to have evidence to prove his involvement;

c.   Threatening the witness with prosecution and life imprisonment in response to denials of involvement; and

d.   Promising the witness that an inculpatory statement will lead to immunity from prosecution.[241]

229.   Hirsch opined that the interrogating officers departed from established recommended practices for interrogations in 1976 in ways that were known to produce unreliable testimony, including by:

a.   Using coercive interrogation tactics with a witness "whose guilt [was not] definite or reasonably certain";

b.   Using a direct threat of prosecution against Woodruff;

c.   "[P]oint[ing] out the possible consequences of a confession" and "hold[ing] out an[] inducement" by offering to immunize and release Woodruff if he accused the other four boys of involvement in the Crawford Murder.[242]

230.   Hirsch concluded that the tactics employed against Woodruff neglected procedural safeguards proscribed by the leading interrogation approach in 1976.[243]

231.   ADA Drury testified at his deposition in this case that, absent Woodruff's confession, there would not have been probable cause to arrest Boyd and Walker, and their prosecutions would not have been possible.[244]

---

[241]   *Id*. at 11–12.

[242]   *Id.* at 11–15, 19–21.

[243]   *Id.* at 20–21.

[244]   *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 241:7–11.

J.    The BPD Arrested Gibson, Boyd, Walker, and Martin Based on False Evidence and Fabricated Additional Evidence Thereafter

232.    Upon obtaining Woodruff's confession, the BPD arrested Boyd, Walker, Gibson, and Martin.[245]

233.    On January 12, 1976, Chief Donovan signed a criminal court complaint alleging that Gibson, Boyd, Walker, and Martin murdered Crawford at 10:30 p.m. on January 1976.[246]

234.    Chief Donovan attached Woodruff's alleged sworn statement to the criminal complaint, while Hough's statements were not mentioned.[247]

235.    ADA Drury testified at his deposition in this case that he did not review or approve the criminal complaint prior to its filing.[248]

236.    ADA Drury acknowledged at his deposition in this case that, absent Woodruff's statement, there was not probable cause for initiating the criminal case against Gibson, Boyd, Walker, and Martin.[249]

237.    The arraignment on the criminal complaint was held January 13, 1976.[250]

238.    At the arraignment, the court ordered that Walker, Boyd and their codefendants be held without bail and they were imprisoned at the Erie County Jail.[251]

---

[245]    Sahasrabudhe Decl., Ex. 3A at COE002187–89; Ex. 3B at COE002190–91. Detectives Arnet and Hunter arrested Gibson and Arnet remained in the car while Hunter arrested Boyd. *Id.* at COE002197–98. Arnet and Montondo personally escorted Boyd to police headquarters to be formally booked and then took him to the cell block to be held pending arraignment. *Id.* at COE002198.

[246]    Sahasrabudhe Decl., Ex. 3A at COE002188–89; Ex. 3B at COE002190–91.

[247]    Ex. 8 (Criminal Complaint).

[248]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 174:18–177:6.

[249]    *Id.* at 178:2–13.

[250]    Sahasrabudhe Decl., Ex. 3B at COE002213

[251]    *Id.*

239.     ADA Drury testified at his deposition in this case that he did not know on January 12, 1976, of the reports demonstrating that the crime occurred at or after 11:30 p.m. rather than 10:30 p.m. as alleged in the criminal complaint.[252]

240.     At a pretrial hearing in the underlying criminal cases, Detective-Sergeant Hunter testified that Chief Donovan was "in charge of every case and everything in every case."[253]

241.     The arrest reports list "Leo J. Donovan and squad" or "Leo J. Donovan, James Hunter, Frank Deubell & Squad" as the arresting officers.[254]

242.     Testifying on behalf of the City, Detective Regan confirmed that this meant the entire Homicide Squad was credited for the arrest.[255]

243.     At their depositions in this case, Detectives Guadagno, Montondo, and Regan all testified that homicide detectives worked jointly on investigations and shared evidence, with all of them working under Chief Donovan's supervision and direction.[256]

244.     On January 12, 1976, Detectives Guadagno and Deubell arrested and interrogated Walker.[257]

245.     In their report, the detectives wrote that Walker "refused to aid us in this investigation." However, they did not include any statements that Walker made to this effect.[258]

---

[252]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 177:7–178:1.

[253]     *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 138:18–139:3.

[254]     Sahasrabudhe Decl., Ex. 3A at COE002188–89; Ex. 3B at COE002190–91.

[255]     Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 27:20–30:20.

[256]     Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 127:18–128:21; Ex. 16 (Montondo Dep.) at 92:11–93:07; Ex. 10 (Regan Dep.) at 23:10–25:14.

[257]     Sahasrabudhe Decl., Ex. 3A at COE002185–86.

[258]     *Id.*

246.     Also on January 12, Detectives Deubell and Montondo went to the Glenny Apartments to pick up Floyd Martin and transport him to BPD Headquarters.[259]

247.     When questioned by the detectives, Martin denied knowing anything about the Crawford Murder.[260]

248.     The detectives then arrested and charged Martin with the Crawford Murder.[261]

249.     After advising Martin of his rights, the detectives interrogated him and prepared a statement.[262]

250.     Consistent with the other boys' statements to the BPD (including Woodruff's initial statement), Martin told Detective Montondo that on that on January 2, 1976, he was with Boyd, Gibson, Walker, and Woodruff at Shirley Floyd's apartment.[263]

251.     Martin also told Detective Montondo that Walker and Woodruff took a cab home from the party and that Gibson and Boyd walked home. Martin said that he stayed in the Glenny Apartments, where he lived.[264]

252.     In a P-73 report of Martin's interrogation, Detective Montondo reported that "most of [Martin's] conversation with me was a lie." However, Montondo did not document what Martin said that he believed to be a lie.[265]

---

[259]     *Id.* at COE002185.

[260]     *Id.*

[261]     *Id.*

[262]     Sahasrabudhe Decl., Ex. 3B at COE002192–93.

[263]     *Id.* at COE002192.

[264]     *Id.*

[265]     *Id.* at COE002192–93.

253.    At his deposition in this case, Detective Montondo acknowledged that he had not identified any of Martin's alleged lies in his report or recorded any of Martin's statements.[266]

254.    Montondo further acknowledged that it would have been important to report the manner in which an individual lied.[267]

255.    Also on January 12, 1976, Detectives Guadagno and Deubell interviewed Hough a second time.

256.    For the first time, Hough stated that, immediately after displaying cash at Simpson's Delicatessen, Boyd confessed to him that Boyd, Gibson, Martin, Walker, and Woodruff robbed and killed Crawford.

257.    Also for the first time, Hough stated that Boyd told him that the five boys saw Crawford in the driveway of a home and ran after him, and then Gibson started hitting him.[268]

258.    The BPD reported that Detective Deubell brought Hough in for a second polygraph examination on January 12, 1976, but the P-73 omits the results of that examination.[269]

259.    ADA Drury wrote in his notes that Hough, after changing his story, refused to be polygraphed a second time about his revised story.[270]

260.    No BPD reports produced in this case document Hough's refusal to take a second polygraph after changing his story.[271]

---

[266]    Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 111:4–115:10, 166:20–170:6.

[267]    *Id.*

[268]    Sahasrabudhe Decl., Ex. 3B at COE002194–95.

[269]    *Id.* at COE002212.

[270]    Ex. 9 (Drury Notes); *see also Boyd* Dkt. 168-15 (Drury Dep. Day II) at 366:01–369:08.

[271]    *See generally* City Statement of Material Facts (containing no statement regarding Hough's refusal to take a second polygraph).

261.    On January 15, 1976, Detective Montondo, in response to a request from Detectives Guadagno and Deubell, interviewed employees of Simpson's Delicatessen.[272]

262.    The store's owner and her daughter knew Gibson, Boyd, Walker, Martin, and Woodruff, they remembered working on both January 2 and January 3, 1976, and neither remembered seeing the boys let alone "flashing any large bills."[273]

263.    Detective Montondo wrote "Simpson's Delicatessen is a very small store, and it would be easy for the workers to over look any one, especially if they were busy."[274]

264.    At his deposition in this case, Detective Montondo acknowledged that a smaller store would make it easier, not harder, to identify customers.[275]

265.    Detective Regan, testifying on behalf of the City, confirmed that this P-73 report did not make sense, as the small store would make it easier, not harder, to identify customers.[276]

K.    Delano and Guadagno Coerced Revised Testimony from Hough and Woodruff Before The Grand Jury

266.    On February 11, 1976, a grand jury heard testimony regarding the Crawford Murder.[277]

267.    Detectives Delano and Guadagno went to the Erie County District Attorney ("ECDA") office to meet with ADA Drury, Hough, and Woodruff.[278]

---

[272]    Sahasrabudhe Decl., Ex. 3B at COE002215.

[273]    *Id.*

[274]    *Id.*

[275]    Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 186:12–189:07.

[276]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 40:12–41:14.

[277]    Sahasrabudhe Decl., Ex. 3B at COE002228–30, COE002231–32.

[278]    *Id.*

268.    Each memorialized their interactions with Hough and Woodruff on that day in separate P-73 reports.[279]

269.    During questioning from ADA Drury and Detective Delano, and in the presence of his foster mother, Hough attempted to recant his prior statement inculpating Gibson, Boyd, Walker, Martin, and Woodruff.[280]

270.    The BPD did not record the details of Hough's recantation.[281]

271.    ADA Drury testified at his deposition in this case that he likely warned Hough that if he did not go back to what he said in his prior statements inculpating the boys, he might be prosecuted for perjury.[282]

272.     Detectives Delano and Guadagno informed Hough's foster mother that they would drive Hough home, and with that assurance, she left Hough alone with them.[283]

273.    Once Hough was alone, Detective Delano accused Hough of lying in his recantation and told him he "better" return to his prior story.[284]

274.    Hough then stated for the first time that Gibson had prior knowledge of a man inside the Golden Nugget with money.[285]

275.    ADA Drury placed Hough in the grand jury to testify as to this version of events.[286]

---

[279]    *Id.*

[280]    *Id.*

[281]    *Id.*

[282]    *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 380:15–381:20.

[283]    Sahasrabudhe Decl., Ex. 3B at COE002228–30.

[284]    *Id.*

[285]    Sahasrabudhe Decl., Ex. 3B at COE002228–30, COE002231–32.

[286]    Ex. 10 (Hough Grand Jury Tr.) at 8.

276.    After ADA Drury brought Hough to the grand jury, Detectives Guadagno and Delano went into a room with Woodruff.[287]

277.    Woodruff appeared to be shaking and nervous.[288]

278.    Detective Delano told Woodruff that he was nervous because he was not telling the whole truth and confronted Woodruff with the revised story from Hough.[289]

279.    However, in a separate P-73 report authored by Detective Guadagno, Guadagno wrote that he elicited new information from Woodruff without mentioning that the detectives confronted Woodruff with Hough's new statement.[290]

280.    Woodruff revised his story to match Hough's version of events.[291]

281.    Detective Regan, testifying on behalf of the City, stated that, it was not appropriate try to tailor one witness's statement to other statements [292]

282.    Detective Guadagno testified at his deposition in this case that ADA Drury did not direct them to provide Woodruff with Hough's revised story.[293]

283.    Detective Guadagno prepared a handwritten statement with these details for Woodruff to sign.[294]

284.    The handwritten statement was marked as an exhibit for the grand jury.[295]

---

[287]    Sahasrabudhe Decl., Ex. 3B at COE002228–30.

[288]    *Id.*

[289]    *Id.*

[290]    *Id.* at COE002231–32.

[291]    *Id.* at COE002228–30, COE002231–32.

[292]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 26:12–27:19.

[293]    Sahasrabudhe Decl., Ex. 17B (Guadagno Dep.) at 394:13–395:10.

[294]    Sahasrabudhe Decl., Ex. 3B at COE002231–33.

[295]    *Id.*

285.     Woodruff's new account contradicted his prior statement. In this version, Gibson and Boyd peeked into the Golden Nugget, saw Crawford drinking and displaying cash, then waited outside Simpson's Delicatessen with the other boys for Crawford to leave the bar. The boys spotted him leaving the bar from two blocks away and then ran to catch him.[296]

286.     ADA Drury placed Woodruff in the grand jury to testify as to this version of events.[297]

287.     Detective Guadagno wrote that Hough and Woodruff were released after his grand jury testimony, indicating that they were detained until they testified.[298]

288.     Woodruff testified at his deposition in this case that he relayed stories that he knew made no sense because he had no actual knowledge of the crime and hoped that the BPD detectives and ADA Drury would realize he could not have been telling the truth and would not call him to testify.[299]

289.     Detective Guadagno testified at his deposition in this case that he never investigated whether Woodruff's story about lying in wait at Simpson's Delicatessen made sense.[300]

290.     ADA Drury relied on the revised stories of Hough and Woodruff to charge Boyd, Walker, Gibson, and Martin with the Crawford Murder.[301]

---

[296]     *Id.* at COE002228–33.

[297]     Ex. 11 (Woodruff Grand Jury Tr.).

[298]     Sahasrabudhe Decl., Ex. 3B at COE002231–32.

[299]     Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 123:08–124:13, 170:3–172:13.

[300]     Sahasrabudhe Decl., Ex. 17B (Guadagno Dep.) at 412:13–413:6.

[301]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 241:7–11; 168-15 (Drury Dep. Day II) at 347:18–348:05.

291.    ADA Drury stated on the record on January 14, 1977, during Gibson's trial, that he had just then obtained the P-73 reports revealing the coordination of Hough and Woodruff's testimony before their grand jury appearances.[302]

292.    Testifying on behalf of the County, ADA David Henry confirmed Woodruff's importance for the County's ability to successfully prosecute Boyd and Walker for the Crawford Murder.[303]

L.    <u>ADA Drury Presented Coerced Testimony to the Grand Jury and Did Not Disclose Exculpatory Information</u>

293.    ADA Drury presented Hough, Woodruff, and Detective Delano to the grand jury to obtain an indictment on February 11, 1977.[304]

294.    During Hough's grand jury testimony, ADA Drury did not elicit key facts disproving Plaintiffs' guilt or discrediting Hough, including but not limited to:

a.   The detectives detaining and questioning Hough without a parent or guardian present without probable cause;

b.    Hough's initial denials of knowledge of the Crawford Murder;

c.   The detectives' threats to prosecute Hough for the Crawford Murder;

d.   Hough's passing his first polygraph examination after he explained his lack of knowledge regarding the Crawford Murder;

e.   The police threats that caused him to change his story and implicate the boys;

f.   Hough's refusal to take a polygraph after changing his story;

---

[302]    *Boyd* Dkt. 168-5 (Gibson Trial Tr.) at 184:6–20; 168-15 (Drury Dep. Day II) at 494:19–498:08.

[303]    *Boyd* Dkt. 168-17 (Henry Dep.) at 296:22–297:15.

[304]    Exs. 10 (Hough Grand Jury Tr.); 11 (Woodruff Grand Jury Tr.); 12 (Delano Grand Jury Tr.).

g.  Hough's recantation on the day of his grand jury testimony;

h.  The isolation and threats that caused Hough to recant his recantation, including Drury's threat to prosecute him for perjury; and

i.  Hough's unlawful police detention until he completed his grand jury testimony.[305]

295.  During Woodruff's grand jury testimony, ADA Drury caused the grand jury to be misled by failing to elicit key facts disproving Plaintiffs' guilt or discrediting Woodruff, including but not limited to:

a.  The detectives detaining and questioning Woodruff without his parents' being present and without probable cause;

b.  The lengthy custodial questioning prior to his alleged confession during which he denied any knowledge of the crime;

c.  The detectives' lie that other witnesses had or would testify against Woodruff if he did not change his story and cooperate with the authorities;

d.  The promise of immunity Woodruff received prior to his alleged confession and that also protected him from his own grand jury testimony;

e.  That police had arrested Woodruff without any probable cause and threatened him with life imprisonment if he failed to cooperate and implicate the other suspects;

f.  That police fed him information to incorporate into his statement;

g.  That taxicab records and witness statements proved that Woodruff was in a taxicab with Walker being driven home, or already was home, at the time the crime was committed;

---

[305]  *See generally* Ex. 10 (Hough Grand Jury Tr.).

h.  That Detectives told him Hough's new statement on February 11 so he would be able to conform his account to Hough's;

i.  That Woodruff's handwritten statement of February 11 that Boyd and Gibson only peaked into the Golden Nugget conflicted with his testimony that they went inside the establishment;

j.  That bar patrons did not see any teenagers inside the bar and they were not generally permitted;

k.  That police crime scene photographs and other forensic evidence disproved Woodruff's claim that Crawford was brutally attacked at the bottom of the driveway and dragged up the driveway to the side of his house;

l.  That Woodruff's claim the boys waited outside Simpson's Store and then ran after Crawford crossed the street and accosted him at the bottom of his driveway did not make sense; and

m.  That Woodruff was held in police custody, despite having been granted immunity from prosecution, until he completed his grand jury testimony.[306]

296.    Woodruff and Hough's grand jury testimony differed substantially from their initial statements.

a.  Woodruff's initial story from January 12, 1976, did not include any of the boys entering the Golden Nugget, Boyd and Gibson spotting Crawford in the bar displaying cash, or the boys waiting by Simpson's Delicatessen for Crawford to emerge. Woodruff's testimony to the grand jury included all these facts.[307]

---

[306]    *See generally* Ex. 11 (Woodruff Grand Jury Tr.).

[307]    *Id.*

  b. Hough's stories on January 8 and January 12, 1976 did not include any of the boys entering the Golden Nugget or learning about Crawford displaying cash, but his grand jury testimony now included these details.[308]

  c. The grand jury was not told about any of these contradictions.[309]

297. During Detective Delano's grand jury testimony, he did not give testimony regarding the circumstances of Woodruff and Hough's confessions or the efforts to coordinate Woodruff and Hough's story, and he did not disclose any of the material concerning the suspected involvement of Watson or Jerome Boyd in the Crawford Murder or the boys' departure from the Glenny Projects in a cab at 11:28 p.m. [310]

298. The grand jury returned an indictment of Boyd, Walker, Gibson, and Martin for murder in the second degree.[311]

  M. <u>BPD Officers Destroyed Notes Taken During Witness Interviews</u>

299. Detective Guadagno testified at his deposition in this case that he was trained to take notes when interviewing witnesses or suspects and that he had a practice of destroying these notes.[312]

300. Detective Guadagno further testified that he took notes during the investigation of the Crawford Murder, and that he destroyed the majority of them.[313]

---

[308] Ex. 10 (Hough Grand Jury Tr.).

[309] *See generally* Exs. 11 (Woodruff Grand Jury Tr.); 10 (Hough Grand Jury Tr.).

[310] Ex. 12 (Delano Grand Jury Tr.).

[311] Sahasrabudhe Decl., Ex. 20 (Indictment).

[312] Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 38:19–40:15.

[313] *Id.* at 40:22–41:07.

301.     Detectives Montondo and Regan also testified at their depositions in this case that they had a practice of taking notes when interviewing witnesses and destroying these notes after incorporating the substance of them into P-73s reports.[314]

302.     Defendants have produced no evidence in this action that any handwritten notes taken by BPD detectives during the Crawford Murder investigation were provided to the ECDA or to the defense.[315]

303.     Defendants have produced no evidence in this action that any handwritten notes taken during these interviews were preserved.[316]

## II.     The ECDA Failed to Turn Over *Brady* Evidence During the Prosecutions of Boyd and Walker.

### A.     The ECDA Recorded What Material Was Turned Over to The Defense

304.     Gibson, Boyd, Walker, and Martin appeared for a preliminary hearing to determine whether probable cause existed to detain them on January 16, 1976.[317]

305.     ADAs Drury and James Verrastro appeared for the ECDA.[318]

306.     Joseph LaTona appeared for Darryn Gibson.[319]

307.     Mark Hulnick appeared for Darryl Boyd.[320]

---

[314]     Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 36:01–38:19; Ex. 10 (Regan Dep.) at 94:10–95:09, 147:11–148:10.

[315]     *See generally* City Statement of Material Facts (containing no reference to disclosure of interview notes).

[316]     *See generally* City Statement of Material Facts (containing no reference to preservation of interview notes).

[317]     *Boyd* Dkt. 168-8 (Preliminary Hrng. Tr.) at 1.

[318]     *Id.*

[319]     *Id.*

[320]     *Id.*

308.    Dan Barry appeared for John Walker.[321]

309.    James McLeod appeared for Floyd Martin.[322]

310.    ADA Drury testified at his deposition in this case that he did not disclose any P-73 reports to the defense at the preliminary hearing, even though by that time he had the BPD case file.[323]

311.    There is no record that the alibi evidence including the taxicab records and witness statements about the timing of the incident or of the third-party culpability evidence was disclosed during the preliminary hearing.[324]

312.    McLeod testified at his deposition in this case that it was the ECDA's practice in 1976 not to disclose information favorable to the defense that might affect the probable cause or bail determination at the time of the arraignment or preliminary hearing.[325]

313.    At the preliminary hearing, Woodruff was the only witness to inculpate Walker, Boyd, and the others.[326]

314.    Woodruff's two signed statements were marked as exhibits and were the only police documents that the prosecution disclosed.[327]

315.    Before testifying, Woodruff, represented by counsel, invoked his Fifth Amendment privilege before receiving a formal grant of complete immunity from prosecution.[328]

---

[321]    *Id.*

[322]    *Id.*

[323]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 185:4–6.

[324]    *See generally Boyd* Dkt. 168-8 (Preliminary Hrng. Tr.).

[325]    *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 316:7–17.

[326]    *See generally Boyd* Dkt. 168-8 (Preliminary Hrng. Tr.).

[327]    *See Boyd* Dkt. 168-14 (Drury Dep. Day I) at 180:18–185:6.

[328]    *See Boyd* Dkt. 168-8 (Preliminary Hrng. Tr.). at 3:1–4:2.

316.    Woodruff testified at the preliminary hearing in the underlying criminal cases that he had not been arrested or threatened with prosecution prior to his statement.[329]

317.    Woodruff did not testify regarding the coercive pressures from police or state that he received a complete grant of immunity prior to his confession.[330]

318.    ADA Drury did not correct the record regarding the circumstances of Woodruff's confession.[331]

319.    ADA Drury testified at his deposition in this case that, as of the date of the preliminary hearing, his only understanding of why Woodruff confessed was the information contained in the January 12, 1976 P-73 report authored by Francis Manista describing an anonymous call that Woodruff allegedly overheard and the January 12, 1976 P-73 report authored by Detective-Sergeant Hunter describing Woodruff's confession after eating cake and making calls.[332]

320.    ADA Drury testified that he was not aware that the detectives had told Woodruff that he was to be prosecuted for murder unless he admitted minor involvement in the Crawford Murder and implicated others[333]

321.    Kevin Gagan, the County's retained expert on prosecutorial practices, admitted at his deposition in this case that prosecutors in 1976 were required to provide favorable evidence to Defendants and the Court at preliminary hearings and bail determinations.[334]

---

[329]    *Id.* at 51:22–52:04.

[330]    *See generally Boyd* Dkt. 168-8 (Preliminary Hrng. Tr.).

[331]    *Id.*

[332]    *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 307:4–313:5.

[333]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 255:20–57:11.

[334]    *Boyd* Dkt. 169-1 (Gagan Dep.) at 67:1–70:8.

322.     Steven Zeidman, an expert in criminal defense practice and procedure, opined that had this material been disclosed, the trial judge may have set reasonable bail or dismissed the case outright, as Woodruff's testimony was the sole basis for the charges at the preliminary hearing.[335]

323.     The court ordered Boyd, Walker, Gibson, and Martin detained until the time of the grand jury proceedings.[336]

324.     Boyd, Walker, Gibson, and Martin each filed an omnibus motion seeking prompt disclosure of *Brady* material.[337]

325.     In disposition slips recording his pretrial appearances, ADA Drury memorialized disclosing prior statements from Gibson and Boyd and the medical reports on Crawford's death. The disposition slips do not record ADA Drury disclosing any other police reports or witness statements.[338]

326.     On November 15, 1976, Boyd, Walker, Gibson, and Martin appeared for a hearing. Attorneys Hulnick and McLeod appeared for Boyd and Martin, Gary Bittner appeared for Gibson, David Jay appeared for Walker, and ADA Drury appeared for the ECDA.[339]

327.     The record reflects that ADA Drury marked thirteen exhibits at the hearing, including five P-73 reports;[340] the rights cards for the interrogations of Gibson, Boyd, and

---

[335]     *Boyd* Dkt. 168-23 (Zeidman Report) at 33–34.

[336]     *Boyd* Dkt. 168-8 (Preliminary Hrng. Tr.) at 101:10–15.

[337]     *Boyd* Dkt. 168-2 at COE001893–912 (Gibson Omnibus Motion), COE002255–72 (Boyd Omnibus Motion), COE002584–99 (Walker Omnibus Motion); Ex. 13 (Martin Omnibus Motion).

[338]     Ex. 14 (Dep. Ex. 68: Combined Pretrial Discovery).

[339]     *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 1.

[340]     *Id.* at 7:8–10, 13:3–5, 143:20–22, 157:17–19, 166:20–22 (disclosing on the record five P-73s containing statements from the defendants).

Martin;[341] the sworn statements of Gibson, Boyd, and Walker during their interrogations;[342] a printout of Martin's criminal record;[343] and the grand jury testimony of Doloris White.[344]

328.    ADA Drury did not disclose any other materials to the defendants beyond the marked exhibits listed in the court's record of the *Huntley* hearing.[345]

329.    During the *Huntley* hearing, ADA Drury refused to disclose all reports, prompting Boyd's counsel to ask the court to examine the prosecution's file for material—a request ADA Drury opposed and the court denied.[346]

330.    On December 6, 1976, Boyd, Walker, Gibson, and Martin appeared for a *Wade* hearing at which the same attorneys appeared as did at the *Huntley* hearing.[347]

331.    The record reflects that ADA Drury marked two signed statements from Andre Hough as court exhibits at the *Wade* hearing.[348]

332.    ADA Drury did not disclose any other materials to the defendants beyond those listed in the court's record of the *Wade* hearing.[349]

333.    ADA Drury testified that he would make a record of disclosing P-73 reports to defendants when he did so.[350]

---

[341]    *Id.* at 5:1–3, 12:5–7, 154:19–21.

[342]    *Id.* at 11:3–5, 14:1–3, 134:16–18.

[343]    *Id.* at 177:19–21.

[344]    *Id.* at 226:2–5.

[345]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 192:1–5.

[346]    *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 268:15–270:23

[347]    *Boyd* Dkt. 168-10 (*Wade* Hrng. Tr.) at 1:16–22.

[348]    *Id.* at 49:5–17.

[349]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 194:20–195:14.

[350]    *Id.* at 30:14–19.

334.     After the *Wade* hearing, Gibson, Boyd, Walker, and Martin's trials were conducted separately and in that order.[351]

335.     ADA Drury did not disclose any additional pretrial discovery material to Gibson's counsel prior to opening statements in the Gibson trial.[352]

336.     ADA Drury did not disclose any *Brady* material to any defense counsel prior to the start of Gibson's trial.[353]

337.     On January 10, 1977, the trial of Darryl Gibson began. ADA Drury represented the ECDA.[354]

338.     Garry Bittner represented Gibson.[355]

339.     During the trial, ADA Drury introduced forty-one exhibits, and Gibson introduced three. Two of the ECDA's exhibits were P-73 reports, and twelve were photographs.[356]

340.     ADA Drury did not disclose any P-73 reports to Gibson's attorney beyond those listed in the court's records.[357]

341.     At the Gibson trial, ADA Drury disclosed the two P-73 reports memorializing Hough's recantation on February 11, 1976, only after Gibson's attorney criticized Drury on the record for failing to disclose *Rosario* material.[358]

---

[351]     *See* City Statement of Material Facts at ¶¶ 148, 150, 152, 154.

[352]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 139:11–23.

[353]     *Id.*

[354]     *Boyd* Dkt. 168-5 (Gibson Trial Tr.) at 1:20–22.

[355]     *Id.*

[356]     *Id.* at 4:1–5:5.

[357]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 197:9–13.

[358]     *Boyd* Dkt. 168-5 (Gibson Trial Tr.) at 124:18–127:1, 184:6–20; 168-15 (Drury Dep. Day II) at 494:19–498:08

342.     ADA Drury testified at his deposition in this case that it was his practice to take back exhibits that he provided to the defense during trial after making them available during cross examination.[359]

343.     Gibson's trial ended in a conviction for murder in the second degree.[360]

344.     On April 21, 1977, the trial of Darryl Boyd began. ADA Drury represented the ECDA.[361]

345.     Hulnick represented Boyd.[362]

346.     ADA Drury did not disclose any *Brady* material to Boyd's counsel in advance of trial.[363]

347.     During the trial, the ECDA introduced twenty-five exhibits, and Boyd introduced one.[364] Two of the ECDA's exhibits were P-73 reports: Detective Dove's January 3, 1976 P-73 report regarding the crime scene and Detective Guadagno's January 8, 1976 P-73 report regarding the interrogation of Darryl Boyd.[365]

348.     ADA Drury testified at his deposition in this case that he did not disclose any P-73 reports to the defense during the Boyd trial that were not included in the marked exhibits.[366]

349.     The ECDA introduced ten photographs as exhibits.[367]

---

[359]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 102:19–103:19.

[360]     *Boyd* Dkt. 168-5 (Gibson Trial Tr.) at 893:23–895:8.

[361]     *Boyd* Dkt. 168-6 (Boyd Trial. Tr.) at 1.

[362]     *Id.*

[363]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 158:18–23.

[364]     *Boyd* Dkt. 168-6 (Boyd Trial. Tr.) at 3:3–19

[365]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 197:9–202:18; *Boyd* Dkt. 168-6 (Boyd Trial Tr.) at 113:7–19 (referring to Dove's P-73 as reflecting his "general investigation" on January 3.

[366]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 202:13–18.

[367]     *Boyd* Dkt. 168-6 (Boyd Trial. Tr.) at 3:3–19.

350.    ADA Drury provided an additional eight photographs to the defense during the trial that were not moved into evidence.[368]

351.    The ECDA called the following witnesses at Boyd's trial:

      i.   Albert Hauser;[369]

     ii.   Larry Watson;[370]

   iii.   David Donnelly, a Buffalo firefighter;[371]

   iv.   Gerald Dove;[372]

    v.   Tyrone Woodruff;[373]

   vi.   Charles Severson, the Medical Examiner;[374]

  vii.   Margaret Crawford;[375] and

 viii.   Andre Hough.[376]

352.    Hulnick called four witnesses:

      i.   Debbie Jeffrey;[377]

---

[368]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 142:18–146:06; 168–6 (Boyd Trial Tr.) at 55:16–17.

[369]    *Boyd* Dkt. 168-6 (Boyd Trial. Tr.) at 49:14–16.

[370]    *Id.* at 61:1–3.

[371]    *Id.* at 83:10–12.

[372]    *Id.* at 104:19–21.

[373]    *Id.* at ECF Page 522:1–2. In the version of the *Boyd* trial transcript included in Defendant County of Erie's Appendix, Woodruff's testimony is separated out from the rest of the transcript and paginated differently, so we cite the page number of the document filed via ECF.

[374]    *Id.* at 267:1–4.

[375]    *Id.* at 342:3–5.

[376]    *Id.* at 349:21–23.

[377]    *Id.* at 452:16–18.

      ii.   Alison Zachery, Floyd Martin's sister-in-law;[378]

      iii.   Joyce Washington, who spent time with Boyd and Hough on January 2, 1976;[379] and

      iv.   Dorothea Washington, Joyce's mother.[380]

353.    The ECDA called Detective Guadagno as a rebuttal witness.[381]

354.    ADAs Drury and Henry testified at their depositions in this case that their practice was to document on the record the material that they disclosed pursuant to New York's *Rosario* rule when a witness completed his direct examination.[382]

355.    The trial records show that the material disclosed after the Woodruff and Hough examinations was limited to their formal witness statements and prior sworn testimony and did not include their statements as memorialized in BPD P-73 reports.[383]

356.    Hulnick did not present an argument that Watson or Jerome Boyd committed the Crawford Murder or elicit the circumstances suggesting their involvement.[384]

357.    Hulnick did not impeach the testimony of Watson or Jeffrey when they said that Crawford did not prominently display cash in the Golden Nugget.[385]

---

[378]   *Id.* at 507:4–6.

[379]   *Id.* at 472:11–13.

[380]   *Id.* at 486:13–15.

[381]   *Id.* at 521:18–20.

[382]   *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 100:20–101:4; 168–17 (Henry Dep.) at 131:16–20.

[383]   *Boyd* Dkt. 168-6 (Boyd Trial Tr.) at 370:17–73:6, ECF Pages 560:1–562:22.

[384]   *See generally id.*

[385]   *Id.* at 75:4–77:05, 457:19–458:22.

358.     Hulnick did not impeach the testimony of Detective Dove when he testified that he saw no footprints leading away from the body through Crawford's backyard.[386]

359.     Hulnick did not present argument that the Crawford Murder occurred at 11:30 p.m. or later or impeach Mrs. Crawford's testimony that she heard a noise outside the side of her house about 11 p.m.[387]

360.     Hulnick did not argue that BPD records confirmed that Walker and Woodruff could not have been present for the Crawford Murder because they were in a cab heading home or were already home at the time it occurred.[388]

361.     Hulnick did not impeach Woodruff's testimony using the two January 12, 1976 P-73 reports providing contradictory accounts of Woodruff's confession and contradicting Woodruff's testimony that his signed statement was a verbatim record of his interview.[389]

362.     Hulnick did not use Detectives Guadagno and Delano's February 11, 1976, P-73 reports to impeach the testimony of Hough or Woodruff regarding the detectives' efforts to coordinate their testimony prior to their grand jury appearances.[390]

363.     Hulnick did not impeach Woodruff's testimony with his handwritten statement of February 11, 1976.[391]

364.     Boyd's trial ended in a conviction for murder in the second degree.[392]

---

[386]     *Id.* at 111:01–17:17.

[387]     *See generally id.*; *see also id.* at 349:6–14.

[388]     *See generally id.*

[389]     *Id.* at ECF Pages 570:10–670:12

[390]     *Id.* at 373:13–416:14, 421:09–24:16, 426:01–27:18, ECF Pages 570:10–670:12.

[391]     *Id.* at ECF Pages 570:10–670:12.

[392]     *Id.* at 688:16–90:13.

365.    ADA Henry took over the role of lead trial prosecutor in John Walker and Floyd Martin's cases from ADA Drury, assisted by ADA Verrastro.[393]

366.    ADA Henry testified at his deposition in this case that he did not provide any additional pretrial disclosures to Walker's counsel and assumed ADA Drury had completed pretrial discovery.[394]

367.    On June 6, 1977, the trial of John Walker began. ADAs Henry and Verrastro represented the ECDA.[395]

368.    David Jay represented Walker.[396]

369.    ADA Henry testified at his deposition in this case that his practice was to document when he made disclosures to defendants.[397]

370.    ADA Verrastro testified at his deposition in this case that he had no recollection of disclosing any material during Walker's trial.[398]

371.    During the trial, the ECDA introduced seventeen exhibits, and Walker introduced one.[399]

372.    The ECDA did not introduce any P-73 reports during Walker's trial.[400]

---

[393]    *Boyd* Dkt. 168-17 (Henry Dep.) at 83:1–17.

[394]    *Id.*

[395]    *Boyd* Dkt. 168-7 (Walker I Trial Tr.) at 1:12–17. The Walker trial transcript is divided into two volumes. "Walker I" refers to the first volume, which includes the proceedings of June 6–9, 1977. "Walker II" refers to the second volume, which includes the proceedings of June 10 and 13, 1977.

[396]    *Id.* at 1:16–18.

[397]    *Boyd* Dkt. 168-17 (Henry Dep.) at 113:19–114:5.

[398]    *Boyd* Dkt. 168-18 (Verrastro Dep.) at 31:17–33:6.

[399]    *Boyd* Dkt. 168-7 (Walker I Trial Tr.) at 2:13–21.

[400]    *See generally Boyd* Dkt. 168-7 (Walker Trial Tr.).

373.    The ECDA introduced nine photographs at Walker's trial.[401]

374.    The ECDA called the same witnesses that they called at Boyd's trial, plus Debbie Jeffrey—who had been called by the defense at Boyd's trial—and a jailhouse informant, Joseph Tatar.[402]

375.    The ECDA did not disclose any witness statements beyond those disclosed at Boyd's trial, other than statements of Joseph Tatar.[403]

376.    ADA Henry testified at his deposition in this case that he does not recall disclosing any additional photographs during the Walker trial.[404]

377.    Jay did not call any witnesses.[405]

378.    Jay did not present circumstances supporting or an argument that Watson or Jerome Boyd committed the Crawford Murder.[406]

379.    Jay did not impeach the testimony of Watson regarding his prior statement that he and Crawford's simultaneous departure was a coincidence, which was inconsistent with his trial testimony.[407]

380.    Jay did not question Jeffrey regarding her suspicion that Watson committed the Crawford Murder or attempt to elicit from her circumstances supporting that suspicion.[408]

---

[401]    *Boyd* Dkt. 168-7 (Walker I Trial Tr.) at 2:13–21.

[402]    *Id.* at 2:3–9, (Walker II Trial Tr.) at 69:10–12.

[403]    *See generally Boyd* Dkt. 168-7 (Walker Trial Tr.).

[404]    *Boyd* Dkt. 168-17 (Henry Dep.) at 121:16–122:7.

[405]    *See generally Boyd* Dkt. 168-7 (Walker Trial Tr.).

[406]    *See generally id.*

[407]    *Boyd* Dkt. 168-7 (Walker I Trial Tr.) at 51:14–21, 54:12–61:8.

[408]    *Id.* at 108:21–12:10.

381.    Jay did not argue that BPD records confirmed that Walker and Woodruff could not have been present for the Crawford Murder because they were in a cab heading home or were already home.[409]

382.    Jay did not present evidence or argument that the Crawford Murder occurred at 11:30 p.m. or later.[410]

383.    Jay did not impeach the testimony of Detective Dove when he testified that he saw no footprints leading away from the body through Crawford's backyard.[411]

384.    Jay did not impeach the testimony of Woodruff using the two January 12, 1976 P-73 reports providing contradictory accounts of Woodruff's confession.[412]

385.    Jay did not use Detectives Guadagno and Delano's February 11, 1976 P-73 reports to impeach the testimony of Hough or Woodruff regarding the detectives' efforts to coordinate their testimony prior to their grand jury appearances.[413]

386.    ADA Henry testified at his deposition in this case that he has no recollection of disclosing any discovery to Walker beyond a letter concerning Tatar.[414]

387.    Walker's trial ended in a conviction for murder in the second degree.[415]

---

[409]    *See generally Boyd* Dkt. 168-7 (Walker Trial Tr.).

[410]    *See generally id.*

[411]    *Boyd* Dkt. 168-7 (Walker I Trial Tr.) at 76:22–81:17.

[412]    *Id.* at 115:22–204:4.

[413]    *Id.*

[414]    *Boyd* Dkt. 168-17 (Henry Dep.) at 113:4–114:16.

[415]    *Boyd* Dkt. 168-7 (Walker II Trial Tr.) at 239:9–22.

B.  Evidence Implicating Other Suspects in the Crawford Murder Was Never Turned Over or Was Turned Over Too Late for Defense Counsel to Use It

388.  Watson testified for the ECDA in the Boyd trial.[416]

389.  ADA Drury disclosed Watson's January 7, 1976 sworn statement only after Watson testified that he had signed a formal statement during his direct examination.[417]

390.  Hulnick indicated on the record that he had never seen this document prior to trial.[418]

391.  Watson also testified for the County in the Walker trial.[419]

392.  ADA Henry disclosed Watson's January 7, 1976 statement after Watson testified during his direct examination.[420]

393.  Jay indicated on the record that he had not seen this document prior to trial.[421]

394.  After Detective Dove testified at the Boyd trial, ADA Drury disclosed the January 3, 1976 P-73 report Dove authored, which reported that a set of house keys had been found near Crawford's body.[422]

395.  The same report contained Margaret Crawford's statement that her husband typically rang the bell for her to let him in the house, implying that he did not carry keys on his person.[423]

---

[416]  *Boyd* Dkt. 168-6 (Boyd Trial Tr.) at 61:1–83:7.

[417]  *Id.* at 68:2–71:07.

[418]  *Id.* at 71:4–7.

[419]  *Boyd* Dkt. 168-7 (Walker I Trial Tr.) at 49:2–54:10.

[420]  *Id.* at 55:23–56:10.

[421]  *Id.*

[422]  Sahasrabudhe Decl., Ex. 3A at COE002125–27; *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 204:11–205:14.

[423]  Sahasrabudhe Decl., Ex. 3A at COE002125–27.

396.    The report also contained Julia Watson's initial statement (which she and other witnesses later contradicted) that Crawford had left the bar alone at 9:00 p.m., while she and her husband did not leave until 11:15 p.m.[424]

397.    Hulnick indicated on the record had never seen this document prior to trial.[425]

398.    There is no record that Detective Dove's January 3, 1976 P-73 report was disclosed to Walker.[426]

399.    There is no record that the January 3, 1976 P-73 report authored by Detective Grabowski recording statements from witnesses at the Golden Nugget was disclosed to either Boyd or Walker.[427] There is no exhibit marking on this document.[428]

400.    This single undisclosed document revealed that:

   a.    Crawford had been openly displaying large quantities of cash against the advice of Jeffrey;

   b.    Crawford's money was easily visible to Watson;

   c.    Watson was sitting with Crawford, who was buying drinks for Watson and his wife;

   d.     Watson offered to walk Crawford home;

   e.    Kalb, Watson, and Neubecker placed Crawford's departure from the bar at or after 11:30 p.m.;

---

[424]    *Id.*

[425]    *Boyd* Dkt. 168-6 (Boyd Trial Tr.) at 71:4–7.

[426]    *Boyd* Dkt. 168-17 (Henry Dep.) at 183:5–184:3.

[427]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 219:11–220:7.

[428]    Sahasrabudhe Decl., Ex. 3A at COE002131–34.

f.   Watson contradicted both Kalb and Jeffrey by describing his departure with Crawford as coincidental, while they stated that Watson offered to walk Crawford home;

g.   Watson returned after leaving with Crawford and rushed his wife out of the bar with uncharacteristic speed;

h.   Julia Watson called the bar to report that Watson was missing his keys, and Howard, her stepson, told her that they were in Watson's coat pocket; and

i.   Jeffrey believed Watson had harmed Crawford.[429]

401.   ADA Drury testified that he believed Jeffrey's suspicions regarding Watson constituted *Brady* material, but he had no record or recollection of disclosing this report to Boyd or Walker.[430]

402.   ADA Henry testified on behalf of the County that Jeffrey's suspicions did not constitute *Brady* material, and no policy of the ECDA required disclosure of this material.[431]

403.   There is no record that the January 6, 1976 sworn witness statement from Frances Kalb was disclosed to either Boyd or Walker.[432] There is no exhibit marking on this document.[433]

404.   In her January 6, 1976 sworn witness statement, Kalb stated that she observed Crawford displaying large quantities of cash, that Watson volunteered to walk Crawford home,

---

[429]   *Id.*

[430]   *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 410:9–412:14.

[431]   *Boyd* Dkt. 168-17 (Henry Dep.) at 368:10–371:7.

[432]   *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 220:23–221:12.

[433]   Sahasrabudhe Decl., Ex. 3A at COE002147–48.

that the two men left after 11:00 p.m., and that Watson returned 20 minutes later to collect his wife and leave in a hurry.[434]

405.    There is no record that the January 6, 1976 P-73 report authored by Detective Grabowski recording a statement from Margaret Crawford that Crawford regularly used the side door of the house, and that she heard a thump on the side of the house at 11:30 p.m. was disclosed to either Boyd or Walker.[435] There is no exhibit marking on this document.[436]

406.    There is no record that the January 7, 1976 sworn witness statement of Julia Watson, in which she again contradicted other witnesses by stating that she did not see Crawford displaying cash in the Golden Nugget, was disclosed to either Boyd or Walker.[437] There is no exhibit marking on this document.[438]

407.    There is no record that the January 12, 1976 P-73 report authored by Detective Pantano, in which Jeffrey contradicted the Watsons' accounts that they did not see Crawford displaying cash and again stated that the two left abnormally quickly upon Watson's return to the bar, was disclosed to either Boyd or Walker.[439] There is no exhibit marking on this document.[440]

408.    McLeod testified at his deposition in this case that the ECDA did not disclose the P-73 reports and sworn witness statements referenced in ¶¶ 399–407, *supra*, pointing to Watson's involvement in the Crawford Murder, to him at any point during the prosecution of Martin.[441]

---

[434]    *Id.*

[435]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 218:23–219:10.

[436]    Sahasrabudhe Decl., Ex. 3A at COE002146.

[437]    *Id.* at COE002158–59.

[438]    *Id.*

[439]    *Boyd* Dkt. 168-14 (Drury Dep.) at 220:15–22.

[440]    Sahasrabudhe Decl., Ex. 3A at COE002183–84.

[441]    *Boyd* Dkt. 168-21 (McLeod Dep.) at 325:21–32:22, 353:06–58:22.

409.    There is no record that the crime scene photograph showing footprints leading away from Crawford's body through his backyard and towards Watson's home was disclosed to either Boyd or Walker.[442]

410.    ADA Drury testified at his deposition in this case that there were more photos in the BPD records than he disclosed at the trials of Gibson and Boyd.[443]

411.    Zeidman opined that reasonably skilled defense counsel would have used the P-73 reports, sworn witness statements, and photographs referenced in ¶¶ 388–407, *supra*, to convince a jury that Watson was a more likely perpetrator of the Crawford Murder than Boyd or Walker, or at least to instill reasonable doubt.[444]

412.    There is no record that the January 3, 1976 P-73 report authored by Detective Grabowski, in which he reported receiving an anonymous call identifying the perpetrators of the Crawford Murder as Andre Howe and Gerry Boyd, was disclosed to either Boyd or Walker.[445] There is no exhibit marking on this document.[446]

413.    There is no record that Jerome Boyd's mugshot and arrest record were disclosed to either Boyd or Walker.[447] There are no exhibit markings on these documents.[448]

414.    There is no record that the January 6, 1976 P-73 report authored by Detectives Dove, Pantano, and Delano, in which they reported that several employees of the Golden Nugget

---

[442]    *See generally Boyd* Dkt. 168-6 (Boyd Trial Tr.); *Boyd* Dkt. 168-7 (Walker I Trial Tr.).

[443]    *Boyd* Dkt. 168-14 (Drury Dep.) at 157:10–58:01.

[444]    *Boyd* Dkt. 168-23 (Zeidman Report) at 18–28, 31–32.

[445]    *Boyd* Dkt. 168-14 (Drury Dep.) at 222:9–16.

[446]    Sahasrabudhe Decl., Ex. 3A at COE002135.

[447]    *Boyd* Dkt. 168-14 (Drury Dep.) at 222:17–123:7.

[448]    Sahasrabudhe Decl., Ex. 3A at COE002136.

saw Jerome Boyd present in the bar on the night of the Crawford Murder, was disclosed to either Boyd or Walker.[449] There is no exhibit marking on this document.[450]

415.    The undisclosed January 6, 1976 sworn witness statement of Kalb, referenced in ¶ 404, *supra*, confirmed that Jerome Boyd was present in the Golden Nugget on the night of the Crawford Murder.[451] There is no record this report was disclosed to counsel either for Darryl Boyd or Walker.[452]

416.    Watson's January 7, 1976 sworn witness statement, referenced in ¶ 389, *supra*, in which he stated that that a dark-skinned individual in his 30s with kinky hair followed him out of the Golden Nugget when he left with Crawford, was only turned over to Boyd and Walker on the completion of his direct testimony at their respective trials (but without any of the other evidence identifying Jerome Boyd as that individual or linking him to the homicide).[453]

417.    Zeidman opined that reasonably skilled defense counsel would have used the P-73 reports and sworn witness statements referenced in ¶¶ 412–16, *supra*, to convince a jury that Jerome Boyd, either alone or in cooperation with Watson, was a more likely perpetrator of the Crawford Murder than Darryl Boyd or Walker, or at least to instill reasonable doubt.[454]

---

[449]    *Boyd* Dkt. 168-14 (Drury Dep.) at 218:23–219:10.

[450]    Sahasrabudhe Decl., Ex. 3A at COE002140.

[451]    *Id.* at COE002147–48.

[452]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 220:25–221:12.

[453]    *Id.* at COE002160–61.

[454]    *Boyd* Dkt. 168-23 (Zeidman Report) at 18–28, 31–32.

418.     ADA Drury testified at his deposition in this case that, as late as the presentation of evidence to the grand jury, he suspected Watson and Jerome Boyd of involvement in the Crawford Murder.[455]

419.     McLeod testified at his deposition in this case that ADA Drury never informed him or disclosed material about his suspicions during McLeod's representation of Martin.[456]

420.     ADA Drury acknowledged that the P-73 reports pointing to Jerome Boyd's presence in the Golden Nugget and involvement in the Crawford Murder constituted *Brady* material, but he had no record of disclosing them.[457]

421.     ADA Drury testified that his decisions during the prosecutions of Boyd and Walker about what materials to disclose to the defense were made consistently with the policies and practices of the ECDA.[458]

422.     McLeod testified at his deposition in this case that the ECDA did not disclose the P-73 reports and sworn witness statements referenced in ¶¶ 412–16, *supra*, pointing to Jerome Boyd's involvement in the Crawford Murder, to him at any point during the prosecution of Martin.[459]

423.     ADA Henry testified on behalf of the County that the material concerning Jerome Boyd was not *Brady* material, and nondisclosure was consistent with the ECDA's policies and practices.[460]

---

[455]    *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 402:15–403:03, 409:18–410:07.

[456]    *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 356:11–14.

[457]    *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 411:09–412:07.

[458]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 57:2–15.

[459]    *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 348:16–354:15.

[460]    *Boyd* Dkt. 168-17 (Henry Dep.) at 360:15–361:10.

C.     Evidence Corroborating Their Alibi Was Not Disclosed to Boyd and Walker

424.     There is no record that the January 8, 1976 P-73 report authored by Detective Guadagno, in which the Fillmore Cab Company stated that two cabs were dispatched to the Glenny Apartments on January 2, 1976, the first at 11:28 p.m. and the second at 11:44 p.m., was disclosed to either Boyd or Walker.[461] There is no exhibit marking on this document.[462]

425.     There is no record that the P-73 reports and sworn witness statements referenced in ¶¶ 133–40, *supra*, establishing the time of the Crawford Murder as 11:30 p.m. or later, were disclosed to either Boyd or Walker.

426.     McLeod testified at his deposition in this case that the ECDA did not disclose the P-73 reports and sworn witness statements referenced in ¶¶ 133–40, *supra*, concerning the time of the Crawford Murder, and the P-73 report referenced in ¶ 424, *supra*, concerning the Fillmore Cab Company's records, to him at any point during the prosecution of Martin.[463]

427.     ADA Drury agreed at his deposition in this case that if Woodruff and Walker were in a cab at 11:28 p.m., before or at the same time as Crawford left the Golden Nugget, then they could not have committed the crime, and Woodruff could not have witnessed it.[464]

428.     ADA Drury testified at his deposition in this case that, under *Brady*, he should have disclosed the P-73 reports and sworn witness statements referenced in ¶¶ 424–25, *supra*, concerning the time of the Crawford Murder and the Fillmore Cab Company records.[465]

---

[461]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 216:23–217:11; 168-15 (Drury Dep. Day II) at 346:7–347:9; 168-17 (Henry Dep.) at 201:9–205:17.

[462]     Sahasrabudhe Decl., Ex. 3A at COE002173–74.

[463]     *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 332:16–335:13.

[464]     *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 343:15–344:5.

[465]     *Id.* at 346:7–347:9.

429.   He acknowledged that he should have done so early in the prosecution of Gibson, Boyd, Walker, and Martin so that defense counsel would have had the opportunity to investigate while memories were fresh.[466]

430.   ADA Henry testified at his deposition on behalf of the County in this case that the P-73 reports and sworn witness statements referenced in ¶¶ 424–25, *supra*, concerning the time of the Crawford Murder and the Fillmore Cab Company records, were not *Brady* material, and nondisclosure was consistent with the ECDA's policies and practices.[467]

431.   Zeidman opined that reasonably skilled defense counsel would have used the Fillmore Cab Company report, along with the statements of witnesses that Crawford did not leave the bar until 11:30 p.m. or later, to present a compelling alibi and demonstrate that Woodruff was not present when he said he witnessed the murder.[468]

432.   McLeod agreed that if he had received these materials in the Martin prosecution, he would have used them to discredit the prosecution's theory of the case and support his argument that Martin and the other boys were not the perpetrators.[469]

---

[466]   *Id.* at 346:14–18.

[467]   *Boyd* Dkt. 168-17 (Henry Dep.) at 353:10–355:11.

[468]   *Boyd* Dkt. 168-23 (Zeidman Report) at 18–28, 31–32.

[469]   *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 395:20–397:4.

D.   Evidence Challenging Hough and Woodruff's Credibility Was Not Disclosed to Boyd and Walker

433.   There is no record that the January 12, 1976 P-73 reports authored by Detectives Manista and Arnet, describing the circumstances of Woodruff's confession, were disclosed to either Boyd or Walker.[470] There are no exhibit marking on these documents.[471]

434.   McLeod testified at his deposition in this case that the ECDA did not disclose the P-73 reports referenced in ¶¶ 188–204 and 433, *supra*, describing the circumstances of Woodruff's confession, to him at any point during the prosecution of Martin.[472]

435.   ADAs Drury and Henry testified at their depositions in this case that the P-73 reports referenced in ¶¶ 188–204 and 433, *supra*, were not *Brady* material, and nondisclosure was consistent with the ECDA's policies and practices.[473]

436.   ADA Drury acknowledged at his deposition in this case that Woodruff's prior statements recorded in the P-73 reports were required to be disclosed pursuant to *Rosario*.[474]

437.   ADA Henry, testifying on behalf of the County, said that in 1977, the ECDA did not consider prior witness statements recorded in P-73 reports rather than sworn witness statements to require disclosure pursuant to *Rosario*.[475]

438.   There is no record that the circumstances of Woodruff's confession—namely, that he was detained for questioning without probable cause, that neither of his parents or his minister

---

[470]   Sahasrabudhe Decl., Ex. 3B at COE002197–99, 2202; *Boyd* Dkt. 168-17 (Henry Dep.) at 312:03–313:10.

[471]   Sahasrabudhe Decl., Ex. 3A at COE002173–74.

[472]   *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 342:11–347:14.

[473]   *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 290:6–17, 301:11–305:19; 168-17 (Henry Dep.) at 310:18–312:13.

[474]   *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 286:20–90:17.

[475]   *Boyd* Dkt. 168-17 (Henry Dep.) at 195:13–196:3.

were present, that he was told he was under arrest for murder, told he would go to prison for life, confronted with an anonymous caller allegedly implicating him in the crime, told one of the other boys was ready to cooperate if he did not, repeatedly denied his involvement, was crying, was promised complete immunity from prosecution if he cooperated, and then was fed details of the crime by the police—were disclosed to either Boyd or Walker.[476]

439.    McLeod confirmed at his deposition in this case that the ECDA did not disclose the circumstances of Woodruff's confession referenced in ¶¶ 205–15, *supra*, to him at any point during the prosecution of Martin.[477]

440.    Zeidman opined that reasonably skilled defense counsel would have used the circumstances of Woodruff's confession referenced in ¶¶ 205–15, *supra*, to show the jury that Woodruff's testimony was the product of coercion and to cast doubt on the integrity of the BPD's investigation.[478]

441.    There is no record that the January 8, 1976 P-73 report authored by Detective Guadagno, reflecting the circumstances of Hough's initial statement to the BPD, was disclosed to either Boyd or Walker.[479] There is no exhibit marking on this document.[480]

---

[476]    *Boyd* Dkt. 168-8 (Preliminary Hrng. Tr.) at 51:10–53:3; 168–14 (Drury Dep. Day I) at 264:6–266:9; Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 81:13–82:22, 124:1–127:18, 134:25–136:7, 148:25–151:14, 156:3–23, 164:18–166:7; *Boyd* Dkt. 168-6 (Boyd Trial Tr.) at ECF Pages 603:19–605:20.

[477]    *Boyd* Dkt. 168-21 (McLeod Dep.) at 341:5–342:10.

[478]    *Boyd* Dkt. 168-23 (Zeidman Report) at 18–28, 31–32.

[479]    Sahasrabudhe Decl., Ex. 3A at COE002165; *see generally Boyd* Dkt. 168-6 (Boyd Trial Tr.); *Boyd* Dkt. 168-7 (Walker I Trial Tr.).

[480]    Sahasrabudhe Decl., Ex. 3A at COE002165.

442.    There is no record that a report of Hough's initial polygraph examination, in which Hough denied knowledge of the Crawford Murder and was informed that he passed, was disclosed to either Boyd or Walker.[481]

443.    There is no record that Hough's refusal to take a second polygraph after changing his story to implicate Gibson, Boyd, Walker, and Martin in the Crawford Murder was disclosed to either Boyd or Walker.[482]

444.    McLeod testified at his deposition in this case that the ECDA did not disclose Hough's refusal to take a second polygraph examination after he changed his story to implicate Gibson, Boyd, Walker, and Martin in the Crawford Murder to him at any point during the prosecution of Martin.[483]

445.    There is no record that the circumstances of Hough's changed testimony—namely, that he was detained for questioning without a parent present, told he would be charged with the Crawford Murder if he did not cooperate, and offered release in exchange for testimony implicating Boyd and Walker—were disclosed to either Boyd or Walker.[484]

446.    Zeidman opined that reasonably skilled defense counsel would have used Hough's changing testimony, his refusal to take a second polygraph examination, and the circumstances that led to his changed testimony to discredit Hough's testimony at the Boyd and Walker trials.[485]

447.    There is no record that the February 11, 1976 P-73 reports authored by Detectives Delano and Guadagno describing Hough's attempt to recant, Hough's changed testimony, and the

---

[481]    *See generally Boyd* Dkt. 168-6 (Boyd Trial Tr.); *Boyd* Dkt. 168-7 (Walker I Trial Tr.).

[482]    *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 366:1–369:18

[483]    *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 366:23–367:6.

[484]    *See generally Boyd* Dkt. 168-6 (Boyd Trial Tr.); *Boyd* Dkt. 168-7 (Walker I Trial Tr.).

[485]    *Boyd* Dkt. 168-23 (Zeidman Report) at 18–28, 31–32.

pressure on Woodruff to change his testimony to conform to Hough's immediately prior to their grand jury testimony were disclosed to either Boyd or Walker.[486]

448.    There is no record that ADA Drury's February 11, 1976 threat to prosecute Hough for perjury was disclosed to either Boyd or Walker.[487]

449.    There is no record that the February 11, 1976 handwritten statement prepared for and signed by Woodruff and containing a revised confession was disclosed to either Boyd or Walker.[488]

450.    McLeod testified at his deposition in this case that the ECDA did not disclose the P-73 reports and Woodruff's handwritten statement referenced in ¶¶ 447–49, *supra*, concerning the circumstances leading to Hough and Woodruff's revised testimony before the grand jury, to him at any point during the prosecution of Martin.[489]

451.    ADA Drury acknowledged at his deposition in this case that Hough's recantation constituted *Brady* material.[490]

452.    He also acknowledged that the P-73 report in which Detective Delano confronted Woodruff with Hough's revised account of the Crawford Murder and convinced Woodruff to conform his testimony constituted *Brady* material.[491]

---

[486]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 215:6–216:12; 168-17 (Henry Dep.) at 174:10–179:18.

[487]    *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 383:11–16, 388:15–19.

[488]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 216:13–22; 168-17 (Henry Dep.) at 180:18–181:5.

[489]    *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 257:14–275:19, 358:12–361:9.

[490]    *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 381:22–383:10.

[491]    *Id.* at 394:21–395:3.

453.     ADA Henry, testifying on behalf of the County, denied that either Hough's recantation or the detectives' effort to coordinate Hough and Woodruff's stories constituted *Brady* material, and said nondisclosure was consistent with his understanding of *Brady*.[492]

454.     There is no record that the January 15, 1976 P-73 report authored by Detective Montondo, in which he reported that employees of Simpson's Delicatessen had no recollection of seeing Boyd on January 3, 1976, was disclosed to either Boyd or Walker.[493] There is no exhibit marking on this document.[494]

455.     ADA Drury acknowledged at his deposition in this case that the January 15, 1976 P-73 report concerning Simpson's Delicatessen employees not seeing Boyd on January 3, 1976 constituted *Brady* material.[495]

456.     Lieutenant James P. Riley authored the first P-73 report regarding the Crawford Murder on January 3, 1976, but this report's stamp states it was "received" by the *Homicide Squad*, not by any court.[496]

457.     Zeidman opined that that a reasonably skilled defense attorney would have used the P-73 reports and the handwritten witness statement referenced in ¶¶ 447–49, *supra*, to discredit the testimony of Hough and Woodruff, in the Boyd and Walker trials and Detective Guadagno in Boyd's trial, or at least to instill reasonable doubt.[497]

---

[492]    *Boyd* Dkt. 168-17 (Henry Dep.) at 316:19–317:4.

[493]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 221:22–222:8; 168-17 (Henry Dep.) at 206:2–208:6.

[494]    Sahasrabudhe Decl., Ex. 3B at COE002215.

[495]    *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 372:8–373:9.

[496]    Sahasrabudhe Decl., Ex. 3A at COE002124.

[497]    *Boyd* Dkt. 168-23 (Zeidman Report) 18–28, 31–32.

III.  **ECDA Prosecutors Conducted Improper Summations In The Boyd And Walker Trials.**

      A.  <u>ADA Drury's Summation at Boyd's Trial Deprived Boyd of His Right to a Fair Trial</u>

458.  Summation is a critical phase in a criminal trial, and one where the prosecutor may be most tempted to engage in "gamesmanship and winning at all costs."[498]

459.  On April 29, 1977, Hulnick and ADA Drury presented summations in the Boyd trial.[499]

460.  In his summation for the defense, Hulnick challenged Woodruff's testimony, stating "I submit to you [Woodruff's testimony] was not just a recollection. I submit to you that as the information came in and was processed and the story started to congeal somewhat then and only then did Woodruff start to change his story. Not a process of remembering, a process of indoctrination."[500]

461.  ADA Drury interrupted Hulnick's summation to object to this statement, describing these comments as "wild allegations" for which there was "no proof."[501]

462.  ADA Drury denied at his deposition in this case that this objection was improper in light of the undisclosed evidence showing the circumstances that led to Woodruff's evolving testimony.[502]

---

[498]  Professor Zeidman expounds on the case law warning prosecutors against improper summations and the specific prohibitions in his report. *Id.* at 8–9 (citing cases).

[499]  *Boyd* Dkt. 168-6 (Boyd Trial Tr.) at 571:4–636:5

[500]  *Id.* at 588:16–22.

[501]  *Id.* at 588:23–589:05.

[502]  *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 400:11–14.

463.     During his summation, ADA Drury referred to Woodruff as a "poor product of his environment," a "ghetto kid," a "blithering idiot," a "snook," an "idiot," a "nitwit," and "[h]apless, stupid."[503]

464.      ADA Drury referred to the Glenny Apartments—where Boyd and his co-defendants spent time—as "a junkyard."[504]

465.     ADA Drury said that Woodruff was "as bad as the rest of them."[505]

466.     ADA Drury also vouched for Woodruff's veracity, stating, "I submit to you still he is telling the truth."[506]

467.     At his deposition in this case, ADA Drury testified that he denigrated Woodruff as a means of enhancing his credibility.[507]

468.     During summation, ADA Drury stated that Woodruff's testimony became truthful once he had a lawyer: "[Woodruff became] a little bit more forthcoming, he got himself a lawyer. A lawyer told him to tell the truth and eventually he did."[508]

469.     ADA Drury sarcastically said of the idea that Boyd would be scared while he was being interrogated by the BPD without his parents present: "The poor kid is confused, the poor kid is only 16. He is in there without his mommy and daddy."[509]

---

[503]    *Boyd* Dkt. 168-6 (Boyd Trial Tr.) at 607:2–4, 614:3–5, 623:7–9.

[504]    *Id.* at 634:17–18.

[505]    *Id.* at 634:8–9.

[506]    *Id.* at 624:22–23.

[507]    *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 426:1–427:25.

[508]    *Boyd* Dkt. 168-6 (Boyd Trial Tr.) at 613:21–614:1.

[509]    *Id.* at 612:1–3.

470.    ADA Drury also employed sarcasm to critique the testimony of defense witnesses Dorothea Luster, Joyce Washington, and Alison Zachery and suggested that the jury could treat their testimony as "worthless."[510]

471.    ADA Drury also vouched for his own credibility regarding why only one BPD officer testified: "Is two policemen better than one? I put one on, I thought it was sufficient." [511]

472.    ADA Drury also vouched for the police investigation, ""You got what you have. The police turned over everything to you."[512]

473.    ADA Drury attempted to invoke sympathy for the victim as a reason to convict: "If you tend toward sympathy, you know what happened to that man, you know his family circumstances."[513]

474.    ADA Drury also shifted the burden of proof to the accused, stating: "[Y]ou see what Darryl [Boyd] has to offer. Zilch."[514]

475.    ADA Drury ended his summation by again vouching for Woodruff and contradicting the undisclosed evidence: "I would just say this to you, I would absolutely reject, if I were to make this argument to you, any suggestion, any beliefs of the police or our office or myself had anything to do with changing Tyrone's testimony or making it fit in any pattern[.]"[515]

---

[510]    *Id.* at 621:9–623:4.

[511]    *Id.* at 608:16–19.

[512]    *Id.* at 634:18–20.

[513]    *Id.* at 612:3–6.

[514]    *Id.* at 626:18–19.

[515]    *Id.* at 635:15–21.

476.     Zeidman opined that ADA Drury's summation was outside the bounds of appropriate summation conduct, and it was doubly improper considering the undisclosed evidence supporting the defense's theory regarding Woodruff's changed testimony.[516]

477.     Zeidman further opined that terms such as "ghetto kid" and "junkyard" improperly exploited racial divisions between the teenaged, Black alleged perpetrators and the white victims and juries.[517]

B. <u>ADA Henry's Summation at Walker's Trial Deprived Walker of His Right to a Fair Trial</u>

478.     On June 13, 1977, Jay and ADA Henry presented summations in the Walker trial.[518]

479.     In his summation for the prosecution, ADA Henry stated that Hough supplied the necessary corroboration for Woodruff, stating: "Andre gives you all five of them together, the planning, in a sense, sixteen year old black kids plan."[519]

480.     ADA Henry argued that neither Woodruff nor Hough had a motive to lie and did not disclose the prior threats of prosecution or promises of immunity made to them.[520]

481.     ADA Henry vouched for Hough, telling the jury that "[h]is testimony is the same" and that he related it "without any mistake," without disclosing that Hough had recanted.[521]

482.     ADA Henry asked the jury to credit Woodruff and Hough's testimony because they corroborated each other without having "gotten together" to conform their stories, without

---

[516]     *Boyd* Dkt. 168-23 (Zeidman Report).

[517]     *Id.*

[518]     *Boyd* Dkt. 168-7 (Walker II Trial Tr.) at 103:3–154:10.

[519]     *Id.* at 136:13–19.

[520]     *Id.* at 135:4–7, 143:10–145:14.

[521]     *Id.* at 134:4–10.

disclosing the evidence showing the BPD working to conform Woodruff and Hough's statements.[522]

483.    ADA Henry asked the jury to credit Watson by indicting that he lacked any motive to lie, without disclosing the evidence pointing to Watson as a possible perpetrator of the Crawford Murder.[523]

484.    ADA Henry repeatedly emphasized the brutality of the assault, making references to "blood spattered, splashed up on the house," "two puddles of blood," "blood … just absolutely splattered all over," and "blood spattering on the walls."[524]

485.    In his conclusion, ADA Henry returned to this theme, referring to Gibson "flaying away on the man's head, and the blood splattering on the walls, and running out on the sidewalk" and telling the jury that "[o]ne of the worst things probably about this homicide, the puddles of blood, blood on the walls." This inaccurate description of the crime prompted Jay to object, but his objection was overruled.[525]

486.    Zeidman opined that ADA Henry's summation was outside the bounds of appropriate summation conduct as it was inflammatory, improperly drew attention to racial divisions through the use of the phrase "black kids plan," and improperly vouched for the testimony of prosecution witnesses.[526]

---

[522]    *Id.* at 147:19–148:6.

[523]    *Id.* at 132:14–133:18.

[524]    *Id.* at 130:14–131:11, 146:3–5, 152:22–153:7.

[525]    *Id.* at 153:6–13. Gagan acknowledged defense attorneys often do not object to summation misconduct for fear that they will appear obstructive or call extra attention to the improper remark. *See Boyd* Dkt. 169-1 (Gagan Dep.) at 446:24–447:12.

[526]    *Boyd* Dkt. 168-23 (Zeidman Report) at 32–33.

487.    Zeidman also noted that ADA Henry presented facts to the jury inconsistent with the evidence, including the consistency of Hough's statements; the motives of Watson, Hough, and Woodruff to lie; the ability of the prosecution and the BPD to coordinate Hough and Woodruff's statements; and the location of the blood.[527]

## IV.    Floyd Martin Was Acquitted Because His Attorney Relied on Evidence Not Disclosed to Boyd and Walker

### A.   Only Martin Had Crime Scene Photographs Discrediting Woodruff and Pointing to An Alternative Suspect

488.    Floyd Martin was the last of the four boys to face trial.[528]

489.    Jury selection opened on July 6, 1977.[529]

490.    On July 14, 1976, Martin was acquitted.[530]

491.    McLeod represented Martin, and ADA Henry represented the People.[531]

492.    No transcript of the Martin trial was preserved.[532]

493.    In advance of trial, McLeod included in his omnibus discovery motion a specific request for photographs.[533]

494.    Jay and Hulnick did not specifically request photographs in their discovery motions.[534]

---

[527]    *Id.*

[528]    *Boyd* Dkt. 168-3 at COE009455–62 (Martin Trial Clerk's Notes).

[529]    *Id.*

[530]    *Id.*

[531]    *Id.*

[532]    Sahasrabudhe Decl., Ex. 6 (2021 440 Decision) at 3–4.

[533]    Ex. 13 (Martin Omnibus Motion) at COE002404.

[534]    Sahasrabudhe Decl., Ex. 6 (2021 440 Decision) at 4–5.

495.    McLeod testified at a hearing in 2021 and at his deposition in this case that he based his successful theory of defense on photographs that he received in discovery, one of which depicted a single set of footprints leading away from Crawford's body through the backyard of Crawford's house in the direction of Watson's house and another which clearly showed the absence of dragging marks in the driveway.[535]

496.    McLeod testified that a BPD officer at Martin's trial testified that the footprints were made by a single, heavyset man, which did not match the description of any of the five boys.[536]

497.    McLeod also testified at the 2021 hearing that he received a photograph that clearly showed there was no dragging of Crawford's body as indicated by Woodruff's testimony.[537]

498.    McLeod represented Boyd after his conviction at the sentencing stage.[538]

499.    At that proceeding, McLeod was unaware that the crime scene photographs he had relied on in his defense of Martin had not been disclosed to Boyd.[539]

500.    McLeod testified that he first learned that the crime scene photographs had not been disclosed to Boyd and Walker around 2005, when he spoke at a dinner in support of Walker's exoneration efforts.[540]

---

[535]    *Boyd* Dkt. 168-20 (McLeod Dep. Day I) at 19:1–24:13; 168-3 at COE003891–914 (440 Hrng. Tr. at 4:20–27:10).

[536]    *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 224:9–228:16; 168-3 at COE003898-99 (440 Hrng. Tr. at 11:12–12:16).

[537]    Sahasrabudhe Decl., Ex. 6 (2021 440 Decision) at 5; *Boyd* Dkt. 168-3 at COE003897-98 (440 Hrng. Tr. at 10:24–11:11).

[538]    *Boyd* Dkt. 168-2 at COE001726-45 (Boyd Sentencing Tr. at 1:19–20:6).

[539]    *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 228:19–234:21.

[540]    *Id.* at 236:4–239:17.

501.    At the sentencing, McLeod argued to the judge, based on his experience at Martin's trial, that the physical evidence was inconsistent with the prosecution's theory of the case and supported a theory that only one individual was responsible for the Crawford Murder.[541]

        **B.   ADA Henry's Trial Notes Confirmed McLeod's Testimony.**

502.    ADA Henry retained his notes from the Martin trial.[542]

503.    These notes contain the notation "Convict the heavyset man," corroborating McLeod's recollection as to the nature of his defense.[543]

## V.    Boyd and Walker Spent Decades in Prison and Under Parole Supervision Due to Their Wrongful Convictions

504.    Boyd served 20 years in prison after his conviction.[544]

505.    His parole was violated on four occasions for technical violations, with each resulting in an additional two years of imprisonment.[545]

506.    Boyd remained subject to parole supervision, including a 9 p.m. curfew, until his conviction was vacated in 2021.

507.    Walker, while still technically imprisoned, was granted work release in 1992, then was returned to prison despite an excellent work record over four and a half years, because of a change in policy concerning release of convicted murderers.[546]

---

[541]    *Id.* at 228:19–234:21.

[542]    Ex. 2 (ADA Henry: Martin Trial Notes).

[543]    *Id.*

[544]    *Boyd* Dkt. 168-13 (Boyd Dep.) at 482:6–23.

[545]    *Id.*

[546]    Sahasrabudhe Decl., Ex. 14A (Walker Dep. Day I) at 227:7–228:10.

508.   Walker was restored to parole in 1998 and remained under intense supervision until his parole was terminated in 2015.[547]

## VI.   Post-Trial Developments Revealed Errors in Boyd and Walker's Convictions

### A.   <u>Hough Recanted and Stated That His Inculpatory Statements Were The Result of Coercion</u>

509.   On June 29, 1977, in a handwritten statement, Hough recanted his statement that Boyd had confessed involvement in the Crawford Murder to him and described that statement as a product of BPD coercion, including threats to charge him for the murder.[548]

510.   On July 11, 1977, Hough again denied that Boyd confessed to him. Hough stated that he made up the story after pressure from law enforcement.[549]

511.   On October 1, 1982, Hough provided a sworn statement in support of Boyd's motion for a new trial. Hough stated that Boyd never admitted to him any involvement in the Crawford Murder, and he only implicated Boyd due to police pressure.[550]

512.   Andre Hough passed away in 1989.[551]

### B.   <u>Woodruff Recanted and Stated That His Confessions Were the Result of Coercion</u>

513.   On November 1, 1985, Woodruff recanted his confession under oath and stated that the confession was a result of the BPD's threats to prosecute him for murder.[552]

---

[547]   Sahasrabudhe Decl., Ex. 14B (Walker Dep. Day II) at 362:2–6, 379:3–18.

[548]   Ex. 15 (June 29, 1977 Hough Statement).

[549]   Ex. 16 (July 11, 1977 Martin Hrng. Tr.).

[550]   Ex. 17 (Oct. 1, 1982 Hough Affidavit).

[551]   *See* Ex. 7 (Hirsch Report) at 17 n.23.

[552]   Ex. 18 (Nov. 1, 1985 Woodruff Recantation).

514.     On April 6, 2010, Woodruff again stated under oath that his confession was false and resulted from police coercion.[553]

515.     On January 25, 2024, Woodruff testified at his deposition in this case that he had falsely confessed and that he had spent the last almost forty years telling anyone who asked that Gibson, Boyd, Walker, and Martin were not involved in the Crawford Murder.[554]

### C.   Boyd and Walker's Convictions Were Overturned

516.     On August 18, 2021, after an evidentiary hearing at which McLeod, ADA Henry, and ADA Drury testified, Justice Christopher Burns of the New York Supreme Court, Erie County vacated Boyd and Walker's convictions based on the undisclosed crime scene photographs that led to Martin's acquittal, crediting McLeod's testimony that he had received the photographs, relying in part on Henry's notation.[555]

517.     Justice Burns wrote that Boyd and Walker's pre-trial discovery demands required disclosure of the photograph, and the evidence did not show that the photograph was disclosed to Boyd and Walker.[556]

518.     BPD Commissioner Byron Lockwood publicly indicated his belief in Walker's innocence in July 2021.[557]

519.     After the vacatur, then-Erie County District Attorney John Flynn stated that the prosecution's case was "weak," even at the time of the original convictions.[558]

---

[553]     Ex. 19 (Apr. 6, 2010 Woodruff Recantation).

[554]     Sahasrabudhe Decl., Ex. 9 (Woodruff Dep.) at 182:14–184:25.

[555]     Sahasrabudhe Decl., Ex. 6 (2021 440 Decision) at 5–8.

[556]     *Id.*

[557]     Ex. 20 (Interview of Byron Lockwood).

[558]     Ex. 21 (Aug. 18, 2021 Press Conference of John Flynn) at 19:35.

520.    On September 23, 2021, the County declined to pursue an appeal or a new trial and dismissed all charges against Boyd and Walker.[559]

521.    Upon the dismissal of the charges, on October 5, 2021, the Buffalo Common Council issued a unanimous proclamation that Darryn Gibson, Darryl Boyd, John Walker, Jr., Floyd Martin, and Tyrone Woodruff, "were profiled, wrongly blamed, falsely accused, and then indicted, prosecuted, and convicted, for a brutal robbery and murder that they did not commit."[560]

522.    The Common Council "proclaim[ed] jubilation upon the exoneration of the Buffalo Five[.]"[561]

## VII.    The City Had an Unlawful Custom or Practice of Using Coercive Interrogation Tactics Against Suspects and Witnesses

### A.    The 1961 Temporary Commission of Investigation of the State of New York Report Criticized the BPD's Culture of Corruption

523.    In January 1961, the Temporary Commission of Investigation of the State of New York ("Commission") issued a report finding corruption, inefficacy, and an absence of supervision, discipline, and training in the BPD.[562]

524.    The Commission was established in 1958 to "keep the public informed as to ... problems of criminal law enforcement in the state."[563]

---

[559]    Ex. 22 (Sept. 23, 2021 Tr.).

[560]    Ex. 23 (Common Council Proclamations).

[561]    *Id.*

[562]    Ex. 24 (1961 NYS Commission of Investigation on BPD Report).

[563]    N.Y. Unconsol. Law § 7502 (10).

525.    The Commission had a broad mandate to conduct investigations concerning the possible misconduct of public officers, and possible breaches of the "faithful execution and effective enforcement of the laws of the state."[564]

526.    It was vested by state law with the authority to investigate the internal management or affairs of police departments[565]

527.    The Commission was composed of six members and was bipartisan.[566]

528.    The Commission's staff included numerous counsel and investigators (including former FBI agents), and some of the latter went undercover to investigate the BPD's operations.[567]

529.    The Commission reviewed tens of thousands of documents and examined 267 witnesses under oath at private hearings, including close to 200 police officers.[568]

530.    In 1960, the Commission held a six-day public hearing.[569]

531.    In its 1961 report, the Commission stated:

Our investigation revealed Departmental discipline had failed in each of four vital phases: (1) The Department failed properly to investigate and follow up citizen complaints of misconduct against police officers. (2) It lacked sure and effective machinery to investigate other evidences of police misconduct on its own initiative. (3) It failed to establish adequate supervision so as to assure performance of routine police assignments. (4) It failed to utilize available statutory powers providing for disciplinary proceedings against officers charged with misconduct. The result was inevitable. Enforcement of Department discipline was almost non-existent.[570]

---

[564]    N.Y. Unconsol. Law § 7502(1)(a), 7502(3).

[565]    *Id.*

[566]    N.Y. Unconsol. Law §§ 7501(1), 7501(3).

[567]    Ex. 24 (1961 NYS Commission of Investigation on BPD Report) at BOYD-WALKER-00054092, 00054108–09.

[568]    *Id.* at BOYD–WALKER-00054117.

[569]    *Id.* at BOYD-WALKER-00054119.

[570]    *Id.* at BOYD-WALKER-00054214.

532.    The report continued, "Policies and practices of the Department have been detrimental to its own order, discipline and morale, to its very integrity."[571]

533.    With regard to training, the report stated:

Interviews with a substantial cross-section of the officers and men of the Department and detailed analysis of various Departmental records revealed a marked lack of professional competence in many areas. By all indications these deficiencies must, in considerable part, be attributed to an inadequate training program, both initially and in-service.

***

Apparently no systematic or organized training is provided officers assigned to various detective squads where they are to perform specialist services as "experts" in their particular areas. Rather, a new detective obtains his primary training from the hand-me-down, verbal bits of information he is given sporadically by 'the boys' already on that squad. This is a completely insufficient approach to the vast body of general and technical knowledge now available and essential for effective criminal investigation.[572]

B.    <u>Court Decisions and Legal Filings Provided Notice of Coercive Interrogation Practices in BPD Homicide Investigations</u>

534.    The New York Court of Appeals in *People v. Robinson and Jackson*, in December 1963, reversed the convictions of Willie James Robinson and Ernest Jackson due to the admission at trial of statements obtained from Jackson using a sham vagrancy charge as a pretext to detain him in connection with a homicide investigation.[573]

535.    An Erie County judge in *People v. Robinson*, in December 1967, ruled that police coercion rendered the statement of defendant Willie James Robinson involuntary and suppressed it.[574]

---

[571]    *Id.* at BOYD-WALKER-00054220.

[572]    *Id.* at BOYD-WALKER-00054230.

[573]    Ex. 25 (*People v. Robinson*, 13 N.Y.2d 296 (1963)) at 301.

[574]    Ex. 26 (*People v. Robinson*, Ind. No. 27,774 (Erie Cnty. Ct. Dec. 29, 1967)) at A71.

536.    The court found that in 1959 members of the BPD picked up 25 to 30 Black men, held them without charge, questioned them, and released them.[575]

537.    The court found that police arrested Robinson twice without a warrant, and that there was no probable cause for the second arrest[576]

538.    The court found that the first time he was arrested, he was not identified by any of several witnesses in a lineup and then released.[577]

539.    The court found that the second time he was arrested was at 12:15 a.m. at a tavern where he had been drinking.[578]

540.    The court stated the police had a practice of arresting suspects without a warrant and holding them in a cell for questioning.[579]

541.    The court found that at least seven officers questioned Robinson in various locations at Police Headquarters at different times throughout the night.[580]

542.    The court noted that Robinson's highest level of education was fifth grade in a school in Alabama.[581]

543.    The court found that, when Robinson continued to deny his involvement, officers typed a phony confession by another suspect, Ernest Jackson, and forged Jackson's signature, making it appear Jackson had confessed and named Robinson as the "trigger man."[582]

---

[575]    *Id.* at A66.

[576]    *Id.*

[577]    *Id.*

[578]    *Id.*

[579]    *Id.*

[580]    *Id.*

[581]    *Id.* at A67.

[582]    *Id.*

544.    The court stated that, at about 6:00 a.m., the officers confronted Robinson with the false statement by Jackson to try to trick him into believing he could be prosecuted based on the phony statement, but Robinson continued to deny involvement in the crime.[583]

545.    The court stated that, at about 7:20 a.m., a detective-sergeant questioned Robinson alone, discussed the "benefits" of talking and that he "shouldn't let them put a rope around his neck."[584]

546.    The court noted that Robinson at first continued to deny involvement but, having been in police custody for about seven hours without any sleep, agreed to give a statement.[585]

547.    The court found that neither the police nor the ECDA advised Robinson of his right to remain silent or right to counsel.[586]

548.    The court found that Robinson was never advised that he had already been charged with murder or that he could incriminate himself in a murder even though he was not the "trigger man."[587]

549.    The court found that Robinson was not arraigned until about 14 hours after being taken into custody and more than 12 hours after being booked and charged with murder.[588]

550.    Chief Donovan was involved in the interrogation of Robinson criticized in the 1967 state court decision.[589]

---

[583]   *Id.*

[584]   *Id.* at A67–68.

[585]   *Id.* at A68.

[586]   *Id.*

[587]   *Id.* at A69.

[588]   *Id.*

[589]   Ex. 27 (Olsen Dep.) at 51:16–52:6.

551.     While on appeal the Appellate Division, in 1968, reversed the result of the case and reinstated Robinson's sentence, it explicitly disapproved of the detectives' use of "deception" during their interrogation of Robinson.[590]

552.     Robinson filed a federal habeas corpus petition in 1973 attacking the behavior of the BPD and alleging that his confession had been involuntary.[591]

553.     On July 30, 1976, Judge Curtin of the District Court for the Western District of New York held oral argument on Robinson's habeas petition alleging the BPD had violated his federal constitutional rights in the manner found years earlier by Judge Latona.[592]

554.     On May 9, 1978, Judge Curtin issued a decision granting Robinson's habeas corpus petition.[593]

555.     The court reiterated the facts of the police misconduct that had been noted in Judge Latona's 1967 decision, which the federal court described as "detailed and well-reasoned."[594]

556.     Judge Curtin found that the police arrested Robinson at midnight in a tavern where he had been drinking, and then interrogated him "at a time when an attorney would not be accessible and when family and friends would not be available to offer support to petitioner"— tactics that were "unnecessary" and "intended to heighten the anxiety which petitioner would experience during the course of questioning."[595]

---

[590]     Ex. 28 (*People v. Robinson*, 31 A.D.2d 724 (4th Dep't 1968)) at 725.

[591]     Ex. 27 (Olsen Dep.) at 43:7–12.

[592]     Ex. 27 (Olsen Dep.) at 45:9–10.

[593]     Ex. 29 (*Robinson v. Smith*, 451 F. Supp. 1278 (W.D.N.Y. 1978)).

[594]     *Id.* at 1281.

[595]     *Id.* at 1286.

557.    Judge Curtin concurred with Judge Latona that the BPD lacked probable cause to arrest Robinson.[596]

558.    Judge Curtin found that "the illegal arrest enabled the police to effectively assert their authority over petitioner, to hold him incommunicado for an indefinite period of time at police headquarters and to subject him to extensive interrogation while he was illegally detained."[597]

559.    Judge Curtin also noted that Robinson "was held incommunicado in police headquarters until he confessed."[598]

560.    Judge Curtin stated that "[d]uring much of the 14-hour period preceding arraignment [Robinson] was surrounded by police officers," that Robinson "was not allowed to make telephone calls or to see or speak with anyone other than police," and that Robinson "was not given any substantial food nor … allowed to sleep until after his arraignment" the afternoon following his late-night arrest.[599]

561.    Judge Curtin stated there was conflicting testimony about whether Robinson had requested a lawyer, but officers testified that "even if the petitioner had requested counsel, his request would have been ignored."[600]

562.    Judge Curtin found that the police interrogators promises to Robinson that "they would help [him] and that he could help himself by confessing were clearly misleading" and were a factor that "compelled petitioner to confess."[601]

---

[596]    *Id.*

[597]    *Id.* at 1287.

[598]    *Id.* at 1288.

[599]    *Id.*

[600]    *Id.* at 1289.

[601]    *Id.* at 1290–91.

563.     Judge Curtin also criticized the BPD for telling Robinson that one of his alleged accomplices had accused him of pulling the trigger. He wrote that they "foisted [a] spurious confession [on him] in an obvious effort to trick him into implicating himself and others," and then continued: "This police practice is to be soundly condemned. Such deception clearly has no place in our system of justice."[602]

564.     Judge Curtin stated that police then "lied" to petitioner that he could "avoid having a rope put around his neck" by acknowledging his role and clearing himself of the charge that he had been the trigger man, not telling him that doing so would implicate him in the equally serious charge of felony murder.[603]

565.     Judge Curtin condemned the police for arresting Robinson's alleged accomplice, Ernest Jackson, on a "trumped-up vagrancy charge" because they lacked sufficient evidence implicating Jackson in the murder.[604]

566.     Judge Curtin stated that the police then questioned Jackson, put him in a cell for the night, and used a police informant in a neighboring cell to obtain incriminating statements from him.[605]

567.     Judge Curtin found "it is clear that the police piled deception (the phony confession) upon illegality (Jackson's illegally obtained statements) in a successful effort to trick and trap petitioner."[606]

---

[602]     *Id.* at 1291.

[603]     *Id.*

[604]     *Id.* at 1292.

[605]     *Id.* at 1292.

[606]     *Id.*

568.    Judge Curtin summed up the police misconduct as follows: "[N]umerous coercive influences, evaluated for their cumulative impact on petitioner's will, lead me to conclude that petitioner's capacity for self-determination was critically impaired and that compulsion propelled the confessions … ."[607]

569.    In September 1978, the Second Circuit summarily affirmed the district court decision in *Robinson*.[608]

570.    No one from the BPD ever contacted R. Nils Olsen or Michael Davidson, Robinson's attorneys on his habeas petition and habeas appeal, as part of any review of police interrogation or investigatory procedures criticized by the District Court.[609]

571.    In 1966, an Erie County Supreme Court Justice ruled in *People v. Golwitzer*, following a *Huntley* hearing, that a defendant's statement, taken by experienced officers, i.e., sergeants, in the BPD Homicide Squad earlier that year, was involuntary.[610]

572.    The court suppressed the statement because "there were indications of emotional instability sufficient to give warning to the enforcement officers of the inadvisability of continuing the interrogation and to cast serious doubt on the voluntariness of any statement taken from this defendant."[611]

---

[607]    *Id.* at 1292–93.

[608]    Ex. 30 (*Robinson v. Smith*, No. 78-2068 (2d Cir. Sept. 15, 1978) (summary order)).

[609]    Ex. 27 (Olsen Dep.) at 52:12–54:1.

[610]    Ex. 31 (*People v. Golwitzer*, 52 Misc.2d 925 (Sup. Ct., Erie Cnty. 1966)).

[611]    *Id.* at 930.

573.    At the homicide trial in *People v. Eugene Anderson and Timothy Ward* in the summer of 1972, Chief Donovan testified that he took videotaped statements from each of the defendants in November 1971.[612]

574.    The videotapes of Anderson and Ward's statements were played at trial and transcribed verbatim by the court reporter.[613]

575.    The videotapes themselves no longer exist.

576.    Chief Donovan testified at the Anderson and Ward trial that, several days after the murder, he arrested Anderson at 11:30 p.m. and spoke to Anderson on videotape at about 3:10 ot 3:12 a.m.[614]

577.    The following exchange occurred between Chief Donovan and Anderson:

Q. Now, having these rights in mind, do you wish to talk to us now?
A. To who?
Q. Do you want to talk to me now?
A. I don't.
Q. What?
A. No.
Q. You don't want to talk to me? Why?
A. I done told you already.[615]

578.    Despite Anderson's repeated invocation of his right to remain silent, Chief Donovan continued questioning him.[616]

---

[612]    Ex. 32 (Anderson/Ward Trial Tr.) at 676:22–678:19, 710:17–22.

[613]    *Id.* at 714:16–728:9, 752:4–756:21, 758:6–768:10.

[614]    *Id.* at 630:7–633:23.

[615]    *Id.* at 756:11–19. The original transcription of the last line was "I don't know why." *Id.* at 717:1. Successive replays of the videotape led Chief Donovan to agree Anderson said "I done told you already." *Id.* at 756:19–757:6

[616]    *Id.* at 717:19–728:9.

579.    Chief Donovan also testified at trial that he ordered two of his detectives to pick up Timothy Ward at his home.[617] Detective-Sergeant Hunter testified that he brought Ward into Chief Donovan's office around 4:00 a.m.[618]

580.    Detective-Sergeant Hunter testified that Ward was in the outer office during Anderson's statement and that the monitor in the outer office was operating while Anderson made his confession.[619]

581.    Detective-Sergeant Hunter testified that Chief Donovan told Ward that Anderson had made a statement implicating him in the homicide.[620]

582.    Chief Donovan, apparently testifying falsely, denied telling Ward that Anderson had implicated him.[621]

583.    The videotaped confession played at the Anderson and Ward trial, and transcribed by the court reporter at the trial, contained the following exchange between Chief Donovan and Ward:

> Q. Now, having these rights in mind, do you wish to talk to us now?
> A. I said I did it.
> Q. Well, do you want to talk to us? It has to be willing? It has to be voluntary. We are not pressing you. Have you been abused in any way? No threats or promises made?
> A. (No answer.)
> Q. All right. Do you want to talk to me now about (unintelligible)
> A. No, I don't want to talk about it. You say I done it, I done it.[622]

---

[617]    *Id.* at 696:2–697:19.

[618]    *Id.* at 908:4–14.

[619]    *Id.* at 834:1–22, 902:1–903:22.

[620]    *Id.* at 911:6–18.

[621]    *Id.* at 788:5–9.

[622]    *Id.* at 760:18–761:4, 787:13–18.

Donovan then continued questioning Ward despite his invocation of his right to remain silent.[623]

584.    In January 1973, after Anderson and Ward were convicted, attorneys for the defendants filed a brief in the Fourth Department challenging their convictions.[624]

585.    Appellants' brief contained excerpts from the videotaped recording, as transcribed in the *Huntley* hearing and at trial, in which Chief Donovan disregarded Anderson and Ward's invocations of their right to remain silent,[625] and alleged that Chief Donovan coerced confessions from the defendants.[626]

586.    Appellants' 1973 brief also cited trial testimony by the prosecution's witnesses stating that the police dragged the defendants to police headquarters at approximately midnight and 3 a.m., respectively, even though three days had passed since the crime occurred and there was no indication the defendants were a flight risk.[627]

587.    The brief stated that Anderson was only 18 years old, while Ward was only 16 years old.[628]

588.    In June 1981, Judge Elfvin of the District Court for the Western District of New York granted a habeas petition by Ward, finding that in 1971 Chief Donovan "improperly persisted in the interrogation of 16-year-old Timothy Ward after Ward said that he did not wish to talk to the officers" and that Ward was possibly confused after Detective-Sergeant Hunter and another

---

[623]    *Id.* at 761:5–768:10.
[624]    Ex. 33 (Anderson/Ward App. Brief).
[625]    *Id.* at 14–15, 25.
[626]    *Id.* at 14–22.
[627]    *Id.* at 4, 10, 17.
[628]    *Id.* at 18.

detective awakened him from his bed at 3 a.m. and brought him to police headquarters, where he was questioned by Chief Donovan and three other officers.[629]

589.    In May 1984, Judge Elfvin granted a habeas petition by Anderson, finding that Anderson's videotaped statement showed "Anderson clearly exercised his right to terminate the interrogation when he told Donovan that he did not want to talk with him, yet Donovan improperly persisted in his questioning."[630]

590.    In December 1984, the Second Circuit affirmed the district court's grant of Anderson's habeas petition.[631]

591.    The Second Circuit found that "[w]ith Anderson at several points seeking to terminate the questioning, the interrogator plowed ahead" and criticized "Donovan's refusal to accept [Anderson's] silence."[632]

592.    No one from the BPD ever contacted Nils Olsen, Anderson's attorney on his federal habeas case, with respect to the improper interrogation tactics Chief Donovan and Detective-Sergeant Hunter had used in the case.[633]

593.    In *Forman v. Smith*, following an evidentiary hearing, Judge Curtin granted Edward Forman's habeas petition based on the court's finding that the BPD had violated Forman's right to counsel in September 1972 by questioning him without counsel after he was indicted and represented.[634]

---

[629]    Ex. 34 (Buffalo News, *Retry or Free Attica Inmate, Judge Rules*, June 13, 1981).

[630]    Ex. 35 (*Anderson v. Smith*, 82-Civ.-116E (W.D.N.Y. May 23, 1984)) at 5–6.

[631]    Ex. 36 (*Anderson v. Smith*, 751 F.2d 96 (2d Cir. 1984)).

[632]    *Id.* at 102–03.

[633]    Ex. 27 (Olsen Dep.) at 56:9–15.

[634]    Ex. 37 (*Forman v. Smith*, 482 F. Supp. 941 (W.D.N.Y. 1979)).

594.    The court stated that Chief Donovan violated Forman's constitutional rights during the interrogation.[635]

595.    The court found:

Donovan signed the information charging Forman with hindering the prosecution and assumed, at the time of questioning on September 29, 1972, that Forman was represented by an attorney. Nonetheless, Donovan never asked Forman who his lawyer was and merely read him the list of rights on a form police waiver card. Under New York law at the time, it was impermissible to question Forman in the absence of an attorney representing him on a related charge and without a waiver.[636]

596.    In *People v. Cooper*, Chief Donovan and other experienced detectives testified at a *Huntley* hearing in November 1979 and at trial in April 1980 concerning their interrogation of the defendant in a homicide investigation.

597.    At the *Huntley* hearing, Detective Dove testified that he questioned Cooper for five or six hours beginning around 2 p.m. on July 19.[637]

598.    Detective Dove testified he took Cooper to Buffalo General Hospital, where his alleged accomplice was being treated for a gunshot wound.[638]

599.    Dove testified that, after apparently speaking to the alleged accomplice at the hospital, he told Cooper that the alleged accomplice said he was with Cooper at the scene of the crime.[639]

600.    Detective Dove testified that, later that afternoon, he learned Cooper was receiving kidney dialysis treatments.[640]

---

[635]    *Id.*

[636]    *Id.* at 951.

[637]    Ex. 38 (Cooper *Huntley* Hrng. Tr.) at 8:18–24:15.

[638]    *Id.* at 14:12–18, 18:5–20:6.

[639]    *Id.* at 18:5–20:6.

[640]    *Id.* at 15:11–16:3.

601.     Detective Gorski testified at the *Huntley* hearing that, at about midnight (10 hours after the physically compromised Cooper was first brought to police headquarters), he and his partner took Cooper from his cell and questioned him for approximately two hours.[641]

602.     Detective Dove testified that sometime before 9 a.m. the next morning (19 hours after Cooper first arrived at police headquarters), Dove spoke to Cooper, who asked to speak to his father.[642]

603.     Detective Dove testified that when he took the phone and spoke to Cooper's father, Cooper's father asked, "How about an attorney?" but Dove did not tell Cooper his father had inquired about an attorney.[643]

604.     Chief Donovan testified at the *Huntley* hearing that ADA Frank Clark offered Cooper a plea, that during the recording Donovan realized Cooper was not giving his "full cooperation" and concluded the deal was off, but that Chief Donovan did not tell this to Cooper and let him complete the taped confession.[644]

605.     Chief Donovan admitted when testifying at Cooper's trial that offering Cooper a deal after he had already been charged with murder and attempted robbery was deceitful.[645]

606.     Detective Dove testified at the *Huntley* hearing that Chief Donovan videotaped a confession by Cooper lasting from 10:52 a.m. to 12:13 p.m.[646]

---

[641]     *Id.* at 133:8–19, 135:17–136:6.

[642]     *Id.* at 25:9–26:10.

[643]     *Id.* at 26:15–28:6, 59:20–60:3.

[644]     *Id.* at 74:12–75:18, 81:1–22.

[645]     Ex. 39 (Cooper Trial Tr.) at 1145:4–8.

[646]     Ex. 38 (Cooper *Huntley* Hrng. Tr.) at 30:19–32:19.

607.    Chief Donovan testified that Cooper repeatedly yawned deeply, was slow in responding to questions, and spoke in a low voice.[647]

608.    Detective Dove testified that Cooper was finally arraigned the afternoon of July 20.[648]

609.    In April 1984, the Fourth Department reversed Cooper's conviction and suppressed his videotaped statement, finding the BPD had obtained it in violation of his constitutional rights.[649]

610.    The court held that Donovan and other BPD homicide detectives "engaged in a series of tactics designed to induce defendant to confess, including extensive interrogation, unnecessary delay in arraignment, and promises of a reduced plea which were not forthcoming and that these circumstances, combined with defendant's physical condition" rendered the confession involuntary.[650]

611.    Specifically, the Appellate Division found that "[t]he police detained [Cooper] in custody for approximately 24 hours prior to his arraignment and, during the first 12 hours subjected him to practically continuous interrogation."[651]

612.    The court stated the police "took defendant to the hospital, ostensibly for an identification which was unnecessary and never occurred, and told him that [his co-defendant] had implicated him."[652]

---

[647]    *Id.* at 101:16–102:12; Ex. 39 (Cooper Trial Tr.) at 1119:15–21, 1127:12–21.

[648]    *Id.* at 57:16–19, 58:23–59:8.

[649]    Ex. 40 (*People v. Cooper*, 101 A.D.2d 1 (4th Dep't 1984)).

[650]    *Id.* at 14 (internal citations omitted).

[651]    *Id.*

[652]    *Id.* at 14–15.

613.    The court noted that police "said there were probably films of the crime and persuaded [defendant's] father to advise defendant to confess."[653]

614.    The Appellate Division found:

> Instead of filing the felony complaint and arraigning defendant which would result in defendant's having an attorney who could negotiate the plea bargain, the police encouraged defendant to engage in the plea bargaining without an attorney—a process clearly requiring legal expertise. Defendant gave the taped confession, believing that it was the first step in carrying out his part of the deal. Police thus obtained his confession, which was used against him at trial; then the prosecutor unilaterally terminated the deal without telling him.
>
> Moreover, defendant's physical condition, including lack of sleep and need for dialysis, may have affected his judgment and will. Gorski said he questioned defendant from midnight until 2:00 A.M. and defendant was fingerprinted at 4:25 A.M.; defendant claims he was permitted no sleep at all. His dialysis treatment was overdue and, according to Donovan, during the taping he often yawned deeply and at one point in the second tape admitted that he was falling asleep. Defendant testified that he was 'exhausted and sick,' 'scratching,' and that his mind was 'all confused.'"[654]

615.    In *People v. Royle*, the Fourth Department reversed a murder conviction because the defendant's statements to the BPD were illegally obtained and should have been suppressed.[655]

616.    The Fourth Department found that Detective Gorski failed to inquire whether the defendant had counsel on an unrelated pending charge during questioning of the defendant in October 1979.[656]

617.    The court stated that during the investigation of the murder, the BPD had learned that Royle, then a suspect, was detained at the Erie County Holding Center.[657]

---

[653]    *Id.* at 15.

[654]    *Id.* (internal citation omitted).

[655]    Ex. 41 (*People v. Royle*, 84 A.D.2d 932 (4th Dep't 1981)).

[656]    *Id.* at 933.

[657]    *Id.*

618.    The court noted that Detective Gorski obtained Royle's arrest card, from which he learned of Royle's arrest on a burglary charge earlier that month.[658]

619.    The Fourth Department found that "given Gorski's knowledge of the outstanding burglary charge, his rank, his involvement in the murder investigation and his presence at the interrogation, particularly during the waiver of rights by the defendant, he was required to inquire whether defendant had counsel on the pending charge."[659]

620.    In 1985, following an evidentiary hearing in 1983, a Supreme Court justice threw out defendant Tommy Rollins's coerced confession due to "blatant and egregious misconduct" by Buffalo homicide detectives, specifically Chief Donovan and Detective Montondo.[660]

621.    The underlying events had occurred in 1982.[661]

622.    Justice Kasler rebuked the homicide detectives for what he called "deliberate" violations in illegally holding the 15-year-old Rollins incommunicado from his family for 12 hours.[662]

623.    He observed that Detective Montondo took Rollins and his co-defendant, Shelby Davis, into custody without probable cause.[663]

624.    Justice Kasler found that detectives violated both defendants' *Miranda* rights by asking Davis in the homicide bureau, "Why did you do it?" without providing *Miranda*

---

[658]    *Id.* at 932–33.

[659]    *Id.* at 933.

[660]    Ex. 42 (*People v. Davis and Rollins*, Order, Erie Cnty. Sup. Ct. (Apr. 15, 1985)).

[661]    *Id.* at 3–17.

[662]    *Id.* at 23.

[663]    *Id.* at 25, 30.

warnings,[664] and then failing to inquire whether Rollins had been read his *Miranda* rights or wished to waive them before questioning him alone in the back of a police car.[665]

625.    Justice Kasler reprimanded Chief Donovan for having "brow-beaten" the intellectually impaired Rollins into admitting complicity in the killings and implicating his cousin as the killer.[666]

626.    The homicide detectives' conduct, Justice Kasler said, was "an orgy of constitutional and statutory illegal police conduct."[667]

627.    The court also noted that a homicide detective acknowledged during the hearing that he had failed to include apparently inconsistent remarks Rollins gave about the crime in Rollins's signed written statement.[668]

628.    Chief Donovan, and Detectives Hunter, Dove, Gorski, and Montondo, criticized in the court decisions described above, all participated in the Crawford murder investigation.[669]

C.    The BPD and Its Homicide Squad Had an Unlawful Custom of Coercive Interrogations and Was Indifferent to the Need for Training, Supervision and Discipline

629.    The BPD had no written rules or policies, as of January 1976, on appropriate practices for interrogating or questioning witnesses or suspects.[670]

---

[664]    *Id.* at 28–30.

[665]    *Id.* at 7.

[666]    *Id.* at 22, 25.

[667]    *Id.* at 25.

[668]    *Id.* at 10.

[669]    *See supra*, Counterstatement ¶¶ 20, 37, 166, 240–41.

[670]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 46:16–23.

630.    The BPD Manual of Procedures ("MOP") was the document that promulgated or described the policies of the BPD in effect in 1976 and 1977 with respect to investigative and other police functions.[671]

631.    The City did not produce any other training, policy, or procedural materials.[672]

632.    With regard to the questioning of police officers concerning misconduct, the MOP instructs that questioning of officers shall not be "overly long" and that officers shall not be threatened nor promised rewards as an inducement to answer questions.[673]

633.    The MOP section contains no such safeguards against improper interrogation methods for civilian suspects or witnesses.[674]

634.    The only guidance in the MOP concerning what an interrogator could or could not say to a suspect or witness was to give *Miranda* warnings and try to avoid leading questions.[675]

635.    The MOP did not warn against any other improper interrogation tactics or give any other guidance about how to conduct questioning or interrogations of witnesses or suspects.[676]

636.    Detectives were not trained to consult the MOP for guidance about how to perform their duties and never consulted it.[677]

---

[671]    Ex. 43 (City Defendants' Oct. 31, 2022 Interrogatory Responses) at 4.

[672]    *See generally* City Statement of Material Facts (containing no other training, policy, or procedural manuals).

[673]    Ex. 44 (BPD MOP) at COB-Walker/Boyd_001294.

[674]    *See generally id.* at COB-Walker/Boyd_000806–811.

[675]    Ex. 44 (BPD MOP) at COB-Walker/Boyd_000806–811.

[676]    *Id.*

[677]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 44:5–46:3; Ex. 16 (Montondo Dep.) at 35:5–8.

637.     Notwithstanding the notice provided by the 1961 Commission report, the BPD continued to fail to provide any formal training to detectives who were assigned to the homicide bureau.[678]

638.     Detective Regan, who was assigned to the homicide bureau in July 1971,[679] testified on behalf of the City that he did not receive any formal training prior to January 1976 concerning questioning of suspects or witnesses,[680] including on the use of threats and promises, lying to witnesses that they had been implicated in a crime by others, eliciting a story implicating others the detective knew or should have known was false, and procedures for questioning juveniles.[681]

639.     Homicide Squad openings were filled with inexperienced officers, who then received no formal training in relevant areas.[682]

640.     Detective Guadagno testified that he was not trained at the police academy on the use of cooperating witnesses or informants, the interrogation of juveniles, or the use of improper promises during interrogations.[683]

641.     Detective Montondo testified that he did not receive training at the police academy about interrogation techniques and procedures, including as to juveniles, or handling cooperating witnesses or informants.[684] He did not recall ever being trained on things not to do in interrogating

---

[678]     Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 136:10–22; Ex. 16 (Montondo Dep.) at 47:7–17.

[679]     Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 18:1–15.

[680]     *Id.* at 51:15–22.

[681]     *Id.* at 43:3–44:4, 96:1–99:15, 104:11–106:7.

[682]     *Id.* at 54:8–56:6.

[683]     Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 38:6–13, 68:17–69:1.

[684]     Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 35:9–20, 227:23–228:5.

witnesses or suspects,[685] or the proper methods to be used in questioning someone as young as sixteen.[686]

642.    Detective Regan testified on behalf of the City that he did not recall receiving any training at the police academy about how to conduct questioning of witnesses or suspects, including juveniles.[687]

643.    Hirsch has explained how untrained detectives could pursue a confession or accusation without appreciating the degree to which ratcheting up coercive pressure increases the likelihood of false testimony.[688]

644.    State law required that juveniles be interrogated in special facilities that were less intimidating than adult interrogation rooms.[689]

645.    The BPD's own MOP contained the state law requirement concerning special facilities for juveniles.[690]

646.    However, in practice, the BPD had no such special facility for questioning juveniles.[691]

647.    Officers did not receive training about whether to interrogate juveniles in regular or special interrogation rooms.[692]

---

[685]    *Id.* at 47:19–48:2

[686]    *Id.* at 126:14–18.

[687]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 43:9–44:4.

[688]    Ex. 7 (Hirsch Report) at 4.

[689]    Ex. 45 (Family Court Act § 724).

[690]    Ex. 44 (BPD MOP) at COB-Walker/Boyd_000855.

[691]    Sahasrabudhe Decl., Ex. 17B (Guadagno Dep.) at 273:23–274:9.

[692]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 97:23–98:5.

648.    They received no training about the proper methods to use in questioning someone as young as 16.[693]

649.    Absent any written procedures or training, detectives conformed their practices to those of more experienced detectives.[694]

650.    Montondo asked suspects if they would be willing to take a polygraph to ascertain whether a suspect appeared truthful.[695]

651.    He learned to use polygraphs in this way from observing other detectives at the homicide bureau use the same technique.[696]

652.    The City has conceded that the Commissioner of Police and Deputy Commissioners were policymakers for the BPD.[697]

653.    Authority in homicide investigations was delegated to Chief Donovan, who was "the main detective" in the homicide bureau, with the others were "just his subordinates working for him."[698]

654.    Chief Donovan was "in charge of homicide investigations," and "was the boss."[699]

655.    He was "in charge of every case and every thing in every case."[700]

---

[693]    Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 126:2–127:3.

[694]    Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 136:10–22; Ex. 16 (Montondo Dep.) at 42:40–44:3, 73:8–19; Ex. 10 (Regan Dep.) at 52:15–21.

[695]    Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 74:12–75:21.

[696]    *Id.* at 75:22–76:1.

[697]    *See* Ex. 46 (City Defendants' Nov. 28, 2022 Interrogatory Responses) at 2.

[698]    Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 133:15–20.

[699]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 72:16–19.

[700]    *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 138:18–139:3.

656.    As of January 1976, the "chief of the homicide bureau" was accountable for resolving homicide cases and holding detectives responsible for errors.[701]

657.    Chief Donovan was responsible for the manner in which homicide investigations were conducted.[702]

658.    Detectives conformed to Chief Donovan's ways because otherwise they would be "gone."[703]

659.    Chief Donovan set the policy concerning how questioning of suspects or witnesses was conducted by the bureau.[704]

660.    Chief Donovan also determined the standard for when to take individuals into custody.[705]

661.    It was the practice of the principal detective on a homicide investigation to discuss strategy to be used in the investigation with the chief of homicide."[706]

662.    Chief Donovan was likely the individual who made the decision to offer Woodruff immunity, because Donovan was "the boss."[707]

663.    The detectives' P-73 reports were provided to Chief Donovan, and Detective Guadagno testified that "as a superior and chief in charge of the homicide bureau, a man of his nature would read every single word."[708]

---

[701]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 62:9–15.

[702]    *Id.* at 70:15–18.

[703]    *Id.* at 56:20–57:17.

[704]    *Id.* at 70:15–73:11.

[705]    *Id.* at 73:12–75:11.

[706]    Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 135:22–136:3.

[707]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 239:2–16.

[708]    Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 82:10–83:11.

664.    Chief Donovan reviewed detectives' P-73 reports and caused them to be inserted into the case file.[709]

665.    It was Chief Donovan's job to provide reports and statements generated in a homicide investigation to the ECDA.[710]

666.    Detective Regan testified on behalf of the City in this case that all the police conduct described in the P-73 reports in the Crawford murder investigation was consistent with the training and policies of the BPD in 1976.[711]

667.    Gagan, the County's retained expert on police practices,[712] confirmed that the police actions in this case were in every way consistent with BPD practice.[713]

668.    It was consistent with BPD policy and practice in 1976 to take a suspect into custody for interrogation in the absence of probable cause.[714]

669.    Letting Woodruff hear the anonymous call would be "intimidation,"[715] and would have been coercive.[716]

670.    Holding Boyd in custody on January 8, 1976, on mere suspicion to find out if he knew anything about the Crawford murder was consistent with BPD practices.[717]

---

[709]    Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 62:6–63:1, 92:22–93:7.

[710]    Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 242:14–16; Ex. 16 (Montondo Dep.) at 97:19–22.

[711]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 106:9–20.

[712]    *Boyd* Dkt. 169-1 (Gagan Dep.) at 22:15–23:5.

[713]    *Boyd* Dkt. 169-1 (Gagan Dep.) at 111:9–112:22.

[714]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 127:9–18; Ex. 17B (Guadagno Dep.) at 252:17–253:7, 261:6–262:2, 269:9–14.

[715]    Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 110:2–18.

[716]    Sahasrabudhe Decl., Ex. 17B (Guadagno Dep.) at 337:1–12.

[717]    *Id.* at 252:17–253:7, 261:6–262:2, 269:9–14.

671.     The BPD had a practice of allowing a suspect in a homicide to listen to a call from an anonymous caller claiming to be an eyewitness to the suspect's involvement in a murder.[718]

672.     The BPD also had a practice of telling one witness what another witness was saying to cause the first witness to change his story.[719]

673.     Chief Donovan was aware of the Reid interrogation technique ("Reid Method") by the time of the *Anderson-Ward* trial in 1972.[720]

674.     BPD homicide detectives appear to have used the Reid Method in interrogating Woodruff and Hough in 1976.[721]

675.     The Reid Method was known to pose a risk of false confessions and accusations, especially when the target was a juvenile.[722]

676.     To mitigate this risk, the Reid Method was only to be used when the detective had "a high degree of confidence" in the suspect's guilt.[723]

677.     Even where used, the Reid Method instructed that the detective was not to make threats or "hold out any inducement whatsoever," since threats and promises could "induce an innocent man to confess."[724]

678.     In 1976, the Homicide Bureau assigned cases to the entire squad rather than individuals or teams.[725]

---

[718]     *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 309:15–311:9.

[719]     *Id.* at 396:16–397:8.

[720]     Ex. 32 (Anderson/Ward Trial Tr.) at 743:13–14

[721]     Ex. 7 (Hirsch Report) at 11 & n.14, 12, 17–18; Ex. 47 (Hirsch Dep.) at 67:22–69:3.

[722]     Ex. 7 (Hirsch Report) at 5–7.

[723]     *Id.* at 8.

[724]     *Id.* at 12.

[725]     Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 23:15–24:9.

679.    However, police reports asserted that the "officer in charge of the case" and "investigating officer" in the Crawford murder investigation was Chief Donovan, and also listed Detectives Delano and Dove.[726]

680.    The BPD Homicide Bureau had no performance objectives or measures, no system for evaluating the quality of witness interrogations, and never conducted any quality reviews of homicide cases.[727]

681.    There was no manual, publication, or other writing that set forth BPD procedures for investigating allegations of misconduct by officers during criminal investigations or potential punishment for officers found to have committed misconduct during a criminal investigation.[728]

682.    Detectives did not receive training on any process for disciplining officers who engaged in misconduct during a criminal investigation.[729]

683.    No BPD employee was responsible in January 1976 for investigating allegations of misconduct by police officers during criminal investigations.[730]

684.    Gagan testified that police officers who engage in misconduct should be disciplined, even for mere negligence, to ensure they adhere to rules and to maintain the ethics and professionalism of the department.[731]

---

[726]    *Boyd* Dkt. 168-2 (Forensics File) at COE002094–97.

[727]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 67:9–69:12.

[728]    *Id.* at 200:16–201:8.

[729]    Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 47:22–48:5.

[730]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 200:5–15.

[731]    *Boyd* Dkt. 169-1 (Gagan Dep.) 105:23-108:11.

685.    The BPD never investigated or disciplined any detective for misconduct in investigating a case.[732]

686.    No BPD procedures were reexamined or changed in response to the 1978 federal court decision in *Robinson*.[733]

687.    The BPD never examined Chief Donovan and Detective-Sergeant Hunter's conduct or took disciplinary action against them in response to the federal court decisions in *Anderson* and *Ward*.[734]

688.    The BPD never conducted any inquiry into the behavior of or took any disciplinary action against Chief Donovan or Detective-Sergeant Hunter in relation to the *Rollins* and *Davis* case, even after the court decision.[735]

689.    Chief Donovan was never disciplined for his involvement in the interrogations found to be coercive by state and federal courts.[736]

690.    Detective Regan testified on behalf of the City that Chief Donovan was "ticked off" about Justice Kasler's decision in the *Rollins* and *Davis* case.[737]

---

[732]    Ex. 48 (City Defendants' Jan. 20, 2023 Am. Interrogatory Responses) at 2; Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 201:9–12, 204:22–205:5; Ex. 17A (Guadagno Dep.) at 48:6–11; Ex. 16 (Montondo Dep.) at 33:9–16

[733]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 206:17–21.

[734]    *Id.* at 206:22–210:18; *see also supra,* Counterstatement ¶ 285.

[735]    *Id.* at 211:4–213:17.

[736]    *Id.* at 209:15–19, 213:14–17.

[737]    *Id.* at 212:7–13.

691.    Leo Donovan became the Chief of the Homicide Bureau in 1964 and remained in command of the Bureau for 21 years, until 1985.[738]

692.    Donovan's position was initially styled "Commanding Officer" of the Homicide Bureau, and then, beginning February 16, 1973, it was simply "Chief of Homicide."[739]

693.    No one from the BPD ever asked Guadagno about Andre Hough's testimony at a *Wade* hearing in December 1976 that Detective Guadagno and other officers threatened to lock him up and pin the Crawford murder on him if he did not tell them what he was purportedly holding back from them.[740]

694.    During his time at the BPD, no one ever spoke to Detective Montondo with any disapproval about anything he did as a detective.[741]

695.    The BPD never investigated the misconduct identified by Justice Kasler in the *Rollins* case, not did it discipline the detectives involved.[742]

696.    Detective Montondo was honored with a Mayor's Merits Award in part for his work on the *Rollins* case, known as the Pink Street murder case.[743]

---

[738]    Ex. 40 (Cooper Trial Tr.) at 1106:18–1107:5; Ex. 32 (Anderson/Ward Trial Tr.) at 610:2–13; Ex. 49 (Donovan BPD Personnel File) at COB-Walker/Boyd_001396 (reflecting retirement in 1985).

[739]    *See* Ex. 32 (Anderson/Ward Trial Tr.) at 610:2–13; *see also* Ex. 50 (P-73 from Anderson/Ward case, dated July 21, 1972, signed by Donovan as "Lt. Commanding[,] Homicide Bureau"); Ex. 49 (Donovan Personnel File) at COB-Walker/Boyd_001397.

[740]    Sahasrabudhe Decl., Ex. 17B (Guadagno Dep.) at 374:10–376:23.

[741]    Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 44:5–11.

[742]    *Id.* at 31:22–32:12, 226:9–227:22.

[743]    *Id.* at 26:19–27:7, 230:7–232:19.

**VIII.   The BPD Had an Unlawful Custom or Practice of *Brady* Violations, Preparation of False or Misleading Reports, and Destroying Notes Potentially Revealing Exculpatory or Impeachment Evidence**

697.   The BPD had no written policy or other procedure regarding what information to disclose to the ECDA under *Brady*.[744]

698.   The BPD did not train detectives at the police academy or on the job on the *Brady* rule and disclosure to the ECDA of information favorable to criminal defendants, including information that tended to show a criminal defendant was innocent or a prior inconsistent statement of a prosecution witness.[745]

699.   Homicide detectives took notes when they interviewed witnesses.[746]

700.   Detectives destroyed their notes after preparing P-73 reports.[747]

701.   Detectives were instructed, encouraged, or even "forced" to destroy their notes, purportedly to reduce storage costs.[748]

702.   Detectives did not receive any training at the police academy or in-service that it was improper to destroy their notes.[749]

---

[744]   Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 158:17–159:8; Ex. 16 (Montondo Dep.) at 46:23–47:5.

[745]   Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 46:7–22, 80:7–81:17.

[746]   Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 94:12–95:9; Ex. 16 (Montondo Dep.) at 36:18–37:23; Ex. 17A (Guadagno Dep.) at 38:19–39:2.

[747]   Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 38:4–39:3, 53:8–54:12, 171:2–12; Ex. 17A (Guadagno Dep.) at 39:3–40:6; *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 97:23–98:10, 162:23–163:3, 175:9–14.

[748]   Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 38:15–19, 53:8–54:12; *Boyd* Dkt. 169-1 (Gagan Dep.) at 26:22–27:15, 33:25–35:11, 130:7–18.

[749]   Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 150:11–15; Ex. 17A (Guadagno Dep.) at 39:16–20, 44:13–45:9.

703.     The BPD did not train officers about what information from their notes to include in P-73 reports, including what information to include that might be *Brady*.[750]

704.     Destroying notes made it impossible for defense counsel to determine if the reports prepared from the notes were complete and accurate.[751]

705.     Before pretrial hearings and the trials, detectives destroyed notes taken during the Crawford homicide investigation.[752]

706.     Defense attorney examinations of BPD officers at trial sometimes revealed that the officers had omitted information from their P-73 reports.[753]

707.     The MOP recommended that detectives take statements in a "question and answer form."[754]

708.     Detectives testified in court proceedings that the Q&A signed statements contained every question and answer stated in an interview.[755]

709.     However, detectives interviewed witnesses before taking a statement in Q&A format.[756]

---

[750]     Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 95:10–13; *Boyd* Dkt. 169-1 (Gagan Dep.) at 35:12–20 (unaware of training on what information from their notes officers should include in their reports).

[751]     *Boyd* Dkt. 169-1 (Gagan Dep.) at 129:17–130:18.

[752]     Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 53:8–54:12, 171:2–12; *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 97:23–98:10, 162:23–163:3, 175:9–14.

[753]     *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 290:11–291:23.

[754]     Ex. 44 (BPD MOP) at COB-Walker/Boyd)_000807.

[755]     *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 105:8–106:7, 121:7–14.

[756]     Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 152:2–10; Ex. 16 (Montondo Dep.) at 68:5–69:19; Ex. 17 (Guadagno Dep.) at 77:10–79:6, 92:14–20, 263:14–17; *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 119:14–120:8, 184:11–22.

710.     Some detectives kept no record or notes of the initial interview.[757]

711.     Other detectives took notes when interviewing witnesses to find out what they had to say before starting to record answers in question-and-answer format, then destroyed their notes of what the witness said before the detective began recording their answers in the signed statement using the question-and-answer format.[758]

712.     In the 1972 *Anderson-Ward* trial, witness Gladys Bracy testified that she asked to change statements in her question-and-answer signed statement and that detectives agreed to make the changes but did not actually do so.[759]

713.     In the 1972 *Anderson-Ward* trial, witness Tyrone Powell testified that there were inaccuracies in his question-and-answer signed statement.[760]

714.     In the 1981 investigation of Rollins and Davis, Detective Stanley Suszek questioned Rollins for thirty to forty minutes before taking anything down in writing.[761]

715.     Detective Suszek wrote in P-73 reports that after the conclusion of the typewritten statement, Rollins stated other things which were so inconsistent with his prior story that it brought the defendant "to the point of no longer being believed," but Suszek made no record of what those inconsistencies were, nor did he remember what they were.[762]

716.     The practice of preparing signed statements in question-and-answer format that gave the misleading impression of being verbatim and complete recordings of interviews

---

[757]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 152:2–10

[758]    Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 37:15–38:14.

[759]    Ex. 32 (Anderson/Ward Trial Tr.) at 1172:10–1175:17, 1195:5–11.

[760]    *Id.* at 1319:7–1320:4, 1341:14–1343:11.

[761]    Ex. 42 (*People v. Davis and Rollins*, Order, Erie Cnty. Sup. Ct. (Apr. 15, 1985)) at 9.

[762]    *Id.* at 10.

continued as late as 2004, as documented in the record *Ortiz v. Stambach*, 16-cv-321 (W.D.N.Y.).[763]

717.   Detectives did not receive any training that promises or suggestions made to a witness about potential leniency should be made part of the file.[764]

718.   Detectives did not receive any training about whether to make a record of a witness or suspect's inconsistent statements or threats of punishment for non-cooperation.[765]

719.   ADA Drury, who worked with the BPD Homicide Bureau on numerous cases in the 1970s, testified that it probably was consistent with the practice of the BPD not to memorialize in a P-73 report the fact that Woodruff only implicated the defendants after he was told he would receive immunity from prosecution.[766]

720.   P-73 reports generated by the Homicide Bureau in 1976 were dated but not numbered sequentially.[767]

721.   There was no master list or index of all reports prepared in connection with an investigation that could enable someone to determine if reports were discarded, added, or altered after the fact.[768]

---

[763]   Ex. 51 (Ortiz Trial Tr.) at A.2333:15–24, 2338:6–14, 2352:20–24, 2672:8–11, 2902, 2912–14.

[764]   Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 162:5–15.

[765]   *Id.* at 161:19–162:4.

[766]   *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 265:9–266:9.

[767]   Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 224:23–225:4; Ex. 16 (Montondo Dep.) at 89:21–90:5, 99:10–11; Ex. 10 (Regan Dep.) at 87:15–88:21.

[768]   Sahasrabudhe Decl., Ex. 17A (Guadagno Dep.) at 227:13–228:13; Ex. 10 (Regan Dep.) at 91:6–92:12; Ex. 16 (Montondo Dep.) at 99:1–101:5.

722.    Detective Regan, testifying on behalf of the City, provided no reason reports were not consecutively numbered to guard against alterations or destruction of reports.[769]

723.    A March 1968 amendment to the BPD's MOP required that the "complete interrogation" of officers investigated for misconduct "shall be recorded."[770]

724.    The MOP prohibited any "'off-the-record' questions" and required that [a]ll recesses called during the questioning shall be recorded."[771]

725.    However, there were no such requirements with respect to interrogations of civilian witnesses or suspects.[772]

726.    Chief Donovan's office in January 1976 was equipped with a videotape machine capable of recording interrogations.[773]

727.    A video recording would have been the most accurate record of a suspect's statement.[774]

728.    In the 1972 trial in *People v. Anderson and Ward*, Chief Donovan testified that he videotaped statements by each of the defendants in 1971.[775]

729.    In the 1972 trial in *People v. Anderson and Ward*, Sergeant Hunter testified that he was present for videotaped statements by each of the defendants in 1971.[776]

---

[769]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 92:8–12.

[770]    Ex. 44 (BPD MOP) at COB-Walker/Boyd_001294.

[771]    *Id.*

[772]    *Id.* at COB-Walker/Boyd_000806–811.

[773]    *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 179:15–20, 183:2–12; Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 119:13–122:14.

[774]    Sahasrabudhe Decl., Ex. 16 (Montondo Dep.) at 123:8–15.

[775]    Ex. 32 (Anderson/Ward Trial Tr.) at 677:1–678:19, 710:17–22.

[776]    *Id.* at 825:2–6, 841:16–18.

730.    At the 1979 *Huntley* hearing and 1980 trial in *People v. Cooper*, Donovan testified that he videotaped his interview with the defendant.[777]

731.    The police videotaped separate interrogations of Tommy Rollins and Shelby Davis in 1982.[778]

732.    The BPD did not have a practice of making audio recordings of interrogations.[779]

733.    No statements were recorded by video or audio in the Crawford homicide investigation.[780]

## IX.    The Misconduct of ADAs in Plaintiffs' Cases Resulted from Patterns and Practices of the ECDA

734.    Edward Cosgrove was the District Attorney of Erie County from January 1, 1974, to December 31, 1981.[781]

735.    As District Attorney, Cosgrove oversaw the work of about 70-80 ADAs at any one time[782] and thousands of criminal cases.[783]

---

[777]    Ex. 38 (Cooper *Huntley* Hrng. Tr.) at 72:9–20; Ex. 39 (Cooper Trial Tr.) at 1113:4–1114:13.

[778]    Ex. 42 (*People v. Davis and Rollins*, Order, Erie Cnty. Sup. Ct. (Apr. 15, 1985)) at 7, 10–11.

[779]    Sahasrabudhe Decl., Ex. 10 (Regan Dep.) at 169:12–15.

[780]    *Boyd* Dkt. 168-9 (*Huntley* Hrng. Tr.) at 100:23–101:5, 106:8–9, 112:5–12, 116:17–117:6, 179:15–20, 183:2–12.

[781]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 31:1–10.

[782]    *Id.* at 31:11–16; *Boyd* Dkt. 168-17 (Henry Dep.) at 32:8–10; Ex. 52 (Solomon Dep. Day I) at 25:18–26:10.

[783]    *Boyd* Dkt. 168–16 (Cosgrove Dep.) at 32:1–4.

A.      The Erie County District Attorney's Disclosure Obligations Were Clarified in Court Decisions in the 1960s and 1970s.

736.    In 1963, the Supreme Court held in *Brady v. Maryland* that evidence favorable to the defense in that it tended to exculpate a criminal defendant had to be disclosed to the defense upon request in all state criminal prosecutions.[784]

737.    In 1972, in *Giglio v. United States*, the Court explicitly instructed that the *Brady* rule includes impeachment evidence.[785]

738.    In 1976, in *United States v. Agurs*, the Court held that favorable evidence had to be disclosed even without a specific request where it "creates a reasonable doubt that did not otherwise exist."[786]

739.    *Agurs* further instructed that "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."[787]

740.    Gagan acknowledged at his deposition in this case that if even one juror has a reasonable doubt and does not convict, it's a more favorable result to a defendant than a conviction.[788]

741.    In 1976-77, as recognized in the ABA Standards for the Prosecution Function and under constitutional principles, prosecutors were required to make "timely disclosure" to the

---

[784]    373 U.S. 83, 87–88.

[785]    405 U.S. 150, 154.

[786]    427 U.S. 97, 110–13.

[787]    *Id.* at 113.

[788]    *Boyd* Dkt. 169-1 (Gagan Dep.) at 390:16–19.

defense of evidence "supporting the innocence of the defendant" or which would "tend to negate … guilt."[789]

742.    They were similarly required to present evidence tending to negate guilt at a preliminary hearing and a bail hearing.[790]

743.    They were required at such proceedings not to rely on false or misleading evidence or argument, and to correct false testimony by prosecution witnesses when it occurred.[791]

744.    The County's expert, Gagan, and ADA Drury, acknowledged that prosecutors at all stages of a criminal proceeding, including hearings and trial, in 1977, were constitutionally and ethically required to refrain from relying on false or misleading evidence or argument and to correct the same when it occurred.[792]

745.    Under New York's *Rosario* rule in 1977, prosecutors were required to disclose all recorded statements by prosecution witnesses relevant to the subject matter of their direct examinations.[793]

746.    This rule included oral statements recorded, verbatim or in summary form, in police reports and in handwritten notes.[794] The New York Criminal Procedure Law ("CPL") provided for

---

[789]    *Id.* at 95:3–96:13.

[790]    *Id.* at 68:7–71:8.

[791]    *Id.* at 66:14–68:6.

[792]    *Id.* at 97:25–98:23 (prosecutors were required in 1976–77, by the Constitution, ethics rules, and other sources of rules, to not intentionally misstate the evidence or mislead the jury as to inferences it may draw, and this standard also applied to pretrial proceedings); *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 56:5–14 (understood in 1976 or 1977 that an ADA had an obligation under the Constitution to correct false or misleading testimony given by a prosecution witness).

[793]    *People v. Rosario*, 9 N.Y.2d 286, 289 (1961).

[794]    *People v. Consolazio*, 40 N.Y.2d 446, 453–54 (1976).

limited pretrial discovery that covered things like the defendant's own statements and the results of scientific tests.[795]

747.    In 1977, under state law and practice, such disclosure was not required before the end of a witness's direct examination.[796]

748.    The ECDA prosecutors withheld *Rosario* material until the witness's direct examination at trial was complete.[797]

749.    Being a federal constitutional rule, *Brady* superseded *Rosario,* meaning that witness statements falling within *Brady*'s mandate had to be disclosed earlier than *Rosario* material if requested by the court, ordered by the court, or necessary to allow the defense to adequately prepare for trial.[798]

B.    <u>The County Failed to Promulgate Written Policies or Training for Disclosure Under *Brady*, and More Generally for Handling Criminal Prosecution</u>

750.    Gagan testified that Supreme Court case law concerning *Brady* was "in such an extreme state of flux" in 1976-77, that it is fair to say of many prosecutors in Erie County that they did not understand their obligations.[799]

---

[795]    Ex. 4 (CPL § 240 as of 1976–77) at BOYD-WALKER-00045885–86.

[796]    *Boyd* Dkt. 168-23 (Zeidman Report) at 7–8; 169-1 (Gagan Dep.) at 367:9–15; 168–14 (Drury Dep. Day I) at 25:9–11, 100:20–101:1; 168–17 (Henry Dep.) at 142:17–143:1.

[797]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 100:20–101:4; 168-17 (Henry Dep.). at 142:17–143:1.

[798]    *See Boyd* Dkt. 168-23 (Zeidman Report) at 8; 169-1 (Gagan Dep.) at 206:5–207:2 (prosecutor must disclose *Brady* material even if it doesn't have to be disclosed under the New York state discovery law or *Rosario*), 207:9–13 (*Brady* supersedes state discovery law or *Rosario*, when it comes to timing of disclosure), 207:20–23 (*Rosario* material might have to be disclosed earlier if also constituting *Brady* material).

[799]    *Boyd* Dkt. 169-1 (Gagan Dep.) at 168:14–169:6.

751.     As a result, he testified, it was the responsibility of the District Attorney to take reasonable steps to ensure that such prosecutors complied with their obligations.[800]

752.     Gagan acknowledged that the ABA Standards for the Prosecution Function in effect in 1976-77 established that prosecutors, as a matter of best practice, should have handbooks and policy guidelines and procedures, and that such materials should guide prosecutors in their exercise of their discretion in discovery, including discretion in disclosing *Brady* material.[801]

753.     However, Gagan had not seen any ECDA prosecutors' handbook, policy guidelines, or procedures from 1976-77.[802]

754.     ADA Henry, testifying on behalf of the County, admitted that the ECDA had no written *Brady* policies or manual regarding any facet of *Brady* compliance, or compliance with the parallel *Rosario* obligation.[803]

755.     Under the ABA Standards, Gagan acknowledged, prosecutors' offices also should have training programs for prosecutors.[804]

756.     Gagan acknowledged that the Supreme Court, in *Giglio,* counselled it would be best practice for prosecutors' offices to adopt procedures to ensure an assigned prosecutor knows of all material in the possession of the "office" required to be disclosed, and agreed that the Erie County District Attorney had the authority to establish such procedures to ensure that prosecutors were in a position to disclose *Brady* material.[805]

---

[800]     *Id.* at 170:15–23.

[801]     *Id.* at 88:18–90:18.

[802]     *Id.* at 89:11–15.

[803]     *Boyd* Dkt. 168-17 (Henry Dep.) at 56:18–23; 57:1–6, 61:22–62:2, 62:19–23, 63:8–18.

[804]     *Boyd* Dkt. 169-1 (Gagan Dep.) at 90:20–91:11.

[805]     *Id.* at 214:13–215:24.

757.     The ECDA lacked written policies and procedures not only as to *Brady* and *Rosario*, but also generally for the handling of criminal cases by its line prosecutors, including opening statements and summations, handling cooperating witnesses, taking and preserving notes of witness interviews, and confirming the accuracy of witness statements.[806]

758.     ADA Henry, testified in his deposition on behalf of the County in this case, that there were no written policies governing:

    a.   The proper conduct of opening statements and summations;[807]

    b.   How to prosecute criminal cases or disclosure of statutory discovery material, other than what was dictated by the Criminal Procedure Law;[808] or

    c.   The use of jailhouse informants;[809]

759.     DA Cosgrove testified at his deposition in this case that he did not remember:

    a.   Any written policy requiring disclosure of police files;[810]

    b.   Whether he or his office issued any written policies regarding summations;[811]

    c.   Whether he had any formal written policies governing how his prosecutors should interact with cooperating witnesses;[812]

---

[806]   *See infra*, Counterstatement ¶¶ 758–61.

[807]   *Boyd* Dkt. 168-17 (Henry Dep.) at 45:19–46:5.

[808]   *Id.* at 55:4–10, 56:2–13.

[809]   *Id.* at 69:20–70:2.

[810]   *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 48:4–10.

[811]   *Id.* at 60:10–13.

[812]   *Id.* at 71:11–71:21.

d.  Any formal written policies regarding what his prosecutors could promise to witnesses, the use of pressure or threats of prosecution to induce cooperation, or the granting of immunity to cooperating witnesses;[813]

e.  A written policy in his office governing when line prosecutors could offer immunity in a homicide case;[814]

f.  Any written police on maintaining and preserving interview notes;[815]

g.  Any written policy requiring the documentation or disclosure of prior inconsistent statements of testifying witnesses at trial;[816]

h.  Any written policies regarding how a line prosecutor should confirm the accuracy of a witness statement;[817] or

i.  Any written policy regarding the use of jailhouse cooperators.[818]

760.  ADAs Drury, Verrastro, and Solomon likewise were not aware of any written policies or manuals.[819]

761.  Debra Carosa, testifying on behalf of the County, regarding the preservation and location of records, confirmed that she was not asked to search for policy documents.[820]

---

[813]  *Id.* at 71:23–72:16.

[814]  *Id.* at 75:16–76:1.

[815]  *Id.* at 77:2–9, 78:16–19.

[816]  *Id.* at 79:8–13.

[817]  *Id.* at 81:7–17.

[818]  *Id.* at 87:4–10

[819]  *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 59:5–8; *Boyd* Dkt. 168-18 (Verrastro Dep.) at 24:11–13; Ex. 52 (Solomon Dep. Day I) at 60:7–11, 62:23–63:4.

[820]  Ex. 54 (Carosa Dep.) at 105:3–10.

762.     The ECDA did not conduct formal training programs on *Brady*, *Rosario*, statutory discovery requirements, the handling of witnesses, trial advocacy, and other areas implicating the ethical obligations of prosecutors.[821]

763.     In the County's August 31, 2023, response to Plaintiffs' Interrogatory No. 7, the County stated it "has searched for and is not aware of any documentation maintained by the ECDA regarding training received by ADAs prior to December 31, 1977, and consequently does not intend to rely on such documentation at trial."[822]

764.     ADA Henry, testifying on behalf of the County could not recall:

a.   Whether there was ever a presentation about how to comply with *Rosario* or *Brady* obligations;[823]

b.   Any specific training from the DA or any other executive or supervisor concerning the scope of the *Brady* rule prior to the Walker trial;[824]

c.   Whether he received any training about what he was required to disclose under *Brady* prior to the Walker trial;[825]

d.   Any training, prior to the Walker trial, concerning any Supreme Court decision concerning *Brady* that may have come down after 1963.[826]

---

[821]     *See infra*, Counterstatement ¶¶ 763–66.

[822]     Ex. 55 (County's Aug. 31, 2023 Supp. Interrogatory Responses) at 4.

[823]     *Boyd* Dkt. 168-17 (Henry Dep.) at 73:9–74:2.

[824]     *Id.* at 223:14–19.

[825]     *Id.* at 223:20–224:13.

[826]     *Id.* at 224:15–22.

765.    ADAs Drury, Verrastro, and Solomon likewise could not recall formal training on how to try cases, conduct disclosure, work with police, or perform jury addresses.[827]

766.    Gagan testified he was unaware of any ECDA training programs.[828]

767.    Instead, training was on-the-job: less-experienced ADAs learned from more-experienced ADAs.[829]

C.    The County Maintained Unlawful *Brady* and *Rosario* Policies and Practices

768.    During the 1970s, the ECDA had no policy requiring disclosure at the preliminary hearing or bail hearing stage of exculpatory information that might affect whether a defendant would be released.[830]

769.    The ECDA's practice was not to disclose such exculpatory information at the time of the arraignment or preliminary hearing.[831]

---

[827]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 46:5–8; *Boyd* Dkt. 168-18 (Verrastro Dep.) at 23:8–12, 25:2–28:1; Ex. 53 (Solomon Dep. Day II) at 14:21–15:1, 35:19–38:5.

[828]    *Boyd* Dkt. 169-1 (Gagan Dep.) at 91:12–16

[829]    *Boyd* Dkt. 168-18 (Verrastro Dep.) at 22:22–23:7 (other than asking questions of others, the training he received at the ECDA was "on-the-job training"); 168-17 (Henry Dep.) at 72:11–15 (describing the ECDA's training as "a system of experienced prosecutors instructing new prosecutors on what they're doing and how to do it"); Ex. 52 (Solomon Dep. Day I) at 32:14–33:16 (when he was doing his on-the-job training upon starting at the ECDA, it was the office's expectation that he would learn from those more senior to him, and Solomon thought that other ADAs were modeling the best practices of the office that he was expected to follow).

[830]    *Boyd* Dkt. 168-17 (Henry Dep.) at 371:9–17 (does not know of any ECDA policy requiring prosecutors to make such disclosure); 168-14 (Drury Dep. Day I) at 185:11–187:2 (does not recall any ECDA policy requiring him to turn over exculpatory evidence at an initial criminal court arraignment or a preliminary hearing, or ECDA practice of doing so).

[831]    *Boyd* Dkt. 168-21 (McLeod Dep.) at 316:7–17; 168-14 (Drury Dep. Day I) at 185:11–187:2 (it wasn't his practice to do so, and recalls no ECDA practice of doing so); 168-18 (Verrastro Dep.) at 38:5–8 (doesn't recall whether there was any process for disclosing documents to defense counsel at the arraignment stage); *see also* 168-17 (Henry Dep.) at 371:19–373:16 (asked if ECDA prosecutors had a practice of disclosing "*Brady*[-]type material as exculpatory evidence at the time of a criminal court arraignment or a preliminary hearing," responds that the prosecutor would not have the file at that time, indicating the practice was for prosecutors not to make such disclosures).

770.     Consistent with this practice, ADA Drury did not disclose any P-73 reports at the preliminary hearing in the Plaintiffs' criminal case, even though by that time he had the complete police file.[832]

771.     Gagan acknowledged that ADA Drury did not disclose at the preliminary hearing that police detectives promised Woodruff immunity before he changed his original statement that he had no knowledge of the crime.[833]

772.     Further, Gagan acknowledged that, if ADA Drury was in possession of police reports at the preliminary hearing that, if believed, proved that Woodruff, contrary to his testimony, was not present when the crime occurred, or materials showing that he and Walker already were on their way home in a taxicab when the crime occurred, he would be required to disclose it to the defense by the time of the preliminary hearing.[834]

773.     Gagan testified that Drury also was obligated to disclose at such time evidence tending to show that a third party committed the crime.[835]

774.     Gagan stated that if ADA Drury had evidence showing that Woodruff and Walker were not present when the crime was committed, ADA Drury would be required to disclose it and dismiss the case.[836]

775.     Gagan further testified that the ECDA's position "in the '70s and '80s was that [evidence] had to be exculpatory" to constitute *Brady* material.[837]

---

[832]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 185:4–10.

[833]     *Boyd* Dkt. 169-1 (Gagan Dep.) at 272:7–273:19.

[834]     *Id.* at 285:23–287:5.

[835]     *Id.* at 286:8–15.

[836]     *Id.* at 286:17–287:8.

[837]     *Id.* at 208:18–209:21.

776. Per Gagan, impeachment material did not then qualify as evidence favorable to the accused.[838]

777. ADA Henry, testifying for the County, stated that, in addition to disclosing discovery material, when prosecutors decided whether to disclose materials under *Brady*, they looked for any information that would be helpful to the defendant in terms of proving innocence.[839]

778. In *People v. Terry,* Ind. No. 45,881B, the ECDA, on October 16, 1979, opposed a requested *Brady* disclosure as follows: "Brady Material: The People know of no evidence which tends to *exculpate* the defendant regarding the charges in the above indictment" (emphasis added).[840]

779. When the defense complained about *Brady* violations on appeal of a conviction in the same case, the ECDA, in a September 28, 1981, brief submitted on behalf of DA Cosgrove, contended that undisclosed evidence cited by the appellant was not *Brady* material because it was not "exculpatory evidence material to the issue of the defendant's guilt."[841]

780. The defense had alleged, in its brief on appeal, that ADA Martin Littlefield had failed to timely disclose significant favorable evidence, including evidence that Calvin Kyle, an unindicted accomplice, received $1,000 of the alleged robbery proceeds; that Kyle in fact helped to plan the robbery; that the weapon used was a piece of metal, not a gun; that James Jones, a codefendant cooperating with the prosecution, was the one who forcibly took the money from the victim; and the terms beneficial to Jones of Jones's plea bargain.[842]

---

[838]   *Id.* at 190:5–15, 205:18–206:4.

[839]   *Id.* at 58:19–61:14.

[840]   Ex. 56 (Terry Discovery Response) at 3.

[841]   Ex. 57 (Terry Resp. Brief) at 1.

[842]   Ex. 58 (Terry App. Brief) at 9.

781.    DA Cosgrove expected that the briefs submitted by the ECDA's appeals unit would comply with his policies, signed off on their positions regarding criminal procedure, and testified he is not aware of any instance in which a brief submitted by that unit did not comply with his policies.[843]

782.    DA Cosgrove approved of the ECDA's statement in *Terry*.[844]

783.    The *Terry* brief was filed in 1981, but Cosgrove assumed that the ECDA's *Brady* policy was the same in 1977 as it was in 1981.[845]

784.    ECDA prosecutors repeatedly expressed similar positions about the scope of the *Brady* rule to trial courts.

785.    In *People v. Cadby*, Ind. No. 44,318, in response to a February 13, 1979, decision by a state supreme court justice on a defense pretrial omnibus motion, the People declined to make any *Brady* disclosure because "[n]o *exculpatory* evidence under Brady [is] in possession of or known to the People at this time" (emphasis added).[846]

786.    When, during the course of the trial in *Cadby* in February 1979, the defense moved for a mistrial on the basis of a late disclosure of a police report that contained a statement by the complainant contradicting her trial testimony and corroborating the defense that any sexual activity had been consensual, the People opposed the motion on the basis that the material in question was not "exculpatory."[847]

---

[843]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 175:12–176:18, 177:23–178:6. He also testified that the role of the Appeals Bureau in his office included "educating the assistant district attorneys as to the law and what was required of them." *Id.* at 175:14-19.

[844]    *Id.* at 178:12–183:2.

[845]    *Id.* at 183:4–11.

[846]    Ex. 59 (Cadby Discovery Response) at 1.

[847]    Ex. 60 (Cadby Trial Tr.) at 744–49, 752–55.

787.    This understanding of *Brady* was held by ADA Drury.[848]

788.    It was, according to ADA Drury, consistent with the policies and practices of his Office at the time.[849]

789.    Gagan, the County's expert witness, testified that it was "the practice ... of prosecutors in 1976 and '77"—and was "the practice in Erie County" in particular—to suppress statements by "inner city" prosecution witnesses that the defendant is innocent, if deemed untrue.[850]

790.    Gagan further asserted that:

a.    "[T]he prosecutor may choose whether or not to disclose a statement saying that the defendant is innocent based upon the prosecutor's judgment about whether or not that statement was true."[851]

b.    In 1976, 1977, and today, "if the prosecutor determines that the testimony in court is truthful, and the prior [inconsistent] statement is untruthful ... the prosecutor may decline to disclose the [prior] statement [under] *Brady*."[852]

c.     "The *Brady* rule doesn't apply unless [the evidence in question is] exculpatory," and "[i]f the police officer was convinced it's not exculpatory, it's not exculpatory."[853]

---

[848]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 50:10–51:6.

[849]    *Id.* at 51:8–10.

[850]    *Boyd* Dkt. 169-1 (Gagan Dep.) at 158:20–160:3.

[851]    *Id.* at 155:9–15.

[852]    *Id.* at 156:21–157:14.

[853]    *Id.* at 144:24–145:3.

d. "My point is that they have to be exculpatory, so that the police officer has to believe that they're actually exculpatory."[854]

e. Under the law as it stood in 1976 and 1977, "if the police officer believes that a statement by a witness that defendant John Doe is innocent is a lie, then the police officer has no obligation to disclose it to the prosecutor or to the defense."[855]

f. It was reasonable for the police not to consider a witness' statement to be exculpatory if "the witness was not telling the truth."[856]

791. When asked how the prosecutor is supposed to determine the reason why a witness recanted, Gagan said "it's an art, not a science," one that requires "experience," "understanding," and some "prodding and poking" of the witness.[857]

792. Gagan could not "quantify how many" versions of a story an ECDA prosecutor would need to hear before he could identify "'the' story or 'the' version that you feel is the truth, right, the version that you feel all along was the truth," stating that it depends "on the person you're speaking with, the criminal history of the person you're speaking with, the neighborhood in which they live, the community in which they live, the things they are saying."[858]

793. Gagan explained that:

a. Members of the "upper crust" usually "tell the police the truth, the whole truth, and nothing but the truth in the first encounter."[859]

---

[854] *Id.* at 143:12–25.
[855] *Id.* at 144:6–17.
[856] *Id.* at 142:4–15.
[857] *Id.* at 153:5–12.
[858] *Id.* at 142:16–143:11.
[859] *Id.* at 138:3–16.

b. Those who are "professionals," "older," and "not part of the inner city culture" normally do not lie to police, and so it would maybe be exculpatory if someone of this background said a defendant was innocent.[860]

c. A statement by a non-resident of the "inner city" might have to be disclosed (where it might not have been exculpatory if made by an "inner city" resident).[861]

d. On the other hand, when "an inner city witness" lies, saying "that somebody didn't do something that the police officer thinks they did," that witness's statement "is not exoneration material" because inner-city witnesses "hardly ever" tell the complete truth to police in the first encounter.[862]

e. An eyewitness to a shooting in "that community" would "[a]bsolutely" say the shooter was not there, and so Gagan "disagree[s] vehemently that that's exculpatory," but it is possible that "later, when you work him—and you work with him, [] you develop and get the truth out of him."[863]

f. If a prosecutor became aware that a purported eyewitness to a crime told police earlier in the investigation that the defendant absolutely was not involved, the prosecutor would not have been required to disclose that to the defense under *Brady* in 1976.[864]

g. Where there is disclosure of facially exculpatory statements by inner-city witnesses (believed by prosecutors to not be exculpatory), and the case is tried to "a jury of

---

[860]   *Id.* at 145:5–25.

[861]   *Id.* at 149:4–18.

[862]   *Id.* at 138:3–16.

[863]   *Id.* at 146:25–147:18

[864]   *Id.* at 147:22–148:8.

affluent Caucasian people who don't understand the interactions in the inner city," things "would just go on, and on, and on" with "defense attorney[s]" or "experts on police interactions."[865]

794.   Gagan also had the following exchanges with Plaintiffs' counsel:

a.   "Q. Isn't a statement by an eyewitness, for example, that the defendant was not present and had nothing to do with the commission of the crime— A. Mm-hmm. Q. —isn't that on its face exculpatory? A. No, absolutely not. Q. I said on its face exculpatory. A. Not on its face. Not in that community."[866]

b.   "Q. So if I understand the answer you just gave correctly, most people would understand a witness saying that the defendant is innocent as exculpatory, but prosecutors in Erie County in 1976 and 1977 would not consider it exculpatory if it came from a witness in the inner city? THE WITNESS: You need more context than just from the inner city. But yes, that's kind of the gist of what I'm saying."[867]

795.   Gagan concluded that exculpatory or impeaching statements made by Woodruff and Hough were not *Brady* material because Woodruff and Hough "were the product of the inner city": "They were poor, or at least economically disadvantaged, whatever euphemism you want," they were "living in government projects," and their "whole culture would be, do not cooperate with the police."[868]

---

[865]   *Id.* at 224:8–225:21.

[866]   *Id.* at 146:18–147:3.

[867]   *Id.* at 225:23–226:8.

[868]   *Id.* at 150:12–151:12.

796.    Accordingly, Gagan testified, Woodruff's initial statement denying knowledge of the Crawford murder was "not exculpatory" because of "the way young men comport themselves in the inner cities vis-a-vi[s] law enforcement."[869]

797.    Likewise, Gagan claimed Hough's initial denial could be disbelieved because the "experienced prosecutors" knew "that Mr. Hough wasn't telling the truth at the time."[870]

798.    Gagan acknowledged that the 15-year-old Hough "'[c]hanged his story'" to inculpate Boyd only after he was "worked on by the police and the DAs,"[871] and that he later recanted the accusation extracted from him,[872] but he nevertheless concluded that Hough's recantation was not *Brady* material because "[t]hey recant as often as they don't" and "the point is to find out—you know, to get them to tell the truth."[873]

799.    Gagan believed that, since "Hough was an inner-city kid," the prosecutors "were entitled to discount the truthfulness of his recantation."[874]

800.    The Simpson's Delicatessen interview contradicting Hough's account was not *Brady* material either, in Gagan's view, because the prosecution naturally "wouldn't get the cooperation from the witnesses in the community and in the neighborhood."[875]

801.    There were a number of other instances in Gagan's testimony where he confined *Brady* to "exonerating" or "conclusive" evidence.[876]

---

[869]    *Id.* at 223:8–17.

[870]    *Id.* at 294:14–22.

[871]    *Id.* at 293:16–21.

[872]    *Id.* at 411:21–412:4.

[873]    *Id.* at 152:9–18.

[874]    *Id.* at 361:3–18.

[875]    *Id.* at 409:11–411:7.

[876]    *Id.* at 336:19–337:10, 354:5–10, 380:2–10, 402:23–403:7, 407:4–13.

802.     An example of the ECDA practices Gagan described occurred in *People v. Clark*,

a high-profile murder conspiracy case. On March 2, 1978, the ECDA defended a late disclosure of

a P-73 report indicating the primary eyewitness initially identified the prosecution's star witness

as one of the killers, and that an anonymous call identified people other than the defendants as the

true culprits.[877]

803.     The P-73 report was not disclosed to the defense until after the eyewitness's direct

examination—two weeks into trial, seven months after the court had ordered the disclosure of

*Brady* material, and seventeen months after the indictment.[878]

804.     The ECDA defended the late disclosure on the basis that the identification was

tentative, the anonymous call was not reliable, and leads to alternative suspects do not constitute

*Brady* material.[879]

805.     The court responded to the ECDA's argument by stating, "I don't see how [the

report] can be read as anything but favorable to the defendants."[880]

806.     Notwithstanding *Agurs*, ADA Henry testified in his deposition in this case that at

the time of Walker's trial, he understood that *Brady* only applied where there was a defense request

for disclosure.[881]

807.     Despite *Agurs* being rendered in 1976, ADA Solomon, who was at the ECDA from

1975 to 1981 or 1982, did not recall whether any of his superiors ever discussed with him changes

---

[877]     Ex. 61 (Clark Trial Tr.) at 1680:11–1716:11.

[878]     *Id.* at 1680:1, 1680:18–1683:8; Ex. 62 (Clark Case Card) at COE012725.

[879]     Ex. 61 (Clark Trial Tr.) at 1705:1–1706:16, 1710:19–1716:11.

[880]     *Id.* at 1725:5–14; 1726:2–11.

[881]     *Boyd* Dkt. 168-17 (Henry Dep.) at 216:6–218:21; *see also id.* at 223:7–12 (Henry presumed that his practices were based upon the practices of the office generally, and that others did what he did).

in the law concerning discovery that necessitated changes in policy, or any conversations with superiors about specific changes to discovery practice.[882]

808.   When McLeod wrote to ADA Henry requesting disclosure of *Brady* material, ADA Henry responded that McLeod needed to specify what material he was requesting.[883]

809.   ADA Henry testified that he hopes his general practice was to document whatever information he disclosed to defense counsel and that the possibility of a conviction being overturned, due to a failure to disclose *Brady* material, was one of the reasons he would make a record of such disclosure.[884]

810.   ADA Henry's *Brady* disclosure practices were based upon the practices of the ECDA generally.[885]

811.   In *People v. Ivey*, Ind. No. 41,539, the prosecutor, ADA Albert Ranni, a high executive in the ECDA,[886] stated on October 18, 1976, in response to a complaint by the defense that he had withheld law enforcement notes of conversations with witnesses, "They were not withheld, you didn't ask for it."[887]

812.   In the Crawford matter, the photograph showing footprints in the snow leading from Crawford's backyard towards the backyard of his neighbor Watson, was only disclosed to McLeod

---

[882]    Ex. 52 (Solomon Dep. Day I) at 55:5–12.

[883]    Exs. 63 (McLeod Letter to Henry); 64 (Henry Letter to McLeod).

[884]    *Boyd* Dkt. 168-17 (Henry Dep.) at 112:18–114:5, 224:23–225:22.

[885]    *Id.* at 223:7–12.

[886]    *See infra*, Counterstatement ¶¶ 870–75 (concerning Ranni's high-level position).

[887]    Ex. 65 (Ivey App. App'x) at A-91:5–92:5.

where he made a specific request for disclosure of "photographs" whereas the other attorneys did not.[888]

813.    According to ADA David Henry, testifying on behalf of the County, the following police reports were not *Brady* material under the ECDA's policies on *Brady* as of 1977:

a. a P-73 report documenting that Tyrone Woodruff changed his story that he knew nothing about the crime and implicated himself and four of his friends as having committed the crime together only after police allowed him to overhear an anonymous telephone caller accuse him and his friends of participating in the murder and dividing up the robbery proceeds, after which he was shaking and so nervous he could not hold his cup of coffee;[889]

b. P-73 reports documenting that Andre Hough told two different stories and recanted his story accusing Boyd;[890]

c. P-73 reports documenting witness statements that the crime occurred at 11:30 p.m. or later together with Fillmore Cab Company records showing that Tyrone Woodruff and John Walker were picked up from the Glenny Drive Projects and driven home at 11:28 p.m.[891]

d. a P-73 report documenting an anonymous call accusing Jerome Boyd in the murder and police documentation that detectives showed Jerome Boyd's mugshot to witnesses at the bar where the victim had been drinking, and two witnesses

---

[888]    *See infra*, Counterstatement ¶¶ 493–99.

[889]    *Boyd* Dkt. 168-17 (Henry Dep.) at 303:12–312:13.

[890]    *Id.* at 312:15–317:17.

[891]    *Id.* at 353:10–355:11.

identified Jerome Boyd as having been present at the bar on the night of the murder;[892] and

e.  P-73 reports and signed statements that the barmaid suspected Larry Watson of killing William Crawford; that Watson acted strangely when he returned to the bar after walking Crawford home; that Watson *volunteered* to walk Crawford home, which contradicted Watson's trial testimony that walked Crawford home only after someone else asked him to do so; and detectives' observation that the barmaid's and bar patron's accounts contradicted Watson's denial that he saw Crawford display a great deal of money.[893]

814.   ADA Henry also testified, concerning a portion of a P-73 report that stated that Woodruff and Hough were "released" following their grand jury testimony (suggesting that they were in custody until they gave the testimony), that he does not think it should have been disclosed to defense counsel as *Brady* material.[894]

815.   ADA Henry claimed that Jeffrey's inculpation of Watson was not *Brady* material because, in Henry's view, she had no basis to say what she said.[895]

816.   ADA Drury admitted he did not disclose anything as *Brady* material in the course of handling the Crawford murder prosecutions.[896]

817.   This was despite several pretrial court orders that he disclose all *Brady* material.[897]

---

[892]   *Id.* at 360:15–361:10.

[893]   *Id.* at 364:7–371:7.

[894]   *Id.* at 329:5–15.

[895]   *Id.* at 368:10–371:7.

[896]   *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 26:4–14; 26:15–19; 140:1–5, 140:15–19; 158:18–23.

[897]   Ex. 14 (Dep. Ex. 68: Combined Pretrial Discovery) at 3–4, 5, 23–25.

818.   At his deposition in this case, ADA Drury testified that he was familiar with whatever policies the ECDA had and tried to conform to them, including policies concerning compliance with *Brady*, that he tried to conform with DA Cosgrove's expectations in the handling of criminal prosecutions, and that he tried to conduct himself regarding *Brady* in a way that he thought would meet with DA Cosgrove's approval.[898]

819.   ADA Drury claimed that in the Boyd case, he tried to conform to whatever he understood the policies of the ECDA were with respect to *Brady* disclosure.[899]

820.   ADA Drury testified that any decision he made not to produce documents or information under *Brady* was consistent with the ECDA's policies and practices.[900]

821.   ADA Drury testified at his deposition in this case that he did not consider the following to be *Brady* material:

   a.   As of 1977, a determination by the police polygraph examiner that a witness was deceptive.[901]

   b.   As of 1976-77, the refusal by a prosecution witness to take a polygraph examination.[902]

   c.   The P-73 report showing that, in contradiction to his trial testimony that police brought him to their office with his father and pastor, Woodruff was taken there

---

[898]   *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 35:20–36:18.

[899]   *Id.* at 57:9–15.

[900]   *Id.* at 160:23–161:6.

[901]   *Id.* at 168:23–169:10.

[902]   *Id.* at 171:14–20.

alone, and that his father and pastor arrived at a subsequent point after Woodruff had already admitted that he was a witness to the Crawford homicide.[903]

    d.   A P-73 report documenting that Tyrone Woodruff changed his story that he knew nothing about the crime and implicated himself and four of his friends as having committed the crime together only after police allowed him to overhear an anonymous telephone caller accuse him and his friends of participating in the murder and dividing up the robbery proceeds, after which he was shaking and so nervous he could not hold his cup of coffee.[904]

    e.   Hough's initial denial of knowledge concerning the homicide.[905]

    f.   A P-73 report documenting that Debbie Jeffrey reported that Larry Watson and his wife left without saying goodbye, and without finishing their drinks, which struck Jeffrey as odd.[906]

822.    In *People v. Ivey*, on October 18, 1976, ADA Ranni argued that police officers' notes do not constitute *Rosario* material.[907]

823.    Earlier that year, the Court of Appeals, in *People v. Consolazio*, held that "abbreviated notes capsulizing witnesses' responses to questions relating directly to material issues raised on defendant's trial" constituted *Rosario* material.[908]

---

[903]    *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 288:10–13, 290:6–17.

[904]    *Id.* at 304:22–306:2, 313:22–314:9.

[905]    *Id.* at 352:16–354:13.

[906]    *Id.* at 419:17–420:13.

[907]    Ex. 65 (Ivey App. App'x) at A-86:9–21.

[908]    40 N.Y.2d 446, 453–54 (1976).

824.    On appeal in *Ivey*, the ECDA stated in its respondent's brief, dated April 29, 1981, that ADA Ranni's understanding of *Rosario* "was in error," but argued that the case law on the disclosure of police and prosecutor notes was new enough that "the prosecutor's interpretation of *Rosario* was arguably understandable."[909]

825.    In 1977, ADA Drury also did not understand *Rosario* to require disclosure of the handwritten notes of police, and his understanding was consistent with the practices of the ECDA at the time.[910]

826.    ADA Henry never asked BPD detectives for handwritten notes that they had prepared in connection with any case he was involved with, including the Walker and Martin cases.[911]

827.    At the time of the Walker trial, Henry did not consider a P-73 report purporting to summarize the statement of a witness who testified at trial to be *Rosario* material.[912]

828.    By contrast, Gagan testified that in 1977, P-73 reports memorializing witness statements clearly qualified as *Rosario* material; that ECDA prosecutors almost certainly knew about the BPD's note destruction; and that the DA should have instructed police officers that they must preserve notes subject to *Rosario*.[913]

---

[909]    Ex. 66 (Ivey Resp. Br.) at 39–40.

[910]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 99:1–14; *see also id.* at 137:3–7; 168-15 (Drury Dep. Day II) at 384:23–385:13.

[911]    *Boyd* Dkt. 168-17 (Henry Dep.) at 198:3–8, 199:2–8.

[912]    *Id.* at 192:13–19; *see also id.* at 194:19–22 (does not believe that a January 12, 1976, P-73 report from Detectives Paul R. Delano and V.J. Pantano to Chief of Homicide Leo J. Donovan, relating statements by Debbie Jeffrey, falls under the *Rosario* rule as it existed in 1977).

[913]    *Boyd* Dkt. 169-1 (Gagan Dep.) at 125:3–9, 126:13–127:4, 353:17–355:14, 360:8–25, 362:7–25.

829.     There was no ECDA policy requiring the production as *Rosario* material of a statement by a witness that was described in a P-73 report authored by a detective.[914]

830.     In *People v. Cadby*, ADA George Quinlan had a colloquy with the court in which he appeared to deny that a police report relaying the substance of what a witness said had to be turned over to the defense.[915]

831.     Gagan testified that P-73 reports containing summaries of witness statements had to be disclosed under *Rosario* in 1977, and the failure to disclose them would have been so clearly illegal as to be "unprofessional," "unfathomable," and career-endangering.[916]

## X.     The ECDA Maintained a Policy of Deliberate Indifference to the Fair Trial Rights of Criminal Defendants

832.     Numerous court decisions close in time to DA Cosgrove assuming office put him on notice of fair trial violations that ECDA prosecutors had been committing:

   a.   *People v. Moore,* 26 A.D.2d 902 (4th Dep't 1966): the Appellate Division reversed the conviction and required a new trial because the prosecutor, during his summation, improperly commented on the defendant's exercise of his constitutional right to remain silent and "exceeded proper limits in telling the jury that if they wanted to live in a community where crime runs rampant they should acquit the defendant."[917]

---

[914]     *Boyd* Dkt. 168-17 (Henry Dep.) at 194:4–8 (knows of no such policy); *Boyd* Dkt. 168-18 (Verrastro Dep.) at 68:13–18 (does not recall whether he would have turned over a police report that reflected a conversation with Woodruff to the defense under *Rosario*).

[915]     Ex. 60 (Cadby Trial Tr.) at 772–74.

[916]     *Boyd* Dkt. 169-1 (Gagan Dep.) at 353:17–354:4, 354:24–355:18, 360:8–25, 362:7–25; *see also id.* at 366:4–367:8, 371:5–18, 450:11–23.

[917]     Ex. 67 (*People v. Moore,* 26 A.D.2d 902 (4th Dep't 1966)).

b. *People v. Slaughter*, 28 A.D.2d 1082 (4th Dep't 1967): the court reversed a murder conviction after the prosecutor, ridiculing the defendant's insanity defense, stated falsely in summation that if the defendant was acquitted, he would be "on the streets again within 30 days," decried permissive societal attitudes, urged the jury not to "extend to the Henry Slaughters of the world the license to strike out and kill … or are you going to call them to task? Are you going to protect, finally here, … the rights of the community in which you live."[918]

c. *People v. Zachery*, 31 A.D.2d 732 (4th Dep't 1968): the Appellate Division reversed a robbery conviction due to the "prejudicial conduct of the prosecutor in calling to the witness stand a co-defendant with advance knowledge that he was going to invoke the privilege against self-incrimination and refuse to answer questions" and the "impropriety" in eliciting the out-of-court statement of a co-defendant incriminating the defendant.[919]

d. *People v. Washington,* 32 A.D.2d 605 (4th Dep't 1969): the Appellate Division reversed a robbery conviction where the prosecutor improperly cross-examined the defendant repeatedly whether he had twice kicked a police officer in the groin, in an improper effort "to persuade the jury that defendant was an habitual groin kicker."[920]

e. *People v. Damon*, 24 N.Y.2d 256 (1969): the Court of Appeals reversed a child sexual assault conviction because an Erie County prosecutor in summation argued

---

[918]   Ex. 68 (*People v. Slaughter*, 28 A.D.2d 1082 (4th Dep't 1967)).

[919]   Ex. 69 (*People v. Zachery*, 31 A.D.2d 732 (4th Dep't 1968)).

[920]   Ex. 70 (*People v. Washington,* 32 A.D.2d 605 (4th Dep't 1969)) at 606.

that the defendant was "a homosexual or deviate," improperly vouched for the police while personally attacking defense counsel, falsely argued prejudicial "facts" that were not in evidence, and made inflammatory remarks to the jury about the nature of the crime.[921]

      f.   *People v. Cardinale*, 35 A.D.2d 1073 (4th Dep't 1970): although the defendant was charged only with criminal contempt, the court reversed the conviction because of the prosecutor's "highly prejudicial" opening statement that the grand jury had heard evidence that the defendant, police officers, and public officials had been involved in a gambling conspiracy.[922]

833.    DA Cosgrove knew of these decisions, not just as a practicing lawyer,[923] but also because, when he took office, he reviewed every ECDA case file going back to 1940.[924]

834.    In the months prior to DA Cosgrove's assuming office, the *Buffalo Evening News* carried reports of two additional instances of prosecutorial misconduct:

      a.   *People v. Williams*: the *Buffalo Evening News* reported on August 22, 1973 that the court declared a mistrial, after ADA Drury asked the defendant "if he had not raped another woman in his apartment in December 1972 while awaiting trial in this case," where the charges related to the alleged incident had been dismissed. The

---

[921]    Ex. 71 (*People v. Damon*, 24 N.Y.2d 256 (1969)) at 259–60.

[922]    Ex. 72 (*People v. Cardinale*, 35 A.D.2d 1073 (4th Dep't 1970)) at 1073.

[923]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 26:13–16 (practiced law in Buffalo for 11 years prior to becoming district attorney).

[924]    *Id.* at 110:5–13.

*Evening News* reported the court as stating that the question "poisoned the atmosphere so the defendant could no longer get a fair trial."[925]

    b.   *People v. Gesegnet*: the *Evening News* reported on December 6, 1973 that the court declared a mistrial "based on prejudicial statements made by the prosecution during opening remarks to the jury.".["[926]

835.    Cosgrove testified he is and was an avid reader of the Buffalo newspapers.[927]

A.    <u>The County Had Notice of the Need for Corrective Action During the Cosgrove Administration</u>

836.    During DA Cosgrove's tenure, there were numerous additional instances in which courts, at the trial and/or the appellate levels, found misconduct by ECDA prosecutors regarding their disclosure and other fair trial obligations, including their *Brady* obligations and their handling of witness testimony and summation advocacy:

    a.   *People v. Reingold*, 44 A.D.2d 191 (4th Dep't Apr. 11, 1974): the Appellate Division reversed a burglary conviction because the prosecutor, in bad faith, cross-examined the defendant to show he had a criminal propensity in a manner that was "so improper and inflammatory that it made an impartial consideration of the competent evidence adduced at trial virtually impossible."[928]

---

[925]    Ex. 73 (Buffalo Evening News, *Mistrial Declared in Attack Case*, Aug. 22, 1973).

[926]    Ex. 74 (Buffalo Evening News, *DA May Appeal Dismissal in Case Of Patrolman*, Dec. 27, 1973).

[927]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 130:11–131:4.

[928]    Ex. 75 (*People v. Reingold*, 44 A.D.2d 191 (4th Dep't Apr. 11, 1974)) at 195–96.

b. *People v. Freeland*, 45 A.D.2d 814 (4th Dep't June 27, 1974): the Appellate Division, while declining to reverse the conviction, noted it does "not condone the excesses of the District Attorney's summation."[929]

c. *People v. Ketchum*, 35 N.Y.2d 740 (Oct. 23, 1974): the Court of Appeals noted "grievous misconduct by the prosecution in cross-examination and summation which we strongly condemn."[930]

d. *People v. Donaldson*, 49 A.D.2d 1004 (4th Dep't Oct. 24, 1975): the Appellate Division, in reversing the conviction, condemned the prosecutor for arguing improper inferences from hearsay evidence, improperly arguing a negative inference against the defendant for exercising his constitutional right not to testify, and for his "entirely improper and prejudicial" urging of the jury to credit the testimony of a prosecution witness with a long criminal record because the grand jury had believed him.[931]

e. *People v. Greer*, 49 A.D.2d 297 (4th Dep't Nov. 6, 1975): the court reversed a rape conviction because of the prosecutor's "improper" cross-examination of the defendant impermissibly intended to show his criminal propensity.[932]

f. *People v. Bader & Horton*: the *Buffalo Evening News* reported on February 27, 1976 that the trial judge ordered a new trial on the murder charges because the prosecution withheld fire investigator's reports showing the building, to which fire

---

[929]   Ex. 76 (*People v. Freeland*, 45 A.D.2d 814 (4th Dep't June 27, 1974)) at 815.

[930]   Ex. 77 (*People v. Ketchum*, 35 N.Y.2d 740 (Oct. 23, 1974)) at 741.

[931]   Ex. 78 (*People v. Donaldson*, 49 A.D.2d 1004 (4th Dep't Oct. 24, 1975)) at 1005.

[932]   Ex. 79 (*People v. Greer*, 49 A.D.2d 297 (4th Dep't Nov. 6, 1975)) at 304–05.

had been set, had been weakened by looting and previous arsons.[933] This rendered the defense unable "to present intelligently for the jury all probabilities pointing to the death of" a firefighter who died fighting the fire.[934]

g.  *People v. Balsano*, 51 A.D.2d 130 (4th Dep't Feb. 20, 1976): the court reversed a conviction for unlawful imprisonment where, among other things, the prosecutor improperly questioned the defendant about criminal conduct not related to his credibility, improperly elicited that he had a pending charge, improperly asked the jury to draw a negative inference from the defendant's failure to call a witness, and repeatedly forced the defense to object to "inflammatory" remarks, causing the trial judge to "properly admonish[] the prosecutor."[935]

h.  *People v. Weston,* 51 A.D.2d 881 (4th Dep't Feb. 24, 1976): the Appellate Division reversed a conviction for burglary, rape, and robbery because the prosecutor cross-examined the defendant in bad faith about his criminal propensity.[936] The court also agreed with the defendant's condemnation of the prosecutor's "inflammatory and intimidating" remarks in summation and admonished him not to "put his personal credibility behind his statements and make himself an 'unsworn witness.'"[937]

i.  *People v. Ivey*: it was discovered in the middle of this October 1976 trial that ADA Ranni had failed to disclose all *Rosario* material; the court ruled on October 18,

---

[933]   Ex. 80 (Buffalo Evening News, *New Trial Ordered in Arson Death*, Feb. 27, 1976).

[934]   *Id.*

[935]   Ex. 81 (*People v. Balsano*, 51 A.D.2d 130 (4th Dep't Feb. 20, 1976)) at 133–35.

[936]   Ex. 82 (*People v. Weston,* 51 A.D.2d 881 (4th Dep't Feb. 24, 1976)) at 882.

[937]   *Id.* at 883.

1976, over Ranni's argument to the contrary, that he was required to disclose police notes of conversations with witnesses.[938]

j.   In *People v. Clark*, a high-profile murder conspiracy case, the ECDA on March 2, 1978, defended a late disclosure of a P-73 report indicating the primary eyewitness initially identified the prosecution's star witness as one of the killers, and that an anonymous call identified people other than the defendants as the true culprits. The court responded to the argument by stating, "I don't see how [the report] can be read as anything but favorable to the defendants."[939]

k.   *People v. Mordino*: subsequent to a March 1975 trial, the defendant filed an appellate brief alleging that the prosecutor exhorted the jury to "engage in guilt by association."[940] The brief specifically noted that the prosecutor remarked, "if you walk like a duck and you talk like a duck and you keep the company of ducks, then you are a damned duck."[941] On July 12, 1977, the Appellate Division reversed on other grounds, but noted that "respondent frankly concedes in its brief, and we concur, that some of the prosecuting attorneys' remarks on summation should have been tempered and some omitted entirely. In particular, the characterization of the defendants as 'vultures' and the so-called 'duck joke' were improper."[942]

---

[938]   Ex. 65 (Ivey App. App'x) at A-86:22–93:17.

[939]   *See supra*, Counterstatement ¶¶ 802–05.

[940]   Ex. 83 (Mordino I App. Br.) at 15–16; *see also id.* at 21 (alleging that "the prosecutor argued strenuously that if a defendant associated with criminals then he was a criminal").

[941]   *Id.* at 15–16. The defendant-appellant's brief is undated, but the ECDA brief was dated May 3, 1977, Ex. 84 (Mordino I Resp. Br.), indicating that the defendant-appellant's brief was filed sometime before that, i.e., at some point before the June 1977 trial of John Walker.

[942]   Ex. 85 (*People v. Mordino*, 58 A.D.2d 197 (4th Dep't July 12, 1977)) at 207.

l.   *People v. McKinley*: the *Buffalo Evening News* reported on April 19, 1978 that the court declared a mistrial after the prosecution failed to disclose a copy of "an exculpatory statement [made by the defendant] taken by the arresting officer."[943]

m.   *People v. Reese*: the *Buffalo Evening News* reported on January 23, 1979 that a mistrial was declared in this case "because prosecutors reportedly failed to disclose all the material they had that was favorable to the defendant."[944] ADA Drury was the prosecutor.[945]

n.   *People v. Cadby*: the defendant moved for a mistrial on March 12, 1979, on the grounds that the prosecution had failed to disclose until the fourth day of trial a P-1191 police report prepared by the BPD based on a statement taken from the complainant immediately after the incident.[946] The court denied the defendant's mistrial motion on the grounds that the report was duplicative of other materials provided to the defense, but admonished the ECDA:

> THE COURT: …as an admonition to the prosecutor's office, and I strongly want this to be passed on to your colleagues, Mr. Quinlan—
>
> MR. QUINLAN: Yes, sir.
>
> THE COURT: —you read this case [referring to *People v. Consolazio*, 40 N.Y.2d 446 (1976)]. The better practice would be to direct—to turn over forthwith, and by engaging

---

[943]   Ex. 86 (Buffalo Evening News, *Judge Grants Mistrial In McKinley Slaying Case*, Apr. 19, 1978; Buffalo Courier-Express, *Judge Grants Mistrial In Knifing Case*) at BOYD-WALKER-00033784.

[944]   Ex. 87 (Buffalo Evening News, *Reese Murder Case Ends in Mistrial*, Jan. 23, 1979); *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 37:18–21 (judge made a finding that he had failed to disclose certain paperwork that he should have).

[945]   *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 36:20–37:23; *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 277:21–278:8.

[946]   Ex. 60 (Cadby Trial Tr.) at 744–49, 752–54.

in a collateral analysis as to whether the defendant would or would not be technically entitled to disclosure, you have been assigned to the major violent felony part, Mr. Quinlan, and forthwith I want all those files to be gleaned, and those items are to be turned over to the defense upon command. Is that clear?[947]

o. *People v. Johnson*, 62 A.D.2d 555 (4th Dep't June 2, 1978): all five justices of the Appellate Division condemned Ranni's behavior in this trial, which took place from June 6 to 23, 1977.[948]

    i. The majority opinion of three justices called out ADA Ranni by name in expressing their "concern with misconduct of Mr. Ranni throughout the trial" while warning, in an apparent indirect reference to the County, that "unadulterated unfairness and deceit have become the rule."[949]

    ii. The majority did not reverse the conviction because of the overwhelming evidence of the defendant's guilt, but in the dissenting opinion by Justice Hancock, he and Justice Witmer detailed misconduct by ADA Ranni.[950]

---

[947] *Id.* at 798–99. The defendant-appellant's brief was dated December 11, 1979. Ex. 88 (Cadby App. Br.) at 80. The ECDA's brief as respondent was dated January 14, 1980. Ex. 89 (Cadby Resp. Br.) at 41. The defendant-appellant's reply brief was dated January 1980. Ex. 90 (Cadby Reply Br.) at BOYD-WALKER-00027494. On appeal, the Appellate Division agreed that the withheld police report was *Rosario* material. Ex. 91 (*People v. Cadby*, 75 A.D.2d 713 (4th Dep't April 8, 1980)) at 714. It remanded for a hearing on the issue of duplicative equivalence, because the record before it concerning the trial court's ruling on the mistrial motion was incomplete, due to absence of the prior statements of which the report was held to be duplicative. *Id.*

[948] Ex. 92 (Johnson Case Card) at COE0012719.

[949] Ex. 93 (*People v. Johnson*, 62 A.D.2d 555 (4th Dep't June 2, 1978)) at 560.

[950] *Id.* at 569–71.

iii.  Justice Hancock wrote "the record is ... permeated with acts of improper, overreaching and prejudicial conduct by the prosecuting attorney [.]"[951]

iv.  Justice Hancock recorded his and Justice Witmer's "particular disapproval" of ADA Ranni accusing the defense of having "sugared up," "staged," and "rehearsed" the testimony of defense witnesses.[952]

v.  They condemned as "highly improper" his having accused the defendant of lying when he pleaded not guilty to unrelated charges only to later admit guilt, and then argued in summation that the defendant's not guilty plea in the case at hand was similarly false.[953]

vi.  Justice Hancock disapproved of the prosecutor's tactics "in asking irrelevant questions of the defendant ... which were obviously asked for their prejudicial effect," such as whether he remembered admitting to a judge in an unrelated case that he had "called the arresting officer ... a 'motherf[***]er,'" and portraying the defendant as a "hard drug traffic[ker]" through repetitive questioning distorting his involvement in small marijuana sales.[954]

vii.  Finally, Justices Hancock and Witmer condemned ADA Ranni for deriding defense counsel by calling him "Dr. Hocus Pocus" and saying that "the DA is not going to prosecute for perjury" because defense counsel's arguments had not been made under oath.[955]

---

[951]  *Id.* at 569.

[952]  *Id.* at 569.

[953]  *Id.*

[954]  *Id.* at 569–70.

[955]  *Id.* at 570.

viii.   Summing up, Justice Hancock wrote: "From the record there clearly emerges
the picture of an overbearing prosecutor obsessed with the idea of obtaining
a conviction at any costs, ignoring the court's rulings, deliberately asking
improper and prejudicial questions, and engaging in unpardonable efforts in
comments during the trial and in summation to disparage defense counsel and
to destroy his credibility with the jury."[956]

p.   *People v. Ashley*: on November 7, 1978, the *Buffalo Evening News* reported that
the court declared a mistrial because ADA Drury had questioned the defendant,
while his attorney, James McLeod, was in chambers with the judge and ADA Louis
J. Gicale, Jr., about his having been a witness in an unrelated case, and ADA Gicale
then made references to the information learned by Drury in his cross-examination
of the defendant.[957]

q.   *People v. Keller*, 67 A.D.2d 153 (4th Dep't April 6, 1979): the Appellate Division
reversed an assault and weapons conviction due to misconduct by an ECDA
prosecutor.[958] In an unanimous opinion by five justices, the court condemned the
prosecutor for "egregious errors" and "grossly improper remarks" in repeatedly
referring to the defendant and his witnesses as liars, repeatedly expressing his

---

[956]   *Id.* at 570–71. The defendant-appellant's brief was dated February 23, 1978. Ex. 94
(Johnson App. Br.) at 59. The ECDA's brief as respondent was dated March 10, 1978. Ex. 95
(Johnson Resp. Br.) at 61. Subsequently, on February 18, 1984, a federal district court issued
habeas relief because Ranni's pervasive misconduct had violated the defendant's federal
constitutional right to due process and a fair trial, noting that the ECDA had conceded that Ranni's
conduct had been "improper." Ex. 96 (*Johnson v. Smith*, CIV-81-329E (W.D.N.Y. Feb. 18, 1984))
at 7-11.

[957]   Ex. 97 (Buffalo Evening News, *Improper Questions Cause Mistrial Order*, Nov. 7, 1978).

[958]   Ex. 98 (*People v. Keller*, 67 A.D.2d 153 (4th Dep't Apr. 6, 1979)) at 158–61, 164.

personal opinion about witnesses' credibility, implying in summation there was a lie detector test and other evidence the jury had been prevented from hearing, and making various "irrelevant and inflammatory" remarks which, in their totality, "patently deprived defendant of a fair trial[.]"[959]

r.   *People v. King,* 72 A.D.2d 930 (4th Dep't Nov. 16, 1979): the Appellate Division, while reversing an attempted robbery conviction because of the misconduct of the trial judge, noted that the prosecutor joined him in some of it, including holding *ex parte* "conferences … outside of the presence of defense counsel."[960]

s.   *People v. Steele, Steele, and Rehrauer*: on April 15, 1980, the *Buffalo Evening News* reported that the court dismissed the underlying indictments because of the prosecutor's failure to turn over favorable evidence.[961]

t.   *People v. Duke*: on May 15, 1980, the *Buffalo Evening News* reported that the court dismissed charges against the defendant, implying that he did so because of the prosecutors' failure to present exculpatory evidence in the grand jury.[962]

u.   *People v. Zurenda*: on October 8, 1980, the *Buffalo Evening News* reported that the court declared a mistrial because "the prosecutor had called into question the

---

[959]   *Id.* at 158–61. The trial in this case was held from May 16 to 19, 1978. Ex. 99 (Keller Case Card) at COE012722. The defendant-appellant's brief was dated December 28, 1978. Ex. 100 (Keller App. Br.) at 18. The ECDA's brief as respondent was dated January 25, 1979. Ex. 101 (Keller Resp. Br.) at 20.

[960]   Ex. 102 (*People v. King,* 72 A.D.2d 930 (4th Dep't Nov. 16, 1979)) at 930. The trial in this case was held in October 1976. Ex. 103 (King Resp. Br.) at 2. The defendant-appellant's brief was dated November 27, 1978, Ex. 104 (King App. Br.) at BOYD-WALKER-00031880, and the ECDA's brief as respondent was dated August 3, 1979, Ex. 103 (King Resp. Br.) at 39.

[961]   Ex. 105 (Buffalo Evening News, *Charges Dismissed In Stolen-Truck Sale*, Apr. 15, 1980).

[962]   Ex. 106 (Buffalo Evening News, *Insurance Fraud Charge Against Officer Dropped*, May 15, 1980).

credibility of his own witness by showing contradictions in her testimony compared to previous statements she made against her brother."[963]

v.   *People v. Potenza*: On October 20, 1980, the *Buffalo Evening News* reported that during the trial in this case, where ADA Ranni was the prosecutor, the court "ruled that a weeklong delay by prosecutors in obtaining the original copy of an allegedly incriminating tape-recording was improper" and granted a defense mistrial motion, saying "the latest prosecution delay was merely the 'culmination' of a series of legal problems that had marred the trial."[964] The Appellate Division, while refusing to bar a second trial, noted that many of defense counsel's objections to the prosecutor's improper opening statement had been sustained and the court had "minimized the possible prejudice by admonishing the prosecutor before the jury."[965] The Appellate Division also noted that it did not "condone" the prosecutor's repeated failure to follow the court's warning against leading questions.[966]

w.   *People v. Mordino*, 83 A.D.2d 775 (4th Dep't July 9, 1981): the Appellate Division declined to reverse a murder conviction for prosecutorial misconduct by ADA Ranni, but only because defense counsel did not object to many of the improper questions, where the defense did object the court gave "curative" instructions to

---

[963]   Ex. 107 (Buffalo Evening News, *Mistrial Is Declared Over Questioning Of Zurenda's Sister*, Oct. 10, 1980).

[964]   Ex. 108 (Buffalo Evening News, *Mistrial Ruled On Tape Delay In Potenza Case*, Dec. 30, 1980).

[965]   Ex. 109 (*Matter of Potenza v. Kane*, 79 A.D.2d 467 (4th Dep't Mar. 27, 1981)) at 472.

[966]   *Id.* at 473.

prevent prejudice, and the conduct was not "*egregiously* improper … as would warrant a reversal" in the absence of contemporaneous objection.[967]

x.   *People v. Ivey*, 83 A.D.2d 788 (4th Dep't July 9, 1981): the Appellate Division overturned the defendant's conviction for three counts of murder and two counts of first-degree robbery, deploring ADA Ranni's behavior throughout the trial: "The record is replete with numerous and repeated acts of improper and prejudicial conduct … which deprived defendant of a fair trial."[968]

i.   Writing that it would discuss just a few of ADA Ranni's many acts of misconduct, the court noted that he repeatedly offered into evidence, in front of the jury, clearly inadmissible composite sketches that the court had ordered to be excluded, then made a "highly improper" argument to the jury "insinuat[ing] that the court's ruling unfairly precluded him" from offering such evidence.[969]

ii.   The court "condemn[ed] the prosecutor's inflammatory and prejudicial opening statement and summation," which tried to scare the jury that an acquittal "would mean that the 'murderer goes free,'" as well as his remarks

---

[967]   Ex. 110 (*People v. Mordino*, 83 A.D.2d 775 (4th Dep't July 9, 1981) at 776 (emphasis added); Ex. 111 (Mordino Case Card) at COE012718. The trial occurred in June 1978, *id.*, the defendant-appellant's brief was undated, Ex. 112 (Mordino II App. Br.), the District Attorney's brief as respondent was dated April 13, 1981, Ex. 113 at 60 (Mordino II Resp. Br.), and the defendant appellant's reply brief was undated, Ex. 114 (Mordino II Reply Br.).

[968]   Ex. 115 (*People v. Ivey*, 83 A.D.2d 788 (4th Dep't July 9, 1981) at 788; Ex. 116 (Ivey Case Card) at COE012727.

[969]   Ex. 115 (*People v. Ivey*, 83 A.D.2d 788 (4th Dep't July 9, 1981)) at 789.

to the jury implying "that he knew some things about the case he wished that they knew …"[970]

iii. The court also "condemned" the prosecutor's "attempts in his summation to inject sympathy for the victim" and his "disparagement" of the defendant's alibi witnesses and his lawyer.[971]

y. *People v. Ciccarelli*: on November 14, 1981, the *Buffalo Evening News* reported that, following a September 1981 bench trial, the court voided its earlier finding of guilty and dismissed the underlying sexual misconduct charge against the defendant because prosecutors withheld possible evidence.[972] According to the article, "[the court] said the assistant attorney who prosecuted the case, Joseph J. Terranova, had an obligation to divulge the fact that the victim in the case had suffered bruises in an earlier beating. He accused the prosecutor of 'overreaching' by making a medical judgment that the earlier beating would play no role in the case against Ciccarelli… [the court] ruled [the prosecutors'] explanation 'unacceptable' in his decision Friday and said the district attorney was obligated to inform the defense before the trial."[973]

z. *People v. Terry*, 83 A.D.2d 491 (4th Dep't Dec. 23, 1981): The Appellate Division reversed a robbery conviction in part because of the prosecutor's "totally improper"

---

[970]   *Id.* at 789.

[971]   *Id.* The trial occurred in October 1976. Ex. 116 (Ivey Case Card) at COE012727. The defendant-appellant's brief was dated January 26, 1981, Ex. 117 (Ivey App. Br.) at 99, and the ECDA's brief as respondent was dated April 29, 1981, Ex. 66 (Ivey Resp. Br.) at 57.

[972]   Ex. 118 (Buffalo Evening News, *City Judge Voids Conviction of Ciccarelli in Sex Assault Case*, Nov. 14, 1981).

[973]   *Id.*

argument that the jury should hold against the defendant his failure to produce to testify as an alibi witness a government employee whose identity was unknown to him.[974] Additionally, the defense had alleged in its appellate brief, as part of an ineffective assistance of counsel claim, that "[b]ecause no motion for 'Brady' material was made," the prosecutor failed to disclose significant favorable evidence until trial, including evidence that Calvin Kyle, an unindicted accomplice, received $1,000 of the alleged robbery proceeds; that Kyle in fact helped to plan the robbery; that the weapon used was a piece of metal, not a gun; that James Jones, a codefendant cooperating with the prosecution, was the one who forcibly took the money from the victim; and what the terms of Jones's plea bargain were.[975]

837.    During his tenure, DA Cosgrove read every piece of mail that came to the ECDA.[976]

838.    DA Cosgrove stated at his deposition in this case that it would have come to his attention if an ADA had done something unethical.[977]

839.    Gagan and ADA Drury did not dispute that the terms Drury used to refer to Woodruff in summation were consistent with practices of ECDA prosecutors at that time.[978]

840.    ADA Drury's summation argument that no suggestion or offers from police had anything to do with changing Woodruff's testimony or making it fit in any pattern, notwithstanding

---

[974]    Ex. 119 (*People v. Terry*, 83 A.D.2d 491 (4th Dep't Dec. 23, 1981)) at 492–96.

[975]    Ex. 58 (Terry App. Br.) at 9. The trial occurred in December 1979. Ex. 57 (Terry Resp. Br.) at 2. the defendant-appellant's brief was undated, Ex. 58, and the ECDA's brief as respondent was dated September 28, 1981, Ex. 57 at 28.

[976]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 33:12–18.

[977]    *Id.* at 104:2–23.

[978]    *Boyd* Dkt. 169-1 (Gagan Dep.) at 441:6–11; *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 428:7–11.

the February 11, 1976 P-73 reports showing how police confronted Woodruff with Hough's new story and Woodruff then adopted that story, was consistent with the policies and practices of the ECDA at that time.[979]

841.   ADA Drury testified that, prior to the Boyd trial in 1977, he had received training from Judith Manzella of the Appeals Bureau about what he was and was not allowed to argue in summation, and that when he delivered summations on behalf of the ECDA, including in the *Boyd* trial, he tried to conform to the training he had received.[980]

**B.    The ECDA Appeals Bureau Admitted Prosecutors Engaged in Improper Conduct**

842.   In at least five of the above cases, DA Cosgrove's Appeals Bureau admitted that prosecutors had committed improper conduct.

a.   *People v. Donaldson*: in its brief as respondent, dated July 29, 1975, the ECDA wrote that "[z]eal does not excuse the excesses of the prosecutor that are apparent on this record."[981]

b.   *People v. Johnson*: in its brief as respondent dated March 10, 1978, the ECDA conceded that ADA Ranni had committed "many … examples of impropriety," but wrote they were "not as serious or as prejudicial as might appear from Appellant's brief."[982]

c.   *People v. Keller*: in its brief as respondent, dated January 25, 1979, the ECDA stated that it "does not quarrel" with the contention that statements by the

---

[979]   *Boyd* Dkt. 168-15 (Drury Dep. Day II) at 400:2–18. Drury's summation remark that "the police turned over everything to you" was also consistent with office policy and practice. *Id.* at 428:12–429:10.

[980]   *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 56:15–57:8.

[981]   Ex. 120 (Donaldson Resp. Br.) at 9–10.

[982]   Ex. 95 (Johnson Resp. Br.) at 22.

prosecutor betraying his opinion that a witness was not believable "were wholly improper,"[983] and "does not dispute the impropriety of the prosecutor's gratuitous summation comments indicating, without evidentiary basis, and did not dispute that there existed proof tending to corroborate the testimony" of a witness,[984] but, "while in no way attempting to condone the comments made by the prosecutor, asserts that the totality of the trial circumstances do not indicate that a new trial is warranted."[985]

    d. *People v. Mordino*: in its brief as respondent dated April 13, 1981, the ECDA "admitted that the overly expressive candor and demonstrated incredulity of the prosecutor [in summation] may be criticized as a matter of tact and trial diplomacy[.]"[986]

    e. *People v. Cadby*: in its brief as respondent, dated January 14, 1980, the ECDA, while arguing that the prosecutor's failure to turn over a prior statement by the complainant "was not intentional," "conceded" that it "cannot be justified."[987]

    C.    <u>Notwithstanding the Above History, the ECDA Failed to Discipline Misconduct</u>

    843.    ADA Henry, testifying for the County, agreed at his deposition in this case "that the unethical actions of a prosecutor, if discovered, can poison an entire office."[988]

---

[983]    Ex. 101 (Keller Resp. Br.) at 8–9.

[984]    *Id.* at 12.

[985]    *Id.* at 8.

[986]    Ex. 113 (Mordino II Resp. Br.) at 37–38.

[987]    Ex. 89 (Cadby Resp. Br.) at 9 & n.1.

[988]    *Boyd* Dkt. 168-17 (Henry Dep.) at 239:2–10.

844.    Gagan testified that prosecutors should be disciplined for intentional, reckless and even negligent misconduct, and that this was important because of the need to maintain the office's legitimacy.[989]

845.    DA Cosgrove did not have any written policy spelling out what types of errors or misconduct could lead an ADA to be punished.[990]

846.    The ECDA had no writing of any kind making clear what kinds of penalties might be imposed for misconduct during the prosecution of a case.[991]

847.    The ECDA had no written policy providing for the investigation or discipline of ADAs who committed misconduct during a criminal prosecution.[992]

848.    The ECDA had no system, formal or informal, for conducting a disciplinary investigation or inquiry for the purpose of deciding whether an ADA should be disciplined.[993]

849.    The Cosgrove Administration never disciplined an ADA for prosecutorial misconduct, including but not limited to *Brady* and *Rosario* violations, mishandling of witnesses, or summation misconduct, as evidenced by the following:

  a.    On September 29, 2022, Plaintiffs served upon the County an interrogatory asking that, with regard to each of the ADAs associated with 31 court decisions, it "state whether such ADA was investigated or disciplined for misconduct in the

---

[989]    *Boyd* Dkt. 169-1 (Gagan Dep.) at 109:5–110:10.

[990]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 101:11–15; *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 58:4–12.

[991]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 58:17–59:4 (Drury had no knowledge of any such writing).

[992]    *Boyd* Dkt. 168-17 (Henry Dep.) at 241:3–15; 168-14 (Drury Dep. Day I) at 57:16–21.

[993]    *Boyd* Dkt. 168-17 (Henry Dep.) at 247:10–19; 168-14 (Drury Dep. Day I) at 60:9–18; 168-18 (Verrastro Dep.) at 29:14–22; 169-1 (Gagan Dep.) at 110:12–19.

prosecution that was the subject of the court decision by the County and, if so, state the date discipline was imposed and describe in detail the discipline imposed."[994] In a response dated August 31, 2023, the County stated that it "has searched for and is not aware of any instances of responsive discipline, negative performance evaluations, or referrals to any Departmental Grievance Committees for the ADAs involved[.]"[995]

b.   DA Cosgrove admitted that he did not impose punishment or discipline on a prosecutor at any point in his tenure, and that he does not recall any specific instance of his supervisors disciplining or punishing a prosecutor, or any prosecutor being disciplined for a *Brady* violation, *Rosario* violation, improper handling of a witness, improperly granting immunity, summation misconduct, or a discovery violation.[996]

c.   ADA Henry testified, on behalf of the County, that he is not aware of whether any ADA was ever disciplined between 1966 and 1985 for any misconduct of any nature committed during the course of a criminal prosecution.[997]

d.   ADA Drury testified that he never learned, while he was at the ECDA, that an ADA was investigated or disciplined by a supervisor or executive for their alleged failure to disclose *Brady*, *Rosario*, or discovery material.[998]

---

[994]   Ex. 121 (Plaintiffs' Interrogatories to County) at 8.

[995]   Ex. 55 (County's Aug. 31, 2023 Supp. Interrogatory Responses) at 3.

[996]   *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 105:13–107:16.

[997]   *Boyd* Dkt. 168-17 (Henry Dep.) at 253:15–19; *see also id.* at 246:8–23; 250:18–23, 252:17–253:6.

[998]   *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 62:4–12.

> e. ADA Solomon testified that he has no recollection of whether he was aware of any ADAs who were disciplined for their performance, and that he was not aware of any ADAs who were fired for performance reasons.[999]
>
> f. ADA Verrastro testified that he has no knowledge of any other ADAs being disciplined while he was at the ECDA.[1000]

850.    The Cosgrove Administration never investigated an ADA for prosecutorial misconduct.[1001]

851.    DA Cosgrove did not consider prior misconduct as a factor in deciding whether to promote an Assistant District Attorney.[1002]

852.    The ECDA had no system for evaluating the performance of ADAs.[1003]

853.    ADA Henry testified on behalf of the County that ADAs did not receive evaluations.[1004]

---

[999]    Ex. 52 (Solomon Dep. Day I) at 38:10–15, 39:3–5.

[1000]    *Boyd* Dkt. 168-18 (Verrastro Dep.) at 29:4–12.

[1001]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 105:10–12, 108:20–109:9; *Boyd* Dkt. 168-17 (Henry Dep.) at 249:20–250:8, 252:9–16; *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 61:12–17; 62:4–12.

[1002]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 109:16–21.

[1003]    *Id.* at 117:1–6; 117:7–15; *Boyd* Dkt. 168-17 (Henry Dep.) at 255:14–256:3; Ex. 52 (Solomon Dep. Day I) at 25:18–21, 37:3–38:4 (does not recollect his supervisor, ADA Ranni, having meetings with him to discuss his performance, and neither ADA Ranni nor any of his other supervisors ever came to talk to him about a problem with his performance), 37:20–23 (does not remember receiving written evaluations on his performance); *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 59:19–22 (does not think he ever received a written evaluation of his performance), 59:23–60:8 (believes there was a process for periodic oral evaluations of ADAs while he was at the ECDA, but he does not recall ever sitting down with an executive or supervisor and receiving an oral evaluation of his performance for a period of time).

[1004]    *Boyd* Dkt. 168-17 (Henry Dep.) at 255:14–256:3.

854.    ADA Henry, testifying for the County, could not say whether a single prosecutor had been disciplined, for misconduct of any nature in a criminal prosecution, between 1966 and 1985.[1005]

855.    ADA Drury was not disciplined despite fair trial violations that drew press attention.[1006]

856.    Immediately before DA Cosgrove took office, the *Buffalo Evening News* reported that a Supreme Court justice had declared a mistrial in a rape case after ADA Drury asked the defendant, during cross-examination, "if he had not raped another woman in his apartment in December 1972 while awaiting trial in this case," even though charges relating to such an alleged incident had been dismissed.[1007]

857.    The *Evening News* reported that the court stated that the question "poisoned the atmosphere so the defendant could no longer get a fair trial."[1008]

858.    At his deposition in this case, ADA Drury testified that he "agree[s]" with the judge's comment.[1009]

859.    On March 15, 1977, the *Buffalo Evening News* reported that at the trial of five defendants, including James Conorozzo, a prosecution witness, John Tarasek, testified that he saw Conorozzo and two other individuals standing in a group around the decedent's body; that on cross-examination, Tarasek admitted that the prosecutor, Drury, suggested to him, during questioning, the names of the individuals he testified he saw standing around the decedent's body;

---

[1005]    *Id.* at 253:15–19.

[1006]    *See infra*, Counterstatement ¶¶ 856–69.

[1007]    Ex. 73 (Buffalo Evening News, *Mistrial Declared in Attack Case*, Aug. 22, 1973).

[1008]    *Id.*

[1009]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 83:7–84:21.

that he further testified on cross-examination that he told Drury and later the grand jury that the group standing around the decedent's body included two men who were not defendants; and that during the questioning, "Drury called him a liar and threatened to charge him with perjury."[1010]

860.    On November 7, 1978, the *Evening News* reported that in the *Ashley* case, the court declared a mistrial because ADA Drury, who had been in the audience, had questioned the defendant, while his attorney, McLeod, was in chambers with the judge and the assigned prosecutor, and the results of Drury's questioning were then used by the assigned prosecutor in cross-examination of the defendant.[1011]

861.    At his deposition in this case, ADA Drury testified that the reported conduct would have been improper and that he is sure the judge did the right thing in declaring a mistrial.[1012]

862.    At his deposition in this case, DA Cosgrove agreed that a prosecutor's speaking to a defendant while his attorney and the judge are meeting in a separate room is improper, and that "something should happen to" such a prosecutor.[1013]

863.    McLeod testified that no at the supervisory or executive level of the ECDA ever asked to speak to him to obtain further details of what ADA Drury had done in the *Ashley* case.[1014]

---

[1010]    Ex. 122 (Buffalo Evening News, *Witness Says Two Men Invited Him to Join in Fatal Beating at Tavern*, Mar. 15, 1977); *see also Boyd* Dkt. 168-14 (Drury Dep. Day I) at 86:22–88:9 (unable to remember whether any of the reported facts cited in ¶ 859 are true).

[1011]    Ex. 97 (Buffalo Evening News, *Improper Questions Cause Mistrial Order*, Nov. 7, 1978); *see also Boyd* Dkt. 168-21 (McLeod Dep.) at 367:21–370:7 (testifying to the truth of these facts).

[1012]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 89:17–93:22.

[1013]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 167:16–21, 168:19–169:2.

[1014]    *Boyd* Dkt. 168-21 (McLeod Dep. Day II) at 372:18–373:6.

864.     On January 23, 1979, the *Evening News* reported that a mistrial was declared in the *Reese* case by the court "because prosecutors reportedly failed to disclose all the material they had that was favorable to the defendant."[1015] Drury was the prosecutor in this case.[1016]

865.     ADA Drury was never disciplined for prosecutorial misconduct in any of these cases.[1017]

866.     ADA Drury was never criticized by a superior for his conduct in these cases, or any other case.[1018]

867.     ADA Drury testified at his deposition in this case that his conduct in these cases was never investigated.[1019]

868.     DA Cosgrove testified that he did not conduct any investigation into Drury's conduct in the *Ashley*, *Reese*, or *Conorozzo* cases.[1020]

869.     Notwithstanding ADA Drury's apparent, repeated misconduct, DA Cosgrove testified he had no reason to believe Drury violated any of his office's policies and that his

---

[1015]     Ex. 87 (Buffalo Evening News, *Reese Murder Case Ends in Mistrial*, Jan. 23, 1979); *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 37:18–21.

[1016]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 36:20–37:23; 168-15 (Drury Dep. Day II) at 277:21–278:8.

[1017]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 32:6–15; *see also* 168-16 (Cosgrove Dep.) at 40:15–17; 163:13–20; 175:9–11.

[1018]     *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 32:16–23.

[1019]     *Id.* at 31:18–32:4 (testifying that he was not, to his knowledge, the subject of an ECDA disciplinary investigation, while he was employed by the ECDA, with respect to his handling of a criminal investigation or prosecution); *see also* 38:11–13, 40:4–12, 84:22–85:13, 88:15–21, 88:22–89:7, 93:23–94:6, 94:7–13 (providing same answers regarding specific cases and supervisors).

[1020]     *See also Boyd* Dkt. 168-16 (Cosgrove Dep.) at 160:5–163:12; 167:3–8; 173:2–174:14.

performance was consistent with those policies, and he trusted Drury to comply with his *Brady* and other fair trial obligations.[1021]

870.    ADA Ranni served as the Chief of Felony Trials in the Cosgrove Administration,[1022] and had authority over homicide prosecutions.[1023]

871.    ADA Drury was assigned to Felony Trials in 1976-77.[1024]

872.    On May 18, 1979, the *Buffalo Evening News* reported on DA Cosgrove's announcement that Ranni would head a new Career Criminal Bureau.[1025]

873.    It also stated in that article that ADA Ranni occupied the position of "chief trial counsel."[1026]

874.    On February 14, 1980, *the Evening News* reported Ranni was chief of operations, "training," and planning.[1027]

---

[1021]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 39:3–6, 39:22–40:11, 40:12–14, 40:18–41:4.

[1022]    *Boyd* Dkt. 168-17 (Henry Dep.) at 268:8–269:13 (Albert Ranni was the ECDA's Chief of Felony Trials when Henry left the ECDA in 1977), 282:3–9 (Ranni was chief of the Felony Trial Bureau in March and April 1977); Ex. 52 (Solomon Dep. Day I) at 25:18–21, 37:3–12, Ex. 53 (Solomon Dep. Day II) at 40:19–42:2 (Solomon was in the Felony Trial Bureau from 1975 to about 1981 or 1982, and ADA Ranni was its Chief for some of that time); *see also Boyd* Dkt. 168-16 (Cosgrove Dep.) at 128:3-6.

[1023]    *Boyd* Dkt. 168-17 (Henry Dep.) at 35:11–17.

[1024]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 33:11–13.

[1025]    Ex. 123 (Buffalo Evening News, *DA Forms Unit To Prosecute Career Criminals*, May 18, 1979).

[1026]    *Id.*

[1027]    Ex. 124 (Buffalo Evening News, *17 Candidates Screened For U.S. Attorney Post*, Feb. 14, 1980).

875.    Although DA Cosgrove read the Buffalo newspapers every day,[1028] he did not send any correction to this reporting.[1029]

876.    DA Cosgrove testified that one of the ways ADAs learned how they should practice law was by looking to supervisors in the office, whom they would look to as role models; that when he made someone a supervisor, that was an indication of his trust in them, and, he hopes, an indication of his belief that they complied with his policies; and that a supervisor would not have been a supervisor unless DA Cosgrove understood that they could do the job and he trusted them to conform with the policies of his office.[1030]

877.    ADA Ranni was widely known in the local legal community for stepping over the line in his cases.[1031]

878.    Nonetheless, ADA Ranni was looked up to, and considered a role model, by ADAs at the ECDA.[1032]

879.    Other ADAs watched ADA Ranni's trials, and ADA Drury noted that he was aware of the *Johnson* case and followed the trial as Ranni conducted it.[1033]

---

[1028]    *See* ¶ 835, *supra*.

[1029]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 130:17–131:4.

[1030]    *Id.* at 84:20–86: 17.

[1031]    Ex. 27 (Olsen Dep.) at 54:4–21.

[1032]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 68:15–69:1; *see also id.* at 69:5–17 (Ranni had a reputation for being "imaginative" at trial; he had a strong personality and juries liked him), 69:19–21 (stating that he believes Ranni conducted himself in an appropriate way).

[1033]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 77:7–19 (attended some of the *Johnson* trial); 168-17 (Henry Dep.) at 284:15–18 (from time to time, during a trial like *Johnson*, prosecutors would stop into the courtroom and watch Ranni).

880.    The Appellate Division's decision in *Johnson*, and its criticism of Ranni, was well-known in the ECDA.[1034]

881.    ADA Drury testified at his deposition that he thinks *Ivey* was a well-known case in the ECDA, and ADA Solomon called it a "big case."[1035]

882.    At his deposition in this case, DA Cosgrove testified that the *Ivey* decision would have been brought to his attention and he is sure he read it; that he would have been "very angry" if he did see it upon its being rendered; that disciplinary action should have been taken concerning Ranni following the decision; and that he apparently did nothing in response to it.[1036]

883.    While denying memory of the *Johnson* case, DA Cosgrove testified that disciplinary action should have been taken.[1037]

884.    ADA Henry, testifying on behalf of the County, admitted that ADA Ranni's conduct in the *Ivey* and *Johnson* cases was improper.[1038]

885.    ADA Drury admitted that ADA Ranni should have been disciplined for what he did in these two cases,[1039] and that the behavior described in the Appellate Division's decision in *Johnson* is "very bad."[1040]

---

[1034]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 79:22–80:10 (there were discussions in the ECDA when the *Johnson* decision was rendered that Ranni "was wrong" and went "too far").

[1035]    *Id.* at 73:9–13; Ex. 53 (Solomon Dep. Day II) at 56:23–57:15.

[1036]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 135:13–16, 140:14–15, 141:1–4, 141:17–21, 142:11–143:4.

[1037]    *Id.* at 148:3–20.

[1038]    *Boyd* Dkt. 168-17 (Henry Dep.) at 265:6–11, 265:13–23, 284:19–285:7; *see also id.* at 285:9–15.

[1039]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 74:19–23 (the prosecutor who did the things described in the *Ivey* decision deserved to be disciplined), 80:18—80:22 (he believes, having read the *Johnson* decision, that Ranni should have been disciplined).

[1040]    *Id.* at 82:7–13.

886.    However, ADA Ranni was never disciplined for prosecutorial misconduct.[1041]

887.    ADA Ranni's conduct in these cases was never investigated.[1042]

888.    Notwithstanding these instances of prosecutorial misconduct, DA Cosgrove approved of the adequacy of ADA Ranni's performance and assumed he followed office policies.[1043]

D.    The ECDA Failed to Supervise ADAs

889.    DA Cosgrove failed to take meaningful steps, personally, to ensure that his subordinates were being supervised in their handling of criminal prosecutions, as evidenced by the following:

a.    When asked at his deposition in this case if he took any specific steps to ensure that his subordinates were requiring the line prosecutors to comply with *Brady*, DA Cosgrove pointed to none.[1044]

b.    DA Cosgrove testified that he left it up to supervisor-ADAs Manzella, McCarthy, Keuker, and Terrizzi to make sure that *Miranda*, *Rosario*, and *Brady* were followed.[1045] In response to being asked what he did to ensure these supervisors had the correct understanding of *Brady*, DA Cosgrove offered nothing specific,

---

[1041]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 133:23–134:1 (Cosgrove never disciplined Ranni); *supra*, Counterstatement ¶ 849; *Boyd* Dkt. 168-17 (Henry Dep.) at 285:17–18 (does not know if anyone tried to correct Ranni for the conduct reported in the Appellate Division's decision in *Johnson*),); 168-14 (Drury Dep. Day I) at 75:2-4 (does not know whether Ranni was ever disciplined for his performance in the *Ivey* case).

[1042]    *Supra*, Counterstatement ¶¶ 850; *see also Boyd* Dkt. 168-14 (Drury Dep. Day I) at 81:11–21; Ex. 53 (Solomon Dep. Day II) at 68:20–69:3, 62:14–21.

[1043]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 132:1–16.

[1044]    *Boyd* Dkt. 168-16 (Cosgrove Dep.) at 63:9–22.

[1045]    *Id.* at 69:2–12.

instead testifying he knew that these supervisors would do their very best with respect to their responsibilities and he left it up to them.[1046]

    c.   However, he has no knowledge now of what procedures these supervisors instituted to ensure compliance with *Brady*.[1047]

890.    Supervisors at the ECDA would not ask line prosecutors whether they had disclosed *Brady* material.[1048]

891.    Former ADA Drury was not supervised specifically in connection with the prosecutions of Boyd and Gibson and did not report to his supervisors on the status of these prosecutions.[1049]

892.    Nor did ADA Henry receive supervision in connection with the prosecutions of Walker and Martin.[1050]

Dated:      New York, New York
             June 24, 2024          Respectfully submitted,

                            **LAW OFFICES OF JOEL B. RUDIN, P.C.**
                            By: /s/ Joel B. Rudin
                            Joel B. Rudin
                            David E. Rudin
                            Carnegie Hall Tower
                            152 West 57th Street, 8th Floor
                            New York, New York 10019
                            (212) 752-7600
                            *jbrudin@rudinlaw.com*

---

[1046]    *Id.* at 69:16–22.

[1047]    *Id.* at 71:7–10.

[1048]    *Boyd* Dkt. 168-17 (Henry Dep.) at 51:18–52:17 (supervisors would ask whether discovery had finished, but would *not* specifically ask if the prosecutor disclosed *Brady* material); Ex. 53 (Solomon Dep. Day II) at 43:20–22 (does not recall whether supervisor ADA Ranni ever spoke with him about his obligations under *Brady*).

[1049]    *Boyd* Dkt. 168-14 (Drury Dep. Day I) at 33:11–34:9.

[1050]    *Boyd* Dkt. 168-17 (Henry Dep.) at 36:20–37:1.

**WILMER CUTLER PICKERING
HALE AND DORR LLP**
By: /s/ Ryanne E. Perio
Ross E. Firsenbaum
Ryanne E. Perio
Gideon A. Hanft
Phoebe Silos
Erin Hughes
Trena Riley
Melissa Zubizaretta
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
*ross.firsenbaum@wilmerhale.com*

**HOOVER & DURLAND LLP**
By: /s/ Spencer L. Durland
Timothy W. Hoover
Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*thoover@hooverdurland.com*

*Attorneys for Plaintiffs Darryl Boyd
and John Walker, Jr.*