UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARRYL BOYD,<br><br>        Plaintiff,<br><br>    - against -<br><br>THE CITY OF BUFFALO, *et al.*,<br><br>        Defendants. | **Case No. 1:22-cv-519** |
| JOHN WALKER, JR.<br><br>        Plaintiff,<br><br>    - against -<br><br>THE CITY OF BUFFALO, *et al.*,<br><br>        Defendants. | **Case No. 1:22-cv-520** |

**PLAINTIFFS DARRYL BOYD AND JOHN WALKER, JR.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE CERTAIN ALLEGED *MONELL* EVIDENCE**

**INTRODUCTION**

Defendant County of Erie (the "County") seeks to prevent Plaintiffs Darryl Boyd and John Walker, Jr. from introducing evidence at their respective trials proving that the Erie County District Attorney's Office ("ECDA") had a policy of deliberate indifference to the fair trial rights of criminal defendants. *See Boyd*, Dkt. 228; *Walker* Dkt. 222 ("Mem."). The evidence is substantial and powerful—the obvious reason why the County wants to keep it out. Among other things, Plaintiffs intend to offer evidence regarding 38 other criminal cases prosecuted by the ECDA during the 1965 to 1983 time period in which there were credible allegations and many findings of prosecutorial misconduct, including numerous instances of reported *Brady* and summation misconduct. The County's hearsay and relevance objections are based on a misunderstanding of the purpose for which Plaintiffs' will introduce evidence of misconduct by ECDA prosecutors in other cases and the legal principles underlying Plaintiffs' theories of *Monell* liability. Evidence of criticism by judges and others of ECDA prosecutors for misconduct in other cases is admissible for the non-hearsay purpose of notice to policymakers of a need to investigate or discipline (a need that they disregarded). From the ECDA's abject failure to discipline prosecutors for misconduct of any kind despite blistering criticism of its prosecutors for egregious misconduct, the jury may infer a policy of deliberate indifference and an anything-goes atmosphere that was a substantial cause of Plaintiffs' wrongful convictions.

**ARGUMENT**

A. **Newspaper Articles, Court Decisions, Briefs, and Other Court Documents Are Admissible for A Non-Hearsay Purpose.**

The County's objection to Plaintiffs' use of judicial decisions and newspaper articles on hearsay grounds demonstrates a misunderstanding of the non-hearsay purpose for which Plaintiffs will introduce such evidence. As discussed in detail in Plaintiffs' summary judgment opposition

1

memorandum of law and Local Rule 56.1 Counterstatement, *see* Dkt. 176, at 61–76; 176-128, at 277–329,[1] Plaintiffs will introduce evidence to support three theories of *Monell* liability: (i) the prosecutorial misconduct resulted from ECDA policy and/or widespread custom or practice; (ii) the prosecutorial misconduct resulted from the ECDA's deliberate indifference to the fair-trial rights of criminal defendants and the "anything-goes" attitude that likely engendered; and (iii) the *Brady* violations resulted from inadequate training.

To prove their theory of deliberate indifference based on a failure to discipline, Plaintiffs will rely on evidence that the ECDA policymakers were on notice of repeated misconduct by ECDA prosecutors but failed to investigate or discipline them—indeed, despite this history, policymakers established no meaningful disciplinary system or process at all. A jury may find that the ECDA's pervasive failure to discipline prosecutors for *Brady* violations, improper summations, and other fair trial violations, many of them highly publicized and notorious, created an atmosphere of tolerance for violations of defendants' fair trial rights and a belief that getting a conviction at any cost was all that mattered to policymakers. *See Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012) ("deliberate indifference on the part of supervisory personnel to abuse of the rights of black people, which was communicated to line officers so as to give them the sense that they could engage in such abuse of rights without risking appropriate disciplinary consequences"); *Disorbo v. Hoy*, 74 F. App'x 101, 104 (2d Cir. 2003) ("[t]he jury reasonably could have inferred that the City's failure to discipline adequately and the subsequent promotions of

---

[1] To avoid duplication, Plaintiffs cite to the docket numbers for *Darryl Boyd v. City of Buffalo*, No. 22-cv-519, to refer to the docket entries in both cases.

2

officers involved in Rodick's beating created an atmosphere whereby the police department tolerated misconduct and even police brutality").[2]

Evidence of the ECDA's inaction despite notice of misconduct also supports an inference of an unlawful custom or policy. *See Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 301-08 (2d Cir. 2020) (supervisory indifference to one corrections officer's incidents of sexual misconduct towards inmates created factual question as to existence of a widespread municipal practice); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62–63 (2d Cir. 2014) (supervisory indifference to a campaign of racist harassment directed at a single white employee who had married a Black woman revealed a "custom and practice" triggering *Monell* liability); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) ("Another method of implicating a policymaking official through subordinates' conduct is to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.").

Plaintiffs will offer the judicial decisions and newspaper articles on their exhibit lists not for the truth of the matters asserted, but for the non-hearsay purpose that the criticisms of ECDA prosecutors documented in them existed and put ECDA policymakers on notice of apparent misconduct by prosecutors in the Office. *See United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."); *see also United States v. Moseley*, 980

---

[2] *See also Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) ("deliberate indifference may be inferred if [prior complaints of misconduct] are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents"); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 330-32 (2d Cir. 1986) (failure to investigate prior incidents "would have been viewed by the officers … as reflecting an indifference"); *Rodriguez v. Cnty. of Los Angeles,* 891 F.3d 776, 803 (9th Cir. 2018) (failure to take remedial action "perpetuated a culture where excessive force was encouraged"); *Smith v. City of Fontana,* 818 F.2d 1411, 1420 n.13 (9th Cir. 1987) (failure to discipline could give rise to an "atmosphere of lawlessness").

F.3d 9, 27 (2d Cir. 2020) (statement admissible for non-hearsay purpose of showing listener put on notice of illegal acts as relevant to assessing defendant's state of mind); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("reports cited by plaintiffs would not be hearsay if they were offered for the purpose of proving something other than the truth of the matters stated therein, such as whether appellees had notice [of criticism of arrest practices]").

For this same purpose of establishing notice, Plaintiffs will also offer appellate briefs and other court documents credibly alleging and describing misconduct and quoting trial courts' criticism of prosecutors. *See Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 479 (E.D.N.Y. 2002) ("jury could rationally conclude that…letters of complaints and criticisms demonstrate an 'obvious need for more or better supervision to protect against constitutional violations.'" (quoting *Vann*, 72 F.3d at 1049)). The appellate briefs, in particular, were a form of complaint that were reliable in that they were made by members of the Bar who had an ethical responsibility to accurately state the underlying facts and claims for which they had a good-faith basis.

Based upon the full record that Plaintiffs will present, a jury will be entitled to infer that ECDA policymakers, including District Attorney, Edward Cosgrove, and/or the Chief of his Appeals Bureau, were aware of the notice provided by the aforementioned materials and deliberately disregarded such notice because of their indifference to the misconduct that the materials alleged. As head of the ECDA, Cosgrove delegated responsibility to respond to appellate briefs to the Appeals Bureau, which submitted briefs under his name consistent with his policies. Dkt. 168-16 (Cosgrove Dep.) at 176:8–178:6. A jury can reasonably infer that Cosgrove and his Appeals Bureau Chief were aware of decisions by, and briefs before, the Appellate Division, Fourth Department, and the New York Court of Appeals, noting serious violations of defendants' fair trial rights and criticizing prosecutors for them. A jury could also reasonably infer that

Cosgrove and his Appeals Chief knew, or should have known, of articles in local Buffalo newspapers describing trial court rulings criticizing ECDA prosecutors for misconduct during criminal prosecutions. Indeed, Cosgrove testified at his deposition in this case that he read the Buffalo newspapers every day while he was District Attorney, and that, as part of his job, he was aware of what the Buffalo newspapers were writing about his office. Dkt. 168-16 at 32:10–34:1.

Plaintiffs will introduce other evidence showing that the ECDA did not discipline any prosecutors despite receiving such notice of reported misconduct. Cosgrove testified that he never disciplined any prosecutor at any point as District Attorney and did not recall any instance of a supervisor disciplining a prosecutor. Dkt. 168-16 at 105:13–107:16. ADA David Henry, the County's 30(b)(6) witness, admitted on behalf of the County that he was not aware of any ADA being disciplined between 1966 and 1985 for any misconduct of any nature committed during the course of a criminal prosecution. Dkt. 168-17 (Henry Dep.) at 253:15–19; *see also* 246:8–23; 250:18–23; 252:17–253:6. Henry testified that the ECDA had no system, formal or informal, for conducting a disciplinary investigation or inquiry for the purpose of deciding whether a prosecutor should be disciplined. *Id.* 247:10–19. ADA James Verrastro testified he has no knowledge of any ADA being disciplined while he was at the ECDA. Dkt. 168-18 (Verrastro Dep.) at 29:4–12. In response to an interrogatory request listing 31 court decisions finding misconduct by ECDA prosecutors, the County responded it was "not aware of any instances of responsive discipline, negative performance evaluations, or referrals to any Departmental Grievance Committees for the ADAs involved." Dkt. 176-56, at 3. ADA Timothy Drury testified at his deposition that he was never disciplined, despite newspaper reports describing courts' criticism of his misconduct. Dkt. 168-14 (Drury Dep. Day I) at 32:6–15. He, too, was unaware of any discipline imposed upon any other prosecutor. Dkt. 168-14 at 61:12–62:12. Both Cosgrove and Drury admitted that Chief of

Trials Al Ranni, according to Appellate Division decisions, engaged in egregious misconduct that was well known in the Office and should have been disciplined. Dkt. 168-16 at 142:11–143:4, 147:13–148:20; Dkt. 168-14 at 74:19–23, 79:14–81:18. Drury acknowledged that Ranni was an experienced prosecutor, his contemporary, and his friend, and that prosecutors in the Office looked up to him for guidance. Dkt. 168-14 at 62:14–63:7, 68:15–69:1.

The County cites several cases for the proposition that judicial decisions and newspaper articles are hearsay but omits that those same cases recognize that such materials are admissible for the non-hearsay purpose of notice. It is unclear from the County's brief what it intended to cite from *Grant v. City of Syracuse*; the court in that case allowed Syracuse Citizen Review Board reports and findings into evidence at trial because they were used for a non-hearsay purpose and "directly relevant to plaintiff's *Monell* claim." *Grant v. City of Syracuse*, 357 F. Supp. 3d 180, 197 (N.D.N.Y. 2019). The County quotes the same sentence twice from *McAllister v. N.Y. City Police Dep't*; that sentence goes on to say "… [newspaper articles] might be admissible to show notice of the City of allegations of misconduct." 49 F. Supp. 2d 688, 706 n.12 (S.D.N.Y. 1999). The *McAllister* court did not address the non-hearsay purpose of notice, as the pro se plaintiff made only "[c]onclusory allegations" of an unlawful policy.[3]

---

[3]   Other cases the County cites are inapposite or support use of the documents for the non-hearsay purpose of notice. In *Dockery v. Tucker,* a pro se plaintiff failed to allege specific policy, custom, or training or supervisory deficiency and submitted no evidence of insufficient investigation or discipline of the police misconduct reported in the articles and decisions he cited. 2006 WL 5893295, at *23-24 (E.D.N.Y. Sept. 6, 2006). In *Delrosario v. City of New York*, then-District Judge Sullivan noted "[i]t is true that in considering a deliberate indifference claim, including claims for failure to supervise or discipline, a Court may consider complaints made against a municipality and its response to them to determine whether the municipality acted with deliberate indifference," but the plaintiff had failed to allege facts about how the City responded to the complaints of misconduct. 2010 WL 882990, at *7 n.5 (S.D.N.Y. Mar. 4, 2010) (citing *Fiacco*, 783 F.2d at 327-28).

6

Though the County does not address the admissibility of the statements by the ECDA in its respondent's briefs or by trial prosecutors in discovery responses or court transcripts, these documents are admissible as an opposing party's statement. Fed. R. Evid. 801(d)(2) (statement is not hearsay if "[t]he statement is offered against an opposing party and ... was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."). These statements, made by ECDA prosecutors representing the office and signed by DA Edward Cosgrove—the ECDA's policymaker—himself, clearly meet this standard.

Finally, statements by ECDA prosecutors as to their view of *Brady* are not improper hearsay for the additional reason that they are offered, not for the "truth" of the matter asserted, i.e., what *Brady* does or does not require, but rather as evidence of the County's policy. ECDA prosecutors, including members of its Appeals Bureau, repeatedly argued that *Brady* applied only to exculpatory material, even after the Supreme Court expressly held to the contrary, in 1972, in *Giglio,* and the jury may infer from such statements that they reflected Office policy. In a high-profile murder trial months before Plaintiffs' trials, the ECDA Chief of Felony trials, Al Ranni, stated that police notes of a witness interview did not need to be disclosed even though they might include impeachment material. In formal appellate briefs, the ECDA argued that *Brady* only applied to "exculpatory," as opposed to impeachment, evidence. Cosgrove testified at his deposition that the ECDA's appeals unit was responsible for educating ADAs as to the law and what was required of them. Dkt. 168-16 at 175:15–19. These statements support an inference—along with deposition testimony by County witnesses Cosgrove, Drury, Henry, and Kevin Gagan—that they expressed Office policy or practice. All of this is highly relevant and used for a non-hearsay purpose.

7

B.  **The Cases Plaintiffs Intend to Introduce in Evidence Are Relevant to their *Monell* Deliberate Indifference Theory.**

The County's arguments to limit Plaintiffs' *Monell* evidence on temporal and substantive bases suffer from a misunderstanding of Plaintiffs' theories of *Monell* liability as well.[4] First, the County argues that cases post-dating Plaintiffs' criminal trials cannot be argued to prove notice. This position was incorrect when it was rejected by Judge McCarthy in a well-reasoned opinion compelling discovery and remains so. *See* Dkt. 104 at 11–15. The ECDA's failure to respond to notice of misconduct by its prosecutors after Plaintiffs' trials is probative of a policy of deliberate indifference or acquiescence at the time of Plaintiffs' trials. *See Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 151 (2d Cir. 1991) (post-incident ratification permits inference that unlawful policy existed at the time of the violation of the plaintiff's rights); *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the [municipality] on the date of an alleged deprivation of constitutional right."); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (same); *Henry v. Cnty. of Shasta*, 132 F.3d 512, 520 (9th Cir. 1997) (holding that "failure even after being sued to correct a blatantly unconstitutional course of [conduct]" is evidence of the prior policy), *amended*, 137 F.3d 1372 (9th Cir. 1998); *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (upholding the use of "after-the-fact events" to prove "a prior policy of acquiescence"). The case cited by the County, *Greene v. City of New York*, 742 F. App'x 532, 537 (2d Cir. 2018), besides being unpublished, is an unlawful training or practice case, not a failure to discipline or unconstitutional policy or custom case. *See*

---

[4]  The County limits its motion *in limine* to cases of misconduct by ECDA prosecutors contained in Plaintiffs' Amended Complaints. *See* Mem. at 5. However, during discovery Plaintiffs disclosed many additional cases of misconduct by ECDA prosecutors consisting mainly of newspaper articles reporting on misconduct by ECDA prosecutors. Plaintiffs discussed this evidence at length in their opposition to the County's motion for summary judgment. Notwithstanding the omissions in the County's motion, Plaintiffs' arguments as to admissibility and relevance apply to all reported instances of ECDA misconduct contained in their exhibit lists.

8

Dkt. 104 (Decision and Order), at 12 ("Unlike the failure to train theory of *Monell* liability, subsequent or contemporaneous conduct can be circumstantial evidence of the existence of municipal policy or custom." (cleaned up)).

The County provides no support for its arbitrary cut-off of five years after Plaintiffs' criminal trials. *See* Mem. at 9. A jury could reasonably conclude that if, after case law had developed further, the ECDA was still failing to investigate or discipline prosecutors in response to courts' criticism for "callous disregard of fundamental obligations," Decl. of David Rudin, Ex. 1, at 2, or "deplorable tactics," Decl. Ex. 2, the ECDA was likely to have had even less regard for fair trial violations in 1977. Indeed, the fact that the indifference extended a greater number of years after Plaintiffs' trials makes the evidence of indifference even more—not less—powerful.

The County is wrong that Plaintiffs do not have evidence that the ECDA was on notice of *Brady* or related disclosure violations before Plaintiffs' trials. *See* Mem. at 6. In February 1976, in *People v. Bader, Horton*, the Supreme Court, Erie County found that an ECDA prosecutor had withheld favorable investigator reports from the defense in a murder prosecution and ordered a new trial. Dkt. 176-81. In October 1976, in *People v. Ivey*, a murder prosecution that ADA Drury recalled "had some notoriety" at the ECDA, Dkt. 168-14 at 73:9–20, the Supreme Court, Erie County found that ADA Ranni had deliberately withheld police notes of interviews with prosecution witnesses that the ECDA was required to disclose under *Rosario*. Dkt. 176-66, at 19–20. *Rosario* violations are relevant as they too involve disclosure of potential impeachment evidence and, as 30(b)(6) witness David Henry testified on behalf of the County, prosecutors viewed them as inextricably linked. Dkt. 168-17 at 57:1–15. Indifference to *Rosario* violations likely was perceived by prosecutors as indifference to disclosure violations generally and thus likely led to *Brady* violations.

9

The County's assertion that Plaintiffs have offered only three cases in which *Brady* issues were discussed is also incorrect. *See* Mem. at 6. Plaintiffs will introduce evidence of ten cases of *Brady* or related *Rosario* violations in judicial opinions or articles in the Buffalo press, which DA Cosgrove regularly read. Dkt. 168-16 at 130:11–131:4. In the three years between 1978 and 1981, in eight separate cases courts found prosecutors failed to disclose *Brady* material, causing mistrials or even dismissal of charges—misconduct that ECDA policymakers were presumptively aware of and ratified by failing to investigate or discipline any prosecutor involved. This is a remarkable number, particularly because, by their very nature, *Brady* violations are unknown to the defense and frequently do not come to light.

The County argues that certain cases finding *Brady* violations that post-dated Plaintiffs' trials are irrelevant because none involved failure by a prosecutor to disclose "exculpatory" photographs. *See* Mem. at 6. This level of specificity has no basis in the facts of this case or legal precedent on any theory of *Monell* liability. First, the *Brady* violations at Plaintiffs' criminal trials are far broader than the failure to disclose photographs. The evidence the prosecutor withheld included police reports corroborating Plaintiffs' alibi; police reports, a signed statement, and information known to ADA Drury impeaching prosecution witnesses; police reports, signed statements, and other police documents implicating third-party suspects; and ADA Drury's notes corroborating Plaintiffs' alibi, impeaching witnesses, and implicating third-party suspects. *See* Dkt. 235-6, at 3–5.

Second, the tolerated misconduct need not be the same as the misconduct in the plaintiff's case. *See, e.g., Cash v. Cnty. of Erie*, 654 F.3d 324, 337 (2d Cir. 2011) (prior tolerated incident of invited "sexual contact" supported claim involving a violent sexual assault committed by the defendant officer); *Vann v. City of New York*, 72 F.3d 1040, 1050 (2d Cir. 1995) (deliberate

indifference shown by "Department's general methods of dealing with problem policemen"); *Gentile*, 926 F.2d at 146 (same, where "employee misconduct … in several different areas of criminal law" was tolerated); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("[T]he persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of Monell.").

Third, the County appears to suggest that some number of cases is required to prove a *Monell* claim and that the ECDA cannot be subject to liability for failing to maintain an "unblemished" record. Mem. at 7. Putting aside that this is a legal question not relevant to admissibility of evidence, the County's argument again misunderstands Plaintiffs' failure to discipline theory and custom theory. It is not the allegation of misconduct alone, but the ECDA's complete inaction, despite notice of that misconduct, that evidences a policy of deliberate indifference to the fair trial rights of criminal defendants. On either a deliberate indifference or "atmosphere of lawlessness" theory, even one, or a handful, of tolerated abuses may suffice to establish *Monell* liability. *See, e.g., Cash*, 654 F.3d at 334 (one incident); *Amnesty Am.*, 361 F.3d at 129 (single "egregious" incident); *Disorbo*, 74 F. App'x at 104 (single incident and subsequent promotion of the officer involved); *Fiacco*, 783 F.2d at 329-32 (five incidents). The County cites no deliberate indifference case stating otherwise.

The County's attempt to exclude other summation misconduct cases suffers from the same errors of fact and law. The County argues that evidence of improper summations violating criminal defendants' right to a fair trial should be limited to summations with issues concerning a description of the crime scene or an appeal to racial prejudice. *See* Mem. at 6. However, the pervasive summation violations at Plaintiffs' trials went much further. In his summation at Mr.

11

Boyd's trial, ADA Drury made false or misleading statements that were belied by undisclosed *Brady* material; personally vouched for the integrity of the investigation and prosecution and a prosecution witness's truthfulness, made himself an unsworn witness, shifted the burden of proof, denigrated defense witnesses and belittled the defendant, and made racially charged attacks on a prosecution witness and the environment he and the defendant came from. *See* Dkt. 235-6, at 6–8. In his summation at Mr. Walker's trial, ADA Henry made false statements contradicted by the undisclosed *Brady* material, thus compounding the *Brady* violations; exploited racial prejudice; and made numerous exaggerated and inflammatory references to blood. *See id.* at 8. Plaintiffs will argue that these manifold violations were substantially caused by the anything-goes atmosphere arising from the ECDA's failure to discipline for any summation violations or other fair trial violations, as well as a custom of disregard for the norms of summation advocacy.

The County, in relying on *Connick v. Thompson,* seems to assume that everything *Connick* says about failure-to-train cases applies to all other *Monell* theories. *See* Mem. at 7. But in *Connick,* the Court evaluated only whether the evidence sufficed to support a stand-alone failure to train claim. *See Connick v. Thompson*, 563 U.S. 51, 61-64 (2011). Noting that a failure-to-train claim is the "most tenuous" form of *Monell* liability, it held that, before a District Attorney can be required to expend limited resources on a *Brady* training program, he must be on notice of a "*specific reason*, such as a pattern of violations," to believe such a program is necessary to prevent future violations. *Id.* at 67 (emphasis added). However, *Connick* does not elaborate on other forms of *Monell* liability, such as deliberate indifference based on failure to discipline and unlawful policy and practice claims, and post-*Connick* decisions from the Second Circuit do not cabin other theories of *Monell* recovery based upon it. *Connick's* narrow holding has no bearing upon Plaintiffs' theory here that a policy of disciplinary and supervisory "inaction" following

12

prosecutorial misconduct at trial allowed to continue, or encouraged, unlawful practices and a noxious anything-goes culture. *See, e.g.*, *Jones,* 691 F.3d at 81 (citing *Amesty Am. v. Town of W. Hartford,* 361 F.3d 113, 126 (2d Cir. 2004)); *supra* at 3, n.2 (citing cases). The other case cited by the County, *O'Neal v. City of New York*, also concerned a failure to train theory of *Monell* liability. 196 F. Supp. 3d 421, 436 (S.D.N.Y. 2016) ("O'Neal has not pleaded the elements of a *Monell* claim because he has not pleaded a constitutional violation by the NYCDA and has not pleaded a pattern of violations necessary to make a failure to train claim."), *aff'd*, 679 F. App'x 16 (2d Cir. 2017).

Even *Connick*—a deliberate indifference theory based on failure to train—does not define the level of similarity as narrowly as the County does here. *Connick* involved the withholding of the results of blood-evidence testing, but the Court did not require that prior cases also involve such results, just the withholding of "physical or scientific evidence of *any kind*." 563 U.S. at 62–63 (emphasis added). Other cases also define similarity by general categories.[5] Here, *Connick's* approach to categorization of a single type of violation does not apply; prosecutors did not withhold a single type of evidence, but evidence of every kind: evidence corroborating Plaintiffs' alibis; third-party culpability evidence; and impeachment evidence, including inconsistent statements, recantations, and motive to lie. The same is true of the prosecutors' pervasive summation violations.

Finally, *Connick's* holding should not apply even to a failure-to-train claim here. The premise of *Connick's* holding is that prosecutors have the legal training and professional

---

[5] *See, e.g., Cash*, 654 F.3d at 329 (relying, in a prison sexual assault case, on prior incident of *invited sexual contact* between a prisoner and guards to "support[] a jury inference that defendants were not committed ... to protect prisoners from sexual exploitation"); *Vann*, 72 F.3d at 1050 (upholding reliance, in a police brutality case, on "evidence of the Department's general methods of dealing with *problem policemen* ..." (emphasis added)); *Gentile*, 926 F.2d at 146 (plaintiff properly relied, in police brutality case, on "employee misconduct ... in *several different areas of criminal law*" (emphasis added)).

13

responsibility to know their constitutional obligations, therefore creating a presumption that they would not need to be trained further "in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations." *Connick*, 563 U.S. at 66.  The specific circumstances of this case prove the premise inapplicable here.  *Giglio v. United States*, 405 U.S. 150 (1972), the decision extending the rule of *Brady* to impeachment evidence, came down in 1972, and *United States v. Agurs*, 427 U.S. 97 (1976), requiring prosecutors to disclose *Brady* material even if the defense has not specifically requested it, was issued on June 24, 1976, less than one year before Plaintiffs' criminal trials.  The County's expert, Kevin Gagan, testified that Supreme Court case law concerning *Brady* was "in such an extreme state of flux" in 1976-77, that it is fair to say of many prosecutors in Erie County that they did not understand their obligations, Dkt. 169-1 (Gagan Dep.) at 168:14–169:6, a situation distinct from the time of the *Brady* violation in *Connick* in 1985.  In the 1970s, prior to computers, prosecutors could not be expected to immediately learn of new court decisions, and absent any process for instructing prosecutors about the recent Supreme Court *Giglio* and *Agurs* decisions, the ECDA took the foreseeable risk that prosecutors might be unaware of what they required.

      Plaintiffs' evidence will allow a jury to conclude that the ECDA had a specific reason to train prosecutors following *Giglio*, *Agurs*, and the cases of ECDA misconduct preceding Plaintiffs' trials.  In an appellate brief filed in *People v. Ivey*, the ECDA effectively recognized its prosecutors did not have the tools to understand new precedent when it conceded its "prosecutor learned his understanding of the *Rosario* rule was in error" during trial only after he violated *Rosario* by withholding police notes of interviews with prosecution witnesses. Dkt. 176-67, at 39.  The ECDA argued the error by Al Ranni, an experienced ADA, was "understandable" because the New York Court of Appeal's decision in *People v. Consolazio* was new.  *Id.* at 40.  Notwithstanding *Agurs*,

14

ADA Henry testified in his deposition that at the time of John Walker's trial, he understood that *Brady* only applied where there was a defense request for disclosure. Dkt. 168-17 at 216:6–218:21. Indeed, when James McLeod wrote to ADA Henry requesting disclosure of *Brady* material, ADA Henry responded that McLeod needed to specify what material he was requesting. Dkt. 176-64, 176-65.

Thus, prosecutors in the ECDA would not have received training as to *Giglio* and *Agur's* expansion of the scope of *Brady* by the time of Plaintiffs' trials, and a jury could reasonably conclude that *Giglio* and *Agurs*, and the interplay between *Giglio* and *Rosario*, created a need to train prosecutors, absent any prior violations.

**C.     The County's Requested Offer of Proof Would Serve No Purpose Other than Delay and Distraction.**

Finally, the County's request that Plaintiffs make an offer of proof before referencing any deficient policy or practice, or before introducing evidence of misconduct by prosecutors in other ECDA cases, is unsupported and not warranted. The County cites no case law supporting a request for an offer of proof, particularly in a case where the *only defendant* is the municipality and thus there is no risk of spillover prejudice to individual (or other) defendants.[6] Nor are there any surprises in Plaintiffs' case for *Monell* liability. Plaintiffs detailed their *Monell* legal theories and

---

[6] The County relies on cases involving the irrelevant subject of bifurcation of discovery, which the Court denied in this case. *See, e.g.*, *Bellamy v. City of New York*, 914 F.3d 727, 756 n.29 (2d Cir. 2019) (noting that Bellamy had yet to have full discovery on QCDA policies); *Busch v. City of New York*, 2002 WL 31051589, at *3 (E.D.N.Y. Sept. 9, 2002) (bifurcating discovery); *Masi v. City of New York*, 1999 WL 688453, at *1 (S.D.N.Y. Sept. 2, 1999) (same). It also cites cases ordering bifurcation to avoid prejudice at a multi-defendant trial. *See Ricciuti v. New York City Transit Auth.*, 796 F. Supp. 84, 86 (S.D.N.Y. 1992) (granting order to bifurcate trials due to "the danger of contaminating the minds of jurors with evidence that is applicable to some defendants but not to others"); *Ismail v. Cohen*, 706 F. Supp. 243, 251 (S.D.N.Y. 1989) (ordering separate trials to avoid evidence admissible to issues relating to conduct by the City or the individual officer defendant contaminating the mind of the finder of fact in its consideration of the liability of the other defendant), *aff'd*, 899 F.2d 183 (2d Cir. 1990).

15

the facts supporting them in their summary judgment opposition papers (among other places, including this document). *See Boyd* Dkt. 176, at 72–87; 176-128, at 277–329. A requirement of an offer of proof would only cause delay, disrupt the presentation of Plaintiffs' cases, and waste the jury's time.

## CONCLUSION

For these reasons, the Court should deny the County's motion.

Dated:       February 24, 2025

Respectfully submitted,

**LAW OFFICES OF JOEL B. RUDIN, P.C.**
By: /s/ Joel B. Rudin
Joel B. Rudin
David E. Rudin
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
*jbrudin@rudinlaw.com*

**WILMER CUTLER PICKERING HALE AND DORR LLP**
By: /s/ Ryanne E. Perio
Ross E. Firsenbaum
Ryanne E. Perio
Gideon A. Hanft
Phoebe Silos
Erin Hughes
Trena Riley
Melissa Zubizarreta
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
*ross.firsenbaum@wilmerhale.com*

**HOOVER & DURLAND LLP**
By: /s/ Spencer L. Durland
Timothy W. Hoover

16

Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*sdurland@hooverdurland.com*

*Attorneys for Plaintiffs Darryl Boyd and John Walker, Jr.*