**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ESTATE OF DARRYL BOYD, ) | |
| ) | |
| Plaintiff, ) | **Case No. 1:22-cv-519** |
| ) | |
| - against - ) | |
| ) | |
| THE COUNTY OF ERIE, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR AN**
***IN LIMINE* ORDER ADMITTING CERTAIN *MONELL* EVIDENCE**

**INTRODUCTION**

Prior to John Walker, Jr.'s 2025 civil-rights trial, Walker and Darryl Boyd filed essentially identical submissions seeking to admit into evidence various court decisions, newspaper articles about court rulings, and excerpts of appellate briefs, as evidence of the Erie County District Attorney's Office's (the "ECDA") unlawful policies, customs, and/or practices; policymakers' deliberate indifference to unlawful trial behavior by prosecutors; or both. *Walker*, Dkts. 230-5, 268, 291, 291-1; *Boyd*, Dkts. 235-5, 273, 298, 298-1; *see also Walker*, Dkt. 333. In a draft Decision and Order circulated to counsel, *Walker,* Dkt. 340-1, as well as subsequent rulings during the course of the trial, *Walker*, Tr. T. 839:20–866:14, the Court agreed to admit some of the exhibits into evidence, on one or both of Walker's theories, but excluded others.

We request, for the reasons previously stated in our above-referenced written submissions and in oral argument during trial—*Walker*, Mar. 3, 2025, Pretrial Hearing T. 221:25–228:1; *Walker*, Mar. 17, 2025, Pretrial Hearing T. 80:14–82:7, 84:22–86:6; *Walker* Tr. T. 824:23–831:21—that the Court admit the same exhibits it accepted into evidence in *Walker* at the Boyd Estate's trial for the same purposes. (Some were admitted for their truth under the ancient documents exception, Federal Rule of Evidence ("FRE") 803(16), as evidence of unlawful policy, custom, or practice, and others only for the non-hearsay purpose of notice to the District Attorney of the need for remedial action). In addition, we believe, and explain below, that six exhibits not admitted in *Walker* should be admitted in this case, both for their truth as "ancient documents," and for notice under different and narrower theories not directly or fully addressed previously by the Court.[1]

---

[1] For the reasons previously argued by the Boyd Estate, we believe the "anything goes" theory is correct. Our theory is not that the failure to ever impose discipline on prosecutors for anything they do on the job is evidence of deliberate indifference, but rather that the failure to ever investigate or discipline prosecutors for the narrower category of *fair-trial violations* encouraged prosecutors to believe that, as subsets of "fair-trial" violations, *Brady* suppression and summation misconduct would be tolerated. We recognize that the Court rejected this theory in its

**ARGUMENT**

I. **Pre-incident court decisions involving conduct 'sufficiently similar' to the categories of misconduct at issue in plaintiff's case, as well as pre-incident court rulings finding misconduct but not overturning the conviction, are admissible under *Monell* to establish unlawful custom or practice and a policymaker's deliberate indifference.**

   A. **"Sufficiently similar" conduct cases are admissible.**

The Court's draft decision correctly recognized that a judicial ruling need not necessarily say "*Brady* violation" or "summation misconduct" to be relevant to Walker's *Monell* claim, so long as it is "sufficiently similar" to one of the types of constitutional violations alleged. *Walker*, Dkt. 340-1 at 9, 34–35. This approach is consistent with case law rejecting the overly narrow categorization of *Monell* claims.

In *Connick v. Thompson,* while the Supreme Court, in support of a stringent failure-to-train theory relating to prosecutors' failure to disclose exculpatory blood evidence, required prior similar incidents giving notice to the policymaker of a need to train, it categorized such relevant evidence not just as other incidents of failure to disclose blood evidence, but rather as the failure to disclose "blood evidence, *a crime lab report, or physical or scientific evidence of any kind.*" 563 U.S. 51, 62–63 (2011) (emphasis added). That is, the Court looked for evidence of prior incidents that were far more variegated in nature than the specific category of violation that occurred in the case at hand so long as the misconduct was similar in its general nature.

The Second Circuit has taken a similarly broad approach in its reported, precedential decisions. In *Jones v. Town of East Haven*, the Second Circuit, while holding that the plaintiff lacked sufficient evidence to prove his claim, approved a theory of a policy of deliberate indifference to "abuse of the rights of black people," a category spanning many types of specific

---

prior written decision, but we reiterate it to preserve our record, while otherwise advancing the narrower arguments set forth in this memorandum.

police misconduct, different from the misconduct alleged in that case, such as varieties of physical force, abusive language, harassment, and unlawful stops. *See* 691 F.3d 72, 81–85 (2d Cir. 2012). The Second Circuit also has held that evidence of a generally inadequate disciplinary system for "problem" officers could be considered as some evidence suggesting a causal relationship to the conduct of the defendant police officers in using undue force. *See Vann v. City of New York*, 72 F.3d 1040, 1050–51 (2d Cir. 1995).

In *Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir. 1991), the Second Circuit affirmed the late Judge Jack B. Weinstein's decision, 129 F.R.D. 435 (E.D.N.Y. 1990), to admit portions of a State Investigation Commission report finding that the Suffolk County D.A.'s Office and Police Department had "systematically mismanaged their offices, had tolerated and even ratified employee misconduct and had failed to investigate or punish such conduct. Although the Commission initially focused its inquiry on the handling of homicide cases, the scope of the investigation was soon expanded to cover allegations of impropriety and lack of oversight *in several different areas of criminal law*." 926 F.2d at 146 (emphasis added). Indeed, the Second Circuit noted that quotations from the report that were read to the jury found a general failure to "investigate and to discipline cases of employee misconduct." *Id.* The report's excerpts were not confined to the same categories of misconduct that occurred in the plaintiffs' underlying case.

This is made even clearer in the decision of Judge Weinstein that the Second Circuit affirmed. This decision admitted numerous findings by the Commission that showed an overall indifference to "police misconduct" and "poor management" which were not linked to the specific type of misconduct in the plaintiffs' case (malicious prosecution and evidence fabrication). *See Gentile*, 129 F.R.D. at 441. Judge Weinstein noted that the Commission report "details numerous incidents of police and prosecutorial misconduct in Suffolk County—evidence that clearly supports a finding of at least constructive knowledge on the part of the Police Department and

3

District Attorney's Office." *Id.* at 446. Judge Weinstein explicitly rejected the defendant County's argument that the report did not make findings concerning similar prior investigative misconduct matching the misconduct in the plaintiffs' case, emphasizing that "mismanagement and misconduct were endemic in the Suffolk County Police Department and Suffolk County District Attorney's Office and *were not confined to any one area*." *Id.* at 447 (emphasis added). Finally, Judge Weinstein, quoting the broad language of FRE 401 and 402, pointed out that evidence is admissible if "relevant," in that it has a tendency to make the existence of a consequential fact "more probable," and that "all relevant evidence is admissible"; the evidence in question did not have to fully prove each element of the plaintiffs' *Monell* claim but merely support it. *Id.* at 444.

Other circuits have warned against use of overly narrow categories to exclude evidence that bears some relevance to an element of a plaintiff's theory of deliberate indifference liability under *Monell*. *See, e.g., Forest v. Parry*, 930 F.3d 93, 107–09 (3d Cir. 2019) (reversing district court for narrowing the plaintiff's deliberate indifference claim based on an overall failure to supervise officers "engaged in illicit conduct—often consisting of false arrest and excessive force—knowing that they were not being supervised").

Courts have long recognized that introducing, or failing to correct, false evidence or argument, is closely related to withholding favorable evidence under *Brady*: they are two sides of the same coin. *See United States v. Vozzella*, 124 F.3d 389, 392 (2d Cir. 1997) (*Brady* applies to "a conviction obtained through the use of false evidence") (citing *Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Napue v. Illinois*, 360 U.S. 264 (1959)); *see also Brady v. Maryland*, 373 U.S. 83, 86 (1963) (explaining that *Brady* "is an extension of" *Mooney*, *supra*, which held that deliberate presentation of perjured testimony violates due process). In both types of cases, the jury is misled about the strength of the underlying case or focused on impermissible evidence to convict. A district attorney's failure to discipline a prosecutor for

4

utilizing, or failing to correct, false or misleading evidence would be admissible in a *Monell* case premised on a *Brady* violation because it would tend to show the policymaker's deliberate indifference to misleading juries about the strength of the prosecution's case in order to obtain convictions and, together with the failure to discipline, would be some evidence of causation.

Similarly, indifference to various types of misconduct other than summation misconduct can be relevant to prove a summation misconduct claim under *Monell*. Various types of summation misconduct—making false arguments, arguing facts not in evidence, vouching, and appealing to excessive emotion or juror prejudice through inflammatory remarks—involve conduct potentially distracting the jury from focusing on the competent evidence of guilt and instead influencing the jury to convict on improper grounds. The district attorney's deliberate indifference to similar misconduct in opening statements, or in a prosecutor's examination of a witness before the jury, inferred from the issuance of court decisions finding misconduct, coupled with the district attorney's failure to discipline, would be relevant, even if not conclusive, to show deliberate indifference and/or causation with respect to a case involving similarly prejudicial conduct in a summation.

Just to give a couple of additional illustrations, in a case involving an appeal to racial prejudice in a summation, the district attorney's tolerance of similar conduct in an opening statement, or in the examination of a police officer or other witness, would be sufficiently relevant. Indeed, it would be akin to the practice of taking unjustified police action against "Black people" which, in theory, the Second Circuit upheld in *Jones*. In a case involving summation misconduct involving vouching or arguing facts not in evidence, a district attorney's disciplinary indifference to a prosecutor who improperly injects his personal knowledge into a hostile cross-examination of a defendant or defense witness would have relevance as well. The prior disciplinary indifference, of course, need not conclusively establish the plaintiff's *Monell* claim, but its tendency to show

5

the policymaker's *mens rea* in regard to the general type of misconduct at issue in the plaintiff's case, or its relevance to the related but separate element of causation, should make it admissible in support of the plaintiff's deliberate-indifference theory.

> **B. Court decisions finding misconduct by a prosecutor, but declining to reverse the underlying conviction due to some other ground, such as 'harmless error' or lack of preservation, should be admitted as well.**

Numerous courts have held that credible allegations of misconduct, even if not substantiated by a definitive court decision or investigative finding by a government agency, when coupled with a failure to conduct any disciplinary investigation, are supportive of a deliberate indifference claim. *See, e.g.*, *Gentile,* 926 F.2d at 152–53 (inferring causal connection where County police and prosecutors failed to investigate unsubstantiated citizen claims of misconduct) (citing *Batista v. Rodriguez*, 702 F.2d 393, 398 (2d Cir. 1983)); *Fiacco v. City of Rensselaer, New York,* 783 F.2d 319, 328 (relying on proof of uninvestigated misconduct claims "[w]hether or not the claims had validity").

It follows that an appellate court's finding of a summation or disclosure violation should not be excluded simply because the court failed to reverse the conviction. Indeed, a court's finding of misconduct provides much clearer notice of a need to investigate than a mere unsubstantiated civilian complaint to a law enforcement agency. The fact that, for reasons extraneous to the prosecutor's behavior, the court elects not to vacate or reverse the criminal defendant's conviction, has no bearing on whether the finding of prosecutorial misconduct should trigger at least some disciplinary inquiry.

Appellate courts apply harmless-error analysis to avoid reversing convictions where the underlying evidence of guilt is strong, on the theory that society should not suffer where the constable blunders. But that does not mean that the underlying behavior was not offensive and deserving of disciplinary investigation or punishment to deter future misbehavior by the same or

6

different prosecutors. The same behavior does not suddenly lose its unethical or offensive quality merely because the prosecutor engages in it when presenting a strong case. Indeed, absent disciplinary consequences, the same or other prosecutors would feel emboldened to next employ such improper tactics in an otherwise weak case.

Similarly, state case law is replete with appellate decisions declining to reverse convictions because the defense attorney failed to adequately preserve a claim of error by the prosecutor or trial judge. Only in the most extreme such cases will the court nevertheless reverse an unpreserved claim under its interest of justice jurisdiction. Meanwhile, the New York Court of Appeals lacks such jurisdiction and is powerless even to address unpreserved claims. Where a prosecutor's misconduct is not preserved for appellate review by a defense attorney, either due to negligence or strategic judgment (many defense attorneys are concerned the court will deny an objection and the prejudicial comment will only be emphasized to the jury, or that repeatedly objecting will be viewed by the jury as impolite), the behavior is no less deserving of disciplinary investigation and potential punishment by the district attorney or his designee.

Accordingly, this Court should not decline to admit court decisions finding misconduct by prosecutors merely because such findings were not coupled with a reversal of the underlying conviction.

**II.    The Court, at the Boyd Estate trial, should admit evidence of six judicial decisions involving prosecutorial misconduct that is sufficiently similar in nature to the misconduct alleged in this case to be probative of deliberate indifference or causation, regardless of whether the court reversed the underlying conviction.**

In this case, the testimony of former ADAs Timothy Drury and David Henry, as well as that of the late former District Attorney Cosgrove, establishes that the ECDA before, during, and after Cosgrove's tenure, had no formal disciplinary system and in no instance conducted a disciplinary investigation, or imposed discipline, against a prosecutor for a *Brady* or disclosure violation, for summation error, or for any other type of fair trial violation. We believe the following

7

cases from before Boyd's criminal trial should be admitted, even though only one falls into the narrow categories of *Brady* violations or summation misconduct and that case did not result in a reversal of the conviction, because they provided notice to the District Attorney of apparent misconduct that was sufficiently similar to the misconduct in this case that the failure to take remedial action could have been a contributing cause to the misconduct in this case.[2] Furthermore, we note that though this other-case evidence was not admitted at the Walker trial, there is greater justification for admitting it at the Boyd Estate trial. Drury engaged in a greater variety of summation misconduct at Boyd's criminal trial than Henry did at Walker's, and unlike Henry, was directly involved in manufacturing Woodruff's and Hough's accusatory statements. Accordingly, a broader range of other-case evidence is similar to Drury's misconduct, as shown by the discussion below.

    1.    *People v. Conorozzo, et al.*, Buffalo Evening News article dated March 15, 1977, *Boyd*, PX 201/*Walker*, PX 206 – the article reported that ADA Drury was accused by a prosecution witness, on cross-examination, of suggesting the names of suspects for the witness to accuse and, when the witness named two others who were not charged defendants, accused him of lying. In *Boyd*, Drury is similarly accused of personal involvement in witness coercion and evidence fabrication with respect to Tyrone Woodruff and Andre Hough; of suppressing from the defense his knowledge of such misconduct by himself and police detectives; and of making false statements or misleading representations to the jury during his summation that there was no such

---

[2] A jury can reasonably infer that District Attorney Edward Cosgrove and his Appeals Bureau Chief were aware of decisions by the Appellate Division, Fourth Department, and the New York Court of Appeals noting the prosecutorial misconduct described herein and criticizing prosecutors. A jury could also reasonably infer that Cosgrove and his Appeals Chief knew of articles in local Buffalo newspapers describing trial-court rulings criticizing ECDA prosecutors for misconduct during criminal prosecutions. Indeed, Cosgrove testified at his deposition in this case that he read the Buffalo newspapers every day while he was District Attorney and that, as part of his job, he was aware of what the Buffalo newspapers were writing about his office. *Boyd*, Dkt. 168-16 (Cosgrove Dep.) at 32:10–34:1.

8

coercion or collusion,[3] and that the "police turned over everything." *Boyd*, Dkt. 168-6 (Boyd criminal trial transcript) at 634:18–20. Especially because Drury was the prosecutor in Boyd's criminal trial, his knowledge that he suffered no disciplinary inquiry following the public reporting of his apparent misconduct in the *Conorozzo* case, which occurred immediately before the Boyd trial, is directly relevant to causation as well as to the deliberate indifference of the District Attorney. The article is admissible under the ancient records exception and for notice to the District Attorney.

    2.    *People v. Greer,* 49 A.D.2d 297, 303–04 (3d Dep't 1975), *Boyd*, PX 200/*Walker*, PX 205 – a sexual-coercion conviction was reversed, in part, because the ADA improperly besmirched the defendant, potentially distracting the jury from the competent evidence and unfairly prejudicing it, by cross-examining the defendant about a five-year-old allegation of sexual assault which "was improper because it could serve no purpose but to show a propensity on the part of the defendant to commit the sort of crime for which he was on trial," and about a similarly remote juvenile-assault charge. This decision is admissible under the ancient documents exception and for notice. The conduct is similar to ADA Drury's inflammatory summation in the Boyd case, in which he accused Boyd's friend, Tyrone Woodruff, of being a "ghetto kid" and "poor product of his environment," who lived in "a junkyard" (referring to the Glenny Projects, where Boyd and his co-defendants spent time), a "blithering idiot," a "snook," an "idiot," a "nitwit," and "[h]apless, stupid, but we are asking you to believe him," *Boyd*, Dkt. 168-6 at 607:2–4, 614:3–5, 623:8–9, 634:17–18, and suggested Boyd's similar character by stating that Woodruff was "as bad as the

---

[3] These include the following statements by Drury in his summation: "I would just say this to you, I would absolutely reject, if I were to make this argument to you, any suggestion, any beliefs of the police or our office or myself had anything to do with changing Tyronne's testimony or making it fit in any pattern," *Boyd*, Dkt. 168-6 (Boyd criminal trial transcript) at 635:15–21; "Any suggestion that there is any conspiracy here to make the testimony fit the facts or do anything like that, it is absolutely ridiculous," *id.* at 635:22–636:1.

9

rest of them," *id.* at 634:8–9. He also similarly attempted to distract the jury from dispassionately considering the evidence, by invoking sympathy for the victim: "If you tend toward sympathy, you know what happened to that man, you know his family circumstances." *Id.* at 612:3–6.

      3.      *People v. Reingold,* 44 A.D.2d 191, 196 (3d Dep't 1974), *Boyd*, PX 197/*Walker*, PX 202 – the court reversed a burglary conviction because the prosecutor questioned the defendant about unrelated crimes without "any basis in fact," "clearly trying to serve no other purpose but to show … [criminal] propensity," and where the conduct was "so improper and inflammatory that it made impartial consideration of the competent evidence adduced at trial virtually impossible." This case is admissible as an ancient document and for notice. The conduct is similar to Drury's in the Boyd trial where he made knowingly false or misleading argument about the absence of coercion and collusion and he tried to inflame, distract, and prejudice the jury against the defendant with racially charged arguments and an invocation of sympathy, as quoted in the previous paragraph.

      4.      *People v. Williams,* Buffalo Evening News article dated August 22, 1973, *Boyd*, PX 194/*Walker*, PX 199 – ADA Drury caused a mistrial in a rape case by cross-examining the defendant about another rape charge, unrelated to the case, that had been dismissed. As in the Boyd case, this was a tactic to inflame the jury and distract it from the competent evidence in the case. The court ruled that Drury "poisoned the atmosphere so the defendant could no longer get a fair trial." The District Attorney's failure to even investigate this apparent misconduct was likely to cause Drury to believe he could get away with similar inflammatory and distracting behavior in the Boyd case. The article is admissible under the ancient documents exception and for notice.

      5.      *People v. Freeland,* 45 A.D.2d 814, 815 (3d Dep't 1974), *Boyd*, PX 140/*Walker*, PX 145 – ADA Ranni's summation in this attempted murder case was termed "inflammatory" by the Appellate Division, which further stated that "we do not condone the excesses of the District

Attorney's summation…" While these "excesses" were held not to be egregious enough to deny the defendant a fair trial, they clearly consisted, in light of the Appellate Division's condemnation, of misconduct. (The Court of Appeals granted leave to appeal and reversed on other grounds. *People v. Freeland*, 36 N.Y.2d 518 (1975).) That ADA Ranni was then, or soon after, appointed to Chief of Trials, and continued in that position, makes this misconduct, without any disciplinary follow-up, particularly likely to cause other prosecutors to believe summation misconduct would be condoned. Indeed, this decision adds to the lamentable course of misconduct by Ranni and makes the ECDA's failure to discipline him for his later summation misconduct, in cases this Court held admissible, even more egregious. This decision should be admitted under the ancient documents exception and for notice.

6.   *People v. Washington,* 32 A.D.2d 605, 606 (3d Dep't 1969), *Boyd*, PX 193/*Walker*, PX 198 – the Appellate Division reversed a first-degree robbery conviction because the ADA twice cross-examined the defendant about kicking police officers in the groin and tried to establish his "propensity to kick individuals in the groin" when it had nothing to do with his robbery case and was an obviously prejudicial tactic that courts had "clearly condemned." Again, this effort to distract the jury from the competent evidence and unfairly prejudice it against the defendant was sufficiently similar to ADA Drury's tactics in summation in the Boyd case, in which he made racially inflammatory remarks and appealed to juror sympathy, as quoted in the paragraph above describing *People v. Reingold*, such that it is relevant and should be admitted, under the ancient documents exception and for notice.

## **CONCLUSION**

The Court should issue an *in limine* ruling allowing the six cases described above into evidence, along with the *Monell* materials admitted at the Walker trial.

Dated:        September 22, 2025            Respectfully submitted,

11

**LAW OFFICES OF JOEL B. RUDIN, P.C.**
By: /s/ Joel B. Rudin
Joel B. Rudin
David E. Rudin
Partha Sharma
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
*jbrudin@rudinlaw.com*

**WILMER CUTLER PICKERING HALE AND DORR LLP**
By: /s/ Ross E. Firsenbaum
Ross E. Firsenbaum
Gideon A. Hanft
Phoebe Silos
Erin Hughes
Trena Riley
Melissa Zubizarreta
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
*ross.firsenbaum@wilmerhale.com*

**HOOVER & DURLAND LLP**
By:  /s/ Spencer L. Durland
Timothy W. Hoover
Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*sdurland@hooverdurland.com*

*Attorneys for Plaintiff Estate of Darryl Boyd*