UNITED STATES      DISTRICT COURT

 WESTERN DISTRICT OF NEW YORK

_____

KATHLEEN WEPPNER, AS EXECUTOR OF THE

ESTATE OF DARRYL BOYD,

                    Plaintiff,

          -vs-

THE COUNTY OF ERIE,

                    Defendant.
_____

Index No.
22-CV-0519-MAV

Rochester, New York
November 3, 2025
8:33 a.m.

**PRETRIAL CONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MEREDITH A. VACCA
UNITED STATES DISTRICT JUDGE

2

A p p e a r a n c e s

For Plaintiffs        WILMER CUTLER PICKERING HALE AND DORR,
                      LLP
                      By:  ROSS FIRSENBAUM, ESQ.
                           GIDEON HANFT, ESQ.
                           ERIN HUGHES, ESQ.
                           MELISSA ZUBIZARRETA, ESQ.
                           PHOEBE SILOS, ESQ.
                           TRENA RILEY, ESQ.
                      7 World Trade Center
                      250 Greenwich Street
                      New York, NY 10007

                      LAW OFFICES OF JOEL B. RUDIN, PC
                      By:  JOEL B. RUDIN, ESQ.
                           DAVID E. RUDIN, ESQ.
                      152 West 57th Street
                      New York, New York 10019

                      HOOVER & DURLAND, LLP
                      By:  SPENCER DURLAND, ESQ.
                      561 Franklin Street
                      Buffalo, NY 14202

For Defendant:        LIPPES MATHIAS
                      By:  JAMES BLENK, ESQ.
                           KIRSTIE MEANS, ESQ.
                           THOMAS SOUTHARD, ESQ.
                      50 Fountain Plaza - Suite 1700
                      Buffalo, New York 14202

COURT REPORTER:       JOONY L. ODENBACH, RPR, CRR
                      joonyodenbach@gmail.com

3

P R O C E E D I N G S

\*    \*    \*

(Open court.)

THE COURT:  We can get started, although it looks like maybe we're missing a few people.

MR. BLENK:  Your Honor, I expect that we may have other people coming in one day or the other, but as a general proposition it will be the three of us on a daily basis.

THE COURT:  Okay.  Great.  Thank you.

MR. BLENK:  And, with Your Honor's permission, we have staged some documents.  There's a version for the Court, if it wants it, and we've -- there's a version for us.  In case we have some sort of technical problem that we need to go to the ELMO, we have hard copies of our exhibits.

THE COURT:  Okay.  Thank you.  Are you expecting just the three of you today then?

MR. BLENK:  That's correct, Your Honor.

THE COURT:  Okay.  This is The Boyd Estate versus The County of Erie, 22-CV-0519.  Both parties are present.

I'd like to address some remaining pretrial matters before we start with our jury selection.  I'd like to start with the issue regarding who is going to be seated at Plaintiff's table.  And so it's my understanding that the County is objecting to D'Anthony Boyd sitting at the table.

4

And, Plaintiff, what's your position?

MR. FIRSENBAUM:  Good morning, Your Honor.

Our position is that Mr. Boyd is Mr. Darryl Boyd's son. He's a beneficiary of the estate.  He has an interest in the matter.  He's the chosen representative by Ms. Weppner, the executor of the estate.

The County has identified no legal authority that mandates that Ms. Weppner herself be the person seated at the table or that she can't designate someone with an interest in the matter who would serve as the representative.

We've cited case law in multiple jurisdictions allowing someone who is not the executor of the estate to sit as representative here.  Mr. Boyd has an interest in the matter and is the chosen person from the estate to sit here, and there's no prejudice to the other side.  Mr. Boyd is not a witness in the case.  Even if he were, we would be entitled to have one non-sequestered witness, but he's not going to be testifying, and there's not going to be any discussion about Mr. Boyd or harm to him that would unfairly prejudice the County.

THE COURT:  Okay.  Thank you.

Did you want to be heard?

MR. BLENK:  Thank you, Your Honor.  Just for a point of clarification on what I said earlier, we do expect Mr. Henry to be joining us every day or nearly every day through the

5

course of the trial, just for point of clarification.

I just wanted to add, Your Honor, that I think that Mr. Boyd has -- certainly has a right to -- Mr. D'Anthony Boyd certainly has a right to be here.  There's a galley for onlookers.

Our concern, Your Honor, is especially under the circumstances of this case where we're having Mr. Boyd's death foregrounded in the case over our objection and where there is a -- and there's really no testimony about Mr. D'Anthony Boyd. We don't have -- we see a significant risk in the idea that the jury would take their perception outside of the recoverable damages in this case, which are only those that went to Mr. Boyd, and start thinking about the distributees of his estate.

So case law about a wrongful death action where there is a distributee component is totally distinguishable because those people have a context -- in that circumstance that person has a context in the case.  Mr. D'Anthony Boyd sitting at Plaintiff's table invites a secondary or tertiary conception of damages as to how he was affected or additional ramifications to Mr. Boyd beyond what are recoverable damages.

THE COURT:  Okay.  I'm going to allow Mr. D'Anthony Boyd to sit at plaintiff's table.  If there's any proposed instruction for final instructions regarding that, then you can submit that.

6

Is Ms. Weppner -- is she going to be here during the trial at all?  Because I was planning on introducing her as well during voir dire.

MR. FIRSENBAUM:  Yes, Your Honor.  We are expecting her today as well.

THE COURT:  Okay.  Well, if she's here when I get to that, then she can stand up so the prospective jurors can see her.  But I will introduce or at least name everyone even, if they're not here today.

And Mr. Mahoney is listed as counsel.  He'll be here at some point during the trial; is that right?

MR. BLENK:  That's unlikely, Your Honor.

THE COURT:  Okay.  Because he was listed.  So I should take his name out then?

MR. BLENK:  Yes, Your Honor.

THE COURT:  Because I was going to --

MR. BLENK:  For the purposes of cross-referencing people that the jurors might know?

THE COURT:  Well, no.  Well, this morning during voir dire I was going to introduce all of the attorneys, and Mr. Mahoney was listed on your pretrial submission.  I noticed that he wasn't here during our pretrial conference, but I wanted to know if he is planning on being here during the trial or not.

MR. BLENK:  He is not planning on being here.

7

THE COURT:  Okay.  That's fine.  I will not introduce him then.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  Okay.  Let's address the preliminary instructions.  I did -- actually Ms. Austin provided a draft of that to everyone.  Would anyone like to be heard regarding that?  Plaintiff's counsel?

MR. FIRSENBAUM:  No, Your Honor.

THE COURT:  Okay.  Mr. Blenk or Ms. Means, go ahead.

MS. MEANS:  Your Honor, just briefly.  And these issues have somewhat been addressed.  So part of this is simply noting our exception to the extent the Court is not inclined to revisit some of its rulings.

In the background section, the introduction to Mr. Boyd, it says Mr. Boyd passed away in February 2025 from cancer.  His cancer diagnosis was unrelated to his conviction and incarceration.  The County proposes to change that sentence in the initial introduction to Mr. Boyd to, Mr. Boyd passed away in February 2025 from causes unrelated to his conviction and incarceration.

THE COURT:  Okay.  Your exception is noted.

Anything else?

MS. MEANS:  On the second page describing the vacatur, Mr. Boyd was not retried.  The indictment or criminal charges against him were dismissed, and Mr. Boyd's criminal case was

8

closed.

For complete context the County is requesting that we include language that specifies that that decision did not constitute an exoneration.

THE COURT: Okay. I'm going to deny that request. Your exception is noted.

Anything else?

MS. MEANS: Nothing else, Your Honor.

THE COURT: Okay. Thank you.

Okay. I'd like to address the DNA statement in the weak case statement. We addressed it the other day. However, it's my understanding now Plaintiff wants that statement excluded, but County would like that included; is that right?

MS. MEANS: Correct, Your Honor.

THE COURT: Would you like to be heard any further regarding that statement?

MR. FIRSENBAUM: Just that this was the position the County took on the DNA statement.

When we saw that Your Honor was proposing either an instruction or a stipulation, our view is that that would complicate the presentation of the evidence to the jury and that it would be much simpler to just strike the statement, which was what the County originally wanted. It removes any ambiguity that comes with any mention of DNA evidence at all. And so we would submit that's the easier way to go that does

9

not prejudice anybody or risk confusing the jury with stipulations or instructions when the evidence is presented.

THE COURT:  Okay.  And, Ms. Means, to clarify your argument, you would like it included because you believe it goes to I guess the credibility of the statement itself; is that fair?

MS. MEANS:  Correct, Your Honor, and consistent with our position that that decision does delve into assessing the ability to retry the case, and we believe that Mr. Flynn's reference to DNA evidence in that statement is demonstrative of that.  So to the extent that the statement is coming in and to the extent we are not permitted to introduce additional context under 106, at a minimum we would want the DNA statement to stay in with the limiting instruction that we've proposed in my e-mail.

THE COURT:  Okay.  While recognizing that the County has kind of shifted their argument, their position, I had previously ruled that that portion of the statement would be admissible and then I would give some sort of instruction about that.  And so I'm going to maintain that ruling.  And so we'll keep that portion in.

Okay.  I'd like to address the Martin acquittal.  And I'd like to hear from both, specifically regarding the fact that Mr. Martin was acquitted.  What would your position be if then all the other codefendants' verdicts were also excluded?

10

That might pose a few problems with Mr. Walker.

I guess if I'm going to exclude Mr. Martin's acquittal, then my inclination would be to exclude at least Mr. Gibson's. But I wanted to give you a chance. And recognizing that Mr. Walker, if he testifies, that might pose some problems because he'll testify at least regarding his incarceration. And so go ahead.

MR. FIRSENBAUM: Thank you, Your Honor.

I think the way -- the approach in the Walker trial is the right approach here where the jury can learn about the outcome of each trial. It avoids any kind of speculation and gives the jury the facts, and there's nothing prejudicial. And, in fact, it's important that the jury have the facts for a couple of reasons.

First, as to the Martin acquittal, there is incredibly substantive relevance to the fact that he was acquitted. The fact that that's why a transcript of that trial does not exist -- the jury is going to learn about transcripts or portions thereof from some of the other cases. And if there's -- the issue of the existence of the two photographs is a very important issue in this case.

The County is challenging the credibility of Mr. McLeod on this. The obvious corroboration for his testimony would be the transcript of that trial or the exhibits from that trial record. We don't have that. The reason why there's no

transcript is because Mr. Martin was acquitted. And so we need to be able to explain that to the jury and to be able to explain that the County was responsible for maintaining the exhibits as well. And I think we would be very prejudiced by not being able to corroborate Mr. McLeod or respond to the anticipated impeachment of Mr. McLeod if we can't say that there was an acquittal.

As to Mr. Walker, Mr. Walker is going to be giving testimony not only -- Your Honor certainly left open the door to him offering testimony about time in prison in conjunction with Mr. Gibson, but beyond that we expect him to be testifying about his efforts to achieve justice afterward along with Mr. Boyd, and Mr. Boyd's testimony is that he was doing that alongside with Mr. Walker. And so there won't be any context for that testimony from Mr. Walker and Mr. Boyd via video. In fact, it would be I think very confusing to the jury if they weren't told what happened to Mr. Walker in terms of the conviction and why he was doing these things if he wasn't convicted. So I think the fact of his conviction is necessary to provide context.

And, you know, the fact that one was convicted, one was acquitted, nobody argued in Walker that that was relevant for any reason other than the point that the transcript is not available in the Martin trial. We certainly don't expect to make any arguments about those outcomes other than the same

argument as to why there's no transcript of the Martin trial.

So I don't think there's any unfair prejudice that comes from identifying that Mr. Martin was acquitted, that Mr. Walker was convicted, and, you know, I think for the sake of completeness that Mr. Gibson was convicted as well.

THE COURT:  I recognize the probative value of Martin's acquittal for the lack of the transcript, but I'm weighing that against the potential prejudice really against the County for the possibility of the jury kind of concluding that, well, Mr. Martin was acquitted because of these photographs that Mr. McLeod used, even though I would tell them not to do that.

And so I understand your argument.  I do think there's the other side that I'm weighing or, you know, trying to balance.  And so did you want to respond at all to that? Because I do see that there is a potential for prejudice.

MR. FIRSENBAUM:  I mean, I don't think -- and I could certainly -- Mr. McLeod is not our client.  I can only do so much to sort of ensure that his testimony is where the Court needs it to be, but I can certainly do my absolute best to make sure that his testimony is limited to why the evidence that he didn't receive was favorable, why the photographs were favorable, how he used them and the fact that there ultimately was an acquittal and no transcript was created for that reason and not link the photographs to the acquittal in any of my questions or his answers.

MR. JOEL RUDIN:  Your Honor, may we have a moment?

THE COURT:  Sure.

(Plaintiff's counsel conferring.)

MR. FIRSENBAUM:  So Mr. Rudin also points out that because part of Mr. McLeod's testimony is that he didn't receive the other Brady evidence that if we leave the outcome unspoken then the implication from the jurors would probably be the wrong one, which is that he, too, was convicted, and we shouldn't be having them speculate in the wrong direction.  So not having any speculation is really the way to avoid undue prejudice to both sides.

THE COURT:  Okay.  Thank you.

Mr. Blenk, did you want to be heard?

MR. BLENK:  I think Your Honor captured our position pretty clearly.  It's -- I think that, just the same, the transcripts cut both ways.  The nonexistence of the transcript is not the responsibility of a party to this suit.  There's no case against the Erie County clerk's office as to the transcript.  We know it's neither the plaintiff's fault nor the defendant's fault that the transcript is no longer in existence.  I think that can be resolved pretty cleanly with an instruction to the jury to that effect and there wouldn't be -- there would be no reason for them to be holding anybody to account one way or the other that the transcript no longer exists.

THE COURT:  Okay.  I'm not going to allow the Martin acquittal, the fact that Mr. Martin was acquitted, to be admissible at trial.

I'm going to reserve on Mr. Walker.  I think that I probably will allow evidence regarding Mr. Walker's conviction because I think it's going to be needed.  The County had given a proposed instruction for the jurors regarding the lack of transcript.  And so if you want to take some time just to look at that and then propose any -- your own instruction or any changes to that, then that's fine, and we can address that later.

Regarding Mr. Walker's testimony, during our final pretrial conference -- I am not precluding Mr. Walker from testifying.  My concern is his testimony while he was incarcerated.  And it's my understanding that he was incarcerated I guess in the same facility as Mr. Boyd.  And so that would be kind of the reasoning for allowing his testimony.  But I would preclude Mr. Walker from testifying regarding like his kind of subjective experiences and opinions.  And sometimes I think there can be a gray area between things he observed and also not knowing whether Mr. Boyd himself saw these same things while incarcerated or had these same experiences.

So that's what I want to limit.  I want to make sure that whatever Mr. Walker testifies to that this is really just

15

corroborating experiences that Mr. Boyd had specifically while in prison.  And so I just wanted to bring that up.  It would be helpful to have maybe a proffer or something maybe more specific about the kinds of things that you would expect Mr. Walker to testify to regarding his time in prison.

MR. DURLAND:  Judge, I can handle that.

I don't anticipate Mr. Walker giving that testimony, the testimony about the overlap in incarceration.  I do anticipate Mr. Walker kind of picking up the story after both he and Darryl Boyd were released from prison.

THE COURT:  Okay.

MR. DURLAND:  And, you know, their efforts to bring public attention to their case, the way that they learned about the photographs and then made a FOIL request and received documents.  That I do anticipate Mr. Walker testifying to, and that does implicate the issue that Your Honor raised about that story not making any sense unless it's understood by the jury that he was convicted.

And so, you know, there will be this kind of imbalance between Mr. Boyd was convicted, John Walker was convicted.  I'm not sure where Your Honor has landed on Darryn Gibson and then Floyd Martin.  It will be sort of unspoken.  I anticipate the jury will assume that he was convicted as well.  But Mr. Walker's testimony will kind of -- I still think it's unavoidable.  The point Your Honor made stands, that that's --

16

THE COURT:  I don't see any really significant probative value of Mr. Gibson -- the verdict from Mr. Gibson's trial. And so we will work on crafting a jury instruction regarding, you know, the jurors not to speculate about what the verdict was and an instruction regarding Mr. Walker's guilty verdict and for them not to speculate on that as well.

MR. DURLAND:  Thank you, Judge.

MR. BLENK:  Your Honor, may I be heard on -- I'm not sure exactly what the Plaintiff intends in terms of the postconviction advocacy.  I understand that there is a -- there is a particular relevance or probative value to the assertion that there was a FOIL request made and documents obtained, and we understand that, but in terms of generally discussing further advocacy after the fact I think invites speculation as to the basis for the vacatur of the conviction.

MR. DURLAND:  Judge, if I could address that.

THE COURT:  Sure.

MR. DURLAND:  Mr. Walker is not going to be talking about 440 motions or legal proceedings.  When I say "advocacy," I mean he's going to describe in very general terms -- it will probably be 30 seconds -- that they held rallies, events.  He'll authenticate some photographs in which he and Mr. Boyd are engaged in those events.  And there are three or four of them.  And the probative value there is to demonstrate the ongoing burden of Mr. Boyd's conviction even

17

after he was released from prison.  And those events -- one of those events is the event where they learned about -- Mr. Walker learned about these two photographs.

So that's the purpose of that testimony.  It's not inviting the jurors to speculate about the basis for the vacatur.

THE COURT:  Okay.  And I've already ruled upon the 440s and their inadmissibility, but from what you have stated, that testimony sounds fine.  But we don't have to address the specifics now.

Regarding the issue of the admissibility of substance abuse, I'm not going to allow any evidence of Mr. Boyd's substance abuse before the murder, the homicide.  There was a question about after, and I want to hear from Plaintiff first. I know there are certain parole violations that you are not pursuing damages with respect to those, and I don't know if they're related to substance abuse.  So I guess if -- to make my decision on that I really need to know, would any of the evidence that you are presenting open the door to that?  So if you could speak to that.

MR. DURLAND:  So in terms of the relevance question, Judge, I don't think that any of the four parole violations would open the door to substance abuse.  In other words, Mr. Boyd doesn't say I violated parole because I was abusing substances and that was because of the conviction or anything

18

like that.  It's simply an account of -- his account of what happened.  I, you know, was outside in my backyard and my parole officer said I had to be in my house and that resulted in, you know, a two-year stint re-incarcerated.

So I know Your Honor knows that we have additional arguments about -- I should say in terms of the relevance, if Your Honor precludes substance abuse, Dr. Drob won't say anything about it.  So, you know, we would be perfectly fine with excluding that entirely from the case.

Because we know the County wants to put it in, we have designated certain portions of Mr. Boyd's deposition because if, you know, the decision goes against us we wouldn't want to just leave that -- we'd want to front it.  So that's the only reason that those designations are there.  So I think if the Court rules that substance abuse is out, then, no, those four parole violations would not open the door.

I mean, we have additional objections that, you know, the County has waived this argument, this is the third round.  This is the evidence that they want to put in.  Is it admissible.  It's hearsay.  They have no witness to lay the requisite foundation.  We have a number of other objections that I wouldn't want to be heard to be abandoning.  But in terms of Your Honor's questions about relevance, no, I don't think that the parole violations would -- Mr. Boyd talking about the parole violations themselves would not open the door

19

to substance abuse postconviction.

THE COURT:  Okay.  Thank you.

Mr. Blenk, did you want to be heard?

MR. BLENK:  Yes.  Thank you, Your Honor.

I just wanted to clarify that Dr. Drob's -- Dr. Drob's analysis of Mr. Boyd and his analysis of Mr. Boyd's posttraumatic stress disorder is intertwined with substance abuse history.  Mr. Drob missed that substance abuse history and the pre-existing substance abuse history in Mr. Boyd's records.

I think that the case law in the Second Circuit is clear that putting at issue -- not even anything intertwined with substance abuse, but putting it at issue -- specifically posttraumatic stress disorder puts at issue pre-existing substance abuse disorder.  I cited a case to that effect in my submission.

I would add a case called Fletcher versus City of New York, 54 F.Supp.2d 328.

I would add Warr versus Liberatore, which was a decision by Judge Payson, 437 F.Supp.3d 259.

And Burke versus Spartanics, Second Circuit, 252 F.3d 131.

The County cannot be constrained to getting -- as an initial matter, Your Honor, I'm not sure how the idea of substance abuse even became intertwined with prior bad acts.

It's just substance abuse.  It's a disease that many people suffer from.  And it's reflected in his medical records as he's reporting this history, the onset of these symptoms, well before prison.

Two, the subsequent substance use, I think Mr. Drob concedes that the -- Mr. Boyd's postconviction life was largely influenced by those substances, that his violations are interconnected with substance abuse and that Mr. Boyd concedes that he was using substances in violation of his terms of his parole and his reports to -- in his medical reports.  And these are things that are relevant to Mr. Boyd presenting the idea that he's being subjected to this arbitrary and racist parole observation, when really he's not following the terms of his parole.

In addition to that, two of the -- two of the -- his first two parole violations are connected with in-community contacts with the police.  These are not -- these are not simply parole officers swooping down, but that he's being arrested and charged with crimes independent of the influence or actions of his parole officers.  And I think that's also relevant and needs to come in to contextualize Mr. Boyd's experience of parole.

THE COURT:  So you're saying that Mr. Boyd's substance abuse was intertwined or related to that parole violation?

MR. BLENK:  It's intertwined and related to all of his

21

parole violations in the sense that he's using at the times that this is happening, and that's reflected in his records, and that it's not something where it's this arbitrary changing the rules after the fact by parole, parole being overly burdensome, parole being focused on him to the exclusion of other people.  It's that he's in consistent violation of the terms of his parole, including as it pertains to substance abuse.

THE COURT:  I'm going to continue to reserve on that, but I'm going to give you my decision as soon as possible because I know that Plaintiff had asked if I was going to allow that in that you would want me to potentially ask a question during jury selection.

MR. DURLAND:  That's correct, Your Honor.  Although, I mean, I think that if the Court asked the question at jury selection and then the jury heard nothing else about substance abuse the rest of the trial, I don't think that that would be -- because our question doesn't say, you know, who you're referring to.  It just asks a general question about substance abuse.  So, in other words, I think Your Honor could ask the question and still, you know, safely reserve without feeling like you've committed yourself by asking the question.

THE COURT:  Okay.  That's fair.  So I can ask the question in kind of a generic form.

MR. DURLAND:  Can I have 30 seconds just to respond to

22

what Mr. Blenk said?

THE COURT:  Yes.  Go ahead.

MR. DURLAND:  In terms of Dr. Drob, they have no -- they have no expert.  They have no basis to say that substance use with, you know, a 14-year-old or a 15-year-old has anything to do with mental illness now.  Dr. Drob does not say that preconviction substance abuse is intertwined with PTSD or anything else.  I don't know what these three cases say because, you know, we just got them, but I suspect that courts have definitely not held that PTSD is inherently related to substance abuse 20 years earlier.

And in terms of their point about parole, I think Your Honor asked exactly the right question.  Were the parole violations related to substance abuse?  No, they weren't.  Mr. Blenk is just saying if he's talking about parole then we can say whatever we want about parole and we can try to sort of change the story or put it in a more negative context using inadmissible hearsay, and we object to that.

MR. BLENK:  And, Your Honor, I just -- we were somewhat hamstrung about putting this case into the docket because these issues were confidential, and I just want to make sure for the purposes of the record the case that we're trying to make is extremely clear.

Mr. Boyd disclosed feelings of less -- being lesser than his community and experiences of being bullied in his

community and trauma in his home as a connection to his onset of alcohol use at 13, and he specifically reported that he was drinking a pint of liquor each day prior to his incarceration.

At the conclusion of his -- he treated with the Office of Mental Health while he was in prison. And at the conclusion of his prison stay in his outgoing interview he is disclosing no psychiatric symptoms. So he has this -- what certainly looks like a mental distress onset of substance abuse prior to his incarceration. He doesn't have symptoms at the conclusion of his incarceration.

Dr. Drob didn't -- apparently didn't see his substance abuse history -- his reported substance abuse history in his records. And Dr. Drob at his deposition conceded that substance abuse can cause and worsen posttraumatic stress symptoms. In other words, that it could be a cause, except that he is relying on a chronology that suggests that they're at least coincident if not preceded by the -- this significant experience of his life of being incarcerated.

That chronology is out the window now. That chronology is not true. The jurors cannot be presented with opinions that rely on that chronology without cross-examination. He -- again, it's his deposition in which he concedes that substance abuse can cause the same symptoms that he's diagnosing in Mr. Boyd. So when he leaves prison without those symptoms, and then engages in decades of substance abuse after prison that

24

he specifically says is the same as when he went into prison, that has to be used to -- as contrary evidence and also to impeach Mr. Drob's process.

THE COURT:  Okay.  Thank you.  I understand the parties' positions, and I will get an answer to you as soon as I can.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  I want to address briefly the two stipulations that you docketed regarding the exhibits.  You had stipulated to the authenticity of many exhibits and you also stipulated to the universe of documents that were admitted at various proceedings as well as the universe of the alleged Brady evidence.

I just wanted to clarify.  Are there certain exhibits in the stipulations that you agreed to their admissibility?  Because it wasn't clear, and I just want to make sure it's very clear.  Are those all exhibits that you are stipulating to their admissibility?  Because I just would like to make that clear so we don't have to waste time during trial to offer and receive exhibits, with the understanding that some of those are transcripts that I still have to rule upon and those could be admitted subject to redaction.

MR. FIRSENBAUM:  The short answer to Your Honor's question is no.  The stipulation does not cover admissibility of anything.  We had proposed to the County that it should along the lines of the stipulation from the Walker case that

25

the Brady evidence -- alleged Brady evidence and the documents that were marked as exhibits on the record of the criminal trials and pretrial proceedings all be stipulated as admitted at least for the limited purposes of nondisclosure, favorability, materiality as appropriate.

The County refused to stipulate to that.  So we stipulated to what we could get agreement on, which was admissibility -- sorry -- authentication and which documents were marked on the record.  So as of now nothing is stipulated to, but we will certainly be offering the Brady evidence shortly.

THE COURT:  Thank you.

There are no exhibits that you can stipulate to, to their admissibility?

MR. BLENK:  We would stipulate to -- there was no independent discussion of admissibility.  And we had never moved into -- even in the last trial the documents had been stipulated to be admissible, though not admitted.  We had not had a follow-up conversation about specific documents.

As to the Brady evidence, Your Honor, our position is that these purported Brady violations fall outside the scope of an articulated policy and procedure, and their introduction is, therefore, prejudicial to be discussed at all.  They really -- in the event -- if they don't fit into a Monell theory, they are simply going to guilt and innocence.

26

As it pertains to a specific piece of evidence that was addressed in our filing on Friday, it's our position that the evidence that came to be after the conviction of Mr. Boyd is not subject to the rule of Brady and that it's -- Plaintiff has no plausible -- the Plaintiff has no claim for disclosure of evidence that arises after a conviction which is governed by a different body of case law and that, therefore, it shouldn't come into the case.

THE COURT: Okay. I mean, it's just difficult for me to believe that there are no exhibits that the parties can stipulate to their admissibility, and then those can be received and we don't have to go through offering and receiving those. And so I'm asking the parties to confer about that and to give us hopefully maybe an updated stipulation by tomorrow morning with exhibits that you can at least agree that they are admissible and that we can receive those exhibits. I think that would just make the trial run more smoothly.

We were able to do that in Mr. Walker's trial. And so I don't know if there's a significant difference here that would prevent that from happening here. So go ahead.

MR. BLENK: And, Your Honor, if I may raise one issue just because we need to understand what's going on to make appropriate accommodations, if necessary.

But the plaintiff stipulated to the authenticity of

27

certain medical records and certain public records and certain business records, and it's our position that they have stipulated to -- by stipulating to the authenticity, they have stipulated to the document being what it purports to be, that the document is a medical document, that the document is a public record of Mr. Boyd's incarceration. That authenticity is resolved.

The Plaintiff has now taken the position that though that is resolved that those documents aren't getting through the levels -- the hearsay exceptions that would be applicable to those types of documents. So these are documents that Mr. Drob relied upon. These are documents that Mr. Drob called medical records. They are described as treatment records in the stipulation, and that's something that -- and I hope that we can perhaps confer on that, but we also need to -- in the interest of protecting our client's rights we need to make the appropriate application for a trial subpoena as necessary as soon as possible. So I'd like to understand the nature of the Plaintiff's objection.

THE COURT: Okay. I mean, I brought this issue up not to argue specifically about any exhibits, but really just to say can you please just try to find some exhibits that you can agree to their admissibility and so we can just streamline the process. That's it. Okay? And so hopefully you can do that and you can get that to us by tomorrow morning. Okay?

28

MR. FIRSENBAUM:  Your Honor, can I just be heard for 30 seconds on that?

THE COURT:  Sure.

MR. FIRSENBAUM:  Will do in response to Your Honor's request.  I would think that certainly we could stipulate to some of the police reports.

As far as what Mr. Blenk just said, which is an entirely separate issue, it's just wrong.  The stipulation, as Your Honor can see, is that it's to the requirements for authenticity pursuant to FRE 901.  It's not a stipulation that the foundation for business record has been met.  It's not a stipulation that the foundation for a medical record has been set at all.

And so if the County wanted to introduce documents as business records or medical records, it needed to figure out how it was going to do that during discovery.  It needed to identify custodians on its Rule 26(a) disclosures.  It needed to put custodians on its witness list.  Didn't do any of these things, and we're about to pick a jury in about fifteen minutes, and they want to start bringing in new people to the case?  That's not how this works.

If they wanted to bring in documents, they needed to do it in a timely manner with whatever foundation was necessary.  They haven't done it.  We certainly haven't stipulated to the foundation that gets those documents in.  And, you know,

29

they're going to have to try the case based on how they prepared for it, Your Honor. We can't delay it, and we shouldn't be sandbagged with witness testimony where they weren't disclosed and we didn't have the opportunity to depose them.

MR. BLENK: We're just talking about authenticating records that the Plaintiff has authenticated, Your Honor. These are just documents that were disclosed by the Plaintiff in discovery. They have conceded to the authenticity thereof. They've had their own experts rely on them as medical records. These are medical records that by authenticating them they are what they purport to be, medical records, and they can be used accordingly.

THE COURT: Well, there's clearly a disagreement about their admissibility. And so we will address -- we will certainly address that. Since it's been brought up, we'll address it later.

MR. BLENK: Thank you, Your Honor.

THE COURT: Okay. Just a quick -- a few quick things about voir dire. We're going to run it I guess similar or the same way as we did with Mr. Walker's trial. And so we'll have 14 jurors in the box. And when someone is excused for cause I like to fill that seat right away, and we'll just kind of bring them up-to-date.

Well, what is different, as we've already notified you,

30

is that I am not going to give the attorneys a chance to ask questions to the jurors.  I did receive something from Plaintiff regarding proposed questions.  And so I am going to ask those questions or at least variations of them to the jurors.  I don't think I received anything from the County for that.  So I will do the same kinds of questions plus a few other questions that were proposed by Plaintiff.

I'm going to kind of end the questions with the juror questionnaire, and we'll go through each juror, and then we'll excuse them, do our challenges for cause, and then the attorneys will be able to exercise their peremptory challenges.

And like in Mr. Walker's trial, I'm going to ask you to exercise them starting with Plaintiff.  Plaintiff's first peremptory challenge, and then defendant.  And then the second round the defendant starts and then Plaintiff.  And then in the third round Plaintiff starts and then defendant.  And so it's kind of that snake pattern.

And I think when you exercised them last time the jurors were not present.  Are you asking for the jurors to be seated when you are doing that or would you like them to be excused or it doesn't matter to you?

MR. FIRSENBAUM:  I think we defer to Your Honor.  We don't have a strong view about that.

THE COURT:  Okay.  Then we'll have them excused.

31

Okay.  Are there any questions at all or anything else that you would like to address before we bring the prospective jurors up?

MR. BLENK:  We're all set.  Thank you, Your Honor.

THE COURT:  Okay.  Great.  Then we'll take a brief recess.  And we're scheduled to start with our prospective jurors at 9:30.  Thank you, everyone.

(Recess taken.)

(Jury selection to commence at 9:30 a.m.)

*               *               *

CERTIFICATE OF REPORTER

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court of the Western District of New York before the Honorable Meredith A. Vacca on November 3, 2025.


S/ Joony L. Odenbach

Joony L. Odenbach, RPR, CRR

Official Court Reporter