UNITED STATES        DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

_____

KATHLEEN WEPPNER, AS EXECUTOR OF THE

ESTATE OF DARRYL BOYD,

                    Plaintiff,

        -vs-

THE COUNTY OF ERIE,

                    Defendant.

_____

Index No.
22-CV-0519-MAV

Rochester, New York
November 3, 2025
2:02 p.m.

**JURY TRIAL (PM session)**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MEREDITH A. VACCA
UNITED STATES DISTRICT JUDGE

2

A p p e a r a n c e s

For Plaintiffs          WILMER CUTLER PICKERING HALE AND DORR,
                        LLP
                        By:  ROSS FIRSENBAUM, ESQ.
                             GIDEON HANFT, ESQ.
                             ERIN HUGHES, ESQ.
                             MELISSA ZUBIZARRETA, ESQ.
                             PHOEBE SILOS, ESQ.
                             TRENA RILEY, ESQ.
                        7 World Trade Center
                        250 Greenwich Street
                        New York, NY 10007

                        LAW OFFICES OF JOEL B. RUDIN, PC
                        By:  JOEL B. RUDIN, ESQ.
                             DAVID E. RUDIN, ESQ.
                        152 West 57th Street
                        New York, New York 10019

                        HOOVER & DURLAND, LLP
                        By:  SPENCER DURLAND, ESQ.
                        561 Franklin Street
                        Buffalo, NY 14202

For Defendant:          LIPPES MATHIAS
                        By:  JAMES BLENK, ESQ.
                             KIRSTIE MEANS, ESQ.
                             THOMAS SOUTHARD, ESQ.
                        50 Fountain Plaza - Suite 1700
                        Buffalo, New York 14202

COURT REPORTER:         JOONY L. ODENBACH, RPR, CRR
                        joonyodenbach@gmail.com

3

INDEX

Preliminary Jury Instructions                               7

Opening Statements

       By Mr. Durland                                    20

       By Mr. Blenk                                      56

Boyd v. County of Erie, 22-CV-519                    4

P R O C E E D I N G S

*    *    *

(Open court.)

THE COURT:  We can get started.  The parties are present.  The jurors are not in the courtroom.  Before I bring them out, I want to address the slides that I received.

Mr. Blenk, do you have any specific objections to any of these slides?  And are there any slides that you think reasonably would not be admissible?

MR. BLENK:  Beyond the arguments that we've previously raised in our motions in limine and in my prior comment regarding the scope of appropriate Brady in the absence of Monell, we wouldn't have any further objections, Your Honor.

THE COURT:  Okay.  Thank you.

So I've looked at all the slides.  I'm going to allow you to use all of the slides that you have proposed.

MR. DURLAND:  Thank you, Your Honor.  May I raise one thing?

THE COURT:  Sure.

MR. DURLAND:  I didn't mean to interrupt, but we had talked before about the substance abuse and the fact that Plaintiff maintains objections -- Your Honor has ruled the topic relevant, but we maintain objections to the substance of the records.  And I would ask that -- perhaps Mr. Blenk

doesn't have any intention of saying -- talking about the substance of the records in his opening, but if he did, we would certainly object to him saying, repeating something that is in a record that Mr. Boyd purportedly said in his opening when, you know, in our view, that evidence, it's not admissible. It's hearsay and, you know, we're reserving our right to object to it. So that occurred to me after we left. So I wanted to raise it.

THE COURT: Okay.

Mr. Blenk, do you expect to get into any of that during your opening statement?

MR. BLENK: No, Your Honor.

THE COURT: Okay. Thank you.

And that really goes for any evidence, that at this point I think all of you have a good idea of what evidence may not come in. And so if there's a question about whether it's going to come in or not, then you should avoid it. And if you have a question about it, then just let me know. But we don't have much time left to do that.

One other thing. When I bring the jury in and read the preliminary jury instructions, I'm going to just mention the full official caption of the case. I haven't read that yet. And so I just want everyone to know that I'm going to read that to them. I'll refer to it as the Boyd estate or the estate of Darryl Boyd, but I'm going to just read the entire

Boyd v. County of Erie, 22-CV-519                    6

"Kathleen Weppner as Executor" for this first instance.

Okay.  Is there anything else before we bring the jurors in?

MR. DURLAND:  Just the setup for the openings, Judge.

THE COURT:  Yes.

MR. DURLAND:  Will we be at -- are we going to turn the podium towards -- to face the jurors or --

THE COURT:  Yes.  You are welcome to do that if you want.

MR. DURLAND:  Okay.

THE COURT:  If you want to -- do you want to do that now?

MR. DURLAND:  Yeah, if you don't mind.

THE COURT:  Yeah.  Go ahead and do it.

MR. JOEL RUDIN:  We've had a problem with that microphone before.

MR. DURLAND:  I'd like to be able to see the slide, if possible.

THE COURT:  Real quick, before we bring them in, just so my law clerk can start working on issues for tomorrow, can you tell us the expected witnesses for tomorrow?

MR. FIRSENBAUM:  Yes, Your Honor.  I think we anticipate reading some of the Brady evidence first, as we did at the beginning last time.

THE COURT:  Okay.

MR. FIRSENBAUM:  And then we anticipate playing video clips from Mr. Boyd's deposition.  And so I think we need rulings on those designations.

THE COURT:  Okay.

MR. FIRSENBAUM:  And then if there is time after that we would call Mr. Walker.

THE COURT:  Okay.  Thank you.  We can bring the jurors in.

(Jury present.)

THE COURT:  Please have a seat, everyone.  Thank you.

Okay.  Our jurors have returned to the courtroom.

These are your seats for the duration of the trial. There may be a few instances where we need you to just shift down a little bit, but if we do, we'll let you know.  So please remember that these are your assigned seats.  And so every time we come back to court make sure that you're sitting in the correct seat.

I am going to give you some preliminary instructions, and then after that we're going to proceed with opening statements from the attorneys.

This case is now officially on trial, and you are the jurors in the case.  The official caption of this case is Kathleen Weppner, as Executor of the Estate of Darryl Boyd, versus The County of Erie.

Now that you have been sworn, I am going to give you

Preliminary Jury Instructions                8

some preliminary instructions to guide you in your participation in the trial.  At the end of the case I will give you much more extensive instructions about how to consider the evidence and reach a verdict.  These preliminary instructions really are just some general rules of the road to help guide you until we reach the end.

I want to go over some housekeeping matters.  As I already indicated to you this morning, we hope that the trial will be done by the end of Friday, November 21st.  However, given the unpredictable nature of trials, we are asking that everyone remain available through the end of Tuesday, November 25th.

And so, as I said earlier, we'll meet for full days beginning around nine or 9:30 in the morning.  We'll go until about 4:30 or five at the end of the day with about one hour for a lunch break every day and a mid morning recess and a mid afternoon recess.

You were in the jury room.  That's going to be your new kind of home away from home.  There is a refrigerator there. So you are welcome to bring in your lunch to keep in the refrigerator.  You can also bring in water or coffee into the courtroom, but I would just ask that you have -- that they're in closed containers.  So if you would like to do that, that's fine.

As we begin the trial, I want to apologize in advance

Preliminary Jury Instructions                    9

for what I call the difference between court time and real time.  When I tell you that I intend to begin at nine a.m., I really mean that.  For example, when I tell you we are going to take a fifteen-minute break, I really want to limit it to fifteen minutes.  However, legal matters inevitably come up that necessitate discussions outside of your presence.  And so when that occurs we may run a little bit longer or we may start a little bit later.  So I can assure you that all of us are working very hard and diligently throughout the whole trial, but I do expect there to be delays in the trial while we are addressing matters outside of your presence.

You may notice during the trial that myself or Ms. Popp, my courtroom deputy, or my law clerks are using our computers.  I actually have the transcript right now that Ms. Odenbach is taking on my computer.  And so please understand that we're using our computers to do work for this case. We're not just doing games online or anything like that.

It will be your duty to find from the evidence what the facts are.  The function of the jury is to decide the disputed factual issues in this case.  In order to discharge this duty, it is important that you pay close attention to the evidence and listen carefully to the witnesses as they testify and form no judgment with respect to any witness or the outcome of the case as the trial moves forward.  You must keep an open mind throughout the entire trial.

Nothing that I say or do during the course of the trial is intended to indicate or should be taken by you as indicating what your verdict should be.  You will then have to apply those facts to the law that I give to you.  You must follow the law whether you agree with it or not.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents and other things received in the record as exhibits and any facts the parties agree to or stipulate to or that the Court may instruct you to find.  Certain things are not evidence and must not be considered by you.  I will list them for you now.

Statements, arguments and questions by any of the lawyers are not evidence.

Objections to questions are not evidence.  The lawyers for both parties have an obligation to make an objection when they believe evidence being offered is improper under the rules of evidence.  You should not be influenced by the objection or by my ruling on it.  If the objection is sustained, ignore the question.  If it is overruled, treat the answer like any other.

Testimony that the Court has excluded or told you to disregard is not evidence and must not be considered. Likewise, if you are instructed that some item of evidence is admitted for a limited purpose only, you must follow that instruction, and only consider that evidence for the

Preliminary Jury Instructions                11

specified limited purpose that I give you.

Anything you may have seen or heard outside of the courtroom is not evidence and must be disregarded. You are to decide this case solely on the evidence presented here in the courtroom.

There are two kinds of evidence: Direct and circumstantial. Direct evidence is direct proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. I will give you further instructions on these as well as other matters at the end of the case, but keep in mind that you may consider both kinds of evidence. In other words, both direct and circumstantial evidence may be considered.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject. It is important that you carefully observe the witnesses as they testify because a witness's manner of testifying is a factor that may play an important part in your reaching a judgment as to whether or not you can accept that witness's testimony as reliable. I will give you some guidelines for determining the credibility of witnesses at the end of the case.

As I mentioned during voir dire, this case involves allegations by Plaintiff that Mr. Boyd's constitutional right

to a fair trial under the Fifth and Fourteenth Amendments was violated in 1977 due to the misconduct of Erie County Assistant District Attorneys, which in turn was caused by policies and practices of the Erie County District Attorney's Office.

Mr. Boyd passed away in February of 2025 from cancer. His cancer diagnosis was unrelated to his conviction and incarceration. Kathleen Weppner is the executor of Mr. Boyd's estate, and in that capacity she has been, what is referred to as, substituted as the Plaintiff in this case to continue to pursue Mr. Boyd's claim on his behalf. That is why you may hear me or the attorneys refer to the Plaintiff as the Boyd Estate or the Estate of Darryl Boyd. The Boyd Estate is alleging that the County of Erie, the defendant in this case, is liable for the prosecutor's misconduct, and is seeking compensation from the County for these alleged violations.

The Boyd estate's case against the County of Erie is based on a federal statute and Supreme Court case law: Title 42 United States Code Section 1983 and a case called Monell versus Department of Social Services of the City of New York, which protects against violations of an individual's constitutional rights under color of state law that are caused by a deficient municipal policy.

Under the law of Section 1983 a plaintiff cannot bring

a lawsuit challenging a violation of his right to a fair trial until after his criminal conviction is vacated.  Here Mr. Boyd's 1977 criminal conviction for a murder in Buffalo was vacated in August of 2021, which left open the possibility of Mr. Boyd being retried.

Mr. Boyd was not retried.  The indictment or criminal charged against him were dismissed and Mr. Boyd's criminal case was closed.  You should not speculate as to the reasons the conviction was vacated, that Mr. Boyd was not retried or that the indictment was dismissed.

The County has denied plaintiff's allegations, both denying that any constitutional violations occurred in 1977 and that any policy or practice of the Erie County District Attorney's Office caused the alleged violations.  Keep in mind at the end of the case I will instruct you in great detail as to exactly the elements that Plaintiff must prove.

A quick word about civil cases.  As you know, this is a civil case, and, as such, Plaintiff has the burden of proving the material allegations of any claims by a preponderance of the evidence, which means more likely than not.  There is one claim in this case against the County, though the Boyd estate will attempt to prove their case on this one claim by multiple theories, and I'm going to go into that later on.

If after considering all of the testimony you are satisfied that the Boyd estate has met their burden on each

essential point of their claim, then you must find for the Plaintiff.  If after such consideration you find that the Plaintiff has not met their burden on each essential element of their claim, then you must find in favor of the defendant. I will give you further instructions on this point later, but bear in mind that in this respect a civil case is different than a criminal case.

I will briefly describe to you now how the trial will be conducted.  We'll start in a few minutes with what are called opening statements.  An attorney representing Plaintiff, the Boyd estate, and an attorney representing the County, the defendant, will before any evidence is received appear before you and make opening statements.  This is a sort of framework or reference as to what the case is about, and both sides will set forth what they believe the evidence will show.  These statements are made for the purpose of helping you follow the evidence with reference to the issues in the case.  However, as I previously instructed you, opening statements are not evidence and cannot substitute for evidence.  The only evidence that you may act upon to render a verdict is that which you will hear from a witness when testifying under oath, along with any documents or other items that are admitted into evidence.

After opening statements the Plaintiff will offer their proof.  This is called the Plaintiff's case in chief.  Upon

the conclusion of the Plaintiff's case in chief, the defendant will offer their proof.  Upon the conclusion of all of the evidence, the parties' attorneys will again address you, and these are called summations or closing arguments, and each side will urge you to consider the arguments that they believe support their position.  You should, of course, listen attentively to both closing arguments.  The determination as to whether you accept any argument advanced before you by the Plaintiff or by the Defendant is entirely up to you.

Following summations I will instruct you as to the law. Then at that point you will go to the jury room and undertake your fact-finding function, also called deliberations.  You as the jury are the ultimate decision-makers in finding the facts.  This must be based on the evidence presented before you.  Nothing I say or do during the course of the trial is intended to indicate nor should be taken by you as indicating what your verdict should be.  That's not my job.  I am not the fact-finder.  I am in charge of the law.  But you as the jury are solely responsible for determining the facts.

A few words about your conduct as jurors.  And I talked about this before a little bit, but I'm going to reiterate the rules that must govern your conduct during the course of this trial.  You may not discuss this case with anyone either amongst yourselves or with anyone else during the course of

the trial. And when I say "anyone," that means anyone at home, any person. You cannot talk about the case at all. This includes discussing the case in person, in writing, by phone or electronic means, by text message, e-mail, Facebook, TikTok, any version. You cannot talk or communicate about the case with anyone.

In fairness to both sides you should keep an open mind throughout the trial, reaching your conclusion only during your final deliberations after all the evidence is in and after you have heard the closing arguments and my instructions to you on the law, and then and only then after you've had a chance to discuss the evidence with the other members of the jury.

We want you to decide this case solely on the evidence presented in this courtroom and not on the basis of anything anyone who has not heard the evidence may think about the case. If anyone does try to discuss the case with you or does anything else that you think is improper, then you should, of course, immediately walk away. You should also report that fact to me as soon as possible, and you can do that by letting Ms. Popp know or one of the court security officers know, and then they will make arrangements with me for you to meet with me.

You should not, however, discuss with any other juror that fact or any other fact that you feel necessary to bring

to my attention.  That is, do not seek advice from another juror.  Don't let them know what you want to talk about.  When in doubt, err on the side of caution and let me know if you think something happened that is improper.  No one is going to get in trouble, and I, the attorneys and the parties will be very grateful that any concerns are promptly brought to me.  It is all of our responsibilities to make sure that your deliberations in deciding this case are based only on the evidence admitted in this courtroom.

You may hear testimony during the trial about particular locations in the Western District of New York, and you may be tempted to visit some of those locations.  You should not do so.  Because of the time that elapses before a case comes to trial, substantial changes may have occurred at the location in question since the event that resulted in this trial.  Also, in making a visit without the benefit of explanation, you might get a mistaken impression.  Even if you happen to live near the location, please avoid going to it or passing it until the case is over.  Beyond that, do not do any research or make any investigation about the case on your own.  Do not Google or search any legal term, any name of the party or attorneys or anyone related to the case or try to look up anything else related to this case.

Although it is a normal human tendency to talk to people with whom one comes into contact, please do not during

the time you serve on the jury talk either in or outside of the courtroom with any of the attorneys, the parties or any witness. And by this I mean not only do not talk about the case, but do not talk to them at all, even to pass the time of day. In no other way can all parties be assured of the absolute impartiality they are entitled to expect from you as jurors.

These courtrooms are open courtrooms. That means anyone can come in and watch the proceedings, including the media. Therefore, in the event that there are any media accounts of the case, whether it be online or on the radio, the news, or any other source, you are not to read, watch or listen to any such accounts. Similarly, do not try to access any information about the case or do research on any issue that arises in the case from any outside source, including dictionaries, reference books or anything on the internet. You are, of course, in the best position to decide what happens in this courtroom, and you do not need to rely on any secondhand account.

If you have questions during your deliberations, you will have the opportunity to submit questions to me. But, again, your sworn duty is to decide this case solely and wholly on the evidence presented in any courtroom.

The subject of note-taking may cross your mind or may have already crossed your mind. In that regard I am going to

permit you to take notes in this case.  You already have them.  Ms. Popp has distributed pencils and pads for your use.  I do want to give you a few warnings about taking notes.

First of all, do not allow your note-taking to distract you from listening carefully to the testimony that is being presented.  If you would prefer not to take notes at all and simply to listen, please feel free to do so.  The fact that a particular juror has taken notes entitles that juror's views to no greater weight than those of any other juror.

Please remember also that not everything you write down is necessarily what was said.  Thus, when you return to the jury room to discuss the case at the end of this case, do not assume simply because something appears in somebody's notes that it necessarily took place in court.  Instead, it is your individual and collective memory that must control as you deliberate upon the verdict.  Please make sure you leave your notebook on your chair at every recess and at the end of the day, and Ms. Popp will collect the notebooks and return them to your chair the following day.  In other words, do not bring your notes back with you to the jury room or anywhere else during the trial.  You will have your notebooks available to you during your deliberations at the end of the case, but you should make use of them only as an aid to your memory.  In other words, you should not give your notes any

Opening Statement by Mr. Durland            20

precedence over your independent recollection of the evidence or the lack of evidence, and neither should you be unduly influenced by the notes of other jurors.

If you need testimony read back, our court reporter Ms. Odenbach will be available to do so.  Ms. Odenbach is creating the official trial transcript of these proceedings. I emphasize that notes are not entitled to any greater weight than the memory or impression of each juror as to what the testimony may have been.

That concludes my preliminary instructions.  We are going to move on to opening statements from counsel.

Mr. Durland, you can proceed.

MR. DURLAND:  Thank you, Your Honor.

May it please the Court, counsel, Members of the jury. This case is about a 1977 murder trial and a County District Attorney's Office that concealed evidence, deceived the jury and destroyed a man's life.

My name is Spencer Durland, and along with my colleagues here, I am immensely proud to be representing the Plaintiff in this case, Darryl Anthony Boyd.  I should say the Estate of Darryl Anthony Boyd.  In a more perfect world, this would be the moment that I would turn and introduce you to Darryl.  You would see him and he would see you.  I can't do that, as you know, because Darryl died of cancer earlier this year.

Sitting at counsel's table is Darryl's son D'Anthony Boyd. We are all here in Darryl's name to demand accountability for an egregious injustice: Darryl Boyd's wrongful conviction in 1977 for the murder of William Crawford.

William Crawford was killed in Buffalo in January 1976 after a night of heavy drinking at the bar across the street from his house. The Erie County District Attorney's Office charged four teenagers with this crime: Darryl Boyd, John Walker, Darryn Gibson and Floyd Martin. The prosecutor's claim was that these four boys killed Crawford together, along with a fifth boy Tyrone Woodruff.

Now, the County charged these boys, even though they had compelling evidence that the boys hadn't done it and somebody else had, compelling evidence that was never disclosed to Darryl Boyd's defense attorney. In fact, you'll see that on the very day that the prosecutor convened a grand jury to charge Darryl Boyd, he wrote down in his private notes that he suspected someone else and that his star witness was lying.

Criminal prosecutions are extremely serious. So serious that the United States Constitution itself creates rules to ensure that every trial is fair to the defendant. Two rules are most important for this case, both of which the judge will fully instruct you on.

First rule:  If a prosecutor obtains evidence that is favorable to the defendant, he must turn it over so that the defense attorney can decide how to use it at the trial.

Second rule:  When a prosecutor makes arguments to a jury, he can be an advocate, but he has to stick to the evidence.  He cannot misstate the evidence.  He cannot mislead the jury.  He cannot inject his personal opinions or attempt to shift the burden of proof from the prosecution to the defense.  And he certainly cannot appeal to racial prejudice.

You will see that the prosecutor in Darryl Boyd's case broke those rules repeatedly.  This prosecutor, a man named Timothy Drury, had at least 19 pieces of favorable evidence that he did not disclose to Darryl Boyd's defense attorney. And when he stood up to make his closing arguments to the jury, he made numerous misleading and downright false statements that took advantage of his suppression of favorable evidence.  On top of that you will see that he tried to shift the burden of proof.  He injected his personal opinions and he appealed to racial prejudice.

Darryl Boyd was 16 years old when he was arrested for the Crawford homicide.  As a result of his wrongful conviction, he spent 27 years in some of New York's most infamous maximum security prisons.  Before Darryl passed away we recorded his testimony on video.  So you will get to hear

Opening Statement by Mr. Durland          23

from him.  Darryl will tell you what it was like to spend decades in places like Attica and Sing Sing, and decades more under suffocating humiliating parole supervision.

We will also present to you a forensic psychologist Dr. Sanford Drob who has evaluated thousands of inmates and former inmates over his long career.  And what he will tell you is that while the incarceration is bad enough by itself, wrongful incarceration is a special torment.  Every agony of prison life bites deeper when you know you didn't do the thing you are being punished for.  The injustice of it eats at you.  It enrages you.  It frightens you.  It depresses you.  It keeps you from making peace with your predicament.

And so it was with Darryl Boyd.  You will see that long after he was released he remained preoccupied with his conviction, determined to clear his name, and eventually he caught his break when he learned about a trove of old records filled with favorable information that his defense attorney had never received.  And finally -- finally -- in August of 2021, 44 years after he was convicted, Mr. Boyd's conviction was vacated, the charges against him were dismissed and his criminal case was closed.

Darryl will tell you about that moment.  Euphoria, deliverance.  Then his doctor got some concerning test results, which turned out to be terminal cancer, which took Darryl's life on February 26, 2025.  Darryl Boyd was granted

Opening Statement by Mr. Durland                24

65 years on this earth, and almost all of the life he was granted was stolen from him when the Erie County District Attorney's Office prosecuted him for a crime they had evidence he did not commit.

Over the next 55 minutes or so I'm going to outline for you the evidence that we intend to present to show that Darryl Boyd's constitutional right to a fair trial was violated and that the County is responsible for the violation and for the unspeakable damage it caused.

Let's go back to the beginning, wintertime 1976. Detectives of the Buffalo Police Department were investigating a homicide, and they documented their investigation in a series of police reports that they later turned over to the Erie County District Attorney's Office. Here is a preview of what you will see in those reports.

January 2nd was a snowy night in Buffalo, and William Crawford was drinking at the Golden Nugget, which is a bar across the street from his house. See, right here on the right-hand side of the screen, you'll see the sign there, Golden Nugget. Mr. Crawford's house is across the street.

William Crawford was drinking with his neighbors Larry and Julia Watson. And you will see from these police reports that Mr. Crawford had a lot of cash on him that night and he was buying rounds for the group and sort of being flashy with the money, even trying to lay it all out on the bar. The

bartender told him to stop, put it away, you are asking for trouble.

Now, over the course of the evening Mr. Crawford got drunk. So drunk that he couldn't walk himself back home across the street. Larry Watson his neighbor volunteered to walk Mr. Crawford home, which he did, while his wife Julia Watson stayed behind. 20 minutes later Larry Watson returned, said something to his wife, she grabbed her coat and the two of them hurried out, uncharacteristically leaving their unfinished drinks at the bar and neglecting to say good night to their friend the bartender, Debbie Jeffrey.

Just after one a.m. William Crawford was found lying in his driveway in the snow severely beaten about the head. Here is the scene. His wife spotted him, called 911, and paramedics arrived. Mr. Crawford was alive at the time the ambulance came, but he soon succumbed to his injuries.

Now, nobody alive today can say for sure what happened to Mr. Crawford on that short walk from the Golden Nugget to the side door of his house, but the last person seen joining him on that walk was his neighbor Larry Watson. You will see from the police reports that I described to you that in the early days of the police investigation detectives focused on Larry Watson as the most likely suspect, and they recorded their findings and their suspicions in a series of police reports, reports that Darryl Boyd's defense attorney never

received.

For example, the bartender Debbie Jeffrey told detectives that Larry Watson was drinking with William Crawford, that Larry Watson saw Crawford was drunk and had cash on him, that Larry Watson volunteered to walk Crawford home, returned 20 minutes later acting hurried and suspicious. In fact, Debbie Jeffrey said straight out I think Larry Watson did it. Told the two police, and it appeared in the police reports.

A woman named Francis Kalb who was a patron at the bar that night told police much the same thing. She noticed Crawford had a large amount of cash on him, and she heard the Watsons tell Debbie Jeffrey we'll take William Crawford home.

Now, police also interviewed Larry Watson and his family, and those interviews raised their suspicions even more because the Watsons' stories were very different from the accounts given by the other witnesses. Larry and Julia Watson told police that they had not seen William Crawford's cash, and Larry Watson also denied that he had been asked to walk William Crawford home or that he had volunteered to walk William Crawford home. He initially told police it was just a coincidence that they happened to be leaving the bar at the same time.

You will see that police noted these discrepancies in their police reports and further noted Larry Watson's odd

behavior.  Once again, noted these things in police reports that Darryl Boyd's attorney never saw.

The evidence will also show that in addition to these materials pointing in the direction of suspect number one Larry Watson, police also documented a tip identifying the name, a man named Jerome Boyd, as Larry Watson's killer.  As a quick side note, Jerome Boyd is no relation to Darryl Boyd.

This is Jerome Boyd.  And you will see that police followed up on the tip, at least initially.  They pulled Jerome Boyd's criminal record and mugshot, and they asked around about him at the Golden Nugget.  The bar owner recognized Jerome Boyd.  The bartender recalled serving Jerome Boyd a drink on the night of the murder.  Francis Kalb, the bar patron, was shown Jerome Boyd's mugshot and said that he looked like a real big guy who she saw talking to Julia Watson, Larry Watson's wife.  Larry Watson himself said that he saw a man matching Jerome Boyd's description leaving the bar behind William Crawford.  Again, these findings by the police documented in police reports that Darryl Boyd never got.

Despite these promising leads regarding suspect number one, Larry Watson, and suspect number two, Jerome Boyd, the evidence will show that detectives soon fixated on a neighborhood teenager named Darryn Gibson after supposedly receiving an anonymous tip naming him.  When the 16-year-old

innocent was interviewed by police, he said he didn't know what happened to Mr. Crawford.  He said that on the night of January 2nd, 1976 he was at a party at the Glenny Drive apartments with four friends:  Darryl Boyd, John Walker, Floyd Martin and Tyrone Woodruff.  He also said that at 11:30 p.m. John Walker and Tyrone Woodruff went home in a Fillmore Cab Company taxi, and that he and Darryl Boyd then walked home.

You'll see that detectives soon followed up with those four friends that Darryn Gibson had named starting with Darryl Boyd, and Darryl Boyd told detectives much the same thing.  There was a party at the Glenny Drive apartments. John Walker and Tyrone Woodruff went home in a cab.  Then a second cab was called for some friends who had missed the first, at which point he, Darryl Boyd and Darryn Gibson walked home.

This next part is important.  Detectives then went to the Fillmore Cab Company to check out the boys' story, and they confirmed it.  More than that, they documented their confirmation in a January 8th police report.  What the police found is that the company logbook showed just two cabs dispatched to the Glenny Drive apartments that night.  The first at 11:28 p.m., almost exactly the time that Darryn Gibson had given; and the second at 11:44 p.m., just as Darryl Boyd had described.  Those cab rides -- more

specifically, the times of those cab rides are critical.

While not every witness remembered things the same way, four witnesses said that William Crawford had left the bar at 11:30 p.m. or later.  Francis Kalb, the bar patron, said it was 11:30.  William Crawford's wife Margaret Crawford said she was sitting up in bed at home and she felt a thump on the side of the house, the same side of the house that corresponds with that side door where William Crawford's body was found.  She felt that thump at 11:30 p.m.  Larry Watson himself said that he and Crawford left the bar at midnight, and another neighbor reported to police that he heard argument and shouting outside of his house at midnight or 12:30 a.m.

So what does this mean?  It means that in an undisclosed police report detectives reported neutral documentary proof showing that John Walker and Tyrone Woodruff were in a cab heading home or had already arrived at home before William Crawford even left the bar, meaning that this theory the prosecutor advanced about the five boys killing William Crawford could not have been true.  But Darryl Boyd never got the taxicab report or the statements about the time of the crime.

John Walker and Tyrone Woodruff were interviewed as well, and they gave much the same account.  Party at the Glenny apartments.  Cab ride home.  No idea what happened to

Opening Statement by Mr. Durland                30

William Crawford.  At this point there was no actual evidence pointing to Darryl Boyd and his friends, but rather than pursue the two obvious suspects, Larry Watson and Jerome Boyd, detectives interrogated five teenagers alone in the police station surrounded by armed officers with no parents and no lawyer, and they applied a highly coercive interrogation tactic known as the Reid method.

The Reid method goes something like this:  First you confront the suspect.  You dismiss utterly any claims of innocence.  You say you know they are lying.  You call out any physical reactions that you are seeing.  You are shaking because you're lying.  You're crying because you have a guilty conscience.

You say that there's evidence against the person, even if there's not.  You say we have a witness who saw you.  You point out the consequences of refusing to confess.  We are going to arrest you.  You are going to prison for the rest of your life.  You tell them time is running out.  Somebody else is ready to make a deal.  You make the person feel utter despair, utter hopelessness, and then you throw them a life line.  You say, well, maybe you just saw something.  Maybe you were just the lookout.  Once the suspect grabs the life line, acknowledges even a minor role, they are trapped. There's no way back.

You'll hear from an expert in this case, an expert on

Opening Statement by Mr. Durland          31

false confessions named Alan Hirsch, and he will explain to you that the Reid method is very effective in getting confessions.  The problem is you have no idea if the confession is false or genuine.  Professor Hirsch will also explain that the detectives investigating the Crawford case used the Reid method -- really an extreme version of the Reid method until they got one of the boys to break.

The boy who broke was Tyrone Tony Woodruff.  You'll hear from Tyrone Woodruff in this case.  He's a grown man now, but in 1976 he was a scared kid.  I expect you will see that it is excruciating for him to talk about what happened, but he will describe to you as best he can the ordeal he went through and how it caused him to give false testimony implicating himself and his friends.

He'll explain to you that initially he told police I don't know what happened to Mr. Crawford, but they insisted he was guilty.  They said they had a witness against him, that someone else was going to make a deal, that he was going to go away for a long time.  But -- and here comes the life line -- if you confess, if you implicate yourself and your friends, you can have total immunity.  Not a shorter prison sentence, not no prison sentence, not even a charge.  That was the offer made.  And it was too much for Tyrone Woodruff to resist.  He grabbed the life line.  He gave the confession that was demanded in return and he turned witness against his

friends.

When Tyrone Woodruff confessed, prosecutor Timothy Drury was alerted and he came down to the police station.

Quick note here about terminology.  The district attorney is the boss of a prosecutor's office, and the individual prosecutors who handle specific cases are assistant district attorneys or ADAs.

So this prosecutor Timothy Drury, ADA Drury, will testify in this case, and I expect he will acknowledge that when he got to the police station or shortly thereafter he knew that police had gotten Tyrone Woodruff to change his story by threatening him with arrest and promising him immunity.  I also expect him to acknowledge that he knew the threat and the promise came before Woodruff changed his story.  In other words, changed it from I don't know what happened to, yeah, we all did it.  I further expect ADA Drury to acknowledge that Tyrone Woodruff was indispensable to the prosecution's case.  Without Woodruff there was no basis to even arrest Mr. Boyd, let alone prosecute him.

On the same day that Tyrone Woodruff changed his story, Darryl Boyd and his friends were arrested.  And after the arrest you will see that the next procedural step was what's called an indictment, a formal criminal charge obtained from a grand jury.  A grand jury is -- it's a pretrial proceeding where the prosecutor runs the show.  There's no defense

attorney.  There's no judge.  And essentially what the prosecutor does is present evidence and ask grand jurors to issue an indictment, a formal charge against the defendant.

To obtain an indictment in this case ADA Drury planned to call Tyrone Woodruff, and also an even younger boy, a 15-year-old foster kid named Andre Hough.  Like Woodruff, Hough initially told police he did not know what happened to Mr. Crawford, but after a round of the Reid method he changed his story and said actually Darryl Boyd confessed everything to me.

What happened before the grand jury is jaw-dropping.  You will see evidence that ADA Drury summoned Woodruff and Hough to the DA's office to prepare for their testimony.  Two detectives were present as well.  Andre Hough arrived with his foster mother and he recanted.  He admitted it's not true, Darryl never confessed to me, that didn't happen.

Now, at some point his foster mother had to leave, and she asked police to give Andre a ride home.  Once she left, ADA Drury and the detectives turned on this 15-year-old.  They accused him of lying.  ADA Drury threatened to prosecute him for perjury unless he retracted his recantation and went back to the story where he is accusing Darryl Boyd.  Through these threats the 15-year-old Hough readopted his original story, readopted the story where he is accusing Darryl Boyd, and embellished it.  He added new details, at which point ADA

Drury marched Hough into the grand jury room to tell this newly embellished story.  And, once again, very important for this case:  These things were documented in police reports that Darryl Boyd's defense attorney never received.

Now, there was one problem with Andre Hough's newly embellished story.  It was inconsistent with the story previously extracted from the star witness Tyrone Woodruff.  So what did the prosecutor do?  Did he pause?  Did he reassess this case?  No.  You will see he and the detectives went back to the same trace.  ADA Drury sent the detectives into the room where Tyrone Woodruff was waiting before his grand jury testimony, and they told Woodruff we know you're lying.  You're shaking because you're lying.  Then they fed Woodruff the new story that he had just gotten from Hough and got Woodruff to adopt it, at which point ADA Drury took Woodruff into the grand jury to tell the story he had just been fed.

Even more remarkable than that are the notes that ADA Drury took the day that all of this happened, the day of the grand jury.  You remember those police reports I told you about regarding suspect number one, Larry Watson, and suspect number two, Jerome Boyd.  You will see that ADA Drury read those reports, and they caused him to suspect that Larry Watson and Jerome Boyd had seen Crawford flashing money, walked him home and robbed him at his side door.  He wrote

down this suspicion in his private notes.  Was a Boyd, Jerome Boyd, that came in.  Decedent William Crawford flashed a roll to the barmaid.  Maybe Watkins -- he said Watkins, he admits he meant Watson -- talked to Boyd and he set it up.  And then he wrote down Tony is lying, right there in the prosecutor's notes.  Tyrone Woodruff, Tony Woodruff, the star witness is lying.

Once again, what did the prosecutor do?  Did he tell Darryl Boyd's lawyer about his suspicions regarding Larry Watson and Jerome Boyd?  Did he disclose the police reports that had made him suspicious in the first place?  Did he reveal his knowledge that his star witness was lying?  No.  The evidence will show that ADA Drury pressed forward with prosecuting Darryl Boyd.  He never disclosed to Darryl Boyd the evidence implicating Larry Watson, the evidence implicating Jerome Boyd, the police report regarding the investigation in the Fillmore Cab Company or the police reports from the grand jury showing that Tyrone Woodruff and Andre Hough had been coerced and their testimony coordinated.

There's one more category of undisclosed evidence that you should know about.  You will hear from a man named James McLeod who is the lawyer for Floyd Martin, the fourth of the boys to be tried.  James McLeod will tell you about two photographs that he used in his defense of Floyd Martin.

The first depicted the driveway outside of William

Crawford's house with no drag marks in the snow, which contradicted the prosecution's theory that Mr. Crawford had been assaulted down by the sidewalk and then dragged up to that side door.

The second photograph depicted a single set of footprints in the snow in the backyard of William Crawford's house. That single set of footprints led across the backyard due north in the direction of Crawford's neighbor two houses away, suspect number one, Larry Watson.

Though James McLeod managed to get these photographs from the prosecutor in the Martin case, they were never disclosed to Darryl's lawyer, just like the other evidence implicating Larry Watson.

Now, unfortunately, you will not get to see those photographs in this trial. There was no transcript made of the Martin trial and the County's records are incomplete, but James McLeod the attorney will be here and he will tell you how those photographs were used. He will also explain to you that he could have made a much stronger case that Larry Watson was the real killer if he had had the other evidence implicating Larry Watson, and that he could have made a much stronger argument that Woodruff and Hough were not telling the truth and that the case had been manufactured if he had had the taxicab evidence and the grand jury reports. But he will tell you he didn't have those police reports either.

The prosecutor didn't provide them to him just like they weren't provided to Darryl Boyd.

At this point you may be wondering how did Darryl Boyd find out about this undisclosed evidence. You remember John Walker. I mentioned him as one of the other boys who was prosecuted. You will hear from John, and he will tell you that after he and Darryl were released from prison to parole they held a number of events and rallies picketing outside the courthouse, all to bring public attention to their case. In the course of these efforts they learned about those two photographs that James McLeod had used in the Martin case, which led John and Darryl to demand records from the Erie County DA's Office. Which turned up a trove of evidence filled with -- a trove of reports, I should say, filled with favorable evidence that was never disclosed to Darryl's lawyer.

In 2022 after Darryl's conviction was vacated and the charges against him dismissed he filed a lawsuit that brings us here today. So let's talk about that lawsuit. What are the claims, what do we have to show and how we intend to do it.

I'm going to start with the Plaintiff's burden of proof, which Judge Vacca mentioned to you just now. The judge will give you full instructions on that, and whenever anyone is talking about the law the judge is the final

Opening Statement by Mr. Durland                38

authority, but here's an overview.

As the plaintiff we bear the burden of proof.  It's our burden to prove our claims, and we embrace it.  You should hold us to it.  We are ready to put on our case.  And we'll be aiming for a blowout, but the law does not require a blowout.  Unlike a criminal case where the prosecution has to prove guilt beyond a reasonable doubt, in a civil case, as Judge Vacca said, the standard is a preponderance of the evidence, it's more likely than not that our allegations are true.  If our evidence is even a tiny bit better than theirs, we've carried our burden.

You can imagine the scale, the one that Lady Justice holds, and imagine there are five hundred sheets of paper on one side and five hundred sheets of paper on the other.  If the evidence stays like that, a dead heat, an exact tie, we lose.  We haven't carried our burden.  But if you take just one sheet from their side and put it onto our side, just barely tip the scales, that's enough.  That's a preponderance.  That's all we need to do to carry our burden.

With that in mind, let me give you some specifics about what we will prove.  In a nutshell, we will show that ADA Drury violated Darryl's constitutional right to a fair trial, that the violation was caused by a policy, custom or practice of the Erie County DA's office, and that as a result of the violation Darryl Boyd was damaged.  We'll prove dozens of

Opening Statement by Mr. Durland                    39

distinct fair trial violations, but the various violations we're going to prove here come in two types, as you see on the slide here.

First, ADA Drury didn't disclose favorable evidence to Darryl Boyd's attorney as he was required to do under the law.

Second, ADA Drury made various arguments to the jury in summation that the law forbade him to make.

Let's start with the failure to disclose favorable evidence.  You may have seen on the slide the word "Brady." I expect you are going to hear that in 1976 and in 1977 there were various disclosure rules that were instituted to ensure that a trial was fair to the accused.  The key rule is the Brady rule named after *Brady v. Maryland*.  And what Brady says is that if a prosecutor has evidence that is favorable to the defense, whether it is because it shows the defendant didn't do it or that somebody else did or that the prosecution's witnesses are unreliable, the prosecutor must disclose that evidence to the defendant in time for the defendant to make effective use of it at trial.

I expect the judge will instruct you that Brady is automatic.  The defense doesn't have to ask for it, doesn't have to beg for it, doesn't have to uncover it, doesn't have to wrench it out of the prosecutor's fingers.  It's the prosecutor's responsibility to identify favorable evidence in

Opening Statement by Mr. Durland                40

his possession and turn it over to the defense.  I expect you'll hear that withholding even one piece of Brady material could be a Brady violation, but we will show at least 19 pieces of favorable evidence not disclosed to Darryl Boyd. 19 pieces.  And that's just documents.  That's not even counting the information ADA Drury knew and didn't reveal.

Some of those 19 pieces are favorable because they implicated Larry Watson and Jerome Boyd as the real killers. Some of these 19 pieces were favorable because they put Tyrone Woodruff and John Walker in a taxicab at the time of the crime.  Some of these 19 pieces were favorable because they showed that Tyrone Woodruff and Andre Hough, the two key witnesses, had been coerced and their testimony coordinated. And some of these 19 pieces were favorable because they contradicted stories that Woodruff and Hough were telling. All of them had to be disclosed.  The evidence will show that those 19 pieces were not disclosed.

Some of our evidence in this regard will come from witnesses who were there at the time, but the most important evidence regarding nondisclosure is the documentary evidence. The reason the documentary record in 1977 is the most important thing all these years later is that the record doesn't forget and the record doesn't lie.

You will see that when ADA Drury disclosed material to the defense either before trial or during the trial it was

Opening Statement by Mr. Durland                    41

his practice to make a record of it.  Here's an example.  You see right here Mr. Drury identifies some exhibits, marks them for identification and says may the record show I'm giving these to defense counsel.  ADA Drury followed this practice in Darryl Boyd's trial.  That example I just gave you was from Darryl Boyd's trial from the transcript.  The reason for doing this is to make a permanent record clearly showing for all time what was disclosed to the defendant and what was not.

Here the County admits in what's called a stipulation that if you go through the pretrial and trial proceedings concerning Darryl Boyd and look at every instance where ADA Drury made a record of disclosing information, those 19 pieces of Brady material are nowhere to be found.  They were not disclosed.

Now, so far we've been talking about the prosecutor's failure to disclose favorable evidence.  There's another concept that you'll have to bear in mind here, and that's called materiality.  Again, Judge Vacca will fully instruct you on this, but, essentially, what it means is that the undisclosed favorable material had to have mattered.  If all taken together it had to have mattered to some degree.

To answer this materiality question, you are going to compare the strength of the case presented against Darryl Boyd in 1977 with the potential impact of all the 19 pieces

of Brady material, all the withheld favorable evidence.  If the evidence of guilt was strong and the undisclosed evidence was trivial, then maybe it's not material, but if the evidence of guilt is weak and the undisclosed favorable evidence is significant or there's a lot of it, that's a different story.

The evidence will show in this case that the case against Darryl Boyd brought in 1977 was weak.  This was a weak case.  That's not my phrase.  That's the County's phrase.  You will hear in 2021 after Darryl Boyd's conviction was vacated the Erie County District Attorney at the time John Flynn gave a press conference.  And while acknowledging that obviously the jury had voted to convict back in 1977, DA Flynn said this about the strength of the case presented against Darryl Boyd:  I believe, quite frankly, in my heart of hearts that this was a weak case, quite frankly.  This wasn't the strongest case 45 years ago.  I'll concede that, all right.  I'll concede it wasn't the greatest case.

You will all have a chance to review the case put on against Darryl Boyd in 1977, and I expect you will agree with DA Flynn.  It was a weak case.  The trial transcript will show that there were two groups of witnesses.  Five background witnesses who generally described the circumstances of the crime and its discovery, and two witnesses who accused Darryl Boyd.

Opening Statement by Mr. Durland                43

One thing to notice about these background witnesses is that they included suspect number one Larry Watson, starring in the role of the victim's friendly neighbor and neutral witness to what happened in the bar.  The defense had no idea of the evidence implicating Larry Watson.  So when Darryl's defense attorney stood up to cross-examine Larry Watson, he never went after him as the real killer.  He never said, my friends, that man is getting away with murder.  He just asked him some questions about what happened in the bar.

As for the two accusing witnesses, you already met them:  Star witness Tyrone Woodruff and the fifteen-year-old foster kid Andre Hough who had recanted before the grand jury.  You will see that their testimony was filled with holes.  In fact, I expect ADA Drury will acknowledge that Tyrone Woodruff was both the prosecution's most important witness and a terrible witness.  So even without disclosing the 19 pieces of favorable evidence, the prosecution's case was wobbling badly.  As DA Flynn said, this was a weak case.

We will prove that if ADA Drury had disclosed those 19 pieces of favorable evidence there's at least a reasonable possibility that at least one juror would have had a doubt about Darryl Boyd's guilt, and that's all the defense needs in a criminal case.

To help you understand the impact of these 19 pieces of Brady material, favorable evidence, we will call an expert in

criminal defense practice, Professor Steven Zeidman.  And what Professor Zeidman will explain to you is a defense attorney armed with these 19 pieces of favorable evidence could have made a much stronger case that Woodruff's story was made up since he was in a taxicab at the time the crime occurred, that Woodruff and Hough had been coerced and their testimony coordinated, and that the crime was likely committed by suspect number one, Larry Watson, suspect number, two Jerome Boyd, or both.  In short, those 19 pieces of favorable evidence would have greatly strengthened the attack on an already weak case.

That's the first type of constitutional violation we're going to prove in this case.  The second is summation misconduct.

At the end of trial lawyers give summations or closing arguments, and you will learn that that's a very important part of a criminal case.  And I expect Judge Vacca will instruct you that there are certain types of arguments that a prosecutor is not allowed to make.  Among others, a prosecutor cannot mislead the jury and cannot misstate the evidence.  We will show you that ADA Drury's summation was riddled with misstatements which Darryl's lawyer could have contradicted if he had received those 19 pieces of favorable evidence.

Let me give you a few examples.  In a state court

Opening Statement by Mr. Durland                45

criminal case the defense lawyer gives his summation first, and Darryl's lawyer focused on the fact that Tyrone Woodruff's story had been constantly changing.  The prosecution had tried to say that Mr. Woodruff's story changed.  It was just him slowly telling more of the truth. Darryl's lawyer argued that Woodruff's evolving story was not a process of remembering, but a process of indoctrination.

The story changed, he argued, because Mr. Drury got involved.  You will see that at this ADA Drury sprang up and objected.  These are wild allegations.  There is no proof of it.  In Mr. Drury's own summation he returned to this issue. He categorically denied that any beliefs of the police or our office or myself had anything to do with changing Tyrone's testimony or making it fit in any pattern.  He said any suggestion that there is any conspiracy here to make the testimony fit the facts or do anything like that is absolutely ridiculous.  Positively unequivocally no.

The police reports from the grand jury showed the very coercion and coaching that ADA Drury there denied.  Tyrone Woodruff will be on the stand, and he will explain to you how he was coerced and coached and how ADA Drury was personally involved in it.  The defense had no proof because ADA Drury had withheld the proof in violation of Brady, and here he exploits that violation secure in the knowledge that the defense cannot contradict him.

Opening Statement by Mr. Durland                46

Our evidence will further show that ADA Drury's summation took an even darker turn.  We will show you that it was not lost on ADA Drury that Tyrone Woodruff was both his star witness and an uncredible witness.  And it was also no secret that race was an issue bubbling away in the background.  It's 1977.  White victim, black teenager on trial.  In fact, you'll see one of the first things that Darryl Boyd's attorney did in his summation was to caution the jurors against racial prejudice.

The evidence will show that ADA Drury went in the other direction.  He used racial prejudice to explain away the problems with Tyrone Woodruff's testimony and push his weak case over the goal line.  ADA Drury argued that the jury should believe Woodruff even though he had trouble remembering the basic details of the crime he supposedly witnessed because, hey, what do you expect?  He's just a ghetto kid who hangs out in a junkyard.  He's a snook, an idiot, a nitwit, a stupid dolt, a poor product of his environment.  He kept changing stories, ADA Drury argued, not because he was coached but because he employs a childish form of logic.  I expect the judge will instruct you that the law does not permit prosecutors to win convictions by exploiting racial prejudice.

I just previewed for you the two constitutional violations that we're going to establish, but there's a

second part of this you'll need to think about, and that's the role of the Erie County District Attorney's Office itself. You see there, that yellow box is what I'm talking about. I expect Judge Vacca will instruct you that if you find at least one fair trial violation you'll have to ask whether that fair trial violation was caused by a policy, custom or practice of the DA's office. You'll hear the lawyers talk about this as the Monell part of the case, and I think Judge Vacca mentioned that as well. Monell is the name of another Supreme Court case.

Much of the evidence in the back half of our case will be about the Brady and summation practices of the DA's office and about the boss DA Edward Cosgrove's utter indifference to Brady violations and summation misconduct. When you are listening to this Monell evidence I want you to think about the different ways that a policy or a practice or a custom can arise. The judge will instruct you on this, but here's an illustration to help you think about it.

Suppose I start work at a new office and I'm wondering if my employer has a policy about wearing jeans on Fridays. One way my employer would communicate that to me would be writing it down in a policy manual, but that's not the only way. Maybe on the first several Fridays I notice that my coworkers are wearing jeans. The boss must see them. He's there. It's a widespread practice, but he doesn't stop

Opening Statement by Mr. Durland                48

anybody.  He doesn't send out some e-mail saying, everyone, remember the dress code here.  That's a practice.  That's a custom.  That's a policy.  Lots of people are doing it and the boss allows it.

With that in mind, let me give you this preview of some of our Monell evidence.  Obviously you are not going to see a manual from the DA's office that said don't give defendants a fair trial.  What you will see are witnesses describing the office's Brady and summation practices.  You will see that it was office practice to do things that were contrary to the law, as Judge Vacca gives it to you, and that parallel the misconduct in Darryl Boyd's case.

For example, we expect that ADA Drury will tell you that his disclosure decisions and his summation in Darryl Boyd's case were perfectly consistent with office practice. You will also have additional evidence from the trials of Gibson, Walker and Martin.  You will see that prosecutors in those three other trials withheld most of the same evidence that was withheld from Darryl Boyd.

You will also have evidence from other Erie County cases unrelated to the Crawford homicide.  You will see courts strongly criticizing Erie County prosecutors for Brady violations and summation misconduct, the same violations at issue here.

Here's what one court said in vacating a murder

conviction due to repeated misconduct by the Erie County prosecutor: We will not tolerate trials where unadulterated unfairness and deceit have become the rule.

We will show you that the boss of the DA's office at the time Edward Cosgrove knew about these criticisms and did nothing. You will hear that throughout his entire tenure as DA no prosecutor was so much as investigated for misconduct, let alone disciplined, not even when courts vacated convictions for Brady violations and summation misconduct. People are wearing jeans and the boss is fine with it.

From this I expect you will see that ADA Drury was not some rogue prosecutor operating in the case without regard to office policy. He was acting in accord with office policy. He was following office policy. He was doing what his boss permitted him to do.

So what does the County say about all this? They've got their own lawyers. They'll give you their view of the world in just a minute, but while I'm here let me give you my two cents.

I expect that you will hear two at least two very different defenses. The first defense I expect you'll hear is that Darryl Boyd had a great trial, a completely fair trial, that ADA Drury disclosed all the favorable evidence, that summation was squeaky clean, professional in every respect. Now, the County won't have any actual proof that

those 19 pieces of favorable evidence were disclosed, but here are a couple points you may hear.

I expect the County will really want to fixate on four documents disclosed to a different defendant, Darryn Gibson, the first of the four boys to be tried. You'll see that under pressure from Gibson's lawyer ADA Drury reluctantly handed over four of the 19 pieces of favorable evidence. This happened right in the middle of the trial, right before the cross-examination of Tyrone Woodruff, the most important witness.

If this were a case about Darryn Gibson, I might be inclined to point out to you that this is just four of the 19 pieces and that disclosing it in the middle of trial still violates Brady, but this is not a case about Darryn Gibson. This is a case about Darryl Boyd. They had different lawyers. Gibson was tried separately. For Darryl Boyd to get this material the prosecutor would have had to disclose it to Darryl Boyd. Because I expect you will hear from ADA Drury that he retrieved those four documents from Darryn Gibson's lawyer after the Gibson trial and they went back to the DA's office. So bear this in mind if you hear the County talking about the Gibson trial.

I also expect the County will raise the possibility of off-the-record disclosure. As I said, when ADA Drury disclosed material to the defense he made a practice of

making a record of it, and there's no on-the-record disclosure of those 19 pieces of favorable evidence to Darryl Boyd. And I expect that ADA Drury will also agree that he has no recollection of making an off-the-record disclosure to Darryl Boyd, but the County could argue maybe he did. Maybe at some court appearance he slid some documents across the table, and maybe this mythical off-the-record disclosure just happened to contain all 19 pieces of favorable evidence.

If you hear this argument, I encourage you to use the common sense that you've all agreed you have and follow the documentary record. The record doesn't forget and the record doesn't lie. That's the whole reason that ADA Drury made a record in the first place. That's the whole point of making a permanent record, so that you can always see what was disclosed and what wasn't. Every place where you would expect to see these documents, if they had indeed been disclosed, they are not there. So that's what I expect in the first defense.

The second defense I expect the County to raise is something called apportionment, and I believe that Judge Vacca will instruct you that the County bears the burden on this defense. This defense is very different. In this defense the County says we're not completely to blame for Darryl Boyd's wrongful conviction. The detectives share the fault because they coerced Tyrone Woodruff into giving false

testimony.

Now, we entirely agree that the police coerced Tyrone Woodruff into giving false testimony.  Where we disagree is this idea that the coercion of Tyrone Woodruff allows the County to shift even an iota of the blame.  Our evidence will show you ADA Drury's complicity in the interrogation and coaching and shaping of Tyrone Woodruff's testimony.  You'll see that in his private notes Tony is lying.  You'll see that in the police reports from the grand jury, and you will see that in Tyrone Woodruff's testimony in this trial.

One more thing about apportionment.  Keep an eye out for the testimony of Edward Cosgrove who you remember is the DA, the boss in 1977.  He will testify that as the chief law enforcement officer of Erie County he supervised the interrogation practices of the Buffalo Police Department.  So no matter what you think about the police conduct in this case, and we agree it's bad, the County cannot shift even a tiny portion of the blame for Darryl Boyd's wrongful conviction.

ADA Drury is the lawyer here.  It's his obligation, not the detectives, to turn over favorable evidence.  It's his obligation, not the detectives, to deliver a proper summation.  The wrongful conviction that he obtained in accordance with County policy lies at the County's doorstep. If you find that we have proven our claims by a preponderance

of the evidence, you'll have to consider damages.

How is Darryl Boyd injured as a result of his wrongful conviction?  Much of our evidence as to Mr. Boyd's injuries pertains to his decades in mostly maximum security prisons. He served 20 years initially, and then an additional period of incarceration due to violations of curfew and other parole rules, rules of parole he never would have been subjected to had he not been wrongfully convicted in the first place.

I will warn you right now this is not pleasant stuff. Darryl will tell you about cramped filthy prison cells where the most private aspects of daily life happened right out in the open.  He will tell you about gruesome physical and sexual violence that occurred on a regular basis, about how as a teenager he learned what a rape sounds like and how it smells when a human being is set on fire.  He will tell you about how every second outside of his cell was spent on edge, on guard, back often against literally the wall, fear and suspicion shredding his nerves.  And he will tell you about the loneliness and despair that descends on a young man as the months stretch into years and he watches his friendships and his family ties and his vision for his future slip away.

To help you appreciate the enormity of the injury that Mr. Boyd suffered we are going to be calling a psychologist who I mentioned earlier Dr. Sanford Drob, who will explain to you that although Mr. Boyd had certainly a tumultuous life

after his release from 20 years of incarceration, which included struggles with substance abuse, it was his decades of incarceration that caused him to develop severe mental illnesses.

In particular, Mr. Boyd's doctors diagnosed him with PTSD.  And you'll see that he suffered from recurrent intrusive memories and flashbacks to his worst experiences in prison.  Dr. Drob will tell you that flashbacks are so much more than memories.  It is as though this horrific experience is actually happening again right there in your living room.

This is one of several ways you'll hear about that even after Darryl Boyd's body was released from prison, his mind was not.

THE COURT:  Mr. Durland, you have three minutes left.

MR. DURLAND:  Thank you, Judge.

There's no amount of money that will bring Darryl back or restore the years that he lost or undo the suffering he endured.  That's fixed, permanent, irretrievable.  Your task, which the judge will instruct you on, will be to say when I look at the consequences of Darryl Boyd's wrongful conviction how much did he suffer in dollars.  In other words, how large of a sum is needed to compensate for the suffering caused by this wrongful conviction.  It's Darryl's suffering during his life that matters.  The number doesn't change.  Darryl's suffering isn't less because he died before he had his day in

Opening Statement by Mr. Durland                55

court.  We will show you that Darryl's suffering was enormous, and that under the law only a significant award -- a very, very significant award -- is required.

A few final thoughts.  As you can tell, this case has a deep history.  The case that you have been chosen to hear is nearly five decades in the making.  Today marks the beginning of the final stage, the final climb toward lasting justice in this matter.  And while we are heartbroken that Darryl cannot be here for the last leg of his odyssey, his estate intends to see justice done.

Now, whether that happens, how the story ends, what justice means in this case is ultimately up to you to decide based on the law the judge gives you and the evidence that the parties present.  Not just us, the County, too.  They deserve to have their say.  That is all as it should be.  That is how the jury system is supposed to work.  And we have every confidence that the same jury system the prosecution corrupted in 1977 will return a righteous verdict now, a verdict for Darryl Boyd.

Thank you all in advance for the care and attention I know you will bring to this very important case.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Durland.

Members of the jury, we're going to take our mid-afternoon recess.  So you can return to the jury room in

a moment.  All of the recess admonishments apply.  Do not talk about the case with anyone.  We'll be about fifteen minutes.

(Jury not present.)

THE COURT:  We'll resume at 3:45.

(Recess taken.)

THE COURT:  We can resume.

Mr. Durland, are the slides marked as an exhibit?

MR. DURLAND:  No, Judge, they're not.

THE COURT:  Can you do that later?

MR. DURLAND:  Certainly.

THE COURT:  Okay.  Thank you.  It looks like everyone is here.  So we can bring the jurors out.

(Jury present.)

THE COURT:  Please have a seat, everyone.  Thank you.

We are going to continue with opening statements.

Mr. Blenk, go ahead.

MR. BLENK:  Thank you, Your Honor.

Good afternoon, Members of the jury.  May it please the Court.

My name is JP Blenk.  I, together with my co-counsel Kirstie Means and Tom Southard, we'll be presenting this case from the perspective of the County.  We're joined by Mr. David Henry who was the prosecutor in one of the underlying criminal prosecutions associated with the William

Opening Statement by Mr. Blenk                57

Crawford murder.

You will also be hearing from a number of people who were mentioned in Mr. Durland's opening statement.  These include Tim Drury, these include District Attorney Ed Cosgrove.  What I want you to do is to remember that an opening statement, whether it's from me or whether it's from Mr. Durland, is not evidence.  It's not evidence.  And I want you to hold us to the burden that we're promising.  We're telling you what we think this trial is going to show you, and I want you to hold both of us to that burden.  Remember, it's the Plaintiff's burden.  The Plaintiff has to make the elements of this case to obtain liability and we'll talk more about that.

So you're in a strange position relative to most trials.  You're not going to hear just everything fresh, but rather we're going to be orbiting through the course of this case around an underlying trial of Darryl Boyd.  The trial is going to be based on a transcript and some evidence that's approaching fifty years old.  And you'll be addressing the allegations in this case against that trial record.

I want to orient you to some of the facts that I think you're going to see in that trial record.  This is Mr. Boyd's underlying trial record from 1977.  So on January 2nd, 1976 William Crawford was murdered in his driveway at his home in Buffalo by blunt force trauma to his head.  He was robbed of

money at that time.

Days later Mr. Boyd's friend Tyrone Woodruff confessed that he and Mr. Boyd and Mr. Gibson and Mr. Walker and Mr. Floyd Martin committed the robbery and the murder of Mr. Crawford.  Mr. Boyd's participation in the murder was corroborated by a friend of Mr. Boyd, who you've previously heard, the foster child Andre Hough who testified that he was with Mr. Boyd before and the day after the murder of Mr. Crawford.

So this case was put on in front of a jury in Erie County in 1977.  Mr. Woodruff sat and put on his testimony and he was cross-examined by an attorney for Mr. Boyd for a long time.  He was previously cross-examined by another attorney in another case prior to that, Mr. Gibson's trial. He had been cross-examined times before at preliminary hearings and other prior proceedings in the case.  He withstood that cross-examination, and then Mr. Hough was put on as well.  And, just like Mr. Woodruff, he was cross-examined.

The defense then called two witnesses.  These witnesses were intended to alibi Mr. Boyd.  We heard -- the jurors in that case heard from a juror named -- or I'm sorry -- a witness named Joyce Washington and her mother Dorothea Luster.  They put Mr. Boyd in Mr. Luster's Glenny Drive apartment until midnight on January 2nd.  According to them,

it was at this time that Mr. Boyd departed with the same group that Mr. Woodruff had implicated:  Himself, Mr. Walker, Mr. Martin, Mr. Gibson.

A third defense witness was then put on.  According to this witness, she testified that except for Boyd all the rest of the young men were in her apartment at another place at the Glenny Drive apartments until 11:30 p.m. that night. After the defense rested the prosecution admitted a statement that Mr. Boyd had given to the police.  This is the same statement that Mr. Durland was referring to at least as it pertained to Mr. Boyd.  In that statement and the testimony that went on at trial the jury heard that Mr. Boyd had been given a Miranda warning, and then in the course of that statement he told the jury -- he told the police officers three things:  He was with a group, the same group implicated by Mr. Woodruff, by 9:30 on January 2nd.  This statement also reflected that he was in the proximity of Mr. Crawford's house at 11:25.  The statement concluded with him being at the Glenny Drive apartments until 12:45 a.m.  Mr. Boyd's own statement contradicted the facts of his own alibi defense.

After hearing the prosecution's case, the defense case and the prosecution's rebuttal, the summation of the attorneys, the jury convicted Darryl Boyd.  I think these were some of the facts that perhaps were left out of the statement that you heard from Mr. Flynn.  And when we're

Opening Statement by Mr. Blenk                    60

answering questions in this case we're going to look to that trial record.  And the judge is going to tell you about what your role is, but I think the judge will instruct you that we're going to be looking at that trial record to determine some of the issues in the case.

So you heard from the Plaintiff that there's going to be arguments that are being made about disclosure of evidence, the Brady rule -- that's one category -- and then summation.  So I think for both of these issues there's a good framework to think about.  When we're -- when you're hearing evidence, when you're segmenting that evidence to one issue or to another, whether you're hearing it from the Plaintiff or whether you're hearing it from me, I want you to think about it this way:  There's three steps.

The first step is for you as jurors to decide what happened.  What happened not in the underlying case but what happened with the prosecution, with the defense and what happened at the trial.  Okay?

The second step is to assess materiality.  Mr. Durland referred to materiality just the same.  When you're thinking about these issues, when you see that -- if you suspect that an error occurred, you have to assess that against materiality.  Would it have made a difference in the underlying case?

And then, third, this is the issue of Monell.  Do those

things tie from one to two to three before you get to liability?  Now, there's going to be important delineations between those.  Some of those are going to be compelled by the judge, but others I'm going to suggest that you try to compartmentalize your analysis based on that three-step analysis.

So this is what I want you to think about when you're thinking about each of the steps.  So, step one, what happened.  On the issue of disclosure you are going to see, like I said, a trial that occurred fifty years ago.  It's the Plaintiff's burden -- and I think the judge is going to instruct you this.  It's the Plaintiff's burden to demonstrate that a document was not disclosed, not the County's burden, as in connection with the district attorney to demonstrate that a document conclusively was disclosed.

So when we're getting into the issues of disclosure, we're talking about a time period -- and I think this was brought up in jury selection -- where business was conducted in a different way.  The convictions occurred in 1977, and this is before, of course, e-mails.  This is even before fax machines, before documents were transmitted using a system where you could record the transmission itself.  We are going to show you evidence from which you can infer that other documents were exchanged in this case.  There's another aspect of time, and that's the witnesses.

I want to be very clear.  The Plaintiff makes reference to the idea that documents were not disclosed to Mr. Hulnick, who was Mr. Boyd's attorney.  But we're not hearing that from Mr. Hulnick.  We're hearing about a case that's been brought decades after anybody has lost any sort of individual recollection of exactly what happened at that trial.  I think you'll see that from the witnesses from both sides.  And the Plaintiff will make arguments about what you should assume based on the records that we do have, and we'll make other arguments about the inferences you could make about what was going on in 1977.

As to summation, you saw some harsh language that was quoted in the opening to you.  I intend to show you that that language was about the case, that language I already told you that we already know that Mr. Woodruff testified over and over again.  There were distinctions in the story.  There were distinctions in its account.  There's no hiding that. We think you'll see that that's something that was fully played out in front of the jury at the underlying trial, but when you're thinking about that, that's the context.  And I want you to think about the context for the words that you see that are exchanged in summation.  What's the context for this?  And I want you to think about whether it's about the case.  Okay?  The judge is going to inform you about what the rule ultimately is, but I want you to think about am I

hearing something about the case or am I just looking at harsh language in a vacuum?

So then step two: Materiality. Would it have made a difference? To answer that question, I'd ask you to put yourself in the shoes of a juror sitting about sixty miles down the road back in 1977 and think about whether the information you're seeing -- if you're thinking -- if you're seeing that an error occurred in the first step, you're seeing that an error occurred, then in the second step you need to decide whether that error made a difference. Did it make a difference in the underlying trial?

When we're looking at -- when we're looking at the different theories of disclosure that we're talking about, I think you'll see that the Plaintiff is promising a lot, and I'm not sure that you'll see that the Plaintiff meets their burden. The Plaintiff makes reference to individuals who could have been a third party who committed the murder. These theories have never been subjected to the crucible of a trial like Mr. Boyd's trial that he received back in 1977. I want you to think about that when you're weighing the value or the assertions from the Plaintiff about what you could make out of one piece of evidence or what you could make out of another piece of evidence.

Second, you heard about these photographs. Nobody has seen these photographs, even in Mr. McLeod's account since

Opening Statement by Mr. Blenk                    64

1977.  Mr. Henry was the prosecutor in that case, and he says that the photographs don't exist.  I think you'll see that even Mr. McLeod who is the advocate for the photographs had opportunities to address the photographs, had opportunities to mention the existence of the photographs at times that we'll play out for you, and I think you're going to see also just the same that the record is going to show that there weren't photographs -- that Mr. McLeod never brought up the photographs for 30 years.  We think that Mr. McLeod is mistaken.  We don't think that these photographs exist, and I think that ultimately you will agree with us on that point.

We heard allusions to -- we heard allusions to the idea that there's a record about a taxicab.  There's no record that puts any individual in a taxicab at the time of the murder.  Now, the Plaintiff encourages inferences about the records that -- about these records, and I think -- I want you to think about those, think about is that a rational thing that I would have thought if it were presented to me, but I also want you to think about whether they connect with either the alibis that Mr. Boyd advanced at his trial or his own statement.  I think you're going to see that they don't line up, and really for that reason they wouldn't have made a difference at his underlying trial.

I also want to talk to you about Monell liability, step three.  So step one, step two, step three.  Track the

theories along.  Mr. Durland has told you there's going to be -- you're going to be hearing about 20 theories, more than 20 theories.  Don't let the Plaintiff jump around from step one to step two to step three.  It has to be -- and I think this is going to be consistent with what the judge instructs you.  It has to be the same theory flowing up.  It has to -- you have to confirm that there is an error that existed.  You have to confirm that that same error was material.  And then you have to do this step three analysis, which is policy and procedure.  Was this an outcome of a policy or procedure of the County, the County meaning the District Attorney's Office in this context.

So, generally, here in New York State and in Erie County there is -- the Erie County District Attorney is an independently elected official.  He then employs, like Mr. Durland mentioned, assistant district attorneys, who are generally the people who represent the People of the State of New York in criminal prosecutions.  In most respects that I'm discussing with you it's the same now as it was then.

To help this process, and consistent with your oath as jurors, I ask you to compartmentalize the evidence that you're hearing about the Erie County District Attorney's Office as it conducted itself in 1977 relative to the underlying case itself.  So what you're hearing from a witness about what happened in this case is different than

what you're hearing about what was the policy and practice. They may line up, they may not line up. That's for you to decide. But you're not supposed to be considering one for the other.

There's another aspect of the passage of time that's going to be relevant here. And I think that the Plaintiff -- as illustrated by the jeans on Friday perhaps, the Plaintiff is going to try to impose a circa 2025 human resources approach to the prosecutor's office in 1977. I don't think that you'll think that is ultimately realistic. I think that the Erie County District Attorney's Office was consistent with the norms of the time.

Now, at this, individuals who are assistant district attorneys are making these decisions that we're talking about. For example, about Brady, what to say in summation, how to present evidence, and these are all individuals who are only making those decisions after they have been credentialed as lawyers. They have gone to undergrad. They have gone to law school. They have been admitted to the New York State Bar. They have a license to practice law. They have an advanced degree and then they are subjected to oversight by judges, oversight by their opposing counsel and oversight by their own colleagues. And, ultimately, if all those things fail, they are answerable to the New York State Bar.

You'll hear more evidence from Mr. Cosgrove about how his office -- about how his office operated.  You'll hear testimony from some of the surviving members.  Unfortunately, Mr. Cosgrove died subsequent to his deposition in this case, but you'll hear also from surviving members of the Erie County District Attorney's Office who are going to explain to you how things worked there, how the Court system worked and how the office worked and how those interacted.

On this issue we really don't think that the Plaintiff is going to meet their burden.  This puts you in a difficult spot, just like I mentioned before about how we're orbiting around another trial.  So it's ordinarily the case that a party to a lawsuit isn't going to -- matters aren't going to be introduced that are extraneous to the facts at issue.

Now, from the policy and procedure perspective, the Plaintiff is going to be putting on other instances of conduct, other instances of -- you heard of court decisions that Plaintiff is going to try to use to develop this idea that at step three that items that are at issue in this case were caused by a policy or procedure.  Again, the Court I think will remind you about this pretty consistently, but those other instances -- and this is -- I think the judge will tell you this is required by your oath.  Those other instances can't be -- can't be influencing whether you -- how you're seeing what happened in the underlying trial or how

you're addressing materiality. So there's going to be evidence that comes in about events that happened that goes to step three, but it can't go to step one and step two.

I want you to think carefully because this is a difficult thing for a jury to do. It's difficult to piece together and to compartmentalize what you're hearing about extraneous facts, extraneous evidence that is about the same parties, it's about the same people, but it's not about the case -- it's not about the case that we're talking about with Mr. Boyd. And it's difficult. It's going to be difficult for you to compartmentalize that. But what I'd ask you to do is to think about it logically. Think about what the Plaintiff is telling you, and does it coalesce -- does it coalesce into a policy or procedure. We'll talk about this more at the end of the case with more specifics when I'm talking to you about -- after all the evidence is in, after you've heard all the witnesses, we're going to talk about a lot about this in detail.

What I'm asking -- I'm asking for you to keep an open mind in the mean time and to be thinking about is this just -- am I being told about another bad event, am I being told about an error, or am I being told about events that tell me that a policy caused an error in this case, caused issue, caused step one. Okay? The judge is going to be reminding you of these concepts throughout the trial, but I'd

ask you to just keep an open mind, and we're going to talk about it at the end.

Mr. Durland mentioned that you're going to hear from some experts in this case. The judge will tell you about how to receive evidence from an expert, but I want to ask you to keep an independent account of what you're hearing about step one and step two and step three. Those experts might be informing how you're seeing some of those issues, but they're not deciding the underlying facts. You're here to decide the facts. The jury -- or the experts might help you on that, and the judge will tell you about that, but I want you to make sure that you're thinking about what are the underlying facts that these experts are talking about and am I accepting these opinions and this testimony.

For example, nothing that an expert can do can change the facts about what did or didn't occur in Mr. Boyd's trial in 1977. And, likewise, an opinion from a psychiatrist is no stronger than the evidence on which it relies. So I want you to be thinking about that. And we'll be advancing arguments, and the Plaintiff will be putting on experts, and we'll be advancing cross-examination. I want you to think about that. We'll talk more about it at the end of the case.

Mr. Durland made reference to the idea of apportionment. So you're going to hear evidence about conduct that was undertaken by Erie County District

Opening Statement by Mr. Blenk                70

Attorneys.  You're going to hear as a derivative of a trial allegation about what happened in the underlying trial of Mr. Boyd.  And then you're also going to hear about allegations about what the Buffalo Police Department officers did in connection with the investigation of the case.

I want you to think about this a lot like the same principle that I expressed regarding Monell evidence. Compartmentalize or try to separate to the extent you can -- I'm not guaranteeing that you can, but try to segment am I hearing about something that -- am I hearing about an act that was engaged in by a Buffalo police officer or am I hearing about an action of the Erie County Assistant District Attorney.  When you're hearing that evidence and you're hearing evidence from Mr. Woodruff, when you're hearing from Mr. Hirsch, I want you to think about that, and I'd suggest it's consistent with your oath as jurors to maintain that delineation.

So the three steps, in conclusion:  What happened, did it make a difference in the underlying trial of Darryl Boyd, and did it line up.  I think you're not going to see that burden met.  We'll be showing you the evidence.  Plaintiff will be showing you their best case.  They will do a great job.  We will be showing you our evidence from the County's perspective.

I want you to keep an open mind.  We'll talk more about

that, especially as we see how one leads to two leads to three at the end of the case after all of the evidence has been put in front of you.

I want to thank you for your attention today.  And I also want to explain that we're putting on the case as quickly as we possibly can.  We need to make sure on behalf of our client that we get the facts in front of you that you need to make a decision, and I appreciate your patience as we get through that as efficiently as possible.

I look forward to spending the next three weeks with you.  Thank you.

THE COURT:  Thank you, Mr. Blenk.

Members of the jury, we are going to recess for the night.

Just a few things.  If you could make sure that you return here tomorrow at 9:15.  When you return you can come up to this floor.  The court security officers will let you back to the jury room.  When we're ready for you we'll bring you all out.  I just want to let you know that we cannot start the trial unless all of you are present.  So please make sure you are here on time.  So 9:15 tomorrow.

There should be a form in the jury room to give your contact information.  So make sure that you fill that out so we have your e-mail address and phone number to reach you in case there's a change in schedule or something else.

Boyd v. County of Erie, 22-CV-519                72

All of the recess admonishments apply.  Again, please keep an open mind until you have heard all of the evidence and been instructed on the law.  Do not form any opinions about the case or express any opinions about the case to anyone else.  Do not talk about the case at all amongst yourselves or with anyone else.  Do not read, view or listen to any media or internet accounts about the case.  Do not visit any of the relevant locations.  Do not do any research about the case or any legal terms or anything associated with the case.

Have a good night.  We'll see you tomorrow at 9:15.  Thank you.

(Jury not present.)

THE COURT:  Have a seat, everyone.

The jurors have left the courtroom.  Just a couple things before we end for the night.

I want to give an order of sequestration.  So any witness should not be present for any of the testimony with the exception of Mr. Henry.  I don't know if he's testifying in this trial, but Mr. Henry as the designee for the County can remain here in court.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  And let's see.  Was there another request?

MR. FIRSENBAUM:  Your Honor, just on that issue, as in the Walker trial, is there an exception for experts who

Boyd v. County of Erie, 22-CV-519                              73

are -- so I think in the Walker trial Your Honor had allowed

Professor Hirsch to be present for Mr. Woodruff's testimony.

I believe -- was Dr. Drob -- well --

MR. DURLAND:  Dr. Drob was permitted to review the

transcript.  He wasn't present in the courtroom, but it was

the extension of the same ruling, Judge.

THE COURT:  Okay.  That's fine.  Yes.  Those -- and

those exceptions apply as well.

MR. FIRSENBAUM:  Thank you, Your Honor.

THE COURT:  Okay.  So we will address the various

issues for tomorrow's expected evidence and we can -- I'll

make my rulings tomorrow morning.  It would be helpful if you

could e-mail us the expected schedule I guess even for the

week.  I'm not going to hold you to it, but it would just be

helpful for us to plan ahead to know what days -- what

witnesses are testifying and what issues we need to resolve

before then.  So if that's something you can do, that would

be really helpful to me.

MR. JOEL RUDIN:  Your Honor --

THE COURT:  Sure, yes.

MR. JOEL RUDIN:  -- I've had some conversation with

Mr. Blenk about the logistics of Mr. Drury testifying.  I

know this came up at the last trial.  I think my examination

of him is going to be quite lengthy.

THE COURT:  Okay.

Boyd v. County of Erie, 22-CV-519                    74

MR. JOEL RUDIN:  It's probably going to be at least five or six hours in total.  I don't know whether the County intends to cross-examine him after I do my so-called direct or whether they are going to reserve and present him in their case the way they did the last time.

Mr. Blenk has indicated to me that Mr. Drury because of his physical issues cannot be here until one o'clock each day, and that may mean that we'll have to break up his testimony.  It may mean that there's an outside chance we won't finish in two days.  If there's any way that they can get him here earlier than one o'clock, like eleven or twelve -- I know that he needs some time to get ready, but eleven or twelve, that would give us a greater chance of getting him done in those two days.  And I indicated to Mr. Blenk that we expect we'll get to him Thursday and Friday.

One other issue is the last time Your Honor may recall that because Mr. Drury is in a wheelchair he could not be up at the witness chair.

THE COURT:  Yes.

MR. JOEL RUDIN:  And I struggled the first day because all of a sudden I had to cross-examine him with the physical materials rather than letting him view prior statements on the -- or exhibits on the screen.  I don't know if it's possible technologically for the Court to arrange for a computer monitor to be placed on the floor where he'll be

Boyd v. County of Erie, 22-CV-519                    75

sitting so that he can view that and we can proceed as normal.  If not, I'll have to do it the other way, but that would be very helpful if we have a few days to try to arrange that if possible.

THE COURT:  That's fine.  I'm going to -- I'll talk to Ms. Popp about it and we'll try to figure something out to get that done for Mr. Drury's testimony.

Mr. Blenk, is that accurate, that Mr. Drury can't come until the afternoon on both days or is there a way that he can come a little bit earlier?

MR. BLENK:  Your Honor, we're exploring, especially as it pertains to his care we're -- and I don't want to get into the details of it necessarily, but we're exploring options to get him here as early as possible and for as long of a period as possible.  I would -- I expect that I'll be able to get some additional clarity to Mr. Rudin by this evening.

THE COURT:  Okay.  Thank you.  And even if we have to break up his testimony over a few days, which it sounds like we probably will have to do regardless of whether he can come in a little earlier, is there -- I don't know -- deposition designations that you can play during that if there's a break in between Mr. Drury testifying?

MR. JOEL RUDIN:  We were planning -- we were planning for that and doing the best we can to fill in the time.

THE COURT:  Okay.

Boyd v. County of Erie, 22-CV-519                76

MR. JOEL RUDIN:  It's just that it can be a little awkward if we have to break up a number of witnesses in the middle.  It sort of interrupts the flow of our case.  And, also, if it doesn't finish on Friday and we have to go to Monday, then we have a scheduling problem with our expert Professor Zeidman, and then we may not finish him in one day. It just has a cascading effect if we can't finish him in those two days.

THE COURT:  Okay.  So you are hoping then to get Professor Zeidman in by the end of this week?

MR. JOEL RUDIN:  On Monday.

THE COURT:  By Monday?

MR. JOEL RUDIN:  On Monday.

THE COURT:  On Monday.  Okay.

MR. JOEL RUDIN:  And Tuesday we're not sitting, and then --

THE COURT:  Okay.

MR. FIRSENBAUM:  Sorry.  I interrupted.  Before we got too far ahead I wanted to go back to tomorrow where there's something a little bit pressing.  So Mr. Walker's physical condition has deteriorated a little bit more since his trial. He, too, will be in a wheelchair and will sort of require the same setup as Mr. Drury.

THE COURT:  Okay.

MR. FIRSENBAUM:  And we do expect him to testify

Boyd v. County of Erie, 22-CV-519                    77

tomorrow.  So I think what Mr. Rudin said about the monitor may become a little bit more of a pressing issue in terms of Mr. Walker being able to see documents tomorrow afternoon.

THE COURT:  Okay.  Thank you for the heads-up.

So I guess I'll just reiterate my request.  And you've already given me some potential schedule, but any other witnesses or deposition designations that you plan on presenting, if you could just give us a rough schedule of that so we can work on making sure that we're prepared to give any rulings ahead of time.  That would be really helpful to me.  And you can just e-mail that to us maybe later tonight.

MR. FIRSENBAUM:  Will do, Your Honor.

THE COURT:  Thank you.  And since tomorrow morning Plaintiff is planning on reading into the record the Brady evidence, it would be helpful if the parties can confer before then and see if there's any agreement you can come to regarding the admissibility and receipt of those exhibits so we don't have to go through that.  If you can come in tomorrow with a stipulation, that would be really helpful.

Okay.  Anything else that you want to address before we recess for the night?

MR. DURLAND:  Yes, Your Honor.  I have one thing.

With respect to the substance abuse issue, I know that the County had put forward a number of different theories,

Boyd v. County of Erie, 22-CV-519                    78

you know, as to why -- or how that evidence could be used. And the reason I'm raising it is that it bears on what deposition designations we would want to, you know, present from Mr. Boyd. And, in particular, my question is will the County be permitted to elicit from Dr. Drob his opinion that we had not planned to offer, that Mr. Boyd's substance abuse was -- post-release was essentially an attempt to self-medicate for the mental illnesses that he was struggling with.

One of the County's theories had been, well, we're going to -- you know, he reached that opinion. We think it's an unreliable opinion, and we want to elicit it even if you're not going to offer it, you know, for the purpose of then attacking it and trying to show that he's unreliable. The County had also put forward a theory that Dr. Drob had simply misread the records or that, you know, he had said -- he had reported something in his report about Mr. Boyd's history of substance use and that was inaccurate and that shows that he's unreliable. That second theory doesn't sound to me like it would be calling for this opinion that Dr. Drob had formed. And I was just wondering if Your Honor could say which theory or how many of these theories the County would be permitted to pursue so we could make our deposition designations accordingly.

THE COURT:  Did you want to be heard, Mr. Blenk?

Boyd v. County of Erie, 22-CV-519                79

MR. BLENK:  We put together our position on that based on the deposition designations as they existed in Mr. Drob's report.  I think that it's -- there's -- we intend -- we intend to put on evidence that would impeach Dr. Drob's process in that he reached a conclusion that -- about Mr. Boyd -- that before he went to prison he smoked marijuana and drank cough syrup.  I don't even want to get that in, but he missed the prior substance abuse in the course of his preparation and that he concedes that substance abuse could cause the sort of mental symptoms that he's describing.

THE COURT:  Okay.  So it seems like then you would be able to get into that testimony because if it's -- so you're saying that Dr. Drob might testify that Mr. Boyd's substance abuse was related to his post-release condition?

MR. DURLAND:  Well, that's right, Your Honor.  So Dr. Drob in his report, he came to the conclusion that the substance abuse difficulties that Mr. Boyd had after his release from prison were connected to the experience he had in prison.  It resulted in mental health symptoms that Mr. Boyd was attempting to self-medicate for.

So I took the County to be saying, well, you know, we can go back and say, look, Mr. Boyd was drinking alcohol before he was ever -- before he was ever convicted. Therefore, this causal connection you are trying to draw, Dr. Drob, is unreliable, calling that causal connection into

Boyd v. County of Erie, 22-CV-519                80

question.  I see that as being very different from saying, you know, Dr. Drob said something in his report.  The County says it's a commentary about what the records show.  I don't agree with that, but that's one argument that the County might make, and that's more about Dr. Drob's process rather than this opinion about a causal connection between substance abuse and the underlying mental health conditions.

So the question that I'm I guess trying to get some clarification on is is the County going to be permitted to not just, you know, attack Dr. Drob's methodology and say you -- you know, you didn't carefully review these records, you said this about the records and you're incorrect.  Are they also going to be able to elicit an opinion from Dr. Drob that we weren't planning to elicit, which is the post-release substance abuse is causally related to the conviction and then, you know, attempts to attack that opinion.

And the reason that I'm asking is that if they're going to be eliciting this opinion then we might as well elicit it as well and designate deposition designations that are in accord with that opinion, whereas if the County is only going to be allowed to say, you know, Dr. Drob, you reviewed these records, you said this about what you found in the records and you missed this and you missed that, and, therefore, you are not a reliable, you know, source of information for the jury, if it's that second one, then I think the opinions we

Boyd v. County of Erie, 22-CV-519                    81

elicited from Dr. Drob would be more limited and the deposition designations for Mr. Boyd would be more limited.

So that's what I'm trying to get at.  I hope that's clear.

THE COURT:  It is.

Mr. Blenk, are you seeking to kind of make both of those arguments?

MR. BLENK:  I'm not -- I would be certainly making an argument that this goes to both process -- well, process as well as undercutting -- his overall process as well as defeating his diagnosis of symptoms connected to incarceration, mental health symptoms connected to incarceration.

THE COURT:  And so you would be making this argument that Mr. Boyd's substance abuse before incarceration is really kind of -- is causally related to his condition after?

MR. BLENK:  It's not his use before.  It's his substance use disorder that reappears in the same manner that it was existing when he was 16.

THE COURT:  Okay.  I guess the bottom line is I'm going to -- I would allow both of those kinds of arguments.  I mean, they're kind of similar.  So, yes, you can -- I'm going to let the County get into those arguments, and you can bring that up on direct examination.

MR. DURLAND:  Okay.  Thank you, Judge.  Of course,

Boyd v. County of Erie, 22-CV-519                82

reserving our rights to object to the admissibility of the records that the County intends to use because they're hearsay.  Thank you.

THE COURT:  Okay.  Thank you.  Anything else?  Okay.

If everyone could be here tomorrow morning at 8:45, we'll try to address everything before we start with the jury at 9:15.  Okay.  Thanks, everyone.  Have a good night.

(Court adjourned at 4:30 p.m.)

                    *                    *                    *


                    CERTIFICATE OF REPORTER


In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court of the Western District of New York before the Honorable Meredith A. Vacca on November 3, 2025.



S/ Joony L. Odenbach

Joony L. Odenbach, RPR, CRR

Official Court Reporter