UNITED STATES      DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

_____

KATHLEEN WEPPNER, AS EXECUTOR OF THE

ESTATE OF DARRYL BOYD,

                    Plaintiff,

          -vs-

THE COUNTY OF ERIE,

                    Defendant.
_____

Index No.
22-CV-0519-MAV

Rochester, New York
November 4, 2025
8:48 a.m.

**JURY TRIAL (AM session)**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MEREDITH A. VACCA
UNITED STATES DISTRICT JUDGE

84

A p p e a r a n c e s

For Plaintiffs        WILMER CUTLER PICKERING HALE AND DORR,
                      LLP
                      By:  ROSS FIRSENBAUM, ESQ.
                           GIDEON HANFT, ESQ.
                           ERIN HUGHES, ESQ.
                           MELISSA ZUBIZARRETA, ESQ.
                           PHOEBE SILOS, ESQ.
                           TRENA RILEY, ESQ.
                      7 World Trade Center
                      250 Greenwich Street
                      New York, NY 10007

                      LAW OFFICES OF JOEL B. RUDIN, PC
                      By:  JOEL B. RUDIN, ESQ.
                           DAVID E. RUDIN, ESQ.
                      152 West 57th Street
                      New York, New York 10019

                      HOOVER & DURLAND, LLP
                      By:  SPENCER DURLAND, ESQ.
                      561 Franklin Street
                      Buffalo, NY 14202

For Defendant:        LIPPES MATHIAS
                      By:  JAMES BLENK, ESQ.
                           KIRSTIE MEANS, ESQ.
                           THOMAS SOUTHARD, ESQ.
                      50 Fountain Plaza - Suite 1700
                      Buffalo, New York 14202

COURT REPORTER:       JOONY L. ODENBACH, RPR, CRR
                      joonyodenbach@gmail.com

85

INDEX

| EXHIBITS | ID | EVD |
|---|---|---|
| PX 6 - 1/3/76 P-73 (Grabowski) | -- | 89 |
| PX 7 - 1/3/76 P-73 (Grabowski) | -- | 89 |
| PX 8 - Jerome Boyd mugshot/arrest record | -- | 89 |
| PX 9 - 1/4/76 P-73 (Pantano) | -- | 89 |
| PX 14 - 1/6/76 P-73 (Grabowski) | -- | 89 |
| PX 17 - 1/7/76 statement (D. Gibson) | -- | 92 |
| PX 18 - 1/7/76 statement (J. Watson) | -- | 89 |
| PX 25 - 1/8/76 statement (D. Boyd) | -- | 90 |
| PX 26 - 1/11/76 statement (J. Walker) | -- | 92 |
| PX 27 - 1/11/76 statement (T. Woodruff) | -- | 92 |
| PX 29 - 1/12/76 P-73 (Pantano) | -- | 89 |
| PX 31 - 1/12/76 P-73 (Manista) | -- | 89 |
| PX 33 - 1/12/76 P-73 (Hunter) | -- | 89 |
| PX 46 - 2/11/76 P-73 (Delano) | -- | 89 |
| PX 47 - 2/11/76 P-73 (Guadagno) | -- | 89 |
| PX 248 - photograph | -- | 146 |
| PX 249 - photograph | -- | 146 |
| DX 500.16 - 1/6/76 statement (F. Kalb) | -- | 89 |
| DX 500.18 - 1/7/76 P-73 (Deubell/Guadagno) | -- | 92 |
| DX 500.32 - 1/9/76 P-73 (Deubell/Guadagno) | -- | 89 |

Boyd v. County of Erie, 22-CV-519                    86

P R O C E E D I N G S

*      *      *

(Open court.)

THE COURT:  Good morning, everyone.  We can get started.  The parties are present.  Actually let's -- I want to just close the door because our jurors are going to be coming in in a little bit.

We're going to just address some matters before we bring the jury in.  The first thing I'd like to address is the Brady evidence.  I know that Plaintiff plans on reading the documents this morning, and yesterday we talked about the parties potentially stipulating to the admissibility of some of those or all of those.

Are there any updates about that?

MR. FIRSENBAUM:  Your Honor, as I mentioned in my e-mail last night, we sent a proposed stipulation to the other side.  We have not received a response.

MR. BLENK:  Unfortunately, Your Honor, the County is not in a position to stipulate to the entry of the evidence based on the objections that I set forth yesterday.

THE COURT:  Okay.  So then that's fine.  You're just going to have to offer them and we'll address that.  We can do that.

Mr. Blenk, do you anticipate having to make a lot of

Boyd v. County of Erie, 22-CV-519                    87

argument about that?  Because we could do that now or we could do that in front of the jury.

MR. BLENK:  I'm happy to do it now.

THE COURT:  Okay.  Why don't you just offer them now and then I'll make my ruling.

MS. SILOS:  Yes, Your Honor.

Plaintiff offers the following exhibits into evidence: Those would be PX 6, 7, 8, 9, 14, 18, 29, 31, 33, 46, 47 and DX 500.16 and 500.32.  These exhibits are all Buffalo Police Department records that Plaintiff alleges were required to be disclosed under Brady.  These documents are relevant to Plaintiff's Brady allegations, and they are non-hearsay as they are not being offered for their truth but for whether their nondisclosure violated Brady.

THE COURT:  Thank you.

Mr. Blenk?

MR. BLENK:  Thank you, Your Honor.

We object to the entry of the items set forth by Ms. Silos and offered into evidence by Ms. Silos.  We've made an objection previously on the basis that this evidence -- just in the same way that the evidence in this case does not in our -- in the position of the County justify the admission of the Monell evidence that the Plaintiff seeks to refer to, the County has also taken the position that to the extent that there is no policy or procedure evidence, including other

Boyd v. County of Erie, 22-CV-519                88

incidents that support a valid theory of liability that ties back to these individual instances, that these items are more prejudicial than probative.

We understand the position the Plaintiff has taken, but, for example, the -- PX 272, DX 500.75 is a piece of evidence that arose after the conviction of -- after the conviction of Mr. Boyd.  It's, therefore, the County's position that this is evidence that is not subject even to the Brady rule and that there are different -- there's a different rule framework to assess postconviction evidence, and that was set forth in our papers on Friday.  That would be Friday the 31st.

As to other aspects of the individual pieces of evidence, we have evidence that was -- that the Plaintiff is offering that was demonstrably disclosed in the Gibson transcript.  We think that the Plaintiff has not come forward with a theory that explains why a certain document was disclosed once and then not disclosed another time.  And so, therefore, we would object to the discussion or the entry into evidence of any of the evidence relating to the grand jury proceedings.

And in addition to that, there's no Monell evidence substantiating any issues with assistant district attorneys coordinating in connection with witnesses or preparing witnesses for grand jury testimony.

Boyd v. County of Erie, 22-CV-519                    89

THE COURT:  Okay.  Thank you, Mr. Blenk.

What were the two DX -- were there only two DX exhibits, 500.16 and 500.32?

MS. SILOS:  Those are the only ones we're offering at this time.  Obviously we reserve to offer others later.

THE COURT:  Okay.  Over defendant's objection I am going to receive those exhibits.  And that would be for the purpose -- the non-hearsay purpose to prove the Brady and favorability.  The instruction was provided to counsel that I will read when the Brady evidence is read to the jury.

And so, for the record, that's Exhibits 6, 7, 8, 9, 14, 18, 29, 31, 33, 46, 47, and then DX 500.16 and 500.32.  Those are all received.

*(Plaintiff's Exhibits 6, 7, 8, 9, 14, 18, 29, 31, 33, 46, 47 and Defendant's Exhibits 500.16 and 500.32 received in evidence.)*

MS. SILOS:  And, Your Honor, Plaintiff has two other sets of exhibits that it would like to offer into evidence at this time.

THE COURT:  Go ahead.

MS. SILOS:  The first is PX 25.  This is the Buffalo Police Department record of Darryl Boyd's January 8th, 1976 statement to police, which was introduced into evidence at his criminal trial in 1977.  Because this document was disclosed at Boyd's criminal trial and admitted into

Boyd v. County of Erie, 22-CV-519                90

evidence, it's relevant to materiality.  It's also, again, not hearsay because it's not being offered for its truth but for whether the County's alleged nondisclosure of the Brady evidence was material.

THE COURT:  Mr. Blenk?

MR. BLENK:  No objection, Your Honor.

THE COURT:  25 is received.

*(Plaintiff's Exhibit 25 received in evidence.)*

MS. SILOS:  Then, finally, Your Honor, Plaintiff offers the following exhibits into evidence:

DX 500.18 as redacted.  It's the P-73 Buffalo Police Department record.

PX 17.  It's Gibson's January 7th statement to police in 1976.

PX 26.  It's Mr. Walker's January 11th statement to police in 1976.

And then PX 27, Tyrone Woodruff's January 11th, 1976 statement to police.

These are all Buffalo Police Department records that were disclosed on the record at pretrial hearings or at Mr. Boyd's criminal trial in 1977 but that were not admitted into evidence at Mr. Boyd's criminal trial.  These documents are relevant because the information provided in the documents, whether or not true, makes the information in the alleged Brady evidence favorable.  For example, they include Walker,

Boyd v. County of Erie, 22-CV-519                    91

Woodruff and Gibson, statements that Mr. Walker, Mr. Woodruff took a cab home on the night of the murder, which in part is what makes the taxicab P-73 Brady.  Again, they're not hearsay as they're not being offered for their truth, but for whether nondisclosure of evidence violated Brady.

THE COURT:  Mr. Blenk?

MR. BLENK:  We would object, Your Honor, to the admission of the Darryn Gibson statements for this purpose. There is no foundation that any of these documents would have been admissible in the underlying trial or could have been made admissible in the underlying trial.  I think it's going to be confusing for the jury.

We all know that Mr. Gibson could not be called as a witness in Mr. Boyd's trial, and it's -- the favorability can -- should either line up with Mr. Woodruff's statement and/or Mr. Boyd's statement or it should go in -- there's no basis to supplement Mr. Gibson's testimony, and it goes into facts that are outside the record of the underlying trial and that never could have come into the underlying trial realistically.

THE COURT:  So, Mr. Blenk, is there a specific document that you're saying didn't exist until after Mr. Boyd was convicted?

MR. BLENK:  Yes.  That's PX 272, DX 500.75.

THE COURT:  Can you tell me what that is?  What that is

Boyd v. County of Erie, 22-CV-519                    92

and when you --

MR. BLENK:  That's a document where Andre Hough's foster mother is coming to the police and saying I don't think -- something to the effect of she doesn't think that Andre Hough is telling the truth.

THE COURT:  Okay.  And you're saying that report is dated after Mr. Boyd's conviction?

MR. BLENK:  That's correct.

THE COURT:  What was the date?

MR. BLENK:  July 8th, 1977.

THE COURT:  And was that before Mr. Boyd was sentenced?

MS. SILOS:  Yes, Your Honor.

THE COURT:  Okay.  Over defendant's objection I am going to receive those exhibits that Plaintiff offered as it goes to favorability, materiality.  And I do find that 272 would be relevant to that as well since it was completed before Mr. Boyd was sentenced.

Are there any other exhibits that you would like to offer now?

MS. SILOS:  Not at this time.

*(Defendant's Exhibit 500.18 and Plaintiff's Exhibits 17, 26, 27 received in evidence.)*

THE COURT:  Okay.  So we provided the limiting instruction to counsel regarding the Brady material.  Would you like to be heard at all with respect to that?  Plaintiff?

Boyd v. County of Erie, 22-CV-519                                    93

MR. FIRSENBAUM:  No, Your Honor.

THE COURT:  Mr. Blenk, would you like to be heard?

MR. BLENK:  No, Your Honor.

THE COURT:  Okay.  Let's move on to Mr. Boyd's deposition designations.  I provided a chart with all of my rulings.  So hopefully that will be helpful to you.  The last page contains some limiting instructions that are relevant.  And so I know I just gave them to you, but let me know if there's any questions or objections to the chart or limiting instructions.

MR. DURLAND:  Your Honor, may I raise one point about the rulings on the deposition designations?

THE COURT:  Sure.

MR. DURLAND:  So if Your Honor has already considered this argument and rejected it, that's fine.  I'm not looking to reargue it.  But the ruling on that portion of the designation where Mr. Boyd talks about the plea offer that ADA Drury made and then he gives the response that he gives, Your Honor cited Rule 408, which I think is the objection that the County had raised acknowledging that this is relevant but that this would be using a settlement offer to prove the amount of a claim.  In other words, the damages.

There's -- in all the filings -- perhaps Your Honor didn't see that there's a Second Circuit case saying very clearly that 408 doesn't apply to offers in a criminal case.

Boyd v. County of Erie, 22-CV-519                    94

That's 410 that applies to offers, plea discussions in a criminal case, and it only precludes the use of the offer against the defendant.

And there's also cases talking about 408 applying only to an offer to compromise the claim that's at issue.  So, in other words, if ADA Drury had offered to compromise this civil rights suit that that would be inadmissible, but an offer to compromise a different matter is outside the scope of 408, and that's -- we discuss those cases at Docket 420 at pages 20 to 21.

And, again, if Your Honor has considered this and disagrees, that's fine.  I just wanted to bring it to the Court's attention in case it would be helpful.

THE COURT:  I did consider it.  I recognize that criminal exception.  I think this situation is unique in that we're dealing with this criminal case but it's applied to a civil case.  And so let me -- I'll have my law clerk -- can you look at that?  We'll look at it again.

MR. DURLAND:  Okay.  And I can give the cite of the two cases if that would be helpful.

THE COURT:  Sure.

MR. DURLAND:  Baker is 926 F.2d. 179.  And Westside Winery, 511 F. Supp. 3d 256, that's the case talking about 408 only applying to offers to compromise the claim at issue.

Thank you, Judge.

Boyd v. County of Erie, 22-CV-519                    95

THE COURT:  Okay.  Thank you.

MR. BLENK:  I would just say, Your Honor, if we could, that everything in there is hearsay just the same, that it only comes in as hearsay.  And, in addition to that, obviously it's our position that it falls -- it certainly falls within the spirit of 408 when brought up in this context.

THE COURT:  Okay.  Thanks.

MR. BLENK:  Thanks.

THE COURT:  I will -- you are planning on playing those designations later this morning; is that right?

MR. DURLAND:  Yes, Your Honor.

THE COURT:  So that will probably be after the mid-morning recess.  So I'll get back to you about that.

MR. DURLAND:  Thank you, Judge.

THE COURT:  Okay.  I want to talk about Mr. Walker's testimony.

Mr. Durland, you are doing Mr. Walker's testimony?

MR. DURLAND:  Yes, Your Honor.

THE COURT:  Now, yesterday you said that you were not anticipating any testimony from Mr. Walker about kind of his own experiences, observations while in prison.  Is that right?

MR. DURLAND:  That's correct, Your Honor.  We're going to skip from conviction to postconviction advocacy.

Boyd v. County of Erie, 22-CV-519                    96

THE COURT:  Okay.  Regarding the postconviction advocacy, I want to just help clarify the line that I want to draw of what he can testify to and what he cannot testify to. I'm going to allow him to testify that he kind of worked with and helped Mr. Boyd in this postconviction advocacy, but I don't want the jury to hear any evidence or testimony that Mr. Walker also had Brady violations or there were documents that he didn't receive during the course of his criminal case.

So I think we have to draw really a fine line to that. I think it's fair for Mr. Walker to testify that he helped Mr. Boyd kind of obtain these documents and if he has a basis of knowledge that he knows that Mr. Boyd obtained documents as a result of their efforts, but he shouldn't testify about his own experiences of not having these documents, not being aware of them and then receiving them.

Does that make sense?

MR. DURLAND:  Yes, it does, Your Honor.  I think -- I think I can -- I'll have to ask him some very specific questions, but I think I can -- I think I can do that.  My plan was to really use photographs to illustrate what he's talking about, these postconviction, you know, events.  And I was going to use the phrase, you know, events to bring public attention to your case to try to steer clear of anything about innocence or that sort of thing.

Boyd v. County of Erie, 22-CV-519                    97

And then with respect to one of the events where Mr. McLeod spoke, I would ask him did he mention photographs, what did he say about the content of the photographs, what did you do next, FOIL request, obtained documents.  Am I permitted to ask what he found in the documents or should I just simply say did you share this discovery with Mr. Boyd and leave it at that?

THE COURT:  I would just leave it at that.  As long as the testimony isn't implying that Mr. Walker didn't have these documents, that there were these Brady violations, then he can testify about how it affected Mr. Boyd.

MR. DURLAND:  The thing that I'm -- and Mr. Firsenbaum is raising and I tend to agree with is it's just -- I'm worried it's going to be a little bit odd that he is -- it's going to be clear that he's -- you know, he's involved in the postconviction advocacy, that he was convicted as well and that he's attempting to bring public attention to his case.  And, you know, he hears about photographs and that prompts him to submit a FOIL request.  I take it that's still fair game?

THE COURT:  Well, did he --

MR. DURLAND:  I mean, that was a part of the opening based on the prior ruling regarding Mr. Walker's testimony, Your Honor, is that there was this mention of the photographs and that that's what prompted him to submit this FOIL

Boyd v. County of Erie, 22-CV-519                    98

request.  I mean, I think that -- I do think I can do it without -- without getting into what happened in Mr. Walker's case or, you know, you never -- I can avoid asking him the question, like you never saw that -- you've never seen those photographs before.  I take it Your Honor is saying I can't ask that?

THE COURT:  Correct.

MR. DURLAND:  And I can't ask when he receives the -- you know, the documents -- he says I received P-73s in response to the FOIL request, I can't ask him you had never seen those before; is that correct?

THE COURT:  Correct.

MR. DURLAND:  Okay.  Is it also correct that the County is not going to be able to cross-examine Mr. Walker -- because I'm afraid that the County is going to stand up and start showing documents and saying, well, did you get this one, did you get that one, and that's going to be a line of cross-examination they pursue, and it's going to look -- it's going to make our direct examination, you know, look incomplete or misleading if we haven't asked similar questions on the front end.

THE COURT:  Do you intend on asking those kinds of questions?

MS. MEANS:  We don't, Your Honor.

THE COURT:  I mean, if they do, then that opens the

Boyd v. County of Erie, 22-CV-519                    99

door.  I mean, the evidence that I'm keeping out I think is not relevant and prejudicial.  It really is -- if I let it in, it really would be kind of like Monell evidence in a way.  Like, okay, well, then Mr. Walker is saying I didn't get these documents either, so they were Brady violations against me too, and that's not relevant.  It's not probative.  It's prejudicial.

If the County asks questions about, well, did you get this document, did you not get this document, then to me that opens the door, and then you could get back up on redirect and ask questions about that, but I don't anticipate the County wanting to do that.

MR. DURLAND:  Your Honor, if the testimony from Mr. Walker was I submitted a FOIL request, I received documents, I provided them to Darryl Boyd and he was shocked, is that acceptable?

THE COURT:  Yes.  If he was to testify that he handed them over to him and he observed this reaction, then yes.

MR. DURLAND:  Okay.

THE COURT:  And I agree that the testimony -- it might be a little bit difficult because -- well, let me say this: If you would like an instruction for the jury not to speculate, then I can do that.  I didn't know if that was something you would want me to bring attention to.  If you want me just to tell the jury that they cannot speculate as

Boyd v. County of Erie, 22-CV-519                    100

to why Mr. Walker was engaged in this, I mean, I think that I could consider that, Mr. Blenk, Ms. Means.  Okay.  So --

MS. MEANS:  Your Honor --

THE COURT:  Yes.

MS. MEANS:  -- I think this discussion is overall kind of demonstrative of the restrictions and kind of the danger of having Mr. Walker testify.  It's leaving the jury only to speculate that Mr. Walker had -- you know, he was involved in the same type of proceedings that led Mr. Boyd to this trial, and it's going to leave the jury to speculate as to the potential -- or the reality of Mr. Walker's civil trial.

And as I'm -- you know, these discussions -- it's not at all clear to me what Mr. Walker might be permitted to testify to with respect to the FOIL request that he was connected with and a part of and, you know, really how he would have standing or be involved in pursuing those documents, you know, on behalf of Mr. Boyd.

THE COURT:  Okay.  I mean, there are deposition designations from Mr. Boyd about his postconviction advocacy, no?

MR. DURLAND:  There are some, but not many, and certainly nothing authenticating photographs establishing the -- you know, this consistent advocacy throughout time.

And, Your Honor, this is -- this is exactly the point of Dr. Drob's testimony, that a person who believes himself

Boyd v. County of Erie, 22-CV-519                    101

innocent is preoccupied with the conviction and is unable to move on from it.  And what the County objected to with Dr. Drob is him getting up there and saying, well, I diagnose him with this type of condition.  So Dr. Drob is not going to say that.  But then we have to be able to put on the proof that he is doing the things that Dr. Drob identified as the hallmarks of this particular type of injury.

THE COURT:  And I agree with that.  And I'm letting you do that.  I just don't want you to get into any evidence at all about Mr. Walker also doing it for himself because he had the same problems in his case.  So that's where I'm drawing the line.  But I agree that he can -- that there can be evidence and testimony about Mr. Boyd's postconviction advocacy and the documents that he was able to obtain.

MR. DURLAND:  Okay.  Your Honor, I will -- I will certainly talk to Mr. Walker.  I will give him the Court's direction.  And I'm going to ask very specific questions to kind of lead him through that piece so we steer clear of what the Court doesn't want him talking about, if that's fair.

THE COURT:  That's fair.

MR. BLENK:  And am I to understand that Dr. Drob is not going to convey a diagnosis at all?

MR. DURLAND:  No, certainly not.  Dr. Drob is going to convey -- we're talking about the innocence-based injury, for lack of a better term, the way that a person who believes

Boyd v. County of Erie, 22-CV-519                    102

himself innocent suffers more and differently while

incarcerated.  And Dr. Drob is going to describe why that is

so, but then in order to tie it to Mr. Boyd we have to put on

evidence that Mr. Boyd is doing the things that Dr. Drob

described and that he is evincing the symptoms that Dr. Drob

described.

Some of that could come from Dr. Drob based on his

evaluation, but some of it can't.  Dr. Drob doesn't have

personal knowledge of Darryl Boyd's postconviction advocacy,

the manifestation of his inability to move on from his

conviction.  So that's what we intend to do.

THE COURT:  Okay.  Let's move on then.  There's a few

other issues I'd like to address.

There was a motion from Plaintiff regarding a judicial

notice with respect to Mr. Hulnick.  Would you like to be

heard, Mr. Blenk?

MR. BLENK:  Yes, Your Honor.  We have -- we have no

objection to the Court taking notice of Mr. Hulnick's death.

We would ask for -- we would reject the idea that the

suddenness of his death would be included or that there be

some connection to the possibility that -- that the parties

planned for a deposition, but I think it's totally fair to

note that he died on the date that he died on.

We would expect the same courtesy as it pertains to

some of our witnesses, if necessary, including Mr. Cosgrove

Boyd v. County of Erie, 22-CV-519    103

and including, depending on how Mr. Walker's testimony comes in, David Jay.

THE COURT:  Okay.  And there was I think a statement in the proposed judicial notice regarding his sudden death.  And so you have no objection to that?

MR. BLENK:  No.  I do object to the suddenness.  The characterization of it as sudden, I do object to that.  The date of death is totally acceptable to us.  We object to the suddenness, and we object to this characterization that the parties anticipated a deposition before he could be deposed by the parties.  The fact that he died, absolutely fair.

MR. FIRSENBAUM:  Your Honor, first, to the extent that the County is asking for reciprocal judicial notice of the date of other witnesses' deaths, we have no objection to that.

I think, though, the different circumstances is what warrants inclusion of the word "sudden" and the reference to before the parties could take the deposition.  And if the County doesn't want it to say "parties" and wants it to say "Plaintiff," we have no problem with that.  We attempted to be more neutral by including the word "parties."  But other instances in this case where we have a witness who died, at least with Mr. Boyd and Mr. Cosgrove, it was after their deposition was taken.  The jury has already learned that and will be watching the video.

Boyd v. County of Erie, 22-CV-519    104

We believe that Mr. Blenk's opening statement created an implication for the jury that we have somehow chosen not to present testimony from Mr. Hulnick because we couldn't get the testimony that supports our case, and that's just not true.  He died suddenly while the discovery period was still open and before -- I don't know if it was before any deposition was taken, but it was certainly while the deposition period was open.

And so I think without burdening the jury with facts about discovery periods and depositions and all of that, we thought that our proposed instruction was neutral but provided the information so that nothing be held against the Plaintiff for not being able to secure Mr. Hulnick's testimony.

THE COURT:  Okay.  I will grant the Plaintiff's motion. I will allow that language about his sudden death.  It's in the obituary that was provided.

If there's anything else specific that you would like to subtract or add, then just e-mail the Court and I'll consider that.  And then you can let me know when you'd like to have that presented during the trial, but we don't have to decide that right now.

MR. FIRSENBAUM:  Thank you, Your Honor.

THE COURT:  Okay.  Plaintiff, are you still seeking the deposition designations for Mr. Gagan?

Boyd v. County of Erie, 22-CV-519    105

MR. FIRSENBAUM:  Yes, Your Honor.

THE COURT:  Okay.  Then we will get you the decision on that as soon as possible.  Not right this minute, but I just wanted to verify.

I would note for the record that the slides utilized by Mr. Durland yesterday in his opening statement have been marked now as PX 291.  They are not received in evidence, but they are marked for the record.

Just a reminder to parties, if you are anticipating using demonstrative evidence or charts or slides that will not be received in evidence, if you could please -- I think we had stated two days' notice.  So if you're going to use slides during the summation, if you could just make sure you provide them to the Court at least two days before so I have time to review them and rule upon them beforehand, that would be great.

There was a proposed instruction regarding the Martin transcript or the lack thereof from Plaintiff, which is different from what the defendant had proposed, basically saying that it was never created.

And so do you have an objection to that, Mr. Blenk or Ms. Means?

MR. BLENK:  We have no objection to the language, which we understand to be, No transcript of Floyd Martin's 1977 criminal trial was ever created; and, therefore, none exists

Boyd v. County of Erie, 22-CV-519                106

today.

THE COURT:  Okay.  Then I will read that instruction at the time.

And then one more thing.  Mr. Rudin, you had asked if we could try to accommodate Mr. Walker and Mr. Drury when they testify, and we can do that.  So Mr. Walker wouldn't testify until this afternoon, correct?  So during our lunch recess we will get that set up and we will get an extra monitor and a small table or desk to put in front of him so that he can look at the monitor.

MR. JOEL RUDIN:  Thank you.

THE COURT:  Okay.  Anything else before we bring the jurors out?

MS. SILOS:  Your Honor, before I do my readings of the police reports, would we be able to move the stand?

THE COURT:  Sure.  That's fine.

MS. SILOS:  Okay.

THE COURT:  And if you could just make sure when you are reading them to make the record clear what you are reading.  And if it's already been received, then just state that so it's clear for the record and for me.  Okay?

MS. SILOS:  Yes, Your Honor.  They have all already been received, but I will make that clear for the record.

THE COURT:  Thank you.

(Jury present.)

Boyd v. County of Erie, 22-CV-519                    107

THE COURT:  Have a seat, everyone.  Thank you.

Good morning, everyone.

THE JURY:  Good morning.

THE COURT:  The Members of the jury have returned to the courtroom from last night's recess.  I hope that you all had a good night.

We are going to proceed this morning with Plaintiff's proof and Ms. Silos in just one moment.  I'm going to read the jurors an instruction, and then you can proceed.  I'm going to read you an instruction regarding the evidence that the Plaintiff is going to be presenting to you in just a few minutes.

Members of the jury, yesterday you heard about 19 pieces of evidence that Plaintiff alleges were not disclosed to Mr. Boyd in 1977 in violation of his constitutional right to a fair trial.  Portions of each of those documents will be read to you by counsel in a few moments.

Normally, such evidence known as hearsay is not permitted.  There is an exception to the rule against hearsay where, for example, as here, the evidence is not being offered for its truth but for the purposes of determining whether or not such documents were favorable or not to Mr. Boyd's case, whether or not such documents were disclosed to Mr. Boyd's attorney for his criminal case, and the effect that any disclosure or nondisclosure had at Mr. Boyd's trial.

Boyd v. County of Erie, 22-CV-519                     108

In these circumstances you may not consider these documents for the truth of the contents within the documents. You may consider the words only for the reasons they are offered. For example, if hypothetically one of the documents states that it was raining on March 1st, 2025, you may not consider that evidence for the purpose to determine whether it was, in fact, raining on March 1st 2025. Instead, you can only consider such evidence for the limited purpose they are being offered.

Thank you.

Ms. Silos, you can go ahead.

MS. SILOS: Good morning.

Are the screens turned on?

THE CLERK: They are.

MS. SILOS: Apologies. Please bear with us. If it's working for the jurors, I think we can proceed.

THE CLERK: And that one should be working.

THE COURT: Are the monitors working for the jurors?

THE JURY: Yes.

THE COURT: Then we'll proceed.

MS. SILOS: Thank you, Your Honor.

I'm first going to show you a document marked as Plaintiff's Trial Exhibit 14, which has been received into evidence. This is a P-73 Buffalo Police Department interdepartmental correspondence. It's dated January 6th,

Boyd v. County of Erie, 22-CV-519                109

1976 from Detectives Robert Grabowski and Edwin Gorski.

It states:  We interviewed Mrs. William Crawford of 2041 Fillmore Avenue, wife of the deceased William Crawford, regarding the events of January 2nd, 1976.

Mrs. Crawford reports that her husband William left their house at about 7:30 p.m. on January 2nd, 1976 to visit area taverns.  She reports that he had a black regular folding wallet that he carried in his right back pocket.

On the evening on January 2nd, 1976 at about 11:30 p.m., Mrs. Crawford advises that she was watching television in the rear northeast bedroom.  She was sitting in bed with her back against the bed headboard, which is against the north wall of the house.  Mrs. Crawford is extremely hard of hearing, besides being a semi-invalid.  She reports that she heard or rather felt a noise or something hit the house against the east side of the house near the side door.  She reports that she got out of bed and went to the side hall door, as she thought that her husband was coming home, as he always used the side door.  She did not see her husband at this time and did not go down the stairs to the side door.

She reports that at one a.m. she became concerned for her husband who usually came home at 11:30 or twelve when he was out drinking.  She reports of going down the stairs to the side hall and looking out the side door curtain and seeing her husband's feet lying north of the side door.

Boyd v. County of Erie, 22-CV-519                    110

I'm now showing you a document marked as Plaintiff's Trial Exhibit 6, which has been received into evidence.

This is a P-73 Buffalo Police Department interdepartmental correspondence dated January 3, 1976 from Detective Grabowski.

It states:  We interviewed one Francis Kalb of 234 Glenny Drive, Apartment G-10, telephone 834-2591, who called this office relative to the Crawford homicide.

Mrs. Kalb reports that she was in the Golden Nugget during the evening of January 2nd, 1976.  She reports that William Crawford came in the Nugget tavern at about 7:30 p.m. He was joined by a woman named Julia Watson, her husband Larry Watson and Julia's son Bill Howard at the end of the bar.

Mrs. Kalb reports that Crawford appeared to be a regular customer as the barmaid recognized him and spoke with him, friendly, as to a good friend.  She reports that Crawford bought about four or five rounds of drinks for this group.  William Crawford was showing Julia a scar from a previous operation during this time.

Mrs. Kalb reports that the barmaid Debbie said that William Crawford had had enough to drink and asked Julia and her husband Larry to take him home.  She reports that Larry Watson and William Crawford left the Nugget at about 11:30 p.m.

Boyd v. County of Erie, 22-CV-519                              111

She further reports that Bill Howard and Julia Watson stayed in the Nugget after Crawford and Larry Watson left the tavern.  About twenty minutes later Larry Watson returned to the tavern and got his wife Julia and they went home to 2049 Fillmore Avenue.

We interviewed Deborah Jeffries, age 44, DOB 10/29/31, of 117 Leroy Avenue, telephone 838-4153, a barmaid at the Golden Nugget on January 2nd, 1976.  She reports that he had about three hundred neatly folded in a small dark-colored folder which he carried in his shirt pocket.

She states he bought about three or four rounds of drinks during this time period that he was in the tavern.  She emphatically denies asking anyone to take William Crawford home, but states that Larry Watson stated he was going to take Crawford home.

Debbie Jeffries states that Larry Watson returned about twenty minutes later and got his wife Julia and left the Tavern.  She feels whatever happened to William Crawford happened after he left the Golden Nugget.  She indicates that she suspects Larry Watson of harming William Crawford.

This office further received a phone call from one Clarence Neubecker, age 66, of 2094 Fillmore Avenue, telephone 883-4813, who when interviewed states that he has known William Crawford for the past 25 years.

He reports that at about midnight or 12:30 on January

Boyd v. County of Erie, 22-CV-519                    112

3rd, 1976 he was awaken by a commotion in front of his house. He reports of hearing shouting and arguing like a fight. He states that any commotion raised in front of his house are carried to his rear bedroom through the alley between 2094 and 2100 Fillmore.

We further interviewed Lawrence Robert Watson, age 32, DOB 6/5/43, of 2049 Fillmore Avenue, telephone number 837-5360, who reports of being in the Golden Nugget from about four p.m. on January 2nd, 1976 until he left with his wife later that evening at about 12:30 a.m.

Watson reports that William Crawford left the Nugget at about midnight and that he went out the door at the same time. Larry Watson states his purpose for leaving the tavern was to use the toilet at his home at 2049 Fillmore across the street. At this time Watson reports that Crawford was in the front of the tavern getting ready to cross the street to the east side of Fillmore where he lived.

Watson also reports that the storm door of his house was open and that he checked the house for a break-in, used the toilet, and then returned to the Nugget to get his wife Julia at approximately 12:20 a.m., and then they left the tavern at about 12:30 a.m., went home and to bed.

I'm now showing you a document marked as Plaintiff's Trial Exhibit 18, which has been received into evidence. This is a statement of Julia Watson to the City of Buffalo

Boyd v. County of Erie, 22-CV-519                    113

Police Department.  It's dated January 7th, 1976.

Julia Watson, 47 years old, DOB 8/5/27, residing at 2049 Fillmore Avenue with husband and son, phone number 837-5360, being duly sworn, deposes and makes the following statement:

On January 3rd, 1976 at about 1:29 a.m. --

Question:  On January 3rd, 1976 at about 1:29 a.m., the body of one William Crawford was found in his driveway at 2041 Fillmore Avenue.  Do you know Mr. Crawford, and, if so, can you tell me the last time you saw him alive?

Answer:  Yes, I know him.  Not his last name.  I know him as Bill.  I moved on Fillmore Avenue the 1st of last August and I have seen him around -- I have seen him around.

The last time I saw him was Friday night, January 2nd, 1976.  We were sitting side by side at the bar in the Golden Nugget bar, which is across the street from where we live.  I was sitting at the bar with my husband Larry.  Bill asked the barmaid Debbie-doo to ask me if I would come down to where he was sitting at the bar and have a drink with him.  So I did.

Question:  Did anyone else join you and Bill for a drink?

Answer:  Yes.  My husband Lawrence Watson and later my son William Howard.

Question:  Did Bill show you or anyone else at the bar how much money he had on him?

Boyd v. County of Erie, 22-CV-519                    114

Answer:  No, he didn't show me.  And I don't know if he showed anyone else.

Question:  Did you see Bill with a wallet with money in it?

Answer:  No, I didn't.

Question:  What time did Bill Crawford leave the bar and with who did he leave?

Answer:  I don't know what time he left the bar.  Bill and my husband Larry left the bar together.  I think that Debbie said Larry see Bill across the street.  I was sitting at the bar when they left.

Question:  After Bill and Larry left the bar how long of a time was it before your husband Larry returned to the bar?

Answer:  About 15 or 20 minutes.

All right.  I am now showing you a document marked as Plaintiff's Trial Exhibit 29, which has been received into evidence.  This is a P-73 Buffalo Police Department correspondence dated January 12, 1976.

At ten a.m. this date detectives in car 271 manned by the above-mentioned detectives went to 117 Leroy in the upper.  There had a conversation with one Deborah Jeffries, also known as Debbie, phone 838-4153.  Debbie Jeffries was in the homicide office and gave a statement in regards to the activity in the Golden Nugget bar prior to the death of

Boyd v. County of Erie, 22-CV-519                115

William Crawford.  This statement was given on January 6th, 1976.

Debbie stated that she did not ask anyone to take Bill home.  What she told Bill was that she couldn't take him home because Ralph, who is the owner, was not there.  The owner's name is Ralph Davis.  She said that Bill Crawford was worried about the fact that he had to go back into the hospital Monday, and Debbie said why don't you go home, Bill, if you're worried, but I can't take you because Ralph is not here.  It was Larry Watson who offered to take Bill home stating that he had to go anyway to use the bathroom.  She is definite on this point.

Another point that she made was the fact that when she took the ten dollar bill out of the wallet of Bill Crawford she said that there was a considerable amount of twenties before she could get to a ten, and that because of the close proximity of everybody sitting at the bar together it would have been impossible for everyone else there not to have seen this money.  However, Larry and Julia both stated that they did not see any money.

She did say that both Watsons were in a drunken condition, and that after Larry came back from walking Bill home, which took about 20 minutes, he said something to his wife and then they both got up and left.  She thought that strange because they left drinks on the bar to William

Boyd v. County of Erie, 22-CV-519                              116

Howard, the son of Julia, and that Larry never left any drinks but always finished them before he left.

She stated that she was not sure of the time, that it could have been 10:30 or perhaps an hour later.  However, she did say another thing that struck us as odd, that they always said goodbye to her and that after Larry came in and said something to Julia they got up and left and didn't say goodbye to her.

I am now showing you a document marked as Plaintiff's Trial Exhibit 7, which has been received into evidence.  It's another P-73 from the Buffalo Police Department.  It's dated January 3rd, 1976.

It states:  At approximately 6:30 p.m. the assistant chief's office received an anonymous phone call from a black male who advised that the killers of William Crawford were Andre How and Jerry Boyd, phonetic spelling.  Detective D. Vaccaro passed this information on to us, and we in turn apprised Sergeant Dove and Detective Delano of this information upon being released at twelve p.m.

Attached is a record printout and mug for Jerome Boyd and NVB information.  We were unable to obtain any information on Andre How.

I am now showing you a document marked Plaintiff's Exhibit 8, which, again, has been received in evidence.

This is a photo of a man with the name Jerome Boyd

Boyd v. County of Erie, 22-CV-519                117

written above it.  To the right you can see the number 057167.  Lower down on the page you can see 2/3/74, assault 3rd.

I am now showing you a document marked as Plaintiff's Trial Exhibit 9, which has been received into evidence.  It's a P-73 from the Buffalo Police Department, which is dated January 4th, 1976.

It states:  At 1:30 a.m. this date the above-mentioned detectives went to the Golden Nugget Tavern, and this is at 2046 Fillmore Avenue, phone 836-9776.

Upon arrival for the twelve midnight tour the above-mentioned detectives were told by Detective Robert Grabowski of this command that he received a telephone call saying that one Andre House and a Jerome Boyd were responsible for the death of William Crawford.  The detectives got a police identification mug picture number 057167 of Jerome Boyd at 32 Glenny Drive, 10/5/39.

Upon arrival at the Golden Nugget the detectives talked to the owner Mr. Ralph Davis who stated that he saw Jerome Boyd in his tavern; however, didn't know his name but recognized his face, but couldn't say whether or not he was in the night before when William Crawford was also present shortly before he was killed.

The picture was also shown to Deborah Jeffries, a barmaid.  She stated she could not recognize the man.

Boyd v. County of Erie, 22-CV-519                                    118

Also shown the picture was a bartender waiter, one

Theotis Love, AKA Teddy Love, and he stated that he served a

drink to Jerome Boyd on the night of the Crawford killing.

However, he did not know what time Boyd came in or what time

he left.  He also stated that he did not know Boyd by name

but only by sight.  When asked about Andre House they stated

that they did not recognize the name.

I am now showing you a document marked as Defendant's

Trial Exhibit DX 500.16, which has been received into

evidence.  This is a statement of Francis Kalb to the City of

Buffalo Police Department.  It's dated January 6th, 1976.

Francis Kalb of 234 Glenny Drive, Apartment C-10, age 32, DOB

11/19/43, phone 834-2591, being duly sworn, deposes and makes

the following statement in Room 328 of Buffalo police

headquarters:

Question:  Were you in the Golden Nugget tavern on the

evening of January 2nd, 1976?

Answer:  Yes, I was.

Question:  I will show you a Buffalo police mugshot

number 57167 and ask you if this person was in the tavern

that night on January 2nd, 1976.

Answer:  It looks like a real big guy that came in and

talked with Julia and stayed for only a few minutes.

I will tell you now that the mugshot that I showed you

is that of Jerome Boyd of 32 Glenny Drive.  Do you

Boyd v. County of Erie, 22-CV-519    119

understand?

Answer:  Yes.

Apologies.  The software is freaking out.

Are we all good?  All right.  Thank you.  Okay.

What's on the screen is what I just read.

Question to Francis Kalb:  I will now show you a Buffalo police mugshot 57167 and ask if this person was in the tavern that night on January 2nd, 1976.

Answer:  It looks like a real big guy that came in and talked with Julia and stayed for only a few minutes.

Question:  I will tell you now that the mugshot that I showed you is that of Jerome Boyd of 32 Glenny Drive.  Do you understand?

Answer:  Yes.

I will now show you a document marked as Defendant's Trial Exhibit 500.18, which has been received into evidence.  It's a P-73 Buffalo Police Department interdepartmental correspondence dated January 7th, 1976.

Received -- it states:  Received information from a person who wishes to remain anonymous at this time.  This female caller stated the person who killed the man on Fillmore Avenue is Darryn Gibson who lives on Rodney Street.  This female would give no further information.

We picked Darryn Gibson up at his home at 10:38 a.m. this date and read him his constitutional rights at 10:41

Boyd v. County of Erie, 22-CV-519                          120

a.m.

I took him to Buffalo police headquarters into the homicide interrogation room, and he gave the following account of his activity on the night of January 3rd, 1976.

He claims he went to the apartment of a woman named Shirley, last name unknown, about 23 years of age, living at 138 Glenny Drive on the sixth floor, apartment F-6.  He claims this is a girlfriend of a friend of his by the name of Eugene Muskey Martin, about 20 years old, who lives with this Shirley.  They all went there around six p.m. and played cards until ten p.m. on Saturday, January 3rd.  They stopped playing cards at ten and sat there talking until after the news on television, at which time Tony Woodrow and John Walker decided to call the Fillmore cab for a ride home.  Then Woodrow, Walker, Gibson and Boyd went downstairs and the cab came, and Walker and Woodrow left in the cab.

After talking with Darryn Gibson it was decided to put him on the polygraph machine, which he agreed to.

I am now showing you a document marked as Plaintiff's Trial Exhibit 17.  This is a statement of Darryn Gibson to the City of Buffalo Police Department.  It's dated January 7th, 1976.

Darryn Gibson, DOB 1/19/59, 190 Wakefield, being duly sworn, deposes and makes the following statement in Room 320 of the Buffalo police headquarters:

Boyd v. County of Erie, 22-CV-519                    121

Early Saturday morning at about 1:29 a.m. on January 3rd, 1976 the body of William Crawford was found in the driveway of 2041 Fillmore Avenue.  Do you know who killed Mr. Crawford?

Answer:  No.

Is there -- question:  Is there anything you can tell us that will help us in the investigation of William Crawford's death?

Answer:  No.

I am now showing you a document marked as Plaintiff's Trial Exhibit 25 which has been received into evidence.  This is a statement of Darryl Boyd to the Buffalo Police Department.  It's dated January 8th, 1976.

Darryl Boyd, DOB 8/14/59, residing at 93 Leroy Avenue, being duly sworn, deposes and makes the following statement in Room 328 at Buffalo police headquarters.

Question:  Did you know the man who was found dead at 2041 Fillmore?  His name was William Crawford.

Answer:  No, I didn't.  I never saw him.

Question:  Will you submit to a polygraph test as to the truth of this statement?

Answer:  Yes.

I am now showing you a document marked as Defendant's Trial Exhibit 500.32.  It's, again, another P-73, Buffalo Police Department record, and it's dated January 9th, 1976.

Boyd v. County of Erie, 22-CV-519                    122

It states:  Upon information from Darryn Gibson of 190 Wakefield, we went to check his story of January 2nd, 1976 on Friday night.  He stated that while at the Glenny Drive projects a Fillmore cab was called around 11:30 p.m. which took John Walker AKA Bo Bo and Tony Woodrow home.

We went to the Fillmore cab company, 100 East Ferry Street, phone 897-0204.  There we spoke to the secretary, a Dorothy Moore.  She showed us through their log books.  We found where a cab number 150 driven by a Geno, last name unknown, was sent to 194 Glenny Drive at 11:28 p.m.  Then again at 11:44 p.m. cab number 163 driven by a Brian Woods was dispatched to 194 Glenny Drive at that time.  Those were the only two cabs dispatched to the Glenny Drive projects within a four-hour span period in either direction.

You are now seeing on your screen a document marked as Plaintiff's Trial Exhibit 26, which has been received into evidence.  It's a statement of John Walker to the Department of Police in the City of Buffalo.  It's dated January 11th, 1976.  John H. Walker, NM, age 16, DOB 7/10/59, residing at 403 Best Street, Buffalo, New York, phone number 886-3698, being duly sworn, deposes and makes the following statement:

Question:  We are investigating the beating death of one William F. Crawford, a white male who lived at 2041 Fillmore Avenue.  He was 62 years old.  Mr. Crawford's body was found in the driveway of his home 1:30 a.m., 1/3/76.  I

Boyd v. County of Erie, 22-CV-519                    123

want you to tell me in your own words what you know or heard in regards to Mr. Crawford's death.

Answer:  I read it in the newspaper and heard it on the news.  And Darryn and them told me that you all picked him up and questioned him.  That is all I know about it.

Question:  Who were you with Friday evening, January 2nd, 1976?

I was with Darryl Boyd, 16 years old; Floyd Martin, 16 years old of 138 Glenny apartment, C-9; Darryn Gibson, 16 years old of 190 Wakefield, and Tony Woodruff of 494 Best Street.

Question:  What time did you meet these fellows and what did you do?

Answer:  Between four and five o'clock stayed in the Glenny Drive apartments at Shirley's house.  She lives at 138 Glenny Drive on the sixth floor.

What time did you leave the Glenny Drive apartments?

Answer:  About twelve midnight.

And then what did you do?

I went home in a cab with Tony and went to bed.

Question:  When will you be able to take a lie detector test about this case?

Answer:  Any time.

Question:  Is there anything else that you can tell us that will aid us in this investigation?

Boyd v. County of Erie, 22-CV-519                    124

Answer:  No.

You are now seeing on your screens a document marked as Plaintiff's Trial Exhibit 27.  It's been received into evidence.  This is a statement of Tyrone Woodruff to the Buffalo Police Department.  It's dated January 11th, 1976.

Tony Woodruff, age 17, DOB 6/27/58, residing at 494 Best Street in Buffalo, New York, phone number 885-3128, being duly sworn, deposes and makes the following statement in Room 328, homicide bureau, Buffalo police headquarters:

Question:  The Buffalo police are investigating the death of one William Crawford, a white male, 62 years old that lived at 2041 Fillmore Avenue.  Mr. Crawford's body was found in the driveway of his home January 3rd, 1976 at about 1:29 a.m.  Will you tell me in your own words what you know or may have heard about the death of Mr. Crawford?

Answer:  I don't know nothing about the death of Mr. Crawford and I didn't hear nothing about it.

Question:  What time on January 2nd did you meet these fellows and what did you do?

Answer:  I don't know what time it was, but we were in the projects on Glenny Drive.

Question:  What time did you leave these fellows?

Answer:  I don't know the time.

Question:  How did you leave them?

Answer:  Cab I guess.

Boyd v. County of Erie, 22-CV-519                    125

Question:  Who did you go home with, if anyone?

Answer:  John Walker.

I am now showing you a document marked as Plaintiff's Trial Exhibit 31.  It's another P-73 record from the Buffalo Police Department.  It's dated January 12th, 1976.

It states:  At 5:40 p.m. this date I received a telephone call from Negro female who wishes to remain anonymous.  She stated that the person responsible for killing the white man on Fillmore Avenue was John Walker, 403 Best; Darryn Gibson, 190 Wakefield.  I asked this person how she knew that these were the persons involved in the killing, and she said that she was at 138 Glenny when they were cutting up the money.  She said that there was a large amount of cash -- she said that there was a large amount of money and a lot of quarters.  She said this happened in the hallway of 138 Glenny.  She said that two of them called the cab and that the cab came about 12 midnight and Tony and John Walker left in a cab.

This person was asked if she would come in and talk to the police or if anyone from this bureau could meet her some place.  She said no and hung up.

Note:  During this conversation, phone, Tyrone Tony Woodruff was seated in the main homicide office and was listening to the conversation.  He was in the company of Detective Robert Arnett.

Boyd v. County of Erie, 22-CV-519    126

It was noted that Tyrone Woodruff became very nervous and could barely raise a cup of coffee he was drinking. He was asked by Detective Manista in the presence of Detective Arnett if he could remember anything now. He was told that a person -- he was told that a person puts him in the hallway dividing money at 5:45 p.m. He told Detectives Manista and Arnett Gibson was hitting him. Gibson was hitting him I think. Detective Manista appraised Chief Donovan what had taken place and Detective Deubell was also told about the phone call and the statement that Woodruff said to Detectives Arnett and Manista. Two-and-a-half page statement taken from Tyrone Woodruff is now -- is now in the Crawford homicide file.

You are now looking at a document marked as Plaintiff's Trial Exhibit 47, which, again, has been received into evidence. It's another P-73 from the Buffalo Police Department. It's dated February 11th, 1976.

Today I went to Erie County -- it states: Today I went to Erie County District Attorney's Office for the purpose of testifying in a grand jury. I met with Assistant District Attorney Timothy Drury in his office along with Detective Delano and Andre Hough. Andre wanted to change his story about the truth of the statement that I had taken from him. He said he lied in the statement about what Darryl Boyd told him. He said Darryl never told him that he killed William

Boyd v. County of Erie, 22-CV-519          127

Crawford, but later on he admitted to us that the statement is, in fact, true to Detective Delano and myself.

Andre told us he was in contact with some of the dudes on the streets and he was afraid.  He wanted to lie in the grand jury so that the heat would be off his back.  He told us that Darryl and Darryn has friends on the street and that he was afraid.  He then admitted to Assistant District Attorney Drury that the statement is, in fact, true.  He then was brought into the grand jury and testified to those facts.

While Assistant District Attorney Drury went into the grand jury with Andre, he asked me to talk to Tony Woodruff. I talked with Tony and came up with more important information.

Detective Guadagno wrote part of these facts down on paper and Tyrone Woodruff signed his name to the bottom.  It was dated February 11th, 1976, and the time was 3:45 p.m.

Shortly after Detective Delano came in and the story was repeated to him.  Assistant District Attorney Drury was apprised of this new confession.  We all talked briefly to Tyrone before he went in to testify.  Assistant DA Drury brought the signed confession to the grand jury with him.  He later returned it to Detective Guadagno and wanted it made part of the file.

We talked to Tyrone again with the permission of his lawyer, and then he and Andre were released.  Andre was

Boyd v. County of Erie, 22-CV-519                128

brought back to our office so we could give him a ride home.

Finally, I am now showing you a document marked as Plaintiff's Trial Exhibit 46. This has been received into evidence. It's another P-73 Buffalo Police Department record dated February 11th, 1976.

Detective Paul Delano was ordered to the District Attorney's Office to testify in the William Crawford homicide before the grand jury. Detective Delano went to Assistant DA Timothy Drury's office and met with Mr. Drury and Andre Hough. Andre Hough was there with his mother, and after lengthy questioning by Mr. Drury and Detective Delano Mrs. Hough decided to leave and stated that she wanted us to give Andre a ride home, and she did leave.

Detective Delano remained with Mr. Drury and questioned Andre Hough further. After further questioning we were joined by Detective Michael Guadagno. Andre was advised by Detective Delano that he was lying and that he had better tell the truth and that the detective thought he was lying for fear of retaliation on the street by people who were involved in the Crawford homicide. Andre then stated that this was true and he was afraid of the people who would try and stick with us and that the statement that he gave before to Detective Michael Guadagno in our office at police headquarters was true and correct. The only reason he was trying to change his statement now in this office was to

Boyd v. County of Erie, 22-CV-519                129

protect himself against the element on the street who were involved in the Crawford homicide.  Mr. Drury advised him that he would keep his statements confidential and they would not be released and the only one who could release them on the street would be by himself by talking to his friends.

Andre then told the detectives and Mr. Drury that he was told that Boyd and Gibson went into the tavern first and looked around and that they waited for Mr. Crawford down the street.  In parentheses, this is just what he was told.

Detectives then went to the grand jury room and Mr. Drury went into the jury room and Detective Guadagno went to a room with Tony Woodruff.  After awhile Detective Delano then went to the room with Detective Guadagno and Tony Woodruff.  Detective Delano confronted the subject as to why he was shaking and why he was so nervous.  He stated that he didn't know why he was shaking and nervous, that he just was. Detective Delano then advised him that he was shaking because he was not telling the truth to the detectives, that he had not told the whole story as to how the assault and robbery of Mr. Crawford went down.  And when confronted by Detective Delano with the statement made by Andre that two of his associates went into the tavern first and picked out a score before the assault and robbery, he then stated to detectives, yeah, okay, I'll tell you the truth.

At this time Tony Woodruff and Mr. Drury after being

Boyd v. County of Erie, 22-CV-519                    130

advised of the statement that Tony Woodruff had made to the detectives was taken into the grand jury where he did testify and was brought out by Mr. Drury, and Mr. Drury advised the detectives that he did tell the truth and told the grand jury what he had told us in the new statement.  It is advised that a new statement be taken by Tony Woodruff as to the information that he has given us as far as the two men entering the tavern beforehand and picking out a victim.

Thank you.

THE COURT:  Thank you, Ms. Silos.

We're going to take an early recess because there are some things that we need to address outside of your presence. All of the recess admonishments apply.  Do not talk about the case with anyone.  We'll be about ten minutes or so.  Thank you.

(Jury not present.)

THE COURT:  The jurors have left the courtroom.  The next presentation is the Boyd designations.  So I just wanted to give you my ruling before we went ahead with that.

Mr. Durland, we did go back and look at those cases that you had cited.  And so I'm going to change my ruling.  I am going to allow that portion.  I do find that that designation is not covered under Rule 408.

It is well established that Rule 408 only bars the use of compromised evidence to prove the validity or invalidity

Boyd v. County of Erie, 22-CV-519                    131

of the claim that was the subject of the compromise, not some other claim.  This is a Southern District case, Williams versus Regus Management from 2012.

And it was not the subject of the compromise of this claim.  So, obviously, if they were statements regarding a compromise for the civil case, that would be covered, but this is distinct from that.

I also find that it's not covered under Rule 410.  410 governs admissibility of criminal plea discussions, but it only bars admission of such discussions against the defendant who made the plea or participated in the plea discussions.  And so here it's Mr. Boyd participating in those plea discussions.  The County, who is the defendant here, isn't the defendant who participated in the plea discussions.

Regarding the defendant's argument of hearsay, I would first note that what Drury said about the plea offer would be an admission of a party opponent under 801(d)(2)(C).  I'm also going to allow -- because really what he's testifying to is that his attorney told him that he had this discussion with the ADA, and for that level of hearsay I'm going to find that it is an exception.  It's not going to be considered for the truth of its contents.  That is, what his attorney told Mr. Boyd that the ADA said cannot be considered for the truth of its contents but for the effect on the listener; specifically, Mr. Boyd.  And so based on that I will allow

Boyd v. County of Erie, 22-CV-519                    132

that designation.  And so after it's played I just need you
to stop and I can read a limiting instruction to the jury.

Mr. Blenk?

MR. BLENK:  Your Honor, there is no relevance to this
testimony -- there's no relevance to the testimony that
speaks to Mr. Boyd hearing the item.  It's not like it's
relevant to damages.  It's about that -- the only
significance of it, which would be extremely prejudicial
coming in under any circumstances, is that Mr. Drury conveyed
something to Mr. Hulnick who conveyed it to Mr. Boyd, and
that the truth of that -- that it was said by Mr. Drury is
the only thing that would be relevant.

So there's no effect -- there's nothing about the
effect that should go in front of the jury.  There's no
independent relevance of the effect of the statement on Mr.
Boyd.  It's only about the statement being made by Mr. Drury.
This is not -- this does not fit into some sort of other
purpose or alternative purpose to the truth of the matter
asserted.  It's only relevant for the truth of the matter
asserted.  It's extremely prejudicial, and it's certainly
within the spirit of 408 and 410.

This is not testimony that came in in Mr. Walker's
trial, and it's really an out-of-court proponent conveying
double hearsay through a deposition transcript.  It's -- I
would ask Your Honor to reconsider and allow us to make a

Boyd v. County of Erie, 22-CV-519                    133

written submission on that before that goes in front of the jury because there's no coming back from that, Your Honor.

MR. DURLAND:  Your Honor, that's what -- what Mr. Blenk said is simply incorrect.  This is not hearsay.  This is not being offered for the truth of -- there really is no underlying matter.  It's for the fact that the statement was made and that Mr. Boyd -- his response to ADA Drury.

It's certainly relevant to Mr. Boyd's belief in his own innocence, but it's also relevant to the effect on -- to the knowledge of ADA Drury.  The County's apportionment defense squarely implicates the things that ADA Drury knew.  And I know the Court is fully familiar with all of the other indications that ADA Drury had that there were problems here with Mr. Woodruff's statement, and here you have -- he's offering a defendant who is facing 20 to life -- he's offering him five years, and that person says to him I'm not taking this, I didn't do it, and anything I said about this event would be a lie.  And the jury is entitled to consider it.

I mean, the County can argue that, oh, well, ADA Drury must have thought that everyone says they're innocent and they can dismiss it in that fashion, and that's fine, but it's still a probative fact that the jury is entitled to consider, along with everything else that we are going to put into this case about what ADA Drury knew and what he did when

Boyd v. County of Erie, 22-CV-519                134

he went forward with his prosecution.

So I think it's relevant on two levels, Your Honor. It's certainly not hearsay. It's relevant for Mr. Boyd's state of mind as he receives the statement and for his response. I mean, that's the necessary context to Mr. Boyd's response to ADA Drury. So on several levels this is entirely admissible. And, I mean --

MR. BLENK: I'd ask Your Honor to think about what Mr. Durland just said. The truth of the matter is that it was said to Mr. Hulnick. That's the significant fact. That is going to the truth of the matter asserted that it was said. That's what's being passed along through triple hearsay with Mr. Boyd, and Mr. Boyd is not clear that he's talking to Mr. Drury.

We know how these things work. He's talking to his attorney if he's talking to anybody. So there's nothing that's conveying that he -- he has no foundation to know any information that's getting from himself to Mr. Drury.

His personal belief -- Mr. Drury -- there's no doubt that he pled -- he's pled not guilty to the crime. There's no additional relevance to the idea -- we know this statement -- they're going to see this statement that he denied being involved in the crime. Mr. Drury would have known that. There's no independent relevance to him making some sort of -- conveying another hearsay in the sense that

Boyd v. County of Erie, 22-CV-519                    135

he's conveying something that he said at a prior time that somehow might have made it to Mr. Drury, a denial by a criminal defendant in the course of a potential proffer.

MR. DURLAND:  Your Honor, this is a meeting in Mr. Drury's office.  And, I mean, the County can call Mr. Drury, and he can -- he can deny that this happened.  He can say whatever he wants to say about it.  But it's not just the fact that he pled not guilty.  It's the fact that he was offered this enormous inducement, and in the face of that he said to the prosecutor, no, we didn't do this and anything I said would be a lie.  That's an important fact for the jury to consider when the County is going to stand up and say, you know, this is all the police.  The police hoodwinked ADA Drury.  If this was -- you know, if Mr. Woodruff's statement was false, then that's not on us.  We were tricked like everyone else.

The jury has to be able to consider this.  This is their apportionment defense.  They are squarely putting it in issue.  And this exchange happened.  It's not hearsay.  The truth of the matter is like the underlying fact, not the fact that the statement was made.  I mean, that's -- that's clearly not hearsay.

A person can say someone else said to me X, Y and Z if the X, Y and Z has independent relevance, and here it absolutely does.  The offer was made.  That was the statement

Boyd v. County of Erie, 22-CV-519                    136

that Mr. Boyd received, and that's the statement he responded to, and he delivered that response to ADA Drury.

THE COURT:  Hold on one second.

I think what you just said though, that it was a huge inducement, then really kind of necessitates the juror to consider the truth of the contents of what the ADA is saying. And so --

MR. DURLAND:  Your Honor, I think -- so hearsay would be he was saying that we were -- you know, I said to ADA Drury that we were in the bar that night.  We were -- the fact that you were in the bar that night, that's the truth of the matter asserted.  The fact that the statement was made to ADA Drury though, that's not hearsay.  That's just the fact that the statement was made.  A person can testify to the fact that a statement was made.

THE COURT:  Okay.

MR. DURLAND:  I mean, this is Darryl Boyd saying I made this statement to ADA Drury.

MR. BLENK:  This is Mark Hulnick telling Mr. Boyd what Mr. Drury told him and that being told is the significant event.  That's the -- it does go to the truth of the matter asserted, Your Honor.

THE COURT:  Just hold on one second.

Counsel, why don't you take your recess.  And I understand both positions.  I just want to go back and look

Boyd v. County of Erie, 22-CV-519                    137

at that portion of the transcript.  I just need to pull it up.  Okay?

MR. BLENK:  Your Honor, may I make one point on the apportionment?  This is not something we're putting at issue.  We're not saying that Mr. Boyd was -- that Mr. Boyd was himself fabricated.  We know what we're hearing from the Plaintiff, what they're trying to get to.  This is a prime fact that's unreliable based on being inadmissible that they are trying to get to the idea of Mr. Boyd's underlying innocence.  It's very clear.  There's no additional relevance other than all sorts of facts in the case.  This is -- there's no aspect of this that gets into something that's not otherwise manifest in the case.  His own statement, for example, denying his involvement, they do not need to get into this for the -- it would be our matter to get into it as an initial matter, in any event, to -- it's not -- this is their -- what they are designating in their case in chief.

MR. DURLAND:  Ten-second response to Mr. Blenk.

Judge, first, we are entitled to put in evidence on apportionment.  They don't get to call dibs on apportionment.  We can put in evidence, too.

Second, it's Mr. Boyd's belief in his own innocence.  It's not to innocence itself.  I mean, that was Your Honor's initial point, and I think it's absolutely correct.  Apportionment is an important point as well, but Mr. Boyd's

Boyd v. County of Erie, 22-CV-519                          138

own state of mind, that's not hearsay.  This is an expression

of his state of mind, his own --

        MR. BLENK:  In the exact same --

        MR. DURLAND:  Excuse me one second.  His own

consciousness of his innocence.

        MR. BLENK:  In the exact same transcript -- in the

exact same transcript that we're talking about Mr. Boyd

expresses his personal understanding of innocence on the same

day that he conveys this purported settlement conversation.

There's no reason they can't rely on it just coming from Mr.

Boyd.  Based our prior representations, we object to the idea

of innocence being an issue in the case.  But there's no

reason they have to turn to this to bolster his direct

testimony on that issue.

        THE COURT:  Okay.  I do understand your arguments.  So

why don't you just take a recess.  I will look into this and

I will let you know before we bring the jury back.

        MR. BLENK:  Thank you, Your Honor.

(Recess taken.)

        THE COURT:  The jurors are outside of the courtroom.

        I have the portion of the transcript in front of me.

So pages 455 to 457 of Mr. Boyd's deposition.  And this is

the portion that I'm going to allow:  Starting with 455, line

16 through 23.  So the bottom portion of that page.

        Moving on to page 456, I will allow lines 1 through 8.

Boyd v. County of Erie, 22-CV-519                    139

And then going to the next page, 457, I will allow lines 11 through 23.

As I said earlier, I'm going to allow this because it's not coming in for the truth of the matter, but for the effect on the listener, that is Mr. Boyd, that he believed that he was there to discuss an offer or a negotiation or potentially cooperating. And so the fact that -- whether he was there for an offer -- well, let me just say this: It's his perception or what he perceived he was there for that's relevant. But I did take out a portion of it regarding the I think five years.

I am going to read a limiting instruction to the jury, which I have already provided to counsel.

I know, Mr. Blenk, that you are arguing that this is cumulative. I do find that this evidence is relevant to Mr. Boyd's subjective belief that he was innocent. I am not aware of any evidence of him expressing this subjective belief back when the case was pending. So in that way I don't find that it's cumulative.

And, additionally, I'm not limiting Plaintiff to just having, you know, one instance where Mr. Boyd is saying that he believes he was innocent. And so I don't find that it's cumulative. And any potential prejudice I think is alleviated by not only the limiting instruction that I'm going to give the jury, but also the portions that I took

Boyd v. County of Erie, 22-CV-519                    140

out.

MR. BLENK:  Your Honor, I --

THE COURT:  I also find that it's not relevant to apportionment.  I find this evidence really is relevant to the subjective belief of Mr. Boyd that he was innocent.

Go ahead.

MR. BLENK:  Your Honor, we have a statement from Mr. Boyd to the police that Ms. Silos just published to the jury in which he said he didn't have anything to do with the crime.  He's expressed -- which is to say, Your Honor -- let me be very clear.

We have two instances in this transcript where Mr. -- at least two instances.  There's pages and pages, but in terms of the designation clearly on the nose he says I didn't do it.  Okay?  Your Honor has already admitted -- Your Honor has decided that's coming in.

Of course, in terms of the probativeness of the evidence that's going to be in front of the jury, isn't it going to be -- the fact that he said that again at deposition and through hearsay pieced together a conversation that he had in the context of a settlement negotiation is of very limited probative value compared to the fact that at the time when he was arrested he said he didn't have anything to do -- he didn't know anything about Mr. Crawford's murder.  That's -- he's already -- he did contemporaneously register

Boyd v. County of Erie, 22-CV-519                          141

his noninvolvement.

They don't need to make -- to seek leave in an extraordinary -- in a description that's all hearsay that's an extraordinary event that's conveyed by Mr. Boyd when the plain facts are he denied it at the time and he's denied it in deposition.  To add another reference to that in a very -- that comes in very prejudicially in the course of that deposition, Your Honor, I think that -- I fear that could even be reversible error.

MR. DURLAND:  Your Honor, I'd like to correct Mr. Blenk.  I believe you struck that portion that he's referring to from the deposition where he says squarely absolutely not I didn't do it, but -- is that not correct?  It looks to us as though that portion is stricken.

And, also, Mr. Blenk's reference to the statement, it's not in for the truth, and Your Honor is giving that direction.

So we've already had this debate.  Your Honor has ruled.  I think Your Honor ought to adhere to the ruling that you've made.  But Mr. Blenk can't reference the statement -- and the portion that Mr. Blenk was referring to I'm now confirming was stricken.  So this is not cumulative at all.

MR. BLENK:  But it was stricken I think, Your Honor, because -- if it were stricken at all, it was stricken because it spoke to his personal understanding of innocence.

Boyd v. County of Erie, 22-CV-519                    142

This is the problem we're running into, Your Honor.

THE COURT:  Okay.  Your exception is noted, Mr. Blenk.  My ruling remains.

I'm going to -- let's see.  I know I gave you these rulings on Mr. Boyd's deposition this morning.  I just wanted to bring up one other thing.

There was a ruling about his cancer, and I wanted the pancreatic reference to be redacted.  And so I just wanted to make sure you were aware of that because I don't know how you can redact that.  It looks like you are aware of that.

MR. HANFT:  We just cut around it.

THE COURT:  Okay.  That's fine.

MR. BLENK:  And, Your Honor, could we just suggest that this portion that they designated and that Your Honor struck at page 433, 6 through 8 expressing Mr. Boyd's subjective understanding of innocence at least be substituted in favor -- in lieu of this discussion of a proffer meeting in order to mitigate the -- mitigate the prejudice to the County?

MR. DURLAND:  Your Honor, we object to that.  Your Honor made the point correctly.  We're not limited to just like one time and the County gets to dictate to us what the one time is.  I mean, we're not going to do it too much.  There's obviously a limit that the Court can set, but, I mean, this is -- it's relevant evidence, it's probative

Boyd v. County of Erie, 22-CV-519                    143

evidence, and we're doing it the proper way, through Mr. Boyd, not through Dr. Drob.

THE COURT: Okay. The request to substitute is denied.

Okay. Is everyone ready for the -- to play the Boyd deposition designations?

MR. FIRSENBAUM: Your Honor, we are.

And this is something that we're just flagging as advance notice for Your Honor. We don't need to be heard right now, but I think it is relevant to Mr. Walker's testimony and then subsequent evidence throughout the week and just to sort of flag the issue.

As we think we understand Your Honor's rulings from this morning about Mr. Walker's testimony and from certain portions of Your Honor's opinion from Sunday, we would like to be heard on the issue of whether nondisclosure of the Brady evidence in Mr. Walker's criminal trial will be admitted in this case. We think it's relevant on at least two different issues. One is nondisclosure in Mr. Boyd's case and second is as to Monell. If Your Honor has drawn a line that is allowing certain evidence as to that issue and not to others, I think we'd like to understand the clarification. And if Your Honor is saying that none of it's admissible, we obviously want to note our exception to that on the record, but also to be heard in particular based on the doors that have already been opened as to what's been

Boyd v. County of Erie, 22-CV-519                144

disclosed and what the County claims is disclosed in Gibson.

So we're not really sure if there is an issue to be heard on or not because we'd seek clarification on Your Honor's ruling. And it is -- it's at least relevant to Mr. Walker's potential testimony. We may not get into it with him. It sounds like Your Honor doesn't want us to get into it with him, and I don't think we will. But that does raise sort of the bigger question for subsequent witnesses in the case.

And so we just wanted to let Your Honor know that we would like to be heard on that issue if there's an issue. And it doesn't need to be right now.

THE COURT: That's fine. I think if you don't think we need to address it this afternoon before Mr. Walker testifies, then we can do that tomorrow. If you want to submit something brief tonight, that's fine, and we can address it tomorrow morning.

MR. FIRSENBAUM: Thank you, Your Honor. That's fine. We just don't want there to be any form of waiver of the issue for appeal by not raising it before Mr. Walker's testimony, but we'll submit it for -- by motion tonight or we'll submit something tonight.

THE COURT: Okay. That's fine.

MR. FIRSENBAUM: Thank you.

One question about Mr. Boyd's video. Do we need to

Boyd v. County of Erie, 22-CV-519                    145

pause after --

MR. HANFT:  After the portions that Your Honor just admitted after argument should we pause the video there for Your Honor's limiting instruction?

THE COURT:  Yes.  That would be very helpful.

MR. FIRSENBAUM:  Okay.

THE COURT:  Okay.  All the monitors are okay, right?

THE CLERK:  They should be.

THE COURT:  Okay.  We can bring the jurors in then.

MS. SILOS:  Your Honor, before we bring the jurors back in, I have two additional exhibits that Plaintiff would like to offer into evidence.

THE COURT:  Okay.  Go ahead.

MS. SILOS:  There are two exhibits referenced in the excerpts of Darryl Boyd's deposition testimony which Your Honor -- portions of the deposition designations Your Honor has ruled admissible.  These exhibits are PX 248 and 249. Plaintiff intends to show these documents to the jury alongside testimony and offers them into evidence now.

THE COURT:  Okay.  The two photos that were used?

MS. SILOS:  Yes, Your Honor.

THE COURT:  Any objection?

MR. BLENK:  I'm pulling those up now, Your Honor.

Ms. Silos, was that 248 and 249?

MS. SILOS:  Yes.  PX 248 and 249.

Boyd v. County of Erie, 22-CV-519                    146

MR. BLENK:  We don't have any objection to the photos themselves, Your Honor, but we maintain our objection to offering any sort of -- any sort of alternative explanation or additional evidence about the logistics of the explanation for what occurred on January 2nd and rebuttal of the underlying trial record on that front, but to orient the jury to the places that are being discussed in the case, we have no objection.

THE COURT:  Okay.  Then those are received, 248 and 249.

(Plaintiff's Exhibits 248 and 249 received in evidence.)

THE COURT:  And, just to be clear, I allowed that portion of the designations as background information, but what you said, you know, alternative explanations of what happened is precluded.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  Okay.  Then we'll bring the jurors in.

MS. SILOS:  Apologies, Your Honor.  I do actually have one additional question about a specific portion of the Boyd designations for which Your Honor sustained the County's objection.  It's just one line.

Your Honor struck 452, line 9 to 453, line 5.  Stretching the sustained objection to 453, line 5 cuts off the first two words of a question and sort of creates a sentence that doesn't make sense.  I'm wondering if Your

Boyd v. County of Erie, 22-CV-519                    147

Honor meant to 453, 4, but I just wanted to get clarification on that because it does cut off in the middle of the sentence.

THE COURT:  I'm not going to allow any of that page, 453.  So that was an error on my part in the chart.  So 452, 9 -- because that was just about bail.  So 452, 9 through all of 453, and then into 454, 1 through 16 is precluded.

Does that clarify things for you, Ms. Silos?  I'm just looking at the designation.  It was 452, 3 to 455, 3.

MR. HANFT:  Yes, Your Honor.

May I confirm, Your Honor, we can begin at 454, 17 to 455, 3?  That's the designation from that section you are allowing in?

THE COURT:  Yes.

MR. HANFT:  Okay.

THE COURT:  That's when he starts talking about at the end of the trial he went to Elmira Correctional Facility.  So that's fine.

MS. SILOS:  Thank you, Your Honor.

THE COURT:  Thank you.

MS. MEANS:  Your Honor, may I just briefly be heard on the limiting instruction relative to the impact of cancer on credibility?

THE COURT:  Yes.

MS. MEANS:  We object just to the inclusion of the last

Boyd v. County of Erie, 22-CV-519                        148

sentence on the ground that it's redundant and also the reference to credibility is somewhat vague.  Frankly, I don't know what the apparent manifestation -- how the jury is to consider that in assessing Mr. Boyd's credibility.  I think that the premise is sufficiently covered by the first two sentences, which say that he may be experiencing symptoms that are apparent in his testimony, but to then conflate that with their ability to consider the manifestation for purposes of assessing Mr. Boyd's credibility I think is vague and I'm not sure what that means or how the jury is to interpret that.

THE COURT:  Well, I guess the instruction was requested because Mr. Boyd was grimacing during parts of the deposition, and Plaintiff wanted the jury to know that he was doing that because of his diagnosis and condition at the time.  And so that's why I included this instruction.  So as far as assessing his credibility, I guess really his demeanor during the deposition.  I can add Mr. Boyd's demeanor and credibility just to kind of clarify that we're really just talking about his demeanor and so they understand why he may have been acting the way he was during the deposition.

MS. MEANS:  Your Honor, our preference would be to strike credibility in favor of including demeanor for purposes of clarification because I do think that that's covered by he was undergoing treatment and experiencing

Boyd v. County of Erie, 22-CV-519                    149

symptoms in his deposition.

THE COURT:  Your exception is noted.  I'm just -- I'll keep it as demeanor and credibility just to clarify.

Okay.  Anything else?  Okay.  So what we'll do is we'll bring them in.  I will read those two limiting instructions, and then I'll read the other instruction regarding the parole officer at the time, and you can pause and I'll read that instruction.

Okay.  We'll bring the jury in.

(Jury present.)

THE COURT:  Please have a seat, everyone.

The jurors have returned to the courtroom.  Thank you very much for your patience.  There were a number of things that we needed to address outside of your presence, but we are going to resume with Plaintiff's case in chief.

I want to read you just a couple instructions before Plaintiff proceeds.

Members of the jury, you are about to hear excerpts of Mr. Boyd's deposition that was taken over the course of two days in January of 2019.  At that time Mr. Boyd had been diagnosed with cancer and he was undergoing treatment and experiencing symptoms therefrom.  As I mentioned to you earlier during my preliminary instructions, Mr. Boyd's cancer diagnosis is unrelated to his conviction and incarceration.  You may, however, consider the fact of Mr. Boyd's cancer

Boyd v. County of Erie, 22-CV-519                    150

diagnosis, that he was undergoing treatment and any apparent

manifestation of his associated symptoms for the limited

purpose of assessing Mr. Boyd's demeanor and credibility

during his deposition.

During Mr. Boyd's deposition you may hear him talk

about his belief in his own innocence of the homicide for

which he was convicted.  This trial is not about retrying Mr.

Boyd for that crime.  Whether Mr. Boyd was, in fact, guilty

or innocent of that crime is irrelevant.  The question we are

all here to address is whether Mr. Boyd had a fair trial.

That said, as I expect you will hear from Plaintiff's expert

Dr. Drob, Mr. Boyd's own belief in his innocence is relevant

for the limited purpose of assessing his damages.

Okay.  Thank you.  You may proceed.

MS. SILOS:  Plaintiff will be introducing video

excerpts from the deposition of Darryl Boyd.

(Video played.)

THE COURT:  Members of the jury, we're going to just

pause so I can give you a limiting instruction about the

evidence that you just heard.

You just heard evidence about what Mr. Boyd understood

to be a meeting about a possible plea offer.  You can

consider this evidence for the limited purpose of what Mr.

Boyd subjectively understood the meeting to be about and his

own subjective belief that he is innocent or was innocent of

Boyd v. County of Erie, 22-CV-519                    151

the homicide.  You may not consider this as any evidence that a plea offer was actually made to Mr. Boyd.

Remember, whether Mr. Boyd is, in fact, guilty or innocent of the crime is irrelevant.  The question we are here to address is whether Mr. Boyd had a fair trial.  Mr. Boyd's own subjective belief of his innocence is relevant to damages, which I expect will be testified to later by Plaintiff's expert Dr. Drob.

Thank you.  You can proceed.

(Video played.)

THE COURT:  Can we pause for a second, please?  Can counsel approach?

(Discussion held off the record.)

THE COURT:  If someone could just note the time for the record of where we're stopping right now.

MR. HANFT:  544, 17 is the line.

THE COURT:  Okay.  Thank you.

We're going to take our lunch recess now.  So if everyone could return to court at 1:30.  If you could please just make sure you go to the jury room, and we'll bring you out when we're ready.

All other recess admonishments apply.  Do not talk about the case with anyone.

Have a good lunch.  Thank you.

(Jury not present.)

Boyd v. County of Erie, 22-CV-519                    152

THE COURT:  Have a seat, everyone.

Is there anything that you need me to work on over lunch that we need to address for this afternoon?

MR. FIRSENBAUM:  Nothing, Your Honor.

THE COURT:  Okay.

MR. BLENK:  No, Your Honor.

THE COURT:  Okay.

MR. DURLAND:  Sorry.  One thing, Judge.

I do have -- for Mr. Walker's testimony I have a number of photographs I'm going to show him that are subsets of exhibits that are on our exhibit list.  So I've just made them into like A and B numbers.  And I have copies of them if Your Honor wanted to just flip through them.

The only thing that I think is perhaps of note is that there are -- like this photograph that will be 281(a), there have been redactions to remove -- it previously had the word "exoneration" on the shirt.  So I assumed that Your Honor would not permit that.  So those have been removed.

And my plan was to have Mr. Walker authenticate them, move them into evidence, and then if they were received then we would update the exhibit books with the exhibit that had been admitted.  Is that acceptable?

THE COURT:  Okay.  Yes.  That's fine.  You can just pass them up if you have a copy for me.

And I'm assuming, Mr. Blenk, you have a copy as well?

Boyd v. County of Erie, 22-CV-519                    153

MR. BLENK:  We've been provided a copy of the exhibits. Yes, Your Honor.

THE COURT:  Okay.  I'll take a look at them.  And then if there's nothing else, then we can take our lunch recess, and we'll resume at 1:30.

Okay.  Thanks, everyone.  Have a good lunch.

Yes.  Before you leave actually, can you just give Nicole the charts with my rulings?  Because I'm going to amend them and then file them on the docket since I made some changes to the charts.  So I think I gave everyone two copies of the charts.  So can you please just give them to Nicole? I'm going to modify them.  We'll give you new copies and then we're going to docket it.

Okay.  Thank you.

MR. BLENK:  Your Honor, would we be permitted to keep one of the copies?

THE COURT:  I can get you the modified copy right after lunch.

MR. BLENK:  I mean, one of the prior -- just a prior copy.

THE COURT:  Okay.

MR. BLENK:  Your Honor, we have to preserve any argument we have on the discussion of the --

THE COURT:  I mean, that's all preserved on the record. So if you want to keep a copy, I guess that's fine.  I don't

Boyd v. County of Erie, 22-CV-519          154

see why you need it.  I mean, everything is on the record.
I'm not going to docket that one.

MR. BLENK:  I understand.  If Your Honor would grant
the permission, we would keep one, but, if not, we'll give
them both back.

THE COURT:  Okay.  Sure.  You can keep it.  That's
fine.

MR. BLENK:  Thank you.

(Recess taken at 12:38 p.m.)

*          *          *

CERTIFICATE OF REPORTER

In accordance with 28, U.S.C., 753(b), I certify
that these original notes are a true and correct record of
proceedings in the United States District Court of the
Western District of New York before the Honorable Meredith A.
Vacca on November 4, 2025.


S/ Joony L. Odenbach

Joony L. Odenbach, RPR, CRR

Official Court Reporter