UNITED STATES     DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

_____

KATHLEEN WEPPNER, AS EXECUTOR OF THE

ESTATE OF DARRYL BOYD,

                    Plaintiff,

         -vs-

THE COUNTY OF ERIE,

                    Defendant.

Index No.
22-CV-0519-MAV

Vol. 3

Rochester, New York
November 5, 2025
9:32 a.m.

**JURY TRIAL (AM session)**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MEREDITH A. VACCA
UNITED STATES DISTRICT JUDGE

A p p e a r a n c e s

For Plaintiffs          WILMER CUTLER PICKERING HALE AND DORR,
                        LLP
                        By:  ROSS FIRSENBAUM, ESQ.
                             GIDEON HANFT, ESQ.
                             ERIN HUGHES, ESQ.
                             TRENA RILEY, ESQ.
                        7 World Trade Center
                        250 Greenwich Street
                        New York, NY 10007

                        LAW OFFICES OF JOEL B. RUDIN, PC
                        By:  JOEL B. RUDIN, ESQ.
                             DAVID E. RUDIN, ESQ.
                        152 West 57th Street
                        New York, New York 10019

                        HOOVER & DURLAND, LLP
                        By:  SPENCER DURLAND, ESQ.
                        561 Franklin Street
                        Buffalo, NY 14202

For Defendant:          LIPPES MATHIAS
                        By:  JAMES BLENK, ESQ.
                             KIRSTIE MEANS, ESQ.
                             THOMAS SOUTHARD, ESQ.
                        50 Fountain Plaza - Suite 1700
                        Buffalo, New York 14202

COURT REPORTER:         JOONY L. ODENBACH, RPR, CRR
                        joonyodenbach@gmail.com

267

INDEX


Tyrone Woodruff

      Cont. Cross-Examination by Mr. Blenk        276

      Redirect Examination by Ms. Hughes         313

      Recross-Examination by Mr. Blenk           330


Alan Hirsch

      Direct Examination by Mr. Hanft            332


EXHIBITS                                        ID    EVD

PX 45 - Redacted 1/16/76 PH transcript          --    299

PX 74 - Redacted Apr. 21-29, 1977 transcript    --    299

PX 214 - Portion of 4/6/10 Woodruff statement   --    325

PX 246 - Portion of 11/30/23 Cosgrove depo.     --    272

268

P R O C E E D I N G S

*    *    *

(Open court.)

THE COURT:  Good morning, everyone.  The parties are present.  The jurors are in the jury room.

I know you've been here for awhile.  I apologize for being late.  I just needed to finish the Henry deposition designations.  There were a lot.  But I finished them.

Nicole, did you provide -- okay.  So you should all have -- I gave two copies per party of the decision.

Just so you know, I did not include the designations where there wasn't an objection and there were no counter-designations.  So I would not just go off of that when you're creating the video.  So those ones aren't on the chart.  Okay?

I'll just say going through the Henry designations there were a lot of designations that were very short where it wasn't clear sometimes what document was being referenced. And so where it could have -- might otherwise be admissible, it wasn't -- it just wasn't clear.  So I just want to let you know that there were some instances of that.  There were some instances where it was clear, and I did go back to -- I would go back to, you know, read some of it before.  And I know some of the designations were all kind of connected together,

269

but it was just -- some of it was just unclear.

Okay. I want to address the Monell. I'm going to get you a decision as soon as I can on Monell evidence. I already told you that I expect the Monell decision to be really the same as before, but there were three cases for Monell evidence that are in the Henry deposition designations. Johnson, Ivey and Reese I think. Those were the three. And those three are all admissible as Monell evidence on Plaintiff's case.

I also wanted to just talk about Johnson. So Johnson was the one where the conviction was reversed in federal court on the habeas petition. I am going to allow evidence of the appellate division decision. Even though it affirmed the conviction, there was some dissent in there that talked about Mr. Ranni's summation. And so I do find that's relevant given the ultimate outcome of the case.

Is there any question about that at this point?

MR. JOEL RUDIN: Your Honor, with respect to the rulings about Mr. Henry's deposition designations, I just quickly reviewed the Court's rulings. I don't know if you're going to discuss them in more detail or if I can address a particular issue now.

THE COURT: When are you planning on presenting those?

MR. JOEL RUDIN: I think it won't be until the afternoon because we have Mr. Hirsch after Mr. Woodruff.

270

THE COURT:  Okay.

MR. JOEL RUDIN:  There's some fundamental issues that I really would like to address with the Court, if I may.  We can do it later.

THE COURT:  That's fine.  Let's do it later then.  But we'll do it before you present them.

MR. JOEL RUDIN:  All right.  We're also in the process of filing a memorandum -- oh, it is filed apparently on these issues.  So the Court will have that by that time.

THE COURT:  Okay.  So this morning I saw Professor Hirsch outside.  So we'll finish with Mr. Woodruff and then Professor Hirsch is after that.  Okay.

MR. HANFT:  Your Honor, could I inquire about a few points regarding Professor Hirsch?

THE COURT:  Sure.  Go ahead.

MR. HANFT:  The first point is we may wish to use with Professor Hirsch portions of the testimony of District Attorney Cosgrove.  Specifically, the portion to which the County filed a motion in limine, PX 246 at 157, 23 to 158, 6.  Your Honor may remember this is the "oh, yes, we did" quote.  We just wanted to know if it would be acceptable to move that into evidence.  We're not sure, but we may use that with Professor Hirsch.  And Your Honor ruled in our motion in limine that this was admissible for the purpose of the apportionment issue.

271

THE COURT:  Okay.  Do you have that specific portion handy right now?

MR. HANFT:  I can read the quote.  And it's just -- this is PX 246 at 157, 23 to 158, 6, omitting objections ending after yes, we did.

The question is:  As chief law enforcement of Erie County did you supervise the Buffalo Police Department with respect to how they interrogated witnesses?

Answer:  Oh, yes, we did.

THE COURT:  And what's your question?

MR. HANFT:  May we play that clip with Professor Hirsch?

THE COURT:  Okay.  But I already ruled on that.

MR. HANFT:  You already ruled it was admissible.  I just wanted to make sure since it hadn't been moved into evidence.

THE COURT:  Okay.  Yes, you can play it.  So what I would do is just make sure that you offer it first so we can officially receive it and then you can play it.

MR. HANFT:  And that's what I was trying to do now. Apologies if I was confusing.

THE COURT:  So it's PX 246.  And does that include just that portion or does it include the entire -- all of Cosgrove?

MR. HANFT:  PX 246 is all of Cosgrove.  We can make

272

246(a) just that portion, if Your Honor prefers.

THE COURT:  Okay.  That's fine.  Or we can even say 246 just that portion of the exhibit is received.

MR. HANFT:  Thank you, Your Honor.

(Above-mentioned portion of Plaintiff's Exhibit 246 received in evidence.)

MR. HANFT:  And we have one more question regarding Professor Hirsch.  At Mr. Walker's trial the County cross-examined Professor Hirsch regarding his expertise and whether juries in the past had disagreed with him, suggesting that his opinion had been rejected.  We believe that testimony would open the door to examining Mr. Hirsch about whether -- a recent trial in this district where he testified, was qualified as an expert and a jury sided with the party proffering him.  So if the County intends to pursue that cross, we believe that would open the door to that testimony.

THE COURT:  Are you planning on asking that type of question?

MR. BLENK:  That's Ms. Means.

THE COURT:  Ms. Means?

MS. MEANS:  Your Honor, in general terms, certainly, if Plaintiff's counsel is taking the position that that would open the door to Mr. Walker's trial, which I dispute that it would, we would not, but --

273

THE COURT:  I'll just say this:  I mean, I guess it depends on the question.  I mean, if there's -- it potentially could open the door, but I don't want to make a ruling on that now, unless there's a specific question that you are planning on asking him.  If there is, then you can approach and you can let me know and I can tell you.

Do you have any questions now that you plan on asking him that are about that?

MS. MEANS:  Not into any specific trial.  So I don't believe that redirect -- to get into the specifics of a trial in which his testimony was admitted, I think Plaintiff's counsel can make the point that his testimony has been accepted in trials without getting into the details of the trials it was accepted.  I don't -- I don't think that it opens the door to Walker's trial specifically.

THE COURT:  Well, okay.  I understand your position, but are you -- do you have questions right now that you expect to ask of the witness that are along those lines? Because if you would like, I can listen to them now and I can tell you whether I think that would open the door or not.

MS. MEANS:  Sure, Your Honor.  So the question would generally be, "Isn't it true that your testimony has been rejected in jury trials in the past?"

MR. HANFT:  Your Honor, we believe that would absolutely open the door to saying his jury trial was

274

accepted -- his testimony was accepted at a jury trial in the very recent past within the last six months.

MR. BLENK:  What Mr. Hirsch is testifying at those criminal trials and Ms. Means is going to be referencing, he's essentially always speaking to an ultimate issue, a dispositive issue in the case.  When we're -- when we would be talking about what happened in this trial, there is no necessary element of the -- of the jury accepting Mr. Hirsch's explanation one way or the other.  As we all know, the Plaintiff has multiple dozens of theories of liability.  And so there's nothing even implied in Mr. Walker's trial.

THE COURT:  Okay.  I'm sorry to interrupt, Mr. Blenk, but I'm not going to -- I don't find that that opens the door.  So if you ask that question, then I'm not -- I don't find that it opens the door.  I mean, I think it only opens the door to, of course, well, he's also testified in cases where the jury has found consistent with his testimony, but I don't think it opens the door to Mr. Walker's trial.

THE COURT:  Okay.

MR. HANFT:  Without referencing Mr. Walker's trial specifically, would we be able to say at a recent -- at any trial in the last year has a jury sided with -- agreed -- accepted your testimony and sided and reached a verdict on behalf of the party proffering you?

275

MR. BLENK:  That speculates on the jury's reasoning.

MR. HANFT:  Your Honor, he's saying that Mr. Hirsch -- any question would be speculating on the jury's reasoning. He's saying Mr. Hirsch testifies to ultimate issues in criminal trials.  Mr. Hirsch is never permitted to testify to ultimate issues.  He's an expert.  To suggest that just because Mr. Hirsch -- an interrogation was coercive and a jury found someone guilty, that doesn't mean that they rejected Mr. Hirsch's testimony.

THE COURT:  I mean, it goes both ways, right?  You know, it doesn't -- if that's your argument, it's speculative, then none of these questions are okay.  Then, you know what, I'm going to say you can't ask that question at all, and neither can you.

MR. HANFT:  Understood, Your Honor.

THE COURT:  Okay.  Is there anything else?  Okay.

MR. BLENK:  Your Honor, we mentioned the matter of the subpoenas.

THE COURT:  Yes.

MR. BLENK:  We have copies of subpoenas that we've shared with Plaintiff's counsel.

THE COURT:  I will take a look at these.  I know that Plaintiff wants to be heard on these.  And so I'm not going to sign them right now.  I really want to get the jury out here.  So we can address these during our recess.  Okay?

T. Woodruff - CX by Mr. Blenk    276

MR. BLENK:  Thank you, Your Honor.

THE COURT:  Okay.  We can bring the jurors in.

(Jury present.)

THE COURT:  Have a seat, everyone.  Thank you.

The jurors have returned to the courtroom.  I hope that you all had a good night.  Thank you again for your patience.

We're going to continue with Plaintiff's case in chief and the cross-examination of Mr. Woodruff.

We can bring Mr. Woodruff in.

(Mr. Woodruff present.)

THE COURT:  Good morning, Mr. Woodruff.  You can have a seat.

Mr. Woodruff, I just want to remind you that you are still under oath.

THE WITNESS:  Yes.

THE COURT:  Okay.  You can go ahead.

MR. BLENK:  Thank you, Your Honor.

CONT. CROSS-EXAMINATION

BY MR. BLENK:

Q.   Good morning, Mr. Woodruff.

A.   Good morning.

Q.   So at the end of the day yesterday we went over your 1985 statement to Mr. McLeod.  Do you recall that?

A.   Yes.

Q.   And in that statement you said that it was the

T. Woodruff - CX by Mr. Blenk                277

homicide police that forced you to give a statement implicating your friends, correct?

A.   Yes.

Q.   And in that statement you said that based on your understanding you had no reason to think that Mr. Drury was thinking anything other than that you were telling the truth?

A.   Yes.

Q.   When you gave that 1985 statement you implicated the homicide division.  Do you remember the officers that you specifically met with?

A.   No, not by name.

Q.   Did you ever have the occasion to look back through records to identify who you had met with?

A.   I didn't know their names.  No.

Q.   I'm -- so at that time these were -- well, tell me, were they uniformed police officers or were they detectives who wore --

A.   Detectives.

Q.   So they didn't have ordinary uniforms on on a day-to-day basis?

A.   No.

Q.   Did they have name tags?

A.   No.

Q.   Okay.  So you didn't know the people who you were talking to by name?

T. Woodruff - CX by Mr. Blenk                                    278

A.    They identified themselves as homicide police.

Q.    Okay.  So you knew they were homicide police?

A.    Yes.

MR. BLENK:  I would ask to bring up Plaintiff's Exhibit 32 in evidence.

BY MR. BLENK:

Q.    Mr. Woodruff, you'll see at the top of this document your name, correct?  Do you see that?

A.    Yes.

Q.    And next to that is your address.  They must have gotten that address from you, correct?

MS. HUGHES:  Objection, Your Honor.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  I can't say because they came to my house before I talked to them.

BY MR. BLENK:

Q.    Fair enough.  That date of birth though, that's your date of birth?

A.    Yes -- no, no, it's not.

Q.    That's not your date of birth?

A.    No, it's not.

Q.    What's your date of birth?

A.    6-27-58.

Q.    And you told us yesterday it's your signature at the

T. Woodruff - CX by Mr. Blenk                        279

bottom of that document?

A.   Yes.

Q.   So that document was generated in your presence?

MS. HUGHES:  Objection, Your Honor.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  I signed it.

BY MR. BLENK:

Q.   That document was presented to you and you signed it on January 12th, 1976?

A.   Yes.

Q.   And at the top of that document there are a list of individuals named Frank Deubell, Francis Manista and Leo Donovan.  Do you understand those to be employees, officers or personnel of the Buffalo Police Department?

A.   I don't remember.

Q.   When you -- when you provided this statement -- when you gave a statement to the police there were police officers in the room?

A.   Yes.

Q.   But as you sit here today you don't know who those police officers are?

A.   I don't remember their names.

Q.   Okay.  When I show you this document does that refresh your recollection that those were the officers that

T. Woodruff - CX by Mr. Blenk                    280

were in the room with you that day?

A.   I don't remember their names.

Q.   Okay.  And at the bottom of that document it's signed by a person named Francis Manista, correct?

A.   Yes.

Q.   Fair to say Mr. Manista was in the room with you?

A.   I know it was two police officers.

Q.   And were -- and what were they wearing?

A.   Plain clothes.

Q.   Okay.  Suits?

A.   I don't remember.  I know it was plain clothes.

Q.   How many rooms were you in at the Buffalo Police Department?

A.   I don't quite remember.

Q.   I'm going to show you what's been marked as Plaintiff's Exhibit 33 in evidence.  Do you recognize this document, Mr. Woodruff?

A.   Yes.

Q.   In fact, you went over this document before appearing for your testimony yesterday in the presence of the Plaintiff's attorneys?

A.   Yes.

Q.   Do you see this document says that a Sergeant Hunter and a Detective Robert F. Arnet went to 494 Best Street to pick you up and they took you to the police station for

further investigation?

A.    Yes.

Q.    And it says that you were escorted to room 328 of the homicide bureau?

A.    Yes.

Q.    So that lines up with your otherwise -- your account of what happened that day, right?  Officers picked you up and they brought you there to a room at the Buffalo Police Department?

A.    Yes.

Q.    In the homicide bureau?

A.    Yes.

Q.    Okay.  Does this refresh your recollection that the officers who were working with you that day were Robert F. Arnet and Sergeant Hunter?

A.    I do not remember their names.

Q.    Fair enough.  On this same document, Mr. Woodruff, it says at the top that it was -- there's a to and a from.  Do you see that?

A.    No.  I don't know what you're talking about.  First paragraph, second, what?

Q.    No.  At the --

A.    To and a from.  Okay.

Q.    The top in those boxes.

A.    Yes.

T. Woodruff - CX by Mr. Blenk                    282

Q.    Do you see that?  From Sergeant James Hunter and from Robert F. Arnet, correct?

A.    Correct.

Q.    And who is it to?

A.    Leo Donovan.

Q.    And do you have any reason to doubt -- strike that.

In preparation for this case have you found any reason to doubt that the person who was in this room with you at that time who picked you up from your house, that those people were Mr. Hunter and Mr. Arnet?

A.    That's what it say on the paper, but I do not remember their names.

Q.    And if you'd listen to my question carefully.

You also have no reason to think that it was not those individuals who did so?

A.    That's what I see on the paper.

Q.    I'm asking you if you've discovered or thought of any reason why it wouldn't be those individuals.

A.    No.

Q.    Thank you.

MS. HUGHES:  I object.

THE COURT:  Are you objecting?

MS. HUGHES:  Sorry, Your Honor.

THE COURT:  Withdrawn?

MS. HUGHES:  Yes, withdrawn.

T. Woodruff - CX by Mr. Blenk                 283

THE COURT:  Okay.

BY MR. BLENK:

Q.    Now, I'd ask you the same thing.

MR. BLENK:  Your Honor, at this time I would move into evidence as a business record and as an ancient documents exception the logistical aspects of PX 33 as an exception to the hearsay rule.

THE COURT:  Can counsel approach, please?

(At bench:)

THE COURT:  So you want PX 33 to come in for the truth of its contents?  Is that what you're saying?

MR. BLENK:  I'm not asking necessarily for the entire document, Your Honor.  All I'm trying to get into is that there are these records being generated and that they reflect that people are moving in space, who is where at what time.  Aside from the fact of Mr. Woodruff saying -- aside from that, which is -- these documents have been shown to the parties consistently.  In some instances the Plaintiff is using them suggesting the truth of the matter asserted to move their witnesses through.  All I'm doing -- this is not opening up an argument about the underlying truth or a part -- lack of truth of the evidence that was generated, but it goes to the logistics of the generation of the evidence, which is relevant to the fabrication claim.

THE COURT:  Okay.  Because it's already received.  So

T. Woodruff - CX by Mr. Blenk                284

is there -- so you want it received for a different purpose? I guess I'm just not really clear about what you're --

MR. BLENK:  I want the logistical components of these documents, those reflecting who is in the room at a given time, who is picking him up, classic business records, not getting into a double hearsay issue.  I want those to come in for the truth of the matter asserted.  For example, the highlighted portion.

THE COURT:  Okay.  So you want some of this to come in for the truth of the matter?

MR. BLENK:  Yes.  And not to open up issues that aren't in the case.

THE COURT:  Okay.

MR. BLENK:  To just talk about who was with Mr. Woodruff at a given point.

MR. HANFT:  Your Honor, this is a business record. There is no foundation as to any of the business records kept in the regular course and generated.  We don't have testimony of either of these defendants doing that.

And then on ancient records, there are cases saying that where there's a motive to fabricate, the ancient records document doesn't apply.

MR. BLENK:  And we would understand that could be applicable to accessing inculpatory evidence, but we're not trying to get the inculpatory evidence.

T. Woodruff - CX by Mr. Blenk                    285

THE COURT:  I understand.

Will you stipulate that Sergeant Hunter and -- I mean, I get that this witness doesn't remember the names, but are you going to be -- would you stipulate that these were the two detectives that signed this report?

MR. FIRSENBAUM:  Your Honor, I think we would reach a more global stipulation as to -- if they want to do that, then we want a reciprocal stipulation that Drury was in the room in all of the reports that say that Drury was in the room.  We would be willing to do that.

THE COURT:  Okay.  Well, then why don't you -- I mean, I understand this would be relevant to your apportionment defense, right?  So I think that I'm going to reserve on that.  And I think you should confer and see if you can come to an agreement where you can -- you know, you can agree that -- because I'm assuming that this applies to other reports, too.  Not just this one that you're seeking, this --

MR. BLENK:  Yeah, but it wouldn't be -- it wouldn't be that many, but yeah.

THE COURT:  Okay.  So see if you can come to an agreement.  If not, then we'll address it.  But I'll reserve.

Do you need a ruling right now for this cross-examination?

MR. BLENK:  I don't think I need a ruling, but I anticipate that I would have to go through documents and ask

him to confirm that he has no reason to doubt the --

THE COURT:  That's fine.  You can ask those questions.

MR. BLENK:  Okay.

THE COURT:  Those are fair questions.

MR. BLENK:  Okay.  Thank you, Your Honor.

THE COURT:  Thank you.

(Open court:)

BY MR. BLENK:

Q.  Thank you for your patience, Mr. Woodruff.  I'm going to go back to Plaintiff's Exhibit 32.

Now, Mr. Woodruff, I'm just going to ask you the same question I asked you about the other document.  We went through the names at the top of this document:  Leo Donovan, Francis Deubell -- Frank Deubell and Francis Manista.  In the course of being involved in this case or in the course of preparing for your testimony today did you ever come to find any reason to doubt that those were the individuals who were present with you on January 2nd, 1976?

A.  It was two police officers.

Q.  Okay.

A.  That's what I remember.

Q.  Okay.  So there was two police officers.  So there may have only been two officers there, but amongst those do you have any reason to doubt that it wouldn't include that universe of individuals; in other words, that those

T. Woodruff - CX by Mr. Blenk                287

individuals weren't consisting of two of the combination of Mr. Deubell, Mr. Manista and Mr. Donovan?

A.    I don't remember their names.  I know it was two of them.

Q.    I understand that.  What I'm trying to ask you is whether you have any reason to doubt that those two individuals that you're describing are the two individuals -- are two of the three individuals who are identified on this document.

MS. HUGHES:  Objection, Your Honor.  Asked and answered.

THE COURT:  Overruled.

You can answer the question, Mr. Woodruff.

THE WITNESS:  That's what's -- that's the names on the paper, but I don't -- I can't say for sure if that was them.

BY MR. BLENK:

Q.    Absolutely fair.  You can't be sure at this time, but you have no reason to doubt those names?

A.    I know it was two police officers.

Q.    And you have no information that would suggest that it was -- that those two police officers were anybody other than those names that are appearing on that document?

A.    That's the names on the paper.  I don't remember their names, but I know it was two detectives.

Q.    Understood.  And you don't know any other names that

T. Woodruff - CX by Mr. Blenk                    288

it could be as you sit here today?

A.   No.

Q.   Thank you.  Now, I'm going to show you Exhibit 31. This is in evidence.  This can be published.  It's Plaintiff's 31, for clarification.

Now, Mr. Woodruff, I'm going to ask you the same thing about this document.  Okay?  This is -- this is the account of there being an anonymous phone call while you were in the room.  Do you see this on that document?

A.   Yes.

Q.   And do you see who the author of that document is, who it is from?

A.   Yes.

Q.   And do you see the second to last paragraph where it says, Detective Manista appraised Chief Donovan what had taken place and Detective Deubell was also told about the phone call and the statement that Woodruff, yourself, made to Detectives Arnet and Manista?  Do you see that?

A.   Yes.

Q.   Do you have any reason to doubt the identity of those individuals that are described in this document as the ones that were involved with you on that day, January 12th, 1976?

A.   That's the names that appear, but I do not remember their names.

Q.   Yeah.  I know.  You can't confirm that those are the people, but you have no reason to think that there's a different name that was involved with you that day?

A.   I don't remember the names of the police officers.

Q.   Right.  So you wouldn't know the names of any other police officers, but you have no reason to doubt the names that are on this sheet?

A.   That's the name that's on there.  Yes.

Q.   Thank you.  I'm going to show you Plaintiff's Exhibit 46 that's in evidence.  I appreciate your patience here, Mr. Woodruff.

Same thing with this document.  Can you read to me who it's from?

A.   Delano.  Paul R. Delano, Delano.

Q.   And Michael Guadagno?

A.   Yeah.

Q.   Do you have any reason to doubt that those are the individuals who were with you from the Buffalo Police Department on February 11, 1976?

A.   I do not remember their names, but that's what's on the paper.

Q.   And you have no reason to think it was anybody else?

A.   That's the names that is on the paper.

Q.   Okay.  It's never come to your attention that it could be some other person, correct?

T. Woodruff - CX by Mr. Blenk                    290

A.    That's the names that's on the paper.  I don't remember their names at the time.

Q.    Understood.  And then I'm going to show you Plaintiff's Exhibit 47.  Mr. Woodruff, do you see that this was from Mr. -- or Detective Michael Guadagno?

A.    Yes.

Q.    And the date of the document is February 11, 1976?

A.    Yes.

Q.    Do you have any reason to doubt that it was Michael Guadagno who engaged in the events that are described in this document and who drafted this document?

A.    That's what's on the paper.

Q.    And you have no reason to think that it would be anybody different?

A.    I don't remember their names.

Q.    Understood.  I'm going to show you what's been marked as Plaintiff's 27.  Plaintiff's 27 is in evidence.

Thank you, Ms. Popp.

Again, Mr. Woodruff, the date of this document -- this is a statement that is dated January 11th, 1976.  Do you see that?

A.    Yes.

Q.    And this is the -- this is the statement in which you initially deny involvement or knowledge of the murder of Mr. Crawford, correct?

T. Woodruff - CX by Mr. Blenk     291

A.   Yes.

Q.   And on this document your date of birth is correct?

A.   Correct.

Q.   And that information must have come from you, correct?

A.   It could have, yes.

Q.   Fair enough.  Maybe it came from somewhere else. And then you see Detective Montondo and Sergeant Hunter mentioned there?

A.   Yes.

Q.   And I'd ask you to turn to the final page.  And do you see a signature there?

A.   Yes.

Q.   Robert Arnet?

A.   Yes.

Q.   Now, do you have any reason to doubt -- and, now, it's your testimony that these individuals were actually -- strike that -- that your January 11th, 1976 statement was actually generated on January 12th?

A.   Repeat that.

Q.   Was it your testimony that your January 11th, 1976 statement was actually generated on January 12th, 1976?

     MS. HUGHES:  Objection.

BY MR. BLENK:

Q.   That you signed two statements in a single day?

T. Woodruff - CX by Mr. Blenk                    292

THE COURT:  Hold on one second.

Overruled.

THE WITNESS:  My signature is on there.

BY MR. BLENK:

Q.    I'm just talking about -- trying to understand what your testimony was, Mr. Woodruff, about how the documents were generated.

The documents, you agree with me, have two different dates on them, correct?

A.    Yes.

Q.    And your testimony on direct with Ms. Hughes was that those documents were actually generated on the same day?

A.    I remember one day.

Q.    Okay.  So at least it's your recollection that they were generated on the same day?

A.    I remember one day.

Q.    Okay.  And do you -- have you ever had any reason to doubt that based on this document that -- whether it was on one day, whether it was on two days, but that Mr. Arnet, Mr. Montondo and Mr. Hunter were the officers that were involved in your providing this first statement, PX 27?

A.    I remember it being two officers.  I remember one day.

Q.    And do you remember two statements or one statement?

A.    I remember one statement.

T. Woodruff - CX by Mr. Blenk                    293

Q.    Okay.  But your signature appears on both statements?

A.    Correct.

MR. BLENK:  Your Honor, I would just make the same motion on those documents.  I understand that Your Honor will likely reserve.

THE COURT:  I'm going to reserve on that.

BY MR. BLENK:

Q.    Now, Mr. Woodruff, we just looked at the documents, but the documents were only the start of the process involving the prosecutions at issue here.  You agree with me on that?

A.    Yes.

Q.    So then you first gave the documents to police.  And those were sworn documents, right?

A.    Right.

Q.    And then including a document -- two documents that we've looked at that you've confirmed your signature on.  And they are in conflict with each other, correct?

A.    In conflict?

Q.    In conflict in the sense that in the first statement you said that you didn't know anything about Mr. Crawford's death and then in the second statement you said that you did, correct?

A.    Correct.

Q.    And both of those were sworn statements?

T. Woodruff - CX by Mr. Blenk                              294

A.   Yes.

Q.   And then you started giving -- you give a series of testimony at different stages in the cases, including the prosecution of Mr. Darryl Boyd, correct?

A.   Correct.

Q.   Do you recall that your first testimony was provided at the preliminary hearing?

A.   Yes.

Q.   And you recall that at that preliminary hearing you gave sworn testimony about the murder of Mr. Crawford?

A.   Correct.

Q.   And in that preliminary hearing you received -- you were granted immunity by the Court?

A.   Yes.

Q.   And at the time that you were granted immunity you had an attorney?

A.   Yes.

Q.   And what was the attorney's name?

A.   John Spadafora.

Q.   And Mr. Spadafora continued representing you in the course of your participation in this case?

A.   Not really.

Q.   Not really.  You never saw Mr. Spadafora again?

A.   I seen him here and there.

MR. BLENK:  At this time, Your Honor, I would move into

T. Woodruff - CX by Mr. Blenk                 295

evidence the record of the preliminary hearing, which is PX

45, Your Honor.

        THE COURT:  Ms. Hughes?

        MS. HUGHES:  Your Honor, may we approach?

        THE COURT:  Sure.

(At bench:)

        MS. HUGHES:  I would like to know what this document is

being offered for.  We'd like to know the purpose that PX 45

is being offered, that the County is offering PX 45 for.

        MR. BLENK:  Yeah.  It's coming in as a public record

for evidence of the matters discussed at the proceedings at

that event, not to the truth of the matter.  It's coming in

for what happened at the proceedings.

        THE COURT:  Okay.  Are you seeking to have the entire

transcript admitted?

        MR. BLENK:  Yes.  There's -- and we would agree to the

Plaintiff's proposed transactions.

        THE COURT:  Redactions?

        MR. BLENK:  Redactions, yeah.

        MR. FIRSENBAUM:  We just wanted to confirm that the

redactions are in what you're offering.

        MR. BLENK:  Yes.

        THE COURT:  Okay.  So any objection to that?

        MS. HUGHES:  No, Your Honor.

        MR. BLENK:  And then if -- I'm going to offer Mr. --

T. Woodruff - CX by Mr. Blenk                    296

I'm going to offer Mr. Woodruff's testimony and subsequent sworn testimony. I'm happy to put it in if -- I don't think you -- so at least Mr. Boyd's transcript, Mr. Woodruff we would put in.

And then Mr. Gibson's, that's subject to the Court's -- I think the Court -- I think that's still an open question with the Court, but we would at least move in the portion that applies to Mr. Woodruff at this time.

MR. FIRSENBAUM: Yeah. I mean, we proposed redacted transcripts of all four trials. We don't have an objection to admission of the versions that we proposed.

MR. BLENK: Right. It's just that if we put in Gibson all together you have an idea of how it should be read. We have a couple minor exceptions that are in front of the Court right now. I think generally it's just a few clumps. But right now my only concern is getting in Mr. Woodruff's because he's -- well, I suppose that I could just -- well, I'll need to show him -- there's a chance I'll need to show him -- I will need to show him his Boyd testimony, the testimony from the trial of Mr. Boyd.

THE COURT: Okay. So I'm going to receive the transcript from the preliminary hearing with the redactions. And so that's PX 45.

MR. BLENK: Right.

THE COURT: Looking ahead, are you offering now the

T. Woodruff - CX by Mr. Blenk                    297

transcript from Mr. Boyd's trial for Mr. Woodruff's testimony?

MR. BLENK:  Yes.

THE COURT:  What is that?

MR. SOUTHARD:  74.

MR. FIRSENBAUM:  PX?

MR. SOUTHARD:  Yes.

MR. FIRSENBAUM:  As long as they are offering the PX version with the redactions, then no objection.

MR. BLENK:  We're not -- do we -- I don't think we've -- we're signing off on the balance of the redactions. I'm just asking about Mr. Woodruff.  And we're not going to show Mr. Woodruff's --

MR. FIRSENBAUM:  Understood that you're only offering Woodruff's portion, but I think for now if you don't want our objection, then it's our version of Woodruff.  So whatever redactions are in Woodruff's testimony.

MR. BLENK:  Your version of Woodruff?

MR. FIRSENBAUM:  Correct.

MR. BLENK:  But not foreclosing argument outside of the scope of Woodruff.

MR. FIRSENBAUM:  Correct.

THE COURT:  Okay.  So then I will receive PX 74 with the redactions, but only with respect to Woodruff's testimony, and that's for Mr. Boyd's criminal trial.

T. Woodruff - CX by Mr. Blenk                    298

MR. BLENK:  Thank you.

THE COURT:  Okay.

MR. HANFT:  Your Honor read an instruction when transcripts were admitted at the previous trial.  Will you be reading the same instruction at this trial?

THE COURT:  Yes.  I just have to get it.  Okay.  So give me a minute.

MR. HANFT:  Thank you.

THE COURT:  Thank you.

MR. BLENK:  Thank you, Your Honor.

(Open court:)

THE COURT:  You can proceed, Mr. Blenk.

MR. BLENK:  Thank you, Your Honor.

BY MR. BLENK:

Q.    Thank you for your patience, Mr. Woodruff.

After giving testimony at the preliminary hearing you proceeded to give testimony at the trial of Darryn Gibson, correct?

A.    Correct.

Q.    And you also testified before the grand jury.  I skipped a step.  You testified before the grand jury as well, correct?

A.    Correct.

Q.    And that was under oath?

A.    Yes.

T. Woodruff - CX by Mr. Blenk          299

Q.   And your testimony in Mr. Gibson's trial was under oath?

A.   Yes.

Q.   And then you testified at Mr. Boyd's trial?

A.   Yes.

Q.   I'm going to show you what's now in evidence as PX 78 in evidence insofar as the portion of Mr. Woodruff's testimony.

THE COURT:  Are you talking about -- I've only received 74, not 78 at this point.  Are you offering 78?

MR. BLENK:  I'm sorry.  It's 74.

THE COURT:  Okay.  And, just so the record is clear and so my court clerk is also clear, PX 45 is received with redactions, and PX 74 is received with redactions with respect to Mr. Woodruff's testimony only.

*(People's Exhibits 45 and 74, with redactions, received in evidence.)*

MR. BLENK:  Thank you, Your Honor.

BY MR. BLENK:

Q.   Now, Mr. Woodruff, do you recall testifying in the trial of Mr. Boyd that your lawyer was present with you that day?

A.   Yes.

Q.   And was that true?

A.   When you say "present," what do you -- in the

T. Woodruff - CX by Mr. Blenk                 300

courtroom?

Q.   Yes.

A.   He might have been, yeah.

Q.   And when you're giving that testimony there is the prosecution there, right?

A.   Yes.

Q.   And then the defense attorneys are there as well?

A.   Yes.

Q.   And so if you -- if it wasn't the fact that your attorney was there, it's likely that one of the attorneys would have noticed, correct?

MS. HUGHES:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I guess I don't know.

BY MR. BLENK:

Q.   Mr. Spadafora was in the courtroom?

A.   He might have been.  I don't remember.  He might have been.

Q.   Would you have told -- would you have told the prosecutor that Mr. Spadafora was in the room if he wasn't?

A.   Would I have told him?  No, I probably wouldn't have.

Q.   You knew at that time what Mr. Spadafora looked like?

A.   Yes.

T. Woodruff - CX by Mr. Blenk                301

Q.   You met him?

A.   Yes.

Q.   And you confirmed in Mr. Boyd's trial that Mr. Spadafora was with you that day?

A.   He probably was, yeah.  I don't quite remember.

Q.   And do you recall at Mr. Boyd's trial you were shown a copy of your January 11th statement and your January 12th statement?

A.   I don't remember if I was shown that.

Q.   Okay.  Before -- before coming here today you had the opportunity to look through your transcript -- the transcript of testimony that you gave at Mr. Boyd's trial?

A.   Yes.

Q.   And that's something that you reviewed in consultation with the Plaintiff's attorneys?

A.   Correct.

Q.   And so you saw what you testified to?

A.   Yes.

Q.   But it doesn't -- it doesn't -- you don't recall when you were going through that that you were discussing your January 11th -- or that you were shown a copy of your January 11th and January 12th statements during your testimony in Mr. Boyd's trial?

A.   I don't remember if I was shown it then.

Q.   Okay.  So this is in evidence as exhibit --

T. Woodruff - CX by Mr. Blenk                302

Plaintiff's 74.

Now, Mr. Woodruff, you've had the opportunity to look at this.  Do you see Mr. Hulnick's name?  Do you remember who Mr. Hulnick is?

A.   No, I don't.

Q.   Do you recall that Mr. Boyd was represented by an attorney at his trial?

A.   Yes.

Q.   I'm going to represent to you that Mr. Hulnick was Mr. Boyd's attorney.  Fair?

A.   Okay.

Q.   Okay.  And you see he's asking you questions about your January 11th statement?

A.   Yes.

Q.   And at that time you told him that that was not -- that your statement on January 11th wasn't accurate?

A.   I don't -- that's what the statement -- if that's what the paper says.  I don't --

Q.   Certainly, in Mr. Boyd's trial your testimony was not consistent with your January 11th statement?

A.   Correct.

Q.   And in your testimony at Mr. Boyd's trial you testified that on January 2nd, 1976 you went to meet with Mr. Walker at his house earlier in the day?

A.   Is that on here?

T. Woodruff - CX by Mr. Blenk                303

Q.   You didn't see this in your preparation?

A.   That I went to meet with Mr. Walker?

Q.   Right.

A.   I don't see that on this statement.

Q.   Well, I'm asking you about your testimony generally. Do you recall testifying at that trial in the course -- strike that.

In the course of preparation you looked at this transcript, right?

A.   Yes.

Q.   And you saw that testimony that you gave at Mr. Boyd's trial?

A.   Yes.

Q.   And that included you describing what happened on -- that included you describing in that transcript what happened on January -- according to that transcript, what happened on January 2nd, 1976?

A.   Yes.

Q.   Okay.  And you testified that you met up with John Walker earlier that day?

A.   Yes.

Q.   At his house?

A.   I don't know if I said at his house.  I don't remember meeting up at his house.

Q.   Okay.  And then you and John Walker proceeded by cab

T. Woodruff - CX by Mr. Blenk                304

to the Glenny Park apartments?

A.   No.   We came home in a cab.

Q.   Okay.   Do you see, Mr. Woodruff, that you testified at that trial that you and Mr. Walker arrived at the Glenny Drive apartments by cab?

A.   Yes.

Q.   And that once you were there you went to Floyd Martin's house at 138 Glenny Drive?

A.   Yes.

Q.   And you met up with Mr. Martin and Mr. Gibson there?

A.   Yes.

Q.   And you testified that when you met up with Mr. Gibson he said he wanted to find Darryl Boyd and go find some money?

A.   That's what it says.

Q.   Go get some money?   I'm just asking you to confirm.

A.   That's what it says.

Q.   I know.   That's what you testified that day?

A.   Yes.

Q.   Thank you.   And then you testified that that group found Mr. Boyd at Andre Hough's house, correct?

A.   Yes.

Q.   And then the group of you, Mr. Boyd, Mr. Gibson, Mr. Martin and Mr. Walker, according to your testimony, they agreed that they were going to go get some money?

A.    Yes.

Q.    And Andre Hough was present in the apartment at that time?

A.    That's what it says.

Q.    But he didn't go with, according to your testimony?

A.    Yes.

Q.    And you testified that yourself, Mr. Gibson, Mr. Martin, Mr. Walker and Mr. Boyd started walking down Fillmore Avenue?

A.    Yes.

Q.    And can you describe to the jury that -- how far is Fillmore Avenue from the Glenny park apartments -- excuse me -- from the Glenny Drive apartments?

A.    Maybe a half a block.

Q.    And the Glenny Drive apartments consisted of multiple buildings?

A.    Yes.

Q.    In a circle?

A.    Yes.

Q.    And each had an individual address, correct?

A.    Yes.

Q.    So there would be apartments that have letters and numbers within the building, but then there is an address reflecting the actual individual buildings, correct?

A.    Yes.

T. Woodruff - CX by Mr. Blenk                    306

Q.   You testified at Mr. Boyd's trial that when -- that Mr. Gibson found a pipe, picked it up and put it in his sleeve?

A.   Yes.

Q.   And you testified that Mr. Boyd and Mr. Gibson went into the Golden Nugget while you, Mr. Martin, Mr. Walker waited outside near Simpson's store?

A.   That's what it says.

Q.   That's what you testified to?

A.   That's what it says.

Q.   I understand -- I understand that you've recanted. I understand. I'm just trying to get -- I'm trying to get -- so the jury understands what the scope of the actual testimony was at trial. I understand you are not adopting that position by testifying today. I understand that completely.

And you testified that Mr. Boyd and Mr. Gibson came out of the Golden Nugget and reported back to you that there was a man inside the Golden Nugget with money?

A.   Yes.

Q.   And then you testified that yourself, Mr. Gibson, Mr. Martin, Mr. Walker and Mr. Boyd waited for that man to come out?

A.   Yes.

Q.   And you testified that Mr. Gibson -- the man was confronted by your group and that Mr. Gibson struck the man

T. Woodruff - CX by Mr. Blenk                    307

with a pipe?

A.   Yes.  That's what it says.

Q.   And you testified that -- you testified that that man was Mr. Crawford?

A.   Yes.

Q.   And you testified that someone in your group took Mr. Crawford's wallet?

A.   Yes.

Q.   And you testified that after Mr. Crawford was hit in the head with a pipe and his wallet was stolen that the group returned to the Glenny Drive apartments?

A.   That's what it says.

Q.   And did you testify that after arriving at the Glenny Drive apartments that the group went up to the top floor to split up the money?

A.   That's what it says.

Q.   And you testified that you received less money than you thought you deserved?

A.   That's what it says.

Q.   That's what you testified to that day?

A.   That's what it says, yes.

Q.   At Mr. Boyd's trial.  And you testified that Mr. Gibson told you that you didn't get -- you got less money because you didn't do anything; is that correct?

A.   If that's what it says.

Q.    In fact, it was your testimony that you were a mere lookout for the group during the crime?

A.    That's what it says.

Q.    And you testified that after the money was split up yourself, Mr. Gibson, Mr. Martin, Mr. Walker and Mr. Boyd then went to Mr. Martin's brother's girlfriend's house?

A.    That's what it says.

Q.    And you testified that you took a cab home that evening?

A.    Yes.

Q.    And you testified in Mr. Boyd's trial that your pastor and your father were present for your January 12th statement?

A.    They came and picked me up.

Q.    Your testimony at Mr. Boyd's trial stated that your pastor and your father were there on January 12th, 1976 with you in the police department?

A.    They came and picked me up.  That's what I remember.

Q.    I understand that's your memory.  I'm asking you about your testimony at trial.

A.    That's what it says, but they wasn't there.

Q.    It wasn't true at that time?

A.    Excuse me?

Q.    That wasn't true at the time?

A.    They wasn't there.  They picked me up.  They wasn't

T. Woodruff - CX by Mr. Blenk                309

in there with me.

Q.   Okay.  And you testified at your trial that you told half the truth when you gave your statement on January 12th, 1976, correct?

A.   Correct.

Q.   And you testified at that time that your parents hired a lawyer for you in connection with this case?

A.   I guess they hired a lawyer.  I'm not sure.

Q.   But that's what you testified to in Mr. Boyd's trial?

A.   Okay.  If that's what it says, yes.

Q.   And you -- we already went through it, that Mr. Spadafora represented you at the preliminary hearing, correct?

A.   Correct.

Q.   And you confirmed that Mr. Spadafora -- at least at Mr. Boyd's trial you confirmed that Mr. Spadafora explained immunity to you?

A.   Yes.

Q.   And you faced cross-examination from Mr. Hulnick, right?

A.   Yes.

Q.   Mr. Hulnick tried to get you to disavow your story, tried to get you to recant, right?

A.   Yes.

T. Woodruff - CX by Mr. Blenk    310

Q.    He asked you about your testimony at the January 16th preliminary hearing?

A.    If it's on there.

Q.    We can show you.  Do you see here at the bottom of this page Mr. Hulnick is asking you questions about your preliminary hearing?

A.    Yes, yes.

Q.    Mr. Hulnick, in fact, was present for your -- the preliminary hearing, right?

A.    Yes.

Q.    So Mr. Hulnick saw how you testified there and he heard the testimony that you provided at Mr. Boyd's trial?

A.    Yes.

Q.    And he asked you about inconsistencies, didn't he?

A.    I guess.

Q.    He asked you about details that had been left out of your earlier statements?

A.    I guess.  If it's -- if I don't see it, I don't remember.

Q.    Sure.  We could show you.  Page 87.  So here he's confronting you about the idea that Mr. Boyd and Mr. Gibson had gone into the Golden Nugget?

A.    What paragraph is that?

Q.    Do you see the line numbering at the side?

A.    Yes.

T. Woodruff - CX by Mr. Blenk                    311

Q.   Looking roughly at line 10, line 7 to line 17.

A.   I see it.

Q.   Mr. Hulnick was asking you about inconsistencies in your statements?

A.   Yes.

Q.   He was asking you about inconsistencies between prior statements that you had given and the testimony that you were providing in that venue in Mr. Boyd's trial?

A.   Yes.

Q.   And you gave explanations, right?

A.   Yes.

Q.   In fact, you testified that certain details were left out of your earlier version of the events because you thought that adding those additional details would make it worse for everyone?

A.   I don't know why or -- I don't see it.

Q.   Okay.  Page 152.  Go down to line 17, please, and after.  So here you confirm that you lied on the 12th?  That came out in Mr. Boyd's trial, right?

A.   That's what it says.

Q.   And this is about the amount of money you received.  And you thought that a robbery -- you explained in your testimony that your earlier statement didn't make such a mention of the money because you were worried that it would make the criminal liability worse for those involved?

T. Woodruff - CX by Mr. Blenk     312

A.   That's what it says.

Q.   That's what you testified?

A.   That's what it says on the paper.

Q.   Page 154.  And you also provided an explanation for why earlier versions of your account of Mr. Crawford's murder -- which I understand you say now as you sit here today that you have no knowledge of that, and I understand that, but you provided an explanation for why the entry into the Golden Nugget was left out of earlier versions of your events, correct?

A.   Correct.

Q.   And that explanation was that you thought that leaving that out would negate some sort of foresight, some sort of premeditation and would, therefore, lower the criminal liability of those involved?

A.   I wouldn't say that was the reason, but that's what it says.

Q.   I understand you are saying that as you sit here today that wasn't the reason, but at the time you provided that reason?

A.   I didn't know if that would be good or bad basically, you know.  I didn't -- I don't remember that, but that's what it says.

Q.   It's something that you offered to explain why your story was one way before and another way as time went on?

T. Woodruff - RDX by Ms. Hughes                313

A.   Correct.

Q.   And you came up with that yourself?

A.   I might have.

MR. BLENK:  Your Honor, I don't have any further questions at this time.

THE COURT:  Thank you.

Any redirect, Ms. Hughes?

MS. HUGHES:  Yes, Your Honor.  One moment, please.

REDIRECT EXAMINATION

BY MS. HUGHES:

Q.   Good morning, Mr. Woodruff.

A.   Good morning.

Q.   Did you ever say to ADA Drury I'm lying, my testimony is not true?

A.   Not in those words.

Q.   Did you ever do anything to indicate -- to try to indicate to ADA Drury that I'm lying, my testimony is not true?

A.   Yes.

Q.   And what did you do?

A.   Tell the story that didn't make sense.

Q.   And why would you do that?

A.   So he can see that, you know, what I'm saying wasn't true because the story kept changing.  And then he would come in and say, well, if it didn't work that way, then it had to

T. Woodruff - RDX by Ms. Hughes    314

happen this way.  So the story would always change.  Always change.  Nothing stayed the same.

Q.   Now, Mr. Blenk showed you yesterday a recantation that you made in 1985, right, that discussed ADA Drury's involvement in your testimony at Mr. Boyd's criminal trial?  Is that correct?

A.   Yes.

Q.   Let's take a look at for the witness only Plaintiff's Exhibit 214.

Mr. Woodruff, is this a sworn statement you gave recanting your testimony from Mr. Boyd's criminal trial?

A.   Yes.

MS. HUGHES:  Your Honor, I'd like to offer into evidence Plaintiff's Exhibit 214.

MR. BLENK:  May we approach, Your Honor?

THE COURT:  Sure.

(At bench:)

THE COURT:  Go ahead.

MR. BLENK:  There's nobody to establish what this document is for the same reasons that we discussed before.  We put it in as an adverse party.  We put in a portion of it as an adverse party.  There's no justification for the balance of the recantation to come in.

MS. HUGHES:  Your Honor, this was their motion.  It's at Docket 318.  And they didn't specify a specific portion in

T. Woodruff - RDX by Ms. Hughes                    315

their motion that they wanted admitted.  They moved for the entire 2010 recantation to be admitted, which Your Honor admitted with our -- with the -- with our consent -- for the Plaintiff's consent that the appropriate redactions redacting prior bad acts be applied.

THE COURT:  Can -- do you have a copy of it?  Can I just --

MS. HUGHES:  Of the recantation?

THE COURT:  Yes.

MS. HUGHES:  Yes, I have a copy of it.

MR. BLENK:  This only goes in for the --

THE COURT:  Hold on one second.  Just let her get it.

MR. BLENK:  Where is the motion?

MS. HUGHES:  I don't have a copy of the motion, but I can get a copy.

MR. BLENK:  The motion --

THE COURT:  Hold on one second.  You have to talk loud enough so that Joony can hear you.

MR. BLENK:  The motion is to admit when they are calling Mr. Woodruff the portions they would want to admit. There's no grounds to get the whole document in.

MR. FIRSENBAUM:  Your Honor, at page 70 of Your Honor's opinion it reads -- is it this one?

MS. HUGHES:  Yes.

MR. FIRSENBAUM:  Plaintiff has consented to the

T. Woodruff - RDX by Ms. Hughes                    316

admission of statements made by Woodruff, with redactions, see ECF number 337-1 at 4 n.4.  Therefore, the County's motion to admit the 1985 and 2010 sworn statements of Woodruff is granted at this stage to the extent of Plaintiff's consent.

MR. BLENK:  We did not move --

MR. FIRSENBAUM:  If anything, we consented to it.

MR. BLENK:  We did not move in an entire document.  I don't think we -- we addressed that we would use this document.  We never -- they can't -- we are -- we got it in for the specific purpose we got it in for.  There's no basis -- we never asked for all of the other balance of information to be admitted.  The portion where he's eliminating Drury as a bad actor in the events is the only thing we care about from this document.  There's no basis for them to get it in as a bolstering prior consistent statement.

MR. FIRSENBAUM:  Your Honor, they filed many motions, as Your Honor is well aware, asking for complete documents to be admitted.  Most of the time we said that's a problem and it needs to be changed.  We consented to this one in particular.  It's their motion.  We consented.  There's a ruling, Your Honor.  That's what it is.  That should be the end of the story.

Now, if we're going to revisit that -- and I don't think Your Honor should -- certainly the prior consistent

statement that's in here is admissible as a prior consistent statement since in response to their admission of the prior --

THE COURT:  I would agree with that, but I want to go back and check and see if I interpreted your motion correctly.

MR. SOUTHARD:  Your Honor, as I clarified, at the pretrial conference the motion we made was for notice.  It was not for wholesale admission of these documents.  And Your Honor ruled as such at the pretrial conference.  Your Honor also included -- asked us to put forward a submission of documents that we might put forward going forward, but to clarify, it was not a motion for wholesale admittance of these documents.

THE COURT:  Okay.

MR. BLENK:  To the extent that -- I don't see -- to get into a prior consistent statement there has to be another change in the statement subsequent thereto.  The idea that he's coming in here and testifying, that he's recanting does not create an inconsistency where there is a change in a motive to deceive that switches it that he would need to refer back to a prior statement.

He's saying what he said in 1985.  He's saying that now.  We can attack him or not attack him on the credibility of that, but that doesn't open the door for prior consistent

T. Woodruff - RDX by Ms. Hughes                    318

statements.  Otherwise, it would just be the same rule that -- distinguishable from saying here's my testimony today, also see what I said at the deposition a few months back.  That's not how prior -- that's not my read on prior consistent statements in this context.

THE COURT:  Okay.  I'm going to go back and look at my decision and the motion that you made.  So we're going to just take a recess.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  So I can take some time to go look at that.

MS. HUGHES:  Thank you, Your Honor.

(Open court:)

THE COURT:  Okay.  Members of the jury, we're going to take our mid-morning recess.  I need to address a few things outside of your presence anyway.

And so all of the recess admonishments apply.  Do not talk about the case with anyone.

Mr. Woodruff, we're going to take about a 15-minute recess.  Do not talk about the case or your testimony with anyone during the recess.  You can step down.

The jurors can go back to the jury room.

(Jury not present.)

THE COURT:  We'll be in recess for fifteen minutes, but I might call you in before then to give you my ruling.  But just give me some time.

T. Woodruff - RDX by Ms. Hughes          319

So we're in recess for now.

(Recess taken.)

THE COURT: The parties have returned to the courtroom. The jury is in the jury room.

I had a chance to look at not only the relevant portion of my decision for the motion in limine but also the defendant's motion. And so that's docket 318, and then on page 12. And I did in my decision say that those could come in.

Looking back, I mean, did you -- have you reviewed it again, that portion, page 12?

MR. BLENK: I looked at our Notice of Motion, Your Honor.

THE COURT: Well, it certainly seems that you are -- that you were seeking the admission of a number of affidavits, including this one.

MR. BLENK: That's -- I disagree with that, Your Honor. We're previewing how we intend to deal with these things and how --

THE COURT: Okay. Then you were saying that they should be admissible?

MR. BLENK: And then they would be admitted to the extent that we're admitting them. In this instance we are admitting the stuff that we want to get in that's subject to a hearsay exception.

T. Woodruff - RDX by Ms. Hughes                320

THE COURT:  Okay.

MR. BLENK:  There's no hearsay exception for the balance of the document.

THE COURT:  Okay.  I understand.

Plaintiff, I understand your position.  Setting aside what you think they've already agreed to, okay, what -- how does this come in?  How does the entire statement come in?

MR. FIRSENBAUM:  Your Honor, the portion -- we obviously believe the whole document, frankly, has been accepted into evidence, but putting that aside, as Your Honor has asked, we certainly think that the statement in here that Mr. Drury was involved in the conversations with Mr. Woodruff and at the police station in connection with his testimony are prior consistent statements and are admissible in light of Plaintiff's -- sorry -- Defendant's cross-examination with an alleged prior inconsistent statement from the 1985 affidavit.

THE COURT:  And those would come under I guess prior consistent statements if there was an allegation of recent fabrication, but there isn't right now.  There isn't an allegation of recent fabrication.

MR. FIRSENBAUM:  Their allegation is that he's fabricating now in this trial to the extent he's testifying that Mr. Drury had any involvement.  That's the whole point of using the '85 affidavit to suggest that he said earlier

T. Woodruff - RDX by Ms. Hughes                     321

that Mr. Drury did not have any involvement.

MR. BLENK:  Your Honor, to get in the prior consistent statement it has to be based on an angle of attack on bias. And you say, sure, I'm susceptible to cross-examination on that issue, but, look, before the event of bias, the recent -- that's why it has to be recent.  It's recent relative to the bias arising.  I said this before the bias arose.  That's not the circumstance in any of these cases. We haven't -- there's no component of bias arising that's influencing -- that anybody is taking an angle of attack on influencing Mr. Woodruff's testimony.

MR. JOEL RUDIN:  Your Honor, may I?

THE COURT:  Go ahead.

MR. JOEL RUDIN:  I understand the rule is that the prior -- they are contending that Mr. Woodruff's testimony now is a change in his story from his 1985 affidavit.  And this is a prior consistent statement from 2010, fifteen years before, long before he had any motive to, as they contend, falsely implicate Mr. Drury.  2010 this wasn't an issue.  And so, I mean, the claims in this lawsuit were not an issue. And for him to -- and so it's admissible under the rule.

THE COURT:  Okay.  Well, then, you have to help me understand how he's alleging that it's different because this most recent statement, 214, has to be different than what he's saying now.  So in what ways is it different?

T. Woodruff - RDX by Ms. Hughes                     322

MR. JOEL RUDIN:  No, no.  The 2010 statement is consistent with what he's saying now, and they are contending that he's saying -- what he's saying now is because he's trying to help Mr. Boyd in his lawsuit.  That's their whole point.

In 2010 before there was any lawsuit he made a statement that's consistent with what he's saying now.  Therefore, that is a prior consistent statement before the motive to fabricate, and it should come in.

MR. HANFT:  Your Honor, may I read the relevant rule?

THE COURT:  Yes.  I have it right in front of me.  Go ahead.

MR. HANFT:  A statement that meets the following condition is not hearsay:

A declarant witness' prior statement.  The declarant testifies and is subject to cross-examination about a prior statement, and the statement is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying or to rehabilitate the declarant's credibility as a witness when attacked on another ground.

I don't think there's any question here that his testimony was attacked and his credibility was attacked.  He testified that Drury was involved.  They presented the

T. Woodruff - RDX by Ms. Hughes                    323

inconsistent statement they allege shows that Drury wasn't involved.  We're allowed to put in a prior consistent statement to rehabilitate credibility.  That's the core of the rule.

MR. BLENK:  There's been no intervening change in his motive or bias, Your Honor.  We haven't really even pressed motive or bias, but his motive in 2010 was to advance the interest of Mr. Walker and Mr. Boyd.  His motive now is to advance the interest of Mr. Walker and Mr. Boyd.

MR. HANFT:  So now they are explicitly stating they are attacking his motives, and --

MR. BLENK:  If there were any motive, we haven't attacked him specifically on that angle.  There is -- he's -- again, this is just amounting to I'm telling you a story X, Y, Z, and previously I said X, Y, Z.

THE COURT:  My view of this rule is not consistent with your view.  And so the way I see it is -- let's say there is an affidavit that says the car is blue, and then he is testifying now that the car is red, and there's an allegation that there's a recent fabrication.  Then, yes, that would come in.  The car is blue affidavit, that would come in.  But right now it's -- the affidavit is saying the same thing.  I mean, he's -- so this affidavit you are trying to get in is -- it's the same thing as he's testifying to now.  So there is not this -- that's where I don't agree.

T. Woodruff - RDX by Ms. Hughes                324

MR. FIRSENBAUM: But that's why Your Honor little two as a whole says to rehabilitate. It's after the witness has been impeached with an inconsistent statement you can then bring in a consistent statement, consistent with the trial testimony on direct, to rehabilitate the declarant's credibility as a witness when attacked on the other ground. So they did the attacking, and now we get to rehabilitate him with a consistent statement, consistent to what his trial testimony was on direct. That's how (d)(1)(B)(ii) works.

MR. BLENK: And, Your Honor, if you don't get into the factual kind of explanation that you had provided, this would, again, just invite consistent deposition testimony to be put in at every trial by every witness who has ever been cross-examined.

MR. HANFT: The deposition is once the case has begun. And, Your Honor, I would just say we consented to the 1985 statement yesterday on the grounds that the 2010 statement was admitted on their motion. I mean, I think the prejudice here is to the maximum. To suggest that we made an explicit admission based on the Court's ruling and the opposing party's motion, and to now say, actually, no, you can't get into that would --

THE COURT: I mean, I very much understand that position. Okay? And to the extent that -- I actually put it in my decision that those would be admissible. But just hold

T. Woodruff - RDX by Ms. Hughes                325

on for one second.  Okay?  Just give me a minute.

Okay.  Question for Plaintiff.  Are you seeking the entire -- I mean, is it your position that the entire affidavit would be admissible under 801 or just a portion of it?

MR. FIRSENBAUM:  So no.  If we're -- if we're ignoring our primary argument and going to our secondary argument of 801(d), then we would say that at Bates 2491, which is I guess it's page -- well, 11 of 36 on the bottom of the document.  It would be lines 11 through 21.

THE COURT:  Okay.

MR. BLENK:  Your Honor, I would add that --

THE COURT:  Can you hold on one second?

MR. BLENK:  Yes, Your Honor.

THE COURT:  Thank you.

Okay.  I'm going to allow just that portion, lines 11 through 21, to be received.

MR. BLENK:  Please note our exception, Your Honor.

THE COURT:  Okay.

*(Plaintiff's Exhibit 214, above-mentioned portion only, received in evidence.)*

MR. FIRSENBAUM:  Thank you, Your Honor.

THE COURT:  Okay.  Let's bring the jurors back in.

(Jury present.)

THE COURT:  Have a seat, everyone.  Thank you.

T. Woodruff - RDX by Ms. Hughes                326

We can bring Mr. Woodruff back in.

(Mr. Woodruff present.)

THE COURT:  Mr. Woodruff, I will just remind you that you are still under oath.

You can proceed.

MS. HUGHES:  Thank you.

BY MS. HUGHES:

Q.   Mr. Woodruff, I'm going to show you page 11, lines 11 through 21 of PX 214, which the Court has accepted into evidence.

This is published to the jury?

THE CLERK:  It should be.

MS. HUGHES:  Thank you.

BY MS. HUGHES:

Q.   Now, you were asked on this page:

Question:  Did anyone tell you what to say?

Answer:  Timothy Drury.  We went over it and it couldn't have happened like this.  So, you know, it had to happen like this.  You know, it was like a rehearsed thing.  You know, I might say something, you know, impossible.  You know what I'm saying?  That's basically -- you know, them words wasn't used, but that's basically what it was, you know.

Do you see that?

A.   Yes.

Q.   Is that consistent with your testimony yesterday and

T. Woodruff - RDX by Ms. Hughes                327

today that ADA Drury told you what to say in your testimony before and during Mr. Boyd's criminal trial?

A.    Yes.

Q.    Now, the County's counsel also asked you some questions about whether the police officers listed in police reports were in the room, right?

A.    Yes.

Q.    And you testified that you did not know the names of the police officers, correct?

A.    Correct.

Q.    Let me show you one of those police reports you looked at with Mr. Blenk, PX 46.  The County's counsel showed you the first page of this, correct?

A.    Yes.

Q.    Now, let me show you the third page.  The County's counsel did not show you this page on the screen, correct?

A.    Correct.

Q.    Please read the first sentence of the second paragraph on this page to the jury out loud.

A.    At this time Tony Woodruff and Mr. Drury after being advised of the statement that Tony Woodruff had made to the detectives was taken into the grand jury where he did testify and was brought out by Mr. Drury, and Mr. Drury advised the detectives that he did tell the truth and told the grand jury what he had told us in the new statement.

T. Woodruff - RDX by Ms. Hughes    328

Q.    That says that Assistant District Attorney Drury was there with you, correct?

A.    Yes.

Q.    And that's what you testified to yesterday, correct?

A.    Correct.

Q.    Let me show you another police report that the County's counsel showed you, PX 47.  This is from February 11th, 1976 as well, correct?

A.    Yes.

Q.    You testified that you did not know the names of the officers who were present, right?

A.    Correct.

Q.    Let me direct you to a paragraph of this report that the County's counsel did not put up on the screen for you, the first paragraph.

It reads:  Today I went to the Erie County District Attorney's Office for the purpose of testifying in a grand jury.  I met with Assistant District Attorney Timothy Drury in his office along with Detective Delano and Andre Hough.

Do you see that?

A.    Yes.

Q.    All right.  Now let's go down to the third paragraph of this same report.  The County's counsel did not show you this -- show this to you or the jury either, correct?

A.    Correct.

T. Woodruff - RDX by Ms. Hughes                    329

Q.   Please read the first sentence of this paragraph out loud.

A.   While Assistant District Attorney Drury went into the grand jury with Andre he asked me to talk to Tony Woodruff.  I talked with Tony and he came up with more information -- important information.

Q.   Thank you, Mr. Woodruff.  This says that Mr. Drury asked the police officer to talk to you, correct?

A.   Correct.

Q.   Let's go to the second page of the same report, the final paragraph starting with Detective Guadagno.  The third sentence of this paragraph reads:

Shortly after Detective Delano came in and the story was repeated to him.  Assistant District Attorney Drury was apprised of the new confession.  We all talked briefly to Tyrone before he went in to testify.

"We all" includes Assistant District Attorney Drury, correct?

A.   Correct.

Q.   And it goes on to say, Assistant DA Drury brought the signed confession to the grand jury with him.  He later returned it to Detective Guadagno and wanted it made part of our file.  We talked to Tyrone again with the permission of his lawyer, and then he and Andre was released.

So the report says that you spoke with ADA Drury here as

well, right?

A.   Yes.

Q.   And that's what you testified to yesterday, correct?

A.   Yes.

Q.   Now, the County's counsel asked you a lot of questions about your testimony at Darryl Boyd's criminal trial and the pretrial proceedings, correct?

A.   Yes.

Q.   Was that testimony true -- sorry.  Let me rephrase the question.

Was the testimony that you gave at Darryl Boyd's criminal trial and pretrial proceedings true?

A.   No.

Q.   The details that Mr. Blenk recited, the pipe, going into the bar, where did that information come from?

A.   Made up from the DA.

MS. HUGHES:  No further questions.  Thank you, Mr. Woodruff.

THE COURT:  Thank you.

Any recross?

MR. BLENK:  Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. BLENK

Q.   Mr. Woodruff, 1985 was only nine years after the murder of Mr. Crawford, right?

A.    Yes.

Q.    And that's when you told Mr. McLeod that Mr. Drury had nothing to do with your fabrication of evidence, correct?

A.    Yes.

Q.    You told them -- you told Mr. McLeod that as far as you knew Mr. Drury thought you were telling the truth?

A.    In so many words, yes.

Q.    Indeed, you told us that -- your testimony today years later is that you were -- you were saying things that you thought didn't make sense?

A.    Correct.

Q.    Right?  And you were providing explanations that didn't make sense?

A.    Correct.

Q.    And one such explanation was that you thought that adding the Golden Nugget could be added to your account so that you could negate premeditation, correct?

A.    That's what it was -- it was given to me or something.  I was just -- I don't know.

Q.    You testified just a moment ago that you were providing information that didn't make sense, that you were giving explanations that didn't make sense, and that's one such explanation, correct?

A.    Correct.

MR. BLENK:  I don't have any further questions.

A. Hirsch - DX by Mr. Hanft                    332

THE COURT:  Thank you.

Thank you, Mr. Woodruff.  You are all set.  You can step down.

Okay.  Plaintiff can call their next witness.

MR. HANFT:  Thank you, Your Honor.  The Boyd Estate calls Professor Alan Hirsch.

THE COURT:  Good morning, Professor Hirsch.  If you could just stand right here and you will be sworn in by my court clerk.

(Whereupon, the witness ALAN HIRSCH was duly sworn and testified as follows:)

THE COURT:  Whenever you're ready.

MR. HANFT:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HANFT:

Q.    Good morning, Professor Hirsch.  Could you please introduce yourself to the jury?

A.    I'm Alan Hirsch.

Q.    Professor Hirsch, are you here to offer expert testimony in a particular field?

A.    I am.

Q.    And what field is that?

A.    Interrogations and false confessions.

Q.    What exactly does it mean to be an expert in interrogations and false confessions?

A. Hirsch - DX by Mr. Hanft                    333

A.    My principal expertise is in the interrogation methods used by law enforcement that are known to cause or at least contribute to false confessions.  I'm conversant with many other aspects of false confessions, but my focus tends to be on interrogation methods.

Q.    Do you ever come into court and offer an opinion that a confession is actually false?

A.    I'm not allowed to do that.

Q.    So fair to say the jury should not be waiting for you to tell them that Tyrone Woodruff or Andre Hough actually gave false testimony at Mr. Boyd's trial?

A.    That's correct.

Q.    So what is it that you do?

A.    I will look at the circumstances of their interrogations, look at what interrogation tactics were used and describe whether they were problematic, whether they are consistent with the tactics that we know contribute to false confessions, as well as other information, such as whether these gentlemen fell into categories of people who were known to be susceptible to these interrogation methods.

Q.    Okay.  So let's go through your credentials and expertise in the field of interrogations and false confessions.  What can you tell us about your educational background?

A.    I received my undergraduate degree from Amherst

A. Hirsch - DX by Mr. Hanft                334

College in 1981 and a law degree from Yale Law School in 1985.

Q.    Please tell the jury about your employment history from after you graduated law school through the present starting with your first job.

A.    Right out of law school I was a law clerk for a judge on the United States Court of Appeals for the Third Circuit in Philadelphia.  I then spent three years as an attorney and writer for a government agency called Federal Judicial Center in Washington, D.C.  And ever since then my work has been teaching and writing and serving as an expert trial consultant.

Q.    So I believe you mentioned teaching.  Were you a professor?

A.    Yes.

Q.    And how long were you a professor?

A.    So I taught for 17 years, three years as an adjunct and then 14 years as a member of the regular faculty, at Williams College --

Q.    Are --

A.    -- until I retired last June.

Q.    What did you teach at Williams College?

A.    I taught in the Justice and Law Studies program.  I taught the two required courses in the program, the introductory course and the senior seminar.

Q.    Could you tell us a little bit about what the law

A. Hirsch - DX by Mr. Hanft                                    335

and justice program covered?

A.    Yes.    It's an interdisciplinary program covering the interaction of law and all facets of society.

Q.    And did you say -- did you mention that you were the chair of that program?

A.    I'm sorry.  I don't think I did.  But for the last -- I don't know how many years -- I think ten I chaired the program as well.

Q.    What does being the chair of the program entail?

A.    So, first, as I said, I taught the two required courses, but in addition, think of the program as a minor as opposed to a major.  I would determine which courses in the -- across the curriculum counted towards the minor.  I would determine whether -- make sure that students who wished to fulfill the requirements of the minor did so.

And then I had all kinds of miscellaneous administrative responsibilities such as overseeing the budget, meeting with prospective students, all sorts of other things like that.

Q.    So across your history as a professor what expertise have you developed in the field of interrogations and false confessions?

A.    Right.  So I've written extensively on this subject going back 20 years, many articles and scholarly law journals and other places primarily for the legal profession, judges and lawyers and academics.  I've also written in mainstream

A. Hirsch - DX by Mr. Hanft                                    336

publications such as the Los Angeles Times.  I started and continued to operate the first website devoted to the subject as well as a podcast.  And I've gotten involved in cases as an expert trial consultant in this area.  Again, over roughly a 20-year period.

Q.   Are there any particular writings that you've done on the subject that are notable?

A.   I'd like to think they all are, but I'd say the most important was an article in 2014 in the Ohio State Journal of Criminal Law, which looked at the leading interrogation method.  I'd like to think it's the most thorough analysis of the leading interrogation method.

Q.   And has that writing been cited anywhere notable?

A.   Yes.  That's been cited by judges and especially by legal scholars.

Q.   And you mentioned some work you've done for a more general audience.  Could you talk about that a little more?

A.   Right.  So I'm also -- I'm trying to do two things, which is educate the bar, but also to educate the public.  So I've written articles, as I said, in the Los Angeles Times.  Plus, my website is geared towards a general audience.

Q.   And has your website received any recognition?

A.   Yes.  In 2007 the American Bar Association Journal listed it first -- listed it in their top 100 law-related websites and first among criminal law-related websites.

A. Hirsch - DX by Mr. Hanft                337

Q.   Now, turning to your other professional experience as a consultant, how many times have you been retained as an expert to testify or have you been retained as an expert on interrogation methods and false confessions?

A.   I don't know exactly, but it's over 400.

Q.   And how many times have you testified in court about those subjects?

A.   I believe it's 62.

Q.   Have you ever been retained to conduct that analysis on behalf of law enforcement?

A.   Yes.

Q.   Have you ever been hired as an expert and determined that law enforcement did nothing problematic in an interrogation?

A.   Oh, sure, many times.

Q.   Did you ever come into your work with a particular -- with an assumption about whether the interrogation practices at issue were likely to generate false confessions?

A.   No.  I come in with an open mind.

Q.   What were you retained to do in this case?

A.   Primarily to analyze the interrogations of Tyrone Woodruff and Andre Hough to determine whether there was anything problematic about them.

Q.   And what did you do to undertake that assignment?

A. Hirsch - DX by Mr. Hanft    338

A.    I reviewed voluminous materials, anything that shed light on the interrogations.

Q.    Are you being compensated for your time here?

A.    Yes.

Q.    What is the compensation rate?

A.    Four hundred dollars hourly.

Q.    Is that your standard rate?

A.    Yes, it is.

Q.    Does your compensation depend on the outcome of this case?

A.    No.

Q.    All right.  I want to turn to more specifics on false confessions.  At the highest level of generality, what is a false confession?

A.    Someone claims to have committed a crime that they did not commit.

Q.    So why would someone confess to something they didn't do?

A.    So there are many reasons.  For example, in high profile cases people come forward voluntarily to have their fifteen minutes of fame or for some other reason.  But the contributor that is most common that I am most concerned with and I focus my work on is the interrogation methods that contribute to false confessions.

Q.    Is there research on false confessions?

A. Hirsch - DX by Mr. Hanft                    339

A.    There is voluminous literature.  There are numerous books and countless articles.

Q.    How far back does that research go?

A.    In embryonic form to the early 20th century, but it really has been the last 30 years or so that that has been a proliferating literature.

Q.    And what would you say are the main studies on false confessions?

A.    So there are several categories that I find particularly useful.

First, there are proven -- there are analyses of proven false confessions.  So we have well over a hundred cases where we know the confession was false and there are a lot of materials to be reviewed.  And Professors Steven Drizin and Richard Leo in particular have closely analyzed those cases to see what interrogation methods were used, what kind of people were confessing and everything else they could glean from looking at those cases.

Second, Professor Leo and another professor, Richard Ofshe, have done invaluable work in trying to understand why an innocent person would confess in these circumstances.  So they've applied basic principles of decisionmaking to the circumstances -- circumstances suspects face when in an interrogation room.

And I'm sure we'll get into this.  It turns out it

A. Hirsch - DX by Mr. Hanft                340

actually makes pretty good sense, as wildly counterintuitive as it may be, that an innocent person would confess to a crime in certain circumstances.  When certain interrogation tactics are used it actually makes good sense.

Third, particularly, a professor named Brandon Garrett has looked at what he calls the substance of false confessions.  What's in these confessions?  What kind of statements are people making when they confess falsely?  Most particularly, we find that in many cases of proven false confessions there are some accurate details, and that at first glance is very hard to understand.  These people are innocent.  Their confessions are false.  How did they know certain facts about the crime?  And we end up learning that law enforcement often supplies those facts.  Usually not intentionally.  Inadvertently in the course of questioning the defendant.

And then, finally, there's some work by Professor Saul Kassin, a colleague of mine at Williams, which pulls together all of these studies, all of the information into one or two places which is just comprehensive, and that's invaluable as well.

Q.    Thank you, Professor.  What do we know about the frequency of false confessions?

A.    Right.  So nothing precise because that data isn't kept, but we know that they are much more frequent than anyone ever imagined.  So there are in the nature of five hundred

A. Hirsch - DX by Mr. Hanft                    341

proven false confessions that take place in an interrogative setting. If you add voluntary false confessions, we're into the thousands. And there is virtually unanimous agreement among experts in the area that those proven false confessions, the ones we know about, are just the tip of a much larger iceberg.

Q. So you mentioned proven false confessions. How do researchers like yourself know that certain cases included in these studies are actually false?

A. We only characterize a confession as proven false under one of four circumstances.

One is when science irrefutably establishes that the person who confessed is innocent. Typically DNA evidence.

Secondly is when the actual culprit is apprehended under circumstances that leave no doubt as to his guilt. So person A confesses. It turns out person B did it for sure, and there's no connection between person A and B.

Third, there are cases -- a surprising number -- where it turns out after someone has confessed it was physically impossible for him or her to have committed the crime. They were incarcerated, they were abroad, something like that.

And, finally, there are a surprising number of cases in which there was no crime at all. So the paradigmatic case is the homicide victim shows up alive and yet someone confessed to having killed them. We know that's a false confession.

Q.    So you mentioned this a little in your previous answer, but using only the proven false confessions, are the number of false -- is that number of false confessions conservative or aggressive?

A.    That's an extremely conservative number.  If we were to count confessions that we were pretty sure were false, that were likely false, that were possibly false, the number would increase exponentially.

Q.    So turning to the factors that contribute to false confessions, has there been research into the specific factors that contribute to false confessions?

A.    Extensive research.

Q.    And what does that research show?

A.    So there's two primary parts.  One I keep coming back to.  It's the most widespread interrogation method used by law enforcement.  Unfortunately, it contributes to false confessions.  And, secondly, there's research into what kinds of individuals, what populations may be especially susceptible to those tactics.

Q.    So I want to start with the first one.  What are those interrogation methods known to produce false confessions?

A.    So we refer to it as the Reid method because Reid & Associates produces by far the most widespread training programs and their manual is by far the most widely used.  And

A. Hirsch - DX by Mr. Hanft    343

this consists of three principle steps:  Isolation, confrontation and minimization.

Isolation, just what the name implies.  Suspects are typically interrogated alone, often usually in a small windowless room.  But, in any case, without a support system, present without an attorney, without family members, without friends.

And then in that situation, which is designed to create stress and eventually desperation, they are first confronted, as the name "confrontation" implies, with evidence of their guilt or, more importantly, certainty of their guilt, often backed by claims to have evidence, which may be exaggerated or even fabricated.  But, in any event, the interrogator is communicating to the suspect in no uncertain terms you are guilty, we know you're guilty, you are in trouble, and there's nothing you can do that will convince us or anyone else otherwise.  And they cut off their denials, "they" being the suspect's denials, their protestations of innocence, again, to make it clear to them you are in real trouble and there's nothing you can do about it, except.  That's the stick.

The carrot is what we call minimization.  These are numerous ways of suggesting to the suspect, sometimes just telling them outright, that things won't be that bad if they confess.  The crime wasn't as serious as it may look or the suspect's culpability isn't as great as it may seem.  So, for

A. Hirsch - DX by Mr. Hanft

344

example, they played only a secondary role. They were provoked by the victim. There were mitigating circumstances, such as alcohol and drug use. It may be said to them let's just do this and you'll move on with your life. We want to put this behind you. Now, they're not saying -- because they are typically not allowed to -- if you confess you are going home, but they are suggesting it won't be that bad.

MS. MEANS: Objection, Your Honor.

May we approach?

THE COURT: Yes.

(At bench:)

MS. MEANS: We are getting far outside of the scope and speaking to generalities and tipping dangerously into the issues of guilt or innocence.

THE COURT: Okay. Well, so you are objecting to his answer right now?

MS. MEANS: Yes.

THE COURT: Okay. Overruled.

(Open court:)

THE COURT: The objection is overruled.

You can continue your answer.

THE WITNESS: Okay. So I indicated that confrontation is the stick; minimization is the carrot. Taken together they are establishing you're sunk if you say you're innocent. If you tell us what we want to hear, if you confess, you'll

A. Hirsch - DX by Mr. Hanft                     345

be okay.

Another way -- another metaphor I think of for this is confrontation makes the suspect feel like he's drowning, minimization supplies the life line. And you can just think about it. If you actually come to conclude those two things, it makes perfect sense that you'll confess. It's the best or even only way out of a desperate situation.

Now, just to be clear, the kind of cost-benefit analysis I'm talking about is not necessarily accurate. They are not necessarily going to get off easy if they confess, and it's not necessarily true that they couldn't establish their innocence. But this is a cost-benefit analysis undertaken in circumstances whose whole purpose is to create that feeling of desperation. And it works, unfortunately.

BY MR. HANFT:

Q.   So you ended with this, but what's the effect of the Reid method on the person subjected to it?

A.   It's tremendously potent. And, just to be clear, you might be wondering why would law enforcement do this if it's producing false confessions predictably, and the answer is because it's such a good method for producing true confessions as well. This is a great way of breaking people down, and, unfortunately, it doesn't distinguish between the innocent and the guilty. So it breaks down a lot of innocent people as well as guilty people.

A. Hirsch - DX by Mr. Hanft                        346

Q.   So you would agree that the Reid method sometimes generates confessions that are true?

A.   Yeah.  As I tell juries, the problem with the Reid method is not that it's ineffective, it's that it's too effective.

Q.   So it also generates confessions that are false?

A.   Yes.

Q.   Now, presumably, you are not sitting in an interrogation room with the police watching an interrogation happen live.  So when you're given a confession or a statement to analyze after the fact what do you look at?

A.   So I'm looking to see whether problematic interrogation methods were used, and then I'm also looking to see whether the confessor belonged to -- was particularly susceptible to these tactics.

Q.   So, yeah.  I want to turn to that.  That was the second item you mentioned besides interrogation methods, populations.  Are there particular characteristics of interviewees that inform your analysis of false confessions?

A.   Yes.  People with mental illness, people who are cognitively challenged, and juveniles have been shown to be vastly overrepresented in the populations of false confessors.

Q.   Is there any research on that?

A.   In the case of all three categories or --

Q.   On the particular susceptibility of youth.

A. Hirsch - DX by Mr. Hanft                    347

A.    Of juveniles, yes.

So, first of all, this was long suspected.  You go back and in the 1940s the Supreme Court was reversing convictions of juveniles who confessed on the grounds that it's just too risky to aggressively interrogate juveniles.  It was well-known even back then that they were susceptible.  And, low and behold, we find decades later when we look at cases of proven false confessions that juveniles are well overrepresented.

Q.    So what, if anything, should law enforcement do when they are interrogating a juvenile suspect?

A.    So there's a number of things they can do.  So many states have adopted laws and local jurisdictions have supplemented those laws with regulations designed to protect juveniles.  They may require that an adult be present when juveniles are questioned, for example.

But beyond that, the interrogation methods I have described should be used very sparingly, if at all, with juveniles.  And this is something even Reid & Associates recognizes.

Q.    So I want to turn to the specific interrogation tactics used in this case.  You mentioned that your assignment here was to analyze the interrogations and statements of Tyrone Woodruff and Andre Hough?

A.    Yes.

A. Hirsch - DX by Mr. Hanft                348

Q. Let's start with Mr. Woodruff. How old was Mr. Woodruff when he was interrogated?

A. 17.

Q. Does that place him in that category of particularly susceptible individuals you were talking about?

A. It does.

Q. Did you have a chance to review Mr. Woodruff's testimony in this trial or witness any of his testimony and in prior proceedings about the Crawford case?

A. Yes.

Q. And did you have a chance to review Mr. Drury's testimony in prior proceedings about the Crawford homicide?

A. Yes.

Q. So you saw the testimony from these two individuals about interrogations that occurred in 1976?

A. Yes.

Q. Was that testimony of those interrogations as described consistent with a particular interrogation technique?

A. So yes and no. Mostly yes. Mr. Woodruff has described in certain respects the Reid method to a T. So this -- they told me it's going to be pinned on you. They will bring someone down and he'll accuse you if you don't tell us what we want to hear. This is textbook aggressive Reid confrontation.

A. Hirsch - DX by Mr. Hanft                      349

The reason I say yes and no is the grant of immunity to Mr. Woodruff, promising a grant of immunity. That is minimization, but it's minimization on steroids. That is the Reid technique, except it goes way beyond what the Reid technique allows. So typically minimization involves hinting to the suspect or suggesting to the suspect that they will receive lenient treatment. Minimization involves promising the suspect that they will receive no punishment. So it's doubly extreme in that regard.

And Reid & Associates says you don't want to grant immunity to suspects at the early stages of an interrogation. That's something you would do at the very end. Not part of the interrogation, but to get their testimony presented in court.

Q.  Did Mr. Woodruff use the specific word "immunity"?

A.   I have seen him use it in some statements, but I do not believe he has done so in court today or yesterday.

Q.   So how do you know he was promised immunity prior to his changed statement?

A.   He was granted it four days later, and ADA Drury admits in his deposition that it was promised to him and he was granted it.

Q.   So you talked about it a little, but can you just expand a little more on why the grant of immunity is so striking here?

A. Hirsch - DX by Mr. Hanft                    350

A.    Right.  So Reid & Associates -- and, again, this is an organization that I'm very critical of.  I believe their methods cause false confessions.  But even they strongly oppose a grant of immunity at this stage.  They say interrogate -- excuse me -- investigate before you interrogate.

Here we're at the very early stages.  They know, as far as I can tell, almost nothing suggesting that anyone is involved in this crime, and they are using this grant of immunity to create a case.

Typically, in a homicide case you thoroughly investigate it.  You know who is involved.  And then maybe at the end you will take the person who was least culpable and give them immunity, often only partial, not complete, by the way, to get them to testify to make a stronger presentation in court against the more culpable individuals.

In this case we don't know who is more or less culpable or if anyone is, and they are using this grant of immunity to try to get Mr. Woodruff to point the finger at others.  And if you think about Mr. Woodruff's position, he's told you may be charged with murder.  There's someone coming down who is going to put the finger on you if you don't tell us what we want to hear.  If you do tell us what we want to hear, you're scot-free.

Now, the temptation for anyone, and a frightened teenager

A. Hirsch - DX by Mr. Hanft                    351

all the more so, to be broken down by that kind of incentive structure really goes without saying once we fully understand what's going on.

Q.   Do cooperating witnesses in criminal cases always receive immunity?

A.   No.   Even if you're going to offer concrete help to a witness, which is something I think you have to be very careful about, again, especially at an early stage, you can propose that you will write a letter about their cooperation to the DA.   You might give them conditional or partial immunity.   You more typically will do what Reid & Associates say, which is hint that they will be better off if they cooperate.   But this grant of immunity at the early stages of a homicide case I have never seen in 20 years.

Q.   So we talked about this a little bit.   Are you just taking Tyrone Woodruff's word that this is what happened to him?

A.   No.   We're talking about the whole thing.   Not just the immunity grant, but the confrontation.   No, not at all.

First of all, this is consistent with what we know about how law enforcement did and does interrogate people.   But in, addition, Mr. Woodruff has maintained this for 40 years, as far as I know, without contradiction.   And ADA Drury confirms a lot of it in his own deposition.   And on top of that police reports in this case confirm most of what Mr. Woodruff says.

Q.    Prosecutors do sometimes offer testifying witnesses immunity, right?

A.    Yes.

Q.    So is it always problematic to bring immunity?

A.    Again, not -- at this stage in a homicide case if we're talking about a low-level misdemeanor or something like that, you're letting someone off, not as big a deal, but at this stage in a homicide case it's, for lack of a better word, crazy.

Q.    So how would you say the use of the method that goes beyond Reid or is Reid on steroids impacts the reliability of a confession?

A.    I think any aggressive Reid interrogation, particularly of a teenager, is going to create major issues of reliability.  I think when you go way beyond Reid and you ignore the cautions proposed by Reid & Associates itself, you are in extremely perilous territory.

Q.    Okay.  I want to now take a look at the first statement that Tyrone Woodruff gave.  This one is dated January 11th.

MR. HANFT:  Can we pull up PX 27, which is received into evidence, and publish that to the jury?

BY MR. HANFT:

Q.    Specifically, I want to take a look at the second Q&A.

A. Hirsch - DX by Mr. Hanft                          353

Q:  The Buffalo police are investigating the death of one William Crawford, a white male, 62 years old, that lived at 2041 Fillmore Avenue.  Mr. Crawford's body was found in the driveway of his home January 3rd, 1976 at about 1:29 a.m.

Will you tell me in your own words what you know or may have heard about the death of Mr. Crawford?

Answer:  I don't know nothing about the death of Mr. Crawford, and I didn't hear nothing about it.

What, if anything, is notable to you about that question and answer?

A.   The question is extremely problematic.  So I mentioned the work of Professor Brandon Garrett about the substance of false confessions where you find accurate details in some false confessions, and I mentioned that that is sometimes because these details are supplied by law enforcement.

Now, law enforcement generally knows they should try to withhold the details for the obvious reason.  When the suspect says that A, B, C and D happened, it's much more reliable if there was no way he could have gotten those details unless he was involved in the crime.  If you give him those details and then he confesses, he could just be spitting back what he was told.

Now, this is a rather extreme example of what not to do. In the very first question in the interrogation they have

A. Hirsch - DX by Mr. Hanft                    354

supplied him the gender, the race and the age of the victim.

So for all the reasons I just stated that's a real no-no.

Q.    Thank you.

MR. HANFT:  Can we take that down?

BY MR. HANFT:

Q.    I want to take a look at Mr. Woodruff's second statement, which has a date of January 12th.

MR. HANFT:  Can we pull up PX 32, which is received into evidence, and publish that for the jury?

BY MR. HANFT:

Q.    So what, if anything, can you tell from this statement about how long Mr. Woodruff's interrogation lasted?

A.    Well, we know it was several hours.  So if you look down just five lines or so, you see that he was Mirandized, read his rights at 4:15.  And then you look up and you see the statement was taken at 6:40.  It was just begun at 6:40.  So that's two and a half hours before he's ready to confess essentially.  That's when they take the statement.

And then I believe if we turn a page or two we see when the statement ended.  And, if I recall correctly, it was eight -- 8:50.  So overall we're talking about a four and a half hour interrogation at least.

Q.    How long is this statement as a whole?

MR. HANFT:  And can we just scroll through it?

THE WITNESS:  Right.  So it's about -- less than three

A. Hirsch - DX by Mr. Hanft                    355

pages single-spaced.

BY MR. HANFT:

Q.    What do you make of the fact that this statement is less than three pages even though Woodruff was in custody for four and a half hours and interrogated for at least two hours before the statement?

A.    Right.  And they claim to be taking the statement -- the time was -- if we circle -- 6:40 and it lasted until 8:50.  So that's two hours and ten minutes.  If you were transcribing someone talking for two hours in discussion, that would be -- I don't know -- thirty, forty, fifty pages.  It would not be two and a half.

So what we know -- first of all, we don't know what happened for the two hours and a half that produced the confession, what interrogation tactics were used.  And, secondly, we don't know what was being said during these two hours and ten minutes.

Just, for example, there may be several times during this questioning where Mr. Woodruff began to deny aspects of this or push back or be uncertain or confused, and they are just typing up a summary, at most two and a half pages.  So we are just getting an extremely selective presentation of what happened.

Q.    At the very top of this document do you see where it says witnessed by Reverend L. T. Boyce and Frank Woodruff and

A. Hirsch - DX by Mr. Hanft                356

Chief Donovan?

A.   Yes.

Q.   And then down at the bottom do you see that Frank Woodruff and Reverend Boyce sign as witnesses?

A.   Yes.

Q.   Does that mean Frank Woodruff, Mr. Woodruff's father, and Reverend Boyce were there while Mr. Woodruff was being interrogated?

MS. MEANS:   Objection, Your Honor.

THE COURT:   Overruled.

THE WITNESS:   No.   There's no suggestion that they were there for the first two and a half hours before he was ready to give the statement, which means when he was ready to confess, that appears to be -- if they came in at all, that would be when it was.

BY MR. HANFT:

Q.   Now, I want to take a look at a couple of police reports from the day January 12th that purports to be the day Woodruff confessed.

MR. HANFT:   Let's pull up PX 31, which is received into evidence, and publish that to the jury.

BY MR. HANFT:

Q.   Do you recognize this document?

A.   Yes.

Q.   What is this document?

A. Hirsch - DX by Mr. Hanft                           357

A.   This is Detective Manista's report purporting to explain the circumstances under which Tyrone Woodruff confessed and accused his friends.

Q.   At a high level can you describe what is being reported here?

A.   There was a claim that he was let in on an anonymous call accusing him and his friends or stating there was evidence against him, and that kind of freaked him out and led him to spill his guts, for lack of a better phrase.

Q.   Now, you've seen that Tyrone Woodruff has testified that this anonymous call never happened, correct?

A.   Yes.

Q.   For the sake of this discussion, let's put that aside for a moment.  What do you make of a report stating that Tyrone Woodruff was allowed to listen in on an anonymous call accusing him of a murder?

A.   If it did happen, it's staggering.  That is just not something police would allow.  I've never seen it before, and for many good reasons.

Q.   What are some of those reasons?

A.   Well, first, there's a reason the caller is anonymous.  She may very well fear for her life if she's actually accusing someone of homicide and accurately.  So you would not let the suspect know who is accusing or hear her voice and so forth.

A. Hirsch - DX by Mr. Hanft                    358

Secondly, what I said before, about you want information to come from the suspect.  So you want to control what they know and don't know.  You don't want them to be hearing all kinds of details from another source.

And, third, even if you did, and there is going to be a stage of the interrogation where you might want to confront them with evidence, you want to control what that evidence is.  You want to make sure it's reliable or, even if it isn't, you know where it's coming from.

This caller hasn't been vetted, and police are just letting her essentially join in the interrogation.  And for a 17-year-old kid to hear himself accused by someone who hasn't been vetted in the slightest, he doesn't know where this is coming from, this is not a procedure that is likely to elicit truth.  It's guaranteed to elicit panic, and that's what Detective Manista is claiming happened.

Q.   Have you ever seen a case where police allowed a suspect to listen in on an anonymous call accusing them of murder?

A.   No.

Q.   Okay.  Now, let's take a look at the other police report from January 12th that purports to document Mr. Woodruff's confession.

MR. HANFT:  Can we pull up PX 33, which is received into evidence?

A. Hirsch - DX by Mr. Hanft                    359

BY MR. HANFT:

Q.   What is this document?

A.   So this, too, except by a different detective, is the same thing.  It's an explanation of the circumstances leading to Mr. Woodruff's confession and accusation on the 12th.

Q.   At a high level could you describe what's reported in this P-73?

A.   Yes.  This is a very different account of what led him to confess.  There's no anonymous call.  Detective Manista isn't even mentioned.  Instead it's a very pleasant interrogation setting.  There is devil food cake being supplied by mom.  There's phone calls.  And it's as if they killed him by love.  This very pleasant circumstance and environment led him to break down and confess to involvement in a homicide.

Q.   You've seen Tyrone Woodruff's testimony that he was never provided devil's food cake?

A.   Yes.

Q.   What do you make of the cake story in this report?

A.   Well, I wasn't there, but it's odd.  Let's just start with including it in a police report is odd.  It's not uncommon for police reports to mention we supplied the suspect with food and water or took him to the bathroom, that kind of thing.  And those details are included to create the

A. Hirsch - DX by Mr. Hanft                    360

impression of cooperation, of a benign environment, which really is at odds with the reality of modern police interrogation, which is extremely tense and confrontational, not holding hands and all these pleasantries.

Here this police report goes further than any I have ever seen in trying to create the impression of that environment with, for example, the specific devil food cake, which I suppose is literally supposed to sound very sweet, and the detail that it was supplied by mom, which I know he denies as well.

So two points. One, again, this is an unrealistic or at least improbable depiction of a police interrogation setting. And, two, it is completely at odds with Mr. -- with the other police report in its explanation of just what happened.

Q. Switching gears a little bit, I want to take a look at the fifth paragraph. And do you see where it says Mr. Woodruff, the father of Tony, and a Reverend Boyce, the family pastor, arrived at police HD and were present the entire time that a statement was taken from Tony Woodruff and subsequently witnessed and signed by them?

A. Yes.

Q. What, if anything, does that indicate to you about whether Frank Woodruff and Reverend Boyce were present for the interrogation?

A. They were apparently not there until the statement

A. Hirsch - DX by Mr. Hanft                361

was taken.  That's what's clearly implied by that paragraph.

MR. HANFT:  Now, can we pull up PX 31 with the anonymous call report and PX 33 the devil's food cake report on a split screen?

BY MR. HANFT:

Q.   Would it be fair to say that both of these reports --

MR. HANFT:  And publish them to the jury.

BY MR. HANFT:

Q.   Would it be fair to say that both of these reports purport to document the circumstances surrounding Mr. Woodruff's confession?

A.   Yes.

Q.   What do you make of the fact that there are two different accounts?

A.   I don't know -- I don't really know what to make of it except they can't both be true.  They could both be false because they both are presenting extreme versions that you don't normally see, but they certainly can't both be true. And it's a recurring theme, and I don't want to sound like a broken record, but this is unprecedented.  I've never seen a case with wildly conflicting police reports about the same interrogation.

Q.   So we've been talking about Tyrone Woodruff.  You mentioned you also analyzed the statements of Andre Hough?

A. Hirsch - DX by Mr. Hanft                    362

A.   Yes.

Q.   How old was Andre Hough in 1976?

A.   15.

Q.   Now, does that place him in the category of susceptible individuals you discussed before?

A.   Even more than Mr. Woodruff.  He was two years younger.

Q.   How, if at all, should his age have factored into how he was questioned?

A.   Once again, he should have been questioned very carefully, very likely in the presence of a family member, but even if you don't agree with that, very carefully.  The Reid method should not have been used on him aggressively, if at all.

Q.   Did Andre Hough give statements to the police?

A.   Yes, he did.

Q.   And they were also in January of 1976?

A.   Correct.

Q.   Do you remember on what days?

A.   Yeah.  The first the 8th, and then the 12th.

Q.   Based on your review of the record, what happened during the initial interrogation of Andre Hough?

A.   He was contacted at home on the 8th, asked about the Crawford homicide, denied any knowledge, taken to the station, supplied -- asked if he would take a polygraph, which he did,

A. Hirsch - DX by Mr. Hanft                    363

was told he passed, but, nevertheless, officers were -- expressed not just skepticism of his story, but certainty that it wasn't true, told him you'll be the one charged with murder if you don't tell us essentially what we want to hear.  And under those interrogative pressures he first crafted an odd story in which Mr. Boyd said that Woodruff did the killing with Boyd and then told them to call the cops and then hung up the phone.

And then four days later said, well, yeah, that -- that happened, but a lot more happened, and then gave the story of Mr. Boyd fully confessing to homicide along with the others.

Q.    Professor, I just want to note, you said a call about Mr. Boyd and Mr. Woodruff.  Did you mean Mr. Hough?

A.    Yes.  Sorry.

Q.    Of course.  All good.  A lot of names.

So you mentioned that Mr. Hough agreed to take a polygraph?

A.    Yes.

Q.    What do you make of the use of polygraph exams in this case?

A.    Short answer is they were used more erratically and inconsistently and even irrationally than they normally are, and they are often used problematically.  So I'm not a big fan of polygraphs and the way they are used.  They are not considered reliable in court.

A. Hirsch - DX by Mr. Hanft                    364

But the basis for using them, according to Reid & Associates, in the 1960s and seventies, and the cops in this case have acknowledged this reasoning, it's not to see the result as much as to see the reaction to the suspect when asked if he will take it.  And the idea is that the innocent suspect will say sure.

As it happens, not just Mr. Hough, but all of the boys did.  And that's suggestive -- not proof, but it's suggestive of innocence, whereas the guilty suspect is much more likely to say, no, I'm not taking the polygraph.

Here, as you know, Mr. Woodruff took it, was told he passed.  That didn't move -- the officers gave them no pause, as far as I can tell, but then after he changed his story he was -- and implicated the boys he was asked if he would take it again, and now he declined, which is very interesting. Again, not proof, but you certainly -- if you believe the officers themselves, you are supposed to take this stuff seriously.

When we asked him if he would take it and he said I'm not involved, I don't know anything, he took it, he passed.  Then he accuses the boys or at least passes along Mr. Boyd's accusation.  Now he won't take the polygraph anymore.  That's certainly noteworthy.

Q.   I'm sorry, Professor Hirsch.

A.   Did I do it again?

A. Hirsch - DX by Mr. Hanft        365

Q.   I may have confused you.  But you're discussing Andre Hough right now, not Tyrone Woodruff, correct?

A.   Senior moment.  Yes.  Sorry.

Q.   No problem.

Is Andre Hough alive today?

A.   No, he's not.  He died in 1989.

Q.   So what are you relying on for your account of Andre Hough's interrogation?

A.   There would be his statements about it a period of years before he passed away.  There would be the police reports.  There would be ADA Drury's deposition.  There would be the fact that it dovetails with what Mr. Woodruff has said that the same officers in the same case were doing.  And on top of all that, Mr. Woodruff -- Mr. Hough himself as a government witness on several occasions gave the same account of what he was subject to and the government never contradicted it, questioned it.  So I think it's pretty uncontroverted at this point.

Q.   Now, Tyrone Woodruff implicated himself saying he was part of the group that committed the crime.  Did Andre Hough implicate himself?

A.   No.  His story does not involve his own involvement.

Q.   Is there a difference between a confession where you implicate yourself and a statement where you implicate others?

A.   Yes.  So this has been studied, and it turns out,

A. Hirsch - DX by Mr. Hanft                              366

not surprisingly, that the Reid method elicits false accusations even more than it elicits false confessions for the obvious reason that the false accuser is clearly not jeopardizing himself legally.

Now, Mr. Woodruff is not jeopardizing himself because of the grant of immunity. That's an unusual circumstance. But Mr. Hough was not endangering himself for a different reason, which is that telling the officers that the others were involved was not a problem for him. So he faced the same circumstance as Mr. Woodruff, but for a different reason. That is, if you don't tell us what we want to hear, it's going to be on you. You are in major trouble. You may be in prison the rest of your life. If you do tell us what we want to hear, you're free, because his story did not implicate himself.

THE COURT: Can we just pause for one second?

MR. HANFT: Yes.

THE COURT: How much longer do you think you have for direct?

MR. HANFT: I would say maybe 30 minutes, 20 to 30 minutes.

THE COURT: Okay. Thank you. We're going to just take a break then for our lunch. We are going to recess for lunch.

I actually have another case, unrelated case, I have to

A. Hirsch - DX by Mr. Hanft    367

address as well.

And so I'm going to direct you, Professor Hirsch, not to talk to anyone during the recess about the case or your testimony. And so you can step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: And to our jurors, it's 12:30. I'm going to ask you to be back at 1:30. And so if you could make sure you go to the -- right to the jury room after your lunch break.

All of the recess admonishments apply. Do not talk to anyone about the case. Thank you.

(Jury not present.)

THE COURT: Have a seat, everyone. So we'll take our lunch recess. I have another case at one o'clock. It shouldn't be too long. So if you want to come -- I don't know -- at 1:10, we can address the subpoenas.

And, Mr. Rudin, you wanted to address the Henry designations?

MR. JOEL RUDIN: Yes, Your Honor. But has the Court received the memorandum that we filed?

THE COURT: I haven't had a chance to look at it, but if it was filed, I'm sure I received it.

MR. JOEL RUDIN: In light of that memorandum as well I would like to address it.

THE COURT: That's fine.

A. Hirsch - DX by Mr. Hanft                    368

And just a quick question.  Is Mr. Henry going to testify during the trial?

And I'm not asking you, Mr. Henry.

Counsel, do we know if Mr. Henry is testifying during the trial?

MR. BLENK:  We would expect that Mr. Henry will testify during the trial, yes.

THE COURT:  Okay.  Then we will address both of those issues at 1:10.  Okay?  Thank you.  You can recess for lunch.

(Recess taken at 12:32 p.m.)

*                    *                    *

CERTIFICATE OF REPORTER

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court of the Western District of New York before the Honorable Meredith A. Vacca on November 5, 2025.


S/ Joony L. Odenbach

Joony L. Odenbach, RPR, CRR

Official Court Reporter