UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

**\*\*\*REVISED DATE ON TITLE AND INDEX PAGE\*\*\***
- - - - - - - - - - - - - - - X
KATHLEEN WEPPNER, AS EXECUTOR
OF THE ESTATE OF DARRYL BOYD)          22CV0519
                    Plaintiffs  )
vs.
                                        Rochester, New York
THE COUNTY OF ERIE
                    Defendants  )    November 4, 2025
                                         1:30 p.m.
- - - - - - - - - - - - - - - X
**TRIAL - VOLUME 2 - (PM SESSION)**

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE MEREDITH A. VACCA**
**UNITED STATES DISTRICT JUDGE**

**FOR PLAINTIFF:   WILMER CUTLER PICKERING HALES AND DORR,**
**                 LLP**
                 BY:  ROSS FIRSENBAUM, ESQ.
                      GIDEON HANFT, ESQ.
                      ERIN HUGHES, ESQ.
                      MELISSA ZUBIZARRETA, ESQ.
                      PHOEBE SILOS, ESQ.
                      TRENA RILEY, ESQ.
                 7 World Trade Center
                 250 Greenwich Street
                 New York, New York 10007

COURT REPORTER: Karen J. Clark, Official Court Reporter
                Karenclark1013@AOL.com

CONTINUATION OF APPEARANCES

**FOR PLAINTIFF:**   LAW OFFICES OF JOEL B. RUDIN, PC.
                     BY:  JOEL B. RUDIN, ESQ.
                          DAVID E. RUDIN, ESQ.
                     152 West 57th Street
                     New York, New York 10019

                     HOOVER & DURLAND, LLP
                     BY:  Spencer Durland, Esq.
                     561 Franklin Street
                     Buffalo, New York 14202

**FOR DEFENDANT:**   LIPPES MATHIAS
                     BY:  JAMES BLENK, ESQ.
                          KIRSTIE MEANS, ESQ.
                          THOMAS SOUTHARD, ESQ.
                     50 Fountain Plaza - Suite 1700
                     Buffalo, New York 14202

### I N D E X

| WITNESS NAME | DX | CX | RDX | RCX |
|---|---|---|---|---|
| J. WALKER | 177 | 207 | | |
| T. WOODRUFF | 212 | 250 | | |

| EXHIBIT NO. | RECEIVED PAGE |
|---|---|
| PX 275A | 184 |
| PX 276A | 186 |
| PX 277A | 189 |
| PX 277B | 192 |
| PX 278A | 197 |
| PX 282A, 282B, 282C | 198 |
| PX 279A | 201 |
| PX 280 | 203 |
| PX 32 | 224 |
| PX 48 | 235 |
| DX 545A | 254 |

K. WEPPNER V. THE COUNTY OF ERIE

**P R O C E E D I N G**

\*                    \*                    \*

MR. BLENK:  Your Honor, can we speak to you at sidebar?

(Whereupon, there was a sidebar discussion on the record.)

MR. BLENK:  So I think Mr. Durland noticed today as well, this is the second day in the row that jurors have kind of returned from lunch and congregated in the hallway, which means just as we're trying to move around and JUST as the gallery is coming and going, that there is a risk of some touch points between those two. I don't remember what the direction was in the last trial, but that was not something that I ever noticed happening, but now it's been two different people on consecutive days.

THE COURT:  So then what we might have to do then is have them report downstairs because they are supposed to just go to the jury room right away, but I'll look into it.  But if not, we'll have them report downstairs and then bring them up all together when we're ready for them.

K. WEPPNER V. THE COUNTY OF ERIE

MR. DURLAND:  JP, are you talking about after they are coming back from lunch they are waiting in the hallway until the door opens or after they are initially released?  Because I noticed there was one person sitting there right now outside in the hall.

MR. BLENK:  I'm talking about just now. Yesterday there was somebody different.  Obviously we're moving as far away as we can, but the gallery is around, other people are coming and going.

THE COURT:  I'll tell them to make sure they go right to the jury room or have them meet downstairs.

MR. BLENK:  Okay.  Thank you.

THE COURT:  Thank you.

(Whereupon, there was a pause in the proceeding.)

(WHEREUPON, THE PROCEEDING CONTINUED.)

THE COURT:  Okay.  We can go on the record.

Counsel just addressed an issue that some of the jurors were kind of hanging out or congregating right outside of the courtroom where the attorneys are. I'm going to tell them that when he they come up to the floor, they need to talk to the court security officer at the desk near the elevator and they will be brought over to the jury room and that they shouldn't hang out

K. WEPPNER V. THE COUNTY OF ERIE

in the area outside of the courtroom.

So we have about 20 minutes or so left of the Boyd deposition designations and then you're going to call Mr. Walker.  Is that right?

MR. DURLAND:  Yes, your Honor.

THE COURT:  I wanted to address Mr. Walker's testimony briefly so we can go right into that.  I just want to reiterate just a few of, I guess, the guidelines for his testimony so it's clear.  The fact that Mr. Walker was found guilty of murder in a separate trial, that is admissible.  It's already been -- we've already had evidence about that.  The fact that he was sentenced to prison and served a prison sentence for that is admissible.  And I find that that is really necessary to explain the fact that he was engaged in these post-conviction activities with Mr. Boyd as it relates to damages.  So that is the reason I'm allowing that in.  However, nothing about the fact that his conviction was vacated is admissible.  It's not -- that is not relevant to liability or damages.  Additionally, it's -- and I know that, Mr. Firsenbaum, you want to submit on this, but at this point, I don't find it's Monell evidence and would be then propensity evidence, which is not permitted.  He can testify that he engaged in

K. WEPPNER V. THE COUNTY OF ERIE

post-conviction activities with Mr. Boyd to challenge their respective convictions, but Mr. Walker cannot testify at all about the reasons he was challenging his convictions, anything at all that might imply that there were alleged Brady violations on his case, none of that is allowed. He cannot testify about the result of these challenges at all.

As I said before, he can't -- there can't be any evidence of his conviction being vacated. He can testify that he obtained certain documents through a FOIL request and he gave them to Mr. Boyd, and that is, I guess, that is what you said you expect his testimony to be. Right, Mr. Durland?

MR. DURLAND: Yes, your Honor.

THE COURT: That he physically gave the documents to Mr. Boyd and that he was there when Mr. Boyd looked at them and that he was -- Mr. Boyd acted surprised. Is that what you expect him to testify to?

MR. DURLAND: I don't anticipate that his recollection is of any one, you know, point of the moment. His recollection is that he obtained the documents. At some point he shared the documents with Mr. Boyd, and that they had discussions about the material that was recovered, and that Mr. Boyd was

K. WEPPNER V. THE COUNTY OF ERIE

shocked, surprised, that that was his reaction during those discussions. I don't anticipate he would be able to say it was, you know, April 7th on this day. It's not -- his recollection is not as sharp as that, but he has a general recollection of sharing this discovery with Mr. Boyd and Mr. Boyd being -- being surprised. And, you know --

THE COURT: And when you say that he was surprised, is that primarily from what he told him that he was surprised about this? I guess, originally when you described it, I guess I had envisioned him giving these documents to him and Mr. Boyd looking at them and acting surprised, and I was going to allow you to get into, I guess, observations of his demeanor, which I think is admissible. But as far as if he told him, "gosh, I'm surprised about these, I've never seen these before," then that would be hearsay and so I wouldn't allow that.

MR. DURLAND: I guess, I don't think that would be hearsay, your Honor, because it would be a present-sense impression and expression of state of mind and I think it would fall into the 803 exception, but --

THE COURT: Maybe. I guess it depends on the circumstances of how he testifies to that. If it

K. WEPPNER V. THE COUNTY OF ERIE

was just based on conversations with him and then he -- he knew that he wasn't aware of these, then that would not be, that would not be permitted.

MR. DURLAND: Okay. Your Honor, what I expect, what I anticipated doing was trying to ask Mr. Walker some very specific questions, you know, about Mr. McCloud's remarks, the content of the remarks, and the FOIL request, and then asking, you know, do you recall sharing this discovery with Mr. Boyd, what was his reaction. And but I don't want to ask that if there is a circumstance where -- I want to ask it, but I'm concerned that your Honor is going to say you shouldn't have done that because the answer to that he gives, you know, your Honor finds, you know, to not meet the hearsay exception.

THE COURT: I think if you can establish some very minimal foundation that, you know, you gave him these documents. Were you able to observe any reaction out of him, and he says, yes, I was, I observed this reaction and he acted surprised, I think that is fair.

MR. DURLAND: Is it your Honor's ruling that if -- if Mr. Boyd or if Mr. Walker and Mr. Boyd were not physically in the same location, that Mr. Boyd's

K. WEPPNER V. THE COUNTY OF ERIE

reaction would be inadmissible?  In other words, if this was a discussion on the telephone?

THE COURT:  I think that he could testify about his, like, demeanor, and so I guess if he wants to describe it as he acted surprised, then I would allow it.

MR. DURLAND:  Okay.

THE COURT:  And I don't think there is going to be -- I don't expect a lot of testimony on that, but I think that would be fair as kind of a description of whether it was hearing his demeanor over the phone or whether it was observing it in person, that his demeanor was surprised, I think that is fair.  Is that helpful to you?

MR. DURLAND:  It is, your Honor.  I remain concerned that, you know, I'm doing my absolute best to make sure Mr. Walker stays within bounds -- within the bounds the Court is setting.  I'm going to be asking really precise questions and I will have told Mr. Walker what your Honor has said he can and cannot say.  You know, I anticipate that he will do his best to stay within those bounds on cross examination as well, but, you know, I can keep my questioning really tight, but if, you know, if the County wants to try and test his,

K. WEPPNER V. THE COUNTY OF ERIE

you know, his testimony about Mr. Boyd's reaction or something, you know, he may, he may say things about, you know, his own reaction.  I just want to put that out there, because this is very difficult for Mr. Walker to, you know, on the fly, observe these very nuanced distinctions that I know make perfect sense to all of the lawyers and your Honor as well, but to him this is his life and he just has trouble with it.

THE COURT:  I understand.  If you need a few minutes after you play the Boyd designations to go talk to him about this, then that is fine.

MR. DURLAND:  That would be helpful.

THE COURT:  And one other thing, I don't want Mr. Walker talking about how they had a shared attorney.  I don't think that is relevant at all.  And so I think the potential is that they had to the same attorney, that made these same arguments and that the SAME results happened.  And so the photos that you provided, I think if there were any photos of them kind of at a joint press conference after the vacatur, then those would not be admissible.  But them engaging in post conviction activities are fine.

MR. DURLAND:  I understand.

THE COURT:  You understand, Mr. Durland, the

K. WEPPNER V. THE COUNTY OF ERIE

guiding principle is I don't want Mr. Walker's testimony to reveal in any way that the reasons that he was challenging his conviction, that he was successful in challenging his conviction for the potential of prejudice, so I just want to make sure that you're clear on that.  And I know that your concerned about Mr. Walker, so, again, I'll give you some time to talk to him about this before he comes in.

MR. DURLAND:  And I am allowed to play the video of District Attorney Flynn that has been admitted, 218?

THE COURT:  Yes.

MR. DURLAND:  Thank you.

THE COURT:  Okay.  Anything else?

I want to remind maybe, Mr. Hanft, after the deposition of Mr. Boyd regarding what the parole officer said to him, if you could just pause that so I can read the limiting instruction to the jury, or whoever is in charge of the video.

MR. DURLAND:  Your Honor, would it be okay if I just stepped out and spoke to Mr. Walker now and that way we wouldn't have to break up the --

THE COURT:  That's fine.  I just want to give you one more -- give everyone one more thing.  I

K. WEPPNER V. THE COUNTY OF ERIE

have a proposed limiting instruction regarding Mr. Walker's testimony that I want to pass down.  I'll read it to you now:

I expect that you will hear testimony from Mr. Walker that he engaged in post-conviction activities with Mr. Boyd to challenge their respective convictions. You should not speculate as to any of the reasons why Mr. Walker challenged his conviction.  That is irrelevant to this case.  Evidence of Mr. Walker's post-conviction activities with Mr. Boyd should only be considered for the limited purpose of explaining why Mr. Walker was involved in those activities as it relates to damages.

So I'm going to just pass it down so you can read it.

Would anyone like to be heard regarding that proposed instruction?

MR. DURLAND:  Yes, your Honor.

MR. FIRSENBAUM:  Yes, your Honor.

THE COURT:  Go ahead.

MR. FIRSENBAUM:  So I think for the last sentence, the evidence is -- that you just -- your Honor just discussed with Mr. Durland that I believe is relevant to the issue of non-disclosure of the Brady

K. WEPPNER V. THE COUNTY OF ERIE

evidence as to Mr. Boyd.

THE COURT:  How is that?

MR. FIRSENBAUM:  The testimony that Mr. Boyd was surprised to hear of the photographs and the FOIL documents in response to the FOIL request explains how he first learned of -- of the Brady evidence that Mr. Boyd is alleging was not disclosed in his case.

Yeah, as Mr. Durland, it's also relevant to the existence of the photographs which is another factual disputed issue in dispute.

THE COURT:  And so we didn't really get into the details of the documents, but do you expect Mr. Walker to testify about what those documents were?

MR. DURLAND:  I expect Mr. Walker to testify about, if we're talking about the photographs, about what Mr. McCloud described at this event, the content of the photographs.  And I expect him to describe, I mean, what he recalls being in the FOIL response were P73s regarding Larry Watson, Jerome Boyd and a taxicab investigation.  So I anticipate that.

THE COURT:  And that testimony is fine regarding the P73s.  As far as testimony from -- so Mr. McCloud, so you're proposing that Mr. Walker testify that Mr. McCloud told him about photographs.  Where was

K. WEPPNER V. THE COUNTY OF ERIE

this?

MR. DURLAND:  This was at the dinner event. This is where Mr. McCloud was talking about the photographs and the content of them.  And in our view, that is one part of the narrative and the impetus for the FOIL request, but also the fact that, you know, the mention of the photographs was, you know, not something prompted by, you know, it wasn't an assertion raised in the context of, you know, litigation.  This was just as part of this event, Mr. McCloud mentioned it.

THE COURT:  What is the hearsay exception for allowing Mr. Walker to testify what Mr. Cloud told them?

MR. DURLAND:  Because we're not offering this for the truth, we're offering it for the fact that Mr. McCloud said it.  We expect that -- the County already opened on the contention that these photographs don't exist.  So the fact that Mr. McCloud had started talking about the photographs long before this case was in existence is probative in and of itself.

THE COURT:  I'm not going to allow Mr. Walker to testify to what Mr. McCloud said.  I don't see how -- I don't see how that evidence is relevant other than for the truth of the matter.  Now, Mr. McCloud --

K. WEPPNER V. THE COUNTY OF ERIE

Mr. McCloud could potentially testify to that.

MR. DURLAND:  But, your Honor, Mr. Walker can't even say that he heard Mr. McCloud talk about photographs that were used in the defense of the Martin trial?  I mean, that was the impetus for the FOIL request.  I would imagine it would come in just for Mr. Walker's state of mind.

THE COURT:  No, because then if it's an impetus for the FOIL request, then we're getting into the reasons why Mr. Walker is challenging his convictions and the reason why he did a FOIL request, so I don't want any of the substance of why Mr. Walker is challenging his conviction, none of that is admissible.

MR. DURLAND:  Well, I mean, I wasn't intending to have Mr. Walker say, "I did a FOIL request because I was challenging my conviction," I would ask him, after you heard about Mr. McCloud's remarks, what did you do next.  He'll say, "I submitted a FOIL request."  And I'll say, "to whom?"  He'll say, "The Erie County District Attorney's Office."  "Did you get a response?"  "Yes, I did."  "Did you review it."  And he would say what was in the response and then he would share that with Mr. Boyd.

THE COURT:  That portion is fine.  He can

K. WEPPNER V. THE COUNTY OF ERIE

testify he did a FOIL request, he got these documents and he shared them with Mr. Boyd.  But that has nothing to do with what Mr. McCloud told him about the photographs.

MR. DURLAND:  Your Honor, several things.  I believe in the last case, we introduced this testimony and I understand it's, you know, somewhat different because now Mr. Walker is not the Plaintiff, but the County was permitted previously to cross examine Mr. McCloud, and I'm sure they plan on doing it again, that he hadn't previously raised these photographs and this is some new kind of contrivance, so in that regard, I think this is clearly rehabilitation of what in response to the argument that the County is going to be making, at least could Mr. Walker say, there was a dinner event, Mr. McCloud spoke, and as a result of Mr. McCloud's comments, he submitted a FOIL request, and then we'll have Mr. McCloud throw in the details if your Honor is going to allow Mr. McCloud to testify about it.

THE COURT:  No.  Mr. Walker cannot testify to that because what that does is it implies the fact that these photographs existed, that he didn't have, he is making this FOIL request, and that is getting into the substance and the reasons why he is challenging his

K. WEPPNER V. THE COUNTY OF ERIE conviction and that is not permitted.

You know, the problem, I think, is with this testimony is that, is that you want it to come from Mr. Walker.  If Mr. McCloud testifies to this as it pertains to Mr. Boyd, then that is different.  So you can Mr. McCloud testify to it, but I'm not allowing Mr. Walker to testify to it because of the implications, the potential implications.

MR. DURLAND:  But if it's not -- sorry, your Honor.  If what Mr. Walker says is not about photographs, but just as a result of Mr. -- just, in other words, just to put the framework on it.  I wouldn't say because you heard about photographs, we would say was there a dinner event, Mr. Mr. McCloud spoke, as a result of Mr. Mr. McCloud's comments, did you make a FOIL request or following Mr. McCloud's comments did you make a FOIL request?

THE COURT:  No, because I already said -- Mr. McCloud, and correct me if I'm wrong, at this point he is representing both Mr. Boyd and Mr. Walker at this time?  No.  Okay.  Is there going to be evidence later that Mr. McCloud talked about these photographs at the dinner from Mr. McCloud?  I guess I don't see -- I don't see the relevancy.  We don't know the reason.  We don't

K. WEPPNER V. THE COUNTY OF ERIE

know the -- know the reason why Mr. Walker made a FOIL request. He made a FOIL request. He got photographs or he got records and he gave them to Mr. Boyd. I mean, that is what is relevant. How is the fact -- how is the fact that Mr. McCloud made these statements to him relevant to why he got -- relevant to this at all?

MR. DURLAND: Well, it's relevant, your Honor, because of the comments Mr. McCloud made. And also because Mr. Walker relayed this information to Mr. Boyd. And I believe that Mr. Walker will be able to testify to Mr. Boyd's reaction.

MS. SILOS: About the photograph specific and not about them. Mr. Walker heard about these photographs and told Mr. Boyd and realized that Mr. Boyd was involved, it's the same logic.

MR. FIRSENBAUM: It also provides --

THE COURT: Let me follow up on that. So Mr. McCloud can't testify to this. The only person that could testify to this would be Mr. Walker?

MR. DURLAND: I think, I have to talk to Mr. Walker, but I'm confident that Mr. McCloud could not testify to Mr. Boyd's reaction to this fact.

THE COURT: Okay. I'm not going to allow it. I understand your position, but I think that it is

K. WEPPNER V. THE COUNTY OF ERIE

-- there is a risk of prejudice that the only reason that Mr. Walker is talking to Mr. McCloud about these alleged missing photographs is because they are helpful to -- helpful to him, that they are relevant to Mr. Walker's case.  That is where the risk is.  And so that is the reason I'm going to not allow that testimony.  Okay.

Let me just go back to Mr. Firsenbaum what you had said about this limiting instruction.

Well, Mr. Blenk, did you want to be heard about the limiting instruction?

MS. MEANS:  Your Honor, our position is that it should remain as drafted.  I think adding any language to this is going to speak to an ultimate issue and to be overly suggestive.  I think the conversation just now is, again, just demonstrating the opinion that Mr. Walker's testimony generally in this case and to now infuse the suggestion that it should also be considered for purposes of the ultimate issue in this case, I think would be improper.

THE COURT:  Okay.  Mr. Firsenbaum, I think that the way I'm going to respond to your request to kind of modify that last sentence is that I'm only talking about the post-conviction activities.  And if

K. WEPPNER V. THE COUNTY OF ERIE

there is another term that you think I should use, but I'm only talking about the post conviction, I mean, the protest they were doing, those kind of things, so it doesn't pertain to, I guess, the limited testimony that he gave these to Mr. Boyd and he observed that Mr. Boyd was surprised about it.

I can understand like the word "activities" might kind of encapsulate that, so if you think there is a better term to use. But in my view, it doesn't, it's just talking about these post-conviction activities.

MR. FIRSENBAUM:  I agree it's an accurate statement based on your Honor's interpretation, so if we could change the word "activities" to another word. "Post-conviction advocacy"?

THE COURT:  Okay.

MR. FIRSENBAUM:  Okay.

THE COURT:  Okay.  I changed it to "advocacy."

MR. FIRSENBAUM:  And just for the record and our understanding of what the rulings have been made, has your Honor reserved on what Mr. McCloud can do or is there a ruling on what Mr. McCloud can say on this issue?  We don't need it right now, I want to make sure we understand if it's something we can continue to

K. WEPPNER V. THE COUNTY OF ERIE

address.

THE COURT:  I think you can continue to address it.  Because in fairness to the defense, I wasn't really giving them an opportunity to respond to that, because I really wanted to primarily focus on Mr. Walker's expected testimony.  We can definitely revisit this testimony with Mr. McCloud and I'll give the defense a chance to respond to that.

MR. FIRSENBAUM:  Thank you.

THE COURT:  So we'll finish up Mr. Boyd's designations.  Mr. Durland, if you want to leave the courtroom and talk to Mr. Walker, then that's fine.

We can bring the jurors in.

(Whereupon, the jury is escorted into the courtroom.)

THE COURT:  Just have a seat.  Our jurors have returned to the courtroom.  I hope you had a good lunch.  I assure you we were back here at 1:30 and we had to address some things.  I didn't think it would take that long.  Thank you for your patience.  We're going to continue with Plaintiff's case in chief.  Specifically Mr. Boyd's deposition.

Counsel can proceed.

(Video testimony is played.)

K. WEPPNER V. THE COUNTY OF ERIE

THE COURT:  We're going to pause for a second and I'm going to read you a limiting instruction with respect to some of the statements that you just heard.  You just heard testimony by Mr. Boyd about alleged statements made to him by his parole officer.  Normally such evidence, known as hearsay, is not permitted.  However, an exception applies here, and so you may consider this testimony, not for its truth, but rather for the limited purpose of how the alleged parole officer's statements may have affected the listener, that is Mr. Boyd, and its relevancy to damages.

Okay.  Thank you.  You can proceed.

(Video testimony continues.)

THE COURT:  Okay.  That concludes the Boyd deposition designations.  Before we have Plaintiff call our next witness, I just want to address something with the jurors.  When you come up, when you come back from your lunch or come up in the morning to start the day, you should make sure that you go to the court security officer that is at the desk near the elevator on the second floor and they will bring you over to the jury room.  We just want to avoid any juror hanging out in the area outside of the courtroom because that is where the attorneys are and the parties, and we just want to

K. WEPPNER V. THE COUNTY OF ERIE

avoid as much interaction amongst you as possible.  So if you could please just make sure you're not hanging outside of the courtroom and talk to the court security officer, there should always be one there at the desk, they will bring you straight to the jury room and you can stay at the jury room.

Okay.  Thank you for your cooperation.

Okay.  We can proceed with the witnesses and Plaintiff can call their next witness.  And while we're bringing in the next witness, I'm going to actually ask the jury if they can just move over to the end of the box.

MR. FIRSENBAUM:  Your Honor, may we move the monitor for him?  Can I approach to help?

THE COURT:  Come on up.

(Whereupon, the witness took the witness stand.)

Okay.  Before we proceed with the next witness, I just want to read an instruction to the jurors about Mr. Walker's testimony.  I expect that you will hear testimony from Mr. Walker that he engaged in post-conviction advocacy with Mr. Boyd to challenge their respective convictions.  You should not speculate as to any of the reasons why Mr. Walker challenged his

J. WALKER - DX BY MR. DURLAND

own conviction.  That is irrelevant to this case. Evidence of Mr. Walker's post-conviction advocacy with Mr. Boyd should only be considered for the limited purpose of explaining why Mr. Walker was involved in those activities as it relates to damages.

Okay.  Thank you.  You can proceed.

MR. DURLAND:  Thank you, your Honor.

THE COURT:  We'll swear him in.

**(J. WALKER, JR. WAS CALLED TO THE WITNESS STAND AND SWORN.)**

THE COURT:  Afternoon, Mr. Walker.  Why don't you introduce yourself to the jury?

MR. DURLAND:  My name is John Walker, Jr.

And, John, I know that you haven't been feeling your best, please try and keep your voice up.

THE WITNESS:  I'll do the best I can.

MR. DURLAND:  And if you get tired or need a break, let me know.

THE WITNESS:  I will.

**DIRECT EXAMINATION BY MR. DURLAND:**

Q.  How old are you now, Mr. Walker?

A.  I'm 66 years old right now.

Q.  Where were you born?

A.  Buffalo, New York.

J. WALKER - DX BY MR. DURLAND

Q.   Where do you live now?

A.   Outside of Buffalo in Depew.

Q.   Are you married?

A.   No.

Q.   Any children?

A.   I do.

Q.   Son or a daughter?

A.   I have a son.

Q.   And his name?

A.   John Walker, III.

Q.   Let's go back to the 1976.  How old were you in January of 1976?

A.   I was 16 years old.

Q.   Where were you living at the time?

A.   In Buffalo, New York on the east side.

Q.   Do you remember the address?

A.   403 Best Street.

Q.   B-e-s-t?

A.   B-e-s-t, correct.

Q.   And did you know Darryl Boyd before the William Crawford case?

A.   Yes.

Q.   And how did you know Darryl Boyd?

A.   He used to come by my house, he used to hang with

J. WALKER - DX BY MR. DURLAND

my brother.

Q.   He was a friend of yours?

A.   Friend of mine and my brother's.

Q.   And how old was Darryl Boyd in 1976?

A.   He was also 16 years old.

Q.   And where did Darryl Boyd live?

A.   At 93 Leroy Street in Buffalo, New York.

Q.   And where is Leroy, what is the nearest kind of Main Street near Leroy?

A.   Off of Fillmore Avenue.

Q.   How long did you and Darryl Boyd remain friends?

A.   To the day he passed away.

Q.   When was that?

A.   February of 2025, just recently.

Q.   At some point, Mr. Walker, were you questioned by the police regarding the murder of William Crawford?

A.   I was.

Q.   And when was that?

A.   In January the 11th, 1976.

Q.   Where did the questioning occur?

A.   Down at what they call headquarters.

Q.   Okay.  When the detectives questioned you on January 11th, did they say what this was all about?

A.   They told me they was investigating the death of

J. WALKER - DX BY MR. DURLAND

William Crawford.

Q. And at that time, did you give a written statement?

A. Yes, yes, I did, I signed a statement, yes.

Q. And you gave a statement and they typed it up and you signed it?

A. Correct.

MR. DURLAND: Could we have PX 26, please, in front of Mr. Walker?

Judge, this is in evidence.

Could we show Mr. Walker the top of this document?

Q. Do you see that, John?

A. I do.

Q. And if we could come down to the very bottom.

THE COURT: Is this on for the jurors?

MR. DURLAND: Yes, this is in evidence. Please. PX 26 was introduced earlier today.

Perhaps we go back to the top.

THE COURT: That's fine, thank you.

Q. Mr. Walker, is this the typed statement that you were just describing to me?

A. It is.

Q. Could we go down to the bottom of page two,

J. WALKER - DX BY MR. DURLAND

please.  Is that your signature, Mr. Walker?

A.  Yes, it is.

Q.  Let's go back to page one of this same document and enlarge the third Q and A.

Question:  We are investigating the beating death of one William F. Crawford, a white male who lived at 2041 Fillmore Avenue, he was 62 years old.  Mr. Crawford's body was found in the ally way of his home at 1:30 a.m., 1376.  I want you to tell me in your own words what you know or heard in regards Mr. Crawford's death.

Answer:  I read it in the newspaper and heard it on the news and Darryn and them told me that you all picked him up and questioned him.  That is all I know about it.

Did I read that correctly?

A.  You did.

Q.  Your answer refers to Darryn?

A.  Yes.

Q.  Who is that?

A.  Darryn Gibson was a friend of ours.

Q.  And when you say a friend of ours, he was a friend of Mr. Boyd's?

A.  Yes.

J. WALKER - DX BY MR. DURLAND

Q.   Is he still alive?

A.   No, he passed away.

Q.   How old was Darryn Gibson?

A.   He was also 16 years old.

Q.   Where did he live?

A.   On Wakefield Avenue, a street off Fillmore.

Q.   And you said Wakefield Avenue?

A.   Yes.

Q.   And that is also off of Fillmore?

A.   Yes.

Q.   Let's return to Mr. Walker's statement, the fourth Q and A.

Question:  Who were you with Friday evening January 2nd, 1976?

Answer:  I was with Darryl Boyd, 16 years old, Floyd Martin, 16 years old of 130 Glenny Apartment C-9, Darryn Gibson, 16 years old of 190 Wakefield, Tony Woodruff of 494 Best Street.  Did I read that correctly?

A.   Yes.

Q.   This answer mentions Darryl Boyd and Darryn Gibson who we've already talked about, right?

A.   Yes.

Q.   And it also mentioned a Floyd Martin?

A.   Yes.

J. WALKER - DX BY MR. DURLAND

Q.   Who is Floyd Martin?

A.   Floyd Martin is another friend of ours that was investigated about the death of William Crawford.

Q.   And did Floyd Martin have a nickname?

A.   Yes, he did.  Dinky, D-i-n-k-y.

Q.   And how old was Floyd Martin in January of 1976?

A.   He was also 16 years old.

Q.   Where did Floyd Martin live?

A.   Glenny Drive Apartments, apartment 138.

Q.   And did Floyd Martin have an older brother?

A.   Yes, he did.

Q.   What was his name?

A.   Eugene Martin, we call him Musky.  That was his nickname, Musky.

Q.   Is Floyd Martin still alive, Mr. Walker?

A.   No.

Q.   This answer here also refers to Tyrone Woodruff, Tony Woodruff.  Do you see that?

A.   Yes, I do.

Q.   Who is Tony Woodruff?

A.   Another friend of ours.

Q.   He was a friend of you and Floyd Martin and Darryl Gibson and Darryn Boyd?

A.   Yes.

J. WALKER - DX BY MR. DURLAND

Q.    And how old was Tyrone Woodruff in January of 1976?

A.    He was also 16 years old.

Q.    And where did Tyrone Woodruff live at the time?

A.    Down the street from me on Best Street.

Q.    Is Tyrone Woodruff still alive?

A.    Yes.

Q.    Could we show for the witness only please PX 275

A.    Do you recognize this photograph, Mr. Walker?

A.    I do.

Q.    Who is this?

A.    Tyrone Woodruff.

Q.    Is this a fair and accurate depiction of Tyrone Woodruff in January of 1976?

A.    Yes, it is.

            MR. DURLAND:  Offer this into evidence, Judge.

            THE COURT:  Any objection?

            MS. MEANS:  No objection.

            THE COURT:  Exhibit is received.

            (**WHEREUPON, EXHIBIT PX 275 A WAS RECEIVED INTO EVIDENCE.**)

Q.    Now that the jury has had a chance to look at this, this is Tyrone Woodruff that lives on Best Street,

J. WALKER - DX BY MR. DURLAND

the street down from you?

A.  Yes.

Q.  And this is what he looked like in January of 1976?

A.  Yes.

Q.  Let me ask you -- we can take that down.

Do you remember a person named Andre Hough?

A.  I do.

Q.  Who is Andre Hough?

A.  He was a cousin of Darryl Boyd's.

Q.  And how old was he in 1976?

A.  I believe 14 years old, 14 or 15 years old.

Q.  14 or 16?

A.  Yes.

Q.  Where did he live in January of 1976?

A.  He also lived in Glenny Drive Apartments.

Q.  Is Andre Hough alive today?

A.  No.

Q.  If we could have for Mr. Walker, for the witness only, PX 276 A.

Do you recognize the person depicted in this photograph, Mr. Walker?

A.  I do.

Q.  Who is it?

J. WALKER - DX BY MR. DURLAND

A.   Andre Hough.

Q.   Is this photo a fair and accurate photo of Andre Hough in January of 1976?

A.   Yes, it is.

MR. DURLAND:  Move this in, Judge.

THE COURT:  Any objection?

MS. MEANS:  No, your Honor.

THE COURT:  PX 276 A is received.

(**WHEREUPON, EXHIBIT PX 276 A IS RECEIVED INTO EVIDENCE.**)

MR. DURLAND:  If we could publish that to the jury, please.

Q.   Mr. Walker, this is Andre Hough, the 14 or 15 year old who lived in the Glenny Drive Apartments?

A.   Yes, it is.

MR. DURLAND:  Let's go back to Mr. Walker's statement, PX 26, and if we could enlarge on the page Q and As five through seven.

Q.   Question:  What time did you meet these fellows and what did you do?

Answer:  Between 4 and 5 o'clock, stayed in the Glenny Drive Apartment at Shirley's house.  She lives at 138 Glenny Drive on the sixth floor.

Question:  What time did you leave the Glenny

J. WALKER - DX BY MR. DURLAND

Drive apartment?

Answer:  About 12 midnight.

Question:  And then what did you do?

Answer:  I went home in a cab with Tony and went to bed.

Did I read that correctly?

A.  You did.

Q.  There is a reference here in your answer to "Shirley."  Do you see that?

A.  Yes, I do.

Q.  Who is Shirley?

A.  Shirley Floyd is Floyd Martin's brother's girlfriend.

Q.  Was that Eugene?

A.  Musky, Eugene.

Q.  So Shirley Floyd is Eugene's girlfriend?

A.  Yes.

Q.  And where did she live?

A.  She lived in the Glenny Drive apartment, I believe 138 Glenny Drive.

Q.  You said you believe 138 Glenny Drive?

A.  Yes.  I believe she lived in the same building as Floyd lived in or could have been the one next to it.

Q.  If you could do your best to keep your voice up,

J. WALKER - DX BY MR. DURLAND

John, that would be great.

THE COURT:  Is there a way to move the microphone closer.

MR. DURLAND:  Mr. Walker said he couldn't see.  I had moved the microphone in front of the screen.

THE COURT:  Okay.

Q.   So we were just talking about Shirley Floyd and you said she lived in the Glenny Drive Apartments?

A.   Yes.

MR. DURLAND:  Let's show for the witness only, please PX 277A.

Q.   Mr. Walker, do you recognize what is depicted in this photograph?

A.   Yes.

Q.   What is it?

A.   138 Glenny Drive.

Q.   How often did you see this apartment building in 1976?

A.   Quite often.

Q.   Is this a fair and accurate depiction of the Glenny Drive Apartment building on January 2nd, 1976?

A.   Yes, it is.

MR. DURLAND:  Move this in, Judge.

THE COURT:  Any objection?

J. WALKER - DX BY MR. DURLAND

Counsel, any objection?

MR. BLENK:  May we have a moment of voir dire?

THE COURT:  Sure.

VOIR DIRE BY MS. MEANS:

Q.  Good afternoon, Mr. Walker.

A.  Good afternoon.

Q.  How can you tell that this is 138 Glenny Drive?

A.  Because I remember it's the one that had the tower on top of it.

Q.  I'm sorry, the what on top of it?

A.  If you look at the picture, the big tower on top of the building.  And when we went to visit Floyd Martin, we would always go up on the tower.  And I knew what building that was because of that tower.

MS. MEANS:  Okay.  Nothing further, your Honor.  No objection.

THE COURT:  PX 277A is received.

(**WHEREUPON, EXHIBIT PX 277A WAS RECEIVED INTO EVIDENCE.**)

MR. DURLAND:  Can we publish this to the jury, please?

Q.  So, John, this is the Glenny Drive Apartment building?

J. WALKER - DX BY MR. DURLAND

A.   Correct.

Q.   And that structure we see at the top of the photograph, that is the water tower that you were just describing?

A.   Yes, it is.

Q.   And this is where Floyd Martin lived?

A.   Yes.

Q.   And Shirley Floyd lived?

A.   Yes.

MR. DURLAND:  And let's take that down the photo let's show Mr. Walker's statement again PX 26, page one, Q and A five through seven.

Q.   These are the three questions and answers we just looked at, right?

A.   Yes, it is.

Q.   And you told the police that you left about midnight?

A.   Yes.

Q.   And you told the police that you went home with Tony in a cab and went to bed.  Do you see that?

A.   Yes.

Q.   Who is Tony?

A.   Tyrone Woodruff.

Q.   That is the friend that lives on Best Street with

J. WALKER - DX BY MR. DURLAND

you?

A.    Down the street from me, correct.

Q.    Down the street from you?

A.    Staying with Mr. Walker's statement, can we look at page two Q and three two through eight.

          Question:  Do you know where the Golden Nugget Tavern is?

          Answer:  Yes.

          Question:  When is the last time you were near there?

          Answer:  It has been a long time.  I would say about two weeks.

          Did I read that correctly?

A.    You did.

Q.    Where was the Golden Nugget located in 1976, on what street?

A.    On Fillmore Avenue.

Q.    Did you frequently walk down Fillmore Avenue in 1976?

A.    Yes.

Q.    Is that a main street in your neighborhood?

A.    Yes.  Like I said, Darryl Boyd and Darryn Gibson all were on Fillmore, so we would go to one of the houses and we would constantly walk past it.

J. WALKER - DX BY MR. DURLAND

MR. DURLAND:  If we could show for the witness only, please, PX 277B.

Q.   Mr. Walker, is this a fair and accurate depiction of the Golden Nugget in 1976?

A.   Yes, it is.

MR. DURLAND:  Offer into evidence.

MS. MEANS:  No objection, your Honor.

THE COURT:  PX 277B is received.

(**WHEREUPON, EXHIBIT PX 277B WAS RECEIVED INTO EVIDENCE.**)

Q.   Mr. Walker, where in this photograph is the Golden Nugget?

A.   To the right.

Q.   And what is the street that is cutting diagonally from left to right in the photograph?

A.   That is Fillmore Avenue.

MR. DURLAND:  Let's go back to Mr. Walker's January 11th statement and publish page two, Q and A 10 through 15.

Q.   Question:  Did you know Mr. Crawford.

Answer:  No.

Question:  Had you ever seen him?

Answer:  I don't think so.

Question:  Did any of the fellows that you have

J. WALKER - DX BY MR. DURLAND

named tell you that they knew anything about the death of Mr. Crawford?

Answer:  No.

Question:  Do you know anything about the death of Mr. Crawford that you haven't told us.

Answer:  No.

Question:  When will you be able to take a lie detector test about this case?

Answer:  Any time.

Question:  Is there anything else that you can tell us that will aid us in this investigation?

Answer:  No.

Did I read that correctly?

A.   You did.

Q.   If we could drop down to page two, the last two Q and answer.

Question:  I will now have you read this statement.  If there is anything you wish to add, change or correct, you may do so at this time.  Do you understand?

Answer:  Yes.

Question:  Now that you have read the statement, is it true and correct?

Answer:  Yes.

J. WALKER - DX BY MR. DURLAND

Q. Did I read that correctly, Mr. Walker?

A. You did.

Q. And is this your signature here at the bottom of page two?

A. It is.

Q. At some point, Mr. Walker -- we can take the statement down.  Thank you.

At some point, Mr. Walker, were you arrested for the murder of William Crawford?

A. I was.

Q. And when was that?

A. January the 12th.

Q. The day after your statement?

A. Correct.

Q. And were where you taken?

A. Down the lockup, headquarters is where they lock you up at.

Q. Who was in lock up?

A. Darryl Boyd and Darryn Gibson.

Q. Was Tyrone Woodruff there?

A. No.

Q. What happened the next day following your arrest?

A. We went to court on arraignment, I think they call it.

J. WALKER - DX BY MR. DURLAND

Q.  And what did you understand arraignment to be?

A.  Where they inform you of what charges you were being charged for.

Q.  And did you find out then why Tyrone Woodruff was not in jail with you?

A.  I did.

Q.  Why was that?

A.  Because he was saying that we had committed the crime that they was charging us with.

Q.  And at some point you were convicted of the Crawford homicide?

A.  I was.

Q.  And were you imprisoned?

A.  I was.

Q.  How long was it until you were paroled?

A.  Twenty-two years.

Q.  Okay.  After you and Mr. Boyd were released from prison onto parole, did you and Darryl Boyd take steps to bring public attention to your case?

A.  For certain, yes.

Q.  What sort of things did the two of you do?

A.  Gave rallies, we gave dinners, we gave any rare opportunity to tell people about our case, we took that opportunity.

J. WALKER - DX BY MR. DURLAND

MR. DURLAND:  Okay.  If we could show for the witness only PX 278A.

Q.  Do you recognize this photograph, Mr. Walker?

A.  I do.

Q.  Does this photo fairly and accurately depict an event that you and Darryl held to bring public attention to your case?

A.  Yes, it does.

MR. DURLAND:  Move this into evidence, Judge.

THE COURT:  Any objection?

MS. MEANS:  Your Honor, may we approach.

THE COURT:  Sure.

(Whereupon, there was a sidebar discussion on the record.)

MS. MEANS:  My objection is that the image on the graphic, on the t-shirt that says "justice delayed" is suggestive and getting into Mr. Walker's conviction.

MR. DURLAND:  So I circulated the images before he was on the stand and the jury is in the box, I mean, it's tiny text.

THE COURT:  I mean, I'm going to allow it in, that image on the shirt.  The jury already knows

J. WALKER - DX BY MR. DURLAND

that he was challenging his own conviction, but there is nothing on the shirt that gives the reasons behind the challenge, which is what I've excluded.

MR. DURLAND:  I'm not going to ask him about his shirt, so that, I think, will help alleviate any concerns.

THE COURT:  Okay.  I'm going to receive PX 287.

MR. DURLAND:  Thank you, your Honor.

(Sidebar completed.)

THE COURT:  PX 278 A is received.  You can proceed.

(**WHEREUPON, EXHIBIT PX 278A WAS RECEIVED INTO EVIDENCE.**)

MR. DURLAND:  If we could publish this to the jury.

Q.  Mr. Walker, what are we looking at here?

A.  A picture of me and Darryl Boyd standing in the driveway where Mr. Crawford was murdered in.

Q.  And this photograph was published in a newspaper?

A.  Yes, it's called "Challenger Newspaper," a community newspaper.

Q.  And this was part of your efforts and Mr. Boyd's effort to bring public attention to your case?

J. WALKER - DX BY MR. DURLAND

A.   Correct.

MR. DURLAND:  If we could show for the witness only, please, 282, PX 282 A, 282 B and 282 C.

Q.   Do you recognize these photographs, Mr. Walker?

A.   I do.

Q.   Do these photographs fairly and accurately depict events that you and Darryl Boyd held to bring public awareness to your case?

A.   Yes.

MR. DURLAND:  Move these into evidence, your Honor.

THE COURT:  Any objection?

MS. MEANS:  No objection.

THE COURT:  PX 282 A, 282 B and 282 C are received.

(**WHEREUPON, EXHIBITS 282A, 282B AND 282C WERE RECEIVED INTO EVIDENCE**.)

MR. DURLAND:  Thank you, your Honor.  Can we please publish PX 282 A to the jury?

Q.   What does this depict?

A.   It's a picture of me and Darryl Boyd and my son standing in church where the pastor allowed us to get up and speak about our case.

Q.   Okay.  The boy in between you and Darryl is your

J. WALKER - DX BY MR. DURLAND

son?

A.   Yes, John Walker, III.

Q.   And where is Darryl Boyd standing?  Which of the two -- describe where in the photograph is Darryl Boyd standing.

A.   Darryl Boyd had the mike in his hand, he has the suit on.  The one with the white shirt is the pastor that allowed us to get up and speak and the young guy is my son, John Walker, III.

Q.   And you we're speaking about your case at church?

A.   Yes, because it was all in the community, so he allowed us to put it in the church, also.

Q.   Let's go to PX 282 B.

Is this another one of the events that you held to bring -- you and Darryl Boyd held to bring public attention to your case?

A.   Yes, it is.

Q.   Where are you standing in this photograph?

A.   In front of the court building, Erie County Court Building.

Q.   So this is the courthouse?

A.   Correct, the courthouse.

Q.   And which person here that is depicted in the photograph is you?

J. WALKER - DX BY MR. DURLAND

A.   I'm the one with the bull horn in my hand.  I have the bull horn up to my face.

Q.   And where is Darryl Boyd?

A.   Standing to the right of me.

Q.   To the right on the photo, it would be your left?

A.   To the left of me and to the right of the photo.

Q.   I understand.

MR. DURLAND:  Let's publish PX 282 C, please.

Q.   Is this the same event?

A.   Yes, it is.

Q.   And this is outside of the county courthouse?

A.   Correct.

Q.   This is another event that you and Darryl Boyd held or it's another photograph of an event that you and Darryl Boyd held to bring public attention to your case?

A.   It is.

Q.   And this gentleman who is standing closest to the camera, who is that?

A.   That is the same pastor, at this point he is a bishop, standing there talking with us and helping us with our case.  He believed what it was we was telling him.

MR. DURLAND:  And let's show PX 279 A to the

J. WALKER - DX BY MR. DURLAND

witness only, please.

Q.   Do you recognize this photograph, Mr. Walker?

A.   I do.

Q.   Approximately when was this photograph taken?

A.   Approximately 2020.

Q.   And does this photograph fairly and accurately depict another event that you and Darryl Boyd held to bring public attention to your case?

A.   Yes, it does.

MR. DURLAND:  Move this into evidence, your Honor.

THE COURT:  Any objection?

MS. MEANS:  No objection.

THE COURT:  279 A is received.

(**WHEREUPON, EXHIBIT PX 279A WAS RECEIVED INTO EVIDENCE**.)

MR. DURLAND:  If we could publish 279 A to the jury, please.

Q.   So, Mr. Walker, where are you in this photograph?

A.   Sitting in the wheelchair.

Q.   And who is the person to the left of you in the photo?

A.   Darryl Boyd.

Q.   And what building are you in front of?

J. WALKER - DX BY MR. DURLAND

A.   Same building, front of the courthouse.

Q.   So this was an example of you and Darryl Boyd picketing in front of the courthouse?

A.   Correct.

Q.   And what is this, you know, object here that is in front of Mr. Boyd?

A.   It's a bowling ball with a chain attached to it and it's locked around his ankle.  And it was meant to show how much extra weight we carry around when we're on parole.

Q.   Looks like writing there on the bowling ball?

A.   It is.

Q.   And what is that?

A.   "Lifetime parole."

MR. DURLAND:  If we could show for the witness only PX 280 A.  Do you recognize this photograph, Mr. Walker.

A.   I do.

Q.   Approximately when was it taken?

A.   Approximately around 2020, somewhere around that time, also.

Q.   Does this photograph fairly and accurately depict another event that you and Darryl Boyd held to bring public attention to your case?

J. WALKER - DX BY MR. DURLAND

A.   It does.

MR. DURLAND:  Move this into evidence, your Honor.

THE COURT:  Any objection?

MS. MEANS:  None.

THE COURT:  PX 280 is received.

(**WHEREUPON, EXHIBIT PX 280 WAS RECEIVED INTO EVIDENCE.**)

MR. DURLAND:  If we could publish this to the jury.

Q.   And, again, where are you?

A.   I have the bull horn in my hand.

Q.   And where is Darryl Boyd?

A.   Standing right to my right or left of the picture.

Q.   And where is this?

A.   Erie courthouse.

Q.   And this is another instance of holding an event in front of the courthouse?

A.   A lot of our events was held in front of the courthouse and we were trying to speak.

Q.   You said a lot of your events were held in front of the Erie County Courthouse?

A.   Yes.

J. WALKER - DX BY MR. DURLAND

Q.   Did there come a time when you submitted a FOIL request?

A.   Yes.

Q.   And tell the jury what FOIL stands from?

A.   Freedom of Information Law.

Q.   And who did you direct your FOIL request to?

A.   To the Erie County District Attorney's Office.

Q.   And did you receive a response to your request?

A.   I did.

Q.   And did you look at what was provided?

A.   I did.

Q.   And in the response to your request, did you find P 73s?

A.   Yes.

Q.   What was the subject matter of these P 73s?

A.   All kinds of subject dealing with our cases, what happened to us dealing with our case.

Q.   So, for example, did you discover P 73s regarding Larry Watson?

A.   I did.

Q.   Did you discover P 73s regarding Jerome Boyd?

A.   I did.

Q.   And in this response to your FOIL request, did that response also -- I'm sorry, we can take the photo

J. WALKER - DX BY MR. DURLAND

down.

Q.    Did this response to your FOIL request also include P 73s regarding a taxicab?

A.    Definitely, yes.

Q.    And did there come a time when you shared this discovery with Darryl Boyd?

A.    Yes.

Q.    Did there come a time, Mr. Walker, when you put those documents into Darryl Boyd's hand?

A.    Later there was, yes.

Q.    And did you have an opportunity to observe Darryl Boyd's demeanor when he reviewed those documents?

A.    Yes.

Q.    What was his demeanor?

A.    He was shocked.

Q.    Setting aside your case, just -- Darryl Boyd's conviction was vacated in August of 2021, is that correct?

A.    That's correct.

Q.    Do you recall that on the day Darryl Boyd's conviction was vacated, the Erie County District Attorney at the time gave a press conference?

A.    I recall.

Q.    Who was the district attorney, the Erie County

J. WALKER - DX BY MR. DURLAND

District Attorney at the time?

A.   His name was John Flynn.

Q.   Do you recall Erie County District Attorney John Flynn commenting on the strength of the evidence presented back in 1977?

A.   I do.

MR. DURLAND:  Could we play PX 218, please, and let's hear what Erie County District Attorney District Attorney John Flynn had to say.

(Video played.)

Q.   Do you recall District Attorney Flynn saying that Mr. Walker?

A.   I recall.

MR. DURLAND:  No further questions.

THE COURT:  Thank you.  Cross examination?

MS. MEANS:  Your Honor, may we request a five-minute recess.

THE COURT:  Can counsel approach?

(Whereupon, there was a sidebar discussion on the record.)

THE COURT:  What do you want the request for?

MS. MEANS:  I would just like to go over my questions.  The scope of the exam was somewhat different

J. WALKER - CX BY MS. MEANS

than I anticipated.

THE COURT:  Okay.  Well, I wanted to take a recess between Mr. Walker's testimony and Mr. Woodruff because we had to -- we have to just arrange some things, so, I mean, can you take a few minutes right now?

MS. MEANS:  That's fine.

THE COURT:  I'll give you a few minutes and we'll stay here.

MS. MEANS:  Thank you, your Honor.

(Sidebar completed.)

THE COURT:  We'll give you a few minutes.  Go ahead.

MS. MEANS:  Thank you, your Honor.

CROSS EXAMINATION BY MS. MEANS:

Q.  Good afternoon, again, Mr. Walker.  During Mr. Durland's questioning, you referred to a FOIL request that you made?

A.  Yes.

Q.  When did you make that FOIL request?

A.  It would have been 2005.

Q.  If I told you that our records indicate that it was in 2008, would you have any reason to disagree with that?

K. WEPPNER V. THE COUNTY OF ERIE

A.   I wouldn't argue with you.

Q.   I'm sorry?

A.   I wouldn't argue with that if you said that.

Q.   Thank you.  That's all we have.

THE COURT:  Any redirect?

MR. DURLAND:  No, your Honor.

THE COURT:  Okay.  Thank you, Mr. Walker.
Thank you, you're all set.

THE WITNESS:  Thank you.

THE COURT:  Okay.  Members of the jury,
we're going to take our mid-afternoon recess.  All of
the recess admonitions apply.  Don't talk about the case
with anyone.  We'll be about 10 or 15 minutes.  Thank
you.

(Whereupon, the jury is escorted from the
courtroom.)

THE COURT:  We'll be in recess.  Thank you.

(Whereupon, there was a break in the
proceeding.)

THE COURT:  We can go on the record.  The
jurors are still in the jury room.  We're going to move
onto the next witness, Mr. Woodruff.  Is that correct?

MS. HUGHES:  Yes, your Honor.  Before we do
that, the Plaintiff would like to offer two exhibits

K. WEPPNER V. THE COUNTY OF ERIE

into evidence.

THE COURT:  Go ahead.

MS. HUGHES:  Your Honor, the Plaintiff offers exhibit PX 32 into evidence.  This is Tyrone Woodruff's January 12th, 1976 statement, which is Tyrone Woodruff's change statement.  This change statement is part of the alleged fabricated evidence that gives rise to the apportionment defense.  The Plaintiff plans to show that ADA Drury was aware of this statement and so we need it entered into evidence.  And this statement is also necessary to provide a contrast with Mr. Woodruff's January 11th, 1976 statement to demonstrate that favorability with the two police reports documenting the circumstances of Mr. Woodruff's changed statement.  The document is not hearsay because it's not offered for the truth.

THE COURT:  Any objection?

MR. BLENK:  Your Honor, I think the exhibit would make more sense coming in with Mr. Woodruff on the stand.  It's his statement.

THE COURT:  Well, I mean, it will, they are just asking for it to be received now.  But, I mean, if you're objecting to it for lack of foundation, then -- do you have an objection to it?  Because it's my

K. WEPPNER V. THE COUNTY OF ERIE

understanding that they are offering it now and then they'll use it during Mr. Woodruff's testimony.

MR. BLENK:  I don't think, your Honor, that there is a -- I don't think there is a basis to get that document in except through Mr. Woodruff.  Mr. Woodruff is going to be allowed by your Honor to testify about what happened.  Putting in the statement of his one way or the other would need the context of what Mr. Woodruff's testimony is going to.

THE COURT:  Okay.  You know what, then you can offer it.  You have two exhibits, right?

MS. HUGHES:  Yes.

THE COURT:  What is the other?

MS. HUGHES:  The other exhibit is PX 48, which is Tyrone Woodruff's February 11th, 1976 handwritten statement that the Plaintiff alleges was required to be disclosed under Brady.  This document is relevant to Plaintiff's Brady allegations and it's non-hearsay evidence as it is not being offered for its truth but for rather its nondisclosure violated Brady.

THE COURT:  Do you have any objection to that exhibit PX 48?

MR. BLENK:  Again, your Honor, I think this is an exhibit that makes much more sense coming in

K. WEPPNER V. THE COUNTY OF ERIE through Mr. Woodruff himself.

THE COURT:  Okay.  You know what, then just offer the two exhibits during Mr. Woodruff's testimony and if you have any further arguments, we can address them then.

MR. BLENK:  Thank you, your Honor.

THE COURT:  Anything else before we call in the jurors?

Anything else, Ms. Hughes, before we call in the jurors?

MS. HUGHES:  No.

MR. BLENK:  No, your Honor.

THE COURT:  Okay.  We can bring the jurors in.

(Whereupon, the jury is escorted into the courtroom.)

THE COURT:  You can sit in your normal seats.

Have a seat, everyone.  Thank you.

Our jurors have returned to the courtroom after our recess.  We're going to continue with Plaintiff's case in chief.

Ms. Hughes, you can call your next witness.

MS. HUGHES:  Thank you, your Honor.

T. WOODRUFF - DX BY MS. HUGHES

Plaintiff calls Tyrone Woodruff.

THE COURT:  Mr. Woodruff, if you could stand in right here and you are going to be sworn in by my court clerk.

(**T. WOODRUFF WAS CALLED TO THE WITNESS STAND AND SWORN.**)

THE COURT:  Whenever you're ready.

MS. HUGHES:  Thank you.

**DIRECT EXAMINATION BY MS. HUGHES:**

Q.  Good afternoon would you please introduce yourself to the jury?

A.  My name is Tyrone Woodruff.

Q.  Where did you grow up, Mr. Woodruff?

A.  Buffalo, New York.

Q.  And where do you live now?

A.  Atlanta.

Q.  How long have you lived in Atlanta?

A.  About 20 years.

Q.  Do you own your home in Atlanta or rent?

A.  Own it.

Q.  When did you buy your house?

A.  In 2019.

Q.  What do you do for work?

A.  I drive trucks for FedEx.

Q.  And how long have you been with FedEx?

T. WOODRUFF - DX BY MS. HUGHES

A.  About 26 years.

Q.  Are you married?

A.  Yes.

Q.  Do you have children?

A.  Yes.

Q.  How many children do you have?

A.  I have three, my wife has two.

Q.  Do you have any grandchildren?

A.  Yes.

Q.  How many?

A.  About nine.

Q.  How old were you when you lived in Buffalo?

A.  I was born and raised here.

Q.  Were you friends with Darryl Boyd during that time?

A.  Yes.

Q.  How did you know Darryl?

A.  Through John Walker.

Q.  And how did you know John Walker?

A.  He stayed up the street from me.

Q.  And by stayed up the street from you?

A.  In the neighborhood.

Q.  You lived in the same neighborhood?

A.  Yes.

T. WOODRUFF - DX BY MS. HUGHES

Q.   And you were you friends with John Walker during that time?

A.   Yes.

Q.   How old were you in 1976?

A.   Seventeen.

MS. HUGHES:  Let's pull up Plaintiff's Exhibit 275 A, which is in evidence.

Q.   Mr. Woodruff, is this you in 1976?

A.   Yes.

MS. HUGHES:  Thank you.  We can pull that down.

Q.   Now, Mr. Woodruff, was there a time when you were interrogated by the Buffalo Police Department in connection with the murder of William Crawford?

A.   Yes.

Q.   Where were you interrogated?

A.   The Buffalo Police Headquarters.

Q.   How did you get there?

A.   Two detectives came and picked me up.

Q.   Where did they pick you up from?

A.   From home.

Q.   Did you feel that you had a choice about whether you could go -- wanted to go to the police station?

A.   No.

T. WOODRUFF - DX BY MS. HUGHES

Q. Did you feel that you were free to leave if you wanted to?

A. No.

Q. Who were you living with at that time?

A. Mother and father.

Q. Did your mother and father go with you to the police station?

A. No.

Q. Did anyone go with you to the police station?

A. No.

Q. And you said you were 17 at the time, correct?

A. Yes.

Q. Did the police ask you questions about the Crawford murder?

A. Yes.

Q. What did you tell them?

A. I didn't know what they was talking about.

Q. How long did they question you?

A. Hours. I can't say how long, but it was some hours.

Q. How many times did you tell them that you didn't know what they were talking about?

A. Constantly, over and over.

Q. Did you give a statement to police about where

T. WOODRUFF - DX BY MS. HUGHES

you were the night of January 2nd and who you were with?

A.   Yes.

Q.   I'd like to take a look at Plaintiff's Exhibit 27, which is in evidence.

Is this the first statement that you gave to police?

A.   Yes.

Q.   Let's take a look at the second question and answer.

Question:   The Buffalo Police are investigating the death of one William Crawford, a white male, 62 years old, that lived at 2041 Fillmore Avenue.  Mr. Crawford's body was found in the driveway of his home on January 3rd, 1976 at about 1:29 a.m.  Will you tell me in your own words what you know or may have heard about the death of Mr. Crawford.

And what was your answer, Mr. Woodruff?

A.   "I don't know nothing about the death of Mr. Crawford and I didn't hear nothing about it."

Q.   Before the police told you the information in that question I just read, did you know any of these facts about the death of William Crawford?

A.   "No, I didn't."

Q.   Let's take a look at the 4th through 8th sets of

T. WOODRUFF - DX BY MS. HUGHES

questions and answers.

First question reads or the 4th question reads: Were these the same friends that you were with on Friday, January 2nd, 1976?

Answer:  Yes.

Question:  Will you tell me who they are?

And what was the answer, Mr. Woodruff?

A.  Floyd Martin, Darryl Gibson -- Darryn Gibson, John Walker and Darryl Boyd.

Q.  Next question reads:  What time on January 2nd, 1976 did you meet these fellows and what did you do?

And what was the answer, Mr. Woodruff?

A.  "I do not know what time it was, but we were in the projects on Glenny Drive."

Q.  Next question is:  What time did you leave these fellows?

And what was your answer?

A.  "I do not know the time."

Q.  Next question:  How did you leave them and what was your answer?

A.  "Cab, I guess."

Q.  Pull up the tenth question.  The question is: Who did you go home with, if anyone.

And what was your answer?

T. WOODRUFF - DX BY MS. HUGHES

A.   "John Walker."

Q.   Now, let's look at the fifteenth question and answer.

Did any of your friends that you have named talk to you about the death of Mr. Crawford?

And what was your answer?

A.   "No."

Q.   Let's go to the second page of this document and look at the first and second questions and answers.

Question:  Did any of your friends tell you that they knew about the death of Mr. Crawford other than the news accounts.

And what was your answer?

A.   "No."

Q.   The second question is, is there anything else that you can tell us that will aid us in the investigation?

And what was your answer?

A.   "No."

Q.   And if we can see the, this whole page.  And you signed this document?

A.   Yes.

Q.   You can take that down now.  Now, after you gave this statement dated January 11th, did the police

T. WOODRUFF - DX BY MS. HUGHES

interrogate you more that day?

A.   Yeah.

Q.   Were your parents there with you?

A.   No.

Q.   Was anyone else there with you while you were interrogated?

A.   No.

Q.   What did you tell the police when they kept interrogating you?

A.   I didn't know anything about it.

Q.   How did the police make you feel during the interrogation?

A.   Scared, nervous, intimidated.

Q.   Did you feel physically intimidated by the police?

A.   Yes.

Q.   What was making you feel physically intimidated?

A.   Just the presence, the way they was coming.  The guns.  Things of that nature.

Q.   Was the fact that you were scared or nervous visible in any way?

A.   Oh, yeah, for sure.

Q.   How so?

A.   Just crying and just was ready to go.

T. WOODRUFF - DX BY MS. HUGHES

Q.   Was it visible to the police that you were crying?

A.   Yes.

Q.   Did the detectives tell you what would happen if you didn't cooperate?

A.   Yes.

Q.   What did they say?

A.   They said I would go away for a long time.

Q.   Did they tell you anything else?

A.   They said they had somebody upstairs that wanted to take my place and cooperate.

Q.   And what did you understand that to mean?

A.   That somebody else would be sitting where I'm sitting.

Q.   Did you understand that you would be offered a deal if you were the one who cooperated?

A.   Yes.

Q.   And did you understand that someone else would get the deal if they cooperated first?

A.   Yes.

Q.   What did you understand that the police wanted you to do to cooperate?

A.   To tell them something about it.

Q.   About what Mr. Woodruff?

T. WOODRUFF - DX BY MS. HUGHES

A.    About the death of Mr. Crawford.

Q.    And it was your understanding that if you -- what was your understanding that if you didn't cooperate and someone else did, what would happen to you?

A.    I would go to jail.

Q.    Did the police tell you you would be facing murder charges if you didn't cooperate?

A.    Yes.

MR. BLENK:  Objection, leading, your Honor.

THE COURT:  Sustained.  The question and answer are stricken.  If you could please keep it to open questions.  Go ahead.

Q.    Did the police say anything to you about a witness saw you involved?

A.    Yes.

Q.    What did they say?

A.    That somebody seen us.  I can't remember, but to that extent, somebody seen us and that was it.

Q.    Someone saw you what?

A.    They seen us doing this deed or something or I can't remember what it was, but that is what they tried to tell me.

Q.    How did that make you feel?

A.    I was nervous.

T. WOODRUFF - DX BY MS. HUGHES

Q.   What was the detective's tone like?

A.   It was very aggressive, intimidating.

Q.   Did you understand that you would be offered a deal if you were the one who cooperated?

A.   Yes.

Q.   Was that before you changed your story?

A.   Yes.

Q.   What made you decide to change what we just looked at in your first statement to the police?

A.   I was just broke, broke down, just wanted to get out.  They just broke me down.

Q.   And when you say you wanted to get out, what did you mean?

A.   I wanted out of the room.  I just wanted it over with.

Q.   What did you think you would have to do to get out of the room?

A.   Tell them something, tell them what they wanted to hear.

Q.   And what did you understand they wanted to hear?

MR. BLENK:  Objection, your Honor, calls for speculation.

THE COURT:  Overruled.  You can answer the question.

T. WOODRUFF - DX BY MS. HUGHES

A.   Just cooperate with them, tell them what they wanted to hear, tell them something.

Q.   Once you broke, did you change your story?

A.   Yes.

Q.   How did you come up with the story?

A.   The police came up with the story.

Q.   What do you mean by that?

A.   What they told me from the beginning and I just filled in the blanks and tried to come up with something to get out of the room.

Q.   What -- when you say the police, what information did the police give you?

A.   They told me about what they was investigating, the death of an elderly man.

Q.   Let's pull up Plaintiff's exhibit 32 for the witness only.

So, Mr. Woodruff, is this a second statement that you gave to the police?

A.   Yes.

MS. HUGHES:   Your Honor, I would like to move into evidence Plaintiff's Exhibit 32.

THE COURT:   Any objection?

MR. BLENK:   May I have some voir dire, your Honor?

T. WOODRUFF - DX BY MS. HUGHES

THE COURT:  Go ahead.

**VOIR DIRE BY MR. BLENK:**

Q.    Mr. Woodruff, is that your signature at the bottom of the document depicts at exhibit 32?

A.    I don't see it, yes.

Q.    That is your signature and that statement was made on January 12th, 1976?

A.    That is my signature, yes.

Q.    And it was made in the presence of Francis Manista as reflected in the Commissioner of deeds signature to the left what you're looking at?

A.    Could you repeat that?

Q.    There is a signature block to the left of your signature that is a signature from what's called a Commissioner of Deeds.  Do you see that?

A.    Yes.

Q.    And is that name Francis Manista?

A.    That is what I'm reading.

Q.    And do you see two additional signatures at the bottom of the page?

A.    Yes.

Q.    Can you read those signatures?

A.    Reverend T.L. Boyce and Frank J. Woodruff.

MR. BLENK:  Thank you, Mr. Woodruff.  We

T. WOODRUFF - DX BY MS. HUGHES

have no objection to the admission of this document.

THE COURT:  Okay.  The document is received.

(**WHEREUPON, EXHIBIT PX 32 WAS RECEIVED INTO EVIDENCE.**)

THE COURT:  I just want to give a quick instruction to the jurors about the receipt of this document.

Members of the jury, this document is being received not for the truth of its contents but for the purposes of determining whether or not this document was favorable or not to Mr. Boyd's case, whether or not the document was disclosed to Mr. Boyd's attorney for his criminal case and the effect that any disclosure or non-disclosure had at Mr. Boyd's trial.  So you should consider this not for the truth of its contents, but for the limited purpose that I have already stated.

Go ahead.

**CONTINUING DIRECT EXAMINATION BY MS. HUGHES:**

Q.   This is published to the jury.

Now, Mr. Woodruff, is this the statement that you gave the police after you broke?

A.   Yes.

Q.   This document is dated January 12th and the previous statement that we looked at was dated January

T. WOODRUFF - DX BY MS. HUGHES

11th.  The way you remember it, was it two different days that you were interrogated by the Buffalo Police or all one day?

MR. BLENK:  Objection, your Honor, leading.

THE COURT:  Overruled.  You can answer the question.

A.  All one day.

Q.  Now, this document is formatted in a question and answer format.  Was there someone sitting there in the room with you typing out the exact questions you were asked and the exact answers you gave the entire time you were being questioned?

A.  No.

Q.  Was this document typed up after your interrogation was completed?

A.  It wasn't typed up when I was there, no.

Q.  And when you say it wasn't typed up when you were there, you didn't see anyone typing?

A.  I didn't see anyone typing it.

Q.  But this document was given to you to sign?

A.  Yes.

Q.  Now, let's turn back to the last page of this document.  And I believe you just testified that where it says, "signed Tyrone Woodruff," that is your

T. WOODRUFF - DX BY MS. HUGHES

signature?

A.   Yes.

Q.   And as you were just asked, there are two witnesses listed there, Reverend LT Boyce and Frank Woodruff.  Can you tell me who they are?

A.   My parents' pastor and my father.

Q.   Were your father and the pastor there with you while you were being interrogated by the police?

A.   No they wasn't.

Q.   Did they come to the police station at some point?

A.   To pick me up.

Q.   When did they pick you up?

A.   Once they was finished.

Q.   When you say "they"?

A.   Once the police was finished with me.

Q.   If we can go back to the first page of this document.  Where did the information in this statement come from?

A.   The police.

Q.   Let's take a look at Plaintiff's Exhibit 31, which is in evidence.  I want to take a look at this Buffalo report P 73 dated January 12th, 1976.  Is that the date, the same date as the statement we just looked

T. WOODRUFF - DX BY MS. HUGHES

at?

   A.   Yes.

   Q.   The first paragraph describes an anonymous caller who identified a Tony involved in the crime.  Do you see that?

   A.   Yes.

   Q.   Going back to the fourth paragraph, it reads: Note:  During the conversation, phone, Tyrone, Tony, Woodruff was seated in the main homicide office and was listening to the conversation.  He was in the company of Detective Robert Arnett.  It was noted that Tyrone Woodruff became very nervous and could barely raise a cup of coffee was he raising.  He was asked in the presence of Detective Manista in the presence of Detective Arnet if he could remember anything now.  He was told that a person puts him in a hallway dividing money.  At 5:45 p.m., He told Detective Manista and Arnet, "Gibson was hitting him, Gibson was hitting him, I think."

        When you were involved in the interrogation, did you overhear a female caller saying you were involved in the crime?

   A.   No, I didn't.

   Q.   Setting that aside that you did not overhear the

T. WOODRUFF - DX BY MS. HUGHES

call, did a police tell you there was a witness who said you were involved in the crime?

A.   Yes.

Q.   Was it scary to you when they told you there was a witness who said you were involved?

A.   Yes.

Q.   Mr. Woodruff did overhearing a witness implicate you cause you to change your story?

A.   No.

Q.   What did?

A.   The police.

Q.   And what do you mean by that?

A.   Just the intimidation and then they said somebody else wanted to take my place and I would be offered a deal.

Q.   Look at Plaintiff's Exhibit 33, which is in evidence.  Now, let's take a look at a second report of your confession.  Is this also dated January 12, 1976?

A.   Yes.

Q.   Let's take a look at the third and fourth paragraphs.  Sergeant Hunter -- which read:  Sergeant Hunter and Detective Robert F. Arnet went to 494 Best Street, the home of Tony Woodruff where he was taken by the above officers to HD for further investigation of

T. WOODRUFF - DX BY MS. HUGHES

the Crawford homicide.  Mr. Woodruff was escorted into room 328 of the homicide bureau.  And he was read his rights at his home and a rights card was signed by him and witnessed by his mother.  After Mr. Woodruff had been waiting in the homicide office and munching on a piece of devil food cake that his mother had sent down with him and after having and received permission to make several phone calls, one to an aunt of his that is a minister and a couple to his mother, he started asking Detective Arnet questions.  And subsequently admitted to Detective Arnet that he was the witness to the Crawford homicide.

Q.  Can you tell us about this devil's food cake that you were eating at the police station?

A.  It never happened, didn't have no cake.

Q.  Would you have been able to eat while your were being interrogated?

A.  No.

Q.  Did you have an appetite while you were being interrogated?

A.  Didn't have an appetite for a couple of weeks.

Q.  For a couple weeks following this interrogation?

A.  Yes.

Q.  Now, did you make any calls to your aunt?

T. WOODRUFF - DX BY MS. HUGHES

A.    No, I didn't.

Q.    Did you make any calls to your mother?

A.    No, I didn't.

Q.    So talking to your mother or your aunt was not what caused you to change your story?

A.    No.

Q.    Let's take a look at the fifth paragraph.  Says, "Mr. Woodruff, the father of Tony, and a Reverend Boyce, the family pastor, arrived at police HD and were present in the entire time that the statement was taken from Tony Woodruff and subsequently witnessed and signed by them.  Do you see that?

A.    Yes.

Q.    Were your father and the Reverend at the police station while you were being questioned?

A.    No, they weren't.

Q.    And I believe you said they came down later?

A.    Yes.

Q.    And when did they come down later?

A.    They came down and picked me up.

Q.    You can take this down.

Now, did you testify at Mr. Boyd's criminal trial?

A.    Yes.

T. WOODRUFF - DX BY MS. HUGHES

Q.   Did you also testify at some hearings before the trial?

A.   Yes.

Q.   Did you meet with an assistant district attorney to prepare for those hearings?

A.   Yes, I did.

Q.   Who did you meet with?

A.   Timothy Drury.

Q.   How many times did you meet with ADA Drury?

A.   Several times.

Q.   What did you do when you met with ADA Drury?

A.   Practiced, get the story right.

Q.   What do you mean by that?

A.   If I said one thing that didn't sound right, he say, well, couldn't have happened like that and then the story changed.

Q.   And what did you do when ADA Drury would say that?

A.   What did what?

Q.   What did you do when ADA Drury would say that?

A.   I said it the way they wanted to hear it.

Q.   Was it your understanding that that is what ADA Drury wanted you to do?

              MR. BLENK:   Objection, your Honor, calls for

T. WOODRUFF - DX BY MS. HUGHES

speculation.

THE COURT:  Overruled.  He can testify as to his understanding of what he thought the ADA wanted him to do.  You can answer the question.

A.   I understood that he wanted me to say it a certain way.

Q.   Was one of the pretrial hearings that you testified at a grand jury hearing?

A.   Yes.

Q.   Did you meet with Mr. Drury to prepare for your testimony before the grand jury?

A.   Yes.

Q.   Were there police officers there, too?

A.   Yes.

Q.   Let's take a look at Plaintiff's Exhibit 47, which is in evidence.  You can see at the top this is another Buffalo Police Department P 73.  Do you see the date as February 11th, 1976?  Do you see that?

A.   Yes.

Q.   I'd like to point you to the top of the third paragraph.  Says while Assistant District Attorney Drury went into the grand jury with Andre, he asked me to talk to Tony Woodruff.  I talked with Tony and he came up with more important information.  When asked, he told me

T. WOODRUFF - DX BY MS. HUGHES

that they had set up William Crawford.  Mr. Woodruff, did you come up with more information about the Crawford homicide on your own?

A.   No, I didn't.

Q.   How did you come up with more information?

A.   The police and the district attorney did.

Q.   Let's go to the second page in the last paragraph.  The second to last sentence says, "We talked to Tyrone again with the permission of his lawyer and then he and Andre was released."

Looking at that word "released," before you were released, were you free to leave if you wanted to?

A.   No.

Q.   Did you believe that you were free to go if you refused to testify against your friends at the grand jury?

A.   No.

Q.   Let's take a look at another statement in this paragraph.  The first sentence of this paragraph reads: Detective Guadagno wrote part of these facts down on paper and Tyrone Woodruff signed his name to the bottom. It was dated 2/11/76 and the time was 3:45 p.m."

Do you see that?

A.   Yes.

T. WOODRUFF - DX BY MS. HUGHES

Q.  Did you sign a statement that was written out for you?

A.  Yes.

Q.  Let's pull up for, the witness only Plaintiff's Exhibit 48.  Mr. Woodruff, is this the handwritten statement that you signed on February 11th, 1976?

A.  Yes.

MS. HUGHES:  Your Honor, I move Plaintiff's Exhibit 48 into evidence.

THE COURT:  Any objection?

MR. BLENK:  No objection, your Honor.

THE COURT:  Exhibit 48 is received.

(**WHEREUPON, EXHIBIT PX 48 WAS RECEIVED INTO EVIDENCE.**)

THE COURT:  I just want to give another brief instruction to the jurors about this.

This evidence is not being offered for its truth but for the purposes of determining whether or not such document is favorable or not to Mr. Boyd's case, whether or not such document was disclosed to Mr. Boyd's attorney for his criminal case and the effect that any disclosure or non-disclosure had at Mr. Boyd's trial. Therefore you should not consider the document for the truth of its contents but for the limited purpose that I

T. WOODRUFF - DX BY MS. HUGHES

just stated.  Go ahead.

**CONTINUING DIRECT EXAMINATION BY MS. HUGHES:**

Q.   So, Mr. Woodruff, down at the bottom, can you tell me the date and time on this statement?

A.   2/11/76, 3:45 p.m.

Q.   And is that your name next to the date and time?

A.   Yes.

Q.   Is your name written in your handwriting?

A.   Yes.

Q.   So you signed this document?

A.   Yes.

Q.   And see the entire statement.  Thank you.

Now, is the actual statement in your handwriting?

A.   No.

Q.   Someone else wrote it for you and you signed your name?

A.   Yes.

Q.   Now, it's your testimony that you didn't come up with the information in this statement on your own, is that right?

A.   Correct.

Q.   You're claiming that somebody else gave you that information?

A.   Yes.

T. WOODRUFF - DX BY MS. HUGHES

Q.   And who was that?

A.   The DA and the police.

Q.   Let's take a look at Plaintiff's Exhibit 46, which is in evidence.  Do you see the date on top of this document?

A.   Yes.

Q.   What is the date, Mr. Woodruff?

A.   2/11/76.

Q.   Now, let's start with the paragraph at the bottom of this page.  Continues onto the next page.  It reads: Detectives then went to the grand jury room and Mr. Drury went into the grand jury room and Detective Guadagno went to a room with Tony Woodruff.  After a while, Detective Delano then went to the room with Detective Guadagno and Tony Woodruff.  Detective Delano confronted the subject as to why he was shaking and why he was so nervous.  He stated that he didn't know why he was shaking and nervous, that he just was.  Detective Delano advised him that he was shaking because he was not telling the truth to the detectives and that he has not told the whole story as to how the assault and robbery of Mr. Crawford went down.  And when confronted by Detective Delano with the statement made by Andre that two of his associates went to the tavern first and

T. WOODRUFF - DX BY MS. HUGHES

had picked out a score before the assault and robbery, he stated to the detectives, "yeah, okay, I'll tell you the truth."  Were you shaking before your testimony to the grand jury?

A.   I probably was.

Q.   Why do you say probably was?

A.   Because I was nervous and didn't want to be there.

Q.   It says they confronted you with the statement made by Andre that two of his associates went to the tavern first and had picked out a score before the assault and robbery.  Is that information that you provided the detectives or they provided you?

A.   They provided me.

Q.   Let's look at the last page, the second to last paragraph.  The first sentence of that paragraph says: At this time, Tony Woodruff and Mr. Drury, after being advised of the statement that Tony Woodruff had made to the detectives was taken into the grand jury where he did testify and was brought out by Mr. Drury and Mr. Drury advised the detectives that he did tell the truth and told the grand jury what he had told us in the new statement.

     Did you tell the grand jury the version of the

T. WOODRUFF - DX BY MS. HUGHES

story in the report we just saw?

A.  I don't remember.

Q.  Did you understand you would be free to leave without testifying in front of the grand jury as to the facts, as to the information the police wanted you to say?

A.  No.

Q.  Now we can take this down.

Did you testify at Mr. Boyd's criminal trial?

A.  Yes.

Q.  Did you prepare with a prosecutor for your testimony of Mr. Boyd's criminal trial?

A.  Yes.

Q.  Who did you prepare with before Mr. Boyd's criminal trial?

A.  Timothy Drury.

Q.  What did you do when you met with ADA Drury?

A.  I tell the story, and if it didn't sound right, he say, "couldn't happen like that," so we went over it to make it sound believable, I guess.

Q.  And you're aware Mr. Boyd was ultimately convicted?

A.  Yes.

Q.  Did you stay in Buffalo after your testimony at

T. WOODRUFF - DX BY MS. HUGHES

the grand jury but before the trial?

A.   No.

Q.   Where did you go?

A.   Went to Cortland, New York.

Q.   What were you doing in Cortland?

A.   Going to school.

Q.   Why Cortland in particular?

A.   I had a brother go to Cortland school up there, college, SUNY Cortland.

Q.   SUNY Cortland.  Was there a time that you joined the service?

A.   Yes.

Q.   When was that?

MR. BLENK:  Objection, your Honor, relevance.

THE COURT:  Overruled.  You can answer the question.

A.   When I got out of school.

Q.   And what branch of service were you in?

A.   Army.

Q.   And where did you serve?

A.   Fort Dix and Fort Bragg, North Carolina.

Q.   How long did you serve in the Army?

A.   Maybe about a year and a half.

T. WOODRUFF - DX BY MS. HUGHES

Q.   Was what was your from discharge?

A.   General honorable conditions.

Q.   Why did you leave the Army?

A.   I requested to get out.

Q.   Why was that?

A.   Just this thing was eating at me, I couldn't focus.

Q.   And by this thing, what are you referring to?

A.   Everything that I went through, things that I said, it just eating at me.

Q.   After you left the Army, did you eventually come back to Buffalo?

A.   Yes.

Q.   Were you in touch with Darryl Boyd's family during this time?

A.   No.

Q.   Were you in touch with Darryl Boyd during this time?

A.   No.

Q.   Did there ever come a time when you decided to recant the story that you told at Darryl's trial?

A.   Yes.

          MR. BLENK:  Objection, your Honor, calls for hearsay.

T. WOODRUFF - DX BY MS. HUGHES

THE COURT:  Overruled.  You can answer the question.

A.   Yes.

Q.   When was that?

A.   In '85.

Q.   1985?

A.   Yes.

Q.   That is about eight years after Darryl's trial?

A.   Correct.

Q.   What caused you to decide to recant?

MR. BLENK:  Objection, your Honor.  Can we approach?

THE COURT:  Yes.

(Whereupon, there was a sidebar discussion on the record.)

MR. BLENK:  There is no basis to be getting into a prior inconsistent statement.  They can't put on -- he is testifying to what he is testifying to.  They can't keep on putting on the other times that he has testified and then they can start putting on deposition, that is not their witness.  They can't just put on prior statements to bolster their own witness.

MS. HUGHES:  Your Honor, the County still or the County's position of this is this evidence wasn't

T. WOODRUFF - DX BY MS. HUGHES

fabricated.  We have the right to put on evidence proving the fabrication of Mr. Woodruff's testimony at trial.

MR. BLENK:  That is what he testified to. There is no reason to get into a hearsay document beyond that.

MS. HUGHES:  We haven't gotten into any documents yet.  We asked when he recanted.

MR. BLENK:  That is -- a recantation is a statement.

MR. DURLAND:  I mean, he can describe the narrative.  There was a time that he recanted.  He is not required to wait until you bring it out.  I mean, I agree how Ms. Hughes has not brought out the contents of the statement.  She brought out the fact that he did it in 1985.

MR. BLENK:  It's the use of it and it's improper bolstering.

THE COURT:  Overruled.

(Sidebar completed.)

THE COURT:  The objection is overruled.  Can you ask the question again?

**CONTINUING DIRECT EXAMINATION BY MS. HUGHES:**

Q.  What caused you to decide to recant?

T. WOODRUFF - DX BY MS. HUGHES

A.   It was the right thing to do.  Like I said, it was eating at me, and I needed to get it out.

Q.   Did Mr. Boyd or anyone in his family --

THE COURT:  Hold on one second.

That wasn't the exact question.  And so the question was that was objected to is:  Did there ever come a time when you decided to recant the story that you told at the trial?

MS. HUGHES:  Apologies, your Honor.

Q.   Did there ever come a time when you decided to recant the story that you told at Darryl's trial?

A.   Yes.

Q.   When was that?

A.   In '85.

Q.   And that was about eight years after Darryl's trial?

A.   Yes.

Q.   Now, did Mr. Boyd or anyone in his family ever threaten you?

A.   No.

Q.   Did anyone else pressure you or threaten you?

A.   No.

Q.   Now, 1985 was 40 years ago, right?

A.   Yes.

245

T. WOODRUFF - DX BY MS. HUGHES

Q.   Was that the only time over the last 40 years that you recanted your testimony at Mr. Boyd's criminal trial?

A.   No.

MR. BLENK:   Same objection.

THE COURT:   Overruled, you can answer the question.

A.   No.

Q.   What are other times that you recanted your testimony?

A.   Any time I was asked to speak or when functions was going on, I always came and tried to tell my side.

Q.   Why did you do that?

A.   Because it was the right thing to do.

Q.   Over the last 40 years, have you ever gone back to the story that you told at Mr. Boyd's trial?

A.   No.

Q.   Did you ever speak to Darryl after his conviction?

A.   No.

Q.   Before -- before -- to clarify, Mr. Woodruff, before Mr. Boyd passed away, did you ever speak with him?

A.   Yes.

T. WOODRUFF - DX BY MS. HUGHES

Q.   When did you first speak to Darryl after his conviction?

A.   It was years after, some years.  I don't know how many, but it was some years after.  When I started speaking and doing functions with him, yeah, we spoke.

Q.   Were you and Darryl friendly before he passed away?

A.   Yes.

Q.   How did you two reconcile?

A.   You know, I always apologized, but they let me know that it wasn't necessary because it could have been either one of us that was sitting in the seat that I'm sitting in.  I could have been sitting in their seat.  But it's just we need to try to get past it and make a difference.

Q.   How often did you talk to Darryl before he passed?

A.   Several times either holidays, through texts, things of that nature.

Q.   When you talk to Darryl, did you ever discuss the events that led to his conviction?

A.   No.

Q.   How did you get up here from Atlanta?

A.   His lawyers flew me up.

T. WOODRUFF - DX BY MS. HUGHES

Q.   And you're staying in a hotel while you're here?

A.   Yes.

Q.   Do you have to pay for the flight and hotel out of pocket?

A.   No.

Q.   Who covered the cost?

A.   The lawyer, his lawyers.

Q.   Did you have to take off time from work to be here?

A.   Yes.

Q.   Were you able to take paid time off?

A.   No.

Q.   Are you getting any reimbursement for the time you had to take off work?

A.   Yes.

Q.   And you're being reimbursed to cover the wages you would have made if you were not here?

A.   Yes.

Q.   Are you expecting to receive any benefit from your testimony today?

A.   No, I am not.

Q.   Have you ever received any benefit from recanting?

A.   No.

T. WOODRUFF - DX BY MS. HUGHES

Q. Have you met with members of our team about your testimony today?

A. Yes.

Q. Did anyone tell you what to say?

A. No.

Q. Did anyone pressure you to testify today?

A. No.

Q. Were you promised anything in connection with your testimony?

A. Not at all.

Q. How often do you think about Darryl's case?

A. Every day from when it happened until now, every day; morning before I go to sleep and when I wake up, every day, never stop thinking about it.

Q. Mr. Woodruff, you were never charged in the Crawford murder, were you?

A. No.

Q. You were never prosecuted for it?

A. No.

Q. I understand that you have a tattoo of the number 41413. What is that?

A. That is the indictment number for the trial.

Q. By the trial, you mean Darryl's criminal case?

A. Yes.

T. WOODRUFF - DX BY MS. HUGHES

Q.  Why do you have a tattoo of the indictment number in Darryl's criminal case on your arm?

A.  Because it's just a reminder, something I never forget.  Just something, just constantly eats at me.

MS. HUGHES:  Thank you, Mr. Woodruff.  I have no further questions.

THE COURT:  Thank you.  Cross examination, Mr. Blenk?

MR. BLENK:  Can we have a brief sidebar, your Honor?

THE COURT:  Yes, come on up.

(Whereupon, there was a sidebar on the record.)

MR. BLENK:  I just want, so his testimony said that he never returned to the story that he told at Mr. Boyd's trial after Mr. Boyd's trial, which is not factually true.  I'm not sure if it was tried to elicit that way.  He also testified at the Walker trial in the course of this.

THE COURT:  You're saying he never returned to --

MR. BLENK:  His account that he provided in Mr. Boyd's trial subsequent to Mr. Boyd's trial.

MS. HUGHES:  And the question was in 1985,

T. WOODRUFF - CX BY MR. BLENK

did he ever return to the story that he told at Mr. Boyd's trial.

MR. BLENK:  Okay.

THE COURT:  He said no.

MR. BLENK:  Okay.

THE COURT:  Okay.  So there is no objection?

MR. BLENK:  No objection.

THE COURT:  Okay.

(Sidebar completed.)

**CROSS EXAMINATION BY MR. BLENK:**

Q.  Hello, Mr. Woodruff, I'm JP Blenk, the attorney for the county.  I'm going to be asking you some questions about your testimony.

MR. BLENK:  Let me pull up just for the witness DX 545.

Q.  Now, Mr. Woodruff, you testified in 1985 you gave a statement to Mr. McCloud.  Is that correct?

A.  Correct.

Q.  And you described that previously in your testimony in your direct that you recanted your testimony?

A.  Yes.

Q.  And you were telling the truth then?

A.  Yes.

T. WOODRUFF - CX BY MR. BLENK

Q.   And in that, when you provided that statement to Mr. McCloud, you told -- you testified that Mr. Drury had nothing to do with your testimony, correct?

A.   I don't remember.

Q.   Okay.  Can we show Mr. Woodruff page nine, Bates number 1934.

THE COURT:  You don't have anything on your monitor?

THE WITNESS:  No, I don't.

MR. BLENK:  Can we use the ELMO?

THE CLERK:  Yeah.

MR. BLENK:  Your Honor, while we figure that out, with your permission, may I approach the witness with a hard copy of the document?

THE COURT:  Sure.  That's fine.

Q.   Mr. Woodruff, does this refresh your recollection that Mr. Drury had nothing to do with your testimony back in 1977?

A.   I don't understand the question you're asking.

Q.   I only have one copy.  Can I approach him?

THE COURT:  That's fine.

Q.   Does this refresh your recollection that it was your understanding when you gave your testimony, which you gave this statement in 1985, that as far as you were

T. WOODRUFF - CX BY MR. BLENK

aware, Mr. Drury would have understood you were telling the truth to him?

A.   In so many words, depends on the way I said it.

MR. BLENK:   Your Honor, I move into evidence page nine of Defendant's Exhibit 535.  -- 545.  Excuse me.

THE COURT:  Any objection?

MS. HUGHES:  Can we have a sidebar, your Honor?

THE COURT:  Come on up and if you could bring up the document as well.

(Whereupon, there was a sidebar discussion on the record.)

MS. HUGHES:  We provided the County of our redactions as your Honor requested of this document, docket 418.  The County hasn't consented to our redactions yet, so we're asking that they use our redacted statement.

MR. BLENK:  Which is only the one page.

THE COURT:  Are there redactions on this page that you used?

MS. HUGHES:  No, your Honor.

Introducing this as impeachment, is that --

THE COURT:  Well, I mean, what is the

T. WOODRUFF - CX BY MR. BLENK

purpose that you're offering it for?

MR. BLENK:  I'm introducing it for impeachment of his testimony today.

THE COURT:  Well, he just kind of admitted that is what he said.  So is there --

MR. BLENK:  It's a prior inconsistent statement, which is independently admissible for the truth of the matter asserted.

THE COURT:  But you confronted him with it and he essentially admitted that, he said it, right, so, but is there another purpose that this would be admissible because it sounds like you were both planning on admitting this?

MR. BLENK:  It contradicts his testimony about Mr. -- about Mr. Drury that he provided today and it's prior sworn testimony from a witness in the case and it goes in for the truth of the matter asserted because it did not go to the truth of his matter asserted today.

MR. DURLAND:  But, your Honor, I don't necessarily disagree with what Mr. Blenk is saying about the admissibility of prior sworn statement because we will be doing the same thing with Mr. Drury's deposition, for example.  But in terms of the

T. WOODRUFF - CX BY MR. BLENK

redactions, we want to make sure we're not doing this page by page and that we don't have something that should be redacted getting in front of the jury.

THE COURT: Is there anything on this page?

MR. DURLAND: I don't believe so.

THE COURT: So are you objecting to the admissibility of this page nine?

MR. DURLAND: No, if it's just page nine, no.

THE COURT: Then it's received. Can you have it, it's DX 545.

MR. BLENK: Do you want to call it 545 A just for the clarification?

THE COURT: Sure.

(Sidebar completed.)

THE COURT: So, for the record, because this is just one page of DX 545, we're going to mark it as DX 545 A so it will stand by itself as the one page, page nine, of that document.

(**WHEREUPON, EXHIBIT DX 545A WAS RECEIVED INTO EVIDENCE.**)

MR. BLENK: Your Honor, may I publish this to the jury?

THE COURT: Yes. Go ahead.

T. WOODRUFF - CX BY MR. BLENK

Q.   Mr. Woodruff, did you tell Mr. McCloud when you were under oath that it was the homicide police that wanted you to be scooped up for some odd reason?

A.   I don't remember if I said that.  I don't see it on the paper.

Q.   You don't see that in the document that is in front of you?

A.   There is nothing in front of me.

MR. BLENK:  Can we publish to the jury and the witness?  Again, this is 545 A.

THE CLERK:  I'm going to have to call IT.

THE COURT:  There is something wrong with the monitor?

It looks like it's working for the jurors.

Do you have it on your monitor?

THE WITNESS:  I don't.

THE COURT:  Can you just show him for now the physical exhibit?

MR. BLENK:  Would it be okay if I stood next to him?

THE COURT:  That's fine, and you don't have to ask permission, that's fine.

**CONTINUING CROSS EXAMINATION BY MR. BLENK:**

Q.   Mr. Woodruff, I'll give you a second.

T. WOODRUFF - CX BY MR. BLENK

A.   You want me to read the whole thing?

Q.   Let me ask you this.  In preparing for your testimony today, did you review this document?

A.   Yes.

Q.   So, that is within the last couple of days, you've looked at this?

A.   Yes.

Q.   And so can you read the testimony starting at the top?

A.   You want me to read it to myself or out loud?

Q.   I ask you to read it out loud, but if you prefer, I could read it to you and I can ask if you testified to that effect?

A.   "When you say they wanted us to take the fall for, who is they."

     "Homicide."

Q.   When you said "homicide," you meant the homicide police, right?

A.   Yes.

Q.   But you meant officers of the Buffalo Police Department?

A.   Correct.

Q.   And then you were then asked by Mr. McCloud about Mr. Drury, right?

T. WOODRUFF - CX BY MR. BLENK

A.   Yes.

Q.   And then did you confirm to Mr. McCloud that Mr. Drury only came about after you had already identified Mr. Walker, Mr. Martin, Mr. Gibson, and yourself in the -- had implicated each other -- excuse me.

Mr. Drury only came around after you had implicated your friends in the murder of Mr. Crawford, correct?

A.   I believe so.

Q.   And it was your understanding that Mr. Drury would have believed the story that you were telling at the trial of Mr. Boyd, that is what you told Mr. McCloud?

A.   I'm looking at it now and I might have not understood the question he asked me.

Q.   Okay.  I'll read it:  "So that which Mr. Drury was going with, when I say going with, I mean the statement that you gave, et cetera, he too was under -- I take it you never told him what you're telling us now."

Answer:  No.

Question:  So he would have believed that your statement was true and voluntary?

Answer:  Right.

T. WOODRUFF - CX BY MR. BLENK

"And it indeed involved facts as they occurred"?

"Right."

"As opposed to what you're telling us now, there is things you made up to protect or save yourself?"

"Yeah, you could say that."

That is your answer.

And when you provided that statement to Mr. McCloud, you knew you were under oath?

A.   Yes.

Q.   Just like you're under oath today?

A.   Yes.

MR. BLENK:  Your Honor, the next sequence in my questioning is going to be pretty directly derived from electronic exhibits.  Is there a way that we could take a quick recess to figure out what's going on.

THE COURT:  How much more time do you think you have?

MR. BLENK:  I'd say about 50 minutes.

THE COURT:  Fifty?

MR. BLENK:  Yeah.

THE COURT:  Then we'll just take a recess for the night because it's 4:30.

MR. BLENK:  Okay, your Honor.  Thank you.

THE COURT:  Okay.  Members of the jury,

K. WEPPNER V. THE COUNTY OF ERIE

we're going to take our recess for the night.  It's 4:30 and we'll address the technological issues.  Before we do that, I want to excuse Mr. Woodruff.

Mr. Woodruff, I'm going to direct you between now and tomorrow when you come back you shouldn't talk to anyone at all about your testimony here today.  And if you could please come back here tomorrow at 9 o'clock.

THE WITNESS:  Okay.

THE COURT:  Thank you.  You can step down.

(Whereupon, the witness exits the courtroom.)

THE COURT:  Have a seat, everyone.  Okay.  We're going to recess for the night.  I want to remind all of you of the recess admonitions.

Please keep an open mind until you have heard all of the evidence and been instructed on the law.  Do not form any opinions about the case or express any opinions about the case to anyone else.  Do not talk about the case at all amongst yourselves or with anyone else.  Do not read, view or listen to any media or internet accounts about the case.  Do not visit any relevant locations.  Do not do any research about the case or any legal terms or anything related to the case

K. WEPPNER V. THE COUNTY OF ERIE

at all.

We'll be in recess until tomorrow morning. If you could report back here at 9:15.  Thank you, have a good night.

(Whereupon, the jury is escorted from the courtroom.)

THE COURT:  Have a seat, everyone.

Okay.  The jurors have left.  I want to make sure the door remains closed while we're addressing a few things before we leave for the night.  So tomorrow we'll finish with Mr. Woodruff's testimony.  And then Plaintiff, can you just remind me what your next witness is or deposition designation is?  Is it Mr. Henry's?

MR. FIRSENBAUM:  Yes, Professor Hirsch will testify after Mr. Woodruff.  And then Mr. Drury is our next live witness.  I think it would be great to have him here as early as possible on Thursday and we will fill whatever time we have between Professor Hirsch and Mr. Drury with designations from Mr. Henry first.

THE COURT:  Okay.  So Mr. Henry designations tomorrow?

MR. FIRSENBAUM:  Yes.

THE COURT:  How long do you think you'll be with Professor Hirsch.

K. WEPPNER V. THE COUNTY OF ERIE

MR. HANFT:  I think between an hour and an hour and a half.

THE COURT:  Okay.  That should be done, hopefully, tomorrow before lunch, and you'll have an afternoon and put in Henry deposition designations.  Anything else?

MR. FIRSENBAUM:  We would have Henry designations, Mr. Henry designations and Mr. Cosgrove designations.

THE COURT:  Okay.

MR. FIRSENBAUM:  And I'm thinking that probably gets us to when Mr. Drury would arrive on Thursday.  I think after that, we would be looking for a ruling, I guess, on Mr. Gagan's designations.

THE COURT:  Okay.  And so on Thursday, as of now, Mr. Drury can come in at what time?

MR. BLENK:  Eleven o'clock, your Honor.

THE COURT:  Okay, that's good.  Okay.  So we'll be ready tomorrow morning to address the deposition designations for Mr. Henry, Mr. Cosgrove.  Are there any other specific issues that we need to address tomorrow morning?

Mr. Rudin.

MR. RUDIN:  As to Mr. Henry, the first thing

K. WEPPNER V. THE COUNTY OF ERIE

I'll do when I get back is to prepare an e-mail that trims it down a bit.  You'll have that and I guess your Honor will need to rule on the other things of the County, your specific designations.  Your Honor has ruled in the big picture, but I'm talking about the specific designations.

THE COURT:  If you can get those to us as soon as possible.  For Mr. Cosgrove's designations, do you think you'll be narrowing that down any further?

MR. HANFT:  No.  I believe the ones we provided are essentially what your Honor admitted in Mr. Walker's trial.

One other point we would like to raise regarding Professor Hirsh's testimony, in accordance with your Honor's instruction with regard to demonstrative evidence.  PX 285, which is in the book and has been shared with the County when we shared exhibits, is a demonstrative that we used with Professor Hirsch at Mr. Walker's trial that we would like to use again at this trial.  It has been produced and we would like to use it and flag that so that everybody is aware of it.

THE COURT:  Can you remind me what it is?

MR. HANFT:  PX 285 is a diagram of movement

K. WEPPNER V. THE COUNTY OF ERIE

between the grand jury so individuals have an easier time tracking exactly who was where when things were happening.

THE COURT:  Okay.  Mr. Blenk, is there any outstanding issues that you feel we need to address tomorrow morning?

MR. BLENK:  We intend on making an application in connection with the records issue that we've previously identified to the Court.  And that is something we could do tomorrow morning.  It would really just be bringing subpoenas for your Honor's signature in connection with those records.

THE COURT:  Are you talking about parole records or medical records?

MR. BLENK:  We have a disclosed witness for parole records, but we would -- it would be medical records, your Honor, which we already have and which we disclosed and were disclosed by the Plaintiff and authenticated by the Plaintiff.

THE COURT:  So you have medical records.  You're looking for a subpoena to get certified medical records?

MR. BLENK:  I guess that is the process we'll have to go through, your Honor, yes.

K. WEPPNER V. THE COUNTY OF ERIE

MR. FIRSENBAUM:  Your Honor, we object to that request.  I don't know if your Honor wants any submissions in writing or not.  We would be happy to provide it overnight.  But I think I previewed our objections yesterday.

THE COURT:  You did.  If you want to submit something, that is fine.  You can bring in the proposed subpoena and we can address it tomorrow morning.

MR. BLENK:  Thank you, your Honor.

MR. FIRSENBAUM:  Thank you, your Honor.

THE COURT:  Okay.  Thank you.  Have a good night, everyone.  We'll see you tomorrow at 8:45.

                    *      *      *

                CERTIFICATE OF REPORTER


   I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

S/ Karen J. Clark,  RPR

Official Court Reporter