UNITED STATES       DISTRICT COURT

 WESTERN DISTRICT OF NEW YORK

_____

KATHLEEN WEPPNER, AS EXECUTOR OF THE     Index No.
                                         22-CV-0519-MAV

ESTATE OF DARRYL BOYD,

                          Plaintiff,     Vol. 4

                -vs-

                                         Rochester, New York
THE COUNTY OF ERIE,                      November 6, 2025
                                         8:49 a.m.
                          Defendant.
_____

**JURY TRIAL (AM session)**


                  TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE MEREDITH A. VACCA
                 UNITED STATES DISTRICT JUDGE

399

Appearances

For Plaintiffs          WILMER CUTLER PICKERING HALE AND DORR,
                        LLP
                        By:  ROSS FIRSENBAUM, ESQ.
                             GIDEON HANFT, ESQ.
                             ERIN HUGHES, ESQ.
                             MELISSA ZUBIZARRETA, ESQ.
                             PHOEBE SILOS, ESQ.
                             TRENA RILEY, ESQ.
                        7 World Trade Center
                        250 Greenwich Street
                        New York, NY 10007

                        LAW OFFICES OF JOEL B. RUDIN, PC
                        By:  JOEL B. RUDIN, ESQ.
                             DAVID E. RUDIN, ESQ.
                        152 West 57th Street
                        New York, New York 10019

                        HOOVER & DURLAND, LLP
                        By:  SPENCER DURLAND, ESQ.
                        561 Franklin Street
                        Buffalo, NY 14202

For Defendant:          LIPPES MATHIAS
                        By:  JAMES BLENK, ESQ.
                             KIRSTIE MEANS, ESQ.
                             THOMAS SOUTHARD, ESQ.
                        50 Fountain Plaza - Suite 1700
                        Buffalo, New York 14202




COURT REPORTER:         JOONY L. ODENBACH, RPR, CRR
                        joonyodenbach@gmail.com

400

INDEX

Alan Hirsch

Cont. Direct Examination by Mr. Hanft          417

Cross-Examination by Ms. Means               429

Redirect Examination by Mr. Hanft            440

Recross-Examination by Ms. Means             443

Timothy Drury

Direct Examination by Mr. Joel Rudin         483

| EXHIBITS | ID | EVD |
|---|---|---|
| PX 44 - 1/15/76 P-73 (Montondo) | -- | 479 |
| PX 67 - 11/15/76 transcript (index only) | -- | 470 |
| PX 69 - 12/6/76 transcript (index only) | -- | 470 |
| PX 70 - 01/77 Gibson trial transcript (redacted) | -- | 472 |
| PX 74 - 04/77 Boyd trial transcript (redacted) | -- | 470 |
| PX 99 - 7/9/81 People v. Ivey decision | -- | 457 |
| PX 100 - 3/11/98 Ivey ECDA case card | -- | 457 |
| PX 170 - 6/2/78 People v. Johnson decision | -- | 457 |
| PX 171 - 2/18/84 Johnson V. Smith decision | -- | 457 |
| PX 246 - 11/30/23 Cosgrove deposition (portion) | -- | 441 |
| PX 272 - 7/8/77 P-73 (Pantano) | -- | 468 |
| PX 285 - interrogation demonstrative | -- | 421 |
| PX 293 - 7/8/77 P-73 (Guadagno, redacted) | -- | 477 |
| DX 500.41 - 1/12/76 Criminal complaint (Dove) | -- | 452 |

401

PROCEEDINGS

*    *    *

(Open court.)

THE COURT:  Good morning, everyone.  We can get started.  The parties are present.  The jurors are not.  I'd like to address some issues before we bring the jurors in hopefully around 9:15 or so.

The first issue I'd like to address is Plaintiff's motion to ask leading questions of Mr. Drury under Rule 611(c).  I did review the County's response.  I do agree with the County that the issue is kind of premature.  And so I'm going to reserve on it.  And we'll see how the testimony goes.  And so since a lot of that is determined by his demeanor, then we'll see how his demeanor is and you can renew your motion at that time.

Who is doing his testimony?  Mr. Rudin, that's right.  You can renew the motion at the time if you feel that you need to.

MR. JOEL RUDIN:  Thank you, Your Honor.

THE COURT:  Okay.  I want to address the Henry designations and I guess kind of the general issue that was brought up by Plaintiff.  They filed the memorandum about allowing in evidence of nondisclosure of codefendants, and I have provided parties a revised decision regarding Henry's

deposition designations. And so I just want to talk about that for a few minutes.

So I guess I'll start by saying in Walker's trial this really never became an issue. There was no motion to have this evidence as Monell evidence. It wasn't something I issued a ruling on. But the parties had stipulated to a lot of that evidence just coming in from the outset. And so there was evidence of nondisclosure -- alleged nondisclosure for the other codefendants. And so Plaintiff had asked me yesterday to kind of reconsider, and so I did reconsider.

So I went back to the stipulation that was filed here in this case and it is a little different, but essentially it is -- the Defendant and Plaintiff are agreeing to the universe of exhibits and documents that were disclosed in all of the court proceedings for all of the codefendants. Obviously not Mr. Martin because we don't have a transcript for that. And so I do think that that fact, that stipulation, makes a difference in my analysis.

Yesterday, Mr. Firsenbaum, I agreed with you that the nondisclosure evidence of the codefendants is Monell. I mean, I agree that it qualifies as Monell. My concern was, as I said, the flip side of the coin, the potential prejudice. And reconsidering that now, because of the stipulation, I do think that it diminishes the potential prejudice. And so what I mean by that is even though the

County has not stipulated to the admissibility of all of the Brady exhibits, although they have been received already, what they did is both parties stipulated to essentially all of the exhibits that were, you know, disclosed on the record during all of the proceedings, and not just Mr. Boyd's proceeding but Mr. Walker's and Mr. Gibson's. And so given that there really is kind of this agreement that where the jury could go through, for instance, the list of the alleged Brady evidence and compare that to all the exhibits that were disclosed during all of the codefendants' proceedings and kind of figure out for themselves what wasn't disclosed.

Now, of course, this doesn't preclude the County from still arguing that certain reports could have been disclosed that weren't on the record, but my point is that this stipulation really in my view diminishes the potential prejudice. If the County had not stipulated to it and said, you know what, Judge, nothing about the Walker trial should come in, then that would be different. Now, I know you had initially made a motion regarding the Walker trial, but then you entered into the stipulation. And so I just wanted to point that out.

I do think that when I'm weighing the probative value of it versus the potential prejudice, that is one of the things that I took into account. The rulings I've already made about the fact that Mr. Walker's criminal conviction was

404

vacated, the fact that he pursued these 440 motions, that he had a shared attorney with Mr. Boyd, and, of course, anything about his civil trial here earlier this year, all of that is still precluded. And I think that that's important in ensuring that -- when balancing the probative value for Plaintiff against the prejudice to the County, it's important to keep those things out. And so those rulings still stand.

So I guess similar to in Mr. Walker's trial, I will allow evidence of nondisclosure to the codefendants as Monell evidence. And when I say "as Monell evidence," you know, a lot of the Monell evidence we talked about are about other cases or other specific incidents where a court has already ruled there was a Brady violation or there was summation misconduct. That obviously is different here. So I recognize there can be different forms of Monell evidence.

So this is not the kind of incident that the plaintiffs have offered. And I know I still have to get you a decision on that. It's not like Johnson or Ivey. This is different because in those situations a Court has already ruled that there was a Brady violation, and here that evidence is not going to be presented to the jurors, which, again, I think helps diminish the prejudice against the defendant. I do find that that kind of evidence is very probative to Plaintiff's case.

And, as I referenced yesterday, and as I found in Mr.

Walker's case, I do find that contemporaneous Monell evidence -- so before, during, after -- is relevant to proving widespread policy and practice. And so the nondisclosure evidence for Mr. Boyd's codefendants is permissible to prove widespread practice and policy toward Monell.

So, given that ruling, I did modify the rulings for Mr. Henry's deposition designations. Are there any questions about that?

MR. FIRSENBAUM: None, Your Honor. Thank you.

MR. JOEL RUDIN: I just have one thing about one of Your Honor's specific rulings.

THE COURT: Sure.

MR. JOEL RUDIN: So on page nine of the revised rulings Your Honor allowed in 303, 12 and 305, 13. The way this was presented to the Court there was another subsequent passage that Your Honor ruled out because it appeared vague in what it was referring to, and that is 312, 8 to 13 and 312, 15 to 17. When we were editing this it was inadvertently -- those two sections were inadvertently moved and, in fact, refer to 303, 12 to 305, 13.

So when the Court has the opportunity, if you could just -- I would request that you compare those. And if Your Honor agrees that one relates to the other, then I would ask Your Honor to reconsider that one ruling.

406

And if the Court needs the pages in between from the deposition transcript, we can forward those. We edited those out because there was a lot of back and forth, but it was clear by the end that the conclusion of the witness that expressed at 312 was referring back to the documents I asked him about at 303.

THE COURT: Okay. When do you think you'll get to those? Probably not today, right?

MR. JOEL RUDIN: No.

THE COURT: Okay.

MR. FIRSENBAUM: And, Your Honor, just probably not until after the weekend, if that's helpful to you.

THE COURT: Okay. Because Mr. Drury is coming in this morning at eleven, and then you expect to take the rest of the day with Mr. Drury, possibly until tomorrow?

MR. JOEL RUDIN: Yes, Your Honor.

THE COURT: Okay.

MR. BLENK: Your Honor, may I be heard briefly?

THE COURT: Yes. Go ahead.

MR. BLENK: Just noting our exception on the record, it is our position that Mr. Walker's trial coming in is prejudicial. A stipulation to the scope of evidence that was produced on the record in Mr. Walker's trial is confusing for the jury to understand. The jury is going to understand the context of that stipulation, what it means and what the

407

arguments are outside the scope of that stipulation in this case.  And for them to be -- for this to be presented to them in Mr. Walker's case I think is highly prejudicial.  It doesn't resolve the same confusion and prejudice arguments that we've been making throughout.  The facts are just the facts.  The record reflects what the record reflects.  The parties have been in a general understanding of what those records reflect.  We were making a motion to avoid Mr. Walker's trial to avoid that confusion and prejudice, notwithstanding that the parties have been in a general understanding of those -- the documents at issue on the record and on the record disclosures.

THE COURT:  Go ahead.

MR. BLENK:  As to -- just for a point of clarification -- and I already shared this with Plaintiff's counsel -- we intend, just as we did last time, to reserve on Mr. Drury for the entire scope, including the scope of the testimony that he's providing to Mr. Rudin, so that we would recall him in the same way that we did at Mr. Walker's trial.

THE COURT:  That's fine.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  And, just to be clear, my ruling just now isn't allowing the entire transcript of Mr. Walker's criminal trial into evidence.  It's just the evidence of the nondisclosures, which is really kind of elaborating on what

408

the parties have stipulated to.  So I just want to make that clear.  This is not in any way a ruling that all of these other transcripts are admissible.

Okay.  Let's move on to People v. Ashley.  Did you want to be heard any further?

MR. HANFT:  Your Honor, I think our position is mostly laid out in our papers.  We obviously did not file a reply to the County, but I think our position is that Mr. Cosgrove was certainly on notice of this article.  He testified that he reviewed the Buffalo newspapers every day.  He confirmed that -- confirming that this is the sort of article that would have been brought to his attention.  So I think it's clear that there is impeachment value in the fact that he testified that he was never -- that he never disciplined anyone for this conduct.  He's not aware of any discipline for this conduct.

As we said before, we were willing to stipulate to keep Assistant District Attorney Drury's name out of this testimony, but given the County's position that it would not agree to that, we think it's relevant and probative.  And we have direct on-the-record confirmation from Assistant District Attorney Drury at his deposition that he was never disciplined or investigated at any point, including in relation to this article.  So we think it's relevant to impeach Mr. Cosgrove's testimony regarding whether any

409

prosecutor who committed misconduct would have been disciplined.

THE COURT: Okay. I'm going to deny Plaintiff's request. I know I had proposed kind of a way to kind of get around the fact that this was Mr. Drury, but since it doesn't seem like we can accomplish that, then I do find that -- well, one, it's not Monell evidence. It's not a Brady violation or summation misconduct.

I do find that the probative value of it, which is -- there is some, but I don't think it's strong. I think that weighed against the potential prejudice, given that Mr. Drury was the ADA on Mr. Boyd's case, I'm going to deny the Plaintiff's request.

There was a filing yesterday by the County pertaining to postconviction affidavits. So we don't need to address that now. I just want to give Plaintiff a chance to respond to that. If you could respond to that by the end of the day tomorrow, and then we'll address it next -- at the beginning of next week.

MR. FIRSENBAUM: Will do, Your Honor.

MR. BLENK: Can I ask for a point -- is Mr. Zeidman expected on Monday?

MR. FIRSENBAUM: Yes.

MR. BLENK: Yes?

THE COURT: What was the answer?

410

MR. FIRSENBAUM:  Yes.

MR. BLENK:  Thank you.

THE COURT:  Is that going to -- are you asking to address anything before then?  If there's something specific, then just let us know, and we can try to do that tomorrow at the end of the day.

MR. BLENK:  I would ask Your Honor's permission just to confer, and we'll get that to you as soon as possible if we think there's an issue.

THE COURT:  That's fine.

MR. BLENK:  Thank you.

THE COURT:  There was also a filing yesterday regarding portions of Professor Hirsch's report that the County would like to offer regarding their apportionment defense.

The thing is, Mr. Blenk, there wasn't any evidentiary basis for that, to admit the portions of the report.  So on what basis could I receive portions of the report?

MR. BLENK:  A party admission, Your Honor.

THE COURT:  You know, I disagree with that.  I mean, generally, expert reports are hearsay.  I think there's also case law that indicates that experts really aren't kind of party representatives.  So I don't find that that's a basis to offer that portion of Professor Hirsch's testimony.  I'm assuming you want to offer that during your cross-examination this morning?

411

MS. MEANS:  Potentially, Your Honor.  It may be sufficient to rely on it for impeachment purposes and to refresh his recollection.

THE COURT:  That's fine.  I mean, you can certainly cross-examine him on those portions.  It's just I'm not at this point allowing those portions of the report to be received into evidence.

And that kind of leads me to the Plaintiff's motion for Mr. Gagan.  I'm going to deny Plaintiff's request to admit portions of Mr. Gagan's testimony in the trial, the trial earlier this year as well as his deposition.  I wanted to let you know now, but I do want to place all of my reasoning on the record.  I just don't have that with me right now.  But I just -- because I brought up the fact that there really is -- I think the case law indicates that experts, because they are still independent actors, that they are not necessarily party admissions.

I know that the Plaintiff had argued different bases for receiving Mr. Gagan's prior testimony, but I don't find any of those apply here given that County has asserted that they are not going to call Mr. Gagan.  Well, I guess they conditionally asserted it.

There was also a motion filed by Plaintiff regarding the proffered testimony of Mr. McLeod.  Can you remind me, when do you think Mr. McLeod is going to testify?

412

MR. FIRSENBAUM:  Mr. McLeod will testify on Wednesday.

THE COURT:  Wednesday.  Okay.  So I just want to give you a chance to respond to that.  If you could do that by the end of the day tomorrow.

MS. MEANS:  Certainly, Your Honor.

THE COURT:  Thank you.

MR. FIRSENBAUM:  Your Honor, can we ask just one question about Your Honor's ruling about Mr. Gagan?

THE COURT:  Yes.

MR. FIRSENBAUM:  I think -- if Your Honor's ruling is based on an understanding that the defense is not calling Mr. Gagan in this trial, then can we actually have that confirmed from the defendant that they are not, in fact, calling Mr. Gagan?  Because I think their papers were a little bit unclear, reserving rights.

THE COURT:  I guess the way I read it is that the County was not calling Mr. Gagan unless I allowed you to put in these deposition designations, and then if I did, then they would reserve their right to call him.

But why don't you clarify.

MR. BLENK:  That's correct, Your Honor.  There was an additional level of confusion at the time of our briefing because we were also addressing the admissibility of experts generally, which would have somewhat subsumed Mr. Gagan, but, yes, our position is unequivocal that if his admission -- if

413

his admissions do not come in that we will not be calling Mr. Gagan.

MR. FIRSENBAUM:  Thank you, Your Honor.

THE COURT:  Okay.  Anything else that you'd like to address before we proceed?

MR. HANFT:  Yes, Your Honor.  A few minor housekeeping issues.

We have two new exhibits that I'd like to hand up to Your Honor with permission.  One is just a stamped version of the stipulation the parties signed that you discussed.  It was not on the exhibit list because it was agreed to after the exhibit list was submitted.  So we have stamped it as PX 292.  We are not intending on showing it to the jury, but we may use it with witnesses for clarification.

THE COURT:  Okay.

MR. HANFT:  And the second is PX 293, which is just a redacted version of DX 500.26.  So there's no surprise, we may use this with Assistant District Attorney Drury, but we just wanted to re-stamp it because we were putting redactions on it.

THE COURT:  Okay.

MR. HANFT:  Can I hand these up to Your Honor?

THE COURT:  Yes.

MR. HANFT:  And then one additional minor point for Professor Hirsch.  I just wanted to flag for Your Honor that

414

we are getting close to the point in his examination when we would use the demonstrative.  So I just wanted to make that clear that that was coming up shortly.

THE COURT:  Okay.  That's that -- kind of the layout of the rooms?

MR. HANFT:  The rooms and the movement of individuals as described in the police reports before the grand jury.

THE COURT:  And you have a copy of that, Mr. Blenk?

MR. BLENK:  Yes, Your Honor.

THE COURT:  Okay.  That's fine.  It's the same one as -- the same one that you used before?

MR. HANFT:  Yes.  No changes.

THE COURT:  Okay.  That's fine.

MR. JOEL RUDIN:  Your Honor, before Mr. Drury testifies there are a number of exhibits that I'd like to move into evidence, but we can do it then.  I just wanted to alert the Court, unless you want to do it now.

THE COURT:  No.  We can do it then.  We'll probably take a recess before Mr. Drury.  So we can do it during that time.

MR. BLENK:  And just for a point of clarification, 500 -- I'd like to discuss 500.26 because it's outside -- this is certainly something that wasn't admitted in Walker. I don't really understand the relevance of it.  That's not something that's relevant to Mr. Hirsch, right?

415

MR. HANFT:  No.  We do not intend to use that with Mr. Hirsch.  That's for Mr. Drury.

MR. BLENK:  So we can put that off until the conversation about the exhibits that are going to be used for Mr. Drury.

MR. JOEL RUDIN:  Yes.

MR. BLENK:  Okay.  Your Honor, may I be excused for just a moment?

THE COURT:  Sure.  Go ahead.

MR. BLENK:  Thank you.

THE COURT:  I just wanted to clarify one thing.  Plaintiff's Exhibit 45, which was received yesterday, it was a portion of the transcript for the preliminary hearing.  Just clarifying, because the parties consented to that, it was just for Mr. Woodruff's testimony in the preliminary hearing, correct?  Is that right?  I just want to make sure.  I know it was --

MR. FIRSENBAUM:  That was my understanding, Your Honor.

THE COURT:  Okay.  I just wanted to make sure it was clear on the record.  So for both of those transcripts that we received yesterday, the parties consented to it, just Mr. Woodruff's testimony as redacted?

MR. FIRSENBAUM:  Yes, Your Honor.

MR. SOUTHARD:  Correct, Your Honor.

THE COURT:  Okay.  Thank you.  We'll just wait for

A. Hirsch - DX by Mr. Hanft                416

Mr. Blenk to come back and then we'll bring the jurors in.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  Okay.  We can bring the jurors in.

(Jury present.)

THE COURT:  Have a seat, everyone.  Good morning, everyone.

THE JURY:  Good morning.

THE COURT:  Our jurors have returned to the courtroom. And I hope that everyone had a good night.  I'm sorry, Ms. Segar, about your car.

We're going to proceed with Professor Hirsch's testimony.  We can bring Professor Hirsch in.

(Mr. Hirsch present.)

THE COURT:  Good morning, Professor Hirsch.

THE WITNESS:  Good morning.

THE COURT:  You can have a seat.

THE WITNESS:  Thank you.

THE COURT:  Professor, I'm just going to remind you that you are still under oath.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Whenever you're ready.

MR. HANFT:  Thank you, Your Honor.

CONT. DIRECT EXAMINATION

BY MR. HANFT:

Q.   Good morning, Professor Hirsch.

A. Hirsch - DX by Mr. Hanft                417

A.   Good morning.

Q.   So when we broke yesterday for the day we were discussing the interrogations of Andre Hough on January 8th and January 12th, correct?

A.   Yes.

Q.   And just returning to that, was the interrogation of Andre Hough consistent with a particular interrogation method?

A.   Yes.

Q.   And what method was that?

A.   The Reid method, except, as I indicated, consistent with but beyond.

Q.   And how did it go beyond the Reid method?

A.   I'm sorry.  With Mr. Woodruff it was primarily beyond.  With Mr. Hough it was consistent with.

Q.   Mr. Hirsch, we talked a bit yesterday about where you gained information, and you mentioned the deposition testimony of Mr. Drury.  Do you remember when that deposition was?

A.   I believe two years ago roughly.

Q.   Thank you.  Now, I'd like to turn to the grand jury proceeding on February 11th.  Did Mr. Woodruff and Mr. Hough testify before the grand jury?

A.   Yes, they did.

Q.   And what in the record are you relying on to develop your understanding of what occurred on February 11th before

A. Hirsch - DX by Mr. Hanft                418

the grand jury?

A.    Primarily two police reports.

Q.    Could you describe at a very high level what happened before the grand jury?

A.    Yes.  So before the grand jury, as in prior to, yes. So earlier that day in preparation for their testimony before the grand jury the police and ADA Drury met with both Mr. Hough and Mr. Woodruff, each of whom recanted their confessions and/or accusations, and during discussions with law enforcement they recanted their recantations and actually developed an expanded version of their stories of what happened, which involved even greater culpability for the boys, and their stories changed and were brought into -- they were coordinated.

So let's just say they ended up testifying before the grand jury not only returning to their accusations after having recanted, but having a greater story and a coordinated story.

MR. HANFT:  Can we pull up PX 47, which is received into evidence, and publish that to the jury?

BY MR. HANFT:

Q.    What is this February 11th report?

A.    This is Detective Guadagno's description of what happened in those discussions prior to their testimony before the grand jury.

A. Hirsch - DX by Mr. Hanft                419

Q.    And what did Detective Guadagno say happened with Andre Hough?

A.    To summarize, Mr. Hough recanted his story, as I indicated, claiming he knew nothing about -- he had been lying in claiming that he knew something about the involvement of the boys or that Mr. Boyd had told him something, and then spontaneously changed his mind and once again said that what Mr. Boyd had told him was the case.

Q.    And what did Detective Guadagno say happened with Tyrone Woodruff?

A.    Tyrone Woodruff spontaneously provided more information.  He expanded his prior story about what had happened.

Q.    Is there anything notable to you about this version of events?

A.    Well, the double spontaneity.  These two people coming up with spontaneously -- in the case of Mr. Hough, recanting his recantation; in the case of Mr. Woodruff, coming up with more information.  That would be unusual in this setting for them to recant in the case of Mr. Hough, and just to spontaneously expand his story in the case of Mr. Woodruff.

MR. HANFT:  Can we now bring up PX 46, which is also received into evidence?

BY MR. HANFT:

Q.    This is the second February 11th police report on

A. Hirsch - DX by Mr. Hanft                    420

the Woodruff and Hough interrogations before the grand jury?

A. Yes.

Q. And this one is written by Detective Delano?

A. Yes.

Q. And what does Detective Delano say happened with Andre Hough?

A. Right. So we have the recantation. We also in this case have Mr. Hough's mother present. Then she leaves, asks the police to take her son home. They don't. Instead, they subject him to the Reid method, tell him he's lying and he's in serious trouble unless he tells them what they want to hear, which is what he had previously told them, and he now returns to that story, except that he embellishes it, adds a crucial element to it.

Q. And what does Detective Delano say happened with Tyrone Woodruff?

A. So Mr. Woodruff, too, apparently recants or at any rate says -- changes his story, says he doesn't know much. He is confronted with what Mr. Hough has told them separately, and that leads him not only to return to his confession but to expand it in a way that coordinates with or matches Mr. Hough's expanded story.

Q. So I know it's a little hard to keep track of all of the movements between the rooms before the grand jury in these reports. So could you help us walk through an illustration

A. Hirsch - DX by Mr. Hanft                421

based on the reports that we were looking at of what's happening here?

A.   Sure.

MR. HANFT:   Can we bring up PX 285 as demonstrative evidence the grand jury presentation and move this into evidence as demonstrative evidence?

THE COURT:   Any objection?

MR. BLENK:   No objection, Your Honor.

THE COURT:   PX 285 is received as demonstrative evidence.

MR. HANFT:   And could we publish 285 to the jury?

*(Plaintiff's Exhibit 285 received in evidence.)*

BY MR. HANFT:

Q.   So what do we see in this first image?

A.   Detective Delano and ADA Drury talking to Andre Hough with his mother present.  And presumably this is when Mr. Hough recants his story about what Mr. Boyd allegedly told him.  Obviously Tyrone Woodruff is waiting alone in the other room.

Q.   And what do we see happening when Andre's mother leaves?

A.   Is this going to change or -- just what I know happens when she --

Q.   I'll go back.  You may have missed it.

A.   Oh, she already left.  Okay.  Sorry.  I missed that.

Yeah.  When she is no longer there the officers continue to question Mr. Hough.  And this we know is when he recants his recantation.

Q.   So what do we see happening after Andre recants his recantation?

A.   He is then taken before the grand jury where he gives the version -- the expanded version of his account of what Mr. Boyd told him.

Q.   What do we see happening with Mr. Woodruff at this point?

A.   Now we're going to have conversations between Mr. Woodruff and law enforcement.

Q.   And what happens when Detectives Delano and Detective Guadagno question Tyrone Woodruff here?

A.   Well, it kind of depends which one of them you believe.  If you believe Detective Guadagno, Mr. Woodruff spontaneously supplies more information.  If you believe Detective Delano, Mr. Woodruff too recants his statements, is confronted with what Mr. Hough told him, recants his recantation and expands his version of what happened.

Q.   And what happens when ADA Drury enters the room?

A.   Now ADA Drury comes.  Mr. Woodruff is confronted with what Mr. Hough has testified to, and Mr. Woodruff now recants his recantation and expands his story and it comes into sync with Mr. Hough's story, which, by the way, also

A. Hirsch - DX by Mr. Hanft                        423

changed in ways that brought his story into coordination with what was previously Mr. Woodruff's story, which is to say they both changed their stories.  They are now embellished and matched.

Q.    And what do we see happening next?

A.    Mr. Woodruff is then taken before the grand jury where he repeats that story, the embellished story that matches Mr. Hough's embellished story.

Q.    And what happens at this point?

A.    Well, before long the boys are released.  I guess Detective Delano testifies before the grand jury, and then they join Mr. Hough and then they are released.  Sorry.  I got ahead of myself.

Q.    Thanks for the explanation, Professor.

Now, what, if any, interrogation technique is being used with these two boys prior to the grand jury?

A.    The Reid technique.

Q.    And you mentioned both boys changed their stories at the grand jury.  Was that a significant change?

A.    Definitely.

Q.    How was it significant?

A.    Well, both of them now say that instead of Mr. Crawford just coming out of the bar by happenstance Mr. Boyd and Mr. Walker -- Gibson scoped out the Golden Nugget.  Essentially, they went there looking for a victim,

A. Hirsch - DX by Mr. Hanft                424

and when they did they saw someone happen to flash huge amounts of money, and then they waited for him and so forth. That's the most significant change.

In addition, for the first time Mr. Hough talks about Mr. Gibson having a pipe, which he had not previously mentioned, as the murder weapon.

Q.   What do you make of the fact that the stories changed at this point?

A.   It's very concerning.  Even Reid & Associates acknowledges that when stories change that's a grounds for concern, and here the circumstances which led to the stories changing is even more concerning.

MR. HANFT:  If we could, I'd like to pull up PX 46 and PX 47 side by side next to each other.  And can we publish that to the jury?

BY MR. HANFT:

Q.   Now, are these two reports meant to document the same events?

A.   Yes.

Q.   What do you make of having two different accounts of the same events by two different police officers?

A.   Yeah.  So here we see the same phenomenon, which I had before here never seen before, but we now see it twice in one case of conflicting police reports.  I mean, just telling a very -- a very different account of what is supposed to be

A. Hirsch - DX by Mr. Hanft                    425

the same event.

The spontaneous recantation or expansion of the story, that's Detective Guadagno's story. The aggressive interrogation tactics that lead to the recantations of the recantations, that's Detective Delano's story. They are obviously very different explanations of what led these boys to change their stories.

Q. And who, if anyone, do we see in these reports from the -- from the District Attorney's Office as present?

A. Yeah. ADA Drury obviously is very present for these events, plays a significant role.

Q. Let's take a look at one more document.

MR. HANFT: Can we pull up PX 48, which is received into evidence?

BY MR. HANFT:

Q. Do you recognize this as the February 11th, 1976 statement of Tyrone Woodruff?

A. Yes.

Q. Now, you heard Mr. Woodruff testify that he did not write this document, just signed his name?

A. Yes.

Q. And one of the police reports states that an officer wrote it and Mr. Woodruff just signed his name?

A. Yes.

Q. What, if anything, do you make of the fact that he

A. Hirsch - DX by Mr. Hanft                426

didn't write this statement himself, just signed it?

A.   It's a lot more reliable obviously if this is coming from the hand of the person who is telling the story.

Q.   Did Tyrone Woodruff testify at Mr. Boyd's trial?

A.   Yes, he did.

Q.   Generally speaking, was Tyrone Woodruff's story implicating Mr. Boyd -- Mr. Boyd at his trial consistent with his changed story before the grand jury?

A.   Yes.

Q.   What do you make of the fact that at this point the stories became more consistent?

A.   You mean that the testimony at the Boyd trial matches the testimony he gave before the grand jury?

Q.   Yes.

A.   Yes.  That's not the slightest bit surprising.

Q.   Why is that?

A.   Once he's testified before the grand jury his story is locked in.  At that point he faces perjury charges.  If he changes his story -- he has immunity if he sticks to his story.  The only way he can get into any trouble is if he changes his story.  So we would expect just from the standpoint of Mr. Woodruff's self-interest that he would maintain that story whether or not it was true.

Q.   Professor Hirsch, I believe you've testified that you've reviewed hundreds of cases in your career?

A. Hirsch - DX by Mr. Hanft                    427

A.   Yes.

Q.   How did the interrogation and investigation techniques at issue here compare to those in other cases you've studied?

A.   You mean this whole case?

Q.   Yes.

MS. MEANS:  Objection, Your Honor.  May we approach?

THE COURT:  Yes.

(At bench:)

MS. MEANS:  This is -- we're objecting on the lack of foundation and this sounds like it's --

THE COURT:  Lack of foundation and what?

MS. MEANS:  The question has a lack of foundation for any cases --

THE COURT:  Can you talk a little bit more clearly?  You can talk a little louder because we have this background noise.

MS. MEANS:  Yes.  We're objecting on the ground of lack of foundation.  There's been no testimony from Mr. Hirsch to compare this to other incidents that he's seen, and it's going to leave the jury to speculate as to something that's not in the record.

THE COURT:  Overruled.

(Open court:)

BY MR. HANFT:

A. Hirsch - DX by Mr. Hanft                    428

Q.    I'll just re-ask my question.

Professor Hirsch, how did the interrogation and investigation techniques at issue in this case as a whole compare to those hundreds of other cases you've studied?

A.    Different, more concerning.  And that's because any number of things that happened in this case were either completely unprecedented in my experience or very unusual.

So, first, there is the whole grand jury business we just went over, these coordinating stories and embellishment of stories at the last minute.  I don't think I've seen that before.

The anonymous call, if it happened, the suspect being -- hearing an anonymous call, I've never seen that before.

The grant of immunity at the outset of the investigation of a homicide case, I've never seen that before.

The conflicting police reports, which we see not only in connection with Mr. Woodruff's statement on January 12th but then again the -- both he and Mr. Hough's statements on February 11th, I've never seen that before.

The use of polygraphs, not unprecedented perhaps, but as erratic and inconsistent, the use of polygraphs, as I've ever seen before.

You put all of this together and I would say, number one, just to state the obvious, it was an extremely unusual investigation and series of interrogations and, number two, it

A. Hirsch - CX by Ms. Means                        429

was as problematic of a series of interrogations and an

investigation as I've ever seen.

Q.    Thank you, Professor.

MR. HANFT:  Nothing further.

THE COURT:  Thank you.

Cross-examination?

CROSS-EXAMINATION

BY MS. MEANS:

Q.    Good morning, Mr. Hirsch.

A.    Good morning.

Q.    You were retained by Plaintiff's counsel to assess

the interrogation tactics by the Buffalo Police Department

against Mr. Woodruff and Mr. Hough; is that correct?

A.    Yes.

Q.    And yesterday you testified about some of your

experience, which includes offering testimony in criminal

trials; is that right?

A.    Yes.

Q.    And yesterday you testified that you've testified on

behalf of law enforcement; is that right?

A.    No.

Q.    That was not your testimony yesterday?

A.    No.  I testified that I've been retained by law

enforcement.

Q.    Okay.  So each time that you have testified when

A. Hirsch - CX by Ms. Means                     430

you've been retained by law enforcement, that would be on behalf of a criminal defendant?

A.   I've never testified on behalf of law enforcement. I've been retained by law enforcement, but the cases did not reach the trial stage or they were -- did not involve testimony.

Q.   Okay.  So you've never testified in a case that you were retained by law enforcement; that's correct?

A.   That's correct.

Q.   When you have testified in criminal matters has that always been in defense of a confession that's been made?

A.   In defense of a confession?  I don't understand what you mean by that.

Q.   When you've testified in criminal proceedings have you ever testified in a manner that was supportive of a confession?

A.   Yes.  By "supportive of a confession" meaning that I testified that a confession seemed reliable or unproblematic?

Q.   Correct.

A.   Yes.  That's -- my testimony has sometimes been to that effect.

Q.   And how many times would you say you've testified in that respect?

A.   I have no idea.

Q.   You testified that you have testified in

431

approximately 60 cases I believe yesterday?

A.   62, yes.

Q.   And you have no idea how many times you've testified -- I'm sorry -- of those 60 times you have no concept of how many times you've testified that a confession was reliable?

A.   So, just to be clear, many of the cases I'm involved in involve multiple confessions, some of which are reliable, some of which aren't.  So in all of those cases I'm testifying on behalf of a defendant there is at least one confession.

By the way, just to be very clear, I'm never testifying that the confession is true or false.  There are many of those cases in which all I am testifying about is the interrogation methods.

Q.   And, Mr. Hirsch, my question wasn't whether the confession was true or false.  I was just asking if it was reliable or --

A.   On many of those cases I'm not testifying about that either.  I'm simply testifying that certain interrogation methods were used that are problematic.

Q.   So the testimony that you typically offer is focused on the interrogation methods?

A.   Correct.

Q.   So this is not -- so assessing the statement for certain indicia of reliability then is not within the typical

A. Hirsch - CX by Ms. Means                    432

wheelhouse of the testimony you provide?

A.    No.  Often it is, often it isn't.

There's a vast range of testimony that I'm asked to give. Sometimes it's involving looking closely at a confession and indicia of reliability.  Sometimes I'm not looking at the confession at all.  I'm giving what's called cold testimony where I simply give the jury background about false confessions.  Sometimes I'm describing interrogation methods that were used in a particular case, but nothing about the confession that was given.  There's just a wide range.  I couldn't generalize and I couldn't give estimates about how many times it was X, Y or Z.

Q.    Yesterday and a bit today you explained to the jury an approach to police interrogation known as the Reid method; is that right?

A.    Yes.

Q.    And you testified that you are very critical of the Reid method; is that accurate?

A.    Yes.

Q.    You agree that the Reid method has been around for decades?

A.    Yes.

Q.    It remains widely used still to this day?

A.    Yes.

Q.    It's not illegal in New York?

Case 1:22-cv-00519-MAV-JJM    Document 455    Filed 11/12/25    Page 36 of 123

A. Hirsch - CX by Ms. Means

433

A.   No.

Q.   Nor anywhere in the United States?

A.   Aspects of it are illegal in certain states.

Q.   I'm sorry?

A.   Aspects of it are now illegal in certain states.

Q.   You testified that you agree that the Reid method is also effective in producing reliable confessions; is that right?

A.   Yes.  Well, I think I said true confessions.  Yes.

Q.   I believe your testimony is that you cannot offer an opinion on whether confessions are, in fact, true?

A.   My testimony was that I'm not allowed to.  And, certainly, in many cases I'm not in a position to because I don't see all the evidence in the case as presented at trial.

Q.   So when you are analyzing confessions your review is limited not to determining their truth but limited to identifying certain indicia of falsity?

A.   Again, what I do in a particular case varies a lot. I am never or almost never allowed to give my opinion about whether a confession was false, but what I do do varies a lot. It may be to look at indicia of unreliability.  It may be just to look at the interrogation tactics.  It may be to do all sorts of other things depending on the case.

Q.   Understood.  For purposes of this case --

A.   Yes.

A. Hirsch - CX by Ms. Means                434

Q.    -- you were not assessing the statements to determine definitively the truth or the falsity of the statement; is that correct?

A.    It was understood that I would not be allowed to give the jury my opinion about whether the statements were true or false.

Q.    So yes?

A.    I think that's a yes, if I understood the question.

Q.    In preparation for your testimony today and your review of this case you had the opportunity to review the conduct of the Buffalo Police Department during their investigation of the Crawford homicide; is that correct?

A.    Yes.

Q.    And yesterday you summarized various materials that you reviewed in connection with that review; is that right?

A.    Yes.

Q.    And it's your opinion that certain officers of the Buffalo Police Department used the Reid method in their interrogation of Mr. Woodruff and Mr. Hough; is that right?

A.    Yes.

Q.    And it's your opinion that the conduct of certain officers went beyond the Reid method; is that accurate?

A.    Yes.

Q.    And which officers do you believe exceeded -- exceeded the Reid method in their interrogation of

A. Hirsch - CX by Ms. Means                435

Mr. Woodruff?

A.   Just in the interrogations.  Well, it's hard to know because you read the police reports and it's hard to know who was doing what.  For example, if Detective Manista let Mr. Woodruff hear an anonymous call, he certainly engaged in improper conduct, but, according to Mr. Woodruff, that never happened.  According to the other police report, it's not even clear Detective Manista was in the room.

But I would say all of the officers who were involved in the interrogation.  So Hunter, Arnet, Guadagno, Delano.  I may be leaving some out.  As well as ADA Drury.

Q.   Mr. Hirsch, ADA Drury is not employed by the Buffalo Police Department, right?

A.   Correct, as far as I know.

Q.   I'm sorry.  Has your review of the records suggested that Mr. Drury was employed by the Buffalo Police Department?

A.   No.  It's suggested that, as far as I know, he is not.

Q.   Thank you.  Plaintiff's counsel put forward a visual or a video or a demonstrative.  You didn't generate that, correct?

A.   That's correct.

Q.   Your attorneys provided it to you?

A.   My attorneys?

Q.   I'm sorry.  The attorneys that retained you to

A. Hirsch - CX by Ms. Means                    436

review this matter provided that to you?

A.    Plaintiff's attorneys put that together, yes.

Q.    You have no personal knowledge of the layout of that demonstrative?

A.    The physical layout, like the size of the rooms, that sort of thing, that's correct.  Yeah, yes.

Q.    And your understanding of how that proceeding went forward is based on your review of the materials that were produced to you in your review of this matter?

A.    Yes.

Q.    Relative to Mr. Woodruff's January 12th, 1976 confession statement, you agree that that was obtained by the Buffalo Police Department?

A.    The statement he gave on the 12th?

Q.    Correct.

A.    Yes.  That doesn't mean there was no involvement by the County in the obtaining of that statement.

Q.    Mr. Hirsch --

A.    I just wanted to give a thorough answer.

Q.    That wasn't my question.  I didn't ask that question.

A.    Okay.  The Buffalo Police Department were present and took his statement, yes.

Q.    And who were the specific officers involved in obtaining that statement?

A. Hirsch - CX by Ms. Means                437

A.    Hunter, Arnet, Manista maybe.  I guess -- I guess those were the ones.

Q.    And it was also witnessed by Chief Leo Donovan; is that right?

A.    Yes.

Q.    The statement was also signed by Mr. Woodruff's father Frank Woodruff?

A.    Yes.

Q.    And --

A.    He signed it as a witness.  He didn't sign the statement itself, but yeah.

Q.    Fair.  Okay.  And it was also signed as a witness by Reverend Boyce?

A.    Yes.

Q.    After Mr. Woodruff gave his January 12th statement to the police if he did recant that confession he would have been facing perjury thereafter, correct?

A.    Yes.

Q.    And that would have included if he recanted at the time of the grand jury proceeding; is that correct?

A.    Well, yes, but to be clear --

Q.    Mr. Hirsch, it's yes or no.

A.    I'm trying to answer your question.  Perjury charges are very rarely brought because of a statement given to police.  They are much more --

A. Hirsch - CX by Ms. Means

438

Q. Mr. Hirsch, my question wasn't about the likelihood --

THE COURT: Can we -- I just don't want people talking over each other. So ask the question and then you can answer the question.

THE WITNESS: Thank you, Your Honor.

BY MS. MEANS:

Q. Mr. Hirsch, you provided certain examples of improper interrogation tactics by the Buffalo Police Department in your testimony; is that correct?

A. Yes.

Q. You offered one example that the Buffalo Police Department interrogated Mr. Woodruff in the absence of his parents; is that correct?

A. Yes.

Q. You also offered as an example that the Buffalo Police Department allowed Mr. Woodruff to overhear a phone call; is that correct?

A. If they did, yes. I should just add that if they didn't, then falsely claiming that they did in a police report would be highly improper.

Q. So it's your opinion that regardless of the veracity of the statement, whether they did permit Mr. Woodruff to overhear that phone call, it would have been improper conduct by the Buffalo Police Department?

A. Hirsch - CX by Ms. Means

439

A.  If they allowed it, it was improper conduct.  If they didn't allow it, it was an improper police report.

Q.  Okay.  And, again, that Buffalo police report was generated by the Buffalo Police Department?

A.  Yes.

Q.  Mr. Hirsch, is it fair to say that you've never tried a criminal case?

A.  Yes.

Q.  You've never presented a case to a grand jury?

A.  That's correct.

Q.  And you've never interviewed a witness in a capacity as a prosecutor?

A.  I've never been a prosecutor.  That's correct.

Q.  You've never interviewed a witness in a capacity as a police officer?

A.  Never been a police officer.  That's correct.

Q.  And you understand that in the United States detectives investigate crimes; is that correct?

A.  Of course.

Q.  And that prosecutors prosecute crimes?

A.  Of course.

Q.  And has your review of the records in this case -- do you agree that the chief of homicide of the Buffalo Police Department in 1976 was Leo Donovan?

A.  Yes.

A. Hirsch - RDX by Mr. Hanft    440

MS. MEANS:  If I could just have one moment.

THE COURT:  That's fine.

MS. MEANS:  Nothing further, Mr. Hirsch.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

Any redirect?

MR. HANFT:  Yes, Your Honor.

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. HANFT:

Q.    Professor Hirsch, Ms. Means asked you some questions about the interrogation conduct of Buffalo Police Department detectives, correct?

A.    Yes.

Q.    Do you know as a general matter who was responsible for supervising the Buffalo Police Department with respect to how they interrogated witnesses?

A.    No.

Q.    Let's see if we have someone who can answer that question for us.

MR. HANFT:  Your Honor, at this time Plaintiff moves into evidence PX 246 at 157, 23 to 158, 6, a video clip from the deposition of Erie County District Attorney Edward Cosgrove, the district attorney in 1976 and 1977.

THE COURT:  Ms. Means?

A. Hirsch - RDX by Mr. Hanft                441

MS. MEANS:  No objection, Your Honor.

THE COURT:  That portion of PX 246 is received.

*(Plaintiff's Exhibit 246, above-mentioned portion, received in evidence.)*

MR. HANFT:  Thank you, Your Honor.

Can we publish that to the jury and have it played?

(Video played.)

BY MR. HANFT:

Q.   According to District Attorney Edward Cosgrove, the district attorney in 1976, who supervised the Buffalo Police Department with respect to how they interrogated witnesses?

MS. MEANS:  Objection, Your Honor.  Leading.

THE COURT:  Overruled.  He's stating -- it was just in evidence.

THE WITNESS:  Apparently the Erie County District Attorney's Office.

BY MR. HANFT:

Q.   Now, you were also asked some questions of Mr. Woodruff and Mr. Hough about their interrogations on February 11th, the day that they testified before the grand jury, correct?

A.   Yes.

Q.   Does the -- did the grand jury return an indictment that day?

A.   Yes.

A. Hirsch - RDX by Mr. Hanft                     442

Q.   What is an indictment?

A.   An accusation of a crime.

Q.   And who is responsible for convening the grand jury to return an indictment, the Buffalo police or the Erie County District Attorney's Office?

A.   That would be a district attorney's function.

Q.   And who presented the case to the grand jury, the Buffalo police or the Erie County District Attorney's Office and ADA Drury?

A.   ADA Drury.

Q.   So if ADA Drury had decided not to present the case against Mr. Boyd to a grand jury because he was writing in his notes that Tony Woodruff was lying, what would have happened?

A.   There would not have been any indictment.

Q.   And if ADA Drury decided not to present the case to the grand jury, could Mr. Boyd have been convicted for 20 years to life because of the investigation by the police?

A.   He never would have faced trial.

Q.   Now, Ms. Means asked you some questions about facing perjury charges.

A.   Yes.

Q.   Who decides whether to bring perjury charges, the police or the district attorney?

A.   That would be the DA's office.

Q.   Who pursued a criminal trial against Mr. Boyd, the

A. Hirsch - RCX by Ms. Means                                443

Buffalo police or the Erie County District Attorney's Office?

A.   The DA's office.

Q.   So if ADA Drury had decided not to try the case after the grand jury indictment because he thought -- because a jury might think Tony Woodruff was lying, what would have happened?

A.   There would have been no trials.

Q.   And if ADA Drury had decided not to try the case against Mr. Boyd before a jury, could Mr. Boyd have been convicted for 20 years to life and sent to prison because of the investigation by police?

MS. MEANS:  Objection, Your Honor.  Speculation.

THE COURT:  Overruled.

THE WITNESS:  You could not be prosecuted and convicted if a case is not brought.

MR. HANFT:  Thank you, Professor Hirsch.  No further questions.

THE COURT:  Any recross?

MS. MEANS:  Yes, Your Honor.

RECROSS-EXAMINATION

BY MS. MEANS:

Q.   Mr. Hirsch, outside of that brief video clip that you were shown and in your review of the files that you were asked to review in this matter, have you seen anything to indicate that Mr. Cosgrove was involved in any of the

Case 1:22-cv-00519-MAV-JJM   Document 455   Filed 11/12/25   Page 47 of 123

A. Hirsch - RCX by Ms. Means 444

interrogations?

A.   No.

MS. MEANS:  I'd like to publish -- I'm sorry -- PX 47 for the jury, which is in evidence.

BY MS. MEANS:

Q.   And Mr. Hanft asked you some questions about the grand jury proceedings during his further questioning just now.  Do you recall that --

A.   Yes.

Q.   -- that question and answer?  And you see that from this report Detective Guadagno took this statement; is that accurate?

A.   Yes.

Q.   And this is the statement from Mr. Woodruff, correct?

A.   No.  I believe this is a police report.  This is not a statement.

Q.   Where he's memorializing Mr. Woodruff's statement?

A.   He's memorializing what happened in the run-up to his testimony before the grand jury.

Q.   Okay.  Fair.  So Guadagno is summarizing the lead-up to the grand jury proceeding, correct?

A.   Yes, that's correct.

Q.   Thank you.

MS. MEANS:  And I'd also like to pull up PX 48, please.

A. Hirsch - RCX by Ms. Means                445

BY MS. MEANS:

Q.    And you also testified regarding this statement, correct?

A.    Yes.

Q.    And this was also the initials MGG.  You understand that to be Detective Guadagno; is that correct?

A.    Yes.

MS. MEANS:  Thank you.  Nothing further.

THE COURT:  Thank you.  You're all set, Professor Hirsch.

THE WITNESS:  Thank you very much, Your Honor.

THE COURT:  Can counsel approach, please?

(At bench:)

THE COURT:  Just for scheduling purposes, we have like an hour until Mr. Drury comes.  So do you have something to present?

MR. JOEL RUDIN:  Not to the jury.

THE COURT:  Not to the jury.  Okay.

MR. HANFT:  There's nothing that really fits in our case right here.

THE COURT:  Okay.  Then we'll just have to take a recess.  And just let us know as soon as possible when Mr. Drury gets here.

MR. JOEL RUDIN:  At some point we can also do exhibits.

THE COURT:  Okay.

Boyd v. County of Erie, 22-CV-519                    446

MR. JOEL RUDIN:  The exhibits we are offering.

THE COURT:  That's fine.  Do you want to do that in front of the jurors?

MR. JOEL RUDIN:  No, no.

THE COURT:  Okay.  That's fine.

(Open court:)

THE COURT:  Members of the jury, we're going to take a recess to address some things outside of your presence, and then we'll continue with the Plaintiff's next witness.  I just want to let you know it's going to be a little longer of a break because we have to deal with some things and then wait for the witness to get here.

So all of the admonishments apply.  Do not talk about the case with anyone.

Just so you know, it's going to be about probably an hour break.  Okay?  Thank you for your patience.

(Jury not present.)

THE COURT:  Have a seat, everyone.

The jurors have left the courtroom.

Mr. Rudin, did you want to offer some exhibits?

MR. JOEL RUDIN:  Yes, Your Honor.  There are quite a few.

DX 500.41 is the criminal court complaint from January 12th, 1976, to which Mr. Woodruff's January 12th, 19 -- January 12th, 1976 statement is attached.  That has been

Boyd v. County of Erie, 22-CV-519                    447

stipulated to as to authenticity.

PX 69 is the redacted Wade hearing transcript.

PX 67 the redacted Huntley hearing transcript.

PX 68 is the undated handwritten notes by Mr. Drury that he authenticated and that were admitted at the last trial, but may not have been authenticated yet by Mr. Drury.

THE COURT:  Mr. Rudin, can you just hold on for one second?

MR. JOEL RUDIN:  I'm sorry.  I'm sorry.  The notes are authenticated, yes.

THE COURT:  If there's going to be argument about these, then I guess I just want to take them one at a time.

So DX 500.41, defense counsel?

MR. BLENK:  This is the first we're hearing of it, Your Honor.  I don't know if it might make sense to -- if Mr. Rudin just gives us the list and we come back in fifteen minutes.

THE COURT:  That's fine.

MR. JOEL RUDIN:  That's fine.

THE COURT:  Yes.  Let me know.  We could even come back and have a little bit more time than that since we're going to be in recess for about an hour.  Just let one of us know.  Okay?

Thank you.  We're in recess.

*(Recess taken.)*

Boyd v. County of Erie, 22-CV-519                    448

THE COURT:  While we're waiting for Mr. Drury, we gave everyone a copy of the proposed limiting instructions for Mr. Drury.  I just wanted to give everyone a chance to make any recommendations for changes or any objections.

Mr. Rudin?

MR. FIRSENBAUM:  No objection, Your Honor.

THE COURT:  Okay.  And so what I'll do is -- I know it says after each time.  I'm not going to do that.  But we can kind of figure out a good place to do that.

Mr. Blenk, do you have any objections or requests regarding the proposed instructions?

MR. BLENK:  Ms. Means will handle that.

MS. MEANS:  Your Honor, the reference to, "You may, however consider Mr. Drury's testimony about his understanding of legal principles for the limited purposes of assessing what, if any, policies, customs or practices at the Erie County District Attorney's Office existed at the time," I think that is going to be potentially problematic, but I think it depends on how the -- first, the way that the questions are asked.  If he's going to be -- if the questions are going to be couched in his understanding as they existed at the time of his -- at the time of his trials.

And then, separately, I understand Plaintiff is not pursuing a failure to train claim in this proceeding, and his understanding of legal principles would be connected to a

Boyd v. County of Erie, 22-CV-519                    449

failure to train claim.  So overall I think that the limiting instruction is confusing, but this also stems back to our confusion -- I suppose confirmation from Plaintiff's counsel as to whether they are or are not pursuing a failure to train claim.

THE COURT:  Well, I don't think they're not pursuing a failure to train claim, and I don't think that means that the jury can't consider testimony -- this kind of testimony for a different purpose.  And so I do think it's relevant to Monell.

I mean, the Plaintiff is trying to show that this was the -- this is what the ADAs believed Brady was and this is how they acted pursuant to that, whether it was right or wrong.  And so I think questions about how Mr. Drury understood Brady to be -- I mean, those are very relevant to Plaintiff's case.  And so that's why I'm allowing those questions and answers, and that's why I want to be clear that I think it's important for the jury to hear that kind of evidence, but it's also important for them to know what Brady is is what I'll be giving them, and they need to follow that.

But, certainly, Mr. Drury's understanding of Brady and other ADAs at the time, what their understanding of Brady was, how they carried that policy out with the practice of disclosing Brady, all of that is very relevant to Plaintiff's case.

Boyd v. County of Erie, 22-CV-519                    450

Was there anything else?

MS. MEANS:  Your Honor, no.  We would just note our exception to directing the jury to consider that testimony for purposes of Plaintiff's Monell claim.

THE COURT:  Your exception is noted.

Regarding the last -- the third instruction for the Brady evidence, Mr. Rudin, do you expect there to be a certain portion?  I'm just trying to figure out when is the best time to read that instruction.  Because I definitely don't want to read it every time you bring up some Brady evidence.  That would be a lot.  But is there a section that you think it would be relevant, or I could do it, you know, after we're done and we break for lunch, I could do it before?  My hesitancy in doing it before is that I'm giving them a lot of instructions then.

MR. JOEL RUDIN:  Also before they understand the context, yeah.

So I think the way my outline goes I'm primarily going to focus initially on disclosure without getting deeply or at all in the substance, and then later on I'm going to get into the substance.  So I would imagine the first time that the Court feels that I am getting into substance might be the time to do it.

THE COURT:  Okay.  That's fine.  And then I'll interrupt you and I'll read it and then you can continue kind

Boyd v. County of Erie, 22-CV-519                    451

of asking those kinds of questions.

Do we know whether Mr. Drury is here?

MR. BLENK:  I have not heard from him yet, Your Honor.
I don't believe he's here.

MS. SILOS:  Your Honor, while we're still waiting for
Mr. Drury to arrive, we would like to offer the exhibits into
evidence that we discussed before.

MR. BLENK:  At this time I'm ready to discuss -- I
would be ready to discuss if you want to talk about them.

THE COURT:  That's fine.  Are these exhibits relevant
to Mr. Drury's testimony?

MS. SILOS:  Yes, Your Honor.

THE COURT:  Yes.  Okay.  Go ahead.

So DX 500.41?

MS. SILOS:  Yes, Your Honor.  DX 500.41 is the criminal
court complaint of Mr. Boyd dated January 12th, 1976.  It
encloses Tyrone Woodruff's January 12th statement, which is
already separately in evidence and the County has stipulated
to its authenticity.

THE COURT:  Mr. Blenk?

MR. BLENK:  If I could just have a moment, Your Honor.

THE COURT:  Sure.  Are all these for Mr. Drury or just
some of them?  All of them?

MR. JOEL RUDIN:  They are all for Mr. Drury.

THE COURT:  Okay.

Boyd v. County of Erie, 22-CV-519                    452

MR. BLENK:  No objection, Your Honor.

THE COURT:  Okay.  DX 500.41 is received.

*(Defendant's Exhibit 500.41 received in evidence.)*

MR. JOEL RUDIN:  Your Honor, I believe there's a redaction in it.  No, there's not?  No.  I'm sorry.  I take that back.

THE COURT:  No.  Okay.  Well, to make it a little quicker, are there any exhibits that you've already -- the parties have already agreed to receive?

MR. BLENK:  We would -- well, based on Your Honor's representation that over our objection the Monell evidence is going to come in to the same extent as in Mr. Walker's case, we have no further objection beyond those previously stated to PX 99, PX 100, PX 170, PX 171.

As it pertains to PX 172, we object.  That was not evidence that was admitted at Mr. Walker's trial.  That's the case card that we think is unnecessary and cumulative of the other evidence that the Plaintiff is putting in that's in the Johnson decisions, 170 and 171.

As it pertains to Mr. Drury's notes, the existence -- and this is the same position that we took, Your Honor, in Mr. Walker's trial.  It's our position that Mr. Drury's notes PX 53, PX 54, PX 75 should only come in with foundation from Mr. Drury.  In essence, we're not contesting that they are notes within the file of the DA's office, but we reject the

Boyd v. County of Erie, 22-CV-519                453

idea that the authorship of those notes is manifest in them or that in many cases even the text of the notes is manifest on the face of the documents.

THE COURT: Okay. Is that all?

MR. BLENK: The DX 500.22, Mr. Watson's January 7th, 1976 statement, we see -- I don't believe that that was an exhibit that was admitted at Mr. Boyd's trial.

THE COURT: Mr. Walker's? You mean Mr. Boyd's criminal trial?

MR. BLENK: Right.

THE COURT: Okay. Statement of Larry Watson. Okay.

MR. BLENK: So I don't think there's an apparent purpose to that coming in. Mr. Watson was a witness at the trial. And to add additional statements of a witness -- I don't know if whether it's for the purpose of impeaching the evidence at trial, but it threatens the parameters that Your Honor has laid out as it pertains to us kind of orbiting around the trial and assessing materiality around and through the trial.

THE COURT: Okay.

MR. BLENK: The same objection would apply to PX 272, PX 293.

As it pertains to our objection as to notes, that extends to PX 68 as well.

We would agree to the form of the Boyd trial set forth

Boyd v. County of Erie, 22-CV-519   454

by the Plaintiff at PX 74 with the exception that we reserve the right to make an application as to -- with appropriate foundation to expand the scope into redacted portions that -- for example -- not to get into matters that are precluded by the Court's prior orders, but to get into matters that may become relevant in the course of the trial.

For example, rulings that are made that wouldn't be in the presence of the jury. In other words, we agree that this is a fair presentation of what was presented to the jury, and for that purpose we have no objection to PX 74 as it's currently redacted, but we would just clarify that we don't -- we don't mean to foreclose at all that we wouldn't have any additional arguments to get further into that document to the extent that it came up in the course of the trial.

THE COURT: Okay.

MR. BLENK: Our position on 44 is the same as our position as to PX 272. We -- I believe this may have been admitted as Brady in Mr. Walker's trial, but it's -- we see this document particularly in the context of Mr. Boyd's trial as consistent with the -- with his own statement. This is the Simpson store P-73. There's the discussion of the possibility that the individual -- that Mr. Hough and Mr. Boyd had not been at the Simpson store when, in fact, Mr. Boyd's statement that was ultimately admitted and put in

Boyd v. County of Erie, 22-CV-519                    455

front of the jury in Mr. Boyd's trial confirmed that Mr. Boyd was, in fact, at Simpson's store on the 3rd, the following day. So it doesn't have any Brady application to the instant trial.

As to the Huntley transcript, we would -- the Plaintiff seeks to admit the index only.

THE COURT: Which exhibit is that?

MR. BLENK: PX 67.

THE COURT: Okay.

MR. BLENK: We intend to put portions of -- we intend to put in components of the Huntley transcript under 804(b)(1) as testimony about the origination of the evidence in the underlying criminal trial. We would object to PX 67 being admitted for -- only for the purpose or for simply on the basis of the index -- only in the scope of the index.

THE COURT: Well, do you have any objection to admissibility of the index? I understand that you want more than that, but do you have any objection to the index?

MR. BLENK: I don't have a specific objection to the index coming in, Your Honor.

THE COURT: Okay. So we could at least receive that, and then you could offer more than that as well.

MR. BLENK: Okay.

THE COURT: Okay. Anything else?

MR. BLENK: As to the Wade hearing, we would seek to

Boyd v. County of Erie, 22-CV-519                456

admit -- they also want to put the index only.  We would put testimony from Mr. Woodruff in or Mr. Hough in as additional disclosure evidence as prior testimony of Mr. Woodruff and Mr. Hough that was in the presence of -- in the possession of and in the presence of Mr. Hulnick.

THE COURT:  Okay.  Anything else?

MR. BLENK:  And the Gibson trial transcript should be the last of these listed documents.  We addressed that briefly, Your Honor, during Mr. Woodruff's testimony.  I think the parties are close in terms of the scope of the document as it should come in.  We have a pending submission on that on a relatively narrow portion.

We certainly don't seek to further redact what the Plaintiff has put on the table.  So we're not -- we're not waiving the pending application or the further removal of redaction, but we don't have an issue with the Gibson trial transcript otherwise.

THE COURT:  Okay.  Thank you.  Does that cover all of the exhibits that you're offering then?

MR. JOEL RUDIN:  Well, we have a response, Your Honor.

MS. SILOS:  Yes.

THE COURT:  I know.  I just want to make sure.

MS. SILOS:  Yes, it covers all of them.

THE COURT:  Okay.  Because they were kind of everywhere.

Boyd v. County of Erie, 22-CV-519                457

So let's kind of go by grouping.

So 99, 100, 170, 171, those are all -- the parties are consenting to those.  So those are all received.

MR. BLENK:  May I just note -- I don't mean to be pedantic, but we're not consenting -- we previously objected to them.  We're not consenting --

THE COURT:  I'm sorry.  You are consenting to the authentication of them, right, and then you are not consenting to the admissibility of them?  Is that it?

MR. BLENK:  We've -- it's subject to our objections to the Monell evidence that we've previously raised, but we have no further objection given Your Honor's current direction that the Monell evidence that came in in Walker will be coming into this case.

THE COURT:  Understood.  With those objections reserved, then I will receive 99, 100, 170 and 171.

*(Plaintiff's Exhibits 99, 100, 170, 171 received in evidence.)*

THE COURT:  Then we'll go on to 172.  That's the case card.  Can you just -- let's see.  172.

MS. SILOS:  Your Honor, we can withdraw that exhibit.

THE COURT:  Withdrawn?  Okay.  172 is withdrawn.

Let's go to Mr. Drury's handwritten notes.  So that covers 53, 54, 55 and 68.

MS. SILOS:  Yes, Your Honor.

THE COURT:  What I'll do is I will reserve decision on

Boyd v. County of Erie, 22-CV-519                458

those.  It's my understanding that defendant's objection is only to whether they were authored by Mr. Drury.

And so, Mr. Rudin, during your direct examination you can show them to him.  And if you can lay a foundation, then just offer them then.

MS. SILOS:  Your Honor, I'd just like to point out that for PX 53 and 54, which are two of the handwritten notes, the County has stipulated to their authenticity.

THE COURT:  I think that what he said is he stipulated to their authenticity as being notes from the DA's office, but was contesting whether they were actually written by Mr. Drury.  So --

MS. SILOS:  So, Your Honor --

THE COURT:  Go ahead.

MS. SILOS:  I'm sorry.  Apologies.

THE COURT:  Is that -- is the stipulation something different than what Mr. Blenk said?

MS. SILOS:  The stipulation --

MR. FIRSENBAUM:  Your Honor, the issue -- the argument as to those two exhibits is not the stipulation.  It's the fact that Mr. Drury has already testified under oath that those are his notes.  So we just think the foundation is already set under oath, unless he's going to now -- I mean, that --

THE COURT:  I mean, yeah, I get that these exhibits

Boyd v. County of Erie, 22-CV-519                          459

were already -- without me having to go back and look and confirm, then I think it's -- which I can do, or it might be just easier to just have Mr. Rudin show the exhibits to him, see if he agrees they're his.  If he denies it, then that's a different question, and I think we could go back to that.  So --

MR. FIRSENBAUM:  That's fair, Your Honor.

THE COURT:  But I understand that these were all exhibits that were received in Mr. Walker's trial.

MR. HANFT:  Your Honor, if I may just on the stipulation point, the two that Ms. Silos raised, the stipulation signed by the County explicitly describes them as Timothy Drury's handwritten notes dated February 11th and Timothy Drury's handwritten notes dated February 13th.  So I think for those two at least the County has stipulated that they are Timothy Drury's notes.

THE COURT:  Do you agree with that?

MR. BLENK:  This goes to our medical records, Your Honor.  We have stipulated that they are medical records, and that doesn't mean that they're coming in.  These documents need additional foundation amongst other reasons to purport to confirm the actual contents thereof, including that they're all written scribbled notes.

I have no reason to think that Mr. Drury's testimony is going to come in any differently.  I think it's just

Boyd v. County of Erie, 22-CV-519                460

premature that this be admitted without -- without foundation so that the jury orients themselves to what these documents are as opposed to -- and Mr. Drury himself is oriented to what the document is.

THE COURT:  Okay.  That's fine.  You know what, we don't need to spend any more time on those.  So I'll just reserve on all four of those.

MR. BLENK:  That's 53, 54, 68 and 75?

THE COURT:  Yes.

MR. BLENK:  Okay.

THE COURT:  Then we'll go to 500.22, this statement of Larry Watson.  Did you want to be heard?

MS. SILOS:  Yes, Your Honor.  The County -- the stipulation agreed to by the County does state that these -- this P-73 was admitted or this statement was admitted at Mr. Boyd's criminal trial.  And, therefore, it would come in for materiality.

MR. BLENK:  In that case if that's -- if it did come in in Mr. Boyd's trial, I have no objection.

THE COURT:  Okay.  Then 500.22 is received.

Okay.  Then we'll go to --

MR. BLENK:  Was it admitted?

THE COURT:  Was it --

MR. JOEL RUDIN:  It wasn't admitted into evidence.  It was marked for identification.

Boyd v. County of Erie, 22-CV-519                461

THE COURT:  Then you are not consenting to that?

MR. BLENK:  No.

THE COURT:  Okay.  Then for 500.22, it's a statement of Larry Watson.

Plaintiff, you are offering it for materiality?  What did you say?

MS. SILOS:  Apologies, Your Honor.  We're offering it as we did for some of the other evidence that we offered when I did readings of the police statements.  We're offering it for the fact that it's a Buffalo Police Department record that was disclosed on the record at Mr. Boyd's criminal trial.  It's relevant because the information provided in this statement, whether or not true, makes the information in the alleged Brady evidence favorable.

For example, that statement contradicts some of the evidence that we are alleging is Brady evidence.  And it was -- Mr. Boyd's counsel, you know, had the Larry Watson statement.  They had 500.22.  And so the fact that they had that statement pertains to why some of our evidence is Brady material.

THE COURT:  Okay.  And so are you offering it not for the truth of the matter but just like all the other Brady documents?

MS. SILOS:  Correct.

THE COURT:  And so this document was referenced at the

Boyd v. County of Erie, 22-CV-519                    462

trial, the criminal trial?

MS. SILOS:  It was disclosed on the record and marked for identification at Mr. Boyd's criminal trial.

THE COURT:  Okay.  And your position is that this statement of Larry Watson, which Mr. Boyd's counsel had at the time of his trial, is important to the jury to help them assess the favorability of other documents that were allegedly not disclosed to him?

MS. SILOS:  Yes, Your Honor.

THE COURT:  Okay.  Then I will receive 500.22.

MR. BLENK:  May I just clarify?  I mean, I think that, Your Honor --

THE COURT:  Sure.

MR. BLENK:  -- this opens up a line of argumentation and a line of analysis that kind of throws out -- taken to its logical extension it throws out the parameters of working off of a trial -- or working off the underlying trial in the sense that Mr. Watson testified at the trial.  They have arguments about documents that they have about non-disclosed Brady material that they may make that doesn't line up with what happens at Mr. Boyd's trial or in the context of Mr. Boyd's trial becomes material.  I don't think it invites a never-ending admission of evidence if we're going to start piecing together what purports to be Brady and then admissible -- or disclosed documents to do a bank shot on

Boyd v. County of Erie, 22-CV-519                         463

Mr. Boyd's trial.  The jury should hear what Mr. Watson said at the trial, but they shouldn't -- to invite them to also piece that together with his prior statements and then to -- and then again address it and attack it with the Brady evidence, it just becomes a level of confusion that is -- that I think is really unsustainable.

THE COURT:  I mean, I agree, Mr. Blenk, that this doesn't mean that every report is admissible.

Are you going to be using this exhibit with Mr. Drury?

MR. JOEL RUDIN:  Yes, Your Honor.

If I could just clarify why we think it's so important to our Brady claim.  This is unquestionably a report that was disclosed to Mr. Hulnick.  Larry Watson unquestionably was a prosecution witness.  If Mr. Hulnick had had the additional Brady documents disclosed to him, he could have brought out through Mr. Watson that he gave statements to the police that were flatly inconsistent with the statements made by other apparently neutral witnesses that contradicted his statement in order to show his consciousness of guilt that he lied to the police.

And so this is -- this is not opening the door to admitting all sorts of stuff that they did not directly disclose to Mr. Hulnick.  I mean, if they want to argue based on something they claim was Rosario or Brady material that was disclosed at the prior trial, Your Honor has already said

Boyd v. County of Erie, 22-CV-519                      464

they can do that, but this is a totally different animal.

MR. BLENK:  And, Your Honor, they made those arguments in Mr. Walker's trial about how things would have gone with Mr. Watson.  Again, they just -- they don't need to hit the bank shot of also referring to something -- an intermediary document that wasn't in front of the jury and that was available to Mr. Hulnick to cross Mr. Watson as he saw fit at the trial with essentially the same motive as the case we're in now.

MR. JOEL RUDIN:  He had no reason to cross Mr. Watson about this document because he was unaware that the statements by Mr. Watson had any significance given that he had been denied disclosure of the documents that showed that they had significance.

So, as Mr. Zeidman will testify, a reasonably competent criminal defense attorney knowing about the Watson document that had been disclosed on the record together with the other material that was not disclosed would have brought out the contradictions between the witnesses in order to show that Mr. Watson had a consciousness of guilt when he lied to the police.

THE COURT:  Okay.  Then why don't we do this.  When you are offering this exhibit -- I'm just going to reserve on it then.  When you are questioning Mr. Drury about the alleged Brady information with respect to Mr. Watson, I'm assuming

Boyd v. County of Erie, 22-CV-519                     465

then you will want to refer to 500.22, and then just offer it.

It would be helpful if you could just give me a copy of it.  If there's a certain portion of the report that you think is relevant to favorability, then you can bring that to my attention.

And I think that -- I don't want to confuse the jury with favorability and materiality because the report, even though it was disclosed during the trial, it wasn't received in evidence during the trial.  So Mr. Boyd's criminal jury didn't see that report.  So I don't want to confuse the issues.  And I might have to give some sort of limiting instruction about how they can consider it just for favorability.

MR. JOEL RUDIN:  We would be able to redact the portions that were not Brady and limit it to what we believe was the Brady.

THE COURT:  Okay.  And are you seeking to admit any other reports kind of on similar grounds, that it's just relevant to favorability?

MR. JOEL RUDIN:  There is one other report that --

MR. BLENK:  272 or 293.

THE COURT:  Okay.

MR. JOEL RUDIN:  Yeah.  Well, in particular, 293 is a report that is a July 8th P-73 by Guadagno in which he

Boyd v. County of Erie, 22-CV-519                    466

reports his version of his interview of Mr. Boyd's mother. And then the rest of the document we would redact. And we'd also redact a reference to Mr. Boyd being on probation that Mr. Guadagno put in that report.

The reason why it's relevant is that Mr. Guadagno -- we believe that what's really material in this case is the People's direct case. Because of what Mr. Hulnick decided to do as a defense case, which then led the prosecution to introduce a rebuttal case, all was potentially the result of having been denied the Brady material. However, the County opened on the rebuttal case -- well, what they said was the lack of credibility of the defense case and contradictions between the defense case and the Brady material.

And then they opened on the rebuttal evidence, which essentially was Guadagno's testimony about taking a statement from Darryl Boyd in which Mr. Boyd changed his story about when he left the Glenny projects, and the reason he changed his story was that Detective Guadagno confronted him with what he said was his mother's statement, that he didn't leave until one o'clock. And so then he got Mr. Boyd to change his story and now say that he didn't leave until one o'clock as opposed to his initial version.

Now, this --

THE COURT: Mr. Rudin, I'm sorry to interrupt, but I'm just -- I just looked at the time.

Boyd v. County of Erie, 22-CV-519                467

Is Mr. Drury here?

MR. SOUTHARD:  He is not here yet, Your Honor.

THE COURT:  Okay.  So this is what I'm going to do.
For 272, 293 and 500.22, I'm going to reserve on those.  You
can offer them at the time during your direct examination.

MR. JOEL RUDIN:  Your Honor, I just -- it's important I
think that we vet the issue of the redactions because we
think that we're entitled to examine Mr. Drury and put into
evidence the portion of the Guadagno statement of January 8th
that we think is favorable to us because of the principle
that a defense lawyer can use the Brady material without
suffering the rest of the document coming into evidence.

THE COURT:  Okay.

MR. FIRSENBAUM:  If I could just summarize the
headline.  This is Brady -- alleged Brady evidence in light
of the Plaintiff's opening.  That's our basis for admitting
that document.  And Mr. Rudin's explanation was why, but
that's the punch line, Your Honor.

MS. SILOS:  And then as to 272, Your Honor I believe
ruled this admissible as Brady evidence on Monday, and it's
in the stipulation as alleged Brady evidence.

THE COURT:  272?

MS. SILOS:  That's correct.

MR. BLENK:  That's, Your Honor, the matter that we
brought up about the post-dated evidence, evidence that comes

Boyd v. County of Erie, 22-CV-519                    468

up after the fact not being subject to Brady.

THE COURT:  Okay.

MR. BLENK:  As to 293, this is -- this is really just a back -- I think a backdoor attempt.  The Plaintiff has a Brady case.  The Plaintiff is pursuing the Brady case.  This is a backdoor attempt to impeach Mr. Boyd's own statement and to impeach the evidence at trial.

THE COURT:  Okay.  I do want to -- I will get to those.  Let me just -- we have a number of others to get to.  So we'll go back to those.  And then I need to just take a moment to pull up the actual exhibits.

So given my ruling the other day for 272, do you have any objection?  This was the one that you said was alleged Brady evidence that existed between his conviction and sentencing, which I find to be relevant to Brady.  But do you have any other arguments against it?

MR. BLENK:  We do not, Your Honor.  Not beyond those previously raised.

THE COURT:  Okay.  Then I will receive 272.

(Plaintiff's Exhibit 272 received in evidence.)

THE COURT:  Okay.  How about 44?

MS. SILOS:  Again, Your Honor, this is in the stipulation as Plaintiff's alleged Brady evidence.

THE COURT:  What's your objection to 44?

MR. BLENK:  In particular, this document -- this is --

Boyd v. County of Erie, 22-CV-519                    469

in the context of Mr. Boyd's trial this is not Brady material because Mr. Boyd's statement that -- the sum and substance of the Brady component of this document is that the individuals who are operating the Simpson store didn't see Mr. Hough and Mr. Boyd the following day on January 3rd.  In Mr. Boyd's statement he says I was at Simpson's store on January 3rd.  That evidence was in front of the jury.  It's not in contrast to -- it's not material or in contrast with anything that came in in Mr. Boyd's trial.

And, of course, Mr. Hulnick -- this wouldn't advantage Mr. Hulnick.  He knew about his client's statement being in Simpson's store.  What would he do with a document that was contrary to that.  Understanding this came in in Walker because it's -- because the trial -- the -- Mr. Walker's trial did not substantiate that Mr. Boyd was at Simpson's store on Friday.  So it could be seen as providing some contrast.

THE COURT:  But we're talking about favorability.  We're not talking about whether it made a difference or materiality.  Okay.  So 500.22, 293 and 44.  I will take a look at those reports.

But let's move on to -- let's see -- PX 74, which is the transcript -- the redacted transcript of Mr. Boyd's criminal trial.  You are consenting to that with redactions, reserving your right to make further argument.  So I'll

Boyd v. County of Erie, 22-CV-519                470

receive PX 74 subject to the redactions.

*(Plaintiff's Exhibit 74, with redactions, received in evidence.)*

THE COURT:  And then PX 67, which is the transcript of Mr. Boyd's Huntley hearing, the Plaintiff is seeking the index only, which is -- you are not arguing that the index shouldn't be received, it's just that you want most of the transcript to be received, right?

MR. BLENK:  That's correct Your Honor.

THE COURT:  Okay.  So what I'll do is I'll receive the index, PX 67.

*(Plaintiff's Exhibit 67, index only, received in evidence.)*

THE COURT:  When you want to offer the rest of it or whatever portions, then you can do that and I'll rule on that.  If the parties want to confer about that and see if you can agree to some portion of the transcript, then please do that.

And then PX 69, the same thing for the Wade hearing transcript.  I will receive PX 69, the index, and you can seek the rest of it later.

*(Plaintiff's Exhibit 69, index only, received in evidence.)*

MR. BLENK:  Thank you, Your Honor.

THE COURT:  And then the Gibson trial transcript, can you remind me what exhibit number that is?

MR. BLENK:  Yeah.  That's similar to the Boyd

Boyd v. County of Erie, 22-CV-519                471

transcript, except there's an actual argument -- there's

actual competing submissions in front of you.  So our

position from that has been no redactions.  Your Honor

directed us to -- that you were going to basically follow

your same approach as in Mr. Boyd's -- or as in Mr. Walker's

trial.  And we have proposed redactions in line with your

order that --

THE COURT:  That's right.  I'm sorry.  You said that

already.  So I'll reserve on that.  And I think you were

going to confer and try to come up with an agreement as to

the Gibson trial transcript.

So we just need to refer to 500.22, 293 and 44.  And

once Mr. Drury gets here can you just let me know?  Because

I'd like to start him because the jury has been waiting for

awhile.

MR. BLENK:  Of course, Your Honor.

MS. SILOS:  Your Honor, before we move on to those, can

I just clarify the Court's ruling on PX 70, the Gibson trial

transcript?  I believe the County said that they don't have

any objection to Plaintiff's redactions, though they'd like

to admit more.  Can I just clarify are Plaintiff's -- is the

exhibit with Plaintiff's current redactions received for now?

Because we plan to question Mr. Drury about it.

THE COURT:  I mean, no, I didn't receive it now because

I -- you need the Gibson trial transcript?  You need a ruling

Boyd v. County of Erie, 22-CV-519                    472

on it now?

MS. SILOS:  That's correct.

THE COURT:  Okay.  Are you able to agree to any portion of the Gibson trial transcript?

MR. BLENK:  In the interest of collegiality and moving the trial along, again, the portion that's in front of Your Honor is relatively narrow, and I assume it's not relevant to their -- perhaps it would be relevant to what we would want to do with Mr. Drury, but I don't see any reason that the Plaintiff's current version of PX 70 cannot be accepted at this point subject to our -- the pending briefing that's in front of Your Honor.

THE COURT:  That's fine.  Then I will receive that.  I don't have the number written down.  Can you tell me?

MS. SILOS:  70.

THE COURT:  PX 70, the Gibson trial transcript, is received as far as the redacted version from Plaintiff with defendant's rights reserved to make further argument.  And I know -- and we'll address your motion later.

*(Plaintiff's Exhibit 70, with above-mentioned redactions, received in evidence.)*

MR. BLENK:  Thank you, Your Honor.

THE COURT:  Okay.  So let me just try to pull these exhibits up.

While I'm pulling these up, is someone calling

Boyd v. County of Erie, 22-CV-519                    473

Mr. Drury or --

        MR. BLENK:  Yes.

        THE COURT:  You are?

        MR. BLENK:  Mr. Southard is right now.

        THE COURT:  Let's refer to PX 293 first.  And I have
the redacted version up here.

        It's Plaintiff's position that this is alleged Brady
material, correct?

        MR. FIRSENBAUM:  Yes, Your Honor.

        THE COURT:  And the parties have stipulated that this
is alleged Brady material?

        MR. FIRSENBAUM:  No, Your Honor.  And so that was the
additional context that I wanted to provide, but I saw Your
Honor wanted to move on.

        THE COURT:  All right.  Go ahead.

        MR. FIRSENBAUM:  So, as Mr. Rudin was saying, you know,
our position is that you judge Brady based on the
prosecution's case in chief, right, and we're not alleging
that this was Brady as to the prosecution's case in chief.
So the stipulated 19 is just what we had in Walker, the 19
that were Brady as to the prosecution's case in chief.

        What happened in the defendant's opening is that they
referred to the defense case and then the rebuttal case that
the prosecution put on from Detective Guadagno.  Our position
is that PX 293 contradicts the testimony of Detective

Boyd v. County of Erie, 22-CV-519                474

Guadagno, and, therefore, became Brady material as to Guadagno when the prosecution called him.  So we need to be able to put this document into evidence to explain both why it was -- why -- how this document could have been used by defense counsel to impeach, contradict Detective Guadagno's testimony in the rebuttal case.

THE COURT:  Okay.  And can you just point to me in this 293 exhibit is there a certain portion that you think would be -- kind of make it Brady?

MR. FIRSENBAUM:  Yes, Your Honor.

So in the second -- this is a statement about -- that Detective Guadagno records about a statement by his mother. The defense case witnesses generally testified that Mr. Boyd left in the 11:30 to -- up until 11:30 or twelve, and Detective Guadagno's testimony was that he -- was that the mom said that he left at one a.m. or later I believe.  This report says that she told -- that Mr. Boyd's mom told him that he left at around 12:10 to 1:10, which is an hour earlier than what Detective Guadagno testified to in the rebuttal case as to what time he arrived.

And that matters because when you push everything back an hour, it now becomes consistent with the time of the taxicabs at 11:38, 11:44 as well as the four other -- so it becomes consistent with the taxicab evidence.  It shows Detective Guadagno was lying separately because he testified

Boyd v. County of Erie, 22-CV-519                475

it was one o'clock and the report shows that it was an hour earlier. And if you fold in all the other favorable evidence that we allege should have been disclosed, then you have four other witnesses who testified -- who gave statements that the relevant time period was between 11:30 and twelve o'clock, which it would have been consistent with.

THE COURT: Okay.

MR. JOEL RUDIN: Your Honor --

THE COURT: Well, I understand --

MR. JOEL RUDIN: There's a very important part that I should add.

THE COURT: Okay.

MR. JOEL RUDIN: That when Guadagno took -- Guadagno testified that he told Mr. Boyd that his mother said that he didn't leave until -- he didn't get home until after one o'clock, and that's what caused Mr. Boyd to change his statement. They're making a big deal out of a change of statement, as did Mr. Drury at the trial.

What Mr. Drury did not disclose was a report from Guadagno that, in fact, Mr. Boyd's mother said 12:10 to 1:10, and then basically he misrepresented the mother's statement to the 16-year-old boy to get the boy to conform his story to his mother. And that became a very important part of the trial, and it was a result of Guadagno lying to Mr. Boyd. And then Mr. Guadagno testified in front of the jury that the

Boyd v. County of Erie, 22-CV-519                    476

mother had told him one o'clock.

THE COURT:  Okay.  And I understand.  Can you just -- how come this wasn't part of the original 19 pieces of Brady evidence?

MR. JOEL RUDIN:  Well, it could have been, but we -- because it's such a complicated story, we didn't -- we made a tactical decision not to go into it, but now that it's been raised in the County's opening and Mr. Boyd's defense and the rebuttal to it has become such an important part of the trial in their view, we think it's particularly necessary.

THE COURT:  Okay.  So it's your position that this has always been alleged Brady evidence that wasn't disclosed, but you didn't think it was really important, but now because of what defense counsel has said that you think it's relevant?

MR. JOEL RUDIN:  We didn't think it was important enough to this civil trial --

THE COURT:  Okay.

MR. JOEL RUDIN:  -- given the complexity to get into it.

THE COURT:  Got it.

Mr. Blenk?

MR. BLENK:  All we're doing is making arguments about the underlying trial record.  That's the frustration here.  I don't -- we're talking about what was in the trial record. And, of course, they continue to move off the trial record to

Boyd v. County of Erie, 22-CV-519                477

do bank shots to impeach the evidence.

In any event, Your Honor, if Mr. Guadagno -- if you go through the statement that Mr. Boyd gave, this isn't even favorable.  Mr. Boyd is giving a statement about where he was, and then Mr. Guadagno says your mother told me that you got home after one o'clock.  She said that he got home between 12:10 and 1:10.  This is not -- this is the most marginal -- a marginal difference that Mr. Boyd essentially agrees to that's consistent with the statement that Guadagno -- Mr. Guadagno is getting from the mother.

THE COURT:  Okay.  Well, I think that goes to the weight of the evidence then, and you can certainly argue that this isn't favorable.  I mean, favorability -- as far as Brady material, whether a prosecutor should turn it over, there's not a high standard for it.  So you can still argue that it's not favorable, but I think that it's admissible.

So I will receive PX 293 with the redactions, the same as the other Brady material that I received, the alleged Brady material.  Not for the truth of its contents, but to show favorability, disclosure, nondisclosure, et cetera.

*(Plaintiff's Exhibit 293, with redactions, received in evidence.)*

MR. BLENK:  Your Honor, may I just be heard for just one moment?

THE COURT:  Sure.

Boyd v. County of Erie, 22-CV-519                    478

MR. BLENK:  This would suggest that any -- that Mr. Guadagno by essentially crossing Mr. Boyd with an assertion that's consistent with what Mr. Boyd's mother told him, consistent with the account that was in Mr. Guadagno's possession, that confronting the witness with that is Brady evidence.  That can't be -- it's not favorable.  It's an interrogation in which he is making an allusion to a representation of him that's consistent with the representation and Mr. Boyd responds to it.

THE COURT:  I mean, I understand that you don't agree with Plaintiff's position that this was favorable evidence. And, like I said, you can make that argument that this report didn't have to be turned over.  But looking at it and listening to Plaintiff's argument, I am going to receive it, and I think it's something that the jury is going to decide.

So is there -- so let's move on to next one.

So 44, is that the same argument?

MS. SILOS:  Yes, Your Honor, except this one was listed among the 19 pieces of Brady evidence in the stipulation, and, again, whether or not it is favorable is a question of fact for the jury.

MR. BLENK:  This is the Simpson store report.

THE COURT:  So you said this is one of your 19?

MS. SILOS:  That's correct.

THE COURT:  Then I will receive PX 44 for the same

Boyd v. County of Erie, 22-CV-519                 479

limited purpose as I've already stated.

*(Plaintiff's Exhibit 44 received in evidence.)*

THE COURT:  And so we're left with 500.22?

MS. SILOS:  That's correct.

THE COURT:  Okay.  Let me just pull it up.

Do you have an extra copy I could look at?

MS. SILOS:  Yes, Your Honor.  We're pulling it up now.

THE COURT:  Okay.  Thanks.

MR. BLENK:  Your Honor, I understand that Mr. Drury has now entered.

THE COURT:  Okay.  Great.

And so, Mr. Rudin, for 500.22, you are arguing that it's relevant to favorability?

MS. SILOS:  Yes, Your Honor.  It's relevant to favorability because with that statement if Mr. Hulnick had had the Brady evidence they would have been able to impeach Mr. Watson's credibility and show his consciousness of guilt because if they had the Brady evidence it would show that Mr. Watson was lying.

For example, Mr. Watson in that statement says that Debbie Jeffrey was the one that told him to take Mr. Crawford home, whereas other witnesses state that -- other witnesses in, you know, our alleged Brady evidence state that that was not the case, that Larry Watson actually was the one who offered to take Mr. Crawford home.

Boyd v. County of Erie, 22-CV-519                480

THE COURT:  Okay.  I understand.  Is there a certain portion of the exhibit that you think is relevant to that?

MS. SILOS:  Your Honor, we can work on redacting it over lunch time.  It would be -- yeah.  We can work on redacting it over lunch time.

THE COURT:  That's fine.  I will receive it, but I just want the portions that you think would be relevant to showing favorability.  And when it is received and it's presented to the jury I'll just need to do a brief limiting instruction so they understand that this, unlike a lot of the other reports, can only be considered for a certain purpose.

MS. SILOS:  Yes, Your Honor.

THE COURT:  Do you want this back?

MS. SILOS:  Yes.

THE COURT:  Okay.  Mr. Drury is here.  We'll just make sure -- let's set him up first and then we'll bring the jurors in.

MR. JOEL RUDIN:  Your Honor, may I be excused for a moment?

THE COURT:  Sure.

THE WITNESS:  Your Honor, I'm sorry.  My daughter is driving me today.

THE COURT:  That's okay.  Don't worry about it, Mr. Drury.  We have a monitor for you.  So you can just get set up, and then we'll get that right in front of you.

T. Drury - DX by Mr. Joel Rudin                481

We'll bring the jurors in.

(Jury present.)

THE COURT:  Have a seat, everyone.  Thank you.

Our jurors have returned to the courtroom.  Thank you for your patience.  I know the recess was a lot longer than I had anticipated.

Plaintiff's next witness is ready to start his testimony.  I have some instructions to read to you, but I'm going to first have my court clerk swear Mr. Drury in.

(Whereupon, the witness TIMOTHY DRURY was duly sworn and testified as follows:)

THE COURT:  Okay.  Before we proceed with the testimony, there are some instructions I want to read to you.

Members of the jury, you may hear this next witness Mr. Drury talk about his understanding of legal principles at or around the time of Mr. Boyd's criminal trial in 1977.  As I told you during my preliminary instructions, I am in charge of the law, and at the end of the trial I will provide you with the law that you must apply to the facts of this case. You may, however, consider Mr. Drury's testimony about his understanding of legal principles for the limited purposes of assessing what, if any, policies, customs or practices of the Erie County District Attorney's Office existed at or around the time of Mr. Boyd's criminal trial in 1977 regarding the disclosure of certain evidence to criminal defendants and

T. Drury - DX by Mr. Joel Rudin                    482

whether such policies, customs or practices caused a deprivation of Mr. Boyd's right to a fair trial.

As you have heard during the course of the trial, in addition to Mr. Boyd, three other individuals were charged and tried for the Crawford homicide in 1977:  Darryn Gibson, John Walker, and Floyd Martin.  Gibson, Walker, Martin and Boyd had separate criminal trials, and you may hear Mr. Drury testify about the evidentiary disclosures that he did or did not make to Mr. Boyd's three codefendants.  This evidence is offered for the purposes of determining what documents were and were not disclosed to Mr. Boyd's attorney in his criminal case, whether or not any withheld documents were favorable, whether any policy, custom or practice of the Erie County District Attorney's Office existed with respect to such disclosures, and whether such policies, customs or practices caused any individual Assistant District Attorneys to violate Mr. Boyd's constitutional rights.

Importantly, this evidence should not be considered by you as proof that any particular document was, in fact, withheld from Mr. Boyd.  That is, you should not and may not consider this evidence to find that because the Assistant District Attorney may have withheld a certain document from one of Mr. Boyd's codefendants, then an Assistant District Attorney must also have withheld that or other documents from Mr. Boyd.

T. Drury - DX by Mr. Joel Rudin                483

Thank you.

You can proceed with direct examination.

MR. JOEL RUDIN:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. JOEL RUDIN:

Q.   Good morning, Mr. Drury.

A.   Hi.

Q.   Mr. Drury, you are presently retired?

A.   Yes.

Q.   You are an attorney?

A.   Right.

Q.   And you are represented by counsel today, by your own attorney?

A.   Yes.

Q.   You are represented by Mr. Blenk and his colleagues at the Lippes Mathias law firm?

A.   Yes.

Q.   And those are also the County's attorneys; is that right?

A.   Yes.

Q.   So you are represented by the same lawyers who are representing the defendant Erie County in this lawsuit?

A.   Yes.

Q.   And is it true that you elected to be represented by Lippes Mathias knowing that it was representing the County?

T. Drury - DX by Mr. Joel Rudin                484

A.   Yes.

Q.   And you knew that Lippes Mathias has a duty to represent the County's interest?

A.   Yes.

Q.   Now, what year did you complete law school?

A.   '67.

Q.   And then you immediately began working at the Erie County DA's office?

A.   Yes.

Q.   And you were employed there until when?

A.   '79.

Q.   And at some point you were assigned to the felony trial bureau?

A.   Yes.

Q.   Do you remember about what year that was?

A.   Let me think.  '82.

Q.   Well, could it have been 1976?

A.   I'm sorry.  It had to be earlier.  The question was what?

Q.   When you were assigned to the felony trial bureau.

A.   Right.  I lost a little bit there.  Probably '72.

Q.   And you were handling mostly homicides by 1976 and '77?

A.   Yes.

Q.   And is it accurate that you were assigned some of

T. Drury - DX by Mr. Joel Rudin                    485

the office's most serious and important cases?

A.    Yes.

Q.    And were you the lead prosecutor assigned to handle the murder case involving the death of William Crawford?

A.    Yes.

Q.    And you handled -- did you handle the pretrial phases of that case?

A.    Yes.

Q.    Involving all four of the defendants?

A.    Yes.

Q.    And were you the prosecutor during the first trial of Darryn Gibson?

A.    Yes.

Q.    And were you the lead prosecutor during the second trial which involved Darryl Boyd?

A.    Yes.

Q.    And did you actually handle the trials of the other two defendants John Walker and Floyd Martin?

A.    No.

Q.    Who handled those trials?

A.    David Henry.

Q.    You transferred the case to David Henry?

A.    Yes.

Q.    And do you recall that you gave what's called a deposition in relation to this civil case?

T. Drury - DX by Mr. Joel Rudin                486

A.    Yes.

Q.    Do you recall that was on November 28th, 2023?

A.    I'll accept that.  Yes.

Q.    And do you understand that a deposition in a civil case is a proceeding out of court where no judge is present?

A.    Yes.

Q.    And do you understand that it's a proceeding that's taken under oath?

A.    Yes.

Q.    In other words, when you testified at that deposition you were sworn to tell the truth?

A.    Yes.

Q.    And did you understand that at a deposition the lawyer who is asking you questions could ask you questions -- relevant questions about any aspect of the case?

A.    Yes.

Q.    And, in fact, that deposition went on for hundreds of pages?

A.    Yes.

Q.    And there's no comparable procedure in a criminal case, right?  There are no depositions in criminal cases, at least in 1976 and 1977?

A.    Yes.

Q.    And so whatever information that the defense lawyer found out about the case was the result of what was disclosed

T. Drury - DX by Mr. Joel Rudin                          487

by the prosecution?

A.    I'm sorry.  Civil or criminal?

Q.    Criminal.

A.    Oh, criminal?

Q.    Yeah.

A.    Can you put the question again?

Q.    In a criminal case as opposed to a civil case there was no -- a criminal defense attorney had no right to take a deposition?

A.    That's right.

Q.    And when you gave a deposition in this case in November of 2023 were you of sound mind?

A.    Yes.

Q.    You were not under the influence of any medication that affected your memory?

A.    Right, yes.

Q.    And you were represented at that deposition by Lippes Mathias?

A.    Yes.

Q.    In particular, by a partner at Lippes Mathias named Brian Mahoney?

A.    Yes.

Q.    And you knew your testimony was important to this lawsuit?

A.    Yes.

T. Drury - DX by Mr. Joel Rudin                    488

Q.   And you knew it was important to the County, to the Plaintiff and to the Court?

A.   Yes.

Q.   And you knew you were under oath?

A.   Yes.

Q.   And so you knew you were testifying under the penalty of perjury?

A.   Yes.

Q.   And that's the same oath that you took here today?

A.   Yes.

Q.   And you only gave testimony at that deposition that you believed was truthful and accurate?

A.   Yes.

Q.   And you prepared for that deposition by meeting with your attorneys who are also the County's attorneys?

A.   Yes.

Q.   And you reviewed various documents to prepare for the deposition?

A.   Yes.

Q.   Did you review prior trial testimony?

A.   Yes.

Q.   Did you review prior -- what I'm referring to is trial testimony from the criminal trials back in 1977.  You reviewed those?

A.   Yes.

T. Drury - DX by Mr. Joel Rudin                489

Q.   And you reviewed -- did you review testimony from pretrial hearings that were conducted in that prosecution, Wade and Huntley?

A.   I don't think so.

Q.   Did you review the police reports that were generated during the police investigation into the Crawford homicide?

A.   Some.

Q.   Well, did you prepare for your testimony here today?

A.   Yes.

Q.   On how many occasions did you meet with the Lippes Mathias attorneys to prepare for your testimony?

A.   Once.

Q.   For what period of time?

A.   A couple hours.

Q.   When did that happen?

A.   A week or two ago.

Q.   A week or two?

A.   Yeah.

Q.   Do you remember more specifically?

A.   No.

Q.   And prior to meeting with the Lippes Mathias attorneys did you again review the trial transcripts?

A.   Yes.

Q.   Did you review the hearing transcripts?

T. Drury - DX by Mr. Joel Rudin                490

A.    The what?

Q.    Hearing transcripts.  Pretrial hearing transcripts.

A.    You mean the depositions?

Q.    No.  The pretrial hearing transcripts from the criminal cases back in '76 and '77.

A.    Some.

Q.    Did you review any police reports?

A.    Some.

Q.    Did you review any of the police reports that you understood the Plaintiff in this case is contending you did not disclose during the criminal trial of Darryl Boyd?

A.    Mostly, yes.

Q.    Now, you are aware that this case, the present trial, involves claims by the estate of Darryl Boyd?

A.    Yes.

Q.    You understand that Mr. Boyd passed away?

A.    Yes.

Q.    And do you understand that Mr. Boyd's estate claims that at his criminal trial in 1977 you failed to disclose certain documents and information that the Plaintiff contends was Brady material?

A.    That's the claim, yes.

Q.    And you understand that the claim in addition is that during your summation you made certain arguments that you were not permitted by law to make?

T. Drury - DX by Mr. Joel Rudin    491

A.    If that's the claim, yes.

Q.    Well, do you understand that the claim involves a claim that you committed misconduct during your summation?

A.    Well, if that's the claim.

Q.    Well, I'm asking you if you understand as you sit here now that that is a claim.

A.    Well, you're telling me.  Okay.

Q.    Did you review your summation with your attorneys?

A.    I reviewed it.  Not with the attorneys.

Q.    You read it over?

A.    Yeah.

Q.    Now, when you testified in your deposition in 2023 -- well, withdrawn.

Who was the district attorney in 1977 at the time of the Darryl Boyd trial?

A.    Good question.  Probably Edward Cosgrove.

Q.    And was Edward Cosgrove related to your wife?

A.    Yes.

Q.    How was he related to your wife?

A.    Let's see.  Well, they were first cousins.

Q.    And you had known him for quite awhile?

A.    Yes.

Q.    You knew him even before you were employed at the DA's office?

A.    Yes.

T. Drury - DX by Mr. Joel Rudin                    492

Q.    And you continued to see him from time to time after you left the DA's office?

A.    Yes.

Q.    And you left the DA's office in 19 --

A.    '79.

Q.    And is it fair to say that you are also good friends with another Erie County prosecutor who worked on these cases, Mr. Henry?

A.    Yes.

Q.    And you have regular lunches with him?

A.    Yes.

Q.    You've had regular lunches for about 40 years?

A.    Yes.  Probably 50.  No.  Regular lunches 30, 40.

Q.    And he's sitting in the courtroom over there with the green tie?

A.    Is he?  I can't see.

Q.    Can you see him?

A.    No.

    MR. JOEL RUDIN:  Mr. Henry, could you stand up?  Thank you.

    THE WITNESS:  That's Mr. Henry.

BY MR. JOEL RUDIN:

Q.    And he's sitting at the County's counsel table; is that right?

A.    Yes.

T. Drury - DX by Mr. Joel Rudin                    493

Q.   And, as you mentioned a moment ago, he handled -- personally handled the John Walker and Floyd Martin trials?

A.   Yes.

Q.   And you know he testified in a deposition in this case as a representative of Erie County?

A.   Yes.

Q.   And you know that he, too, has been represented during the course of this case by Lippes Mathias?

A.   Yes.

Q.   So you, Mr. Henry and the County all have the same attorneys?

A.   Yes.

Q.   And you understand that he's sitting here today in court at counsel's table as a representative of Erie County?

A.   That's what I've been told.

Q.   Even though he's no longer employed by Erie County?

A.   I know he's not -- no longer employed by Erie County.  Now, this whole thing about representatives, I don't understand it.

Q.   Well, you understand he's not employed today by Erie County?

A.   Right.

Q.   And you are testifying today -- well, withdrawn.

Did you receive a subpoena to testify?

A.   Yes.

T. Drury - DX by Mr. Joel Rudin                494

Q.   And is it fair to say that you've never met with me or any of the Plaintiff's attorneys to discuss your testimony?

A.   Right, yes.

Q.   Now, a few minutes ago we agreed that an issue in this case is whether at Mr. Boyd's trial you failed to disclose what lawyers in courts call Brady material.

A.   That's your issue, yes.

Q.   I'm not asking you to concede that we're right, but you understand that that's the issue?  That is an issue in this case?

A.   Yes.

Q.   And disclosure of what lawyers call Brady material is required by a famous decision of the United States Supreme Court from the early 1960s, right?

A.   Yes.

Q.   And would you agree with me that Brady material is evidence that is favorable to a criminal defendant?

A.   Yes.

Q.   And evidence is favorable to a criminal defendant if it falls into the category of what is called exculpatory evidence or evidence of innocence?

A.   Favorable, yes.

Q.   In other words, if -- when we talk about Brady material, that includes, among other things, evidence that tends to show that a criminal defendant may be innocent?

T. Drury - DX by Mr. Joel Rudin                495

A.    Yes.

Q.    And when we refer to Brady material, we also refer to evidence that may tend to contradict or impeach the testimony of a prosecution witness?

A.    Yes.

Q.    And Brady material, when we use that term, includes evidence or information in any form?

A.    Yes.

Q.    In other words, it could be written down, right?

A.    Right.

Q.    Or it can be information known to the prosecutor that is not written down?

A.    Yes.

Q.    And would you agree with me that Brady material is information or evidence that must be, as a general rule, disclosed to the defense counsel even before the trial starts?

A.    Yes.

Q.    It must be disclosed at a time that will give the defense counsel adequate opportunity to investigate the information and put it to use at the trial?

A.    Yes.

Q.    Now, I want to ask you a number of questions about your involvement in the initial proceedings in relation to the investigation and prosecution of the Crawford murder.

A.    Yes.

T. Drury - DX by Mr. Joel Rudin                496

Q.   Is it fair to say that Mr. Crawford was robbed and killed and his body was found in the driveway to the side of his house?

A.   Yes.

Q.   And his house was located across the street from a bar known as the Golden Nugget Tavern?

A.   Yes.

Q.   And that it was established through the course of the investigation that he had been drinking before he was attacked?

A.   Yes.

Q.   And you were assigned the Crawford case even before any of the arrests in the case had been formally made?

A.   Yes.

Q.   And that day before the formal arrests were made you were called down to the Buffalo Police Department's homicide squad office?

A.   Yes.

Q.   And you worked regularly those days with Buffalo's homicide detectives?

A.   Yes.

Q.   And you were handling mostly homicide cases, as we discussed a moment ago?

A.   Yes.

Q.   And when you asked for paperwork from the homicide

T. Drury - DX by Mr. Joel Rudin                497

squad the homicide squad provided it to you?

A.    When I would ask they would, yes.

MR. BLENK:  Your Honor, may we approach?

THE COURT:  Yes.

(At bench:)

MR. BLENK:  I just -- I understand they need to get background information in, and I appreciate that, but I would ask that Mr. Rudin be cautioned about -- I just ask that Mr. Rudin be cautioned on the leading now that we're getting into more of the details of the underlying events.

MR. JOEL RUDIN:  Well, these are pretty much noncontroversial questions.  I'm trying to get through it because it's a very long examination.

MS. SILOS:  Your Honor, at this point we also believe it's an adverse witness given the answers to his questions about being represented by the County's attorney, being represented by the County's attorneys at deposition.  That clearly falls within the scope of what the --

THE COURT:  I'm not going to make that determination yet.  I mean, I think a lot of the determinations -- based on his demeanor I don't think we've really gotten to the point where he's going to be contentious.  And so if there's an objection to a question, then I'll make a ruling on it.

As far as these kind of background questions, I'll give a little leeway so we can keep moving, but I'm going to ask

T. Drury - DX by Mr. Joel Rudin                498

you to try to keep them open and non-leading.

And one other thought that I had.  I know that you didn't meet with him before this, but people from your office did at least.  I don't know who did.  Does he know the Court's rulings about not mentioning his -- Mr. Walker's trial?

MR. BLENK:  I have -- you mean in light of Your Honor's decision this morning?

THE COURT:  Well, no.  My decision -- this -- I made this ruling before.  I just don't want him to --

MR. JOEL RUDIN:  The civil trial.

THE COURT:  I don't want him to talk about the fact that he's testified in this courtroom for Mr. Walker's trial. And I don't know.  You haven't met with him.  You couldn't give him that instruction.  And so I just want to -- it was something I was thinking about.

MR. BLENK:  That's a good point, Your Honor.  Without waiving any confidentiality, I've made allusions to that effect.  I certainly have not prepared him, but he is also aware of the trial testimony.

Do you think -- can we caution him outside the presence of the jury?

THE COURT:  I can tell him that.  I can instruct him on that.

MS. SILOS:  I think one of our other concerns about him

T. Drury - DX by Mr. Joel Rudin                499

being, you know, qualified as an adverse witness is if Mr. Rudin can't ask leading questions we are concerned he might open the door to something, and obviously we don't want that to happen.

THE COURT:  Okay.  I'll excuse the jury and I'll give him that instruction that he can't talk about --

MR. JOEL RUDIN:  I mean, that will come up during impeachment.  I'm not sure I'm going to get to that impeachment before the lunch break.  If I do, I'll let the Court know.

THE COURT:  If you're treading anywhere near that, then stop because I just don't want --

MS. SILOS:  The problem is we just don't know if he might say something soon.  So we would appreciate it if the Court could say something.

THE COURT:  I will.  And then as far as the leading, non-leading questions, I'm going to give you leeway for questions that are not contentious.  Okay?

MR. BLENK:  Thank you, Your Honor.

MS. SILOS:  Thank you, Your Honor.

(Open court:)

MR. RUDIN:  May we have the last question and answer read back, Your Honor?

(Record read.)

BY MR. JOEL RUDIN:

T. Drury - DX by Mr. Joel Rudin                    500

Q.   Mr. Drury, in homicide cases such as this one did you ever ask detectives questions about what happened during their investigation?

A.   Yes.

Q.   Did you ever ask them to explain anything in their reports?

A.   Yes.

Q.   Did you ever ask them to provide additional information that was not provided in their reports?

A.   Yes.

Q.   And did that information sometimes include additional details not in their reports concerning their interrogation of witnesses?

A.   Yes.

Q.   And sometimes you -- well, withdrawn.

Did you ever call a police witness to testify at a pretrial hearing?

A.   Yes.

Q.   Did you ever call a police witness to testify at a trial?

A.   Yes.

Q.   Would it be fair to say that happened many, many, many times?

A.   Yes.

Q.   And when that happened would you prepare the police

T. Drury - DX by Mr. Joel Rudin                501

witness to testify?

A.   Yes.

Q.   And that would include going over with the witness the subject matter that you would question the witness about at the proceeding?

A.   Yes.

Q.   And would that sometimes involve reviewing with the witness the police witness reports that the witness had prepared?

A.   Yes.

Q.   And would it sometimes involve asking the police witness for additional information going beyond what was in the four corners of that officer's reports?

A.   Yes.

Q.   And if any detective wasn't cooperative with you, could you have gone to their boss, the homicide Chief Leo Donovan, to ask Mr. Donovan to instruct them to be cooperative with you?

A.   I could have.  I've never done it.

Q.   You never had to do that?

A.   No.

Q.   And you could also go to your boss Mr. Cosgrove if it was necessary?

A.   I could have, but I never did it.

Q.   You never had to do that; is that right?

T. Drury - DX by Mr. Joel Rudin                    502

A.   Yes.

Q.   Because whenever you needed information from the police they provided it to you?

A.   Yes.

Q.   And, in fact, were the detectives in the Crawford case cooperative with you while you were handling the case?

A.   Yes.

Q.   And did they provide you with the information you wanted?

A.   Yes.

Q.   And did you have the opportunity to discuss with them the testimony of other witnesses in the case, such as Tyrone Woodruff and Andre Hough?

A.   Yes.

Q.   Now, do you recall that you went -- withdrawn.

You testified a moment ago that the first day --
withdrawn.

You testified a moment ago that you were assigned to the case before the formal arrests were made?

A.   Yes.

Q.   And on that day you went down to the homicide squad?

A.   Yes.

Q.   Did you meet with Mr. Tyrone Woodruff at the homicide squad office?

A.   Yes.

T. Drury - DX by Mr. Joel Rudin                    503

Q.   And did you find out whether or not he had already signed a statement implicating his friends?

A.   I don't remember.

MR. JOEL RUDIN:  May we show PX 245, pages 2 -- page 225, lines 4 to 19 to Mr. Drury just to refresh his recollection, just to the witness.

BY MR. JOEL RUDIN:

Q.   Mr. Drury, if you'd read that over and then tell us if that refreshes your recollection that you found out that Mr. Woodruff already had signed a statement implicating his friends.

A.   You know, I don't remember.

Q.   Well, do you recall being asked these questions and giving these answers at your deposition:

Question:  So you learned when you got there that he had agreed to cooperate with the police?

Answer:  Right.  I think they took a statement from him. I think so.

Question:  And I've shown you as Exhibit 77 his signed statement of January 12th.  Do you recall that?

Yeah.

Question:  And that's the statement where he -- he implicated the other four boys?

Answer:  Yes.

Question:  And were you present when he signed that

statement?

Answer:  I don't think so.

Question:  Had he already signed it?

Answer:  I believe so.

Do you recall being asked those questions and giving those answers?

A.   I do, yeah, but I don't remember it.

Q.   You don't remember the events that you testified to at the deposition that I just read to you?

A.   Well, you know, I don't remember anything about a prior statement or a statement.

Q.   You don't remember anything about a statement by Mr. Woodruff?

A.   No.

Q.   Mr. Drury, your deposition, as we established a little while ago, was in November of 2023?

A.   Yeah, yes.

Q.   About two years ago?

A.   Yes.

Q.   And when you gave that deposition in 2023, if my math is correct, it was about 47 years after the -- after January 12th, 1976?

A.   Yes.

Q.   And you gave this deposition -- withdrawn.

You gave this testimony in 2023 recalling the events that

T. Drury - DX by Mr. Joel Rudin                              505

the testimony involved, correct?

A.   Yes.

Q.   And now it's two years later, and you no longer recall any of that?

A.   I've thought about it more, and I don't remember anything about a prior statement.  I just don't.  It's been fifty years.

Q.   So you recalled the prior statement two years ago after 47 years, and now that you are testifying here in front of this jury you no longer recall it?

A.   I didn't recall it.  I said I don't think so in this -- in the questioning.

Q.   You said:

Question:  And were you present when he signed that statement?

Answer:  I don't think so.

Question:  Had he already signed it?

Answer:  I believe so.

That's what you understood and testified to two years ago; is that right?

A.   Right.

Q.   And now two years later after all your preparation sessions with the Lippes Mahoney attorneys you no longer remember?

A.   I'm trying to be as, you know, accurate as possible.

T. Drury - DX by Mr. Joel Rudin   506

This business of a prior statement, I don't remember it.

Q.   Do you remember Mr. Woodruff's prior statement?

A.   When?

Q.   Do you remember?

A.   Now?

Q.   Do you remember that he gave a statement dated January 12, 1976?

A.   There was two statements he gave.

Q.   One was dated January 11th and one was dated January 12th?

A.   Right.  Not that I remember those statements.  It's that you people are showing me paperwork which would indicate that.

Q.   So you have seen the two statements during the course of your deposition testimony, right?

A.   Yes.

Q.   And when I asked you questions at the deposition about that statement you remembered the statement, right?

A.   Well, yeah.  Those were the statements he gave, but to this day I don't remember seeing -- being -- being handed those statements before I had a conversation with Tyrone Woodruff.

MR. JOEL RUDIN:  Let's publish to the jury PX 32, the January 12th statement.

BY MR. JOEL RUDIN:

T. Drury - DX by Mr. Joel Rudin                    507

Q.    Can you see that on the screen, Mr. Drury?

A.    Yeah.

Q.    Is that the January 12th statement that you referred to in your deposition testimony?

A.    Yeah, the one that was offered to me.  It's his second statement.

Q.    And you don't remember as you sit here now that that statement occurred?

A.    Well, I believe from the paperwork he was showing me that statement occurred, but I was not -- I don't remember that it -- that I was given this statement before I had conversations with Tyrone Woodruff.

Q.    Well, do you recall that at some point on January 12th you learned that Mr. Woodruff had given a statement to the police?

A.    You know, I don't know.

Q.    Do you recall learning on January 12th that Mr. Woodruff had given a statement that differed from a statement he gave the previous day on January 11th?

A.    Do I remember then that --

Q.    Do you remember now that that happened?

A.    Yes, because you've shown me the statements.

Q.    So do you remember that you were present --
withdrawn.

As you sit here now do you remember that on January 12th,

T. Drury - DX by Mr. Joel Rudin                 508

1976 you became aware of a statement that Mr. Woodruff had made?

MR. BLENK:  Objection, Your Honor.  Asked and answered.

THE COURT:  Overruled.

You can answer the question.

THE WITNESS:  All right.  Do I remember?  No.  What I do remember about that event is that I questioned him person to person about what happened.  I'm not sure -- I don't know about prior statements.

BY MR. JOEL RUDIN:

Q.   You don't recall questioning him about a statement of January 12th?

A.   Then?

Q.   Yeah.

A.   No.

MR. JOEL RUDIN:  All right.  Why don't we scroll down the statement from January 12th to the -- well, it's the second -- the question and answer -- yeah.

BY MR. JOEL RUDIN:

Q.   Do you see the question on the screen:

Tyrone, on January 11th, 1976 you gave a sworn statement to Detective Sergeant Hunter and Detective Montondo.  It is my understanding that you wish to correct the statement and tell the truth as to how William Crawford of 2041 Fillmore Avenue was found beaten to death at approximately 1:29 a.m. Saturday

T. Drury - DX by Mr. Joel Rudin                    509

3rd, 1976; is this correct?

A.    Yeah.

MR. JOEL RUDIN:  And if we could now move down to on page 2 the statement about taking the taxicab.

MR. JOEL RUDIN:

Q.    Do you see at the top of page 2 the question that, according to this statement, the police asked was, "Will you continue," and the answer was:  The others were behind us, Gibson, Martin and Boyd.  That was Martin's brother's cab, but me and Walker took it.  We went home.  I was dropped off at Timon and Best.  Walker went on in the cab.

A.    Yep.

Q.    That was in the statement of January 12th, correct?

A.    Yes.

Q.    And do you recall that -- well, withdrawn.

MR. JOEL RUDIN:  If we could now go to PX 27, the statement on page 1 about the taxicab.  If we could scroll down.

BY MR. JOEL RUDIN:

Q.    Do you see that this is the statement of January 11th, the statement where he denied any knowledge of the crime?

Question:  What time did you leave with these fellows?

Answer:  I don't know the time.

Question:  How did you leave them?

T. Drury - DX by Mr. Joel Rudin                510

Answer:  Cab I guess.

Question:  Aren't you sure how you got home that night?

Answer:  No.

Question:  Who did you go home with, if anyone?

Answer:  John Walker.

That was in his statement of January 11th, correct?

A.   Yes.

Q.   So in both statements of January 11th and January 12th he said that he took a taxicab home with John Walker?

A.   Yes.

   MR. JOEL RUDIN:  You can take that off.

BY MR. JOEL RUDIN:

Q.   In 1976 what was the punishment for second degree murder, the potential punishment?

A.   Well, it would start with 15 to life and go to 25 to life.

Q.   So the maximum sentence was 25 years to life?

A.   Yes.

Q.   And that was basically a life sentence except that after 25 years a prisoner could ask the parole board for parole?

A.   Yes.

Q.   And so if Mr. Woodruff was prosecuted for the murder of William Crawford he would have faced life in prison?

A.   Yes.

T. Drury - DX by Mr. Joel Rudin                    511

Q.   And were you aware on January 12th that Mr. Woodruff was afraid and he only made a statement implicating his friends after police told him that if he made such a statement he wouldn't have to go to jail?

A.   Was I aware of that back then?

Q.   Yeah.

A.   No.

MR. JOEL RUDIN:  All right.  May we play a clip for the witness and the jury?  Mr. Drury's deposition, page 262, line 15 to 263, line 5.

MR. BLENK:  Objection, Your Honor.  May we approach?

THE COURT:  Yes.

MR. JOEL RUDIN:  Your Honor, I will withdraw the question.  I should have asked one other question first.

THE COURT:  Okay.  Go ahead.

BY MR. JOEL RUDIN:

Q.   Mr. Drury, did you testify at your deposition in 2023 that Mr. Woodruff was afraid and only made a statement implicating his friends after police told him that if he made such a statement he wouldn't have to go to jail?

A.   Did I say that?

Q.   Yes.

A.   I might have assumed that, but no, I -- I wasn't aware of what the police were doing.

MR. JOEL RUDIN:  Your Honor, may I play the clip?

T. Drury - DX by Mr. Joel Rudin                    512

THE COURT:  Is there an objection?

MR. BLENK:  No, Your Honor.

THE COURT:  Okay.  Go ahead.

(Video played.)

BY MR. JOEL RUDIN:

Q.   Mr. Drury, were you aware on January 12th that the police detectives wanted names from Mr. Woodruff in exchange for not charging him?

A.   No, I wasn't aware of that.  I got there and sat down with him and he explained to me what happened at -- to the death of William Crawford.

Q.   Did you testify at your deposition that you were aware that the police wanted names from Mr. Woodruff in exchange for not charging him?

A.   I might have assumed that, but I was not aware of it.

MR. JOEL RUDIN:  Your Honor, may we play the clip, please?  Page 263, line 6 to 8.

MR. BLENK:  Your Honor, that needs to be -- Mr. Drury needs to be presented with that.

MR. JOEL RUDIN:  He just denied it.

MR. BLENK:  Your Honor, may we approach?

THE COURT:  Sure.

(At bench:)

MR. BLENK:  We know how this goes, Your Honor.  We know

T. Drury - DX by Mr. Joel Rudin                    513

how this goes.  It's the same thing as the last time with Mr. Walker's trial that he can ask the question, they can use the testimony with Mr. Drury, and then before there's any presentation of that to the jury --

MR. JOEL RUDIN:  No.  I asked him the question.

THE COURT:  Yeah.  He asked him the question.  He denied it.  And so his prior inconsistent statement, I'm going to allow it.

MR. BLENK:  All I'm saying, Your Honor, is that he should be provided with the inconsistent statement before it goes to the jury.  Ask the question.

MR. JOEL RUDIN:  He did.

THE COURT:  He was --

MR. BLENK:  It was in -- the deposition transcript was in front of him?

THE COURT:  Well, no.  He asked him in his own words did you testify to this, and he said no.

MR. JOEL RUDIN:  I took it exactly from the transcript.

THE COURT:  So I don't think that -- I mean, if he had said I don't remember and he wanted to look at the transcript, then that would be different, but he denied it.

MR. BLENK:  I'm -- I think the rule is pretty clear.  It's 613.  It needs to be presented.  It needs to be presented and given the opportunity to explain before it goes in.

T. Drury - DX by Mr. Joel Rudin                514

THE COURT:  Okay.  So it says, "613:  Unless the Court orders otherwise, extrinsic evidence of a witness's prior inconsistent statement may not be admitted until after the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it."

So he's denied it, but --

MR. JOEL RUDIN:  I read him exactly the testimony, and he denied it.

MR. BLENK:  He needs to be presented --

MS. SILOS:  He denied it.

MR. BLENK:  Again, he needs to be presented with the statement.

MR. JOEL RUDIN:  I just presented it to him.  I just didn't give him the transcript to look at it.

MR. BLENK:  That's -- he needs to have -- he needs to be shown the document.

MR. JOEL RUDIN:  No.

MR. BLENK:  You can't just play back the deposition.

THE COURT:  I don't think that -- there's nothing in the rule that says how he has to present it.  So whether it's by showing him a transcript, whether it's by telling him during your deposition did you say this.  If he had said I don't know or I don't remember, then he could show it to him, but you do have an opportunity to -- okay.

T. Drury - DX by Mr. Joel Rudin                515

I'm going to allow the inconsistent statement.

MR. BLENK:  Is this -- I just -- I'm concerned we're going to get to a point where he's just going to keep -- the idea that he has to be shown a statement is what keeps -- not that Mr. Drury is being dishonest, but Mr. Rudin is -- it needs to be tied to the transcript and he can't just offer his own interpretation of the transcript.  That can't be addressed relative to the transcript by Mr. Drury.

MR. JOEL RUDIN:  I'm not interpreting the transcript. I'm being faithful to the transcript.

THE COURT:  That's okay.  If he -- if the witness wants to look at the transcript, then he can certainly ask to look at the transcript.  So I'm not saying that he can't look at it, but --

MR. BLENK:  Can he be advised of that?

THE COURT:  No.  But he's already -- I mean, no.

(Open court:)

MR. JOEL RUDIN:  May I proceed, Your Honor?

THE COURT:  You know what, we're actually going to take our lunch recess right now.  So I have to address some other things that are not related to this trial.

MR. JOEL RUDIN:  I'll come back to this after lunch.

THE COURT:  Yeah.  Okay.

Members of the jury, we're going to take our lunch recess now.  It's 12:38.  So if you could be back here around

T. Drury - DX by Mr. Joel Rudin                 516

1:40.  All of the admonishments apply.  Please do not talk about the case with anyone.

(Jury not present.)

MR. BLENK:  Your Honor, may I approach just a moment?

THE COURT:  Yes.  Just one moment.  I want to excuse Mr. Drury.  Everyone can have a --

MR. BLENK:  It concerns Mr. Drury.

THE COURT:  It does.  Okay.

MR. BLENK:  I could express it at a sidebar.

THE COURT:  Okay.  Sure.  Counsel, approach.  You want this on the record?

MR. BLENK:  Sure.

(At bench:)

MR. BLENK:  We are going to give an instruction to Mr. Drury about staying away from the Walker trial.  The last time I spoke to Mr. Drury about the pending orders in the Court it was before matters relating to the Walker civil trial had opened up.  So if -- I don't know what Mr. Rudin intends to get into, but just that he shouldn't feel -- to the extent that something about the Walker civil trial is coming up, it wouldn't be contrary to the Court's order that he responds to a question of that nature.

MR. JOEL RUDIN:  I'm going to refer to it as a prior proceeding unless you'd like me to do it some different way, the civil trial.

T. Drury - DX by Mr. Joel Rudin                    517

MR. BLENK:  The Walker criminal trial.  I'm sorry.  The last time I spoke to him the Walker criminal trial was precluded.  And so --

THE COURT:  Understood.

MR. BLENK:  So unless that changes -- so just that he be advised on both matters.

THE COURT:  Okay.

MR. JOEL RUDIN:  I don't think I have any questions about the substance of the Walker criminal trial, but the civil trial is the concern.

THE COURT:  Okay.  I will advise him now, and then I'll excuse him.

MR. BLENK:  Thank you, Your Honor.

(Open court:)

THE COURT:  Okay.  The jurors have left the courtroom.

Mr. Drury, before I excuse you and we take our lunch break I just wanted to advise you of a few things.

There are certain things that you cannot testify to based on rulings that I've already made on this case.  Okay?  So I just want to make sure that you're clear about them.

You cannot testify about the verdict in either the Gibson criminal trial or the Martin criminal trial.  I know -- we know that you testified in Mr. Walker's civil trial here earlier this year, but you cannot make any reference at all to that trial, what occurred at that trial

T. Drury - DX by Mr. Joel Rudin                 518

or what the result of the trial was.

So the jury does not know that Mr. Walker had a civil trial here in this courtroom earlier this year.  And so you shouldn't make any reference to it.  In the event that the attorneys need to ask you about your testimony during Mr. Walker's civil trial earlier this year, then they are just going to refer to it as prior court proceedings.  They are not going to refer to the fact that Mr. Walker had a civil trial.

Do you understand?

THE WITNESS:  Yes.

THE COURT:  Okay.  You cannot refer to the fact that Mr. Walker's criminal conviction was vacated.  You can't talk about the substance of Mr. Boyd and Mr. Walker's challenges to their conviction or the reasons why either of their convictions were vacated.

I do also want you to know that due to some more recent rulings, if there are any questions about Mr. Walker's criminal trial, you can answer those questions.

MR. BLENK:  Is -- the outcome of Mr. Walker's criminal trial is out or in?

THE COURT:  That was in.  The fact that Mr. Walker was convicted, that is admissible.  It's already been presented to the jury.  It's just the verdicts for Mr. Gibson and Mr. Martin's criminal trials that were precluded.

T. Drury - DX by Mr. Joel Rudin                    519

MR. BLENK:  Thank you, Your Honor.

THE COURT:  So really if there are any questions to you, Mr. Drury, about your testimony earlier this year in Mr. Walker's civil trial, those questions are allowed, but we're just -- no one can refer to the fact that Mr. Walker had a civil trial.  It will just be referred to as court proceedings.  No one will be identified with respect to that.

THE WITNESS:  I understand.

THE COURT:  Okay.  Thank you very much.

Okay.  We'll be back around one -- you can come back around 1:35.  Thank you.

Sorry.  One more thing.

Mr. Drury, you can leave.  I'm just going to direct you not to talk to anyone during the recess about the case or your testimony.

THE WITNESS:  Yes.

THE COURT:  Thank you.

(Recess taken at 12:44 p.m.)

                    *          *          *

Boyd v. County of Erie, 22-CV-519                    520

CERTIFICATE OF REPORTER


        In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court of the Western District of New York before the Honorable Meredith A. Vacca on November 6, 2025.



S/ Joony L. Odenbach

Joony L. Odenbach, RPR, CRR

Official Court Reporter