UNITED STATES       DISTRICT COURT

 WESTERN DISTRICT OF NEW YORK

_____

KATHLEEN WEPPNER, AS EXECUTOR OF THE

ESTATE OF DARRYL BOYD,

                          Plaintiff,

                -vs-

THE COUNTY OF ERIE,

                          Defendant.
_____

Index No.
22-CV-0519-MAV

Vol. 5

Rochester, New York
November 7, 2025
8:51 a.m.

**JURY TRIAL**


                  TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE MEREDITH A. VACCA
             UNITED STATES DISTRICT JUDGE

652

A p p e a r a n c e s

For Plaintiffs          WILMER CUTLER PICKERING HALE AND DORR,
                        LLP
                        By:  ROSS FIRSENBAUM, ESQ.
                             GIDEON HANFT, ESQ.
                             ERIN HUGHES, ESQ.
                             MELISSA ZUBIZARRETA, ESQ.
                             PHOEBE SILOS, ESQ.
                             TRENA RILEY, ESQ.
                        7 World Trade Center
                        250 Greenwich Street
                        New York, NY 10007

                        LAW OFFICES OF JOEL B. RUDIN, PC
                        By:  JOEL B. RUDIN, ESQ.
                             DAVID E. RUDIN, ESQ.
                        152 West 57th Street
                        New York, New York 10019

                        HOOVER & DURLAND, LLP
                        By:  SPENCER DURLAND, ESQ.
                        561 Franklin Street
                        Buffalo, NY 14202

For Defendant:          LIPPES MATHIAS
                        By:  JAMES BLENK, ESQ.
                             KIRSTIE MEANS, ESQ.
                             THOMAS SOUTHARD, ESQ.
                        50 Fountain Plaza - Suite 1700
                        Buffalo, New York 14202




COURT REPORTER:         JOONY L. ODENBACH, RPR, CRR
                        joonyodenbach@gmail.com

653

INDEX

Timothy Drury

    Cont. Direct Examination by Mr. Joel Rudin    711

| EXHIBITS | ID | EVD |
|---|---|---|
| PX 53 - 2/11/76 Drury notes | -- | 744 |
| PX 54 - 2/13/76 Drury notes | -- | 722 |
| PX 91 - 8/7/74 Buffalo News article | -- | 704 |
| PX 245 - 11/28-11/29/2023 Drury deposition | | |
|     Page 170, lines 12-21 | -- | 727 |
|     Page 428, lines 7-11 | -- | 813 |
|     Page 36, lines 14-18 | -- | 818 |
|     Page 68, line 21 to page 69, line 1 | -- | 832 |
|     Page 50, lines 19-22 | -- | 848 |
| PX 246 - 11/30/23 Cosgrove deposition | -- | 698 |
| PX 286 - compiled excerpts of Monell | -- | 698 |
| PX 290 - Walker v. COE trial transcript | | |
|     Page 1154, lines 5-6 | -- | 776 |

Boyd v. County of Erie, 22-CV-519                    654

P R O C E E D I N G S

*     *     *

(Open court.)

THE COURT:  Good morning.  We can get started.  The parties are present.  The jurors are not present.

I just want to go through some outstanding issues.

So regarding the Henry designation, I know, Mr. Rudin, you had asked for me to reconsider 312, lines 8 through 13 and you had told me what they refer to.  I think it was kind of separated from the designation chart.  And so I went back to look at those.

I think it was 303, 12 to 305, and then 305, 15 to 16.  So that is admissible because I'm assuming that when you play it you are going to play all three of those designations together, right?  So as long as it's clear and you play them all together, then that's fine.  So that is an amended decision.  That is admissible.

Okay.  And then I'd like to talk about the defendant's motion regarding the Gibson trial transcript.  I know that a lot of the Gibson trial transcript, the parties have stipulated to at least portions of their evidence admissibility, but there are portions in Tater's testimony that defendant is seeking for admission, and I reviewed the papers.  I just have a few specific questions for counsel.

Boyd v. County of Erie, 22-CV-519                    655

So it's my understanding -- Mr. Blenk or Ms. Means, who is going to be addressing this issue today?

MR. BLENK:  I can, Your Honor.

THE COURT:  Okay.  So you're really trying to get this evidence in two different ways.  So, one way, to show that there was disclosure by the ADAs of -- you said Brady or Rosario evidence, and then the other purpose would be to rebut that all disclosures were put on the record.

And so let's deal with the first purpose, showing disclosure of Brady or Rosario evidence.

Mr. Blenk, all of these excerpts that you cited, how will the jury know that those are alleged Brady materials?

MR. BLENK:  The -- in the sense that how will the jury know that they were favorable?

THE COURT:  Yes.

MR. BLENK:  Your Honor, this was, frankly, an issue that Mr. Southard was handling, and Mr. Southard wasn't able to come today due to a serious conflict.

THE COURT:  Well, when do you need a decision on this? I mean --

MR. BLENK:  Before -- I'm sorry.

THE COURT:  I'm prepared to address it now, but if you want to wait for Mr. Southard for Monday, that's fine.

MR. BLENK:  I apologize, Your Honor.  We wouldn't be using it before -- at the very earliest Mr. Zeidman on

Boyd v. County of Erie, 22-CV-519    656

Monday.

THE COURT:  Okay.

MR. BLENK:  And if Your Honor wanted to provide your questions, we could address those in writing over the weekend, if that would be helpful.

THE COURT:  Sure.  I mean, I think the answer is that you can't.  I mean, I asked the question, but I already kind of knew the answer.

There's no way from the excerpts to show that this is Brady.  And that's the purpose is that you're trying to say, hey, look, these DAs turned over Brady material or favorable material.  And so it's not like on the record, you know, they are saying this is favorable, we're turning it over.  They're just turning them over.  And so really the only way to show that would be to then -- you'd have to admit all of these exhibits.

I'll just kind of give you my impression.  And it's fine.  We can wait until Monday morning to address it with Mr. Southard.  But my impression is that would be the only way to use this evidence for the purpose that you want to, and I'm not inclined to receive all of these exhibits because I think that's the only way that you can show they are favorable because really then it's -- what it opens to is that every exhibit that was turned over in any of these trials, then all of the exhibits could potentially be

Boyd v. County of Erie, 22-CV-519                    657

received, which I think would be too confusing to the jury, and there would be these arguments about, well, is this favorable, is this not favorable. And I just don't see how just a few of these exhibits would be that probative at all to say, oh, well, we turned these reports over.

And even if the jury knew they were favorable, it just doesn't have much probative value, especially when you balance it against the danger of prejudice. And I think there is a danger of prejudice because Mr. Tater didn't testify in Mr. Boyd's trial.

I guess when I was kind of looking at your motion what I thought is just -- this is kind of an analogy, and it's not a perfect analogy, but, you know, if someone is charged with petit larceny and the defense is -- well, look at this time, the defendant paid for his groceries. It's kind of like -- to me it's kind of like that. It's not very probative because, of course, the DAs turned over evidence. I mean -- and, as counsel put in their response, I mean, they're not claiming that no Brady evidence was ever disclosed. So really the probative value is pretty low. That's my impression of it, but I'm fine with waiting.

I think that the other argument is there is more probative value to that to show that there was maybe disclosures of evidence that weren't on the record. And so there were two excerpts for that. You don't have to answer

Boyd v. County of Erie, 22-CV-519                    658

this now, but if Mr. Southard could be ready to address the 368, 8 to 369, 5.  I read the portion of the transcript.  I just don't really understand how that shows that there was a prior disclosure that wasn't on the record.  So I just need some clarification.

MR. BLENK:  We will be prepared to address that no later than Monday, Your Honor.  Thank you.

THE COURT:  Okay.  I had a question for Plaintiff.  I'm trying to remember.  For this second purpose, there was evidence that it was maybe disclosed at the Wade hearing, right?  Was there -- I mean, I'm just wondering, was there a record -- I know you provided a transcript of the Wade hearing, but is there -- was there ever a disclosure on the record at the Wade hearing of these documents?

MR. HANFT:  Your Honor, so there are two separate hearings that I think are important here.  There was a Wade hearing, which concerned Mr. Woodruff and Mr. Hough's in-court identification of the defendants.  Separately there was a hearing to suppress the statements of Tater pursuant to Massiah versus United States, which concerned the materials at issue in these portions of the Gibson transcript.  There is a record that these materials were turned over on the record at that suppression hearing.

Now, Mr. Boyd's counsel was not present for that suppression hearing because he was not -- Mr. Tater's

Boyd v. County of Erie, 22-CV-519                    659

statements could not be used against him.  Mr. Bittner I believe said something along the lines of, yeah, I think this was the Wade hearing, but we know from the records that the suppression hearing is where these letters were turned over on the record.

THE COURT:  Okay.  So that would then in your view negate the defendant's argument then, that they were actually turned over on the record?

MR. HANFT:  Yes, Your Honor.  And to merely introduce the statement at the trial about the Wade hearing would open -- would require getting into this, and we've tried to keep all mention of Tater out of this trial.

THE COURT:  Okay.  So I guess I would then have Mr. Southard be prepared to address that, whether it was disclosed on the record, which really would defeat the purpose of, you know, seeking admission for this evidence.

I would say this:  In the event that it is admissible, and I'm not saying it is, I think that there's a way to redact that where Mr. Tater is not mentioned at all, and even redact it so that the jury couldn't even make any -- speculate at all that this was regarding, you know, a cooperator or a jailhouse snitch.

MR. BLENK:  We don't have any objection to that.  We don't want to get into Mr. Tater for the purposes of getting into Mr. Tater by any means.

Boyd v. County of Erie, 22-CV-519                    660

THE COURT:  Understood.  Thank you.

Okay.  So I think that my law clerk gave everyone copies of the proposed limiting instructions.  Let's skip the Gibson one because it may or may not depend on my rulings on the Gibson trial transcript.

If you want to go to DX 500.22, which is I think the Larry Watson evidence, I think that Mr. Rudin plans on -- you plan on using this piece of evidence later on?

MR. FIRSENBAUM:  So, Your Honor, I'll start with the good news first, which is the other two instructions look fine.

As for DX 500.22, with sincere apologies, last night we decided not to use that exhibit.  So we apologize to the Court for having to put in the work on this instruction.

THE COURT:  It's okay.

MR. FIRSENBAUM:  We are not intending to offer it.

THE COURT:  Okay.  That's fine.

MR. BLENK:  Can that exhibit be struck from evidence then?

MR. FIRSENBAUM:  It wasn't admitted.

MR. BLENK:  The Court just advised that it would admit it, but it's not been received.

MR. FIRSENBAUM:  I don't believe so.

THE COURT:  Let me check.

MR. BLENK:  Because there was a discussion of there

Boyd v. County of Erie, 22-CV-519                661

would be only a section perhaps received.

MR. FIRSENBAUM:  No.  That was a different exhibit.

MR. JOEL RUDIN:  No.  We were going to redact it.

THE COURT:  I have a record that it was admitted with redactions.

MR. FIRSENBAUM:  Which is --

MR. JOEL RUDIN:  We never did redact it, but --

THE COURT:  Okay.  I think that we had argument about it, and then I had received it with redactions, but it wasn't redacted.  And so it hasn't been presented to the jury yet.  So are you withdrawing that then?

MR. FIRSENBAUM:  So we just want to confirm that PX 293 is received, right?  Because that's the other one that's redacted.

THE COURT:  Yes.

MR. FIRSENBAUM:  Okay.

THE COURT:  PX 293 is received.

MR. FIRSENBAUM:  Okay.  So then -- okay.  So then 500.22, yes, if that can be withdrawn, we would withdraw it.

THE COURT:  Then 500.22 is withdrawn.  It's not in evidence at this point.

MR. FIRSENBAUM:  Thank you, Your Honor.

THE COURT:  Okay.  Mr. Blenk, did you want to be heard at all with respect to the proposed jury instruction for the Monell incident evidence?

Boyd v. County of Erie, 22-CV-519                    662

MR. BLENK:  Yes, Your Honor.  And we'd like to record on the record our objections to the Monell evidence.  This is --

THE COURT:  Well, yes.  And I'm sorry.  Maybe I should have gone to that first.

Okay.  Why don't I then give my ruling on the other incidents for Monell, and then you can be heard on that and the limiting instruction.  Okay?

MR. BLENK:  Thank you, Your Honor.

THE COURT:  So regarding the Monell evidence, I am going to issue a written decision probably either over the weekend or Monday, but I'm going to give you my rulings now regarding these other incidents.  And so PX 95, 99, 103, 104, 105, 115, 121, 148, 152, 170, 171, 175, 183 and 187.  The other incidents, those are all admissible as Monell evidence.

And, just to be clear, those were all the same other incidents that I deemed admissible in Mr. Walker's trial.

I do find that the evidence is probative to Plaintiff's case in proving their multiple Monell theories.  I don't find that the ones that I have found to be admissible are overly broad or too dissimilar to the alleged Monell claims here.  I do find that the ancient documents hearsay exception applies.  So these would be admissible for the truth of its contents.

I recall that in Mr. Walker's trial there was -- the Plaintiff read certain portions of these exhibits.  And I

Boyd v. County of Erie, 22-CV-519                    663

know, Mr. Hanft, you said that you are going to read the same script as you did in Mr. Walker's trial; is that right?

MR. HANFT:  Yes, Your Honor.  The only difference in the script I have this time is the exhibit numbers.  Otherwise, it's identical.

THE COURT:  Okay.  Great.  And so I recall in Mr. Walker's trial that the defense wanted to reserve their right to I guess supplement any of those exhibits.  So if there were portions of, say, the Ivey decision that Plaintiff didn't read, then defense reserved their rights to read portions of that as well.  And so that's -- so I just wanted to say that's fine to do as well.

But I'm going to let you place your position on the record, Mr. Blenk.  Go ahead.

MR. BLENK:  Thank you, Your Honor.

I trust that Your Honor's decision is based on the prior briefing of these issues as it occurred in Mr. Walker's trial and the arguments that we made therein?

THE COURT:  Yes.  I mean, it's -- the same reasoning that I used in Mr. Walker's trial applies here.

MS. MEANS:  Your Honor, as a global objection, we reiterate our objections and the arguments set forth in opposition to Plaintiff's motion to admit the Monell evidence.

First, on the ground that Plaintiff has not filed a

Boyd v. County of Erie, 22-CV-519                664

proper application for admission of these materials in this case beyond vaguely citing to the Court's earlier determination in the Walker case.  So we incorporate by reference our arguments at docket 369.

We also maintain the objection and arguments in our motion to preclude certain alleged Monell evidence filed at docket 326 in the absence of a preliminary hearing and additionally on the grounds that Plaintiff's purported Monell evidence is factually dissimilar, temporally removed and inadmissible hearsay.

And in light of Your Honor's explanation that the rationale for admitting these incidents in this case is similar to the rationale set forth in Walker, we additionally incorporate by reference our submissions and arguments in the Walker trial, and those are at Walker versus City of Buffalo, 22-CV-00520, at docket numbers 222, 296, 340-3, 384 and 394. And we intend to submit something briefly after -- after today to the docket to memorialize these objections and replace the PX numbers that were cited in docket 296 with the PX numbers that are in -- that pertain to this case.

THE COURT:  Okay.  Thank you.

MR. BLENK:  May I be --

THE COURT:  Your exception is noted.

MR. BLENK:  One more point, Your Honor.

THE COURT:  Sure.

Boyd v. County of Erie, 22-CV-519                665

MR. BLENK:  I think that in the context we're in here when this evidence was admitted in Mr. Walker's trial there was still a pending failure to train claim.  A claim that we had moved for summary judgment on, but there was a pending failure to train claim.  I think if you look -- and we just heard from the Plaintiff that they are not saying that it's -- that every piece of Brady evidence wasn't produced.

We're struggling to understand what the theory is.  And I understand that we've made that position.  We've taken that position many times.  And every time we say it Mr. Rudin says that there's a policy of not disclosing Brady material, which is exactly what the rebuttal was in Mr. Gibson, and then he bobs and weaves back and forth between the general policy and a more specified policy.  Didn't produce impeachment, didn't produce documents except for on demand.

These -- these are not theories that line up with the pattern of the -- even the instant -- even the pattern of Mr. Boyd's trial vis-à-vis Mr. Gibson's trial.  It's not consistent with that, that there's not disclosure of impeachment.  The fact that it's happening in Gibson's trial is specifically -- almost essentially negates Mr. Rudin -- the only times that Mr. Rudin has particularized a theory is negated by the comparison between Gibson and Boyd.

Now, a failure to train argument might be made in the sense that there's an error rate -- there's an unacceptable

Boyd v. County of Erie, 22-CV-519                                    666

error rate that's occurring based on failure to train.  We know that's not an issue here.  So the fact that other instances occurred is very limited probative value, has essentially no probative value, and it's extremely prejudicial for those instances to come in.

Now, we know that they have a failure to discipline claim.  Failure to discipline, that doesn't mean that we can just start pointing to other instances that occurred even prior to the events at issue.  There must be a foundation that connects them as to a cause to Mr. Drury's actions in 1976 and 1977.

This would require looking at the incident, determining that there had not been discipline dolled out to the person involved, and then providing at least circumstantial evidence that Mr. Drury would have been aware of that incident and aware of the outcome of the incident and aware of the non-discipline of the person involved.

Mr. Rudin made an interesting point the other day when he mentioned these cases about a progression of the same people.  That's the traditional application of a failure to discipline claim.  You are tying it to the one person who is doing something sequentially wrong.  And it may not be tied to what other people are doing, and he might be doing something wrong in a different way each time, but it's the same person.  So you can infer that he has knowledge of all

Boyd v. County of Erie, 22-CV-519                667

the relevant facts of the prior incident and he has knowledge that he hasn't been disciplined.

It's a much harder case to make against somebody like Mr. Drury who -- for whom they have no pre-existing disciplinary issues and for whom they are trying to impute this knowledge that based on records, many of which even the overturning of the underlying conduct or the reversal of the underlying conduct or the conduct becoming an issue at all doesn't arise until five years after, even after Mr. Drury has left the office.

And so this information is coming in in a very prejudicial way because the Court is purportedly -- theoretically these cases could have no potential application to a disciplinary theory because they're so back-loaded, but they're going to come in on a policy that hasn't been articulated, and then the jury is going to be looking at this pattern and they're going to be -- it's going to be impossible for them to distinguish between the specific -- the fundamentals of a discipline claim and the fundamentals of a policy claim.

They are poisoning the jury pool with the policy that hasn't been articulated and broadening the evidence in front of the jury without basis.

I hope I was speaking loud enough.  I'm sorry about that.

Boyd v. County of Erie, 22-CV-519                  668

THE COURT:  You were fine.  I'm not sure what happened, but -- okay.  Thank you.

MR. BLENK:  Which is just to say, Your Honor, that especially the earlier evidence, these are applications of Brady that are technical that are based on inferences that could be drawn from the evidence that don't go to like -- don't even go to a factual inculpatory or even impeachment basis, but actually if one looks at them they are -- they tend to negate mens rea at the same time that they are not negating factual guilt.

These are all things that wouldn't -- there's no foundation to think that these would be the types of incidents that would create an atmosphere in the office that would cause Mr. Drury to think that discipline was any less -- or that he was not going to face discipline for any specific conduct.  We think that -- now, again, once the failure to train is out we -- the prejudicial value of these issues is different in the context in which they are being put in in this case.

And in addition to the facial elements that aren't lining up with the facts of this case that we've previously addressed to the Court, we object on the additional basis that particularly in the absence of a failure to train claim this is very prejudicial -- very prejudicial evidence that the jury is going to -- the jury is going to take in and hear

Boyd v. County of Erie, 22-CV-519                    669

these arguments about a failure to discipline when the vast majority of these issues shouldn't come in on any failure to discipline theory because they are not notorious enough. There's no foundation for Mr. Drury being aware of them. There's no foundation for them not resulting in discipline.

THE COURT:  Okay.  Thank you.  I'm going to just at this point say that my decision will address my reasoning and that these other incidences of Monell evidence I think really are probative to all of Plaintiff's theories for different reasons.

Okay.  County has confirmed that they are not seeking apportionment against the City of Buffalo.  And so, Plaintiff, would you like a chance to respond to County's request to admit a portion of the City of Buffalo Police Department rules and procedures?

MR. FIRSENBAUM:  Sure, Your Honor.  We just received this last night, and we're working on a written submission. I mean, I think we could make the point now.

The request by the defense is to admit certain portions of the police department manual.  There may be other reasons why it's not admissible, but it's not relevant.

The City attached the -- sorry -- the County attached the City's interrogatory responses, which attached this manual.  And in attaching the manual, the response to interrogatory number three reads, quote, the Buffalo

Boyd v. County of Erie, 22-CV-519                    670

defendants are unable to identify the exact copy of the rules and procedures that would have been in effect in 1976 and 1977, but will provide a copy of the rules and procedures that somewhat approximates the time period that is relevant to this litigation.  Given the way the rules and procedures were amended and updated, the version provided by the Buffalo defendants will not completely reflect policies and procedures which were in effect during the time period at issue in this litigation, end quote.

So in producing this manual the City said expressly that the content of it is not relevant to the time period at issue in 1976 and 1977.  And so, therefore, it has no probative value as to the structure of the police department versus the District Attorney's Office at the time it matters.

THE COURT:  Then, Mr. Blenk, you were seeking admission of this portion of the rules and procedures to rebut Mr. Cosgrove's deposition testimony?  That's really the only purpose you are seeking admission, right?

MR. BLENK:  That's correct, Your Honor.

THE COURT:  Okay.  I'm going to reserve then.  I'll give you a decision on Monday.

MR. BLENK:  If we can be heard briefly.

THE COURT:  Sure.

MR. BLENK:  I heard Mr. Firsenbaum's argument.  I understand the -- there's nothing that makes it not relevant

Boyd v. County of Erie, 22-CV-519                671

to the instant case.  Just because many years later they can't piece together the particular state of the document, there's -- as it existed then, the rules and procedures are clearly from around the contemporaneous time.

There's no reason to think -- of course, we all know that a police department is operated by a person appointed. In this instance, by the City of Buffalo mayor.  It's an independent law enforcement arm that is not subordinate to the Erie County District Attorney.  And this is substantiated by those documents, and then as it is now, the DA is not in charge of the City of Buffalo Police Department and we must be given -- especially given the age of this case and the fact that Mr. Cosgrove's testimony just does not line up with legal reality, we must be given the opportunity to fairly rebut that.

THE COURT:  Okay.  I'm going to reserve until Monday.

MR. BLENK:  Thank you, Your Honor.

MR. FIRSENBAUM:  And, Your Honor, given that we just received this late last night, if there's anything else that we identify, can we submit something, say, by tomorrow night?

THE COURT:  That's fine.

MR. FIRSENBAUM:  Okay.

THE COURT:  That's fine.

MR. FIRSENBAUM:  Thank you.

THE COURT:  Does Plaintiff now have -- is it 20 alleged

Boyd v. County of Erie, 22-CV-519                672

Brady materials that weren't disclosed?

MR. FIRSENBAUM:  Your Honor, I think we would -- yes is the answer in that we started the case with 19 and given the way they've identified this there's now a twentieth.  The twentieth is more complicated in the sense that when it needed to be disclosed is probably a little bit different than the 19.  Maybe Mr. Rudin disagrees with me on that.  But, yes, I think that we -- we've always said at least 19.

THE COURT:  That's fine.

MR. FIRSENBAUM:  And so I think -- yes is the answer.

THE COURT:  I did not rule on the interrogatories yet.  I, frankly, didn't have enough time to go through them.  I know it's the same interrogatories that you read at Mr. Walker's trial, but I still need to go through them, and I just didn't have enough time.  So it seems to me that that evidence can be presented separate from the other incidences.  Is that acceptable to Plaintiff?  Because, if not, then I'd have to go back and look at them.

MR. FIRSENBAUM:  That's fine, Your Honor.

THE COURT:  Okay.  I'll get to them as soon as I can.

MR. BLENK:  Your Honor, one final issue.  May we make as a Court exhibit our March 11th, 2025 opposition to the Monell evidence?

THE COURT:  You would like to make it an exhibit?

MR. BLENK:  Just a Court exhibit, the memorandum that

Boyd v. County of Erie, 22-CV-519                    673

we --

THE COURT:  Sure.  Why don't I say this:  Plaintiff's memorandum and County's memorandum from Mr. Walker's trial regarding the Monell evidence -- and you're talking about the other incidences, right?

MR. BLENK:  That's correct, Your Honor.

THE COURT:  Both of those are hereby incorporated into Mr. Boyd's trial record.  Okay?

MR. BLENK:  Thank you, Your Honor.  Yep.

THE COURT:  Okay.  Is there anything else that you'd like to address before we bring the jurors in?

MR. HANFT:  Your Honor, would you like me to formally offer the other incident exhibit numbers into evidence before the jury arrives or before I begin my reading?

THE COURT:  You don't have to.

MR. HANFT:  Okay.

THE COURT:  They were already received.  So you don't have to.

And so you're going to read those.  And then since I didn't make my decision on the interrogatories, that's what you have, and then we'll get to Mr. Drury.  Is that the plan?

MR. HANFT:  We would expect that we would then play the deposition -- affirmative deposition designations of Mr. Cosgrove that Your Honor admitted yesterday morning.

THE COURT:  Okay.

Boyd v. County of Erie, 22-CV-519                     674

MR. HANFT:  And we expect that would take us to Mr. Drury.

THE COURT:  Great.  And then do you think Mr. Drury will take the rest of the day?

MR. JOEL RUDIN:  Probably.

THE COURT:  Okay.

MR. JOEL RUDIN:  I mean, until roughly three to four probably, but I'm not sure exactly.

THE COURT:  Okay.  Anything else before I bring the jurors in, Mr. Blenk?

MR. BLENK:  Yes.  I'm sorry.

So we kind of have an empty table over here.  So Mr. Henry is arriving a little bit late today and Mr. Southard will not be here.  Mr. Henry has arrived.  If the jury could just be advised that Mr. Southard isn't here and there's no reason to speculate on the basis for his absence.

THE COURT:  I'm happy to say that, but I told them that the attorneys -- I mean, I think they knew --

MR. BLENK:  They have been -- they have been advised that?

THE COURT:  Well, I think at the beginning we had told them that -- you know, I introduced all of the attorneys and I had said that not all of them are here.  And I think you even said in your opening that some of you would be here some

Boyd v. County of Erie, 22-CV-519                    675

days and not others.  I'm happy to tell them.  I don't think we need to.

MR. BLENK:  You're right, Your Honor.  You're right. It slipped my mind that this has been brought up to them before.

THE COURT:  All right.

MR. BLENK:  And then on the Monell evidence going in, so there is going to be the script read.  Is it -- the exhibits are in evidence?

THE COURT:  Yes.

MR. BLENK:  And the County will have the opportunity to make use of matters outside the scope of the script at the County's discretion provided it's relevant?

THE COURT:  Yes.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  Okay.

MR. JOEL RUDIN:  Your Honor, there's one other issue.

THE COURT:  Okay.

MR. JOEL RUDIN:  I provided to Mr. Blenk this morning a copy of a Buffalo News article from August 7th, 1974 that we probably will offer in evidence during Mr. Drury's testimony. I can provide a copy to the Court.  And it's under the ancient documents exception.

THE COURT:  Okay.  That's fine.  Why don't you provide a copy, and then when we get to that point we can address it.

Boyd v. County of Erie, 22-CV-519                    676

MR. JOEL RUDIN:  Yes.  I don't know if I said this. It's PX 91.

THE COURT:  PX 91.  Okay.  Is this regarding a case that's already been received for Monell?

MR. JOEL RUDIN:  No.

THE COURT:  It's something different.  Okay.

MR. JOEL RUDIN:  It's not Monell.

THE COURT:  Not Monell.  Okay.  Got it.  I'll look at it later.

MR. JOEL RUDIN:  Yeah.

THE COURT:  Okay.  Anything else?  Okay.  Nothing further.  Then we'll have the jurors come in.

MR. HANFT:  Your Honor, may I move this to face the jury?

THE COURT:  Sure.  I'm going to read the instruction to them and then you can proceed.

(Jury present.)

THE COURT:  It's fine for you to sit over here for now. Everyone can have a seat.

Good morning, everyone.  Our jurors have returned to the courtroom.  I hope that you all had a good night.

We're going to take things a little out of order. Mr. Drury will be back a little later today to continue his testimony.  So Plaintiff is going to be presenting some other evidence.  Before Mr. Hanft gets to that, I'm going to read

Boyd v. County of Erie, 22-CV-519                    677

to you an instruction that's relevant to the evidence that you will be presented with.

As you know, Plaintiff is alleging that Mr. Boyd's constitutional right to a fair trial was violated in 1977 due to misconduct of Erie County Assistant District Attorneys, which, in turn, was caused by policies, customs or practices of the Erie County District Attorney's Office.  With respect to the last part of these allegations caused by policies, customs or practices of the Erie County District Attorney's Office, Plaintiff has offered and the Court has received in evidence certain judicial decisions and newspaper articles that predate and postdate Mr. Boyd's trial.

These decisions and newspaper articles discuss matters of the Erie County District Attorney's Office in cases unrelated to the criminal cases of Mr. Boyd, Mr. Walker, Mr. Gibson and Mr. Martin.  I will instruct you in much more detail at the end of the trial as to the law and for what specific purposes you may consider this and other evidence. For now you should understand that these judicial decisions and newspaper articles are offered for the purpose of determining whether any policy, custom or practice of the Erie County District Attorney's Office existed and whether such policies, customs or practices caused any individual Assistant District Attorney to violate Mr. Boyd's constitutional rights.

Boyd v. County of Erie, 22-CV-519    678

Importantly, this evidence should not be considered by you as proof that the alleged constitutional violations against Mr. Boyd occurred. That is, you should not and may not consider this evidence to say that since a different Court found that an Erie County District Attorney violated a person's constitutional right in a different case, then the Assistant District Attorneys in Mr. Boyd's case must have also violated his constitutional rights.

There may be some redactions in the judicial decisions and newspaper articles. The redactions are not pertinent to this case, and you should not speculate about them in any way.

Okay. Thank you.

Mr. Hanft, you can go ahead.

MR. HANFT: Thank you, Your Honor.

Good morning.

I will now read excerpts of what has been received in evidence as PX 95, a Buffalo Evening News article dated February 27th, 1976 relating to the prosecution of Ronald Bader and Joseph Horton by the Erie County District Attorney's Office, represented in this case by Assistant District Attorney Benjamin Andrews.

"New trial ordered in arson death.

State Supreme Court Justice Frederick M. Marshall Thursday ordered a new trial for two men convicted of murder

Boyd v. County of Erie, 22-CV-519                    679

in the January 1975 death of a Buffalo firefighter.  Ronald Bader, 19, and Joseph S. Horton, 20, were convicted last December of murder and two counts of arson in a jury trial before Justice Marshall.

Justice Marshall ordered a new trial on the murder charge but let the arson conviction stand.  He ruled that the prosecution did not provide defense attorney Benjamin L. Berger and Charles P. McCabe with fire investigators' reports.  As a result, the defense was unable to present intelligently to the jury all probabilities pointing to the death of Lieutenant Winspear, Justice Marshall said in a 13-page decision.

Justice Marshall last month sentenced Bader and Horton to prison terms from 15 years to life for murder.  That sentence is wiped out by the Thursday ruling.  However, sentences of up to 10 years in prison for arson are not disturbed."

I will now read you an excerpt of what has been received in evidence as PX 103, a Buffalo News article dated April 19, 1978 relating to the prosecution of Michael K. McKinley by the Erie County District Attorney's office, represented in this case by Assistant District Attorney George Quinlan.

"Judge grants mistrial in knifing case.

A man accused of stabbing his father to death and

Boyd v. County of Erie, 22-CV-519                680

wounding his mother in their suburban home was granted a mistrial after the prosecution failed to give the defense a copy of the statement made by the defendant. Defense attorney Herbert M. Siegel said he had not received a copy of an exculpatory statement taken by arresting officer State Trooper Dennis Sullivan.

Assistant District Attorney George B. Quinlan, Jr., unsuccessfully argued that the statement was in substance the same as one given to another officer following the February 11, 1976 incident. Attorney Siegel argued the statements were completely different."

I will now read you an excerpt of what has been received in evidence as PX 104, a Buffalo Evening News article dated January 23, 1979 relating to the prosecution of John F. Reese by the Erie County District Attorney's Office, represented in this case by Assistant District Attorney Timothy Drury.

"Reese murder case ends in mistrial.

State Supreme Court Justice Theodore S. Kasler declared a mistrial in the murder trial of a Buffalo man charged with a 1968 killing because prosecutors reportedly failed to disclose all the material they had that was favorable to the defendant. Justice Kasler declared the mistrial late Monday after ruling that prosecutors had failed to disclose all the exculpatory material they gathered that could aid defendant

Boyd v. County of Erie, 22-CV-519                    681

John F. Reese.  Justice Kasler dismissed a jury after a week of testimony on the motion of Robert M. Murphy, Reese's attorney."

I will now read an excerpt of what has been received into evidence as Plaintiff's Exhibit 105, the decision of the New York Supreme Court for Erie County in the People of the State of New York, Plaintiff, versus Douglas Jerome Mitchell, Defendant, dated March 2nd, 1979, relating to the prosecution of Jerome Mitchell by the Erie County District Attorney's Office, represented in this case by Assistant District Attorney George Quinlan.

"Appearances of counsel:  George Hamilton Forman for defendant; Edward C. Cosgrove, District Attorney; George B. Quinlan of counsel for Plaintiff.

Opinion of the Court:  Vincent E. Doyle, Justice.

This is an application by the defendant for an order directing the District Attorney to turn over for inspection a transcript of the grand jury testimony of certain named witnesses.

Defendant has been indicted for the crimes of burglary in the second degree and grand larceny in the third degree. The above-mentioned application is part of a pretrial omnibus defense motion.

The defendant maintains that the above-mentioned testimony should be turned over by the People pursuant to

Boyd v. County of Erie, 22-CV-519                    682

*Brady v. Maryland.*  The People oppose this application urging that the witnesses referred to above were produced before the grand jury at the specific request of the defendant.  The People maintain that the defendant, therefore, knows of the exculpatory nature of the witnesses testimony.

The Court has examined a transcript of the testimony given by the witnesses, G. Williams, N. Pearson, S. Pearson and B. Pearson, mentioned above.  There is no question that said testimony is exculpatory and favorable to the accused.

The fact that the grand jury chose to indict the defendant in spite of the testimony given by said witnesses is of no matter.  It is also immaterial to this Court how these witnesses happened to be produced before the grand jury.  Evidence which is favorable to the defendant belongs to him.

As stated in People v. Bottom, compliance with Brady cannot be made with clue-dangling or gamesmanship in place of full disclosure.  A direction that the sought-after testimony be made available is not merely a trial aid to the defendant, but rather a compelling of disclosure of exculpatory material, which this testimony clearly is."

I will now read an excerpt of what has been received into evidence as Plaintiff's Exhibit 115, a Buffalo Evening News article dated April 15, 1980 relating to the prosecution of Merle Steele, Michael Steele and John Rehraurer by the

Boyd v. County of Erie, 22-CV-519                    683

Erie County District Attorney's Office represented in this case by Assistant District Attorney William Knapp.

"Charges dismissed in stolen truck sale.

Stolen property charges against three men implicated in a sting operation by government informant Clyde Speaker were dismissed Monday after a judge declared a mistrial.  State Supreme Court Justice Theodore S. Kasler granted dismissal motions for Merle and Michael Steele and John Rehraurer based on prosecutorial misconduct.  Justice Kasler agreed that a prosecutor had failed to turn over evidence deemed favorable to defense attorneys representing the three men on the charges they sold a stolen truck to Speaker."

I will now read excerpts of what has been received into evidence as 121, a Buffalo Evening News article dated November 14, 1981 relating to the prosecution of Gerald M. Ciccarelli by the Erie County District Attorney's Office represented in this case by Assistant District Attorney Joseph J. Terranova.

"City judge voids conviction of Ciccarelli in sex assault case.

A city judge Friday criticized two prosecutors and threw out a conviction in a sexual assault case based on the judge's findings that an Assistant District Attorney withheld possible evidence during a week -long trial in September. Chief City Judge H. Buswell Roberts in a strongly worded

Boyd v. County of Erie, 22-CV-519                 684

ruling threw out his earlier finding of guilt against Gerald M. Ciccarelli and ordered the charge of sexual assault dismissed.

Judge Roberts said the Assistant District Attorney who prosecuted the case, Joseph J. Terranova, had an obligation to divulge that the victim in the case had suffered bruises in an earlier beating.  He accused the prosecutor of overreaching by making a medical judgment that the earlier beating would play no role in the case against Ciccarelli. Mr. Terranova admitted that he knew of the earlier disciplining by the girl's father, but said it occurred six weeks before the Ciccarelli incident and that the girl told him she had no bruises remaining from it.  Judge Roberts said the Assistant District Attorney was obligated to inform the defense before the trial."

I will now read an excerpt of what has been received into evidence as Plaintiff's Exhibit 148, the decision of the Supreme Court, Appellate Division, Fourth Department, New York in the People of the State of New York versus James Donaldson dated October 24, 1975 relating to the prosecution of James Donaldson by the Erie County District Attorney's Office represented in this case by Assistant District Attorney Michael Stebick.

"Opinion of the Court:  The record fully establishes a sound basis for the District Attorney's acknowledgement with

Boyd v. County of Erie, 22-CV-519                    685

commendable candor that there were prejudicial errors committed in the course of the trial requiring reversal of the judgment of conviction.  In his summation in attempting to support the credibility of a key prosecution witness, who it was established had a long criminal record, the prosecutor asserted that the witness went before the grand jury, as you are aware, and he told them what happened and they believed him.

Such an attempt to have the trial jury accept as true the witness's trial testimony by reason of the grand jury's finding of an indictment was entirely improper and prejudicial to a fair and proper weighing of the testimony on the trial.  From the trial record it would appear that the conduct of the prosecutor was such to deny defendant a fair trial, particularly in the absence of a stronger curative instruction by the Court."

I will now read an excerpt of what has been received into evidence as Plaintiff's Exhibit 183, the decision of the Supreme Court, Appellate Division, Fourth Department, New York, in the People of the State of New York, Respondent, versus Howard J. Vance, Appellant, November 1982, relating to the prosecution of Howard J. Vance by the Erie County District Attorney's Office, represented in this case by Assistant District Attorney Richard Panepinto.

"Opinion of the Court:  In this case where a close

Boyd v. County of Erie, 22-CV-519                686

issue of fact existed as to the defendant's guilt, conduct at trial which allowed the prosecutor to become an unsworn witness created a substantial likelihood of prejudice to the defendant.

The prosecutor became directly involved during the trial in the gathering of rebuttal evidence, and referred to his involvement during the presentation of the evidence and in his summation.  We hold that this conduct impermissibly tipped the scales of justice and deprived defendant of a fair trial, and for this reason reverse defendant's first degree robbery conviction and order a new trial."

I will now read an excerpt of what has been received into evidence as Plaintiff's Exhibit 187, the decision of the Supreme Court, Appellate Division, Fourth Department, New York, in the People of the State of New York, Respondent, versus Patrick Herlan, Appellant, dated January 27, 1984, relating to the prosecution of Patrick Herlan by the Erie County District Attorney's Office, represented in this case by Assistant District Attorney Charles Kelly.

"Opinion of the Court:  Defendant was convicted following a jury trial of burglary in the third degree, criminal mischief in the fourth degree and possession of burglar tools arising out of a break-in of a restaurant during the early morning hours of August 10, 1981.  During the prosecutor's cross-examination of the defendant, he

Boyd v. County of Erie, 22-CV-519                    687

repeatedly questioned defendant as to whether police officers were lying when they testified contrary to defendant's testimony.

At one point the prosecutor asked, 'Oh, he was lying? Mr. Herlan, in your wisdom why would a police officer of sixteen years risk his pension to perjure himself in court over you?  Any reason?'

On summation the prosecutor made the same argument to the jury as to why a police officer would risk his pension rights by lying to convict the defendant.  Such remarks by the prosecutor during summation compounded the prejudicial effect of this cross-examination of defendant as to whether the police officers had lied during their testimony.

Defendant's credibility was an important issue at trial.  The jury had to decide whether to believe the police officers' account of the incident or defendant's claim that he was merely an innocent bystander, or at most, attempting to intervene on the side of the law.  The repeated emphasis on defendant's forced characterization of the officer witnesses' testimony as lies served to deprive him of his right to a fair trial."

I will now read excerpts of what has been received into evidence as Plaintiff's Exhibit 152, the decision of the Supreme Court, Appellate Division, Fourth Department, New York, in the People of the State of New York, Respondent,

Boyd v. County of Erie, 22-CV-519                    688

versus Richard Balsano, Appellant, dated February 20th, 1976, relating to the prosecution of Richard Balsano by the Erie County District Attorney's Office, represented by Assistant District Attorney Constantino.

"Appearances of counsel:  Boreanaz, Ne Moyer and Baker, Harold Boreanaz of counsel for appellant.  Edward C. Cosgrove, District Attorney; William Balthasar of counsel for respondent.

The final argument of defendant is that the prosecutor's summation was so inflammatory as to violate the fair trial guarantee.  There were at least eight objections sustained during the summation, and after defendant moved for a mistrial the prosecutor continued in the same excessive manner.  He made references to the failure of defendant to have called a witness, remarking that the witness was not called because his testimony would have been favorable to the prosecution.

Respondent cites People v. Rodriguez as support for the prosecutor's statements.  The witness was not in control of defendant, as in Rodriguez, and the general rule that there must be no comment upon a defendant's failure to come forward with evidence is the principle which should be followed in the case at bar.

The Court properly admonished the prosecutor and gave curative instructions to the jury.  Because of the rulings

Boyd v. County of Erie, 22-CV-519                                    689

and instructions of the Court, the prosecutor's actions standing alone would be insufficient to require another trial.  However, at such trial the prosecution should not repeat these inflammatory remarks.

The cumulative prejudicial effect of the errors requires that the judgment be reversed and a new trial granted.

Judgment unanimously reversed on the law and facts and a new trial granted."

I will now read excerpts of what has been received into evidence as People's Exhibit 1 -- Plaintiff's Exhibit 175, the decision of the Supreme Court, Appellate Division, Fourth Department, New York, in the People of the State of New York, Respondent, versus John F. Keller, Appellant, dated April 6th, 1979, relating to the prosecution of John Keller by the Erie County District Attorney's Office, represented in this case by Assistant District Attorney Martin Littlefield.

"Appearances of counsel:  Nathaniel A. Barrell; Anna Marks of counsel for appellant.  Edward C. Cosgrove, District Attorney; John De Franks of counsel for respondent.

In his summation the prosecutor made the following remarks:

'See, the People in presenting a case can't bring in evidence to bolster our own evidence.  In other words, I couldn't bring in Detective Grabowski, who is the detective

Boyd v. County of Erie, 22-CV-519                690

involved, to say that I threatened the boy with a lie detector test, and then when we came to the truth that would be bolstering.

I couldn't have brought in people from the bars who saw Jimmy Devine running around because that would bolster my witness, and I am prohibited from doing that.'

Although defendant did not object to this statement, he contends that the prosecutor placed facts not in evidence before the jury.  The People again concede the impropriety of the prosecutor's gratuitous summation comments indicating without evidentiary basis that there existed proof tending to corroborate the testimony of witness James Devine.

The People contend, however, that this misconduct is balanced by statements by defense counsel which were unsupported by the evidence.  While it is true that the prosecutor's misconduct should be considered in respect of defense counsel's comments, nevertheless, grossly improper remarks by a prosecutor may not be justified on the ground of improprieties in the summation of defense.

It is fundamental that the jury must decide the issues on the evidence.  And, therefore, fundamental that counsel in summing up must stay within the four corners of the evidence. Thus, the District Attorney may not refer to matters not in evidence.  The improper statement by the prosecutor in bolstering his main witness's testimony by stating in

Boyd v. County of Erie, 22-CV-519                    691

summation what certain people could testify to if called cannot be excused as harmless error.

Defendant further contends that the following comments made by the prosecutor in summation were improper and inflammatory:

'If that is where the violence is, then that is where we have to stop it.  No.  Because Earl Thompson and all these people are a bunch of drunken bums doesn't mean that violence should be allowed to exist in our society.  Really, what we are talking about is good common sense.  And let's stop all this violence.'

Further, 'Above them and below them we are dealing with violence, and violence has to be stopped.  And you don't let people off from violence because they are in an unfortunate set of circumstances.  This is one of the problems in our American society.  It has got to be stopped, and this is where it does get stopped.'

While allowed the widest latitude by way of comment, denunciation or appeal in advocating his cause, this does not grant the prosecutor any warrant to introduce into summation matters which the jury had no right to consider in determining the guilt or innocence of the defendant.

Above all, the District Attorney should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to

Boyd v. County of Erie, 22-CV-519                    692

prejudice the jury against the defendant.

The comments by the prosecutor, while certainly beyond the bounds of proper advocacy, would not separately in and of themselves mandate a reversal.  However, the cumulative effect of these and other errors must be considered on the record as a whole.  As noted by the Court in People v. Ingram, the above-enumerated errors are such that taken in conjunction they patently deprived defendant of a fair trial as a matter of law."

I will now read excerpts of what has been received into evidence as Plaintiff's Exhibit 170, the decision of the Supreme Court, Appellate Division, Fourth Department, New York, in the People of the State of New York, Respondent, versus Kenneth Johnson, Appellant, dated June 2nd, 1978, related to the prosecution of Kenneth Johnson by the Erie County District Attorney's Office represented in this case by Albert M. Ranni.

"Appearances of counsel:  James P.  Harrington for appellant.  Edward C. Cosgrove, District Attorney; Judith Manzella of counsel for respondent.

Judge Moule:  Defendant contends secondly that the misconduct on the part of the prosecutor Assistant District Attorney Albert M. Ranni requires the granting of a new trial.  The Court is ever mindful of the right of every person accused of a crime to have a fair and impartial trial

Boyd v. County of Erie, 22-CV-519                    693

before an unbiassed court and an unprejudiced jury.  This right is to be accorded in surroundings where the accused and prosecution enjoy the unfettered attention of the jury, to the end that the resulting verdict will be the product solely of evidence adduced on the witness stand.

Although every trial may not be impeccably conducted and free of some error, trials should not be tolerated where unadulterated unfairness and deceit have become the rule.  While we must express our concern with the misconduct of Mr. Ranni throughout the course of the trial, nevertheless we cannot say that his conduct so impaired the development of the factual issues and the presentation of testimony as to jeopardize the fairness of the trial.

Judge Hancock, dissenting:  From the record there clearly emerges the picture of an overbearing prosecutor obsessed with the idea of obtaining a conviction at all costs, ignoring the Court's rulings, deliberately asking improper and prejudicial questions, and engaging in unpardonable efforts in comments during the trial and in summation to disparage defense counsel and to destroy his credibility with the jury."

I will now read excerpts of what has been received into evidence as Plaintiff's Exhibit 171, the decision of the United States District Court for the Western District of New York in Kenneth Johnson, Petitioner, versus Harold J. Smith,

Boyd v. County of Erie, 22-CV-519                 694

Superintendent, Attica Correctional Facility dated February 18, 1984.

This is a federal court decision following the state court decision that I just read which incorporates and references the majority and dissent that I just read excerpts from.  It relates to the same prosecution of Kenneth Johnson by the Erie County District Attorney's Office represented in this case by Assistant District Attorney Albert M. Ranni.

"The majority and dissenting opinions of the Appellate Division, Fourth Department, noted the misconduct of the prosecutor throughout the trial.  Specific objectionable tactics and comments by prosecutor are set forth in the dissenting opinion and are cited by the dissenters as a basis for their conclusion that a new trial was required.

The scope of federal court review of a state district attorney's conduct is limited to claims of violations of due process.  Habeas corpus relief is warranted only where the prosecutorial misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process.

In the case at bar the prosecutor's conduct was so improper as to amount to a pattern of conduct which resulted in a denial of a fair trial to petitioner.  The most serious of the prosecutor's prejudicial actions concerned his attempts during cross-examination and summation to

Boyd v. County of Erie, 22-CV-519                695

demonstrate that petitioner was lying when he denied his involvement in this attack because petitioner had pled not guilty to other offenses in the past, yet subsequently changed his plea to guilty.

During summation the District Attorney's Office -- the District Attorney stated:  Now, the mere assertion of innocence isn't proof.  You know now that this assertion is often made by guilty people to avoid justice.  The defendant himself raised this claim on prior occasions.  Other crimes -- not rape crimes -- other crimes; he pleaded not guilty.

The trial Court sustained the defense attorney's prompt objection to these comments."

I will now read excerpts of what has previously been received in evidence as Plaintiff's Exhibit 99, the decision of the Supreme Court, Appellate Division, Fourth Department, New York, in the People of the State of New York, Respondent, versus J. L. Ivey, Jr., Appellant, dated July 9, 1981, relating to the prosecution of J. L. Ivey, Jr. by the Erie County District Attorney's Office, represented in this case at trial occurring in October of 1976 by Assistant District Attorney Albert M. Ranni.

"Defendant was convicted after a jury trial of three counts of murder in the second degree and two counts of robbery in the first degree which arose from an armed robbery

Boyd v. County of Erie, 22-CV-519                    696

during which a gasoline station attendant, 25-year-old Alan Sturman, was shot to death.  The defendant claimed misidentification and called four alibi witnesses who testified that they were with him at the time the crime occurred.  Defendant's principal contention on appeal is that he is entitled to a new trial because of prosecutorial misconduct.  We agree.  The record is replete with numerous and repeated acts of improper and prejudicial conduct by the prosecution which deprived defendant of a fair trial.

Furthermore, we condemn the prosecutor's inflammatory and prejudicial opening statement and summation designed to scare the jury with warnings that any mistake on his part would mean that the murderer goes free.  Similarly to be condemned are the prosecutor's attempts in his statement to inject sympathy for the victim.

Neither can we condone the prosecutor's disparagement of defendant's alibi witnesses by referring to their testimony as lies, garbage, and advising the jury that we should wash that chair, the witness chair, after she, defendant's alibi witness, leaves, portraying alibi witnesses as bad citizens for their failure to cooperate with the District Attorney is improper.

Lastly, the prosecutor clearly implied to the jury in his summation that he knew some things about the case that he wished they knew and stated, 'In my opening statement to you

Boyd v. County of Erie, 22-CV-519                    697

I would confine the proof to the indictment.  About ten o'clock tomorrow morning you are going to hear about other things.  You are going to hear about the type of crime and about the person who committed that crime.'

This repeated misconduct is obviously inconsistent with a public prosecutor's duty to be fair and impartial and to avoid unfair insinuations designed to prejudice the jury.

Criminal trials are to be conducted that the proof will be legal evidence, unimpaired by intemperate conduct, impertinent counsel, and irrelevant asides, all of which obfuscate the development of factual issues and sidetrack the jury from its basic mission of determining the facts relevant to guilt or innocence.

Although every trial may not be impeccably conducted and free of some error, we will not tolerate trials where unadulterated unfairness and deceit have become the rule. Evenhanded justice requires more, and as the ultimate guardian of the rights of the People and defendants in the state, we have a right to expect more."

Thank you.

THE COURT:  Thank you.

MR. HANFT:  Your Honor, Plaintiff would now move into evidence excerpts of PX 246, deposition designations from the videotaped deposition of District Attorney Edward Cosgrove.

THE COURT:  Mr. Blenk?

Boyd v. County of Erie, 22-CV-519                698

MR. BLENK:  Subject to our prior exceptions noted in motion practice, we have no further objection.

THE COURT:  246 is received based on my rulings that I provided to counsel before.

MR. BLENK:  Thank you, Your Honor.

*(Plaintiff's Exhibit 246 received in evidence.)*

THE COURT:  And I just wanted to place something on the record first.  The exhibit that you just had up, that was --

MR. HANFT:  286, Your Honor.

THE COURT:  Two what?

MR. HANFT:  286, Your Honor.

THE COURT:  Counsel, approach.

(At bench:)

THE COURT:  286 hasn't been received.

MR. HANFT:  Sorry.

THE COURT:  I know that I already received all of the exhibits that made up that, but I just want to make sure that we keep the record clear.  So Plaintiff's 286 is received based on my prior rulings on the Monell evidence.

MR. HANFT:  Thank you, Your Honor.

THE COURT:  Noting the defendant's exception to that.

MR. BLENK:  Thank you, Your Honor.

MR. HANFT:  Thank you, Your Honor.

(Plaintiff's Exhibit 286 received in evidence.)

(Open court:)

Boyd v. County of Erie, 22-CV-519                    699

THE COURT:  Okay.  You can proceed with the deposition designations for Mr. Cosgrove.

MR. HANFT:  Thank you, Your Honor.

(Video played.)

THE COURT:  Counsel approach, please.

(At bench:)

THE COURT:  Just scheduling, what do you have?  Do you have anything else for before Mr. Drury?

MR. FIRSENBAUM:  We don't have anything else before Mr. Drury.

THE COURT:  You said that he might be a little late?  Mr. Drury?  No?

MR. BLENK:  I haven't heard anything.  We told him eleven o'clock, and he said his wife will take him.  I think he was -- he might have made a comment about him being -- apologizing for being a little bit late yesterday.  hopefully -- I mean, it's a logistical issue for him, of course.

THE COURT:  Okay.

MR. BLENK:  But hopefully he will be on time.

THE COURT:  Okay.  Then we'll just take a recess until we get to Mr. Drury.

MR. FIRSENBAUM:  Thank you, Your Honor.

(Open court:)

THE COURT:  Members of the jury, we're going to take

Boyd v. County of Erie, 22-CV-519                    700

our mid-morning recess.  All of the recess admonishments apply.  Do not talk about the case with anyone.

Our recess might be longer than fifteen minutes, just so you know, but hopefully it won't be too long.  Have a good break.

(Jury not present.)

THE COURT:  We'll be in recess.  If there's anything you need to address before Mr. Drury comes back, just let someone know and I'll come back.

MR. JOEL RUDIN:  Just the exhibit that I handed up to the Court.

THE COURT:  Okay.  I'll come back a little early and we can address that, assuming that he'll be here to start at eleven o'clock.

Okay.  Thank you.

(Recess taken.)

THE COURT:  Is Mr. Drury here?

MR. BLENK:  No, Your Honor.

THE COURT:  No, not yet.  Okay.  Well, let's address a few things and then hopefully he'll be here soon.

There was PX 91.  And, Mr. Rudin, you're offering this?

MR. JOEL RUDIN:  Yes, Your Honor.

THE COURT:  Okay.

Mr. Blenk?

MR. BLENK:  Thank you, Your Honor.

Boyd v. County of Erie, 22-CV-519                701

Mr. Drury had been asked at his deposition about this program and he had no recollection of serving in the capacity that's described in this article.  In addition to that, there is -- the program itself seems to be in flux based upon the first paragraph that suggests that the very continuation of it is being contemplated on August 7th, 1974.

I don't think that there is an adequate foundation for this -- to tie this document to the facts in this case.  And I think it would be confusing to put this to the jury when Mr. Drury hasn't confirmed that -- Mr. Drury has no recollection of this program and Mr. Drury has not testified that he was acting in some sort of capacity on the day of January 2nd -- or January 12th, 1976.

I think most notably it's pretty clear that Mr. Drury is not acting in that capacity because he's in person on January 12th, 1976.  This program is describing an on-call program.  I just think it's confusing to go in, and it doesn't have foundation to tie it to the events in this case.

THE COURT:  Okay.  Can you just expound, Mr. Rudin, on the relevancy of this and the basis for allowing this in when it's potentially hearsay?

MR. JOEL RUDIN:  Well, Your Honor, it's based on events at a public meeting that occurred in the presence of the newspaper reporter who then reported it in the newspaper.  So there's no question that these remarks -- I take that back.

Boyd v. County of Erie, 22-CV-519                    702

I guess there could be a question.  But under the ancient documents rule the first -- the last level of hearsay is satisfied and there's really no -- I don't think there's any other level of hearsay because this is being offered for the fact that these remarks were made at a public meeting that was attended, according to this article, by Mr. Drury and Mr. Ranni.  And it's relevant because it shows the relationship of Mr. Drury to the police department.

The article indicates that beginning on July 23rd, 1974 there was a program where Assistant District Attorneys, specifically Mr. Drury and Mr. Ranni, were on call to be consulted with by the police on legal issues.  So it shows the relationship with -- between the District Attorney's Office and the police department, which relates to the evidence we've already introduced about Mr. Cosgrove and his acknowledgement that the District Attorney's Office is in a position of supervising the police.

As I said, it bolsters the testimony of Mr. Drury that he had a close relationship with the police department and could obtain information when he needed it.  It shows the relationship between Mr. Drury and Mr. Ranni, who was, other evidence would show, chief of the felony trial bureau and engaged in egregious misconduct.

And there's other evidence that I will elicit through Mr. Drury about Mr. Drury's closeness with Mr. Ranni, and

Boyd v. County of Erie, 22-CV-519                703

this just ties it all together.  It also shows that at this meeting present was the commissioner of the Buffalo Police Department and the deputy commissioner.

So I just think that for all those reasons this is relevant to show the relationship between the DA's office, Mr. Drury specifically, and the police department, that Mr. Drury is in a position of oversight over the police department, that there's a close relationship with Mr. Ranni, that the District Attorney's Office apparently has assigned Mr. Ranni, notwithstanding his track record, to this position.

And most of this has no second level of hearsay, as I said.  This all occurred in a public forum in the presence of Mr. Drury.  The fact that he testified at his deposition that he doesn't remember it, of course, is the reason why we need the article.

THE COURT:  Has the defense stipulated to the authenticity of the document?

MR. BLENK:  Yes, Your Honor.

THE COURT:  Okay.  So given that and given the age of the document, 1974, then I do find that it falls under the ancient documents exception.  I think that it is relevant somewhat.  I mean, it's a few years before this case, but you can ask him on direct examination about it, and I will receive it into evidence.

Boyd v. County of Erie, 22-CV-519                    704

MR. JOEL RUDIN:  Thank you, Your Honor.

THE COURT:  PX 91 is received.

*(Plaintiff's Exhibit 91 received in evidence.)*

THE COURT:  Mr. Hanft, I had a question for you.  When you were reading the other incidences for Monell, you had given the names of the ADAs for all the cases, and I just want to make sure that all of the names and the ADAs are identified in the actual exhibits that were received in evidence.

MR. HANFT:  And apologies for this, Your Honor.  Not in those exhibits.

We had agreed with the County in the Walker trial that we would say the names to avoid getting into introducing the case card evidence, as Your Honor requested.  The County had confirmed that all of those are the correct names at the Walker trial.  And we do have the case cards for confirmation, if Your Honor would prefer.

THE COURT:  Are you in agreement with this?

MR. BLENK:  I don't recall entering into such a stipulation in connection with the Walker trial.  I don't know that we didn't.  But those names when I was hearing them came as a surprise to me to the extent they weren't in those documents.  I mean, we certainly didn't enter into such a stipulation in this case.

THE COURT:  Do you have an objection -- do you have any

Boyd v. County of Erie, 22-CV-519                705

objection to that?  I mean, it's already been read, but do you have any objection to it?

MR. BLENK:  I don't -- my objection is that they were not reflected in the documents.  We can -- I just ask that we be allowed the opportunity to review the accuracy of the representations that were made to the jury and to note any exceptions and to seek a possible corrective in the event that they are not accurate.

THE COURT:  Okay.  That's fine.  So if you go through it and you agree to it, then we need to place it on the record that you've agreed to the fact that these names, which are -- I mean, maybe some of them are in evidence through other exhibits or other testimony, but that the parties have agreed that the names of the Assistant District Attorneys on each case is admissible, then that's fine.  But if you don't agree to it, then we need to address that.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  And so, moving forward, if there's any evidence that either party is going to present and it hasn't been received in evidence but there is some sort of agreement to it, then you just need to let me know and we can place it on the record before.  Okay?

MR. HANFT:  Yes, Your Honor.  And my apologies.

THE COURT:  As far as -- I think it was -- was Reese the only case that Mr. Drury handled?

Boyd v. County of Erie, 22-CV-519                    706

MR. HANFT:  Yes, Your Honor.

THE COURT:  And I'm assuming, Mr. Rudin, that you are going to question Mr. Drury on Reese?

MR. JOEL RUDIN:  Yes.

THE COURT:  Okay.  So what I would like to do is read a limiting instruction to the jury after those questions, I guess similar to the Monell instruction that I already gave, because that really applied just overall that the jury cannot use this evidence as propensity evidence.  I want to give a more specific instruction as it relates to Mr. Drury.

So when you finish that line of questioning, Mr. Rudin, can you please pause and let me know?  And I will give them the instruction.

MR. JOEL RUDIN:  When I finish?

THE COURT:  When you finish just that line of questioning regarding Reese.

MR. JOEL RUDIN:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Blenk, do you have any objection to me giving some sort of limiting instruction?

MR. BLENK:  No, Your Honor.

THE COURT:  Okay.  Can someone check on Mr. Drury just to see where he might be?

MR. BLENK:  Yes.  Your Honor, I got through to Mr. Drury, and he advised it's going to be about 20 minutes.

THE COURT:  Okay.  Is there anything else that you can

Boyd v. County of Erie, 22-CV-519                707

present?  I mean, I'm not going to force you.  I'm just asking.

MR. FIRSENBAUM:  I mean, Your Honor, we certainly want to be as efficient as possible.  I think starting Mr. Henry's clips and kind of cutting it midway is not how we want to present that testimony to the jury, particularly, because it may not pick up until after the weekend.

THE COURT:  What if we took an early lunch?

MR. FIRSENBAUM:  That totally works.

THE COURT:  Let's just do that.  Because I don't want him to come in and then just break for lunch.  We'll bring the jurors in.

(Jury present.)

THE COURT:  Have a seat, everyone.  Thank you.

Our jurors have returned to the courtroom.

Members of the jury, I apologize, but there has been a bit of a delay.  And so we thought that it might be most efficient to have you break for lunch now, have an early lunch, so that when you come back we can resume with testimony.  So, gosh, it's 11:25.  If you could be back here in an hour, so at 12:25, and we'll resume with the trial, and hopefully we'll be in session the rest of the day.

Okay.  All the recess admonishments apply.  Don't talk to anyone.  Have a good lunch.

(Jury not present.)

Boyd v. County of Erie, 22-CV-519                    708

THE COURT:  Have a seat, everyone.  Before we break for lunch, is there anything that you need me to work on over lunch?

MR. JOEL RUDIN:  Permission granted to have an enjoyable lunch.

THE COURT:  I appreciate that.  I think -- you don't have to tell me now, but maybe you could even e-mail us later tonight, but what you are expecting for next week so that we can plan accordingly.  Okay?  Okay.  Have a good lunch, everyone.

(Recess taken.)

THE COURT:  We can go on the record.  The parties are present.  Mr. Drury is present.

Anything before we bring the jurors out?  No?

MR. BLENK:  No, Your Honor.

THE COURT:  Okay.  Let's bring the jurors in.

(Jury present.)

THE COURT:  Have a seat, everyone.  Thank you.

Our jurors are back from their lunch recess.  We're going to continue with the direct examination of Mr. Drury by Mr. Rudin.

Before we do that, I just want to read you again the instructions that I gave you yesterday that apply to some of Mr. Drury's testimony.  They're important.  So I'm going to reiterate them now.

Boyd v. County of Erie, 22-CV-519                709

You may hear Mr. Drury talk about his understanding of legal principles at or around the time of Mr. Boyd's criminal trial in 1977.  As I said during my preliminary instructions to you, I am in charge of the law, and at the end of this trial I will provide you with the law that you must apply to the facts of this case.  You may, however, consider Mr. Drury's testimony about his understanding of legal principles for the limited purposes of assessing what, if any, policies, customs or practices of the Erie County District Attorney's Office existed at or around the time of Mr. Boyd's criminal trial in 1977 regarding the disclosure of certain evidence to criminal defendants and whether such policies, customs or practices caused a deprivation of Mr. Boyd's right to a fair trial.

As you have heard during the course of the trial, in addition to Mr. Boyd, three other individuals were charged and tried for the Crawford homicide in 1977:  Darryn Gibson, John Walker and Floyd Martin.  Gibson, Walker, Martin and Boyd had separate criminal trials, and you may hear Mr. Drury testify about the evidentiary disclosures that he did or did not make to Mr. Boyd's three codefendants.

This evidence is offered for the purposes of determining what documents were and were not disclosed to Mr. Boyd's attorney in his criminal case, whether or not any withheld documents were favorable, whether any policy, custom

Boyd v. County of Erie, 22-CV-519                                710

or practice of the Erie County District Attorney's Office existed with respect to such disclosures, and whether such policies, customs or practices caused any individual Assistant District Attorneys to violate Mr. Boyd's constitutional rights.

Importantly, however, this evidence should not be considered by you as proof that any particular document was, in fact, withheld from Mr. Boyd.  That is, you should not and you may not consider this evidence to find that because an Assistant District Attorney may have withheld a certain document from one of Mr. Boyd's codefendants, then an Assistant District Attorney must also have withheld that or other documents from Mr. Boyd.

Finally, you may also hear testimony about one of the pieces of evidence that Plaintiff alleges were not disclosed to Mr. Boyd in 1977 in violation of his constitutional right to a fair trial.  Again, normally, such evidence known as hearsay is not permitted.  However, there is an exception to the rule against hearsay where, for example, as here, the evidence is not being offered for its truth but for the purposes of determining whether or not any allegedly withheld documents were favorable, whether any policy, custom or practice of the Erie County District Attorney's Office existed with respect to disclosing such documents, and whether such policies, customs or practices caused any

T. Drury - DX by Mr. Rudin                    711

individual Assistant District Attorney to violate Mr. Boyd's

constitutional rights.

        Thank you.

        Mr. Rudin, you can proceed.

        I would just remind you, Mr. Drury, that you are still

under oath.

        THE WITNESS:  Yes, ma'am.

        MR. JOEL RUDIN:  Thank you, Your Honor.

CONT. DIRECT EXAMINATION

BY MR. JOEL RUDIN:

        Q.   Good afternoon, Mr. Drury.

        A.   Hi.

        Q.   Mr. Drury, we left off yesterday with PX 46 on the

screen.

        If we could put that up again.

        Can you see that in front of you, Mr. Drury?

        A.   Not yet.

        Q.   Do you see it now?

        A.   No.  Do you want to give it to me?  I can read it.

        Q.   Well, I'd rather do it this way, if we can.

        A.   Fine.

        THE COURT:  Mr. Rudin, can you just for now just give

him the actual physical document?  We'll have IT come down to

see if there's something wrong.

        MR. JOEL RUDIN:  We will have to do this with a number

T. Drury - DX by Mr. Rudin                712

documents.

BY MR. JOEL RUDIN:

Q.   Mr. Drury, I'm handing you PX 46.

A.   Thanks.

Q.   You're welcome.

A.   We've been through this already.

Q.   I'm sorry?

A.   I think we've been through this.

Q.   Yeah.  This is the report I showed you yesterday by Detective Delano on February 11th, 1976?

A.   Right.

Q.   And you testified that you have no record or memory of disclosing that to counsel for Mr. Boyd?

A.   Well, it duplicates what Woodruff testified to and told me.  And I would have handed this over.

Q.   Do you have any specific memory of handing it over?

A.   Specific memory now?  We've been through this. Fifty years later, no.

Q.   And you have no record of handing it over?

A.   No.  I would have -- would have handed it over though.

Q.   And you have no notes in your file of handing it over?

A.   No.  I didn't do everything.

Q.   All right.

T. Drury - DX by Mr. Rudin                                      713

MR. JOEL RUDIN:  May we have PX 47?

BY MR. JOEL RUDIN:

Q.    (No question.)

A.    This relates to Andre Hough.

Q.    Well, Mr. Drury, this is a report dated February 11th, this one by a different detective, Michael Guadagno?

A.    Yeah.

Q.    It concerns the same events of that day at your office?

A.    Yes.

Q.    Do you have any record or recollection of having turned over that document to counsel for Mr. Boyd?

A.    No, but it relates to testimony by Andre Hough and Tyrone Woodruff, and I would have handed it over.

Q.    In your view does that document contain any information favorable to Mr. Boyd within the meaning of *Brady v. Maryland*?

A.    No.

Q.    And is that view consistent with the policies and practices of the Erie County DA's office in 1977?

A.    Policies and practices was to turn over favorable -- favorable information, and it was done.

Q.    And under the policies and practices -- I'm sorry. Finish your answer.

MR. BLENK:  Mr. Drury -- I'm not sure Mr. Drury is

T. Drury - DX by Mr. Rudin                    714

aware that the document has two sides, and I don't think he's

been given the opportunity --

THE WITNESS:  Oh, yeah.  Let me look at the back.

THE COURT:  Okay.  We're going to give Mr. Drury a

minute to look at the document.  And someone is here from IT

that's just going to come up and see if we can fix the

monitor.

MR. BLENK:  Thank you, Your Honor.

THE WITNESS:  It was turned off.  This guy is a genius.

Right.  Testimony about Andre Hough and Woodruff and

how they -- what statements they made, which is obviously the

same as what they testified to.

BY MR. JOEL RUDIN:

Q.    And your view in 1977 that this was not favorable

was informed by the training and instruction that you had

received at the Erie County DA's office?

A.    It was not favorable to the defendant, no.

Q.    And that was based upon your understanding of the

principles of Brady that you had been instructed on by your

office, correct?

A.    It's not that difficult.  If it's favorable, you

turn it over.  If it's not favorable, you don't turn it over.

This was not favorable, but would have been turned over anyway

because it duplicates -- it talks about their testimony.

Q.    And there was no training or instruction or policy

T. Drury - DX by Mr. Rudin                                715

or practice at the Erie County DA's office in 1977 that required you to turn over that document?

A.   Why would I turn over something that was not favorable?

Q.   And your view of what was favorable was influenced by the training and instruction you received, correct?

A.   It's not subtle.  If it's favorable, you turn it over.  If you don't -- if it isn't favorable, you don't turn it over.  This duplicated statements and testimony.  So I turned it over.

MR. JOEL RUDIN:  May we have PX 48, please?  Is the screen working now?

THE COURT:  It's working.

THE WITNESS:  It's working now.  Here.  You want this?

BY MR. JOEL RUDIN:

Q.   Yes.

A.   This is the handwritten statement -- I don't know if I made it or somebody else.  Woodruff gave another statement just outside the grand jury whereby he repeated much of what he said, much of what he earlier said.

MR. JOEL RUDIN:  Did you get that?  Did the reporter get that?

COURT REPORTER:  Yes, I did.

THE WITNESS:  Pardon?

BY MR. JOEL RUDIN:

T. Drury - DX by Mr. Rudin                     716

Q.   I'm just asking the court reporter because you weren't -- if you could try to speak up.

A.   Right.

Q.   And you knew about this handwritten statement on February 11th, correct?

A.   Did I -- I don't know who took it.  I don't think it's my handwriting.

Q.   Well, you were there when it was taken, right?

A.   Pardon?

Q.   You were there when it was taken?

A.   I was there.  I think so, yes.

Q.   And it's signed at the bottom by Tyrone Woodruff?

A.   Yes.

Q.   And it was written by a police officer or by someone other than Mr. Woodruff?

A.   I don't know.

Q.   Do you have any record or recollection of disclosing that handwritten statement to counsel for Darryl Boyd?

A.   Do I have a recollection or --

Q.   A recollection of handing that -- a copy of that statement to counsel for Darryl Boyd?

A.   We've been through this time and time again.  In fifty years, no.

Q.   And you have no record of turning that statement over to counsel for Mr. Boyd?

T. Drury - DX by Mr. Rudin                717

A.    I would have turned it over.  It's his statement. It's Darryl -- it's Tyrone Woodruff's statement.

Q.    You would have turned it over, but you made no record in the court transcript of turning it over?

A.    No.  It's Rosario.  You -- these are things you just turn right over.

Q.    You made a record of 25 pieces of Rosario material that you turned over to the defense, but not this one?

A.    No.  It's obvious it would have been turned over. It's his statement.  He's a witness.

MR. JOEL RUDIN:  May we put up PX 293, please?

THE COURT:  Mr. Drury, can you please pull the microphone a little closer to you?

THE WITNESS:  Sure.  I'll try.

THE COURT:  Thank you.

BY MR. JOEL RUDIN:

Q.    Do you see that document on your screen, Mr. Drury?

A.    Not really.

Q.    It's enlarged for you now.  That is a P-73 dated January 8th, 1976, and it says dictated by Detective Michael Guadagno?

A.    Yep.

Q.    Why don't you read it to yourself.

A.    It's about an interview of Darryl Boyd's mother.

Q.    Right.  Now, Darryl Boyd's mother did not testify at

T. Drury - DX by Mr. Rudin                    718

the trial; is that correct?

A.   No, she didn't.

Q.   Did you turn over this document to counsel for Darryl Boyd?

A.   I don't know.

Q.   Do you have any record of turning it over?

A.   No record.  It's -- it's certainly not favorable.

Q.   And is that view consistent with your training at the Erie County DA's office?

A.   Right.  I was told to turn over favorable, and that's where it ended.

Q.   All right.  Why don't we -- I'm finished with that document.  I'm going to ask you a series of questions and then show you PX 54.

Do you recall that in Mr. Boyd's trial that Andre Hough testified that he was born in November 1960?

A.   I assume so.

Q.   And that when you met with him in January 1976 he was just -- he had just turned 15 years of age?

A.   Who are we talking about?

Q.   Andre Hough.

A.   Andre was young.  He was 15.

MR. JOEL RUDIN:  All right.  May we have PX 276(a) on the screen, please?

BY MR. JOEL RUDIN:

T. Drury - DX by Mr. Rudin                    719

Q.    This is a picture of Andre Hough at that time.  Do you recognize that picture?

A.    No.

Q.    Is that consistent with the 15-year-old you recall speaking with?

A.    I just remember he was 15, sort of short.

Q.    Do you remember he was very young-looking?

A.    Yeah.

Q.    Do you remember he was in the 8th grade?

A.    I don't remember that.

Q.    Do you recall that he testified at Mr. Boyd's trial that initially he told the police that he knew nothing about the crime?

A.    Do I remember that now or then?  Do I remember it -- what's the question?

Q.    Do you recall that Mr. Hough initially testified that he told police that he knew nothing about the crime?

A.    Well, yeah, because I went through the various paperwork that's been -- that I had to go through.

Q.    I'm sorry.  Can you repeat that, please?

A.    I went through the various paperwork that I have had to go through to testify today.

Q.    And you saw that he testified at Mr. Boyd's trial that initially he told the police he knew nothing about the crime?

T. Drury - DX by Mr. Rudin                720

A.    That's what the papers that -- the information is, yes.

Q.    And then he testified that he had taken a lie detector test and that police told him he had passed but that the test didn't mean anything?  Do you recall that he gave that testimony?

A.    Do I recall -- yeah.  From reading the paperwork, yes.

Q.    By "the paperwork," you mean the trial transcript?

A.    I don't know if it's in the trial transcript.

MR. JOEL RUDIN:  Well, why don't we show to the witness PX 74, pages 409, line 10 to 410, line 12.

BY MR. JOEL RUDIN:

Q.    See if that refreshes your recollection that he gave that testimony at the trial.

A.    That's what it says.

Q.    That's what it says?

A.    Yeah.

Q.    Do you recall that Mr. Hough testified that even though he had passed the lie detector test the police accused him of lying and told him that he would be prosecuted for the crime unless he cooperated against the other boys?

A.    That's what -- that's what the testimony is, yes.

Q.    And then he testified he gave the police a second story, right?

T. Drury - DX by Mr. Rudin                    721

A.   Right.

Q.   And all this happened while you were there, correct?

A.   Where?

Q.   This is February 11th, 1976 -- withdrawn.  That's withdrawn.

Let me show you PX 54.

A.   Those are my notes, my handwriting.

Q.   These are your notes.  And these notes indicate that they were written down on 2/13?

A.   That's what it says.

Q.   February 13th, 1976?

A.   Right.

Q.   These were your notes that you took in connection with this case?

A.   Yes.

MR. JOEL RUDIN:  Your Honor, I would offer this into evidence as PX 54.

THE COURT:  Mr. Blenk?

MR. BLENK:  I just -- Your Honor, I would just object to the extent that they are not really legible without being explained by Mr. Drury.

MR. JOEL RUDIN:  Well, that's what I'm going to do next.

THE COURT:  Okay.  Overruled.

PX 54 is received.

T. Drury - DX by Mr. Rudin                                        722

*(Plaintiff's Exhibit 54 received in evidence.)*

BY MR. JOEL RUDIN:

Q.   Do you see where you wrote down "Andre" in the left-hand column?

A.   Yeah, yes.

Q.   And it says Andre Hough and you wrote the word "deception," and then you wrote, didn't want to allow us to run it again to check after gave us a story.

A.   That's what it says, yes.

Q.   And then you say two lines down on the 12th, after test given statement wanted to run him a second time.  He wouldn't -- he wouldn't.

Did I read that correctly?  That's your handwriting.  If I made a mistake, please correct me.

A.   No.  That's right.

Q.   So, as your notes indicate, you found out that after Mr. Hough changed his story and gave a second story he refused to take another lie detector test?

A.   That's what it says.

Q.   In other words, when he said he knew nothing about the crime he was told he had passed, but after he changed his story he refused to take another test?

A.   That's what it says.

Q.   Meanwhile, you had information that John Walker had volunteered to be polygraphed, right?

T. Drury - DX by Mr. Rudin                          723

A.    I don't remember.

MR. JOEL RUDIN:  Can we show the witness PX 26 at page 2?

BY MR. JOEL RUDIN:

Q.    Do you see at the very top of page 2 it says, Are you willing to take a lie detector test about this case, and he said yes?

A.    He said yes apparently.  If that's his statement, yes.

Q.    And do you recall that Mr. Boyd in his signed sworn statement also agreed to take a lie detector test?

A.    I don't remember.

MR. JOEL RUDIN:  May we show PX 25 on the second page, the sixth question?

BY MR. JOEL RUDIN:

Q.    Question:  Will you submit to a polygraph test as to the truth of this statement?

Answer:  Yes.

A.    Yes.

MR. JOEL RUDIN:  You can take that off.

THE WITNESS:  Lie detector tests are --

BY MR. JOEL RUDIN:

Q.    Mr. Drury, there's no question pending.

A.    -- unreliable.

THE COURT:  Mr. Drury, Mr. Drury, you have to just

T. Drury - DX by Mr. Rudin                                     724

answer the question.

THE WITNESS:  All right.

THE COURT:  So let's let Mr. Rudin ask another question.

THE WITNESS:  All right.

BY MR. JOEL RUDIN:

Q.  Mr. Drury, you knew back in 1976 that one of the reasons that police detectives ask witnesses to take polygraphs is because they believed that if a witness refused to take a polygraph it might be an indication the witness was not being truthful?

A.  Did I know then?

Q.  Did you know then.

A.  No.  I stayed away from lie detector tests because they're not reliable and they're not admissible in court.

Q.  Mr. Drury, do you recall testifying at your deposition a little less than two years ago -- page 169, line 19 to 170, line 10 -- that you knew that one of the reasons that police detectives asked witnesses to take polygraphs is because they believed that if a witness refused it might be an indication the witness was not being truthful?

A.  Did I say that?

Q.  I'm sorry?

A.  Did I say that?

Q.  Yes.

T. Drury - DX by Mr. Rudin                725

A.   I must have known it then.

Q.   So that's -- your answer is yes, that's what you testified to?

A.   Yes.

Q.   So you did know that then?

A.   I knew it, but I stayed away from these lie detector tests because they're not reliable.

Q.   You knew that police detectives understood that the request to a witness to take a polygraph and the witness's response was indicative of whether or not the witness was being honest and -- honest and truthful or lying because he was afraid to take the test?

A.   Yeah.

Q.   Yes.  You answered yes, right?

A.   They may.  I don't know.

Q.   Well, you just said you testified two years ago that you did understand that that was the belief of the police, right?

A.   Evidently they did, but it's not -- nothing that I did.  Nothing that I would be involved with.

Q.   You didn't believe back in 1976 that asking a witness to take a polygraph test and the witness's response might be an indication of whether or not the witness was being honest or dishonest?

A.   It's based on a lie detector test which are not

T. Drury - DX by Mr. Rudin                    726

admissible in court because they are unreliable.

Q.   That's not my question, Mr. Drury.  My question is whether or not in 1976, like the police, you believed that the willingness of a witness to take a lie detector test was indicative of whether or not the witness was telling the truth.

A.   I avoid the whole subject of lie detector tests because they are not admissible in court and because they are unreliable.

Q.   Mr. Drury --

A.   Whether somebody wants to take one or the police threaten them with it I don't -- that's their business.

Q.   Mr. Drury, do you recall your deposition two years ago at page 170, line 12 to 21 that you testified that you believed that the refusal of a witness to take a lie detector test was an indication of whether or not the witness was being truthful?

A.   No.  I may have said it, but is that -- you're talking about an unreliable device the police may or may not use and -- no.  I stayed away from it.

MR. JOEL RUDIN:  Your Honor, may we play the clip 170, 12 to 21?

THE COURT:  Mr. Blenk?

MR. BLENK:  No objection, Your Honor.

THE COURT:  Are you offering that portion as well?

T. Drury - DX by Mr. Rudin                727

MR. JOEL RUDIN:  Yes, Your Honor.  Thank you.

THE COURT:  That portion is received and can be published to the jury.

*(Above-mentioned Portion of Plaintiff's Exhibit 245 received in evidence.)*

*(Video played.)*

BY MR. JOEL RUDIN:

Q.    Back when you were handling the prosecution of the four defendants for the Crawford homicide you did not disclose to any of the defendants that any prosecution witness had declined to take a polygraph test; isn't that right?

A.    I didn't use it because it's not -- it's unreliable.

Q.    That's not my question, Mr. Drury.

A.    I wouldn't have questioned them about it.

Q.    My question is whether or not you disclosed to any of the four defendants in the Crawford prosecutions that any prosecution witness had declined to take a polygraph test.

A.    No, no.

Q.    You did not disclose?

A.    I wouldn't have disclosed it, and I didn't.

Q.    And was that consistent with the policies and practices of the Erie County DA's office?

A.    I'm sure I was never told about polygraphs while at the DA's office.

Q.    Were you told at the DA's office that if a witness

T. Drury - DX by Mr. Rudin    728

refused to take a polygraph test that that had to be disclosed as favorable under Brady?

A.    Never came up because nobody -- no prosecutor would be involved with a lie detector test.

Q.    No prosecutor was ever involved in a case where the police asked the witness to take a lie detector test?

MR. BLENK:  Objection, Your Honor.  Calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  Never came up because it's something that we didn't use.  It wasn't used by the prosecutors.

BY MR. JOEL RUDIN:

Q.    Mr. Drury, in this case we've already established that the police asked John Walker to take a polygraph, right?

A.    Yes.

Q.    And they asked Darryl Boyd to take a polygraph, right?

A.    Yes.

Q.    And they asked Mr. Hough to take a polygraph, right?

A.    Yes, I think.

Q.    And he passed the polygraph, and then when he changed his story they asked him to take another polygraph, right?

A.    Yes, I guess.

Q.    So it happened four times in this case, and it never

happened in any other case?

A.    I've never heard of it.  Nobody would get near those polygraphs because they were not admissible in court.

Q.    And you did not disclose PX 54, your notes indicating that Mr. Hough had refused to take a polygraph to counsel for Mr. Boyd either, did you?

A.    Yeah, yes, I think.

Q.    Yes, you did not?

A.    I did not.

Q.    Disclose your notes?

A.    If it says it, it says it, but I didn't.

Q.    Did you disclose your notes to counsel for Mr. Boyd indicating that Mr. Hough had refused to take a second polygraph?

A.    I told you.  We don't get involved with polygraphs because they are unreliable.  I'm not going to start giving notes that deal with polygraphs to the defense counsel.

Q.    Now, we have reviewed two police reports from February 11th indicating that Andre Hough before testifying in the grand jury recanted his story implicating Mr. Boyd.  Do you recall that?

A.    Yes.

Q.    And then PX 46, that's the statement by Detective Delano, indicates that Andre was advised by Delano that he was lying and he had better tell the truth, right?

T. Drury - DX by Mr. Rudin                      730

A.   That's Delano's report.

Q.   And then the report indicates that Andre then changed his story and admitted that he was lying to the -- admitted that he was lying to the police -- I'm sorry. Withdrawn.

The report indicates that Andre changed his story and admitted he was lying, and then retracted that statement and went back to an earlier version of his story?

A.   It's called a recantation.

Q.   He recanted -- he recanted his recantation?

A.   Yes.

Q.   And that you then advised him that you would keep his statements confidential?

A.   Yes.  That's what the report says.

Q.   So you were there the whole time of the interaction with Mr. Hough?

A.   I don't remember.

Q.   Well, you were there when his mother was there, right?

A.   I don't remember.

Q.   Well, weren't you there when his mother left, said she was leaving based on her understanding that the detectives had promised to take Andre home?

A.   That's what the report says.

Q.   Well, do you have any reason to think the report is

T. Drury - DX by Mr. Rudin                          731

inaccurate?

A.    No.

Q.    You didn't ask the police to correct the report, did you?

A.    What's the issue here?

Q.    Mr. Drury, the issue is not the issue.  The issue is that you need to answer my question.

A.    All right.  Put the question.

Q.    You were there the entire time, from the time that Mr. Hough got there until the time that his mother left, until the time that he recanted his recantation, until the time that he was put in the grand jury, right?

A.    If it says so, but I don't remember.

Q.    And you did not ask the police to correct anything in these two reports, the February 11th reports?

A.    No.  I don't remember the reports.  I don't remember being there.  If you say so, I'll accept that, but I don't remember -- I don't remember that.

Q.    Well, when these reports came to your attention when you saw these reports for the first time back in 1976 or 1977 the events were fresh in your mind, right?

A.    Yes.

Q.    And so if there was something inaccurate in those reports about your presence during the recantation of Andre Hough and the events that led him to recant his recantation

T. Drury - DX by Mr. Rudin                    732

you could have asked the police to correct their reports,
right?

A.    If it was meaningful.  If it was something relevant.

Q.    You didn't think this was relevant?

A.    It certainly was.

Q.    So you didn't ask them to correct it, right?

A.    No.

Q.    So it's fair to infer that you were there the entire
time that Andre Hough was there until he went into the grand
jury?

A.    If it was relevant to something or other.  Was I
there when he was recanting his recantation?  I don't
remember.

Q.    Now --

A.    You know -- never mind.

Q.    You were there when Detective Delano told
15-year-old Andre that he had better tell the truth, right?

A.    If -- that's what the report does say, yes.

Q.    He accused this boy of lying and told him that he
had better tell the truth?

A.    That's what the report says.

Q.    Did he say what could happen to Andre if he didn't
tell the truth?

A.    I don't remember.

Q.    You knew Andre had previously signed a sworn

T. Drury - DX by Mr. Rudin    733

statement -- two sworn statements that had information accusing Darryl Boyd of various acts that you considered relevant to the case, right?

A.    Yes.

Q.    And you knew those statements had been taken under oath?

A.    Yes.

Q.    And you knew that the reason that the police would ask a witness to sign something under oath is so then the statement could be used to threaten the witness with perjury if the witness tried to change his story?

A.    Conceivably.

Q.    You handled many, many cases involving the Buffalo Police Department, right?

A.    Yes.

Q.    And many of them were homicides?

A.    Yes.

Q.    And many of them were cases where they took statements under oath at the homicide office from various witnesses?

A.    Yes.

Q.    And from time to time when a witness tried to deviate or recant a statement -- deviate from or recant a statement you would tell the witness that the witness could be prosecuted for perjury if he lied?

T. Drury - DX by Mr. Rudin                                   734

MR. BLENK:  Objection, Your Honor.

Can we approach?

THE COURT:  Yes.

(At bench:)

MR. BLENK:  Your Honor, I don't think this line of questioning is relevant to the case, and it's prejudicial. This is not conduct that's at issue in this case.  A threat of perjury is not within the scope of a Brady violation.  And for him to be going down these separate paths about general practices, including those relating to dealing with recanting witnesses per se as distinct from how it deals with this case, is irrelevant and prejudicial.

THE COURT:  Well, this is -- it's my understanding this is about the alleged course of tactics used against Andre Hough, which is the alleged -- some of the alleged Brady material.  So it's very relevant.

MR. BLENK:  The documents that he's talking about that were capturing the sum and substance of these exchanges were produced by Mr. Drury in the Gibson trial to the other side as Brady evidence.  I mean, it's the least probative theory -- it's -- the least plausible of all the policy theories are the ones that flow through the very same evidence that was produced in the preceding trial.  And so it has relatively low probative value, and we shouldn't be going down this path.

T. Drury - DX by Mr. Rudin                    735

THE COURT:  Is it your position that it was disclosed or not disclosed to Mr. Boyd's attorney?

MR. JOEL RUDIN:  Not disclosed.  And there are significances that -- I'm basically finished with that line of questioning.  I'm going to ask him to conclude that because that was his practice -- well, he hasn't answered because I haven't totally finished, but that that was his practice, so he did it in this case because he testified --

MS. SILOS:  And he didn't tell that to --

MR. JOEL RUDIN:  Right.  Didn't disclose it.  And it's also relevant to apportionment, of course.

MS. SILOS:  Mr. Blenk's argument --

(Court reporter interruption.)

MS. SILOS:  Mr. Blenk's point would go to the weight of the evidence, not to admissibility.

THE COURT:  Overruled.

MR. BLENK:  Thank you, Your Honor.

(Open court:)

MR. JOEL RUDIN:  Your Honor, may we have the previous question and answer read back?

(Record read.)

THE WITNESS:  Yeah.  What's your question?

BY MR. JOEL RUDIN:

Q.   Did you have any experience prior to January of 1976 where you were speaking to a witness who would sign a

T. Drury - DX by Mr. Rudin                    736

statement under oath and the witness was trying to change or
retract a statement and you advised the witness that if the
witness lied he could be prosecuted for perjury?

A.    Do I remember actually doing that?

Q.    Did you ever do that?

A.    I don't remember.

Q.    What did you find Detective Delano to mean when he
told Andre Hough that he was lying and he had better tell the
truth?  Did you understand him to mean that Andre could be
prosecuted for perjury?

A.    I don't remember that.  Do you want me to assume
that he said that?

Q.    I would like you to say what you understood at the
time, whether that was an inference.

A.    I don't know if I was there.  I don't remember it.

Q.    Well, now you don't know if you were there?

A.    I told you.  It's been fifty years.  I don't
remember that.

Q.    Did Detective Delano tell Andre that he could be
prosecuted for perjury?

A.    I don't know.

Q.    If he did, would you agree that would be coercive?

MR. BLENK:  Objection, Your Honor.  Hypothetical.

THE WITNESS:  It's -- look at, everything --

THE COURT:  Hold on one second.

T. Drury - DX by Mr. Rudin                737

Overruled.

Go ahead.  You can answer the question.

THE WITNESS:  Everything that happens you deem to be coercive.  I mean, telling somebody that they could be perjuring themselves is coercive?  It isn't.

BY MR. JOEL RUDIN:

Q.   Could be prosecuted for perjury, is that coercive?

A.   No.

Q.   Mr. Drury, did Detective Delano tell Andre that if he continued to recant his earlier sworn statement he could be prosecuted for the murder of William Crawford?

A.   Look at, I don't remember.

Q.   Well, you do remember that --

A.   But if he did, it's not coercive.

Q.   Even if he did it's not coercive?

A.   No.

Q.   Do you recall that Andre testified at trial that he was told by the police that after he denied any knowledge of the homicide or Darryl Boyd's alleged involvement in the homicide that he could be arrested himself for the murder?

A.   What -- do I remember that?  No.

Q.   Do you remember we discussed that a few minutes ago that that was his trial testimony?

A.   Andre's?

Q.   Yeah.

T. Drury - DX by Mr. Rudin                    738

A.   Well, then it happened.

Q.   What I'm asking you is on February 11th, 1976 when the detectives in your presence told Andre that he was lying and better tell the truth, was there any discussion that if he didn't tell the truth that he could be arrested and prosecuted for murder?

A.   I don't remember, but -- if you want me to comment on it I will, but that's because -- well, what the report states.

Q.   Well, I'm trying to get an understanding, Mr. Drury, of what the detectives said to this boy when they told him he had better tell the truth, better tell the truth or what. What would happen?

MR. BLENK:  Objection, Your Honor.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Yeah.  And?

BY MR. JOEL RUDIN:

Q.   Well, what did they tell him?

A.   Probably because otherwise --

MR. BLENK:  Objection, Your Honor.  He's making an assumption, and I'd ask that Mr. Drury be advised not to make assumptions in his answer.

And I object to Mr. Rudin's badgering when Mr. Drury has already testified that he has no independent recollection of the events at issue.

T. Drury - DX by Mr. Rudin                739

MR. JOEL RUDIN:  He thinks something probably happened. I think that has evidentiary value.

THE WITNESS:  What did you say?

THE COURT:  Okay.  The objection is overruled.

Can you ask a new question, please?  You can ask the same question before, but if you could ask it again.

BY MR. JOEL RUDIN:

Q.   Do you consider it likely, Mr. Drury, that when Detective Delano told Andre Hough that he was lying and he had better tell the truth that he went on to say or else you could be prosecuted for the murder?

A.   What's the report state?  I have no recollection. You know that.

Q.   The report doesn't comment on that.  I'm asking you what happened.

A.   I don't know.

Q.   Well, what --

A.   What do I think?

Q.   I will withdraw that.

Now, after the police told Andre that he was lying and he had better tell the truth, you advised Andre that he could be prosecuted for perjury, didn't you?

A.   Did I?

Q.   Yes.

A.   I don't remember if I was there.

T. Drury - DX by Mr. Rudin                 740

Q.    Mr. Drury, do you recall --

A.    Does the report state I was there?

Q.    Well, we've been through that.  The report does say you were there, right?  We just went through that.

A.    If the report said I was there, I was there.

Q.    So while you were there and while you were in the presence of this 15-year-old with two police detectives at your office, did you advise Andre that if he did not recant his recantation he could be prosecuted for perjury?

A.    If the report stated I did, then I did.

Q.    I'm not asking what the report said.  I'm asking what you recall doing.

A.    Look at, we've been through this.  I have no recollection of something that's fifty years -- happened fifty years ago.

Q.    Do you recall testifying at your deposition two years ago -- page 381, lines 10 to 20 -- that you assumed that you did advise him he could be prosecuted for perjury?

A.    I assume.  That's not testimony.

Q.    Based upon your practice at the DA's office you assumed that you would have advised him he could be prosecuted for perjury, right?

A.    Probably, yes.

Q.    And you have no record or no recollection of ever disclosing that as favorable evidence to Mr. Boyd's counsel,

T. Drury - DX by Mr. Rudin                                 741

correct?

A.   Oh, I think this was handed over to Mr. Boyd, yes. Hulnick was the lawyer.  I would have handed this over because it related to Andre's testimony.

Q.   So now you recall turning it over, even though you don't recall that it happened?  You assume that it happened, but you don't recall turning it over?

A.   I would have.  I'm not hiding things.

Q.   Mr. Drury, did you make any record of disclosing to Mark Hulnick -- I withdraw the partial question.

Mr. Drury, do you have any record of disclosing to Mark Hulnick, counsel for Mr. Boyd, that you warned Andre Hough that he could be prosecuted for perjury?

A.   There's no record -- if there's no record, there's no record.

Q.   You made no record of it in the court transcript, right?

A.   Then it wasn't there.  I would have turned it over.

Q.   You made no record of it in the court transcript, you made no record of it in any notes that you took for your own file, you -- there's no correspondence to show it, there's absolutely no record?  All we have is your word all these years later; is that correct?

A.   You better accept my word because that's what happened.

T. Drury - DX by Mr. Rudin                    742

MR. JOEL RUDIN:  Okay.  Can we put up the picture of Andre Hough again, 276(a)?

BY MR. JOEL RUDIN:

Q.   This is the young man who police accused of lying and that he had better tell the truth and that you advised that he could be prosecuted for perjury, you and two detectives at the DA's office?  This is what happened, right?

MR. BLENK:  Objection, Your Honor.  Misstates prior testimony.

THE WITNESS:  According to the report, yes.

THE COURT:  Hold on one second.  Okay?  I need to just rule on the objection.

Overruled.

But can counsel approach, please?

(At bench:)

THE COURT:  I'm going to ask you not to put your basis -- the basis of your objection.  Don't say it in front of the witness and the jurors.

MR. BLENK:  Understood.

THE COURT:  So if I need more information from you I will ask or I will ask you to approach.  Okay?

MR. BLENK:  Understood.

THE COURT:  Okay.

MR. BLENK:  I think in this instance he's built in the premise that Mr. Drury has testified to the fact that he did,

T. Drury - DX by Mr. Rudin                    743

in fact, threaten Mr. Hough with perjury, which is not a fact in evidence.  And it is -- it's a confusing and compound question that -- when he's really just asking for an identification of Mr. Hough.

Obviously, I have no objection to him closing with the idea that this is the person you are talking about, but the idea that he's going to build in the premise and establish that --

MR. JOEL RUDIN:  I will withdraw the question.

THE COURT:  The objection is sustained.  I think you can ask the question in a different way.

Okay.  Thank you.

MR. BLENK:  Thank you, Your Honor.

(Open court:)

MR. JOEL RUDIN:  Your Honor, I withdraw that question.

BY MR. JOEL RUDIN:

Q.   Very simply, Mr. Drury, this is the 15-year-old boy who was in the room with you and two police detectives at the DA's office who recanted, was advised he better recant his recantation, recanted his recantation, and then you put immediately into the grand jury to lock in his testimony; is that right?

A.   Yes.

Q.   All right.  We are finished with this exhibit.

Now, I want to turn to a somewhat different area, the

T. Drury - DX by Mr. Rudin                744

police materials that concerned Larry Watson and Jerome Boyd.

Let me show you PX 53.  This is just to the witness.

Mr. Drury, do you have that in front of you?

A.    Yes.

Q.    And do you see that on the upper left-hand column it says 2/11, February 11th?

A.    Right.

Q.    And you recognize this as your handwriting?

A.    Yes.

Q.    And this is a handwritten -- a set of handwritten notes that you took on February 11th?

A.    Yes.

MR. JOEL RUDIN:  Your Honor, I offer this into evidence.

THE COURT:  Mr. Blenk?

MR. BLENK:  No objection, Your Honor.

THE WITNESS:  It's hardly legible, but --

THE COURT:  PX 53 is received.

(Plaintiff's Exhibit 53 received in evidence.)

BY MR. JOEL RUDIN:

Q.    Well, hardly legible because it's too small?  You can't read your own handwriting?

A.    I can't read my own handwriting.

Q.    Well, we all suffer from that problem, but let's do the best you can.

Q.   Do you see that, first of all, the upper left it says February 11th?

A.   Yes.

Q.   And then you wrote on the right side Martin said something about a pot party?

A.   Were at a pot party.

Q.   All right.  And then it says was a Boyd that came in, right?

A.   Yes.

Q.   Decedent flashed a roll to barmaid?

A.   Yes.

Q.   And that Boyd is a reference to Jerome Boyd, correct?

A.   Yes.

Q.   And that maybe Watkins talked to Boyd and he set it up, right?

A.   Yes.

Q.   And when you said Watkins you meant Larry Watson?

A.   Yes.

Q.   And then you wrote white woman who was -- can you read that?

A.   At Glenny.

Q.   I'm sorry?

A.   At Glenny.

Q.   White woman who was at Glenny said both Watkins

T. Drury - DX by Mr. Rudin    746

left?

A.    With decedent.

Q.    With decedent.  So Watkins meaning Watson went out with the -- with Crawford, the decedent.  And then what does it say?

A.    Everybody else said only Mr. Watkins left and barmaid said he looked disturbed when he came back.

Q.    The barmaid was Debbie Jeffrey?

A.    Yes.

Q.    That Watkins left with the decedent and then he came back and he looked disturbed?

A.    Yes.

Q.    And those were notes you took from the police documents?

A.    Evidently -- I don't know.

Q.    Well, so then the next line you wrote dumb luck?

A.    No.  Dumb break.

Q.    Dumb break.

A.    Or a setup.

Q.    Or a setup and Tony is lying?

A.    Right.

Q.    Tony being Tony Woodruff?

A.    Right.

Q.    So this is a reference to the possibility that Watson and/or Jerome Boyd, possibly the two of them together,

T. Drury - DX by Mr. Rudin                747

perpetrated the homicide; is that right?

A.    Could have.

Q.    Could have.  That's right.  And these -- this page of notes are notes that you took on February 11th, right?

A.    Yes.

Q.    The day you presented the case to the grand jury?

A.    If that's the date.

Q.    And this page of notes is one of dozens and dozens of pages of notes that you took in connection with this case, right?

A.    Yes.

Q.    And those notes are in the -- in the prosecution file, right?

A.    Yes.

Q.    And you took notes about everything, right?  You were very careful to take notes?

A.    I took notes.

Q.    You took notes about meetings that you set up with the witnesses, meetings you had with witnesses, right?

A.    Pardon?

Q.    You took notes about meetings you had with witnesses?

A.    Probably.

Q.    You took notes about -- to remind yourself to set up meetings with witnesses?

T. Drury - DX by Mr. Rudin                748

A.    I don't remember.

Q.    Well, you took notes about things that you wanted to remind yourself to do?

A.    Yes.

Q.    You took notes from police reports to make a record of what you considered to be significant?

A.    Yes.

Q.    You took notes about your trial strategy?

A.    Probably.

Q.    You took notes about everything except Brady material that you turned over off the record, right?  Brady material that you turned over off the record you were careful not to make any notes?

A.    Yeah.  I just handed it.  I would hand it to Hulnick.

Q.    Now, on February 11th, after you wrote that Tony is lying, you put Tony in the grand jury, right?

A.    Yeah, yes.

Q.    And you put Andre Hough in the grand jury?

A.    That's right.

Q.    The same day that Hough recanted you put him in the grand jury too?

A.    He recanted on his recantation.

Q.    And then you called at trial -- a little over a year and a half later at Mr. Boyd's trial you called Larry Watson

T. Drury - DX by Mr. Rudin                                749

to testify, right?

A.    Yes.

Q.    And you called him as a prosecution witness, right?

A.    Yes, yes.

Q.    And you didn't disclose any of the police reports that suggested that Larry Watson may have been involved in the crime?

A.    I'm sure I did.

Q.    Well, do you recall Mr. Hulnick cross examining Larry Watson about any of the police reports that contained the information that caused the police to suspect that Larry Watson was involved in the crime?

A.    If Hulnick decided to use it or not, that's his business.

Q.    So you think that Mark Hulnick just decided to sit on all those reports and not use them?

A.    Well, he had them.  I don't know what -- I don't know what he did or what his plan was.

Q.    Now, did you ever find out if the police even interviewed Jerome Boyd?

A.    No.

Q.    You never tried to find out if they interviewed him?

A.    The proof as to Jerome Boyd was one witness said he was in and out of the bar.

Q.    There were two witnesses, weren't there, who said he

750

was there late at night?

A.   I think there was one.

Q.   Francis Kalb, right?

A.   Yes, I think so.

Q.   And Theotis Love?

A.   Right.

Q.   Two witnesses said he was in the bar that night?

A.   In and out.

Q.   And Larry Watson in his statement said that a black man came out of the bar right behind him, right?

A.   Right.

Q.   And you knew Jerome Boyd had a record for assault?

A.   Do you think Jerome Boyd actually committed this crime and not the four --

Q.   According to you, Mr. Drury, you thought he did it with Larry Watson?  Isn't that what you wrote in your notes?

A.   That's what I wrote in my notes.  That's a possibility.

Q.   Right.  Did you ever ask the police to interview Jerome Boyd to explore that possibility?

A.   Did I ever ask them?  I don't remember.

Q.   Did you ever ask anyone in your office to interview Jerome Boyd?

A.   I don't remember.

Q.   Did you try and interview him yourself?

T. Drury - DX by Mr. Rudin                751

A.    I don't think he was a serious alternative to what we had.

Q.    Did you ever ask the police?

A.    One of the participants told me that the crime was committed by he and his pals.

Q.    You are saying that Mr. Woodruff after he was threatened with a murder prosecution and given immunity told you that the crime was committed by him and his pals and, therefore, you no longer had any obligation to follow up the leads that it was Jerome Boyd?

A.    What leads?  That he was in the bar and left? That's a lead?

Q.    Mr. Drury, did you ever ask Larry Watson when you had him in your office preparing him to testify at trial whether he knew Jerome Boyd?

A.    I don't remember.

Q.    Did you ever do anything at all to explore your suspicion that Larry Watson and Jerome Boyd may have done this together?

A.    Together.  Not alone, together.

Q.    Either possibility.

A.    Well, I talked to Watson.  I talked to him and I used him as a witness, and there was no indication from anything I found out from talking to him that he had committed this crime.

T. Drury - DX by Mr. Rudin                    752

Q.   Did you confront him with the police reports that expressed the suspicion of the police that he committed the crime?

A.   No.  They had no suspicion.

Q.   Did you ask him why the first time that the police spoke with him on January 3rd, 1976 he said that he went out of the bar alone and had no -- had not agreed to walk home Mr. Crawford?

A.   I don't remember that at all.

Q.   Did you ask him why other witnesses said that he, in fact, volunteered to walk Mr. Crawford home?

A.   I'm sorry.  That they volunteered -- yes, they did. They did.  The barmaid and other people.

Q.   Did you ask Mr. Watson why he did not say that to the police the first time they interviewed him when all the other witnesses remembered that that's what happened?

A.   No.  By the way --

Q.   Did you ask Mr. Watson --

A.   Why don't you bring up the so-called footprints in the snow that would indicate Watson did it.  There were no footprints in the snow.  Never were.

     MR. JOEL RUDIN:  Your Honor, I would ask that that be stricken.  That's not remotely responsive.

     THE COURT:  That answer is stricken.

BY MR. JOEL RUDIN:

T. Drury - DX by Mr. Rudin                753

Q.   Did you ask Mr. Watson why he told the police that he didn't see Crawford flashing money when several other witnesses, including Debbie Jeffrey and Francis Kalb, told the police that there's no question at all that Watson saw Crawford flashing a lot of money?

A.   They said that?

Q.   Yes.

A.   I don't remember that.

Q.   Did you ask Watson about that?

A.   No, because -- I don't remember it, but no.

Q.   I'm not sure we got a clear answer before, but did you ask Watson whether or not he knew Jerome Boyd?

A.   No.

Q.   Did you show him Jerome Boyd's photograph and ask him if he recognized him as being there that night?

A.   I did not pursue that line of inquiry.

Q.   You never tried to find out where Jerome Boyd was that night after he left the Golden Nugget?

A.   No, because it wasn't a reliable alternative to what I heard from the various other witnesses, including Tony Woodruff, including Andre Hough.  That was a solid case. Pursuing this Boyd down a rat hole was not going to get me anywhere because it's not viable.  It wasn't viable and it wasn't -- there wasn't a strong indication.

Q.   Did you ever attempt to investigate whether Jerome

T. Drury - DX by Mr. Rudin                    754

Boyd came into money that night?

A.   No.

Q.   Did you ever try to investigate whether Larry Watson came into money that night?

A.   How would I investigate that?  Go to his bank account, search his house?  Over what?

Q.   Did you try to do anything at all?  Did you speak to any of their friends?

A.   I had -- Sergeant Dove in four different trials testified that he went through the backyards looking for footprints, and there were none, either one side or the other. So Watson didn't do that.

Q.   There were no footprints -- you are saying that Sergeant Dove testified at four trials that he didn't see footprints in the backyard and that meant that Larry Watson couldn't have gone home some other way?

A.   Well, he could have I gather, but --

Q.   And that excluded the possibility that Larry Watson was involved and so you had absolutely no obligation to investigate?

A.   Your alternative is believing McLeod who said that there was a photograph of footprints in the snow.  There were never any footprints in the snow because Dove went there and looked earlier the same day.

Q.   And, therefore, you did not conduct any

T. Drury - DX by Mr. Rudin                    755

investigation of any kind about the possibility that Jerome

Boyd or Larry Watson, who your own notes suspected of setting

up the crime, were, in fact, involved in the crime?

    A.    My own notes do not indicate -- it was a

possibility.  I looked -- I talked with the police and Jerome

Boyd -- not your Boyd, Jerome Boyd was not a viable

alternative.

    Q.    I want to ask you some questions about the crime

scene photographs.

    A.    You think --

    THE COURT:  Hold on one second.

    THE WITNESS:  You think I had blinders on?  I didn't

have blinders on.

    THE COURT:  Mr. Drury, this isn't a conversation.  This

is direct examination.  So please don't say anything unless

you are asked a question.

    THE WITNESS:  Yes, Your Honor.

    THE COURT:  Thank you.

    THE WITNESS:  I didn't have blinders on.

    MR. JOEL RUDIN:  May we have Exhibit PX 53 up again?

I'm reminded I forgot to ask a question.

BY MR. JOEL RUDIN:

    Q.    Mr. Drury, do you see PX 53, again, your handwritten

notes from February 11th?

    A.    Yes.

T. Drury - DX by Mr. Rudin                          756

Q.   Did you turn over those notes to counsel for Darryl Boyd?

A.   No.  They were my own musings, my own observations. Why would I turn over my work product?

Q.   All right.  I now want to move to the subject of the crime scene photos.

At Mr. Gibson's trial do you recall that you introduced 12 photographs during the testimony of a police photographer Albert Hauser?

A.   Yes.  I believe so.  The photo -- the numbers of photos varied from case to case.

Q.   At the Gibson trial it was twelve, right?

A.   Right.

Q.   And you have no recollection of showing any additional photos to Mr. Gibson's attorney?

A.   No.  I think what I would do is take the packet of photographs that I got from the police photographer, use what I felt was relevant, and then throw the others on the table and indicate to the defense counsel, there, you want to look at the others.

Q.   So you say your practice was to decide which ones you were going to mark and use in evidence and put all of the other photos that you had at that time on the table so that defense counsel could review them?

A.   Yes.

T. Drury - DX by Mr. Rudin                    757

Q.   Well, do you recall testifying at your deposition -- page 141, line 21 to 142, line 2 -- that you have no recollection of showing any additional photographs to Gibson's attorney?

A.   That's what I would have done.  Do I have a strong recollection?  No.  That's what I would do.

MR. JOEL RUDIN:  Your Honor, may we play that clip, 141, 21 to 142, 2?  And I offer it into evidence.

THE COURT:  Mr. Blenk?

MR. BLENK:  May I approach?

THE COURT:  Yes.

(At bench:)

MR. BLENK:  The objection would apply to a question of that nature, but the testimony at this point is not in contrast to -- he hasn't denied what he said in his deposition and it's not in contrast to his testimony.

THE COURT:  Well, he --

MR. BLENK:  His practice versus -- his description of his practice versus his independent recollection, which was at issue in the deposition, are two different things.

MR. JOEL RUDIN:  I thought he testified that he did that on this occasion.

THE COURT:  Let me just go back and look.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  Okay.  What's your objection?

T. Drury - DX by Mr. Rudin                758

MR. BLENK:  He -- his testimony today has reconciled both the deposition -- he has not contradicted his deposition testimony and he's acknowledged that -- he has acknowledged that he has no recollection.  And he has also separately described his practice.  There's no -- since he hasn't contradicted his deposition testimony, there's no basis for its admission.

THE COURT:  Can you read to me the deposition testimony that you're offering?

MR. JOEL RUDIN:  You don't have any recollection of whether you showed them to the defense lawyer before you introduced them in court?

Answer:  True, yes.

Question:  Do you have any recollection of showing any photographs to Gibson's defense lawyer besides these twelve photographs?

Answer:  No, I don't.

THE COURT:  Okay.  Then overruled.  I mean, I think that what he's saying is that he would put all of the photographs out for the defense attorney and he only marked some of them.  That's what he's saying now.  But that's not what he said in his deposition.  And so I think that it's a prior inconsistent statement, and he was confronted with it with the deposition testimony, and he --

MR. BLENK:  I don't have an issue with the mechanics of

T. Drury - DX by Mr. Rudin                  759

the impeachment.  I'm not understanding the disconnect between the deposition and his testimony today.  I understand them to be reconciled, but --

THE COURT:  Because he's saying in his deposition that he only showed the defense attorney those 12 photographs, but in his testimony just now he said that he put them all out and then he -- just for the defense attorney to see and he only picked the 12 that he marked as exhibits.

MR. BLENK:  He said that that was his practice.  He only testified that it was his practice.  He did not testify that he did it in this instance.

MR. JOEL RUDIN:  I will ask it a clearer way.

THE COURT:  Okay.

MR. JOEL RUDIN:  I mean, obviously I agree with Your Honor, but I see that it's -- there's a little ambiguity.  So I'll try to clear it up.

MR. BLENK:  Thank you, Your Honor.

(Open court:)

MR. JOEL RUDIN:  May I proceed, Your Honor?

THE COURT:  Yes.  Go ahead.

MR. JOEL RUDIN:  I will withdraw that question.

BY MR. JOEL RUDIN:

Q.   Mr. Drury, do you have any recollection of showing any photographs to Mr. Gibson's defense lawyer besides the twelve photographs that you introduced?

T. Drury - DX by Mr. Rudin                 760

A.    Recollection, no.

Q.    Now, at Mr. Boyd's trial you introduced ten photos; is that correct?

A.    Whatever the record shows.

Q.    Well, you introduced ten photos and marked them as exhibits one through ten?

A.    Yes, if that's what it says.

Q.    And then after Mr. Hulnick began to question the police photographer Mr. Hauser and discovered that there were more photographs you then disclosed eight more photographs to Mr. Hulnick.  Do you recall that?

A.    Justice Stiller said -- wanted to get into this and he had -- he requested that the other photos be produced, and they were.

Q.    And you produced eight more photos?

A.    I think Mr. Hauser -- Officer Hauser did.

Q.    Well, you're the one that disclosed them, right? You provided them to Mr. Hulnick to review?

A.    Pardon?

Q.    You had them in your file and you gave them to Mr. Hulnick to review?

A.    I think the testimony was obtained from Officer Hauser.  It doesn't matter.  Either myself or Hauser produced the photos.

Q.    Eight more photos?

T. Drury - DX by Mr. Rudin                761

A.   Yeah, yes.

Q.   And when it came around to the Floyd Martin trial you were supervising Mr. Henry, even though he was conducting the trial in court, correct?

A.   I was generally supervising Mr. Henry, yes.

Q.   And at the time of the Floyd Martin trial at least 19 photos were disclosed, right?

A.   I believe so, but I wasn't there.

Q.   Yes, but you testified previously at your deposition that at least 19 photos were disclosed by your office at the Martin trial, correct?

A.   That's what I understand.

Q.   But you are aware that in total there were at least 20 crime scene photos taken by the police, correct?

A.   Yeah.  There was -- at some point there was a contact sheet obtained and it turned out that there was a total of 20 photos taken by Al Hauser.

Q.   The photographs that you had, the 18 photographs that you disclosed to Mr. Hulnick, were photographs that were on that contact sheet, right?

A.   Yes.

Q.   And there were at least two more photographs that were taken by the police, correct?

A.   Yes.

Q.   There could have been more than two, right?

A.    No.  There were not -- the contact sheet was discussed at some point.

Q.    You told Mr. Hulnick that when you disclosed the total of 18 photos that he had all the photos, didn't you?

A.    That's all I had.

Q.    None of the photos that you disclosed to Mr. Hulnick included a photograph showing footprints in the backyard of Mr. Crawford's property leading towards Watson's property, right?

A.    No.  And there was no photograph.

Q.    Well, that's your testimony, right?

A.    No.  That's the testimony.

Q.    You -- Mr. Drury, you disclosed 18 photos to Mr. Hulnick and you said those are all the photos, and you concede there were at least 20 photos, right?

A.    At some point there was two more photos disclosed.

Q.    These were police photos, weren't they?

A.    Yes.

Q.    And these were photographs that you had available to you, right?

A.    No, I didn't because the -- Hauser gave me 18 photos.

Q.    Hauser held back two photos from you?

A.    Apparently.

Q.    When did you get the other two photos?

T. Drury - DX by Mr. Rudin                        763

A.   Well, the nineteenth photo was disclosed at the Martin trial, and then at some point the contact sheet was discussed and there was another photo.

Q.   So when did the nineteenth photo emerge?  When did the nineteenth photo find its way from the police department to your office?

A.   I don't know.  I didn't handle that case.

Q.   Did you ever explore with Mr. Henry why only 18 photos were provided to you and then a nineteenth photo just mysteriously appeared at the last trial?

A.   No.

Q.   Did you ever explore why only 19 photos appeared at the Martin trial when there were really 20?

A.   It wasn't an issue because Sergeant Dove examined the yards and there were no footprints in the snow.

Q.   And if, in fact, there was a photograph that showed there were footprints in the snow then that could have been used to show that Sergeant Dove's testimony wasn't truthful, correct?

A.   Wasn't truthful.  If he would lie ahead of time about footprints?

Q.   Mr. Drury, you understand how a trial works, right?

A.   Yes.

Q.   A witness testifies, and if there's evidence that tends to contradict the testimony, the defense lawyer has the

right to bring out that evidence so the jury can decide, correct?

A.   Yes.

Q.   And if there were additional photographs here they should have been disclosed to Mr. Boyd's counsel, right?

A.   Additional -- but there's no proof of other -- there is no proof.  The contact sheet at best was 20.  Where is the proof?

Q.   There were 20 photographs at the very least, and you disclosed ten to Mr. Hulnick, and then when he questioned Mr. Hauser and found out there were more you disclosed eight more and you said that's all of it, and, in fact, that wasn't true because there were at least 20, right?

A.   I didn't get them.  I had 18.  I don't know what happened.  There was -- some of those other photographs were photographs taken at the morgue of the body.

MR. JOEL RUDIN:  Your Honor, I'm ready to move on to a different area.

THE WITNESS:  Pardon?

THE COURT:  That's fine.  You can continue.

BY MR. JOEL RUDIN:

Q.   Mr. Drury, I'm going to show you PX 75, which is admitted into evidence.  You testified yesterday that these are your handwritten notes keeping contemporaneous record of the exhibits that you disclosed on the record to defense

T. Drury - DX by Mr. Rudin                765

counsel at Mr. Boyd's trial?

A.   Right.

Q.   And they were marked by the court reporter, but you kept your own list as you went?

A.   Yes.

MR. JOEL RUDIN:   All right.   If we could now pull up side by side with that PX 74.

BY MR. JOEL RUDIN:

Q.   PX 74 is the page from the Boyd trial transcript that has an index of the exhibits kept by the court reporter that you turned over at the trial?

A.   Yes.

Q.   Now, you see that in PX 75, your notes, you have one to ten photographs?

A.   Yes.

Q.   And that matches the court record which indicates that People's Exhibit 1 through 10 are photographs?

A.   Yes.

Q.   And do you see that in the index Exhibit 11 -- People's 11 is described as a statement?

A.   That's -- in my own notes it says statement.

Q.   I'm asking right now -- first of all, the exhibit list kept by the court reporter says People's 11 is a statement?

A.   By the --

T. Drury - DX by Mr. Rudin    766

Q.    That's the exhibit to the right.  Do you see that?
It's highlighted in yellow.

A.    Yes.

Q.    People's 11 is a statement.  If you now look at your
own notes, your own notes say that No. 11 is a statement,
Watson.

A.    I presume I said Watson.  I can't read it.  It says
statement, yes.

Q.    Your handwritten notes match the court record,
right?

A.    Yes.

Q.    And then in the index People's 12 says P-73?

A.    Yes.

Q.    And in your notes, Exhibit 12, it says P-73 Dove?

A.    Yes.

Q.    So your notes match the court record?

A.    Yes.

Q.    And in the index People's 13 and 14 are described as
statements?

A.    11th and 12th.  Yeah.

Q.    And your note for No. 13 says statement 11th?

A.    Yes.

Q.    And then this is Tyrone Woodruff's statement?

A.    I'm sorry.  Where are you now?  Oh, 13 and 14,
statements, 11th.  14 is statement 12th.

T. Drury - DX by Mr. Rudin                    767

Q.   13 says?

A.   Statement 11th.

Q.   Statement 11th.  That's his statement of the 11th, right?

A.   Right.

Q.   And then your number 14 says statement 12th?

A.   Right.

Q.   And the -- that's Tyrone Woodruff's statement on January 12th?

A.   Right.

Q.   And that matches the court record for 13 and 14, and it says statements?

A.   Yes.

Q.   And then in the court record, while we're on that, the index says -- 15 to 17 are described as transcripts?

A.   Yes.

Q.   And in your notes No. 15 says GJ, which means grand jury?

A.   Yes.

Q.   And that's the grand jury transcript testimony of Mr. Woodruff?

A.   I don't know.

Q.   Well, if I told you that your attorneys have stipulated that that's what that is, would you accept that?

A.   Certainly.

T. Drury - DX by Mr. Rudin                768

Q.   And do you see that it says -- your notes for 16 says PH, which stands for preliminary hearing?

A.   Yes.

Q.   And that's the preliminary hearing transcript for Woodruff's testimony?

A.   If that's the agreement, yes.

Q.   Well, if I represent to you that that is the stipulation of the parties, will you accept that?

A.   Yes.

Q.   And in your notes for 17 it says trial?

A.   Yes.

Q.   And this is a reference to the testimony of Mr. Woodruff at the Gibson trial?

A.   It must have been, yes.

Q.   All right.  And so your handwritten notes match the court record with respect to Mr. Woodruff's statements?

A.   Yes.

Q.   And then in the index, the court index for People's 18, it says doctor's records?

A.   Yes.

Q.   And in your notes for 18 you say Severson notes?

A.   Yes.

Q.   And Severson was Dr. Severson, the medical examiner?

A.   Yes.

Q.   So your handwritten notes match the court record

there?

A.   Yes.

Q.   Now, in the index People's 19 is described as a statement?

A.   Yes.

Q.   And in your notes 19 says 1/8 Hough?

A.   Yes.

Q.   Referring to Andre Hough's January 18th statement -- January 8th statement?  I'm sorry.

A.   Yes, I think.

Q.   And your handwritten notes match the court record there?

A.   Yes.

Q.   And then in the index People's 20 is described as a statement?

A.   Yes.

Q.   And in your notes No. 20 says 1/12, referring to Andre Hough's January 12th statement?

A.   I don't know what it refers to.

Q.   Well, if I told you that your attorney has stipulated that that's what that is, will you accept that?

A.   Yes.

Q.   So your handwritten notes match the court record with respect to Mr. Hough?

A.   Right.

T. Drury - DX by Mr. Rudin                    770

Q.   And in the index People's 21 is described as grand jury testimony?

A.   Right.

Q.   And in your notes number 21 says GJ, which stands for grand jury testimony?

A.   Yes.

Q.   And that's the grand jury testimony of Mr. Hough?

A.   Right.

Q.   And so your handwritten notes match the court record?

A.   Yes.

Q.   And in the index People's 22 is described as a statement?  Do you see that?

A.   Right.

Q.   And in your handwritten notes it says statement, Luster referring to a statement by Dorothea Luster?

A.   If that's agreed to.  If that's the --

Q.   Well, that is agreed to.  Do you accept that?

A.   Yeah, yes.

Q.   In the index People's 23 is described as a rights card?

A.   Yes.

Q.   And number 23 in your list is -- it says rights card Boyd?

A.   Yes.

T. Drury - DX by Mr. Rudin                    771

Q.   In the index People's 24 is described as a statement?

A.   Right.

Q.   And in your list it says statement Boyd?

A.   Right.

Q.   So they correspond there, they both involve the statement of Darryl Boyd?

A.   Right.

Q.   And so your handwritten notes match the court record there?

A.   Yes.

Q.   And in the index People's 25 is described as a statement, and in your notes it says P-73 Guadagno?

A.   Yes.

Q.   And so they correspond there?

A.   Yes.

Q.   Your handwritten notes do not mention any other items that you disclosed to defense counsel?

A.   Yes.

Q.   The transcript does not mention any other items that you disclosed to defense counsel?

A.   That's right.

Q.   The 25 documents marked as exhibits in the transcript are the same as those you wrote in your contemporaneous trial notes, right?

T. Drury - DX by Mr. Rudin                    772

A.   Right.

Q.   Each time you offered an exhibit you were careful to write it down?

A.   Yes.

Q.   So you were not such a careless prosecutor, were you, Mr. Drury?

A.   No.

Q.   And we know from the Court and the parties' stipulation that none of the 19 pieces of Brady evidence, at least 19 pieces that we claim were not disclosed, were marked on the record as exhibits, correct?

A.   I'm sorry.  They were or were not?

Q.   They were not.  We know from the Court and the parties stipulation -- we know from the court records and the parties' stipulation that none of the 19 pieces of Brady evidence were marked on the record as exhibits?

A.   Well, you claim they're Brady.  You claim anything and everything is Brady, and I said it has to be favorable. It isn't favorable, it's not Brady.

Q.   And none of the 19 pieces of evidence that we contend was Brady were written down in your handwritten notes?

A.   How can you contend it's Brady when it's not favorable?  And you want to bring in the County -- the County of Erie or the DA's office as --

THE COURT:  Mr. Drury, Mr. Drury, you need to just

T. Drury - DX by Mr. Rudin                    773

answer the question.

THE WITNESS:  Yes, ma'am.

MR. JOEL RUDIN:  Your Honor, I will move on.

THE COURT:  Actually we're going to take a recess.

Members of the jury, we're going to take a fifteen-minute recess.  All of the admonishments apply.  Please do not talk about the case with anyone.  Thank you.

Mr. Drury, we are going to take a recess.  I am just going to direct you not to talk to anyone about the case during the recess.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Thank you.

(Jury not present.)

THE WITNESS:  How long is the recess, fifteen minutes?

THE COURT:  Fifteen minutes.

Could someone just help Mr. Drury?  You can leave the courtroom, Mr. Drury.

THE WITNESS:  Thank you.

THE COURT:  I just want to say one thing before we recess.  I'm going to just direct this comment to everyone, but it's -- I'm focusing on Plaintiff's counsel.  Please refrain from making any facial expressions during testimony, anything.  You are sitting right next to the jury, and it's not acceptable.  Okay?  Okay.

Thank you.  We're in recess.

T. Drury - DX by Mr. Rudin                     774

(Recess taken.)

THE COURT:  We can bring Mr. Drury back in.

Mr. Drury, you can come on up.  We're going to resume.

We can bring the jurors in.

(Jury present.)

THE COURT:  Okay.  Have a seat, everyone.  Our jurors have returned to the courtroom.  We are going to resume with direct examination of Mr. Drury by Mr. Rudin.

Mr. Drury, I would just remind you that you are still under oath.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  Go ahead, Mr. Rudin.

MR. JOEL RUDIN:  Thank you, Your Honor.

BY MR. JOEL RUDIN:

Q.    Mr. Drury, I want to ask you a few questions about Tyrone Woodruff and his trial testimony.

A.    Yes.

Q.    You testified yesterday that he was the prosecution's most important witness?

A.    Yes.

Q.    And based on how he testified at trial you thought he was a terrible witness; is that correct?

A.    He wasn't a good witness.

Q.    Well, your word was "terrible," wasn't it?

A.    If I used it.

T. Drury - DX by Mr. Rudin                    775

Q.   Well, do you remember using it?

A.   No.

Q.   Do you remember testifying in a prior proceeding in this case that he was a terrible witness?

A.   Okay.

Q.   Well --

A.   If I said it, I said it.  Okay?

Q.   Well, do you accept that you said it?

A.   If you say that I said it, I'll accept that.

MR. JOEL RUDIN:  Your Honor, may we have on the screen the prior proceeding 1154, five to six?

THE COURT:  Is this in evidence?  No?

MR. JOEL RUDIN:  No.  It's from the prior proceeding transcript for impeachment.

THE COURT:  PX what?

MR. JOEL RUDIN:  I'm sorry.  PX 290.

THE COURT:  Okay.  One second.

Mr. Blenk?

MR. BLENK:  No objection, Your Honor.

THE COURT:  Okay.  The portion is received.  It can be published to the jury.

MR. JOEL RUDIN:  I offer it into evidence.

THE WITNESS:  That's what I said.

THE COURT:  Yes.  That portion of it is received and can be published.

T. Drury - DX by Mr. Rudin                    776

(Above-mentioned portion of Plaintiff's Exhibit 290 received in evidence.)

MR. JOEL RUDIN:  Thank you.

BY MR. JOEL RUDIN:

Q.   Question:  You thought he was a bad witness, right?

Answer:  Oh, terrible.

A.   Yes.

Q.   So I asked if he was bad and you volunteered he was terrible?

A.   He was a bad witness.

Q.   And that was based upon the way his testimony came out at the trial, correct?

A.   Yes.

Q.   Now, as we've gone over the last two days, you knew that before Mr. Woodruff changed his original story at the homicide office on January 12th police threatened him with the prosecution for murder but then they promised him complete immunity from prosecution?

A.   That I knew?

Q.   Yes.

A.   As I said before, I don't know what the police were doing.  I went there, went knee to knee with him, and he explained to me what had happened, but I don't remember anything else about what the police told me or what they were doing.

T. Drury - DX by Mr. Rudin                777

Q.   All right.  Well, we've been through that.

Mr. Woodruff's attorney was Mr. Spadafora?

A.   Yes.

Q.   And he was not at the homicide office on January 12th when you met with Mr. Woodruff and confirmed for him that he would be given immunity, right?

A.   Yes.

Q.   Yes, he was not at the homicide office?

A.   No, he wasn't.

Q.   And so Mr. Woodruff was promised a deal of immunity in exchange for implicating the other four boys before he had any attorney present?

A.   Yes.

Q.   Yet you brought out on Mr. Woodruff's direct examination at the trial that it was his lawyer who made the immunity deal for him at the preliminary hearing on January 16th, correct?

A.   Yes.

Q.   And the preliminary hearing on January 16th was four days after, in fact, you had promised him immunity and he had changed his story?

A.   Yes.

Q.   And then you made the same point again at Mr. Boyd's trial?  You had him testify again that he only was offered immunity at the preliminary hearing even though, in fact, he

T. Drury - DX by Mr. Rudin                    778

had been offered immunity, promised by you, four days earlier when he changed his story?

A.   Yes.

Q.   And you knew that the promise of immunity after police threatened Woodruff with being charged with murder gave him a strong reason to lie?

A.   No.

Q.   And for that reason you didn't disclose that you offered him immunity on January 12th before he changed his story?  You didn't think that mattered?

A.   What do you mean?

Q.   Did you think it mattered to the defense that you had offered Mr. Woodruff immunity before he changed his story and before he had a lawyer?

A.   No.  One way or the other he got immunity.

Q.   So it didn't make a difference, it didn't matter?

A.   I don't think so.

Q.   And so you didn't feel you had to turn that over under Brady?

A.   No.  That wasn't Brady.

Q.   And that was consistent with your training and practice at the Erie County DA's office, correct?

A.   It was a one-word training.  Hand over everything and anything that's favorable, and that's what I did.

Q.   So the only training you received at the Erie County

DA's office in all the years you were there was you had to turn over favorable evidence?  That was your training?

A.    Why not?  That's Brady.

Q.    And you never received any more specific training than that?

A.    Why?  That's Brady.  Whatever it's called, whatever shape it is, if it's favorable, you turn it over.

Q.    And your belief was that as far as the office -- as far as the office's policy and practice in applying the term favorable, that you didn't have to turn over, that you promised Mr. Woodruff immunity before he changed his story, even though at the trial you made it look like he didn't get immunity until he had a lawyer and was at the preliminary hearing?

A.    He didn't officially get immunity until it was granted to him by Judge LaRusso in city court.

Q.    You deceived the jury at the criminal trial by making it look like Mr. Woodruff changed his story on his own before a promise of immunity gave him such a powerful incentive to lie?

A.    You claim I deceived the jury?

Q.    Did you?

A.    No.  They knew he got immunity from the word go.

Q.    No.  They understood -- we just went over that, Mr. Drury.  You introduced twice through Mr. Woodruff's --

T. Drury - DX by Mr. Rudin                    780

twice that he wasn't given immunity until he was at the preliminary hearing and had a lawyer.

A.    Okay.  You have expanded Brady to mean anything and everything.  It's not.  That doesn't mean -- for whatever reason he was given immunity when he cooperated.  You want to say it's -- somehow that I deceived the jury.  Come on.

Q.    Mr. Drury, do you remember that Mr. Woodruff testified at trial that every word he exchanged with the police while he was questioned on January 12th at the homicide office was recorded in his signed written statement in question and answer format?

A.    It's a long statement.

Q.    Well, do you recall he testified that everything he discussed with the police while he was questioned on January 12th was recorded in that statement?

A.    I don't remember.

MR. JOEL RUDIN:  May we have -- well, may we have PX 74, please, the Boyd transcript, which is in evidence, pages 79, line 6 to 80, line 6 for the jury and the witness?

BY MR. JOEL RUDIN:

Q.    Question -- this is from the trial transcript of Mr. Boyd -- so you were in the police station being questioned from 4:16 p.m. until the completion at 8:50 p.m.; is that correct?

Answer:  Yeah.

T. Drury - DX by Mr. Rudin                    781

Question:  You were there for five hours?

Answer:  Yeah.

Question:  Does that statement accurately and truly reflect every word that you said to the police during that period of time?

Answer:  What you mean?

Question:  I mean, is every word said between you and the police officers from 4:16 p.m. to 8:50 p.m. contained on these three pieces of paper?

Answer:  I believe so.

Question:  You believe so?

Answer:  Yeah.

Question:  Okay.  So the entire conversations that you had with them word for word from 4:16 p.m. until 8:50 p.m. is on that piece of paper?

Answer:  They should be.

Question:  Wasn't edited at all?

Answer:  Edited?

Question:  Yes, edited.

Answer:  I don't think so.

A.   What's your point?

Q.   Well, you knew that wasn't true, Mr. Drury, didn't you?

A.   Well, it's a two-page long statement.  And I think it was -- pretty much contains everything that related to the

T. Drury - DX by Mr. Rudin                    782

assault of and killing of Mr. Crawford.

Q.   No.   The question at the trial was whether or not it contained his entire conversation with the police during the nearly five hours that he was being questioned at the homicide office, right?

A.   Obviously it couldn't be.

Q.   Well, but your witness under oath testified that it did?

A.   That's what he said.

Q.   And you didn't correct him?

A.   And you claim that's Brady?

Q.   Mr. Drury, at the time that Mr. Woodruff gave this testimony you were aware that he had been threatened with arrest for murder and then promised immunity on January 12th, weren't you?

A.   Was I aware at the time?  No.

Q.   We've been through this.

A.   I understood --

Q.   At the very least --

A.   I can't recall what the police were doing.  They didn't tell me.  I don't remember seeing his statement.  Fresh he told me all that happened.

Q.   At the very least, Mr. Drury, I think you have conceded that on January 12th you were aware Mr. Woodruff had been promised immunity because you personally promised it to

him?

A.    Yeah.

Q.    And you personally promised it to him after you learned the police had promised it to him?

A.    Probably, but I have no recollection.

Q.    Whatever Mr. Woodruff discussed with the police about the possibility of being prosecuted for murder and then being promised immunity by the police and by you was not in his January 12th signed statement, correct?

A.    Yes.

Q.    And you recall --

A.    And you claim that's Brady, huh?

Q.    Mr. Drury, do you recall that we've also been discussing the police report by Detective Manista on January 12th?

A.    Yeah.

Q.    That's the report where there supposedly was an anonymous telephone call that Mr. Woodruff was allowed to hear and he was shaking and terrified and then he said okay, okay, I'll cooperate, Gibson hit him, Gibson hit him I think?

A.    Yes.

Q.    Was that in his signed statement?

A.    No.

Q.    And do you recall --

A.    Because --

T. Drury - DX by Mr. Rudin                          784

Q.    -- that there was also a police report --

(Court reporter interruption.)

A.    Because it led up to the signed statement.

Q.    It occurred while he was at the police precinct, right?

A.    Yes.

Q.    During --

THE COURT:  Hold on one second.  Let's just make sure that we don't talk over each other.

Can you ask the question?

BY MR. JOEL RUDIN:

Q.    It occurred during the five hours that he was at the police station where he testified at trial that everything that he discussed with the police was in his written report?

A.    Yes.

Q.    But the anonymous phone call which caused him to be shaking and nervous and to then say, okay, Gibson hit him, Gibson hit him I think, was not in the January 12th statement?

A.    No, because it led up to the January 12th statement.

Q.    It was during the five hours he was at the police precinct, right?

A.    Yes.

Q.    During those five hours he first denied having any knowledge, and then he was threatened with prosecution for murder, and then he was promised immunity, and then he agreed

T. Drury - DX by Mr. Rudin                785

to cooperate, right?

A.    Wasn't -- wasn't he part of the murder?

Q.    Mr. Drury, there's also a report by Detective Manista that during this -- the interrogation of Mr. Woodruff at the homicide squad on January 12th that there was an anonymous phone call which led him to say Gibson hit him, Gibson hit him I think?

A.    Yeah.

Q.    And that happened during the five hours he was there, right?

A.    Right.

Q.    And those are the five hours where he testified that every single thing that happened between him and the police was in his written statement, right?

A.    Right.

Q.    But that was not in his written statement?

A.    Was that the woman --

Q.    The anonymous call.

A.    Yeah.

Q.    That was not in his written statement?

A.    No, because it led up to the written statement and was -- the written statement was detailed in two pages.

Q.    But it was part of the event that occurred at the precinct that he said was in his written statement?

A.    Yeah.

Q.   That include the events that led up to the written statement?

A.   Is this another one of your Brady claims?  You think that was Brady?  It led up to the statement.

Q.   You don't think it was Brady that?

A.   Of course, not.

Q.   You don't?

A.   That's a huge claim of anything and everything that ever happened has to be Brady.  It's not.

Q.   And you didn't think based on the policy and practice at the DA's office that you had to turn over -- when your witness was testifying that everything was in a statement, you didn't have to turn over police statements indicating that other things happened that were not in the statement?

A.   If they were somehow meaningful.

Q.   But they were not meaningful to you?

A.   No.

Q.   And that was based on your training and the practice at the office, right?

A.   I had -- I used my own head.  I made my own judgment.  This led up to the written statement.

Q.   You were -- you were handling the most serious cases in the office?

A.   Of course, I was.

T. Drury - DX by Mr. Rudin                787

Q.   And Mr. Cosgrove trusted you to handle those cases?

A.   Yes.

Q.   And you met with him on a weekly basis, didn't you?

A.   Pardon?

Q.   You met with him on a weekly basis?

A.   Not formally.

Q.   You talked to him all the time?

A.   No, I didn't.

Q.   He assigned you important cases?

A.   Yes.

Q.   He knew how you functioned as a prosecutor?

A.   Yes.

Q.   He knew your attitudes about Brady?

A.   Did he know my attitudes?

Q.   Did he?

A.   Of course.  Brady is favorable.

Q.   And he --

A.   It's not your definition of Brady, which is everything and anything.

Q.   And you were trying to conform the way you handled your responsibilities under Brady to what Mr. Cosgrove expected from you, right?

A.   He didn't -- he didn't -- what do you call it -- detail -- he didn't give me detailed instructions.  I determined he trusted my judgment, and my judgment was only

T. Drury - DX by Mr. Rudin                              788

what's relevant goes in the statement.

Q.   Mr. Drury, you also -- we've also been talking about the devils food cake?

A.   Back to the devils food cake, yes.

Q.   The report of Detective Hunter and that it was after he was fed devils food cake that he said to the police, okay, okay, I'll tell you now that I was present, and then he made this written statement?

A.   Is this Woodruff or --

Q.   Woodruff.

A.   Woodruff?  Yeah.  So?

Q.   And that was not in his written statement?

A.   Devils food cake is your claim of Brady, right?

Q.   Was that in his written statement?

A.   No.  The devils food cake didn't get into the two-page written statement.

Q.   And so when Hough -- when Woodruff --

A.   That's Brady?  The devils food cake, huh?

Q.   So when Woodruff testified that everything that happened is in the statement that was a third example of information that was not in the statement, correct?

A.   I thought you had 25 examples of Brady.

Q.   All right.  Let's turn to the subject of summation misconduct, Mr. Drury.

A.   You want to go to summation?  All right.

T. Drury - DX by Mr. Rudin                789

Q.   I'm sure you would agree with me that it's forbidden for a prosecutor to make false or misleading arguments to the jury in the summation?

A.   Yes.

Q.   During your summation in Mr. Boyd's trial you argued the police turned over everything they had to you?

A.   They did.

Q.   You were referring to the jury that the police turned over everything they had to you, the jury learned everything the police had?

A.   Yes.

Q.   And when you made that argument you knew, as we've been discussing, that there were various police reports that you had not disclosed to the defense?

A.   I had disclosed them to the defense because I handed them to the defense lawyer.

Q.   Oh, you handed the defense lawyer your entire file?

A.   No.  Only what was relevant and what was Brady or Rosario, Rosario meaning the statements that relate to the testimony.

Q.   And if you didn't turn over to the defense all of the 19 items of Brady information that we allege you didn't turn over, then, in fact, your argument to the jury would be misleading, right?

A.   If I hadn't.

T. Drury - DX by Mr. Rudin                    790

Q.   Your argument that the police turned over everything they had to you was consistent with office policy and practice, wasn't it?

A.   Of course, you don't hide things.

Q.   Your argument to the jury that the police turned over everything they had to you together with your knowledge that you had not turned over all 19 pieces was a misleading argument, wasn't it?

A.   If I had kept something that was relevant from the jury, yes.  I hadn't.

Q.   The argument --

A.   I had not.

Q.   The argument that you made to the jury, in your view based on the circumstances of this case, was consistent with office policy and practice, right?

A.   Yes, yes.

Q.   Now, second, during your summation you rejected any suggestion that you or the police had helped Mr. Woodruff tailor his testimony or conform it to the prosecution's case?

A.   That's right.

Q.   Now, we've discussed the two P-73 reports of February 11th, PX 46 and 47, the reports by Detectives Delano and Guadagno, right?  We've been discussing those?

A.   Yeah.  They relate to various things.  Mainly they relate to the testimony of Woodruff and Hough.

791

Q.   And you knew that these two detectives accused Mr. Hough of lying, and then when he came up with a new story about the boys going inside the Golden Nugget bar that the detectives confronted Mr. Woodruff with that story?

A.   Yes.

Q.   And that was the word they used in their report, "confronted"?

A.   Yes, I guess.

Q.   And after the detectives confronted Woodruff with Hough's new story then Mr. Woodruff changed his story?

A.   Yes.  I don't remember all this, understand.  It's in the reports.

Q.   And you know that according to the reports you were the one who sent the detectives to speak to Mr. Woodruff after Hough changed his story?

A.   That's what the report says.

Q.   And you have no reason as you sit here now to think that was inaccurate, do you?

A.   I don't remember it.

Q.   You think it was inaccurate?

A.   No.  It's not -- no.  It's not obviously inaccurate, no.

Q.   And so after Mr. Woodruff learned Mr. Hough's new story, when the police at your request confronted him with the new story, he claimed for the first time that Boyd and Gibson

T. Drury - DX by Mr. Rudin                      792

went inside the Golden Nugget and spotted a victim?

A.    If that's what the report says, yes.

Q.    So he conformed the story to Mr. Hough's?

A.    Yes.  If Mr. Hough was accurate in what he said, then Woodruff added something to the statements he already made.

Q.    Do you recall making this argument to the jury -- and this is at page 606, 22 to 607, 5, PX 74, if we could put this up, this is at line two -- look, if we had fed Woodruff stuff, you wouldn't have that blithering idiot up there talking like he did.  He would be a lot smoother, have everything down, no problem with times.

Do you recall making that statement?

A.    Obviously, I did.

Q.    And do you recall arguing further at page 635, line 16 through 636, line 1:  I would absolutely reject, if I were to make this argument to you, any suggestion, any beliefs of the police or our office or myself had anything to do with changing Tyrone's testimony or making it fit in any pattern. It is there with its defects, with its strengths, everything else.  Any suggestion that there is any conspiracy here to make the testimony fit the facts or do anything like that is absolutely ridiculous.

That's your argument?

A.    Yes.  We were trying to get the truth, and Woodruff

T. Drury - DX by Mr. Rudin          793

would testify, and then he'd hold something back, and it had to be --

Q.    Mr. Drury --

A.    And then he'd give you more and more and more.

Q.    Mr. Drury, those arguments were consistent with your training and the policy and practices at the DA's office?

A.    Certainly.  We didn't put together conspiracies against people.

Q.    Based on your knowledge of the evidence and the background of this case was that argument consistent with your training and the policies and practices of the DA's office?

A.    Yes, it was.

Q.    Now, let me show you --

A.    Everything that was consistent --

Q.    Go ahead.  Finish.

A.    Everything that was consistent and honest was presented to the jury, and nothing was held back.

     MR. JOEL RUDIN:  Let's go to page 615, line 14.

BY MR. JOEL RUDIN:

Q.    Now, Mr. Drury, you wanted the jury to -- well, withdrawn.

You wanted the jury to conclude that the five boys involved in the crime had targeted Mr. Crawford because they already knew that he had a lot of cash on him, that it was not a coincidence, right?

T. Drury - DX by Mr. Rudin                      794

A.    Right.

Q.    And so you argued -- and this is beginning at line 14 -- you know one thing.  There was no accident.  They found a guy with three hundred dollars on the street that night.  They could have hit any number of other people.  How did they know that?  How did they know?  They went in that bar.  They were in the bar.  They will say, well, there --

And then there's an objection.

If we can go to the next page.

Mr. Hulnick objected.  It was overruled.

How many people that night had three hundred dollars in their pocket on Fillmore nearby?

Do you recall making that argument?

A.    Yes.

Q.    Even though you knew how Mr. Hough and Mr. Woodruff had come up with that story?

A.    No.  It's a good argument.  How many people could find -- had three hundred dollars in their pocket on Fillmore Avenue?  Hardly anyone.  Only one.  It was Crawford.

Q.    You knew that was an important argument in your case, right?

A.    Yes, it was.

Q.    And you knew that Mr. Woodruff never said that until on February 11th at your direction police confronted him with a new story that had been obtained from Mr. Hough and for the

T. Drury - DX by Mr. Rudin                795

first time Mr. Woodruff came up with this story that two of the boys had gone inside the Golden Nugget?

A.   It was the truth.

MR. JOEL RUDIN:  All right.  Let's go to PX 74, page 619 --

THE WITNESS:  Can you answer --

BY MR. JOEL RUDIN:

Q.   Mr. Drury, there's no question pending.

MR. JOEL RUDIN:  If we can go to PX 74, the same transcript, at page 619, line 20.

BY MR. JOEL RUDIN:

Q.   Now, in your summation you relied on Mr. Hough's testimony that Mr. Boyd had a lot of money the next day at Simpson's store?

A.   Yes.

Q.   As a matter of fact, Hough testified that he had so much cash it was practically falling out of his pockets?

A.   I don't remember that.

Q.   Do you remember he testified about having a knot of cash, k-n-o-t?

A.   I don't remember.

Q.   Well, at line 20 you argued, What does that kid say? What did he say back on the 8th when he told the police how much Boyd had and was flashing around and was using it at the bar?  Simpson's store the next day.  He said I saw a five, I

T. Drury - DX by Mr. Rudin   796

saw a ten and I saw a twenty in his pocket and there was a knot of money.  Defense says, well, it's got to be more than sixty dollars.  I don't know how much it was.  All of a sudden he has got a lot of money the day after the man is murdered, and he told that the 8th, very soon after.

Do you recall making that argument?

A.   Yes.

Q.   And at the time you made that argument you knew of that January 15th P-73 report that police went to Simpson's store and were unable to corroborate Hough's account?

A.   It's true.

Q.   And you didn't turn that over?

A.   No, I didn't -- I did turn that over because that was Brady material.

Q.   Oh, and that's material you turned over?

A.   Yes.

Q.   But there's no record of it?

A.   Well, as I said, I should have -- I should have made a record of it.

Q.   And would you agree with me that if you didn't turn it over that your argument was taking advantage of your Brady violation?

A.   Oh, yes, yes.

Q.   Now, let's go to 625, line 17.  Do you recall generally, Mr. Drury, arguing that Tyrone Woodruff had no

T. Drury - DX by Mr. Rudin                797

reason to lie against his friends and was testifying against his own interest?

A.   Yes.

Q.   You said to the jury at 625, line 17, I just put this to you.  Why would somebody who didn't do a thing ask for immunity?  And he did.  And he got it.  Other than being a stupid dolt, as you see from the stand, he doesn't seem to be absolutely crazy.  He had a lawyer and he got immunity.  Why do you confess to a crime, go through all this stuff to get immunity, live out of the state and everything else if he didn't do it?  I think you have to believe that he did.

Do you recall making that argument?

A.   Yes.

Q.   And then at page 608 --

A.   It's a good argument, by the way.

Q.   Well, apparently you got a conviction with it, right?

A.   It's a very good argument.

Q.   And you persuaded the jury?

A.   They should have because that was the truth.

Q.   So let's go to page 608, line 7.  And this is with reference to Woodruff.  Testifying against his own interest in two ways.  He has got to come across against his own friends and he has got to admit he is there -- he is in there.  Think about it.

T. Drury - DX by Mr. Rudin                     798

You made that argument, right?

A.    Yes.

Q.    And when you made these arguments that we've just reviewed you knew that after Mr. Woodruff's first sworn statement denying any knowledge of the crime police promised him with prosecution -- threatened him with prosecution but offered him immunity?

A.    Yes.

Q.    You knew that you went along with that deal even though the police offer was improper?

A.    Why was it improper?

Q.    You testified yourself it was improper for the police to offer on behalf of the District Attorney's Office immunity to a witness when only the District Attorney's Office had the authority to make that promise.

A.    That's true.  And they --

Q.    So knowing the police did that in order to extract a change of story from Mr. Woodruff you ratified it?  You said, yes, you shouldn't have done that, but I'm going to do it, too?

A.    He had already made the admission.

Q.    You had already used the improper tactic to get the admission, and now you are offering him immunity, too?

A.    He had given a two-page detailed statement admitting to being part of the crime, and that was the basis for it.

T. Drury - DX by Mr. Rudin                           799

Q.   Right.  After he was offered immunity?

A.   Pardon?

Q.   After he was offered the immunity?

A.   Why wouldn't you?  Otherwise -- you needed him for the prosecution.

Q.   You knew Mr. Woodruff admitting he was involved in the crime and testifying against his friends was in his interest because it allowed him to escape going to prison or at least his fear of going to prison for possibly the rest of his life?

A.   If there was a crime.  You seem to indicate that there wasn't a crime or that these people weren't involved in it.  He -- he's there saying yes, we were involved in it.

Q.   You argued to the jury repeatedly that it was in Mr. Woodruff's -- it was against Mr. Woodruff's interest to implicate his friends and to implicate himself when you knew, in fact, it was in his interest because he could avoid the possibility of going to prison for the rest of his life, a 17-year-old boy?  You knew that, right?

A.   Of course, I did.

Q.   And you made that argument anyway?

A.   Yes.

MR. JOEL RUDIN:  Let's go to page 626.

THE WITNESS:  You mean to say that --

MR. JOEL RUDIN:  Let's go to page 626.

T. Drury - DX by Mr. Rudin                    800

THE WITNESS:  There was a deal made and it was the right thing to do.

MR. JOEL RUDIN:  Let's go to page 626, line 16.  This is with regard to Mr. Hough.  No.  This is the wrong clip.

BY MR. JOEL RUDIN:

Q.  Do you recall arguing that -- I'll withdraw that.

Do you recall arguing that not only Mr. Woodruff but Mr. Hough was testifying against his own interest by testifying against his friend Darryl Boyd?

A.  Yes.

Q.  But you knew that police had received an anonymous tip accusing Hough and Jerome Boyd of committing the crime, right?

A.  Yes.  An anonymous tip.

Q.  And you knew that Hough had been threatened with prosecution even though he was told he had passed the polygraph test, right?

A.  There you go with the wonderful tool, the polygraph.

Q.  And you knew that Hough had refused to take another test after he changed his story, right?

A.  Yes.

Q.  And you knew that Hough had recanted his --

A.  He recanted his recantation.

Q.  You knew he recanted, and then he recanted his recantation after he was told that he was lying and he had

T. Drury - DX by Mr. Rudin                      801

better go back to his previous story?

A.   Yeah.  What's the point?

Q.   And you knew that you had warned him about perjury, right?

A.   Makes you wonder about recantations, doesn't it?

Q.   You knew you had warned him about perjury, right?

A.   Yes, I think so.

Q.   And you knew, therefore, that testifying against Darryl Boyd was in his interest, not against it?

A.   In his interest testifying against your friends?

Q.   In order to escape prosecution for murder.

A.   I don't know what the police did.  I still don't remember, and I have no recollection.

Q.   In order to escape prosecution for perjury?

A.   Yes.

Q.   It was in his interest to not -- not to have you prosecute him for perjury, the way you prosecuted Darryl Boyd for murder?

A.   What it comes down to is the truth.  Recantations cannot be believed.

Q.   Your argument was untrue and you knew it, Mr. Drury, right?

A.   Untrue?

Q.   Yes.

A.   No.  Testifying against your friends?

T. Drury - DX by Mr. Rudin                    802

Q.   You made an argument that took advantage of all the information that you had withheld from Darryl Boyd's attorney?

A.   I did not withhold information from Mr. Hulnick.

Q.   Let's move on to another --

A.   You have this expanded view of Brady, which is nonsense.

Q.   Mr. Drury, there's another summation principle that I assume you would agree with, that a prosecutor may not personally vouch for or express an opinion about the credibility of a witness.

A.   Yes.

Q.   And yet regarding Mr. Woodruff you argued, I will tell you one thing, you got Woodruff up there who testified up there, pretty much ran it down for you in a way I believe, and then after you told the jury what you believe you added that it didn't matter.  Do you remember that?

A.   What didn't matter?

Q.   All right.  I'm sorry.  I asked that in a confusing way.  Let me withdraw that.

Regarding Woodruff you said, I will tell you one thing. You got Woodruff up there who testified up there, pretty much ran it down for you in a way I believe.

Do you recall making that argument?

A.   Yes, if it's there.

Q.   And do you recall arguing he is a ghetto kid, he is

T. Drury - DX by Mr. Rudin                    803

this and that, he is a snook?  You saw him.  He is an idiot, a nitwit.  I am asking you to believe him.

A.   Right.  I had to put him down to bring him up.  And, you know, Hulnick had attacked him in his summation.  So my summation was a reply to Hulnick.

Q.   Do you remember arguing about Mr. Woodruff being hapless, stupid, we are asking you to believe him?

A.   I put him down to bring him up.  Yes.  It's --

Q.   We are asking you to believe him?

A.   Yes.

Q.   Do you remember arguing concerning a defense witness Joyce Washington, I hope I didn't bully her.  I also hope you don't believe this kid for a minute.

Do you remember that argument?

A.   Yes.

Q.   Do you remember arguing --

A.   Was that Joyce Washington?

Q.   Yes.

A.   Yes.

Q.   Do you remember --

A.   Do you know -- do you know what happened that --

Q.   Mr. Drury --

A.   Do you know what happened to the alibi?

Q.   Mr. Drury --

MR. JOEL RUDIN:  Your Honor --

THE COURT:  Mr. Drury, if you could just please answer the question.

THE WITNESS:  Yeah.

BY MR. JOEL RUDIN:

Q.   Concerning Mr. Woodruff's inability to describe Mr. Crawford in detail in his testimony, do you recall arguing if I was involved in this thing I would have a hard time recalling somebody of a different race whose face was bloody or even prior to that I would want to put it out of my mind? Do you recall making that argument?

A.   Yes.

Q.   Mr. Drury --

A.   It was an awful moment for him.

Q.   Mr. Drury, do you also agree with me that a prosecutor may not make an argument about a so-called fact that is not in evidence?

A.   Yes.

Q.   Do you recall arguing at the trial -- or I should say do you recall representing that you didn't call Detective Deubell to testify because, quote, I put on one.  I thought it was sufficient.  All Deubell is going to testify is I took a statement along with Guadagno.

Do you remember that argument?

A.   Right.  I put on the typist.

Q.   You were telling the jury that Mr. Deubell's

T. Drury - DX by Mr. Rudin                    805

testimony would have been the same as Detective Guadagno's, even though the jury never heard from Detective Deubell?

A.    Yes.  Guadagno was the typist, and he testified to what anything that Deubell would have said.

THE COURT:  Hold on for one second.  I just want to put on the record that the -- some of the portions of the summation that you were just going through were published to the jury, which is fine.  They are in evidence.  But moving forward if we're going to publish something let's just make sure we put it on the record.

MR. JOEL RUDIN:  Yes.  I'm going to want to actually have it up on the screen.  I'll ask.

THE COURT:  Okay.

BY MR. JOEL RUDIN:

Q.    You substituted your own testimony for Detective Deubell, right?

A.    My own testimony in place of Deubell -- no.  I had Guadagno.

Q.    But you told the criminal jury that Deubell's testimony would be the same as Guadagno?

A.    Well, Deubell was asking the questions.  Guadagno was typing them out.  And it's the same.

Q.    They were both there for the same incident?

A.    Yes.

Q.    And so you were telling the jury that Deubell's

T. Drury - DX by Mr. Rudin                806

account of what happened during that incident would have been the same as Guadagno?

A.   Of course, it was.  Deubell typed it.

Q.   But you never called Deubell to testify to that, you just made a representation on your own?

A.   Why would I bore the jury?

Q.   Okay.  Mr. Drury, do you agree with me that in our system it is the prosecution that has the burden of proof in a criminal case?

A.   Yes.

Q.   And that a prosecutor may not make an argument that appears to shift that burden to the defense?

A.   That's right.

Q.   Do you recall you argued, quote, and on top of that you see what Darryl has to offer, zilch?

A.   I'm sorry.  Darryl Boyd?

Q.   Yes.

A.   No.  He -- he made a statement.  He gave -- the statement was admitted in court and it rebutted his alibis. It was devastating.

MR. JOEL RUDIN:  May we have 626, lines 18 to 19, please?

BY MR. JOEL RUDIN:

Q.   And on top of that you see what Darryl has to offer, zilch?

T. Drury - DX by Mr. Rudin                         807

A.   He did.

Q.   He --

A.   His statement to whatever the police officer was rebutted the testimony of Joyce Washington and the other witnesses who said the boys were with them all night, and he said no, no we were here, there and everywhere else.  His statement rebutted what they said.

Q.   Mr. Drury, we'll deal with that during this trial, but my question to you is whether or not you argued to the jury that Darryl Boyd had some sort of obligation to offer evidence and he offered zilch.

A.   I didn't mean it that way.

Q.   That's how it came out, right?

MR. BLENK:  Objection, Your Honor.

THE WITNESS:  I don't think so.

THE COURT:  The objection is overruled.

THE WITNESS:  I'm offering what -- the weight of what he had to offer, which was he rebutted his own alibi witnesses.

BY MR. JOEL RUDIN:

Q.   Mr. Drury, do you agree with me that a prosecutor may not suggest to the jury that a defendant's own lawyer doesn't believe in his innocence?

A.   I didn't say that.

Q.   Do you agree with that principle?

T. Drury - DX by Mr. Rudin                                    808

A.    Yeah, yes.

Q.    Yet you told the jury --

MR. JOEL RUDIN:  And let's put this up, line -- page 635, lines four to seven.

BY MR. JOEL RUDIN:

Q.    You, referring to the jury, are not going to break anybody's heart here, at least none of the attorneys here, whatever you decide.

In other words, Darryl Boyd's attorney didn't care what the verdict was for his own client?

A.    That's not the implication there.  That is --

Q.    That's not the implication?

A.    No.

Q.    Let's go to another principle.  A prosecutor may not ridicule the defendant or the witnesses in the case.  Do you agree with that?

A.    Yes.

Q.    Regarding Mr. Boyd -- and let's go to page 612, lines one to three -- the poor kid is confused.  The poor kid is only 16.  He is in there without his mommy and daddy.  God love him.  You can take that.

Did you make that argument?

A.    Yes.

Q.    And then on page --

A.    That's in reply to what the summation by the defense

T. Drury - DX by Mr. Rudin                 809

lawyer was.

Q.   The poor kid is only 16.  He is in there without his mommy and daddy.  God love him.  That's a fair response to the defense lawyer's argument?

A.   You had to read the defense lawyer's argument.

MR. JOEL RUDIN:  Let's go to page 621, lines 5 to 11.

BY MR. JOEL RUDIN:

Q.   Joyce Washington took the stand.  I hope I didn't bully her.  I also hope you don't believe that kid for a minute.

Did you make that argument?

A.   Yes.

Q.   Now, there's another --

MR. JOEL RUDIN:  We can take that off.

THE WITNESS:  That's when she testified that somehow after twelve days later she remembered all that happened in her apartment.

MR. JOEL RUDIN:  Let's actually put that back.  I forgot something.

BY MR. JOEL RUDIN:

Q.   Then you went on, when were you first told that this was a significant date?  What?  Then the mother, precious thing, Dorothea Luster, a product of Mrs. Boyd's multiple defenses, another one of her alibi attempts.

You referred to Dorothea Luster, a defense witness, as a

T. Drury - DX by Mr. Rudin                                810

precious thing?

A.   Yeah.

Q.   That was a grown woman.  That was the mother of Joyce Washington, right?

A.   Yes.

Q.   That was acceptable argument?

A.   I probably demeaned her.  I'm wrong that I did it, but it's one claim in a long summation.

Q.   Would you agree with me that prosecutors are not allowed --

MR. JOEL RUDIN:  You can take that off.

BY MR. RUDIN:

Q.   Prosecutors are not allowed to make arguments that would inflame the passions of the jury?

A.   That's right.  Of course, you have a man that died in his -- by being struck by a pipe multiple times.

Q.   During -- withdrawn.

And would you agree with me that prosecutors are not allowed to make arguments that appeal to racial prejudice?

A.   Racial -- yes.

Q.   Did you argue, look, if we had fed Woodruff stuff you wouldn't have had that blithering idiot up there talking like he did?  Did you make that argument?

A.   Yes.

Q.   Did you make the statement:  Oh, he is not a

T. Drury - DX by Mr. Rudin                                811

beautiful witness.  And I'm telling you, hey, this is a poor product of his environment.  He is a ghetto kid.  He is this and that.  He is a snook.  You saw him.  He is an idiot, a nitwit.  I'm asking you to believe him.

Q.    You made that argument, right?

A.    Oh, yeah.  I demeaned him to get -- to try to get the jury to believe him.

Q.    You said he was hapless, stupid, but we are asking you to believe him, right?

A.    You should have seen the mistakes he made.

Q.    And then you argued why would somebody who didn't do a thing ask for immunity?  And he did.  And he got it.  Other than being a stupid dolt.

You made that argument?

A.    Yes.

Q.    And then you said Woodruff was as bad as the rest of them?  You made that argument?

A.    Yes.  He got the money.

Q.    And then you said you know that place over there, you know the Glenny projects, it is a junkyard?  You made that argument?

A.    It's not a nice place.

Q.    So in sum you called Mr. Woodruff a blithering idiot, a poor product of his environment, a ghetto kid, an idiot, a nitwit, hapless, stupid and a stupid dolt, right?

T. Drury - DX by Mr. Rudin                              812

A.   He was part of a gang of five.

Q.   Did you make those -- that argument?

A.   Part of a gang of five who went out and killed this man for his money.

Q.   Did you make that argument, Mr. Drury?

A.   Yes, I did.

Q.   And were these statements that you made about Mr. Woodruff consistent with office policy and practice about what was permissible to argue in summation?

A.   Well, if you deal with the facts, you -- and those are the facts.  This group of five surrounded him and killed him, beating him with a pipe, putting blood on the wall.

Q.   Mr. Drury, were those statements that you made about Mr. Woodruff consistent with office policy and practice about what was permissible to argue in summation?

A.   I responded to the summation by Mark Hulnick, the lawyer for Mr. Boyd.

MR. JOEL RUDIN:  Your Honor, I would ask to play PX 245, page 428, line 7 through 11, and offer it into evidence.

MR. BLENK:  Mr. Rudin, can you just repeat the line numbers, please?

MR. JOEL RUDIN:  I'm sorry.  428, 7 through 11.

THE COURT:  We're waiting for Mr. Blenk to respond.

MR. JOEL RUDIN:  I'm sorry?

THE COURT:  We're waiting -- I'm waiting for Mr. Blenk

T. Drury - DX by Mr. Rudin                    813

to respond.  He's looking at that portion.

MR. JOEL RUDIN:  I'm sorry.  I didn't realize that.
I'm sorry.

MR. BLENK:  No objection, Your Honor.

THE COURT:  Okay.  That portion is received.  We can publish it to the jury.

MR. JOEL RUDIN:  Thank you.

*(Above-mentioned Portion of Plaintiff's Exhibit 245 received in evidence.)*

(Video played.)

BY MR. JOEL RUDIN:

Q.   Mr. Drury, you said Mr. Woodruff was a ghetto kid?

A.   Yes.

Q.   But you knew that, in fact, he lived in a private house on Fillmore Avenue, not in the Glenny projects?

A.   Yes.

Q.   He lived at 494 Best Street?

A.   Yes.

Q.   Why did you call him a ghetto kid?

A.   It's how you interpret ghetto.

Q.   All right.  I'm asking you a lot of questions, but every now and then you make me speechless.

MR. BLENK:  Objection, Your Honor.  Move to strike.

THE COURT:  That comment is stricken.  The jurors should disregard.

T. Drury - DX by Mr. Rudin                814

BY MR. JOEL RUDIN:

Q.   Was making the argument that Woodruff was a poor product of his environment and a ghetto kid consistent with office policy and practice?

MR. BLENK:  Objection, Your Honor.  Asked and answered.

THE WITNESS:  I probably -- I shouldn't have referred to him as a ghetto kid.

THE COURT:  Overruled.

Just go ahead.

THE WITNESS:  That's a crime-ridden area.

BY MR. JOEL RUDIN:

Q.   You know you went too far?

A.   Yeah, I did.

Q.   And no one from the DA's office pulled you aside after that summation in this murder case and said you shouldn't have said that?  Nobody criticized you?

A.   For one comment in a long summation in response to the defense summation?  No, they didn't.

Q.   Did anyone criticize you or pull you aside for anything at all that you said during your summation?

A.   No.

Q.   For anything at all that you did in the trial?

A.   No.  I didn't do anything wrong.  He was legitimately -- your client was legitimately convicted for the crime that he and his fellows and his pals committed, killing

T. Drury - DX by Mr. Rudin                815

William Crawford in his driveway.

Q.   All right.  Mr. Drury, while you were handling the Crawford case you were familiar with whatever policies the DA's office had, weren't you?

A.   Yes.

Q.   And you tried to conform to those policies?

A.   Yes.

Q.   And the office's appeals bureau informed you what you had to do to comply with office policy regarding Rosario and Brady?

A.   Yes.

Q.   And the head of the appeals bureau was a woman named Judith Manzella?

A.   Yes.

Q.   You tried to conform to office policy with respect to compliance with Brady?

A.   Yes.

Q.   You tried to conform to what you understood District Attorney Cosgrove's expectations were in the handling of criminal prosecutions?

A.   Yes.

Q.   You met with him on a regular basis, right?

MR. BLENK:  Objection, Your Honor.  Asked and answered.

THE WITNESS:  No, I didn't.

THE COURT:  Overruled.

T. Drury - DX by Mr. Rudin                    816

But, Mr. Drury, just wait for me to rule on the objection before you start to answer.  Thank you.

THE WITNESS:  I didn't report to him.

BY MR. JOEL RUDIN:

Q.   Didn't you meet with him every week each week?

A.   Casually, yes.  We were friends.

Q.   So you met with him each week?

A.   Yes.  I'd run into him and say hi Eddie.

Q.   So when you testified previously that you met with him each week you meant you just would say hi Ed?

A.   Yeah.  It was casual.

Q.   You didn't meet with him and talk about your cases?

A.   No.

Q.   Never?

A.   Well, there were probably some cases, yes.

Q.   I mean, all those years you were at the DA's office and you were handling the most important cases in the office you never talked to the District Attorney on whose behalf you were handling those cases to talk about them?

A.   Sometimes.

Q.   He trusted you with the biggest cases in the office because he knew that you would follow his policies, right?

A.   Yes.

Q.   He knew how you handled your cases?

A.   I think so.

T. Drury - DX by Mr. Rudin                                817

Q.   He knew you would do whatever it took to win and he was fine with it, right?

A.   No.  That's not right.  You've got to do it above board, legitimately.  If something is there that somehow helps the defense, you turn it over.  It's called Brady.

Q.   You tried to conduct yourself regarding Brady in a way that would meet with District Attorney Cosgrove's approval, right?

A.   No.  I did it because that was the law.

Q.   Did you try to conduct yourself in a way that would meet with District Attorney Cosgrove's approval?

A.   That and the fact that it was the law.  I didn't really care if he approved it or not.

Q.   I'm sorry?

A.   I don't care if he approved it or not.

Q.   So you weren't trying to conduct yourself regarding Brady in a way that would meet with his approval?

A.   I wasn't doing it to get his approval.  I was doing it because that is the law and dealing with favorable information in my possession.

Q.   Do you recall testifying at your deposition that you tried to conduct yourself regarding Brady in a way that would meet with District Attorney Cosgrove's approval?

A.   I'm sure it met with his approval, but I was doing it because that was the law.

T. Drury - DX by Mr. Rudin                    818

MR. JOEL RUDIN:  Your Honor, I would ask to play the clip at page -- PX 245, page 36, lines 14 to 18.

THE COURT:  Mr. Blenk?

MR. BLENK:  No objection, Your Honor.

THE COURT:  The portion is received.

*(Above-mentioned Portion of Plaintiff's Exhibit 245 received in evidence.)*

*(Video played.)*

BY MR. JOEL RUDIN:

Q.   Mr. Drury, your decision not to disclose documents in your possession, custody or control -- withdrawn.

Any decision you made in this case not to disclose any document in your possession, custody or control reflected a determination they were not Brady; is that right?

A.   Yes, or I turned it over.

Q.   If you decided not to turn over a document, that was because you determined that you did not have to do it under Brady?

A.   Certainly.

Q.   You did not withhold any document you believed you were required to produce by the policies and practices of the Erie County DA's office?

A.   I'm sorry.  Again.

Q.   Do you agree with me that you did not withhold any document that you believed you were required to produce by the

T. Drury - DX by Mr. Rudin

819

policies and practices of the Erie County DA's office?

A.    Right.

Q.    Any decision you made not to produce documents or information under Brady was consistent with the office's policies and practices?

A.    Yes.  I was there.  I was their representative, and I would determine what was Brady or not.

Q.    All right.  I want to go on now to discuss summation policy and practice.

Before Mr. Boyd's trial the appeals bureau provided you training on behalf of the office of what you were and were not allowed to argue in summation, correct?

A.    Right.

Q.    And that bureau was also headed by Ms. Manzella?

A.    Yes.

Q.    And when you delivered summations on behalf of the DA's office you tried to conform to the training you had received?

A.    Yes.

Q.    And that was true for Mr. Boyd's trial?  In your summation you tried to conform to the training you had received?

A.    Yes.

Q.    But you knew that even if a Court found that you had engaged in summation misconduct -- misconduct in your

T. Drury - DX by Mr. Rudin     820

summation you would not be disciplined or get into any trouble with the District Attorney?

A.   I'm sorry.  I knew if I didn't follow those guidelines I would be not be disciplined in some fashion?  Is that your question?

Q.   Yeah.

A.   No.  I might be disciplined, certainly.

Q.   During all your time --

A.   There was a -- there would be a reprimand, yes.

Q.   During all your time at the Erie County DA's office you never heard of a single prosecutor who was disciplined following an appellate reversal for prosecutorial misconduct; isn't that right?

A.   I can't remember if I did.

Q.   I'm sorry?

A.   I can't remember.

Q.   Well, do you recall testifying at your deposition -- page 61, lines 2 to 17 -- that you never heard of any prosecutor while you were there who was disciplined following an appellate reversal for prosecutorial misconduct?

A.   If I said it, I said it.

Q.   Well, did you say it?

A.   In thinking again, no, I don't remember.  I don't recall.

MR. JOEL RUDIN:  All right.  I'd like to offer PX 245,

T. Drury - DX by Mr. Rudin                          821

lines -- page 61, lines 2 to 17.

THE COURT:  Mr. Blenk?

MR. BLENK:  May we approach, Your Honor?

THE COURT:  Sure.

(At bench:)

MR. BLENK:  Again, Your Honor, there's nothing that's contradicting Mr. Drury's testimony in the deposition.

THE COURT:  Can you just show me the portion?  61, 2 to 17.

MR. JOEL RUDIN:  Here.

THE COURT:  Does it go on to the next page?  Okay.

MR. JOEL RUDIN:  Yeah.

THE COURT:  So you're saying that --

MR. JOEL RUDIN:  He said that he doesn't have any memory now, but he declined to say that he didn't know about it then, and that's something that contradicts.

MR. BLENK:  If we're going to go through -- he's basically conceding the sum and substance of his deposition, and we're going to -- this is not impeaching his -- this is not impeaching his testimony today, and it's giving the wrong impression to the jury that there's this -- that he's being confronted with this deposition transcript that doesn't contradict his testimony.

THE COURT:  Well --

MR. BLENK:  I mean, on occasions there has, I

T. Drury - DX by Mr. Rudin                     822

understand that, and those were admitted, but this -- this is not in contrast in my view.

THE COURT:  I mean, I guess he's -- he testified just now that he -- you asked him about whether anyone had been disciplined before.

MR. JOEL RUDIN:  Whether he heard at the DA's office while he was there that anyone was disciplined, and he said he doesn't remember what he heard then, but he doesn't remember now.  And I asked him if he heard then, and he declined to -- he denied that he had any memory of knowing then.  But here he knew that he knew then.

MR. BLENK:  He knew that he knew then that --

MR. JOEL RUDIN:  He testified here that he knew then that no one was disciplined for summation misconduct after appellate reversals.

THE COURT:  Okay.  I mean, I guess this question technically is about --

MR. JOEL RUDIN:  Discipline.

THE COURT:  Was any prosecutor investigated for the purpose of -- is that what you're saying?

MR. BLENK:  He said not that I'm aware of.  Not that I'm aware of.  That's consistent with answering not that I remember.

THE COURT:  Okay.  I'm going to sustain the objection.

MR. FIRSENBAUM:  Your Honor, two other issues.

T. Drury - DX by Mr. Rudin                                823

Number one, I just want to put counsel on notice and the Court on notice that our position is that the witness opened the door to the basis for the 440 decision. The witness testified he believed that -- I don't have the transcript obviously, but the witness testified that he believed this was a valid conviction, and that opens the door to putting before the jury that there's a decision saying that this is not a valid conviction.

MR. BLENK: I disagree with that, Your Honor.

THE COURT: Okay.

MR. FIRSENBAUM: We don't need a ruling on that right now, but we just want to put everyone on notice that we may want to impeach -- I guess we do need a ruling on that right now.

THE COURT: I was going to say, because you'd want to --

MR. FIRSENBAUM: And then second -- yeah. And then, I mean, the witness two or three times has violated the Court's ruling on providing opinions about guilt. We've made a judgment not to jump up out of our seat in front of the jury when that was done, but I think -- I mean, we'd like Your Honor to instruct counsel to instruct the witness that that can't continue to happen.

THE COURT: Okay. I will. And he has.

MR. BLENK: Can that be done outside the presence of

T. Drury - DX by Mr. Rudin                    824

the jury, Your Honor?

THE COURT:  No.  The whole point is -- I mean, okay.  I may have misheard you.  I will give an instruction to the jury that that's not relevant.  So are you asking me for something else?

MR. FIRSENBAUM:  No.  I'm not asking for anything in front of the jury at least right now.

THE COURT:  I was going to actually consider instructing the jury that and reminding them that, you know, guilt or innocence is not relevant, but you're not asking for that?

MR. JOEL RUDIN:  That's --

MR. FIRSENBAUM:  There's a lot of thinking that goes into that.

THE COURT:  Then tell me what your request is.

MR. FIRSENBAUM:  The request was to request that counsel next time they are speaking to the witness instruct the witness that he's not allowed to say that.

MR. BLENK:  Yeah.  We haven't been -- we haven't been in discussion to be very clear.

MR. FIRSENBAUM:  He's your client though.

MR. BLENK:  We have not been discussing testimony.

MR. FIRSENBAUM:  I'm not accusing you of telling him to do that.  I'm not accusing you of talking during it.  I'm saying that last time he testified you didn't call him right

T. Drury - DX by Mr. Rudin    825

away.  You saved him for the rest of your case.  The Court allowed you to speak with him during that interim period. Assuming that's going to be the case again, that you tell him between today and the next time he testifies that he is not allowed to offer that testimony.

MR. BLENK:  And we have no intention of eliciting testimony --

MR. FIRSENBAUM:  I'm asking for more than that because he's violated the court order three times.

MR. JOEL RUDIN:  Can we do that when we finish with him?  Because I would like to finish with him.

THE COURT:  Okay.  I mean, let's take -- I'm going to have the jury go in the jury room just for a few minutes so I can tell him.  And then you can put your response on the record for the request about opening the door.  Okay?

MR. BLENK:  Okay.  Thank you, Your Honor.

(Open court:)

THE COURT:  Members of the jury, we need to address just a few things outside of your presence.  So I'm going to ask you to take a brief recess.  All of the admonishments apply.  And we'll get back to you as soon as we can.  Thank you.

(Jury not present.)

THE COURT:  Okay.  Have a seat.

THE WITNESS:  Would you give me that blue bag?

T. Drury - DX by Mr. Rudin                              826

THE COURT:  Mr. Drury --

THE WITNESS:  Yes, Your Honor.

THE COURT:  -- I wanted to advise you, you've made some statements in your testimony about your opinion that Mr. Boyd or some of the codefendants were actually guilty, and I'm advising you that that kind of opinion is improper here. I've made rulings.  And I know I gave you a bunch of instructions the other day about it, but you cannot give your opinion about the guilt or innocence of any of the codefendants.

Do you understand?

THE WITNESS:  Well, the implication by counsel is that I'm --

THE COURT:  Well, Mr. Drury, I'm not here to debate it. I just am telling you you can't give that opinion.

THE WITNESS:  Okay.

THE COURT:  Okay.  Now, I want to just address your argument.  Would you like to do it outside of the presence of Mr. Drury?

MR. FIRSENBAUM:  Yes.  And I'd like to add to it a little bit more, Your Honor.

THE COURT:  Okay.  That's fine.

Mr. Drury, then can you please exit the courtroom?  We just need to address a few things.

THE WITNESS:  Sure.

T. Drury - DX by Mr. Rudin                          827

THE COURT:  Thank you.

(Mr. Drury not present.)

THE COURT:  Mr. Firsenbaum, go ahead.

MR. FIRSENBAUM:  Thank you, Your Honor.

So the witness actually opened more doors than I articulated at sidebar.  His statement was in the plural as to all codefendants.  These convictions are legitimate was the testimony.  That is false according to two subsequent court proceedings.

The first is the 440 decision that found that both Mr. Boyd's and Mr. Walker's convictions were not legitimate because of the nondisclosure of two photographs.  Second, the Walker civil jury found that Walker's conviction was not legitimate.  And that has opened the door to both findings of both court proceedings that directly contradict the witness's testimony.

MR. JOEL RUDIN:  Floyd Martin was acquitted.

MR. FIRSENBAUM:  Floyd Martin was acquitted.  And Your Honor had not allowed that fact into evidence, and that directly contradicts the witness's testimony.

THE COURT:  Okay.  I'm going to deny Plaintiff's request to get into the verdicts or the vacatur of Mr. Walker's conviction.  I don't find that opened the door.  I mean, this was his -- it was I guess his opinion that he gave, which I agree is impermissible.  And I have instructed

T. Drury - DX by Mr. Rudin                           828

him not to give those opinions, but I don't find that it's opened the door.  So --

MR. FIRSENBAUM:  Your Honor, at the very least, could we ask that the Court when the jury returns restate what Your Honor said in the preliminary instruction, which is -- that the agreed to language that is in the preliminary instruction that the convictions were vacated, that Mr. Boyd's conviction was vacated?

THE COURT:  Mr. Blenk?

MR. BLENK:  I don't think any additional instruction is necessary, Your Honor, and it brings unnecessary attention to the matter.

THE COURT:  I'm not going to advise them of that at this point.  I can give them an instruction that any opinion that he expressed about any of the codefendants' guilt is not relevant and should not be considered.

MR. FIRSENBAUM:  Your Honor, we're not requesting -- we would request that that instruction not be given at least at this time.  We need to think through that before we want that going to the jury.

THE COURT:  That's fine.  Then I'm just going to bring the jury back.  I just would really like to get the direct examination done.

We can bring him back in.  Thank you.

(Mr. Drury present.)

T. Drury - DX by Mr. Rudin                               829

THE COURT:  We're going to bring the jurors in.

MR. BLENK:  Your Honor, is it okay if I just reiterate the matter about opinion?

THE COURT:  To Mr. Drury?

MR. BLENK:  Yeah.

THE COURT:  Sure.

(Defense counsel conferring with witness.)

(Jury present.)

THE COURT:  Okay.  Have a seat, everyone.

The jurors have returned to the courtroom.  We will continue with Mr. Drury's direct examination.

Mr. Drury, I just remind you that you are still under oath.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Mr. Rudin?

MR. JOEL RUDIN:  Your Honor, I will withdraw the previous question and ask my question in a more precise way.

THE COURT:  Okay.  Go ahead.

BY MR. JOEL RUDIN:

Q.   Following any Appellate Division reversal while you were at the DA's office, to your knowledge was any prosecutor investigated for the purpose of deciding whether that prosecutor should be disciplined for the case that was reversed?

A.   I don't remember anything like that.

T. Drury - DX by Mr. Rudin                    830

Q.   While you were at the DA's office did you ever learn that any ADA was ever investigated or disciplined for an alleged failure to disclose Brady, Rosario or discovery material?

A.   I don't recall anything -- anything of that sort.

Q.   Did you know a prosecutor at the DA's office named Al Ranni?

A.   Yes.

Q.   Am I pronouncing his name correctly?

A.   Yes.

Q.   He was there when you started at the office?

A.   We almost -- almost the same time.

Q.   And he was your friend?

A.   Yes.

Q.   You socialized with him outside the office?

A.   Somewhat.

Q.   He was looked up to by other ADAs in the office while you were there?

A.   I don't think so.  Not looked up to, but he was sometimes -- he was thought well.

Q.   I didn't understand.

A.   He was thought well of to some extent.

Q.   He was thought well of at the office?

A.   Yeah.

Q.   And other ADAs looked up to him?

T. Drury - DX by Mr. Rudin                                831

A.   I don't know.

Q.   Do you recall testifying at your deposition -- page 68, line 15 to 19 -- that he was looked up to by other ADAs in the office while you were there?

A.   Well, if I said so, but some did, some didn't.

Q.   Did you say so?

A.   Pardon?

Q.   Did you give that testimony?

A.   Yeah.

Q.   And at some point he became chief of the felony trial bureau?

A.   Not while I was there.

Q.   Are you sure of that?

A.   I'm sure of that.

Q.   Were you assigned to the felony trial bureau?

A.   Yes.

Q.   Not only did prosecutors look up to Mr. Ranni, but they considered him a role model; is that correct?

A.   Oh, I don't know about that.

Q.   Did you testify at your deposition that prosecutors in the office considered Mr. Ranni a role model?

A.   If I testified to it, it was wrong.

Q.   Well, did you testify to it?

A.   Did I testify that he was a role model?

Q.   Yeah.

T. Drury - DX by Mr. Rudin                    832

A.   If I did, I was wrong.  No.

Q.   Did you --

A.   As I said, if I did, I was wrong.  He was not a role model.

MR. JOEL RUDIN:  Your Honor, I would ask to play 245 -- PX 245, pages -- page 68, line 21 to 69, line 1, and offer that into evidence.

THE COURT:  Mr. Blenk?

MR. BLENK:  What's the starting point?

MR. JOEL RUDIN:  68, line 21.

MR. BLENK:  No objection, Your Honor.

THE COURT:  The portion is received.

(Above-mentioned portion of Plaintiff's Exhibit 245 received in evidence.)

(Video played.)

BY MR. JOEL RUDIN:

Q.   Now, you attended some of Mr. Ranni's trials?

A.   I probably did.

Q.   Well, do you remember you testified at your deposition that you did?

A.   I said I probably did.  I don't remember.

MR. JOEL RUDIN:  May we have PX 245, pages 69, lines three -- well, withdrawn.

BY MR. JOEL RUDIN:

Q.   Did you believe at the time that you were at the

T. Drury - DX by Mr. Rudin    833

office that Mr. Ranni conducted himself in an appropriate way?

A.    For the most part.

Q.    Do you remember a robbery/murder case that Mr. Ranni prosecuted People against J. L. Ivey?

A.    I remember the name of the defendant, but other than that I don't.

Q.    Don't you recall that you were initially assigned to that case?

A.    No.

MR. JOEL RUDIN:  May we show the witness and the jury PX 100, the Ivey case card which is in evidence?

Your Honor, I recall that there was an agreement that that case card is in evidence.

THE COURT:  I think I have that PX 100 is in evidence.

Mr. Blenk?

MR. BLENK:  Could we have a sidebar, Your Honor?

THE COURT:  Sure.

(At bench:)

MS. MEANS:  Do you have -- does someone have the date it was admitted?  We're just having trouble finding when.

THE COURT:  The 6th.

(Counsel conferring off the record.)

THE COURT:  It's received.

MR. BLENK:  Thank you, Your Honor.

(Open court:)

T. Drury - DX by Mr. Rudin                    834

THE COURT:  PX 100 is already received.  So you can refer to that.

MR. JOEL RUDIN:  Thank you.

May we have that up on the screen, please, for the witness and the jurors?  PX 100.

BY MR. JOEL RUDIN:

Q.   Do you see, Mr. Drury, that this is a case card that gives the defendant's name as J. L. Ivey?

A.   Yes.

Q.   And do you see that it indicates that he was indicted on the third line on 3-15-76?

A.   Yes.

Q.   And then as you go further down there's a line for arraigned?

A.   Yes.

Q.   And then a little further down it says counsel?

A.   Yes.

Q.   And then it says assigned to Drury?

A.   That's what it says.

Q.   And then later on there are a number of references to Mr. Ranni handling the case.  Do you see that?  Actually the very next entry says jury trial September 22nd, 23rd.  And then on September 23rd, 1976, with Mr. Ranni handling the case, the Court declared a mistrial.

Do you see that?

T. Drury - DX by Mr. Rudin    835

A.    Yes.

Q.    And then underneath that it says three-day trial September 24, 27, 28, 1976.  And, again, it says Ranni and it says a mistrial was declared?

A.    Yes.

Q.    And then there's another trial beginning September 29 and continuing until the end of October.  And it, again, indicates Ranni.  And this results in a conviction?

A.    I don't see Ranni's name.  Yes, I do.  Both times, yes.

Q.    Okay.  So originally you were assigned to the case, and then at some point it was reassigned to Mr. Ranni?

A.    Right.

Q.    So you knew about case?

A.    Did I know about -- I don't remember it.

Q.    Well, you don't remember it now, but at the time you knew about the case?  It was a robbery/murder case.

A.    Evidently if my name was there, but I don't remember it.

MR. JOEL RUDIN:  You can take that off.

BY MR. JOEL RUDIN:

Q.    And so the trial occurred in September 1976 through October 1976, right?  We just went over that?

A.    That's what the card says I think.

Q.    And that was well before Mr. Boyd's trial, right?

T. Drury - DX by Mr. Rudin                                     836

A.    Yeah, yes.

Q.    Mr. Ivey was convicted and he appealed?

A.    Well, the card is removed.  So I don't know.

MR. JOEL RUDIN:  Could we put up PX 99, the Appellate Division decision?

BY MR. JOEL RUDIN:

Q.    Now, you've read this decision before, haven't you?

A.    I did at one point, yes.

Q.    You remember we reviewed it at your deposition?

A.    Pardon?

Q.    We reviewed it at your deposition?

A.    Something like that, yes.

Q.    And do you see that this Court decision indicates -- and this is the right-hand column -- defendant was convicted after a jury trial of three counts of murder in the second degree and two counts of robbery in the first degree which arose from an armed robbery during which a gas station attendant, 25-year-old Alan Sturman, was shot to death.

And then it goes on to say defendant's principal contention on appeal is that he's entitled to a new trial because of prosecutorial misconduct.  We agree.  The record is replete with numerous and repeated acts of improper and prejudicial conduct by the prosecution which deprived defendant of a fair trial.

And then it cites three Court decisions, as well as the

T. Drury - DX by Mr. Rudin                 837

Code of Professional Responsibility.

A.   Yes.

Q.   And then it cites a case, People against Alicea, and has a Court citation 37 NY2d 601.  It's referring to a decision of the New York Court of Appeals, the highest court in New York State, right?

A.   Yes.

Q.   And it's indicating that the conduct of Mr. Ranni in this case was contrary to a Court decision of the highest court in New York State?

A.   Yes.

Q.   And then it goes on to say that it is unnecessary to itemize all the incidents, but we mention briefly the following, and then it starts to go through some of the incidents?

A.   Yes.

Q.   And then going to the third line from the bottom, it was highly improper then for the prosecutor to comment to the jury and insinuate that the Court's ruling unfairly precluded him -- well, withdrawn.

I want to go to the next page just to deal more directly with summation misconduct.

Furthermore, we condemn the prosecutor's inflammatory and prejudicial opening statement and summation designed to scare the jury with warnings that any mistake on his part would mean

T. Drury - DX by Mr. Rudin                838

that the murderer goes free.  Similarly to be condemned are the prosecutor's attempts in his summation to inject sympathy for the victim.

Neither can we condone the prosecutor's disparagement of defendant's alibi witnesses by referring to their testimony as lies, garbage and advising the jury that we should wash that chair, the witness chair, after she, the defendant's alibi witness, leaves.  Portraying alibi witnesses as bad citizens for their failure to cooperate with the District Attorney is improper.

Lastly, the prosecutor clearly implied to the jury in his summation that he knew some things about the case he wished they knew and stated in my opening statement, to you I would confine the proof to the indictment.  About ten o'clock tomorrow morning you are going to hear about other things. You are going to hear about the type of crime and about the person who has committed that crime.

This repeated misconduct is obviously inconsistent with a public prosecutor's duty to be fair and impartial and to avoid unfair insinuations designed to prejudice the jury.

As Judge Gabrielli stated for the Court of appeals in People against Alicea, criminal trials are to be so conducted that the proof will be legal evidence unimpaired by intemperate conduct, impertinent counsel and irrelevant asides, all of which obfuscate the development of factual

T. Drury - DX by Mr. Rudin                          839

issues and sidetrack the jury from its basic mission of determining the facts relevant to guilt or innocence.

Although every trial may not be impeccably conducted and free of some error, we will not tolerate trials where unadulterated unfairness and deceit have become the rule.

Do you recall reading that decision?

A.   Yes.

Q.   And while you were at the DA's office you never heard that your friend Mr. Ranni was disciplined for the misconduct found by this appellate court to have occurred?

A.   I can't remember it.

Q.   You don't ever hearing that he was disciplined for this misconduct?

A.   I can't remember it.

Q.   If I might ask you about another case he conducted, People against Kenneth Johnson.

MR. BLENK:  Your Honor, may we approach?

THE COURT:  Sure.

(At bench:)

MR. BLENK:  I just ask that Mr. Rudin not be allowed to just -- he was -- he just read the last sixty words, just reading quoted language from a decision.

Now, it's one thing if the Court is describing the conduct -- if the Court is describing how they view the conduct, but Mr. Rudin's references to the highest court in

T. Drury - DX by Mr. Rudin                    840

the land and legal citation it's not appropriate.  It's not an appropriate angle of attack.

It's not -- and it's very confusing to the jury that they are being -- I mean, we all know how to read cases, but it took us three years of school to even be initially qualified to read cases.  I understand the point of attack, but to -- I object to the idea that he's reading legal rules and legal quotes from cases and citations to the jury.

THE COURT:  So your objection really was to that one part where he talked about it being contrary to the top court in New York State?  Is that your objection?

MR. BLENK:  And then the final sixty words that he read in front of the jury were a quote where the Court was quoting from another case.  They weren't talking about the events in the case at bar.

THE COURT:  I mean, the decision is in evidence.  If there's a portion of any of these decisions that you are asking to be redacted, then that's something different, and you can certainly make that request, but right now they're in evidence.  So --

MR. BLENK:  I think it's confusing --

THE COURT:  So I'm not going to -- if it's in evidence, then even if it's a quote of another case, I'm going to allow Mr. Rudin to read it.  I can't restrict him from reading the evidence, but if you are objecting to a certain portion of

T. Drury - DX by Mr. Rudin                                    841

the decision, then you need to do that.

MR. BLENK:  I'm objecting to the relevance and the confusion -- the line of questioning is confusing and bordering on irrelevant.  And it certainly -- the evidence is fair game, but that doesn't mean that it's appropriate for him to be attacking -- to be engaging in a line of questioning that confuses the jury by going back and forth between legal standards and the Court's analysis of the cases at bar.

MR. JOEL RUDIN:  All I did was make one aside to the fact that -- explained what the New York Court of Appeals was.

MR. BLENK:  And you read a quote -- an internal quote from another case that was probably sixty words at the -- that was just confusing the jury about whether they are describing -- what is the Court talking about?  Are they talking about what happened at the DA's, are they talking about the general rule of law?  It's -- it can't be digested by a jury in a way that isn't prejudicial, and it's confusing.

MS. MEANS:  Your Honor, when we went through this in Walker we went through those decisions and the court documents case by case and document by document specifically to avoid confusing and prejudicial language being said before the jury.  We were presented the same document last evening

T. Drury - DX by Mr. Rudin                               842

from Plaintiff's counsel with redacted versions of these documents.

While the County reserved the right to introduce additional portions, Plaintiff hasn't -- we didn't have any notice that they would be seeking to introduce full copies of these documents, but I don't know what the purpose of the exercise of the redacted version was if we were just going to be putting forth the complete copies of the documents before this jury.

THE COURT: Okay. This is what I'm going to do. I had received the exhibits. You hadn't made any objections to any -- certain portions of the decisions, but it seems like you are now, right? Is that -- you are asking that certain portions of these Monell decisions be redacted?

MS. MEANS: Not -- the way that this was introduced in Walker is different than it is being introduced in this case now, and I'm having difficulty following the rationale and Plaintiff's intent in offering these documents.

THE COURT: Okay.

MS. MEANS: We did place objections on the record in Walker as to why we found certain language prejudicial, and Plaintiff -- it was my understanding in Walker was going to stay within those confines until both parties were -- until we briefed the issue further with the Court if we were going to introduce additional portions.

T. Drury - DX by Mr. Rudin                843

THE COURT:  Okay.  So this is what we're going to do.  For the rest of today you can only use the portions of the decisions that were in that slideshow that Mr. Hanft used earlier.

MR. JOEL RUDIN:  There's only one more decision, Johnson, and I'll keep that short.

THE COURT:  Okay.

MR. JOEL RUDIN:  I'm running out of time.  So I want to make sure we finish.

THE COURT:  If you have objections to any -- if you're asking for redactions of any of these decisions, then you need to just bring it up.

MR. BLENK:  Thanks, Judge.  Thank you, Your Honor.

(Open court:)

THE COURT:  The objection is overruled.  You can move on and ask a new question.

BY MR. JOEL RUDIN:

Q.   Mr. Drury, do you recall a decision People against Kenneth Johnson?

A.   I know at some point it involved Ranni, and I think at some point it was reversed.

Q.   And do you recall that Mr. Ranni was sharply criticized by name in that case?

A.   I don't actually remember the decision.

MR. JOEL RUDIN:  Your Honor, may we have PX 170 put on

T. Drury - DX by Mr. Rudin                                    844

the screen for the witness only?

BY MR. JOEL RUDIN:

Q.    Mr. Drury, do you see that this is People against Kenneth Johnson, a decision by the Appellate Division?

A.    Yes.

MR. JOEL RUDIN:  If we could scroll down.

BY MR. JOEL RUDIN:

Q.    You see it was handled on appeal by Judith Manzella?

A.    Right.

Q.    Chief of the appeals bureau?

A.    Yes.

MR. JOEL RUDIN:  You can scroll down to the next page.

BY MR. JOEL RUDIN:

Q.    Do you see that right at the top the Court refers to misconduct on the part of the prosecutor, ADA Albert Ranni?

A.    Yeah.  It says granted a new trial.  So it was reversed.

Q.    Right.  And do you -- did you hear about this case at the time?

A.    Yes.

Q.    And you were aware it was being prosecuted by Mr. Ranni?

A.    Yes.

Q.    And you attended part of the trial?

A.    I don't think so.

T. Drury - DX by Mr. Rudin                    845

Q.   I'm sorry?

A.   I do not think so.

Q.   Well, do you recall testifying at your deposition -- page 77, lines 18 to 19 -- that you attended part of the trial?

A.   No.  Then I did.

Q.   And do you recall learning after the trial that the Appellate Division issued a decision highly critical of Mr. Ranni?

A.   Yes.

Q.   And would you agree with me that it is extraordinarily rare for an appellate court to call out an Assistant DA by name in a court decision?

A.   I think so.

Q.   And there were discussions in the office about this decision when it came down, weren't there?

A.   I don't know.  I forget.

Q.   Well, do you recall testifying at your deposition -- page 79, line 22 to 80, line 2 -- that there were discussions in the office about this decision when it came down?

A.   Well, then I did, but I don't remember.

Q.   You acknowledge that you testified that you were aware of discussions at the time?

A.   Evidently, I was.

Q.   But you never heard that Mr. Ranni was investigated

T. Drury - DX by Mr. Rudin                    846

by the office or disciplined in connection with this case?

A.    Right.

Q.    Now, Mr. Drury, the office had no personnel manual or handbook that had anything concerning discipline, correct?

A.    I never knew of one.

Q.    There were no written rules or procedures concerning the disciplining of prosecutors for misconduct during a criminal investigation or prosecution?

A.    There was no -- what?

Q.    There were no written rules or procedures --

A.    Not that I knew of.

Q.    There were no written rules or standards making clear what kinds of behavior would be subject to discipline?

A.    I never heard of one.

Q.    There were no written materials of any kind making clear what kind of penalties might be imposed for misconduct during the prosecution of a criminal case?

A.    I never heard of any penalties.

Q.    While you were at the office you were not aware of any process of any kind for investigating a prosecutor for misconduct or for imposing discipline?

A.    Did I ever hear of steps that could be taken?

Q.    While you were at the office were you aware of any process of any kind for investigating a prosecutor for misconduct or for imposing discipline?

T. Drury - DX by Mr. Rudin                    847

A.   I never knew of one.  There may have been, but I didn't know of it.

Q.   You are not aware that the office even kept personnel files on individual ADAs, right?

A.   I don't -- I never knew of it, no.

Q.   You are not aware that the office ever kept a record of any complaints made against individual ADAs?

A.   I don't know.

Q.   You never received a written evaluation?

A.   I don't know.  I don't know if they did or didn't.

Q.   Well, do you recall testifying at your deposition -- page 59, lines 19 to 22 -- that you never received a written evaluation?

A.   I don't think I did.  I don't know.

Q.   Well, will you accept my representation that you testified that you never received a written evaluation or would you like me to play the clip?

A.   Well, if that's what I testified to, yes, but I don't remember.

MR. JOEL RUDIN:  Your Honor, may we play PX 245, page 59, 19 to 22?

THE COURT:  Mr. Blenk?

MR. BLENK:  No objection, Your Honor.

THE COURT:  That portion is received and it can be published to the jury.

T. Drury - DX by Mr. Rudin                                848

*(Above-mentioned portion of Plaintiff's Exhibit 245 received in evidence.)*

*(Video played.)*

BY MR. JOEL RUDIN:

Q.   Did you ever receive an oral evaluation of your performance?

A.   I don't remember one.

Q.   I think I may have asked you this already, but are you aware of any ADA who was ever investigated or disciplined by a supervisor or executive in the office for a failure to disclose discovery, Rosario, Brady material?

A.   I don't remember one.

Q.   During the period of the Crawford prosecutions in 1976 and 1977 the office didn't have any written policies of any kind concerning Rosario, discovery or Brady compliance?

A.   Written you say?

Q.   Written.

A.   I didn't know of a written one, no.

Q.   Now, you handled a case where a judge named Kasler found that you had failed to disclose certain paperwork that you should have disclosed.  Do you remember that?

A.   That's right.

Q.   And you didn't think it was Brady, but Justice Kasler found that you should have turned it over, right?

A.   That's what he said.

T. Drury - DX by Mr. Rudin                    849

Q.   And the usual remedy for a Brady violation is a new trial?

A.   I don't know.

Q.   Isn't that what usually happens if a Court find a Brady violation, it orders a new trial?  It vacates any conviction and orders a new trial?

A.   I don't know.

Q.   You don't know.  Well, is it your recollection that Justice Kasler dismissed the case?

A.   Well, "dismiss" is a strong word.  No.  He dismissed at that time and it was tried again.

Q.   So you mean that he vacated a conviction and he tried the case again?

A.   There was no conviction.

Q.   He declared a mistrial?

A.   Yes.

Q.   And so a new jury had to be selected?

A.   Was, yes.

Q.   And witnesses had to testify all over again?

A.   I think so.  I didn't follow it.

Q.   Was there a complainant in that case?

A.   It was a murder case.

Q.   Murder case.  So the true complainant, unfortunately, was not in a position to testify, but were there family members who testified?

T. Drury - DX by Mr. Rudin                                    850

A.    I don't remember.

Q.    When a trial occurs there are a lot of personnel involved, right?

A.    Yes.

Q.    There's a judge?

A.    Yes.

Q.    There is courtroom clerks, law clerks?

A.    Yes.

Q.    Court reporters?

A.    Yes.

Q.    Jurors who have to take off time from work and sit there?

A.    Yes.

Q.    And listen to the evidence?

A.    Yes.

Q.    There's yourself as a prosecutor?

A.    Yes.

Q.    You are on the public payroll?

A.    Yes.

Q.    There's a defense lawyer who was either paid by the government or is retained and paid by his client or her client?

A.    It was Robert Murphy.  So he was paid by the client.

Q.    There were witnesses who had to take time off from work?

T. Drury - DX by Mr. Rudin                    851

A.   Yes.

Q.   There were courtroom deputies who were there to make sure the place was secure?

A.   Yes.

Q.   They are all paid by the public?

A.   Yes.

Q.   So when a mistrial is declared it's rather inconvenient for a lot of people, right?

A.   Yes.

Q.   And it could be costly to the public, right?

A.   Yes.

Q.   And so it's not just this defendant had to have a jury selected, sit there for the trial, have you violate his rights and then have to go through it all over again, but there's also a cost to the public?

A.   Right.

Q.   And this was a murder case.  Did any supervisor ever question you to understand why you did not disclose the Brady material?

A.   No, not that I recall.  I just disagreed with Judge Kasler.  It was not Brady in my opinion.

Q.   But this was a case that was covered in the news media, wasn't it?

A.   Apparently it was, yeah.

Q.   So it was a rather important case?

T. Drury - DX by Mr. Rudin                            852

A.    Yes.

Q.    And it was a somewhat notorious case?

A.    I don't know about that.

Q.    Well, it was covered by news media.  They thought it was important?

A.    Well, okay.

Q.    A lot of people read about it, right?

A.    I guess.

Q.    It's a little embarrassing to the DA's office when the senior prosecutor that prosecuted a murder trial has a mistrial declared for withholding Brady material and it's written about in the news media?

A.    Yes.

MR. BLENK:  Objection, Your Honor.

THE COURT:  Sustained.

Mr. Rudin, when you're done with this line of questioning, let me know.  I have to give an instruction to the jury.

BY MR. JOEL RUDIN:

Q.    You don't recall anybody at a supervisor or executive level ever speaking to you to try to understand why you didn't turn over the material that you didn't turn over?

A.    I don't remember.  I just differed -- I forget now what the claim was.

Q.    Did anyone speak --

T. Drury - DX by Mr. Rudin                    853

A.    It was about the Brady, but I disagreed very much with Justice Kasler.

Q.    Did anyone in the office speak to you to find out whether or not your conduct in that case was or was not in conformity with the policies and practices of the office?

A.    I don't remember.

MR. JOEL RUDIN:  I'm finished with that case, Your Honor.

THE COURT:  Okay.  Members of the jury, I just want to read you an instruction regarding the testimony you just heard.

You just heard evidence about a case unrelated to the Crawford homicide prosecutions.  As I instructed you earlier, this evidence is offered for the limited purpose of determining whether any policy, custom or practice of the Erie County District Attorney's Office existed and whether such policies, customs or practices caused any individual Assistant District Attorney to violate Mr. Boyd's constitutional rights.

I want to remind you that this evidence should not be considered by you as proof that the alleged constitutional violations against Mr. Boyd occurred.  That is, you should not and may not consider this evidence to say that since a different Court found that an Erie County Assistant District Attorney violated a person's constitutional right in a

T. Drury - DX by Mr. Rudin                    854

different case, then the Assistant District Attorneys in Mr. Boyd's case must have also violated his constitutional rights.

Thank you.

Go ahead, Mr. Rudin.

MR. JOEL RUDIN:  Thank you, Your Honor.

BY MR. JOEL RUDIN:

Q.   Mr. Drury, you were never the subject of any disciplinary investigation by any Erie County DA executive, supervisor or employee with respect to your handling of any criminal investigation or prosecution; is that correct?

A.   Yes.

Q.   You were never disciplined in any case for any reason, correct?

A.   Right.

Q.   You never received an oral criticism or admonishment, correct?

A.   Not that I can remember.

Q.   And no one investigated what you had done in the Justice Kasler case to determine whether you should be disciplined?

MR. BLENK:  Objection, Your Honor.

THE WITNESS:  I don't remember.

BY MR. JOEL RUDIN:

Q.   Mr. Cosgrove never spoke to you about it?

T. Drury - DX by Mr. Rudin                      855

THE COURT:  Hold on.  There was an objection.

MR. JOEL RUDIN:  I think it was on the basis of asked and answered.

THE COURT:  Overruled.  But he answered it.  So you can ask a new question.

BY MR. JOEL RUDIN:

Q.   Mr. Cosgrove never spoke to you about it?

A.   I don't remember.

Q.   And that's true with Mr. Boyd's case as well, isn't it?

A.   Boyd's case?

Q.   Darryl Boyd.  Did anyone ever speak to you about Darryl Boyd's case?

A.   Are you sure you want an answer to that?

Q.   Did anyone at the office ever discuss with you whether or not the decisions you made about what you did or did not disclose was in conformity with the office's policies regarding Brady?

A.   No.  Nobody -- nobody dealt with Brady as to Boyd. You're --

Q.   Did anyone even supervise you with respect to Mr. Boyd's trial?

A.   What do you mean super -- yeah.  I had Joseph McCarthy and Joseph Forma.  They were my --

Q.   Joseph McCarthy's position was what?

T. Drury - DX by Mr. Rudin                                856

A.    I think he was -- I don't know what his position was.

Q.    He was a high level executive?

A.    Yeah.

Q.    And you discussed with him what you were doing in the case?

A.    No.

Q.    The handling and --

A.    I don't remember doing it, no.

Q.    Well, did anyone in the office have any responsibility to speak with prosecutors to ensure that prosecutors were complying with their Brady obligations?

A.    No, no.  I don't see -- there wasn't -- there wasn't this detailed observance of the assistant DAs, no.  I was conforming to Brady according to them and according to myself.

Q.    And no one ever spoke to you about anything you said in your summation?

A.    No.

Q.    And that's because everything you did in this case conformed to what Mr. Cosgrove and his office expected of you?

A.    In the summation?

Q.    In the summation.

A.    Well, I probably at some point went too far, but I thought it was called for by the facts of the case and by the defense attorney's summation.

T. Drury - DX by Mr. Rudin                857

Q.   So you thought your summation conformed to what Mr. Cosgrove and his office expected of you?

MR. BLENK:  Objection, Your Honor.  Asked and answered.

THE COURT:  Sustained.

THE WITNESS:  In all, yes.

BY MR. JOEL RUDIN:

Q.   And you thought that --

MR. BLENK:  Objection, Your Honor.  Move to strike.

THE COURT:  I had sustained the previous question.  The question and the answer are stricken.

BY MR. JOEL RUDIN:

Q.   Did you think -- withdrawn.

You were not spoken to -- withdrawn.

Did Mr. McCarthy or Mr. Forma --

A.   Forma.

Q.   -- Forma or any other executive or supervisor discuss with you whether or not your decisions with regard to Brady were in conformity with the policies and practices of the office?

A.   In general?

Q.   In general.

A.   No, no, because I was in conformity with the practices of the -- the office.

Q.   And that includes this case?

A.   Pardon?

Boyd v. County of Erie, 22-CV-519                858

Q.   And that includes this case?

A.   Yes, I was.

MR. JOEL RUDIN:  Nothing further, Your Honor.

THE COURT:  Thank you.

Cross-examination, Mr. Blenk?

MR. BLENK:  Your Honor, we are going to reserve our cross-examination until Mr. Drury is recalled in our case.

THE COURT:  Okay.  Mr. Drury, then you are all set. Thank you very much.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Counsel approach.

(At bench:)

THE COURT:  Are we done for the day?

MR. JOEL RUDIN:  Yes.

THE COURT:  I'm fine with that.  Okay.

(Open court:)

THE COURT:  Okay.  Members of the jury, it's four o'clock.  We're going to end for the day.  And so we'll see you back here on Monday at 9:15.

All of the recess admonishments apply.  Please make sure you keep an open mind.  Do not talk about the case with anyone.  Don't do any research about this case or any legal term.  Don't visit any of the relevant locations.

Have a very good weekend.  We'll see you Monday at 9:15.  Thank you.

Boyd v. County of Erie, 22-CV-519                     859

(Jury not present.)

THE COURT:  Have a seat, everyone.  Just a few things and then we can all leave.

So on Monday Professor Zeidman is expected to testify; is that right?

MR. FIRSENBAUM:  Yes, Your Honor.

THE COURT:  Okay.  Anyone else?

MR. FIRSENBAUM:  No.  Just based on the Walker trial I would expect it to be all day.

THE COURT:  Okay.

MR. FIRSENBAUM:  With cross.

THE COURT:  And then we're off Tuesday.  And then Wednesday we have Mr. McLeod?

MR. FIRSENBAUM:  Correct, Your Honor.

THE COURT:  And what else on Wednesday?

MR. FIRSENBAUM:  Wednesday would be Mr. McLeod, Dr. Drob and our Henry clips, Mr. Henry clips.  Sorry.

THE COURT:  And then you'll rest after that?

MR. FIRSENBAUM:  I believe so, Your Honor.

THE COURT:  Okay.  Regarding the other incidences, the Monell decisions that I made a ruling on this morning, if you have -- Mr. Blenk, if you have any requests for redactions of the decisions, then you need to let us know so I can rule upon them.  So this morning I received the exhibits.  I received the whole decision.  But if you -- and you didn't

Boyd v. County of Erie, 22-CV-519                860

say anything at the time.

So if you do have redactions that you are requesting, then please get those in this weekend so I can address those before Plaintiff may want to use them again during the rest of their case.  Okay?

MR. BLENK:  Absolutely, Your Honor.  Understood.

THE COURT:  Okay.  And then next week I expect that -- well, next week or maybe the week after I expect that you may want to offer some of those medical records or the DOCCS records that you've referred to before.  I think it would be helpful to file a written submission with the legal basis for their admission and if there are certain portions of those records that you can let us know because it seems like that might take us a little bit more time.  So it would be helpful for me to review that ahead of time and then give Plaintiff a chance to respond.

MR. BLENK:  Absolutely.

THE COURT:  So if you could file that by Monday, and then Plaintiff can respond to that.

Are there any other issues that are still outstanding that you would like to address by Monday morning?

MR. DURLAND:  Could I just ask for a clarification on the medical and DOCCS records?  Is that the County's submission is going to address admission into evidence and also cross-examination of Dr. Drob?  Because I had understood

Boyd v. County of Erie, 22-CV-519                861

that Mr. Blenk's argument earlier was that -- I know he had mentioned putting some into evidence, but also using them in cross-examination of Dr. Drob.  And before openings Your Honor had said that that would be acceptable as to substance abuse.  So I just wanted to understand the scope of the filing so that we could -- we understood what was going to happen and what the Court was going to allow with Dr. Drob.

THE COURT:  I'm just talking about the actual admission of the documents.  So on defendant's case.  So, yes, you can use those for cross-examination of Dr. Drob, but if you want those admitted, then I need the basis and the portions that you would like admitted.

MR. BLENK:  Understood, Your Honor.

MR. FIRSENBAUM:  Your Honor, just in terms of schedule, maybe this is too ambitious, but I think it's possible that we would be resting mid day on Wednesday.

THE COURT:  Okay.

MR. FIRSENBAUM:  In which case if we could have some notice as to what witness defense counsel intends to put on on Wednesday, Thursday that would be helpful.  If not right now, sometime over the weekend I think would be fair given the notice we've provided.

THE COURT:  Okay.  Could you do that?  You don't have to do it now, but if you want to confer with your co-counsel and e-mail us and give us kind of a general schedule like

Boyd v. County of Erie, 22-CV-519                862

plaintiffs did in the beginning that would be helpful to all of us.

MR. BLENK:  Absolutely.  I'm trying to run the math, but if we're not going to have -- just in terms of scheduling my witnesses, if we're going to have only Mr. Zeidman on Monday and then two witnesses and substantial witnesses on Wednesday, it seems just about impossible that the Plaintiff -- that the defendant could be getting their case on Wednesday.

THE COURT:  Well, why don't you do this.  Maybe if you could have something ready to go, even if it's deposition designations or -- I don't know if you're going to read portions of the transcript like you did last time, but something ready to go even if it's not a witness.

MR. BLENK:  Fair enough.  Of course, Your Honor.

THE COURT:  Okay.  Anything else?  Okay.

MR. FIRSENBAUM:  Your Honor, sorry.  You asked anything else.

I just -- I want to make sure that we're going to be in compliance with the Court's ruling as to Mr. McLeod's testimony.  Your Honor obviously granted our motion as to nondisclosure in the other -- the other matters, which includes the Martin trial about which we would expect Mr. McLeod to testify.  I would anticipate -- I wouldn't necessarily say exactly how everything was structured last

Boyd v. County of Erie, 22-CV-519                    863

time, but I would anticipate eliciting testimony from Mr. McLeod that part of the reason why he remembers that none of the alleged Brady evidence was disclosed to him is because he would have used it and to explain how he would have used it.

THE COURT:  Okay.

MR. FIRSENBAUM:  I just want to make sure that that is okay from Your Honor's perspective in terms of Your Honor's prior ruling.  I'm not asking for the outcome or any opinions about materiality or anything close to that, but I think that type of testimony is relevant because he's -- you know, unless they are stipulating to the fact that none of it was disclosed, which I don't think they are, I think that helps explain why it is that he has that memory.

THE COURT:  Did you want to be heard?

MR. BLENK:  I think his memory -- he doesn't seem -- Mr. McLeod doesn't seem to understand -- or to recall even the evidence that he used in the case.  So I think that it's not -- there's not a foundation that is in his testimony that but for having this evidence that he would remember using it. It doesn't seem -- his -- my recollection of his deposition is that his recollection is so vague as to both what he put on in Mr. Martin's case aside from the photographs.

I understand that he is going to testify in detail to that, but as to the balance of the case, he seems to have a

Boyd v. County of Erie, 22-CV-519                    864

very limited recollection.  And so I don't think it's a fair assumption.  And it's not particularly probative for him to be -- for them -- for the Plaintiff to be using that evidence as sort of a second witness answering hypothetical questions on these issues.

THE COURT:  Okay.

MR. BLENK:  It's very prejudicial evidence, and to simply put it in for the purpose of substantiating a failure to recall these items, it's not really getting to much.

THE COURT:  Well, I guess even -- whether he -- whether this helps him recall or not, I think there's a question as to whether he could even -- he can testify to that.  Because I am allowing, for example, Professor Zeidman to testify how this alleged, you know, Brady material that wasn't disclosed, how an attorney could use it.  And Mr. McLeod is an attorney.

And so I will have an answer for you for that.  Okay?

MR. FIRSENBAUM:  Thank you, Your Honor.

THE COURT:  Okay.  Anything else?  No.  Okay.  Have a good weekend, everyone.  Thank you.

MR. FIRSENBAUM:  Thank you, Your Honor.

THE COURT:  See you at 8:45 on Monday.

(Court adjourned at 4:11 p.m.)

                    *              *              *

Boyd v. County of Erie, 22-CV-519                    865

CERTIFICATE OF REPORTER


        In accordance with 28, U.S.C., 753(b), I certify

that these original notes are a true and correct record of

proceedings in the United States District Court of the

Western District of New York before the Honorable Meredith A.

Vacca on November 7, 2025.




S/ Joony L. Odenbach

Joony L. Odenbach, RPR, CRR

Official Court Reporter