UNITED STATES      DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

_____

KATHLEEN WEPPNER, AS EXECUTOR OF THE

ESTATE OF DARRYL BOYD,

         Plaintiff,

     -vs-

THE COUNTY OF ERIE,

         Defendant.
_____

Index No.
22-CV-0519-MAV

Vol. 6

Rochester, New York
November 10, 2025
8:50 a.m.

**JURY TRIAL**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MEREDITH A. VACCA
UNITED STATES DISTRICT JUDGE

867

Appearances

For Plaintiffs          WILMER CUTLER PICKERING HALE AND DORR,
                        LLP
                        By:  ROSS FIRSENBAUM, ESQ.
                             GIDEON HANFT, ESQ.
                             ERIN HUGHES, ESQ.
                             MELISSA ZUBIZARRETA, ESQ.
                             TRENA RILEY, ESQ.
                        7 World Trade Center
                        250 Greenwich Street
                        New York, NY 10007

                        LAW OFFICES OF JOEL B. RUDIN, PC
                        By:  JOEL B. RUDIN, ESQ.
                             DAVID E. RUDIN, ESQ.
                        152 West 57th Street
                        New York, New York 10019

                        HOOVER & DURLAND, LLP
                        By:  SPENCER DURLAND, ESQ.
                        561 Franklin Street
                        Buffalo, NY 14202

For Defendant:          LIPPES MATHIAS
                        By:  JAMES BLENK, ESQ.
                             KIRSTIE MEANS, ESQ.
                             THOMAS SOUTHARD, ESQ.
                        50 Fountain Plaza - Suite 1700
                        Buffalo, New York 14202




COURT REPORTER:         JOONY L. ODENBACH, RPR, CRR
                        joonyodenbach@gmail.com

868

INDEX

Sanford Drob

    Direct Examination by Mr. Durland         911

    Cross-Examination by Mr. Blenk         977

| EXHIBITS | ID | EVD |
|---|---|---|
| PX 218 - 8/18/21 video, Flynn press conf. | -- | 1093 |
| DX 729 - Pages 115, 116, 136-143 of parole records (redacted) | -- | 887 |
| DX 735 - NYS OMH records | -- | 882 |
| DX 850 - DOCCS chronology | -- | 1006 |

Boyd v. County of Erie, 22-CV-519                     869

P R O C E E D I N G S

*     *     *

(Open court.)

THE COURT:  Good morning, everyone.  We can get started.  The parties are present.  The jurors are not present.

Today Plaintiff expects to call Dr. Drob and do the Henry designations, correct?

MR. FIRSENBAUM:  Yes, Your Honor.

THE COURT:  Okay.  What time is Dr. Drob expected to testify?  Are you starting with him?

MR. FIRSENBAUM:  Yes, Your Honor.  9:15 I think he'll arrive.

THE COURT:  How long do you think you'll have evidence then for today?  Do you think it will go into the afternoon?

MR. FIRSENBAUM:  So we have about an hour and a half of direct of Dr. Drob and about two hours of video.

THE COURT:  Okay.

MR. FIRSENBAUM:  So depending on -- slash readback.

THE COURT:  Okay.

MR. FIRSENBAUM:  So with cross I would think we'd go past lunch.

THE COURT:  Okay.  Thank you.  Then let's -- there's a number of issues I want to address, but let's start with

Boyd v. County of Erie, 22-CV-519                    870

Dr. Drob's testimony.  Specifically, the documents that the County is seeking to admit.

So there are the Horizon treatment records, parole records, the OMH records and the DOCCS records.  I reviewed the parties' submissions.

I know, Plaintiff, you e-mailed me this morning and you can just respond orally as well.

I'll just say this:  I don't find that the residual exception applies here.  Specifically, when it comes to subdivision two of the rule, that it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

I don't find that -- well, I find that the County could have obtained this evidence through reasonable efforts.  I mean, there's a number of things they could have done.  The reason that we're here is because the parties stipulated to the authenticity of the records, and I think it seems that the County thought that they could get those records in.  And so then the issue came up that Plaintiff was objecting to their admissibility.  So the County tried to get the certified records, and I said no because they should have gotten them a long time ago.

So I think it's clear that the County could have done things to -- made reasonable efforts to get this evidence to get the actual certified records, and, as Plaintiff pointed

Boyd v. County of Erie, 22-CV-519                871

out, to cross-examine Mr. Boyd about it, to subpoena a custodian to get these records in through maybe the business records exception.

I'm more interested in the other rules that County cites. Let's just start with the ancient records exception. And so that wouldn't apply to everything, but it would apply to some of these records, at least potentially.

So 729, 735 and 850, Mr. Blenk, are all of those records -- they're all before 1998?

MR. BLENK: They are not all before 1998. There's portions therein that are before 1998.

THE COURT: Okay.

MR. BLENK: So starting with 850, this is a computer chronology addressing various entries that are made that are basically tracking Mr. Boyd's -- most importantly tracking his initial parole date, which tied to the date of the verdict in this case would be the length of time that is at issue in this lawsuit.

When Mr. Boyd was deposed there was, of course, a different universe of damages that were at issue. So narrowing -- and Mr. Boyd's testimony reflects his -- Mr. Boyd's testimony of his time in prison reflects his post-conviction detention as well as his subsequent detention, and this record would be used to -- in conjunction with the date of the verdict to establish the date that he

Boyd v. County of Erie, 22-CV-519                872

was actually in prison for the purposes of this lawsuit.

THE COURT:  Okay.  And so how much of these records for DX 850 would be potentially admissible under the ancient records exception then?

MR. BLENK:  It would be the entirety of the first page and majority of the second page.  And we would redact the dates subsequent to 1998.

THE COURT:  Okay.  How about DX 735?

MR. BLENK:  DX 735 are Office of Mental Health records of Mr. Boyd.  We were only seeking the admission of a single record that's excerpted in the submission that we made to Your Honor yesterday.  That is a mental health assessment of Mr. Boyd on his way out of prison that assesses some of his history and assesses that -- and makes the -- reaches the conclusion that Mr. Boyd is not experiencing any psychiatric symptoms at the time of his -- at the time of his -- or two weeks prior to his parole from his initial stint of incarceration.

THE COURT:  Okay.  And how about 729?

MR. BLENK:  729 are parole records, which are in part dated before December -- in part dated before 1998.

THE COURT:  Okay.  Plaintiff, did you want to be heard just regarding the ancient records exception and whether that would apply to these three documents?

MR. DURLAND:  Yes, Your Honor.

Boyd v. County of Erie, 22-CV-519

873

Starting with DX 850, this is a document created in December 2021.  This is not an ancient record.  The fact that a document contains information about an earlier date doesn't transform those portions of the document into an ancient record.  So if I create a document now and I talk about things that happened in 1900, the document I created is not an ancient record even though the substance of the document I made relates to matters before 1996.  So this is a 2021 document.  850 is not an ancient record.

As to 735, this -- my understanding from what the County was trying to put in was Mr. Blenk referred to one entry, and I'm not -- this is before 1998.

The other entry that the County -- the thing I want to apprise the Court of is the danger of double hearsay.  So there's an additional document that has been the subject of the County's -- most of the County's argument, and this is I think the assessment that Mr. Blenk was just referring to, where somebody says according to classification analysis, quote -- and they are now quoting another document -- IM is an out-of-wedlock child whose parents never married.  They in time separated.  The mother remarried.  And it goes on to talk about Mr. Boyd's chaotic environment and him becoming unmanageable and engaging in, you know, juvenile bad acts.

So this is the portion that the County has stated that it intends to introduce.  This was the subject of briefing.

Boyd v. County of Erie, 22-CV-519                         874

We pointed out the double hearsay problem before, and that problem remains.  That the document itself is dated 1996, fair enough.  But this is a record maker quoting another record who was in turn quoting something that some unidentified declarant said to them.  So this has numerous problems.  735 should not be admitted as an ancient record.

In terms of the parole records, the vast majority of them -- I'm flipping through to try to find some that were noted before 1998.  There may be some.  But you still have lots and lots of double hearsay problems.  And, you know, the County hasn't been specific about which entry it wants to point to, but, you know, as I just flipped through the records, you have detective said something.  You have references to what an ADA said about a pending case.

And then there are all sorts of, you know, relevance and 403 issues.  And it's difficult to address those when the County's proposition or submission is to put in, you know, one hundred pages of parole records loaded with double and triple hearsay and lots of references to items that the Court has already excluded.

Our general proposition is to the extent that a record is early enough to qualify as an ancient record, that's fine.  That's one level of hearsay.  But the other levels of hearsay remain.  The County hasn't specified how they intend to overcome that obstacle.  And, you know, we can't make an

Boyd v. County of Erie, 22-CV-519                    875

intelligent response about relevance and prejudicial effect without knowing which specific entries the County is intending to put in.

And, you know, to the extent, Your Honor, that what we're talking about is the cross-examination of Dr. Drob, you know, our concern, the concern that prompted us to file our submission on Saturday and the concern that was borne out by the County's filing I guess very early this morning, is that the County is going to start reading out from records bad acts or other topics that the Court has excluded.

For example, the County's most recent filing on page 9 says that they are entitled to cross-examine Dr. Drob about juvenile offending.  I think it's very clear that Your Honor has excluded that.  The only topic that Your Honor has permitted from the bad acts briefing is substance abuse. Fair enough.  They can cross-examine about substance abuse. But we want it to be very clear, you know, for present purposes that when the County cross-examines Dr. Drob they don't read into the record matters that the Court has excluded because then we have an unringing the bell problem and we're faced with two unpalatable alternatives, either object and draw more attention to it or to just tolerate this injection of prejudicial material.

MR. JOEL RUDIN:  Your Honor, may I add something?

THE COURT:  Sure.

Boyd v. County of Erie, 22-CV-519                    876

MR. JOEL RUDIN:  Just based on the case law, it's very clear that the ancient documents exception is supposed to apply to documents that were created before the existence of a controversy that is being raised in court.  And as to the parole records -- and I can cite the cases.  Estate of Cole v. CIR TC Memo.  It's a United States tax court case, 58 T.C.M.  715.  And then Cohen v. Cohen, which is a case decided in the Southern District of New York by Judge Preska, 2016 Westlaw 2946194 at seven, that the Committee on Rules of Practice of the Judicial Conference -- and the clear weight of authority is that the documents need to have been created before the existence of the controversy.

And here these parole records reflect a controversy -- the issue now is -- was whether or not Mr. Boyd did not testify truthfully or can be impeached in some way with records that suggest that he committed violations or otherwise acted in a way that is against the positions that we're advocating in court, but these are all records that were created by his parole officer who was an adverse party to him who was seeking his violation, who was basically his prosecutor.  And these were records that were created in order to lay a foundation for taking action against him.  And he did testify that a number of his parole officers -- in particular, I think the one who these records mostly relate to -- were hostile to him and were biassed against him for a

Boyd v. County of Erie, 22-CV-519                    877

variety of reasons.

And so since these records were created as part of the very controversy that is before the Court now -- although, of course, the County was not a party, but the person who created the records was in a hostile relationship with Mr. Boyd, was acting essentially as his prosecutor. And I think clearly under these cases and under the Advisory Committee rules and the intent of the rules that they are not trustworthy enough to be permitted.

THE COURT: So are you saying then that all of the parole records wouldn't fall under the ancient document exception then?

MR. JOEL RUDIN: Would not fall under the exception. They are all created by his parole officer who was trying to lay the groundwork for violating his parole. And so -- and they make allegations that are contrary to his position at the time and his position now and, therefore, were created as part of a controversy about the very same issues that are at issue now.

MR. FIRSENBAUM: The exception is based on the premise that documents that are old enough have a certain level of assumed trustworthiness, but when the document is created by someone with a motive to create a false record to imprison you, which is the incentive of the parole officer, it's an adversary, the circumstances of presumed trustworthiness are

Boyd v. County of Erie, 22-CV-519                                878

lost in this context, Your Honor.  And that's what the Cohen case stands for.

THE COURT:  Okay.

MR. JOEL RUDIN:  I mean, that's an independent basis to exclude them, in addition to the double hearsay level, which Your Honor has already I believe indicated generally applies.

THE COURT:  Thank you.

Can you respond first to that assertion that Mr. Rudin just made?

MR. BLENK:  So to the assertion that Mr. Rudin made, I don't think that there is anything in the FRE that disfavors the use of records of this nature in any context.  So this would only apply to the parole records.

And on top of that we think it's subject to the public records rule, Your Honor.

THE COURT:  Okay.  Well, I don't want to get to that yet.  Okay?

So did you look at that -- have you looked at that decision that Mr. Rudin just referenced?

MR. BLENK:  I have not.

THE COURT:  You haven't.  Okay.  Well, we'll look at it in a moment.

I would just say this:  If there's double hearsay or triple hearsay, those would all be subject to I guess analysis of each kind of level of hearsay.  And I know I've

Boyd v. County of Erie, 22-CV-519                       879

said this before and we put it in our decisions.

So you cited a case in your brief, but I don't find that it applies here.  So if there are multiple levels of hearsay, then you would have to present an exception for each level.  And so at least 850 if you could -- can you just respond to Plaintiff's argument for 850?

MR. BLENK:  850 has no hearsay within the document.

THE COURT:  Okay.

MR. BLENK:  It's simply -- there's no narrative.  It's simply dates.

THE COURT:  These are the dates of his transfers to various facilities?

MR. BLENK:  That's right.

THE COURT:  Okay.  Can you respond to Plaintiff's argument then that this was created in December of 2021 and, therefore, the ancient records exception doesn't apply?

MR. BLENK:  Absolutely.  So, Your Honor, all the Monell evidence was admitted in this case based on a stipulation of authenticity over our objection.  Those records were -- in the same manner were captured -- there were periodicals that were scanned at some point in time and then were accessed by the Plaintiff in 2023 or thereabouts.

It's the same concept that we can look at this document.  You could see that the dates were entered at that time.  You could look at the periodical and the periodical

Boyd v. County of Erie, 22-CV-519                          880

was from that time and it's been authenticated.  There's no -- there's no -- the date of access would -- that would remove any electronic record from the ancient documents rule, which is I think just not what the rule says and is not how it's been used against us in this case.

THE COURT:  Okay.  So you're just saying that these documents since they were actually written before 1998, even if they were I guess produced based on -- I don't know -- a subpoena, that the ancient document exception still applies to these documents, right?

MR. BLENK:  That's right.  They are found in the place where they are supposed to be, which is with DOCCS, with OMH in one instance for 735, with Department of Corrections and Community Supervision Groveland facility for 850.

THE COURT:  Okay.  So how about for DX 735?

MR. BLENK:  So --

THE COURT:  Do you know what the source of this statement is?

MR. BLENK:  This comes from -- this is transmitted from -- this is transmitted from the Office of Mental Health at Groveland Correctional Facility to Thelonious Coleman of Mr. Rudin's office on August 17th of 2022 amongst the documents that were enclosed is this record dated February 5th, 1996.  That was prepared by Rebecca Briney.  And the document has -- even setting aside the hearsay within hearsay

Boyd v. County of Erie, 22-CV-519                 881

aspects of it, it has useful and relevant information.

And as to the hearsay within hearsay, this is a -- this would become an authenticated medical record by virtue of the first -- by virtue of the first order of hearsay, and then the expressions therein would fall within the hearsay that would apply to an ordinary medical record.

So within -- understanding that, to Mr. Durland's point that the expressed -- the expressed quotation of another document may be an issue, the reports of Mr. Boyd would fall within the -- would fall within the exception of statements given conveying history for the purposes of medical treatment and/or medical record exception and separately the evaluation and observation of the provider would not be -- would not be hearsay within hearsay. It would be the first order of hearsay, and it would, therefore, be admissible. Most importantly, the observation that follow-up service is not indicated, inmate is not exhibiting any psychiatric symptoms at this time, that's the first order of hearsay that's within the document.

THE COURT: Do you have a copy? You said it's just one page, right? Can you pass it up?

So regarding DX 735, I just reviewed it. I do find that the ancient record exception applies here. And so I will deem this exhibit admitted; however, subject to redaction. The quote under patient history, the quote that

Boyd v. County of Erie, 22-CV-519                    882

Mr. Durland had referenced, must be redacted.  I do find that is double hearsay.  It's not very clear what the source of this statement is.  And so that needs to be redacted.  But that is received.

(Defendant's Exhibit 735 received in evidence.)

MR. BLENK:  For purposes of clarification, the document that's in the Court's records, the version of 735, is the entirety of that record.  So that is an excerpt of 735.  So I would just propose that we submit something stamped as 735(a), which is an excerpt of DX 735.

THE COURT:  735(a) being the redacted version?

MR. BLENK:  It will be redacted and it will also just be the excerpt and not the entire portion.

THE COURT:  That's fine.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  So if you could at some time, Mr. Blenk, have someone prepare that if you don't have it already.

MR. BLENK:  Yes, Your Honor.

THE COURT:  Thank you.

MR. DURLAND:  Your Honor, could I correct something about 850?

THE COURT:  Yes.

MR. DURLAND:  Mr. Blenk made a point about this December '21 being the access date and that the access date was pertaining to this lawsuit.  Well, the lawsuit wasn't

Boyd v. County of Erie, 22-CV-519                    883

filed until 2022.  And Mr. Blenk is saying that these records existed at the time that they were made contemporaneously and that this is just when they were accessed.

I mean, I don't -- I don't know that.  I don't think Mr. Blenk knows that.  Those are all the questions you would ask a records custodian.  Where did this information come from?  Where was it created?  What underlying source material was it pulled from?  Mr. Blenk's description is plausible, perhaps reasonable, but I don't think that the Court can say, oh, well, I'm sure that these entries were made back in '83 and '84 and '91, and so, therefore, a later-created document that recites entries that one assumes were made earlier qualifies for the ancient records exception.

I mean, the only thing we have is a document that's dated December 22, 2021, and I don't think that the County should be allowed to kind of fill in the gaps that are left by the absence of a records custodian by making argument about what those mean and using those arguments rather than actual evidence to establish the foundation for the ancient records exception.

THE COURT:  Okay.  I understand your position.

Can you pass that document up, please?

MR. DURLAND:  Yes, Your Honor.  It has a pen mark on it, my pen mark.

THE COURT:  That's fine.  I looked at this earlier.  It

Boyd v. County of Erie, 22-CV-519                884

was just the dates of his incarceration.

MR. BLENK:  Your Honor --

THE COURT:  I agree.  This document was created after 1998 even though it's referring to things that happened before 1998.  I mean, the document was created in 2021.  So I do not find that this falls under the ancient records exception.

You can just pass this back down.

MR. BLENK:  Your Honor, may I just be heard quickly on that?

THE COURT:  Sure.

MR. BLENK:  Of course, the standard is not certainty. We just have to make a reasonable showing.  Comparing this to the exhibit that Mr. Rudin had admitted just on Friday, PX 91, this purports to be a newspaper article.  And adding to that, Your Honor, the document we passed up to you that Mr. Durland just passed up, DX 850, is authenticated.  So to a certain extent they have conceded to that on some level it is what it purports to be.

And then if we look at the Buffalo News article that Mr. Rudin admitted on Friday, PX 91, it's the same -- it's downloaded on February 17th, 2023.  By the same -- by the extension of the same logic this is a 2023 document that occurred -- that was generated -- it's copyright 2023.  It certainly wasn't scanned in 1976 -- or excuse me -- 1974.

Boyd v. County of Erie, 22-CV-519                    885

It's the same -- there's no difference in how we look at it as it pertains to reliability, Your Honor, and this was admitted over our objection with the stipulation that it was authentic.

THE COURT:  I disagree.  DX 850 was a record that was produced in 2021, even though it was based on some records from presumably before 1998, but that's different than the admission of an article where the article itself was created before 1998.  So I think they're different.

And so could DX 850 have been received by other means?  Yes, I think it could have been a business record.  If someone came in from DOCCS and was the records custodian, I think it could come in through that, but we don't have that here.  So I'm not going to allow it under the ancient records exception.

And so that leaves DX 729.  How many pages are you seeking to admit, Mr. Blenk, to DX 729?

MR. BLENK:  The application itself was to admit the entirety of DX 729.  We can -- if Your Honor is only considering its admission through the ancient documents rule, we can revise that document to only line with records that were generated prior to 1998.

THE COURT:  Are you seeking to admit this during Dr. Drob's cross-examination?

MR. BLENK:  We certainly intend to use it during

Boyd v. County of Erie, 22-CV-519                886

Dr. Drob's cross-examination.  He had reviewed these records. And we would use them for an appropriate purpose during that even if they weren't admitted.

THE COURT:  I'm asking because if you are -- if you want these documents received during Dr. Drob's testimony, then I need to go back and look at these cases that Mr. Rudin cited.  I'm not ready to rule on 729 right now.  I might need a few minutes to look at these.

MR. BLENK:  It would be the last -- it would be pages of the PDF that we sent Your Honor, it would be pages 115, 116 and 136 to 143.

THE COURT:  Okay.  Just give me a few minutes.  I just want to look into the argument that Mr. Rudin made a little bit more.

MR. FIRSENBAUM:  Your Honor, could we also just supplement the case law for this argument either now or after you read those?

THE COURT:  Sure.

Regarding DX 729 -- do you need a few more minutes to confer, counsel?

MR. DURLAND:  No, Your Honor.

THE COURT:  So you are only seeking to admit those pages that you clarified, right, Mr. Blenk, 115, 116, 136 to 143?

MR. BLENK:  Those are the -- those are the only records

Boyd v. County of Erie, 22-CV-519                887

that we would -- that we believe are admissible solely by virtue of the ancient documents rule, Your Honor.

THE COURT: Okay. I will receive DX 729, those pages specified -- 115, 116, 136 to 143 -- subject to any redactions.

(Defendant's Exhibit 729, above-mentioned pages, subject to redaction, received in evidence.)

And so, Plaintiff's counsel, now that you are aware of the kind of finite portion of records, you can go through those and let me know if there are any specific objections pertaining to double hearsay or whatever. Okay? So I'll give you some time to look through those.

So that really makes your argument regarding the public records exception moot, right? There were no other documents that you were seeking to admit under the public records exception, right, Mr. Blenk, that I haven't already addressed?

MR. BLENK: Well, our position would be that the entirety of 729 would come in through the public records exception.

THE COURT: Okay. I thought you were only offering those discrete pages.

MR. BLENK: As -- so, I'm sorry, Your Honor. As to 735 we only have one argument. We only have one document to get in.

Boyd v. County of Erie, 22-CV-519                888

729 is qualifying as a public record in its entirety as parole records.  And we also think that 850 qualifies as a public record.

THE COURT:  Okay.

MR. BLENK:  And that would apply to the entirety of the document.

THE COURT:  Okay.  Regarding 729, what's the Plaintiff's position with respect to the public records exception?

MR. FIRSENBAUM:  Your Honor, we don't think they qualify as public records.  The public records exception does not apply where the source of information or other circumstances indicate a lack of trustworthiness.  And as we said before when parole records are being created by a parole officer they don't have that level of trustworthiness given the adversarial nature of the relationship.

And we would direct Your Honor to Downie v. Klincar, 759 F. Supp. 425, Northern District of Illinois 1991, which is a parole revocation case that -- I mean, the holding is that the parole records are not public records because comparing the relationship to the police and the arrestee, quote, "It is the initial encounter between the police and the arrestee that is adversarial; the relationship is no less adversarial where the subject of the report is a parolee, see Bell, 785 F.2d. at 644, and the report no more reliable when

Boyd v. County of Erie, 22-CV-519                    889

used in parole revocation hearing rather than a criminal trial," period, end quote.

So it's taking the cases that carve out the exception for police reports in criminal cases and saying that parole reports really have the same problems that police reports do and why the Federal Rules expressly carved out police reports from criminal cases.

And the case also cites Weinstein for this very proposition.  "Congress was apparently motivated by a perception that observations by police officers at the scene of the crime of the apprehension of the defendant are not as reliable as observations by public officials in other cases because of the adversarial nature of the confrontation between the police and the defendant in criminal cases and that the reports are frequently prepared for use of prosecutors who use reports in deciding whether to prosecute."  And from that the Court drew the analogy to the parole records.

And so for that reason, Your Honor, we think that 803(8)(B) would render these records inadmissible.

MR. BLENK:  And, Your Honor, may I be heard --

MR. FIRSENBAUM:  And if I could just -- one other sort of point.  It does seem backward that the records of this kind that are confidential about a person's confidential activities while on parole would qualify as public records.

Boyd v. County of Erie, 22-CV-519                890

They're not accessible to the public.  They are maintained as confidential records.  It would not seem like these are the most confidential records that exist -- and this applies to the OMH records as well -- should qualify as public records.

MR. BLENK:  Your Honor --

MR. JOEL RUDIN:  Your Honor, these are not revocation proceeding records.  I believe they are supervision records.  Intensely private.

MR. FIRSENBAUM:  And just one other case, Hodges v. Keane, 886 F. Supp. 352, SDNY 1995, holding that records did not meet the public records exception.  The negative characterizations of the Plaintiff's anti-social traits, et cetera, are unfairly prejudicial.  And in this case these were psychiatric records, including reports issued to the parole board that were not deemed to be sufficiently trustworthy to fall within the public records exception.

THE COURT:  Okay.  Thank you.

Mr. Blenk?

MR. BLENK:  Thank you, Your Honor.

803(8) plainly contemplates that in a civil proceeding the -- a matter observed under a legal duty to report is subject to the public records rule, and by implication that includes expressly -- by expressed implication I suppose insofar as there's a carveout for -- in a criminal case a matter observed by law enforcement is carved out.  Implicitly

Boyd v. County of Erie, 22-CV-519                891

that means that a law enforcement process, the factual observations of -- setting aside the hearsay within hearsay issue, the factual -- the events and the circumstances of matters observed by law enforcement personnel fall within the exception. And the same is true in a civil case, factual findings from a legally authorized investigation.

These are both -- they fall squarely within the heart of the rule. There's no exception that applies. The Plaintiff's encouragement that there would just be -- the idea that there is some sort of arm's length relationship between the parole officer and the individual being observed, that is consistent with the thrust of the rule in a civil context. It can't be the case that the records themselves are -- perhaps they might have -- if there's an ultimate confrontation between the parole office and the individual, maybe that's a different rule that Mr. Firsenbaum has referenced, but there's no -- these observations are within the heart of it, and the fact that they are being made in a law enforcement context are irrelevant.

In addition to that, Your Honor, these parole violations have been put at issue by the Plaintiff. The Plaintiff has claimed that there's three -- that he did nothing for three of the -- three of the violations when the records reflect that he, you know, waived a hearing at one point, that there's observations that are being made that are

Boyd v. County of Erie, 22-CV-519                  892

inconsistent with Mr. Boyd's account, you know, his self-serving account of parole violations that go to damages in this case.

They are trying to get this timeline expanded beyond the initial 19-year term of incarceration to include these other events that are occurring on parole.  There's nothing personal or confidential about them now that they've been put at issue by the Plaintiff.

THE COURT:  Okay.  Plaintiff's counsel, do you agree with Mr. Blenk that those exceptions that are kind of carved out in 803(8) don't apply here?  Specifically, 803(8)(A)(ii)?  I mean, do you agree with that?

MR. FIRSENBAUM:  The exception expressly applies to criminal cases.  We agree with that.  But the civil case, still the proponent -- or the opponent can show that the source of the information or other circumstances indicate a lack of trustworthiness.  And my point in citing that prior case is that that's one case, citing Weinstein, for the proposition that the rationale behind the exception for criminal cases applies or at least can apply in certain circumstances to parole records in civil cases.

In that case it was a parole revocation proceeding where the Federal Rules of Evidence don't even apply, but the Court still went on to say that there was sufficient indicia of unreliability given the adversarial nature of the parole

Boyd v. County of Erie, 22-CV-519                893

officer and the parolee that it wouldn't consider them.  So the same rationale would apply here, even though the exception under A(ii) applies only in criminal cases.

And the SDNY case, Your Honor, the second case I cited also stands for the proposition that sort of putting in voluminous records, health records that contain contradictory and inconsistent diagnoses in that case by well over a dozen mental health experts would consume an inordinate amount of time, of the Court's time and the jury's time, in sorting and interpreting them and, therefore, excluded them on that basis as well.

And so if we're talking about now the very large voluminous number of records -- and I think Mr. Durland is more familiar with exactly how much it is, but that would be another basis, more of a 403.

THE COURT:  Okay.

MR. JOEL RUDIN:  Your Honor, also, many of the records don't deal with the three or the four parole violations that are at issue.  There's all sorts of scurrilous material in there that have absolutely nothing to do with those violations.  They're just notes by his parole officer trying to make him look like a bad guy.  That's all they are.

MR. HANFT:  Your Honor, there is also a case from the Northern District of Illinois, Stolarczyk ex rel. Estate of Stolarczyk v. Senator Intl. Freight Forwarding, LLC, that

Boyd v. County of Erie, 22-CV-519                    894

explicitly says interview notes by an Equal Employment Opportunity Commission investigator regarding an employee's statements are not admissible in an ADA action because they are just notes.  They are not -- the notes of a parole officer are not public records.  This is not something he's putting in a public file.  These are his internal notes.

So there's no way that -- we're not talking about offering a public document.  We're talking about the internal notes of an investigator.  It's squarely outside the rule.

MR. BLENK:  And, Your Honor, both in the context of what Mr. Hanft just referenced where you actually have what sounds like a description about an actual transaction at issue, whether the ADA, the investigator -- the resulting case that arises from that investigation, or Mr. Firsenbaum's reference to a parole proceeding, those are -- those are adversarial proceedings from one against the other where the party generating the notes is in the adversarial proceeding and then it gets closer to the thrust of the exception.

The fact that Plaintiff's counsel is referencing cases in Illinois simply demonstrates that we're -- our position is in the heart of the rule and the Plaintiff's position is straining for case law anywhere they can find it that would justify some sort of alternative application.

MR. JOEL RUDIN:  Your Honor, these are rough notes that are intended to lay the groundwork for revocation actions.

Boyd v. County of Erie, 22-CV-519                895

They are in his personal supervision file.  They are not public.

And to the extent that we're opening the door as to three or four incidents that led to parole violation proceedings which Mr. Boyd testified about, we certainly haven't opened the door to all these other records that talk, as I mentioned before, and have all sorts of scurrilous allegations that were -- never resulted in revocation proceedings and are more in the nature of bad acts that are intended to attack his character, which Your Honor has been so scrupulous about trying to keep out of the case.

THE COURT:  Mr. Blenk, I mean, do you agree with that?  You want all of these to come under this public records exception, but are there parts of it that are not relevant at all?  I mean, this is the problem when you offer 143 pages of records without really clarifying.  Is it your position that every single page is relevant to the damages that Plaintiff is seeking?

MR. BLENK:  No.  I wouldn't say that every single page if we were going on a page by page analysis, Your Honor.

In my experience when we're putting in records of this nature they would generally go in.  They would be subject to -- they would be subject to redaction at the opposing side's -- you know, in consultation with the opposing side.  And I understand that.  And I don't intend to get into

Boyd v. County of Erie, 22-CV-519                896

anything that's irrelevant.

But the -- I mean, I don't see a whole lot that is particularly -- I don't see a whole lot that is prejudicial above and beyond what would become relevant by Mr. Boyd putting in his own parole violations at issue into this case. For example, there are documents -- there is documentation of the sort of events that Mr. Boyd describes with some additional details, and I think that that comes in to assess whether these parole violations are just occurrences that are happening to Mr. Boyd from factors and forces outside of his control or whether they are part of a sustained pattern of parole violations that resulted -- or a sustained violation of rules of his parole that resulted in four violations.

They've heard Mr. Boyd -- the jury has heard Mr. Boyd's self-serving description of his four violations.  That's not the whole story.

THE COURT:  Okay.  Well, then I'm going to reserve on the admissibility of DX 729 as it pertains to the public records exception.  It would be helpful, Mr. Blenk, if you could narrow down any of the pages of this exhibit that would be relevant.

MR. BLENK:  I expect to -- I expect to still use these documents in cross-examination of Mr. Drob, including the Horizon records, the parole records.  I don't intend to show them to the jury, but I would --

Boyd v. County of Erie, 22-CV-519                897

THE COURT:  Okay.  I mean, I did say that you could use them on cross-examination.  I think the way you use them is probably still up for debate.  And so why don't we just address that briefly.

What's your position as far as how defense counsel can use these records, specifically the ones that have not been received when cross-examining Dr. Drob?

MR. DURLAND:  Your Honor, our position is that -- first off, the subject matter restrictions remain.  Mr. Blenk declares that he intends to use these records with Dr. Drob, but he's not entitled to say, Dr. Drob, you've seen records describing Mr. Boyd's participation in a robbery.  You've seen records describing Mr. Boyd's juvenile offending. That's out of the case.  It's been out of the case.  And, you know --

THE COURT:  Okay.  I mean, Mr. Blenk, do you intend to do that at all?

MR. BLENK:  I do not, Your Honor.

THE COURT:  I expect not, but --

MR. BLENK:  I do not, Your Honor, but I want to clarify that it would be -- there's references to -- and, you know, I think this will all come in with better context during the actual course of the cross-examination, but I do intend to -- so Dr. Drob describes Mr. Boyd's life on parole as basically being characterized by, amongst other things, bad judgment --

Boyd v. County of Erie, 22-CV-519                 898

THE COURT:  So are you saying that the prior bad acts that I've already excluded, that somehow this opens the door to them?

MR. BLENK:  No.  The facts -- well, that has always -- that has always been our position.  And truthfully that is -- that remains our position, Your Honor.

But without even getting into the bad acts, there's reference to his -- to violent confrontations.  And I would just -- I would seek Mr. Drob's agreement that there are records reflecting those same matters prior to Mr. Boyd's incarceration without getting into the details of those exchanges.  Otherwise, this evidence comes in, Your Honor, with the impression that these are things that are at least chronologically subsequent to his incarceration and encourages the inference that they are caused by his incarceration.  Again, it's not talking about any specific event.  It's not --

THE COURT:  Okay.  I've already precluded those.  So what specifically are you saying that Dr. Drob said that would open the door to them?

MR. BLENK:  Dr. Drob testified -- or Dr. Drob's report reflects that Mr. Boyd's time in -- after he was on parole was characterized by poor judgment, becoming trapped in an environment of alcohol and drugs, and engaging in physical conflicts and impulsive behavior.

Boyd v. County of Erie, 22-CV-519                899

THE COURT:  Okay.  How does that open the door?

MR. BLENK:  It opens -- well, first of all --

THE COURT:  Well, let me just say this:  That opinion I don't find opens the door.  And so if Plaintiff puts that -- if Dr. Drob testifies to that, then I don't find that it opens the door, but --

MR. DURLAND:  And, Your Honor, he's not testifying to that.

THE COURT:  Okay.

MR. DURLAND:  So that's not even an issue.  And just to be very clear, at the latest filing from the County it explicitly says they intended to cross-examine Dr. Drob about prior bad acts.  So I appreciate Mr. Blenk saying he's not going to do that, but the latest filing, page nine, at 1:30 a.m., said that's what they're going to do.  So that's the basis for our concern.

As far as seeking Dr. Drob's agreement about what records show, that's not questioning his methodology.  That's not appropriate cross of an expert.  That's just using him as a conduit for the hearsay that they can't get into evidence.  They are just looking for Dr. Drob to say, hey, you reviewed this, isn't it true that the records show this, the records show this, and they are just trying to use him as a vehicle for the submission of hearsay records that -- the records that we've been discussing.

Boyd v. County of Erie, 22-CV-519                    900

They are allowed to cross him -- my understanding of Your Honor's ruling is that he's offering an opinion about substance abuse.  They are allowed to cross-examine him.  They can say aren't there records that reflect substance abuse before Mr. Boyd's incarceration.  Understood.  He'll talk about that on direct.  They can cross-examine him about that.

I think Your Honor asked about the mode of cross-examination.  I agree with Mr. Blenk.  These documents can't be shown to the jury, that Mr. Blenk can ask Dr. Drob about particular records, not say -- not read the record and then say are you aware of that, but direct his attention to a record.  If Dr. Drob doesn't remember that particular record off the top of his head, then Mr. Blenk is entitled to show it to him, to the witness only, ask if it refreshes his recollection.  If it does, then he can question Dr. Drob about the record and, you know, attempt to show that Dr. Drob has overlooked something or that Dr. Drob hasn't sufficiently taken into account one of the records that he reviewed.  All that seems fine to me.

He can't just read the record.  He can't show the record to the jury.  And if Dr. Drob doesn't recall the record after having been refreshed, then he needs to move on.  And I think the same rules would apply to any redirect, that I wouldn't be able to redirect the jury by saying, well,

Boyd v. County of Erie, 22-CV-519                901

Dr. Drob, don't the records say this, and then just read it out.  I think I'd have to ask him about it and not show it to the jury.

THE COURT:  Mr. Blenk, go ahead.

MR. BLENK:  I'm certainly not subject to the limits of Dr. Drob's recollection.  I can do things with documents that Dr. Drob reviewed and for which he based his -- documents on which he based his analysis.  I don't have to sit there and just take his answer that he didn't see this one.  He needs to -- I need to be able to use the document as necessary for the purposes that I'm intending to use it for.  He can't just say I don't remember that one and it just vanishes that he has contrary information -- information that's contrary.

And to the extent that it is contrary, I need to be able to use that to illustrate the degree to which he is overlooking things.  So if it just comes in as there's pre-existing substance abuse, that doesn't really capture -- that doesn't capture the thrust of it without getting into the details that he overlooked, pretty extraordinary symptoms reported by Mr. Boyd, and didn't take that into account in his report.

These are documents that he reviewed.  These are documents that they have put at issue by even putting him up.  They don't -- I don't have to simply refresh his recollection.  He's -- he's an expert who uses these kinds

Boyd v. County of Erie, 22-CV-519                    902

of -- this kind of information and he makes observations from it and he works with it.  There's nothing that keeps me from forcing him to do that on the stand if he doesn't recall the document.

THE COURT:  I mean, I agree you are not limited to just refreshing his recollection.  I mean, you're using these for -- as a form of impeachment really, right, to try to challenge the credibility of his opinions because he's overlooked certain information.  So you can properly cross-examine him referencing those records, but I agree that you can't show the records to the jurors, and it doesn't seem like you're intending to do that.

As far as my previous rulings that prior bad acts -- with the exception of substance abuse prior to his conviction, which is permitted, but any other prior bad acts are excluded, and you cannot cross-examine Dr. Drob on any of those records.  If you feel that a door has been opened, then you need to let me know, and we can address that outside the presence of the jury.

MR. BLENK:  Can I ask two additional questions, Your Honor?

THE COURT:  Sure.

MR. BLENK:  So the first question is I assume that I can talk about the bad acts associated with his parole violations?

Boyd v. County of Erie, 22-CV-519                    903

THE COURT:  The ones that are at issue for damages that we've already heard the deposition designation from Mr. Boyd, yes.

MR. BLENK:  Right.

MR. DURLAND:  Your Honor, could I -- Dr. Drob is not offering any opinion about the parole violations.  So Mr. Blenk seems to think that he can simply ask Dr. Drob any question that he wants to ask, and if, you know, it happens to be an area of the case that they don't have records in that they want to use, then I'll just do it through Dr. Drob.  But Dr. Drob isn't offering -- 805 allows the cross-examiner to require the expert to disclose -- 705 -- to disclose the basis for the opinions the expert is offering on the stand.  It's not an opportunity to just talk to the expert about any record that the expert reviewed.

I mean, Mr. Blenk is entitled to impugn the methodology by which Dr. Drob reached the opinions that he is offering, but Dr. Drob is not going to get on the stand and offer some opinion about what really happened in these parole violations.  It's not -- it wasn't his job to go and kind of compare the parole officer's notes against what Mr. Boyd said and figure out what's the -- you know, what really happened in the underlying parole violations.

That's something that they want to do irrespective of Dr. Drob.  They just want to do it because Mr. Boyd testified

Boyd v. County of Erie, 22-CV-519                904

to it.  They neglected to cross-examine him about it.  They neglected to get in contradictory records.  And now they want to use Dr. Drob as their opportunity to fix those oversights, but that is not permissible under the rules.

THE COURT:  It's hard for me to make a ruling on this because I don't know what Dr. Drob is going to testify to.  And so, yes, you are going to be limited in cross-examination of Dr. Drob based on what he testifies to on direct examination.

So if those parole violations are brought up during Dr. Drob's testimony kind of as it relates to damages, then there would be fair cross-examination on those.  But I agree that if you -- I mean, you can't use Dr. Drob to get into I guess factual issues about the parole violations that -- that's really outside of the scope of what he's testifying to.  You can't use him for that.

MR. BLENK:  That's not outside the scope of his report, Your Honor.  He has reviewed these records and he has information that's relevant to this case.  I should be able to ask him questions about any of those matters.  He seemed -- he seemed informed enough to be rendering opinions about the cause of Mr. Boyd's ultimate parole violations and essentially blaming them on his incarceration.  And they can't just simply pull that off the table and say, oh, he doesn't know anything about parole violations.  He's taking

Boyd v. County of Erie, 22-CV-519                905

narrative from Mr. Boyd about all manner of things in his life and he's basing his analysis on that.  They can't -- we can't be handcuffed just by the scope of information they put on.

I will add that Mr. Boyd has put in his own account. Mr. Boyd has put in his own mental health diagnoses over our objection.  He's put in his own account of what happened in those events.

These are things that -- Dr. Drob is familiar with the parole system.  He relies on the parole system.  I think that will come out very cleanly.  It's fair game for cross-examination to discuss on several levels what's going on here, the first level being directly relevant to damages. The second level -- another level being Dr. Drob's own bias, and a third level being -- we know that he is going to go up there and we're going to get Dr. Drob -- we anticipate that Dr. Drob is going to -- they're going to move the focus away from his very shoddy expert opinion, which was tying mental health and substance abuse to incarceration, which is just not supported by the record.

And they are going to put him up there and they are going to have him talk for a long time about -- in a way that's essentially cumulative of Mr. Boyd's testimony.  They are going to have him say how bad prison was and how he must have felt when he got cancer, and they can't just put him on

Boyd v. County of Erie, 22-CV-519                906

to just recite facts and pretend like he had never -- he was not apprised of contrary facts or of facts that are also relevant to this case that the Plaintiff has put evidence on and that he was apprised of and he felt comfortable opining on until they are pulling that theory at the last second.

MR. DURLAND:  Your Honor, the cross-examination is constrained by the opinions the expert offers on the stand. They are not entitled to say, well, Dr. Drob reviewed this record and I wish I had cross-examined Mr. Boyd about this instant.  I wish I had gotten the records certification in order to put this record into evidence, but I failed to do so, and so I'm just going to seize on the opportunity, the fact that this expert reviewed a record that I'd like to put in front of the jury, and ask a whole bunch of questions that have nothing to do with the opinions the expert is offering.

I agree with Mr. Blenk.  He can test Dr. Drob's methodology and thoroughness, but he can't just talk to Dr. Drob about things he wants to talk about because they're relevant to the case.  I mean, there are lots of rules of evidence that circumscribe what a lawyer is entitled do with evidence and the way to get this stuff in that we've already talked about.  It's not through -- I mean, there are enumerable cases saying you cannot use an expert as a conduit for hearsay.

THE COURT:  I mean, yes.  I agree with that, which is

Boyd v. County of Erie, 22-CV-519                    907

what I've already said.

But, Mr. Blenk, I'm not excluding you from asking Dr. Drob questions about his parole violations, but it's going to be -- I mean, it's not unlimited.  And I agree you can't use Dr. Drob to try to get in all this hearsay, okay, for records that are not in evidence.  But more than that -- I cannot make a ruling now.  I guess we'll have to see what Dr. Drob testifies to.  And if we need to address this later, we will, because I'm not going to sit here and say that you can't ask Dr. Drob these questions pertaining to parole records.

MR. BLENK:  And one final note for clarification, Your Honor.  Dr. Drob recites that Mr. Boyd had a wonderful -- had a beautiful childhood.  There are -- setting aside the prior bad acts that are criminal in nature, there is a wealth of information that's contrary to that in these records.  So we would intend to address that to impeach him, to impeach his process, to impeach the substance of it to the extent that it comes up and to also -- this is what I was getting at before, Your Honor.  Especially when the Plaintiff is using Dr. Drob as a conduit for hearsay themselves where they are getting Dr. Drob to repeat many things that Mr. Boyd disclosed to him in the course of their conversations, that the reliability of Mr. Boyd as a narrator as a self-reporter is also at issue.

MR. DURLAND:  Your Honor, that is not correct.  I think

Boyd v. County of Erie, 22-CV-519                908

that's the third time the County has made this representation that Dr. Drob concluded that Mr. Boyd had a beautiful childhood.  That's false.  What Dr. Drob said is Mr. Boyd reports to me that although his family had difficulties stemming from poverty, all in all he had a beautiful childhood.  That's Dr. Drob relating what Darryl Boyd said. That's a passage of his report.

Dr. Drob is not going to get on the stand and say Mr. Boyd had a beautiful childhood.  I mean, this is just the County -- once again they -- one second they disclaim any intention of introducing prior bad acts, and yet they consistently say that's actually exactly what we want to do and we want to say, look, Dr. Drob, mischaracterized his statement in the hopes of now making this relevant to some kind of cross-examination.  It wasn't a beautiful childhood. He committed this bad act, he committed that bad act.

I mean, this is our concern.  This is why we made this filing in the first place.  We've briefed this over and over, and yet the County keeps insisting that they are entitled to smear Mr. Boyd's character vicariously through Dr. Drob irrespective of what opinions Dr. Drob offers.  We think that's absolutely inappropriate, and we want it to be very clear that this is not to be done in front of the jury because once Mr. Blenk says it and says, oh, I thought I could do it because he opened the door, now they've heard it

Boyd v. County of Erie, 22-CV-519                    909

and now we're stuck.

THE COURT:  I mean, I've already made that clear that, Mr. Blenk, you cannot -- at this point you cannot cross-examine Dr. Drob at all about any other prior bad acts except for the substance abuse preconviction.  And if there's a question that is -- well, if you want to get into any of that, you have to ask to be heard outside the presence of the jury.  If there's a question that you have and you're not sure if it's permissible, then just ask me and I'll address it outside the presence of the jury.  Okay?  And that's -- I don't want to waste any more time because the jurors have been waiting.

MR. BLENK:  I'm not talking about things that Mr. Boyd did.  I'm talking about feelings that he had when he was a child, his abusive relationship with his father, being bullied by neighbor kids and feeling less than in school.  "Less than," this lines up with a lot of the same observations that Dr. Drob is recognizing in Mr. Boyd later in life, and he opined that these things are resulting from the incarceration.  So he's aware of them, but he's not finding the date of onset in his review of the records.  I'm not talking about getting into bad conduct by Mr. Boyd.

THE COURT:  Okay.  Well, then I don't want to spend any more time.  I'm not going to go through every potential question for cross-examination of Dr. Drob.  There were other

Boyd v. County of Erie, 22-CV-519                    910

things I wanted to address, but we can do that later.

I'm going to read the limiting instruction just before Dr. Drob testifies about him testifying about Mr. Boyd's subjective opinion, something I've already read or something similar, and then Dr. Drob can proceed with his direct examination. Okay. So we can bring the jurors in.

Actually hold on one second. We have to do something on my computer.

We can bring the jurors in.

(Jury present.)

THE COURT: Have a seat, everyone. Thank you.

Our jurors have returned to the courtroom. Good morning, everyone. I hope that you had a good weekend.

I apologize for the delay this morning. We've been here for awhile just addressing some matters that we needed to do outside of your presence. And so thank you for your patience.

There is a brief instruction that I want to read to you before Plaintiff's next witness.

Members of the jury, you are about to hear testimony from a witness for Plaintiff, Dr. Sanford Drob. I expect you will hear testimony from Dr. Drob about Mr. Boyd's subjective belief in his own innocence of the Crawford homicide.

We are all here to address whether Mr. Boyd had a fair criminal trial in 1977. Whether Mr. Boyd was, in fact,

Sanford Drob - DX by Mr. Durland                    911

guilty or innocent of the Crawford homicide is irrelevant to that inquiry.  However, Mr. Boyd's own subjective belief of his innocence is relevant for the limited purpose of supporting Plaintiff's alleged damages.

You can call in your next witness.

MR. DURLAND:  Thank you, Your Honor.  Plaintiff calls Dr. Sanford Drob.

THE COURT:  Good morning, Dr. Drob.  You can just come right up here.  My court clerk will swear you in.

THE WITNESS:  Sure.

(Whereupon, the witness SANFORD DROB was duly sworn and testified as follows:)

THE COURT:  You can have a seat, Dr. Drob.

Whenever you're ready, Mr. Durland.

MR. DURLAND:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. DURLAND:

Q.    Dr. Drob, what is your profession?

A.    I'm a clinical and forensic psychologist.

Q.    What were you asked to do in this case?

A.    I was asked to do an examination of Darryl Boyd with respect to any psychological consequences resulting from his years of incarceration.

Q.    Is evaluating current and former inmates something you've done in your career previously?

Sanford Drob - DX by Mr. Durland                912

A.   Yes.

Q.   Approximately how many times?

A.   A long career.  Probably a couple thousand times.

Q.   Of the inmates and former inmates that you have previously evaluated in your career how many have been established to be innocent of the crime for which they were convicted?

A.   At least 10.

Q.   Dr. Drob, I take it you have an undergraduate degree?

A.   Yes.

Q.   Where did you go to college?

A.   I graduated from the State University of New York at Stony Brook.

Q.   And did you attend graduate school?

A.   I did.

Q.   Where?

A.   I attended -- I have two doctorates degrees.  I initially attended graduate school at Boston University where I did a doctorate in philosophy with a specialty in philosophy of psychology, and then I attended Long Island University and did a doctorate in clinical psychology.

Q.   Are you licensed?

A.   Yes.

Q.   In what state?

Sanford Drob - DX by Mr. Durland                913

A.    In New York and in New Jersey.

Q.    During and after your graduate studies where did you work?

A.    Initially at Bellevue Hospital in New York City.

Q.    In what field?

A.    Well, I was the -- I interned on the adolescent unit, and I then went to the Bellevue Forensic Psychiatry Service, which is the prison ward at Bellevue Hospital, and I worked there for many years and then served as the Director of Psychological Assessment at Bellevue.

Q.    So when you talked about the prison ward, a forensic psychologist's patients are inmates?

A.    Yes.  They're New York City inmates that have been sent from New York City jails to Bellevue Hospital either because they are suffering from a mental illness or need to be evaluated for their competency or some other reason the Court wants them to be evaluated.

Q.    Did you do any teaching over the course of your career?

A.    Yes.

Q.    Where?

A.    Well, I've -- I was on the faculty of New York University Medical School.  I was on the faculty where I taught at John Jay Criminal College.  And then beginning in 2005 I became a full-time faculty member at Fielding Graduate

Sanford Drob - DX by Mr. Durland                914

University in Santa Barbara, and I was full-time faculty there until 2022, and I've been a Professor Emeritus there since that time.

Q.   Does your current professional work include evaluating people with legal cases?

A.   Yes.

Q.   Criminal cases, civil cases?  What kind?

A.   Mostly criminal cases, but some civil cases.

Q.   How do you -- how do you come to be involved in a criminal case?

A.   Well, I could be called by a defense counsel. That's the most usual circumstance.  And most of these cases are Court-appointed cases.  So then I have to be appointed by the judge.  I can be called by a prosecutor or I can be called directly by the clerk of the judge who wants a competency or some other evaluation.

Q.   So if a defense counsel calls you, could it -- it could be competency?  Is that one of the reasons?

A.   Competency is one of them.  Sentencing mitigation is another.  And in criminal cases the mental state at time of offense is another possibility.

Q.   And when you're hired by prosecutors what are you asked to do?

A.   Well, typically when I'm hired by prosecutors it's a competency issue, but sometimes a prosecutor will hire me

Sanford Drob - DX by Mr. Durland                 915

after a defendant has put in an insanity defense or filed some other psychological defense to a case and the prosecutor wants a second opinion, their own independent opinion.

Q.    You said that you've been involved in civil cases as well?

A.    Yes.

Q.    How many approximately over the years?

A.    Probably 75 about.

Q.    Have you been hired by plaintiffs, defendants, both?

A.    Both.

Q.    When a judge or a lawyer hires you to render an opinion or do work for them are you paid for your work?

A.    Yes.

Q.    And what are your rates in a private civil case like this one?

A.    Four hundred and fifty dollars an hour, and forty-five hundred dollars for a full day of testimony.

Q.    Okay.  Is that typical for a psychologist of your experience?

A.    It's the rate I've set.  Some of my younger colleagues are charging more.  That's typical I guess, yes.

Q.    And does the fee that you charge depend on the opinion you reach?

A.    No.  I get paid for my time, not for my opinion.

Q.    And I take it the same is true of the result in the

Sanford Drob - DX by Mr. Durland                916

case; you don't get paid more if the case is resolved a certain way?

A.   Absolutely not.

Q.   Have there been occasions when you had to tell the lawyer who hired you something the lawyer didn't want to hear?

A.   Often.

Q.   And in those instances are you still paid for the time that you put into the case?

A.   Yes.

Q.   In this case you said earlier you were asked to evaluate Darryl Boyd?

A.   Correct.

Q.   And you've been compensated for your time in this case?

A.   Yes.

Q.   In this case are you charging your normal civil rate for -- your normal rate for private civil cases?

A.   The rate that I stated, yes.

Q.   Okay.  And does your fee in this case depend on the outcome or the opinion that you reached?

A.   No.

Q.   What sources of information did you review before rendering an opinion in this case?

A.   I reviewed medical records of Mr. Boyd.  I reviewed some educational records.  I reviewed some parole records.

Sanford Drob - DX by Mr. Durland

917

And when I say "medical records," there were extensive mental health and substance abuse records from various facilities.

Q.   And did you also administer tests to Mr. Boyd?

A.   I administered psychological tests.

Q.   And you had the opportunity to interview him?

A.   Yes.

Q.   Are records and psychological testing and patient interviews the typical sources of information that forensic psychologists such as yourself rely upon?

A.   Yes.

Can I get a cup of water perhaps?

Q.   Of course.

A.   Thanks.

Q.   Are you ready?

A.   I am ready.

Q.   We were talking about records just now.  On the whole how far back did Mr. Boyd's records go?

A.   For the most part none of the medical or mental health records went earlier than 2012.

Q.   There were a few isolated records that were earlier?

A.   Yes.

Q.   But the vast majority of them did not go earlier than 2012?

A.   That's my recollection, yes.

Q.   Do you have any sense for why that is?

Sanford Drob - DX by Mr. Durland                918

A.   Well, facilities and even private practitioners are obligated to maintain their records just for seven years or, in some instances, if it's involving a forensic matter ten years.  So I saw Mr. Boyd I believe in 2022 initially, and, as a result -- or 2023 -- and none of the records were more than ten years old.

Q.   Understood.

A.   Yeah.

THE COURT:  Hold on for one second.

Dr. Drob, I apologize, but we have to just fix something on your monitor.  So if you could just bear with us a minute.

MR. DURLAND:  Of course.

THE COURT:  Someone from IT has to change something on your monitor.

THE WITNESS:  Okay.

THE COURT:  We're all set.  Thank you.  You can proceed.

MR. DURLAND:  Thank you, Your Honor.

BY MR. DURLAND:

Q.   Dr. Drob, we were talking about testing?

A.   Yes.

Q.   And I wanted to ask you, what tests did you administer to Mr. Boyd?

A.   I administered the Symptom Checklist-90-Revised and

Sanford Drob - DX by Mr. Durland                    919

the Trauma Symptom Inventory, 2nd Edition.  It's called the TSI-2.  The other one is called the SCL-90-R.

Q.    How long have these tests been in use?

A.    Well, they're both second editions, but in one form or another over 30 years, maybe 40 years.

Q.    So these tests have been researched and validated and refined over the years?

A.    That's correct.

Q.    But in their essential form they've been used for decades?

A.    Yes.

Q.    And these are essential tools of forensic psychologists?

A.    Yes.

Q.    The first test you mentioned, the symptom checklist 90 R, can you explain in a little more detail what that is?

A.    Well, it's a checklist of 90 symptoms, and it's use is you ask the individual to check symptoms rating them on a scale from zero to three, where zero they don't have the symptom at all, three is they have it extremely, symptoms like anxiety depression, et cetera.

The 90 items are then sorted into ten different categories of psychological distress.  Amongst them are anxiety, depression, interpersonal sensitivity, hostility, paranoia, obsessive compulsive symptoms, phobic anxiety,

Sanford Drob - DX by Mr. Durland                    920

psychosis, paranoia, things like that.  And you get a rating based upon their sorting.

What's useful in a forensic context is to go back and interview the individual regarding their endorsements to get a -- both a history of when they began to experience these things and to get a sense of what their experience was.  So if they endorse an item saying that they've had difficulty going on trains and buses, you want to get a detailed qualitative description of what that was like for them.  That enables you to also assess the credibility of their symptoms, whether they just checked it off for whatever reason or they actually experience the symptom.

Q.   In other words, you're comparing the report that the patient makes during this interview process to what is known about psychology and psychological syndromes and kind of the standard --

A.   Yes.

Q.   -- typical presentation?

A.   You don't tell them you're going to do that, but subsequently I do that to get a sense of, you know, what -- you know, how credible and how -- and not only that, but how profound the symptom was for them.

Q.   And I take it you did that with Mr. Boyd?

A.   Yes.

Q.   The other test you mentioned was the Trauma Symptom

Sanford Drob - DX by Mr. Durland                                921

Inventory?

A.   Yes.

Q.   Tell us a little more about that one.

A.   Well, that's a 140 or so item test that specifically lists a set of questions that are designed to assess whether an individual experiences symptoms related to a syndrome called posttraumatic stress disorder.  That test, in addition to assessing those symptoms, also contains within it two validity scales that enable a psychologist to determine the test-taking attitude that the individual took when they took the test, whether they were, you know, kind of over-endorsing symptoms, perhaps under-endorsing symptoms or being straightforward.

Q.   I'll come back to the validity scales in just a second, but we talked about you also interviewing Mr. Boyd?

A.   Yes.

Q.   How many times did you interview Mr. Boyd?

A.   I interviewed Mr. Boyd on two successive days in July of 2023.  I then interviewed him by -- that was in person in Buffalo.  And then I interviewed him on video in December of that year, and then briefly by telephone in February of 2024.

Q.   I want to ask you about that third interview conducted by video.  Had you administered psychological testing at that point?

Sanford Drob - DX by Mr. Durland    922

A.    I did all this testing in 2023, in July of 2023.

Q.    And at that point what -- let me ask:  At what point did you learn that Mr. Boyd's oncologist, cancer doctor, had received concerning lab results?

A.    It was during the interview that I had conducted with him in December of 2023.  While I was actually on the interview with him he got a phone call and took a minute to speak with his cancer doctor, and he was informed right -- right then and there.

Q.    That he had terminal cancer?

A.    He was told that -- I'm not sure if the doctor told him it was terminal, but he was told that -- what was, in fact, a terminal cancer diagnosis, yes.

Q.    And you spoke to Mr. Boyd again in February 2024?

A.    I did.

Q.    Based on your prior interviews, your presence during this December 2023 interview and the follow-up in February of 2024, are you comfortable giving an opinion about the way that Mr. Boyd's cancer diagnosis fits into his overall psychological picture?

A.    Yes.  I can to a certain extent, but I didn't follow him for the months afterwards.

Q.    Of course.  You didn't follow him until his death?

A.    That's correct.

Q.    Coming back to this question about the sources of

Sanford Drob - DX by Mr. Durland                    923

your information, when you're describing testing and interviews of Mr. Boyd, I take it you're relying on the patient to describe the way that he's thinking, the way that he's feeling, the symptoms he's experienced?

A.   Yes.

Q.   That's common across forensic psychology?

A.   You rely on what they say, but you compare that to what you know from the historical record, the medical records and from your experience -- your experience as a psychologist.

Q.   Right.  So I was just going to ask --

A.   Yes.

Q.   -- it sounds like you're referring to, you know, this potential issue of the accuracy of the patient's reports?

A.   In general, yes.  To what extent their report is reasonable, a reflection of their actual experience.

Q.   In other words, psychology is aware of this issue?

A.   Certainly.

Q.   And has taken steps to address it?

A.   Yes.

Q.   And are you familiar -- have you published, for example, on this particular topic?

A.   On malingering and exaggeration.  I have published on it.

Q.   Tell the jury what that means.  Exaggeration of...

A.   Psychological symptoms.

Sanford Drob - DX by Mr. Durland                924

Q.   Okay.  And over the course of your 40-year career have you had occasion to assess patients for exaggeration of symptoms?

A.   It's a standard procedure that's built into virtually every examination.

Q.   Okay.  What is -- what is the procedure?  I think you've alluded to some of it, but tell us more about how a psychologist assesses the veracity or reliability of a patient's self-report.

A.   Well, as I indicated, some psychological tests, like the TSI-2, have built-in validity scales that provide you with important information regarding their test-taking attitude, whether or not they might potentially be exaggerating. Psychology testing in and of itself won't tell you that, but they can give you important information.

You then -- you assess what the individual has told you against other sources of information.  In this case there's -- there were voluminous mental health records over the years, and I could assess what Mr. Boyd says to me and compare let's say the symptoms and psychological disorders that may appear as a result of the interview and I compare them with what he has said in the past and what other diagnoses that have been made by previous clinicians.

And then also, significantly, it's important as a psychologist to listen for whether or not an individual's

Sanford Drob - DX by Mr. Durland                925

presentation is consistent with what is known about particular mental disorders. For example, are the descriptions that he gives of posttraumatic stress disorder something that is typical of individuals who have had PTSD -- is what it's referred to -- and how does that compare to both my own prior experience and the literature on posttraumatic stress disorder.

So there's a multi-faceted procedure. There are certain things that individuals may do in the course of an interview that might alert you to the fact that perhaps they are exaggerating. They may be dramatic in their presentation and insist that you write certain things down that may make you be suspicious. But those are generally the kinds of things I look at and a forensic psychologist looks at.

Q. Can I ask you a little more about this validity scale that you mentioned? I know you said this was -- the TSI itself was 144 questions; is that right?

A. That's correct.

Q. And what aspect of the questions or what aspect of the test is the validity scale piece?

A. Well, there are two of them. The first one, the RL scale, assesses the extent to which an individual is unwilling to admit certain common foibles that we all have. And if they have too many zeroes on that scale, it suggests that the individual is presenting themselves too positively. An item

Sanford Drob - DX by Mr. Durland                926

like I sometimes get angry.  Never.  You know, who doesn't get angry.

Q.    So understating something?

A.    Understating.  Understating there.

Q.    What about the exaggeration?

A.    The exaggeration is the atypical response scale, and those are eight items where an individual can rate those items from zero, which is not at all; to one, which is rarely; two is sometimes; and three quite a bit.  And these eight items because this is a PTSD test are items that sound like symptoms that a person with PTSD might have, but which are actually very rare.

So, for example, an item might read I am sometimes so traumatized by flashbacks that I forget where I live and can't find my way home.  Now, somebody might have that, but it's very rare.  Or an item might say I sometimes -- I experience flashbacks of the traumatic event several times a day for weeks at a time.  That's not typical of people with PTSD.  Those symptoms -- those flashbacks come and go more typically.

So the test gives you a raw score.  You potentially could have 24 points on this because there are eight items.  And if you said quite a bit to all eight of them.  You'd end up with three times eight, or twenty-four.  And you could also have zero.

The makers of the test have determined that if an

Sanford Drob - DX by Mr. Durland                      927

individual has a score of 14 or greater on this atypical

response scale that it's unlikely that the rest of the test is

valid, meaning that it's -- they may have exaggerated their

symptoms let's say or maybe they didn't understand the

questions, but whatever it is it's -- it invalidates the test.

And if you're assessing exaggeration and malingering, it would

be a sign that perhaps they are or not definitive.

Q.   So the jury understands, the patient is going

through these one hundred forty-four questions --

A.   Yes.

Q.   -- and sprinkled throughout the questions are these

eight, you know --

A.   Atypical responses.

Q.   -- atypical responses.  Are those flagged in some

way --

A.   No.

Q.   -- so that the person --

A.   They're flagged for me when I score the test, but

not --

Q.   Not for the person?

A.   No.

Q.   So the person doesn't know.  So the idea is that if

a person has endorsed, said that they have too many of these

unusual responses, crosses that level of 14, then it's a

concern that perhaps, as you say, either they don't understand

Sanford Drob - DX by Mr. Durland                    928

the question or that they are exaggerating their symptoms?

A.   That's correct.

Q.   What was Darryl Boyd's score?

A.   One.

Q.   Have you given this same test to other plaintiffs with active civil litigation?

A.   Yes.

Q.   In your experience how does Darryl Boyd's score on this test compare?

A.   In comparison to other people in civil litigation?

Q.   Correct.

A.   It's one of the lowest I've ever seen.

Q.   Low meaning no faking of symptoms, no exaggeration of symptoms?

A.   No indication of that.

Q.   Is this test result, this extraordinarily low score, consistent with your interview with Mr. Boyd?

A.   Yes.  I didn't find any reason in my interview to believe he was exaggerating his symptoms.

Q.   After you reached your opinions about Darryl Boyd did you commit them to writing?

A.   Yes.

Q.   And does your -- you issued a report?

A.   Yes.

Q.   And does your report write down every fact that you

Sanford Drob - DX by Mr. Durland                929

identified in all of the records that you reviewed?

A.   Certainly not.

Q.   Any sense for how many pages of records you reviewed in total?

A.   Two or three thousand pages of records.

Q.   Okay.  If I told you it was five thousand, does that sound wrong to you?

A.   I didn't count them, but that doesn't sound wrong if that's the number.

MR. BLENK:  Objection, Your Honor.  Move to strike.

THE COURT:  Overruled.

BY MR. DURLAND:

Q.   Dr. Drob, so if your report doesn't write down every single fact you read in these records, what does it do?

A.   It summarizes my opinion and the basis of my opinion and it cites some facts based on the records that I think are important in formulating my opinion.

Q.   Let's talk about your opinions, Dr. Drob.

A.   Okay.

Q.   Am I correct that you've concluded that Mr. Boyd's 45 years in prison or on parole resulted in severe and at times disabling mental illness?

A.   That's correct.  That's my conclusion.

Q.   What mental illnesses resulted from Mr. Boyd's conviction and imprisonment?

Sanford Drob - DX by Mr. Durland                                930

A.    Well --

Q.    Primarily.

A.    Primarily posttraumatic stress disorder, chronic posttraumatic stress disorder, a depressive disorder and a generalized anxiety disorder.

Q.    And posttraumatic, this is PTSD that you referred to earlier?

A.    PTSD, yeah.

Q.    And depression?

A.    Yes.

Q.    And anxiety?

A.    And anxiety.

Q.    Mr. Boyd also had a substance abuse problem at one point?

A.    Yes.  He also had substance abuse disorder or disorders, yes.

Q.    And what in your opinion was the relationship between the mental illnesses caused by Mr. Boyd's decades of incarceration and the substance abuse disorder that he was diagnosed with?

A.    I believe that Mr. Boyd's severe substance abuse was in large measure a response to his PTSD, depression and anxiety that resulted from his years of incarceration and parole.  I also believe that his substance abuse in some instances exacerbated some of those conditions.  You know, he

Sanford Drob - DX by Mr. Durland                    931

used it in many ways to self-medicate himself, but there were many psychological costs to abusing drugs.

Q.   Costs you said?

A.   Psychological costs.  You think it's helping, but it creates problems.

Q.   I understand.  Just so the jury understands what I'm going to be asking you to do, the jury has already heard

Mr. Boyd describe his experience in prison.  And what I'm going to be asking you to do is to help the jurors understand the way that Mr. Boyd's suffering in prison remained with him after his release.  Does that sound fair?

A.   Yes.

Q.   First though, I do have one question about Mr. Boyd's suffering in prison, and to help orient you and the jury can we please play what's in evidence, Darryl Boyd's deposition, at 451, line 9 to 451, line 22.

(Video played.)

MR. DURLAND:  Could we please play 455, line 16 to 457, line 23.

(Video played.)

MR. DURLAND:  Can we please play what's in evidence at 468, line 16 to 470, line 1.

(Video played.)

MR. DURLAND:  Now, please, 483, line 1 to 483, line 14.

Sanford Drob - DX by Mr. Durland                    932

(Video played.)

MR. DURLAND:  Now, please, 363, line 11 to 363, 22.

(Video played.)

MR. DURLAND:  475, line 4 to 476, line 16, please.

(Video played.)

MR. DURLAND:  Finally, 571, line 1 to 571, line 16.

(Video played.)

MR. DURLAND:  Thank you.  We can take that down.

BY MR. DURLAND:

Q.   Dr. Drob, you told us earlier that you've evaluated thousands of inmates and former inmates in your career?

A.   Yes.

Q.   Including inmates who have been established to be innocent?

A.   Yes.

Q.   So does an inmate, a person who is in prison, who believes that he is innocent of the crime for which he was convicted suffer more or differently than an inmate who is in prison and knows he is guilty?

A.   He suffers both more and differently.

Q.   How?

A.   Well, there are several ways.

In the first place, an individual who believes themselves to be innocent is living in a different reality than -- with respect to themselves than everyone else in the prison

Sanford Drob - DX by Mr. Durland                                933

environment is living in.  Typically, people who are in jail have been convicted and are guilty and people assume them to be guilty.  So an individual who believes themselves to be innocent has that burden of having that belief, which others are going to be very skeptical about, and which is -- so it's hard for them to be their true selves.  They spend an enormous amount of time trying to get their case overturned, and that's stressful and requires an enormous amount of psychological energy.

An individual who believes themselves to be innocent can't, like other inmates, come to terms with the fact that they have committed a crime and they owe their debt to society and need to be rehabilitated.  They can't wrap their head around that.  And so they don't have that sense, okay, I did this, I owe my debt to society, let me improve myself and get myself rehabilitated so that I can return to society as a law-abiding productive and fulfilled individual.  A person who believes themselves to be innocent every day wakes up feeling to have no -- there's no reason for them to be in prison and there's no reason for them to be rehabilitated.

An individual who is -- believes themselves to be innocent also suffers from a sense of disillusionment with the law, with the moral order, with, you know, society.  It feels -- he used the word "eerie."  It feels like things are just out of whack.  You know, normally we think that the world

Sanford Drob - DX by Mr. Durland                934

works in a way where the just are rewarded and those who aren't just are held accountable.  And when a person believes they are innocent, that sense of the way the world works is broken for them.

And then, finally, they develop what in psychology we have a term for called learned helplessness where they feel that there isn't an adequate connection between what they do and what happens to them.  So normally we believe that if we act in a good way we'll be rewarded, and if we act in a bad way we'll be punished.  But if we get punished even if we haven't acted in a good way -- in a bad way and we believe that there was no reason for that, there's a sense of helplessness that runs in because one doesn't feel that one has power and control over what happens to them in their lives.

So it's -- being in prison for 20 years can be very, very psychologically debilitating, even for individuals who know they're guilty and realize that, but for those who believe themselves to be innocent it carries those extra burdens.

Q.   Okay.  Just to make sure -- I know the jury heard Judge Vacca's instruction, and I want to be sure that there's no misunderstanding here.  You are not saying that you've looked at Mr. Boyd's symptoms and you've diagnosed him as being innocent, right?

A.   No.

Sanford Drob - DX by Mr. Durland                        935

Q.   No.   You are just telling us about a particular psychological phenomenon, correct?

A.   Yes.   I'm talking about --

Q.   This type of suffering?

A.   -- my experience with individuals -- and the literature, by the way, on this -- of individuals who view themselves as innocent of the crime for which they've been sent to prison.

Q.   Okay.   And you're telling us about certain symptoms that Mr. Boyd has exhibited?

A.   Well, the ones that I've mentioned, he has at various times experienced all of them.

Q.   And these are things that you as a forensic psychologist took into account when you were making your evaluation?

A.   Yes.

Q.   Let's turn to posttraumatic stress disorder.   That was one of the mental illnesses that Mr. Boyd developed as a result of his incarceration?

A.   Yes.

Q.   In your experience, Dr. Drob, is PTSD common among people who have been incarcerated for decades?

A.   Yes.

MR. BLENK:   Your Honor, may we have a sidebar?

THE COURT:   Sure

Sanford Drob - DX by Mr. Durland                    936

(At bench:)

MR. BLENK:  If this goes any longer -- Mr. Durland had said on the record on the 4th that Dr. Drob wouldn't be conveying a diagnosis at all.

MR. DURLAND:  That's not correct.  Mr. Blenk asked whether Dr. Drob would be conveying a diagnosis at all, and I said no, that's not correct.  This has always been his report.  This has always been -- this is what we previewed that he would -- this is the most squarely relevant aspect of his opinion that Mr. Boyd's incarceration resulted in multiple mental illnesses.  That doesn't change the scope of anything that we've been discussing today or anything that we've previewed with the Court or anything that's been -- I mean, that was -- that's the basis for their argument that they are allowed to get into substance abuse in the first place, that they are putting this forward as an alternative cause.  I mean, that's what -- the argument Mr. Blenk made this morning.

MR. BLENK:  I think Mr. Durland has been very clear that he was not going to put on testimony that the substance abuse was a consequence of his incarceration, and now we heard just the opposite.  I don't --

MR. DURLAND:  That's not correct.  What I said was it's not our intention to put on substance abuse, and Mr. Blenk said you can't pull the opinion, and Your Honor said that

Sanford Drob - DX by Mr. Durland                937

they are allowed to cross-examine -- and this was right before openings -- and that we're allowed to bring that out as well.

So because we knew it was coming in anyway, then it didn't make any sense for us to simply not say anything about it and leave it for Mr. Blenk's cross-examination.

THE COURT:  Do you have specific objections?

MR. BLENK:  I just wanted to bring it up, Your Honor, as soon as possible because I think this broadens the scope of the door opening far beyond what had been contemplated prior to this.

THE COURT:  Okay.  So you have no specific objections right now, you just wanted to bring this to our attention?

MR. BLENK:  That's right.

MR. DURLAND:  Your Honor, I'm just going to say we categorically disagree with that.  The entire point of our previewing Dr. Drob's opinions and doing all of this through motion in limine was to make sure that we weren't having these sorts of debates right now where the County says that the thing that we're doing, what we've always previewed we were going to do, opens the door beyond what the Court has already ruled.  So --

THE COURT:  Okay.  Well, all I'm going to say right now is that I don't find that any of the questions pertaining to those two areas that you just raised are objectionable or

Sanford Drob - DX by Mr. Durland                    938

beyond the permissible scope that I've already ruled upon.

MR. BLENK: Yes, Judge. Thank you, Your Honor.

THE COURT: Thank you.

(Open court:)

MR. DURLAND: May I proceed, Your Honor?

THE COURT: Yes. Go ahead.

BY MR. DURLAND:

Q. Dr. Drob, I think the last question I asked you was whether in your experience PTSD, posttraumatic stress disorder, is common among people incarcerated for long periods of time, say, decades?

A. Yes.

Q. Did any other healthcare provider diagnose Mr. Boyd with PTSD before you evaluated him?

A. Yes. Several did.

Q. And it's your opinion, I think you said earlier, that Mr. Boyd's decades of incarceration were the cause of his PTSD?

A. Yes. His experiences during those decades of incarceration.

Q. Were there any other contributing factors to his PTSD?

A. Not that I'm aware of.

Q. Was --

A. I don't believe there were any others.

Sanford Drob - DX by Mr. Durland                    939

Q.   Okay.  In your opinion there are no other contributing factors at least with respect to PTSD?

A.   Yes.

Q.   Was Mr. Boyd's PTSD ever cured?

A.   No.

Q.   He still had PTSD when you evaluated him in 2023 and 2024?

A.   Yes.

Q.   Do you have any reason to doubt that he continued to suffer from PTSD through the end of his life in February 2025?

A.   I have no reason to doubt that he continued.

Q.   Can you tell us briefly, what is PTSD?

A.   Okay.  PTSD, or posttraumatic stress disorder, is a psychological response to trauma.  Trauma is defined as experiencing or witnessing or in some cases hearing about an event that has occurred to one's loved one.  So it can happen -- it could be an event that one experiences, that one sees or in some instances has heard about if it happened to someone that someone is very close to that involves either threat to their bodily integrity or actual serious physical harm to them or a threat to their sexual integrity or actual sexual harm to them.  So that's what we call the fundamental criteria, the first criteria for PTSD.  You've had to have been exposed to that kind of a trauma.

Then there are other aspects that go into PTSD.  And the

Sanford Drob - DX by Mr. Durland                940

first one would be recurring distressing recollections, flashbacks or dreams that disturb one based upon those experiences, that traumatic experience or experiences. They can just simply be memories that come out of the clear blue, one experiences them and can't get them out of their head, or they can actually be flashbacks where one actually feels that one is back in that circumstance and is viscerally feeling what went on or it can be a nightmare where one wakes up and has a dream that relates to one of those experiences in some way.

A second feature of the disorder is that the individual works very hard to avoid those memories and flashbacks. So they avoid conversations about their experiences. They avoid situations. For example, going into crowded subways or trains that might remind them of the crowded circumstances of incarceration. They -- and they avoid watching television programs or observing any other cues that might remind them of the trauma that they either experienced or witnessed. And that avoidance in and of itself becomes like a full-time job for them. It creates anxiety because they are constantly on guard for it.

And then these individuals also develop symptoms that are similar and cross over to depression where they begin to have a negative view of themselves, their environment and other people. And they also develop a heightened reactivity. What

Sanford Drob - DX by Mr. Durland                    941

I mean by that is if they hear a noise they will have an unusually strong startle response. They might get very irritable in circumstances that might remind them of this stress that they went through or the trauma they experienced. So in a crowd or in a conflict situation with another person they might react, overreact.

So that is the general -- the symptoms of PTSD. And it's only diagnosed if it occurs over a lengthy period of time. If you have it for just a few weeks, you would just have what's called an acute stress reaction, but in the case of PTSD it extends over many months, and oftentimes for individuals who have experienced chronic trauma over many years it can be experienced for over a lifetime. And also in order to make the diagnosis a psychologist or psychiatrist has to believe that the symptoms have interfered markedly with the individual's enjoyment in life or their daily psychological functioning.

Q. And that's a conclusion that you reached and other clinicians reached with respect to Mr. Boyd?

A. That he met -- he met -- essentially met the criteria that I've just outlined, yes.

Q. Right. I want to ask you -- you mentioned the relationship between depression and anxiety and PTSD, which are the three primary mental illnesses that you found were caused by Mr. Boyd's decades of incarceration. Is that a

Sanford Drob - DX by Mr. Durland                942

common trifecta, like those three -- those three mental illnesses existing together and reinforcing one another?

A.   Yes, absolutely.   They very commonly come together. First of all, the criteria that's been established for evaluating them overlap to some degree.   And also individuals who have been traumatized in the way that would cause them to have PTSD also oftentimes have experiences that result in depression.

And the PTSD in and of itself creates anxiety, and the effort to avoid the recollections of the trauma or cues that resemble the trauma also causes anxiety.

You know, as psychologists we're looking at an individual.   An individual has their own unique psychological reaction and they don't -- they don't feel, oh, here's my PTSD, here's my depression.   They just have their life, right? But the science of psychology classifies these things separately for purposes of diagnosis and to a certain extent for purposes of treatment.   But these things often do come together in the same individual.

Q.   And, Dr. Drob, you talked a little bit about the types of traumatic experiences that are capable of producing PTSD.   Can you describe why is it that a minor car accident doesn't result in PTSD but, you know, a more traumatic experience is not able to be contained in the same way?

A.   Well, individuals have what psychologists call ego

Sanford Drob - DX by Mr. Durland                    943

strength.  They have the capacity to assimilate and accommodate to the ups and downs of life, and they do it psychologically and they do it physiologically.  So we normally can contain those stresses and tomorrow is another day and we put our stresses behind us, but if one is experiencing an overwhelming stress such as -- that might produce PTSD and, particularly, if one experiences a number of these overwhelming stresses, the person's capacity to accommodate both psychologically and physiologically is overwhelmed, and as a result those experiences are never fully psychologically digested and they keep coming back to the person who is trying to, you know, wrap their head around it, but it doesn't work for them, and they have a visceral and physiological reaction each time they have this memory and they can't control the memory.  They can't put it out of their mind, and it's something that they are overwhelmed by.

          MR. DURLAND:  Can we please play for Dr. Drob and the jury what's in evidence as Darryl Boyd's deposition, 502, line 12 to 502, line 21?

(Video played.)

          MR. DURLAND:  508, line 6 to 508, line 21, please.

 (Video played.)

          MR. DURLAND:  517, line 17 to 518, line 13, please.

(Video played.)

          MR. DURLAND:  527, line 22 to 529, line 15, please.

Sanford Drob - DX by Mr. Durland                 944

(Video played.)

MR. DURLAND:  Finally, 531, line 5 to 531, line 19, please.

(Video played.)

MR. DURLAND:  We can take that down.

BY MR. DURLAND:

Q.   Dr. Drob, are the experiences that we heard Mr. Boyd describe the types of traumas known to produce PTSD?

A.   Yes.

Q.   We heard as well Mr. Boyd talk about, you know, the specific image an eyeball bulging out of the socket or the sound of sexual violence.  What do you make of the vividness of these recollections?

A.   Well, they strike me as being fresh in his mind and continue to be present for him.

Q.   Present through flashbacks and intrusive memories?

A.   Well, he has expressed that, but the vividness of it and the description and the forcefulness of it suggests that they are, in fact, still present for him in a vivid way.

Q.   Just now we were talking about both flashbacks and intrusive memories.  And I think that you talked about Mr. Boyd describing both experiences?

A.   Yes.  He described to me having intrusive memories of being in prison, of the events that he saw in prison or experienced, and also at times having flashbacks of these

Sanford Drob - DX by Mr. Durland                945

events that were very distressing to him.  He also described having panic attacks, and, in fact, was diagnosed by his providers with at various points -- with a panic disorder in which an individual experiences emotions that might be associated with some of these gruesome events, but without necessarily having the thoughts associated with them.

Q.  And what is it that gets the -- you know, Mr. Boyd is going about his life after he's been released from prison.  What is it that gets these flashbacks started or gets these intrusive memories started?

A.  Well, they can just come out of nowhere sometimes.  I mean, that's -- PTSD patients often describe it as they'll just be in the middle of having a dinner and all of a sudden some process goes on in their brain or mind and comes out of nowhere and they experience it.  At other times, and perhaps as frequently, it will result from a cue, something that reminds them of something that happened to them.  They might be watching a television program.  Somebody might bring up a discussion of something in the news.  They might hear about another individual's experience that's similar to them, and they will then have the recollection brought vividly to them and it becomes very distressing and hard for them to get it out of their mind.

Q.  Are the symptoms of PTSD constant or episodic?

A.  Well, they're episodic in two ways.

Sanford Drob - DX by Mr. Durland                946

Q.   Okay.

A.   They -- they are certainly not constant.  And one of the things about PTSD is a person makes a very concerted effort not to have these flashbacks or these memories, and they are sometimes successful at the cost of being kind of hypervigilant and anxious.

But so even when an individual is having flashbacks it's not constant.  They might have a period in their life where for several days they will have flashbacks every day and then they may go for a couple of months without having them.  So it's episodic in the sense that there are periods where it flares up more than at other times.  They have some of the other symptoms of PTSD, the avoidance and the psychological constriction and the hypervigilance and the irritability, but they won't have the flashbacks constantly.  And then even during a period when you're having -- when they're having flashbacks they may have it for five minutes, you know, and then it goes away and it may come back the next day or it may come back a few hours later.

So it's a -- the most dramatic features of the disorder are variable and intermittent.  The less dramatic features of the disorder are -- they also can wax and wane to some extent, but they're more consistent.

Q.   I take it when you say more dramatic and less dramatic these are -- these are all symptoms of a mental

Sanford Drob - DX by Mr. Durland                947

illness?

A.   That's right.

Q.   They're all damaging?

A.   They're all damaging.

Q.   Just in different ways?

A.   A person's hypervigilance where they are constantly trying to avoid threat is less dramatic than experiencing a flashback where they feel they are back in prison.

Q.   Understood.

Let's turn to anxiety disorder.

MR. DURLAND:  And if we could play, please, what's in evidence, Mr. Boyd's testimony, 510, line 10 to 511, line 8.

(Video played.)

MR. DURLAND:  366, line 12 to 367 line 1, please.

(Video played.)

MR. DURLAND:  523, line 15 to 524, line 3, please.

(Video played.)

MR. DURLAND:  529, line 21 to 530, line 3, please.

(Video played.)

MR. DURLAND:  532, line 1 to 533, line 13, please.

(Video played.)

MR. DURLAND:  553, line 6 to 553, line 15, please.

(Video played.)

MR. DURLAND:  We can take that down, please.  Thank you.

Sanford Drob - DX by Mr. Durland                    948

BY MR. DURLAND:

Q.   Dr. Drob, in your 40 years of evaluating inmates and former inmates is the level of guardedness that Mr. Boyd described typical or commonplace?

A.   It's typical and commonplace for individuals who have been in state prison for that length of time, yes.

Q.   And that length of time was 27 years; is that correct?

A.   That's -- that's my understanding of the total amount of time he was in jail, in prison.

Q.   What happens to a person psychologically, physiologically when they are on guard or on edge for that length of time?

A.   They develop a kind of hyperarousal of their nervous system that keeps them on edge even after they are no longer in that circumstance.  It just becomes a kind of conditioned response to the hypervigilant, on guard, nervous, that something could happen at any moment, and that produces an experience of generalized anxiety where their anxiety oftentimes does not -- does not go away at all or only for brief periods of time.

Q.   Doesn't go away even after they are released from prison?

A.   Even -- even after they are released, yes.

Q.   And --

Sanford Drob - DX by Mr. Durland                    949

A.    And it also produces a sense of mistrust in relationships with other people and feeling anxious when one meets new individuals or has encounters with them.

Q.    Is anxiety disorder commonplace in people who have been incarcerated for decades?

A.    It's common, yes.

Q.    Did other healthcare providers diagnose Mr. Boyd with anxiety disorder before you evaluated him?

A.    They diagnosed him with various anxiety disorders, yes.

Q.    Okay.  And was that a consistent finding throughout the records --

A.    Yes.

Q.    -- that you were able to review?

A.    Yes.

Q.    You previously told us that it's your opinion based on your testing and your evaluation of Mr. Boyd and your review of these other diagnoses that he developed anxiety disorder because of his decades of incarceration; is that correct?

A.    Yes.

Q.    Were there other contributing factors to Mr. Boyd's anxiety disorder?

A.    Well, I believe that his anxiety disorder was -- the major cause was the kinds of experiences he -- you just showed

Sanford Drob - DX by Mr. Durland                    950

him describing, but that in the course of his life once he was released he had conflicts with other people, he was using drugs, he was -- you know, had financial and economic problems and work and various life issues contribute to or exacerbate or make his anxiety worse, but the anxiety that he brought from prison was the baseline.

Q.   In other words, when you compare those other factors to 27 years of incarceration in maximum security prisons, you deem them to be, what, secondary?

A.   Absolutely secondary.  I mean, they -- the kinds of experiences he had subsequent to prison would not in and of themselves necessarily have caused anxiety disorder.  The kinds of experiences he had in prison where he had to be on guard constantly is in my professional opinion the cause of his generalized anxiety disorder.  And contributing to it is, as I mentioned earlier, the efforts that he needs to make to avoid experiencing these posttraumatic stress symptoms.  That's anxiety-producing.

Q.   Was Mr. Boyd's anxiety disorder ever cured?

A.   It was treated, but it wasn't cured.

Q.   Did Mr. Boyd still have anxiety disorder when you evaluated him in 2023 and 2024?

A.   Yes.

Q.   Do you have any reason to doubt that Mr. Boyd still had anxiety disorder at the end of his life in February 2025?

Sanford Drob - DX by Mr. Durland                    951

A.   No reason to doubt that.

Q.   And I think you described this a little bit already, but could you give us a short overview of, you know, what is anxiety disorder?  You've talked already about the causes of it, but what are the symptoms?  What does a person feel who has anxiety disorder?

A.   A person who has anxiety disorder is very frequently nervous.  They are on edge.  They are guarded for fear that their anxiety will increase.  Very often, as in Mr. Boyd's case, they are mistrustful of others.

They may develop what are called phobic anxiety symptoms where if they are in certain circumstances their anxiety goes way up.  Mr. Boyd described when he was in crowds -- at one point he didn't even want to have a birthday party for himself because he feared that having too many people in his presence would bring the anxiety up.  Traveling on subways or buses or trains or whatever could cause it.

And also sometimes individuals who have anxiety disorder also have the panic symptoms that we've discussed, and they could either be part of the PTSD syndrome or a separate anxiety disorder, panic disorder, which, as I said, several of his clinicians appeared to have diagnosed at least a couple of them.

Q.   So in terms of the anxiety symptoms that Mr. Boyd experienced, I think you identified hypervigilance as being

Sanford Drob - DX by Mr. Durland                    952

one; is that right?

A.    Yes.

Q.    And certain checking activities, like checking locks on doors, that sort of stuff?

A.    Yes.  He was very obsessive.  He was noted over the years by clinicians that he was very obsessive about those kinds of things.  So actually obsessive compulsive disorder, which I don't diagnose him with, but he had some symptoms of it, is an anxiety disorder.

Q.    Did he --

A.    Also worry.  I didn't mention that.  Individuals who suffer from anxiety disorder worry excessively.

Q.    Worry that something bad is going to happen?

A.    That something bad will happen.

Q.    And these symptoms that Mr. Boyd endorsed, are these -- or I guess the symptoms that Mr. Boyd reported having, he reported those on the tests that you administered to him?

A.    Yes.  They were reported on the tests and they were -- he reported them in the interviews and they are recorded in the records.

Q.    Were Mr. Boyd's anxiety symptoms constant or variable over time?

A.    More constant than the PTSD symptoms, but, like any mental illness, it varies to some extent.  And even an

Sanford Drob - DX by Mr. Durland                953

individual with the most severe anxiety disorder will have periods where they are less anxious, good days where they feel more relaxed.

Q.   How did Mr. Boyd's anxiety disorder shape his perception of threats?

A.   It made him -- it contributed to his hypervigilance to threats.  What I mean by that is always being on guard that something bad could happen.

Q.   Let's turn to depression.

Is depression common among people who have been incarcerated for decades?

A.   Yes.

Q.   What is it about the prison environment that tends to produce depression?

A.   It takes one away from one's family.  It restricts one's freedom to an enormous degree.  It produces a number of experiences that make an individual believe that others -- that relationships with others are -- have to be kept at an arm's distance.  And so you don't develop the kind of relationships that would -- normal people would and would bring life satisfaction.  And so that contributes to depression.

It makes -- it diminishes one's self-esteem and one's self-concept because one is stigmatized by being a prisoner and also oftentimes treated inhumanely and in a way that no

Sanford Drob - DX by Mr. Durland     954

one would be treated on the outside; body searches, having to get down on the ground, things like that.

It takes one out of life circulation so that one feels that one's time is being -- not every prisoner feels completely this way, but that one's time has been taken from them.  Particularly, for an individual who believes themselves to be innocent of the crime, there's a feeling that their life has been taken from them and that they can't lead their life.

So all of those things contribute to a negative view of themselves, of their environment and a sense of helplessness and hopelessness that constitute depression.

Q.   Did Mr. Boyd's healthcare providers diagnose him with clinical depression before you evaluated him?

A.   Before I evaluated him, yes.

Q.   Was that a consistent finding across the --

A.   He had a number of healthcare -- there were a number of instances where he was diagnosed with depression.

Q.   You told us earlier that it's your opinion that Mr. Boyd's depression was substantially caused by his decades of incarceration?

A.   That's my opinion, yes.

Q.   Were there other contributing factors to Mr. Boyd's depression?

A.   Yes.

Q.   What were those?

Sanford Drob - DX by Mr. Durland                955

A.   He had conflicts with other people.  He had family difficulties.  He abused heroin and cocaine, each of which can affect one's mood in a negative way.  He had -- you know, it's -- it's a chicken and an egg phenomenon.  Some of this had to do with him being incarcerated for so many years, but he had considerable difficulties adjusting to society once he left, which is understandable given the fact that he was what we call temporally dislocated.  He was taken out of life for so many years and now reinserted in society, which the society and the people he knows progressed in many ways and he didn't.  And he -- and that contributed to his depression.  And, you know, general life events that people go through.

Q.   How did those other conflicts with family -- we'll come to substance abuse in a moment, but those other factors, how do they compare in terms of the causality to the 27 years Mr. Boyd spent in maximum security prison?

A.   I believe they are relatively minor factors in comparison to those 27 years having been taken out of his life and his feeling that the best years of his life had been taken from him.

Q.   Was Mr. Boyd's depression ever cured?

A.   It was treated and he got in some ways better, but it was never cured.

Q.   Can you give us a short overview of what depression feels like?  Everyone has had sadness, right, but what is it

Sanford Drob - DX by Mr. Durland                      956

about an experience that elevates it to the level of depression that would warrant a diagnosis?

A.   Well, it's a sadness that is unremitting and relentless.  It goes on for days and days with very little relief.  The criteria say that for various forms of depression that you are depressed for a certain number of hours a day most days during the week.  So it's not a constant 24 hours a day, but it's a very significant chunk of time feeling sad.

An individual who suffers from depression also suffers from what's called anhedonia, which is the relative lack of ability to feel joy and to feel happiness and pleasure in life.  That doesn't mean they can't at all, but in comparison to a nondepressed person they struggle with feeling joy, pleasure and happiness.

An individual who suffers from depression oftentimes is preoccupied with negative thoughts, such as thoughts about death, thoughts about failure, a low sense of self-concept or self-esteem.  And one of the ways in which people define depression and see it as sort of at the root of it is what I've described already as a negative view, a pessimistic view about one's self, one's environment and one's future.  So such individuals feel a sense of helplessness and hopelessness.

And in contrast to people who just have a bad day, they can't just snap out of it.  They can't -- they can't tell themselves come on, pick yourself up, feel better.  They try,

Sanford Drob - DX by Mr. Durland                      957

but it doesn't work.  One of the cardinal features of mental illness is that it doesn't feel like it's under the individual's control and they can't get rid of it simply by willing it away.

So those are some of the features of depression.  Some individuals who are depressed feel suicidal, and Mr. Boyd had momentary thoughts like that, but that did not seem to be a major feature for him.

THE COURT:  Mr. Durland, if you could just pause for a moment.  We're going to take a brief recess.  We're going to take our mid-morning recess.

If you could step down.  And I'm going to direct you not to talk about your testimony in the case with anyone during the recess.

THE WITNESS:  Sure.

THE COURT:  Okay.  Thank you.

Members of the jury, we're going to have a brief recess.  All of the admonishments apply.  Do not talk to anyone about the case.  Okay.  Thank you.

(Jury not present.)

THE COURT:  We'll take a fifteen-minute recess.

MR. DURLAND:  Yes, Your Honor.

(Recess taken.)

THE COURT:  We can bring Dr. Drob back in.

Dr. Drob, you can have a seat.

Sanford Drob - DX by Mr. Durland                958

THE WITNESS:  Sure.

THE COURT:  Thank you.  The parties are back.  Dr. Drob has returned.  We can get the jury.

(Jury present.)

THE COURT:  Have a seat, everyone.  Thank you.

Our jurors have returned to the courtroom.  We'll continue with the direct examination of Dr. Drob.

Dr. Drob, I would just remind you that you are still under oath.

THE WITNESS:  Yes.

THE COURT:  Okay.  Go ahead, Mr. Durland.

MR. DURLAND:  Thank you, Your Honor.

BY MR. DURLAND:

Q.   Dr. Drob, when we broke I think we were talking about the symptoms of Mr. Boyd's depression.  And I wanted to ask you, did you verify these symptoms through the testing that you administered to Mr. Boyd?

A.   Well, he certainly had high scores on the depression scale, on the SCL-90-R, yes.

Q.   And did you see symptoms -- the symptoms you've been describing to us, did you see those in Mr. Boyd's treatment records?

A.   Yes.

Q.   Were the symptoms of depression that Mr. Boyd experienced constant or episodic?

Sanford Drob - DX by Mr. Durland                959

A.   Well, as I've said, they are more constant or continuous than the acute symptoms of PTSD, but they were to a certain extent episodic as well.  He had periods where it was relatively alleviated and periods where it got worse.

Q.   You mentioned earlier that one aspect of Mr. Boyd's depression was the persistent feeling that his life had been wasted?

A.   Well, that the best years of his life had been taken from him I would say is how he put it, yeah.

Q.   Taken by what?

A.   Taken by the fact that he was incarcerated for 27 years for something he believed himself to be innocent of.

Q.   Is this feeling something you see repeatedly throughout Mr. Boyd's records?

A.   It -- he states it to a number of prior clinicians as well as to myself, yes.

Q.   And when you first -- when you first evaluated Mr. Boyd he had a number of medical diagnoses?

A.   That's correct.

Q.   And how did those medical diagnoses affect his perception of his life?  I mean, I think you had just mentioned that the best years of his life had been taken from him.  What's the connection between --

A.   Well, he was healthy during the years when he was in prison, and he began to develop fairly serious medical

Sanford Drob - DX by Mr. Durland                960

problems after his release.  And he -- contributing to his depression was the feeling that when he was healthy he was incarcerated, and now that he's free, although not -- he was on parole and still didn't feel fully free, but that he was out and he was unhealthy.  He had medical issues.

Q.    And you told us that during your third meeting with Mr. Boyd he received the news that he had cancer?

A.    That's correct.

Q.    And how in your opinion would Mr. Boyd's cancer diagnosis affect him or impact him, you know, given what you know about his prior statements and his expressions to you about these feelings of the best years being taken from him?

A.    Well, there's no way that it could do anything other than reinforce the sense that, you know, as I say, he -- his good years were spent in prison and now he's got at this point very limited time.

Q.    Dr. Drob, let's turn to the question of substance abuse --

A.    Yes.

Q.    -- which you've mentioned a few times.

You found that Mr. Boyd, I think you mentioned earlier, had a substance abuse disorder or diagnosis after his release from prison?

A.    Yes.

Q.    What substances did Mr. Boyd use?

Sanford Drob - DX by Mr. Durland          961

A.   Well, largely cocaine and heroin.  He also in his later years described use of marijuana and indicated that he had a medical marijuana card.

Q.   And alcohol as well?

A.   And alcohol as well.  I'm sorry.  Yeah.

Q.   And did there come a time when Mr. Boyd suffered an overdose?

A.   I believe in 2017 he had an overdose, yeah.

Q.   Is it common for people incarcerated for long periods of time to develop substance abuse problems?

A.   Yes.

Q.   Was Mr. Boyd still struggling with substance abuse when you evaluated him in 2023 and 2024?

A.   As far as I could determine he was -- he was clean and sober from alcohol, cocaine and heroin.

Q.   Okay.  And what -- so he had gotten clean -- he had gone to recovery and gotten sober before you evaluated him?

A.   Yes, based on the records and based on what he told me.

Q.   We've talked about the various mental illnesses that Mr. Boyd developed as a result of his incarceration, right?  We've talked about that today?

A.   Yes.

Q.   And we've talked about the suffering that those illnesses produce in a person who has them?

Sanford Drob - DX by Mr. Durland                962

A.    Yes.

Q.    And I think you said earlier that in your opinion Mr. Boyd was using drugs and alcohol after his release from prison as a means of coping with this psychological pain?

A.    That's a major factor in his drug abuse, yes.

Q.    Is this dynamic between mental illness and substance use common among people who have been incarcerated for long periods of time?

A.    Yes.

Q.    Why wouldn't a person just seek out a traditional prescription from a doctor?

A.    Okay.  Well, he did, and he was prescribed antidepressant and antianxiety medication, but the effects of prescription medication are different than the effects of street drugs.  Prescription medication takes a long time to stabilize within one's system and to have its effect and its effects, unless they're narcotics, which he wasn't prescribed, are not immediate.  So it's very common even for individuals who are on the prescription medications that he was on -- Celexa and Remeron -- to also abuse other drugs because they find the prescription medications may help but don't help them in acute crises.

Q.    When you evaluated or when you interviewed Mr. Boyd did he hide his substance abuse from you?

A.    No.

Sanford Drob - DX by Mr. Durland                963

Q.    You asked him about substance abuse history and he said what?

A.    Well, he told me that he had used, you know, narcotic cough syrup prior to his incarceration and had used marijuana prior to his incarceration.  He told me that at times while incarcerated he used alcohol.  And he acknowledged that subsequent to his incarceration he became an alcoholic and abused heroin and cocaine and that he also used marijuana.

Q.    Okay.  And did he tell you about his overdose as well?

A.    He told me that he had overdosed.  I think he told me it was 2016.  The records seem to have indicated it was 2017.

Q.    Now, did you see references to his addiction problems in his treating records?

A.    Absolutely, yes.

Q.    I think you mentioned Mr. Boyd's description of some of the substances he used before his arrest.  And you said that during your interview he recalled marijuana and cough syrup?

A.    That's correct.

Q.    And did you review Mr. Boyd's deposition?

A.    Yes.

Q.    And do you recall that he discussed drinking before his arrest during his deposition?

Sanford Drob - DX by Mr. Durland                964

A.    Yes.

Q.    And what did you see in Mr. Boyd's treatment records with respect to -- with respect to substance abuse?

A.    Well, the treatment records indicated that subsequent to his release from prison he utilized the substances he described.  The treatment records are kind of all over the place with regard to what -- if and what he used prior to his incarceration, but there are indications of anywhere from mild to severe alcohol use and other substances. Mainly alcohol use prior to his incarceration in those records.

Q.    Is this kind of variable reporting and records common for people who have substance abuse problems?

A.    Yes.  And I would add that having reviewed thousands of records over the years, variable accounts of an individual's substance abuse is the rule rather than the exception.

Q.    Now, why does that happen?

A.    For one, individuals tend to misattribute what they were using when and, number two, substance abuse -- one of the characteristics of substance abuse is that people tend to be defensive about it and they sometimes don't want to acknowledge to themselves or others what they were using when. And so they can be very variable in what they report.

Q.    And when you talk about misattribution, that means a

Sanford Drob - DX by Mr. Durland                965

person recalling at a later date kind of pushing back in time, recalling a type of use that occurred at one point in life and recalling it as happening much earlier in life?

A.    That happens, yes.

Q.    Does Mr. Boyd having used alcohol and smoking marijuana as a teenager change your opinions about the cause of his mental illnesses?

A.    No.

Q.    Did teenage drinking cause Mr. Boyd to develop PTSD during and after his decades of incarceration?

A.    Absolutely not.

Q.    Did teenage drinking cause Mr. Boyd to develop anxiety disorder?

A.    No.

Q.    Did teenage drinking cause Mr. Boyd to develop the depression that he experienced after his release from decades of incarceration?

A.    No.

Q.    Dr. Drob, you mentioned earlier that other clinicians had diagnosed Mr. Boyd with PTSD, anxiety and depression long before you evaluated him; is that right?

A.    Yes.

Q.    If a person is exhibiting symptoms that would otherwise warrant a diagnosis of PTSD or depression or anxiety but those symptoms are caused by substance abuse, is the

Sanford Drob - DX by Mr. Durland    966

person diagnosed with the mental illness, the PTSD, the anxiety, or the depression?

MR. BLENK:  Objection, Your Honor.

May we approach?

THE COURT:  Yes.

(At bench:)

MR. BLENK:  The last segment of questions and then getting into this segment of questions are attempts to clean up the report.  These are not analyses that are set forth in Dr. Drob's report, differential diagnosis between alcohol and -- between substance abuse and mental health conditions. And it's simply an attempt to try to fix his analysis post hoc.  This was outside the scope of the expert report, Your Honor.

MR. DURLAND:  Your Honor, that's not correct at all. This opinion that he's offering is the opinion that prompted the County to say we get to cross on substance abuse.  We initially said we're not offering the opinion that the mental illnesses caused Mr. Boyd to develop substance abuse, and the County said we're going to cross-examine on it.  Your Honor permitted that.  And so -- and Your Honor said you, and you indicating us, can -- you can offer that as well.

So he's simply offering the opinion that's already in his report that in his view although there are other contributing causes, Mr. Boyd's incarceration is the major

Sanford Drob - DX by Mr. Durland                967

cause of his substance abuse.  And these things that Dr. Drob is talking about right now, he's talking about other diagnoses that other clinicians have made.  That's page 23 of his report.  That's right there that he talks about that.

And he's entitled to -- and the cases are very clear that an expert is not required to just sit up there and read their report.  We're allowed to ask him questions where he describes the basis for his findings.  And, of course, we're not just going to wait for Mr. Blenk's cross-examination.  We're going to elicit on direct the various reasons why he's concluded that he doesn't agree with what Mr. Blenk's view of teenage drinking means.  I think we're entitled to do that.

MR. BLENK:  The report is clear the incarceration caused the mental health which caused the substance abuse.  Now he's washing that analysis by saying that the same analysis stands when we extract substance abuse from it, that we can -- as opposed to as a consequence.  It can't come in that way.  It's just not in the report.  It's not part of his initial disclosed analysis.

MR. DURLAND:  I don't understand.  Can you repeat what you believe that he's doing?  I didn't understand the last part.

MR. BLENK:  You are having him -- so, first of all, you are having him rule out an alcohol origin or substance abuse origin for the -- for the mental health diagnoses, which is

Sanford Drob - DX by Mr. Durland                968

not in his report.  It's not -- the differential diagnosis is not in his report.  Then going to the idea of -- so he commits to a single causal connection.  Prison begets mental health begets substances.  And now Mr. Durland is cleaning that up and saying, well, substances really don't have anything to do with it, and these are all -- these are just independent of -- the mental health diagnoses are independent of the substance issues.

MR. DURLAND:  That's what he's always said.  He's always said that prison is the cause of his mental health diagnoses, not substance abuse.  And then he further says that the substance abuse -- what the County wants to do is to say that the substance abuse exists independent of the incarceration and that's an alternative cause for the mental health illnesses or the symptoms that Mr. Boyd exhibited or its own contributing factor and we can't be held responsible for that.

So what Dr. Drob is saying is, one, the mental illnesses are clearly the result of incarceration, not anything else.  And, two, the substance abuse that Mr. Boyd certainly suffered from is itself a result of the psychological pain that originates with the incarceration, which, I mean -- this is exactly the line of analysis that Mr. Blenk is saying he is not offering.  He is offering that. That's what he's just said, that the use of substances is

Sanford Drob - DX by Mr. Durland                 969

self-medicating.  So I don't --

MR. BLENK:  He's abandoning the chain in his report. The report -- it's clear by the chain, and now he's rearranging --

THE COURT:  So you're saying that the report says that incarceration caused all of these diagnoses?

MR. BLENK:  Caused mental health which in turn itself caused the substance abuse disorders.

THE COURT:  Okay.  And you are saying that he's saying something different now?

MR. BLENK:  Now he's washing substance abuse out of that connection and saying that it can be just seen as this independent thing from the mental health diagnoses.

THE COURT:  Okay.  Well, your objection is overruled. You can cross-examine him on any I guess inconsistencies that you perceive, but I don't find that any of his testimony so far, at least I guess the recent line of questioning that you're objecting to -- I don't find that it's improper.  So I'm going to overrule the objection.

(Open court:)

THE COURT:  The objection is overruled.

BY MR. DURLAND:

Q.   Dr. Drob, I'll re-ask the question.

We had just been talking about the fact that other clinicians throughout the years had diagnosed Mr. Boyd with

Sanford Drob - DX by Mr. Durland                970

PTSD, anxiety and depression, right?

A.   Yes.

Q.   And my question to you was when a person -- if a person has symptoms that would ordinarily meet the criteria for one of those diagnoses, like PTSD or depression or anxiety, but those symptoms are caused by substance abuse, does the person get the mental illness diagnosis or not?

A.   That's an exclusionary criteria.

Q.   Tell us what you mean.

A.   They would not be diagnosed with those mental illnesses.  The DSM, which is the Diagnostic and Statistical Manual of the American Psychiatric Association, lists specific criteria that -- to include a diagnosis -- we've gone through some of them -- and then there's some that exclude it.

For each of those disorders if a clinician believes that the anxiety, the depression or PTSD symptoms are the result of substance intake or, you know, almost exclusively the result of substance intake, then they would not diagnose the mental illness.  They would diagnose simply the substance abuse disorder, and they might note that this individual has certain substance abuse caused depression or anxiety.

So the fact that the clinicians diagnosed him with those disorders and also diagnosed him with a substance abuse disorder means that if they were doing their due diligence, which I assume almost all clinicians do in this instance, they

Sanford Drob - DX by Mr. Durland                971

would believe that the depression, the anxiety and the PTSD were not caused by the substance abuse.

Q.   So, in other words, just so the jury appreciates this, each time another clinician diagnosed Mr. Boyd say with PTSD, what that diagnosis says is Mr. Boyd has PTSD and his PTSD is not caused by substance abuse?

MR. BLENK:   Objection.   Leading, Your Honor.

THE COURT:   Sustained.

BY MR. DURLAND:

Q.   Dr. Drob, what's the significance of the fact that other clinicians who were aware of Mr. Boyd's use of substances diagnosed him with mental illnesses, PTSD, depression and anxiety, rather than substance abuse?

MR. BLENK:   Objection.   Asked and answered, Your Honor.

THE COURT:   Can counsel approach, please?

(At bench:)

THE COURT:   You keep mentioning diagnoses from other clinicians.

MR. DURLAND:   Yes, Your Honor.

THE COURT:   Dr. Drob can rely on hearsay to form his opinion, but that doesn't mean that it's admissible.   So I think I'm going to give an instruction -- a limiting instruction to the jurors that the diagnosis of other clinicians -- I mean, they can't consider that for the truth of the matter.   He can consider the hearsay to form his

Sanford Drob - DX by Mr. Durland                972

opinions, but they can't consider for the truth of the matter that these other clinicians gave these diagnoses too and those clinicians aren't here to testify about those diagnoses.

MR. DURLAND:  No.  Of course.

THE COURT:  So I think your question here -- I'm going to sustain the objection.  I think you have to be careful with your questions about just -- a question just based on the diagnosis of other clinicians.

MR. DURLAND:  No.  That's fair, Your Honor.  My intention had been -- it was a little bit of a -- sort of a complicated issue.  So my intention had been to have Dr. Drob explain it and then ask him is this something that you relied upon in reaching your conclusions here, but I'm happy to just skip to that final question so that it's clear to the jurors that what's being offered here is the basis for Dr. Drob's conclusion as opposed to some sort of independent expert opinion that they are to rely upon.

MR. BLENK:  And that's precisely the issue.  That's not in the report, Your Honor.  He does not disclose that he can rely on that as an exclusion of alcohol in a report.  This is critical information.  He does not disclose that he's excluding alcohol based on a mental health diagnosis until he came here and testified today.

MR. DURLAND:  Your Honor, he discloses in his report

Sanford Drob - DX by Mr. Durland                    973

what his opinion is, that these mental health diagnoses are caused by incarceration, not other things.  He relates -- he lists out the other diagnoses that he sees throughout the records that he's relying upon.  And, I mean, every expert who testifies, there are going to be sentences here and there that don't appear in their reports.  It's their job to depose him when they take his deposition to find out the various bases for his opinion.  And it's not fair to handcuff us because they didn't ask this question.

MR. BLENK:  It's a critical analytical leap.  It's a critical analytical leap beyond the scope of the disclosure.

MR. DURLAND:  That's not correct, Your Honor.  The cases do not constrain the party proffering an expert in that way.

THE COURT:  Okay.  I'm going to sustain the objection based on the basis that I brought up.

And, Mr. Blenk, as I said earlier, you can cross-examine the witness on your perceived inconsistencies.

MR. BLENK:  Thank you, Your Honor.

(Open court:)

THE COURT:  The objection is sustained.  Before we proceed, I just want to give a brief instruction to the jurors.

Members of the jury, you heard some testimony about other clinicians diagnosing Mr. Boyd with certain mental

Sanford Drob - DX by Mr. Durland                974

health disorders.  Mr. Drob can consider that which is hearsay evidence to form his opinion, as a basis to form his own medical opinions; however, you cannot consider that testimony for the truth of the matter.

Thank you.  Go ahead.

MR. DURLAND:  Thank you, Your Honor.

BY MR. DURLAND:

Q.   Dr. Drob, you mentioned earlier that Mr. Boyd successfully recovered from his substance abuse issues?

A.   For the most part, yes.

Q.   In other words, he was clean and sober when you saw him?

A.   Yes.

Q.   After he recovered from his substance abuse issues did he still have mental health symptoms?

A.   Yes.

Q.   And those are the symptoms that you described earlier that were reflected in your evaluation and testing?

A.   Yes.

Q.   And were those symptoms also reflected in his treatment records?

A.   Yes.

Q.   We talked earlier about Mr. Boyd using drugs and alcohol as -- to I think you said self-medicate?

A.   Yes.

Sanford Drob - DX by Mr. Durland                    975

Q.   And you mentioned the way that Mr. Boyd had sought out I guess I'll call it conventional treatment, prescription drugs, to treat his mental illnesses; is that correct?

A.   Well, he went to -- he sought out treatment.  I don't know if he was seeking out those drugs.  He was prescribed those medications, yes.

Q.   I understand.

A.   Yes.

Q.   He sought treatment for his mental health diagnoses?

A.   Yes.

Q.   And the treatment he received was what?

A.   Well, he received both psychotherapy and psychiatric medication.

Q.   And do these treatments cure the mental illness or attempt to manage the symptoms?

A.   They generally endeavor to manage the symptoms.

Q.   Did Mr. Boyd engage in other activities in a further effort to manage his symptoms and to deal with his mental health diagnoses?

A.   Yes.

Q.   What sort of activities did he engage in?

A.   Well, he was -- he -- for years he was involved in work.  He -- as I said, he had substance abuse treatment.  And he, you know, worked on trying to reduce as best he could willfully some of the negative feelings that he had.  For

Sanford Drob - DX by Mr. Durland   976

example, feelings he might have felt towards one of the witnesses who had testified against him, he worked hard to forgive that person.

Q.   This is Tyrone Woodruff?

A.   Yes.

Q.   Dr. Drob, you've evaluated I think you said thousands of inmates and former inmates in your career?

A.   Well, I said a couple of thousand.  Yes.  All right.  That is thousands.

Q.   Understood.  Fair enough.  Dr. Drob, are you confident that Mr. Boyd's conviction and incarceration caused him to develop severe mental illness?

A.   Yes.

Q.   If you look at the time between Mr. Boyd's initial release from prison in 1996 and his death in February 2025, how would you summarize the impact of these mental illnesses on Mr. Boyd's life?

A.   I think they had a devastating impact on his life.

Q.   Do you have any --

A.   Extreme.

Q.   -- hesitation in standing by this opinion?

A.   No.

MR. DURLAND:  I have no further questions, Your Honor.

THE COURT:  Cross-examination.  We'll at least start cross-examination, Mr. Blenk.

Sanford Drob - CX by Mr. Blenk                977

MR. BLENK:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BLENK:

Q.   Hello, Dr. Drob.  Thank you for your patience.

A.   Sure.  Good afternoon.

Q.   I'm JP Blenk.  I'm the attorney for the County.

A.   Yes.

Q.   Starting with your -- why you're here today, how much have you been paid in connection with your work on this case?

A.   Well, I haven't billed for my time completely, but prior to this I think I had on this case something like twenty-five or thirty hours.  So -- and there have been plenty of additional hours since then.  So at 450 an hour.  I don't know.  Fifteen hundred dollars -- fifteen thousand dollars.  Sorry.

Q.   And you've been retained in the past by Mr. Rudin's firm, right?

A.   Yes.

Q.   And was that in a criminal matter?

A.   I've been retained in criminal matters and civil matters in the past.

Q.   By Mr. Rudin's firm?

A.   It's been -- I think at least one other civil matter and there have been a couple of criminal matters.

Sanford Drob - CX by Mr. Blenk                978

Q.   And is the rate higher or lower for criminal matters?

A.   Well, my rate changed.  I mean, I was retained years ago on a couple of these cases, and I'm sure my rate was lower.  But my rate -- my private rate for criminal matters and civil matters is the same at any given time, unless they're public -- public defender matters, in which case I have a reduced rate.

Q.   So right now the rate is 450 dollars?

A.   That's correct.

Q.   And the rate is lower when you're doing work for the Public Defender's Office?

A.   Yeah.  I mean, for example, I do criminal justice administration work, which I'm paid for by the federal government, and I bill three hundred dollars an hour.

Q.   When you do your work for a criminal defendant or for the prosecution against a criminal defendant that's called forensic psychiatry?

A.   Psychology.

Q.   Forensic psychology, yes?

A.   Yes.

Q.   And that also applies to treating people in a prison context?

A.   Well, treat -- treating people in a prison context is usually referred to as correctional psychology whereas

Sanford Drob - CX by Mr. Blenk                    979

doing evaluations of individuals for a legal proceeding is forensic psychology.

Q.   Okay.  So when you are engaged in a criminal case there's a possibility that you'll ultimately have to put on testimony for that case, right?

A.   In many -- many such instances, yes.

Q.   And does that involve putting a report together?

A.   Almost all the time, yes.

Q.   Okay.  And so you always put -- you almost always put a report together before you go to court?

A.   Yes.

Q.   And you send that to -- so in this capacity you are going to be working for a defense attorney, you are going to be working for a prosecutor, you meet with the patient, you meet with the subject, you generate a report and you send it along to the attorney?

A.   Depending on how the case is assigned I may be obligated to send it to all parties.  If the case is assigned simply as a defense or a prosecution case, I may only be obligated to send it to the party that has hired me.

Q.   Understood.  So there was a discussion of the records you reviewed.  And I think you said there might have been two thousand pages, and then there was a suggestion that maybe there was five thousand.  But the truth is that you didn't actually count how many pages, right?

Sanford Drob - CX by Mr. Blenk                980

A.   That's correct.

Q.   But you did review all of them?

A.   I certainly went through all of the records and reviewed.

Q.   Yeah.

A.   Yes.

Q.   Because you wouldn't put into your report that you had reviewed something that you hadn't reviewed?

A.   No.

Q.   Because it's critical that your report is honest, right?

A.   Of course.

Q.   And it's critical for both the party who has retained you, right?

A.   Yes.

Q.   And it's part of the truth-seeking function of this Court, right?

A.   Correct.

Q.   And did you go through and review those records in advance of coming here today?

A.   I didn't review all thousands of records in preparation -- in preparation for this trial, no.

Q.   You reviewed the ones that you thought might come up?

A.   I reviewed some of them and I reviewed some that --

Sanford Drob - CX by Mr. Blenk                         981

that I -- you know, that I may have had a question about.

Q.   So you reviewed -- prior to drafting your report you reviewed medical records of the Erie County Holding Center?

A.   Yes.

Q.   Medical records of UBMD Family Medicine?

A.   Yes.

Q.   Trinity Medical Western New York?

A.   Yes.

Q.   Erie County Medical Center?

A.   I mean, if you're reading from my report -- I don't have memorized the list of all the records that I've read, but I assume you're reading from my report, and I can assert and assent to that.  If I wrote that in my report, those are records I reviewed.

Q.   So everything in your report -- and there was an addendum, too, right?

A.   There was an addendum to the report, yes.

Q.   And you signed that?

A.   Yes.

Q.   So all --

A.   Which included some other records that I hadn't listed I believe, yes.

Q.   And you reviewed -- because you signed both documents?

A.   That's correct.

Sanford Drob - CX by Mr. Blenk                    982

Q.   And so you wouldn't put them in an addendum and you wouldn't put them in the report unless you had reviewed them?

A.   That's correct.

Q.   I see Restoration Society employment records?

A.   Yes.

Q.   New York State Department -- New York State Department of Corrections and Community Supervision records?

A.   Yes.

Q.   Erie County Correction Facility medical records?

A.   Yes.

Q.   Glover Physical Therapy records?

A.   I don't specifically recall that, but if it's in my report I reviewed it.

Q.   Spectrum Health and Human Services?

A.   Yes.

Q.   Parole records?

A.   Yes.

Q.   And fragmentary school records, which I think you already mentioned?

A.   I mentioned that, yes.

Q.   You reviewed the records of Horizon Corporation from 2012 to 2020?

A.   Yes.

Q.   And that record was the one that was -- had the broadest picture of Mr. Boyd's history?

Sanford Drob - CX by Mr. Blenk                983

A.   I would say, yes.

Q.   And then you reviewed some older records that had been maintained by the prison system, right?

A.   There were a few.

Q.   So those are the oldest records that you could find?

A.   Yes.

Q.   And then the Horizon records are probably the most comprehensive, right?

A.   Fair enough.

Q.   And then there are parole records, right?

A.   Separate from the medical records, yes.

Q.   And in the course of your -- in the course of your forensic psychiatry work you've -- you rely on parole records?

A.   I review them and may rely on them.

Q.   It's important?

A.   And, remember, I'm a psychologist.  I'm not a psychiatrist.

Q.   Fair enough.

A.   Okay.

Q.   I apologize.  As a psychologist?

A.   Yeah.

Q.   Practicing forensic psychology?

A.   Yes.

Q.   You from time to time rely on reports of parole officers?

Sanford Drob - CX by Mr. Blenk          984

A.   Yes.

Q.   Records of parole offices?

A.   I mean, the word "rely" -- I mean, I take them into consideration and I may rely on them, yes.

Q.   It gives you more information and it's helpful?

A.   Yes.

Q.   It's helpful to get information over the course of time, right?

A.   Yes.

Q.   And it's helpful to get information over the course of time because it helps you diagnose somebody, right?

A.   Yes.

Q.   And it's also helpful to get information over the course of time if there's a question as to whether a condition was caused by a certain event in the world or a certain experience that the person had?

A.   Correct.

Q.   And when you're in the context of forensic psychology --

A.   Okay.

Q.   -- you are often dealing with people -- and I think this was discussed briefly, but you have competency questions, right?

A.   Yes.

Q.   And a competency question is when somebody who may

Sanford Drob - CX by Mr. Blenk                    985

or may not have been insane at the time of an act may not be mentally well enough to face criminal trial, right?

A.   That would be a competency issue in a criminal proceeding, yes.

Q.   And then that person, if that person succeeded, may not face any criminal responsibility at all?

A.   That's a complicated -- I can't answer that question yes or no.  Usually they're almost inevitably referred to be restored for competency if they have a serious criminal charge.

Q.   And once they are restored they wouldn't have a sentence -- they wouldn't be facing a prison sentence in any case?

A.   No.  I disagree with that.  Would you like me to explain?

Q.   Sure.

A.   Okay.  When an individual is found incompetent to stand trial, both in state and federal court, they are then sent to a forensic psychiatry facility for restoration of competency.  And when -- if and when their competency is restored they go to trial as if they were never found incompetent and they are faced with the same potential consequences that they would have faced had they been competent to begin with.

Q.   Understood.

Sanford Drob - CX by Mr. Blenk          986

A.   It's only in cases where someone is declared permanently incompetent where perhaps the charges could be dropped.

Q.   Okay.  And then there's also the issue of the legal defense of criminal insanity, right?

A.   That's separate.  It's different.

Q.   Right.

A.   Yes.

Q.   And if that defense succeeds, the person wouldn't bear criminal responsibility and would not face a prison sentence if they were to succeed in that claim?

A.   They'd be sent to a hospital.  Yes.

Q.   Without exception?

A.   I'm not sure what you mean.  I've never had an experience where someone was found insane and they were sent home.  The -- they are found not guilty by reason of insanity and they are sent to, again, a forensic psychiatric facility to restore their mental health and only released at a point when they are no longer considered to be a danger to self or others.

Q.   Okay.  And you've spoken about in your direct examination the issue of malingering.  When you mean malingering, you mean an individual is putting on symptoms or faking symptoms in the hope of a better outcome in their -- in the criminal process they're involved in, correct?

Sanford Drob - CX by Mr. Blenk                    987

A.   In whatever legal process they are involved in, yes.

Q.   Fair enough.  And so when you're dealing with somebody in that situation the concern is that they would have motive to exaggerate?

A.   Yes.

Q.   And part of your role is to distinguish the people who are actually deserving of an incompetency determination or an insanity determination and to distinguish those from those who are -- for lack of a better word -- faking it?

A.   Yes.  That would -- that would be the case. Incompetency and insanity, yes.

Q.   And so you're doing a criminal -- or excuse me. Strike that.

You are doing a critical function in the criminal justice system?

A.   I believe so.

Q.   And it's important to get those questions right?

A.   To the best of one's ability, sure.

Q.   And when you're doing that -- and this is why you rely on parole records -- it's good to have as much information as you possibly could have to be making that evaluation?

A.   Fair enough, yes.

Q.   It's good to have observations from people who might be in the same hospital context that the person is at the time

Sanford Drob - CX by Mr. Blenk                988

you are seeing them or prison context at that time?

A.   In a criminal matter, yes.

Q.   I didn't mean to make the question compound or confusing.  I mean that you are seeing them in one setting --

A.   Yes.

Q.   -- at the time that you are seeing them, right, and so the records of that setting would be helpful?

A.   Sure.

Q.   And then you would also -- it would also help you to learn of experiences that the person had in other settings, correct?

A.   Yes.

Q.   And parole is a good -- or a good option for that because that is an outside agency that is making observations of the person who you may be evaluating?

A.   Yes.  They're nonprofessional observations in the sense of psychology, but they are observations and should be considered.

Q.   Absolutely.  Fair enough.  Knowing more is always good?

A.   I can't disagree with that.

Q.   Another aspect -- so that's one aspect is we want to get outside of the environment you're seeing the person in, right, or to try to get --

A.   Well, you want to broaden your horizon beyond the

Sanford Drob - CX by Mr. Blenk                    989

environment you are seeing them in.

Q.   Absolutely.  And you also want to lengthen the horizon, for lack of a -- if I can run with that metaphor, right?

A.   In terms of their personal history?

Q.   Yes.

A.   Yes.

Q.   It's important when you're evaluating somebody's mental health to go back in time to understand what had happened with that person in the past?

A.   Yes.

Q.   It's important to get the facts of their lives, right?

A.   As best as you can, yes.

Q.   It's important to get -- well, would you ever not want to get the facts of their lives?

A.   No.  I'm saying in some -- you know, when we're talking about going back in time, sometimes the information is limited.  So, as I say, you do the best you can to ascertain those facts.

Q.   Absolutely.  And, in fact, when you're going to evaluate somebody, you are always going to ask them about their personal history, right?

A.   Yes.

Q.   And -- but there is an independent value of going

Sanford Drob - CX by Mr. Blenk                990

back and finding records of that person's personal history, right?

A.    Yes.

Q.    And that would include their medical records?

A.    Yes.

Q.    And, for example, you might -- it might include their educational records, like you did here?

A.    Yes.

Q.    And then you would use those records to get a longer term view of the person for the purposes of improving your evaluation, right?

A.    Fair enough.

Q.    And this is an important task that you undertake just to get -- just to get the evaluation right as the person sits in front of you that day, right?

A.    Well, you can't do all those things as they're sitting in front of you, but in the process of writing your report or testifying you would consider those things.

Q.    Absolutely.  Getting the report right?

A.    Uhm-uhm.

(Court reporter interruption.)

THE COURT:  Is that a yes?

THE WITNESS:  Yes.

BY MR. BLENK:

Q.    So when you're in the forensic psychology setting

Sanford Drob - CX by Mr. Blenk                    991

it's -- causality isn't always a direct consideration to your report, right?

A.    Well, in a competency evaluation you are less concerned with causality, but some -- for example, in this evaluation causality is important.

Q.    Right.  But that's not something that always jumps up in other forensic psychology settings, though the history and aspects of somebody's past are still relevant to getting the question right?

A.    Yes.

Q.    And when you're looking at and evaluating history, you're looking for factual history, right?

A.    Yes.

Q.    Could be social history?

A.    Yes.

Q.    How the person goes about in the world?

A.    Yes.

Q.    Employment history?

A.    Yes.

Q.    And within even the realm of medical history you are looking for items like diagnoses?

A.    Yes.

Q.    You are looking for expressions of symptoms even if they don't rise to a diagnosis?

A.    Yes.

Sanford Drob - CX by Mr. Blenk

992

Q.   And all of those facts can be useful for you in getting to -- just getting your evaluation right?

A.   Yes.

Q.   It gives you a better truth value to your report?

A.   Fair enough.

Q.   And then you said here it's even more important, right?

A.   More important than what?

Q.   Well, it's even more complicated from a longitudinal perspective, correct?

A.   I'm not sure --

Q.   You're here to tell the jury about a cause, right?

A.   I'm here to provide a professional psychological opinion about the cause of Mr. Boyd's mental illness.

Q.   And the consequences of his incarceration?

A.   Yes.

Q.   And so in this context piecing together other periods of time is actually independently relevant, right?

A.   It's relevant, yes.

Q.   Whereas when the person -- when you're preparing a report in a forensic psychology context you're just trying to get the best picture of that person at that time?

A.   I --

Q.   That's the task?

A.   No.  It really depends on the question that is being

Sanford Drob - CX by Mr. Blenk                993

asked.  And even in questions of competency where you're only looking to see is this person competent at this moment, if a person presents in an incompetent way, you need to ascertain why they are presenting in that incompetent way because they might, as we've discussed, be malingering or exaggerating, and then you have to go into their past and their history to see if their presentation is reasonable.

Q.  Right.  Because that gives you better information about what's going on with that person?

A.  Yes.

Q.  But it's not that -- it's not likely to be the case -- in a context such as an insanity defense or even an incompetency proceeding it's not independently relevant what caused that person's insanity or what caused that person's incompetency?

A.  It's not the ultimate question, but it's relevant because it's relevant to diagnosis and to assessing the issue of exaggeration and malingering.  So it's not -- nobody is asking me in an insanity defense what caused the schizophrenia.  They are asking me if he has schizophrenia.  But for me to diagnose schizophrenia I have to be careful to look at the history to see how it developed.

Q.  To get a more reliable diagnosis?

A.  Yes, uhm-uhm.

Q.  So really in any context it's really important to

get back into the history?

A.   The history is important, yes.

Q.   Yes.  And sometimes you might even credit or consider the accounts of family or friends and other people who know the subject of your evaluation?

A.   Yes.

Q.   And the same would be useful here?

A.   Yes.

Q.   When you're diagnosing a medical -- strike that.

When you're diagnosing a mental health issue are you -- you're concerned about identifying the etiology?

A.   It is always in the back of my mind.  It may not be the most important factor.

Q.   And can you tell the jury what etiology means?

A.   The causal factors that went into producing that mental illness.

Q.   And amongst the possible etiologies include biological --

A.   It's --

Q.   Biological factors?

A.   It can be a factor.

Q.   Psychological factors?

A.   Yes.

Q.   That would include like trauma and stress?

A.   Yes.

Sanford Drob - CX by Mr. Blenk                 995

Q.   And then social or environmental factors?

A.   Yes.

Q.   And amongst those would include substance abuse?

A.   Is substance -- you're asking me if substance abuse is a social or environmental factor?  I mean, it can be because an individual could be exposed to substance abuse in a particular environment within which they live, but I'm not -- I'm not -- substance abuse isn't in and of itself an environmental factor.

Q.   So you would -- would it be an etiology?

A.   I mean, substance abuse can be a factor in producing mental illness or exacerbating, making it worse, yes.

Q.   Okay.  So if we have three categories -- environmental, psychological and biological -- does alcohol fall into one of those or is it its own -- do substances fall within those three or is it its own category?

A.   I mean, that's a -- that's really a question of how you want to describe it, but we might think of substance abuse as its own category.

Q.   Is that the Dr. Drob approach or is that consistent with --

A.   I'm not really sure.  I haven't -- I don't really see the purpose of categorizing these things.  I have indicated that substance abuse can contribute to mental illness.  It can be an etiological factor in mental illness.

Sanford Drob - CX by Mr. Blenk                996

Q.   Dr. Drob, you don't see the importance of categorizing these things.  The DSM -- you know the DSM, right?

A.   Yes.

Q.   You have to know the DSM?

A.   It's part of my profession, yes.

Q.   What does it stand for?

A.   Diagnostic and Statistical Manual of the American Psychiatric Association.

Q.   And what's the current version it's on?

A.   5-TR.

Q.   And that gives you criteria for categorizing diseases, right?

A.   Sure, sure, but it doesn't -- it's not an etiological document.  In other words, the category -- the criteria they get for PTSD or depression or anxiety doesn't ask you to assess the relative contributions of different causal factors to it.  It's basically a symptom inventory and you have to see whether those symptoms are present.  And then there -- in some instances they ask you to make a causal analysis, like the one we discussed earlier where the drugs were the cause and it becomes exclusionary.

Q.   Okay.

A.   It's not so --

Q.   So it's not an etiological exercise I guess?

Sanford Drob - CX by Mr. Blenk                997

A.    Yes.

Q.    It does not exist for the purpose of etiology, it's just relevant for --

A.    In some instances.

Q.    For the purposes you have brought up?

A.    Yes.

Q.    And those are the only --

A.    Drug exclusion is true for virtually all of the mental illnesses.

Q.    Okay.  So then etiology is essential to the DSM?

A.    In that instance, yes.

Q.    Okay.  So categorization is important?

A.    I don't want to argue about it.  I just didn't quite understand the idea that substance abuse is an environmental category.  I guess -- I guess it's -- you know, it's a behavior.  It's a behavior that someone engages in.  So, I mean, I'm not --

Q.    And then trauma, which one of those would -- does trauma fall within biological, psychological or social, environmental?

A.    It's both psychological and environmental I guess.

Q.    And these same etiologies would be important to track for the purposes of a longitudinal observation, in other words?

A.    I don't quite understand the question.

Sanford Drob - CX by Mr. Blenk                998

Q.   When you're looking -- when you're looking at these records you are looking for items that could be etiologies of mental disease?

A.   Could contribute to the cause of mental disease, yes.

Q.   Sure.  And it could be something very straightforward like a head injury, right?

A.   Fair enough, yeah.

Q.   Or it could be something more complicated, right, like substance abuse?

A.   Yes.

Q.   Or it could be a lived experience like trauma?

A.   Yes.

Q.   Or it could be a social event like a divorce?

A.   Yes.

Q.   And those would all be things that you would be inventorying separate and apart from specifically whether there was a diagnosis in the history you were considering?

A.   Okay.  Yes.

Q.   When you're evaluating somebody, whether you're in this context or in a criminal context -- and let me know if there's a difference -- you're always going to be realistic, right?

A.   Well --

Q.   You're going to be -- you're going --

Sanford Drob - CX by Mr. Blenk                    999

MR. DURLAND:  Objection, Your Honor.  If perhaps Mr. Blenk could let Dr. Drob answer.

THE COURT:  I don't want people talking over each other.  So can you just ask the question and let the witness answer.  So why don't you ask the question, and then we'll let --

MR. BLENK:  I'll withdraw the question.  It was a poorly worded question.

THE COURT:  Okay.  You can ask a new question.

BY MR. BLENK:

Q.  You strive to be objective?

A.  That's fair, yes.

Q.  And sometimes being objective would require you to push back on a self-report from a patient?

A.  Yes.

Q.  Sometimes being objective means that you listen to the person who is reporting to you and then perhaps you look for verification of what they're reporting?

A.  Yes.

Q.  And we already talked about the possible areas of verification.  We could talk to third parties who know that person?

A.  Yes.

Q.  We could talk to parole, if applicable in the context?

Sanford Drob - CX by Mr. Blenk                    1000

A.   Yes.

Q.   Or you could talk to family members?

A.   All of those could possibly be sources of information.

Q.   Providers?

A.   Yes.

Q.   And part of being objective is that you are not trying to reach the conclusion that the subject is seeking, right?

A.   Yes.

Q.   And that's a huge problem for malingering?

A.   That's one of the reasons you're looking at malingering, yes.

Q.   And that's a concern in a lawsuit?

A.   Definitely.

THE COURT:  Mr. Blenk, just so you know, I'd like to end around one o'clock.  So in about five minutes.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  For our lunch recess.

BY MR. BLENK:

Q.   You take all of your experience into a diagnosis, right?

A.   All of my experience with the client or are you talking about all my experience in life?

Q.   All of your experience at least in forensic

Sanford Drob - CX by Mr. Blenk                    1001

psychology, right?

A.   I guess.

Q.   That goes into your diagnosis?

A.   It's -- it helps inform it.

Q.   And you need to have that expertise to make a reliable and accurate diagnosis?

A.   Yes.

Q.   And it also takes expertise to evaluate the etiology of a diagnosis, right?

A.   Yes.

Q.   When you're putting together a report you include some of the items we've discussed, like history, that the person is reporting to you?

A.   Yes.

Q.   Substance use history?

A.   Yes.

Q.   Social history?

A.   Yes.

Q.   And then in most of these engagements you are going to be looking at least at some medical records or other records, right?

A.   Yes.

Q.   And when you do that you write down that you reviewed the record?

A.   Yes.

Sanford Drob - CX by Mr. Blenk                    1002

Q.   But you also write down relevant observations you are making from the record?

A.   Those that you consider to be relevant and important, yes.

Q.   And you do that objectively?

A.   Yes.

Q.   It's not that it's important for your -- the position you are advancing, right?

A.   You are not picking and choosing to come to a certain outcome.

Q.   You put it better than I did.  Thank you.

And that means that sometimes if you're making -- strike that.

So at the conclusion of a forensic psychology analysis you are going to be making -- you are going take a position on, for example, competency or incompetency?

A.   If you can draw a conclusion, you take a position and make a conclusion.

Q.   If that's your role in the case?

A.   Yes.

Q.   And part of -- you know that that could be challenged, right?

A.   Sure.

Q.   And as part of your role, both to show your objectivity as well as to protect yourself from possible

Sanford Drob - CX by Mr. Blenk                    1003

attacks on the report, you take into account even evidence that can be somewhat -- is somewhat contrary to the position you are taking?

A.    Yes.

Q.    And you document what is evidence that is contrary to your position?

A.    To the extent that you can do that or that -- you know, within your power, yes.

Q.    And in a good report you are going to explain your thinking on that issue, right?

A.    Yes.

Q.    You are going to address the evidence that's contrary to the position that you're ultimately advocating?

A.    I think that's fair.

THE COURT:  Mr. Blenk, can you pause for --

MR. BLENK:  Of course, Your Honor.

THE COURT:  We are going to take our lunch recess. It's one o'clock.

So if you could return at two o'clock.  All of the recess admonishments apply.  Do not talk about the case with anyone.

Dr. Drob, we're going to take our recess.  Please do not talk about the case or your testimony with anyone else. Okay.  Thank you.

(Jury not present.)

Sanford Drob - CX by Mr. Blenk                1004

THE COURT:  Dr. Drob, you can step down.  Thank you.

THE WITNESS:  Sure.

THE COURT:  Counsel, we'll just take our lunch recess.  Okay?  We'll see you back at two o'clock.

MR. FIRSENBAUM:  Your Honor, could we make one request?  We'll wait for the witness to leave.

THE COURT:  Sure, yes.

(Dr. Drob not present.)

THE COURT:  Everyone can have a seat.  Okay.  Dr. Drob has left.

MR. FIRSENBAUM:  Thank you, Your Honor.

Just in light of the timing of the County's filing earlier this morning, we were still looking into case law on the public records exception, and we have some additional case law that we were hoping to just submit to Your Honor.  We could do it either by e-mail or on the docket, whatever Your Honor's preference, and we're ready to send it at the beginning of the lunch hour so that Your Honor has it, if that's okay.

THE COURT:  That's fine.  You can just e-mail it.

MR. FIRSENBAUM:  Thank you, Your Honor.

THE COURT:  Thanks.  Have a good lunch, everyone.

(Recess taken.)

THE COURT:  Before we continue with Dr. Drob's testimony, I just want to address the documents that County

Sanford Drob - CX by Mr. Blenk                    1005

was seeking admission.  And I reviewed the Plaintiff's e-mail over the lunch recess.

Regarding DX 729, so those are the 143 pages of parole records, I've already received some of them, maybe 12 or so, under the ancient documents exception.  I find that the public records exception does not apply to DX 729.

Specifically, the County was seeking admission under 803(8)(A)(ii), which reads:  "A record or statement of a public office if it sets out a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law enforcement personnel."

And so I find that this situation is that exception that's specified in subdivision two, that this -- these notes or reports were created in a criminal case by law enforcement personnel or a parole officer.  I had asked Plaintiff about that before, and I know you thought that that exception does not apply here, but I find because -- we're in a civil case, but I find that the description "in a criminal case" is referring to the conditions for which the document was created.

And that really is consistent with all these other exceptions that are specified in Rule 803.  What's important is the conditions under which the document is created.  And here the document was created in a criminal case by a parole officer or law enforcement personnel.

Sanford Drob - CX by Mr. Blenk                    1006

And so based on that I am going to deny the County's request to receive all of those documents.

Regarding DX 850, I am going to receive that under the public records exception.  And that was a record that was created by the New York State Department of Corrections.  I do find that 803(8)(A)(ii) applies here.  It simply goes through the dates and transfers of Mr. Boyd within the New York State Department of Corrections.  And, additionally, the parties had stipulated to its authenticity.

So that covers those three documents.

(Defendant's Exhibit 850 received in evidence.)

MR. BLENK:  Your Honor, I would just note that the exception three -- (A)(iii) would apply in this case, "in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation," just the same.  And that's -- it's disjunctive.  It's a disjunctive list.  (8)(A)(ii) or (8)(A)(iii) would apply equally to the probation documents.

And I would also -- I don't --

THE COURT:  Well, you were seeking admission under 803(8)(A)(ii).

MR. BLENK:  Well, that applies, but so does three.

And I would add, Your Honor, that this -- it's not a criminal law enforcement operation -- or probation work is not a criminal law enforcement operation.  That's why they

needed to reply on the exception that Mr. Firsenbaum was referencing or the -- the break from the rule in the case that Mr. Firsenbaum had cited.

It seems like what we're doing here is -- it's a law enforcement observation. We're not in a criminal case here. It was not in a -- it was not developed in the course of a criminal case in the underlying matter. It's probation observation. That wouldn't even -- it's hard to think of a law enforcement aspect that would be more -- that would be both law enforcement and more attenuated from an actual criminal courtroom.

THE COURT: I mean, what I'm saying is that the parole officer that created the records is part of law enforcement.

MR. BLENK: And the exception contemplates law enforcement records coming in in some manner in a civil case, and by implication it would suggest that the law enforcement concept described there is fair game and pretty much any civil application is forbidden in a criminal proceeding in the sense that, of course, you can't have a FBI agent -- you can't just rely on an FBI agent's report for the criminal case per se, but if we are not in that case, we can use those reports for that purpose.

THE COURT: Okay. What I'm saying is that because the -- because these records were created in a criminal case, those were the conditions they were created under, then the

Sanford Drob - CX by Mr. Blenk                    1008

public records exception does not apply here because that was the context of how these or where these records were created. It's not relevant to the fact that we're in a civil case now, but these were the circumstances they were created. They were created in a criminal matter by law enforcement personnel.

And I think that the reason this kind of exception to the exception exists is because of what Plaintiff had been talking about before, because of kind of the adversarial nature of them. And so I think that applies to a situation where a police officer is writing a P-73 or a police report, Investigative Action Report in the course of their investigation of a criminal matter, and similarly here where a parole officer is writing a report or taking notes about, for instance, a parole violation.

Okay. But your exception is noted.

MR. BLENK: Thank you, Your Honor.

THE COURT: Is there anything else you would like to address before we bring the witness in and the jurors?

MR. BLENK: Your Honor, I'm not that far off from getting into certain aspects that we have discussed about the opinion and matters I would anticipate addressing within -- probably before the next break, including matters concerning mental health symptoms reflected in Mr. Boyd prior to incarceration and their appearance at the same time as

Sanford Drob - CX by Mr. Blenk                    1009

substance abuse, as well as in light of the Plaintiff addressing this idea that this is somehow an outgrowth of Mr. Boyd's attempt to seek traditional pharmaceutical interventions.  There's a lot of references in his records to drug-seeking behavior, which I think is relevant in light of that line of argumentation in support of some sort of mitigation that the jury should think differently about what happened because this is just a person who was -- who found no voice in a traditional pharmaceutical setting or was unsatisfied with traditional pharmaceuticals.

THE COURT:  Okay.  So what's your request right now?

MR. BLENK:  To address those topics.

THE COURT:  Okay.  Well, I don't want to get into this again.  I mean --

MR. BLENK:  You'd rather I take it up to the brink and then address it?  Which is fine --

THE COURT:  Well, I just -- I don't want to sit here and kind of guess what you're going to -- like the questions you're going to ask.  So yes.  And I appreciate you trying to get a ruling beforehand, but it's too vague right now to give you a ruling on that.  So unless there is like a specific question that you would like me to rule upon, then I don't -- I can't give you anything concrete right now about vague lines of questioning.

MR. BLENK:  Fair enough.

Sanford Drob - CX by Mr. Blenk                1010

THE COURT:  Okay.  Let's bring in the witness.

(Dr. Drob present.)

THE COURT:  Dr. Drob, you can have a seat.  Thank you.

THE WITNESS:  Sure.

THE COURT:  We can bring the jurors in.

(Jury present.)

THE COURT:  Have a seat, everyone.

The jurors have returned to the courtroom after our lunch recess.  We're going to continue with the cross-examination of Dr. Drob.

Dr. Drob, I'm just going to remind you that you are still under oath.

Mr. Blenk, go ahead.

MR. BLENK:  Thank you, Your Honor.

BY MR. BLENK:

Q.   Dr. Drob, in our cross-examination we discussed briefly the idea of chronology, correct?

A.   Yes.

Q.   And the idea of cause?

A.   Yes.

Q.   And you'll agree with me that something can't be a consequence of an event if that thing comes before the event? A consequence can't precede what's purported to be the precipitating event?

A.   In ordinary life that is true.

Sanford Drob - CX by Mr. Blenk    1011

Q.    And when you're going through a medical record and you are seeing possible evidence of etiology it's important to keep track of those and to help identify what those etiologies could be contributing to by looking at mental health consequences that are arising around that time?

A.    I'm not -- I'm not sure if I agree with the way you phrased that.  The consequences of an event can happen sometimes long after the event itself.  So you're looking at chronological relationships, yes.

Q.    Sure.  But a consequence can't happen before the event?

A.    It's -- not psychologically, no.

Q.    Right.  And a consequence must not necessarily follow close in time to an event, but it would be indicative of some sort of correlation if that were the case, correct?

A.    Well, if there's -- if there's a -- if something follows immediately after an event, that's perhaps evidence that it's -- that the event is a causal factor in it, yeah.

Q.    And it doesn't -- it doesn't just have to be immediate, it can be less than immediate?  And that evidence might be weaker perhaps, but it would still be important evidence, right?

A.    You're asking me whether an event that takes place much earlier in time could have an effect on someone's psychology years later and it's important to look at that

Sanford Drob - CX by Mr. Blenk                     1012

earlier event in time?  Is that the question you're asking?

I'm just trying to make sense of the question.  I'm not trying

to argue with you.

MR. BLENK:  Can you read back the question?

(Record read.)

THE WITNESS:  So I think I understand the question.

And the answer is yes.  An event earlier might have a weaker

causal connection with a later event, but it could still be a

connection.

BY MR. BLENK:

Q.   So I believe that you conveyed four diagnoses in

your direct examination, correct?

A.   I think I focused upon three.  I talked about

posttraumatic stress disorder, anxiety disorder and

depression.  I also noted that he had been diagnosed with

panic disorder by prior clinicians.

Q.   And you would agree that --

A.   And also substance abuse.  So that would be the

fifth I guess or fourth.

Q.   Okay.  Fair enough.  So you don't have -- you are

not advancing the idea that you personally are -- you're not

personally conveying the observation that Mr. Boyd was

suffering from a panic disorder at the time that you treated

him?

A.   Well, I didn't treat him.  At the time I examined

Sanford Drob - CX by Mr. Blenk                    1013

him.

Q.   Fair enough.

A.   I'm not advancing that.  I do believe he had panic attacks and they probably related to the other two anxiety disorders.  I didn't see a need for a third separate diagnosis.

Q.   So anxiety, depression, PTSD and substance use disorder?

A.   Yes.

Q.   And you'll agree with me that these are some of the most common mental health diagnoses in the world of psychology?

A.   Yes.

Q.   They're very commonly overlapping or comorbid with each other, correct?

A.   Yes.

Q.   And that applies to all four?

A.   I would say all four overlap often.

Q.   And it's oftentimes hard to distinguish the characteristics of one versus another, correct?

A.   Well, as I said, they have overlapping characteristics.  So it becomes a little bit of a -- you know, an exercise to distinguish them, yes.

Q.   And it's hard to identify the cause of those conditions?

Sanford Drob - CX by Mr. Blenk                    1014

A.   Not always.

Q.   Well, it takes expertise?

A.   Well, you have -- but I'm telling you that an expert doesn't -- it's not always hard to find the cause, as in this case.  It wasn't hard.

Q.   And one of the most important things to do to assess the cause when you have these four -- these four different diagnoses, it could be useful to look at chronology, right?

A.   Yes.

Q.   Because the symptoms and onset of these syndromes or diseases are intertwined with each other, correct?

A.   Fair enough.

Q.   And one might cause another or contribute to another?

A.   Well, certainly, for example, posttraumatic stress disorder can contribute to depression and very often does, yes.

Q.   And substance abuse can contribute to depression as well?

A.   Yes.

Q.   And substance abuse can contribute to anxiety?

A.   Yes.

Q.   And substance abuse can contribute to posttraumatic stress disorder?

A.   Substance abuse can I guess exacerbate posttraumatic

Sanford Drob - CX by Mr. Blenk                    1015

stress disorder, but it's not going to be a causal factor in its --

Q.   It's impossible?

A.   What's that?

Q.   It's impossible that it would cause posttraumatic stress?

A.   I mean, I probably could -- no.  I think it's impossible that it would cause posttraumatic stress unless somebody was --

Q.   Understood.

A.   Yeah.  It's not going to cause it.

Q.   And there's something different about posttraumatic stress disorder relative to the other diagnoses.  And you might know other differences, but one of the differences I noticed when you were going through them is that by necessity posttraumatic stress disorder begins with an event in the real world outside of somebody's head?

A.   That's absolutely correct, yes.

Q.   Whereas the other diagnoses do not have to have a precipitating event in the real world?

A.   It's not part of the diagnostic criteria for there to be a precipitating event.

Q.   And you told us about the different ways that one could experience the trauma that gives rise to a posttraumatic stress disorder diagnosis?

Sanford Drob - CX by Mr. Blenk                    1016

A.   Yes.

Q.   And there were four?

A.   I think I said that they could be a direct experience of a physical or sexual threat, they could be observing the physical or sexual assault or threat or they could be hearing about a physical or sexual assault or threat of such to a loved one.  I'm not -- I guess that amounts to three.  I'm not sure if there's a fourth.

Q.   So all it takes is that you're there and you see it?

A.   Well --

Q.   For example, somebody could -- somebody could have PTSD if they were -- if they witnessed a car accident and a gruesome injury?

A.   They could.  It would be unlikely that their PTSD would be chronic, but they could, yes.

Q.   Serious and obvious injuries would tend to increase the risk of PTSD by -- excuse me.  That was a bad question.

If one were witnessing a crime, the seriousness of an issue -- strike that.

If one were witnessing an injury that occurs in an accident, the seriousness of that injury would contribute to the risk of PTSD?

MR. DURLAND:  Can we approach, Your Honor?

THE COURT:  Sure.

(At bench:)

Sanford Drob - CX by Mr. Blenk                    1017

MR. DURLAND:  Judge, I'm not sure what Mr. Blenk is doing, but my impression is that he's trying to open the door himself to this prior incident where there was a robbery and a young man was injured.  I think that Mr. Blenk is trying to lay the foundation and claim that he's opened the door for himself, and I just want to flag that.  It's utterly inappropriate.  The Court has ruled on this.  That's not permissible.  This is not the forum to try to establish some foundation on an issue that's been raised at least five times and has been rejected at least five times.

THE COURT:  Mr. Blenk, is that what you're trying to do?

MR. BLENK:  Well, I wasn't going to ask any question along those lines, but it's important that I maintain the foundation for the issue that we would be trying to get to. We have never withdrawn our interest in at least parsing this issue.  And the fact that Mr. Drob is coming in to make a diagnosis of PTSD and he notes that -- and rules out other factors, including that Mr. Boyd's friend died in a car accident, and minimizes those while also -- while not even addressing the idea that Mr. Boyd had -- shot somebody is I think -- it necessarily opens the door.  It's their claim, and that would be an issue that we would like to get into.

I understand Your Honor's order.  So I wasn't going to say anything to that effect until I got the go-ahead from

Sanford Drob - CX by Mr. Blenk                1018

Your Honor, but I was laying the foundation.

THE COURT:  If I've already made the ruling, then what's the relevancy of these questions then?

MR. BLENK:  Well, the relevance would be if he concedes that there's another -- other possible causes for PTSD diagnosis in which he acknowledges -- he acknowledges trauma that they experienced separate and apart from shooting somebody, that would be an alternate cause for the PTSD.

MR. DURLAND:  Judge, this is just a rehash of the debate that we've had numerous times.  This is Mr. Blenk's opinion about what could cause PTSD.

Dr. Drob did consider it in his report.  It is utterly inappropriate to do this in the middle of a cross-examination when we have raised this issue ahead of time over and over again to avoid this exact possibility.  He can't open the door himself by trying to lay some foundation.  That ship has long sailed, and it would be grossly prejudicial to us for him to try to elicit this.

I mean, this is why we keep trying to raise this issue. And Mr. Blenk keeps disclaiming that this is what he's doing, but this is obviously what he's doing.  It's not appropriate.

THE COURT:  Well, I wasn't sure where that line of questioning was going, but if that's your intent then -- and it's relevant only to something that I've already precluded, then the objection is sustained.

Sanford Drob - CX by Mr. Blenk                    1019

MR. BLENK:  Understood, Your Honor.

(Open court:)

THE COURT:  The objection is sustained.

You can ask a new question, Mr. Blenk.

MR. BLENK:  Thank you, Your Honor.

BY MR. BLENK:

Q.   Dr. Drob, in your report you note -- strike that.

In your report, Dr. Drob, you noted additional life stressors, and when you did so, those are amongst the things that you think could be relevant to an assessment, but you don't think that those would be contributing factors to what was experienced ultimately by Mr. Boyd, correct?

A.   I wouldn't exactly characterize it that way.  I would say that they might have had an exacerbating or minor role in his mental disorders, but weren't the major or prime movers.

Q.   Okay.  And so amongst those that were set forth there were the death of two of Mr. Boyd's friends?

A.   That's correct.

Q.   So what could have -- at that time were you aware of Mr. Boyd having any sort of diagnosis that could be exacerbated?

A.   No, but that -- those stressors could have created vulnerabilities in Mr. Boyd that would then have made it more difficult for him to cope with stress later in life.

Sanford Drob - CX by Mr. Blenk                    1020

Q.   Indeed, one of those -- at least one of those events would fit into at least one of the categories of a potential precipitating event for the purposes of a PTSD diagnosis?

A.   It could.

Q.   You would agree with me, Dr. Drob, that the manifestation of the symptoms of what we're talking about, the diagnoses that you're talking about, they could ebb and flow over time, right?

A.   The manifestations, yes.

Q.   The symptoms --

A.   Yeah.

Q.   -- of those?

A.   The symptoms, uhm-uhm.

Q.   And they could -- amongst the factors that could be contributing to exacerbating the symptoms could be stresses in one's life?

A.   Sure.

Q.   Adverse events?

A.   Yes.

Q.   A lack of sleep?

A.   Yes.

Q.   There's enumerable --

A.   Yeah.

Q.   -- explanations for why symptoms could be better or worse?

Sanford Drob - CX by Mr. Blenk                    1021

A.   Could come and go and why they get worse and better, yeah.

Q.   But when you're looking at -- when you're doing your longitudinal analysis, when you're looking at somebody's symptoms over time, it's important to track generally how the symptoms are improving or becoming worse?

A.   Important for what?

Q.   Well, you're here to assess cause, right?

A.   Well, I assessed the cause of his symptoms was the years he was in prison.  Subsequent to his being released his symptoms ebbed and flowed, and the ebb and flow of those symptoms doesn't change my opinion that the major cause of his mental disorders was the -- his 27 years in prison and the experiences he had there.

Q.   And that's because you know he had no -- he had no mental disorders before going to prison?

A.   I don't -- I don't know for certain that he didn't suffer from, you know -- I mean, he appears to have had some substance abuse issues before prison.  I think he had some vulnerabilities.  But what happens here is a house might have some vulnerabilities or cracks in its foundation and then you hit it -- some guy comes along and hits it with a bulldozer twenty times, and you don't look for the cracks in the foundation as the cause of why the house collapsed.  You've got a situation here where a guy went to prison for 27 years,

Sanford Drob - CX by Mr. Blenk                    1022

believed himself to be innocent, he had all of these horrible traumatic experiences.

Q.    Thank you.

A.    He had 27 years of his life taken away from him. And whatever happened before, whatever he was feeling when he was a child or as an adolescent pales in comparison to what happened to him in prison.  So --

Q.    Dr. Drob, you understand --

A.    So we can talk --

MR. DURLAND:  Judge, if the doctor could finish his answer.

THE COURT:  Hold on one second.  We don't want people talking over each other.  So Dr. Drob can finish the answer, and you can ask another question.

THE WITNESS:  He -- you know, the two guys who died, the fact that he had some substance abuse problems as an adolescent, they're relevant to the fact that he was perhaps a vulnerable person when he was put in prison, but the prison experience in my opinion is the etiology of his mental illness.

BY MR. BLENK:

Q.    And you know that?

A.    That's my -- I know it as well as I know anything in psychology, yeah.  I pretty well know it.

Q.    Right, because when you're giving your expert

Sanford Drob - CX by Mr. Blenk                    1023

opinion -- you're here to be an expert, right?

A.   That's correct.

Q.   And then you're very careful with your analysis and you come to court and you provide that analysis?

A.   That's correct.

Q.   And you stick to the analysis in your report?  Yes or no.

A.   I mean, I don't have my report sitting right here.

Q.   Okay.

A.   It's possible that I may have a slightly different view of one sentence in my report, but basically I made the same conclusion in my report as I'm stating here.

Q.   Right.

A.   That his prison experience is the cause of his mental illness.

Q.   You didn't have any records about -- you didn't have any records that were generated about Mr. Boyd prior to the time that he went to prison, correct?

A.   No.

Q.   And you're not aware if he had any diagnoses before he went to prison?  Yes or no.

A.   Well, I don't think he had any diagnoses before he went to prison, but I'm certainly not aware of any.

Q.   But you didn't see any medical records one way or the other?

Sanford Drob - CX by Mr. Blenk                1024

A.   No.

Q.   So when you're assessing cause you'd be looking for the mental health diagnoses to cluster around the event in question, right?

A.   Cluster temporally around the -- well, you'd want them to follow the events in question in some way, yes.

Q.   Yeah.  And I think we talked about before the closer they are in time the more suggestive it would be of a causal relationship, right?

A.   Generally speaking, yes.

Q.   A careful practitioner would look back to the earliest evidence of a condition to assess the circumstances then existing if he's making a causal determination?

A.   It would be something to -- it would be something to consider, but when there are supervening circumstances that are so profound as the one here, it tends to diminish the importance of the earlier events.

Q.   I understand, Dr. Drob, that you are trying to continue to repeat your opinion, but when you're going through these events you don't go in as an advocate, right?  You go in objectively?  You go --

A.   Of course.

Q.   -- in to find the facts?

A.   Yes.

Q.   That's the important part?

Sanford Drob - CX by Mr. Blenk                    1025

A.   Absolutely.

Q.   To find the facts?

A.   Well --

Q.   Starting as early in time as you can find the facts?

A.   Fair enough.

Q.   And you don't minimize things just because they're early in time, right?

A.   Well, I've already, you know, explained myself in this situation.  We have --

Q.   Yes or no.

A.   We have limited data about him earlier in time.  We know that he was abusing drugs and alcohol prior to his incarceration.  That created a vulnerability to subsequent substance abuse presumably.

We know -- you know, he had an impoverished home.  There might have been some difficulties in childhood that created vulnerability.  But when you have an event and a series of events of such length and such severity that he experienced, those become so important psychologically as to make the others just kind of like vulnerabilities rather than causes.

You know, it's like people who go through the war and get PTSD, they might have had difficulties in childhood, but the war PTSD is what's caused -- their events in the wars would cause the PTSD.  And it is my opinion, and I've stated it here, that it's the events of his incarceration that resulted

Sanford Drob - CX by Mr. Blenk                    1026

in the mental illnesses we're seeing subsequent to his release.

MR. BLENK:  Move to strike as nonresponsive, Your Honor.

THE COURT:  Overruled.

BY MR. BLENK:

Q.  You would agree with me that mental health conditions can cause substance abuse disorder?

A.  They can be major factors in causing it, yes.

Q.  And trauma can cause substance abuse disorder?

A.  Can be a major factor, yes.

Q.  Now, your methodology, especially as it pertains to Mr. Boyd, was heavily reliant on self-report, correct?

A.  It's partly reliant on self-report.  I certainly relied on his self-report, but, as I said on direct examination, I relied on a much broader range of information than just self-report.

Q.  All the records?

A.  The records and my experience as a psychologist.

Q.  And the tests you administered that was entirely self-report?

A.  The tests --

Q.  Yes or no.

A.  The tests are self-report inventories, yes.

Q.  So your analysis relies in part on the reliability

Sanford Drob - CX by Mr. Blenk                    1027

of the information you are getting, correct?

A.   That's correct.

Q.   And that applies to both the records?

A.   It applies to the records, yes.

Q.   And to the self-report of the person who you are evaluating?

A.   Agreed.

Q.   And when you're getting that self-report it's important that you transmit it accurately into your report to the extent that you are going to rely on that information?

A.   Yes.

MR. BLENK:   Your Honor, may we approach?

THE COURT:   Sure.

(At bench:)

MR. BLENK:   Your Honor, I anticipate getting into Mr. Boyd's childhood at this time and with respect to Dr. Drob's observation that Mr. Boyd had a beautiful childhood and to be addressing that to illustrate the general unreliability of Dr. Drob's analysis and the failures of self-report and his lack of diligence in assessing the records.  This also ties in with the underlying analysis because we have clusters of symptoms that are displayed early in Mr. Boyd's life, including feelings of less than, symptomatic of depressive syndrome at the time of the onset of his early drinking.

Sanford Drob - CX by Mr. Blenk                    1028

THE COURT:  Okay.  I think that -- I mean, without making any specific ruling because there's no question, I mean, I think you can fairly challenge the reliability of Dr. Drob's opinion.  So unless there's a specific --

MR. BLENK:  I just -- so I just wanted to make sure everybody was on the same page.

MR. DURLAND:  It depends on what Mr. Boyd's childhood means.  I mean, if your questioning about childhood is intended to elicit facts that the Court has excluded from the case, then, of course, we vociferously object to it.

THE COURT:  That's a given.  I don't know how many times I have to say it.  And I'm not saying you are intending to do that, but you can't cross-examine him on things that have already been precluded.  But if there are other things that have not been precluded, like seeing his friends dying and you want to say, well, that's not -- Dr. Drob's opinion that this was a beautiful childhood isn't correct, is not reliable, then something like that is I think fair.

MR. BLENK:  So it goes to his experience of abuse as a child, experience of abuse, feeling less than and being bullied in his neighborhood.

THE COURT:  And those are reports that Dr. Drob reviewed?

MR. BLENK:  Yes.

THE COURT:  Okay.  Well, I think you have to first

Sanford Drob - CX by Mr. Blenk                    1029

establish that Dr. Drob reviewed those records.  And he's reviewed lots of them.  So I think you need to make it very clear in your questions to lay the foundation that he reviewed these specific records.  And then if there are -- then you can I think fairly cross-examine him on things to challenge his credibility.

MR. BLENK:  And it would be along the lines of saying you would agree with me, Dr. Drob, that this record discloses that Mr. Boyd was the victim of abuse in his youth.

THE COURT:  Physical abuse?

MR. BLENK:  Yes.

THE COURT:  Do you want to be heard about that?

MR. DURLAND:  I don't think so.  I mean, as long as Dr. Drob is being shown the record, I don't think that's a prior bad act that the Court has excluded.

THE COURT:  Yeah.  It's not a prior bad act that I have excluded.  So you can question him on that.  I just -- there's no -- are there any questions about him being -- are there any allegations that he was sexually abused?

MR. BLENK:  No.

THE COURT:  Okay.

MR. BLENK:  It would extend to he -- Dr. Drob describes impulsive behavior.  I would like to get him to concede impulsive behavior without getting into further details.

MR. DURLAND:  That's not --

Sanford Drob - CX by Mr. Blenk                    1030

THE COURT:  Well, is there impulsive behavior that does not include precluded conduct?

MR. BLENK:  Threatening principals.  I mean, it's not -- there's a lot of impulsive behavior.  I would just be looking for a concession that the state that he's describing in the after event is consistent with the state as he found it there.  Understanding Your Honor's rulings, but there's all manner of impulsive behavior reflected in the records.  But without getting into the specifics of the records, I would look to a concession of impulsive pre-existing behavior.

THE COURT:  If there are records of impulsive behavior that does not include the precluded conduct, then, yes, you can ask about that.

MR. DURLAND:  Your Honor, what Mr. Blenk is talking about are the same issues that we've already litigated where, for example, there's a threat -- there's a record reporting that Mr. Boyd threatened somebody, and Mr. Blenk is saying, oh, that strikes me as an impulsive behavior; therefore, I'm going to ask Dr. Drob about this specific incident, but I'll do it in generic terms.  I don't see how that's relevant at all.

Nothing that Dr. Drob talked about in his opinions -- he didn't say that PTSD is characterized by impulsive behavior.  He didn't say depression is characterized by

Sanford Drob - CX by Mr. Blenk                1031

impulsive behavior.  This is not relevant at all.  This is just -- this is just more backdoor attempts to sidle up to bad acts that the Court has precluded.

THE COURT:  When you're looking for that, does Dr. Drob know not to -- does he know my rulings that I've already made?

MR. DURLAND:  Yes, of course.  I've instructed him many times, but the more that there's questioning in the immediate -- you know, immediately adjacent, which I -- you know, Mr. Blenk has done several times --

THE COURT:  Okay.  Mr. Blenk, I've already made my rulings and we've argued these multiple times.  So I'm not changing them.

So you can ask -- you can ask questions of Dr. Drob, like I said, that challenges or undermines his credibility, but you have to remember that all of this is coming in not for the truth of the matter.  It's really for essentially impeachment.  You are challenging his opinion, the credibility or reliability of his opinion.

MR. BLENK:  Right.

THE COURT:  So you can't bring any of this in for the truth of the matter.  That's hearsay.  Okay?  Does that make sense?  I just want to make sure I'm clear.

MR. BLENK:  Yeah.  I just want to make sure I can ask him that there's impulsive behavior reflected in his medical

Sanford Drob - CX by Mr. Blenk                    1032

records.

THE COURT:  Well, what impulsive behavior existed other than what's already been precluded?

MR. BLENK:  Well, I'm not going to try to talk about what's precluded.

THE COURT:  No, but it's the same -- is there something that was impulsive that was not part of the precluded conduct?

MR. BLENK:  He describes becoming unmanageable.

THE COURT:  Who describes it?

MR. BLENK:  Mr. Boyd.

MR. DURLAND:  No, that's not correct.  He doesn't describe becoming unmanageable.  This is one of the records that we've already litigated multiple times where it's like quintuple hearsay of a person saying that Mr. Boyd became unmanageable.  And that's --

MR. BLENK:  That's a personal detail of his life and it's not being used -- I'm not putting it in -- this is being -- this is using it in a way that's consistent with hearsay.  Why does he -- he says that he's manifesting these impulsive behaviors and physical confrontations after the fact.

MR. DURLAND:  He's not saying that.  He did not say that.  We just all heard him testify.  We've gone over this numerous times.

Sanford Drob - CX by Mr. Blenk                    1033

THE COURT:  Show me where he's saying this, where Mr. Boyd said this.

MR. BLENK:  This is the marked up version.

THE COURT:  So you're saying impulsive conduct that occurred after his incarceration and it was caused by that. So I think it's fair to ask about his impulsive behavior after his incarceration.

MR. BLENK:  I can't -- I need to be able to attack the diagnosis, and this is going into the diagnosis.

MR. DURLAND:  Your Honor --

THE COURT:  I know, but I asked you to show me where did Mr. Boyd talk about him being --

MR. BLENK:  Unmanageable.

THE COURT:  Before he was incarcerated.

MR. BLENK:  He's describing his youth.

THE COURT:  Not here.

MR. BLENK:  It's his description -- no, no.  The record I'm referencing is Mr. Boyd describing his youth in 735(a).

THE COURT:  Okay.  Well --

MR. DURLAND:  It's not Mr. Boyd describing himself as unmanageable.

And, Your Honor, we had this exact debate on this point.  We deliberately did not elicit any opinions from Dr. Drob about how Mr. Boyd's impulsivity caused him to violate parole specifically because we had this debate.  Your

Sanford Drob - CX by Mr. Blenk                              1034

Honor said substance abuse only.  So we did not offer this opinion.  And it's not fair for Mr. Blenk to now try to come in and for the fifth time reargue this point and try to -- try to get into this point, elicit an opinion that we deliberately didn't offer, and then try to attack it with some record that the Court has already excluded and hope that Dr. Drob doesn't mention the thing that he's precluded from mentioning.  It's completely inappropriate.

If he wants to cross-examine, pull out the record that he thinks Dr. Drob overlooked, and let's just get on with it.

THE COURT:  Well, that's what you have to do.  And so if there's a record that is not mentioning the precluded conduct but that Mr. Boyd says I was impulsive, I acted impulsively when I was a kid --

MR. BLENK:  I was unmanageable is the language.

THE COURT:  Okay.

MR. BLENK:  But there are other --

THE COURT:  Then pull that up.  I mean, I don't know -- I didn't --

MR. BLENK:  That's 735.

THE COURT:  Okay.  Well, I didn't memorize all the records.  So what you need to do is when you direct Dr. Drob to those records you can have it pulled up, not in front of the jury, but -- so if -- and then I can look at the record

Sanford Drob - CX by Mr. Blenk                    1035

and make a ruling.

MR. BLENK:  Understood.

MR. DURLAND:  And, Your Honor, just for the record, we entirely object to Mr. Blenk cross-examining with this record.  It's not Mr. Boyd saying I was unmanageable.  These are the bad acts that we have already talked about, but Your Honor will see it when the record comes up.

THE COURT:  I'll have to see it.  But if it was a record that he -- that Dr. Drob reviewed and it doesn't have anything to do with the precluded conduct, then you can have it pulled up not for the jury but for -- so I can look at it.

MR. BLENK:  It references -- if you look at it closely, it references his -- it references two judicial stints.  It references two judicial --

THE COURT:  Well, then that's the precluded conduct.  I don't want to -- I'm not trying to unduly limit your cross-examination, but I don't have the records in front of me right now, and I've already precluded certain things that you know about.  So if that is pertaining to the precluded conduct, then, no, you can't ask that question.  Okay?  You cannot ask that question if that's about the precluded conduct.  I don't know how else to say that.

MR. BLENK:  Yeah.  I just want -- he's using impulsivity as a criteria to describe and to assess the onset of mental disease.

Sanford Drob - CX by Mr. Blenk                    1036

MR. DURLAND:  He never did that.  He never said impulsive.

MR. BLENK:  That's in his report.  I need to be able to attack the different diagnoses that he's evading and just saying, well, no, it doesn't really matter.

MR. DURLAND:  That's a prior bad act.

MR. BLENK:  I'm not using prior bad acts.  I'm trying to get him to confirm that the criteria that he's observing after the fact was existing before the fact.  There would be no further prejudice --

THE COURT:  Okay.  We are talking in circles.  I told you:  If there is something in the record that he reviewed that says that he acted impulsively but does not refer to the precluded conduct, then I'm going to allow you to refer him to that, but if it's referring to the precluded conduct, then, no, you cannot.  And without screening the record right now without seeing it then I don't know.  I don't know if there exists any records.

MR. DURLAND:  Thank you, Your Honor.

(Open court:)

THE COURT:  You can go ahead, Mr. Blenk.

MR. BLENK:  Thank you, Your Honor.

BY MR. BLENK:

Q.   Now, Mr. Drob -- Dr. Drob, you described some of the symptoms of posttraumatic stress disorder in your direct

Sanford Drob - CX by Mr. Blenk                    1037

examination, and in your report you noted that a person suffering from this syndrome could be experiencing impulsive reactivity and aggression, right?

A.   That's one of the signs of the syndrome.  They can become irritable and they can be somewhat impulsive.

Q.   And you actually assessed in your report that Mr. Boyd had exhibited those symptoms in your review of his conduct during this time on parole?

A.   Could you show me where you're referencing in my report?  I don't recall.

Q.   It would be page 33.

A.   I don't have the report.

Q.   Showing Dr. Drob page 33 of PX 259, your report reflects that Mr. Boyd engaged in conduct, including physical conflicts with others and impulsive behavior, that while not instrumentally criminal --

MR. DURLAND:  I object, Your Honor, to Mr. Blenk reading out this document.

THE COURT:  Overruled.

BY MR. BLENK:

Q.   -- resulted in contact with the police and the judicial system; is that correct?

A.   That's what I've written, yes.

Q.   Okay.  So here when you're assessing this it is in part to confirm your diagnosis of Mr. Boyd?

Sanford Drob - CX by Mr. Blenk                    1038

A.   Well, in this particular --

Q.   Yes or no.

A.   No.

Q.   No.   So the fact that he's exhibiting behaviors that are consistent with what you describe as psychological sequelae of incarceration, that's not confirming of his diagnosis?

A.   My report says that in addition to the diagnoses there are other psychological sequelae of incarceration, including ordinary human unhappiness.   And in this section we're talking about distortions in his personality development.

And so some of these characteristics were also the result in my view of his incarcerative experience.   They don't -- I'm not using this to substantiate the PTSD diagnosis, but individuals with PTSD diagnoses, particularly chronic complex PTSD, often react -- often have reactions like this.

Q.   I think your testimony on direct suggested that the actual manifestations and the characteristics of one's symptoms are oftentimes used to direct diagnosis, correct?

A.   That's correct.

Q.   But you would say this one is an exception, that really you can't take anything from it just because it's lining up with --

A.   No.   I'm --

Sanford Drob - CX by Mr. Blenk                    1039

Q.   -- the standard characteristics?

THE COURT:  Dr. Drob, if you could wait until the question is asked and answer the question.

THE WITNESS:  Sure.

THE COURT:  Thank you.

THE WITNESS:  No.  I mean, I'm -- I wouldn't say that the behavior that we're calling impulsive and reactive is necessarily what I utilized in diagnosing the PTSD, but it is part of -- part of the syndrome.

BY MR. BLENK:

Q.   And so if it were -- if one observed it happening another time in somebody's life, that could be suggestive of earlier onset of that syndrome?

A.   Well, aggressive, impulsive behavior to the extent that he exhibited it here, it's not -- it is a characteristic of so many different things that I wouldn't -- if you just saw that earlier in someone's life, that wouldn't be the first thing -- PTSD wouldn't be the first thing that comes to my mind.

Q.   Didn't say the first thing that would come to mind.

A.   Yeah.

Q.   But it would be suggestive of an earlier onset, correct?

A.   It wouldn't be suggestive of PTSD, that alone. You'd have to have the other criteria.

Sanford Drob - CX by Mr. Blenk                    1040

Q.   Again, I didn't say that alone.  I'm just -- I'm looking for pieces of evidence and I'm -- because we're trying to be objective?

A.   Yeah.

Q.   We're trying to assess what really happened and when did something really start.  That's what you're always trying to do, whether in this courtroom or another courtroom?

A.   Okay.  Fair enough.  Well, I'll stand by my --

Q.   So you'll agree with me that an earlier onset of these characteristics or evidence of these characteristics earlier in time could be suggestive of an earlier in time origin of the syndrome?

A.   Of PTSD?  Is that what you're suggesting?  I disagree with that, no.  I mean, if there was flashbacks earlier in time, you know, maybe, but if there's aggressive behavior earlier in time or impulsive behavior, I mean, it's -- it's hardly a primary -- primary manifestation of PTSD.

Q.   Again, I didn't ask about primary -- primary evidence.

A.   It doesn't -- it wouldn't suggest it to me.

Q.   It's not suggestive at all?

A.   No.

Q.   But you included it in your report?

A.   I'm including it in my report because it's one of

Sanford Drob - CX by Mr. Blenk                    1041

the things that happened as a result of his incarceration, not because it suggests that if he also was impulsive earlier in life that he must have had PTSD back then.

Q.   Okay.  So if we're talking about assessing some sort of -- for example, if you saw evidence that somebody had been exhibiting signs of depression earlier in their life and you knew that there was a more recent depression diagnosis, would it stand to reason that there was a likelihood that the depression had actually started at an earlier date?

A.   Well, they could be two very different episodes of depression.  And it may be that they had depression at an earlier date and then they have depression at a later date that's caused by something completely different.  It -- if there was depression at an earlier date, it would say they were depressed back then.

Q.   Dr. Drob, I understand -- I understand that there's a lot of variables.

A.   Uhm-uhm.

Q.   All I'm trying to do is find through an objective process --

A.   Yeah.

Q.   -- to find -- or to understand what would be suggestive or not.  And so it would be, in fact, suggestive of an earlier onset of depression symptoms if those symptoms were reflected in the person's medical record long before their

Sanford Drob - CX by Mr. Blenk                    1042

diagnosis?

        A.    Yes.

        Q.    Right.  And so what you're explaining to the jury here is that for the purposes of PTSD the same rule doesn't apply?  It's just an incidental thing that's happening later in time and we can't really go back and identify and trace through time those symptoms of what you purport to be a PTSD diagnosis?

        A.    I'm not saying that.  What I was saying is that in the case of depression if there's evidence that someone was depressed when they were a child, that shows that they were depressed as a child and might have had -- warranted a diagnosis.  If someone -- if there's evidence that someone was impulsive or reactively aggressive as a child, that provides me no information whatsoever with respect to a diagnosis of PTSD because the likelihood is 95 percent or higher that there's some other problem like ADHD or conflicts in the home or something else or peer influence that resulted in that aggression.

        Depression -- in the case of depression, depression is a central characteristic of the syndrome.  So if you had it back then, you've got it.  In the case of PTSD, being reactively aggressive is an occasional outcome of the syndrome.  It's -- it occurs, yes, but it's so much more readily explicable by other means that to then go and infer that because someone was

Sanford Drob - CX by Mr. Blenk                    1043

reactively aggressive or aggressive or impulsive as a child that they had PTSD, it doesn't make any sense.

Q.   Fair enough.  It would be more suggestive if, for example, there were a traumatic event that occurred earlier in the person's life and they were exhibiting those kinds of behaviors around that time?

A.   It might.

Q.   There you would be getting to actual useful information that you could use for at least some evidence in support of a diagnosis?

A.   It's possible.

MR. BLENK:  May I approach the witness, Your Honor, to take back that page?

THE COURT:  Sure.

BY MR. BLENK:

Q.   And you conceded in your report -- this should be going up for the witness only -- you conceded in your report that Mr. Boyd had experienced stressors prior in time to his incarceration?

A.   Yes.

Q.   And you agreed that at least one of those stressors fit the diagnostic criteria for PTSD?

A.   I'm not sure what you're referring to.

MR. DURLAND:  Your Honor, can we approach, please?

THE COURT:  Yes.

Sanford Drob - CX by Mr. Blenk                    1044

(At bench:)

THE COURT:  Are you talking about the death of his friend?

MR. BLENK:  Yes.

THE COURT:  Okay.  Go ahead.

MR. DURLAND:  Well, I mean, that's my concern, Your Honor.  We've just spent five minutes talking about aggression as a child.

I mean, I objected to Mr. Blenk reading this out.  I have no idea why he is permitted to do this.  We maintain our objection.  And it seems to me that he continues to approach this line and attempt to cross it notwithstanding the many times that the Court has directed him to stop doing it.

And this is just -- this is -- if Mr. Blenk wants to raise a particular issue and say didn't Mr. Boyd have the death of his friend and couldn't that be the cause of his PTSD, that's fine, but these continued vague references to aggression as a child and isn't there a traumatic event, he's just trying to get Dr. Drob to inadvertently say the thing that he's not permitted to say.  This is -- I don't know -- what -- the seventh time that we keep approaching this line.

THE COURT:  Or cause the jurors to speculate that something happened in his past.  So I was waiting for some sort of evidence --

MR. BLENK:  That was the foundation for it, Your Honor.

Sanford Drob - CX by Mr. Blenk                    1045

This is --

THE COURT:  This is 735.

MR. BLENK:  This is 735 unredacted.

THE COURT:  Okay.  What part?

MR. BLENK:  He became unmanageable.

MR. DURLAND:  This is the unmanageable, taken to industry.  I mean, this is --

MS. ZUBIZARRETA:  That was ordered redacted, as far as I understand.

MR. DURLAND:  This portion was.

MR. BLENK:  This is being used to examine a witness who reviewed those documents.

THE COURT:  But you can't ask him questions about it.

MR. BLENK:  I'm going to ask him about impulsive -- whether it's reflective of impulsive behavior.

THE COURT:  But where -- where in the reports is there evidence of impulsive behavior pre-incarceration that has nothing to do with the precluded conduct?

MR. BLENK:  Your Honor --

THE COURT:  Where is it?

MR. BLENK:  If the jury is only hearing a yes to the idea that there's impulsive behavior reflected in a record, it's no more prejudicial that it comes -- when he's being confronted with this document that in little scribbled cursive references a trip to industry versus a direct account

Sanford Drob - CX by Mr. Blenk                    1046

of the more serious actions --

THE COURT:  You haven't answered my question.  Is there -- do you have any -- is there any evidence in these reports that Dr. Drob reviewed that talks about impulsive behavior that is separate and apart from the precluded conduct?  Yes or no.  Just answer.

MR. BLENK:  I'm not aware of any.

THE COURT:  Then why have we been arguing about this for way too long?  I already told you you can't ask him any questions about conduct that's already precluded.  I don't know how else to say it.  And so I was letting you ask those questions because I had thought I made it very clear.  And so I don't -- you can't ask those questions because then it leads the jury to speculate about things that are never going to be in evidence.

MR. BLENK:  They're only hearing -- they're only hearing that he's impulsive based on that he's engaging in impulsive behavior.  That's all the jury is going to hear, Your Honor.  I tried -- and maybe I didn't make this clear.  I -- there's juvenile records disclosing -- I did tell you that --

MR. DURLAND:  We've had this debate five times.  You've told Mr. Blenk numerous times he cannot do this.

The answer to your question is no, there is no record like that.  And if he tries to confront Dr. Drob with this

Sanford Drob - CX by Mr. Blenk                    1047

record, of course, it's going to devolve into a debate about what's this impulsivity and Dr. Drob is going to have no choice but to explain the substance, which is precisely what Mr. Blenk is trying to do and has been trying to do for the past two hours.

MR. BLENK:  He became unmanageable in his home.  He was having trouble at home.  He was living in distress and he was acting out.

MR. DURLAND:  What does that have to do with impulsivity?

MR. BLENK:  That's impulsive behavior.

MR. DURLAND:  That's you saying it.  That's you saying that he's unmanageable because he's impulsive.  That's not anything that this record says.  That's not a treatment provider saying that he's become impulsive.  You are confronting him with a particular act and trying to get him to agree that that's impulsive and that means -- I don't know -- that he was impulsive as a kid and, therefore, he had PTSD back as a kid.

MR. BLENK:  He's describing him as impulsive as an adult.

MR. DURLAND:  Who is describing him?

MR. BLENK:  Dr. Drob.

MR. DURLAND:  No.  He said that only because you said that.

Sanford Drob - CX by Mr. Blenk                                       1048

MR. BLENK:  It's in his report.

MR. DURLAND:  It's in his report, which you quoted, but it's not -- he explained to you very clearly that impulsivity is not a diagnostic factor in PTSD.

MR. BLENK:  He's conceding that if there is a precipitating event, which he has confirmed, and if there --

MR. DURLAND:  What precipitating event?

MR. BLENK:  The alternative --

THE COURT:  Okay.  Stop.  I'm reading this part which was redacted.  So it's saying -- it's basically saying that it was -- he grew up in an environment where his parents were never married, is an out-of-wedlock child.

I mean, is this something you want to get into?

MR. BLENK:  No, no, no.  It's just I became unmanageable.

THE COURT:  The mother remarried and presently they are also getting divorced.  Thus, living in such a chaotic background he became somewhat unmanageable.

And so if you're trying to get out the fact that he was unmanageable because of I guess the family dynamic, that he was living in an unstable environment because his parents were getting divorced, then I will allow a question about that.

MR. DURLAND:  Your Honor, this is so far afield from impulsivity or PTSD.  This is like miles away from any

Sanford Drob - CX by Mr. Blenk

1049

opinion that's actually been offered.  And the only upshot of saying he was unmanageable on the heels of improper references to violent and aggressive responses as a child is going to be to cause the jury to speculate about the exact things that we have argued eight times over shouldn't come in and Your Honor has ruled shouldn't come in.

THE COURT:  I know I've already ruled that, but what I'm saying is that he can ask questions about the fact that he lived in an unstable environment.  I mean, I haven't precluded that.  And this report is basically saying that he's unmanageable because of this kind of unstable family life, that his parents are getting divorced.

And so whether that has anything to do with his diagnosis or not, you can ask a question about that.  Okay?

MR. DURLAND:  I mean, we object, Your Honor.

(Open court:)

THE COURT:  Go ahead, Mr. Blenk.

MR. BLENK:  Thank you, Your Honor.

BY MR. BLENK:

Q.   Dr. Drob, you did make observations about Mr. Boyd's childhood?

A.   Yes.

Q.   And you made those observations.  You were getting paid four hundred fifty dollars an hour, right?

A.   I've already answered that question.  Yes.

Sanford Drob - CX by Mr. Blenk                    1050

Q.   So you weren't just writing things down just to pass time?  It was important to your process?

A.   As part of the completeness of my observations I included those observations.

Q.   And we spoke about -- you made reference to Mr. Boyd engaging in impulsive behavior after he was released from prison?

A.   Yes.

Q.   I'm going to show you what's been marked as DX 735 at 46244.

A.   Yes.

THE COURT:  Not to the jurors.  Just to the witness.

THE WITNESS:  I have a black screen right now.  I don't see anything.

BY MR. BLENK:

Q.   Did you see something a moment ago?

A.   There was a cover sheet.

Q.   I'm on the same screen evidently.

Now, you did have the opportunity to go through the New York State Department of Mental Health records before you prepared your report?

A.   That's correct.

Q.   And can you read the date on this record, Your Honor -- or Dr. Drob?

A.   February 5, 1996.

Sanford Drob - CX by Mr. Blenk                    1051

Q.   Okay.   What's going on at this time?

A.   I think that he was probably just a couple weeks or so before possible parole release and he's being -- he's being seen for a routine follow-up.

Q.   And you reviewed a lot of the records like this in the course of preparing your report and preparing to testify today, correct?

A.   Yes.

Q.   And you found them to be lining up with the standards and practices in the world of mental health counseling and psychology?

A.   I'm sorry.   You're asking me if reviewing such records is in line with those practices?

Q.   That's a great question.   I'll ask that one.

A.   Okay.

Q.   Yes?

A.   Yes.

Q.   And the records generally that you've been confronted with in the course of your work on this case, they've met that standard?

A.   Yes.

Q.   And you see here what might be fairly characterized as out of control behavior by Mr. Boyd in his youth?

A.   Can you direct my attention?   It's a little hard to read this handwriting on this screen here.

Sanford Drob - CX by Mr. Blenk                    1052

Q.   I don't want you to read it.  But it's in the second written paragraph.

A.   Okay.  It's better now.  Okay.

Q.   Would you agree with that characterization?

A.   It's what he described, according to this.

THE COURT:  Counsel, approach with the report.

(At bench:)

THE COURT:  Where does it say out of control behavior? Can you point that out to me?

MR. BLENK:  It says he became unmanageable, Your Honor.

THE COURT:  Okay.  Well, you need to use that word. You can't say out of control behavior.

MR. BLENK:  I thought that was a better way of putting it, Your Honor.  I meant to be --

THE COURT:  I mean, no, it's not.  I don't think that they're the same thing.  I think out of control and unmanageable are different things.  And you need to be really specific because there are parts in there that are not admissible.

MR. BLENK:  I know.

THE COURT:  And so you need to be very clear so that he doesn't inadvertently talk about things that are precluded. Okay.

MR. BLENK:  I know.  It was a yes or no question.  I intended to soften it with and also avoid what we would

Sanford Drob - CX by Mr. Blenk                    1053

consider hearsay if I was reading from the document.  I

didn't want to just read from the document.  I wanted to

frame a question around it.  I understand completely though,

and I will keep it tight and to the records.

THE COURT:  Okay.  So you can rephrase it as

unmanageable.

MR. BLENK:  Absolutely.

THE COURT:  And only point him to what's really the

part that's before the unmanageable, not after, because right

after unmanageable is the precluded conduct.  So we're

talking about the divorce and the mother getting remarried.

MR. BLENK:  I'll ask him to confirm that there was

chaos in the home and Mr. Boyd became unmanageable.

MR. DURLAND:  Where does it say chaotic?

MR. BLENK:  Chaotic background.

THE COURT:  You can use the words in there.  It's

hearsay only if it comes in for the truth of the matter.

MR. BLENK:  Understood.

THE COURT:  This is not coming in for the truth of the

matter.  It's coming in as impeachment to undermine his

opinion.

MR. BLENK:  Right.

(Open court:)

MR. BLENK:  We are displaying 735 -- DX 735 for

Dr. Drob only.

Sanford Drob - CX by Mr. Blenk                1054

BY MR. BLENK:

Q.   And just to resolve this document, Dr. Drob, this section reflects that Mr. Boyd had experienced a chaotic background?

A.   Well, it says that --

Q.   Just a yes or no.

A.   That's the opinion of the -- of the writer.

Q.   And it notes that Mr. Boyd had become somewhat unmanageable?

A.   Yes.

Q.   Thank you.

THE COURT:   Counsel approach.

(At bench:)

THE COURT:   Are you going to follow up on that at all? I mean, you can't just leave it as he had a chaotic background.  You have to -- he had a chaotic background because his parents were getting divorced.  Because if you just leave it at chaotic background, it's going to leave the jury to speculate.  So you have to be specific about why.  I mean, I'm letting you get into that, but you have to show why it's relevant.  So were you -- and it seemed like you were done with that line of questioning and that's why I brought you up here.  Were you planning on asking more questions about that?

MR. BLENK:   I was going to confront him with the

language from his report.

THE COURT:  But you can't just leave it as a chaotic background.  You have to ask him about he had a chaotic background because this report said that Mr. Boyd when he was young he had a chaotic background because his parents were getting divorced and his mother was getting remarried.

MR. BLENK:  Absolutely.

THE COURT:  Okay.

(Open court:)

BY MR. BLENK:

Q.   Dr. Drob --

A.   Yes.

Q.   -- this record explains that Mr. Boyd's -- the circumstances that Mr. Boyd is describing was informed by family trouble caused by a pending divorce?

A.   Yes.

Q.   And then turning to your report, your report didn't reflect this detail, correct?

A.   I don't think so.

Q.   Your report, in fact, ventured that for the most part Mr. Boyd had a beautiful childhood?

A.   That's not what my report ventured.  It's what he told me.

Q.   Okay.  So that wasn't something that you needed -- that wasn't something that you needed to check because it

Sanford Drob - CX by Mr. Blenk                    1056

wasn't relevant to your diagnosis?

A.    It's relevant in the sense that it's part of his personal history, but, as I said earlier, the events of his adult life were so profound and the tracing of his mental disorder to those events was so clear that the events earlier in his life were not in my view causative or particularly relevant to his PTSD and major depression and anxiety in adulthood other than perhaps causing some vulnerability.

Q.    Okay.  So the -- basically your report here was written by the time you got the case?  You knew how big of an issue you were going to be seeing in Mr. Boyd's -- in Mr. Boyd's time in prison and there wouldn't really be that much import to what happened before prison?

A.    No.

Q.    So you just take Mr. Boyd at his word?

A.    No.

Q.    That's not the case?

A.    No, not at all.

Q.    It's just a yes or no question.

A.    No.

Q.    Now, you are aware that that's not the only record that is deflective of or would tend to cast doubt on Mr. Boyd's self-report?

A.    Regarding his beautiful childhood?

Q.    Yes.

Sanford Drob - CX by Mr. Blenk                    1057

A.   Yes.

Q.   And you've looked at others?

A.   There are others, yes.

Q.   And these are not documents or concepts or statements that you had addressed in your initial report?

A.   I don't think so, no.

Q.   These -- we were talking earlier about the onset of -- or what you would think about when you saw somebody's youthful behavior, and you thought it might be more likely connected to trouble in the home?

A.   It could be.

Q.   But here that wasn't important to keep track of?

A.   It's not important in view of the PTSD, depression and anxiety that he experienced incident to the 26 years in prison.

Q.   There couldn't be a -- there couldn't be a big enough trauma in Mr. Boyd's life prior to that --

A.   There could be.

Q.   -- that would even justify talking about it?

A.   There could have been if there were any indications that that trauma was preoccupying him, causing him flashbacks, causing him recurrent memories or he was making efforts to dampen down those recurrent memories, but there wasn't anything in my interview with him or in any of the records in which he talked extensively about various things that were

Sanford Drob - CX by Mr. Blenk                1058

troubling him to his therapists that indicated that anything that occurred during his childhood produced posttraumatic symptoms or were resulting in his depression or anxiety.

Q.   And when you say "dampen down," you mean suppressing thoughts?

A.   Perhaps, yes.

Q.   Suppressing negative thoughts, suppressing experiences?

A.   Perhaps, yes.

Q.   I'm going to show you what's been marked as DX 728 at 43385.

A.   Can it be enlarged, please?

Q.   I'll direct you to the bottom paragraph.

A.   Okay.

Q.   Can you read the date at the top of this record?

A.   5/20/15.

Q.   And you'll agree with me, Dr. Drob, that this record discloses that Mr. Boyd self-identified the beginning of his addiction to the age of 13?

A.   Yes.

Q.   And you'll agree with me that the explanation he provides for that early onset substance abuse is that he had a dysfunctional family life and no real guidance?

A.   This is what's reported here.

Q.   He felt that the use of substances made him feel

Sanford Drob - CX by Mr. Blenk                    1059

more able to fit in?

A.   He indicates that he was spending time with his older sister and friends who were using substances and he used them to fit in.

Q.   And this, too, is not a report that is addressed in your report?

A.   This particular note, no, but I did indicate that he reported to me that he used marijuana and narcotic cough syrup as a teenager.

Q.   And that's what he's -- he's describing marijuana or cough syrup here?

A.   He's describing I believe alcohol here.

Q.   So he left that out when he was self-reporting to you?

A.   He didn't -- he didn't indicate that, no.

Q.   Okay.  And you didn't ask him about it?

A.   I don't recall if I specifically asked him.

Q.   Do you see that he puts -- he describes the onset of his symptoms as coincident with his abusive relationship with his father?

A.   Where -- where are you seeing that?

Q.   The page that's in front of you now.

A.   Point to --

Q.   It's a continuation at the top of the page.

A.   I'm not sure what the previous -- it's -- it starts

Sanford Drob - CX by Mr. Blenk                   1060

in the middle of a sentence.

Q.   This is the same paragraph -- the continuation of the same paragraph we just looked at.  We can show you that.

A.   So it says so assuming that, then his use of drugs took away his problems of poverty and his abusive relationship.

Q.   With his father?

A.   Okay, uhm-uhm.

Q.   And he was being bullied by neighborhood kids?

A.   Yes.

Q.   And feeling less than in school?

A.   Yes.

Q.   Now, an abusive relationship could be the origin of a trauma, right?

A.   Depends on what kind of abuse we're talking about.

Q.   It would be important to ask if somebody had presented like that, right?

A.   I suppose.

Q.   And feeling less than, that has the sounds and lines up with the possibility of a depression diagnosis?

A.   Well, it suggests possibly some vulnerability to low self-esteem.  It doesn't create a depression diagnosis.

Q.   It's consistent with --

A.   It could be.

Q.   -- with a diagnosis of depression?

Sanford Drob - CX by Mr. Blenk                    1061

A.    It could be.

Q.    And, again, like we talked about, you didn't have records from that actual time, right?

A.    Right.

Q.    So the only thing you could rely upon to piece together what Mr. Boyd's childhood was like was to ask him and to review records?

A.    That's correct.

Q.    And records such as this didn't make it into your report at all?

A.    It didn't, no.

Q.    And we went through that it would be important to address and deal with and contextualize information that was contrary even to your ultimate conclusion because it makes your conclusion stronger?

A.    It might have done that.  On the other hand, the nature --

Q.    Yes or no.

MR. DURLAND:  Your Honor, I ask that he be --

THE WITNESS:  I can't answer it with a yes or no.

MR. DURLAND:  -- allowed to answer the question.

THE COURT:  He just said he can't answer it with a yes or no.

MR. BLENK:  Fair enough.

THE WITNESS:  You want -- do you want me to explain?

Sanford Drob - CX by Mr. Blenk    1062

MR. BLENK:  We can move on.

THE COURT:  If you can ask a new question.  Is it along the same lines as this?  Because I need to give an instruction to the jurors.

MR. BLENK:  This would be a fair time for the instruction.

THE COURT:  Members of the jury, you just heard testimony regarding Mr. Boyd when he was young, his substance abuse and maybe some of the reasons why he was using.  That testimony should not be considered by you for the truth of its contents.  You can consider it only for the purpose of assessing the credibility of Dr. Drob's opinions and testimony.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  Okay.  We're going to take our mid-afternoon break.  Dr. Drob, I'm going to direct you not to talk to anyone about the case or your testimony during our recess.

THE WITNESS:  Sure, yes.

THE COURT:  We're going to take a fifteen-minute break.

THE WITNESS:  Okay.

THE COURT:  Okay.  Jurors, you can take your break.  All the admonishments apply.

(Jury not present.)

THE COURT:  Everyone have a seat.

Sanford Drob - CX by Mr. Blenk                    1063

THE WITNESS:  Should I remain here or --

THE COURT:  No.  You can leave.  Thank you, Dr. Drob.

(Dr. Drob not present.)

THE COURT:  Mr. Blenk, how much more time do you think you're going to need?  Just an estimate.

MR. BLENK:  I'd say almost certainly until the end of the day, 45 minutes plus.

THE COURT:  Okay.

MR. BLENK:  Probably a little bit more than that.

THE COURT:  Okay.  We'll take a recess.  We'll come back in ten minutes.

(Recess taken.)

THE COURT:  We're not going to go late.  We're not going to go past five, just so everyone knows.  Okay?  Okay.  We can bring Dr. Drob back in.

(Dr. Drob present.)

THE COURT:  We can bring the jurors in as well.

(Jury present.)

THE COURT:  Have a seat, everyone.  Thank you.

The jurors have returned to the courtroom.  We'll continue with cross-examination of Dr. Drob.

Dr. Drob, I would just remind you that you are still under oath.

THE WITNESS:  Yes.

THE COURT:  Go ahead, Mr. Blenk.

Sanford Drob - CX by Mr. Blenk                 1064

MR. BLENK:  Thank you, Your Honor.

BY MR. BLENK:

Q.   Dr. Drob, what year did Mr. Boyd get out of prison?

A.   Initially I believe it was '96.  He may have been in prison until 2014 on remands.

Q.   And then when did he get -- we talked about four diagnoses.  When did he get the first diagnosis?

A.   Well, as I said, there aren't records really prior to 2012.

Q.   So you don't know?

A.   So, I mean, some time subsequent to 2012 the diagnoses start appearing.

Q.   Well, in at least one instance there's a diagnosis that's reflected in an earlier record for Horizon, right?

A.   You'll have to refresh my recollection.

Q.   Horizon was the company we talked about that had the broadest records --

A.   Right.

Q.   -- of Mr. Boyd's medical history, right?

A.   I know they make reference to earlier records in there, yeah.

Q.   It's a 2004 diagnosis?  You don't remember that one?

A.   Offhand, no.

Q.   So, in other words, there's really no evidence in these records of the onset of any mental disease until 2004 at

Sanford Drob - CX by Mr. Blenk                    1065

the earliest, which is eight years after Mr. Boyd was out of prison?

A.   Eight years after he was released from his first 20 years.

Q.   Fair enough.  I understand that Mr. Boyd was re-incarcerated.  I'm not meaning to minimize that.  I'm not doing a gotcha question along those lines.

He returns to the community in 1996.  He gets his first mental health diagnosis in 2004 from the records you observed?

A.   As I said, I don't recall the 2004.  It may be my recollection can be, you know, refreshed, but I don't recall.

Q.   And do you recall his second diagnosis?

A.   I don't have a recollection of the order in which these diagnoses were made.

Q.   Okay.

A.   It's probably in my report, but I don't have a recollection.

Q.   It wouldn't be important to figure out in what ways these symptoms manifest because that's not necessary for you to make the evaluation you did because it was so obvious to you what caused Mr. Boyd's trouble?

A.   No.

Q.   Yes or no.

A.   The answer is no to that question.

Q.   Okay.  And in your report -- by the time you're

Sanford Drob - CX by Mr. Blenk                    1066

preparing this report Mr. Boyd has I think what would be called polysubstance abuse disorder?

A.   Yes.

Q.   Do you recall that his first substance abuse diagnosis is dated -- at least as reflected in records you reviewed, is dated back in February of 2012?

A.   I believe so, yes.

Q.   The second diagnosis he got?

A.   As I said, I don't recall the order.

Q.   And over time the records reflect worsening substance abuse symptoms for Mr. Boyd?

A.   For a period, yes.

Q.   Until when?

A.   I think probably around 2020 or 2021.

Q.   You -- do you recall the impetus for Mr. Boyd to stop using?

A.   He had been in substance abuse treatment and he also indicated to me that his health was compromised by his substance abuse and he was told by his doctors that it would be further compromised, and that was an impetus for him to stop.

Q.   And in 2014 you remember from the Horizon records Mr. Boyd was diagnosed with alcohol dependence?

A.   Yes.

Q.   And alcohol dependence means not just that you're

Sanford Drob - CX by Mr. Blenk                    1067

having behavioral problems associated with -- not just a simple substance abuse disorder, but that you actually physically are reliant on the substance?

A.   Yes.

Q.   And that's something he was suffering from?

A.   Yes.

Q.   And then subsequent to that -- so that's 2014.  How old was Mr. Boyd in 2014?

A.   I'd have to calculate.

Q.   Do you remember the year of his birth?

A.   Is it '59?  I'm not -- I'm not certain.

Q.   You've got it.

A.   Okay.  So -- 41 -- 55.

Q.   And he then, the records reflect, was diagnosed with cocaine and heroin abuse syndromes?

A.   Yes.

Q.   Resulting ultimately in polysubstance abuse or polysubstance abuse disorder where he's using multiple substances at the same time?

A.   Yes.

Q.   I'm going to show you what's been marked as Exhibit DX 728 at 43851 for the witness only, please.

MR. BLENK:  Can you scroll for the date so that we can get the date for this document?

BY MR. BLENK:

Sanford Drob - CX by Mr. Blenk                    1068

Q.   What's the date on this document, Dr. Drob?

A.   March 4, 2013.

Q.   Can you take another look at that?

A.   3/4/2013 -- no.  Date of last use.  I'm sorry. 9/9/2019.

Q.   Now, you know from the records that's not the -- well, strike that.

So here we have Mr. Boyd in a substance use context, right?

A.   Yes.

Q.   Where he's receiving treatment?

A.   Yes.

Q.   Where he's providing history of his use?

A.   Yes.

Q.   And it's for the purposes of getting care and a diagnosis, right?

A.   Correct.

Q.   And these are the kinds of records that you rely upon in your position, right?

A.   Yes.

Q.   So you could have patients in some context where you might be generating a record like this yourself?

A.   When I worked at Bellevue Hospital I did.

Q.   In a former life?

A.   Yeah.

Sanford Drob - CX by Mr. Blenk                    1069

Q.   Or you would be relying on this in the role that you continued to serve in as a forensic psychologist in a --

A.   Well, I review them.  And I make an assessment as to whether they can be relied upon.

Q.   Right.  And here when you say that you make an assessment of whether they can be relied upon, if you made an observation that there were unreliable records that were sent to you, it would be important to include that in your report, correct?

A.   You know, there are thousands of pages of records here.  My report was already 35 pages.  I wasn't going to go down every rabbit hole on every single record that I might have considered or might have disagreed with or had some doubts about.

Q.   So if you saw a record that you thought was false, it wouldn't be worth including that in your report?  Just see what happens, maybe it won't ever come to anything, right?

A.   You know, I don't include everything in my report that I've reviewed.  It would end up being hundreds of pages.

Q.   There's other things you've reviewed that aren't written out in your report?

A.   Of course.  There are three thousand pages of records.  A lot of that is boilerplate, but a lot of it is significant or has content and it doesn't get into the report.

Q.   And we went through the things that you want to

Sanford Drob - CX by Mr. Blenk                    1070

include in your report.  You're talking about history, employment history, work history, and that's because that goes into -- even in an ordinary context that goes into your -- it makes your assessment more reliable?  Yes?

A.   It's important, yes.

Q.   Yeah.

A.   It makes my assessment more reliable and more complete.

Q.   And that's even when we're not even concerned about causality.  We're just trying to get the assessment right. That's really important to include that information?

A.   Yes.

Q.   And it could be the case that it's even more important to do so when causality is at issue because then specific records reflecting medical history and symptom onset can be magnified in their import?

A.   I'm not sure what you mean by -- they can be important.  I will agree to that.

Q.   And they could be even more important than in the context where you're just trying to get it right?

A.   Okay.

Q.   Do you agree?

A.   Fair enough.

Q.   So here we have a record from 2019 where Mr. Boyd states that his first use of alcohol was when he was 16 and he

Sanford Drob - CX by Mr. Blenk          1071

would drink every day one pint.

A.    That's what it says.

Q.    And his heaviest use of alcohol was just before prison, which was a pint a day, and when he came home from prison it returned to the same pattern?

A.    That's what it says.

Q.    This is not a report that was included in your analysis?

A.    That's correct.

Q.    This is not something that you commented on?

A.    I didn't comment on it, no.

Q.    You passed along Mr. Boyd's self-description that he hadn't used anything other than marijuana and cough syrup prior to his incarceration?

A.    That's correct.

Q.    And then you went on in your report to attribute -- to attribute the cause of Mr. Boyd's substance use?

A.    I think I've said it was a major -- that there was -- his imprisonment was a major factor in his substance abuse post-release.

Q.    You knew that substance abuse was an important issue?

A.    Yes.

Q.    In fact, it was a defining aspect for Mr. Boyd after he left prison?

Sanford Drob - CX by Mr. Blenk                    1072

A.    I'm sorry?  What kind of aspect?

Q.    It was a -- Mr. Boyd suffered from substance abuse disorder through most of his time after leaving prison?

A.    That's correct.

Q.    And so you knew it would be important for the issues that we would be discussing in this case?  Yes?

A.    Yes.  And I commented upon that.

Q.    And you commented on it, but you didn't comment on the evidence that we've just seen that reflects that Mr. Boyd had -- was drinking a pint of liquor per day before --

A.    Okay.  Yes.

Q.    -- his incarceration?

A.    You're showing me one --

Q.    Yes or no.  That wasn't in your report?

A.    That wasn't in my report.

Q.    Right.  And he specifically says that it's the same pattern that reappears once he leaves prison, right?

A.    In this note.  He said many, many things in other notes, and extremely variable accounts of his past.

Q.    Pretty important though, right --

A.    Well, I don't --

Q.    -- how did it start?

A.    It's hard to make sense of all the different assertions that he made.  I assumed that he had a substance abuse problem prior to his incarceration and that that was a

Sanford Drob - CX by Mr. Blenk                1073

vulnerability and that the incarceration more or less guaranteed he would continue and be worse when he got out afterwards.

Q.   You assumed?

A.   There were multiple records in which he either denied or had very light substance abuse prior to prison.  It was -- there was a huge number of inconsistencies.

Q.   You assumed he had a substance abuse problem before prison?

A.   Yes, because he told me.

Q.   He did?

A.   He told me he was smoking marijuana and using cough syrup.

Q.   Okay.  And that's how you diagnosed a pre-existing substance use problem?

A.   Well, I think that that's --

Q.   Well, you include -- if you have a diagnosis for somebody, you would include it in your report, right?

THE COURT:  Hold on one second.  Once you ask a question you just need to let the witness answer the question, and then you can ask another question.

MR. BLENK:  Absolutely, Your Honor.

THE COURT:  Okay.  So the question was:  "And that's how you diagnosed a pre-existing substance abuse problem?"

THE WITNESS:  Well, I'm saying here in court today that

Sanford Drob - CX by Mr. Blenk                    1074

he had a pre-existing substance abuse problem based upon his report, what he said in his deposition, and to the extent that the records can be relied upon, what's in the records, although there's an enormous inconsistency from one record to the next.

BY MR. BLENK:

Q.   And the way -- you're here sitting here today and you're conveying the four diagnoses that you recognized in Mr. Boyd.  And the basis for that that we went over is the process that you went through, which is the same process that you described going through for your -- for the criminal defendants when you were working with them in that context.  Where you are generating a report and you are going to defend that report, yet this report doesn't include that diagnosis?  You'll agree with me?

A.   I'm sorry.  What diagnosis doesn't --

Q.   That Mr. Boyd was suffering from a pre-existing substance abuse disorder prior to the time of his incarceration.

A.   I don't -- I don't think my report indicates that.

Q.   And that would have been an important thing to include?

A.   In retrospect it would have been important to include.

Q.   Yeah.

Sanford Drob - CX by Mr. Blenk                1075

A.    But the fact of the matter is that his substance abuse disorder continued throughout his adult life. And individuals who are adolescents who suffer from substance abuse or who use alcohol even heavily are not destined to become substance abusers later in life. And, in fact, usually by the time they are in their thirties they curtail it.

Q.    Okay.

A.    And my conclusion, as I wrote in my report, was that the trauma and other events that he experienced in prison were a major factor in his developing or continuing to have a substance abuse problem --

Q.    Right.

A.    -- subsequently.

Q.    And we know we can trust your process because you're thorough and you are objective and you include your observations in your report, and that's why we can trust your diagnosis of anxiety, that's why we can trust your diagnosis and description of the symptoms of depression, and the same for PTSD. It's just that as it pertains to the fourth diagnosis, that's just something that didn't make it into your report?

A.    Well, I diagnosed him as having a substance abuse disorder as an adult.

Q.    Right. But what did we go over, Dr. Drob? Even relative to -- even relative to your ordinary task of putting

Sanford Drob - CX by Mr. Blenk                    1076

together a report on a psychiatric -- in your role as a forensic psychologist it's particularly important for history in this context because symptom onset is relevant to causality, and we just spoke about that?

A.   Okay.

Q.   You agree with me?

A.   Yes.

MR. BLENK:   Your Honor, may we approach?

THE COURT:   Sure.

(At bench:)

MR. BLENK:   Your Honor, at this time I would move to strike Dr. Drob's testimony.  He's now conveyed a diagnosis that was intertwined with his prior analysis and he has acknowledged that he totally missed it in the underlying records, and now we know that his process wasn't sufficient to qualify as an expert.

MR. DURLAND:   I think that's a ridiculous motion.  And the purpose of cross-examination is to -- Mr. Blenk has made a number of representations to Dr. Drob, and I intend to correct them on redirect examination.  Many of them are incorrect.  But there's zero basis to strike his testimony.  That's ludicrous.  He can cross-examine.  He's been cross-examining.  That motion should be denied.

THE COURT:   The request is denied.  The points that you're making maybe goes to the weight of his testimony, but

Sanford Drob - CX by Mr. Blenk                    1077

it's not -- it doesn't make it inadmissible.  So it's denied.

MR. BLENK:  Thank you, Your Honor.

(Open court:)

BY MR. BLENK:

Q.   Now, we talked about the importance of temporality.

A.   Okay.

Q.   The closer in time that something follows another -- follows a prior event the more likely there is to be a causality relationship between the two events, right?

A.   Generally speaking, yes.

Q.   And we saw that of the diagnoses you conveyed today. Mr. Boyd -- these do not appear in Mr. Boyd's records until he was in his fifties, right?

A.   Well, as I said, we don't have records prior to 2012.  So he was already in his fifties then.  We have very few records, if any.

Q.   But you know that Horizon was treating Mr. Boyd going back before then?

A.   Yes.

Q.   And we have a diagnosis from 2004 that doesn't line up with the diagnoses that you're conveying today?

A.   The diagnosis of alcohol -- which diagnosis are you talking about?

Q.   It's your report.

A.   Well, you'll have to show me my report to remember.

Sanford Drob - CX by Mr. Blenk                    1078

I don't remember all of the dates and all of the places and the records by heart, you know.  I do a lot of cases and I don't have it all memorized.  So if you'd like to show me my report, I'll look at it.

MR. BLENK:  We are pulling up DX 735(a) for the witness and the jury.  This is in evidence.  Actually can you hold off for one second?

BY MR. BLENK:

Q.   So you provided testimony about the experiences that somebody has in prison and what kind of diagnoses can result from that or what kind of mental and emotional injuries can result from that?

A.   Yes.

Q.   And you went through many aspects of being in prison that are relevant to -- that would be probably a shared experience amongst most prisoners regardless of whether they say that they have a subjective understanding of innocence, right?

A.   Many of them, yes.

Q.   And then you also discussed some additional ones that you think are particular to the experience that one who had experienced -- who had the experience of subjective understanding of innocence in prison and how that would affect them?

A.   The belief -- they believe themselves to be innocent

Sanford Drob - CX by Mr. Blenk                    1079

and how that would affect them, yes.

Q.   And in the -- now, there's no record that says that -- there's no psychiatric record from Office of Mental Health that says that Mr. -- strike that.

I'm going to show you what's been marked as an exhibit and admitted into evidence as DX 735(a).

A.   I'm looking at the cover sheet.

MR. BLENK:   We'll go down to the second page.

BY MR. BLENK:

Q.   So this is a document that -- for clarification for the jury, can you -- this is a -- this is a document that concerns Mr. Boyd's mental health treatment while he was still in his initial prison stint with the record generated on February 5, 1996, correct?

A.   That's correct.

Q.   And you see in the paragraph at the bottom -- at the bottom of the page we're looking at now it says, "Inmate denies any current mental health issues"?

A.   Yes.

Q.   And that's in 1996?

A.   Yes.

Q.   And what is -- and this is -- we talked about this earlier, but what's about to happen in Mr. Boyd's life?

A.   Well, I think he's about to be paroled.

Q.   And it says that the inmate is not currently on

Sanford Drob - CX by Mr. Blenk                1080

medication?

A.    Correct.

Q.    And on the following page the record reflects that follow-up services are not indicated, correct?

A.    Yes, uhm-uhm.

Q.    And that inmate, referring to Mr. Boyd, right --

A.    Okay.

Q.    -- is not exhibiting any psychiatric symptoms at this time?

A.    Correct.

Q.    Do you see that?

A.    I see it, yep.

Q.    And this is an important -- this is an important time for your analysis, isn't it?

A.    Well, it has -- it has multiple significances.  He's about to be paroled and he's probably looking not to rock the boat in any way that would get him not to get his parole.

Q.    You are questioning Mr. Boyd's --

A.    Yeah.

Q.    You're questioning Mr. Boyd's reliability as a self-reporter?  Is that --

A.    My experience is that when people come before the parole board they don't in a screening complain about psychiatric problems.

Q.    This is not -- this is not the parole board though.

Sanford Drob - CX by Mr. Blenk                    1081

A.    But the screening prior to it.

Q.    He already has his parole --

A.    Uhm-uhm.

Q.    -- right?

A.    Yes.

Q.    He's on his way out?

A.    Yeah.

Q.    Are you suggesting that somebody like Mr. Boyd would be susceptible to being an unreliable narrator of his own mental health history just because he had an interest in the matter?

A.    He might be concerned that if he discusses mental health issues it will create a problem for him.  It's also possible that he was feeling very good at this point.  He was about to be paroled.

Q.    And you would agree with me --

A.    The fact that -- this document doesn't take away from everything else that we've learned about him.

Q.    But this is the -- you're telling the jury about what you see as consequences of Mr. Boyd's imprisonment, and at the conclusion of his prison sentence on his way out to parole this is a document reflecting the -- this is a document that you didn't note in your report?

A.    I didn't, no.

Q.    And you knew that this time period would be

Sanford Drob - CX by Mr. Blenk                    1082

important at the time that you generated your report because you are trying to tell the jury about the consequences of Mr. Boyd's imprisonment?

A.   This particular moment --

Q.   Yes or no.

A.   Can't answer it with a yes or no.

Q.   And you mentioned that Mr. Boyd might be exaggerating or might be minimizing, but you also gave testimony in your direct examination about medications, right? That was a bad question.  That was a bad question.

You see in this record that Mr. Boyd is not using medications?

A.   At this time, yes.

Q.   And that's something that would be likely known to the provider without even just a self-report from Mr. Boyd?

A.   Yes.

Q.   And so that is objective evidence -- setting aside what narrative Mr. Boyd might have supplied or not, that would have been objective evidence that was known to the writer of this report?

A.   Let me see.  Presumably.

Q.   So part of your report that we already talked about attempts to attribute consequences to Mr. Boyd's incarceration, but you also describe Mr. Boyd's experience on parole.

Sanford Drob - CX by Mr. Blenk                    1083

A.   Yes.

Q.   You explain this as it relates to the -- what you see as the symptoms he's experiencing and you also just explain this as a matter of his history?

A.   Yes.

Q.   And when you went through that process, that's another aspect of Mr. Boyd's life that would be informing your diagnosis, whether or not you were particularly concerned about the cause or the origin or the etiology of any symptom or syndrome that Mr. Boyd was experiencing?

A.   His experiences on parole are relevant to his mental health, yes.

Q.   And you told us before that parole -- that even in your work as a forensic psychologist you rely on parole officers and the reports of parole officers for -- to assist you in assessing -- assessing an individual?

A.   It's one of the things I review.

MR. DURLAND:  Your Honor, if we're moving on, could we have the exhibit down?  I don't want Dr. Drob to be confused.

MR. BLENK:  Absolutely.

THE COURT:  Sure, that's fine.

BY MR. BLENK:

Q.   Now, there was -- you mentioned Mr. Boyd's work history, right?

A.   Yes.

Sanford Drob - CX by Mr. Blenk                    1084

Q.   And that's a section within your report?

A.   Yes.

Q.   And in your report -- in your chronology of his work history you don't make reference to anything after 1998 except for a passing reference to two or three months of employment, right?

A.   I would have to review my report, but if that's what's in my report, fair enough.

Q.   Fair to say Mr. Boyd failed to establish a strong work history after his departure from prison?

A.   I think that's fair enough, but he also obtained disability for his mental health issues.

Q.   And when was that?

A.   I don't recall.

Q.   And when you say "disability," there seemed to be a conflict between what I saw in Mr. Boyd's -- well, strike that.

You included -- you took notes during the course of your meeting with Mr. Boyd?

A.   Correct.

Q.   And were you -- do you take notes in the first person?

A.   At times.

Q.   Did you do that in this case?

A.   I don't recall, but I may have.

Sanford Drob - CX by Mr. Blenk                1085

Q.   It's only -- Mr. Boyd did not -- did Mr. Boyd fill out a report that conveys his social and work history and employment history?

A.   No.

Q.   That was just those forms that --

A.   Notes I took based upon what he told me.

Q.   Okay.  And you understood that Mr. Boyd was ultimately designated disabled, and you understand that he was put on -- he was receiving SSI?

A.   That's my understanding, yes.

Q.   And what -- do you know the difference between -- your report -- strike that.

Your report reflects that he was perhaps on Social Security Disability insurance?

A.   I believe so.

Q.   Was that -- do you understand that to be the same thing?

A.   My understanding is that he was receiving some form of disability payments for his mental health issues.

Q.   Well, you know the difference between SSI and SSDI?

A.   You'll have to explain it to me.

Q.   Did you see in the records that Mr. Boyd expressed an interest in getting on SSI as early as 2013?

A.   I don't recall, but that may be true.

Q.   How old was Mr. Boyd in 2013?

Sanford Drob - CX by Mr. Blenk                 1086

A.   He would have been in his fifties, 54 I believe.

Q.   And at that time do you recall in the records that Mr. Boyd was drinking every day?

A.   I believe he was drinking at that time, yes.

Q.   And you note in your records certain efforts by Mr. Boyd to mitigate the effects of his mental distress?

A.   Yes.

Q.   And these -- well, strike that.

At the same time did you notice in Mr. Boyd's medical records him reporting that idleness was a trigger for him?

A.   That idleness was a trigger for him?  I believe I saw that, yes.

Q.   And that would reflect a failure to mitigate by Mr. Boyd?

A.   I mean, I can't say that.  He described being so depressed at times he couldn't even get out of bed to make a sandwich for himself.  So he may have been idle for depression rather than a willful failure.

Q.   And do you recall him describing boredom as a trigger for him?

A.   No.

Q.   I'm going to show you what's been marked as DX 728 at 43487.

THE COURT:  For the witness only?

MR. BLENK:  For the witness only, yes.

Sanford Drob - CX by Mr. Blenk                    1087

THE WITNESS:  Okay.  This refreshes my recollection now.  Yeah.  He described that he tried to stay busy because boredom was a trigger for him.

BY MR. BLENK:

Q.    And at this point he was using -- he wasn't just using alcohol at this point, right?

A.    It appears he was using opiates and benzos.

Q.    And this is after his overdose?

A.    Yes.

MR. BLENK:  Your Honor, this would be a natural breaking point, though I would -- if Your Honor would prefer, I'd be happy to power through.

THE COURT:  How much time do you think you have left?

MR. BLENK:  I think it's probably an hour.

THE COURT:  Okay.  Then we'll take a break.

Okay.  Members of the jury, we're going to recess for the night.  Tomorrow is Veterans Day.  And so we won't be in session.  If the jurors could please come back here Wednesday morning at 9:15.

All of the recess admonishments apply.  Please do not talk about the case with anyone.  Keep an open mind.  Don't do any research about the case or any legal terms.  And have a good day tomorrow.  Thank you.

(Jury not present.)

THE COURT:  Have a seat, everyone.

Boyd v. County of Erie - 22-CV-519                1088

Dr. Drob, if you could return here Wednesday at 9:15 we'll resume your testimony.

THE WITNESS:  All right.

THE COURT:  During the break please make sure you don't talk to anyone about the case or your testimony.

THE WITNESS:  Okay.

THE COURT:  Thank you very much.

(Dr. Drob not present.)

THE COURT:  Wednesday morning we'll finish Dr. Drob. And then you have Professor Zeidman, correct?

MR. FIRSENBAUM:  I think we're going -- it will be Mr. McLeod first.

THE COURT:  Okay.

MR. FIRSENBAUM:  I think we need to confirm with his schedule.  He's under subpoena.  We had expected that he would start on Wednesday.  I want to make sure that it's still okay that we finish Dr. Drob first, but let's assume Dr. Drob will finish and then we'll call Mr. McLeod.

THE COURT:  Okay.

MR. FIRSENBAUM:  And then I think we'll play the Henry designations and we'll end with Professor Zeidman.

THE COURT:  Okay.  How long do you think Mr. McLeod will be, just an estimate?

MR. FIRSENBAUM:  An hour and a half.

THE COURT:  Okay.  And then the Henry designations are

Boyd v. County of Erie - 22-CV-519                                    1089

about two hours?

MR. FIRSENBAUM:  Probably.  Maybe an hour.

THE COURT:  An hour.  Okay.

MR. FIRSENBAUM:  And then two hours for the designations.

THE COURT:  Okay.  And then Zeidman, probably it would go into the next day then at least?

MR. FIRSENBAUM:  Professor Zeidman's will be a lengthy exam.

THE COURT:  Okay.  Okay.  So just looking ahead then, I think the County should be ready potentially for witnesses maybe Thursday after lunch.  Okay?

Is there anything else?  I mean, there's a number of things that we need to address on Wednesday morning, but is there anything specific that you'd like me to kind of work on over the next day to come back on Wednesday and address?

MR. FIRSENBAUM:  Your Honor, there are -- I think I have seven things jotted down more for discussion today or potentially I guess work tomorrow.  But could we go through some of them now?

THE COURT:  Yeah.  I just have to leave in a little bit to pick up my daughter from school, but we can -- so we can spend five minutes on it.

MR. FIRSENBAUM:  Okay.  That sounds great.

So two of the things very quickly are rulings from Your

Boyd v. County of Erie - 22-CV-519                          1090

Honor on Mr. McLeod, sort of the discussion about the photographs and sort of that issue, along with our request about the County not being allowed to comment on the fact that Mr. Walker didn't testify about that issue.  So that's one issue.

And then the second is the issue I raised about Mr. McLeod on Friday about whether he can testify as to why, you know -- why it is that he believes that he didn't -- that he didn't receive the Brady evidence was because of what he would have done with it.  So those are sort of the two issues where rulings would be helpful.

Third issue:  For Professor Zeidman we just wanted to give the Court and the County notice that we intend to show one of the designations from Mr. Guadagno's deposition, DX 707, 285, line 18 to 288, line 7, which are the County's designations from Mr. Guadagno's deposition that we have not objected to.  We just -- we intend to show that.  And so we would move just that clip into evidence either now or we can do that on Thursday.

THE COURT:  Do you have any objection to that?

MR. BLENK:  I would have -- of course, I would have to look at it, Your Honor.  We have all been over -- they have done the same thing.  We have done the same thing.  We are all preserving our rights and we are over-designating basically all the witnesses and it's being whittled down.  So

Boyd v. County of Erie - 22-CV-519                    1091

I would just ask Your Honor's permission to have until

tomorrow morning to get back to the parties about that.

THE COURT:  That's fine.

MR. BLENK:  Thank you.

MR. FIRSENBAUM:  And then two more things because I'm

cognisant of Your Honor's time.

One is just I think when we broke on Friday Your Honor

asked the County to let us know how -- what witnesses it

intended to start its case with.  We have not received any

word from the County.  If we could get a sense of who they

plan to call on Thursday, that would be appreciated.

THE COURT:  Could you do that maybe tomorrow?  E-mail

us either tonight or tomorrow.  E-mail us just your kind of

tentative schedule for witnesses or other evidence.

MR. BLENK:  Of course, Your Honor.

THE COURT:  Okay.  Thank you.

MR. FIRSENBAUM:  And the last thing is during Professor

Zeidman's exam we intend to play PX 218, which is the --

what's been called the weak case statement in the briefing.

We realized that when that was played earlier in the

trial it was not accepted into evidence on the record.  I

think we had just failed to do that having -- but because

there was an order saying that it was admitted.  So we wanted

to do that again either now or we can do it when we come back

on Wednesday or Thursday, but we just wanted to flag both

Boyd v. County of Erie - 22-CV-519                    1092

that we want to move that into the record and we also

realized that I think the wrong version of that was played.

It omitted the DNA statement.  There was no objection from

the County.

So we can either play the version with the DNA

statement and Your Honor can instruct or we can play the same

version that was inadvertently played earlier that just

omitted the DNA statement.  I don't think there's any

prejudice.  I mean, if anything, it was a statement that we

originally wanted in.

THE COURT:  Yeah.

MR. FIRSENBAUM:  So however Your Honor and the County

would like to proceed.

THE COURT:  Okay.  Did you want to be heard, Mr. Blenk,

on the weak case statement?

MR. BLENK:  Yeah.  Obviously without waiving our prior

position on it, Your Honor, I think we'd rather just it go in

without any special comment.

THE COURT:  But you're asking -- I don't want to

reiterate what we already argued about, but you wanted the

DNA statement in, right?

MR. BLENK:  That's correct, yes.

THE COURT:  Okay.  So I already ruled upon this.  So PX

218 is received based on my prior ruling.  And you should

include the DNA statement and I will give an instruction

Boyd v. County of Erie - 22-CV-519                    1093

about that.

*(Plaintiff's Exhibit 218 received in evidence.)*

MR. FIRSENBAUM:  Will do, Your Honor.  Thank you.  I think the rest can wait until Wednesday so Your Honor can go.

MR. BLENK:  Your Honor, we had one thing just quickly.

THE COURT:  Sure.

MR. BLENK:  One of our points in our motion from the 31st addresses the possibility that we would be able to address Mr. Boyd's settlement with the City through Dr. Drob as a counterweight to the idea of the acuteness of his experience in connection with getting his cancer diagnosis between the time that he's vacated and the time of his -- between the time of his diagnosis and the time of his death he entered into that settlement, and we think that positive -- just the way that the Plaintiff is walking Dr. Drob and Mr. Boyd through the experiences in life that aren't caused by the County, this would be a positive experience that I think is a counterweight to that.

THE COURT:  Okay.  I'm going to deny that request.  I don't find that the probative value of that outweighs the potential prejudice.

Okay.  Anything else?

MR. BLENK:  No, Your Honor.

THE COURT:  No.  Okay.  I will make sure to address all of those then on Wednesday morning.  We'll meet at 8:45.

Boyd v. County of Erie - 22-CV-519                    1094

Okay.  Thank you very much.

MR. DURLAND:  Thank you, Your Honor.

THE COURT:  Have a good day tomorrow.

*               *               *

CERTIFICATE OF REPORTER

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court of the Western District of New York before the Honorable Meredith A. Vacca on November 10, 2025.

S/ Joony L. Odenbach

Joony L. Odenbach, RPR, CRR

Official Court Reporter