UNITED STATES        DISTRICT COURT

 WESTERN DISTRICT OF NEW YORK

_____
                                            Index No.
KATHLEEN WEPPNER, AS EXECUTOR OF THE        22-CV-0519-MAV

ESTATE OF DARRYL BOYD,

                              Plaintiff,    Vol. 7

                -vs-

                                            Rochester, New York
THE COUNTY OF ERIE,                         November 12, 2025
                                            8:47 a.m.
                              Defendant.
_____
**JURY TRIAL**


                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE MEREDITH A. VACCA
                  UNITED STATES DISTRICT JUDGE

1096

Appearances

For Plaintiffs          WILMER CUTLER PICKERING HALE AND DORR,
                        LLP
                        By:  ROSS FIRSENBAUM, ESQ.
                             GIDEON HANFT, ESQ.
                             ERIN HUGHES, ESQ.
                             MELISSA ZUBIZARRETA, ESQ.
                             TRENA RILEY, ESQ.
                             PHOEBE SILOS, ESQ.
                        7 World Trade Center
                        250 Greenwich Street
                        New York, NY 10007

                        LAW OFFICES OF JOEL B. RUDIN, PC
                        By:  JOEL B. RUDIN, ESQ.
                             DAVID E. RUDIN, ESQ.
                        152 West 57th Street
                        New York, New York 10019

                        HOOVER & DURLAND, LLP
                        By:  SPENCER DURLAND, ESQ.
                        561 Franklin Street
                        Buffalo, NY 14202

For Defendant:          LIPPES MATHIAS
                        By:  JAMES BLENK, ESQ.
                             KIRSTIE MEANS, ESQ.
                             THOMAS SOUTHARD, ESQ.
                        50 Fountain Plaza - Suite 1700
                        Buffalo, New York 14202

COURT REPORTER:         JOONY L. ODENBACH, RPR, CRR
                        joonyodenbach@gmail.com

1097

INDEX

Sanford Drob

Cont. Cross-Examination by Mr. Blenk                1133

Redirect Examination by Mr. Durland                1178

Recross-Examination by Mr. Blenk                   1193

EXHIBIT                                        ID    EVD

PX 237 - 8/31/23 Interrogatories 5 and 7;

      RFPs 13 and 14                            --    1099

Boyd v. County of Erie  22-CV-519                    1098

P R O C E E D I N G S

*      *      *

(Open court.)

THE COURT:  Good morning, everyone.  We can get started.  The parties are present.  I just wanted to address some things before the jurors come in.  Let's address the interrogatories first.

So, Mr. Hanft, you're offering PX 237, the interrogatories five and seven, and then the RFPs 13 and 14, correct?

MR. HANFT:  That's correct, Your Honor.

THE COURT:  And I reviewed, Ms. Means, your response to that.

Over defendant's objection, I am going to receive PX 237, just those four sections that are being offered by Plaintiff.  I do find that they're relevant to Monell.  I do not find that they are unduly prejudicial.

It was true that the County could not locate the records.  I don't find that to be misleading.  The County can certainly argue that they were not able to find these records, you know, fifty years later.  And so -- and they can distinguish the fact that they maybe never existed to the fact that they couldn't find them.  So that is something the defendant will be able to address with the jurors in

Boyd v. County of Erie  22-CV-519                    1099

summation.

So that portion is received.

(Plaintiff's 237, above-mentioned portions only, with received in evidence.)

MR. HANFT:  One minor administrative note, Your Honor. The copy of PX 286, the demonstrative that was received into evidence, it has those -- the correct substantive portions in the corner of the slides.  It says PX 224, the same mistake we made earlier.  We haven't read -- we haven't shown those slides to the jury yet because we hadn't admitted that evidence.  Can we submit a correct PX 286 that has the correct exhibit citation?

THE COURT:  That's fine.

MR. HANFT:  Thank you, Your Honor.

THE COURT:  Okay.  Let's talk about Dr. Drob's cross-examination.

Plaintiff submitted something regarding defendant's continued cross-examination of Dr. Drob, and in that they asked me to address just the scope of that.  So I just want to do that now.  And I also addressed it on Monday.

Mr. Blenk, you should not ask any questions to Dr. Drob about any of the precluded conduct.  So asking questions kind of leading up to precluded conduct, also, you should not do that.  If you think that some sort of precluded conduct should be admissible because a door has been opened, then

Boyd v. County of Erie   22-CV-519                     1100

that's different.  You shouldn't ask those questions.  You should ask me to address the issue outside of the jurors's presence.  But the ruling that I made previously precluding certain prior bad acts, that ruling remains.

Is that clear, Mr. Blenk?

MR. BLENK:  That's very clear, Your Honor.

I just wanted to note that Dr. Drob's testimony thus far has conceded that being a witness to a violent act could be a -- fits within the criteria of a traumatic event that could sustain and anchor a posttraumatic stress disorder diagnosis.  And, you know, I just want to make it clear that the County's position throughout this trial has been that that would be -- that would bring within the prior bad acts, including the shooting that Mr. Boyd took part in, into the scope of relevant rebuttal and relevant analysis of Dr. Drob's diagnoses or conveyance of other parties's diagnoses.

I understand that you are also -- I completely understand Your Honor's ruling, that you don't agree with that position and that that alone -- that anchor alone and that foundation alone is insufficient, and I understand that now.

THE COURT:  Okay.

MR. DURLAND:  Your Honor, could I make just one point about the scope of cross-examination?

THE COURT:  Sure.

MR. DURLAND:  With respect to Dr. Drob, I think that a lot of what we're hearing Mr. Blenk do is try to open the door himself.  I mean, whether or not a door has been opened depends on what our direct examination was.  He's not entitled to try to dance around the issue and get Dr. Drob to say things and elicit testimony that he then wants to rebut with otherwise precluded bad acts.

So our position is -- and I think that this was reflected in the Court's discussion before we started the direct -- that it depends on what the direct is.  And we've had direct and we purposely steered well clear of parole violations, bad acts on parole, all of it.  Didn't even touch it.  We put in our submission the four times the word "parole" was even mentioned.

So I don't think that -- I suspect that -- you know, Mr. Blenk's cross-examination keeps getting longer.  It was 45 minutes towards the end of the day.  He cross-examined more, and then it was an hour at the end of the day.  I suspect what we're winding up to is an hour tour through the parole records, and it's going to be a lot of cross-examination designed to show that Mr. Boyd did bad things and is a bad person.  And the submission, the e-mail that Mr. Blenk sent this morning only, serves to confirm this fear, that Mr. Blenk thinks that Mr. Boyd's conduct during

Boyd v. County of Erie  22-CV-519                   1102

parole is relevant to whether his re-incarcerations were

arbitrary and undeserved.  The document they are trying to

put into evidence is filled with bad acts.

        Mr. Blenk just said, oh, I completely understand, Your

Honor, we can't do that, but that's what he's trying to do.

He's trying to put a document into evidence that a report of

somebody saying Mr. Boyd punched him and took his phone, a

report of Mr. Boyd purportedly lying to a parole officer and

making up a story.  I mean, they're still trying to do all of

the things that the Court is saying they can't do, and it's

our position that Your Honor should just say to the County,

say to Mr. Blenk, you cannot cross-examine about any conduct

on parole other than substance abuse.  That's the only thing

that the Court has permitted.

        THE COURT:  Well, I'm not going to say that.  And I'll

explain.

        Mr. Blenk, first of all, it goes without saying you

can't ask questions to open the door yourself.  And hopefully

you understand that.  If Dr. Drob says something based on a

permissible question that you think opens the door, then

that's something different and you can certainly ask to

address that outside the jury's presence.

        Regarding the -- I guess the ten pages of the parole

records that I received based on the ancient document

exception, do you agree that I guess the proposed redactions

Boyd v. County of Erie   22-CV-519                    1103

by Plaintiff, all of those refer to I guess prior bad acts that do not have anything to do with the four parole violations that Plaintiff have made relevant here?

MR. BLENK:  I agree that the events were -- that are reflected in those are not specifically the events that gave rise to a formal parole violation resulting in re-incarceration.  I don't think that that captures the universe of relevant events though.

The Plaintiff has pretty clearly advanced a narrative that Mr. Boyd was subjected to arbitrary re-incarcerations. I think that the volume -- the entire scope of his actions on parole are, therefore, at issue.

THE COURT:  Well, no.  No, they're not.  The only relevance of the other parole violations then would be propensity evidence, and that is not permitted.

Now, you can certainly try to counteract the arguments I guess -- the evidence that the Plaintiff has set forth regarding those four relevant parole violations.  Plaintiff has already presented evidence from Mr. Boyd's deposition that, you know, his version of the parole violations, that maybe they lacked merit.  And so that is -- they put that at issue.  And so you can certainly present evidence to counteract that, but not through these records.  And certainly these are unrelated to those four parole violations.

Boyd v. County of Erie   22-CV-519                    1104

And so, as I said, the only relevancy would be as propensity evidence, which is not permitted.  So all of the proposed redactions from Plaintiff, those are prior bad acts that I've already precluded.  It's hearsay.

And so I am going to accept all of the proposed redactions by Plaintiff for that exhibit, which is 7 -- DX 729.

MR. BLENK:  And as our position is not -- was conveyed through e-mail, I just wanted to clarify it for the record. We don't think that the matters that are redacted are within -- are testimonial in nature, and they fit more commonly within the record itself and the types of matters that would be described in a record and not accounts that are given by a person about a relevant event.  They're non-testimonial and they don't constitute hearsay within hearsay.

And separately, just to clarify --

THE COURT:  Well, let me just respond to that.

I disagree with that.  All of these kinds of redactions pertain to the parole officer writing down hearsay information that they later on got from the police or the DA's office.  And so that in and of itself, that's not non-testimonial.  I mean, if this was the actual like statement made of a 911 call or something like that, then I could -- I might accept your argument, but I don't

Boyd v. County of Erie   22-CV-519                1105

characterize these as -- I mean, this is hearsay.

What was your other argument?

MR. BLENK:  We think that Dr. Drob plainly reached a conclusion that part of Mr. Boyd's mental anguish is driven by his -- is driven by the fact asserted or the observation asserted by Dr. Drob that Mr. Boyd was returned to prison for nearly eight more years for conduct that would have otherwise been unlikely to result in incarceration.  This is his analysis.  When he looks at the problem that's presented to him by the Plaintiff, this is an observation that he reaches.

I think that that puts into -- that broadens the scope of relevant evidence not just to violations themselves but to the consciousness of guilt or consciousness of arbitrariness that Mr. Boyd would have been experiencing in the circumstances that he was in.  This would go beyond the violations themselves and into a broader range of what one would -- one would feel from a position of the arbitrariness of what's been imposed on him as opposed to the potential blameworthiness that one might feel in a given event given the volume of the conduct at issue.

We intend -- we are in the process of issuing subpoenas for the relevant underlying records in conformity with our exhibit list disclosure and our disclosure of witnesses, and we intend to get these documents in for their full force. But I also intend to go through the parole records with

Boyd v. County of Erie  22-CV-519                1106

Dr. Drob and to analyze the individual instances that are related to the violation as well as instances relating to continuing substance abuse while he is on parole.

MR. DURLAND:  Your Honor, can I respond to that?

THE COURT:  Go ahead.

MR. DURLAND:  This portion that Mr. Blenk just described, that doesn't even -- that he thinks -- this is from Dr. Drob's report, of course, not from his actual testimony to the jurors.  This portion of his report doesn't even inject the underlying merits or demerits of the violations.  All Dr. Drob is saying is that if he weren't on parole, drinking alcohol doesn't get two years in state prison.  That's the point that Dr. Drob is making.

He's not saying anything about -- he didn't testify and he doesn't say in his report anything about additional anguish because the parole violation is justified or unjustified.  Mr. Blenk is trying to use Dr. Drob as a conduit for hearsay.  He just said I'm going to try to very, very, very belatedly issue subpoenas to get these records in, but I'm also going to do the same thing with Dr. Drob on the stand.  I'm going to take him through these records and the underlying violations.

The only purpose for this is to vicariously impeach Darryl Boyd's testimony about the underlying violations, and there's just no way that these jurors are going to be able to

Boyd v. County of Erie  22-CV-519                 1107

apply Your Honor's instruction that says you are not to consider these records for their truth.

Dr. Drob is on the stand, and he's allowed to -- the County can require him to disclose the hearsay basis for his opinions, the opinions he testified to, but this is nothing that he testified to.  And Mr. Blenk just wants to use him as a vehicle, take the opportunity, the fact that he's on the stand, he reviewed the parole records, so I'm just going to talk out loud about the parole records and I'm going to try to get these facts in front of the jury when, you know, I haven't done what I needed to do to try to clear the hearsay hurdles and put the actual records into evidence.

I mean, this is exactly what we feared was going to happen, and we think there's absolutely no basis for it. They can't do this through Dr. Drob for sure.

THE COURT:  Mr. Blenk, you can't use Dr. Drob, as Mr. Durland said, as a conduit to try to counteract or argue the merits of the parole violations.  I mean, that's not permissible.

The parole records, there are a few in.  All these other records that you want to cross-examine Dr. Drob on, those are hearsay.  They're not admitted into evidence for the truth of its contents.

And, second of all, Dr. Drob didn't testify about the merits of the parole violations.  I mean, that's not his

Boyd v. County of Erie   22-CV-519                   1108

purpose for his testimony.

The only permissible I guess scope of cross-examination of Dr. Drob that could relate to parole violations would be -- and this is just a hypothetical.  If there was evidence that in one of the parole violations Mr. Boyd observed a traumatic event and that he did not take that into account when assessing his PTSD.  And so I think there is potentially -- I don't know if that scenario even exists.  So that's why I don't want to -- I'm not going to outright preclude you from mentioning the parole violations, but you can only ask Dr. Drob questions about these four parole violations if you are using them for non-hearsay purposes to really just challenge or undermine Dr. Drob's opinions.

MR. BLENK:  And that's exactly what I'm doing.  And the reason --

THE COURT:  Well, that's not what it sounds like.  It sounds like you're using them to try to argue the merits of the parole violations.  So give me an example then.  So give me an example of how you would like to cross-examine Dr. Drob with one of these parole violations.

MR. BLENK:  So Dr. Drob observes and in his conclusions and formulation on page 35, the crescendo of the whole report, he says, "While Mr. Boyd experienced a number of other life stresses, including those resulting from his own poor judgment, family difficulties and medical problems,

Boyd v. County of Erie  22-CV-519                1109

these other stresses occurred in a context in which he suffered 20 years of wrongful incarceration followed by approximately 25 years of wrongful parole, during which he was returned to prison for nearly eight more years for conduct that would have otherwise been unlikely to result in incarceration."

This is not a problem of my creation, Your Honor.  This is a problem that they've -- the Plaintiff has made by adopting an expert who looked at the parole records, whitewashes the parole records, and expressly includes that in his analysis of the experience that Mr. Boyd had.  There is -- this is -- this is not -- I did not create this problem.

We didn't want Dr. Drob to testify, Your Honor.  That was the application that we made.  We didn't think this was amenable to expert testimony.  They are bringing in the expert.  The expert has reviewed parole records.  The expert has conceded that he reviews parole records in the course of his day-to-day work in all manner, even in his day-to-day job as an expert in a competency proceeding.  He has relevant information about the case that is something that he built into his expressed analysis.

THE COURT:  So just -- then give me an example of the kinds of questions that you would want to ask Dr. Drob --

MR. BLENK:  Well, he calls it --

Boyd v. County of Erie  22-CV-519                    1110

THE COURT:  -- that would -- as I said, would challenge or attempt to undermine his opinions.

MR. BLENK:  Yeah.  A comparison of -- so he calls it problematic behavior.  He dismisses these minor things that wouldn't have resulted in incarceration as problematic behavior.  And we would go through the parole records that he reviewed and relied upon and see if that fairly aligns with an analysis of problematic behavior in his view.

MR. DURLAND:  Your Honor, he said nothing about that from the witness stand.  I mean, this is Mr. Blenk trying to seize upon a description in a report and get Dr. Drob to say that, and that's going to excuse him going through the parole records and saying is this problematic behavior, is this problematic, and that's just using them for the truth.  He can't do that.

The reason that Mr. Blenk keeps talking about the report and the reason he's not answering Your Honor's question is that there is no permissible cross-examination.  There is no -- there is no incident in these things that resulted in parole violations that could conceivably result in depression or anxiety or PTSD, and Dr. Drob certainly didn't say that from the witness stand.

He very clearly articulated his opinion that these mental illnesses arose from Mr. Boyd's 20 years of incarceration and subsequent re-incarcerations.  He never

Boyd v. County of Erie   22-CV-519                    1111

said a word about the re-incarcerations being unjustified. He's just saying that if he hadn't been convicted in the first place, he wouldn't be on parole.  People who aren't on parole are allowed to drink alcohol.  They're allowed to leave the County.  There aren't these restrictions.  And his point is simply that the re-incarcerations are a result of the parole rules, which are in turn a result of the underlying conviction.  But he's not -- he's simply not giving this testimony.

I understand Mr. Blenk's desperation to get into this, but this is not a problem of our making.  It's a problem of their making.  And he's trying to backfill their failure to get admissible evidence on this issue they want to put in, and he's trying to use Dr. Drob to do it, and he's insisting on doing it and he keeps talking about the report because he knows full well there's absolutely nothing in Dr. Drob's testimony that has opened the door to this, and he knows full well that he has no good faith basis to say that there's any connection between the diagnoses that Dr. Drob is offering and the stuff that he wants to get in.  He's using this for pure hearsay purposes.

THE COURT:  Mr. Blenk, except for the twelve pages that I received of parole records, all of the other 130, whatever, pages of the parole records are not received.  Therefore, they can't be used for the truth of its contents.

Boyd v. County of Erie   22-CV-519                    1112

And so, as I said before, you can -- the only way that you can cross-examine Dr. Drob is if you have a good faith basis to think that there was something in those four parole violations that undermine his opinion about his, you know, depression or anxiety or PTSD.  And from what you've said, it doesn't seem that you'd be using any of those records in that way.

MR. BLENK:  Your Honor, Dr. Drob explained his process. He explains that the objectivity requires that you go through and you generate a report that reflects your observations -- his observations.  This is not him passing along Mr. Boyd -- this is not him blindly passing along Mr. Boyd's self-report. This is him taking in Mr. Boyd's self-report, having the parole records in front of him and reaching a conclusion that in his analysis, the conclusions and formulation that his mental anguish was contributed by the fact that he was -- went to prison for nearly eight more years for conduct that would have otherwise been unlikely to result in incarceration.

Now, if Dr. Drob -- Dr. Drob could have said, oh, my report is garbage and I disavow my report, and then we would be in a different world where we would just be talking about his direct examination and he probably would be precluded as an expert.  He can't dance away from his analysis on these issues that were core to his process.

Boyd v. County of Erie   22-CV-519                    1113

He describes the process.  I'm attacking the process.
The process is unreliable because he's taking Mr. Boyd's
self-reports and he's not looking critically at anything
that's coming in, and it happens to be in each instance
biassed in a way that would substantiate damages.  It goes to
the entirety of his analysis that his bias is being reflected
in this analysis and his minimization about problematic
behavior in the face of objective evidence to the contrary
that he ignored.

MR. DURLAND:  Your Honor --

THE COURT:  I'm not going to allow you to cross-examine
Dr. Drob in that way.

MR. BLENK:  So is -- Your Honor is advising that I
can't use the -- I can't cross-examine him on accounts that
he reviewed about the parole violations unless it goes to
a -- it has to be an event that precipitates -- that could
have been a precipitating event for posttraumatic stress
disorder?

THE COURT:  Well, no.  That was an example that I gave.
What I'm saying is that you can use these records not for the
truth of the matter but really for impeachment, so to
undermine his opinions.  And so that was just an example that
I gave, that let's say there was something in the parole
violation that Mr. Boyd observed something traumatic and that
you think that Dr. Drob didn't take into account when

Boyd v. County of Erie   22-CV-519                1114

assessing his PTSD.  So that was just an example.  But what you are proffering right now, I do not find that permissible.

The fact that he has reviewed these records -- I mean, he reviewed five thousand records.  It doesn't mean that you can cross-examine him on any record that he's reviewed.  I mean, you have to use these records in a permissible way as cross-examination.  You can't use them to bring up a new theory of -- I mean, that would be something that you'd have to get your own expert to do.  This is only to challenge his opinion, and what you're saying is -- I think you're trying to couch it in this way that you're challenging his opinion, but it's not.

I mean, what you're doing is just saying -- you're just using this, as Mr. Durland said, just really as a conduit to get in these records, and that's not permissible.

MR. BLENK:  Your Honor, I think that anything that's in the records that's contrary to his observations is inherently relevant, and that would be fit for cross-examination from an opponent of an expert, making him address the contrary evidence that underlies -- the evidence that he had access to that he didn't --

THE COURT:  I don't understand how what you just proffered is contrary to his opinions.

MR. BLENK:  It's contrary to his opinions because he says that Mr. Boyd's anguish is being driven by the fact that

Boyd v. County of Erie   22-CV-519                    1115

he was returned to prison for nearly eight more years for conduct that would have been otherwise unlikely to result in incarceration.

MR. DURLAND:  That's not what he says, Your Honor. That's just not what he says.  He doesn't say anything about anguish being tied to the unjustified nature of being returned to prison.  That's just not true.

MR. BLENK:  It's in his report, Your Honor.  He told us about --

THE COURT:  Just give me the report and show it to me, please.  Can you just show me what part you're talking about?

MR. BLENK:  It's underlined in that paragraph.

THE COURT:  Okay.  So this is the part that Mr. Blenk just referenced me to.

"While Mr. Boyd experienced a number of other life stresses, including those resulting from his own poor judgment, family difficulties and medical problems, these other stresses occurred in a context in which he suffered 20 years of wrongful incarceration, followed by approximately 25 years of wrongful parole, during which he was returned to prison for nearly eight more years for conduct that would have otherwise been unlikely to result in incarceration.

And so, Mr. Blenk, what -- can you be specific about what incidences you are claiming would apply here that actually in your opinion would have resulted -- or would have

Boyd v. County of Erie   22-CV-519                    1116

potentially resulted in incarceration?

MR. BLENK:  So Mr. Boyd reports to Mr. Drob that his second parole violation was the result of a misunderstanding. And Dr. Drob told us that you've got to be critical -- part of being objective is being skeptical about what's being reported to you, and he had a record that substantiated that Mr. Boyd was at -- the parole violations related to Mr. Boyd being at the back door of a person who had a protective order against him.

MR. DURLAND:  Your Honor, just to be clear though, how this is going to play out, this is going to be now -- so now we're not talking about whether it's justified or unjustified.  Now we're talking about -- because that's not what Dr. Drob says.  Now we're talking about cross-examining Dr. Drob with a record and saying isn't it true that Mr. Boyd was at the back door of somebody's house, using the record for impermissible hearsay purposes, and then trying to use Dr. Drob as an expert on what would or wouldn't precipitate two years in state prison.  I guess Mr. Blenk is going to try to get Dr. Drob to acknowledge that it's possible that a violation of an Order of Protection would result in two years in state prison.

And, you know, I'm sure Mr. Blenk is going to say, hey, it's in his report.  It's not any -- what's in his report is about the fact that violating parole gets you incarcerated

Boyd v. County of Erie  22-CV-519                    1117

for things that ordinarily you wouldn't be incarcerated for. He's not saying that somebody lied about the purported violation.  There's been zero testimony, you know, in front of this jury about what did or didn't happen in this underlying parole violation.  So to me this is, one, an impermissible use of hearsay records for their truth, and it's trying to convert Dr. Drob into an expert on criminal procedure.

And I absolutely agree with the characterization that what Mr. Blenk is trying to do is trying to couch this in the terms of it's examining his methodology.  It's like you've got to be critical, but what he really wants to do is cast a critical eye on Mr. Boyd's testimony, and he wants to use records to impeach Mr. Boyd's testimony and show that Mr. Boyd is a bad guy.

THE COURT:  Okay.  I mean, I don't think that -- I mean, Dr. Drob did say would have been otherwise likely to result in incarceration.  And so I think that opinion that he gave I guess somewhat implies that he has a knowledge of what may have resulted in incarceration and what may not have resulted in incarceration.

MR. DURLAND:  Well, at the very least, Your Honor -- so I don't think that's what Dr. Drob meant.  I think Dr. Drob is simply referring to the fact that Mr. Boyd was on parole, and these are parole violations, not criminal adjudications,

Boyd v. County of Erie   22-CV-519                1118

and that that's different.

But certainly on a 403 analysis -- I mean, this is so glancing.  It's picking out this one thing from his report. He's offered no testimony about it.  It's picking out this one phrase, eliciting it from him on cross-examination, and then using that as the hook for, you know, an hour and a half of going through parole records and using them for the truth, and then, you know, we're going to expect that the jury is going to remember, oh, yeah, all of that stuff that Mr. Blenk said about bad acts and all the rest of it, we just have to ignore all of that because the judge says it's not for the truth, it's just for Dr. Drob's methodology.  I think that's -- I think that would be not a reasonable 403 balance. I mean, this is so --

THE COURT:  Okay.  Well, I can't make a 403 balance yet because I don't know what parole violations you think would apply here.

And so you said one -- so you said the second parole violation that he violated an Order of Protection.  Okay. What else?

MR. BLENK:  The first parole violation he was in a fight and he was drinking at the time.  He had been admonished days prior by his parole officer to stop using alcohol eleven days prior, and then eleven days later he gets into a fight and was -- while drinking vodka and was -- that

Boyd v. County of Erie   22-CV-519                    1119

resulted in a parole violation.

THE COURT:  Okay.  Well, the fact that there was a fight, I mean, to me doesn't -- there's not enough information to say that that conduct would have resulted in incarceration.

MR. BLENK:  Well, that's not the only point we're making, Your Honor.

THE COURT:  Well, that's --

MR. BLENK:  So the fact that he's -- this is ongoing substance abuse and contextualizing the --

THE COURT:  No.  But then you're -- you're trying to get that in for the truth of the matter, and that's not okay.

MR. BLENK:  But he's adopted -- he's adopted Mr. Boyd's self-description of these events in his own analysis, and that informs --

THE COURT:  Okay.  That's not -- no.  First of all, Dr. Drob has already testified that -- I mean, he recognized that he continued to use substances until a certain date.  So I don't think that's applicable.

From what you have said, I don't find that the first parole violation would be conduct that would have likely resulted in incarceration.

And so what's -- any other parole violations that you think are relevant?

MR. BLENK:  Well, I don't think that the first parole

Boyd v. County of Erie   22-CV-519                    1120

violation is a glaring example of one that would justify --

that would be clearly something that would result in

additional incarceration, but I also think that putting

context to Dr. Drob's own observations about the physical

conflicts that Mr. Boyd was engaging in is relevant and is

consistent with his analysis of Mr. Boyd.

THE COURT:  No.  I'm not permitting it for that

purpose.

MR. BLENK:  Okay.

THE COURT:  I've considered your argument about this

one sentence in this report.  And so in order for me to do my

403 analysis, I need to know what information you want to

present for this.  So we have so far only that he violated an

Order of Protection.

MR. BLENK:  And that -- the first one was that he was

drinking vodka in connection with a physical conflict.

THE COURT:  But that drinking vodka and getting in a

fight, I don't find that would have been likely to result in

incarceration so that it could be used to challenge this

opinion.

And so what's the next one?  Are there any more?

MR. BLENK:  So in the fourth violation Mr. Boyd kicked

a door in to enter a dwelling, and he was also drinking at

that time.

THE COURT:  Kicked a door at a dwelling.  You have to

Boyd v. County of Erie  22-CV-519                1121

be more specific.  Are you -- what are you saying that he could have been incarcerated for?

MR. BLENK:  Breaking and entering.

THE COURT:  So a burglary?

MR. BLENK:  Yeah.

THE COURT:  Of whose dwelling?

MR. BLENK:  A woman who he was dating, the person's ex-partner.

THE COURT:  Can I just see that report?  Does it say anywhere that she called 911?

MR. BLENK:  He was arrested for it.

THE COURT:  He was arrested for it?

MR. BLENK:  Yeah.  All -- the first one he was arrested for as well.

THE COURT:  For the fight?

MR. DURLAND:  And the charges were dismissed.

THE COURT:  Okay.  The charges were dismissed.

MR. DURLAND:  That's right.  And the last one resulted in a criminal mischief misdemeanor.

THE COURT:  And were the charges dismissed?

MR. DURLAND:  The last one, no.  It was a criminal mischief misdemeanor.  I believe he pled guilty to that.

THE COURT:  And he wasn't sentenced to prison?  He wasn't sentenced -- was he sentenced at all on the criminal mischief?

Boyd v. County of Erie  22-CV-519                    1122

MR. DURLAND:  No.  Just the parole violation.

THE COURT:  Okay.

MR. DURLAND:  In other words, his parole was violated as a result of that incident, but it resulted -- it was -- the actual charge that was sustained was criminal mischief, not breaking and entering.

THE COURT:  Okay.

MR. DURLAND:  And, of course, what Mr. Blenk wants to do is say, well, the actual conduct was, and now he's using it --

THE COURT:  And I didn't know that these actually resulted in charges.  So then the first one is definitely not admissible because they were dismissed.  And so I think that it can't be used to undermine his opinion because we already know that he wasn't incarcerated for that.

MR. BLENK:  But, Your Honor, I think --

THE COURT:  No.  I don't want to keep arguing -- I'm not going to let you keep arguing.  Okay?

The second one, was there any arrest for the violation of the Order of Protection?  No.  Okay.

So we're skipping over the third one.

The fourth one you said he was arrested for criminal mischief fourth and he pled guilty to criminal mischief fourth?

MR. DURLAND:  Yes, Your Honor, I believe so.

Boyd v. County of Erie  22-CV-519                    1123

THE COURT:  What was his sentence?

MR. DURLAND:  That I don't know offhand.  My understanding is that there was no sentence -- there was no punishment other than the parole violation, which resulted in 18 months in prison.

THE COURT:  Is that your understanding?

MR. BLENK:  Yeah.  I don't disagree with that.

THE COURT:  Okay.  Well, then if he didn't get any incarceration on the criminal mischief fourth, then we already know that he didn't -- then that opinion isn't being undermined by evidence of the CM-4.

So the only one that's possible would be the violation of the Order of Protection.  He wasn't arrested on it.  I guess --

MR. DURLAND:  Your Honor, I also don't believe that there's any evidence of an actual judicial Order of Protection.  I believe this was an order from his parole officer to stay away from Ms. Gavin.

THE COURT:  Okay.  I apologize.  I thought it was an Order of Protection.  Was there an Order of Protection?

MR. BLENK:  That's reflected in the record, that there was a current Order of Protection.

MR. DURLAND:  A judicial Order of Protection or is it a directive from his parole officer?  My understanding is it was the latter, but I could be corrected on that.

Boyd v. County of Erie   22-CV-519                    1124

MR. BLENK:  Directed to call police and advise them that you have a current Order of Protection from the Plaintiff -- or from the parolee.

THE COURT:  Okay.  And he wasn't arrested for it?

MR. BLENK:  He was taken into custody the next day.

THE COURT:  For the parole -- for a parole violation, but was he arrested at all for the -- on like a criminal contempt?

MR. BLENK:  He was -- the records reflect that he was served charges.  I think the point that -- we all know how these matters are disposed of in the context of a parolee who is acting in a criminal manner.  The matter is turned into a parole violation and it's disposed of that way.  That's not -- but that is not specifically the point that --

THE COURT:  Well, that's not always true.  But my question is -- so you're saying there was an actual Order of Protection that was issued by a judge and you said charges ensued.  What does that mean?  The parole violation or was there any criminal contempt charges from that incident?

MR. BLENK:  I'm basing it off the parole record, Your Honor, and it says that there was -- that there was a current Order of Protection protecting the petitioner -- or the parolee and he's taken into custody the next day and he's at the correctional facility and charges were served along with a 9011, preliminary hearing waived, PH waived.

Boyd v. County of Erie  22-CV-519                    1125

THE COURT:  Okay.  That doesn't really answer my question, but can you pass it up?  Let me look at it.

MR. BLENK:  I just passed up to Your Honor, just for the record, Boyd Walker 44153 of DX 729.

THE COURT:  Okay.  So, Mr. Durland, you're not sure if this resulted in criminal contempt charges or not?

MR. DURLAND:  I have no reason to think that it did.  In other words, I've never seen any evidence to that effect.  I've never seen that.  Certainly, the County is not proffering that.  And I would think that they would need to proffer that if they're going to justify the cross-examination they intend to present to Dr. Drob.

I also think when Mr. Blenk said I'm basing this off the parole records, exactly.  That's the problem, is that he's then going to be using the parole records to say isn't it true, Dr. Drob, that this happened and this happened and that could have resulted in --

THE COURT:  Well, you can't do that.  I mean, you're not going -- are you going to ask -- you can't ask questions in that way because that would -- those would be questions for the truth of the contents of these records, and that's not permissible.  And so I think --

MR. BLENK:  Records that he -- he minimized.

THE COURT:  He reviewed.  Records that he reviewed.  And I will give an instruction to the jurors.  So I will

Boyd v. County of Erie   22-CV-519                    1126

allow you to in a very limited scope ask just about this Order of Protection, and that's it.

MR. BLENK:  That disclosed that Mr. Boyd had violated an Order of Protection at the home of an individual known to Mr. Boyd?

THE COURT:  And the only way that you can ask is that he -- whether he reviewed those -- whether he reviewed those records.  But you can't use those records for the truth of its contents.  So we're not arguing over the merits of whether he actually violated the Order of Protection or didn't, but whether he -- whether Dr. Drob reviewed those records and for the purpose of challenging this part of his opinion.

And so what you'll have to do is just first refer him to that portion of his opinion.  And so this is very limited in scope.  Does that make sense, Mr. Blenk?

MR. BLENK:  Yes.  I would also intend to elicit his own opinion that Mr. Boyd's post-release conduct was -- involved him entering an environment of alcohol and drugs, exhibiting poor judgment, and engaging in physical conflicts and impulsive behavior.

MR. DURLAND:  This is not even attacking his testimony. Now it's embracing it and saying, Dr. Drob, you're right. And this is pure character evidence saying, Dr. Drob, isn't it -- and then just leaving the jury to speculate about what

Boyd v. County of Erie  22-CV-519                    1127

all the other physical conflicts and violent confrontations could be.  I mean, I think we had this debate a number of times on Monday.

THE COURT:  Mr. Blenk, Dr. Drob testified about his substance abuse.  So you can ask him about -- you can ask him about that.  But you can't use these records for that purpose.

MR. BLENK:  I'm not -- these are generalities that are coming -- directly driven from his report, Your Honor.  And the reason for this is that his analysis is that Mr. Boyd was -- Mr. Boyd was -- before he found out about the pre-existing substance abuse, his analysis was basically like he was incarcerated and then he had these mental health problems and then he started self-medicating and what could be done.  These are the kinds of things that happen.  And now in the course of that analysis, now he knows that there's -- there was a pre-existing substance use issue that he has now testified to that wasn't disclosed in his report.

And this -- so the jury needs to understand the context for the violations, that it's not -- it's not a completely arbitrary process and that Mr. Boyd was -- just being realistic about what was going on in his life after his release from prison is that it was characterized by physical conflicts, impulsive behavior by Dr. Drob's own analysis.

MR. DURLAND:  He's just trying to do in generalities

Boyd v. County of Erie   22-CV-519                1128

now what the Court has precluded him from doing in specifics. Well, I can't get into specific bad acts, so I'm just going to elicit from Dr. Drob he did all this bad stuff and let's -- we'll call that context and let's let the jurors speculate about what that might be.

THE COURT:  I've already said that you can cross-examine him on his substance use.  But I'm not going to let you ask him about that in the context of these parole violations.

Okay.  I'm going to pass this back down to you.  I guess I just want to be clear about that.  So I've already given my ruling about what you can cross-examine Dr. Drob with for the parole violations.  Okay?

MR. BLENK:  Your Honor --

THE COURT:  And so, if I'm understanding correctly, you're trying to get into the fact that he was maybe drinking and using substances during let's say this first parole violation, which would go to the truth of the matter.  And so you can't ask him about those records.

MR. BLENK:  It goes to -- he has attributed everything that's going on with Mr. Boyd in his life -- he's attributed it to his experience in prison.  The fact that he's heavily abusing substances before prison and heavily abusing substances in his own report to the same extent after prison and that this is contributing to the incidents that are

Boyd v. County of Erie   22-CV-519                     1129

resulting in police conduct, it's very prejudicial that we can't get into that because it undermines an attack on the causal analysis that he's advancing too, that the cause -- what's the cause.  The cause of -- at the time of his --

THE COURT:  So, Mr. Blenk, then tell me a specific question that you want to ask.

MR. BLENK:  Getting into the generalities that Mr. --

THE COURT:  No, no.  Like a specific question.  Give me an example of a specific question that you want to ask Dr. Drob.

MR. BLENK:  Do you concede that Mr. Boyd's -- Mr. Boyd's life on parole was characterized by poor judgment, was characterized by substance abuse, and that it was characterized by violent behavior and you were aware of records that reflected that these things were intertwined, that there was substances involved with many of the instances of --

THE COURT:  Okay.  If that's the question you're going to ask Dr. Drob, then, no, you can't ask -- that question -- you can't -- that's the question you're going to ask Dr. Drob?

MR. BLENK:  I would ask one question at a time and he would answer.

THE COURT:  Well, I need -- then give me one question that you would ask Dr. Drob.

Boyd v. County of Erie   22-CV-519                    1130

MR. BLENK:  You would agree, Dr. Drob, that Mr. Boyd's substance use played a part in parole violations that he experienced after his initial release from prison?

MR. DURLAND:  He's not here as an expert to analyze the causality of the parole violations.  He's here to say the cause of Mr. Boyd's mental illnesses, and he's here to talk about the cause of the substance abuse being related to the mental illnesses and the symptoms of those mental illnesses. Now Mr. Blenk wants him to be up there to say the cause of the parole violations was substance abuse or it was his own bad judgment.

I mean, Mr. Blenk is trying to have a mini trial about the four parole violations through Dr. Drob using inadmissible hearsay as his evidentiary foundation, and then maybe at the end he'll say, oh, and you considered this as part of your methodology, right, in order to try to tie it into the expert cross-examination.  And this is so clearly impermissible, Your Honor.  And every time I hear Mr. Blenk offer up the questions that he's going to ask, I think it only reinforces that conclusion.  401 definitely, 705 definitely, and 403.  I mean, this is --

THE COURT:  Mr. Durland, I'm sorry to interrupt, but I don't need to hear anymore.

You can't ask that question.  You're trying to get into the merits of the parole violations with Dr. Drob, and that's

Boyd v. County of Erie   22-CV-519                    1131

not allowed.  Okay?  And that's it.  I don't -- listen, we are already behind our schedule.  And I want to give everyone a chance to make their arguments, but I'm going to limit it when we're arguing in circles and I've made my ruling.  And this is important to all of us.  We want this trial to be done.  And, I mean -- right?  So we can't -- we can't keep doing this or we're going to keep getting off schedule.

There's a lot of other things that I wanted to discuss this morning, but I don't want to do it because I want to bring the jury out.  And so we can get to I guess McLeod and the others after.  Okay?  Even if we have to work through the recess.

MR. BLENK:  So I can address one of the instances, but I otherwise can't address any of his conduct other than substance abuse on parole, and I can't address the relationship of substance abuse to his parole violations, but I can to his broader life?  Is that --

THE COURT:  I mean, Mr. Blenk, you can cross-examine him -- I'm not saying you can't cross-examine him on any substance abuse.  I mean, he testified about substance abuse.  So you can ask him fair questions about that, but when it comes to the specific parole violations and the role that substance abuse played in kind of driving him to engage in this behavior for this specific parole violation, no, because it's getting to the merits of what happened with the conduct

Boyd v. County of Erie  22-CV-519                    1132

for that parole violation, and I'm not permitting that.

MR. BLENK:  Just for the record, I think it's a clear argument about the -- he's coming here to tell us about the proximate -- what's proximately caused by --

THE COURT:  We're done with argument.  If you want to submit something in writing to make a record on it, that's fine, but I don't want to waste any more time on this.

MR. BLENK:  Understood.  Thank you, Your Honor.

THE COURT:  Okay.  Is there anything else that's really pressing right now that we need to address before we bring the jurors in?

MR. DURLAND:  No, Your Honor.

THE COURT:  Okay.  Okay.  We can bring the jurors in and bring Dr. Drob up.

(Dr. Drob present.)

THE WITNESS:  Good morning.

THE COURT:  Good morning.

(Jury present.)

THE COURT:  Have a seat, everyone.  Thank you.  Good morning, jurors.  We're going to continue with cross-examination of Dr. Drob.

I just want to remind you of a very brief instruction that I gave you the other day.

You are about to hear continued testimony from Plaintiff's witness Dr. Drob.  You may hear testimony from

Sanford Drob - CX by Mr. Blenk                    1133

Dr. Drob about Mr. Boyd's subjective belief in his own innocence of the Crawford homicide.

We are all here to address whether Mr. Boyd had a fair criminal trial in 1977.  Whether Mr. Boyd was, in fact, guilty or innocent of the Crawford homicide is irrelevant to that inquiry.  However, Mr. Boyd's own subjective belief of his innocence is relevant for the limited purpose of supporting Plaintiff's alleged damages.

You can continue, Mr. Blenk.

MR. BLENK:  Thank you, Your Honor.

THE COURT:  Dr. Drob, I would just remind you that you are still under oath.

THE WITNESS:  Yes.

CONT. CROSS-EXAMINATION

BY MR. BLENK:

Q.   Hello again, Dr. Drob.

A.   Good morning.

Q.   So just to recap briefly from Monday, we discussed your process?

A.   Yes.

Q.   That begins with developing a report, right?

A.   Yes.

Q.   And then the report embodies your work product for a particular engagement, right?

A.   Yes.

Sanford Drob - CX by Mr. Blenk                    1134

Q.   And that's true here as it was -- as it is in all your engagements?

A.   That's correct.

Q.   And there is nothing in your report that is inaccurate?

A.   As far as -- I didn't put anything in there that I didn't believe was accurate.

Q.   Is there anything that's inaccurate today?

A.   As far as I know, no.

Q.   But you are aware of information that's contrary to -- or evidence that would be contrary to some of the conclusions and analysis in your report?

A.   As I indicated earlier, I'm aware of many things that are in the records that I didn't include in my report, but I took them into consideration in answering the question regarding the consequences of Mr. Boyd's 26, 27 years in prison, and I stand by my conclusions.

Q.   And that analysis of the consequence begins with your report?

A.   It's contained in my report.

Q.   So I'm going to show you a -- one page from your report.  That would be page 23 of your report.  This is PX 259.

MR. BLENK:  I'm showing page 23 to the witness.

THE WITNESS:  Sure.

Sanford Drob - CX by Mr. Blenk                    1135

BY MR. BLENK:

Q.   Now, this provides a list of diagnoses that you had found in Mr. Boyd's medical records, correct?

A.   That's correct.

Q.   And these would all have been consistent with -- as far as you're aware, the providers who would have been giving these diagnoses would have been following the same DSM that you follow, right?

A.   Well, they may have been following an earlier version of it.

Q.   Fair enough.

A.   But I'm going to assume that.  Some people follow another similar diagnostic manual, but generally speaking in the United States the DSM, yes.

Q.   Safe to say you're speaking the same language?

A.   Yes.

Q.   And so you testified that the DSM is not --

A.   I'm sorry?

Q.   It's not an etiological document?

A.   No.

Q.   It doesn't tell us about cause?

A.   Well, with the exception of the posttraumatic stress disorder cause criteria it doesn't.

Q.   And in that document you see the first -- what's the first diagnosis you recognize in the medical records?

Sanford Drob - CX by Mr. Blenk                1136

A.    Adjustment disorder, unspecified.

Q.    And then what's the second?

A.    Alcohol abuse.

Q.    And the third?

A.    Anxiety disorder, not otherwise specified.

Q.    So anxiety disorders, those are commonly -- those are susceptible to self-medication?

A.    Do people -- you're asking me if people self-medicate themselves for anxiety disorders?  The answer is yes.

Q.    Yes.  And it's a common diagnosis, right?

A.    Very common.

Q.    And there are subsets of anxiety diagnoses?

A.    Well, there are -- there are -- there are subsets and then there are other diagnoses that generally fall under anxiety disorders, yes.

Q.    That's what I meant to get across.

A.    Okay.

Q.    You understand the taxonomy better than I do, surely.

And amongst those would be agoraphobia?

A.    Yes.

Q.    Which could be a fear of crowds?

A.    Yes.

Q.    Fear of going out?

Sanford Drob - CX by Mr. Blenk                1137

A.    Yes.

Q.    And anxiety and agoraphobia, neither of those are defined by a pre-existing traumatic event?

A.    That's correct.

Q.    And in the document that you have in front of you when do you first see a posttraumatic stress disorder diagnosis in Mr. Boyd's record?

A.    Looking at this I see 2017.

Q.    So how long had Mr. Boyd been out of prison -- how long since Mr. Boyd had initially left prison until the time of his diagnosis?

A.    I think he was in prison until 2014.

Q.    When did he initially leave prison?

A.    From the first -- initially he was released in '96 or seven.

Q.    Okay.  So what's the time frame between the initial release from prison and a diagnosis of posttraumatic stress disorder?

A.    Well, as I said, we don't have records prior to 2012, but there's a lengthy time.  There's 21 years.

Q.    And then --

THE COURT:  Hold on one second.  I just want to give the jurors a brief instruction.

Members of the jury, as I had instructed you on Monday, this testimony about these records should not be considered

Sanford Drob - CX by Mr. Blenk                    1138

by you for the truth of its contents, but should be considered regarding the reliability and credibility of Dr. Drob's opinions.

Go ahead.

BY MR. BLENK:

Q.   And you administered a test to Mr. Boyd and you looked at documents, right?

A.   I administered two tests.

Q.   You administered two tests.  You looked at documents, you had a conversation with Mr. Boyd?

A.   I did a psychological examination of Mr. Boyd.

Q.   And the test itself, that's also not an etiological document?  It's a symptom inventory, right?

A.   In the case of the symptom inventory it's a non-etiological document.

Q.   And the other test is etiological?

A.   Not -- more so than the SCL-90, but not specifically.

Q.   Thank you.  It's not specifically --

A.   It's not specifically etiological, no.

Q.   And that means that it doesn't tell you what the cause of any diagnosis is?

A.   That's correct.

Q.   I'll take that back.

A.   Sure.

Sanford Drob - CX by Mr. Blenk                1139

MR. BLENK:  May I approach the witness?

THE COURT:  Sure.

THE WITNESS:  Here you go.

BY MR. BLENK:

Q.    And we looked at a record about Mr. Boyd's departure from prison, and in that record it reflected that he was not taking psychiatric medication at that time?

A.    That's correct.

Q.    And, according to the record, the provider who saw Mr. Boyd observed no psychiatric symptoms?

A.    I think the writer indicated that he -- that Mr. Boyd at that time reported no psychiatric symptoms.

Q.    And that's in 1996?

A.    That's correct.

Q.    And when Mr. Boyd -- and we went through a record about Mr. Boyd's departure from prison and his description of his drinking before and after prison.  And what did he report in that document that we went over on Monday?

A.    I'm not -- I know that you showed me one document -- one of many documents that indicate his reports about his drinking before and after prison, and in that one document he indicated I believe that he drank a pint of hard liquor prior to his going to prison.

Q.    And then what did he do when he got out?

A.    He said in that document that he also drank

Sanford Drob - CX by Mr. Blenk                    1140

similarly when he got out.

Q.    So basically the same substance abuse before and the same substance abuse after?

A.    In that report.

Q.    And then you -- your analysis is that Mr. Boyd began self-medicating after -- after leaving prison?

A.    He may have self-medicated while he was in prison. Prison was also a very traumatic and very unhappy experience for him.

Q.    And so you wouldn't say that unless you had evidence that Mr. Boyd was --

A.    I'm not saying that, but you're asking me if it's my belief that he began to self-medicate after he left prison.  I know that he self-medicated at points after he left prison.  I don't know to what extent he was or was not self-medicating while in prison.

Q.    You never saw a record to that effect?

A.    I don't.  I didn't.  Excuse me.

Q.    And in the course of your work on this project you reviewed records of Mr. Boyd's parole?

A.    Yes.

Q.    And you also reviewed records -- medical records that could be relevant to events that were going on in Mr. Boyd's life while he was on parole?

A.    Yes.

Sanford Drob - CX by Mr. Blenk    1141

Q.   And these include traditional or -- strike that.

These include records that were elicited in a substance use and behavioral health context?

A.   Some of them, yes.

Q.   As well as a traditional primary care context?

A.   Yes.

Q.   And other medical settings?

A.   Yes.

Q.   So you had a lot of information about what was going on in Mr. Boyd's life?

A.   During that period, yes.

Q.   And you also received a self-report from him?

A.   Yes.

Q.   About -- he told you about parole violations?

A.   Yes.

Q.   And you wrote down his explanation for those parole violations?

A.   Yes.

Q.   And you relied on him for those -- for his description of those parole violations?

A.   I don't make a judgment about what happened during those parole violations.  I indicated in my report what he told me.

Q.   Okay.  And then -- didn't we go over on Monday about how it's important when you're receiving a self-report to be

Sanford Drob - CX by Mr. Blenk                    1142

somewhat skeptical in considering how realistic or objective the person is being when they're describing events in their lives?

A.    That's part of my role, yes.

Q.    Okay.  But am I to understand that for the parole violations when Mr. Boyd was explaining them to you you just took -- you just took him at his word?

A.    No, I didn't take him at his word.  I wrote down what he told me occurred.  I'm examining this man's mental state, his experience and his sense of what has occurred in his life.

Q.    And then you --

A.    It's not my job to do an investigation about the underlying events in his past.

Q.    So it's not your job to do an investigation about underlying events in the process of trying to identify an underlying cause of symptoms that you are testifying about?

A.    Yeah.  Only to that extent.

Q.    Okay.  So we can put blinders on for underlying events but still have an accurate analysis of underlying cause; is that your testimony?

A.    No.  I'm not -- you know, as I testified here, I'm testifying, for example, to Mr. Boyd's belief and experience of his innocence.  I'm not testifying, nor is it my role to do an investigation as to who committed the homicide for which he

Sanford Drob - CX by Mr. Blenk                    1143

was charged.  And if there's differing reports from different people as to what happened during a parole violation, that's outside of my professional charge and capacity to investigate that.

Q.   Sure.

A.   And there's always differing understandings of what occurred regarding these things.

Q.   So that's why you said to the lawyers you were working with don't bother getting me the parole records, I don't need to see them, I can just look at Mr. Boyd, I can assess Mr. Boyd, I'll take him subjectively and I'll pass along his subjective analysis, I don't need any additional parole records; is that right?

A.   Well, that's your characterization that you would like people to believe, but that's not true.

Q.   It's not true.  So you --

A.   Yes.

Q.   You did -- you did look for parole records?

A.   I looked at the parole records, yes.

Q.   Okay.  So then -- so it's not the case that you can just rely on Mr. Boyd's analysis alone; you do need to fact-check with the parole records to see if you're getting an accurate account of what happened?

A.   To the extent that they're relevant to the question I'm asked to comment upon or opine upon, yes.

Sanford Drob - CX by Mr. Blenk                    1144

Q.   Okay.  So when it's fitting the conclusions you're reaching, that's something you might use -- you might be supplementing with the parole records, but if not, you can just ignore the records?

A.   No.

Q.   Would you agree with me, Dr. Drob, that substance use was a contributing factor to Mr. Boyd's parole violations?

MR. DURLAND:  Objection, Your Honor.

THE COURT:  Sustained.  The question is stricken.  The jurors should disregard.

BY MR. BLENK:

Q.   Dr. Drob, did you characterize Mr. Boyd's post -- or Mr. Boyd's events -- strike that.

THE COURT:  Counsel approach.

(At bench:)

THE COURT:  Mr. Blenk, I don't appreciate you asking questions that I've already ruled upon.  I already ruled upon that question.  And, I mean, this is why we spent all this time and I said that was not -- that was not a permissible question.  So you shouldn't -- you shouldn't ask the question now.  I already ruled upon that.

MR. BLENK:  I'm sorry.  I must have misunderstood.  Am I -- I'm not permitted to address the violation of the Order of Protection either?

THE COURT:  Well, I think potentially you can, and I've

Sanford Drob - CX by Mr. Blenk                    1145

already said that.  But you have to address that part of the opinion that you showed me, and depending on his explanation of what that means then maybe you can.  I don't -- it's -- potentially you can, but I'm talking about the question that you just asked about whether it's his opinion that his alcohol was the cause of his parole violations, and I already said that he can't testify to that.  I ruled upon that already before the jurors came out.  And so you can't ask those questions now.

MR. DURLAND:  Your Honor, you also ruled on the next one that he just asked, which is is it your opinion that he's -- he's about to elicit that general characterization of Mr. Boyd's time on parole.  That one is precluded, too.

MR. BLENK:  I can't say problematic -- that he engaged in problematic behavior during his time on parole?

MR. DURLAND:  Her Honor just ruled on it.

THE COURT:  That's too broad of a question.  If you want to be -- we already -- we do know that there were these four parole violations, but he has already said it's not his job to determine whether these actually happened or not.  So I'm not -- you can't ask too broad of a -- you can't ask a general question like that.  If you want to be more specific, then go ahead.

Okay.  I just wanted to -- that's all.

(Open court:)

Sanford Drob - CX by Mr. Blenk                 1146

BY MR. BLENK:

Q.    Dr. Drob, Mr. Boyd reported four parole violations to you, correct?

A.    Yes.

Q.    And you took down his account of those parole violations?

A.    Yes.

Q.    And you made reference to the parole violations and his re-incarcerations in your conclusions and formulations at page 35 of your report?

A.    If you'd like to show me that, it will refresh my recollection.  Thank you.  I mean, I've read that paragraph. I'm not exactly sure what you're asking me.

Q.    You made reference to Mr. Boyd's re-incarcerations in that paragraph, correct?

A.    I did.

Q.    And we established on Monday that Mr. Boyd was suffering from a substance use disorder before entering prison, correct?

A.    He certainly used substances.  He abused substances prior to entering prison.

Q.    And that was the same pattern that -- strike that.

He was abusing substances after he left prison as well?

A.    That's correct.

Q.    Up until near the time that you met with him?

Sanford Drob - CX by Mr. Blenk                    1147

A.   That's correct.

Q.   And Mr. Boyd explained to you the substance of some of his parole violations?

A.   He -- yes, fair enough.

Q.   And you accepted his characterization of those events?

A.   We've already discussed this.  I've answered my question.  I wrote down what he said.  I generally accept that that's his experience of what happened, but I don't have an independent judgment as to whether or not he's being accurate.

Q.   And it was your view that the events that described -- what were described by Mr. Boyd resulting in parole violations that they didn't -- they weren't -- they didn't seem particularly serious?  Yes or no.

A.   That's not my view.  My view is that he was adjudicated as having a wrongful incarceration, and so his parole violations, which also ended up in incarcerations, were wrongful.  And that's part of my opinion, that his incarcerations -- the first incarceration and the others contributed to his psychological distress.

Q.   Okay.  And so for your -- for the purposes of your opinion it wouldn't matter if the circumstances -- the events and circumstances surrounding the parole violations were extremely serious or if they were minor?

A.   Well, they might be -- it might be relevant if those

Sanford Drob - CX by Mr. Blenk          1148

circumstances had -- themselves independent of his going back to prison had a huge impact on him.

Q. There was some testimony on Monday about Mr. Boyd attempting to seek I think treatment through traditional pharmaceuticals, correct?

A. Yes. I mean, I testified that he sought treatment and he was prescribed traditional medications.

Q. And you were -- at the time that you put together your report you were aware that there were references in those reports to drug-seeking behavior by Mr. Boyd?

A. That's correct.

Q. And that includes both medications that would be traditionally used to treat anxiety disorders and opiates, painkillers?

A. My recollection is that he might have had drug-seeking behavior in connection with pain killer medications, which would have been opiates. I don't recall that there is indication that he was seeking Remeron or Celexa other than for appropriate reasons. Those are antidepressants. Those are the main medications that he was on for awhile.

Q. What class of drugs are those?

A. Antidepressant medications.

Q. And what other drugs was he on?

A. He may have been on --

Sanford Drob - CX by Mr. Blenk                1149

Q.   Remeron and -- I'm sorry.

A.   He may have been on some antianxiety medications.

Q.   And do you -- and are benzodiazepines a class of drug that's oftentimes used for anxiety -- a treating anxiety medication?

A.   At times.

Q.   That was a bad question.

And you didn't -- you weren't aware of Mr. Boyd engaging in any drug-seeking behavior in connection with that?

A.   Well, he used -- I think he used Xanax from the street I believe.

Q.   And you didn't see any other records -- any other references in the records to prescriptions that he was seeking in a clinical setting?

A.   I believe opiates and painkillers, but if you want to refresh my recollection, you can show me a record.

Q.   I will show you, for the witness only, DX 728, 43188.

A.   Is something supposed to be on my screen?

Q.   It will be momentarily.

A.   Okay.

MR. BLENK:  For the witness only.

BY MR. BLENK:

Q.   Can you determine from this record, Dr. Drob, what kind of pharmaceutical is at issue?

Sanford Drob - CX by Mr. Blenk                    1150

A.   From this record alone it's simply stating that he could possibly be med seeking.  I don't see a specification as to what drugs he could be seeking.

Q.   And what's the date of this document?

A.   2015, October 2015.

Q.   And this would have been amongst the records that you reviewed in the course of putting together your report?

A.   Sure.

Q.   And I'll ask you --

MR. BLENK:  Can we scroll up to the page above?

BY MR. BLENK:

Q.   Now that you've had the opportunity to review this record, can you classify what type of pharmaceutical is at issue in this medical record?

A.   Could I have the document enlarged?  Alprazolam is listed here that he was taking for PTSD and Celexa, which -- and RXs of benzos, benzodiazepines.

Is this the previous page from the one that you indicated?  Okay.

Q.   Yes.

A.   So it's -- I mean, it's not clear to me what the writer meant on that first page you showed me as to which drugs he might have been drug seeking, but he is on those medications.  It's possible that the writer thought that he was seeking those or other drugs.  Maybe he was asking for

Sanford Drob - CX by Mr. Blenk                    1151

other drugs as well.  I don't know.

Q.   And the record reflects that Mr. Boyd had simultaneous prescriptions for the same class of drug?

A.   Which are you referring to?

Q.   Alprazolam --

A.   Well, it may be.

Q.   Klonopin.

A.   I'm not certain about alprazolam.  It could be a benzo.  So I don't know if they are making reference to that or referring to another one.

Q.   Well, what others do you see referenced --

A.   I see Celexa.

Q.   And then it says -- in Mr. Boyd -- the record reflects that Mr. Boyd was receiving Klonopin at the time, too?  He had a prescription for Klonopin?

A.   I'm sorry.  Where is that?

Q.   That's at the --

A.   Klonopin.  Yes, yes.  So he was receiving at that time two antianxiety agents.

Q.   And which caused the provider to have concerns about --

A.   Possibly -- that possibly could be it.

Q.   And that's in 2015?

A.   Yes.  It's common for drug addicts to seek drugs.

MR. BLENK:  Let's show to the witness BW 43425.  That's

Sanford Drob - CX by Mr. Blenk                    1152

of DX 728.

BY MR. BLENK:

Q.   So what's the date of this record, Dr. Drob?

A.   2018.

Q.   And, again, this would have been a document that you had available to you?

A.   Yes.

Q.   And, again, the provider is noting drug-seeking behavior?

A.   Correct.

Q.   I'll show you from the same exhibit the following page, 43814.  This record reflects, again, Mr. Boyd pressing the provider for what looks like Klonopin?

A.   I guess Klonopin or some other benzo.

Q.   And what's the date of this record?

A.   2019.

Q.   And then I'll show you 43848.

THE COURT:  Counsel, can you approach please?

(At bench:)

THE COURT:  I've lost track.  Is this report that you're showing him -- what's the purpose of showing him all of these records?  Is it to -- what is it for?

MR. BLENK:  The Plaintiff -- in his direct testimony he made reference to a sort of portrayal of Mr. Boyd as someone who was seeking medications in a pharmaceutical context and

Sanford Drob - CX by Mr. Blenk                    1153

those simply proved inadequate.  I think that these records of -- referencing the drug-seeking behavior are relevant to that.  And, if nothing else, then to support that Mr. Boyd had recurring access to treatment and that he continued -- he was getting pharmaceuticals and was continuing to press for more pharmaceuticals, that there wasn't this -- it's simply not meeting this like, oh, I was on -- I was taking medication, I kind of slipped.  That's not really what's reflected in medical records from the pharmaceutical perspective.

MR. DURLAND:  I mean, we obviously object to this.  I think everyone knows what Mr. Blenk is doing.  This is just to make -- you know, to wallow in the details of a person with a substance abuse problem and try to make him look like an unsavory person.

THE COURT:  I mean, I think that where you're going is maybe minimally relevant, but you have to be specific about what Dr. Drob's opinion was and how what you're showing him is undermining that in your view.

So I'm going to just give another instruction to the jurors.  I think that this is kind of leading elsewhere, and I don't -- I think when it's --

MR. BLENK:  He brought up in his own direct testimony about Mr. Boyd seeking care -- seeking care, and obviously it's -- there's more to the story than that.  The point is

Sanford Drob - CX by Mr. Blenk                1154

just about resolved.  I'm not going to harp on it any longer.

THE COURT:  Okay.  Well, I allowed some latitude, but what I'm saying is when you're asking Dr. Drob about these reports you really have to be specific about what his opinion is and how these are undermining or challenging his opinion.

So I'm going to give an instruction to the jurors. They can't consider this for the truth.  I'm just going to keep repeating it because it's important.

MR. BLENK:  Your Honor, could I -- can I be heard on that briefly?  So, for example, I don't think that that is strictly true.  If he's interpreting a -- if he's interpreting evidence and saying that -- he -- the Plaintiff themselves has been sitting on this idea that he has all these diagnoses that he's hoovering up from medical records and passing along verbatim to the jury.  That's -- they've been relying on the records for the truth of the records and --

THE COURT:  They haven't.  I gave the same instruction when -- or on Monday during a direct examination when there were questions about these other diagnoses I gave the same instruction.  And I -- and you just brought them up.  You brought up all these diagnoses again.  So I'm -- I'll give them the same instruction.  All of these records, they're all hearsay.  But he relied on them because he reviewed them. And so I'm letting both of you get into them, but not for the

Sanford Drob - CX by Mr. Blenk                1155

truth of the matter.

MR. BLENK:  Understood, Your Honor.

(Open court:)

THE COURT:  Just one moment.

I just want to remind the jurors of an instruction that I've already given to you repeatedly, but this testimony about these medical records that are being shown to the witness about other -- maybe other diagnoses given to Mr. Boyd from other providers and evidence about prescriptions that were given or Mr. Boyd seeking certain medications, all of that cannot be considered by you as to the truth of its contents.  What I mean by that is you can't consider it as proof that this actually happened.  You can consider it only with respect to your assessment of Dr. Drob's opinions as it goes to the reliability and the credibility of his opinions and his testimony.

Okay.  Go ahead.

BY MR. BLENK:

Q.   Dr. Drob, you testified to the -- to Mr. Boyd's experience on parole.

A.   I think I may have given some limited testimony on direct on his experience on parole.  I'm not sure what you're referring to.

Q.   The continuing burden that he felt while experiencing parole?

Sanford Drob - CX by Mr. Blenk                    1156

A.   Well, I certainly believe that he felt a continuing burden.  I may have testified about that on direct, yes.

Q.   And that was -- that was part of your -- part of your analysis of that -- that's just like everything else, that was informed by the records you reviewed?

A.   In part, yes.

Q.   And, again, we went through when we see a record that might be contrary to the position that we're ultimately going to take the right way of handling it is to address that record in our report and say why the conclusion stands, notwithstanding evidence to the contrary?  That's the most thorough and objective way to deliver an opinion, right?

A.   Normally speaking you would address some of those issues if they -- if you felt that they were something that was particularly relevant to your conclusions.

In my case I have concluded that his incarceration and parole were major factors in his developing mental illness and substance abuse.  And I didn't consider every single other possible factor that contributed because I assumed, and I indicated in my report, that there were other factors that contributed.  So it wasn't -- it didn't behoove me to chase down the rabbit hole of every single other factor that might have contributed and explain my thinking about it.

Q.   So you just testified -- so the substance abuse was caused by incarceration?

Sanford Drob - CX by Mr. Blenk                1157

A.   That's not what I testified.  I testified that the substance abuse was a major -- that his incarceration was a major factor in his continued substance abuse.  And as I stated on direct, individuals who have drug habits or even addiction in adolescence don't invariably go on to be drug addicts later in life, and very many of them stop being drug addicts in their mid thirties.  We call that aging out.

Individuals who, nevertheless, don't have the opportunity for resilience during that period and have a whole developmental period of their life kind of taken from them because they were wrongfully incarcerated from age 16 to 37 don't have the opportunity to age out of their drug experience because they don't have the family relations, they don't have the opportunities in life, they don't have the friendships, they don't have the sense of cultural opportunities and other family and work opportunities that enable one to form an identity that enables them to shed their drug habit.  And when they come out at 37 temporally displaced for 20 years, then the fact that they were in prison is a major contribution to --

THE COURT:  Dr. Drob, I'm sorry to interrupt, but I need to address something outside the jury's presence.

So I'm going to ask the jurors to please return to the jury room.  All the admonishments apply.

Dr. Drob, I'm going to just ask you to just for a few

Sanford Drob - CX by Mr. Blenk                    1158

minutes exit the courtroom.  I need to address something with the attorneys.

THE WITNESS:  Sure.

(Jury not present; Dr. Drob not present.)

THE COURT:  Have a seat, everyone.

I just need -- the jurors have left the courtroom. Dr. Drob has left the courtroom.

I need to address what Dr. Drob has said now multiple times, that Mr. Boyd was wrongfully incarcerated.  That's clearly not permissible.  And so what I propose to do is to give -- one, tell Dr. Drob outside of the presence of the jury that he cannot say that; and, two, bring the jurors in and give them an instruction that they should disregard that testimony and it's really their determination, not anyone else's.

MR. DURLAND:  Your Honor, if I could just -- this came up because this is the section of the report that Mr. Blenk was showing to Dr. Drob and having him read, and that was the first instance of -- we obviously have instructed him he's not to say -- and we didn't say it in the direct -- that he's not to say wrongful.  And I just -- I know that that's the way this --

THE COURT:  I know.  And I'm not at this moment blaming anyone for it, but I just want it to be corrected.

So is there any objection to me going ahead with those

Sanford Drob - CX by Mr. Blenk                    1159

two things?

MR. FIRSENBAUM:  Sorry.  Your Honor, Mr. Drury blurted out many times that this was a valid conviction, and there was no correction of that testimony at all.  And so I'm not suggesting that -- we certainly were not expecting him to say that.  There's been, you know, obviously none of that.  But, you know, that happened more frequently than Dr. Drob has said anything.  There was no correction.  And the fact that only Dr. Drob's statement would be corrected, but Mr. Drury's statement to the contrary was not corrected, I think would give off an unfair impression that Mr. Drury's comments were appropriate and correct and Mr. -- Dr. Drob's were inappropriate and not correct.

THE COURT:  Well, no.  I think that this -- this is a different situation.  I think with Mr. Drury he was blurting out an opinion -- his own opinion that he thinks it was, that he was rightfully convicted.  This here -- first of all, it's an expert testifying, and I think coming from an expert it's different.  And, two, it's -- this is not -- he's not portraying this as just his opinion, but that this is what happened.  This is factual.  It happened.  So whether he's -- well, either way it's impermissible.  So I think that there's a difference between those two situations.

And so setting aside that argument, do you have any objection to me doing those two things?

Sanford Drob - CX by Mr. Blenk                    1160

MR. FIRSENBAUM:  Well, I don't have an objection to you telling Dr. Drob outside of the presence of the jury that he shouldn't refer to that.  There's certainly no objection there.  But I think we do object to a curative instruction for the reason I've noted, and because it sends the message to the jury that the statement was wrong.

And I think, you know, Your Honor has given an instruction that the conviction was vacated, and sort of moving it in the other direction just sends the message that the testimony was wrong and that with Mr. Drury's testimony on the record -- I mean, he's not an expert on the conviction.  And so I don't think the jury is going to give more weight to an expert's testimony about what took place historically in terms of the conviction.  They could give more weight to his testimony about psychological impacts.  But, you know, I just -- I think -- I think we're going to go in the opposite direction if something is coming from Your Honor directly to the jury about -- suggesting that that statement was wrong.

And it all comes from questioning that came from the other side.  It's not as though we elicited this testimony that has caused, you know, this to happen.  This is because the other side -- I mean -- and this is what the other side's strategy has been from the get-go.  Let's ask questions about portions of the report that tow the line hoping that the

Sanford Drob - CX by Mr. Blenk                    1161

witness will open the door to tell the jury bad things.  And Your Honor has correctly shut that down in most instances. And here the questions have caused Dr. Drob to reference a different issue.  And for the -- the improper questions to lead to an instruction that will cause the jury to think that that was mistaken testimony, it's unfairly prejudicial to us to let him -- to let the County's counsel cause that to happen.

And so I think the right answer here either is to give the instruction to Dr. Drob outside the presence of the jury and that's it, or if Your Honor would like to do more to just repeat the instruction limiting -- that the testimony about innocence be limited to damages and not to whether, in fact, he's innocent, the same instruction that Your Honor gave at the beginning of the testimony this morning.

MR. JOEL RUDIN:  Your Honor, may I speak to Mr. Firsenbaum just for a moment?

THE COURT:  Sure.

(Plaintiff's counsel conferring.)

THE COURT:  Just regarding Mr. Drury, the request was after he made those statements you wanted me to correct -- like give I think a correction, which I didn't do.  There were two requests, and then I also had said I would give a limiting instruction to the jurors, and you had said, well, no, let's hold off on that, you need to think about that, and

Sanford Drob - CX by Mr. Blenk                    1162

then we never went back to do it.

So, Mr. Blenk, what's your request?

MR. BLENK:  I think the language you're using is fair, Your Honor, and it reminds the jury that the decision-making is in their hands and it's -- you're not telling the jury which way to come out one way or the other.

I would -- I would also add, Your Honor, that the -- this entire analysis is outside the scope of the expert report and it should be struck anyway, this analysis that there was an onset of substance abuse and that substance abuse would be -- would be likely to recede or to go away by the age of 30.  That's not in the scope of the report.  This is something that he's only made up after the fact that he's been challenged with the pre-existing substance abuse history.  That should be struck for the substance of it beyond this additional matter of prejudice.

THE COURT:  You're asking me to strike the testimony that you just elicited?

MR. BLENK:  Yeah.  It wasn't responsive to my -- it wasn't responsive to my question.

THE COURT:  Okay.  That request is denied.

I'm going to bring the jurors back in.  Well, I'll bring Dr. Drob back in, just give him an instruction not to make any statement about the wrongfulness of Mr. Boyd's incarceration, and then I'm going to give a very brief

Sanford Drob - CX by Mr. Blenk                    1163

instruction to the jurors when they come back in.

What I can do is -- when I tell them to disregard any witness's testimony about the alleged wrongfulness of Mr. Boyd's incarceration, I can say it in a more neutral way about the alleged correctness or wrongfulness of Mr. Boyd's incarceration.  That determination is reserved for you, the, jury, alone.  And that I guess kind of relates to Mr. Drury's testimony.  I think that would be a fair instruction.  Are you asking me to do that?

MR. FIRSENBAUM:  I think that works, Your Honor. Perhaps -- I mean, obviously if you're giving the instruction now, you know, there's some relationship to Dr. Drob, but I guess we would just ask that you not reference any witness's name in giving the instruction.

THE COURT:  I'm not going to reference any person's name.

MR. FIRSENBAUM:  Okay.  Thank you, Your Honor.

THE COURT:  Okay.  Then let's bring in Dr. Drob.

MR. BLENK:  Your Honor, may I be excused just to fill up my water cup?

THE COURT:  Sure.

(Dr. Drob present.)

THE COURT:  Dr. Drob, you can have a seat.

THE WITNESS:  Sure.

THE COURT:  Dr. Drob, I wanted to advise you of

Sanford Drob - CX by Mr. Blenk                    1164

something outside the presence of the jury.

THE WITNESS:  Yes.

THE COURT:  So I think a few times during your testimony, your cross-examination, you testified about the fact that Mr. Boyd was -- it was adjudicated that he was wrongfully incarcerated, and you said another time about him being wrongfully incarcerated.  And I'm going to direct you not to testify at all about that or any vacatur or anything else about that.  Do you understand?

THE WITNESS:  Sure.

THE COURT:  Okay.  Thank you.

Let's bring the jurors in.

(Jury present.)

THE COURT:  Have a seat, everyone.

Members of the jury, I just want to give you a brief instruction, and then we'll continue with cross-examination.

Members of the jury, as a reminder, it is your responsibility as the finder of fact in this case to determine whether Mr. Boyd was deprived of a fair trial in 1977 and whether any policies, practices and customs attributable to Erie County existed and caused such a constitutional violation.  You must disregard any witness's testimony about the alleged correctness or wrongfulness of Mr. Boyd's conviction and incarceration.  Whether Mr. Boyd was denied a fair trial is a question reserved for you, the

jury, alone.

Okay.  You can proceed with cross-examination.

MR. BLENK:  Thank you, Your Honor.

BY MR. BLENK:

Q.   Dr. Drob, you just expressed an opinion about substance abuse and its likelihood of going away with time.  But that's not an opinion that you expressed in your report?

A.   I don't think I expressed that in my report, no.

Q.   Because, in fact, you didn't recognize substance abuse by Mr. Boyd at all in your report?

A.   That's not correct.  I indicated that he does suffer from substance abuse.

Q.   I'm sorry.  You're absolutely right.  You did not -- you did not recognize pre-existing substance abuse in your report?

A.   I recognized it to the extent that he reported using narcotic cough syrup and marijuana prior to his incarceration.

Q.   And you didn't call those symptoms of substance abuse at that time?

A.   I don't know whether I called them that.  They're certainly symptoms of substance abuse.

Q.   So you diagnosed Mr. Boyd with a substance use disorder -- in your analysis Mr. Boyd had a substance use disorder prior to going to prison?

A.   In all likelihood.

Sanford Drob - CX by Mr. Blenk                    1166

Q.   And that's based on your observations and his self-report that he was using cough syrup and marijuana at the time of his entry into prison?

A.   And my review of the records.

Q.   Which -- but you don't reference any alcohol abuse prior to him going to jail, to prison?

A.   In the report I don't think so.

Q.   And, again, the report is how we ensure objectivity, right?

A.   It's an expression of my objective opinion.

Q.   And the opposite of an objective opinion is a conclusion-focused opinion, right?

A.   I'm not -- I'm not sure what you're saying.  The opposite of an objective opinion is a nonobjective opinion.

Q.   Fair enough.  You've written and to avoid -- and to pursue objectivity you have written that providers in a forensic psychology context have to avoid conclusion-based analysis?

A.   Well, yes.  Putting the conclusion prior to their analysis, sure.

Q.   And here all you did was apply a test that has no validity to identifying etiology, two tests, right?

A.   That's not all I did.  That's a -- that's another mischaracterization of what I've done, which you've done several times or many times throughout this cross-examination.

Sanford Drob - CX by Mr. Blenk    1167

I explained on direct that I administered the SCL-90 and I interviewed him regarding virtually all of the salient symptoms on that test.  I administered the TSI-2 and did the same, and I conducted extensive interviews with Mr. Boyd and reviewed extensive records.  So to say that all I did was to administer a test is a gross mischaracterization of my procedure.

Q.    Right.  Fair enough.  And when you performed that test at the conclusion of that test you determined that -- that mental illness was a consequence of Mr. Boyd's incarceration and that substance use was a consequence of his mental illness, correct?

A.    I'm not going to repeat myself other than to say no.

Q.    You don't call anxiety and PTSD an impetus to Mr. Boyd's substance use disorder in your report?

A.    I do call it that and I stand by it.

Q.    Okay.  So, again, the incarceration followed by the mental illness followed by the substance use, correct?

A.    I --

Q.    That was your --

A.    That's an oversimplification of my conclusion.  As I stated several times, I indicated that his incarceration was a major factor in his substance abuse.  I don't draw a simple causal line between incarceration, mental illness and substance abuse.  I recognize it's more complicated than that,

Sanford Drob - CX by Mr. Blenk                    1168

and my report recognizes that.

Q.   When you say "impetus," you mean cause?

A.   A causal factor.

Q.   Yeah.

A.   Yes.

Q.   And when we talk about -- we talked about cause before.  That means that the consequence has to come after the cause.  So if --

A.   Okay.  Fair enough.

Q.   Correct?  Yeah.  And so if you -- this report is what you were using to paint an objective picture for what happened.  I'm only reading from your report.

You say that the mental illness caused the substance abuse?

A.   Could you show me in my report where I use that language?  I mean, I think his mental illness was a factor in causing his substance abuse or a factor in his reigniting his substance abuse once he left prison, but it's not -- as I said, it's not as simple as mental illness causing substance abuse.

Q.   Because it's always complicated because substance abuse can contribute to mental illness and mental illness can contribute to substance abuse?

A.   Yes.  And I believe on direct I indicated that substance abuse was a contributory factor to his -- likely

Sanford Drob - CX by Mr. Blenk                    1169

contributory factor to his failure to recover from mental illness and the symptoms.

Q.   And the anxiety, the PTSD and depression you put in your report were an impetus to the substance abuse disorder?

A.   I think that's an impetus.

Q.   Okay.  A cause?

A.   A cause, yeah.

Q.   Coming before?

A.   It's a cause, an impetus to his continued substance abuse.

Q.   That's not --

A.   Very heavy substance abuse subsequent to his release from prison.

Q.   And if it were important to include that nuance that would have been something that you would have included in your report?

A.   I think it's included in my report when I say that his incarceration was a major factor.  I'm not excluding other factors.

Q.   Dr. Drob, you called the mental health diagnoses an impetus for the substance abuse?

A.   An impetus.  I mean --

Q.   A cause?

A.   We're quibbling about words.  It is a cause.  It is an impetus.  It is a factor.  The article --

Sanford Drob - CX by Mr. Blenk                    1170

THE COURT:  Stop.  We need -- you cannot speak over each other.  Okay?

THE WITNESS:  Okay.

THE COURT:  So let Dr. Drob finish his answer, and then you can ask a new question.

THE WITNESS:  I mean, I don't want to give you a lesson in grammar, but the article "a" means that it's one amongst several.  The article "the" would mean that it would be the only cause.  And I have indicated that it was a factor.

BY MR. BLENK:

Q.   I get that.  I get the multifactorial analysis.

A.   Okay.

Q.   I don't really see it in your report, but I understand the logic of it.

I'm asking about cause.  And we were very clear cause has to come before a consequence.  And so, therefore, in your report your analysis was that the mental illness preexisted the substance abuse?  That was your conclusion?

A.   No.

Q.   Okay.  It's an impetus that came after?

A.   I explained -- I explained myself before we went out and I can explain myself again, that the incarceration that he experienced, the trauma he experienced --

MR. BLENK:  This is not -- Your Honor, this is not --

THE WITNESS:  Because you're characterizing -- you're

Sanford Drob - CX by Mr. Blenk                1171

characterizing my -- my conclusions in a misleading way, and I feel I need to explain myself.

Your Honor, should I continue?

THE COURT:  You can continue answering the question.

THE WITNESS:  Could I hear what the question is?

THE COURT:  Well, he had said it's an impetus that came after, and then you started your explanation.

THE WITNESS:  Well, you're suggesting that I'm making a claim of reverse causality, that a cause somehow comes after the event that happened.  And that's not my point, and that's not my claim.  My claim --

BY MR. BLENK:

Q.   Thank you.

A.   My claim is, as I stated earlier, that his incarceration and the mental illness that he developed in part because of that incarceration served as an impetus to his serious abuse of substances for many years subsequent to his release.

Q.   Okay.  And you reached that conclusion without the knowledge that he was abusing substances prior to going to prison?

A.   I knew that he was abusing substances prior to his going to prison.

Q.   And when we're analyzing substance abuse it's important to include the abused -- the drug of choice, right?

Sanford Drob - CX by Mr. Blenk                    1172

That's relevant to a diagnosis?

A.    Fair enough.

Q.    Okay.  And so when you had the opportunity to describe Mr. Boyd's state before he went to prison, you said marijuana and -- you said marijuana and cough syrup and that was -- those were not the items that Mr. Boyd was abusing before he went to prison, correct?

A.    As I said, he -- based on what he told me he -- those were the items he was using.  Based upon the records there are indications that he was using alcohol, and it's unclear how much he was using prior to going to prison.

Q.    And it --

A.    I will assume and do assume that he was using alcohol prior to going to prison and may have been using it heavily, but it doesn't change my opinion about what you're calling the impetus or what I'm calling a major factor of his incarceration as being a major factor or impetus to his continued drug and substance abuse subsequently.

Q.    And on Monday we also looked at what could be called impetuses or possible impetuses for Mr. Boyd's pre-existing alcohol use.  And when we looked at those Mr. Boyd reported that they included trauma early in his life, right?

A.    He indicated that he -- his parents -- his mother divorced twice and there's some indication that he experienced some abuse from his father -- I'm assuming his stepfather

Sanford Drob - CX by Mr. Blenk                1173

because he didn't know his natural father -- and that that may have contributed to his use of alcohol.

Q.    And at the time he was feeling lesser than?

A.    I'm sorry?

Q.    He expressed feelings of being lesser than peers?

A.    I don't recall that word.  I know he said that he felt he was being bullied by peers.

MR. BLENK:  Can we have DX -- we are showing to the witness only DX 728, 43385 through -- correction -- 43395.

THE WITNESS:  I see what you're referring to.  It says that he was feeling less than in school.

BY MR. BLENK:

Q.    You would agree with me that --

A.    I'm not sure what that means, but obviously there was some negative feelings in school.

Q.    And that would be -- that could be indicative of a symptom of depression?

A.    I mean --

Q.    Yes or no.

A.    It is certainly a negative affect.  It doesn't amount to a diagnosis of depression.

Q.    I'm trying to be fair with you.  I want you to be fair with me.  I didn't say diagnosis.  I said that would be a symptom of depression.

A.    Feeling less than in school, it's too vague for me

Sanford Drob - CX by Mr. Blenk                1174

to answer that in the affirmative.

Q. Too vague. When one is explaining the onset of their drinking in adolescence that would be a vague expression of a symptom in that context?

A. It's certainly a negative -- he certainly had some negative feelings that he at least here is attributing to his use of alcohol -- I mean, as factors in his use in alcohol.

Q. And we also talked about other traumatic events in Mr. Boyd's life, including experiencing experiences concerning his friends and losing his friends in a violent death, a shooting and then a motor vehicle accident?

A. There were two deaths; one at age 10, one at age 14. Yes.

Q. And those are not the -- strike that.

And you interviewed Mr. Boyd and you didn't elicit from him that he was abusing alcohol prior to going to prison?

A. That's correct.

Q. Because you would have written that down if that happened?

A. Yes.

Q. And, in fact, you would have done more? You would have asked him more questions about it, about what was going on in his life before prison?

A. I might have.

Q. And that might have affected your report and it

Sanford Drob - CX by Mr. Blenk                    1175

might have affected your testimony today?

     A.   No.

     Q.   No, because there was a different conclusion that you already had in mind?

     A.   No.  I have indicated many times that I considered his incarceration to be a major factor -- in all likelihood by an overwhelming factor in his depression and his anxiety and posttraumatic stress disorder.  I did not testify, nor am I testifying here, that there weren't other factors, and I indicated I believe in my report that there were other factors, including family conflicts, the death of those two friends that have likely contributed to his mental picture, but --

     Q.   It's just that --

     A.   -- your line of questioning is attempting to create --

          MR. BLENK:  Your Honor, I would object --

          THE WITNESS:  -- a theory --

          MR. BLENK:  -- to Dr. Drob being allowed to go on like this and to characterize a line of questioning as opposed to answering the question.

          THE COURT:  Overruled.

          You can finish answering the question.

          THE WITNESS:  The nature of your question is to me -- is suggesting that somehow these events in childhood were so

Sanford Drob - CX by Mr. Blenk    1176

powerful that the explanation I'm giving for his mental illness subsequent to 27 years in prison is somehow vitiated or diminished by the fact that he had negative experiences in childhood.  If anything, those negative experiences in childhood made him a vulnerable person, and incarceration only made -- the effects of incarceration were only worse as a result of the fact that he may have been fragile prior to going in.

It seems to me absurd to think that all of the symptoms or a majority of the symptoms that he had subsequent to his release from prison are attributable to those early experiences when, in fact, everything we know about people who have been in jail for 27 years, and particularly those who believe themselves to be innocent, tells us otherwise.

BY MR. BLENK:

Q.    And those vulnerabilities are -- your analysis of Mr. Boyd and the vulnerabilities that were presented by those circumstances of his life are not things that are addressed in your report but they were simply dismissed with the observation that Mr. Boyd had a beautiful childhood?

A.    No.

Q.    Okay.  And then you went on -- you are telling us that incarceration is the elephant in the room.  You're telling us that you likened it to the person -- a person going to war and it's -- on Monday, correct?

Sanford Drob - RDX by Mr. Durland                1177

A.   Well, in fact --

Q.   A person returning from war?  Yes or no.

A.   -- the literature -- I made that analogy.  And, in fact, the literature on incarceration of people who believe themselves to be innocent does, in fact, liken it to the experiences of posttraumatic syndrome who have been in war. Grounds in 2003 did a study of 18 such individuals and likened it to that.

Q.   Right.  And what your analysis amounted to on Monday was that once you learned that this big event had happened in somebody's life that had to be the explanation, so that when Mr. Rudin brought this case to you and you looked at it and you understood that the individual at issue had been in prison for a long time, you understood that that was the necessary conclusion and that would have to be the cause of the circumstances of Mr. Boyd's life, correct?

A.   You're testifying now, and my answer to your question is no.

MR. BLENK:  I don't have any further questions at this time, Your Honor.

THE COURT:  Thank you.

Any redirect?

MR. DURLAND:  Two minutes to confer, Your Honor.

THE COURT:  Go ahead.

(Plaintiff's counsel conferring.)

Sanford Drob - RDX by Mr. Durland                1178

MR. DURLAND:  May I proceed, Your Honor?

THE COURT:  Yes.  Go ahead.

REDIRECT EXAMINATION

BY MR. DURLAND:

Q.   Dr. Drob, during your cross-examination Mr. Blenk suggested that determining causation, as you were asked to do here, is difficult.  Do you recall that?

A.   Yes.

Q.   I think what you just indicated now, and which you indicated before, is that at least in this case it was not difficult?

A.   Not particularly.

Q.   And in this case, Dr. Drob, are you aware of any other expert who disagrees with your opinions?

A.   No.

Q.   The opinions that we heard from the County during cross-examination, those are coming from Mr. Blenk?

A.   Yes.

Q.   Mr. Blenk, you're aware, is the lawyer for Erie County and for former Erie County Prosecutor Timothy Drury?

A.   Yes.

Q.   During your cross-examination do you recall Mr. Blenk asking you about Mr. Boyd's work history?

A.   Yes.

Q.   And Mr. Blenk said that in your report there were no

Sanford Drob - RDX by Mr. Durland                    1179

references to employment after 1998.  Do you remember that?

A.   I'm not sure if I recall that, but I know that he said a certain date -- after a certain date.

Q.   And you said if that's what my report says, fair enough?

A.   Yes.

Q.   And Mr. Blenk didn't actually show you your report, did he?

A.   No.

MR. DURLAND:  Let's show Dr. Drob PX 259 for the witness only, please.  We'll go to page five.

BY MR. DURLAND:

Q.   You see this is the work history in your report?

A.   Yes.

MR. DURLAND:  And if we can go down to the top of page six as well.

BY MR. DURLAND:

Q.   Do you see this, Dr. Drob?

A.   I see this page, yes.

Q.   And on this page of your report you, in fact, do indicate that Mr. Boyd worked through 1999?

A.   Yes.

Q.   And 1999 is when Mr. Boyd was returned to prison on a parole violation?

A.   Yes.

Sanford Drob - RDX by Mr. Durland                1180

Q.   You also indicate that Mr. Boyd later worked at Silverado?

A.   You're pointing that out.  I'm reading it, yes.

Q.   You point out that Mr. Boyd worked at PacStar?

A.   That's correct.

Q.   And Restoration Society?

A.   Yes.

Q.   He was a caregiver, correct?  At least this is what you indicate in your report?

A.   He indicated that he was employed as a caregiver, yes.

Q.   And a delivery truck driver?

A.   That's correct.

Q.   And that three of these jobs he lost because of his conviction?

A.   That was what he reported.

MR. DURLAND:  We can take that down.

BY MR. DURLAND:

Q.   During your cross-examination on Monday and again today Mr. Blenk talked a lot about onset.  Do you recall that?

A.   Yes.

Q.   And do you recall him saying to you that there's no evidence in these records of the onset of any mental disease until 2004 at the earliest?  Do you recall that?

A.   Yes.

Sanford Drob - RDX by Mr. Durland                1181

MR. BLENK:  Objection.  Leading, Your Honor.

THE COURT:  Overruled.  He's just referencing to prior testimony.  So I'll allow it.

MR. DURLAND:  Can we please pull up for the witness only DX 728?  Actually forgive me.  Let's go back to Dr. Drob's report.  Let's start there.  This is PX 259 at page 20.

BY MR. DURLAND:

Q.   And am I correct, Dr. Drob, that in this portion of your report you have identified evidence that Mr. Boyd began mental health counseling in 1996?

A.   Yes.

Q.   Okay.  So that's considerably before 2004?

A.   Yes.

MR. DURLAND:  And now if we could go to that exhibit I referenced before, DX 728.

BY MR. DURLAND:

Q.   These are those Horizon health records that Mr. Blenk was talking to you about?

A.   Yeah.  I'm at a cover page.

Q.   Right.  But you recall Mr. Blenk --

A.   Yes.

Q.   -- talking to you about the Horizon health records?

A.   That's correct.

Q.   And referencing these records as being the most

Sanford Drob - RDX by Mr. Durland                1182

comprehensive and the most complete?

A.   Yes.

MR. DURLAND:  If we could go to page 42957.

BY MR. DURLAND:

Q.   Dr. Drob, do you see here that this is an entry where:  Mr. Boyd reports a history of depression and anxiety while he was incarcerated and struggling with symptoms of same for majority of sentence.  He received counseling and psych meds in prison.  Darryl reports medication wasn't that helpful.

Do you see that entry?

A.   Yes.

Q.   Is this one of the records that you relied upon, Dr. Drob --

A.   Yes.

Q.   -- to determine the onset of Mr. Boyd's mental illness?

A.   Yes.

Q.   In conjunction with the rest of your knowledge about how these mental illnesses come to be?

A.   Yes.

MR. DURLAND:  Could we please on the same exhibit go to 42956?

BY MR. DURLAND:

Q.   And here, Dr. Drob, you see that we have another

Sanford Drob - RDX by Mr. Durland                1183

entry where Mr. Boyd reports feeling depressed for a long time and onset was during prison.  Two sentences later:  Darryl attributed much of his depression to having gone to prison at age 17 and not returning to the community until his forties.

Do you see that?

A.    Yes.

Q.    Is this another one of the records that you relied upon in forming your conclusions?

A.    Yes.

MR. DURLAND:  Same exhibit, 43754, please.

BY MR. DURLAND:

Q.    Do you see here we have an entry towards the bottom of the box where Mr. Boyd reports:  First panic attack was in prison.  Reports they were consistent then.  Reports they were more frequent when he was in maximum security prison.  Says it was more claustrophobic.  Says this is what initially drove him to seek mental health treatment.

Do you see that?

A.    Yes.

Q.    And this is another entry that you relied upon along with the other evidence you had at your disposal?

A.    Yes.

MR. DURLAND:  We can take that down.  Thank you.

THE COURT:  Just one second.

I just want to direct the jurors that this testimony

Sanford Drob - RDX by Mr. Durland                    1184

about these records that Mr. Durland is showing the witness, again, those should not be considered for the truth of its contents, but can be considered by you in assessing the reliability and credibility of Dr. Drob's opinions.

Go ahead.

MR. DURLAND:  Thank you, Your Honor.

BY MR. DURLAND:

Q.   Also during your cross-examination Mr. Blenk was talking to you about -- do you remember him talking about symptom inventories?

A.   Yes.

Q.   And he was asking whether a symptom inventory is etiological, if it gives you information about the cause of the mental health illness?

A.   Yes.

Q.   And I think during that discussion you indicated that the symptom inventory itself isn't an etiological document; is that fair?

A.   That's fair.

Q.   But the symptoms do point to a cause, correct?

A.   Certainly in the case of posttraumatic stress disorder they point to a cause.

Q.   So let's start there.  What did Mr. Boyd have flashbacks to?

A.   Events in prison.

Sanford Drob - RDX by Mr. Durland                1185

Q.   Not to neighborhood bullying, right?

A.   No.

Q.   Not to his parents' divorce?

A.   No.

Q.   And does the fact that Mr. Boyd had flashbacks to his experiences in prison rather than to his childhood poverty or to his parents' divorce tell you something about the origins of his PTSD?

A.   Yes.  It suggests that those -- that the prison experience is the causal factor.

Q.   And how about anxiety?  When we talked on direct examination we talked about the anxiety symptoms that Mr. Boyd expressed, right?

A.   That's correct.

Q.   And those were exaggerated startle reflex?

A.   Yes.

Q.   And checking locks on doors, avoiding crowds, avoiding confined spaces, worrying about the next attack?

A.   Being nervous around people.

Q.   Right.  And what did those symptoms tell you about the cause or the root -- the driver of Mr. Boyd's anxiety?

A.   Well, it's -- a slightly stronger inference is needed here, but he connected them, and it makes sense to connect them to the kinds of anxieties that he -- that developed as a result of being incarcerated.

Sanford Drob - RDX by Mr. Durland                    1186

Q.   As compared to factors like teenage drinking?

A.   Yes.

Q.   And Mr. Blenk was just questioning you about feeling less than in school.  Do you recall that?

A.   Yes.

Q.   A feeling of less than in school is not connected to any of the symptoms of anxiety that Mr. Boyd expressed?

A.   He didn't discuss that in his treatment.

Q.   In terms of Mr. Boyd's depression symptoms, I think you talked about Mr. Boyd's feeling of anger and frustration at lost time due to incarceration.  Do you recall that?

A.   Anger, frustration and deep sadness.

Q.   And when he was describing these symptoms he was talking about the lost time due to what, Dr. Drob?

A.   Due to his years of incarceration.

Q.   Not to childhood poverty or drinking alcohol as a child?

A.   Correct.

Q.   Earlier today Mr. Blenk was -- he talked to you some about self-report, and I think he mentioned this on Monday as well.  Do you remember that?

A.   Yes.

Q.   That psychologists necessarily rely on their patients to describe what they're thinking and feeling?

A.   That's correct.

Sanford Drob - RDX by Mr. Durland                    1187

Q.   And I think Mr. Blenk suggested that we ought to be cautious about what Mr. Boyd is reporting because he's a plaintiff with civil litigation, right?

A.   Yes.

Q.   Right.  And you know what would be helpful I think, Dr. Drob, is if there were some test that a psychologist could administer, perhaps a test filled with various questions designed to reveal whether a person is faking symptoms or embellishing symptoms.  Is there such a test, Dr. Drob?

A.   Well, there are a number of tests that do that, and one of the tests that I administered had scales embedded within it that do that.

Q.   And what did Mr. Boyd score on this -- the unusual response scale, the one that identifies faking or exaggeration?

A.   One.

Q.   And you told us before that that's one of the lowest scores you've ever seen from a plaintiff in active civil litigation?

A.   Correct.

Q.   Do you recall that during your cross-examination Mr. Blenk raised this issue about Mr. Boyd's belief in his own innocence?

A.   Yes.

Q.   And during your cross -- Mr. Blenk's

Sanford Drob - RDX by Mr. Durland        1188

cross-examination he said to you there's no medical record that says that. Do you recall?

MR. BLENK: Objection, Your Honor.

Can we approach?

THE COURT: Yes.

(At bench:)

MR. BLENK: Your Honor, this testimony obviously goes to the idea that one is not diagnosed with the subjective feeling of innocence, that there's no -- there's no psychology that goes into making that assessment. It's an assumption that he's making that he's going with and it comes in clean that way. Obviously it does not open the door for them to go into other expressions of subjective innocence by Mr. Boyd over the course of time. Totally unrelated concepts.

MR. DURLAND: They are not unrelated concepts, Your Honor.

If you look right here, what Mr. Blenk does is he -- he's talked about this subjective belief in innocence. Then he says there's no medical record that says that, and then he shows Dr. Drob that 1996 document and elicits from Dr. Drob to the jury the point that, look here, Mr. Boyd reported no symptoms. And clearly what he's indicating is just -- I mean, just what he just said, that this is just something Dr. Drob accepts and that's what he's going with and that

Sanford Drob - RDX by Mr. Durland                    1189

there's nothing in the actual medical records that support

where Mr. Boyd is expressing the types of feelings or

opinions of not just I'm innocent, but feeling anger about it

or feeling frustrated about it.

I mean, Mr. Blenk has made it seem as though this is

just something that was cooked up for this litigation.

There's nothing in the records that Dr. Drob is relying upon.

That's not true.

THE COURT:  How many instances do you want to show to

the witness?

MR. DURLAND:  Well, I mean, how many instances are

there or how many am I going to show?

THE COURT:  How many are you seeking to show to him?

MR. DURLAND:  I think I had three, but Mr. Blenk, one

of the records he used had one of those in another box that

Mr. Blenk didn't show.  So I think I'm up to four now.

MR. BLENK:  I also object to the way that Mr. Durland

is presenting the records and reading them.  He's even being

more direct in getting at hearsay from -- as a proponent of

his witness and leading him asking him -- basically doing

exactly what they said I couldn't do by reading from the

record and saying is that true.  I was actually framing

questions that were based on the records.

But more to the point, Your Honor, the circumstances

are very clear.  Mr. Boyd -- the jury knows that Mr. Boyd has

Sanford Drob - RDX by Mr. Durland                1190

a subjective understanding of innocence.  The jury understands that there is no -- there's no way of a psychological proof or absence of proof of that truth -- or absence of truth.  And so this is just bolstering.  Nobody thinks that --

THE COURT:  Okay.

MR. BLENK:  They know the circumstances.

MR. DURLAND:  It's not bolstering, Your Honor.  It's responsive to --

THE COURT:  Can you just give me a second?  I'm just going to read this.

MR. DURLAND:  You might want to start on 77 as well, Your Honor.  I get confused by the --

MS. PERSICO:  I didn't suggest -- I never suggested that he didn't think he was innocent in 1996.

MR. DURLAND:  Well, I'm not going to continue while the judge is reading.

THE COURT:  Can you just show me where he's saying that he didn't have a subjective opinion at that point of his innocence?  Is that what you're saying?

MR. DURLAND:  Yes, Your Honor.  So what I'm saying -- so this is all about what Dr. Drob relied upon.  Dr. Drob described this phenomenon and he described Mr. Boyd displaying, you know, certain features like the preoccupation with the conviction and, you know, the anger and frustration

Sanford Drob - RDX by Mr. Durland                    1191

with the injustice of it.  And Mr. Blenk raised that issue, and then he said there's no medical record that says that undermining --

THE COURT:  Where does it say that?

MR. DURLAND:  So this is 1078, 21.  Is that right? That's the start of it.  Yeah.  And then it comes up right here.

THE COURT:  Okay.

MR. DURLAND:  And then right here Mr. Blenk says, and, now, there's no record that says that.  And then he starts to introduce this Office of Mental Health issue, and then he shows 735(a), which is the 1996 document.

THE COURT:  But this is all -- I mean, he's kind of starting up a question and he says strike that.

MR. DURLAND:  Well, he says -- I mean --

THE COURT:  But I don't know what --

MR. DURLAND:  He's striking his reference -- he can't strike anything because he's not the judge, but he starts a question.  He says there's no medical record that says that. He starts to describe the record he's introducing.  He stops describing it.  Then he pulls up 735(a), and if you go on, he deliberately elicits the fact that Mr. Boyd said no mental health symptoms.  So he's pairing these two issues and making it seem as though, oh, you're just -- you know, this is -- this is the thing you're doing, but like, look, Mr. Boyd

Sanford Drob - RDX by Mr. Durland                1192

didn't say that.

THE COURT:  No.  I don't think that this testimony that you're referring to is -- I don't think Mr. Blenk was making the point that he didn't say earlier that he had -- that he didn't have a subjective belief of his own innocence.  This is about him not talking about mental health problems because he was up for parole.  And there was discussion about him maybe not wanting to mess things up because he was going to be released or maybe that he was feeling okay at the time because he was being released, but it has nothing to do with the lack of evidence of his subjective opinions of his innocence.

MR. DURLAND:  Okay.  Well, if that's the Court's ruling, fair enough.

THE COURT:  Okay.

(Open court:)

THE COURT:  You can proceed, Mr. Durland.

MR. DURLAND:  Thank you, Your Honor.

BY MR. DURLAND:

Q.  Dr. Drob, right at the beginning of this discussion you talked about your assignment in this case turning out to be not particularly hard; is that fair?

A.  Well, I mean, the work was hard --

Q.  Of course.

A.  -- but --

Sanford Drob - RCX by Mr. Blenk                    1193

Q.   The conclusion seems clear to you?

A.   It's one of the clearer conclusions I've come to in my career.

Q.   And those conclusions are that Mr. Boyd's incarceration was a major factor in causing his PTSD, his depression and his anxiety?

A.   Yes.

Q.   And that his post-release substance abuse was an effort to cope with the agony of that mental illness and his experience in prison, not with the difficulties in his childhood?

A.   That it was at least in part an effort to cope with his post-release, and not -- and certainly not an effort to cope with the difficulties of his childhood.

MR. DURLAND:  I have no further questions, Your Honor.

THE COURT:  Thank you.

Recross?

MR. BLENK:  Briefly, Your Honor.

THE COURT:  Go ahead.

MR. BLENK:  Thank you.

RECROSS-EXAMINATION

BY MR. BLENK:

Q.   Dr. Drob, I want to be very clear that you understand that my questions are coming from a place of trying to analyze the underlying cause, right?

Sanford Drob - RCX by Mr. Blenk                    1194

A.    Yes.

Q.    And that's what you -- that's what your role was in this case?

A.    Not the underlying cause in this case, but the consequences of his incarceration as a cause.

Q.    Consequences.  What were -- what were the -- what can we fairly attribute to what happened to Mr. Boyd as distinct from what happened independent of the events at issue in this case?

A.    Fair enough.

Q.    And I asked you a lot of questions about things that you missed in your report, and you answered some of those questions.  And I think that some of the things that -- the matters that were just brought up to you in the course of redirect, I don't see some of those on the face of your report.  Do you think that all those matters were adequately addressed in your report?

A.    Well, whether they were adequately addressed in my report is an independent question as to whether or not my opinion here is substantially correct and in part based upon those things.  As I indicated, I didn't write every thing that I considered in my report.  I believe it was 36 pages.  It could have been a hundred.

Q.    Well, we already talked about the things that you'd want to -- you'd want to rely on in your report, and if you

Sanford Drob - RCX by Mr. Blenk                1195

see contrary evidence you would want to address it, right?

A.   If it's substantial and relevant, yes.

Q.   But not if -- if the assignment that's given to you gives you such an overarching or all-encompassing aspect of cause, then it's not as important in that context?  This is the easiest case to -- easiest conclusion to reach in your life and that's because the issue is just so big, right?

A.   No.  I didn't say that it was the easiest case in my life.  I indicated that it was one of the easier conclusions to come to in my career because the nature of the trauma in this individual's life and the nature of his being taken out of society for so many years produced a set of psychological symptoms that were so clearly related to that trauma as to be evident and obvious.

So yes, it was -- the conclusion is easy, but the conclusion, again, was that the incarceration was a major cause.  I didn't say it was 90 percent.  I didn't say it was 100 percent.  I indicated that it was a major cause of his psychological symptoms.  I stand by it, and I stand by my assertion that it's an easy conclusion for a forensic or clinical psychologist to arrive at.

Q.   And that conclusion -- that conclusion was reached by your objective process, right?

A.   Absolutely.

Q.   And your objective process lived up to all the

Sanford Drob - RCX by Mr. Blenk                 1196

standards you always hold yourself to?

A.   Yes.

Q.   And it's not conclusion-oriented?

A.   I don't --

Q.   Yes or no.

A.   I didn't -- I didn't walk into this examination with a predisposed or preformulated conclusion and then wrote my report, tailored my report to arrive at that conclusion.  That would be unprofessional.  I never do that.  I didn't do that.

Q.   And yet --

A.   When given -- let me finish.

When given this assignment and I was told what happened to this man, yes, I guess I had some thoughts that it's unlikely that the 26 years wouldn't have had any psychological consequence on him.  But I needed to find out by examining him, by testing him and reviewing records.  I did it and I wrote my report, and I've testified here to that effect.

Q.   You knew where you needed to get in your analysis?

A.   No.

Q.   Question withdrawn.

A.   Answer:  No.

Q.   So you engaged in an objective process and then you happened to miss -- you happened to miss that Mr. Boyd had -- was not disclosing any symptoms -- symptoms of -- or psychiatric symptoms at the time of his discharge in 1996?

Sanford Drob - RCX by Mr. Blenk                    1197

A.   I didn't happen to miss that.  I read it.  It didn't -- it didn't affect my opinion.

Q.   Wouldn't that be an important question for cause though?  We know about chronology.  And that's after an 18 or more year stint in prison and Mr. Boyd is not disclosing any psychiatric symptoms.  That wouldn't be something that would be at least important to address in your report if you were being objective?

A.   Well, as I said, there probably were things I could have addressed in my report that I didn't address in my report.  I'll grant you that.  But none of that is substantially relevant to my opinion here today because they -- it doesn't -- it doesn't have a substantial impact upon my opinion.

Q.   And you also missed -- you also missed the prior substance abuse history, which is a conclusion that is not addressed in your report?  You didn't see that in the records?

A.   I saw it in the records.

Q.   You saw -- you saw Mr. Boyd was drinking a pint of liquor a day and then you didn't include that in your report?

A.   I saw that at one point he reported that he was drinking a pint of liquor a day.

I mean, when I saw that I said to myself, my God, that's -- you know what that is, that's ten or eleven standard drinks of liquor a day at age 16 or 15.  If he was drinking

Sanford Drob - RCX by Mr. Blenk                    1198

that amount he probably would have been hospitalized for it. So it's hard to imagine that that was true, but I definitely considered the fact and have considered the fact here today that he was drinking alcohol prior to his arrest. That I didn't put it in my report, you can -- you can say that my report is incomplete, but it doesn't impact on my opinion.

Q. So you don't trust the -- you think that Mr. Boyd inaccurately described his drinking?

MR. DURLAND: I object to the scope, Your Honor.

THE COURT: Hold on one second.

Sustained.

BY MR. BLENK:

Q. I'm going to show you, Dr. Drob, what's been previously marked as DX 28.

MR. BLENK: This is for Dr. Drob only at 42874.

BY MR. BLENK:

Q. Now, we talked on Monday about the importance of external sources for evaluating what's going on with the subject of your -- that you are evaluating, correct?

A. Fair enough.

Q. And that includes longitudinal history, what's going on with their life over time?

A. Yes.

Q. And you just expressed that Mr. Boyd was -- lost a job at a PacStar because Mr. Boyd had -- because it was

Sanford Drob - RCX by Mr. Blenk                    1199

related to the conditions of his parole or some such?

MR. DURLAND:  I object, Your Honor, on 701, 702.

THE COURT:  Overruled.

THE WITNESS:  I -- Mr. Boyd reported to me that he lost a couple of jobs because they determined that he was a felon and they could not keep him on.  I don't recall if I stated that it was -- it was from PacStar that he told me that.

BY MR. BLENK:

Q.   Fair enough.

A.   But he told me that a couple of those jobs, one working with mental health patients and another job, he lost for those reasons.

Q.   Do you know when -- do you know when Mr. -- strike that.

In the work history that you related for Mr. Boyd --

MR. BLENK:  May I have a moment, Your Honor?

THE COURT:  Sure.

BY MR. BLENK:

Q.   In your report you observed that Mr. Boyd reports to you that he lost opportunities or was terminated from employment because of his criminal record and parole status, and you report that he says that he was terminated from a job at PacStar even though he had been honest on his application?

A.   Okay.

Q.   And that -- and we talked about an objective

Sanford Drob - RCX by Mr. Blenk                1200

process.  And when you're evaluating somebody you can't just always take them at their word, right?

A.    Yes.

Q.    And you had records in your possession -- this is a Horizon health record in front of you?

A.    Yes.

Q.    And this provides information about Mr. Boyd's termination from PacStar as well?

A.    Yes.

Q.    And it says that he was -- he was terminated for showing up late?

A.    Apparently he reported that.

Q.    And that's not something that came out in your analysis?

A.    That's correct.

Q.    Now, what did come out in your analysis were references to flashbacks.  You said -- you testified on Monday that flashbacks are a defining aspect of posttraumatic stress disorder?

A.    Well, some form --

Q.    Or could be?

A.    Some form of intrusive ideation is a defining aspect of it, and amongst those kinds of intrusive ideations flashbacks is one.

Q.    Okay.  And you were having a conversation about

Sanford Drob - RCX by Mr. Blenk   1201

Mr. Boyd -- with Mr. Boyd about -- a long conversation about what was going on while he was in prison?

A.   Yes.

Q.   And you didn't have all the facts at that time about what was going on in Mr. Boyd's childhood or they would have been reflected in your report?

A.   I don't recall whether or not when I had that conversation I had already reviewed the records that pertain to that.  It's possible I reviewed them subsequently.

Q.   Abuse, feeling lesser than and --

A.   It's possible that I saw that.

Q.   At the very least you wouldn't have simply relayed the -- that Mr. Boyd had a beautiful childhood in your report if you knew those facts --

MR. DURLAND:  I object to the characterization, Your Honor.

BY MR. BLENK:

Q.   -- because you'd want to be accurate?

THE COURT:  Hold on a second.

Overruled.

THE WITNESS:  He reported to me that he had a beautiful childhood.  And, you know, in listening to that I can imagine that he romanticized it, particularly in view of a horrible adolescence and adulthood he experienced, but I didn't simply take that as his word -- take him at his word for that.  I've

Sanford Drob - RCX by Mr. Blenk                    1202

already said that.

BY MR. BLENK:

Q.   You met with Mr. Boyd while this lawsuit was going on?

A.   Yes.

Q.   And he reported to you that he had flashbacks of upsetting events from earlier in his life.  That's actually related in his symptom inventory, right?

A.   Yes.

Q.   And that's -- again, that's not something etiological.  So that alone doesn't tell us the cause?

A.   Well, his self-report doesn't -- doesn't by itself tell us the cause.

Q.   And upsetting events earlier in life would be too vague from which we could draw a conclusion?

A.   Well, I inquired what those flashbacks were about. I inquired specifically whether he had flashbacks or intrusive memories of the two deaths of his friends when he was in childhood.  I inquired if there were any other flashbacks, and his response to me was that the flashbacks and intrusive ideation were based upon the years that he spent in prison.

Q.   And you -- and I searched your report for the word "flashback," and it appears three times.  First you report generic symptoms.

A.   Okay.

Sanford Drob - RCX by Mr. Blenk          1203

Q.   Then you report his -- his flashbacks to a time in Elmira Correctional where there was somebody who was attacked in a visiting room?

A.   Yes.

Q.   And so it was some sort of physical assault that he was present for?

A.   Yes.

Q.   And then a flashback to a prison -- when he watches movies about prison?

A.   Yes.

Q.   He has flashbacks?

A.   That's -- yes.

Q.   And if there were other flashbacks reported, it would be important to put them in your report?

A.   I gave them as examples.  I'm not sure if they were the only ones that he expressed to me.

Q.   You might have left some out?

A.   It's possible.

Q.   And, again, that's after you had a long conversation about Mr. Boyd's experience in prison, right?

A.   My report was written after having a -- conducting a psychological -- extensive psychological interview with him.

Q.   And while the lawsuit was going on?

A.   Yes.

Q.   And while you were told that Mr. Boyd had a

Sanford Drob - RCX by Mr. Blenk                1204

beautiful childhood?

MR. DURLAND:  Objection, Your Honor.

THE COURT:  Overruled.

BY MR. BLENK:

Q.   Yes or no.

A.   I'm not sure what you mean by while I was told.

Q.   Sure.

A.   I mean --

Q.   In the course --

A.   He told me that he had a beautiful childhood during my interview of him.

MR. BLENK:  Thank you.  I don't have any further questions.

THE COURT:  Dr. Drob, thank you.  You are all set.

THE WITNESS:  Okay.  Thank you.

THE COURT:  You can step down.

Can counsel approach just for scheduling?

(At bench:)

THE COURT:  Were you going to do --

MR. DURLAND:  I'll let Mr. Firsenbaum answer.

THE COURT:  -- Henry or --

MR. FIRSENBAUM:  No.  Mr. McLeod.

THE COURT:  Okay.  We're going to just take our lunch recess, and then -- because I need to address some things with -- about Mr. McLeod's testimony.  So we'll take our

Boyd v. County of Erie   22-CV-519                    1205

lunch break.

MR. FIRSENBAUM:  Okay.

(Open court:)

THE COURT:  Okay.  Members of the jury, it's 11:51. We're going to take our lunch recess now, and then start with a new witness after our lunch.  So if you could please report back here in one hour.  So at 12:50.

All of the admonishments apply.  Do not talk about the case with anyone.  Have a good lunch.

(Jury not present.)

THE COURT:  Have a seat.

What I'd like to do is come back in a half an hour and then go over just some things regarding Mr. McLeod's testimony.

And then after Mr. McLeod you have -- what's after Mr. McLeod?

MR. FIRSENBAUM:  The videos and readback from Mr. Henry's deposition and trial testimony.

THE COURT:  Okay.  We'll see you in half an hour. Thanks.

(Recess taken at 11:52 a.m.)

                    *           *           *

Boyd v. County of Erie   22-CV-519                    1206

CERTIFICATE OF REPORTER


        In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court of the Western District of New York before the Honorable Meredith A. Vacca on November 12, 2025.



S/ Joony L. Odenbach

Joony L. Odenbach, RPR, CRR

Official Court Reporter