**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| KATHLEEN WEPPNER, AS EXECUTOR OF THE ESTATE OF DARRYL BOYD, | ) ) ) ) | **Case No. 1:22-cv-519** |
| Plaintiff, | ) ) |  |
| - against - | ) ) |  |
| COUNTY OF ERIE, | ) ) |  |
| Defendant. | ) |  |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S POST-TRIAL MOTION PURSUANT TO FRCP 59**

**TABLE OF CONTENTS**

**Page**

ARGUMENT ...........................................................................................................................1

I.    THE COURT'S HANDLING OF JURY ISSUES WAS NOT AN ABUSE OF
      DISCRETION. ...............................................................................................................1

      A.    District courts wield very broad discretion when addressing juror issues. ...........1

      B.    The Court did not abuse its considerable discretion in handling Juror 1's
            report about Juror 3. ...............................................................................................2

      C.    The County does not establish actual prejudice. ....................................................7

II.   THE JURY WAS PROPERLY INSTRUCTED. ............................................................10

      A.    The jury was properly instructed on *Monell* liability ...........................................11

      B.    The jury was properly instructed on *Brady* materiality. .....................................13

      C.    The Court appropriately declined to instruct the jury that *Brady*
            violations and summation misconduct require intentional wrongdoing. .............15

      D.    The jury was properly instructed on the burden of proof. ...................................17

      E.    The jury was properly instructed on apportionment. ...........................................17

III.  THE COURT DID NOT ABUSE ITS DISCRETION IN FASHIONING A
      VERDICT SHEET. ......................................................................................................20

      A.    The verdict form fairly and accurately framed the *Monell* inquiry. ...................21

      B.    The verdict sheet fairly and accurately framed the apportionment
            inquiry. ..................................................................................................................22

IV.   THE COUNTY IS NOT ENTITLED TO A NEW TRIAL BASED ON ANY
      CLAIMED EVIDENTIARY ERROR. ..........................................................................22

      A.    The Court did not abuse its discretion by admitting expert testimony. ..............23

      B.    The Court deftly handled the issue of factual guilt or innocence. ......................30

      C.    The Court correctly precluded the County from introducing evidence
            that Boyd's counsel should have discovered the *Brady* material that
            ADA Drury suppressed. .........................................................................................33

      D.    The Court properly admitted other-case *Monell* evidence. .................................34

      E.    The Court's rulings on party admissions were consistent and correct. ...............37

      F.    The Court properly ruled on issues related to damages. ......................................38

      G.    The Court properly admitted DA Cosgrove's admissions regarding his
            supervision of the Buffalo Police Department. ....................................................41

V.    THE COUNTY IS NOT ENTITLED TO A REMITTITUR. ........................................41

      A.    The jury's damages award is not excessive. .........................................................42

B.      Boyd's pretrial settlement does not entitle the County to an offset. ....................45

CONCLUSION ...............................................................................................................................45

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Akermanis v. Sea-Land Service, Inc.*,
    688 F.2d 898 (2d Cir. 1982).................................................................................41

*Alston v. City of New York*,
    2023 WL 11956309 (E.D.N.Y. Nov. 9, 2023),
    *report and recommendation adopted*,
    2024 WL 4100175 (E.D.N.Y. Sept. 5, 2024) .......................................................44

*Alvarez v. Royal Atlantic Devs., Inc.*,
    2011 WL 13173807 (S.D. Fla. May 31, 2011) .....................................................39

*Amorgianos v. National R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002).................................................................................25

*Atlantic Resources Marketing Systems, Inc. v. Troy*,
    659 F.3d 1345 (Fed. Cir. 2011)..............................................................................6

*Banks v. Dretke*,
    540 U.S. 668 (2004)..............................................................................................33

*Bellamy v. City of New York*,
    914 F.3d 727 (2d Cir. 2019)...........................................................................14, 15

*Bender v. City of New York*,
    78 F.3d 787 (2d Cir. 1996)...................................................................................20

*Bermudez v. City of New York*,
    790 F.3d 368 (2d Cir. 2015).................................................................................19

*Bibbins v. Dalsheim*,
    21 F.3d 13 (2d Cir. 1994) ......................................................................................7

*Brady v. Maryland*,
    373 U.S. 83 (1963)..........................................................................................13, 15

*Brown v. City of Chicago*,
    2025 WL 2785426 (N.D. Ill. Sept. 30, 2025) .....................................................44

*Burton v. City of New York*,
    630 F. Supp. 3d 586 (S.D.N.Y. 2022)..............................................................38, 39

*Carroll v. Trump*,
124 F.4th 140 (2d Cir. 2024),
*cert. pending*, No. 25-573 (Nov. 13. 2025)..........................................................................22

*Cash v. County of Erie*,
654 F.3d 324 (2d Cir. 2011)....................................................................................20, 21

*Darnell v. Pineiro*,
849 F.3d 17 (2d Cir. 2017)...............................................................................................16

*Davis v. Velez*,
15 F. Supp. 3d 234 (E.D.N.Y. 2014),
*aff'd*, 797 F.3d 192 (2d Cir. 2015)..................................................................................7

*DiSimone v. Phillips*,
461 F.3d 181 (2d Cir. 2006)............................................................................................13

*DiSorbo v. Hoy*,
343 F.3d 172 (2d Cir. 2003)............................................................................................43

*Dominguez v. Hendley*,
545 F.3d 585 (7th Cir. 2008) ..........................................................................................45

*Dufort v. City of New York*,
874 F.3d 338 (2d Cir. 2017).............................................................................................19

*Fappiano v. City of New York*,
640 F. App'x 115 (2d Cir. 2016) ................................................................................15, 16

*Franco v. Gunsalus*,
2023 WL 3590102 (2d Cir. May 23, 2023) ....................................................................10

*Fuentes v. Griffin*,
829 F.3d 233 (2d Cir. 2016)............................................................................................32

*Gillispie v. Miami Township, Ohio*,
2025 WL 1276900 (6th Cir. May 2, 2025) .....................................................................45

*Glossip v. Oklahoma*,
604 U.S. 226 (2025)........................................................................................................14

*Gonzalez v. United States*,
80 F.4th 183 (2d Cir. 2023) ............................................................................................44

*Gorawara v. Caprio*,
2025 WL 1571762 (2d Cir. June 4, 2025) ......................................................................16

*Houston v. Cotter*,
 2016 WL 1253391 (E.D.N.Y. Mar. 30, 2016)...............................................21

*Hudson v. New York City*,
 271 F.3d 62 (2d Cir. 2001).............................................................................15

*In re Davis New York Venture Fund Fee Litigation*,
 2019 WL 11272913 (S.D.N.Y. July 2, 2019)..................................................36

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*,
 725 F.3d 65 (2d Cir. 2013)..................................................................1, 2, 7, 8, 9

*Jarvis v. Ford Motor Co.*,
 283 F.3d 33 (2d Cir. 2002)..............................................................................10

*Jean v. Krauss*,
 2015 WL 430116 (W.D.N.Y. Feb. 2, 2015) ....................................................11

*Jimenez v. City of Chicago*,
 732 F.3d 710 (7th Cir. 2013) ..........................................................................45

*Keeling v. Hars*,
 809 F.3d 43 (2d Cir. 2015)........................................................................10, 11

*Kimes v. United States*,
 242 F.2d 99 (5th Cir. 1957) ............................................................................10

*Kingsley v. Hendrickson*,
 576 U.S. 389 (2015)........................................................................................16

*Kyles v. Whitley*,
 514 U.S. 419 (1995)........................................................................................14

*Leka v. Portuondo*,
 257 F.3d 89 (2d Cir. 2001)..............................................................................13

*Lewis v. City of Albany Police Department*,
 547 F. Supp. 2d 191 (N.D.N.Y. 2008),
 *aff'd*, 332 F. App'x 641 (2d Cir. 2009)...........................................................44

*Lewis v. Connecticut Commissioner of Correction*,
 790 F.3d 109 (2d Cir. 2015)............................................................................33

*Lopez v. City of New York*,
 105 F. Supp. 3d 242 (E.D.N.Y. 2015) ............................................................19

*Los Angeles v. Humphries*,
 562 U.S. 29 (2010)..........................................................................................21

*Luca v. County of Nassau*,
    344 F. App'x 637 (2d Cir. 2009) ........................................................6

*Lucente v. County of Suffolk*,
    980 F.3d 284 (2d Cir. 2020)...........................................................11

*Marx v. Hartford Accident & Indemnity Co.*,
    321 F.2d 70 (5th Cir. 1963) ........................................................9, 10

*Matusick v. Erie County Water Authority*,
    757 F.3d 31 (2d Cir. 2014)............................................................11

*McCann v. Fuller*,
    2023 WL 10947185 (W.D. Mich. Apr. 20, 2023) .............................44

*McCullock v. H.B. Fuller Co.*,
    61 F.3d 1038 (2d Cir. 1995)...........................................................25

*MMA Consultants 1, Inc. v. Republic of Peru*,
    719 F. App'x 47, 50 (2d Cir. 2017)..................................................36

*Newton v. City of New York*,
    171 F. Supp. 3d 156 (S.D.N.Y. 2016)..............................................45

*Nielson v. Union Pacific R.R.*,
    2024 WL 4458648 (D. Neb. Oct. 10, 2024) .....................................39

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)........................................................22, 23

*Nnodimele v. Derienzo*,
    2016 WL 3561708 (E.D.N.Y. June 27, 2016) ...................................30

*Ortiz v. Stambach*,
    137 F.4th 48 (2d Cir. 2025) ........................................................17, 20

*Paolitto v. John Brown E. & C., Inc.*,
    151 F.3d 60 (2d Cir. 1998)..............................................................27

*Patterson v. City of New York*,
    2017 WL 3432718 (E.D.N.Y. Aug. 9, 2017).....................................35

*Peacock v. City of Rochester*,
    2016 WL 4150445 (W.D.N.Y. Aug. 5, 2016) ...................................30

*Poventud v. City of New York*,
    750 F.3d 121 (2d Cir. 2014)........................................................15, 30

*Price v. Kramer*,
    200 F.3d 1237 (9th Cir. 2000) ................................................................................7

*Quinby v. WestLB AG*,
    2008 WL 3826695 (S.D.N.Y. Aug. 15, 2008) ..................................................43

*Rangolan v. County of Nassau*,
    370 F.3d 239 (2d Cir. 2004) ..............................................................................43

*Reach Music Publishing, Inc. v. Warner Chappell Music, Inc.*,
    988 F. Supp. 2d 395 (S.D.N.Y. 2013) ..............................................................26

*Redd v. New York Division of Parole*,
    678 F.3d 166 (2d Cir. 2012) ..............................................................................43

*Restivo v. Hessemann*,
    846 F.3d 547 (2d Cir. 2017) ..........................................................17, 19, 20, 23

*Rivas v. Onondaga County*,
    2025 WL 2675826 (N.D.N.Y. Sept. 18, 2025) ................................................37

*Saint-Jean v. Emigrant Mortgage Co.*,
    129 F.4th 124 (2d Cir. 2025) ............................................................................10

*Sanchez v. City of Buffalo*,
    2024 WL 641265 (W.D.N.Y. Feb. 15, 2024) ..................................................40

*Scala v. Moore McCormack Lines, Inc.*,
    985 F.2d 680 (2d Cir. 1993) ..............................................................................43

*Scoma v. City of New York*,
    2021 WL 1784385 (E.D.N.Y. May 4, 2021) ....................................................38

*Segars v. Atlantic Coast Line R.R.*,
    286 F.2d 767 (4th Cir. 1961) ..............................................................................9

*Shih Wei Su v. Filion*,
    335 F.3d 119 (2d Cir. 2003) ..............................................................................33

*Tankleff v. Senkowski*,
    135 F.3d 235 (2d Cir. 1998) ..............................................................................14

*Tesser v. Board of Education*,
    370 F.3d 314 (2d Cir. 2004) ..............................................................................22

*Townes v. City of New York*,
    176 F.3d 138 (2d Cir. 1999) ..............................................................................18

*Tyler v. Bethlehem Steel Corp.*,
958 F.2d 1176 (2d Cir. 1992)........................................................................26

*United States v. Abrams*,
137 F.3d 704 (2d Cir. 1998)............................................................................8

*United States v. Acosta*,
833 F. App'x 856 (2d Cir. 2020) .....................................................................4

*United States v. Agurs*,
427 U.S. 97 (1976).........................................................................................14

*United States v. Aiyer*,
33 F.4th 97 (2d Cir. 2022) ...............................................................................1

*United States v. Anderson*,
561 F.2d 1301 (9th Cir. 1977) .........................................................................9

*United States v. Baker*,
899 F.3d 123 (2d Cir. 2018).............................................................................7

*United States v. Brotherton*,
427 F.2d 1286 (8th Cir. 1970) .........................................................................9

*United States v. Calderon*,
610 F. App'x 42 (2d Cir. 2015) .......................................................................6

*United States v. Cox*,
324 F.3d 77 (2d Cir. 2003)............................................................................1, 6

*United States v. Eldridge*,
860 F. App'x 773 (2d Cir. 2021) .....................................................................5

*United States v. Farhane*,
634 F.3d 127 (2d Cir. 2011).......................................................................1, 8, 9

*United States v. Feng Li*,
630 F. App'x 29 (2d Cir. 2015) .......................................................................4

*United States v. Finley*,
245 F.3d 199 (2d Cir. 2001)...........................................................................34

*United States v. Gillis*,
773 F.2d 549 (4th Cir. 1985) .........................................................................27

*United States v. Griffith*,
284 F.3d 338 (2d Cir. 2002)...........................................................................27

*United States v. Haynes*,
729 F.3d 178 (2d Cir. 2013).................................................................................6

*United States v. Helmsley*,
985 F.2d 1202 (2d Cir. 1993)..............................................................................14

*United States v. Kaiser*,
609 F.3d 556 (2d Cir. 2010)................................................................................27

*United States v. Peterson*,
385 F.3d 127 (2d Cir. 2004).................................................................1, 4, 5, 6, 7

*United States v. Pollok*,
139 F.4th 126 (2d Cir. 2025) ..............................................................................23

*United States v. Rosa*,
11 F.3d 315 (2d Cir. 1993),
*overruled on other grounds by*,
*Crawford v. Washington*, 541 U.S. 36 (2004) ...................................................27

*United States v. Siegel*,
271 F. App'x 115 (2d Cir. 2008) ...................................................................2, 6, 7

*United States v. Taylor*,
820 F. Supp. 124 (S.D.N.Y. 1993).......................................................................27

*United States v. Thai*,
29 F.3d 785 (2d Cir. 1994)....................................................................................2

*United States v. Torres*,
124 F.4th 84 (2d Cir. 2024) ...........................................................................1, 2, 5, 6

*United States v. Williams*, 930 F.3d 44 (2d Cir. 2019) ..................................................37

*United States v. Wilson*,
2013 WL 1966932 (E.D.N.Y. May 13, 2013) .......................................................8

*United States ex rel. Owen v. McMann*,
435 F.2d 813 (2d Cir. 1970)..............................................................................7, 8

*Valentin v. City of Rochester*,
783 F. App'x 97 (2d Cir. 2019) ..........................................................................15

*Villasana v. Wilhoit*,
368 F.3d 976 (8th Cir. 2004) ..............................................................................33

*Wedyke v. Speedway LLC*,
2019 WL 3425378 (E.D. Mich. July 30, 2019) ..................................................39

*Weppner v. County of Erie*,
2025 WL 3214581 (W.D.N.Y. Nov. 18, 2025) ........................................................34, 35

*Wheatley v. Ford*,
679 F.2d 1037 (2d Cir. 1982)......................................................................................44

*White v. City of New York*,
206 F. Supp. 3d 920 (S.D.N.Y. 2016)...........................................................................35

*White v. McKinley*,
2009 WL 813001 (W.D. Mo. Mar. 26, 2009),
*aff'd*, 605 F.3d 525 (8th Cir. 2010).............................................................................45

*White v. McKinley*,
2009 WL 813372 (W.D. Mo. Mar. 26, 2009)................................................................44

*White v. McKinley*,
605 F.3d 525 (8th Cir. 2010) ......................................................................................44

*Wilburn v. Eastman Kodak Co.*,
180 F.3d 475 (2d Cir. 1999)..........................................................................................9

*Wray v. City of New York*,
490 F.3d 189 (2d Cir. 2007)..................................................................................18, 19

*Zeno v. Pine Plains Central School District*,
702 F.3d 655 (2d Cir. 2012)............................................................................42, 43, 45

**DOCKETED CASES**

*McCann v. Fuller*,
No. 1:19-cv-1032, ECF No. 245 (W.D. Mich. Sept. 20, 2023).......................................44

**STATUTES, RULES, AND REGULATIONS**

FED. R. CIV. P. 51.........................................................................................................10

FED. R. EVID. 401.........................................................................................................24

**OTHER AUTHORITIES**

U.S. Bureau of Labor Statistics Inflation Calculator,
*available at*, https://www.bls.gov/data/inflation_calculator.htm......................................44

Plaintiff Kathleen Weppner, Executor of the Estate of Darryl Boyd (the "Boyd Estate") respectfully submits this memorandum in opposition to Defendant County of Erie's Post-Trial Motion Pursuant to Federal Rule of Civil Procedure 59 (the "Motion" or "Mem.").[1]

## ARGUMENT

### I. THE COURT'S HANDLING OF JURY ISSUES WAS NOT AN ABUSE OF DISCRETION.

#### A. District courts wield very broad discretion when addressing juror issues.

When investigating potential juror issues, district courts "face a delicate and complex task," *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 125 (2d Cir. 2013) (cleaned up), which requires them to weigh "a series of discretionary (and often countervailing) factors," *United States v. Aiyer*, 33 F.4th 97, 130 (2d Cir. 2022). While the court "must investigate and, if necessary, correct a problem, it must also avoid tainting a jury unnecessarily," avoid "disrupt[ing] the trial," and safeguard "the ability of the jurors to deliberate with each other." *United States v. Cox*, 324 F.3d 77, 88 (2d Cir. 2003); *see also United States v. Torres*, 124 F.4th 84, 104 (2d Cir. 2024) ("[A]ny investigation is inherently intrusive and risks tainting the jury[.]").

Because the district court is best positioned "to evaluate jurors' credibility" and make "a fact-specific, discretionary determination," it "must be given wide discretion to decide upon the appropriate course to take, in view of [its] personal observations of the jurors and parties." *Aiyer*, 33 F.4th at 128, 130 (cleaned up); *see also United States v. Farhane*, 634 F.3d 127, 168 (2d Cir. 2011) (district court "position[ed] to sense the atmosphere of the courtroom as no appellate court can" (citation omitted)); *United States v. Peterson*, 385 F.3d 127, 134 (2d Cir. 2004) ("[T]he trial

---

[1] The notation "Dkt. __" refers to documents filed in *Boyd v. County of Erie*, No. 22-CV-519 (W.D.N.Y.). Pinpoint citations generally refer to the cited document's internal page numbering, but the notation "ECF p. __" refers to the page numbers contained in the CM-ECF banner at the top of the page. The notation "Tr. T." refers to the transcript of the Boyd Estate's civil-rights trial. The notations "PX" and "DX" refer to exhibits admitted in the Boyd Estate's civil-rights trial.

judge is in a unique position to ascertain an appropriate remedy, having the privilege of continuous observation of the jury in court." (cleaned up)). Often, "the court's reiteration of its cautionary instructions to the jury is all that is necessary." *United States v. Thai*, 29 F.3d 785, 803 (2d Cir. 1994). If the court elects to do more, it "enjoys broad flexibility . . . with respect to when to question jurors and the manner of that inquiry." *Torres*, 124 F.4th at 104 (cleaned up); *see also United States v. Siegel*, 271 F. App'x 115, 117 (2d Cir. 2008) ("Encompassed in [the district court's] discretion is the decision whether or not to question jurors to determine more about possible misconduct . . . ."). The district court's discretion is especially broad where, as here, "the allegations of misconduct relate to statements made by the jurors themselves, rather than to outside influences," *In re MTBE*, 725 F.3d at 125 (cleaned up). And even where the district court abuses its discretion, a new trial is not warranted unless the movant "also demonstrate[s] that actual prejudice resulted." *Id.* (cleaned up).

B. **The Court did not abuse its considerable discretion in handling Juror 1's report about Juror 3.**

On the evening of November 17, the Court emailed counsel to say that there was a juror issue which would need to be addressed the following morning. Dkt. 495-11. The next day, the Court explained that Juror 1 had informed the jury administrator that Juror 3 had expressed antipathy to police and had made comments about the case. Tr. T. 1999:7-15. The Boyd Estate asked the Court to simply "reiterate [its] instructions" about keeping an open mind and not discussing the case, *id.* at 2001:10-15, 2004:17-22, but the Court denied that request, *id.* at 2002:14-16, 2005:3-4, and individually interviewed Juror 1 and Juror 3.

Juror 1 stated that Juror 3 had professed a bias against police based on his "experience living in the streets in Brooklyn"; had implied that he (Juror 3) was discussing the case at home; and had made comments regarding the strength of the Boyd Estate's proof. *Id.* at 2022:7-2023:11.

- 2 -

Defense counsel proposed several follow-up questions, *id.* at 2023:19-2024:10, and the Court, over the Boyd Estate's objection, agreed to inquire further, *id.* at 2024:23-2025:3. In response to the Court's follow-up questions, Juror 1 said that Juror 3 had made comments on three to five occasions; that he (Juror 1) and other jurors had responded "we should be avoiding this type of thing"; and that Juror 3 had "gotten better since" receiving these remonstrances. *Id.* at 2025:5-25. Pressing further, the Court asked Juror 1 whether, in response to Juror 3's comments, other jurors had said anything beyond steering Juror 3 away from the case. *Id.* at 2026:1-3. Juror 1 replied that "sometimes people start to talk a little bit, but . . . nothing too in depth or too long." *Id.* at 2026:4-11. When the Court asked Juror 1 to elaborate on "talk a little bit," Juror 1 could not think of anything beyond other jurors moving the discussion to "a different topic." *Id.* at 2026:12-2027:8.

The Court then excused Juror 1, summoned Juror 3, and asked him if he had expressed to his fellow jurors any biases against police officers or opinions about the case. *Id.* at 2030:2-2031:3. Juror 3 denied expressing antipathy to police. *Id.* at 2030:18-2031:1. He also denied discussing the case, saying "I haven't made anything like that, but you hear those types of statements in there." *Id.* at 2030:12-17. At sidebar, defense counsel said he was confused about whether the phrase "you hear those types of statements in there" referred to "the testimony" of witnesses or comments by other jurors. *Id.* at 2031:17-25. The Court agreed to follow up, and asked Juror 3 whether he had had "any discussion at all however brief with any of the other jurors about the case." *Id.* at 2032:1-8. Juror 3 said "[n]o," he "wouldn't be the oddball" in the jury room "speaking about the case when you ain't supposed to talk about the case." *Id.* at 2032:9-15.

Based on its interviews of the two jurors and "the totality of what has been addressed," the Court "credit[ed] [Juror 1]'s account," *id.* at 2035:4-8, and, over the Boyd Estate's objection, *id.* at 2033:4-19, excused Juror 3 for bias, *id.* at 2035:1-3. The Court also decided, again over the

Boyd Estate's objection, *id*. at 2036:23-2037:1, that it would question each remaining juror individually to verify that they were untainted and impartial, *id.* at 2036:15-2037:14. The County requested that the Court's questioning canvass all the "comings and goings of what's been going on in the jury room," and the "conversations that [each juror] recalls," reasoning that the Court may "find out there's these widespread conversations beyond [Juror 3]." *Id*. at 2038:4-22. But the Court denied that request, finding that "there hasn't been any indication that there has been these widespread discussions about the case at all." *Id*. at 2038:23-25. Juror 1 credibly testified that there were "three to five times" when Juror 3 "made these comments," and Juror 1 "wasn't able to recall anything of substance that another juror responded with about the case," other than "tr[ying] to change the conversation." *Id*. at 2039:11-16. Absent evidence of bias or case discussion beyond Juror 3, the Court was unwilling "to try to pry and see if there has been." *Id*. at 2038:25-2039:1; *accord United States v. Acosta*, 833 F. App'x 856, 865 (2d Cir. 2020) (district court properly declined to question juror involved in premature discussions when "the possibility of any far-reaching conversation regarding views on the case was minimal" (citation omitted)).[2]

The Court then summoned the jurors individually; informed them that Juror 3 had been excused for violating the Court's rules; asked them whether Juror 3 had said anything that affected their ability to be fair and impartial; and asked if they could promise that, notwithstanding anything Juror 3 may have said, they could continue to be fair and impartial. Tr. T. 2040:11-2047:6. Based on the jurors' responses and demeanor, the Court determined that any potential issue had been resolved and the trial could proceed. *Id*. at 2047:9-10; *accord Peterson*, 385 F.3d at 136 (district

---

[2] *See also United States v. Feng Li*, 630 F. App'x 29, 32-33 (2d Cir. 2015) (district court properly interviewed Juror 6 and credited her statement that "Juror 10 may have made occasional comments or questions about the case [outside of court] but nothing inappropriate was said"); *Peterson*, 385 F.3d at 135 ("[I]t was within Judge Larimer's discretion to determine whether to inquire more extensively as to what other discussions had taken place among the jurors.").

court appropriately addressed potential impartiality by "asking the jurors themselves whether they were able to remain impartial after hearing juror number three's comments," "gaug[ing] the jurors' responses," "observing their demeanor," and concluding that they could be impartial).

The County raises four objections to the Court's investigation. Each is meritless.

*First*, the County claims that the Court's overnight email alerting counsel to a "juror issue" was too generic. Mem. at 4. But the County cannot complain about the Court's email when it never requested a more detailed preview, and even now cannot say what it would have done differently.

*Second*, the County complains that the jury administrator did not testify about her discussion with Juror 1. But the Court relayed what Juror 1 had said to the jury administrator, Tr. T. 1999:7-15; *contra* Mem. at 4; the County never demanded testimony from the jury administrator, Tr. T. 2020:21-24; and what mattered was Juror 1's observations, not the administrator's second-hand retelling. The Court ensured that counsel "ascertain[ed] all the facts," Mem. at 4, by interviewing Juror 1 in counsel's presence and inviting counsel to propose follow-up questions, Tr. T. 2021:10-2027:13.

*Third*, the County claims that the Court did not "inquir[e] into how Juror No. 3 may have influenced other members of the Jury." Mem. at 4-5. That is simply untrue. The Court questioned each juror individually and determined that nothing Juror 3 may have said impacted their ability to render a fair and impartial verdict. Tr. T. 2040:11-2047:10. This is just the sort of inquiry the Second Circuit has endorsed. *See, e.g.*, *Peterson*, 385 F.3d at 134, 136.[3] And it is just the sort of

---

[3] In fact, the Second Circuit routinely approves inquiries far less searching than the Court's. *See, e.g.*, *Torres*, 124 F.4th at 104 (no abuse of discretion where district court interviewed juror and determined that she could be impartial because "'she did not say that she could not be impartial'"); *United States v. Eldridge*, 860 F. App'x 773, 778 (2d Cir. 2021) (no abuse of discretion where district court addressed potential juror impartiality by "question[ing] the entire panel of jurors at once . . . rather than conducting individual inquiries," and then "issuing a cautionary instruction to

inquiry the district court did *not* undertake in the two cases the County cites. *See United States v. Haynes*, 729 F.3d 178, 191-92 (2d Cir. 2013) (district court refused to investigate evidence that "jurors had questioned the presumption of innocence"); *Atl. Res. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1358-61 (Fed. Cir. 2011) (new trial warranted where juror in trade-secret trial brought a clamp into the jury room and the district court failed to "ask[] if the jurors could remain impartial after viewing the clamp"). The County's complaint about the form of the Court's questioning, Mem. at 5, is equally meritless. The formulation of questions lies squarely within the Court's discretion, *Torres*, 124 F.4th at 104, and the Second Circuit has approved the form of questioning the Court selected, *Peterson*, 385 F.3d at 134, 136.

*Fourth*, the County objects that the Court did not investigate whether jurors other than Juror 3 engaged in premature deliberations. Mem. at 3, 5. Again, not so; the Court *did* investigate this issue. Tr. T. 2021:18-2027:13, 2029:5-2032:16, 2038:23-2039:16. The County is simply unhappy with the Court's findings. Thus, whereas the County points to Juror 1's initial comment about other jurors speaking "a little bit" in response to Juror 3's comments, Mem. at 5, the Court determined, based on Juror 1's responses to follow-up questions urged by the County, that there were no broader discussions of the case, Tr. T. 2038:23-2039:16. Likewise, whereas the County cites Juror 3's reference to hearing "'those types of statements in there,'" Mem. at 5, the Court rejected Juror

---

the jury on its obligation to be fair and impartial"); *United States v. Calderon*, 610 F. App'x 42, 45 (2d Cir. 2015) (district court properly addressed potential premature deliberations by reiterating instructions); *Luca v. Cnty. of Nassau*, 344 F. App'x 637, 640-41 (2d Cir. 2009) (no abuse of discretion where district court addressed mid-trial contact between a witness and a juror by interviewing the witness, crediting witness's account, and "determin[ing] without further inquiry of the juror that the fairness of the trial had not been compromised"); *Siegel*, 271 F. App'x at 117 ("[W]e have frequently found no abuse of discretion when judges have declined to investigate allegations of jury misconduct but instead merely reiterated their instructions against premature deliberation."); *Cox*, 324 F.3d at 87-88 (district court properly investigated premature deliberations by interviewing "the two jurors thought to be involved, and then briefly canvass[ing] the jury as a whole" without conducting an "individualized examination of each juror").

3's testimony as not credible, Tr. T. 2035:3-5. Moreover, though the County now calls Juror 3's comment "unambiguous," Mem. at 5, its lead attorney found the comment confusing and requested further inquiry, Tr. T. 2031:17-25. When the Court followed up, Juror 3 said that "speaking about the case" would have made him "the oddball" in the jury room, *id*. at 2032:1-15, corroborating Juror 1's statement that other jurors were not discussing the case.

## C.    The County does not establish actual prejudice.

Even if the County had established that the Court abused its discretion, it has not shown "that actual prejudice resulted." *In re MTBE*, 725 F.3d at 125 (cleaned up). To start, the County has not identified any juror misconduct that could have, even theoretically, tainted the jury. While jurors should not deliberate before receiving all the evidence, "generalized discussions" of the case do not meet the "common sense definition of deliberation." *United States v. Baker*, 899 F.3d 123, 132 (2d Cir. 2018) (cleaned up).[4] Likewise, while jurors cannot rely on extrinsic "facts about the specific defendant then on trial," jurors' personal experiences and "subjective opinions" are "the very human elements that constitute one of the strengths of our jury system." *United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970) (cleaned up); *accord Price v. Kramer*, 200 F.3d 1237, 1255 (9th Cir. 2000) (two jurors in civil-rights trial "telling the other jurors about their own experiences with the police" did not "constitute[] improper extraneous evidence").[5] Here,

---

[4] *See also Siegel*, 271 F. App'x at 117 ("Jurors are permitted to have conversations amongst themselves; they must simply steer clear of topics that would prejudice their later deliberations or taint the reasoning of their fellow jurors."); *Peterson*, 385 F.3d at 135 ("[W]e do not agree that juror number three was engaging in premature deliberations when she told another juror that she knew the defendants.").

[5] *See also Bibbins v. Dalsheim*, 21 F.3d 13, 14, 17 (2d Cir. 1994) (per curiam) ("no juror misconduct" where juror related personal knowledge of the street where the crime took place; such observations are "part of the fund of ordinary experience that jurors may bring to the jury room"); *Davis v. Velez*, 15 F. Supp. 3d 234, 244 (E.D.N.Y. 2014) (juror's reference to newspaper article

Juror 3's experience with police is not extrinsic evidence, and his passing comments about the evidence are not premature deliberations. *Cf.* Tr. T. 2035:6-8 (excusing Juror 3 for bias, not for prematurely deliberating or introducing extrinsic evidence).

Still less has the County identified any way in which Juror 3's comments could have "change[d] the outcome of the case," *In re MTBE*, 725 F.3d at 125. After Juror 3 was excused, the remaining jurors affirmed that nothing Juror 3 had said would affect their ability to be fair and impartial, and all promised to render a fair and impartial verdict. Tr. T. 2040:11-2047:6. These assurances, which the Court credited, are fatal to any claim of prejudice. *In re MTBE*, 725 F.3d at 125 (jurors' assurances that they "felt capable of rendering an independent decision" doomed the defendant's "theory of prejudice").[6]

The possibility of prejudice is further diminished when Juror 3's comments are viewed, as they must be, *see Owen*, 435 F.2d at 818 & n.5, in the context of the entire trial. In all the time the jurors spent in the jury room, there were no more than five occasions where one juror made potentially improper comments, which other jurors politely deflected. *Compare United States v. Wilson*, 2013 WL 1966932, at *3 (E.D.N.Y. May 13, 2013) (fleeting discussions of the case, even if improper, were "extremely unlikely to affect [jurors'] ability to properly execute their duties"). These isolated comments from an idiosyncratic juror who took no part in the jury's deliberations pale beside the overwhelming proof presented by the Boyd Estate and the meager defense

---

regarding police corruption did not taint trial in § 1983 case against police officers because "it contained no facts or information related to the instant case"), *aff'd*, 797 F.3d 192 (2d Cir. 2015).

[6] *See also Farhane*, 634 F.3d at 170 (where district court questions jurors, and all confirm that they can follow the court's instructions, the court can "reasonably conclude[] from the totality of the circumstances that the misconduct at issue did not warrant either a mistrial or new trial"); *United States v. Abrams*, 137 F.3d 704, 708-09 (2d Cir. 1998) (per curiam) (curative instruction "effectively communicated that any opinions that had been formed based upon [premature] conversations should be disregarded, thereby dispelling any possible damage").

presented by the County. Indeed, because the County's principal defense was to blame detectives for Darryl Boyd's wrongful conviction, *see* Tr. T. 2206:7-2215:17 (County summation), Juror 3's criticism of the police worked in its favor, *see Farhane*, 634 F.3d at 169 (defendant "unlikely to be harmed by extrinsic information entirely consistent with his own [summation]"). In short, it is preposterous to suggest that the jury found for the Boyd Estate because of Juror 3's passing comments rather than the trial evidence.

And indeed, the County barely argues prejudice. All it says is that the jury rendered a substantial plaintiff's verdict "after only one hour of deliberation," raising "the very real possibility of premature deliberation." Mem. at 6. To start, this argument misses the point of a prejudice inquiry. Even if the speed of the jury's verdict somehow raised a possibility of *premature deliberation*, the County offers no basis to conclude that this possible premature deliberation "change[d] the outcome of the case," *In re MTBE*, 725 F.3d at 125. In any event, courts confronted with far shorter deliberations consistently reject the inference the County proposes. *See, e.g.*, *Wilburn v. Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir. 1999) (per curiam) (twenty-minute deliberation "d[id] not show that the jury failed to give full, conscientious or impartial consideration to the evidence"). More likely, a fast verdict indicates "that the members of the jury felt that the evidence was overwhelming." *Segars v. Atl. Coast Line R.R.*, 286 F.2d 767, 771 (4th Cir. 1961) (citation omitted) (surveying cases approving verdicts reached in three, four, eight, ten, fifteen, twenty, and thirty minutes).[7] Here, the issues were aired and sharpened for the jury over

---

[7] *See also United States v. Anderson*, 561 F.2d 1301, 1303 (9th Cir. 1977) (per curiam) (rejecting argument "that the jury's brief deliberation indicates it did not give full and impartial consideration to the evidence," finding it just as likely that the jurors "thought there was not even a shadow of doubt as to guilt"); *United States v. Brotherton*, 427 F.2d 1286, 1289 (8th Cir. 1970) (nothing suspicious about five-minute deliberation in criminal case); *Marx v. Hartford Acc. & Indem. Co.*, 321 F.2d 70, 71 (5th Cir. 1963) (per curiam) (finding "no merit" to argument that fourteen-minute

- 9 -

three weeks, and the proof was markedly one-sided. To borrow a line from the Fifth Circuit: "Some

of us might not have required [sixty] minutes to reach the verdict." *Marx v. Hartford Acc. & Indem.*

*Co.*, 321 F.2d 70, 71 (5th Cir. 1963) (per curiam).

## II.     THE JURY WAS PROPERLY INSTRUCTED.

Courts "will overturn a verdict on a [preserved] challenge to jury instructions only if (1)

the instructions were erroneous, and (2) the error was prejudicial." *Saint-Jean v. Emigrant Mortg.*

*Co.*, 129 F.4th 124, 147 (2d Cir. 2025). "Jury instructions are erroneous if they mislead the jury or

do not adequately inform the jury of the law." *Id.* (cleaned up). "[A] jury instruction will be deemed

adequate if the charge, taken as a whole, is correct and sufficiently covers the case so that a jury

can intelligently determine the questions presented to it." *Keeling v. Hars*, 809 F.3d 43, 52 (2d Cir.

2015) (citation omitted). An erroneous jury instruction is prejudicial only where the movant "can

show that the error, in light of the charge as a whole, improperly influenced the jury's verdict."

*Saint-Jean*, 129 F.4th at 147 (cleaned up).

To preserve a challenge to jury instructions, the "party who objects to an instruction or the

failure to give an instruction must do so on the record, stating distinctly the matter objected to and

the grounds for the objection." FED. R. CIV. P. 51(c)(1). This rule requires an "explicit, precise,

and reasoned objection," supported by "legal argument" and "authority." *Jarvis v. Ford Motor*

*Co.*, 283 F.3d 33, 55, 60–61 (2d Cir. 2002). Objecting to specific language without "provid[ing] a

reason for [the] objection" does not satisfy Rule 51. *Franco v. Gunsalus*, 2023 WL 3590102, at *1

(2d Cir. May 23, 2023) (summary order). Where an instructional challenge is not properly

preserved, the instructions are reviewed only for plain error. *See* FED. R. CIV. P. 51(d)(2). The

---

deliberation is proof of an unreasoned decision); *Kimes v. United States*, 242 F.2d 99, 101 (5th Cir. 1957) (finding "nothing suspicious, questionable, or remarkable in the action of the jury in returning its verdict of guilty after deliberating only twenty minutes," since, during the course of the trial, "the jury had ample time for consideration and reflection").

Second Circuit has long held that "the plain-error exception . . . should only be invoked with extreme caution in the civil context." *Keeling*, 809 F.3d at 52 (cleaned up). It is also "well established" that where a post-trial motion raises issues "in a perfunctory manner, unaccompanied by some effort at developed argumentation," those issues "are deemed waived." *Jean v. Krauss*, 2015 WL 430116, at *2 (W.D.N.Y. Feb. 2, 2015) (cleaned up).

### A.    The jury was properly instructed on *Monell* liability.

The County lodges four objections to the Court's *Monell* instructions. Each is meritless. The *Monell* instructions were adequate and legally correct, and the County identifies no prejudice.

#### 1.    The Court did not invite respondeat superior liability.

The County first claims that the *Monell* instructions permitted the jury "to impose *Monell* liability based on *respondeat superior*." Mem. at 7. This argument is unpreserved, *cf.* Tr. T. 2128:18-2129:3; Dkt. 474-2 at ECF p.38 n.1, and frivolous. The passage the County cites correctly explained that "*Monell*" is shorthand for a § 1983 case where "the person the Plaintiff is attempting to hold liable is a municipality." Tr. T. 2301:23-2302:1. When the Court described the elements of a *Monell* claim, it stated that the County "may not be held liable for the actions of its employees simply because they are employed by the County." *Id.* at 2308:25-2309:2.

#### 2.    The Court appropriately explained the widespread-practice theory of Monell liability.

Under the widespread-practice theory of *Monell* liability, "actual notice by the policymakers need not be proven"; proof that a practice is widespread allows the plaintiff to ascribe to the policymaker "constructive notice of (and constructive acquiescence to) that conduct." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 306, 308 (2d Cir. 2020); *see also Matusick v. Erie County Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (unlawful practice exists where acts of misconduct are "sufficiently widespread and persistent to support a finding that they constituted a custom,

policy, or usage of which supervisors must have been aware" (cleaned up)). As defense counsel

conceded during the charge conference, if a practice is "so widespread as to have the force of law,

then that knowledge can be imputed to [the policymaker]." Tr. T. 2146:15-17.

Consistent with these principles, the Court gave the following instruction on the

widespread-practice theory:

> Plaintiff must establish that a practice or custom is so persistent or widespread as
> to carry the force of law or that the misconduct of a subordinate agent or employee
> was so manifest as to imply the constructive acquiescence of senior policymaking
> officials that caused an alleged injury. You may infer that a custom or practice
> existed in the Erie County District Attorney's Office even if Erie County did not
> formally approve such custom or practice, so long as you conclude that the District
> Attorney knew of acts of misconduct and did not act to prevent them from
> continuing. This includes a situation where the District Attorney must have known
> about the actions or failure to act by other prosecutors in the Erie County District
> Attorney's Office by virtue of his position and allowed them to continue.

Tr. T. 2312:23-2313:12; *accord id*. at 2310:4-10; *id*. at 2311:3-12.

The County objects that the phrase "by virtue of his position" allowed the jury "[t]o impute

knowledge to the District Attorney simply because he held the office." Mem. at 8. But this

language—which comes straight from the Seventh Circuit's pattern instructions, *see* FED. CIV.

JURY INSTR. 7TH CIR. 7.24 (2024), and is amply supported by cases like *Lucente* and *Matusick*—

does nothing of the kind. The challenged sentence ensures that the preceding sentence does not

suggest that actual knowledge is required. Read as a whole, the charge correctly explains that if a

practice is widespread, the policymaker is deemed to know of and to acquiesce in it.

Moreover, the County does not even try to show that the words "by virtue of his position"

improperly influenced the jury's verdict. Nor could it. Plaintiff's counsel never argued that DA

Cosgrove ratified ADA Drury's misconduct simply by being Drury's boss. Counsel's widespread-

practice argument focused almost entirely on the evidence establishing the existence of illicit and

widespread practices. Tr. T. 2248:24-2254:15, 2255:23-2260:20, 2261:7-2262:18. Counsel

- 12 -

referenced Cosgrove only when citing evidence of Cosgrove's actual knowledge and toleration of the practices proved at trial. *Id.* at 2259:4-19, 2262:19-2263:2, 2261:8-14, 2262:19-2263:1.

      3.    *The Court appropriately explained the deliberate-indifference theory of Monell liability.*

The County contends that the Court's deliberate-indifference instruction "only included Plaintiff's allegation," "had no clear instruction as to what proof was required," and "failed to include a sufficient description of 'deliberate indifference.'" Mem. at 8. The County did not raise these arguments before the verdict, *see* Tr. T. 2149:18-2150:9; Dkt. 474-2 at ECF p.65-66, and the three-sentence argument in its Motion is insufficiently developed. Waiver aside, the Court thoroughly and accurately defined the proof required to establish deliberate indifference and took pains to emphasize the legal limits important to the County. Tr. T. 2313:13-2314:4.

      4.    *The Court did not confuse or conflate the widespread-practice and deliberate-indifference theories.*

The County claims in passing that the widespread-practice and deliberate-indifference instructions were "generally confusing" and "conflated two distinct theories." Mem. at 8-9. This perfunctory argument is unpreserved and the Court's instructions clearly delineated and explained the two theories, Tr. T. 2310:11-2314:11.

    **B.**    **The jury was properly instructed on *Brady* materiality.**

The County requested a jury instruction stating that evidence is not favorable to the accused if it is "merely speculative, cumulative or duplicative of other evidence available at trial." Dkt. 474-2 at ECF pp. 50-51. Because this request misstates the favorability element, *see Brady v. Maryland*, 373 U.S. 83, 87 (1963); *DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006); *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001), the Court could have simply denied it. Instead, the Court generously construed the County's request as bearing on the materiality element, and it

- 13 -

modified the materiality instruction to say that evidence "duplicative of information that defense counsel did possess . . . would not be material," Tr. T. 2306:17-2307:16.

The County now claims that the Court should have declared "cumulative" and "speculative" evidence to be necessarily immaterial as well. Mem. at 9. But because the County did not raise this or any other objection to the Court's modified materiality instruction, Tr. T. 2161:10-2162:1, the argument is waived. In any event, the County has no cause for complaint. Duplicative evidence is necessarily immaterial because, by definition, it adds nothing to what defense counsel already has. Whether undisclosed *Brady* evidence is too "cumulative" or "speculative" to undermine confidence in the guilty verdict, however, is a question of fact for the jury. *Glossip v. Oklahoma*, 604 U.S. 226, 248-251 (2025); *Bellamy v. City of New York*, 914 F.3d 727, 751-56, 761-62 (2d Cir. 2019). The County's cases only further this point, as each cites the cumulative nature of the undisclosed *Brady* evidence as just one factor in the materiality analysis. *United States v. Agurs*, 427 U.S. 97, 114 (1976); *Tankleff v. Senkowski*, 135 F.3d 235, 250-51 (2d Cir. 1998); *United States v. Helmsley*, 985 F.2d 1202, 1210 (2d Cir. 1993).

The County was free to argue that the undisclosed *Brady* evidence was too "cumulative" or "speculative" to undermine confidence in Boyd's criminal trial, and it (fleetingly) did so, Tr. T. 2184:9-12. The problem for the County was not the Court's instructions, but the unrebutted expert testimony establishing the significance of the undisclosed *Brady* evidence—which is why, presumably, the Motion does not even try to argue prejudice.

Finally, in a separate section of its Motion, the County objects to the Court instructing the jury "to consider the alleged [*Brady*] violations collectively." Mem. at 11; Tr. T. 2304:9-14. This claim is unpreserved, *see* Dkt. 474-2 at ECF pp. 44-45, insufficiently developed, and meritless, *Kyles v. Whitley*, 514 U.S. 419, 441 (1995) (*Brady* materiality is a cumulative analysis).

- 14 -

C.      **The Court appropriately declined to instruct the jury that *Brady* violations and summation misconduct require intentional wrongdoing.**

The County contends that in a § 1983 action, unlike in a criminal case, there is no *Brady* violation unless the prosecutor *intentionally* suppresses favorable evidence, and there is no summation misconduct unless the prosecutor *intentionally* makes comments *meant* to infect the trial with substantial unfairness. Mem. at 9-10; Dkt. 474-2 at ECF pp. 44, 55. The Court properly declined to make intentionality an element of the underlying constitutional violations.

*First*, for reasons the Boyd Estate has set out at length, *see* Dkt. 468 at 1-8, and incorporates by reference here, the County is wrong on the law. "Section 1983 does not require any intent to violate constitutional rights" and "does not itself import an intent standard into an underlying constitutional deprivation that lacks such a requirement." *Hudson v. New York City*, 271 F.3d 62, 68 (2d Cir. 2001). Rather, it simply creates a procedural vehicle for enforcing constitutional rights as they exist. *Id.* Thus, when the Second Circuit has defined the underlying constitutional violation in § 1983 cases alleging *Brady* violations or summation misconduct by prosecutors, it has used the ordinary tests applied in criminal cases, which do not require intentionality. *See Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc); *Bellamy*, 914 F.3d at 762. And when the Second Circuit was presented with a *Monell* claim alleging a municipal policy that produced unwitting *Brady* violations by line prosecutors, the court issued a precedential opinion endorsing the plaintiff's theory. *See Bellamy*, 914 F.3d at 762.

The County's contrary arguments, Mem. at 9-10, rely on unpublished opinions expressing uncertainty about whether civil *Brady* claims against *police officers* require intentionality, *Valentin v. City of Rochester*, 783 F. App'x 97, 100 (2d Cir. 2019); *Fappiano v. City of New York*, 640 F. App'x 115 (2d Cir. 2016). But no such uncertainty surrounds a *prosecutor*'s disclosure obligations. *See, e.g.*, *Brady*, 373 U.S. at 87. The County also cites conditions-of-confinement and use-of-force

- 15 -

cases holding that mere negligence is insufficient to violate due process, *Kingsley v. Hendrickson*, 576 U.S. 389, 395-97 (2015); *Darnell v. Pineiro*, 849 F.3d 17, 32, 36 (2d Cir. 2017). But such cases are inapposite, and the Court did not permit "liability for negligently inflicted harm," Mem. at 9 (cleaned up). The Court instructed the jury that the County was not liable unless the policymaker's intentional adoption or knowing toleration of an illicit policy, or his deliberate indifference to violations of law, caused a constitutional violation. Tr. T. 2309:7-10, 2310:3-2311:25; *accord Fappiano*, 640 F. App'x at 118 (whereas "police officers may be held liable for *Brady* violations when they intentionally suppress exculpatory evidence," the *mens rea* in a *Monell* claim alleging *Brady* violations by prosecutors is the "municipality's deliberate indifference").

*Second*, even if the County were right on the law, a litigant "is not entitled to have the court give the jury an instruction for which there is no factual predicate in the trial record," and here the County has not provided the Court with "any citations to the trial record to demonstrate that there was a factual predicate" for an intentionality instruction. *Gorawara v. Caprio*, 2025 WL 1571762, at *2 (2d Cir. June 4, 2025) (summary order) (cleaned up). ADA Drury never claimed that he accidentally suppressed *Brady* material. Rather, he insisted that some of the undisclosed material did not constitute *Brady* material, and that everything which did constitute *Brady* material must have been disclosed, *e.g.*, Tr. T. 818:10-19. Nor is there evidence suggesting that when Drury delivered his summation in Boyd's criminal trial, he was unaware of what he was doing.

*Third*, the County does not even try to show that "the omission of an instruction on intentionality," Mem. at 10, worked any prejudice, nor could it. If the County thought that ADA Drury withheld favorable evidence and delivered an improper summation by accident, it was free to argue that Drury's individual negligence, not a municipal policy, was the moving force behind

the constitutional violations. And the County did make that argument, at length. Tr. T. 2187:11-12, 2198:19-2206:6. The jury simply rejected it, as it was entitled to do.

> **D.    The jury was properly instructed on the burden of proof.**

The County next argues that "[t]he Court's instructions on the burden of proof" improperly "allowed the jury to choose from an assortment of liability theories and apply them to an assortment of alleged misconduct." Mem. at 10-11. This argument is unpreserved, *see* Dkt. 474-2 at ECF pp. 59-60, 62, 65-66; Tr. T. 2143:4-8, 2147:9-22, 2150:10-2152:9,[8] insufficiently developed, and meritless. The Court appropriately instructed the jury that the County is liable if *any* municipal policy caused *any* constitutional violation, Tr. T. 2308:19-2314:11, a principle the County elsewhere concedes, Mem. at 16-17, 22.

> **E.    The jury was properly instructed on apportionment.**

For its final claim of instructional error, the County challenges two aspects of the Court's apportionment instruction. Both objections are meritless.

> > *1.    The Court's apportionment instructions properly instructed the jury on proximate cause.*

To establish an apportionment defense, the County bore the burden to prove that one or more City detectives were "tortfeasors." *Restivo v. Hessemann*, 846 F.3d 547, 586 (2d Cir. 2017). The tort the County alleged is fabrication of evidence, which requires proof that the creation of false evidence proximately caused "a deprivation of life, liberty, or property," *Ortiz v. Stambach*, 137 F.4th 48, 67 (2d Cir. 2025) (cleaned up). Accordingly, a detective is not a joint tortfeasor, and the County is not entitled to apportionment, unless a detective's creation of false evidence

---

[8] The County claims that it "timely objected to this and all other objectionable charges," but simply cites the entire charge conference. Mem. at 11 n.4. Nowhere in the charge conference (or the pre-conference filing) did the County raise the objections set forth in the Motion. Instead, the County either did not object to the portions of the charge challenged in the Motion, or it raised different objections. Dkt. 474-2 at ECF pp. 59-60, 62, 65-66.

proximately caused Boyd's post-conviction incarceration and parole. This causation requirement implicates the doctrine of superseding causation, which the Second Circuit has addressed in a line of cases beginning with *Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999). Adhering to *Townes* and its descendants, the Court instructed the jury that "[i]f the individual detective misled or coerced Mr. Drury into making uninformed decisions about Mr. Boyd's prosecution, proximate cause would be established," but if "Mr. Drury was not misled or coerced by the Buffalo Police Department officer, . . . Mr. Drury's actions in prosecuting Mr. Boyd would preclude any apportioning of fault to the officer at issue." Tr. T. 2318:14-2319:4. The County contends that the causation instruction should have simply asked "whether it was reasonably foreseeable that such fabricated evidence would be used by ADA Drury in Mr. Boyd's 1977 trial." Dkt. 474-2 at ECF pp. 79-80; *accord* Mem. at 15.[9] For the reasons the Boyd Estate has previously given, Dkt. 409 at 4-7; Dkt. 468 at 10-15, and incorporates by reference here, the Court's instruction was correct.

In *Townes*, the Second Circuit held that even where police misconduct "could foreseeably cause" a subsequent conviction and incarceration, "as a matter of law" the "chain of causation" between the police misconduct and the "subsequent conviction and incarceration is broken by the intervening exercise of independent judgment" by a prosecutor or judge, at least "in the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment." 176 F.3d at 146-47. In *Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007), the court held that *Townes* applies to fair-trial claims, *id.* at 193-94, and it affirmed that "an investigative abuse" does not proximately cause a subsequent conviction when the prosecutor or other intervening decisionmaker "is not misled or deceived," *id.* at 195. Because the

---

[9] The County also claims, in passing, that superseding cause is irrelevant where the defendant "seek[s] to offset a damages verdict." Mem. at 12. This objection is unpreserved, Dkt. 467-1 at 23; Dkt. 474-2 at ECF pp. 79-80, and an "offset" is unavailable, *see infra* § II.E.2.

- 18 -

defendant-officer had not "misled or pressured the prosecution," the court concluded, the prosecutor's intervening decisions were "not reasonably foreseeable" as a matter of law, and the officer was entitled to summary judgment. *Id*. at 195-96.

The decision the County most heavily relies upon, *Lopez v. City of New York*, 105 F. Supp. 3d 242 (E.D.N.Y. 2015), reads dicta in a separate Second Circuit decision to imply a retreat from *Townes*. *See id.* at 250. But shortly after *Lopez* was decided, the Second Circuit reaffirmed that under *Townes* and *Wray*, the law "let[s] the officer off the hook" for investigatory misconduct unless he "misled or pressured the prosecution." *Bermudez v. City of New York*, 790 F.3d 368, 374 (2d Cir. 2015) (cleaned up); *accord Dufort v. City of New York*, 874 F.3d 338, 352 (2d Cir. 2017).

The County reads *Bermudez* to say that misleading or coercing the prosecutor is just *one* way for police misconduct to remain a proximate cause of a subsequent conviction. Mem. at 14. But both *Bermudez* (and *Dufort*) affirm the basic rule of *Townes* and *Wray*: police misconduct is *not* a proximate cause of a subsequent conviction unless the prosecutor was misled or coerced. *Bermudez*, 790 F.3d at 374 (citing *Townes* and *Wray*); *Dufort*, 874 F.3d at 352 (citing *Townes*).

> 2.   *The County's other objections to the apportionment instruction are unpreserved, perfunctory, and meritless.*

Although the County raises several further objections to the Court's apportionment instruction, Mem. at 11-12, 15-16, it did not object to any aspect of the instruction apart from causation, Dkt. 474-2 at ECF pp. 76-81; Tr. T. 2152:20-2153:5. And even now, the County does not say what instruction the Court should have given (or not given).

Waiver aside, the County's complaints are meritless. All revolve around the idea that the apportionment instruction "permitted Plaintiff to evade the double recovery rule." Mem. at 11-12. That is incorrect. "The rule against double recovery is designed to prevent a plaintiff from recovering twice for the same harms." *Restivo*, 846 F.3d at 594 (Livingston, J., dissenting). Courts

guard against double recoveries by asking the jury to decide "what amount of money reasonably compensates the plaintiff for the injury and which of the defendants are liable for causing that injury," *Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996), which is exactly what the Court did. Both the jury instructions and the verdict sheet required the jurors to determine the damages Boyd suffered as a result of his wrongful conviction—specifically, his injuries from the date of his conviction to the date of his death—and who is responsible for them. *See* Tr. T. 2314:24-2315:4, 2316:16-2320:1; Dkt. 483 at 3. The jury concluded that Boyd's post-conviction damages total $80 million, and that the County is 100% responsible for those damages. Dkt. 483 at 3.

The County seems to think it is automatically entitled to shift responsibility to the City simply because the City settled with Boyd before trial and the parties agree that City detectives coerced false evidence from Woodruff and Hough. Mem. at 12. But the City's settlement does not automatically reduce the County's responsibility—*i.e.*, it is not an offset—because the City "never admitted liability," *Restivo*, 846 F.3d at 583, and the jury was explicitly directed to assess Boyd's *post*-conviction damages only, not the total injury Boyd suffered from his arrest onward, *id.* at 584; *accord* Dkt. 223 at 14. To apportion fault for Boyd's *post*-conviction damages, the County had to prove that detectives' creation of false evidence proximately caused those post-conviction damages, *Ortiz*, 137 F.4th at 67. The Court's instructions rightly held the County to this burden.

### III.    THE COURT DID NOT ABUSE ITS DISCRETION IN FASHIONING A VERDICT SHEET.

"The formulation of special verdict questions rests in the sound discretion of the trial judge." *Cash v. Cnty. of Erie*, 654 F.3d 324, 340 (2d Cir. 2011). An abuse of discretion occurs only where the questions posed on the verdict form, when read "in conjunction with the judge's charge to the jury," "mislead or confuse the jury, or inaccurately frame the issues to be resolved." *Id.* (cleaned up). No such abuses occurred here.

- 20 -

### A.     The verdict form fairly and accurately framed the *Monell* inquiry.

With respect to municipal liability for *Brady* violations, the verdict sheet asked the jury (i) whether ADA Drury committed one or more *Brady* violations; (ii) if so, whether a County policy, practice, or custom "existed with respect to disclosures of exculpatory and/or impeachment evidence"; and (iii) if so, whether that "policy, custom, or practice caused the [*Brady*] violation." Dkt. 483 at 1. The verdict sheet posed the same questions with respect to municipal liability for summation misconduct. *Id.* at 2. The County raises three objections to the *Monell* questions. Mem. at 17-19. Each is meritless.

*First*, the County claims that the verdict sheet did not ask the jury "to determine whether a policy, custom or practice actually existed before determining whether it caused the alleged constitutional violation." Mem. at 17-18. That is incorrect; as noted above, the verdict sheet explicitly posed this very question. Dkt. 483 at 1-2. Besides, even if the verdict sheet had posed a single *Monell* question—whether the constitutional violation was caused by a municipal policy— the Second Circuit has explicitly approved that formulation. *See Cash*, 654 F.3d at 340.

*Second*, the County contends that the verdict sheet's question about *Monell* liability should not have included the word "policy" at all, because there was no evidence of a *formal* policy. Mem. at 17 n.8. But "policy" does not necessarily mean "formal policy," the phrase "policy, custom, or practice" accurately distills the relevant legal standard, *Los Angeles v. Humphries*, 562 U.S. 29, 36 (2010), and the Court's instructions clearly defined the terms used in the verdict sheet, Tr. T. 2302:15-22, 2309:7-2314:11.

*Third*, the County complains that the verdict sheet in this case—like the verdict sheet that now-Circuit Judge Bianco used in *Houston v. Cotter*, 2016 WL 1253391, at *6 & n.7 (E.D.N.Y. Mar. 30, 2016), and every other *Monell* verdict sheet the Court has reviewed, *cf.* Tr. T. 2159:22- 2160:1—did not itemize the *Monell* theories presented to the jury, Mem. at 18-19. This was

improper, the County reasons, because different *Monell* theories require different showings. *Id*. at 19. But the jury instructions fully explained the showing required for each *Monell* theory, Tr. T. 2308:25-2314:11, the County conceded that itemizing *Monell* theories makes the verdict sheet "confusing," *id.* at 2159:2-16, and the County has never cited any authority requiring itemized *Monell* theories—rendering its objection both unpreserved and meritless.

**B.      The verdict sheet fairly and accurately framed the apportionment inquiry.**

The County's main objection to the verdict sheet's questions on apportionment mirrors its objection to the apportionment instructions. Mem. at 20. That objection is meritless for the reasons given above. Its other complaint—that part of Question 7 was "redundant" of Question 6, *see id.* —is wrong too. Question 6 asked whether *any* detective committed the tort of evidence fabrication. Dkt. 483 at 3. It was still necessary to say, in Question 7, that if *a particular detective* did not participate in the fabrication, *that particular detective* must be assigned 0% fault. *Id.* at 4. This quibble is also immaterial, since the jurors never reached Question 7.

**IV.    THE COUNTY IS NOT ENTITLED TO A NEW TRIAL BASED ON ANY CLAIMED EVIDENTIARY ERROR.**

To obtain a new trial based on evidentiary rulings, the County must demonstrate that the rulings were "a clear abuse of discretion *and* … so clearly prejudicial to the outcome of the trial that the court is convinced [of] … a seriously erroneous result or … miscarriage of justice." *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005) (cleaned up).[10] Under an abuse-of-discretion standard, evidentiary rulings should not be disturbed unless they are "manifestly erroneous" resulting from "arbitrary or irrational" decisions. *See Carroll v. Trump*, 124 F.4th 140, 157 (2d

---

[10] The County's reliance on the harmless-error standard applied in criminal cases, *see* Mem. at 26, is erroneous, *see, e.g.*, *Tesser v. Bd. of Educ.*, 370 F.3d 314, 319 (2d Cir. 2004).

Cir. 2024), *cert. pending*, No. 25-573 (Nov. 13. 2025). The County fails to show manifest error or prejudice.

**A.      The Court did not abuse its discretion by admitting expert testimony.**

Under FRE 702's "liberal" and "permissive" standard, *Nimely*, 414 F.3d at 395-96, expert testimony should be excluded only "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," *Restivo*, 846 F.3d at 577 (cleaned up). Criticisms of an expert's credentials, data, or methods "go to the weight, not the admissibility, of the testimony." *Id*. (cleaned up).

*1.    The Court properly admitted testimony from Professor Alan Hirsch.*

For the reasons the Boyd Estate previously gave, Dkt. 375 at 4-12; Dkt. 409 at 4, and incorporates by reference here, Hirsch's testimony was reliable, relevant, and not unduly prejudicial. As to reliability, federal and state courts routinely admit testimony on false or unreliable confessions, Dkt. 375 at 6-7, and Hirsch's report and trial testimony detailed the extensive body of research he applied in analyzing the present case, Dkt. 327-3; Tr. T. 332:16-347:20. The County's citation to a few cases rejecting other experts' analyses, Mem. at 21, does nothing to impugn Hirsch's testimony here.

As to relevance, Hirsch's testimony (i) worked in tandem with Steven Zeidman's testimony to show that the undisclosed police reports concerning Woodruff and Hough were favorable and material; (ii) rebutted the County's attack on Woodruff's credibility by explaining a counterintuitive phenomenon; and (iii) directly addressed the County's apportionment defense. Ignoring the first point altogether, the County claims that testimony on false confessions is not outside the ken of lay jurors and amounts to improper bolstering. Mem. at 22. The Second Circuit recently rejected both arguments. *United States v. Pollok*, 139 F.4th 126, 141-42 (2d Cir. 2025). The County also claims that evidence bearing on the County's apportionment defense is

"irrelevant" because it does not bear on facts that are "Plaintiff's burden" to prove. Mem. at 22. That is incorrect. Evidence is relevant if it bears on *any* fact that "is of consequence in determining the action," FED. R. EVID. 401(b), even if the fact relates to a defense, and even if the fact is "conceded by the opponent," 1972 Adv. Comm. Notes, FED. R. EVID. 401.

As to prejudice, the County complains that Hirsch's testimony improperly "impeach[ed] the evidence from Boyd's underlying trial" and "encouraged speculation" "on factual innocence." Mem. at 22. That is not correct. Hirsch's testimony helped the jury appreciate why certain undisclosed *Brady* evidence was favorable, and how a defense attorney could have used that evidence, and Hirsch cautioned that he was *not* opining on whether Woodruff's and Hough's inculpatory statements were true. Tr. T. 333:6-12, 433:10-434:8. The County, on the other hand, explicitly argued that Woodruff's and Hough's inculpatory statements—the only evidence against Darryl Boyd—were fabrications concocted by the police. *Id.* at 1907:8-1908:14, 2006:22-2007:3, 2207:18-2209:6; Dkt. 495-4 at ECF pp. 32-35. The County cannot complain about Hirsch undermining the inculpatory statements made by Woodruff and Hough, thereby suggesting factual innocence, when it was simultaneously pursuing a defense predicated on the proposition that Woodruff's and Hough's inculpatory statements were false and "[t]he entire homicide detectives unit knowingly participated in fabricating a case against Mr. Boyd," Tr. T. 2088:16-23.

2.    *The Court properly admitted testimony from Dr. Sanford Drob.*

Dr. Drob's testimony was relevant and sufficiently reliable to go to the jury, and the County had ample opportunity to test it through cross-examination.

a.    Dr. Drob reliably explained the particular suffering endured by an inmate who believes himself innocent.

Dr. Drob did not "offer a direct opinion on [Boyd]'s guilt or innocence," Mem. at 33, but explained why an inmate who believes himself innocent suffers more and differently than an

- 24 -

inmate who believes himself guilty, Tr. T. 912:5-9, 932:11-934:20, 954:4-9, 959:6-13. This was not an "unnecessary detour," Mem. at 23, but a relevant feature of Boyd's damages. And the County cannot possibly claim prejudice when the Court instructed the jury to consider this testimony only "for the limited purpose of supporting Plaintiff's alleged damages," Tr. T. 910:21-911:5, 1132:22-1133:8; Dr. Drob repeatedly disclaimed any opinion on Boyd's innocence, *id.* at 934:21-935:17, 1142:19-1143:4; and the County itself was simultaneously arguing that the case against Boyd was wholly fabricated, *see supra* § IV.A.1.

The County argues that Dr. Drob's testimony was unreliable because he "cited no analysis or study discussing the effects of prison on those who believe they were wrongly incarcerated," and failed to "consider and rule out the possibility" that Boyd's mental illness was caused by "the mere fact that he spent many years in prison," Mem. at 23. As the Boyd Estate explained pre-trial, Dkt. 375 at 14-17, none of that is correct. Dr. Drob was free to rely on personal experience, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266-67 (2d Cir. 2002); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995); his personal experience is consistent with an extensive literature, Tr. T. 912:5-9, 932:11-16, 935:4-9, 1176:22-1177:8; and he ruled out the possibility that Boyd's injuries were the result of "mere" incarceration, Dkt. 327-7 (deposition) at 51:7-15, 106:23-107:1-7, 111:1-12; Dkt. 327-6 (report) at 26-31, 33.

        b.    The Court properly refused to strike Dr. Drob's testimony.

The County contends that "Dr. Drob's testimony should have been stricken upon his concession that his analysis of Boyd was unreliable." Mem. at 24. But Dr. Drob made no such concession. On cross-examination, the County tried to get Dr. Drob to admit that because his report did not specifically mention certain records regarding Boyd's pre-incarceration drinking, Dr. Drob had overlooked pre-incarceration substance abuse. Dr. Drob replied that he *did* know "[Boyd] was abusing substances prior to his going to prison"; he did not overlook the records defense counsel

cited; and while his report could have more fully addressed Boyd's pre-incarceration substance abuse, he knows "as well as [he] know[s] anything in psychology" that Boyd's incarceration was a major factor in his post-release substance abuse. Tr. T. 1069:6-1076:8, 1021:16-1023:14, 1134:10-17, 1139:15-1140:16, 1156:3-1157:20, 1165:5-1172:22, 1193:8-1197:1198:6. Accusing an expert of overlooking something is garden-variety cross-examination which, as the Court ruled, *id.* at 1076:12-1077:2, goes only to the weight of Dr. Drob's testimony, *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992); *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 405 (S.D.N.Y. 2013).

Elsewhere in its Motion, the County contends that Dr. Drob "inexplicably leaped" to the conclusion that Boyd's incarceration caused his post-release mental illnesses, even though "he did not know whether those disorders predated Boyd's 1977 conviction." Mem. at 24-25. That too is wrong. Dr. Drob testified that he does not believe, and there is no evidence to suggest, that Boyd developed PTSD, depression, or anxiety before his incarceration, Tr. T. 1023:21-1024:2, and he explained at length the basis for his opinion that Boyd's mental illnesses were caused by his incarceration and parole, not by his parents' divorce, his impoverished upbringing, bullying at school, or teenaged drinking, *see generally id.* at 965:6-1204:13.

       c.    The Court did not unduly restrict the County's cross-examination of Dr. Drob.

Though the County's cross-examination of Dr. Drob covers 211 pages of transcript, Tr. T. 977:4-1177:20, 1193:21-1204:13, more than any other cross-examination it conducted, the County complains that the Court prevented "meaningful cross-examination" of Dr. Drob by forbidding reference to Boyd's prior bad acts. Mem. at 23. The Court had excluded those bad acts before trial and had directed the County to notify the Court if it believed a door had been opened. Tr. T. 902:6-20, 907:13-909:13, 1099:21-1100:6. Notably, the Motion does *not* challenge the pretrial exclusion

- 26 -

but instead claims that Dr. Drob "opened the door" through his testimony about the origin of Boyd's PTSD. Mem. at 24-26. The Court has "wide discretion to impose limitations on the cross-examination of witnesses," *United States v. Griffith*, 284 F.3d 338, 352 (2d Cir. 2002), and to determine when a door has been opened, *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 66 (2d Cir. 1998). The County identifies neither an abuse of discretion nor prejudice.

*First*, the testimony cited as purportedly opening the door was elicited by the County. Tr. T. 1015:24-1016:16, 1036:25-1037:6, 1203:1-4. It is elementary that a party cannot open a door for itself. *See, e.g.*, *United States v. Rosa*, 11 F.3d 315, 334-35 (2d Cir. 1993) (holding that it was "frivolous" for the government to argue that evidence "introduced by the government itself" opened the door, since only "the opposing party" can open the door), *overruled on other grounds by*, *Crawford v. Washington*, 541 U.S. 36 (2004).[11]

*Second*, as the Court has already held, Tr. T. 898:2-899:7, 1015:24-1019:5, nothing Dr. Drob said to the jury opened the door to otherwise inadmissible prior bad acts.

The County's first door-opening theory is that because Dr. Drob's *report* cited impulsivity as "a symptom of [PTSD]," impulsivity must be *diagnostic* of PTSD, and the County should have been allowed to confront Dr. Drob with incidents of "impulsive violence engaged in by Boyd prior to his incarceration" to suggest that Boyd had PTSD before he was incarcerated. Mem. at 25 & n.12; *accord* Tr. T. 1029:23-1036:11. But this argument is unpreserved. Defense counsel asked to

---

[11] *See also United States v. Kaiser*, 609 F.3d 556, 572 n.4 (2d Cir. 2010) (rejecting government's door-opening argument because "it was the government" itself that "elicited [the] testimony" which supposedly opened the door); *United States v. Taylor*, 820 F. Supp. 124, 128 & n.3 (S.D.N.Y. 1993) (noting that although the government's evidence might open the door to battered-women's syndrome, it was "[o]f course" the case that "[the defendant] could not open that door by offering proof herself"); *cf. United States v. Gillis*, 773 F.2d 549, 553-54 (4th Cir. 1985) (cited in Mem. at 25) (holding that expert testimony elicited by the *defendant* opened the door to otherwise inadmissible evidence introduced by the *government*).

cross-examine about pre-incarceration impulsivity "without getting into the specifics" of any particular event, reasoning that by "not using prior bad acts" there would be "no further prejudice." Tr. T. 1029:23-1036:11, 1046:17-22; *accord id*. at 909:22-23 ("I'm not talking about getting into bad conduct by Mr. Boyd."); *id*. at 1032:4-5 ("I'm not going to try to talk about what's precluded."). The Court agreed and permitted generic cross-examination about youthful impulsivity and reactive aggression. *Id.* at 1036:25-1057:2.

The cross-examination the Court permitted, moreover, shows why specific incidents of impulsivity are irrelevant. Dr. Drob acknowledged the existence of pre-incarceration impulsivity, but explained that impulsivity is *not* diagnostic of PTSD, *id.* at 1036:24-1043:3, and that "evidence that someone was impulsive or reactively aggressive as a child . . . provides me no information whatsoever with respect to a diagnosis of PTSD. Tr. T. 1042:14-17; *see also id*. at 1043:1-3 ("it doesn't make any sense" to "infer that because someone was reactively aggressive or aggressive or impulsive as a child that they had PTSD"). Accordingly, confronting Dr. Drob with specific incidents of pre-incarceration impulsivity would not undermine his opinion about the origin of Boyd's PTSD. Worse, the incidents the County cites—Thomas Graham (not Darryl Boyd) firing a gun into a house, Dkt. 383-2; Boyd punching Martin Bannath, Dkt. 383-4; Boyd accidentally firing a gun during the drycleaner robbery, Dkt. 383-5; Boyd joyriding in stolen cars, Mem. at 25; and Boyd threatening a principal, *id.*—are simply bad acts, not impulsive acts.

The County's second door-opening theory—the only door-opening argument it made at trial, Tr. T. 1017:14-1018:9, 1100:7-22—is that because Dr. Drob "conceded that simply witnessing a gruesome injury could cause PTSD symptoms," the County should have been

permitted to confront Dr. Drob with "[Boyd]'s prior bad acts." Mem. at 26.[12] But the only bad act that entailed a gruesome injury is the drycleaner robbery; the County's *in limine* briefing offered this very rationale for introducing the drycleaner robbery, Dkt. 383 at 1-2, 6-7; the Court properly rejected that argument pretrial, as the prejudicial effect vastly exceeds the probative value, 10/24/2025 Tr. at 113:18-124:21; Dkt. 418 at 84-85; and when defense counsel pursued this line of cross-examination anyway, and the Court demanded a justification, all the County could offer was the same baseless argument the Court had already rejected, Tr. T. 1015:24-1019:2.[13]

*Third*, the County ignores the harmless-error issue, presumably because it has no argument to make. Dr. Drob's opinion about the origin of Boyd's PTSD is sound, categorical, unchallenged by any opposing expert, and uniformly supported by contemporaneous medical records tying Boyd's flashbacks and other PTSD symptoms to his traumatic experiences in prison, not to any childhood trauma. Tr. T. 929:25-930:9, 938:9-939:12, 1013:25-1014:6, 1022:16-25, 1178:5-15, 1195:3-21. And a cross-examination accusing Dr. Drob of overlooking or minimizing alternative causes for Boyd's PTSD—the only legitimate purpose for presenting hearsay descriptions of pre-incarceration events, *id.* at 1031:12-1032:2, 1053:20-23—would be cumulative of the cross-examination the County conducted, which incessantly challenged Dr. Drob's methodology, bias, and exclusion of childhood trauma as an alternative cause. *See generally id.* at 977:9-1204:13. It is absurd to suggest that the jury reached the verdict it did because the County was not allowed to make the exact same point using grossly prejudicial and inflammatory prior bad acts.

---

[12] Dr. Drob did not itemize the "traumatic events that Boyd experienced in prison . . . as the potential origin of Boyd's post-traumatic stress symptoms," Mem. at 26. In the one example the County cites, the person recounting Boyd's flashbacks to an "attack[] in a visiting room" is the County's lawyer, Tr. T. 1203:1-4.

[13] Tellingly, the County never asked to cross-examine about Boyd *witnessing* a shooting.

- 29 -

### B.    The Court deftly handled the issue of factual guilt or innocence.

The issue of guilt and innocence required careful balancing from the Court. On the one hand, Boyd's factual guilt or innocence was irrelevant to the *Brady* and summation-misconduct claims, *Poventud*, 750 F.3d at 133, and there was a grave risk of the trial devolving into a retrial of the Crawford homicide. Dkt. 418 at 21-25, 27-28. On the other hand, Boyd's *subjective belief* in his innocence was highly relevant to his damages. *Id.* at 26; *accord Nnodimele v. Derienzo*, 2016 WL 3561708, at *10 n.7 (E.D.N.Y. June 27, 2016); *Peacock v. City of Rochester*, 2016 WL 4150445, at *2 (W.D.N.Y. Aug. 5, 2016). To ensure a fair presentation of the relevant issues, the Court set the following ground rules: neither party could try to prove what really happened on the night of the Crawford homicide; Boyd could testify that he believed himself innocent; Dr. Drob could explain why inmates who believe themselves innocent suffer more and differently than inmates who believe themselves guilty; and the County could attempt to impeach Boyd's subjective belief and Dr. Drob's opinions. Dkt. 418 at 21-28.

The County now contends that the Court's rulings were unbalanced and prejudicial. Mem. at 33-34. These arguments come in two varieties, both of which are meritless.

*First*, the County complains that whereas Dr. Drob "offer[ed] a direct opinion on [Boyd]'s guilt or innocence," Boyd testified about "his subjective belief in innocence," and John Walker testified about "Boyd's post-conviction advocacy," the Court excluded "observations of judges and prosecutors who were present for Boyd's trial" and "evidence or testimony suggestive of Plaintiff's guilt more generally, including events surrounding the night of the Crawford murder." Mem. at 33. This is all specious. Dr. Drob did *not* opine on Boyd's innocence. *See supra* § IV.A.2.a. Walker's testimony about Boyd's post-conviction advocacy was offered to establish the enduring burdens of Boyd's conviction, not Boyd's factual innocence, Tr. T. 195:18-203:25. *Neither* party was permitted to prove what really happened on January 2, 1976, because factual

- 30 -

guilt is irrelevant, whereas Boyd was allowed to (briefly) assert his subjective belief in his own innocence because his subjective belief *is* relevant. The County, of course, could have argued that Boyd did not believe himself innocent, but it apparently deemed such an argument fruitless. Tr. T. 1189:25-1190:1 (defense counsel conceding "the jury knows that Mr. Boyd has a subjective understanding of innocence"). Meanwhile, the observation of a sentencing judge (who, incidentally, had no knowledge of the *Brady* material Drury suppressed) is hearsay, irrelevant to Boyd's subjective belief, and grossly prejudicial. Drury's opinion about factual guilt is likewise irrelevant to Boyd's subjective belief and likewise prejudicial. Even so, disregarding the Court's rulings, Drury twice shouted out from the witness stand his belief in Boyd's guilt, Tr. T. 540:6-7, 814:24-815:1.

The County also fails to establish prejudice. The Court repeatedly instructed the jury on the irrelevance of factual innocence and the limited purpose for which it could consider Boyd's subjective belief. Tr. T. 150:5-13, 151:3-8; 910:21-911:5; 1132:24-1133:8. If the County was truly concerned about the jurors' ability to follow the Court's instructions, it would have moved to bifurcate the trial into a liability phase and a damages phase, Dkt. 418 at 26-27, but it declined to do so—presumably because it hoped that its damages arguments about teenaged drinking and reactive aggression would poison the jurors' assessment of liability. Moreover, to the extent that admissible evidence was theoretically suggestive of factual guilt or innocence, that risk threatened both parties equally. The County, for instance, was able to linger on the evidence presented against Boyd in 1977 and to forcefully argue that the prosecution had compellingly established Boyd's guilt. Finally, as explained above, the County cannot possibly claim prejudice when it advanced an apportionment defense predicated on the proposition that the sole evidence against Darryl Boyd

was factually untrue and fabricated by police. This argument suggested Boyd's factual innocence far more directly than anything the Boyd Estate presented.

*Second*, and rather unrelatedly, the County contends that "the materiality analysis required under *Brady* was skewed and rendered untenable" because the Boyd Estate introduced extrinsic evidence to undermine the prosecution's 1977 case against Boyd, whereas "the County was barred from introducing evidence extrinsic to the trial record for purposes of attempting to impeach Plaintiff's alleged *Brady* evidence." Mem. at 34. This too is incorrect.

The law prescribes a limited universe for a *Brady* materiality analysis. The jury must compare the strength of the proof presented in the underlying criminal trial against the likely impact of the undisclosed *Brady* evidence. Dkt. 418 at 24-25; *Fuentes v. T. Griffin*, 829 F.3d 233, 249 (2d Cir. 2016). Thus, the Court was right to hold that the County could not diminish the impact of the undisclosed *Brady* material by introducing extrinsic evidence that Drury supposedly would have offered in response to the *Brady* material he suppressed. Dkt. 418 at 24-25, 33-35.

Nor did the Court allow the Boyd Estate to use extrinsic evidence to attack the prosecution's case. The County's contrary argument misstates the record. James McLeod did not testify that Woodruff's 1977 testimony *was* false or that Lawrence Watson *was* the real killer, *contra* Mem. at 34 & n.20. Rather, McLeod properly explained how a defense attorney like himself could have used the undisclosed *Brady* evidence to impeach Woodruff and implicate Watson, Tr. T. 1247:21-1254:5, 1261:12-1263:9. Woodruff and Hirsch likewise did not testify that Woodruff's 1977 testimony *was* false. Rather, they testified about detectives' coercion of Woodruff and Andre Hough, and ADA Drury's presence, involvement, knowledge, and coaching. Tr. T. 219:12-223:15, 232:2-239:21 (Woodruff); Trial Tr. 333:6-20, 348:17-366:15, 418:3-429:2 (Hirsch). This testimony tended to show that the suppressed *Brady* material was favorable, tended to show how

- 32 -

the suppressed *Brady* material could have been used to impeach Woodruff and Hough, and tended to rebut the County's apportionment defense.

Finally, the County again fails to establish prejudice. The Court carefully instructed the jury about the permissible purposes for the evidence it was receiving, *see, e.g.*, Tr. T. 150:5-13, 151:3-8, 910:21-911:5, 1132:24-1133:8, and, in its final instructions, thoroughly instructed the jury on *Brady* materiality, *id.* at 2306:17-2307:16. Moreover, the County cannot possibly claim it was prejudiced by evidence establishing the "coercive nature of the [BPD] investigation" or evidence "suggesting that Mr. Woodruff's testimony at Boyd's underlying trial was false," Mem. at 34, when it argued these very propositions to establish its apportionment defense.

### C.    The Court correctly precluded the County from introducing evidence that Boyd's counsel should have discovered the *Brady* material that ADA Drury suppressed.

The County next argues that it was improperly precluded from arguing that certain of the *Brady* evidence was not suppressed where Boyd "should have known" of the existence of similar information. Mem. at 35. These types of arguments improperly dilute a prosecutor's "absolute duty" under *Brady* "to produce all materially favorable evidence in the State's possession," *Villasana v. Wilhoit*, 368 F.3d 976, 979 (8th Cir. 2004); *accord Banks v. Dretke*, 540 U.S. 668, 695 (2004); *Shih Wei Su v. Filion*, 335 F.3d 119, 128 (2d Cir. 2003). As the Second Circuit held in *Lewis v. Connecticut Commissioner of Correction*, 790 F.3d 109 (2d Cir. 2015), "[t]he Supreme Court *has never required* a defendant to exercise due diligence to obtain *Brady* material." *Id*. at 121 (emphasis added).

Though the County has seen these authorities before, it musters little response to them. The fact that *Lewis* "post-dates Boyd's underlying trial by more than three decades," Mem. at 35, is irrelevant, because *Lewis* holds not that the Supreme Court has done away with a due-diligence requirement, but that the Supreme Court "has never" imposed such a requirement. The two cases

- 33 -

the County cites, Mem. at 35, are non-precedential, pre-date *Lewis*, and are distinguishable because the defendant knew about the favorable evidence or had equal access to it.

Moreover, the County has not established prejudice, nor could it. Almost all of the 19 pieces of undisclosed *Brady* evidence were police reports, police photos, and handwritten notes held in Drury's sole possession. There is no plausible argument that Boyd's attorney should have secured this information on his own. He could only obtain it if Drury disclosed it to him.

### D.    The Court properly admitted other-case *Monell* evidence.

The Boyd Estate's most important *Monell* evidence was the testimony of Timothy Drury, David Henry, and Edward Cosgrove. These witnesses' admissions were supplemented by evidence of misconduct by Erie County prosecutors in other cases (the "other-case evidence"). Ignoring the many instances in which the Court exercised its discretion to exclude other-case evidence proffered by the Boyd Estate, the County contends that all other-case evidence should have been excluded. Mem. at 27-33. Here again, the County identifies neither an abuse of discretion nor prejudice.

### 1.    The Court properly denied the County's request for a pretrial hearing.

The Court did not abuse its broad discretion, *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001), when it denied the County's request for a pretrial hearing on the Boyd Estate's *Monell* evidence, *contra* Mem. at 28-29. The County had ample notice of what the proof would be from the *Walker* trial and the pre-trial briefing and disclosures in the Boyd Estate's case, and the County had ample opportunity to present any objections through written submissions.

### 2.    The other-case evidence was relevant and admissible.

The County first contends that the Boyd Estate's other-case *Monell* evidence should have been excluded because it was too remote and dissimilar from Drury's misconduct, was insufficiently numerous, and related to an overbroad theory. Mem. at 29-31. These arguments, which the Court has rejected, *Weppner v. Cnty. of Erie*, 2025 WL 3214581, at *2-3, *6-11

- 34 -

(W.D.N.Y. Nov. 18, 2025),[14] are wrong for the reasons given in the Rule 50(b) opposition, filed contemporaneously with this brief.  *See* Rule 50(b) Opposition Brief at 12-13, 19-24, 37-38.

The County also raises a hearsay objection. Some of the other-case evidence was admitted for its truth under the ancient-documents hearsay exception. *Weppner*, 2025 WL 3214581, at *3. The County now contends that "the ancient documents exception cures only a single level of hearsay and does not render admissible documents containing multiple layers of hearsay." Mem. at 31. This argument is unpreserved, undeveloped, and meritless as applied to the *Monell* evidence.

During the *Walker* trial, the County conceded that the other-case evidence is *not* inadmissible hearsay, given the ancient-documents exception, and so limited its objections to relevance. *Walker*, Tr. T. 837:21–22. In a motion *in limine* to preclude *Monell* evidence from the Boyd Estate trial, the County incorporated its positions in *Walker*, acknowledged the applicability of the ancient-documents exception, and added only that this "exception does not create relevance." Dkt. 326-1 at 15 & n.15; *accord Weppner*, 2025 WL 3214581, at *3. On November 7, when the Court stated that it would admit the same other-case evidence it admitted in *Walker*, the County reiterated its reliance on the positions it took "in Mr. Walker's trial." Tr. T. 663:16-18. Then, for avoidance of doubt, counsel orally recited the bases for its opposition to the other-case evidence, *id.* at 663:21-669:5, and filed a written submission "to memorialize these objections," *id.* at 664:17–20; Dkt. 447. Neither of these recitations makes a multiple-hearsay argument. Indeed, later in the trial, the County argued that the ancient-documents exception cures *all* levels of hearsay. Dkt. 451 at 1, 14-15.

---

[14] The County faults the Court for not "grappling" with *Patterson v. City of New York*, 2017 WL 3432718 (E.D.N.Y. Aug. 9, 2017), and *White v. City of New York*, 206 F. Supp. 3d 920, 937 (S.D.N.Y. 2016). But these cases are inapposite. Both were decided at the motion-to-dismiss stage, the plaintiffs lacked the direct evidence of municipal practice presented to the jury here, and the plaintiffs claimed unconstitutional treatment of an entire religious or gender-identity group.

The County claims that it raised the multiple-hearsay objection in its opposition to the Boyd Estate's motion *in limine* seeking to admit *Monell* evidence. Mem. at 31 (citing Dkt. 369-1 at 15-16). But the memorandum the County cites addressed *both* the other-case evidence the Court admitted in *Walker* and six documents excluded in *Walker*. After briefly objecting to the *Monell* evidence admitted in *Walker*, Dkt. 352-1 at 2-3, the County stated that "[t]he remainder of this memorandum addresses why the additional items Plaintiff seeks to admit are inadmissible," *id.* at 3. The only multiple-hearsay argument the County raised concerned one of those six additional items—a newspaper article regarding *People v. Conorozzo*. *Id.* at 15-16. That article, like the five other documents excluded in *Walker*, was excluded from the Boyd trial as well.[15] The County never identified a single multiple-hearsay problem in the other-case evidence the Court admitted.

Moreover, the Motion *still* fails to identify a single multiple-hearsay problem in the admitted other-case evidence (thereby abandoning the objection), and no problem exists. Every piece of other-case evidence admitted for its truth under the ancient-documents exception either did not contain multiple levels of hearsay or each level of hearsay fell within a hearsay exception. *Compare MMA Consultants 1, Inc. v. Republic of Peru*, 719 F. App'x 47, 50 (2d Cir. 2017) (factual findings in 1901 arbitration award "could be considered for their truth because they were made in an ancient document"); *In re Davis New York Venture Fund Fee Litig.*, 2019 WL 11272913, at *3

---

[15] The County's memorandum also included a footnote purporting to "preserve[] the argument that the ancient document exception does not and cannot cure the multiple levels of hearsay." Dkt. 369-1 at 16 n.12. But that perfunctory statement appears in the portion of the memorandum dedicated to the six documents excluded in *Walker*. Dkt. 352-1 at 3. And in any event, litigants "preserve" arguments by directing the Court's attention to a specific evidentiary problem and relevant legal authority. *See supra* § II. This footnote does not identify any multiple-hearsay problem in any piece of *Monell* evidence.

(S.D.N.Y. July 2, 2019) (1993 article reporting that an entity decided to replace its "adviser …

after considering 17 other applicants" admissible as an ancient document).[16]

Nor does the County establish prejudice. Though it complains that the other-case *Monell*

evidence "invited the Jury to draw impermissible propensity-based inferences . . . rather than

evaluating the specific constitutional claims at issue," Mem. at 32, the Court forbade any such

inference, Tr. T. 677:19–678:8, and the evidence of constitutional violations was overwhelming.

**E.     The Court's rulings on party admissions were consistent and correct.**

*1.     The Court properly admitted a portion of DA Flynn's 2021 press conference.*

As the Court held, *see* Dkt. 418 at 72-75, DA Flynn's statement during an August 2021

press conference describing Boyd's underlying prosecution as a "weak case" was relevant to

materiality (as to *Brady* and summation misconduct); was not unfairly prejudicial; and, as a party

admission, was not hearsay. The County offers no law or fact showing how the Court's ruling was

erroneous, and its complaint about the Court excluding "additional context," Mem. at 36, is

meritless. The Court admitted those of the County's counter-designations that included comments

from DA Flynn about the 1977 trial, but correctly excluded the rest, which were not necessary to

correct a misimpression, FRE 106; *United States v. Williams*, 930 F.3d 44, 58 (2d Cir. 2019), and

addressed topics the Court had excluded.

*2.     The Court properly admitted portions of the County's discovery responses.*

The Court's rulings admitting portions of the County' discovery responses, the Amended

Complaint, and the Counter Statement of Material Facts were proper and internally consistent, and

the County does not even try to argue prejudice.

---

[16] The one multiple-hearsay case the County cites, *Rivas v. Onondaga County*, 2025 WL 2675826, at \*21 & n.33 (N.D.N.Y. Sept. 18, 2025), contains no reasoning and does not identify the multiple-hearsay statements at issue.

*First*, the Court rightly admitted discovery responses stating that the County had nothing to provide in response to certain document requests regarding training and discipline. PX-237. The responses were relevant and, as "[party] admissions," not hearsay, *Scoma v. City of New York*, 2021 WL 1784385, at *12 (E.D.N.Y. May 4, 2021) (cleaned up). While the absence of records did not *conclusively prove* an absence of training and discipline, Mem. at 36, alternative explanations for this absence were points for the jury, not grounds for exclusion, Tr. T. 1098:20-24.

*Second*, the Court properly admitted some, but not all, of the proffered paragraphs from the Boyd Estate's prior filings. Though these filings were, like the County's discovery responses, party admissions, Tr. T. 1789:10-14, most of the paragraphs the County proffered were irrelevant and/or riddled with double- and triple- hearsay, *see* Hanft Decl. Ex. 2. Where these vices did not exist, the Court admitted the statement.

**F.    The Court properly ruled on issues related to damages.**

*1.    The Court properly admitted evidence that Boyd was diagnosed with terminal cancer shortly after his conviction was vacated.*

Evidence that Boyd was diagnosed with cancer two years after his conviction was vacated was, as the Court found, Dkt. 418 at 77, relevant to pain and suffering and not unduly prejudicial.

The County claims that the cancer diagnosis was irrelevant because it occurred "after [Boyd] had been relieved of the circumstances that could conceivably be proximately caused by the County." Mem. 39. But Boyd was *never* relieved of the consequences of his wrongful conviction; his PTSD, anxiety, and depression continued until his death. Tr. T. 939:5-12, 950:20-951:2, 955:22-24; *compare Burton v. City of New York*, 630 F. Supp. 3d 586, 590 (S.D.N.Y. 2022) (plaintiff's wrongful incarceration "has lasting effects that continue[] and likely will continue until the end of [his] life"). Boyd's cancer diagnosis made him excruciatingly conscious that his healthy years—indeed, almost all of his limited lifespan—had been taken from him. Tr. T. 959:21-960:17,

1022:5-25, 1186:9-18; *accord Burton*, 630 F. Supp. at 586, 597-98 (death of plaintiff's father during plaintiff's wrongful imprisonment was part of plaintiff's damage even though defendant did not cause father's death).

The County's prejudice argument fails too. Though the County claims that references to cancer "could only . . . confuse and inflame the Jury," Mem. at 38, courts regularly hold that "a diagnosis of cancer is not so obviously inflammatory as to invite a decision on an improper basis." *Nielson v. Union Pac. R.R.*, 2024 WL 4458648, at *3 (D. Neb. Oct. 10, 2024); *accord Wedyke v. Speedway LLC*, 2019 WL 3425378, at *3 (E.D. Mich. July 30, 2019).[17] Indeed, if the County really believed that cancer is an inherently inflammatory topic, it would not have rejected the Court's invitation, *see* Email from Nicole W. Austin, Esq., sent on Oct. 30, 2025 at 1:16 pm, to voir dire prospective jurors on the subject. The testimony and arguments the County cites, Mem. at 38-39, were not inflammatory and they strictly adhered to the purpose for which Boyd's diagnosis was admitted. The Court eliminated any remaining potential for prejudice by telling the jury that Boyd's cancer was not caused by his conviction or incarceration, Tr. T. 12:6-8, and forbidding a verdict based on sympathy, *id.* at 2291:4-5.

> 2.  *The Court properly excluded evidence of Boyd's settlement with the City of Buffalo.*

The County next argues that introducing Boyd's cancer diagnosis required admission of the settlement between Boyd and the City of Buffalo. Mem. at 39. Before trial, the Court found the settlement inadmissible under FRE 408 and FRE 403, and granted the Boyd Estate's motion to exclude it, Dkt. 418 at 18-21. The County then moved to re-argue, claiming that it should be

---

[17] In the case the County cites, the court did not exclude "evidence pertaining to plaintiff's cancer," Mem. at 38. Rather, the court *informed* the jury that the decedent "died from cancer," but excluded evidence of cancer treatments and any argument that the defendant caused the cancer, *Alvarez v. Royal Atl. Devs., Inc.*, 2011 WL 13173807, at *4 (S.D. Fla. May 31, 2011)—just what the Court did here.

- 39 -

allowed to cross-examine Dr. Drob about the happiness Boyd supposedly derived from the settlement. Dkt. 416. The Court denied this motion as well. Tr. T. at 1093:8-22. Here, the County challenges only the denial of its motion to re-argue, contending that the settlement was a "counterweight to Plaintiff's remarks and Dr. Drob's opinions concerning Boyd's post-conviction psychological state and perception of justice," because it "would have logically mitigated the emotional salience of dying before" his day in court. Mem. at 39. This objection is meritless.

To start, the County's motion to re-argue came nowhere close to satisfying the re-argument standard, which required a showing that the Court had overlooked controlling precedent or critical facts, *Sanchez v. City of Buffalo*, 2024 WL 641265, at *2 (W.D.N.Y. Feb. 15, 2024). Waiver aside, the County offers no reason why excluding the settlement was an abuse of discretion. Dr. Drob never testified to Boyd's "perception of justice," negating the County's core theory of relevance. And because the settlement was reached on December 5, 2024, *see* Dkt. 200, just two months before Boyd's death, neither Dr. Drob nor the parties had any opportunity to ask Boyd whether his cheap settlement with the City—which he struck while dying, and had hardly any time to enjoy due to the County's frivolous obstruction, Dkt. 208—lessened his rage and sadness at having almost his entire life taken from him. Because Dr. Drob naturally did not rely on the eve-of-trial settlement, and had no information about Boyd's reaction to it, injecting this fact through cross-examination would impermissibly make Dr. Drob a conduit for hearsay, and would serve no purpose other than to pollute the jury's deliberations with impermissible considerations. Accordingly, rejecting the County's improper motion for re-argument was well within the Court's discretion.

**G.    The Court properly admitted DA Cosgrove's admissions regarding his supervision of the Buffalo Police Department.**

The County objects to the admission of DA Cosgrove's testimony that he supervised BPD officers with respect to interrogations, claiming that the testimony was irrelevant, misleading, and prejudicial. Mem. at 39–40. Not so. In advancing its apportionment defense, the County argued that the ECDAO had no role in police interrogations, making detectives entirely responsible for Woodruff's and Hough's inculpatory statements, Tr. T. 2206:7-2215:17. Cosgrove's party admission directly rebutted that argument. While the County claims that Cosgrove's words could not possibly be true, Mem. at 40, it never asked any clarifying questions during Cosgrove's deposition, and the meaning of Cosgrove's admission was for the jury to decide based on the evidence presented by the Boyd Estate and the countervailing evidence presented by the County, Tr. T. 2088:24-2089:11.[18] Nor is Cosgrove's admission prejudicial in the FRE 403 sense. Though the County accuses plaintiff's counsel of "exploit[ing]" the admission to "inflame the jury," Mem. at 40, it cites no support for this argument, and a review of the transcript shows that counsel's brief references to this admission were appropriate, Tr. T. 52:11-19 (opening), 2268:1-9 (closing).

## V.    THE COUNTY IS NOT ENTITLED TO A REMITTITUR.

Remittitur is a "limited exception to the sanctity of jury fact-finding," which must "be scrutinized with the utmost care" and used "only when an award is grossly excessive." *Akermanis v. Sea-Land Serv., Inc.*, 688 F.2d 898, 902 (2d Cir. 1982) (cleaned up). Here, the jury was tasked with identifying the amount of money necessary to compensate Boyd for all the suffering he

---

[18] The County adds that Cosgrove's admission was contradicted by an organizational chart which it "sought to admit" at trial. Mem. at 40. But contradictions in the evidence are for the jury to weigh, and here there is not even a contradiction. The chart the County "sought to admit" was excluded because the County neglected to lay the requisite foundation, despite having notice of this exact problem from the *Walker* trial, Tr. T. 1561:5-1565:22, and the County does not even attempt to argue that this exclusion was erroneous.

- 41 -

endured as a result of his wrongful conviction. Tr. T. 2314:24-2316:15. The figure it arrived at was $80 million. The County's request to strike over 80% of that award must be denied.

### A.    The jury's damages award is not excessive.

The County's principal ground for remittitur is that the jury's award was intrinsically excessive. Mem. at 41-44. To remit a jury award on this basis, the Court would have to find that the award is "so high as to shock the judicial conscience and constitute a denial of justice." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012) (cleaned up). Far from shocking the conscience, the jury's verdict reflects the unique and appalling suffering Boyd experienced.

Boyd's nearly 28 years of wrongful incarceration were "[p]ure agony," PX-252, 362:20; a cauldron of violence, terror, squalor, and humiliation that consumed the most formative and vibrant period of his life, *id.* at 503:11-507:1. When Boyd arrived at Elmira Correctional Facility at age 17, he was taunted as "fresh meat" and had fire, trash, and urine thrown on him. *See* PX-252, 500:18-502:1. Over the years that followed, he was burned, stabbed, scarred, and gassed. PX-252, 369:5-370:8, 371:17-372:6, 520:15-521:8. He witnessed "an individual in his cell get set on fire," "sexual assaults," "multiple stabbings," a friend murdered "over a piece of chicken," an inmate have "his eye put out by a [guard's] stick," and countless other instances of violence. PX-252, 371:10-17, 517:22-518:13, 529:5-13. And his consciousness of innocence, and the daily injustice of his punishment, sharpened his rage, mistrust, and depression. Tr. T. 932:24-934:20. Release to parole brought only modest relief, given the suffocating, degrading supervision he was forced to endure. PX-252, 534:1-537:6.

The result was lifelong mental illness—severe, chronic PTSD, depression, and anxiety—which leached much of the happiness from his life. Tr. T. 939:5-11; PX-252, 484:1-14. Then, shortly after his conviction was vacated, Boyd was diagnosed with terminal cancer, PX-252, 487:3-21, and he spent his final years knowing that the County's misconduct had robbed him of

nearly his entire life, Tr. T. 960:7-17. Calling such injuries "garden variety emotional damages," Mem. at 43, is an obscene understatement. These are, without question, the "debilitating and permanent alterations in lifestyle" that courts recognize as supporting large compensatory damages. *Quinby v. WestLB AG*, 2008 WL 3826695, at *3 (S.D.N.Y. Aug. 15, 2008).

In declaring the jury's verdict excessive, the County assumes that damages for wrongful incarceration must be evaluated on a per-year basis and cannot exceed $1 million per year. Mem. at 41-43. Both premises are wrong.

First, damages awards are too fact-specific to be prescribed by judicial formulas or measured against an average of other awards. *Zeno*, 702 F.3d at 671. The question is whether the award falls within the reasonable range for injuries of comparable severity, *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003), "bearing in mind that any given judgment depends on a unique set of facts and circumstances," *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) (cleaned up). The unique facts and circumstances here amply support the jury's award.

Second, a review of comparator cases forecloses remittitur here. Courts routinely uphold wrongful-conviction verdicts that exceed both the $1-million-per-year cap that the County invented and the annualized compensation that Boyd received. Because Boyd received "less than the maximum previously held to be reasonable for injuries of similar severity," Circuit precedent *precludes* a remittitur. *Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 247 (2d Cir. 2004).

Even if one were to ignore the 18 years Boyd spent on parole and the emotional damage Boyd carried his entire life, an award of $80 million for 27 years' imprisonment[19] comes to $2.96

---

[19] In a footnote, the County argues that Boyd's 7.5 years of reincarceration on parole violations were caused by Boyd's "intervening conduct" and "the independent decisions of the criminal justice system." Mem. at 42 n.26. But "[i]ssues of causation … are questions of fact." *Redd v. New York Div. of Parole*, 678 F.3d 166, 178 (2d Cir. 2012). The Court rightly left it to the jury to decide

million/year. That is far less than the $12.5 million that Raymond McCann II received in September 2023 as compensation for approximately 20 months of wrongful incarceration (**$7.90 million/year** in 2025 dollars).[20] *McCann v. Fuller*, 2023 WL 10947185, at *7-8 (W.D. Mich. Apr. 20, 2023); *McCann v. Fuller*, No. 1:19-cv-1032, ECF No. 245 (W.D. Mich. Sept. 20, 2023). Likewise, in September 2024, a jury awarded Marcel Brown $50 million for 10 years of wrongful incarceration (**$5.14 million/year** in 2025 dollars), and the district court declined to order remittitur, reasoning that Brown was 18 years old when convicted and, while in prison, "witnessed death and extreme violence," "struggled to receive medical care," and was physically injured by other inmates. *See Brown v. City of Chicago*, 2025 WL 2785426, at *3, 31-32 (N.D. Ill. Sept. 30, 2025). In August 2008, a jury awarded Theodore White $14 million in compensatory damages for 5.5 years of wrongful incarceration (**$3.77 million/year** in 2025 dollars). *See White v. McKinley*, 605 F.3d 525, 536 (8th Cir. 2010); *White v. McKinley*, 2009 WL 813372, at *1 (W.D. Mo. Mar. 26, 2009). There too, the district court declined to amend the judgment, in part because the evidence at trial supported the finding that White, like Boyd, "suffered financial and emotional

---

whether the Boyd's wrongful conviction proximately caused his later reincarcerations, Tr. T. 2166:12-17, and the County did not (and does not) object to the Court having done so. The Court must assume that the jury resolved this factual question in favor of the Boyd Estate. *Wheatley v. Ford*, 679 F.2d 1037, 1039 (2d Cir. 1982). The one case the County cites is not to the contrary. There, the court did not *overturn* a jury's proximate-cause determination but simply made *its own* determination while sitting as the fact-finder in a damages inquest. *Alston v. City of New York*, 2023 WL 11956309, at *2, *5 (E.D.N.Y. Nov. 9, 2023), *report and recommendation adopted*, 2024 WL 4100175 (E.D.N.Y. Sept. 5, 2024). Here, the jury heard different evidence about a different individual and reasonably reached a different conclusion.

[20] When analyzing a jury award, comparator awards must be adjusted for inflation. *Gonzalez v. United States*, 80 F.4th 183, 199 (2d Cir. 2023). The Boyd Estate has adjusted historical awards to December 2025 dollars using the U.S. Bureau of Labor Statistics Inflation Calculator, *available at*, https://www.bls.gov/data/inflation_calculator.htm; *accord Lewis v. City of Albany Police Dep't*, 547 F. Supp. 2d 191, 208 (N.D.N.Y. 2008) (using similar), *aff'd*, 332 F. App'x 641 (2d Cir. 2009).

losses and physical abuse in prison." *White v. McKinley*, 2009 WL 813001, at \*22 (W.D. Mo. Mar. 26, 2009), *aff'd*, 605 F.3d 525 (8th Cir. 2010). In October 2006, a jury awarded Alejandro Dominguez—who, like Boyd, was a minor when wrongfully convicted—$9.063 million for 4 years of wrongful incarceration (**$3.64 million/year** in 2025 dollars). *See Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008).[21]

The County's citation, Mem. at 42-43, to awards lower than the Boyd Estate's simply shows that the Boyd Estate's verdict falls within a "reasonable range" between the lesser awards the County cites and the larger awards discussed above. *Zeno*, 702 F.3d at 671. Only one of the cases the County cites actually ordered a remittitur, and that was because the plaintiff there, unlike Boyd, served ten years on a lawful conviction for a similar crime, was incarcerated as an adult, and was not the victim of "egregious governmental misconduct." *Newton v. City of New York*, 171 F. Supp. 3d 156, 173, 177 (S.D.N.Y. 2016) (cleaned up).

**B.     Boyd's pretrial settlement does not entitle the County to an offset.**

The County's final argument—that the Court should reduce the jury's award by the amount of Boyd's settlement with the City Defendants, Mem. at 44-45—fails as well. As explained above, *Restivo* forecloses an offset; the jury's damages award did not include pre-conviction incarceration damages; there are no "common damages," *id.* at 44, between the County and the City Defendants; and the Court properly instructed the jury on apportionment. *See supra* §§ II.B, III.B.

**CONCLUSION**

For the foregoing reasons, the Court should deny the County's motion.

---

[21] *See also Gillispie v. Miami Twp., Ohio*, 2025 WL 1276900, at \*2, \*9 (6th Cir. May 2, 2025) (affirming district court's refusal to amend jury's award of $45 million for over 21 years' wrongful incarceration (**$2.31 million/year** in 2025 dollars)); *Jimenez v. City of Chicago*, 732 F.3d 710, 712, 723 (7th Cir. 2013) (affirming district court's judgment where jury awarded $25 million for 16 years' wrongful incarceration (**$2.23 million/year** in 2025 dollars)).

Dated: March 20, 2026                    Respectfully submitted,

                                         **WILMER CUTLER PICKERING
                                           HALE AND DORR LLP**

                                         By: /s/ Ross E. Firsenbaum
                                         Ross E. Firsenbaum
                                         Gideon A. Hanft
                                         Phoebe Silos
                                         Erin Hughes
                                         Trena Riley
                                         Melissa Zubizarreta
                                         7 World Trade Center
                                         250 Greenwich Street
                                         New York, New York 10007
                                         (212) 230-8800
                                         *ross.firsenbaum@wilmerhale.com*

                                         **LAW OFFICES OF JOEL B. RUDIN, P.C.**

                                         By: /s/ Joel B. Rudin
                                         Joel B. Rudin
                                         David E. Rudin
                                         Partha Sharma
                                         Carnegie Hall Tower
                                         152 West 57th Street, 8th Floor
                                         New York, New York 10019
                                         (212) 752–7600
                                         *jbrudin@rudinlaw.com*

                                         **HOOVER & DURLAND LLP**

                                         By:  /s/ Spencer L. Durland
                                         Timothy W. Hoover
                                         Spencer L. Durland
                                         561 Franklin Street
                                         Buffalo, New York 14202
                                         (716) 800-2600
                                         *thoover@hooverdurland.com*

                                         *Attorneys for Plaintiff Estate of Darryl Boyd*