**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KATHLEEN WEPPNER, AS EXECUTOR OF THE ESTATE OF DARRYL BOYD, <br><br> Plaintiff, <br><br> - against - <br><br> COUNTY OF ERIE, <br><br> Defendant. | **Case No. 1:22-cv-519** |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
FOR JUDGMENT AS A MATTER OF LAW UNDER FRCP 50(b)**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

FACTS .................................................................................................................................1

ARGUMENT .......................................................................................................................2

    I.    THE GOVERNING LEGAL PRINCIPLES MAKE IT EXCEEDINGLY
        DIFFICULT FOR THE COUNTY TO PREVAIL. ..........................................................2

        A.    As the party seeking to overturn a jury verdict, the County bears a heavy
             burden. ...................................................................................................................2

        B.    The County's motion must be denied if there is sufficient evidence in the
             record for either the *Brady* claim or the summation-misconduct claim
             under either one of the Boyd Estate's *Monell* theories. .........................................3

        C.    Arguments not specifically raised in the County's Rule 50(a) motion are
             waived. ...................................................................................................................4

    II.    A REASONABLE JUROR COULD FIND THE COUNTY LIABLE FOR A
        *BRADY* VIOLATION. .........................................................................................5

        A.    A reasonable juror could find that ADA Drury violated *Brady* ...........................5

        B.    A reasonable juror could find that the *Brady* violations in Boyd's case
             were caused by County policy, custom, or practice. ...............................................8

    III.    A REASONABLE JUROR COULD FIND THE COUNTY LIABLE FOR
        SUMMATION MISCONDUCT. ...........................................................................23

        A.    The Boyd Estate Proved that Boyd Did Not Receive a Fair Trial Due to
             Summation Misconduct. .......................................................................................24

        B.    A reasonable juror could find that ADA Drury's summation misconduct
             was caused by County policy, custom, or practice. ...............................................31

CONCLUSION ...................................................................................................................38

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Advance Pharmaceutical, Inc. v. United States*,
  391 F.3d 377 (2d Cir. 2004)........................................................................................3

*AIG Global Securities Lending Corp. v. Banc of America Securities, LLC*,
  386 F. App'x 5 (2d Cir. 2010) ....................................................................................4

*Alwan v. City of New York*,
  311 F. Supp. 3d 570 (E.D.N.Y. 2018) ......................................................................16

*Amnesty America v. Town of West Hartford*,
  361 F.3d 113 (2d Cir. 2004)..........................................................................15, 16, 21

*Batista v. Rodriguez*,
  702 F.2d 393 (2d Cir. 1983)......................................................................................21

*Bellamy v. City of New York*,
  914 F.3d 727 (2d Cir. 2019)..............................................19, 21, 23, 24, 30, 37

*Bordanaro v. McLeod*,
  871 F.2d 1151 (1st Cir. 1989)...................................................................................17

*Boyd v. City of Buffalo*,
  2025 WL 92362 (W.D.N.Y. Jan. 14, 2025)................................................................8

*Brady v. Wal–Mart Stores, Inc.*,
  531 F.3d 127 (2d Cir.2008)..........................................................................................3

*Buari v. City of New York*,
  530 F. Supp. 3d 356 (S.D.N.Y. 2021).......................................................................16

*Cash v. County of Erie*,
  654 F.3d 324 (2d Cir. 2011).................................................................................2, 15

*Chepilko v. City of New York*,
  2012 WL 398700 (E.D.N.Y. Feb. 6, 2012)..........................................................19, 23

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*,
  746 F.3d 42 (2d Cir. 2014)...........................................................................................4

*City of Canton v. Harris*,
  489 U.S. 378 (1989)..............................................................................................15, 16

*Connick v. Thompson*,
    563 U.S. 51 (2011).............................................................................................20

*Ferrari v. County of Suffolk*,
    2013 WL 4017022 (E.D.N.Y. Aug. 6, 2013),
    *rev'd on other grounds*, 845 F.3d 46 (2d Cir. 2016)..........................................9

*Garnett v. Undercover Officer C0039*,
    838 F.3d 265 (2d Cir. 2016)...........................................................................3, 14

*Gentile v. County of Suffolk*,
    926 F.2d 142 (2d Cir. 1991)....................................................................16, 17, 19

*Gleeson v. County of Nassau*,
    2019 WL 4754326 (E.D.N.Y. Sept. 30, 2019) .................................................23

*Gravelet-Blondin v. Shelton*,
    728 F.3d 1086 (9th Cir. 2013) ............................................................................9

*Greene v. City of New York*,
    742 F. App'x 532 (2d Cir. 2018) ......................................................................21

*Griffin v. United States*,
    502 U.S. 46 (1991)..............................................................................................3

*Hayvin Gaming, LLC v. Workinman Interactive, LLC*,
    2024 WL 2702202 (W.D.N.Y. May 24, 2024)...................................................5

*Houston v. Cotter*,
    2016 WL 1253391 (E.D.N.Y. Mar. 30, 2016)....................................................4

*Indu Craft, Inc. v. Bank of Baroda*,
    47 F.3d 490 (2d Cir. 1995)..................................................................................4

*Isaac v. City of New York*,
    2018 WL 5020173 (E.D.N.Y. Aug. 6, 2018),
    *report and recommendation adopted*,
    2018 WL 4583481 (Sept. 24, 2018)..................................................................22

*Jeffes v. Barnes*,
    208 F.3d 49 (2d Cir. 2000)...........................................................................19, 31

*Jones v. City of New York*,
    603 F. App'x 13 (2d Cir. 2015) ..........................................................................9

*Jones v. Town of East Haven*,
    691 F.3d 72 (2d Cir. 2012)..................................................................9, 15, 19, 23

*Leevson v. Aqualife USA Inc.*,
770 F. App'x 577 (2d Cir. 2019) ........................................................................5

*Lore v. City of Syracuse*,
670 F.3d 127 (2d Cir. 2012) .............................................................................4, 5

*Lucente v. County of Suffolk*,
980 F.3d 284 (2d Cir. 2020) .............................................................................8, 22

*Matusick v. Erie County Water Authority*,
757 F.3d 31 (2d Cir. 2014) ...............................................................................34

*Melvin v. County of Westchester*,
2016 WL 1254394 (S.D.N.Y. Mar. 29, 2016) .................................................23

*Miller v. County of Monroe*,
2024 WL 2804435 (W.D.N.Y. May 31, 2024) .................................................21

*Morse v. Fusto*,
804 F.3d 538 (2d Cir. 2015) .............................................................................3, 4

*Moses v. Westchester County Department of Correction*,
2017 WL 4386362 (S.D.N.Y. Sept. 29, 2017) .................................................23

*Ortiz v. Stambach*,
137 F.4th 48 (2d Cir. 2025) ..............................................................................3, 27

*Parkinson v. Desormeau*,
2024 WL 4973490 (E.D.N.Y. Dec. 4, 2024) ...................................................22

*People v. Balsano*,
51 A.D.2d 130 (4th Dep't 1976) .......................................................................32, 37

*People v. Donaldson*,
49 A.D.2d 1004 (4th Dep't 1975) .....................................................................32, 37

*People v. Herlan*,
99 A.D.2d 647 (4th Dep't 1984) .......................................................................32, 37

*People v. Ivey*,
83 A.D.2d 788 (4th Dep't 1981) .......................................................................32, 33, 37

*People v. Johnson*,
62 A.D.2d 555 (4th Dep't 1978) .......................................................................32, 33, 34, 37

*People v. Keller*,
67 A.D.2d 153 (4th Dep't 1979) .......................................................................32, 37

*People v. Vance*,
89 A.D.2d 347 (4th Dep't 1982).................................................................32, 37

*Poventud v. City of New York*,
2015 WL 1062186 (S.D.N.Y. Mar. 9, 2015) ...................................................21

*Poventud v. City of New York*,
750 F.3d 121 (2d Cir. 2014)..............................................................................5

*PPC Broadband, Inc. v. Corning Optical Communications RF, LLC*,
193 F. Supp. 3d 133 (N.D.N.Y. 2016)...............................................................4

*Rasmussen v. City of New York*,
766 F. Supp. 2d 399 (E.D.N.Y. 2011) .............................................................19

*Rivera v. City of New York*,
594 F. App'x 2 (2d Cir. 2014) ...........................................................................5

*Rodriguez v. County of Westchester*,
2017 WL 11802 (S.D.N.Y. Jan. 11, 2017) ......................................................23

*Silva v. San Pablo Police Department*,
805 F. App'x 482 (9th Cir. 2020) ......................................................................9

*Sorlucco v. New York City Police Department*,
971 F.2d 864 (2d Cir. 1992)............................................................................12

*Sornberger v. City of Knoxville*,
434 F.3d 1006 (7th Cir. 2006) ...........................................................................9

*Tennant v. Peoria & Pekin Union Railway*,
321 U.S. 29 (1944)..............................................................................................3

*Torcivia v. Suffolk County*,
17 F.4th 342 (2d Cir. 2021) ...............................................................................9

*United States v. Agurs*,
427 U.S. 97 (1976).............................................................................................13

*United States v. Burse*,
531 F.2d 1151 (2d Cir. 1976)............................................................................25

*United States v. Certified Environmental Services, Inc.*,
753 F.3d 72 (2d Cir. 2014)................................................................................24

*United States v. Drummond*,
481 F.2d 62 (2d Cir. 1973).................................................................................25

*United States v. Forlorma*,
94 F.3d 91 (2d Cir. 1996) ...............................................................................................25

*United States v. Friedman*,
909 F.2d 705 (2d Cir. 1990)...........................................................................................25

*Vann v. City of New York*,
72 F.3d 1040 (2d Cir. 1995)....................................................................................16, 17

*Vassiliou v. City of New York*,
2021 WL 76916 (E.D.N.Y. Jan. 7, 2021) ........................................................................19

*Walker v. City of New York*,
974 F.2d 293 (2d Cir. 1992)....................................................................................16, 21

*Weppner v. County of Erie*,
2025 WL 3214581 (W.D.N.Y. Nov. 18, 2025) ....................................18, 19, 20, 22, 37, 38

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 50....................................................................................1, 2, 3, 4, 5, 8, 15, 24, 38

**INTRODUCTION**

Forty-eight years after Darryl Boyd was wrongfully convicted for the murder of William Crawford, Plaintiff the Estate of Darryl Boyd (the "Boyd Estate") won a jury verdict finding Defendant County of Erie (the "County") liable for violating Boyd's constitutional rights and awarding $80 million in compensatory damages. The County now asks the Court to annul the jury's verdict and declare it the winner, based on meritless arguments that this Court has already rejected or that the County waived by omitting them from its previous motion for a directed verdict, brought under Federal Rule of Civil Procedure 50(a). The County's motion must be denied.

**FACTS**

The parties went to trial on a *Monell* claim alleging that (i) the prosecutor handling Boyd's 1977 criminal case denied him a fair trial by committing *Brady* violations and engaging in summation misconduct; and (ii) these constitutional violations were caused by (a) one or more unlawful practices, policies, or customs within the Erie County District Attorney's Office (the "widespread-practice theory"), and (b) District Attorney Edward Cosgrove's deliberate indifference to such misconduct as evidenced by Cosgrove's failure to ever impose discipline (the "deliberate-indifference theory"). The Boyd Estate's proof of the County's unlawful policies, customs, and practices (the "*Monell* evidence") included admissions by Cosgrove, admissions by former ADAs Timothy Drury and David Henry, testimony from attorney James McLeod, documentary evidence from the trials of co-defendants Darryn Gibson and John Walker, and judicial findings that prosecutors employed by the Erie County District Attorney's Office ("ECDAO" or "Office") had committed *Brady* violations and summation misconduct in other contemporaneous criminal cases (the "other-case evidence").

On November 15, 2025, upon the close of the Boyd Estate's proof, the County moved for a directed verdict under Rule 50(a), arguing that the other-case evidence could not support *Monell* liability. Dkt. 466; Dkt. 466-1.[1] The Court denied the motion. Tr. T. 2126:13–19.

On November 19, 2025, after hearing two-and-a-half weeks of proof and counsels' summations, the jury unanimously found that: (i) Drury violated Boyd's right to a fair trial by withholding *Brady* material; (ii) these *Brady* violations were caused by County policy, custom, or practice; (iii) Drury violated Boyd's right to a fair trial by engaging in summation misconduct; (iv) Drury's summation misconduct was caused by County policy, custom, or practice; (v) the Boyd Estate was entitled to $80 million in compensatory damages; and (vi) none of the fault for Boyd's post-conviction injuries could be apportioned to City of Buffalo police officers. *See* Dkt. 486.

On February 2, 2026, the County moved for a directed verdict under Rule 50(b), *see* Dkt. 493, and separately moved for a new trial or remittitur under Rule 59, *see* Dkt. 495, raising essentially the same arguments that this Court previously has rejected.

## ARGUMENT

### I. THE GOVERNING LEGAL PRINCIPLES MAKE IT EXCEEDINGLY DIFFICULT FOR THE COUNTY TO PREVAIL.

#### A. As the party seeking to overturn a jury verdict, the County bears a heavy burden.

The burden on a party seeking a directed verdict under Rule 50 "is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (cleaned up). A district court

---

[1] The notation "Dkt. __" refers to documents filed in *Boyd v. Cnty. of Erie*, No. 22-CV-519 (W.D.N.Y.). Pinpoint citations generally refer to the cited document's internal page numbering, but the notation "ECF p. __" refers to the page numbers contained in the CM-ECF banner at the top of the page. The notation "Tr. T." refers to the transcript of the Boyd Estate's civil-rights trial. The notations "PX" and "DX" refer to exhibits admitted in the Boyd Estate's civil-rights trial.

reviewing a Rule 50(b) motion "may not make credibility determinations or weigh the evidence," "must draw all reasonable inferences in favor of the nonmoving party," and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 274 (2d Cir. 2016) (cleaned up). Having thus construed the evidence in the non-movant's favor, the Court must uphold the jury's verdict unless there is "a complete absence of evidence" to support it, or "the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Morse v. Fusto*, 804 F.3d 538, 546 (2d Cir. 2015) (quoting *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir.2008)); *see also id.* at 550 (courts may not upset verdicts merely because they "feel that other results are more reasonable." (quoting *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35 (1944)).

> **B.**     **The County's motion must be denied if there is sufficient evidence in the record for either the *Brady* claim or the summation-misconduct claim under either one of the Boyd Estate's *Monell* theories.**

The jury found the County liable for *Brady* violations and summation misconduct. *See* Dkt. 483. Because these distinct constitutional violations produced the same injury—Boyd's wrongful conviction and imprisonment—the County cannot prevail on its Rule 50(b) motion unless it is entitled to judgment as a matter of law on both claims. *See, e.g., Ortiz v. Stambach*, 137 F.4th 48, 66 (2d Cir. 2025).

The same principle applies to the two theories of *Monell* liability presented to the jury, even though those theories were not itemized on the verdict form. When a defense request for special interrogatories is denied, "a general jury verdict [i]s valid so long as it [i]s legally supportable on one of the submitted [theories of liability]," because, even if an alternative theory lacked sufficient evidentiary support, the jury is presumed to have relied on the theory supported by sufficient evidence. *Griffin v. United States*, 502 U.S. 46, 48–49, 59 (1991); *see Advance*

- 3 -

*Pharm., Inc. v. United States*, 391 F.3d 377, 391 (2d Cir. 2004) (same); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 193 F. Supp. 3d 133, 140–41 (N.D.N.Y. 2016) (same). Thus, in *Houston v. Cotter*, then-District Judge Bianco held that where the verdict form posed a general question on *Monell* liability, sufficient evidence as to either a widespread-practice theory or a deliberate-indifference theory required denial of a Rule 50(b) motion. 2016 WL 1253391, at *6 & n.7, *9 (E.D.N.Y. Mar. 30, 2016) (citing *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995)).[2]

### C.    Arguments not specifically raised in the County's Rule 50(a) motion are waived.

Because a Rule 50(b) motion is simply the renewal of a Rule 50(a) motion, any arguments not specifically raised in the Rule 50(a) motion are waived and may not be raised in a Rule 50(b)

---

[2] For the sake of completeness and to avoid any potential confusion, we note that under a separate doctrine known as the general-verdict rule, a defendant can seek a *new trial* on the ground that (i) one of the plaintiff's theories of liability should not have been submitted to the jury; (ii) the verdict form does not indicate which theory of liability the jury relied upon; and (iii) the defendant properly requested, in accordance with Rule 51, a verdict form itemizing each theory of liability. *See Morse*, 804 F.3d at 550–53. However, it is the *Griffin* doctrine discussed above that applies here, not the general-verdict rule, for several reasons. *First*, the County's Rule 50(b) motion seeks a directed verdict in its favor, not a new trial. *Second*, neither of the County's post-verdict motions invokes the general-verdict rule, so any such argument is forfeited. *Third*, the County could not have invoked the general-verdict rule anyway because it did not, prior to the jury receiving the case, attack the legal validity of the Boyd Estate's claims, but only the sufficiency of the trial evidence. *See generally* Dkt. 342-1; *see AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 386 F. App'x 5, 8 (2d Cir. 2010) (defendant "cannot rely on the general verdict rule" to seek a new trial where its Rule 50(a) motion "did not argue to the district court that any of Plaintiffs' theories of liability . . . were invalid as a matter of law," but instead "limit[ed] its arguments to whether the trial evidence was sufficient to support Plaintiffs' theories"). *Fourth*, the County could not have invoked the general-verdict rule for the additional reason that, as explained more fully in the Boyd Estate's Rule 59 opposition, it did not properly request a verdict form itemizing each *Monell* theory submitted to the jury. *See Morse*, 804 F.3d at 550–53 (failure to request itemized verdict form with the specificity and legal argumentation that Rule 51 requires waives reliance on the general-verdict rule). *Finally*, the general-verdict rule does not compel a new trial where the court can be "reasonably sure that the jury in fact relied upon a theory with adequate evidentiary support." *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 50 (2d Cir. 2014) (cleaned up).

- 4 -

motion or on appeal. *See Lore v. City of Syracuse*, 670 F.3d 127, 152–53 (2d Cir. 2012); *see also Leevson v. Aqualife USA Inc.*, 770 F. App'x 577, 580–81 (2d Cir. 2019) (reversing district court for setting aside verdict based on argument not raised in Rule 50(a) motion); *Rivera v. City of New York*, 594 F. App'x 2, 6 (2d Cir. 2014) (same). The "specificity requirement is obligatory," and "[a] Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a JMOL argument based on the latter." *Lore*, 670 F.3d at 152 (cleaned up). As discussed in more detail below, many of the County's Rule 50(b) arguments were not raised in the Rule 50(a) motion, and so are waived.[3]

## II. A REASONABLE JUROR COULD FIND THE COUNTY LIABLE FOR A *BRADY* VIOLATION.

Construed in the Boyd Estate's favor, the trial evidence amply supports the jury's findings that Drury violated *Brady*, and that his *Brady* violations were caused by County policy, custom, or practice.

### A. A reasonable juror could find that ADA Drury violated *Brady*.

A *Brady* violation occurs when a prosecutor intentionally or inadvertently withholds evidence that is favorable to the criminal defendant (either because it is impeaching or because it is exculpatory) and the withheld evidence is material to the outcome of the case. *See Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc). Here, the proof of each of these elements, which the County's motion does not challenge, was overwhelming.

---

[3] Waiver may be excused only "to prevent manifest injustice." *Lore*, 670 F.3d at 153. The County does not argue and is thus foreclosed from relying on this exception, *see, e.g.*, *Hayvin Gaming, LLC v. Workinman Interactive, LLC*, 2024 WL 2702202, at *5 (W.D.N.Y. May 24, 2024) (issues raised for the first time in reply are waived). In any event, there is no manifest injustice here for the reasons set forth below.

The prosecution's proof at Boyd's criminal trial in 1977 consisted of testimony by Tyrone Woodruff claiming he witnessed Boyd and their other three friends committing the robbery-homicide of Crawford, and Andre Hough accusing Boyd of having made incriminating statements after the fact. In addition, several other witnesses contributed to the case, including Sgt. Gerald Dove, who testified he saw no footprints in the backyard of Crawford's house or adjoining properties, *see* PX 74 (*People v. Boyd* Tr. T.) at 110:5–111:2, and Larry Watson, who testified that Crawford left the Golden Nugget Bar at the same time he did, *id.* at 65:11–66:17. Measured against this record, the 20 items of *Brady* evidence plainly were both favorable and material.[4] The evidence included, but was not limited to, the following:

1.  Undisclosed police reports and witness statements which, read together, showed that Woodruff and Walker left the Glenny Drive Projects in a Fillmore Cab Company taxi about 11:28 p.m. to go home and that this was *before* Crawford either left the bar or arrived at his house, impeaching Woodruff's testimony that he was present for and observed Boyd and their friends committing the crime. *See* Tr. T. 1508:17–1513:6, 1513:7–1519:21 (Zeidman); PX 6, 14, 29; DX 500.16, 500.32.

2.  Undisclosed police reports and Drury's own notes and information he was aware of which showed that Woodruff and Hough were repeatedly coerced, recanted, and pressured to conform their stories and that Hough refused to take a polygraph examination after changing his account. *See* Tr. T. 1414:6–1415:8, 1419:1, 1469:15–1475:12; 1477:14–1479:10, 1481:11–1482:16, 1483:8–1487:14, 1489:1–1491:8, 1493:3–1495:15, 1522:5–1523:14, 1550:12–1551:25 (Zeidman); *id.* at 645:12–18, 533:7–25, 740:20–23, 743:17–23, 745:1–748:23, 782:23–783:10 (Drury); PX 245A, 235:2–17, 256:20–257:11, 262:15–263:20; PX 31, 33, 43, 46, 47, 48, 54, 293.

3.  Interviews at Simpson's Store contradicting Woodruff's account that the five boys were outside the Store just before the assault occurred and contradicting Hough's account that Boyd flashed money while visiting the Store the next day. *See* Tr. T. 1504:21–1507:2 (Zeidman); PX 44.

4.  Police crime-scene photographs showing footprints in the backyard of Crawford's property leading towards Larry Watson's property, which impeached Dove's

---

[4] Though the parties stipulated to 19 items of *Brady* evidence that were not referenced or marked in any pre-trial or trial transcript, there was an additional police report documenting an interview of Darryl Boyd's mother that was the subject of testimony by Professor Zeidman.

testimony and supported a third-party culpability defense, *see* Tr. T. 1524:14–1527:12 (Zeidman); *id.* at 548:9–551:9 (McLeod); *id.* at 2162:13–19 (Henry); PX 88A, 88B, and showing an absence of drag marks in the driveway of Crawford's property, which impeached Woodruff's testimony, Tr. T. 551:14–553:1 (McLeod); *id.* at 1430:19–1431:10 (Zeidman).

5.    Evidence pointing towards Larry Watson and/or Jerome Boyd as the assailants, which impeached Watson and Woodruff while establishing a third-party culpability defense that exculpated Boyd. *See* Tr. T. 1438:4–1440:16, 1441:10–1444:21, 1445:5–1446:11, 1449:5–1450:5, 1450:6–1452:2, 1457:24–1460:3, 1460:10–1461:6, 1461:13–1462:23, 1463:4–1464:14, 1519:22–1521:22 (Zeidman); PX 6, 7, 8, 9, 18, 29, 53; DX 500.16.

6.    A police report contradicting Detective Guadagno's testimony that Darryl Boyd's mother told Guadagno that her son did not arrive home the night of the crime until after 1 a.m.—she in fact said it was as early as 12:10 a.m.—which Guadagno used to mislead Boyd and get him to change his account. *See* Tr. T. 1549:25–1555:4 (Zeidman); PX 293.

A reasonable juror could easily find that this favorable and material evidence was not disclosed to Boyd's defense attorney, Mark Hulnick. Drury admitted he had no record or memory of disclosing any of these items during pretrial proceedings that he conducted on behalf of the Office and disclosed none of them to Boyd's counsel. *See* Tr. T. 545:22–546:5, 598:3–11, 600:2–602:10, 604:22–605:8, 608:14–609:10, 615:19–20, 617:2–9, 618:5–12, 620:10–16, 623:13–16, 624:18–24, 626:8–25, 628:10–15, 633:22–634:3, 636:7–15, 638:17–639:23, 641:9–14, 645:5–14, 713:11–14, 716:17–717:10, 718:3–7, 727:15–20, 729:4–17, 740:20–741:25, 755:23–756:4, 771:17–772:4, 776:14–778:20; PX 245A, 26:4-14, 158:123. The hearing and trial transcripts do not show that any of the above items were disclosed to Boyd's counsel. *See id.* at 1460:4–9, 1461:7–12, 1466:1–25, 1467:1–1468:14, 1498:3–1500:2, 1507:9–1508:16, 1527:16–1530:16 (Zeidman). The documents bear no exhibit markings from Boyd's trial. *See id.* at 1448:23–1449:4, 1461:7–12, 1462:24–1463:3, 1464:15–20, 1482:17–1483:7, 1492:23–1493:2, 1507:3–8, 1521:23–1522:4. Boyd testified he was not aware of information contained in the above items at the time of his trial, PX 252A, 459:16–467:18, and Walker testified that when he shared police reports with

Boyd he obtained through a FOIL request, Boyd was shocked, Tr. T. 204:2–205:16. And, as Professor Zeidman testified, while a reasonably competent criminal defense attorney would have used these materials if they had been disclosed to him, the Boyd trial transcript shows that Hulnick did not use them, thereby implying he did not have them.[5] *See* Tr. T. 1452:3–1454:18, 1466:1–1468:14, 1498:17–1499:15, 1554:8–1555:4, 1729:17–1731:10.

> **B.** **A reasonable juror could find that the *Brady* violations in Boyd's case were caused by County policy, custom, or practice.**

There was also ample evidence that the numerous *Brady* violations committed in Boyd's criminal case were caused by County policy, custom, or practice to not comply with the *Brady* rule. As noted above, the Boyd Estate argued both that the County had a widespread practice of failing to disclose *Brady* material and that County policymakers were deliberately indifferent to *Brady* violations by line prosecutors. In arguing that the Boyd Estate failed to prove municipal liability, the County fixates on the Boyd Estate's other-case evidence but ignores the direct evidence of unlawful policy and practice that the Boyd Estate presented and that the Court relied upon in denying the County's Rule 50(a) motion.

> *1.    The ECDAO's policy, custom, or practice of violating Brady.*

> *a.    The law on widespread-practice liability.*

As this Court noted in denying the County's summary-judgment motion, "[i]t is well settled that a policy or custom can be found in an act performed pursuant to a custom that has not been formally approved by an appropriate decisionmaker . . . but is so widespread as to have the force of law," where "widespread" means "common or prevalent throughout the entity." *Boyd v. City of*

---

[5] That 4 of the 20 items were disclosed to *Gibson's* counsel in the middle of the Gibson trial, and retrieved by Drury, as Drury admitted, does not prove that the content of even these 4 documents was known to *Boyd's* counsel.

*Buffalo*, 2025 WL 92362, at *11 (W.D.N.Y. Jan. 14, 2025) (cleaned up). For a plaintiff to prevail on a widespread-practice theory, "actual notice by the policymakers need not be proven." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 306 (2d Cir. 2020). Rather, liability may be imposed if unconstitutional acts "were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities *must have been aware*." *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (emphasis added).

The County claims that a plaintiff presenting a widespread-practice theory must put forth "a sufficient record of prior misconduct that was tolerated over time," Mem. at 23, apparently meaning that a plaintiff must identify specific instances of misconduct going back many years. The County points to no case that stands for this proposition, and it is plainly incorrect. In *Torcivia v. Suffolk County*, the Second Circuit held that a practice can be established through a single police officer's deposition testimony describing the municipality's "standard procedure." 17 F.4th 342, 355–56 & n.20 (2d Cir. 2021); *see also Jones v. City of New York*, 603 F. App'x 13, 15 (2d Cir. 2015) (police officer's deposition testimony acknowledging "[t]hat is what we do" "could support a finding of custom or policy under *Monell*"). Other courts have relied upon similar testimony to uphold *Monell* claims. *See, e.g.*, *Ferrari v. Cnty. of Suffolk*, 2013 WL 4017022, at *10 (E.D.N.Y. Aug. 6, 2013) (prosecutor's legal arguments were "consistent with the training she received" (emphasis added)), *rev'd on other grounds*, 845 F.3d 46 (2d Cir. 2016); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1030 (7th Cir. 2006) (police officer's conduct was "consistent with 'policies and practices of the Galesburg police department'"); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (officer's belief about departmental policy was "consistent with

City policy"); *Silva v. San Pablo Police Dep't*, 805 F. App'x 482, 485 (9th Cir. 2020) (defendant's

expert testimony that officer's conduct was "consistent with . . . departmental policies").[6]

> b.   *ADA Drury and ADA Henry admitted that their non-disclosure decisions were consistent with and conformed to County policy, custom, and practice.*

Former District Attorney Cosgrove testified that while he did not have a written *Brady*

policy, he trusted his staff to conform to the policies he set and believed Drury, with whom he had

a close relationship, did so. PX 246A, 39:22–41:4, 62:13–21, 84:20–85:20. Drury, who handled

pre-trial discovery for all four Crawford defendants and handled Boyd's trial, admitted that his

failure to disclose the *Brady* evidence before and during that trial conformed to the Office's

policies, customs, and practices. Tr. T. 625:15–18; 626:21–25; 632:19–25; 637:19–638; 642:15–

18, 815:2–21, 857:14–858:2. ADA Henry likewise acknowledged that his *Brady* decisions, which

resulted in the same non-disclosures at Walker's and Martin's trials, conformed to the County's

policies, customs, and practices. *See*, *e.g.*, Tr. T. 1932:2–8; 1988:4–10; PX 236A (Henry Dep.), at

186:6–23, 187:2–188:3, 189:6–190:11, 201:9–202:19, 203:9–204:5, 206:2–208:6, 218:4–21,

222:23–223:12, 352:23–355:11, 370:3–22; PX 290A (Henry testimony at *Walker* Tr.), 2012:19–

2017:21, 2021:2–21, 2041:5–18, 2042:23–2043:22.

Drury's and Henry's admissions that their *Brady* decisions conformed to and were

consistent with the County's policies, customs, and practices were reinforced by their testimony

that they handled *Brady* disclosure based on the training they received, and the instructions they

were provided, at the D.A.'s Office. Drury testified that he received training and instruction on

*Brady* from the County's Appeals Bureau. Tr. T. 635:10–15, 815:2–21. Henry explained that if

---

[6] Although several of these cases were in the summary-judgment context, reasoning that particular evidence would suffice to support a jury's finding of liability obviously applies to the trial context as well.

- 10 -

there were any questions regarding *Brady* obligations, the Appeals Bureau would provide guidance on "whether *under office practice and policy* [he] should turn [the evidence] over." Tr. T. 1986:6–14 (emphasis added). Henry acknowledged that neither he nor the County contended that he and Drury were rogue prosecutors, a position the County confirmed by designating Henry as its 30(b)(6) witness. Tr. T. 1932:9–15.

The County ignores the litany of cases the Boyd Estate has cited holding that testimony from municipal actors that their misconduct in an individual case reflected or was consistent with office policy or practice is sufficient to support a jury's finding of *Monell* liability. While it cites self-serving testimony by Drury that he was exercising his own judgment, the jury was not required to credit testimony that was so clearly tailored to the County's trial defense. To the contrary, the jury was entitled to credit Drury's and Henry's prior, sworn deposition admissions and their admissions at trial.[7]

---

[7] The jury's finding is unsurprising when one considers the blizzard of reversals and contradictions in Drury's testimony. *See, e.g.*, Tr. T. 615:23–616:5 ("Q. So when you testified at your deposition, you had no recollection of turning this over to counsel for Mr. Boyd, but now you say you have such recollection because of course you would have turned over evidence to the defense? A. I probably didn't read it, but, yes, I turned it over because of that line."); Tr. T. 616:24–617:13 ("Q. You remember now turning it over to the defense? A. Yes, I would have. Q. Do you recall testifying at your deposition, PX 245, page 222, 9[] to 16, that you have no record and no recollection of disclosing that document to the defense? A. I was wrong. I did. Q. Well, did you testify that you had no memory and no recollection of disclosing that to the defense? A. That is what I said, but I was wrong. Q. So at your deposition, your sworn deposition two years ago, you had no memory, but now two years later, you have a memory? A. Yeah."). He even directly contradicted his own trial testimony. *See, e.g.,* Tr. T. 628:16–22 ("Q. And you testified earlier that you didn't turn over anything to Mr. Boyd's counsel that you characterized as Brady material? A. I was wrong. Q. Your testimony earlier was wrong that in fact you did turn over Brady material? A. I would have turned this over."); 640:24–641:14 ("A. Yeah, it would have been turned over. The cab is an issue. . . . Q. Talking about the taxi cab information, this is information you would have turned over because you acknowledge it was favorable to the defense? A. Yes. . . . A. Okay. I don't think it's favorable. Q. You do not think it's favorable? A. No.").

Indeed, the County's point that Drury and Henry made their own decisions about what evidence needed to be disclosed as favorable, *see* Mem. at 27, only reinforces the existence of an unconstitutional practice. Both Henry and Drury acknowledged that their personal understanding of favorability was consistent with or conformed to Office training and policies, and they both failed to disclose the same *19 items* of *Brady* evidence.[8] Tr. T. 625:15–18; 626:21–25; 632:19–25; 637:19–638; 642:15–18; 787:1–788:1; PX 290A, 2041:5–18, 2042:23–2043:22; PX 287. That two experienced prosecutors, conforming to Office practice (three, including ADA Verrastro) in four separately tried cases, failed to disclose the same, obviously favorable evidence practically compels the inference that their unlawful *Brady* decisions were caused by the Office's unlawful policy and practice. *See, e.g.*, *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 872–73 (2d Cir. 1992) (where employees in two separate NYPD offices reflexively assumed that female officer was lying about complaint, jury could interpret the consistency as evidence of a widespread practice).

> c. *The other-case evidence further supports the widespread-practice theory.*

In addition to the *Brady* violations that pervaded the four trials conducted concerning the Crawford murder, the Boyd Estate introduced evidence of six additional *Brady* violations occurring during the five-year period surrounding Boyd's trial. Tr. T. 678:17–684:15; PX 95, 103, 104, 105, 115, 121. The evidence included a February 1976 *Buffalo Evening News* article reporting that a court vacated two murder convictions and ordered a new trial after it was discovered that ECDAO had withheld favorable fire investigator's reports, *see* PX 95; April 1978 *Buffalo Evening News* and *Buffalo Courier-Express* articles reporting that a court declared a mistrial in a murder

---

[8] The Boyd Estate does not argue that the police report documenting an interview of Darryl Boyd's mother was *Brady* material as to Walker or Martin. *See supra* n.4

prosecution after the prosecutor withheld favorable evidence, *see* PX 103; a January 1979 *Buffalo Evening News* article reporting that a court declared a mistrial in a murder case because of a *Brady* violation, *see* PX 104; a March 1979 court decision ordering the prosecution to disclose exculpatory evidence over the prosecutor's opposition, *see* PX 105; an April 1980 *Buffalo Evening News* article reporting that a court declared a mistrial and dismissed the charges because the prosecutor withheld *Brady* material, *see* PX 115; and a November 1981 *Buffalo Evening News* article reporting that a court had vacated a guilty verdict and dismissed sexual-assault charges after finding that prosecutors withheld favorable evidence, *see* PX 121.

Cosgrove testified that he read the Buffalo newspapers every day while he was District Attorney, including articles written about his Office, as it was part of his job. *See* PX 246 at 32:10–34:1. However, in not one instance did Cosgrove or his administration conduct a disciplinary investigation of the prosecutors involved or take any remedial action for their apparent *Brady* violations. Tr. T. 829:20–830:5 Consistent with this Court's charge, *id.* at 2310:20–2311:12, the District Attorney's complete failure to investigate even the possibility of discipline, let alone impose it, when he learned of judicial findings of *Brady* violations, permits the inference that withholding *Brady* material of every kind was consistent with and conformed to his Office's policies and practices, and that such policies and practices were the moving force behind the *Brady* violations committed in Boyd's case.

> d.    *Direct evidence established that ECDAO policy was to unlawfully withhold Brady material if the defense failed to make a specific demand or the prosecutor subjectively disbelieved the evidence.*

In *United States v. Agurs*, 427 U.S. 97 (1976), the Supreme Court held that prosecutors must disclose evidence favorable to the accused without waiting for a defense request. However, in deposition testimony introduced at trial, ADA Henry, the County's representative witness, testified that at the time of Boyd's criminal case, he understood that *Brady* material only had to be

disclosed following a defendant's request for such information. PX 236A, 218:7–21. He further acknowledged that his practice of requiring a demand was "based upon the practices of the office generally." PX 236A, 223:7–12.

The jury saw evidence of this practice memorialized in contemporaneous documents. When James McLeod, attorney for Floyd Martin, made a general written request for *Brady* material, Henry declined to produce material unless McLeod made his request specific. PX 80. Boyd's attorney requested *Brady* material, generally, but there was no record of his making a specific demand for any particular piece of evidence. *See* Tr. T. 1843:12–24, 1950:17–1951:25. The jury reasonably could have concluded that Drury adhered to the same office practice and did not disclose the *Brady* material in this case because no specific demand was made on behalf of Boyd.

Similarly, Henry, on behalf of the County, admitted at the Walker trial, in an excerpt that was introduced in this case and read for the jury, that he did not disclose Hough's recantation because he did not believe Hough's "waffling" constituted a true recantation. *See* PX 290A, 2041:5–18, 2042:23–2043:11. Henry testified that this non-disclosure was consistent with the policies of the office and the training he received. *Id*. at 2043:12–22. Construing the evidence in the light most favorable to the Boyd Estate, the jury could conclude that the office practice was not to disclose material a prosecutor subjectively disbelieved and infer that Drury followed the same practice when he decided not to disclose the 20 items of *Brady* material. *See* Tr. T. 800:22–801:5 (demonstrating Drury's doubt as to the value and veracity of recantations).

Of course, after Henry observed every day of trial, including other witnesses' testimony and legal arguments made outside of the presence of the jury (and after he sat through and testified during John Walker's trial earlier in 2025), he attempted to recast his deposition testimony as a

- 14 -

misunderstanding. *See* Mem. at 31–33; Tr. T. 1940:11–1944:14. But the jury did not have to credit Henry's self-serving testimony. Henry conceded he had every opportunity to correct his deposition testimony and transcript but did not, Tr. T. 1939:10–1940:10, suggesting that he only "clarified" or changed his story when he realized it undermined the County's defense. He obviously was a biased and interested witness. This Court by law must presume that the jury credited that part of Henry's testimony that favored Plaintiff and rejected his contrary, self-serving explanations. *See Garnett*, 838 F.3d at 274.

2.   *DA Cosgrove's deliberate indifference to Brady violations.*

As explained above, the evidence establishing a widespread practice of *Brady* violations, standing alone, requires the Court to deny the County's Rule 50(b) motion. The same evidence also establishes the Boyd Estate's alternative claim of deliberate indifference to *Brady* violations.[9]

a.   *The law on deliberate-indifference liability.*

"A municipal policy may be pronounced or tacit and reflected in either action or inaction." *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). Accordingly, a municipality also may be liable where "rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.). "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Id.* (cleaned up); *accord Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("deliberate indifference

---

[9] For the reasons stated below in § II.B.3, which apply also to the Boyd Estate's deliberate-indifference theory, the County's overbreadth argument is meritless.

to . . . unconstitutional actions, or risk of unconstitutional actions" (cleaned up)); *Amnesty Am.*, 361 F.3d at 126 ("policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the subordinate's actions").

Under a deliberate-indifference theory, the notice of wrongdoing may be "actual or constructive." *Jones*, 691 F.3d at 81–82 (citing *City of Canton v. Harris*, 489 U.S. 378, 396 (1989) (O'Connor, J., concurring in part and dissenting in part)). The omission to act must be "substantially certain" to result in future violations. *Id.* "[T]he plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious," *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citing *Canton*, 489 U.S. at 390), such that a failure to take meaningful action after such notice was "tantamount to deliberate indifference." *Buari v. City of New York*, 530 F. Supp. 3d 356, 400 (S.D.N.Y. 2021) (quoting *Alwan v. City of New York*, 311 F. Supp. 3d 570, 578 (E.D.N.Y. 2018)).

Plaintiffs most commonly establish deliberate indifference "through proof of repeated complaints of civil rights violations . . . followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann*, 72 F.3d at 1049. But, as this Court recognized in its *Monell* decision, this is not the only way a plaintiff can establish that a need for discipline was obvious. *See* Dkt. 418 at 48 (recognizing Plaintiffs may rely on the ECDAO's "complete lack of attention or commitment to disciplining or training assistant district attorneys," as well as "admissions of party opponents during discovery" (citing *Vann*, 72 F.3d at 1041, 1050–51; *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 146, 153 (2d Cir. 1991))). As the Second Circuit noted in *Amnesty America*, "[w]hile we have held that proof of a policymaker's failure to respond to repeated complaints of civil rights violations would be sufficient to establish deliberate indifference, we have never required such a showing. The means of establishing deliberate

indifference will vary given the facts of the case and need not rely on any particular factual showing." 361 F.3d at 128 (internal citation omitted); *see also Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992) (failure to take remedial action despite knowledge of police violations of constitutional rights one way to establish deliberate indifference (quoting *Canton*, 489 U.S. at 390 n. 10)).

In *Vann*, the Second Circuit found that evidence of the NYPD's deficient system for monitoring problem policemen, and its lack of a response to past incidents involving the individual defendant, reflected a deliberate indifference by the municipal defendants to the dangers posed by problem officers restored to full-duty service. *See* 72 F.3d at 1050–51. Similarly, in *Gentile*, the Second Circuit affirmed a jury verdict on a deliberate-indifference theory based on a government report detailing incidents of misconduct presumably known to policymakers followed by inaction. 926 F.2d at 153; *see also Bordanaro v. McLeod*, 871 F.2d 1151, 1162–63 (1st Cir. 1989) (affirming jury *Monell* verdict where the "absence of a strictly enforced disciplinary system led the officers . . . to believe they were above the law and would not be sanctioned for their misconduct").

> b.  *Evidence that D.A. Cosgrove failed to address the Office's widespread unlawful* Brady *practices established his deliberate indifference to such violations.*

Under the above case law, the same direct evidence that supports the Boyd Estate's widespread-practice theory also supports his deliberate-indifference theory. A reasonable jury could find that Cosgrove was aware that his prosecutors had adopted erroneous approaches to *Brady* that were highly likely to result in future non-disclosure of favorable materials and took no action in response. Drury and Henry testified that their *Brady* decisions in the Crawford homicide cases—decisions that the jury could find were illegal—were consistent with or conformed to Office practice, of which Cosgrove is presumed to have been aware, yet he took no disciplinary or other remedial action. Similarly, Cosgrove was at least constructively aware of the unlawful

practices, admitted by Henry in testimony introduced at trial, of requiring a specific request and withholding *Brady* material that prosecutors subjectively discredited. PX 236A at 218:7–21, 223:7–12, PX 290A, 2041:5–18, 2042:23–2043:22. Despite the notice that these practices gave Cosgrove and his executive team, he never disciplined any prosecutor throughout his entire tenure as District Attorney. *See* PX 246A, 102:7–9, 105:10–18, 108:20–109:15. Cosgrove did not even recall any instance in which he instructed his secretary to place a note relating to misconduct in an ADA's personnel file or memorialize a finding that an ADA committed misconduct. *Id.* at 108:2–109:15. He adopted no written policy indicating what types of errors or misconduct could lead an ADA to be punished. *Id.* at 101:11–15. And he had no procedure for issuing regular written evaluations of ADAs and had no knowledge of any procedure for oral evaluations. *See id.* at 117:3–15.

Significantly, Henry, testifying as the County's representative under 30(b)(6), acknowledged that the failure to punish even one prosecutor for unethical actions "can poison an entire office." PX 236B at 239:2–10. In addition to the above unlawful-practice evidence which failed to move Cosgrove to act, the Boyd Estate proved a serious *Brady* violation in another homicide case that was committed just one year before Boyd's trial. In February 1976, the *Buffalo Evening News* reported that a judge ordered a new trial for two men convicted of murder in 1976 after discovering that the prosecution had withheld evidence favorable to the defense. *See* PX 95. Yet Cosgrove failed to even investigate this matter, let alone impose discipline for it. *See* PX 246A, 32:10–34:1, 102:7–9, 105:10–106:10, 108:4–109:15. A reasonable juror could find that Cosgrove's abject failure to investigate or discipline prosecutors who withheld *Brady* material rose to the level of deliberate indifference and infer that Drury's *Brady* violations were caused by this policy.

       3.     *The Boyd Estate's* Monell *theories were not overbroad, and the Court properly admitted other-case evidence supporting them.*

The County argues that the Boyd Estate pursued impermissibly broad *Monell* theories as to *Brady,* Mem. at 12–14, but the Court has already rejected this argument, holding that a "widespread practice of *Brady* violations" or a failure "to provide adequate supervision or discipline with respect to *Brady* violations" is not overly general. *Weppner v. Cnty. of Erie*, 2025 WL 3214581, at *2–3 (W.D.N.Y. Nov. 18, 2025). In so holding, the Court correctly relied upon the Second Circuit's decision in *Jones* which approved a theory of a policy of deliberate indifference to "abuse of the rights of black people," a category spanning many types of specific police misconduct. *Jones*, 691 F.3d at 81–85;[10] *Weppner*, 2025 WL 3214581 at *3 (relying upon *Jones*). This Court's holding is also supported by other decisions of the Second Circuit approving theories at levels of generality equal to or greater than "*Brady* violations" (or "summation misconduct"). *See Bellamy v. City of New York,* 914 F.3d 727, 756 (2d Cir. 2019) (allowing a theory of "failure to discipline summation misconduct" to proceed); *Jeffes v. Barnes*, 208 F.3d 49, 62 (2d Cir. 2000) ("code of silence" by officers, which could encompass various categories of wrongdoing at the county jail), *Gentile*, 926 F.2d at 152 (approving theory of "negligent disciplinary policies in handling cases of *police and prosecutorial misconduct*") (emphasis added).[11]

---

[10] While agreeing that this theory theoretically was viable under *Monell*, the Second Circuit held that the plaintiff had failed to introduce sufficient evidence to prove its claim.

[11] The cases the County cites to show "overbreadth" that were in a summary-judgment posture turned on the absence of sufficient proof of the theories alleged. *See Vassiliou v. City of New York*, 2021 WL 76916, at *4–5 (E.D.N.Y. Jan. 7, 2021) (the alleged custom of "falsely stopping, frisking, and arresting individuals and using excessive and unjustified force" was inadequately supported (cleaned up)); *Chepilko v. City of New York*, 2012 WL 398700, at *15 (E.D.N.Y. Feb. 6, 2012) (plaintiff's claim that the municipality had a custom of unlawful enforcement of vendor rules was inadequately supported with five dismissed summonses issued against him); *Rasmussen v. City of*

The Court's ruling was fully supported by the evidence in this case. Drury's and Henry's testimony covered *Brady* disclosure (or rather, non-disclosure) decisions spanning every facet of the *Brady* rule: third-party culpability evidence, alibi evidence, prior inconsistent statements, recantation evidence, evidence of police coercion and bad faith, and evidence of motive, bias, or interest. *See supra* at p. 6–8, 10. They testified that their *Brady* decisions were made consistently or in conformity with the Office's policies or practices. *See supra* at p. 10–12. Further, a jury could conclude from Henry's deposition admissions that the practice of the Office's prosecutors was to require a specific request or to refrain from disclosing evidence that they subjectively disbelieved. *See supra* at § II.B.1.d. A jury, based upon the Boyd Estate's proof, could reasonably conclude that the Office's overall practice was to fail to comply with *Brady* as a whole, and that the District Attorney was deliberately indifferent to the likelihood that his condonation of this practice would lead, in the future, to the types of violations that occurred in Boyd's case. The Boyd Estate's theory was not overly broad and was fully supported by the evidence.

The County argues that the *Brady* violations in the six other cases admitted into evidence were insufficiently similar to the violations alleged in Boyd's case to support Boyd's theory. The Court has rightly rejected this argument too. *Weppner*, 2025 WL 3214581, at *6–11. If a theory defined at the level of "*Brady* violations" is permissible, it follows that any *Brady* violation is admissible to prove this theory.

The County relies on language in *Connick v. Thompson*, 563 U.S. 51 (2011), requiring that evidence in a *failure-to-train* case fall into the same general category as the *Brady* violation alleged to have been committed in that case, but this Court has correctly noted that this requirement is

---

*New York*, 766 F. Supp. 2d 399, 408–10 (E.D.N.Y. 2011) (plaintiff's claim that the municipality "purposely ignores violations of individuals' constitutional rights" was inadequately supported with unproven allegations of misconduct).

limited to inadequate-training cases. *See Walker*, Dkt. 340-1 at 18 ("a failure to train theory . . .

requires a more rigorous matching" than with other *Monell* theories). Moreover, in *Connick,* in

contrast to this case, the *Brady* violation at issue was limited to one type of forensic evidence, and

the Court declined to hold that a District Attorney, who was entitled to presume that prosecutors

trained in law school understand their ethical obligations under *Brady*, must train prosecutors

absent notice that they did not understand their legal obligations. *Connick*, 563 U.S. at 56–57, 63–

68. Here, District Attorney Cosgrove, who claimed that *he* understood *Brady*, DX 697 at 41:5–23,

had ample notice that his prosecutors were routinely violating it. The jury was entitled to infer that

his failure to consider or impose discipline communicated to his staff that he would tolerate such

violations and encouraged Drury to think he could get away with them too. This case fits

comfortably with the deliberate-indifference cases this Court has cited which uphold relatively

broad categories of wrongdoing under a deliberate-indifference theory. *See Walker*, Dkt. 340-1 at

10, 16 n.1 (citing *Batista v. Rodriguez*, 702 F.2d 393, 398 (2d Cir. 1983) ("instances of unusual

brutality"); *Walker v. City of New York*, 974 F.2d at 300 ("a practice of condoning perjury")); *see*

*also Bellamy*, 914 F.3d at 756 (failure to discipline summation misconduct). The County's brief

does nothing to show that this Court's prior reasoning is wrong.[12]

---

[12] The County has previously claimed that this Court's reading of *Connick* as limited to failure-to-train claims is refuted by *Greene v. City of New York*, 742 F. App'x 532 (2d Cir. 2018), an unpublished, nonprecedential decision, which applied *Connick*'s requirement of a past pattern of similar misconduct to a failure-to-supervise claim. *Boyd*, Dkt. 326-1 at 8 n.11. *Greene* provides no reasoning on this score and does not warrant the County's previously stated assertion that Connick's "factual similarity requirement applies uniformly across deliberate indifference theories." *Id.* The Second Circuit, in a published decision by then-Judge Sotomayor, has explained that failure-to-train and failure-to-supervise theories "require different showings in order to establish deliberate indifference," and so "must be analyzed independently, rather than evaluated collectively." *Amnesty America*, 361 F.3d at 127. *Greene*, in treating the theories alike without any explanation, engaged in exactly what the binding authority of *Amnesty* forecloses. *Connick* was concerned with requiring a municipality to go to the expense of training in the absence of a history

The County also argues that "Plaintiff was permitted to introduce incidents that [were] too temporally remote." Mem. at 25. However, the events that occurred during the 1974–82 administration of a single District Attorney, Edward Cosgrove, are not "remote," especially when Boyd's 1977 trial came right in the middle of that eight-year period. Again, the Court previously rejected the County's argument. *See Weppner*, 2025 WL 3214581, at \*6. The Court's decision is consistent with binding case law and certainly did not work a manifest injustice in this case.

To see the correctness of the Court's decision, one need only consider *Lucente v. Cnty. of Suffolk*, 980 F.3d 284 (2d Cir. 2020). There, the underlying constitutional violations occurred between 2009 and 2011, but the Second Circuit held that the "plaintiffs should be able to utilize []

---

of similar misconduct showing the risk of recurrence. A supervision claim, on the other hand, may involve, in real time, a condonation or ratification of misconduct as it is occurring or afterwards. *See id.* at 127–29. For similar reasons, *Connick* does not apply in a failure-to-discipline context. *See, e.g.*, *Poventud v. City of New York*, 2015 WL 1062186, at \*16 (S.D.N.Y. Mar. 9, 2015) (holding that *Connick* does not apply to failure-to-supervise or failure-to-discipline theories).

The County's motion cites reasoning concerning dissimilarity in a case involving both custom and deliberate-indifference theories, *Miller v. Cnty. of Monroe*, 2024 WL 2804435 (W.D.N.Y. May 31, 2024) (Geraci, J.), where the Court was considering a motion to dismiss for failure to state a claim. The Court acknowledged that a plaintiff could proceed on a custom theory by showing that "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions," but noted that "[a] plaintiff may also plead" such a theory "by citing [] complaints in other cases that contain similar allegations," i.e., complaints "involv[ing] factually similar misconduct." *Id.* at \*4 (cleaned up). In considering whether the plaintiff had satisfied the requirements of the latter route, the Court stressed the factual dissimilarity between the *Brady* violations cited by plaintiff's complaint and those at issue in his case. *See id.* at \*6. The court did not hold that a plaintiff cannot prove a *Monell* claim by sworn testimony evidencing a widespread practice, combined with other-case evidence corroborating that practice, where the other-case evidence likely involves one or more of the categories of misconduct at issue in the plaintiff's case—which was the case here.

Nor did the district court so hold in another case cited by the County, *Isaac v. City of New York*, 2018 WL 5020173 (E.D.N.Y. Aug. 6, 2018), *report and recommendation adopted*, 2018 WL 4583481 (Sept. 24, 2018). There, the court recommended judgment on the pleadings to the defense, where the plaintiff made a "boilerplate assertion[]" that "the City has a custom of arresting innocent people and fabricating evidence to satisfy arrest quotas," and the court found no support for the plaintiff's theory in other-case evidence. *Id.* at \*17.

reports *from the 1990s* as background to attempt to demonstrate that the Sheriff's lack of response to the earlier allegations against [the officer who committed the misconduct] evidenced the beginning of a policy or custom of inaction and acquiescence that continued for well over a decade . . . ," noting that "[i]t is *squarely within the province of the jury to decide*, in determining municipal liability, what weight this evidence should receive on the issue of a policymaker's actual or constructive notice of the unconstitutional conduct in light of all the evidence in this case." *Id.* at 301 (emphasis added).

The Boyd Estate's other-case evidence that post-dated Boyd's trial came close in time to that trial, under the same District Attorney's Administration. *See Parkinson v. Desormeau*, 2024 WL 4973490, at *5 (E.D.N.Y. Dec. 4, 2024) (granting discovery of other-case evidence up until the year 2018, where the underlying constitutional violations occurred between 2013 and 2015, because it could serve as "circumstantial evidence of the existence of preceding municipal policy or custom"); *Jones*, 493 F. Supp. 2d at 331–32, 337 (holding that subsequent conduct "is probative for purposes of showing the existence of a municipal policy or custom," and relying upon such conduct from January 2000, nearly three years after the April 1997 constitutional violation).[13] And

---

[13] The cases the County relies on are inapposite. The cases in the Second Circuit cited by *Gleeson v. Cnty. of Nassau*, 2019 WL 4754326, at *16 (E.D.N.Y. Sept. 30, 2019), which are obliquely referenced by the County in a parenthetical, are *Rodriguez v. Cnty. of Westchester*, 2017 WL 11802 (S.D.N.Y. Jan. 11, 2017); *Melvin v. Cnty. of Westchester*, 2016 WL 1254394 (S.D.N.Y. Mar. 29, 2016); and *Moses v. Westchester Cnty. Dep't of Correction*, 2017 WL 4386362 (S.D.N.Y. Sept. 29, 2017). In *Rodriguez*, the municipality changed contractors in the intervening time. 2017 WL 11802 at *7. That was also the case in *Melvin*. 2016 WL 1254394 at *15. In *Moses*, the plaintiff failed to cite more than a couple of incidents proximate in time to the underlying incident. 2017 WL 4386362 at *13. As for *Chepilko v. City of New York*, 2012 WL 398700 (E.D.N.Y. Feb. 6, 2012), the evidence of custom presented by that plaintiff was insufficient because he *only* cited post-incident conduct, totaling five instances, all of which were three or more years after the violation of his constitutional rights. *See id.* at *15. Here, by contrast, the Boyd Estate cited both pre- and post-incident conduct, including conduct close in time to the underlying constitutional violations, and, above all, introduced direct evidence establishing the relevant practices. In *Jones*,

such post-verdict evidence was only some of the universe of evidence that Boyd relied on and that

the jury was entitled to credit.

## III.    A REASONABLE JUROR COULD FIND THE COUNTY LIABLE FOR SUMMATION MISCONDUCT.

In *Bellamy v. City of New York,* 914 F.3d 727 (2d Cir. 2019), the Second Circuit held that

a municipality in New York State may be held liable for a policy, custom or practice of committing

or tolerating summation misconduct at criminal trials. Adopting the standard that applies in

criminal cases, it applied a three-part test in evaluating whether a fair trial violation occurred: (1)

whether the prosecutor committed misconduct and the severity of the misconduct, (2) whether the

trial court took any corrective action, and (3) the strength of the prosecution's evidence at trial. *Id.*

at 762 (citing *United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 95 (2d Cir. 2014).

Assuming a fair trial violation occurred, a municipality is liable under *Monell* if its unlawful policy,

custom, or widespread practice caused the violation. Here, the County argues that the Boyd Estate

failed as a matter of law to prove summation misconduct that was sufficiently prejudicial and to

prove *Monell* causation. It is wrong on both counts.

### A.    The Boyd Estate Proved that Boyd Did Not Receive a Fair Trial Due to Summation Misconduct.

The County cannot possibly meet the rigorous standard that applies under Rule 50(b) to

overturn the jury's determination that ADA Drury's summation misconduct deprived Darryl Boyd

of his constitutional right to a fair trial. Indeed, it barely tries. It entirely ignores the second and

third prongs of the Second Circuit's test and, with respect to the first prong, entirely ignores most

of the summation misconduct that was proved at trial, including nine times when Drury misled the

---

691 F.3d at 85, the plaintiff, as the County's parenthetical notes, offered "two instances [of misconduct], or at the most three, over a period of several years," whereas the Boyd Estate presents direct evidence as well as numerous court findings of similar constitutional violations.

jury through exploitation of his *Brady* violations. Even as to the handful of specific transgressions the County does address, the jury was entitled to credit Professor Zeidman's testimony and conclude both that these were serious errors and that such errors, considered cumulatively, denied Boyd a fair trial. But the court need not even consider the contested instances of misconduct, since the errors that the County ignores more than satisfied the Boyd Estate's burden of proof.

In its charge to the jury, the court correctly, and without objection, provided the jury with some examples of impermissible summation behavior, including (a) making false or misleading arguments; (b) vouching for the credibility of a witness; (c) making unduly inflammatory remarks; (d) appealing to racial prejudice, and (e) shifting the burden of proof to the criminal defendant. *See* Tr. T. 2308:3–9. The Boyd Estate's expert, Professor Steven Zeidman, testified about the same rules of behavior and added (f) the obligation to refrain from arguing facts not in evidence. Tr. T. 1580:1–1581:2. Professor Zeidman testified that every one of these departures from the rules of behavior occurred at Darryl Boyd's trial. Indeed, he testified to nearly two dozen instances. *See infra* at p. 23–28.

The County points out that federal courts overturn relatively few criminal convictions for summation misconduct, but that has nothing to do with this case. In other cases, appellate courts may excuse less serious errors, particularly where the evidence of guilt is strong, or find the error to be unpreserved. Federal courts also have sharply limited authority to overturn state convictions on habeas review. Still, the Second Circuit has reversed federal criminal convictions for denial of

a fair trial where the prosecutor committed just one,[14] two,[15] or a combination of errors,[16] and New York State's appellate courts have done so countless times, including in the cases the Boyd Estate presented to the jury.

In this case, the County does not even contest that the evidence at trial was weak and that the trial court did nothing to cure the errors in the prosecutor's summation. Meanwhile, the jury, guided by Professor Zeidman's uncontradicted testimony, was entitled to conclude that numerous instances of misconduct occurred which, viewed alone or cumulatively, deprived Darryl Boyd of his constitutional right to a fair trial and caused his damages.

> *1. The County does not deny that Drury made false or misleading arguments in summation which were uncorrected by the court and bolstered a weak prosecution case.*

Professor Zeidman testified that ADA Drury:

- Objected to the defense argument that Drury influenced Woodruff to change his testimony as "wild allegations, there's no proof of it," when he knew of but had suppressed such proof, Tr. T. 1588:1–23;

- Objected to the defense claim there was a law enforcement conspiracy to conform the testimony when he knew but failed to disclose that it was true, Tr. T. 1582:24–1583:13, 1591:4–1592:4;

- Said that law enforcement had nothing "to do with changing Tyrone's testimony or making it fit any pattern" even though he knew undisclosed evidence showed that Woodruff was pressured to conform his testimony to Hough's new story in ADA Drury's own office and Drury knew about it, Tr. T. 1582:24–1583:13, 1591:4–1592:4;

---

[14] *United States v. Forlorma*, 94 F.3d 91, 95 (2d Cir. 1996) (prosecutor made three misstatements).

[15] *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) (prosecutor improperly shifted the burden of proof and "malign[ed]" defense counsel).

[16] *United States v. Burse*, 531 F.2d 1151, 1154–1155 (2d Cir. 1976) (prosecutor misrepresented conspirator's motivation, referred to uncharged crimes, shifted the burden of proof, referred to evidence outside the record, made "potentially derogatory" statements about defense counsel, misstated evidence, and vouched); *United States v. Drummond*, 481 F.2d 62, 64 (2d Cir. 1973) (prosecutor vouched for a witness, misstated the record, and expressed opinion on the defendant's guilt).

- Insisted that Woodruff and Hough were "testifying against their own interests" even though he knew, but did not disclose, that Woodruff was threatened with prosecution for murder, then promised immunity, and that Hough was threatened with arrest, changed his story, recanted, and then recanted his recantation after Drury and the police threatened him, including with a perjury prosecution, Tr. T. 1597:24–1598:17;

- Represented that Woodruff first changed his story on his own and voluntarily, and then only later got immunity when he was represented by a lawyer, when Drury knew, but failed to disclose, that in fact the detectives and Drury offered him immunity before he changed his story and before he had a lawyer, Tr. T. 1598:21–1599:23;

- Demeaned Woodruff as a "ghetto kid" living in the "projects" when Drury knew Woodruff lived in a private house and not in any housing project, Tr. T. 1584:8–24;

- Said that Boyd had a "knot of money" at Simpson's Store the day after the crime, even though he knew a suppressed police report contained witness statements disproving this, *see* Tr. T. 1592:5–1593:6;

- Emphasized Detective Guadagno's hearsay testimony that Boyd's mother said he "got home at one o'clock," which contradicted Boyd's own statement to police, even though Drury knew an undisclosed police report stated that she really said it was between 12:10 am to 1:10 am," which was consistent with Boyd's statement, *see* Tr. T. 1593:17–1594:16; and

- Represented that "[t]he police turned over everything they had to you," knowing that numerous police reports that were favorable to the defense under *Brady* had not been turned over to the defense and thus had been concealed from the jury, Tr. T. 1594:20–1595:20.

The County does not address even one of these nine instances of misconduct, no doubt recognizing that the behavior is indefensible. Drury himself *admitted* that if he failed to disclose the Simpson's Store report—which the jury was entitled to infer he in fact failed to disclose—his summation was misleading, Tr. T. 796:8–23, and *admitted* that, when he argued that Woodruff had no reason to lie for the prosecution, he knew of the facts showing he did have such an interest. Tr. T. 799:14–22.

Unable to dispute Drury's serial misleading of the jury, the County makes the novel argument that a prosecutor's misleading statements cannot support a summation-misconduct claim if they exploit a prior *Brady* violation, since in that case the summation misconduct is "duplicative"

of the *Brady* violation, "not a distinct constitutional violation." Mem. at 8. The County cites no authority for this illogical argument, and it is plainly wrong. Courts often find that the same misconduct violates multiple constitutional rights. In *Ortiz*, for example, the same misconduct satisfied the elements of three separate constitutional claims. 137 F.4th at 61–68. Moreover, the Boyd Estate's claims are not duplicative. Drury violated *Brady* by suppressing favorable, material evidence. Drury committed summation misconduct by making false and misleading statements to the jury. Of course, those misleading statements were particularly insidious because Drury was exploiting a prior constitutional violation. But the fact remains that the two claims are independent and distinct, each having its own elements and addressing a different type of behavior. Such distinctions led the County to argue, and the Court to agree, that the impact of the *Brady* and summation-misconduct claims had to be considered separately.

In sum, in relation to the nine instances of lying to or misleading the jury, all three prongs of the *Bellamy* test are uncontested: there was serious misconduct, the criminal trial court did nothing to counteract the prejudice, and the overall prosecution case was weak. Crediting Professor Zeidman's testimony and giving the Boyd Estate the benefit of all reasonable inferences from the evidence, the jury's determination that Boyd did not receive a fair trial has ample evidentiary support and its verdict must stand.

> 2. *The County does not dispute Professor Zeidman's testimony that additional summation remarks were outside the bounds of permitted advocacy.*

The County's motion also does not take issue with Professor Zeidman's testimony that the following additional statements in Drury's summation departed from the standards to which prosecutors are required to adhere:

- His denigrating the defense, and insinuating that defense counsel didn't care what happened to his client, by arguing, "You are not going to break anybody's heart here, at least none of the attorneys here, whatever you decide," Tr. T. 1596:8–22;

- His mocking and demeaning of Boyd, the criminal defendant on trial, by stating, "The poor kid is confused, the poor kid is only 16. He is in there without his mommy and daddy," Tr. T. 1600:2–17;

- His vouching, in several separate instances, for Woodruff's credibility, Tr. T. 1582:18–23, 1597:24–1599:23;

- His testifying to facts not in evidence and his vouching by stating, "If I was involved in this thing I would have a hard time recalling somebody of a different race whose face was bloody or even prior to that I would want to put it out of my mind," Tr. T. 1601:17–1602:14; and

- His invocation of sympathy for the victim by lamenting, "God love him. . . . If you tend toward sympathy you know what happened to the man – that man. You know his family circumstances," Tr. T. 1600:2–1601:1;

These additional, uncontested violations of various rules of summation advocacy are on top of the nine violations discussed in the preceding section. The total is 14 serious, prejudicial, evidently undisputed instances of misconduct by the prosecutor, unaddressed by the trial court, in the context of a weak case.

### 3. *The jury also was entitled to credit Professor Zeidman's testimony regarding the additional summation violations that the County does address.*

The County's motion focuses only on a handful of lines of Drury's summation, which Professor Zeidman testified were inconsistent with a prosecutor's obligations. The County apparently believes these specific errors are contestable. As we've shown, the handful of contested errors are unnecessary to the Boyd Estate's case. But even as to these errors, the County is wrong.

The County argues that Drury did not appeal to racial prejudice or improperly demean witnesses. Mem. 4–6. But even Drury admitted that he "shouldn't have" called Woodruff—who didn't even live in any "ghetto"—a "ghetto kid," Tr. T. 814:6–7, and that he "demeaned" Joyce Washington, a grown woman, as a "precious thing," Tr. T. 809:25–810:7, thereby admitting the correctness of Zeidman's testimony condemning these comments. Tr. T. 1583:16–20. Zeidman

- 29 -

testified that the "ghetto kid" comment about Woodruff, together with all of Drury's other remarks ("idiot," "blithering idiot," "nitwit," a "product of his environment," living in a "junkyard," "as bad as the rest of them"), was particularly improper because they appealed to racial prejudice, were demeaning, and invited the jury to condemn all the boys, including Boyd, as "worthless." Tr. T. 1584:8–24, 1603:4–25. The County takes a different position, but the jury had the right to, and evidently did, reject it.

Failing to contest Zeidman's opinion about several instances in which Drury violated the rule against improper vouching and expressions of personal opinion, *see supra* at p. 25, the County focuses on just two of Drury's many improper vouching remarks. *See* Mem. at 3–6. The first is Drury's statement that "I believe" Woodruff's testimony but "what I believe doesn't matter." Mem. at 5. In *Bellamy,* the Second Circuit wrote that it is extremely serious misconduct for a prosecutor to express his personal opinion about the defendant's guilt or other issues in the case. 914 F.3d at 763. It then went on to reject the defense argument that the prosecutor qualified his statement of opinion by saying, "don't take my word," because "a prosecutor may not inform the jury either way what his 'word' is." *Id.* In Boyd's case, Drury told the jury what his "word" was about Woodruff and then said the equivalent of "don't take my word." *Bellamy* thus squarely controls here.

As for the second statement, the County argues that Drury's statement, as to defense witness Joyce Washington—"I . . . hope you don't believe that kid for a minute," PX 74, 621:6–7—"reflected his argument that inconsistencies rendered Washington's testimony unreliable." Mem. at 6. But, as *Bellamy* recognizes, there is a world of difference between making an argument from the evidence that the jury should not credit a witness's testimony and expressing a personal

opinion that it should not. Here, the jury in Boyd's civil case was entitled to conclude that Drury crossed the line.

Finally, the County argues that Drury did not impermissibly shift the burden to Boyd because, when Drury said, "And on top of that you can see what Darryl Boyd has to offer. Zilch," he was merely responding to inconsistencies in Boyd's alibi defense. Mem. at 7–8. This is untrue. The trial transcript shows that what led up to the "zilch" comment was Drury's (false) contention that Woodruff and Hough had no motive to lie and were, in fact, "testifying against their own interests." PX 74 at 625:17–626:19. Drury then burnished his point by saying, "And on top of that, you see what Darryl has to offer. Zilch." *Id.* at 626:18–19. The jury was entitled to accept Professor Zeidman's opinion, based upon his review of the trial record, that this comment impermissibly shifted onto the defense a burden to produce evidence contradicting the prosecution's case, Tr. T. 1582:11–17, 1597:1–20.

In sum, there was ample evidence adduced at trial to support the jury's finding that Drury committed summation misconduct depriving Boyd of his constitutional right to a fair trial.

**C.    A reasonable juror could find that ADA Drury's summation misconduct was caused by County policy, custom, or practice.**

Causation under Section 1983 is quintessentially a jury issue. *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000). There was ample evidence from which the jury could infer that Drury's summation misconduct was caused by a widespread practice maintained by ECDAO prosecutors and/or Cosgrove's deliberate indifference to summation misconduct.

*1.    The ECDAO's custom or practice of summation misconduct.*

As with the *Brady* claim, the Boyd Estate's principal evidence of a widespread practice of summation misconduct is direct evidence from the County's witnesses themselves. For example, Drury testified that his comments calling Tyrone Woodruff a "blithering idiot," "a snook,"

"hapless," "stupid," "dumb," and "as bad as the rest of them" were consistent with office policy and practice regarding what was permissible to argue in summation. Tr. T. 810:13–813:10, PX 245A, 428:7–11. Drury similarly testified that his (false) arguments that police turned over everything they had, and that police or prosecutors did not coerce Woodruff's testimony or cause it to conform to Hough's, were consistent with the Office's training, policies, and practices. Tr. T. 790:1–793:12. While Drury reluctantly and belatedly acknowledged that some of his comments about the witnesses went too far, *see* Tr. T. 809:21–810:8, 813:12–814:13, he conceded that he was never the subject of any discipline or correction regarding such remarks, *see* Tr. T. 814:14–21. Indeed, Drury followed his slight concession with a retraction, stating that he "didn't do anything wrong" at Boyd's trial. *See* Tr. T. 814:23. Drury's insistence on the appropriateness of his conduct is unsurprising considering he testified that his summation *conformed* to DA Cosgrove's expectations and reflected the training he received from the office's Appeals Bureau. *See* Tr. T. 815:2–21; 819:10–23. As with his concessions on *Brady*, the County's only response is to offer alternative interpretations of Drury's remarks, *see* Mem. at 27, but the jury was not required to adopt the County's interpretation. Drury's testimony alone permitted the jury to infer the existence of unlawful summation practices and causation.

District Attorney Cosgrove's history of tolerating such summation practices further supported that inference. Cosgrove, and Henry as the County's Rule 30(b)(6) witness, each admitted that, to their knowledge, the Office's executives and supervisors did not discipline a single prosecutor for summation misconduct from 1966 to 1985, a period that included Cosgrove's eight years in Office (1975–83). PX 246A (Cosgrove Dep.), 107:8–11; PX 236B (Henry Dep.), 253:8–13. This was so even though the trial record contains seven Appellate Division decisions, admitted for their truth, which found summation misconduct that was similar to at least some of

the misconduct that occurred in Boyd's case. *See, e.g.*, *People v. Donaldson*, 49 A.D.2d 1004, 1005 (4th Dep't 1975) (improperly bolstering witness's credibility by going outside the record) (PX 148); *People v. Balsano*, 51 A.D.2d 130, 134 (4th Dep't 1976) ("inflammatory remarks") (PX 152); *People v. Johnson*, 62 A.D.2d 555, 561, 569–71 (4th Dep't 1978) (Hancock, J., dissenting) (detailing inflammatory comments) (PX 170); *People v. Keller*, 67 A.D.2d 153, 160 (4th Dep't 1979) ("inflammatory" argument and arguing "facts" not in evidence) (PX 175); *People v. Ivey*, 83 A.D.2d 788, 789 (4th Dep't 1981) ("inflammatory . . . summation" and many other types of misconduct) (PX 99); *People v. Vance*, 89 A.D.2d 347, 350–51 (4th Dep't 1982) (PX 183)*; People v. Herlan*, 99 A.D.2d 647 (4th Dep't 1984) (improper credibility argument) (PX 187).[17]

Some of the most compelling evidence of tolerated widespread practice involves Cosgrove's chief of felony trials, Albert Ranni. Ranni tried the *Ivey* case in 1976, before the Boyd trial. ECDA *Ivey* case card (PX 100); PX 236B (Henry Dep.), 261:19–262:10. Henry testified that Ranni either was felony bureau chief then or was promoted to that position after the *Ivey* trial. Tr. T. 1767:25–1768:8; PX 236B (Henry Dep.), 33:14–19, 38:5–7, 50:14–17 (testifying that Ranni was felony bureau chief in 1977). In reversing the *Ivey* conviction due to pervasive summation misconduct of various types, the Appellate Division condemned Ranni because "unadulterated unfairness and deceit have become *the rule*." 83 A.D.2d at 789 (PX 99, p. 2); PX 236B (Henry Dep.), 270:5–13 (emphasis added). While noting that it was not itemizing "all the incidents," the

---

[17] As discussed above, outside the context of a failure-to-train theory, there is no requirement that other-case evidence involve the same fact pattern as the constitutional violations suffered by the plaintiff. It is enough that the evidence involves the same type of constitutional violation—here, summation misconduct. Accordingly, the County's argument that the other-case evidence is not sufficiently similar is without merit. Likewise, as discussed above, the County's argument that this other-case evidence is too temporally removed from Boyd's 1977 trial is without merit; the incidents are far closer in time to the underlying trial than incidents the Second Circuit has deemed admissible.

Appellate Division condemned Ranni's "inflammatory" comments which served to "obfuscate the development of factual issues and sidetrack the jury from its basic mission of determining the facts relevant to guilt or innocence." 83 A.D.2d at 789 (PX 99, p. 2).

Also contemporaneous with the Boyd trial, Ranni tried the *Johnson* case. PX 236B, 271:14–23. Henry testified that Ranni definitely was chief of the felony trial bureau by that time, *id.* at 33:17–19, meaning he either was promoted after his performance in *Ivey* or kept in his position despite that performance. The Appellate Division in *Johnson* took the extraordinary step of identifying Ranni by name and again quoted the remarkable language it had used in *Ivey* to characterize how Ranni conducted trials: "unadulterated unfairness and deceit have become *the rule*." 62 A.D.2d at 560 (majority); 571 (dissent) (PX 170, p. 3, 8) (emphasis added). While the majority affirmed the conviction because of the strong evidence of guilt, it wrote: "[W]e must express our concern with the misconduct of Mr. Ranni through the course of the trial." 62 A.D.2d at 560 (PX 170, p. 3). The dissenting opinion, which a federal judge later adopted in granting habeas corpus relief, was even stronger than the majority opinion's condemnation, terming Ranni "an overbearing prosecutor obsessed with the idea of obtaining a conviction at all costs." *Id*. at 570–71 (PX 170, p. 8).

*Ivey* and *Johnson* were important trials to the Office: *Ivey* was a murder case originally handled by Drury, while *Johnson* was a high-profile rape case. PX 236B (Henry Dep.) at 280:19–281:5. Ranni's direct supervisors, given his high position, were Cosgrove's two highest-ranking aides: Executive Assistant D.A. Joseph McCarthy and Chief of Appeals Judith Manzella. Tr. T. 1760:24–1761:13 (Henry); PX 236B (Henry Dep.), 37:8–17, 257:2–4. Cosgrove delegated training functions to Manzella, PX 246A (Cosgrove Dep.), 62:13–21, and prosecutors in the office followed what they said. Tr. T. 815:8–17, 819:10–23 (Drury); Tr. T. 1769:19–1770:9, 1771:11–

- 34 -

1772:12, 1845:23–22, 1986:6–14 (Henry); PX 236B, 256:14–23. That McCarthy and Manzella did nothing about Ranni's misconduct while it was occurring, despite being his direct supervisors, supports a finding that Ranni's summation misconduct reflected Office de facto policy and widespread practice. *See Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 63 (2d Cir. 2014) (fact that supervisor in "high-level position" failed to address unlawful conduct "supports an inference that [the policymaker] also knew of the [conduct] and allowed for the conduct to become the accepted custom or practice of the [municipality]").

Cosgrove's own testimony supports this conclusion. He testified that an ADA would not be a supervisor unless he could be trusted to conform to Office policy, PX 246A, 86:14–17, and, as noted above, Cosgrove *promoted* Ranni to be chief of felony trials and then left him in that position after the Appellate Division's decisions finding summation misconduct. Besides keeping him as chief of felony trials, Cosgrove admittedly took no other disciplinary action against Ranni, *id.* at 133:23–134:1, even after the two Appellate Division decisions were handed down, which Cosgrove admitted he was aware of. *Id.* at 140:8–15 (*Ivey*); 148:10–16 (*Johnson*). Cosgrove further admitted that, while *Ranni should have been disciplined*, *id.* at 142:11–143:4 (*Ivey*), 148:3–8 (*Johnson*), he had done "nothing, apparently." *Id.* at 141:5–21. That Cosgrove did "nothing" when the Appellate Division twice condemned his chief of felony trials for egregious summation misconduct and lamented that "unadulterated unfairness and deceit have become the rule" is powerful evidence of unlawful policy, custom, or widespread practice to achieve convictions through summation misconduct. Cosgrove's chief of felony trials would not have repeatedly and flagrantly engaged in such practices if it was not consistent with Office policy and practice which, as chief of felony trials and as Drury's supervisor, he undoubtedly helped to formulate and carry out.

- 35 -

The jury could also reasonably conclude that the Office's unlawful summation policies influenced Drury to conduct himself in conformity therewith. If the condoned "practice" in the ECDAO was to give summations like Ranni's, the jury could readily and properly infer that this condoned practice is what caused Drury to conform his behavior to it in this case.

But there is still more evidence of causation in this record. Cosgrove conceded that ADAs learned from their supervisors who directed trials and whom he trusted to conform with the policies of his office, PX 246A, 62:13–21, 86:14–17, and a felony ADA such as Drury would logically follow the lead of his bureau chief, Ranni. Henry, as a Rule 30(b)(6) witness testifying on behalf of the County, conceded that "unethical actions of a prosecutor, if discovered, can poison an entire office." PX 236B, 239:2–8. He also conceded that Ranni's behavior in the *Ivey* case was known around the office, *id.* at 264:3–10. Indeed, Drury admitted he was Ranni's contemporary and friend and would observe his trials, and that prosecutors in the office considered Ranni a role model. Tr. T. 830:6–24, 832:17–21; PX 245A, 68:21–69:1. All this was *before* the Boyd trial. In order words, a juror, based on Henry's admissions alone, reasonably could find that the Office was already "poisoned" by the time Drury gave his summation in Boyd's case.

### 2. DA Cosgrove's deliberate indifference to summation misconduct.

The same evidence in the record that supports the Boyd Estate's unlawful policy and practice theory also supports the Boyd Estate's alternative theory that Cosgrove's deliberate indifference to summation misconduct caused Drury to violate Boyd's due-process rights. Presumed to be aware of serious summation misconduct, both from general, routine practice as well as egregious reported cases, Cosgrove did nothing about it.

Cosgrove recognized the need for discipline in order to deter future transgressions. While he never disciplined any prosecutor, he testified that he hoped lower-level executives and supervisors did so. PX 246A, 105:13–106:3. However, he had no knowledge that they ever did so,

*id.* at 106:8–11, and Henry admitted on behalf of the County as its 30(b)(6) witness that he had no knowledge that anyone ever was disciplined. PX-236B, 246:12–23. Drury also testified he had no knowledge of investigation or discipline of any prosecutor in the Office. Tr. T. 829:20–830:5. Cosgrove failed to discipline Ranni for his misconduct before the Boyd trial even though he conceded he should have. The Office's indifference to summation misconduct by prosecutors, especially a leader and "role model" such as Ranni, could not have gone unnoticed by the Office's ADAs, including a prosecutor such as Drury, and would have encouraged them to put winning over the due-process rights of criminal defendants they wanted to convict, just as Ranni did.

Henry's Rule 30(b)(6) admission for Erie County is worth repeating: "Unethical actions of a prosecutor, if discovered, can poison an entire office." PX 236B, 239:2–8. Here, the jury could find that the Office was poisoned at the time of Boyd's trial and that the attitude of indifference at the top caused Drury, in his role as Boyd's prosecutor, to commit rampant summation misconduct to ensure Boyd's conviction.

3.    *The Boyd Estate's* Monell *theories were not overbroad, and the jury could properly rely on other-case evidence supporting them.*

This Court has already rejected the County's argument that the Boyd Estate's theories as to summation misconduct are overbroad. *Weppner*, 2025 WL 3214581, at *3. As noted, *supra* at p. 18, in *Bellamy,* the Second Circuit allowed a theory of "failure to discipline summation misconduct" to proceed. 914 F.3d at 756. The category of "summation misconduct" certainly was not overbroad in this case where the violations in question involved virtually every type of summation error and Drury testified that his summation conformed to the Office's training, policy, and practice. The reported court decisions that the Boyd Estate also relied on to prove its *Monell* theories involved the same categories of misconduct. *See People v. Donaldson*, 49 A.D.2d 1004, 1005 (4th Dep't 1975) (improperly bolstering witness's credibility by going outside the record)

(PX 148); *People v. Balsano*, 51 A.D.2d 130, 134 (4th Dep't 1976) ("inflammatory remarks") (PX 152); *People v. Johnson*, 62 A.D.2d 555, 561, 569–71 (4th Dep't 1978) (Hancock, J., dissenting) (inflammatory comments) (PX 170); *People v. Keller*, 67 A.D.2d 153, 160 (4th Dep't 1979) ("inflammatory" argument and arguing "facts" not in evidence) (PX 175); *People v. Ivey*, 83 A.D.2d 788, 789 (4th Dep't 1981) ("inflammatory … summation" and many other types of misconduct) (PX 99); *People v. Vance*, 89 A.D.2d 347, 350–51 (4th Dep't 1982) (becoming unsworn witness against defendant by referring to his own involvement in gathering evidence) (PX 183); *People v. Herlan*, 99 A.D.2d 647 (4th Dep't 1984) (improper credibility argument) (PX 187).

Like the prosecutors in *Balsano*, *Johnson*, *Keller*, and *Ivey*, Drury inflamed the jury in this case by using racially derogatory and demeaning comments. *See supra* at p. 26. Similar to the prosecutor's misconduct in *Vance*, Drury became an unsworn witness. *See supra* at p. 25–26. And like the prosecutors in *Donaldson* and *Herlan*, Drury made improper credibility arguments. *See supra* at p. 25–26. Requiring matching more specific than this would make the "matching" inquiry (which is not the law but a requirement the County invented) impossible to satisfy.

The County's argument that the evidence is too temporally remote has also been previously rejected, *Weppner*, 2025 WL 3214581, at *6, and is, as shown in Section II as to the Boyd Estate's *Brady* claim, meritless.

### CONCLUSION

The Court should issue an order denying the County's Rule 50(b) motion in its entirety.

Dated:          March 20, 2026                Respectfully submitted,

                                              **WILMER CUTLER PICKERING**
                                              **HALE AND DORR LLP**
                                              By: /s/ Ross E. Firsenbaum
                                              Ross E. Firsenbaum
                                              Gideon A. Hanft

- 38 -

Phoebe Silos
Erin Hughes
Trena Riley
Melissa Zubizarreta
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800
*ross.firsenbaum@wilmerhale.com*

**LAW OFFICES OF JOEL B. RUDIN, P.C.**
By: /s/ Joel B. Rudin
Joel B. Rudin
David E. Rudin
Partha Sharma
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
*jbrudin@rudinlaw.com*

**HOOVER & DURLAND LLP**
By: /s/ Spencer L. Durland
Timothy W. Hoover
Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600
*sdurland@hooverdurland.com*

*Attorneys for Plaintiff Estate of Darryl Boyd*